**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. 23-cr-490 (SHS)

**UNDER SEAL**

---

## SENATOR ROBERT MENENDEZ'S MEMORANDUM OF LAW IN SUPPORT OF HIS FIRST MOTION TO DISMISS

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice* pending)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 5

    A.    The Egyptian Aid Scheme ............................................................ 6

        *1.*    *The Indictment's Allegations* .............................................. 6
        *2.*    *The Government's Allegations Are False* ........................... 7

    B.    The IS EG Halal Scheme ............................................................. 8

        *1.*    *The Indictment's Allegations* .............................................. 8
        *2.*    *The Government's Allegations Are False* ........................... 9

    C.    The New Jersey State Scheme ..................................................... 9

        *1.*    *The Indictment's Allegations* .............................................. 9
        *2.*    *The Government's Allegations Are False* ......................... 10

    D.    The U.S. Attorney Scheme ........................................................ 10

        *1.*    *The Indictment's Allegations* ............................................ 10
        *2.*    *The Government's Allegations Are False* ......................... 11

    E.    The Qatar Investment Scheme ................................................... 11

        *1.*    *The Indictment's Allegations* ............................................ 11
        *2.*    *The Government's Allegations Are False.* ......................... 11

STANDARD OF REVIEW .............................................................................................. 12

ARGUMENT .................................................................................................................. 12

  I.    THE BRIBERY COUNTS MUST BE DISMISSED. ....................................... 12

    A.    Federal Law Sharply Constrains Bribery Prosecutions Against
        Members of Congress. ............................................................... 13

    B.    The Indictment Exceeds These Constraints. .............................. 18

        *1.*    *The New Jersey Scheme* .................................................... 18
        *2.*    *The U.S. Attorney Scheme* ................................................ 23
        *3.*    *The Qatar Investment Scheme* ......................................... 28
        *4.*    *The IS EG Halal Scheme* ................................................... 29
        *5.*    *The Egyptian Aid Scheme* ................................................ 30

  II.    THE FARA COUNT MUST BE DISMISSED. ............................................. 34

    A.    The Speech or Debate Clause Forecloses the FARA Count. .................. 35

    B.    As Applied to Members of Congress, § 219 Unconstitutionally
        Interferes with the Separation of Powers. .................................. 37

CONCLUSION ............................................................................................................... 42

# TABLE OF AUTHORITIES

**Page**

CASES

*Att'y Gen. of U.S. v. Irish N. Aid Comm.*,
  668 F.2d 159 (2d Cir. 1982)........................................................................35, 39

*Coffin v. Coffin*,
  4 Mass. 1 (1808) ..............................................................................................31

*Doe v. McMillan*,
  412 U.S. 306 (1973)..............................................................................16, 30, 31

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975)..........................................................................................17

*Fields v. Off. of Eddie Bernice Johnson*,
  459 F.3d 1 (D.C. Cir. 2006)..............................................................................17

*Gravel v. United States*,
  408 U.S. 606 (1972)................................................................................. *passim*

*Hein v. Freedom from Religion Found., Inc.*,
  551 U.S. 587 (2007)....................................................................................37, 38

*Houston Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022)..........................................................................................39

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979)..........................................................................................33

*Jewish War Veterans v. Gates*,
  506 F. Supp. 2d 30 (D.D.C. 2007) ...................................................................25

*Jud. Watch, Inc. v. Schiff*,
  998 F.3d 989 (D.C. Cir. 2021) ..........................................................................30

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880)....................................................................................24, 31

*McDonnell v. United States*,
  579 U.S. 550 (2016)................................................................................. *passim*

*McSurely v. McClellan*,
    553 F.2d 1277 (D.C. Cir. 1976) ............................................................. *passim*

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ............................................................................... 40

*Percoco v. United States*,
    598 U.S. 319 (2023) ............................................................................... 41

*Printz v. United States*,
    521 U.S. 898 (1997) ............................................................................... 19

*Russell v. United States*,
    369 U.S. 749 (1962) ............................................................................... 12

*Schick v. Reed*,
    419 U.S. 256 (1974) ......................................................................... 38, 39

*SEC v. U.S. House Comm. on Ways & Means*,
    161 F. Supp. 3d 199 (S.D.N.Y. 2015) ............................................... 25, 32

*Skilling v. United States*,
    561 U.S. 358 (2010) ............................................................................... 20

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) ......................................................................... 17, 40

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ........................................................................... 25

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ............................................................... 12, 27

*United States v. Alfisi*,
    308 F.3d 144 (2d Cir. 2002) ................................................................. 15

*United States v. Allocco*,
    305 F.2d 704 (2d Cir. 1962) ................................................................. 24

*United States v. Bailey*,
    2023 WL 2139365 (D.D.C. 2023) ........................................................ 15

*United States v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988) ........................................................ 17, 25, 31

*United States v. Birdsall*,
233 U.S. 223 (1914)................................................................14, 19

*United States v. Blagojevich*,
794 F.3d 729 (7th Cir. 2015) .............................................................27

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) .............................................................12

*United States v. Brewster*,
408 U.S. 501 (1972)................................................................ *passim*

*United States v. Dowdy*,
479 F.2d 213 (4th Cir. 1973) ........................................................16, 25

*United States v. Fattah*,
914 F.3d 112 (3d Cir. 2019)...........................................................23, 32

*United States v. Fernandez*,
No. 19-15044, 2022 WL 3581793 (11th Cir. 2022) ....................................... *passim*

*United States v. Helstoski*,
442 U.S. 447 (1979)................................................................13, 15

*United States v. Hess*,
124 U.S. 483 (1888)................................................................21

*United States v. Jefferson*,
289 F. Supp. 3d 717 (E.D. Va. 2017) ................................................. *passim*

*United States v. Johnson*,
383 U.S. 169 (1966)................................................................ *passim*

*United States v. Klein*,
80 U.S. 128 (1871)................................................................38

*United States v. McDade*,
28 F.3d 283 (3d Cir. 1994)...........................................................30

*United States v. Miller*,
26 F. Supp. 2d 415 (N.D.N.Y. 1998) .................................................34

*United States v. Miselis*,
972 F.3d 518 (4th Cir. 2020) .......................................................37

*United States v. Morlang*,
   531 F.2d 183 (4th Cir. 1975) ..................................................................15

*United States v. Murphy*,
   642 F.2d 699 (2d Cir. 1980) ..................................................................16

*United States v. Myers*,
   635 F.2d 932 (2d Cir. 1980) .................................................18, 36, 38, 41

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ...............................................................12, 21

*United States v. Rostenkowski*,
   59 F.3d 1291 (D.C. Cir. 1995) ..............................................................38

*United States v. Silver*,
   864 F.3d 102 (2d Cir. 2017) ...................................................... *passim*

*United States v. Teh*,
   535 F.3d 511 (6th Cir. 2008) .................................................................21

*United States v. Urciuoli*,
   513 F.3d 290 (1st Cir. 2008) ...........................................................19, 21

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999) ....................................................................12

## STATUTES

18 U.S.C. § 201 ................................................................................. *passim*

18 U.S.C. § 219 ................................................................................. *passim*

18 U.S.C. § 793 .........................................................................................32

18 U.S.C. § 1346 .........................................................................................5

22 U.S.C. § 611 ....................................................................................35, 38

18 U.S.C. § 1951 .........................................................................................5

## OTHER AUTHORITIES

75 Fed. Reg. 707 (Dec. 29, 2009) ................................................................33

David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491, 1495 (1992) .......................................................24

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2357-58 (2001)...................................................................................................................................22

Jennifer Elsea, Cong. Rsch. Rep., *The Protection of Classified Information: The Legal Framework* (2023) ........................................................................................................33

## INTRODUCTION

Senator Robert Menendez has served his constituents, his state, and his country with honor, dedication, and distinction for nearly 50 years.  The government's accusations in this case—that he sold his office and even sold out his nation—are outrageously false, and indeed distort reality. Every official act the Senator took represented his good-faith policy judgments based solely on appropriate considerations.  The Senator stands behind all of his official actions and decisions, and will be proud to defend them at trial.

Requiring him to do so, however, would offend the Constitution.  The Framers believed Members of Congress should be principally accountable to the people, not to other branches of government; legislators must explain their conduct to voters, not to overzealous prosecutors.  This fundamental protection of legislative independence is embedded in the Speech or Debate Clause, which precludes "draw[ing] in question the legislative acts of [a] member of Congress or his motives for performing them."  *United States v. Johnson*, 383 U.S. 169, 185 (1966).  Yet the Second Superseding Indictment here (the "Indictment") does exactly that.  It calls into question how the Senator, in his work with the Senate Foreign Relations Committee, exercised his committee prerogatives.  It casts doubt on how New Jersey's senior Senator advised the President in connection with federal nominations in his State.  And it heaps shade on how the Senator performed fact-finding and information-gathering in support of his legislative functions.

All of this conduct is constitutionally immune; none of it can form the basis for, or even be included in, a criminal indictment.  To be clear, no Member of Congress is above the law—Senator Menendez included.  The government is free to prosecute a Member of Congress for *agreeing* to exchange legislative action for personal benefits, so long as it does not cast aspersions on (or reference) any legislative acts themselves. *See United States v. Brewster*, 408 U.S. 501, 526 (1972). But here, the Indictment does not try to walk that line; it flouts it entirely.  The Indictment alleges

1

the protected legislative activity itself, and seeks to draw an inference of illicit bribery by impugning the Senator's motives for those acts. That is precisely what the Speech or Debate Clause forbids, as it would obligate the Senator to justify his official (legislative) conduct as part of an (executive) *criminal* prosecution brought before a third co-equal branch of government (the judiciary).

To be sure, some of the government's allegations steer clear of Speech or Debate Clause immunity; but those allegations improperly focus on the Senator's <u>*unofficial*</u> acts, which simply cannot sustain a criminal prosecution. For example, the Indictment alleges that the Senator contacted local state prosecutors to advocate on behalf of certain New Jersey constituents, even though he neither took nor threatened any official action with respect to these state criminal matters, over which he has no authority whatsoever. The government also makes much of the fact that constituents were invited to meetings with foreign dignitaries. And the government goes so far as to impugn the Senator for introducing constituents to investors abroad. None of this is illegal, or even improper. The Supreme Court squarely held, in *McDonnell v. United States*, 579 U.S. 550 (2016), that such unofficial acts cannot support a bribery charge. Rather, the Court emphasized that political bribery requires a *quid pro quo* involving an exercise of the official's governmental power, not merely routine political courtesies or constituent services like these.

Put simply, the Indictment fails to navigate the legal path between *McDonnell*'s insistence on *official* conduct and the Constitution's immunity for *legislative* action. Stripping out both, its (legally insufficient) unofficial acts and its (constitutionally protected) legislative ones leaves no adequate factual foundation to support the requisite *quid pro quo* for the Indictment's bribery counts (Counts I-III).

As for Count IV, the government asserts—for the first time ever—that a Member of Congress violated 18 U.S.C. § 219 by acting at the direction or request of a foreign principal (here, the government of Egypt).  The charge is as constitutionally infirm as it is factually ludicrous.  It *directly* criminalizes Senator Menendez's legislative activity, without even the pretense of a distinct "agreement."  It does so by empowering the Executive and Judicial Branches to second-guess the way the Senator chose to engage with foreign representatives in the course of his duties.  That fundamentally disrupts the separation of powers.  Indeed, if § 219 can be used in this way to superintend the functions of Members of Congress, a future Administration would be free to prosecute its legislative enemies as agents of Ukraine (for supporting aid during its war with Russia), China (for resisting a proposed ban of TikTok), or Israel (for supporting military aid to fight Hamas).  The Court should not permit this novel and dangerous encroachment on legislative independence.

These legal defects are only the beginning of the problems with the Indictment.  As we will detail in additional motions to be filed by January 15, the defects with the Indictment go much further, as the Indictment was filed in an improper district and prejudicially groups separate schemes into single conspiracy counts. These separate defects further warrant dismissal.

While there are numerous legal defects with the Indictment, there are even more factual defects that provide great cause for concern.  Indeed, after long telling the defense that the government is "aware of our [*Brady*] disclosure obligations . . . [and] have complied with those obligations," the government has now belatedly made disclosures—which it refuses to acknowledge are required under *Brady v. United States*—that expose how the government has distorted reality and hidden key exculpatory evidence from the public's and the Court's view.

3

On the bribery side, the government substitutes made-for-tabloid images of cash and gold bars for actual evidence of a bribery scheme, and manufactures a narrative based on speculation, cherry-picking, and innuendo.  For example, the Indictment uses innocent photographs of meetings with foreign dignitaries to suggest impropriety, even though the meetings were in the Senator's offices and observed by Senate staff.  Even the photographs of gold bars and cash found in the Senator's home lack incriminating value: The cash reflects decades of documented withdrawals by the Senator from his own bank account, most of which occurred years before any of the alleged bribery payments.  And the gold bars in question will be shown to be entirely unrelated to any actions on the part of the Senator.

The newest allegations, relating to Qatar, are shockingly hollow: The only "official act" the Indictment even alludes to was a non-binding resolution, introduced by Senator Lindsey Graham, thanking Qatar for assisting with evacuations of U.S. citizens and Afghan refugees after the Taliban takeover of Afghanistan.  Senator Menendez did not introduce, sponsor, or revise the resolution; it was approved by "voice vote," meaning he never *even recorded a vote for it*.  Incredibly, that is the sum total of the government's latest headline-grabbing superseding indictment.

On the "foreign agent" side, were this charge to survive dismissal—and it should not—the government's charges would be met with overwhelming, indisputable evidence of Senator Menendez's independence from any foreign principal.  As the government knows from its own investigation, far from doing Egypt's bidding during the life of the alleged conspiracy, the Senator repeatedly held up military aid and took Egypt to task, challenging its government's record for imprisoning political dissidents, running roughshod over the press, and other human rights abuses.

Indeed, a centerpiece of the Indictment concerns a State-Department sanctioned trip that Senator Menendez took to Egypt in the fall of 2021.  Dkt. 115 ("SSI") ¶ 37f.  But the government shockingly fails to disclose the exculpatory fact that ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████  Why then does the government even discuss this trip to Egypt in the Indictment, with photographs of meetings there, if not to falsely impugn the Senator's reputation?  All this only exposes again why the § 219 charge especially offends the separation of powers and the Speech or Debate Clause: It directly criminalizes the Senator's legislative activities, and forces him to defend his policy record before two other co-extensive branches of government.

Ultimately, despite the government's overheated rhetoric, the political conduct at issue in this case cannot be subject to federal criminal prosecution.  As *McDonnell* reaffirmed, some is simply too "prosaic" to rise to that level.  As the Speech or Debate Clause reflects, some is too *serious* to entrust to competing branches of government.  The Indictment fails to locate a viable middle ground between these poles.  Its charges therefore must be adjudicated by the democratic process, not the legal process.

## BACKGROUND

The government charges Senator Menendez with three counts of conspiring to commit federal bribery—in violation of the federal-official bribery statute, 18 U.S.C. § 201 (Count I); the honest-services statute, 18 U.S.C. § 1346 (Count II); and the Hobbs Act, 18 U.S.C. § 1951 (Count III)—as well as one count of conspiring to violate a provision of the Foreign Agents Registration

Act (FARA), 18 U.S.C. § 219 (Count IV).  *See* SSI ¶¶ 71-83.  The Indictment rests on several distinct alleged bribery schemes, one of which largely overlaps with the alleged FARA violation. The allegations supporting each scheme are detailed further below, but their basics are as follows:

### A.    The Egyptian Aid Scheme

#### 1.    *The Indictment's Allegations*

The Indictment alleges that Senator Menendez took certain acts on behalf of Egypt from 2018 to 2022, as part of a corrupt bargain.  SSI ¶ 2.  On its telling, the Senator entered a deal in early 2018, whereby he agreed to provide ongoing support to a foreign power in exchange for a "low-or-no-show job" for Nadine Arslanian—a woman he had been then dating for a month or so. *Id.* ¶¶ 6, 16, 19.  In exchange for that pittance, the Indictment alleges that the Senator facilitated foreign military aid to Egypt, and shared unclassified but purportedly "sensitive" information with Egyptian agents.  *Id.* ¶¶ 19, 19b, 27-28.

Come 2020, the Indictment alleges that the Senator also received other "things of value"— principally, other benefits to Ms. Arslanian, provided by the same people—in exchange for additional "actions favorable to Egypt."  *Id.* ¶¶ 31-32, 37.  In particular, it alleges that the Senator (i) wrote a letter to the Secretaries of Treasury and State urging them to "engage" in a dispute among Egypt, Ethiopia, and Sudan over a regional dam; and (ii) helped Egyptian officials prepare for meetings with Senators, including by providing them with a public "news article reporting on questions that other U.S. Senators intended to ask."  *Id.* ¶¶ 37a, 37d.

The Indictment never *directly* alleges an illicit deal; that is, it includes no factual allegations that Senator Menendez ever entered a corrupt bargain with Egypt.  *See id.* ¶¶ 19, 20, 19a, 21, 37, 37b, 37d, 37f.  Instead, the Indictment *infers* one from the allegations that the Senator (or more aptly, his then-girlfriend) received certain benefits, coincident with his taking of certain actions.

The Egyptian Scheme does double-duty to support the later-added alleged violation of FARA.  According to the Indictment, the Senator unlawfully acted as an "agent" of a "foreign principal" (Egypt) when he facilitated certain limited military aid to Egypt and shared allegedly "sensitive" information with Egyptian officials.  *See id.* ¶¶ 2–3, 82.

### 2.       *The Government's Allegations Are False*

The allegations on their face fail to support the government's insinuations of wrongdoing.  Urging federal officials to "engage" on a sensitive foreign relations issue is precisely what a Senator on the Foreign Relations Committee should be doing; it is not evidence of bribery.  And there is simply (and understandably) no rule, regulation, or other prohibition against sharing unclassified information—like press articles or embassy-related information—with official representatives of foreign governments, especially where, as here, the Senator was doing so to bind those representatives to positions **that serve U.S. interests**.  Indeed, the government's *Brady* disclosures confirm ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████

The facts expose the Egyptian allegations as especially frivolous and misleading.  The Senator's actual record manifestly shows his independence with respect to Egypt.  For example, during the period of his alleged agreement to act as Egypt's agent, Senator Menendez unilaterally blocked and held a military aid package that the Biden Administration was trying to deliver to Egypt.  At various relevant times, Senator Menendez maintained a "hold" on weapons sales and other military aid that Egypt requested, through the exercise of his authority as then-Chair of the Senate Foreign Relations Committee to refuse to sign off on such military aid packages.  The Indictment concedes that "multiple U.S. Senators had raised human rights or rule-of-law

objections to foreign military financing to Egypt," (SSI ¶ 18), but notably fails to disclose the Senator's record in doing the same, including with Egyptian President el-Sisi directly. ███

███████████████████████████

The government instead focuses on Senator Menendez's approval of certain limited sales of ammunition that the Biden Administration requested for Egypt's counter-terrorism campaign in the Sinai.  SSI ¶ 20.  The government ridiculously claims that he did so because he was a foreign agent to Egypt—even though his action was consistent with what the Biden Administration sought—but omits that, even after this sale of ammunition, Senator Menendez continued to put a hold on various, much larger military aid proposals to Egypt.  Indeed, as a key State Department official told the government pre-Indictment████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███ *The government never mentions these events in the Indictment because they blow up the false narrative being forced on this Court, the media, and the American public.*

**B.     The IS EG Halal Scheme**

*1.     The Indictment's Allegations*

Under the same Egypt heading, the Indictment also alleges a distinct scheme by which Senator Menendez supposedly pressured officials at the U.S. Department of Agriculture (USDA) to withdraw their opposition to an Egyptian halal monopoly benefiting co-defendant Hana.  *Id.* ¶¶ 28-30.  USDA did not withdraw its opposition, and Egypt did not withdraw the monopoly.  *Id.* ¶ 30.  According to the Indictment, the Senator took this action to facilitate bribe payments from Hana.  *See id.* ¶¶ 31-34.

### 2.    *The Government's Allegations Are False*

The Indictment's descriptions of the Senator's actions are not accurate.  But even if they were, the Indictment does not come close to alleging an "official act" to support a criminal charge here.  While the government of ***Egypt*** exercised governmental power in granting a monopoly to IS EG Halal, there was no matter pending before any ***American*** federal official at any time regarding the company. This is a frivolous set of allegations—USDA has no role in Egyptian monopoly determinations, and simply expressing opposition to a foreign government's policy is not even official action in its own right.

### C.    The New Jersey State Scheme

### 1.    *The Indictment's Allegations*

The Indictment also alleges, under a single heading, two separate schemes by which the government claims the Senator attempted to "disrupt" a New Jersey state prosecution (in January 2019) and then a separate New Jersey criminal investigation (in July 2019), concerning two distinct individuals.  *Id.* ¶¶ 39-42, 44.  According to the Indictment, Senator Menendez did so to benefit co-defendant Jose Uribe, whom the government alleges helped pay for a Mercedes Benz car for Nadine Arslanian in April 2019.  *See, e.g.*, *id.* ¶¶ 8, 39, 43.

As for Senator Menendez's actions, the Indictment alleges that he "contacted a senior state prosecutor in the Office of the New Jersey Attorney General" and applied "advice and pressure" on him to resolve the matters favorably.  *Id.* ¶ 39.  Specifically, the Indictment alleges that the Senator talked to this prosecutor twice.  *Id.* ¶¶ 42b, 44c.  The Indictment is silent as to the content of the Senator's alleged conversations with the New Jersey prosecutor; and nowhere does it allege the Senator used his office to apply pressure in any way.

## 2.  *The Government's Allegations Are False*

In a shocking omission from the Indictment, the government's belated *Brady* disclosures undercut the heart of the New Jersey State Scheme.  Specifically, while the Indictment claims that during a January 29, 2019 call with Official-2, the Senator applied "advice and pressure" in an effort to help the criminal defendant in that case, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ The Indictment further concedes that the Senator's outreaches were never communicated to the prosecution teams and had no effect on the outcome of either the New Jersey prosecution or state investigation.  *Id.* ¶¶ 42c, 44g.  There is no "meat" in this sandwich.

### D.  **The U.S. Attorney Scheme**

#### 1.  *The Indictment's Allegations*

Next, the Indictment claims the Senator sought to "disrupt" a federal criminal prosecution of co-defendant Fred Daibes, a local businessman and real estate developer, in exchange for a host of valuables (*e.g.*, cash, furniture, gold bars).  *Id.* ¶ 9, 46.  This alleged scheme is also distinct from those above.  It had nothing to do with the Egyptians (or, for that matter, Jose Uribe).

According to the government, the Senator primarily fulfilled his end of the deal by recommending a candidate for U.S. Attorney whom he thought would be sympathetic to Daibes.  *See id.* ¶¶ 46, 48, 50, 52.  When the (now-confirmed) candidate recused, Senator Menendez allegedly twice called the First Assistant supervising the case.  *Id.* ¶¶ 53d, 53e.  As above, the Indictment does not discuss the contents of those conversations; it does not even say they were about Daibes.  And it makes no direct allegations of a Menendez-Daibes deal.  *See id.* ¶¶ 53a-h.

### 2.     The Government's Allegations Are False

We now know why the Indictment was silent on the details of this purported conduct; the government's belated *Brady* disclosures *once again undercut the core of these allegations*: ███

████████████████████████████████████████████████████████

████████████████████████████████████

### E.     The Qatar Investment Scheme

### 1.     The Indictment's Allegations

In the third iteration of the Indictment, the government hedges on its allegations about the supposed bribery agreement with Daibes.  It now alleges that the things of value provided by Daibes may have been given to assist in closing a deal involving a Qatari investment fund that Daibes wanted to invest in one of his enterprises.  *Id.* ¶¶ 2, 55.  The Senator allegedly introduced Daibes to a Qatari who operated a state-linked investment fund.  *Id.* ¶ 56.  To help Daibes nail down the deal, the government suggests, Senator Menendez issued a press release praising Qatar.  *Id.* ¶ 57.  The Indictment also vaguely alludes to a Senate resolution relating to Qatar, without identifying any action taken (or promised to be taken) by the Senator on it.  *Id.* ¶¶ 58, 60.

### 2.     The Government's Allegations Are False.

In truth, the alluded-to resolution was introduced by Republican Senator Lindsey Graham (not Senator Menendez), thanking the Qatari government for helping to evacuate American citizens and Afghan refugees fleeing Taliban violence after the U.S. military's withdrawal from Afghanistan.[1]  Senator Menendez played no part in drafting, sponsoring, proposing, or editing the resolution.  And it was ultimately approved through a "voice vote," meaning no individual votes were even cast or recorded.  It is the least plausible subject of an ominous bribery scheme.

---

[1]  https://www.congress.gov/bill/117th-congress/senate-resolution/390/text

## STANDARD OF REVIEW

"[D]istrict courts have as much of a responsibility to police criminal indictments as they do civil complaints." *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023).  A "criminal indictment—like a civil complaint—should be dismissed" if it fails to "state an offense."  *Id*.  For an indictment to do so, it must allege more than "generic terms," and must instead "descend to particulars," *Russell v. United States*, 369 U.S. 749, 765 (1962), to ensure "the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).  In short, the indictment "must state some fact specific enough to describe a particular criminal act."  *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000).  If it does not, it fails to "allege a crime," and must be dismissed.  *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).

## ARGUMENT

### I.   THE BRIBERY COUNTS MUST BE DISMISSED.

As noted, the Indictment charges the Senator with three counts of conspiracy to commit bribery, each arising under a different statute.  Although the statutory foundations are different, the core elements are the same: A bribery offense requires proof that the Senator agreed to accept something of value (a *quid*) in exchange for (*pro*) taking an official act or violating an official duty (a *quo*).  *See* 18 U.S.C. § 201(b)(2)(A), (C) (so providing); *McDonnell v. United States*, 579 U.S. 550, 566-67 (2016) (looking to § 201 to define scope of bribery under honest-services statute); *United States v. Silver*, 864 F.3d 102, 111 (2d Cir. 2017) (holding that Hobbs Act bribery likewise requires proof of an "exchange for an official act").

Although the charges fail *factually* as to each of those elements, the Indictment fails *legally* as to the *quo* requirement—and that compels dismissal.  Some of the acts that the Senator allegedly took or agreed to take are not "official" under the Supreme Court's clarification of that phrase in

12

*McDonnell*.  Nowhere does the Indictment viably allege that the Senator breached any "official duty" held by virtue of his office.  And where the government does allege conduct within the Senator's official role, it walks directly into the Speech or Debate Clause—the special constitutional immunity for Members of Congress, who cannot be punished for their legislative acts.  Any bribery prosecution of a federal legislator must steer a defined but narrow course between these statutory and constitutional barriers.  This indictment veers off-track in both directions and therefore cannot proceed.

> **A.      Federal Law Sharply Constrains Bribery Prosecutions Against Members of Congress.**

Charging an elected Member of Congress with criminal bribery is a serious matter.  And federal law imposes a concomitant burden when the government seeks to pursue such a charge.  On the one hand, since bribery by its nature requires the corruption of sovereign power, the prosecutors must link the receipt of benefits to a "formal exercise of governmental power." *McDonnell*, 579 U.S. at 578.  On the other hand, Members of Congress are entitled to special protection for their legislative acts, which means they cannot feature in an indictment or criminal trial.  *See United States v. Helstoski*, 442 U.S. 447, 487 (1979).  The result is a legal Scylla and Charybdis, where federal prosecutors must navigate a narrow path to satisfy the law's ***demands*** without exceeding its marked ***restrictions***.  The Indictment fails to do so.

***The Demands: Official Action and Official Duties.***  The first limitation on any bribery prosecution—whether of a federal, state, or local official, in any branch of government—is the required nexus to official power.  That is what distinguishes criminal bribery from "normal political interaction between public officials and their constituents," and it is what prevents these laws from "cast[ing] a pall of potential prosecution over these relationships."  *McDonnell*, 579 U.S. at 575-76.

13

Most often, the link to sovereign power takes the form of official action.  An "official act" is defined by statute to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).

*McDonnell* held that the phrase "official act" is limited by two requirements.  *First*, there must be a "formal exercise of governmental power," of a "focused and concrete" nature, that is "pending either before the public official who is performing the official act, or before another public official."  579 U.S. at 569-70.  *Second*, the public official "must make a decision or take an action *on* that question or matter."  *Id.* at 572.  The official can do so through exercising his own power, or by "using his official position" either "to exert pressure on another official to perform an 'official act'" or "to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.* at 574.  For example, if an official's role is to advise a superior on whether to grant clemency, then selling those recommendations is a bribe.  *See id.* at 572 (citing *United States v. Birdsall*, 233 U.S. 223, 234 (1914)).  It is not sufficient, however, to merely engage in some procedural action relating to a pending matter—such as by "[s]etting up a meeting," or "calling an official," or "gather[ing] additional information."  *Id.* at 573.  Nor does "expressing support" for an action "qualify" on its own as official action.  *Id.* Rather, the official must take real action, within the sphere of his official duties, to advance a concrete exercise of sovereign power.  *See generally Silver*, 864 F.3d at 115-17.

Section 201 also provides for a second type of bribery—where the *quo* is not the taking of official action, but the breach of official duty through an action or omission.  18 U.S.C. § 201(b)(2)(C).  For example, if a prison guard has a "duty to prevent the smuggling of

contraband," paying the guard to turn a blind eye would be official-duty bribery. *United States v. Alfisi*, 308 F.3d 144, 151 n.3 (2d Cir. 2002). Official duty "encompasses a public official's job responsibilities as dictated by governing statutes, rules, and regulations." *United States v. Fernandez*, No. 19-15044, 2022 WL 3581793, at *4 (11th Cir. 2022). But, like official actions, they must be focused and concrete, "as opposed to broad ethical and moral precepts." *United States v. Morlang*, 531 F.2d 183, 192 (4th Cir. 1975). And the official duty cannot be a generalized one; it must be held "by virtue of and specific to the office stewarded by the person receiving … the bribe." *United States v. Bailey*, 2023 WL 2139365, at *4 (D.D.C. 2023); *see also Morlang*, 531 F.2d at 192 (reversing conviction where jury "should have been instructed only as to those standards which reasonably related to the discharge of specific duties as [Federal Housing Administration] director"); *Fernandez*, 2022 WL 3581793, at *5 (agreeing that duty must be "specific" to the office at issue).

     ***The Restrictions: Speech or Debate Clause.*** For most bribery prosecutions, it is enough to allege a *quid pro quo* for an official action or breach of official duty. But for Members of Congress, a special constraint—of constitutional design—makes "prosecutions more difficult." *Helstoski*, 442 U.S. at 488. While bribery law limits the offense's terrain to official conduct, Article I's Speech or Debate Clause "protect[s] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts." *Brewster*, 408 U.S. at 509. "[T]hroughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature." *Johnson*, 383 U.S. at 178. It does so by "protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary." *Id.* at 179.

To be sure, the Speech or Debate Clause does not provide absolute immunity.  Indeed, the Supreme Court held in *Brewster* that a Member of Congress may still be prosecuted for *agreeing* to take legislative action in exchange for a bribe; for "it is taking the bribe, not performance of the illicit compact, that is a criminal act."  408 U.S. at 526.  Rather, the constitutional protection provides a privilege whereby the government is prohibited from relying on allegations or evidence of legislative acts to *prosecute* such an agreement.  *Id.* at 527.  Thus, as *Brewster* made clear, the Clause "precludes any showing of how [the Member of Congress] acted, voted, or decided"—even if that proof would make for a "more appealing case"—because "evidence of acts protected by the Clause is inadmissible."  *Id.* at 527-28.  "Evidence of a legislative act" thus may not be "introduced" at trial.  *Helstoski*, 442 U.S. at 487-88.  And allegations of such acts must be "wholly purged" from any indictment.  *Johnson*, 383 U.S. at 185; *see also United States v. Murphy*, 642 F.2d 699, 700 (2d Cir. 1980) (per curiam); *United States v. Dowdy*, 479 F.2d 213, 222-24 (4th Cir. 1973).

The Speech or Debate Clause's sphere of "legislative action" is not coextensive with bribery's sphere of "official action"—leaving space for prosecution for selling acts that fall within the latter but not the former—but the two overlap in significant part as to federal legislators.  The Supreme Court has defined a legislative act to "broadly" include "anything 'generally done in a session of the House by one of its members in relation to the business before it.'"  *Doe v. McMillan*, 412 U.S. 306, 311 (1973).  A legislative act is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."  *Gravel v. United States*, 408 U.S. 606, 625 (1972).

That does not cover *everything* a legislator does.  In particular, the Court has excluded from the immunity many of the same constituent services that *McDonnell* held could not support a bribery charge—*e.g.*, "'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents," and the like.  *Brewster*, 408 U.S. at 512.  The Court conceptualized those activities as "political in nature rather than legislative," meaning they are undertaken to secure support for reelection rather than to advance Article I prerogatives.  *Id.*

At the same time, Speech or Debate protection extends beyond floor speeches and votes to cover other conduct within the "sphere of legitimate legislative activity."  *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).  That includes committee work, *Gravel*, 408 U.S. at 624; "legislative factfinding" and "information gathering," *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988); and consideration of "matters which the Constitution places within the Jurisdiction" of the House or Senate, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975).  *See also Fields v. Off. of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 (D.C. Cir. 2006) (collecting cases and examples).

All told, the test is whether the activity is "related to the due functioning of the legislative process."  *Johnson*, 383 U.S. at 172.  And the test is an objective one: Consistent with the Clause's purpose, so long as an "activity is arguably within the 'legitimate legislative sphere' the Speech or Debate Clause bars inquiry even in the face of a claim of 'unworthy motive.'"  *McSurely v. McClellan*, 553 F.2d 1277, 1295 (D.C. Cir. 1976).  In other words, courts must look to the action alone, for the Clause "forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, 'even to determine if they are legislative in fact.'"  *Biaggi*, 853 F.2d at 103; *see also, e.g.*, *Brewster*, 408 U.S. at 525.

The bottom line is that "the Speech or Debate Clause imposes significant limits on the prosecution of congressional bribery." *United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980). "Conduct that falls within the broad category of legislative action may not be charged as an offense under [any] statute, nor may evidence of a Member's legislative action be offered in evidence against him." *Id.*

## B.     The Indictment Exceeds These Constraints.

In light of the above, any bribery indictment of a Member of Congress must allege that the legislator agreed to a *quid pro quo* implicating either official action or official duty—but must do so *without* reference to legislative acts that the Member undertook.  The question here is whether the Indictment manages to navigate those parallel legal constraints.  The answer is clear: It does not.

The government relies heavily on allegations that are flatly barred by the Speech or Debate Clause.  Once the Indictment is purged of this content, as it must be, it is inescapably deficient.  It fails to identify a single viable *quo*—a single official act, or breach of official duty—to support any of its bribery schemes.  It thus fails to state an offense, and must be dismissed.

### 1.     *The New Jersey Scheme*

To start with the local, the Indictment claims the Senator tried to "disrupt" a state prosecution of the "New Jersey Defendant" and a state investigation of the "New Jersey Investigative Subject" in exchange for a car to his wife Nadine.  SSI ¶ 39.  On its telling, the Senator applied "advice and pressure" on a local prosecutor overseeing the cases, by speaking with him and urging him to resolve things "favorably."  *Id.* ¶¶ 39, 42b, 44c.  The facts alleged are entirely inaccurate. But even if this were true, it would not matter: A U.S. Senator has no power over *state* decisions or officials, and the government does not allege that the Senator invoked or leveraged his *federal* office in any way in relation to this scheme.  This is not official action under

*McDonnell*; what the Senator allegedly did is no different in kind from the sort of coaxing any private citizen could have done.

       a.    **No official action.**  The Indictment does not viably allege that the Senator took, or agreed to take, "official action" by allegedly pressing a New Jersey prosecutor to favorably resolve New Jersey criminal matters.

       *Federal* legislators have no authority over *state* matters, so they lack the power to command organs of state governments to do anything.  That is not some nicety or mere convention; it is a bedrock principle of federalism.  *See Printz v. United States*, 521 U.S. 898, 919 (1997) ("the Framers rejected the concept of a central government that would act upon and through the States").  Accordingly, federal officials generally have no capacity to take official action respecting a *state* matter.

       Nor can a federal official's mere request for action by the State, standing alone, qualify as "advice" or "pressure" under *McDonnell*.  The Court held that an official can take official action for purposes of the federal bribery laws if he "*use[s] his official position* to exert pressure on another official to perform an 'official act.'"  *McDonnell*, 579 U.S. at 574 (emphasis added).  But the key is the official must "use" his office in some way—whether by exercising an official advisory function (as in *Birdsall*, where his duty was to render clemency recommendations to a superior), or by leveraging official power to impose pressure (*e.g.*, by threatening to cut federal funding).  A naked request for action, by contrast, does not suffice.  That is no different from any citizen making a call or any lobbyist peddling a cause.  To be sure, a Senator may be more likely to be heard out, by virtue of his profile.  But "trad[ing] in part on the reputation, network and influence that comes with political office" has never sufficed to qualify as official action.  *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008).

After all, the essence of bribery is the corruption of *power*; without some link to official power, there can be no bribe.  That is why, as the text of § 201 makes clear, a *federal* official commits bribery only by taking official action on a matter pending before the *federal* government. 18 U.S.C. § 201(a)(3) (defining "official act" as action on matter pending "before any public official"); *id.* § 201(a)(1) (defining "public official" as federal officers and agents).  So too for honest-services fraud, an official breaches his fiduciary duty to the public only by abusing powers granted to him by the public.  *Skilling v. United States*, 561 U.S. 358, 407 n.41 (2010).  And under the Hobbs Act, an official does not engage in extortion "under color of" law unless he invokes a power conferred on him by law.  *See Silver*, 864 F.3d at 111.  Across these statutes, in short, bribery requires the *use of public office* for private gain.  Merely asking for something, from someone over whom the official has no power, is not a use of public office.

The leading case on this point is *United States v. Jefferson*, 289 F. Supp. 3d 717, (E.D. Va. 2017).  A nine-term congressman had been convicted of bribery for, among other things, pressuring African officials to take certain actions to help a U.S. company that was paying him. After *McDonnell*, the court set these convictions aside, reasoning that, without more, a federal official urging a *foreign government* to take action could not constitute an official act on the part of the official himself.  *See Jefferson,* 289 F. Supp. 3d at  737-38.  A federal official's attempted exertion of influence over a *separate sovereign*, without more, lacks the necessary nexus to federal authority that is required for there to be any sort of official action or bribery offense.  *See id.*

Under these principles, the Indictment is deficient in charging the New Jersey Scheme. Obviously, Senator Menendez had no official power to direct investigatory or prosecutorial decisions by the State of New Jersey—a separate sovereign in our constitutional structure—any more than Representative Jefferson had power over African nations.  Nor is there any allegation

that the Senator used his office *in any way* to "pressure" state officials, *e.g.*, by leveraging funding, threatening a subpoena, or the like.  Rather, the sole charge is that the Senator asked a New Jersey prosecutor to "resolve these matters favorably."  SSI ¶ 39.  That entreaty involves no aspect of his office; it implicates no *use*—and therefore no *abuse*—of federal authority.  Sure, a call from a Senator likely carries more heft than one from an average citizen.  But so too might a call from Taylor Swift, Kim Kardashian, or any other prominent person.  Profile and cache are not stand-ins for the exercise of official power.  *See Urciuoli*, 513 F.3d at 296.  And the Indictment contains zero allegations of the latter.

> **b.      No breach of official duty**.  Perhaps recognizing the lack of official action, the Indictment alleges without explanation that the Senator breached an "official duty" when he pressured the state prosecutor.  SSI ¶ 2.  This does not work either.

Most fundamentally, the government fails to identify any duty the Senator breached.  It nowhere specifies any actual law, rule, regulation, or even custom he violated.  That alone is fatal.  An indictment must state the "specific offense" charged.  *United States v. Hess*, 124 U.S. 483, 487 (1888).  For that reason, it is black letter law that "where an indictment charges a crime that depends in turn on [a] violation of another statute, the indictment must identify the underlying offense."  *Pirro*, 212 F.3d at 93; *see also, e.g.*, *United States v. Teh*, 535 F.3d 511, 516 (6th Cir. 2008) ("An indictment only including the words 'contrary to law'—without stating *which* law the defendant's conduct violated—is inadequate because it does not fully set forth the 'contrary to law' element.").  That principle applies here: An indictment cannot simply allege a breach of "duty" and move on; it must *state the duty*, both so that the defendant can understand the charges against him and so the legal validity of the theory can be tested.  But the Indictment here never identified any duty that the Senator supposedly breached.

Regardless, no such duty exists. Criminal investigation is a governmental function, at bottom. Elected officials often choose to maintain distance from specific charging decisions, so as to avoid undue politicization. *Cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2357-58 (2001). But that is, at most, an aspirational ethical norm—nothing remotely akin to the sort of specific, office-bound legal "duties" that could support a bribery offense. There is nothing here "dictated by governing statutes, rules, and regulations." *Fernandez*, 2022 WL 3581793, at *4.

To fill that void, the Indictment points to part of the Senator's website that foreswore his power to "intervene with judicial issues" or "overturn or in any way influence a court's decision." SSI ¶ 5. But of course, the fact that a senator tells constituents not to contact him about something does not mean he has a duty not to do it. Indeed, the Senator's page also said that he cannot "influence matters involving private businesses." *Id.* But his Garden State colleague has a website dedicated to just that—where constituents can "request a letter of support" from Senator Booker for their federal grant application.[2] And Senator Menendez, like dozens of his colleagues, routinely co-signs *amici* briefs on important issues in federal appellate courts and makes submissions to immigration judges in aid of constituents seeking relief, showing that he and others in the Senate do try to influence court decisions.[3] In any event, to the extent the government is relying on a website as a source of binding legal duties, that is not a serious argument.

---

[2] https://www.booker.senate.gov/services/grants/letter-of-support.

[3] *See, e.g.,* https://www.menendez.senate.gov/newsroom/press/menendez-and-booker-join-251-congressional-democrats-in-filing-amicus-brief-urging-fifth-circuit-to-reverse-texas-district-courts-ruling-on-mifepristone; https://www.menendez.senate.gov/newsroom/press/menendez-booker-join-colleagues-in-filing-congressional-amicus-brief-in-masterpiece-cakeshop-case; https://www.menendez.senate.gov/newsroom/press/menendez-joins-senate-democrats-on-amicus-brief-in-hobby-lobby-scotus-case.

Ultimately, the New Jersey Scheme rests on activities that any private citizen could equally undertake. That is a telling sign that it involves neither official action nor breach of official duty. In legal terms, this scheme has no *quo*.

### 2.   The U.S. Attorney Scheme

The U.S. Attorney Scheme has the same problem, albeit for different reasons. The Indictment rests on two sets of action: Foremost, a recommendation to the President of a certain candidate to be U.S. Attorney for New Jersey; and in distant second, two calls by the Senator to the official who oversaw the potential prosecution of Daibes. *See* SSI ¶ 46. But the former is squarely barred by the Speech or Debate Clause; and the latter is not an official act. Put together, this scheme does not amount to any complete bribery offense either.

**a.   The recommendation is a legislative act.** The government alleges that Senator Menendez "recommend[ed] a candidate for U.S. Attorney for the District of New Jersey who [the Senator] believed could be influenced by [him] with respect to [Fred Daibes's] case." *Id.*; *see also id.* ¶ 48 (recommending candidate "likely [to] be sympathetic to him"); *id.* ¶ 50 (recommending "the Candidate" later confirmed).

The government pursues this charge on the theory that the Senator's recommendation was an official act because it is part of the Senator's "Advice and Consent" responsibilities—as the Indictment puts it, "the ability to recommend to the President that a particular individual be nominated to serve as [a] U.S. Attorney" that a "Senator" has by "virtue of his position." *Id.* ¶ 5; *cf. United States v. Fattah*, 914 F.3d 112, 155-56 (3d Cir. 2019) (recognizing congressional role in nomination and confirmation of federal officers as relevant to "official act" inquiry).

But, by the same token, this recommendation is undoubtedly a *legislative* act under the Speech or Debate Clause. Again, legislative acts include those "integral" to "matters which the Constitution places within the jurisdiction" of a congressional chamber. *Gravel*, 408 U.S. at 625.

And the Constitution places within the jurisdiction of the Senate the power to give "Advice and Consent" in federal nominations.  Art. II, § 2, cl.2.  Half of this "Advice and Consent" power, of course, is the giving of *advice* on whom the President should nominate.  And "recommendations" by "Senators" are what put the "advice" in "advice and consent."  *United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962); *see also, e.g.*, David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491, 1495 (1992) (explaining that the Constitution's text and history "assigns" the Senate a "distinct … advisory role before the nomination has occurred").

Recommending a candidate for U.S. Attorney—a position that requires Senate confirmation—is thus a square legislative act.  It is an "integral" part of a legislative prerogative that "the Constitution places" within the "jurisdiction" of the Senate.  *Gravel*, 408 U.S. at 625.  Unlike the sort of generic "attempt[s] to influence" executive action on the "administration of a federal statute"—something Members of Congress may do, but not as part of any legislative function, *id.*—making a recommendation for a federal nominee is a direct discharge of a senator's assigned duties; it is part-and-parcel of the advice-and-consent "process" entrusted to the Senate.  *Id.*; *see also Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880) (recognizing that "the Senate is made a partaker in the functions of appointing officers … by requiring its consent").

Accordingly, when a senator recommends a nominee to the President, that is a legislative act; it thus cannot give rise to a bribery charge, or support an indictment.  So all of the allegations regarding Senator Menendez's recommendation of a nominee for U.S. Attorney—or in more constitutional terms, all of the allegations regarding the Senator's "advice" to the President—must be "wholly purged," *Johnson*, 383 U.S. at 185.  *See, e.g.*, SSI ¶ 2 (alleging decision to "recommend" particular person as U.S. Attorney); ¶ 46 (same); ¶ 47 (same); ¶ 48 (same); ¶ 50 (same).

Moreover, the Speech or Debate Clause safeguards not only the *culmination* of the legislative process (*e.g.*, voting), but also those acts that are the constitutive *parts* of that process. In particular, it is well-settled that "information gathering" and "legislative factfinding"—both formal and informal—are legislative acts. *Biaggi*, 853 F.2d at 102-03; *see also SEC v. U.S. House Comm. on Ways & Means*, 161 F. Supp. 3d 199, 236-37 (S.D.N.Y. 2015) (collecting cases). After all, "[w]ithout information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020). The Speech or Debate Clause therefore also covers—and immunizes—the Senator's meetings with potential nominees for U.S. Attorney. When senators meet a nominee, in deciding whether to vote for him or, earlier, in deciding whether to recommend him, that is the "gathering of information … in connection with or in aid of an activity … that qualifies as 'legislative in nature." *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007). And those actions fall within the core of the Speech or Debate Clause. *Dowdy*, 479 F.2d at 224. They cannot be used to prosecute the legislator.

Yet the Indictment relies on these exact sorts of exchanges. It discusses a "meeting" whose "purpose" was for the Senator to "consider a potential candida[te]" for U.S. Attorney. SSI ¶ 47. And it depicts the Senator's discussions with that candidate about how he would act while in office. *Id.* ¶ 49. That is quintessential information-gathering, placed off-limits by the Constitution.

Finally, the Speech or Debate Clause also picks up the conduct of the Senator's "Advisor" relating to the U.S. Attorney recommendation. Much as Members cannot do their job without information, they also cannot do it without aides. As such, "for purpose of construing the privilege a Member and his aide are to be treated as one." *Gravel*, 408 U.S. at 616. The Speech or Debate Clause thus protects the deliberations between a Member and his aide as to a legislative act, *id.*, as well as "information gathering" by "staff," *McSurely*, 553 F.2d at 1286. The Speech or Debate

Clause thus also precludes the allegations concerning deliberations among Senator Menendez and his staff about "the Candidate," plus the "Advisor's" efforts to gather information from that candidate regarding his would-be positions. *See, e.g.*, SSI ¶ 49.

Added up, *every single paragraph* about the Senator's U.S. Attorney pick must be "purged" from the indictment. *Johnson*, 383 U.S. at 185. And, to be clear, while the government could permissibly prosecute an agreement to recommend or support a U.S. Attorney nominee in exchange for things of value, the Indictment does not include a single factual allegation—no recording, email, or text message—evidencing an unlawful agreement between Senator Menendez and Daibes. All the government has are these acts themselves, which are immune.

        **b.**    **The calls are not official acts.** Without the above material, there is virtually nothing left to support the U.S. Attorney Scheme. At most, the government can point to two calls—one 15 seconds, the other 84—where the Senator allegedly spoke to "Official-4," the First Assistant overseeing Daibes's case. SSI ¶¶ 53d, 53e. But these brief exchanges do not allege anything close to an official act.

The mere existence of the calls is not enough, since simply "talking to another official" is not official action "without more." *McDonnell*, 579 U.S. at 574. And while an "official act" may include an official "using his official position to exert pressure … or to advise another official" to take action, *id.*, the Indictment is *entirely silent* as to the content of these two calls—probably because Official-4 told the government ████████████████████████████████ ████████████████████████████████ There is thus no allegation of advice or pressure, because there is no allegation *at all* about the calls' substance. Not only is there no way to determine from the allegations whether any "advice" was ever provided or any "pressure" ever imposed, there is also no way to determine whether the Senator "use[d] his official position" to

advance any objective.  *Id.*  (Nor was any objective in fact advanced; by the government's own admission, no action was taken in favor of Daibes, and the case was resolved on its merits.  SSI ¶ 54.)  Once more, an official's cajoling does not suffice without some use of his office.  *See Silver*, 864 F.3d at 122-23 (refusing to treat Silver's opposition to a methadone clinic as advice, because he never "formally used his power as Speaker … to oppose the clinic").  So the Indictment fails to provide the factual allegations necessary to support a charge that these calls constituted official acts.  They cannot predicate a bribery offense either.

> **c.      No breach of official duty.**  Finally, as with the New Jersey Scheme, the government tries to circumvent the lack of official action by claiming in passing that Senator Menendez breached an "official duty" when he made his U.S. Attorney recommendation to the President.  SSI ¶ 2.  This fares no better.  To start, it harbors all of the same Speech or Debate defects as above—it rests upon the same allegations of legislative action that the Constitution demands be purged.  *See supra* at 23-26.

> Even putting that to the side, the Indictment again fails even to identify the "official duty" the Senator allegedly breached here—which alone is fatal.  *Supra* at 21.  And again, in all events, the government *could not* identify any such duty.  There is no freestanding duty—let alone one rooted in "governing statutes, rules, and regulations," *Fernandez*, 2022 WL 3581793, at *4—that Senators recommend federal nominees based on merit alone; all politics hinges on trades, favors, and log-rolling.  *See United States v. Blagojevich*, 794 F.3d 729, 734-35 (7th Cir. 2015).

> All told, once purged of the allegations violative of the Speech or Debate Clause, the Indictment contains no allegations—zero—of any official act or breach of official duty in service of the alleged U.S. Attorney scheme.  It fails to allege any legally viable *quo*, and thus "fails to allege a crime."  *Aleynikov*, 676 F.3d at 76.

27

### 3.   *The Qatar Investment Scheme*

Pitched by the Indictment as a fallback for the U.S. Attorney Scheme, the Qatar Investment Scheme suffers from the same basic flaws.  It rests on plainly unofficial acts, dances around an obvious Speech or Debate Clause pothole, and ultimately includes no viable allegations of any *quid pro quo* agreement.  It is fodder for headlines, but an unserious foundation for a felony charge.

The Indictment does not even try to allege an official act for this scheme.  It alleges that Senator Menendez introduced Daibes to a connected Qatari investor.  SSI ¶ 56.  But "[s]etting up a meeting" is a quintessential example of something that is *not* an official act.  *McDonnell*, 579 U.S. at 573.  Likewise, the Indictment suggests that, to help Daibes seal his investment deal, the Senator issued a press release praising Qatar and sent the Qatari a text message promoting Daibes.  SSI ¶ 57.  But "[s]imply expressing support" for something (or for a country) is the other classic example, identified by the Supreme Court, as something that does *not* rise to the level of official action.  *McDonnell*, 579 U.S. at 573; *see also, e.g.*, *Silver* 864 F.3d at 120-22.

The Indictment *alludes* to official action through two opaque references to a "Senate resolution supportive of Qatar."  SSI ¶¶ 58, 60.  As noted above, this was in fact an uncontroversial resolution, introduced by a Republican senator and passed on a voice vote, thanking Qatar for use of its territory in conducting evacuations from Afghanistan in the wake of the Taliban takeover.  *See supra* at 11.  In all events, the Indictment does not claim the Senator took any action on this resolution—even the government seems to recognize that would be a textbook violation of the Speech or Debate Clause.  Nor does the Indictment allege an *agreement* by Senator Menendez to take action on the resolution (which, given its nature, would be absurd).  It simply says he received two texts about it.  That cannot support a bribery charge.

Last, the Indictment states in passing the Senator also breached an "official duty" as part of all this.  *See, e.g.*, SSI ¶ 45.  But as above, the Indictment does not state the duty the Senator

allegedly violated—and that alone is sufficient. *Supra* at 21. And, as above, the Indictment is silent because it cannot say anything more. No "governing statutes, rules, [or] regulations," *Fernandez*, 2022 WL 3581793, at *4, control how Members of Congress interact with constituents—be it helping them network with others, or making press statements to advance their interests. That sort of rote conduct is *exactly* what federal law leaves to politics.

### 4. The IS EG Halal Scheme

Crossing the Sinai, the Indictment alleges that Senator Menendez pressured USDA to drop its opposition to an Egyptian monopoly certification, to facilitate Hana's payment of illicit bribes to his wife. SSI ¶ 30. But that is not an official act, and the Indictment lacks anything else to state a bribery offense here.

According to the Indictment, Egypt granted IS EG Halal—co-defendant Hana's company—a monopoly on certifying U.S. meat exports as Halal. SSI ¶¶ 24-25. Some in the USDA supposedly sought to raise "objections" to it. *Id.* ¶¶ 27-28. To safeguard this monopoly for Hana, the government alleges that the Senator placed a single call to a "high-level USDA official," where he "insisted, in sum and substance, that the USDA stop opposing IS EG Halal's status as sole halal certifier." *Id.* ¶ 30.

There is no official act here. The only exercise of governmental power was by *Egypt* in granting the monopoly. That does not qualify as an "official act" for federal bribery purposes, because it was not a matter pending before any federal official. *See, e.g.*, *Jefferson*, 289 F. Supp. 3d at 738. Nor can the Senator be characterized as having advised or pressured USDA to take official action, *McDonnell*, 579 U.S. at 574—because USDA's expressions of "opposition" to Egypt's halal monopoly (SSI ¶ 30) are not official acts either. USDA has no role in Egyptian monopoly determinations, and simply opposing a policy—no different from "[s]imply expressing support" for one—is not official action in its own right. *McDonnell*, 579 U.S. at 573; *see also,*

*e.g.*, *Silver* 864 F.3d at 122 ("Taking a public position on an issue, by itself … is not an 'official act'").  The only ultimate exercise of governmental power is still by Egypt.  *Jefferson*, 289 F. Supp. 3d at 738.  This is *unofficial* action all the way down.

### 5.    *The Egyptian Aid Scheme*

The Indictment's final scheme charges that Senator Menendez took actions to "benefit" Egypt and co-defendant Will Hana, in exchange for personal benefits to his now-wife.  SSI ¶ 16.  Although this alleged scheme contains multiple constituent parts, their sum does not produce a legally cognizable whole.

### a.    **Aid approvals are legislative acts.**  The heart of the Egyptian Aid Scheme

is the allegation that Senator Menendez "use[d] his power and authority to facilitate [foreign military] sales and financing to Egypt."  *Id.* ¶ 19.  The government will say that was "official action" in the Senator's capacity "as the Chairman or the Ranking Member of the [Senate Foreign Relations Committee]."  *Id.* ¶ 17.  For the exact same reasons, however, these are also *legislative* acts under the Speech or Debate Clause.  They thus must be purged from the Indictment.

A legislative act, again, is something "generally done in a session of the House by one of its members in relation to the business before it."  *McMillan*, 412 U.S. at 311.  That fits this conduct to a tee.  When a senator signs-off on foreign aid (or places a hold on it), he is exercising a power of his office, as to official "business" placed before the Senate.  It is certainly not a "political" act, "casually or incidentally related to legislative affairs," such as a press release or campaign speech.  *Brewster*, 408 U.S. at 512, 528.  Rather, it is part of the "the legislative process itself."  *Id.*

Whenever the Chairman or Ranking Member of the Senate Foreign Relations Committee reviews an Executive Branch decision on military aid, he performs his role in an established oversight process—itself a legislative act.  *See Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 992 (D.C. Cir. 2021); *see also United States v. McDade*, 28 F.3d 283, 304-05 (3d Cir. 1994) (Scirica, J.,

concurring in part and dissenting in part).  But when the Chairman or Ranking Member *signs off* (or *rejects*) such aid, that is akin to true legislative authority, in the Speech or Debate Clause heartland.  These acts are instances of the Senator "executing the duties of his office," and thus shielded by the Speech or Debate Clause.  *Coffin v. Coffin*, 4 Mass. 1, 28 (1808) (interpreting nearly identical clause of Massachusetts Constitution); *see also Kilbourn*, 103 U.S. at 204 (describing *Coffin* as "most authoritative case" on Clause).

As such, when the Senator "use[d] his power and authority to facilitate such sales and financing to Egypt," SSI ¶ 19, those were legislative acts.  So the allegations regarding those acts, *see, e.g.*, *id.* ¶ 16, must fall from the Indictment.

Of a piece, the allegations as to conduct surrounding these acts must be purged too.  The Indictment invokes "meetings" between the Senator and "Egyptian officials" to discuss matters like "foreign military sales and foreign military financing," where he would receive "materials advocating Egyptian foreign policy goals and positions."  SSI ¶¶ 19-20; *see also, e.g.*, *id.* ¶¶ 19a, 21, 37, 37b, 37d.  Likewise, the indictment attacks a "formal congressional delegation" trip to Egypt.  *Id.* ¶ 37f.  Absent any allegations that unlawful bribery agreements were reached during these meetings or delegations—and the Indictment includes none—these are all textbook information-gathering activities that are safeguarded by the Speech or Debate Clause.  *See, e.g.*, *Biaggi*, 853 F.2d at 103 ("[L]egislative factfinding activity conducted by [the Member] during his Florida trips was protected.").  In each instance, the Senator was meeting with foreign officials to learn about foreign issues that bore on "business" regularly before the Senate Foreign Relations Committee.  *See McMillan*, 412 U.S. at 311.  Indeed, although the Indictment omits this fact, the Egyptian delegation that met with Senator Menendez in July 2018 had similar meetings with numerous other Members of Congress during the same trip.  ████████████

Accordingly, each of Senator Menendez's meetings amounted to "information gathering activities" that are indisputably protected by the Constitution, *Ways & Means*, 161 F. Supp. at 236, and therefore cannot support the charges.[4]

        **b.**     **The executive outreach was not official action.**   Stripped of the allegations that violate Speech or Debate protection, the Indictment fails to state an offense. In its best light, it alleges at most one other act in support of this scheme—that the Senator "wrote a letter" to Treasury and State, expressing his concern over "stalled negotiations" over a dam in Africa and urging increased "engagement" on the matter. SSI ¶ 37a. There is nothing official here either. Like the halal monopoly, the dam is a joint project by Egypt, Ethiopia, and Sudan; it is not a matter pending before any U.S. official. *See supra* at 29. And urging the Secretaries of Treasury and State to "engage" on the Dam is not official action. For one thing, "engagement" is too abstract: It is neither sufficiently "focused and concrete" nor adequately tied to a "formal exercise of governmental power" to satisfy *McDonnell*. 579 U.S. at 569-70; *see, e.g.*, *Fattah*, 914 F.3d at 153 ("matters described at a high level of generality … are not sufficiently 'focused and concrete'"). For another, "actions to pressure foreign officials cannot be official acts" without some distinct exercise of federal power, which is not alleged here. *Jefferson*, 289 F. Supp. 3d at 738.

        **c.**     **Disclosing unclassified material does not breach an official duty.**   The Egyptian Scheme's last reed is the claim that the Senator breached "official duty" when he allegedly shared certain unclassified but "sensitive" information—and in some cases, *publicly available* information. SSI ¶¶ 2, 19b, 19c, 20, 37(d). This falters like the rest.

---

[4] In the initial Indictment, the government attempted to impugn the Senator's meeting in March 2018 with the Egyptian delegation by claiming that the Senator excluded both his staff and the staff of the Senate Foreign Relations Committee from that meeting. That was false; his staff participated in the meeting. The government has effectively admitted as much by excising the scandalous allegation from the Superseding Indictment. *Compare* Indict. ¶ 12(a) with SSI ¶ 19(a).

Yet again, the Indictment fails to identify any "official duty" the Senator allegedly breached. As explained, that is fatal; an indictment's legal predicate must be plainly identified, so that criminal defendants are not reduced to playing whack-a-mole. *Supra* at 21. And yet again, there is no living mole in any event. The Federal Government has a comprehensive system of laws, rules, and regulations governing the handling of classified or otherwise protected information. *See generally* Jennifer Elsea, Cong. Rsch. Rep., *The Protection of Classified Information: The Legal Framework* (2023); *see also* Classified National Security Information, 75 Fed. Reg. 707 (Dec. 29, 2009) (Exec. Order No. 13526); 18 U.S.C. § 793 (prohibition on certain disclosures of "national defense" information). If none of those rules or regulations applies, there is no free-floating "official duty" to handle unclassified but allegedly "sensitive" information in a particular way—let alone a duty specific to Members of Congress. Much less is there any official duty attaching to the dissemination of *publicly available* information. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

Moreover, the allegations that the Senator shared information with Egyptian officials or their proxies are precluded by the Speech or Debate Clause too. Given his role on the Foreign Relations Committee, Senator Menendez's legislative function required him to trade information with foreign contacts; after all, a stenographer is an ineffective interlocutor, and it is impossible to *gather* information without *giving* some too. In other words, exchanging sensitive information with foreign contacts is "integral" to the Senator's execution of his legislative responsibilities, and is thus a legislative act. *Gravel*, 408 U.S. at 625. This is not akin to a constituent newsletter, which the Supreme Court has treated as a political rather than a legislative activity. *Hutchinson v.*

*Proxmire*, 443 U.S. 111, 130-31 (1979).  Exchanging information with foreign contacts is bound

up with, and the "necessary concomitant" of, the Senator's information-gathering responsibilities.

*McSurely*, 553 F.2d at 1286-87.

\*      \*      \*

For all its talk of gold bars, the Indictment needs legal alchemy to survive.  The bulk of its

allegations are in the teeth of the Speech or Debate Clause, and therefore must be purged.  And

what remains is legally deficient.  The result is a conclusory indictment that fails to allege any

viable *quo* for any of its distinct bribery schemes.  That being a critical element of federal bribery,

Counts I-III must be dismissed.[5]

## II.     THE FARA COUNT MUST BE DISMISSED.

The bribery counts, while legally deficient, are at least fairly conventional.  But the FARA

count under 18 U.S.C. § 219 added by the (first) Superseding Indictment is unprecedented.  Indeed,

we have been unable to identify a single prosecution of any public official—let alone a sitting or

former Member of Congress—for violating this statute since its adoption in 1966.  Yet the

government is now accusing a sitting Senator—a former Chairman of the Foreign Relations

Committee, no less—of acting in the interest of a foreign power, based on the way he executed his

constitutionally prescribed functions.  Even if the Egyptian Aid Scheme could survive as a theory

of bribery, repackaging it as a FARA violation is a frontal attack on Congress that flouts the

Constitution.  This count surely cannot stand.

---

[5] At minimum, the Court must strike the allegations proscribed by the Speech or Debate Clause. *Johnson*, 383 U.S. at 185.  It should also strike those allegations related to whatever bribery schemes fail to independently state an offense.  While the government crams distinct schemes into shared counts—a severe duplicity problem in its own right—none is relevant to proving the other, but any would be deeply inflammatory and prejudicial at trial. *See, e.g.*, *United States v. Miller*, 26 F. Supp. 2d 415, 420-21 (N.D.N.Y. 1998) (striking allegations distinct from charged "scheme[]").

### A.    The Speech or Debate Clause Forecloses the FARA Count.

The Indictment charges Senator Menendez with acting as an agent of a foreign power, on the theory that he took certain legislative acts for the benefit of Egypt rather than in the best interests of his country.  SSI ¶ 3.  It is hard to imagine a criminal prosecution that is more flatly foreclosed by the Speech or Debate Clause.

To appreciate why, some background on FARA is needed.  For most Americans, FARA is a disclosure statute: It requires those who meet its definition of "agent of a foreign principal" to register with the Department of Justice.  FARA works differently for "public officials," however, including "Member[s] of Congress."  18 U.S.C. § 219(c).  For them, FARA is not a disclosure obligation, but a criminal prohibition; it is a felony if any public official "is or acts" as an agent of a foreign principal.  *Id.* § 219(a).

As to Members of Congress, the FARA analysis therefore turns exclusively on whether the legislator has acted as a foreign agent.  And the definition of "agent" is broad: It includes anyone who (i) engages in "political activities," "publicity" services, or certain other acts, (ii) "at the order, request, or under the direction or control, of a foreign principal."  22 U.S.C. § 611(c)(1).  The first element sweeps in most of what legislators do: Political activities include anything that will "in any way influence" the government or the public with respect to "domestic or foreign policies" or "the political or public interests, policies, or relations of a government of a foreign country."  *Id.* § 611(o).  The second element, moreover, is so far-reaching that not even a "common law agency" relationship is required to satisfy its terms.  *Att'y Gen. of U.S. v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982).

As these elements reflect, § 219 thus operates differently than bribery statutes.  The latter proscribe corrupt *agreements* by public officials.  That is why it is possible to prosecute Members of Congress for agreeing to sell legislative acts, without proving or otherwise calling into question

those acts themselves.  *Brewster*, 408 U.S. at 526.  By contrast, FARA targets *actions*.  *See* 18 U.S.C. § 219(a) (prohibiting "act[ing]" as agent of a foreign principal).  And if those action are *legislative* in nature, they are immunized as Speech or Debate.  Accordingly, an indictment cannot charge a Member of Congress with "acting" as a foreign agent by taking legislative acts.  That would require a jury to evaluate legislative acts and motives—*i.e.*, whether a foreign hand was at play.  Yet the Clause's *core purpose* is to "protect[] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts," *Brewster*, 408 U.S. at 509, even if taken for "unworthy motive," *McSurely*, 553 F.2d at 1295.  A charge "'dependent' on prohibited inquiries as to the circumstances surrounding and motivations for legislative action" cannot survive.  *Myers*, 635 F.2d at 937.

Count IV is a classic example.  The government premises this unprecedented FARA prosecution on two sets of alleged acts: the Senator's facilitation of military aid to Egypt, and his sharing of unclassified information with Egyptian officials.  *See* SSI ¶ 3.  On its telling, the Senator took these "act[ions] as an agent of a foreign principal," at the behest of "the Government of Egypt." *Id.* ¶ 82.  But, as already explained, both acts are legislative.  *See supra* at 30-32, 33-34.  The government cannot constitutionally hinge a criminal charge on those acts or the Senator's motives for them.  At bare minimum, then, Count IV must be dismissed as a matter of law.

That said, it bears repeating that the government's factual narrative is risible.  In numerous ways over the years, Senator Menendez has challenged the government of Egypt to improve its human rights record, and continued to withhold military aid to Egypt as a result, including during the life of the alleged conspiracy (from 2018 through 2022).  *See supra* at 7-8.[6]  Senator Menendez

---

[6] The ammunition that Senator Menendez signed off on in July 2018 was needed for Egypt's counter-terrorism campaign in the Sinai, and is distinct from the much broader military aid packages that Senator Menendez continued to refuse to approve thereafter.  *See supra* at 8.

has a constitutional right under the Speech or Debate Clause *not* to have his legislative record put on trial—but at any such trial, he would have no difficulty establishing his independence from Egypt and the *bona fides* of his foreign relations track record.

    **B.**    **As Applied to Members of Congress, § 219 Unconstitutionally Interferes with the Separation of Powers.**

The Speech or Debate Clause forecloses the FARA count in this case.  But there is a more fundamental constitutional problem with applying § 219 to any Member of Congress—which is perhaps why this has *never before been done*.  For the Executive Branch to accuse an Article I legislator of a crime based on the way he performs his constitutional duties is an affront to the separation of powers and an infringement on the First Amendment.  One branch cannot superintend another, let alone its *advocacy*, without posing serious dangers to the proper functioning of our democracy.  For this reason too, the Indictment's unprecedented Count IV must be dismissed.[7]

The Speech or Debate Clause is not the only "protection from prosecution that the Constitution provides to a Member of Congress"—the "doctrine of the separation of powers" offers independent shelter.  *United States v. Rostenkowski*, 59 F.3d 1291, 1307 (D.C. Cir. 1995).  And if the separation of powers means anything, it means that one branch of government cannot "superintend" the work of another.  *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 611-12 (2007) (plurality).  Just as one branch cannot directly exercise the powers of another, nor can one branch indirectly control the other's work.  At day's end, sword and purse are collapsed all the same if Congress tugs the strings according to the Executive's tune.

---

[7] It makes no difference, for this argument or the last one, that the Indictment charges *conspiracy* to violate § 219, rather than a substantive violation.  If the underlying offense is unconstitutional or otherwise cannot be prosecuted, there cannot be a valid charge of unlawful conspiracy to commit the offense either.  *See United States v. Miselis*, 972 F.3d 518, 529 (4th Cir. 2020).

This superintendence principle lies at the heart of the separation of powers.  It is the reason why the political branches cannot dictate to the federal courts a "rule of decision."  *United States v. Klein*, 80 U.S. 128, 146 (1871).  So too why Congress cannot dictate to the Executive the permissible bases for a pardon.  *Schick v. Reed*, 419 U.S. 256, 266 (1974).  And it is why other branches may not interfere with "the right of the people to be fully and fearlessly represented by their elected [representatives]" in Congress.  *Myers*, 635 F.2d at 936; *see also, e.g.*, *Rostenkowski*, 59 F.3d at 1306 (noting that Article I's Rulemaking Clause gives each House the exclusive power to set rules and punish misbehavior).  The common thread is woven into our system of divided power: No branch may arrogate power over the day-to-day functions of another.

The Supreme Court's decision in *Hein* is instructive.  There, the Court rejected an expansive theory of taxpayer standing that would "deputize federal courts as 'virtually continuing monitors of the wisdom and soundness of Executive action,'" with potential oversight over "the speeches, statements, and myriad daily activities" of the Executive Branch.  551 U.S. at 611-12 (plurality).  That would improperly "alter the allocation of power at the national level," the Court warned.  *Id.* at 611.  And it would violate the "separation and equilibration of powers," because it is outside the "role of the judiciary" to oversee "purely executive action."  *Id.* at 611-12.

But, as applied to Members of Congress, § 219 does exactly that; indeed, it parallels the power grab the Supreme Court declined in *Hein*, by criminalizing *how* a Member of Congress may carry out the basic functions of his job.  As detailed above, § 219 has a remarkably broad reach. It covers anything that could "in any way influence any agency or official of the Government of the United States or any section of the public within the United States" as to public policy.  22 U.S.C. § 611(o).  That may as well be a legislator's job description; it conceivably covers everything that a Member of Congress does on a daily basis.  And while FARA only prohibits

those acts when they are taken as an "agent" of a foreign principal, the law defines an "agent" incredibly broadly: No money need change hands; no traditional agency relationship is needed, *see Irish N. Aid Comm.*, 668 F.2d at 161; and it suffices to act at the "order" or "request" of a foreign power, 22 U.S.C. § 611(c)(1).  Senators do that routinely—especially Senators who play an important role in U.S. foreign relations. To take just one example, groups of Senators (though **not** Senator Menendez) have repeatedly introduced legislation to end the Cuban trade embargo, specifically citing the need to "boost" opportunities for constituent American businesses in Cuba. These Senators have done so after visiting with Cuban officials, and hearing the foreign officials' requests—repeated *ad nauseam*—to do precisely what the legislation seeks to do, and all for expanded economic opportunities for the Senators' constituents.[8]  The government's theory here may render those Senators foreign agents as well.

    FARA thus proscribes otherwise legitimate action—indeed, everyday conduct and even First Amendment activity of legislators, such as giving a speech, promoting a policy, or influencing an agency—based solely on the impetus behind it.  *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) (noting that First Amendment applies to "elected representative[s] … speak[ing] freely on questions of government policy").  Said differently, it makes it a crime for Members to perform aspects of their job for certain reasons, *viz.*, if at the "request" of a foreign principal.  Again unlike the bribery laws, which proscribe illicit *agreements*, FARA extends to Members' *routine acts*, and dictates when they can perform them.   That is the exact superintendence the Constitution forbids—no different from a law dictating when the President can deliver a pardon.  *Schick*, 419 U.S. at 266.  And it inevitably thrusts the Executive Branch (and the courts) into the position of evaluating whether a Member of Congress's advocacy or other

---

[8] *See, e.g.,* https://thehill.com/latino/3886489-bipartisan-senate-bill-would-end-cuban-embargo

actions—including, as here, in the realm of foreign relations—were undertaken based on sincere policy views, or instead on a request or demand from a foreign principal.

To be clear, the problem is not that Senator Menendez or any other Member of Congress wishes to act as a foreign agent. The problem, rather, is that § 219's broad and vague terms create a specter of potential prosecution—the threat of being second-guessed in one's motives, potentially by political adversaries—that would effectively "prevent" the Congress "from accomplishing its constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). Not a week goes by when a Member does not "influence" policy, or when the Chairman of the Foreign Relations Committee does not interact with foreign officials. It would thus fall to the Executive and Judiciary to assess the propriety of virtually everything virtually every federal legislator does, casting a "pall of potential prosecution" over all of it. *McDonnell*, 579 U.S. at 575.

Indeed, it takes little imagination to see what winds the government is sowing. Suppose a senator comes back from Israel, and says he will support whatever aid Prime Minister Netanyahu seeks. When he does so, is that at the "order" or "request" of a foreign power? Does it matter whether he would vote that way anyway? Is this really a question for a jury at trial? Now layer on top the risk of selective prosecution. Envision a future President hostile to Ukraine. Under § 219, that President could prosecute any legislative thorn in his side by charging a FARA violation for having promoted military aid at the behest of President Zelenskyy. As this case reveals, an indictment alone wreaks enormous political damage. This threat would produce a deep chill across Congress, freezing the ability of legislators to execute their functions. That is incompatible with our constitutional structure. *See Tenney*, 341 U.S. at 377 (worrying about "deterrents to the uninhibited discharge of … legislative duty").

Nor can this defect be cured by a narrow construction of FARA's exceedingly broad terms. The text allows for no principled limit, and courts cannot employ vague "know it when I see it" tests in the criminal sphere without running afoul of the Due Process Clause. Last year, the Supreme Court rejected as "too vague" the Second Circuit's test for identifying those with sufficient "influence" to owe duties to the public, finding that standard "ill-defined" and thus inadequate to provide fair notice. *Percoco v. United States*, 598 U.S. 319, 328-29 (2023); *see also id.* at 337-38 (Gorsuch, J., concurring in judgment) ("[C]ongress's prohibition must be knowable in advance—not a lesson to be learned by individuals only when the prosecutor comes calling or the judge debuts a novel charging instruction."). So too here: Any attempt to *narrow* § 219 to avoid one set of constitutional infirmities would only *create* another.

The upshot is this: FARA's sweeping language delegates to the Executive and Judiciary the power to supervise the daily functioning of the Legislative. This leaves Congress's legislative activity subordinated to the scrutiny and superintendence of the Second and Third Branches. Yet the separation of powers compels the "Executive and Judicial Branches to respect the independence of the Legislative Branch." *Myers*, 635 F.2d at 935-36. If § 219 does not violate that principle, little does. Count IV therefore must be dismissed as unconstitutional.

*     *     *

There is a reason the government has never before prosecuted a case under § 219. Unlike allegations of *quid pro quo* bribery, accusations of foreign influence *simpliciter* against federal legislators—whether legitimate or (as here) contrived, whether lobbed in good faith or (as here) as a political grenade—simply cannot be resolved through the criminal process without eviscerating the separation of powers. These political libels must be resolved between the Senator and his constituents through the democratic process, not between him and competing branches of government through litigation.

41

## CONCLUSION

This Court should dismiss the Indictment under Federal Rule of Criminal Procedure 12(b)(3) or, at minimum, strike pursuant to Federal Rule 7(d) those allegations that either offend the Speech or Debate Clause or concern acts that cannot constitute "official acts" under *McDonnell*.

Dated: January 10, 2024                           Respectfully submitted,


Yaakov M. Roth (*pro hac vice* pending)           By: */s/  Adam Fee*
JONES DAY                                               Adam Fee
51 Louisiana Avenue N.W.                                PAUL HASTINGS LLP
Washington, D.C. 20001                                  1999 Avenue of the Stars
Telephone: (202) 879-3939                               Los Angeles, CA 90067
Facsimile: (202) 626-1700                               Telephone: 1(310) 620-5719
                                                        Facsimile: 1(310) 620-5819

                                                        Avi Weitzman
                                                        PAUL HASTINGS LLP
                                                        200 Park Avenue
                                                        New York, NY 10166
                                                        Telephone: 1(212) 318-6000
                                                        Facsimile: 1(212) 725-3620

                                                        Robert D. Luskin
                                                        PAUL HASTINGS LLP
                                                        2050 M Street NW
                                                        Washington, D.C. 20036
                                                        Telephone: 1(202) 551-1966
                                                        Facsimile: 1(202) 551-0466


*Attorneys for Defendant Robert Menendez*