UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA         :
                                          :

        -*v.*-                   :      S2 23 Cr. 490 (SHS)
                                          :

ROBERT MENENDEZ,           :
NADINE MENENDEZ,           :
     a/k/a "Nadine Arslanian,"    :
WAEL HANA,               :
     a/k/a "Will Hana,"        :
JOSE URIBE, and          :
FRED DAIBES,              :
                                          :

                    Defendants.     :
                                          :
----------------------------------------------------------------x

# OMNIBUS MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS (1) TO DISMISS THE INDICTMENT, (2) FOR SEVERANCE, (3) FOR TRANSFER, (4) FOR A BILL OF PARTICULARS, AND (5) TO STRIKE

 

DAMIAN WILLIAMS
United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................... 1

    A.    Procedural Background.............................................................................. 1

    B.    Overview of the Charged Scheme .............................................................. 2

    C.    Actions Related to Egypt ........................................................................... 3

        1.    Menendez's Offers of Assistance to Egypt in Exchange for Hana's Promises of Payment.............................................................. 3

        2.    Menendez's Actions to Protect the IS EG Halal Bribe Revenue Stream ................................................................................ 5

        3.    Menendez's Continued Promises and Actions for the Benefit of Egypt in Exchange for Additional Things of Value ...................... 6

    D.    Actions Related to the New Jersey Attorney General's Office Criminal Matters ........................................................................................ 7

    E.    Actions Related to Daibes's Federal Prosecution and Qatar ..................... 8

        1.    Menendez's Agreement and Attempt to Disrupt Daibes's Federal Prosecution.................................................................... 9

        2.    Menendez's Acceptance of Cash and Gold Bars Knowing that Daibes Expected Him in Exchange to Assist Daibes by Benefiting the Government of Qatar ......................................... 10

    F.    Attempts to Cover Up Bribe Payments.................................................... 12

DISCUSSION ............................................................................................................... 12

    I.    THE DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE BRIBERY AND EXTORTION CHARGES AGAINST THEM ........................ 12

    A.    Applicable Law ....................................................................................... 17

        1.    The Pleading Standard ................................................................ 17

        2.    The Speech or Debate Clause – Overview of the Law ................. 20

        3.    The Speech or Debate Clause – Analysis of a Challenged Act .... 26

        4.    *McDonnell* and the "Official Act" Requirement ......................... 30

        5.    *McDonnell* and the Pleading Standard......................................... 33

    B.    Discussion ............................................................................................... 34

        1.    The Speech or Debate Clause Does Not Bar the Charged Acts or Evidence.................................................................................. 34

            a)    Foreign Military Sales, Foreign Military Financing, and Related Allegations ........................................................... 36

                    b)  Recommendations for U.S. Attorney and a Prior Meeting and Communications with a Particular U.S. Attorney Candidate ....................................................................... 45

          2.    *McDonnell* Does Not Entitle the Defendants to Dismissal of the Charges ............................................................................ 53

                    a)  Menendez's Intervention with the U.S. Department of Agriculture ........................................................................ 55

                    b)  Menendez's Receipt of Payments Knowing Daibes Expected Menendez to Take Official Action in Exchange to Benefit Daibes and Qatar .................................................... 61

                    c)  Menendez's Attempts to Interfere with Daibes's Federal Criminal Case.................................................................... 63

                    d)  Menendez's Attempts to Interfere with a State Criminal Investigation and Prosecution ........................................... 65

                    e)  Menendez's Claims Concerning Breaches of Duty .......... 71

                    f)  Hana's *McDonnell* Claims ................................................ 71

                    g)  Daibes's *McDonnell* Claims ............................................ 74

II.    THE DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE FOREIGN AGENT CHARGE ........................................................... 75

     A.    The Speech or Debate Clause Does Not Invalidate Section 219 ............. 75

     B.    Section 219 is Consistent with the Separation of Powers ........................ 76

     C.    This Court Should Decline to Carve out an "Affirmative Legislative Policy Exception" to Conspiracy Liability for Section 219 ..................... 83

     D.    Section 219 Is Not Vague ....................................................................... 86

III.   THE INDICTMENT IS NOT DUPLICITOUS .................................................... 88

     A.    Applicable Law ....................................................................................... 88

     B.    Discussion ............................................................................................... 90

          1.    Each Count of the Indictment Alleges A Single Scheme ............. 91

          2.    There Is No Justification for Dismissal or Other Pretrial Relief .. 96

IV.   HANA'S MULTIPLICITY CHALLENGE IS PREMATURE AND MERITLESS ...................................................................................................... 101

     A.    Applicable Law ..................................................................................... 101

     B.    Discussion ............................................................................................. 104

V.    THE DEFENDANTS' MOTIONS FOR SEVERANCE ARE MERITLESS .... 106

    A.    Applicable Law ........................................................................... 107

        1.    Joinder – Rule 8(b) ............................................................ 107

        2.    Severance of Properly Joined Charges – Rule 14(a) ................. 108

    B.    Discussion ................................................................................. 112

        1.    The Defendants Are Properly Joined Under Rule 8(b) .............. 112

        2.    There is No Basis for a Severance Under Rule 14(a) of Menendez
           and Nadine Menendez ................................................................ 114

        3.    There is No Basis to Sever Menendez from the Other Defendants
           ........................................................................................ 125

        4.    There is No Basis to Sever Daibes from the Other Defendants .. 128

VI.   THE DEFENDANTS' MOTIONS TO DISMISS FOR ALLEGED LACK OF
      VENUE SHOULD BE DENIED ........................................................ 130

    A.    Applicable Law ........................................................................... 131

        1.    General Principles of Venue ................................................. 131

        2.    Venue in a Criminal Conspiracy .......................................... 132

    B.    Discussion ................................................................................. 135

VII.  THE DEFENDANTS' ALTERNATIVE MOTION TO TRANSFER SHOULD
      BE DENIED ................................................................................. 146

    A.    Applicable Law ........................................................................... 146

    B.    Discussion ................................................................................. 148

        1.    Residence of the Defendants ................................................ 148

        2.    Location of Witnesses ........................................................ 150

        3.    Location of Events ............................................................. 152

        4.    Location of Documents and Physical Evidence ........................ 152

        5.    Disruption of the Defendants' Business ................................. 153

        6.    Expenses to the Parties ....................................................... 154

        7.    Location of Counsel ........................................................... 154

        8.    Relative Accessibility of the Place of Trial ............................ 155

        9.    Docket Conditions ............................................................. 156

VIII. HANA'S AND MENENDEZ'S MOTIONS FOR A BILL OF PARTICULARS
      SHOULD BE DENIED ................................................................... 157

      A.     Applicable Law ................................................................................ 158

      B.     Discussion .................................................................................... 162

IX.    HANA IS NOT ENTITLED TO HAVE PARAGRAPH 15 OF THE INDICTMENT STUCK AS TO HIM ................................................... 173

      A.     Applicable Law ................................................................................ 173

      B.     Discussion .................................................................................... 175

CONCLUSION ........................................................................................... 177

## **TABLE OF AUTHORITIES**

### **Cases**

*Alderman v. United States*, 394 U.S. 165 (1969) ................................................................. 116, 118

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................................................... 80

*Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982) ...................................... 83

*Bastien v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301 (10th Cir. 2004) ........... 23

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ........................................ 14

*Biden v. Texas*, 597 U.S. 785 (2022) ......................................................................................... 59

*Blockburger v. United States*, 284 U.S. 299 (1932) ................................................................. 106

*Blumenthal v. United States*, 332 U.S. 539 (1947) .................................................................... 96

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ........................................... 13, 18

*Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) ........................ 20

*City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991) ..................................... 54

*Costello v. United States*, 350 U.S. 359 (1956) .................................................................. 12, 17

*Cushing v. Packard*, 30 F. 4th 27 (1st Cir. 2022) (en banc) ...................................................... 21

*Davis v. Passman*, 442 U.S. 228 (1979) .................................................................................... 80

*Doe v. McMillan*, 412 U.S. 306 (1973) ................................................................ 21, 22, 37, 47

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ................................................... 21, 26

*Edmond v. United States*, 520 U.S. 651 (1997) ........................................................................ 49

*Elkins v. United States*, 364 U.S. 206 (1960) .......................................................................... 121

*Evans v. United States*, 504 U.S. 255 (1992) ......................................................... 53, 59, 62, 64

*Fields v. Office of Johnson*, 459 F.3d 1 (D.C. Cir. 2006) (en banc) ...................................... 20, 26

*Forrester v. White*, 484 U.S. 219 (1988) .................................................................................. 22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ................................... 78

*Fulton Cnty. Special Purpose Grand Jury v. Graham*, No. 22-12696-DD, 2022 WL 13682659
    (11th Cir. Oct. 20, 2022) (per curiam) .................................................... 26, 27, 41, 49

*Gebardi v. United States*, 287 U.S. 112 (1932) .................................................................. 83, 84

*G-Fours, Inc. v. Miele*, 496 F.2d 809 (2d Cir. 1974) ............................................................... 120

*Gov't of Virgin Islands v. Lee*, 775 F.2d 514 (3d Cir. 1985) .............................................. 26, 27

*Gravel v. United States*, 408 U.S. 606 (1972) ................................................................. *passim*

*Hamling v. United States*, 418 U.S. 87 (1974) .......................................................................... 18

*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007) ................................ 78, 79, 80

*Hemphill v. United States*, 392 F.2d 45 (8th Cir. 1968) ............................................ 160

*Holt v. United States*, 218 U.S. 245 (1910) ................................................................ 12

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) .............................................. 20, 24, 35

*In re Grand Jury (Intervenor A)*, 587 F.2d 589 (3d Cir. 1978) ............................... 27

*In re Grand Jury Investigation*, 608 F. App'x 99 (3d Cir. 2015) ......................... 30, 49

*Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30 (D.D.C. 2007) ............................ 42

*Jud. Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021) ...................................... 39

*Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) ....................... 77

*Kilbourn v. Thompson*, 103 U.S. 168 (1880) ........................................................... 21

*McCormick v. United States*, 500 U.S. 257 (1991) .................................................. 32

*McDonnell v. United States*, 579 U.S. 550 (2016) .......................................... *passim*

*McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) ................................... *passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .................................. 78

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ................... 86

*North Carolina v. Pearce*, 395 U.S. 711 (1969) .................................................. 101

*Ocasio v. United States*, 578 U.S. 282 (2016) ...................................................... 85

*Pasquantino v. United States*, 544 U.S. 349 (2005) ................................................ 54

*Payne v. District of Columbia*, 279 F.R.D. 1 (D.D.C. 2011) ..................................... 42

*Percoco v. United States*, 598 U.S. 319 (2023) ............................................... 53, 67

*Pereira v. United States*, 347 U.S. 1 (1954) ........................................................ 120

*Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964) ........................ 147, 148

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) ..................................... 48

*Richardson v. Marsh*, 481 U.S. 200 (1987) ................................................... 109, 115

*Salahuddin v. United States*, Crim. No. 10-104, 2018 WL 5342766 (D.N.J. Oct. 29, 2018) ....... 68

*Salinas v. United States*, 522 U.S. 62 (1997) ........................................................ 85

*Secs. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199 (S.D.N.Y. 2015) ........................ 25

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ........................................................... 28

*Trammel v. United States*, 445 U.S. 40 (1980) ............................................... 119, 121

*United State v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796 (S.D.N.Y. Dec. 14, 2020) ................................................................ *passim*

ii

*United States v. Abakporo*, 959 F. Supp. 2d 382 (S.D.N.Y. 2013) ............................................. 99

*United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011) 174

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) .................................................. 83

*United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ...................................... *passim*

*United States v. Aliperti*, 867 F. Supp. 142 (E.D.N.Y. 1994) ................................... 167

*United States v. Allocco*, 305 F.2d 704 (2d Cir. 1962) ................................................ 48

*United States v. Alshahhi*, No. 21 Cr. 371 (BMC), 2022 WL 2239624 (E.D.N.Y. June 22, 2022) ......................................................................... 86

*United States v. Amen*, 831 F.2d 373 (2d Cir. 1987) ........................................... 83, 84

*United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) ......................................................................... 171

*United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983).................................................. 119

*United States v. Aracri*, 968 F.2d 1512 (2d Cir. 1992)................................................ 89

*United States v. Arguedas*, No. 20 Cr. 135 (JMF), 2021 WL 5567749 (S.D.N.Y. Nov. 29, 2021) ......................................................................... 96

*United States v. Aronson*, No. 98 Cr. 564 (DAB), 1999 WL 97923 (S.D.N.Y. Feb. 24, 1999). 107

*United States v. Artates*, No. 12 Cr. 826 (SOM), 2012 WL 6597752 (D. Haw. Dec. 18, 2012) 122

*United States v. Attanasio*, 870 F.2d 809 (2d Cir. 1989).................................. 107, 108, 112. 113

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y 2021) ................................. 54

*United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2019 WL 4640232 (S.D.N.Y. Sept. 24, 2019) ......................................................................... 149, 151, 154

*United States v. Bari*, 750 F.2d 1169 (2d Cir. 1984) ........................................... 116

*United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011) ...................................... 116

*United States v. Batchelder*, 442 U.S. 114 (1979) .................................................. 105

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)........................... 131

*United States v. Beeman*, No. 01 Cr. 1141 (DAB), 2003 WL 22047871 (S.D.N.Y. Aug. 29, 2003) ......................................................................... 149, 151

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003)................................. 160

*United States v. Bellomo*, 954 F. Supp. 630 (S.D.N.Y. 1997).................................... 130

*United States v. Bennett*, 485 F. Supp. 2d 508 (S.D.N.Y. 2007) ......................... 111, 127

*United States v. Biaggi*, 675 F. Supp. 790 (S.D.N.Y. 1987)........................................... 160

*United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988)........................................ 24, 27, 40

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)........................................... 121

iii

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ............................................ 173

*United States v. Bin Laden*, 109 F. Supp. 2d 211 (S.D.N.Y. 2000) .......................................... 110

*United States v. Birdsall*, 233 U.S. 223 (1914) ........................................................... 33, 66

*United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .. 150

*United States v. Block*, No. 16 Cr. 595 (JPO), 2017 WL 1608905 (S.D.N.Y. Apr. 28, 2017) ... 159

*United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019) .................................................................................................. 132, 147. 148

*United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019) ............................................................ 124

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ................................................ 163

*United States v. Borker*, No. 10 Cr. 1266 (RJS), 2011 WL 1630344 (S.D.N.Y. Apr. 28, 2011) .............................................................................................................................. 149

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ................................. 158, 159, 162, 173

*United States v. Boruch*, 550 F. App'x 30 (2d Cir. 2013) ...................................................... 142

*United States v. Bout*, 731 F.3d 233 (2d Cir. 2013) ............................................................... 19

*United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720 (S.D.N.Y. July 11, 2011) ...... 19

*United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) ......................................................... 67

*United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995) .......................................................... 124

*United States v. Brewster*, 408 U.S. 501 (1972) ......................................................... *passim*

*United States v. Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 342352 (S.D.N.Y. Aug. 5, 2021) 168

*United States v. Broce*, 488 U.S. 563 (1989) ....................................................................... 100

*United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626 (S.D.N.Y. July 31, 2008) .................................................................................................................. 151, 152

*United States v. Bryan*, 339 U.S. 323 (1950) ....................................................................... 119

*United States v. Burke*, No. 19 Cr. 322, 2022 WL 1970189 (N.D. Ill. June 6, 2022) ................ 68

*United States v. Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004) ....................................... 174, 175

*United States v. Caglar*, No. 08 Cr. 232 (CFD), 2009 WL 2169232 (D. Ct. Jul. 20, 2009) ...... 176

*United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 703391 (S.D.N.Y. Feb. 12, 2020) .................................................................................................................. 147, 154

*United States v. Callahan*, 300 F. Supp. 519 (S.D.N.Y. 1969) ............................................. 146

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991) .............................................. 110, 123

*United States v. Carey*, 152 F. Supp. 2d 415 (S.D.N.Y. 2001) .............................................. 154

*United States v. Carroll*, 510 F.2d 507 (2d Cir. 1975) ......................................................... 136

*United States v. Carrozza*, 728 F. Supp. 266 (S.D.N.Y. 1990) .............................................. 100

*United States v. Carson*, 702 F.2d 351 (2d Cir. 1983)................................................ 110, 111, 129

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ............................................. 123, 130

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) ............................................................. 101

*United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228 (S.D.N.Y. Dec. 18, 2017) ...........................................................................................................................133, 145

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007)................................... 107, 146

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004)............................................................... 163

*United States v. Chen*, 754 F.2d 817 (9th Cir. 1985)............................................................... 119

*United States v. Chocron*, No. 20 Cr. 400 (JSR), 2021 WL 3005086 (S.D.N.Y. July 14, 2021) ...............................................................................................................................132

*United States v. Christian*, No. 12 Cr. 41 (KBF), 2012 WL 1134035 (S.D.N.Y. Apr. 2, 2012) ................................................................................................148, 149, 151, 156

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005)................................................ 174

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012)............................................................... 134

*United States v. Coriaty*, No. 99 Cr. 1251 (DAB), 2000 WL 1099920 (S.D.N.Y. Aug. 7, 2000) ...............................................................................................................................148

*United States v. Costanzo*, No. 22 Cr. 281 (JPO), 2023 WL 8451868 (S.D.N.Y. Dec. 6, 2023) ..........................................................................................................................102, 106

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)...................................... 160, 169

*United States v. Datta*, 797 F. Supp. 2d 448 (S.D.N.Y. 2011) .......................................... 152, 156

*United States v. Davis*, 689 F.3d 179 (2d Cir. 2012) ............................................................... 142

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ............................................. 86, 91, 93, 96

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ........................................................ 18

*United States v. DeKunchak*, 467 F.2d 432 (2d Cir. 1972) ....................................................... 149

*United States v. DePalma*, 461 F. Supp. 778 (S.D.N.Y. 1978) ................................................. 173

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)................................................................... 128

*United States v. Diaz*, 878 F.2d 608 (2d Cir. 1989)................................................................. 126

*United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018) ...............................................................................................................................113

*United States v. Dobson*, No. 02 Cr. 616, 2003 WL 22427984 (E.D. Pa. Aug. 18, 2003)......... 124

*United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703 (S.D.N.Y. June 26, 2018) ..........................................................................................................................103, 106

*United States v. Dupigny*, No. S1 18 Cr. 528 (JMF), 2019 WL 2327697 (S.D.N.Y. May 30, 2019) ......................................................................................................................... 132

*United States v. Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154 (S.D.N.Y. Oct. 18, 2004) ................................................................................................................. 140, 154

*United States v. Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842 (S.D.N.Y. Jan. 10, 2008)...............................................................................................131, 135

*United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) .......... 19

*United States v. Estes*, 793 F.2d 465 (2d Cir. 1986)........................................................ 118, 120

*United States v. Ezeobi*, No. 10 Cr. 669 (DLC), 2011 WL 3625662 (S.D.N.Y. Aug. 17, 2011) .......................................................................................................................129

*United States v. Ferguson*, 246 F.R.D. 107 (D. Conn. 2007) .................................................. 111

*United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003) ............................................... 107, 109, 113

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) .................................................. 121, 127

*United States v. Freeman*, 694 F. Supp. 190 (E.D. Va. 1988)......................................... 114, 122

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988)............................................ 89, 92, 100

*United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996)...................................................... 97

*United States v. Galvan*, No. 04 Cr. 00403 (LTB), 2006 WL 1659610 (D. Colo. June 8, 2006) ..........................................................................................................................122

*United States v. Ganim*, 225 F. Supp. 2d 145 (D. Conn. 2002)................................................. 167

*United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ................................................................................................... 103, 106

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)........................................ 160, 169

*United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982) ............................................................. 141

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) .......................................... 13, 18, 57, 64

*United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) .............................................................................................................. 90, 92, 96

*United States v. Griffith*, No. 20 Cr. 15 (PKC), 2020 WL 4369650 (S.D.N.Y. July 29, 2020) ............................................................................................................136, 172

*United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .................................................................................................... 135, 142, 145

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ............................................................. 126

*United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512 (S.D.N.Y. Oct. 1, 2020) ............................................................................................................... 103, 106

*United States v. Hardy*, 762 F. Supp. 1403 (D. Haw. 1991)....................................................... 98

*United States v. Harrelson*, 754 F.2d 1153 (5th Cir. 1985)..................................................... 128

*United States v. Harwood*, 998 F.2d 91 (2d Cir. 1993) .......................................................... 125

*United States v. Hawit*, No. 15 Cr. 252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ... 167

vi

*United States v. Helstoski*, 442 U.S. 477 (1979) ........................................................ 20, 24, 30, 44

*United States v. Hennings*, No. 18 Cr. 28, 2018 WL 4221575 (W.D.N.Y. Sept. 5, 2018) ......... 100

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .................................................... 161

*United States v. Hernandez*, 85 F.3d 1023 (2d Cir. 1996) ......................................................... 174

*United States v. Hicks*, 5 F.4th 270 (2d Cir. 2021) .................................................................... 106

*United States v. Hood*, 343 U.S. 148 (1952) ................................................................................ 65

*United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014) .................................................. 87

*United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018) ........................................................ 83, 84, 85

*United States v. Issa*, No. 17 Cr. 74 (CM), 2018 WL 461131 (S.D.N.Y. Jan. 9, 2018) ............. 167

*United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017) ............................. 57, 58, 69, 70

*United States v. Jimenez Recio*, 537 U.S. 270 (2003) ................................................................. 85

*United States v. Jimenez*, 824 F. Supp. 351 (S.D.N.Y. 1993) ........................... 109, 115, 160, 173

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995) ......................................................... 89, 99

*United States v. Johnson*, 383 U.S. 169 (1966) ................................................................... *passim*

*United States v. Johnson*, No. S2 10 Cr. 431 (CM), 2013 WL 150104 (S.D.N.Y. Jan. 10, 2013) ........................................................................................................... 130

*United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006) (per curiam) ............ 101, 102, 104, 105

*United States v. Juncal*, No. 97 Cr. 1162 (JFK), 1998 WL 473949 (S.D.N.Y. Aug. 7, 1998) ... 150

*United States v. Kahale*, 789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................ 166

*United States v. Kapirulja*, 314 F. App'x 337 (2d Cir. 2008) .................................................... 134

*United States v. Keleher*, 505 F. Supp. 3d 41 (D.P.R. 2020) ........................................... 33, 68, 69

*United States v. Keuylian*, 602 F.2d 1033 (2d Cir. 1979) ................................................... 153, 155

*United States v. Key*, No. 12 Cr. 712 (SHS), 2013 WL 12204221 (S.D.N.Y. Aug. 28, 2013) ... 128

*United States v. Killeen*, No. 98 Cr. 143 (AGS), 1998 WL 760237 (S.D.N.Y. Oct. 29, 1998) .... 92

*United States v. Kimbrew*, 944 F.3d 810 (9th Cir. 2019) .................................................. 57, 67, 70

*United States v. Lanier*, 520 U.S. 259 (1997) ............................................................................. 81

*United States v. Lanza*, 790 F.2d 1015 (2d Cir. 1986) ............................................................. 111

*United States v. Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411 (S.D.N.Y. Jan. 16, 2014) ........................................................................................................ 147, 157

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) ............................................................. 135

*United States v. Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995) ......................................................... 100

*United States v. Lee*, 106 U.S. 196 (1882) .................................................................................. 12

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) ............................................................. *passim*

*United States v. Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) .................................................... 160

*United States v. Levine*, 750 F. Supp. 1433 (D. Colo. 1990) ............................................. 120, 122

*United States v. Levine*, 970 F.2d 681 (10th Cir. 1992) ............................................................. 120

*United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ........ 159

*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........... 170

*United States v. Mackey*, 652 F. Supp. 3d 309 (E.D.N.Y. 2023) ............................................... 141

*United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ................................................................................................................... 158, 160, 161

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ............................................ 147

*United States v. Manafort*, 318 F. Supp. 3d 1 (D.D.C. 2018) ..................................................... 75

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ............................................. 159

*United States v. Marashi,* 913 F.2d 724 (9th Cir. 1990) ............................................................ 118

*United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) ............................................................... 158

*United States v. Margiotta*, 646 F.2d 729 (2d Cir. 1981) ............................................... 89, 96, 98

*United States v. Marlinga*, No. Cr. 04-80372, 2005 WL 513494 (E.D. Mich. Feb. 28, 2005) .... 98

*United States v. Marzano*, 160 F.3d 399 (7th Cir. 1998) .......................................................... 108

*United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021) ...................................... 102, 106

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) .......................................................... 102

*United States v. McDad*e, 28 F.3d 283 (3rd Cir. 1994) ....................................................... *passim*

*United States v. McDade*, 827 F. Supp. 1153 (E.D. Pa. 1993) .................................................... 29

*United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015) ...................................................... 117

*United States v. McDonnell*, No. 14 Cr. 12 (JRS) (E.D. Va. Apr. 17, 2014) .................... 117, 118

*United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917 (S.D.N.Y. July 7, 2014) ............................................................................................................................... 103, 106

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ................................................................. 71

*United States v. Menashe*, 741 F. Supp. 1135 (S.D.N.Y. 1990) ............................................... 113

*United States v. Menendez*, 132 F. Supp. 3d 610 (D.N.J. 2015) .......................................... *passim*

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018) ................................................ 68

*United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016) ..................................................... *passim*

*United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982) ......................................................... 144

*United States v. Michel*, No. CR 19-148-1 (CKK), 2022 WL 4182342 (D.D.C. Sept. 13, 2022) ............................................................................................................................... 87

*United States v. Mitchell*, 137 F.2d 1006 (2d Cir. 1943) ............................................................ 119

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001).......................... 160, 163, 169, 171

*United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) ....................................................................................................................................... 159

*United States v. Morelli*, No. S1 04 Cr. 391 (DAB), 2005 WL 743062 (S.D.N.Y. Mar. 29, 2005) ....................................................................................................................................... 116

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) .............................. 103, 106, 174

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)........................................................ 173, 174

*United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997) ................................................. 98

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................... 132, 172, 173

*United States v. Murphy*, 642 F.2d 699 (2d Cir. 1980) (per curiam)................................ 28, 37, 46

*United States v. Myers*, 635 F.2d 932 (2d Cir. 1990) .......................................................... *passim*

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) ....................................................... 28, 50, 54

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ............................. 164, 168, 169

*United States v. Napolitano*, 552 F. Supp. 465 (S.D.N.Y. 1982) ............................................... 173

*United States v. Naranjo*, 14 F.3d 145 (2d Cir. 1994) ............................................................... 133

*United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988)........................................... 108, 112, 130

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019).................................................. 54, 55

*United States v. Ng*, No. 15 Cr. 706 (VSB) (S.D.N.Y. Apr. 26, 2017).................................... 167

*United States v. Oaks*, 302 F. Supp. 3d 716 (D. Md. 2018)........................................................ 34

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) .............................................. *passim*

*United States v. Page*, 657 F.3d 126 (2d Cir. 2011) .................................................. 110, 111, 127

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) .............................................................. 111

*United States v. Parrilla*, No. 13 Cr. 360 (AJN), 2014 WL 1621487 (S.D.N.Y. Apr. 22, 2014) ....................................................................................................................................... 153

*United States v. Pastore*, No. 17 Cr. 343 (NSR), 2018 WL 395490 (S.D.N.Y. Jan. 11, 2018) . 156

*United States v. Pawlowski*, 351 F. Supp. 3d 840 (E.D. Pa. 2018) ............................................ 68

*United States v. Payne*, 591 F.3d 46 (2d Cir. 2010) ............................................................ *passim*

*United States v. Pena*, 932 F. Supp. 2d 464 (S.D.N.Y. 2013) ................................................... 130

*United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ....................................................................................................................... 89, 92, 156, 157

*United States v. Percoco*, No. 16 Cr. 776 (VEC), 2019 WL 493962 (S.D.N.Y. Sept. 8, 2019)....... ................................................................................................................................ 66, 67, 69

ix

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ........................................ 19

*United States v. Peterson*, 357 F. Supp. 2d 748 (S.D.N.Y. 2005) ......................... 131

*United States v. Pilnick*, 267 F. Supp. 791 (S.D.N.Y. 1967) ............................... 152

*United States v. Pirro*, 76 F. Supp. 2d 478 (S.D.N.Y. 1999) ............................... 110

*United States v. Polakoff*, 121 F.2d 333 (2d Cir. 1941) ...................................... 54

*United States v. Posner*, 549 F. Supp. 475 (S.D.N.Y. 1982) ........................ 146, 148

*United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*, 71 F.3d 1067 (2d Cir. 1995) .................................................................................. 119, 120

*United States v. Prevezon Holdings*, 251 F. Supp. 3d 684 (S.D.N.Y. 2017) ............ 144

*United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005) ......................... 147, 148

*United States v. Rabinowich*, 238 U.S. 78 (1915) ............................................. 85

*United States v. Rajaratnam*, 736 F. Supp. 2d 683 (S.D.N.Y. 2010) ...................... 89

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ..................................... 133

*United States v. Ramirez-Amaya*, 812 F.2d 813 (2d Cir. 1987) ............................ 133

*United States v. Ramos*, 346 F. Supp. 2d 567 (S.D.N.Y. 2004) ..................... 111, 129

*United States v. Raniere*, 384 F. Supp. 3d 282 (E.D.N.Y. 2019) .......................... 86

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ......................................... 105

*United States v. Reed*, 773 F.2d 477 (2d Cir. 1985) ......................................... 133

*United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011) ............................... *passim*

*United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014) ................................. 22, 41

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ...................................... 18

*United States v. Richardson*, 418 U.S. 166 (1974) ........................................... 80

*United States v. Rigas*, 281 F. Supp. 2d 660 (S.D.N.Y. 2003) ....................... 90, 99

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ........................................ 18

*United States v. Riley*, 296 F.R.D. 272 (S.D.N.Y. 2014) ................................... 154

*United States v. Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014) ......... 132

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ................. 160, 171

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008) .................. 108, 110, 112, 113

*United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011) .. 103

*United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ................................................................................................. 171

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ...................................... 134

x

*United States v. Rooney*, 866 F.2d 28 (2d Cir. 1989) ............................................................ 90, 95

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ........................................................ 111, 126

*United States v. Rose*, 28 F.3d 181 (D.C. Cir. 1994) ................................................................ 77

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) .............................................................. 86

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) ...................................... *passim*

*United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978) .......................................................... 110

*United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ............................................. *passim*

*United States v. Rutkoske*, 394 F. Supp. 2d 641 (S.D.N.Y. 2005) ................................. 156, 172

*United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157 (S.D.N.Y. Dec. 10, 2021) ................................................................................................................ ...103, 106

*United States v. Saavedra*, 223 F.3d 85 (2d Cir. 2000) ........................................................ 134

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ........................................... 110, 112, 129

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004) ....................................................... 114

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018) ........................................................ 13

*United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ................................................................................................................... 161, 165

*United States v. Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001) ......................................... 111

*United States v. Sarshar*, No. 21 Cr. 202 (GHW) (S.D.N.Y. Aug 13, 2021) ........................ 100

*United States v. Sasso*, 78 F.R.D. 292 (S.D.N.Y. 1977) ................................................. 114, 122

*United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ....... 168

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) ................................................ 173, 174, 175

*United States v. Schlapman*, 968 F.2d 22 (10th Cir. 1992) .................................................. 120

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ............................................................ 108

*United States v. Shepard*, 500 F. App'x 20 (2d Cir. 2012) .................................................... 142

*United States v. Siddiqi*, No. 06 Cr. 377 (SWK), 2007 WL 549420, (S.D.N.Y. Feb. 21, 2007) ................................................................................................................................ ..166

*United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) ....................................................... 32, 74

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ..................................................... *passim*

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) .................................................. 67, 69

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ................................................................................................................................. .132

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................... 173, 174, 175

*United States v. Sneed,* No. 19 Cr. 580-B, 2022 WL 35801 (N.D. Tex. Jan. 4, 2022) .............. 122

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) .................................................. 111, 126, 129

*United States v. Spy Factory, Inc.*, 951 F. Supp. 450 (S.D.N.Y. 1997)..................... 147, 148, 150

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ............................ 99, 131, 150, 151

*United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990) ................................................ 153, 155

*United States v. Stokes*, 726 F.3d 880 (7th Cir. 2013) .................................................................... 87

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................................. 18

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001)................................................................ 88

*United States v. Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998). *passim*

*United States v. Taggart*, No. 07 Cr. 142 (JLH), 2008 WL 2705109 (E.D. Ark. July 8, 2008)
................................................................................................................................ ..114, 116

*United States v. Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) ..................................... 133, 134, 144, 146

*United States v. Thomas*, No. 06 Cr. 365 (DLC), 2006 WL 2283772 (S.D.N.Y. Aug. 9, 2006)
.............................................................................................................................................151

*United States v. Tom*, 787 F.2d 65 (2d Cir. 1986) ......................................................................... 29

*United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 2064978 (S.D.N.Y. June 6, 2012)
.............................................................................................................................................138

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990)........................................................... *passim*

*United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023)
.............................................................................................................................................136

*United States v. Travers*, 233 F.3d 1327 (11th Cir. 2000)......................................................... 116

*United States v. Travers*, No. 96 Cr. 477, 1998 WL 36030672 (S.D. Fla. July 16, 1998) ......... 116

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)........................................... 159, 171

*United States v. Tucker*, No. 16 Cr. 91 (PKC), 2017 WL 3610587 (S.D.N.Y. Mar. 1, 2017) ... 132

*United States v. Turoff*, 652 F. Supp. 707 (E.D.NY. 1987) ........................................................ 176

*United States v. Turoff*, 853 F.2d 1037 (2d Cir. 1988) .............................................. 107, 108, 110

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989)................................................................. 89

*United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................ 165, 166

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011)........................................................... *passim*

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014).................................................. 99

*United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013)
.............................................................................................................................................132

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ....................................................... 18, 88, 144

*United States v. Villegas*, 899 F.2d 1324 (2d Cir. 1990) ......................................................... 123

xii

*United States v. Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999) ...................................................... 123

*United States v. Walker*, 142 F.3d 103 (2d Cir. 1998) ................................................................ 110

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ........................................................... 158, 163

*United States v. Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) ............................................................................................................................. ..163, 171

*United States v. Werner*, 620 F.2d 922 (2d Cir. 1980) ...................................................... 114, 125

*United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ....... 144

*United States v. Williams*, No. 16 Cr. 03 (TCB), 2017 WL 1030804 (N.D. Ga. Mar. 16, 2017). 34

*United States v. Wilson*, 503 U.S. 329 (1992) ............................................................................. 61

*United States v. Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001) .........
.......................................................................................................................... 149, 152, 153

*United States v. Zackson*, 6 F.3d 911 (2d Cir. 1993) ................................................................. 110

*United States v. Zafiro*, 945 F.2d 881 (7th Cir. 1991) ......................................................... 109, 115

*United States. v. Percoco*, 13 F.4th 180 (2d Cir. 2021) ...................................................... *passim*

*Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984) ................................................................. *passim*

*Wolfe v. United States*, 291 U.S. 7 (1934) ...................................................................... 118, 119

*Zafiro v. United States*, 506 U.S. 534 (1993) .................................................................... *passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ...................................................... 59, 81

## **Statutes**

18 U.S.C. § 1343 .......................................................................................................................... 104

18 U.S.C. § 1346 .......................................................................................................................... 104

18 U.S.C. § 1349 ..................................................................................................................... 1, 104

18 U.S.C. § 1951 .............................................................................................................................. 2

18 U.S.C. § 2 ................................................................................................................................... 84

18 U.S.C. § 201 ..................................................................................................................... *passim*

18 U.S.C. § 219 ..................................................................................................................... *passim*

18 U.S.C. § 3237(a) ..................................................................................................................... 133

18 U.S.C. § 3500 ............................................................................................................................ 64

18 U.S.C. § 371 ..................................................................................................................... *passim*

18 U.S.C. § 951 ...................................................................................................................... 85, 86

22 U.S.C. § 611 .............................................................................................................................. 88

22 U.S.C. § 612 .............................................................................................................................. 88

22 U.S.C. § 613 ...................................................................................................... 88

22 U.S.C. § 615 ...................................................................................................... 88

22 U.S.C. § 618 ................................................................................................. 75, 87

26 U.S.C. § 7206 .................................................................................................... 85

**Other Authorities**

Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 Harv. J. L. & Pub Pol'y 103 (2005) ................................... 47

David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491 (1992) .................................................................. 48

Jay Rothrock, *Striking a Balance: The Speech or Debate Clause's Testimonial Privilege and Policing Government Corruption*, 24 Touro L. Rev. 739 (2008) ............................... 21

Jean Galbraith, *Prospective Advice and Consent*, 37 Yale J. Int'l L. 247 (2012) ...................... 47

Select Comm. on Ethics, U.S. Senate, *Senate Ethics Manual* (2003) ................................... 52, 77

U.S Dep't of Justice, *National Security Unit, Foreign Agents Registration Act, Browse/Search Filings* ............................................................................................. 175

*Understanding the Speech or Debate Clause,* Congressional Research Service, Dec. 1, 2017 ... 20

United States Senate, *Lobbying Disclosure, Search Registrations* ........................................... 175

**Rules**

Fed. R. Crim. P. 21(b) ........................................................................................ 146, 147

Fed. R. Crim. P. 29 ................................................................................................ 19

Fed. R. Crim. P. 7(c)(1) .......................................................................................... 18

Fed. R. Crim. P. 7(d) ............................................................................................ 173

Fed. R. Evid. 404(b) ............................................................................................. 174

**Constitutional Provisions**

U.S. Const., art. I, § 5, cl. 2 ...................................................................................... 79

U.S. Const., art. I, § 8, cl. 1 ...................................................................................... 47

U.S. Const., art. II, § 2, cl. 2 ..................................................................................... 46

The Government respectfully submits this memorandum of law in opposition to (i) Robert Menendez's first motion to dismiss the Second Superseding Indictment (the "Indictment"); (ii) Menendez's second motion to dismiss the Indictment and for a severance and a bill of particulars; (iii) Nadine Menendez's motion for a severance, (iv) Wael Hana's motion to dismiss the Indictment, strike alleged surplusage from it, and for a bill of particulars, and (v) Fred Daibes's motion to dismiss the Indictment and for a severance.[1]   For the reasons set forth below, these motions should be denied.

## BACKGROUND

### A.   Procedural Background

On or about January 2, 2024, a grand jury in the Southern District of New York returned a four-count Superseding Indictment, No. S2 23 Cr. 490 (SHS) (the "Indictment"), charging defendants Robert Menendez, Nadine Menendez, a/k/a "Nadine Arslanian," Wael Hana, a/k/a "Will Hana," Jose Uribe, and Fred Daibes.[2]   Count One charges all five defendants with participating in a conspiracy to bribe Menendez, the senior United States Senator from New Jersey, between approximately 2018 and 2023, in violation of 18 U.S.C. § 371.   Count Two charges all five defendants with honest services wire fraud conspiracy during the same timeframe, in violation of 18 U.S.C. § 1349.   Count Three charges Menendez and Nadine Menendez with conspiracy to

---

[1] Citations to "Dkt." refer to docket entries in this case.   Citations to "Menendez First Mot." refer to the memorandum of law in support of Menendez's first motion (Dkt. 120); citations to "Menendez Second Mot." refer to the memorandum of law in support of Menendez's second motion (Dkt. 137); citations to "N. Menendez Mot." refer to the memorandum of law in support of Nadine Menendez's motion (Dkt. 132); citations to "Hana Mot." refer to the memorandum of law in support of Hana's motion (Dkt. 143); and citations to "Daibes Mot." refer to the memorandum of law in support of Daibes's motion (Dkt. 130).

[2] For clarity, the Indictment and this brief refers to Robert Menendez as "Menendez" and to Nadine Menendez by her first and last name.

commit extortion under color of official right during the same timeframe, in violation of 18 U.S.C. § 1951.  Count Four charges Menendez, Nadine Menendez, and Hana with conspiracy for a public official to act as a foreign agent, between approximately 2018 and 2022, in violation of 18 U.S.C. § 371.  Trial is scheduled to commence on May 6, 2024.

### B.    Overview of the Charged Scheme

The Indictment charges that from in or about 2018 through in or about 2023, Menendez agreed to take hundreds of thousands of dollars in bribes paid to him and his wife Nadine Menendez by Hana, Uribe, and Daibes, three New Jersey businessmen, in exchange for Menendez using his power and influence to seek to protect and enrich them, as well as to benefit the governments of Egypt and Qatar.  (Indictment ¶ 1.)  Over the course of their corrupt relationship, Menendez and Nadine Menendez accepted bribes from Hana, Uribe, and Daibes in the form of cash, gold, payments toward a home mortgage, compensation for a low-or-no-show job, and a luxury Mercedes-Benz convertible, among other things of value.  (Indictment ¶ 1; *see also, e.g.*, *id.* ¶¶ 4, 32-34, 37(c), 37(e), 38, 43(d)-(f), 44(h), 51, 53(a), 53(d), 53(h), 63-66.)

As part of the corrupt scheme, Menendez agreed to take, promised to take, took, and/or received payments knowing he was expected to take a one or more actions in exchange.  The Indictment alleges that those agreements, promises, and actions included, among other things:

- Promising and agreeing that Menendez would use his official position to facilitate billions of dollars in U.S. military aid to Egypt (*see, e.g.*, Indictment ¶¶ 2, 16-21, 28, 35, 37(g));

- Providing and agreeing to provide the Government of Egypt with sensitive and non-public U.S. government information and other forms of surreptitious assistance (*see, e.g.*, *id.* ¶¶ 2-3, 19(b)-(d), 21, 28, 36, 37);

- Agreeing and attempting to pressure the U.S. Department of Agriculture ("USDA") to acquiesce to a lucrative business monopoly the Government of Egypt granted to Hana during the course of the scheme, and that Hana went on to use to pay bribes to Menendez and Nadine Menendez (*see, e.g.*, *id.* ¶¶ 2, 22-34);

2

- Agreeing and attempting to disrupt a criminal prosecution and related criminal investigation being supervised by the New Jersey Attorney General's Office (*see, e.g.*, *id.* ¶¶ 2, 39-44);

- Agreeing and attempting to disrupt the federal prosecution of Daibes in the District of New Jersey, both before and after the confirmation of a new U.S. Attorney (*see, e.g.*, *id.* ¶¶ 2, 45-54); and

- Receiving bribes knowing that Daibes expected him in exchange to take actions that would assist Daibes by benefitting the Government of Qatar, including to advance a Senate resolution related to Qatar (*see, e.g.*, *id.* ¶¶ 2, 55-67).

As alleged in the Indictment, these acts were taken, promised, agreed upon, and requested, and payment was solicited, made, and received, beginning in or about 2018 and continuing into 2023.

### C.    Actions Related to Egypt

   1.    *Menendez's Offers of Assistance to Egypt in Exchange for Hana's Promises of Payment*

As alleged, the scheme began in early 2018 when Menendez, Nadine Menendez (then his new romantic partner, whom he married in late 2020), and Hana (a friend of Nadine Menendez with ties to the Egyptian government) agreed that Menendez would perform actions for the benefit of the Egyptian government in exchange for promises that Hana would pay Nadine Menendez through a low-or-no-show job.

As part of the scheme, Menendez promised to use his influence to facilitate the State Department's annual provision of billions of dollars of military aid to Egypt. As alleged, the State Department played a central role in the United States' provision of two forms of military aid— foreign military financing ("FMF") and foreign military sales ("FMS")—and would as a matter of longstanding voluntary practice honor "holds" placed by the Chairman or Ranking Member of the Senate Foreign Relations Committee ("SFRC"), meaning that it would generally not transfer FMF grant money to Egypt's bank account or proceed with an FMS if the Chairman or Ranking Member was maintaining a hold on such a transfer or sale. As a result, Menendez, who was the Ranking

Member or the Chairman of the SFRC during the entire relevant time period, had substantial influence over the State Department's execution of FMF and FMS to Egypt.  (Indictment ¶ 17.)

The Indictment alleges that shortly after Menendez and Nadine Menendez began dating in early 2018, Hana and Nadine Menendez arranged a series of meetings and dinners with Menendez at which Egyptian officials made requests related to FMS and FMF.  In exchange for Menendez and Nadine Menendez's promise that Menendez would, among other things, facilitate the FMS and FMF to Egypt, Hana promised to put Nadine Menendez on the payroll of his company in a low-or-no-show job.  (Indictment ¶ 19.)

Shortly following one of the meetings Hana and Nadine Menendez arranged, Menendez represented that he would clear, that is, not hold, an FMS to Egypt.  In July 2018—the day after meeting with an Egyptian government official identified in the Indictment as "Egyptian Official-1" at a meeting scheduled and attended by Hana and Nadine Menendez—Menendez texted Nadine Menendez that she should tell Hana that he planned to approve a $99 million FMS of tank ammunition.  (Indictment ¶ 20.)

In addition to the promise of assistance with military aid, Menendez agreed to and did furnish the Government of Egypt with various forms of surreptitious assistance during this time period as well.  This assistance included providing, through Nadine Menendez and then Hana, sensitive non-public information, which presented an operational security risk, about the numbers and nationality of personnel at the American Embassy in Cairo (Indictment ¶ 19(b)); providing, through Hana, non-public information about the lifting of a ban on certain weapons sales (*id.* ¶ 19(c)); and ghost-writing a letter on behalf of Egypt seeking to convince other Senators to lift a hold on U.S. aid to Egypt (*id.* ¶ 19(d)).

2.    *Menendez's Actions to Protect the IS EG Halal Bribe Revenue Stream*

Despite Menendez's promises and actions on behalf of Egypt in 2018, Hana did not, at the time, have substantial business income and did not deliver on his promises to provide Nadine Menendez a paycheck, causing Nadine Menendez to complain.  (Indictment ¶¶ 22-23.)  In the spring of 2019, however, the Government of Egypt granted Hana's company IS EG Halal Certified, Inc. ("IS EG Halal") a lucrative monopoly on halal certification for U.S. food exports to Egypt despite his and his company's lack of experience with halal certification.  (*Id.* ¶ 24.)

The USDA, responding to the increased costs and market disruption caused by the monopoly, intervened to attempt to undo the Government of Egypt's grant of the monopoly to IS EG Halal.  Multiple USDA officials contacted the Government of Egypt objecting to and seeking reconsideration of the grant of monopoly rights, and the USDA prepared a public report regarding the likely market disruption caused by the monopoly.  (Indictment ¶ 27.)

At Hana's request, Menendez intervened to attempt to advise and pressure a senior USDA official to change course and acquiesce to the monopoly.  After a May 21, 2019 meeting and dinner between Menendez, Nadine Menendez, Hana, and an Egyptian government official referred to in the Indictment as "Egyptian Official-3," Menendez called a senior USDA official (referred to in the Indictment as "Official-1") and demanded that the USDA stop opposing IS EG Halal's monopoly.  (Indictment ¶¶ 27-30.)  Although Official-1 did not acquiesce to Menendez's demand, IS EG Halal kept its monopoly.

After IS EG Halal began generating substantial monopoly proceeds, Hana—with the assistance of Uribe and Daibes—began making the promised bribe payments.  In or about July 2019, Hana caused IS EG Halal to pay over $23,000 to the company that held the mortgage on Nadine Menendez's house.  (Indictment ¶ 32.)  Daibes (a financial backer of IS EG Halal (*id.*

5

¶ 22)) and Uribe (who was seeking acts from Menendez related to two criminal matters being supervised by the New Jersey Attorney General's Office and thus benefited from preserving the corrupt relationship (*id.* ¶¶ 40, 42-44)) both participated in the discussions leading up to this mortgage company payment.  (Indictment ¶ 32.)

In addition to the July 2019 payments to the mortgage company, Hana, from approximately August to November 2019, caused IS EG Halal to issue a series of three $10,000 checks to a purported consulting company owned by Nadine Menendez.  (Indictment ¶¶ 33-34.)  Menendez assisted Nadine Menendez in setting up this supposed consulting company, which was used to receive bribe payments.  (*Id.* ¶ 26.)  Daibes personally delivered one of the checks to Menendez (*id.* ¶ 33), and on two occasions in September 2019, Nadine Menendez contacted Daibes to complain that Hana was delinquent on these payments (*id.* ¶¶ 33-34).

3.    *Menendez's Continued Promises and Actions for the Benefit of Egypt in Exchange for Additional Things of Value*

After receiving the promised bribe payments from IS EG Halal, Menendez continued to perform or promise to perform a series of acts for the benefit of Egypt and Hana, and continued to receive payment from Hana.

Menendez's promises included further promises that he would clear or would not impose holds on FMS or FMF to Egypt.  For example, in early September 2019, Menendez communicated to Hana, through Daibes, that he was not maintaining a hold on $1 billion in FMF to Egypt (Indictment ¶ 35), and in January 2022, Menendez sent Nadine Menendez a link to news reporting on two FMS worth $2.5 billion, which Nadine Menendez forwarded to Hana, writing, "Bob had to sign off on this" (*id.* ¶ 37(g)).

Menendez also continued to perform or promise to perform other sorts of acts for the benefit of Egypt or Hana, such as offering assistance to Egypt and Hana generally (*id.* ¶¶ 36, 37(a)),

writing a letter to the then-Secretaries of State and the Treasury regarding negotiations between Egypt and other countries concerning a dam on the Nile River (*id.* ¶ 37(a)), and briefing a senior Egyptian intelligence official regarding an issue other Senators planned to ask that official about at an upcoming meeting so that the official could prepare his "rebuttals" (*id.* ¶ 37(d)).

As Menendez continued to act and promise to act for the benefit of Egypt and Hana, he and Nadine Menendez continued to receive additional bribe payments from Hana, including home furnishings and one-ounce gold bars.  (Indictment ¶ 37(e).)

### D.   Actions Related to the New Jersey Attorney General's Office Criminal Matters

During the same time period in which he was acting and promising to act on behalf of Egypt and Hana in exchange for Hana's as-yet-unfulfilled promises of bribe payments, Menendez promised and attempted to disrupt two criminal matters supervised by the New Jersey Attorney General's Office for the benefit of business associates of Uribe.  Menendez and Nadine Menendez promised and attempted to do so in exchange for, among other things, promises of a luxury Mercedes-Benz convertible for Nadine Menendez (the "Mercedes-Benz Convertible") by Hana and Uribe, and for Uribe's eventual provision of the funds for the down payment and periodic payments on the Mercedes-Benz Convertible.  (Indictment ¶¶ 39-44.)

Beginning in or about January 2019—*i.e.*, during the time period in which Hana had not yet made good on his promises of paychecks to Nadine Menendez (Indictment ¶ 22)—Menendez agreed and promised to intervene with a senior prosecutor (referred to in the Indictment as "Official-2") supervising the criminal insurance fraud prosecution of an individual (referred to in the Indictment as the "New Jersey Defendant") who was an insurance client of Uribe, in exchange for promises from Hana of the Mercedes-Benz Convertible for Nadine Menendez.  (*Id.* ¶¶ 40, 42.) After being briefed on the prosecution by Hana (through Nadine Menendez), Menendez called

Official-2 and spoke with him in an attempt, through advice and pressure, to cause a favorable resolution of the prosecution.  (*Id.* ¶ 42(b).)  Following Menendez's contact with Official-2, Uribe provided Nadine Menendez with funds for the Mercedes-Benz Convertible.  (*Id.* ¶¶ 43-44.)

In addition to his January 2019 outreach on behalf of the New Jersey Defendant, Menendez also promised and attempted to intervene with Official-2 to disrupt a related investigation that sought evidence from an individual (referred to in the Indictment as the "New Jersey Investigative Subject") who was an employee of Uribe's insurance business.  (Indictment ¶¶ 32, 44(a).)  After Uribe requested his intervention, Menendez had an in-person meeting with Official-2 in September 2019 and attempted, through advice and pressure, to cause Official-2 to favorably resolve the investigation.  (*Id.* ¶ 44.)

### E.    Actions Related to Daibes's Federal Prosecution and Qatar

During the same period in which Daibes was financially backing IS EG Halal and facilitating Hana's bribe payments from IS EG Halal to Menendez and Nadine Menendez, Daibes was facing pending federal criminal charges in the District of New Jersey.  During the pendency of that case, Menendez promised and attempted to take actions seeking to disrupt that prosecution both before and after the nomination and installation of a new U.S. Attorney for the District of New Jersey, in exchange for cash, gold bars, and a recliner from Daibes.  (Indictment ¶¶ 45-46.)  At the same time, Daibes was seeking financing from an investment company with ties to the Government of Qatar (referred to in the Indictment as the "Qatari Investment Company"), and when Menendez accepted certain of the cash and gold bars from Daibes, he knew Daibes also expected him in exchange to, among other things, advance a Senate resolution supportive of Qatar. (*Id.* ¶¶ 45, 55.)

1.     *Menendez's Agreement and Attempt to Disrupt Daibes's Federal Prosecution*

In or about October 2018, Daibes was charged by the U.S. Attorney's Office for the District of New Jersey with offenses arising from a bank loan scheme.  (Indictment ¶ 9.)  Menendez, as the senior U.S. Senator from New Jersey, had the ability to recommend that a particular individual be nominated to serve as U.S. Attorney for the District of New Jersey.  (*Id.* ¶ 5.)  After the 2020 election, Menendez sought to use that ability to recommend that the President nominate a candidate who Menendez believed could be influenced by Menendez regarding Daibes's case.  (*Id.* ¶ 46.)

In or about December 2020, Menendez met with a potential candidate for U.S. Attorney (referred to in the Indictment as the "Candidate") and, among other things, complained about the Daibes prosecution—the only individual case Menendez raised—and said that he hoped that the Candidate would "look into" the case if the Candidate became U.S. Attorney.  (Indictment ¶ 47.) After learning that the Candidate might have to recuse from the Daibes prosecution due to an unrelated conflict, however, Menendez informed the Candidate that he would be recommending a different individual for the position.  (*Id.*)

In 2021, after the publication of news reports critical of the other individual recommended for U.S. Attorney, Menendez had an outside political advisor of his (referred to in the Indictment as the "Advisor") speak to the Candidate about the position.  (Indictment ¶ 49.)  After being informed by the Advisor that the Advisor believed the Candidate would in fact likely *not* have to recuse from the Daibes prosecution, Menendez recommended to the White House that the Candidate be nominated for U.S. Attorney.  (*Id.* ¶¶ 49-50.)

Following the Candidate's confirmation as U.S. Attorney (referred to in the Indictment as "Official-3" following the confirmation) in or about December 2021, Menendez attempted to disrupt Daibes's prosecution by, among other things, seeking to have the Advisor cause the new

9

U.S. Attorney to breach his recusal.  (Indictment ¶¶ 53(f)-(g).)  During this time period, Daibes remarked to Nadine Menendez that Menendez was "amazing in all he did" (*id.* ¶ 53(a)), furnished Menendez with a recliner (*id.*), and delivered to Nadine Menendez a thing of value causing her to remark "Christmas in January," several days before Menendez performed a search for the price of a kilogram of gold (*id.* ¶ 53(d)).  Through the course of the scheme, Daibes caused Menendez and Nadine Menendez to be provided with, among other things, at least four one-kilogram bars of gold (*id.* ¶¶ 53(h), 65)—two of which Nadine Menendez caused to be sold in Manhattan the day after a March 30, 2022 meeting with Daibes (*id.* ¶ 53(h))—and approximately ten envelopes of cash, with tens of thousands of dollars (*id.* ¶ 65).

2.   *Menendez's Acceptance of Cash and Gold Bars Knowing that Daibes Expected Him in Exchange to Assist Daibes by Benefiting the Government of Qatar*

When he received some of these things of value from Daibes, Menendez knew that Daibes expected him in exchange not only to attempt to disrupt Daibes's federal prosecution, but also to take actions to benefit the Government of Qatar (which actions would have the effect of assisting Daibes, who was seeking a multimillion-dollar investment from the Qatari Investment Company).

Menendez introduced Daibes to the Qatari Investment Company in mid-2021, during a time period in which IS EG Halal was continuing to pay him bribes (*see, e.g.*, Indictment ¶¶ 37(c), (e)) and in which Daibes was still under federal indictment and seeking to move forward on a real estate project in New Jersey. (*Id.* ¶ 56.)  After the introduction, while the Qatari Investment Company was considering a multimillion-dollar investment in Daibes's project, Menendez made public statements supportive of the Government of Qatar, sent Daibes advance drafts of those statements so that Daibes could share them with persons associated with the Qatari Investment

Company, and attended with Daibes a private event in Manhattan hosted by the Qatari government. (*Id.* ¶¶ 57-58.)

In the fall of 2021, Daibes offered Menendez bribes and requested Menendez's assistance with a Senate resolution supportive of Qatar.  On or about September 29, 2021, days after sending Menendez pictures of luxury wristwatches, Daibes sent Menendez a link to a Congressional website stating that a resolution supportive of Qatar had just been introduced and referred to the SFRC, of which Menendez was Chairman.  (Indictment ¶ 58.)  Several weeks later, Daibes sent his driver to pick up Menendez and Nadine Menendez at JFK International Airport upon their return from a congressional delegation to Qatar and Egypt, and the next day Menendez performed a web search for "how much is one kilo of gold worth."  (*Id.* ¶¶ 51, 59.)  Several weeks after that, Daibes again sent Menendez an update on the proposed Senate resolution.  (*Id.* ¶ 60.)

Menendez continued to receive bribes from Daibes while the Qatari Investment Company was considering, and preparing to make, an investment in Daibes's project.  (Indictment ¶¶ 61-66.)  For example, the delivery causing Nadine Menendez to remark "Christmas in January" was provided days after a meeting between Daibes and the principal of the Qatari Investment Company. (*Id.* ¶ 61.)  Similarly, the March 30, 2022 meeting between Nadine Menendez and Daibes and the subsequent sale by Nadine Menendez of two kilogram gold bars was the same day that Menendez and Daibes met with Qatari individuals for a lengthy dinner.  (*Id.* ¶ 62.)  And in late May 2022, days after the Qatari Investment Company signed a letter of intent to make a multimillion-dollar investment with Daibes, Daibes met with Menendez, who then again performed a Google search for the price of a kilogram gold bar.  (*Id.* ¶ 64.)  Additionally, the Qatari Investment Company twice provided tickets for a relative of Nadine Menendez to attend a Formula One race, most recently in May 2023.  (*Id.* ¶¶ 63, 66.)

### F.      Attempts to Cover Up Bribe Payments

The Indictment also alleges that in December 2022, Menendez and Nadine Menendez attempted to cover up the bribery scheme by repaying Hana and Uribe certain of the bribe payments they had received, and in so doing wrote checks falsely describing these bribe payments as loans.  (Indictment ¶¶ 68-70.)  Additionally, on his required annual Senate financial disclosure forms, Menendez never disclosed, among other things, the receipt of any payments towards the Mercedes-Benz Convertible for the benefit of him or Nadine Menendez, the receipt of any cash or gold bars by him or Nadine Menendez, or the Miami Grand Prix tickets for Nadine Menendez's relative in any relevant calendar year.  (*Id.* ¶ 67.)

### DISCUSSION

### I.   THE DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE BRIBERY AND EXTORTION CHARGES AGAINST THEM

Two foundational legal principles govern—and compel rejection of—the defendants' principal motions to dismiss the bribery and extortion charges against them.

*First*, a defendant cannot avoid a public trial in which a lay jury of fellow citizens will fairly and fully evaluate his or her guilt under the law by asserting that an indictment's factual allegations or charges are false, mistaken, or taken out of context.  *See, e.g.*, *Holt v. United States*, 218 U.S. 245, 247-48 (1910).  In short, an indictment, "if valid on its face, is enough to call for trial of the charge on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).

*Second*, "every man who by accepting office participates in [the law's] functions is only the more strongly bound to submit to [its] supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."  *United States v. Lee*, 106 U.S. 196, 220 (1882).  In short, "legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons."  *Gravel v. United States*, 408 U.S. 606, 615 (1972).

12

"Members of Congress" are not "super-citizens, immune from criminal responsibility." *United States v. Brewster*, 408 U.S. 501, 516 (1972) (upholding prosecution of a U.S. Senator).

In his first motion to dismiss, defendant Robert Menendez does not openly dispute these legal principles. However, his brief is replete with factual assertions, including that the allegations against him are "false" (Menendez First Mot. 1, 7, 8, 9, 10, 11, 32); that they are "ludicrous" (*id.* 3); that they are "distorted" (*id.*); that they are "hollow" (*id.* 4); that they are "misleading" (*id.* 7); that they are "entirely inaccurate" (*id.* 18); that they contain "shocking[]" omissions (*id.* 5, 10); that "in truth" or in "fact" what occurred is different (*id.* 11, 27, 28, 31); and that, in "reality" (*id.* 1, 3), these "insinuations" (*id.* 7) are "frivolous" (*id.* 7, 9), "ridiculous[]" (*id.* 8), "absurd" (*id.* 28), "risible" (*id.* 36), "and "libels" (*id.* 41).

None of these factual assertions—or hyperbolic characterizations of what the grand jury found in returning a detailed, 50-page Indictment—is correct, as the Government expects to demonstrate amply at trial. None is proper in a legal memorandum on a motion to dismiss. None is a cognizable basis for a defendant to avoid a jury trial. And none can or should be considered by this Court. Just the opposite—every allegation of the Indictment must, at this time, be taken as *true.* *See, e.g.*, *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir.), *cert. denied*, 472 U.S. 1009 (1985). "Contrary assertions of fact by the defendant will not be considered." *Goldberg*, 756 F.2d at 950. Much of Menendez's brief is irreconcilable with this fundamental rule, which applies to all defendants, no matter their position or rhetorical choices, and ensures "the inviolable function of the jury in our criminal justice system." *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018) (internal quotation marks omitted).

Menendez's actual legal claims (joined in by co-defendants Nadine Menendez, Wael Hana, and Fred Daibes), to the extent they are not premature, fail for substantially the same reasons, as do the similar claims of Hana and Daibes.  Even if these claims rested on full and correct statements of the law—and they do not—they could only result in dismissal if the Court were to disregard the Indictment's allegations, construe them in the defendants' favor, or look beyond the Indictment to supposed, contestable, and contested facts.

As to Menendez, these "sweeping claims" would also "render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office." *Brewster*, 408 U.S. at 520.  According to Menendez, not one of the many acts, over multiple years, with respect to multiple people, multiple agencies, and multiple governments, that he is alleged to have promised or agreed to take (and/or in fact taken), in exchange for bribes can be prosecuted at all, under any federal statute, much less weighed by a jury.  This is so, he asserts, because every aspect of his charged conduct, and the evidence thereof, purportedly is either (1) categorically immune under the Speech or Debate Clause of the Constitution or (2) categorically un-prosecutable under the Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016), which defined an "official act."  These two propositions, he asserts, create a so-called "legal Scylla and Charybdis," and to the extent the Indictment survives one, it necessarily, conclusively, and permanently founders on the other. (Menendez First Mot. 13.)  In short, if Menendez were correct, he "would be in the enviable position of 'heads-I-win tails-you-lose.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 318 (1985) (internal quotation marks omitted).

It is not so.  The law does not place Menendez, or any other criminal defendant, in such a position.  "The Speech or Debate Clause does not prohibit inquiry into illegal conduct simply

14

because it has some nexus to legislative functions." *Brewster*, 408 U.S. at 528; *see also, e.g.*, *id.* at 526 ("Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act."). Indeed, Menendez's Speech or Debate claims are substantially similar to those he pressed in his prior federal criminal case, which were uniformly and thoroughly rejected, both in the district court and on appeal. *See United States v. Menendez*, 132 F. Supp. 3d 610 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016), *cert. denied*, 580 U.S. 1198 (2017). Menendez does not cite these decisions in his brief.

Nor does *McDonnell* entitle Menendez, or any other defendant, to avoid a jury trial. That case concerned jury instructions, not the facial sufficiency of an indictment. And, in any event, the Indictment's detailed allegations, which must be taken as true, more than adequately describe a promise or agreement to take one or more "official acts."

Indeed, while the defendants raise a myriad of arguments, and the Government responds to each below, the Court can deny their motions without reaching almost any of their contentions at this time. The Indictment alleges that the defendants entered into a scheme in which Menendez promised and agreed to take official action in exchange for bribes. What an indictment needs to allege to survive a motion to dismiss is well-settled and straightforward, and the Indictment more than meets those requirements, justifying denial of the motion on this ground alone. It is also well-settled that promising or agreeing to take an act, which is what Menendez is charged with doing, is not covered by the Speech or Debate Clause, regardless of the nature of the act. Accordingly, while the Indictment's underlying factual allegations include actions themselves, even if Menendez were correct that those actions were covered by the Speech or Debate Clause—and he is not correct—the Indictment still would not be subject to dismissal. Finally, and similarly, it is well-settled that a public official need not take any action in exchange for a bribe in order to be

15

held accountable under the applicable statutes, but merely promise or agree to do so.  Therefore, again, it does not matter whether the defendants are correct—and they are not—as to whether one or more of the actions that Menendez actually took was an "official act," because the Indictment also alleges that Menendez promised or agreed to take official acts.  No more is required.

In sum, to obtain the dismissal he seeks, Menendez must, at the very least, show that the Indictment fails to allege *any* official act that (a) was promised, agreed upon, or performed as part of a corrupt *quid pro quo* and also (b) is not barred by the Speech or Debate Clause.  If the Indictment's charges rest on even a single such alleged promised, agreed upon, or performed act in exchange for a bribe, there is no basis for dismissal, as other disputes regarding other acts, whether factual or legal, are matters to be resolved at the appropriate time, such as through evidentiary rulings or jury instructions, or are for the jury to determine in the first instance.

The Indictment alleges multiple such official acts, including: (i) Menendez's promise or agreement not to place holds on foreign military financing or foreign military sales to Egypt (*see, e.g.*, Indictment ¶¶ 2, 16-21, 28, 35, 37(g)); (ii) his promise, agreement, and attempt to pressure the USDA to acquiesce in a lucrative monopoly used to enrich Hana and fund bribes to Menendez (*see, e.g.*, *id.* ¶¶ 2, 22-34); (iii) his promises, agreements, and attempts to disrupt two pending New Jersey criminal proceedings (*see, e.g.*, *id.* ¶¶ 2, 39-44); (iv) his promise, agreement, and attempt to disrupt the federal prosecution of Daibes both before and after the confirmation of a new U.S. Attorney (*see, e.g.*, *id.* ¶¶ 2, 45-54); and (v) his receipt of payments knowing that Daibes expected him in exchange to advance or assist with a Senate resolution related to Qatar (*see, e.g.*, *id.* ¶¶ 2, 55-67).  For the reasons stated below, *each* of these promised, agreed upon, or performed official acts, on its own, suffices to deny Menendez's motion, and the Court can so rule as to any or all of them at this time.  But as to certain of these actions, Menendez does not meaningfully or at all

16

contest the sufficiency of the Indictment, justifying the denial of his motion without reaching his other contentions.

For example, Menendez in his brief does not contest that his promise or agreement to place or not place holds on foreign military financing or foreign military sales by the Executive Branch to Egypt is a promise or agreement to take official acts, and he offers no basis suggesting that the Speech or Debate Clause bars a charge based on such an agreement or promise.  On the contrary, he acknowledges that "[t]he government is free to prosecute a Member of Congress for *agreeing* to exchange legislative action for personal benefits, so long as it does not cast aspersions on (or reference) any legislative acts themselves." (Menendez First Mot. 1 (emphasis in original).)  That alone suffices to deny his motion.

And even those acts that Menendez squarely challenges need not detain the Court for long. To the extent that the Court reaches such challenges—and it does not need to do so—it should conclude that, at a minimum, Menendez's attempts to influence the Executive Branch, including the USDA with respect to Hana's company, are official acts, and that the Speech or Debate Clause does not transform Menendez's communications with the Executive Branch about the discharge of Executive Branch responsibilities into protected legislative activity.  Menendez's other promised, agreed upon, attempted, or taken actions also are official acts, and also are not protected legislative activity, as explained below.  But, again, even one such action suffices to defeat his motion.

### A.    Applicable Law

#### 1.    *The Pleading Standard*

"An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello*, 350 U.S. at 363.  Accordingly,

dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1) (alterations omitted)). "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)), *cert. denied*, 571 U.S. 1083 (2013); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). To state an offense "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). "An indictment . . . need not be perfect, and common sense and reason are more important than technicalities." *De La Pava*, 268 F.3d at 162.

On a motion to dismiss an indictment, its accusations must be deemed true. *See, e.g.*, *Boyce Motor Lines*, 342 U.S. at 343 n.16; *Goldberg*, 756 F.2d at 950. This is the case not just as to the charges themselves, but as to "all of the allegations of the indictment," and "[c]ontrary assertions of fact by the defendant will not be considered." *Id.* A reviewing court must also deem the indictment "to include facts which are necessarily implied by the specific allegations made." *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007), *cert. denied*, 552 U.S. 1242 (2008).

18

It follows that a defendant may not seek dismissal of an indictment, or portions thereof, based on his or her assertion that the evidence at trial will be insufficient to prove guilt.  "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial"—which it has not done here, and where the investigation remains ongoing— "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) (internal quotation marks and alteration omitted), *cert. denied*, 559 U.S. 1049 (2010).  Rather, a defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence.  *See* Fed. R. Crim. P. 29.  This is true both with respect to the indictment's express allegations and inferences from the expected evidence.  *See, e.g.*, *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ("To the extent that the district court look[s] beyond the face of the indictment and dr[aws] inferences as to proof that would be introduced by the government at trial . . . such an inquiry into the sufficiency of the evidence [is] premature.").  In short, "[t]here is no summary judgment in criminal cases."  *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) (internal quotation marks omitted)); *see also, e.g.*, *United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [the defendant's] challenges are to the sufficiency of the Government's evidence to *satisfy*—as opposed to the sufficiency of the Indictment to *allege*—the federal elements of the crimes charged, those arguments are not appropriately decided on a motion to dismiss." (internal quotation marks omitted; emphasis in original)), *aff'd*, 731 F.3d 233 (2d Cir. 2013).

19

2.      *The Speech or Debate Clause – Overview of the Law*

The Speech or Debate Clause (the "Clause"), U.S. Const., art. I, § 6, cl. 1, provides that, "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place."  The Clause, derived from the English Bill of Rights of 1689, is understood to have been intended to protect the independence of the legislative branch by limiting inquiry into certain aspects of the legislative process.  *See United States v. Helstoski*, 442 U.S. 477, 491 (1979) (the Clause's "purpose was to preserve the constitutional structure of separate, coequal, and independent branches of government"); *United States v. Johnson*, 383 U.S. 169, 178 (1966) (the Clause "reinforc[es] the separation of powers so deliberately established by the Founders"); *Fields v. Office of Johnson*, 459 F.3d 1, 8 (D.C. Cir. 2006) (en banc) ("The Speech or Debate Clause reinforces the separation of powers and protects legislative independence."), *appeal dismissed and cert. denied sub nom. Office of Dayton v. Hanson*, 550 U.S. 511 (2007).

The Supreme Court has given "the Clause a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979).  As is relevant in criminal matters, case law has described two forms of protection provided by the Clause.  *See generally Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995) ("From this terse prohibition has emerged a somewhat complicated privilege, with several strands.").  The first—and that relevant here—is a form of legislative immunity.[3]

---

[3] Some courts have said that the Clause provides three forms of protection: "a testimonial privilege, an evidentiary privilege, and a privilege against liability."  *United States v. Renzi*, 651 F.3d 1012, 1035 n.27 (9th Cir. 2011), *cert. denied*, 565 U.S. 1157 (2012).  Others have conceptualized the Clause as providing two forms, namely, (1) a type of immunity (that at issue here) and (2) a corresponding non-disclosure or evidentiary component.  *See generally Understanding the Speech or Debate Clause*, Congressional Research Service, Dec. 1, 2017, https://crsreports.congress.gov/product/pdf/R/R45043/3.  It is not clear that the precise analytical framework matters in most or all cases.  *See, e.g.*, Jay Rothrock, *Striking a Balance: The Speech*

In short, a Member of Congress may not be prosecuted for "legislative acts" taken in the course of his or her official duties.  *See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975) ("[W]hen it applies, the Clause provides protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch.").  This form of immunity, when it attaches, is near absolute.  "Congressmen and their aides are immune from liability for their actions within the legislative sphere, even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."  *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (internal quotation marks omitted).[4]

Precisely because it is so powerful, it has long been the law that a "legislative act" cannot, and does not, mean any official act, or every act connected to legislative activity.  "The Speech or Debate Clause does not immunize every official act performed by a member of Congress."  *United States v. McDade*, 28 F.3d 283, 295 (3rd Cir. 1994), *cert. denied*, 514 U.S. 1003 (1995).  Rather, consistent with its important—but discrete—purpose, the Clause covers only those acts that are an "integral part of the deliberative and communicative processes by which Members participate in

---

or Debate Clause's Testimonial Privilege and Policing Government Corruption*, 24 Touro L. Rev. 739, 751 n.45 (2008) (conceiving of separate protections involves "a logical, albeit irrelevant distinction").

[4] That is not to say that any seemingly legislative act falling within the Clause, no matter its character or purpose, is immune.  *See Kilbourn v. Thompson*, 103 U.S. 168, 204-05 (1880) (reserving decision whether "there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible"); *Cushing v. Packard*, 30 F. 4th 27, 50 (1st Cir.) (en banc) ("In line with *Kilbourn*, we have recognized that that there may be some conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." (internal quotation marks omitted)), *cert. denied*, 143 S. Ct. 308 (2022).  The Court need not reach this issue in this case, because nothing in the Indictment (or the Government's expected proof) falls within the Clause.

committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

Such a limitation is critical, lest "Members of Congress" become "super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516; *see also, e.g.*, *United States v. Renzi*, 769 F.3d 731, 736 (9th Cir. 2014) ("Congressmen may write the law, but they are not above the law."), *cert. denied*, 576 U.S. 1054 (2015). Accordingly, the Supreme Court "has repeatedly insisted that the [] Clause is subject to 'finite limits,' refusing to stretch its protective umbrella 'beyond the legislative sphere' to conduct not 'essential to legislating.'" *McSurely v. McClellan*, 553 F.2d 1277, 1285 (D.C. Cir. 1976) (quoting *Doe*, 412 U.S. at 317, and *Gravel*, 408 U.S. at 621, 624-25), *dismissing cert.*, 438 U.S. 189 (1978). In short, "[t]he Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." *Brewster*, 408 U.S. at 528; *see also id.* at 517 (the Clause's "shield does not extend beyond what is necessary to preserve the integrity of the legislative process"); *Forrester v. White*, 484 U.S. 219, 224 (1988) ("the Court has been careful not to extend the scope of [the Clause] further than its purposes require").

It follows that the mere fact that an act is within a Member of Congress's official duties, authority, or interest, or could bear on legislation or legislative activity, is not, without more, sufficient. That is particularly true with respect to a Member of Congress interacting with or seeking to influence the Executive Branch. *See, e.g.*, *Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature. Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with

22

respect to the administration of a federal statute—but such conduct, though generally done, is not

protected legislative activity."); *Johnson*, 383 U.S. at 172 ("No argument is made, nor do we think

that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as

was involved in the attempt to influence the Department of Justice, that is in no w[ay] related to

the due functioning of the legislative process.").  As the Supreme Court has explained:

> It is well known, of course, that Members of the Congress engage in
> many activities other than the purely legislative activities protected
> by the Speech or Debate Clause.  These include a wide range of
> legitimate 'errands' performed for constituents, the making of
> appointments with Government agencies, assistance in securing
> Government contracts, preparing so-called 'news letters' to
> constituents, news releases, and speeches delivered outside the
> Congress.  The range of these related activities has grown over the
> years.  They are performed in part because they have come to be
> expected by constituents, and because they are a means of
> developing continuing support for future elections.  Although these
> are entirely legitimate activities, they are political in nature rather
> than legislative, in the sense that term has been used by the Court in
> prior cases.  But it has never been seriously contended that these
> political matters, however appropriate, have the protection afforded
> by the Speech or Debate Clause.

*Brewster*, 408 U.S. at 512; *see also McSurely*, 553 F.2d at 1285-86 ("Even though Members of

Congress or their aides frequently intercede on behalf of constituents with agencies of the

Executive Branch or disseminate to the public beyond the legitimate legislative needs of Congress

documents introduced at committee hearings, such conduct falls outside of legislative immunity."

(internal quotation marks and footnotes omitted)); *Bastien v. Office of Senator Ben Nighthorse*

*Campbell*, 390 F.3d 1301, 1316 (10th Cir. 2004) ("No Supreme Court opinion indicates that

Speech or Debate Clause immunity extends to informal information gathering by individual

members of Congress. . . . To extend protection to informal information gathering—either

personally by a member of Congress or by congressional aides—would be the equivalent of

extending Speech or Debate Clause immunity to debates before local radio stations or Rotary Clubs"), *cert. denied*, 546 U.S. 926 (2005).

Similarly, the Clause does not cover the dissemination of information outside of Congress. *See, e.g.*, *Hutchinson*, 443 U.S. at 133 ("[T]he transmittal of . . . information [about their activities] by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process."); *McSurely*, 553 F.2d at 1285 ("To the extent plaintiffs charge dissemination outside of the Halls of Congress, the federal defendants are not immune to further questioning.").

Nor does the Clause cover travel to a meeting, regardless of what occurs at the meeting. *See United States v. Biaggi*, 853 F.2d 89, 104 (2d Cir. 1988) ("Unless the focus of [pertinent] legislation itself is transportation, the mere transport of oneself from one place to another is simply not 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings.'" (quoting *Gravel*, 408 U.S. at 625)), *cert. denied*, 489 U.S. 1052 (1989); *McDade*, 28 F.3d at 298 ("travel by a member of Congress to or from a location where the member performs legislative acts is not itself protected by the Speech or Debate Clause").

Moreover, only a legislative act *itself*—if it has occurred—is protected, not a promise to perform such an act. "Promises by a Member [of Congress] to perform an act in the future are not legislative acts." *Helstoski*, 442 U.S. at 489; *see also id.* at 490 ("A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.'"); *Brewster*, 408 U.S. at 526 (the Clause is not implicated when "the Government need not show any act of [the defendant] subsequent to the corrupt promise for payment," and it need not do so to prove bribery, "for it is taking the bribe, not performance of the illicit compact, that is a criminal act").

24

Finally, and most fundamentally, the Clause does not prohibit prosecution for agreeing to, soliciting, or accepting a bribe—even if the charge is that the bribe was agreed to, sought, or accepted in exchange for undertaking a legislative act—because "[t]aking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act." *Brewster*, 408 U.S. at 526. To be sure, the Clause may protect against the use of evidence of certain acts, *e.g.*, how a legislator voted, to prove that he or she took a bribe. But provided that the case does not use such evidence, nothing in the Clause is implicated. *See id.* (The Clause is not implicated where "[t]here is no need for the Government to show that [the defendant] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise."); *see also Gravel*, 408 U.S. at 622 (the Clause does not protect "criminal conduct threatening the security of the person or property of others, whether performed (by a Member or] at the direction of [a] [Member] in preparation for or in execution of a legislative act"); *United States v. Myers*, 635 F.2d 932, 937 (2d Cir.) (rejecting Clause challenge; "This indictment charges Congressman Myers with accepting $15,000 and demanding an additional $35,000 for a promise to take further official action, including the enactment of private immigration bills. . . . Legislative actions are referred to in the indictment only for the entirely permissible purpose of detailing the nature of the corrupt promise allegedly made."), *cert. denied*, 449 U.S. 956 (1990).

In sum, while the Clause may present an evidentiary hurdle in certain cases, "[c]ountless successful prosecutions have been brought against corrupt legislators without resort to 'legislative act' documents, however, in large part because the elements necessary to prove crimes of corruption do not involve 'legislative acts.'" *Secs. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 244 (S.D.N.Y. 2015).

25

3.        *The Speech or Debate Clause – Analysis of a Challenged Act*

Some acts, on their face, are inherently and undeniably legislative acts.  *See, e.g.*, *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985) (listing examples of "manifestly legislative acts," such as "introducing proposed legislation," "subpoenaing records for committee hearing," "introducing evidence during committee hearings," or "delivering a speech on the floor of the House," and citing cases).  Other acts may or may not be legislative acts, depending on the particular context and details.  *See, e.g.*, *id.* ("In the instant case, [the defendant] argues that his 'conversations' and 'meetings' in New York and Washington with various officials were likewise protected by legislative privilege.  However, [his] private conversations do not, in and of themselves, trigger the legislative privilege because they are not manifestly legislative acts.  Private conversations—even between officials of governments—do not necessarily involve official business.").  A court cannot merely accept a legislator's say-so about such ambiguous acts, which would result in the very thing that the Supreme Court has cautioned against, *i.e.*, turn "Members of Congress" into "super-citizens, immune from criminal responsibility."  *Brewster*, 408 U.S. at 516.  As the Eleventh Circuit explained, the reason for caution "is obvious": "'there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process.'"  *Fulton Cnty. Special Purpose Grand Jury v. Graham*, No. 22-12696-DD, 2022 WL 13682659, at *1 (11th Cir. Oct. 20, 2022) (per curiam) (quoting *Brewster*, 408 U.S. at 516); *see also Eastland*, 421 U.S. at 503 (the Clause only applies "*once it is determined* that" the act in question involved a Member of Congress "acting within the legitimate legislative sphere" (emphasis added; internal quotation marks omitted)); *Menendez*, 831 F.3d at 168 ("claims of [congressional] 'oversight' do not automatically result in Speech or Debate protection"); *Fields*, 459 F.3d at 11, 16 (because the "duties [of a congressional aide] are too crude a proxy for protected

26

activity," in an employment suit in which a Member of Congress raises a Clause defense, the court must "determine whether the asserted activity is in fact protected").

Accordingly, where a challenged act, on its face, may or may not be a legislative act, a court should weigh the actual act, not simply decide whether such an act *could* be a legislative act, or accept a defendant's assertion that, in his or her particular case, it is such an act.  *See Graham*, 2022 WL 13682659, at *1 ("[E]ven assuming that such informal investigations are covered by the Speech and Debate Clause, courts still must determine whether a legislator's conversation was a protected investigation or an unprotected non-legislative discussion."); *Menendez*, 831 F.3d at 168 ("We therefore reject Senator Menendez's first argument that the Speech or Debate Clause necessarily protects apparently legislative activity.  Courts may dig down to discern if it should be deemed legislative or non-legislative."); *Lee*, 775 F.2d at 523-24 (vacating decision where defendant asserted "conversations purportedly involved legislative fact-finding, [and] legislative immunity barred any inquiry into whether the conversations actually involved legislative fact-finding," and remanding for district court "to determine which acts were proper legislative acts"). When such a challenge is made, the legislator, as the movant invoking a form of privilege, bears the burden.  *See id.* at 524; *In re Grand Jury (Intervenor A)*, 587 F.2d 589, 597 (3d Cir. 1978) (same); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1302-03 (D.C. Cir. 1995).[5]

---

[5] In his brief, Menendez suggests that the Second Circuit, in *Biaggi*, held that a court may not inquire *at all* into any purportedly legislative act.  (Menendez First Mot. 17.)  Menendez is incorrect.  His suggestion rests on an excerpt in which he omits both the word "generally" and that the court was focused on the particular inquiry at trial.  *See Biaggi*, 853 F.2d at 103.  As the Third Circuit explained in Menendez's prior federal criminal case, *Biaggi* "allows the Government to inquire into the reasons for apparently legislative activity."  *Menendez*, 831 F.3d at 168.  In any event, whatever ambiguity may exist in *Biaggi*'s general statement (which was not necessary to the decision), the Second Circuit subsequently—consistent with the case law cited herein— rejected a claim on the ground that the content of a communication rendered it unprotected,

That is not to say that a pretrial hearing or formal factual finding is necessary whenever a defendant challenges an act in an indictment as allegedly violative of the Speech or Debate Clause. On the contrary, as with other facial challenges to an indictment, such a challenge often may and should be resolved based on the indictment's allegations (which, as set forth above, must be deemed true). *See, e.g.*, *Rostenkowski*, 59 F.3d at 1300-01; *McDade*, 28 F.3d at 298; *see also Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (asking "whether from the pleadings it appears that the defendants were acting in the sphere of legitimate legislative activity").

Moreover, provided that a charge itself is not facially barred by the Clause, a district court should deny a motion to dismiss, while reserving the related but distinct question of whether certain *evidence* asserted to violate the Clause may be considered by the jury until a record is developed at trial. *See United States v. Murphy*, 642 F.2d 699, 700 (2d Cir. 1980) (per curiam) ("The essence of all the allegations against the Congressmen is the acceptance of bribes in return for corrupt promises to take official action, conduct beyond the protection of the Speech or Debate Clause. In some instances, an overt act is alleged that may turn out, upon development of the facts at trial, to involve protected legislative action. . . . [I]f an offer of proof at trial indicates that it is protected when assessed in light of the other evidence, the appellants will be entitled to have that particular allegation stricken." (citation omitted)); *McDade*, 28 F.3d at 300 ("Both counts I and III, which charge conspiracies under 18 U.S.C. § 371, allege numerous other overt acts, and an indictment

---

notwithstanding that it was between two Members of Congress on the House floor. *See United States v. Myers*, 692 F.2d 823, 860 (2d Cir. 1982) ("Thompson claims that the Speech or Debate Clause bars the introduction into evidence of his private conversations with Congressman Murtha on the floor of the House of Representatives, in which he invited Murtha to join the ranks of those accepting bribes. One would think that a Congressman, even when grasping for objections to a criminal conviction, would understand that the Speech or Debate Clause accords immunity to what is said on the House floor in the course of the legislative process, *Gravel v. United States*, *supra*, not to whispered solicitations to commit a crime."), *cert denied*, 461 U.S. 961 (1983).

under 18 U.S.C. § 371 need only allege one overt act.  Thus, irrespective of the validity of the two overt acts in question, it is apparent that the district court was not required to dismiss (or to conduct a hearing in order to determine whether to dismiss) either count I or count III." (citations omitted)); *id.* at 301 ("[r]etention of these overt acts in the indictment does not necessarily mean that the prosecution will attempt or will be permitted to prove them at trial"); *Rostenkowski*, 59 F.3d at 1300 (even if a "preview of the evidence that the Government proposes to present at trial would reveal some Speech or Debate material, it would still not be appropriate for the district court to dismiss the indictment; rather, the court would merely prohibit the Government from presenting that evidence at trial"); *cf. Renzi*, 651 F.3d at 1031-32 ("The now-struck evidence—all of which concerned 'the legislative performance itself'—is superfluous . . . because the indictment could have been returned even absent these exhibits. . . .  We [therefore] affirm the district court's refusal to grant his dismissal motion.").

Put differently, "[t]he Government's use of Speech or Debate material in the course of a prosecution based upon a valid indictment implicates only the substantive protection of the Speech or Debate Clause against conviction, not its procedural protection against prosecution." *Rostenkowski*, 59 F.3d at 1301; *see also United States v. McDade*, 827 F. Supp. 1153, 1170 (E.D. Pa. 1993) ("Because I do not find that any of the allegations in the indictment carries with it an inevitability, or even a high probability, of violating the Speech or Debate Clause, and because I find no support for the proposition that the government should have to prove its case and proffer all its evidence in the pretrial stage, I shall not order an evidentiary hearing.  If questions of admissibility on Speech or Debate grounds arise during trial, Mr. McDade may make objections."), *aff'd*, 28 F.3d 283 (3d Cir. 1994); *see generally United States v. Tom*, 787 F.2d 65, 68 (2d Cir. 1986) (a defendant is "not entitled to an interlocutory appeal to avoid . . . having to defend against

29

allegations made or evidence presented in connection with a count on which trial will in any event occur").

Finally, just as with any other evidence that may be partially privileged or otherwise protected, where the evidence of an act contains both protected legislative components and non-protected components, only the protected components are shielded from use.  *See Helstoski*, 442 U.S. at 488 n.7 (the Clause does not "prohibit[] excising references to legislative acts, so that the remainder of the evidence would be admissible.  This is a familiar process in the admission of documentary evidence."); *In re Grand Jury Investigation*, 608 F. App'x 99, 101 (3d Cir. 2015).

### 4.    McDonnell *and the "Official Act" Requirement*

The Supreme Court, in *McDonnell v. United States*, 579 U.S. 550 (2016), considered, in reviewing a challenge to jury instructions, the definition of "official act" under the general federal bribery statute, 18 U.S.C. § 201.

That statute makes it a crime for, among other things, a public official corruptly "to receive or accept anything of value" in return for being "influenced in the performance of any official act," 18 U.S.C. § 201(b)(2), with "official act," in turn, defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit," *id.* § 201(a)(3).  Construing this language in light of certain constitutional vagueness concerns, the Supreme Court adopted a two-part test for what qualifies as an "official act" under Section 201:

First, the "question" or "matter" must involve a "formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories."  *McDonnell*, 579 U.S. at 569.  In addition, "the

question or matter must be 'pending' or 'may by law be brought' before 'any public official.'" *Id.* at 570. "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* "'[M]ay by law be brought' conveys something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* "The word 'any' conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id.*

Second, where the defendant is the alleged bribe recipient, he or she "must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so. That action or decision may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574. However, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'" *Id.* "Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant . . . . If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act." *Id.* at 573. Indeed, "[a] jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be

illegal." *Id.*; *see also, e.g.*, *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017), *cert. denied*, 583 U.S. 1091 (2018).[6]

The Supreme Court emphasized that "a public official is not required to actually make a decision or take an action . . . . [I]t is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *McDonnell*, 579 U.S. at 572; *see also United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)), *cert. denied*, 141 S. Ct. 656 (2021).[7]

---

[6] The Supreme Court's decision rested on Section 201, notwithstanding that that statute was not charged, because the parties in the district court agreed to use Section 201's definition in describing honest services fraud and extortion. *See McDonnell*, 579 U.S. at 562. "[T]he Supreme Court did not hold that § 201(a)(3) of the federal bribery statute must *necessarily* be the exclusive source for the definition of an official action in every honest services fraud and Hobbs Act extortion case." *Silver*, 864 F.3d at 116 n.67 (emphasis in original), *see also Silver*, 948 F.3d at 551 (2d Cir. 2020) ("It remains an open question whether vagueness concerns further require that honest services fraud be defined, in all cases, by reference to one of the various federal bribery statutes."), *cert. denied*, 141 S. Ct. 656 (2021). In any event, the Government treats the definition as applicable to the bribery and extortion charges in this case.

[7] Similarly, bribery can involve an agreement by the official "not to perform" an official act. *See McCormick v. United States*, 500 U.S. 257, 273 (1991) (discussing Hobbs Act extortion). Whether the agreement is for official action or declining to take official action, circumstantial evidence often is sufficient. "Indeed, bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo. Past experience shows that the Government will be able to introduce, in the appropriate circumstances, circumstantial and other evidence that the payor and official understood the *quid pro quo* to center on an exchange of a

The Supreme Court also explained that "'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decisionmaking process." *McDonnell*, 579 U.S. at 573 (quoting *United States v. Birdsall*, 233 U.S. 223, 230-31 (1914)).

### 5.    McDonnell *and the Pleading Standard*

As described above, *McDonnell* concerned jury instructions, not the facial sufficiency of an indictment, and the Supreme Court did not purport to change long-settled law concerning what must be alleged.  Rather, the Supreme Court explained: "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' . . . [and] the jury may consider a broad range of pertinent evidence, including the nature of the transactions, to answer that question."  *McDonnell*, 579 U.S. at 572-73; *see also, e.g.*, *United States v. Lee*, 919 F.3d 340, 353, 354-55 (6th Cir. 2019) ("the standard for sufficiency of an indictment is not the same as that for a conviction"; "At a minimum, the indictment supports an inference that Defendant had agreed to perform an official act or pressure or advise other officials to perform official acts in exchange for gifts or loans from [the payor]. Therefore, the indictment sufficiently alleges the elements of Counts One through Four, and [the] district court did not err in denying Defendant's Motion to Dismiss the Indictment." (citation omitted)), *cert. denied*, 140 S. Ct. 895 (2020); *United States v. Keleher*, 505 F. Supp. 3d 41, 48 (D.P.R. 2020) ("The indictment's allegations satisfy the government's burden at this stage, because they sufficiently notify the defendants of the crimes with which they are charged and would allow them to raise a double jeopardy issue should that become warranted.  A jury, not this Court, must determine whether [the charged] actions . . .

---

thing of value for official acts related to some sufficiently defined and concrete question or matter involving the formal exercise of governmental power."  *Silver*, 948 F.3d at 557 n.10.

constitute an official act or evidence an agreement to take an official act.'" (citations omitted));

*United States v. Oaks*, 302 F. Supp. 3d 716, 726 (D. Md. 2018) ("[T]he Defendant argued at the hearing that an honest services indictment must allege everything *McDonnell* requires in jury instructions. . . . This Court finds no basis to extend the full breadth of *McDonnell* to indictments . . . ."); *United States v. Williams*, No. 16 Cr. 03 (TCB), 2017 WL 1030804, at *4 (N.D. Ga. Mar. 16, 2017) ("*McDonnell* does not affirmatively answer the question of whether the indictment adequately charges attempted Hobbs Act extortion under color of official right.").

**B.    Discussion**

As described above, Menendez claims that the Speech or Debate Clause categorically bars much of the case against him, and that those portions that are not so barred are categorically precluded by *McDonnell*.[8]  Co-defendants Hana and Daibes also make *McDonnell* claims.  Many of these claims are premature.  None has merit.

1.    *The Speech or Debate Clause Does Not Bar the Charged Acts or Evidence*

Throughout the argument section of his brief, Menendez intersperses arguments about the Speech or Debate Clause with arguments about *McDonnell*.  (*See* Menendez First Mot. 18-34.) However, these claims are legally and analytically distinct, rest on different substantive and procedural frameworks, and concern different allegations.  They are also, as to *McDonnell*, largely

---

[8] Nadine Menendez subsequently stated that she joins Menendez's claims and those of co-defendants.  (Dkt. 146; *see also* Dkt. 178.)  But she cannot make a Speech or Debate claim. *See Gravel*, 408 U.S. at 622 (the Clause is "invocable only by the Senator or by the aide on the Senator's behalf").  Nor does she provide a basis to conclude that, if this case is severed, as she seeks (N. Menendez Mot.), she may continue to press for or benefit from a Speech or Debate ruling.  Daibes similarly states that he joins Menendez's arguments (Daibes Mot. 1), and he also, albeit briefly, makes a Speech or Debate argument (*id.* 5), but he too both cannot make a Speech or Debate claim and seeks severance (*id.* 18).  However, the Court need not reach these issues, both because Menendez's Speech or Debate claims are without merit and because severance is unwarranted, as described below.

or entirely for the jury at trial, not this Court on a motion to dismiss.  The Government accordingly discusses the two claims separately.  The Government starts with Speech or Debate, first by addressing the allegations concerning or relating to acts Menendez agreed to take with respect to Egypt, including in connection with FMF and FMS.  (*See* Second Superseding Indictment (referred to herein as the "Indictment") ¶¶ 1-2, 5, 16-21.)[9]

However, separate from any particular claims, it should be noted that Menendez misstates the relevant test for whether an act falls within the Speech or Debate Clause.  Menendez states: "All told, the test is whether the activity is 'related to the due functioning of the legislative process.'"  (Menendez First Mot. 17 (quoting *Johnson*, 383 U.S. at 172).)  That is *not* the test.  As the Supreme Court explained in rejecting the argument that it had endorsed such a "broad[] test":

> It is urged that we held that the Clause protected from executive or judicial inquiry all conduct 'related to the due functioning of the legislative process.'  It is true that the quoted words appear in the *Johnson* opinion, but appellee takes them out of context; in context they reflect a quite different meaning from that now urged. . . . In stating that those things 'in no w[ay] related to the due functioning of the legislative process' were not covered by the privilege, the Court did not in any sense imply as a corollary that everything that 'related' to the office of a Member was shielded by the Clause. Quite the contrary, in *Johnson* we held, citing *Kilbourn v. Thompson*, *supra*, that only acts generally done in the course of the process of enacting legislation were protected.

*Brewster*, 408 U.S. 513-14; *see also Hutchinson*, 443 U.S. at 131 (explaining that in *Brewster*, "we went on to note that *United States v. Johnson*, 383 U.S. 169 [] (1966), had carefully distinguished

---

[9] To the extent that Menendez has stated that he might attempt to seek an interlocutory appeal of a Speech or Debate ruling, as he did in his prior federal criminal case, *see Menendez*, 831 F.3d at 164, the Government requests that the Court prioritize such a ruling, to the extent practicable. (*See* Dkt. 105 at 3 ("on behalf of Senator Menendez, we expect to file a partial motion to dismiss based on the Speech and Debate Clause, which may well result in an interlocutory appeal"); *see also* Pretrial Conference (Oct. 2, 2023) Tr. at 10-11.)

between what is only 'related to the due functioning of the legislative process,' and what constitutes the legislative process entitled to immunity under the Clause").

> a)   Foreign Military Sales, Foreign Military Financing, and Related Allegations

Menendez contends that all allegations in the Indictment concerning or relating to FMS or FMF, and all cited evidence in support of or related to these allegations, including meetings with and information provided to foreign officials, are categorically barred by the Speech or Debate Clause.  This contention fails for multiple reasons.

However, before explaining why that is so, the Government first notes that, contrary to how Menendez frames this portion of his argument (*see* Menendez First Mot. 30), he is not charged solely with promising or agreeing to take or to decline to take action concerning FMF or FMS or to provide certain information to foreign officials in exchange for bribes.  Rather, as is relevant here, the Indictment charges that Menendez agreed to "use his influence and power and breach his official duty in ways that benefited the Government of Egypt and WAEL HANA, a/k/a 'Will Hana,'" in furtherance of which Menendez, "[a]mong other actions," "provided sensitive U.S. Government information and took other steps that secretly aided the Government of Egypt. MENENDEZ also improperly advised and pressured an official at the United States Department of Agriculture for the purpose of protecting a business monopoly granted to HANA by Egypt and used in part to fund the bribes being paid to MENENDEZ through NADINE MENENDEZ." (Indictment ¶ 2; *see also, e.g.*, *id.* ¶ 19 ("In exchange for MENENDEZ and NADINE MENENDEZ's promise that MENENDEZ would, among other things, use his power and authority to facilitate [FMF and FMS] to Egypt, HANA promised, among other things, to put NADINE MENENDEZ on the payroll of his company in a low-or-no-show job.").)  In short, the actions that Menendez challenges under the Clause are only certain of multiple alleged acts in furtherance of

36

the scheme, not the scheme itself, which is broader and encompasses actions that Menendez does not challenge under the Clause.  Accordingly, even if Menendez were correct, he still would not be entitled to dismissal.  *See Murphy*, 642 F.2d at 700; *McDade*, 28 F.3d at 300; *Rostenkowski*, 59 F.3d at 1300.  In any event, Menendez is not correct, for multiple reasons.

As an initial matter, while Menendez uses the general terms "foreign aid" or "military aid" (Menendez First Mot. 30), the Indictment—which must be deemed true at this time—is far more specific regarding the type of aid, and type of action, at issue here.  Whatever formal power Congress may have over matters related to FMS or FMF, no such power or any action connected thereto is alleged or at issue in the Indictment.  Rather, as the Indictment alleges, and describes in some detail, the charges concern a "longstanding, voluntary practice," in which "the State Department would typically honor so-called 'holds' placed by the Chairman or the Ranking Member of the SFRC on both [FMF] and [FMS]."  (Indictment ¶ 17; *see also id.* ¶¶ 19(d), 20, 35, 37.)

Menendez cites no case, and the Government is unaware of any, in support of the proposition that where the Executive Branch chooses *voluntarily* to provide certain Members of Congress with a *non-binding* opportunity to seek to delay or affect *a decision of the Executive Branch*, the Executive Branch thereby creates an inviolate "legislative act."  As described above, the Supreme Court "has repeatedly insisted that the [] Clause is subject to 'finite limits,' refusing to stretch its protective umbrella 'beyond the legislative sphere' to conduct not 'essential to legislating.'"  *McSurely*, 553 F.2d at 1285 (quoting *Doe*, 412 U.S. at 317, and *Gravel*, 408 U.S. at 621, 624-25).  As described in the Indictment, a hold does not in any way involve "legislating," much less is it "essential" thereto.

Menendez does not cogently disagree.  Instead, he asserts that even if a hold *itself* does not involve legislating, because *the ability* to place a hold was only provided to him because he was a Senator, when he exercised a hold, he was "exercising a power of his office, as to official 'business' placed before the Senate."  (Menendez First Mot. 30; *see also id.* 31 (in placing or declining to place a hold, Menendez was "executing the duties of his office" (internal quotation marks omitted)).)  This assertion, at least for present purposes, may be deemed correct—and is why any *McDonnell* challenge to the allegations concerning holds would fail.  This assertion is also legally insufficient to trigger the protections of the Speech or Debate Clause.

The Supreme Court has repeatedly explained that there must be and is a critical and meaningful distinction between what is "official" conduct and what is a "legislative act."  *See, e.g.*, *Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature.  Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity."); *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir.) (the Speech or Debate Clause does not extend to "official activities of Congress members . . . outside the legislative core" (internal quotation marks omitted)), *cert. denied*, 469 U.S. 1036 (1984).  In short, contrary to Menendez's argument, "[t]he key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor." *Walker*, 733 F.2d at 929.  Here, the act presented involved decision-making by the Executive Branch, in connection with which, as a longstanding practice, the State Department provided an opportunity for Menendez's input.  In short, Menendez's actions sought to influence the actions

that the Executive Branch, *i.e.*, the State Department, would take, *not* actions of Congress. Menendez's actions in holding or clearing FMS or FMF were thus not legislative acts.

Nor does the possibility that, if the Executive Branch were to act contrary to a Member of Congress's desires, the Member might take some form of legislative action in reprisal, convert communication or interaction with the Executive Branch into a legislative act itself. Any time a Member of Congress "exhort[s]" the Executive Branch, there is undoubtedly the same possibility of a legislative response if the Member does not get the desired outcome, but that does not make the exhortation itself "protected legislative activity." *Gravel*, 408 U.S. at 625. Thus, the risk of legislative consequences if the State Department proceeded with the FMS or FMF contrary to a hold does not the convert the hold *itself* into a legislative act.

Menendez's invocation of "oversight" (Menendez First Mot. 30), without more, also does not transform a non-legislative act into a legislative act. Of course, Members of Congress may and do perform oversight of the Executive Branch. But for good reason, "claims of [congressional] 'oversight' do not automatically result in Speech or Debate protection." *Menendez*, 831 F.3d at 168 ("[A] blanket approach is much too broad, as it would immunize many illegal acts that have only dubious ties to the legislative process."). Menendez's argument as to oversight appears to be a single sentence: "Whenever the Chairman or Ranking Member of the Senate Foreign Relations Committee reviews an Executive Branch decision on military aid, he performs his role in an established oversight process—itself a legislative act." (Menendez First Mot. 30.) Menendez says nothing more about this "oversight process" and the Indictment contains nothing whatsoever in support of his assertion. *Compare Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 992 (D.C. Cir. 2021) (cited without elaboration at Menendez First Mot. 30) (the "issuance of subpoenas" as "part of an oversight investigation or impeachment inquiry" is a "legislative act"), *with* Indictment (no

39

allegation of legal process, a congressional inquiry, a hearing, or substantive interaction with the Executive Branch regarding holds); *see also McDade*, 28 F.3d at 304 (Scirica, J., concurring) (cited without elaboration at Menendez First Mot. 30) (only "true legislative oversight" is covered by the Clause). At bottom, Menendez's conclusory "oversight" argument appears to be no more than a linguistic repackaging of his circular argument that, because his position as a *legislator* caused the Executive Branch to provide him the option to place holds, any hold is both necessarily *legislative* and sufficiently so that it must be covered by the Speech or Debate Clause. That argument collapses the longstanding and important distinction between an official act and a legislative act, and thus must be rejected. *See, e.g.*, *Walker*, 733 F.2d at 929.

So too with Menendez's similar assertion that all of his meetings with Egyptian officials, on their face, are categorically barred by the Speech or Debate Clause because, as the Chairman of the SFRC, Menendez could, and he now asserts, was "meeting with foreign officials to learn about foreign issues that bore on 'business' regularly before the [SFRC]." (Menendez First Mot. 31.[10]) As an initial matter, Menendez, through now-former counsel—after being provided by the Government with a lengthy opportunity to claim Speech or Debate protection over materials sought by subpoena from him or his Senate office, or obtained from his devices or accounts by search warrant (which the prosecution team did not review until Menendez had completed his review and withheld what he asserted was protected) (*see* Pretrial Conference (Oct. 2, 2023) Tr. at 10)—previously provided the Government with, among other things, his official calendar,

---

[10] Menendez does not appear to argue that his travel to meetings or where they took place is protected, and as described above, any such argument is foreclosed. *See Biaggi*, 853 F.2d at 104; *see also McDad*e, 28 F.3d at 298.

listing certain, but not all, such meetings.  He accordingly may be deemed to have waived any potential claim over such evidence.[11]

In any event, Menendez's assertion regarding meetings with Egyptian officials both sweeps too widely and is divorced from the actual allegations in this case.  As described above, the question before this Court is not whether Menendez could have engaged in meetings that could have been "information-gathering activities that are safeguarded by the Speech or Debate Clause" (Menendez First Mot. 31), but whether the Indictment rests on meetings that, independent of Menendez's mere say-so, were such activities.  *See, e.g.*, *Graham*, 2022 WL 13682659, at *1; *Rostenkowski*, 59 F.3d at 1300-01; *McDade*, 28 F.3d at 298; *see also Renzi*, 651 F.3d at 1029 (a court should avoid "transforming the shield of the Clause into a sword that unscrupulous Members might wield to avoid prosecution for even unprotected acts").  The Indictment does not rely on any such activities.

Even assuming *arguendo* that informal meetings (or in this case, often, meals), as opposed to congressional hearings or other forms of officially arranged or sanctioned information gathering, may qualify as protected legislative factfinding—an issue that is both "nuanced" and unsettled,

---

[11] The Government does not believe it necessary for the Court to reach the question of waiver at this time, nor would reaching this question appear to resolve all of Menendez's claims.  The Government notes the foregoing only to preserve the waiver argument, and does not provide details herein regarding the review opportunity provided to Menendez and the privilege logs and materials he produced, but will do so upon request.  Relatedly, to the extent that Menendez were to seek to introduce at trial or ask this Court to rely upon evidence of acts that he otherwise did or could assert were protected, the Government would be entitled to respond with evidence concerning the same acts without regard to the Clause.  *See, e.g.*, *Myers*, 635 F.2d at 942; *Renzi*, 769 F.3d at 746-47.  Indeed, in his brief, Menendez appears to ask this Court to rely on such evidence.  (*See* Menendez First Mot. 11 (making assertions about the "introduc[tion]," "drafting, sponsoring, proposing, or editing," and "approving" of a congressional resolution); *id.* 4 (similar)); *see also infra* n.12.  The Government does not respond to these assertions herein, which are factual and therefore premature (assuming *arguendo* that they are relevant).

*Payne v. District of Columbia*, 279 F.R.D. 1, 7 (D.D.C. 2011)—nothing about the meetings alleged here supports the notion that Menendez was engaged in such factfinding. *See Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (cited at Menendez First Mot. 25) (no "'method'" of factfinding "warrants protected status unless the information is being gathered as part of, in connection with, or in aid of a legitimate legislative act"), *appeal dismissed*, 279 F. App'x 3 (D.C. Cir. 2008). On the contrary, the Indictment describes meetings with or relating to foreign officials which, among other things:

- were arranged and/or attended by Menendez's then-girlfriend (Nadine Menendez), who had no official role in any government, and her friend (Hana), who also had no official role with any government, not by Menendez's professional staff (Indictment ¶ 19(a));

- were followed by a separate meeting with Hana, to whom, through Nadine Menendez, Menendez provided sensitive non-public information, "[w]ithout telling his professional staff, SFRC staff, or the State Department" (*id.* ¶ 19(b));

- involved Menendez, again through Nadine Menendez and Hana, receiving materials from Egyptian officials and conveying non-public information back, again through Nadine Menendez and Hana (*id.* ¶ 20);

- were attended by an Egyptian intelligence official who thereafter gave "orders" to Hana that if Menendez could resolve a concern of Egypt, Menendez would "sit very comfortably," and who then transmitted information to Hana, who transmitted it to Nadine Menendez, who transmitted it to Menendez and then deleted it (*id.* ¶ 21); and

- were followed the same day by a dinner during which Nadine Menendez asked, referring to Menendez, who was at the dinner, "what else can the love of my life do for you?" (*id.* ¶ 28).

Further, Menendez and Nadine Menendez are alleged to have deleted multiple communications concerning the subject matters of or with attendees in these meetings and/or related actions (conduct that plainly is both unprotected and sheds light on the nature of the meetings). (*See id.* ¶¶ 7, 19(d), 21, 29.) In short, taking the Indictment's allegations as true, the meetings alleged in the Indictment were not ones in which Menendez, acting as a Senator, was

engaged in factfinding in aid of a protected legislative act; they were ones in which Menendez was corrupted by and engaged in corruption with his co-conspirators.  Of course, Menendez is entitled to, and does, dispute that that is what occurred in and following these meetings.  But so disputing, without more, does not entitle him to prevent the jury from reaching its own conclusion.  *Cf. Renzi*, 651 F.3d at 1025 ("If [Congressman] Renzi's unprotected negotiations [with his bribe-payors] are sufficiently cloaked under a broader category of protected legislative activity, *i.e.*, an investigation, then the Clause would fall like an iron curtain to preclude prosecution for the otherwise unprotected activity as well."); (*see* Menendez First Mot. 31 (appearing to acknowledge that to the extent the Indictment's allegations supported a finding that "unlawful bribery agreements were reached during these meetings," they would not be protected).)

Similarly, Menendez's assertion that "exchanging sensitive information with foreign contacts is 'integral' to the Senator's execution of his legislative responsibilities" (Menendez First Mot. 33 (quoting *Gravel*, 408 U.S. at 625)), and thus any allegation that he shared information with a foreign government, no matter the nature or context, is categorically barred by the Clause, fails for substantially the same reasons.  Even assuming *arguendo* that (1) providing sensitive information *to a foreign government* (including to its intelligence service) could theoretically, in the appropriate circumstances, (2) be sufficiently connected to "information-gathering" (Menendez First Mot. 34) *from a foreign government*, and that gathering, in turn were (3) sufficiently connected *to a legislative act* such that the first step in this process were protected—and Menendez offers no support for this expansive proposition, much less identifies the legislative act such conduct was purportedly in aid of—nothing about the allegations in this case supports Menendez's conclusory claim.  Put simply, "the way that Senator Menendez chooses to characterize his actions does not resolve the Speech-or-Debate-Clause question."  *Menendez*,

43

831 F.3d at 172; *see also, e.g.*, *Walker*, 733 F.2d at 932 (the "characterization of [a challenged act] as 'legislative'" does not control).   As described above, the Indictment alleges that Menendez provided non-public and sensitive information to a foreign power, including that which "pose[d] significant operational security concerns" (Indictment ¶ 19(b)), not in a contemporaneous and direct "exchang[e]" of information between "officials" in aid of legislative activity (Menendez First Mot. 33), but secretly, through his then-girlfriend and her friend, and generally without involving his staff, as part of a corrupt scheme in which he served as an agent of that foreign power. That conduct is untethered to any legislative act and cannot reasonably be deemed protected legislative activity.  *Cf. Renzi*, 651 F.3d at 1025.

Finally, although the Indictment references FMF and FMS multiple times, at no point does the Indictment allege that Menendez *in fact* placed or declined to place a single hold.  Rather, all of the Indictment's allegations in this respect concern (1) what he promised to do, said he had done, or agreed to seek to have done, or (2) what co-conspirators believed he would do or had done.  (*See* Indictment ¶¶ 19(c), 19(d), 20, 35, 37(g).)   None of this is protected conduct. *See, e.g.*, *Helstoski*, 442 U.S. at 490 ("A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.'").[12]  In short, irrespective of whether a hold itself is a protected legislative act (and it is not for the reasons discussed above), the Indictment alleges promises and communications *about* holds, not holds themselves, and accordingly does not implicate the Speech or Debate Clause with respect to holds.  And because it is also undisputed that a promise or agreement to place or not to place a hold on FMS or FMF is a promise or

---

[12]  Menendez, by comparison, makes multiple assertions about actual holds in his brief. (*See* Menendez First Mot. 7, 8, 36); *see supra* n.11.

agreement to take or not take an official act, these promises or agreements, *standing alone*, warrant denial of Menendez's motion to dismiss.

                        b)       Recommendations for U.S. Attorney and a Prior Meeting and Communications with a Particular U.S. Attorney Candidate

Menendez also contends that all allegations in the Indictment relating to his recommendations to the White House as to who should be nominated to serve as the United States Attorney for the District of New Jersey, including (i) a meeting that Menendez had with one such person (referred to in the Indictment as the "Candidate"), and (ii) calls that an outside political advisor (referred to in the Indictment as the "Advisor") had with the Candidate prior to a recommendation, are categorically barred by the Speech or Debate Clause.  (Menendez First Mot. 23-26.)  As with Menendez's claim concerning FMF, FMS, and foreign officials, this claim fails for multiple reasons, including because it too conflates what is "official" with what is a "legislative act" and rests on a misreading of the Indictment's allegations.

However, before explaining why that is so, the Government again first notes that Menendez's framing of the charges against him is overly and artificially constricted.  Contrary to how Menendez frames this portion of his argument (*see* Menendez First Mot. 23), he is not charged with agreeing to recommend a particular person for U.S. Attorney in return for bribes.  Rather, as is relevant here, the Indictment charges that Menendez "promised to and did use his influence and power and breach his official duty to recommend that the President nominate an individual as U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to the federal criminal prosecution of FRED DAIBES, the defendant, and to seek to disrupt that same prosecution."  (Indictment ¶ 2; *see also, e.g., id.* ¶ 46 (Menendez "agreed to attempt to influence and attempted to influence the pending federal prosecution of FRED DAIBES, the defendant, in exchange for cash, furniture, and gold bars that DAIBES

45

provided to MENENDEZ and NADINE MENENDEZ, a/k/a 'Nadine Arslanian,' the defendant, including by recommending that the President nominate a candidate for U.S Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's case, and by attempting to influence the U.S. Attorney's Office for the District of New Jersey to act favorably in DAIBES's case.").)  In short, as with his prior claim, the actions that Menendez challenges under the Clause are alleged to have been only certain of multiple acts in furtherance of the scheme, not the scheme itself, which is broader and encompasses actions that Menendez does not challenge under the Clause.  Accordingly, even if Menendez were correct, he still would not be entitled to dismissal.  *See Murphy*, 642 F.2d at 700; *McDade*, 28 F.3d at 300; *Rostenkowski*, 59 F.3d at 1300.  In any event, again, Menendez is not correct, for multiple reasons.

Menendez presses three apparently interrelated points in support of his claim:

(1) The Constitution provides that the President, "by and with the Advice and Consent of the Senate," may appoint officers of the United States.  (Menendez First Mot. 23-24.) The recommendation of who should be nominated is "advice."  (*Id.* 24 (emphasis omitted).)  "Recommending a candidate for U.S. Attorney—a position that requires Senate confirmation—is thus a square legislative act."  (*Id.*)

(2) Because such a recommendation is a protected legislative act, anything that "culminat[es]" in the recommendation, no matter its character, is protected "information gathering."  (*Id.* 25.)

(3) This information gathering or factfinding includes both Menendez's own meeting and communications with the Candidate and, because Members of Congress may and often do function through "aides," it includes all conversations between the Advisor and the Candidate prior to the recommendation.  (*Id.* 25-26.)

These points are legally flawed, reach too far, and misread the Indictment.

As to the first of Menendez's points, there is no dispute that the Constitution vests the President with the "Power," to "nominate, and by and with the Advice and Consent of the Senate,"

to "appoint . . . Officers of the United States."  U.S. Const., art. II, § 2, Cl. 2.  But that does not automatically turn "Advice" into a legislative act.  As an initial matter, although not dispositive, certain historical sources suggest that "by and with the Advice and Consent of the Senate" referred to the Senate deliberating and then voting on a nomination, not the providing of "advice" before a nomination, as might be understood in modern parlance.  *See, e.g.*, Jean Galbraith, *Prospective Advice and Consent*, 37 Yale J. Int'l L. 247, 254-56 (2012); *see generally* Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 Harv. J. L. & Pub Pol'y 103 (2005).

In any event, regardless of whether "by and with the Advice" means *the pre-nomination giving of advice*, as Menendez's argument assumes, the Constitution's apparent reference to the giving of advice does not *ipso facto* render such advice a legislative act within the meaning of the Speech or Debate Clause.  Congress has numerous enumerated powers under the Constitution, including broadly to "provide for the common Defence and general Welfare of the United States," U.S. Const., art. I, § 8, cl. 1, but that does not mean that every action in furtherance of or connected to such powers is conduct "'essential to legislating.'"  *McSurely*, 553 F.2d at 1285 (quoting *Gravel*, 408 U.S. at 621); *see also, e.g.*, *Walker*, 733 F.2d at 929 (the Clause only protects "activity integral to lawmaking").  Were the rule otherwise, there would be virtually no limit to the Clause.  The Supreme Court "has repeatedly insisted that the [] Clause is subject to 'finite limits.'"  *McSurely*, 553 F.2d at 1285 (quoting *Doe*, 412 U.S. at 317).

Of course, a "legislative act" need not always involve actual legislation itself.  As Menendez notes (Menendez First Mot. 24), the Supreme Court has stated that the Clause covers those acts that are an "integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and

47

passage or rejection of proposed legislation *or with respect to other matters which the Constitution places within the jurisdiction of either House*." *Gravel*, 408 U.S. 625 (emphasis added).  For this reason, there is no dispute in this case that the Senate providing "Consent" (or non-consent) to a nomination, *i.e.*, voting on the nomination, may be deemed a protected legislative act, as may be the hearing or similar formal process to vet a nominee prior to such a vote.  *See, e.g.*, *Walker*, 733 F.2d at 929 (the Clause generally protects "participation in committee investigations, proceedings, and reports").

However, the giving of "advice" prior to a nomination is not a vote or integral to a vote.  It is not the exercise of legislative power, but a method through which a legislator may seek to influence an *exclusive power of the President*.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring in judgment) ("No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for appointment."); *United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962) (cited at Menendez First Mot. 24) (the President makes the decision as to whom to nominate, after obtaining "the recommendations of the candidate's Senators").  To be sure, "the advisory function makes consent more likely" *if* there is a nomination of the person who has been recommended, that is, if the advice is followed.  David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491, 1495 (1992) (cited at Menendez First Mot. 24).  But that does not mean that the Senate's "advisory role before the nomination has occurred" is the same as and legally inseparable from the Senate's "reviewing function after the fact."  101 Yale L.J. at 1495.  The advisory role is different in timing, form, and function.  It is not a power of one branch, but rather part of a "consultative relationship between the Senate and the President."  *Id.* That is not *legislating*, or akin to legislating.  In short, the advisory function is just that.

48

*See Edmond v. United States*, 520 U.S. 651, 659 (1997) ("By vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches.").

But even if "advice" were a protected legislative act, and even if a recommendation alone (*i.e.*, the mere fact of a recommendation, without any content, as is alleged here (Indictment ¶¶ 48, 50)) were deemed to fall within such advice, it would not follow that Menendez's meeting and communications with the Candidate would also be protected legislative acts. The pertinent meeting and communications here precede the Candidate's recommendation. (*Id.* ¶ 47.) Each is therefore at least one level removed from "advice," much less a vote on a nomination (and indeed, the first person whom Menendez recommended was not nominated (*see id.* ¶ 48)). As described above, merely alleging that an action preceding a legislative act is a "part[]" of that act, as Menendez does (Menendez First Mot. 25 (emphasis omitted)), is not sufficient to bring the act within the Clause. *See, e.g., Graham*, 2022 WL 13682659, at *1; *Menendez*, 831 F.3d at 168; *In re Grand Jury Investigation*, 608 F. App'x at 101; *see also Menendez*, 132 F. Supp. 3d at 624.

Here, Menendez, who bears the burden on his claim, *see, e.g., Menendez*, 831 F.3d at 165, offers only one basis for a finding that his meeting and subsequent communications with the Candidate should be deemed protected legislative acts. Specifically, he claims these constitute "information gathering" in purported aid of deciding whether to recommend the Candidate to the White House as a nominee for U.S. Attorney. (Menendez First Mot. 25.) But the Indictment does not describe any "information" that Menendez sought to "gather[]" in his meeting with the Candidate *at all*. Rather, it alleges that, during the meeting: "MENENDEZ criticized the U.S. Attorney's Office for the District of New Jersey's prosecution of FRED DAIBES, the defendant,

49

and said that he hoped that the Candidate would look into DAIBES's case if the Candidate became the U.S. Attorney.  MENENDEZ did not mention any other case in the meeting."  (Indictment ¶ 47.)  Irrespective of whether any other statement in this meeting might be admissible were Menendez to object—an issue the Court need not decide at present—the Indictment does not describe any other statements, and this allegation bears no plausible relationship to protected legislative information gathering (or any other protected act).  *Cf. Menendez*, 132 F. Supp. 3d at 630 ("To the extent that any legislative communications took place at the meeting between Menendez and Tavenner [a nominee], they are not alleged in the indictment."); *see also Menendez*, 831 F.3d at 169 (rejecting argument that because communications with the Executive Branch could have been motivated by "policy concerns," they were protected, because the actual communications were at least predominantly made "with an eye toward Dr. Melgen's specific situation"); *McDade*, 28 F.3d at 300 (drawing distinction between letter advocating on behalf of specific company and letter that discussed a "broader policy question"); *see generally Johnson*, 383 U.S. at 172 (rejecting claim that the Clause covers corrupt "attempt to influence the Department of Justice").

Nor, contrary to Menendez's suggestion (Menendez First Mot. 25), does it matter that Menendez's statement took place in a meeting with the Candidate that might facially have appeared legitimate.  *Cf., e.g., Myers*, 692 F.2d at 860 ("Thompson claims that the Speech or Debate Clause bars the introduction into evidence of his private conversations with Congressman Murtha on the floor of the House of Representatives, in which he invited Murtha to join the ranks of those accepting bribes.  One would think that a Congressman, even when grasping for objections to a criminal conviction, would understand that the Speech or Debate Clause accords immunity to

what is said on the House floor in the course of the legislative process, *Gravel v. United States*, *supra*, not to whispered solicitations to commit a crime."); *Menendez*, 132 F. Supp. 3d at 630.

For the same reasons, the Indictment's allegations concerning Menendez's related post-meeting communications with the Candidate are not covered by the Clause. Menendez does not describe these communications. As is relevant here, the Indictment alleges, in its entirety:

> After the meeting, the Candidate informed MENENDEZ that he might have to recuse himself from the DAIBES prosecution as a result of a matter he had handled in private practice involving DAIBES. MENENDEZ subsequently informed the Candidate that MENENDEZ would not put forward the Candidate's name to the White House for a recommendation to be nominated by the President for the position of U.S. Attorney. MENENDEZ also told the Candidate that MENENDEZ would be recommending a different individual for the position.

(Indictment ¶ 47.) Again, irrespective of whether any other aspect of Menendez's communications with the Candidate might be inadmissible were Menendez to object—an issue the Court need not decide at present—these allegations bear no resemblance whatsoever to protected legislative information gathering. Indeed, they do not describe any information Menendez sought at all.[13]

Finally, Menendez asserts that the Advisor's pre-recommendation communications with the Candidate are protected. (Menendez First Mot. 25-26.) Menendez does not describe these communications, either. As is relevant here, the Indictment alleges, in its entirety:

> During that time period, in or about the spring of 2021, [the Advisor] spoke to the Candidate and discussed, among other things, the possibility of the Candidate recusing from the prosecution of FRED DAIBES, the defendant. Subsequently, the Advisor informed MENENDEZ that the Advisor believed that the Candidate would

---

[13] Although Menendez does not appear to make such an argument, to extent that his own statements to the Candidate might theoretically, separate from any purported "information gathering," be deemed protected, they are not covered by the Clause for multiple reasons, including because they were part of a corrupt scheme to seek to interfere with Daibes's federal prosecution. *Cf., e.g.*, *Menendez*, 831 F.3d at 169; *see also Johnson*, 383 U.S. at 172.

> likely not have to recuse from the prosecution of DAIBES.  On or about May 2, 2021, in connection with MENENDEZ's potential recommendation of the Candidate, the Advisor texted MENENDEZ, "I think if you call [the Candidate], you'll be comfortable with what he says."

(Indictment ¶ 49.)  These allegations are not covered by the Clause for the same reasons set forth above.[14]

In any event, these allegations also are not covered by the Clause for a separate and independent reason: because the Advisor was not a Senate "aide[], "—as Menendez suggests, but does not directly state (Menendez First Mot. 25)—but rather was an outside political consultant employed by a private firm.  Menendez cites no case, and the Government is unaware of any, in support of the proposition that a Senator may choose to act not through legislative staff—who, among other things, are subject to Senate ethics rules and discipline, as described in the Senate Ethics Manual *see* Select Comm. on Ethics, U.S. Senate, *Senate Ethics Manual* (2003), *available at* https://www.ethics.senate.gov/downloads/pdffiles/manual.pdf—but rather through an outside political consultant with a private firm, and then claim protection under the Clause.  *See, e.g.*, *Menendez*, 132 F. Supp. 3d at 624 ("Nothing . . . in *Gravel* or later cases suggests that the Speech or Debate Clause protects a *former* aide who has left the employment of a Member." (emphasis in original)); (*see also* Menendez First Mot. 17 (acknowledging that where an act is more political than legislative, it does not fall within the Clause).)

---

[14] The Advisor also was asked by Menendez to get information from and/or convey a message to the Candidate after the Candidate became U.S. Attorney.  (*See* Indictment ¶ 53(f), (g).)  Menendez does not claim that these statements are covered by the Clause; they are not, *see, e.g.*, *Johnson*, 383 U.S. at 172, and they shed light on the prior statements.

2.       McDonnell *Does Not Entitle the Defendants to Dismissal of the Charges*

In addition to his Speech or Debate Claims, Menendez asserts that he is entitled to dismissal of all of the bribery and extortion counts under *McDonnell*.   Hana and Daibes also make *McDonnell* claims.   None has merit.   The Government discusses particular claims below.   It does so in the same general order as the above-described Speech or Debate claims, starting with Egypt-related allegations.   However, the Government first briefly sets forth two fundamental legal points that, along with those discussed above, assist in disposing of or substantially narrowing multiple of the defendants' claims, should the Court choose to reach them.

*First*, whether charged in conspiracy counts or substantive counts, provided the elements are otherwise met, a defendant is guilty of participating in a bribery or extortion under color of official right scheme irrespective of whether the public official took any action in exchange for the bribe or intended contemporaneously to do so.   *See McDonnell*, 579 U.S. at 572 ("Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so."); *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *Brewster*, 408 U.S. at 526 ("There is no need for the Government to show that [the defendant] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise."); *United States. v. Percoco*, 13 F.4th 180, 201 (2d Cir. 2021) ("All that ultimately matters is Percoco's *agreement* to perform official action, not his execution of the deal." (emphasis in original)), *rev'd on other grounds*, 598 U.S. 319 (2023); *Silver*, 948 F.3d at 551 (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation

53

marks and brackets omitted)); *Myers*, 692 F.2d at 842 ("If Myers was 'playacting' and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violated the bribery statute."); *United States v. Polakoff*, 121 F.2d 333, 334 (2d Cir. 1941) ("success in the endeavor is not necessary"); *United States v. Avenatti*, 432 F. Supp. 3d 354, 362 (S.D.N.Y 2021) (rejecting dismissal of honest services fraud charge; "[t]he Government is not required to prove that the fraudulent scheme was successful" (citing, *inter alia*, *Pasquantino v. United States*, 544 U.S. 349, 371 (2005))); *see also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid.").

*Second*, and relatedly, because a bribery scheme need not involve actual action, it follows that not all acts promised or agreed to be taken, or in fact taken, in connection with or furtherance of the scheme must themselves be official acts. As *McDonnell* explained, while "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act,'" that does not mean such an act is irrelevant, because, for example, it "could serve as evidence of an agreement to take an official act." *McDonnell*, 579 U.S. at 573, 574. In short, the pertinent question is not whether *every* one of the acts a defendant promised or agreed or was bribed to take—much less actually took—in a scheme is an "official act," but whether *any* is. *See, e.g.*, *Percoco*, 13 F.4th at 193 ("because the evidence of an agreement on the Labor Peace Agreement is so overwhelming, we need not address the other official acts identified by the government"); *United States v. Ng Lap Seng*, 934 F.3d 110, 141-42 (2d Cir. 2019) (because the scheme involved at least one official act, "we need not resolve the parties' dispute as to whether any of these additional actions could themselves qualify as 'official acts' under *McDonnell*"), *cert. denied*, 141 S. Ct. 161 (2020).

With these legal principles in mind, the Government addresses the defendants' challenges to the acts alleged in the Indictment. The Government first discusses allegations involving Menendez's intervention with the USDA, then turns to the Qatar-related allegations, next addresses the allegations related to Daibes's federal criminal prosecution in the District of New Jersey, and finally discusses the allegations involving the New Jersey state prosecution and investigation. After addressing these allegations, the Government responds to Menendez's claims regarding official duty, and then addresses the arguments that Hana and Daibes raise with respect to *McDonnell*.

           a)      Menendez's Intervention with the U.S. Department of Agriculture

Menendez contends that the Indictment's allegations concerning his intervention with the USDA fail to state an offense because his intervention purportedly was not an "official act." (Menendez First Mot. 29-30.) This contention is both premature and meritless. But even if it were both ripe and meritorious—and it is neither—Menendez still would not be entitled to dismissal. This is so because the Indictment alleges that he promised and agreed to take multiple official acts, any one of which suffices to sustain the charges, *see, e.g.*, *Ng Lap Seng*, 934 F.3d at 141-42, and not all of which he challenges under *McDonnell*. In any event, this and his other *McDonnell* challenges fail.

As an initial matter, Menendez acknowledges that "the Indictment alleges that [he] pressured USDA to drop its opposition to an Egyptian monopoly certification, to facilitate Hana's payment of illicit bribes to his wife." (Menendez First Mot. 29.) Specifically, the Indictment alleges that the "corrupt relationship" described in the Indictment involved "ROBERT MENENDEZ, the defendant, promising to take and taking a series of official acts and breaches of official duty in exchange for bribes that benefitted him both directly, and indirectly through

55

NADINE MENENDEZ, a/k/a 'Nadine Arslanian,' the defendant," including that Menendez "improperly advised and pressured an official at the United States Department of Agriculture for the purpose of protecting a business monopoly granted to HANA by Egypt and used in part to fund the bribes being paid to MENENDEZ through NADINE MENENDEZ." (Indictment ¶ 2; *see also id.* ¶¶ 27-30 (describing Menendez's intervention with the USDA).) Menendez does not assert, nor could he, that the statutory language that follows these and the other allegations in the Indictment fails to comport with the law concerning what an indictment must allege, namely, it "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776. Menendez's challenge can and should be rejected on this ground alone. *See, e.g.*, *Lee*, 919 F.3d at 353.

Nor does Menendez appear seriously to argue that the factual allegations described above do not, on their face, state an offense. Menendez is alleged to have entered into a conspiracy in which he promised or agreed to take "official acts" in "exchange for bribes," including "improperly advis[ing] and pressur[ing] an official" at a federal agency "for the purpose of protecting a business monopoly" of one of the persons bribing him. (Indictment ¶ 2.) Even if *McDonnell* were read to suggest that "the standard for sufficiency of an indictment" charging bribery were "the same as that for a conviction," and it should not be so read, *Lee*, 919 F.3d at 353, these allegations, if true, describe a crime. Menendez nevertheless asks this Court to hold, as a matter of law, that the allegations against him cannot even be considered by the jury. He presses two arguments in support of this request. Each argument fails.

*First*, Menendez suggests that although the Indictment expressly alleges that he "improperly advised and pressured" a high-ranking USDA official, Menendez did no more than "place[] a single call" that cannot be "characterized as having advised or pressured" the official.

(Menendez First Mot. 29.)  Menendez does not expand on this argument, which is a factual one at odds with the Indictment, and accordingly cannot be considered at this time.  *See, e.g.*, *Goldberg*, 756 F.2d at 950.  The Government expects to demonstrate at trial that Menendez's call was not nearly as benign as he conclusorily suggests, but the Indictment's allegations alone are sufficient to overcome Menendez's factual challenge at this stage.

*Second*, Menendez argues that no matter the purpose or nature of his call, it cannot be deemed an "official act" because Egypt granted IS EG Halal the monopoly, the "USDA has no role in Egyptian monopoly determinations," and, therefore, regardless of whatever "policy" the USDA may have had, the "only ultimate exercise of governmental power is still by Egypt" alone. (Menendez First Mot. 29-30.)  To the extent that this argument appears to be partially factual, it too is premature.

In any event, the sole support that Menendez offers for his position that an "official act," as a matter of law, cannot be an act within the ultimate authority of a foreign nation is *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017).  (*See* Menendez First Mot. 30.)  However, the pertinent portion of that decision rested on certain statutory language in Section 201, not *McDonnell* (which, as described above, did not involve a Section 201 charge).  *See Jefferson*, 289 F. Supp. 3d at 737 (stating that because Section 201 "defines a public official to include only officials of the U.S. government", a federal official can only be guilty if the official act itself would also be undertaken by a federal official).  There is good reason to doubt that *Jefferson*, the reasoning of which appears to be a single sentence, is correct even as to Section 201.  *Compare id. with, e.g.*, *United States v. Kimbrew*, 944 F.3d 810, 814, 815 (9th Cir. 2019) (affirming Section 201 conviction of aide to congresswoman for accepting bribes in exchange for promises to pressure

city employees, and explaining, *inter alia*, "[t]he bribe recipient need not be the final decisionmaker"), *cert. denied*, 141 S. Ct. 400 (2020).[15]

But the Court need not decide whether *Jefferson* is correct to reject Menendez's claim, because the claim is premised on the undeveloped, yet critical, assumption that the action that he is alleged to have sought from the USDA cannot—itself—be found by the jury to be an "official act."  The Government expects to present ample evidence at trial from which the jury could so find, including the following:  Official-1, the senior official whom Menendez improperly advised and pressured, oversaw the Foreign Agricultural Service, which handles agricultural export issues, including working to expand and maintain access to foreign markets for U.S. agricultural products by removing trade barriers.  The IS EG Halal monopoly was expected to raise costs and disrupt the U.S. market (*see* Indictment ¶ 27), and thus fell squarely within the Foreign Agricultural Service's mandate.  Accordingly, the USDA's formal requests that Egypt suspend or reverse course—including one that Official-1 personally signed—concerned a core aspect of the agency's federal authority and role, and represented the considered and official position of the Executive Branch on an important matter of economic and foreign affairs, with real-world effects, which position or the effecting thereof Menendez sought to change (*see id.* ¶ 30).  In other words, the Indictment alleges, and the Government expects to prove at trial, that Menendez's call to Official-1 sought to advise and pressure the USDA to affirmatively change the Executive Branch's official position on a matter involving a specific company, with ramifications for an entire industry and

_____

[15]  Even if *Jefferson* were correct as to Section 201, Counts Two and Three of the Indictment do not rest on Section 201, and while Count One does rest on Section 201, the Indictment alleges that Menendez agreed and promised to take multiple official acts, not all of which Menendez challenges under *McDonnell*, and multiple of which involve federal officials and federal action and thus do not fall within *Jefferson*'s statement.  *See infra* pp. 70-71

Case 1:23-cr-00490-SHS   Document 180   Filed 02/05/24   Page 78 of 196

for the country's relations with another sovereign—*i.e.*, to take a specific action on a discrete matter within the agency's mandate.

Indeed, the Supreme Court has recognized that even nominally informal communications between one sovereign nation and another have great legal significance due to the need for the nation to speak "with one voice" on foreign policy matters. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015); *see also id.* (holding unconstitutional Congressional requirement that the Executive make a statement in a passport, even one that "would not itself constitute a formal act of recognition," because it would conflict with the Executive's exclusive authority to recognize foreign governments, and noting that a passport is "addressed to foreign powers" (internal quotation marks omitted)); *Biden v. Texas*, 597 U.S. 785, 805 (2022) ("Article II of the Constitution authorizes the Executive to engage in direct diplomacy with foreign heads of state and their ministers." (internal quotation marks and brackets omitted)).  In sum, the USDA's official policy and actions with respect to the monopoly was of significant import to the United States, such that Menendez was not merely seeking action by a foreign government, but was seeking action by an official within the Executive Branch on a matter of consequence to the United States.

Moreover, to the extent that Menendez's claim rests on the further assumption that his call to USDA must itself constitute or cause an official act, the law is to the contrary.  The Government need not allege, much less demonstrate, that Menendez actually *engaged* in any official acts, but rather that he agreed and/or promised to undertake at least one. *See, e.g.*, *McDonnell*, 579 U.S. at 572; *Evans*, 504 U.S. at 268; *Brewster*, 408 U.S. at 526; *Silver*, 948 F.3d at 551-52.  Irrespective of whether a properly-instructed jury could find that the USDA call was itself an official act—and the jury could so find—the call is indisputably relevant and probative of whether Menendez promised and agreed to take official action "in ways that benefited the Government of Egypt and

59

WAEL HANA, a/k/a 'Will Hana,' the defendant, an Egyptian-American businessman, among others."  (Indictment ¶ 2.)  Nor does Menendez challenge under *McDonnell* other actions in this portion of the scheme, including his promises as to FMF and FMS, which, as stated above, are alone sufficient to warrant denial of the motion to dismiss.

Of course, Menendez is entitled to argue that the jury should not find that he promised or agreed to take any "official act" at all.  But to accept his claim at this stage, without any factual presentation to the jury, would effectively exclude from the scope of all bribery statutes large swaths of the U.S. government.  Indeed, accepting his argument would appear to immunize against bribery charges a bribe paid to seek to induce the U.S. Secretary of State or a U.S. Ambassador to abandon an effort for a foreign country to support Ukraine, rather than Russia, in the Ukrainian war, whether through financial aid or the provision of arms, since there too, the "ultimate exercise of governmental power" would be by a foreign nation (Menendez First Mot. 30).  Similarly, Menendez's argument would appear to immunize against bribery charges a bribe paid to seek to induce federal officials to pressure a different country to follow (or not follow) the U.S.'s "longstanding one China policy," *see* https://www.state.gov/u-s-relations-with-taiwan/; to recognize (or decline to recognize) a particular organization as a terrorist organization, *see* https://www.state.gov/foreign-terrorist-organizations/; to use (or decline to use) military force rather than diplomatic efforts, or vice-versa, to resolve a dispute; to agree (or not agree) to a ceasefire in a conflict; or any number of other matters involving or connected to foreign or military affairs, no matter their nature, scope, or serious real-world ramifications, so long as the "ultimate" decision was that of a different country.  The Court should not adopt a reading of "official act"

such that these kinds of absurdities would result.  *See, e.g.*, *United States v. Wilson*, 503 U.S. 329, 334 (1992) ("[A]bsurd results are to be avoided.").[16]

> b)      Menendez's Receipt of Payments Knowing Daibes Expected Menendez to Take Official Action in Exchange to Benefit Daibes and Qatar

Menendez also asserts that no Qatar-related allegations describe official action. (Menendez First Mot. 28.)  The Court need not reach this claim, either, because, as discussed above, even non-official acts may be evidence of a bribery scheme, and a bribery charge will stand so long as the Government proves an agreement or promise to undertake at least one official act.

In any event, Menendez does not dispute that he is alleged to have agreed to receive payments from Daibes knowing that Daibes expected Menendez in return to take action.  (*See, e.g.*, Indictment ¶ 45 ("when he accepted at least certain of those things of value from DAIBES, MENENDEZ knew that DAIBES also expected MENENDEZ in exchange to take action to benefit the Government of Qatar, and thereby benefit DAIBES, who was seeking millions of dollars in

---

[16] Menendez similarly and briefly contends that the Egypt-related allegations concerning his communication with the Departments of Treasury and State fail.  (Menendez Mot. 32.)  This contention is again at least partially factual and again incorrectly assumes that every act he undertook must be, in and of itself, an "official act."  As is relevant here, the Indictment alleges:

> NADINE MENENDEZ texted Egyptian Official-3, "anytime you need anything you have my number and we will make everything happen."  A few days later she arranged for MENENDEZ to meet with Egyptian Official-3, whom [she] referred to as "the general," regarding negotiations between Egypt, Ethiopia, and Sudan over a dam on the Nile River being built by Ethiopia, known as the Grand Ethiopian Renaissance Dam (the "Dam"), which was generally regarded as one of the most important foreign policy issues for Egypt.  Within one month, in or about April 2020, MENENDEZ wrote a letter to the then-Secretary of the Treasury and the then-Secretary of State regarding the Dam . . . .

(Indictment ¶ 37(a).)  Menendez does not dispute the obvious relevance of these allegations, and he is not entitled to dismissal regardless of whether, standing alone, they describe an official act.

investment from a fund with ties to the Government of Qatar"); *id.* ¶¶ 55-66 (describing series of events, involving Daibes and Qatar).)  Nor does Menendez dispute that at least one such action plainly involves an official act, namely, the passage of a Senate resolution.  (*See* Menendez First Mot. 28.)

Menendez argues, however, that while the Indictment alleges that he took multiple actions, because the Indictment does not allege that he "took any action on this resolution" itself, the allegations fail as a matter of law.  (*Id.*)  This argument is foreclosed by the cases cited above, which hold in unequivocal terms that if—as alleged—a public official agreed to accept payment in exchange for an official act, it does not matter whether he or she fact undertook such an act or even intended to do so.  *See, e.g.*, *McDonnell*, 579 U.S. at 572; *Evans*, 504 U.S. at 268; *Brewster*, 408 U.S. at 526; *Silver*, 948 F.3d at 551-52; *see also id.* at 545 ("Extortion under color of right and honest services fraud require that the official reasonably believe, at the time the promise is made, that the payment is made in return for a commitment to perform some official action.").  Here, the Indictment alleges that Menendez accepted at least one thing of value knowing that Daibes expected him to take at least one official act, including supporting the resolution, in exchange.  The law requires no more.  *See, e.g.*, *McDonnell*, 579 U.S. at 572 ("A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return.").  Thus, that the Indictment does not allege actual action on the Senate resolution itself is legally irrelevant.[17]

---

[17] That is not to say that Menendez did or did not take action on the Senate resolution.  But to the extent that such action may fall within the Speech or Debate Clause (*see* Menendez First Mot. 28), it is not alleged in the Indictment.

c)    Menendez's Attempts to Interfere with Daibes's Federal Criminal Case

Menendez also contends that the Indictment's allegations concerning his attempts to interfere with Daibes's pending federal criminal case in the District of New Jersey fail to state an offense because Menendez's actual and attempted outreaches to the U.S. Attorney's Office for the District of New Jersey purportedly were not themselves "official acts." (Menendez First Mot. 26-27.) This contention too need not be ruled upon, is premature, and is meritless.

Menendez again does not assert, nor could he, that the Indictment does not, on its face, state an offense. (*See, e.g.*, Indictment ¶ 2 (Menendez promised to undertake "official acts . . . in exchange for bribes," including that he "promised to and did use his influence and power . . . to seek to disrupt" Daibes's federal prosecution"); *id.* ¶ 46 ("From at least in or about December 2020 to at least in or about early 2022, ROBERT MENENDEZ, the defendant, agreed to attempt to influence and attempted to influence the pending federal prosecution of FRED DAIBES, the defendant, in exchange for cash, furniture, and gold bars that DAIBES provided to MENENDEZ and NADINE MENENDEZ, a/k/a 'Nadine Arslanian,' the defendant, including by . . . by attempting to influence the U.S. Attorney's Office for the District of New Jersey to act favorably in DAIBES's case."); *id.* ¶ 53 (describing events following the Candidate becoming U.S. Attorney.).) On that basis alone, the Court can and should reject Menendez's argument and leave his factual disputes for the jury to resolve at trial. Instead of contesting this fundamental point, Menendez makes two arguments. Neither has merit.

*First*, Menendez suggests that, "in fact," his conduct was not intended to and did not advance any criminal "objective." (Menendez First Mot. 27.) The Indictment alleges to the contrary, Menendez's factual suggestion cannot be considered at this time, *see, e.g.*, *Goldberg*,

756 F.2d at 950, and the Government expects to demonstrate amply at trial that his actions were corrupt.

*Second*, Menendez asserts that while the Indictment alleges that he promised to and did undertake actions with criminal intent, the Indictment is "*silent* as to the content of" his calls to U.S. Attorney's Office officials. (Menendez First Mot. 26 (emphasis in original).) But Menendez cites no case or other legal authority in support of the supposed requirement that if an indictment does not describe the content of a call alleged to have been part of a criminal scheme, the Indictment must be dismissed. That is not the law. *See, e.g.*, *Alfonso*, 143 F.3d at 776.[18]

Moreover, to the extent that Menendez's claim rests on the assumption that his calls to the U.S. Attorney's Office and his attempts to breach the Candidate's recusal after he became U.S. Attorney (*see* Indictment) ¶ 53(g)) must themselves and without more be official acts, the law is to the contrary. *See, e.g.*, *McDonnell*, 579 U.S. at 572; *Evans*, 504 U.S. at 268; *Brewster*, 408 U.S. at 526; *Silver*, 948 F.3d at 551-52. Irrespective of whether a properly-instructed jury could find any of that these acts were themselves official acts—and the jury could so find—they are indisputably relevant and probative of whether Menendez agreed to take an official act by attempting to influence Daibes's case. (*See, e.g.*, Indictment ¶ 2.) As that agreement, standing alone, satisfies *McDonnell*, the motion to dismiss may be denied on this ground alone.

---

[18] Although immaterial to his present claim, Menendez is aware of the content of his own calls, certain witness statements related to these calls have already been provided to him as a courtesy, he will receive material pursuant to 18 U.S.C. § 3500 prior to trial, and he will have the opportunity to cross-examine all witnesses against him. He is not entitled to avoid a jury trial by suggesting that certain potential witnesses are mistaken or allegedly do "not recall" enough for the jury to find him guilty (Menendez First Mot. 26).

   d)  Menendez's Attempts to Interfere with a State Criminal
      Investigation and Prosecution

  Finally, Menendez claims that the Indictment's allegations concerning his attempts to

interfere in a New Jersey state criminal investigation and prosecution also fail to describe one or

more "official acts."  As with his above-discussed claims, Menendez does not challenge the facial

sufficiency of the allegations or charges; to the extent that he makes factual assertions or

characterizations (as he appears to (*see, e.g.*, Menendez First Mot. 20-21)), they cannot be

considered at this time; and the Court need not resolve his claim, since it concerns only one portion

of the charged scheme.  Once again, on this basis alone, the Court can and should deny Menendez's

motion.  In any event, his claim has no merit.

  Menendez's claim rests on the contention that no public official can be prosecuted for

bribery, under any federal statute, unless the official act sought is within the actual "authority" of

the charged official, and because "federal officials generally have no capacity to take official action

respecting a *state* matter," to the extent the charges here rest on allegations that Menendez sought

to interfere with a state matter, they fail as a matter of law.  (Menendez First Mot. 19 (emphasis in

original); *see also id.* 20.)  This broad contention is irreconcilable with decades of case law,

elevates empty formalism over reality, and would immunize officials, at all levels of government,

against federal bribery charges, no matter the facts, provided that the act the bribe-payor sought is

not one that the public official can guarantee will occur because it is not within his or her formal

legal authority.  That has never been, and is not, the law.

  More than seventy years ago, the Supreme Court explained, consistent with the numerous

cases cited above, *see supra* pp. 53-54, that "[i]t is no less corrupt to sell an office one may never

be able to deliver than to sell one he can."  *United States v. Hood*, 343 U.S. 148, 151 (1952).  The

Supreme Court was equally clear in *McDonnell*, explaining, without caveat, that (1) "the question

65

or matter [for which a bribe is solicited, offered, paid, or agreed to be accepted or accepted] must be 'pending' *or* 'may by law be brought' before 'any public official'"; (2) and "[t]he word 'any' conveys that the matter may be pending either before the public official who is performing the official act, *or before another public official*."  *McDonnell*, 579 U.S. at 570 (emphases added). The Supreme Court also explained that "'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decisionmaking process."  *Id.* at 573 (quoting *Birdsall*, 233 U.S. at 230-31).  The Supreme Court thus did not suggest, much less hold, that a public official may categorically escape the reach of all federal bribery laws on the ground that he or she promised or agreed to take official action outside his or her formal authority in exchange for a bribe.

Indeed, such a holding would make no sense, because the Supreme Court was using Section 201 to describe a principle governing jury instructions with respect to extortion under color of official right and honest services fraud charges against a public official—and none of the statutes providing for such charges contains anything like the limitation that Menendez asserts exists.  As Judge Caproni explained: "*McDonnell* defined *what* an official act is, but it said nothing about *who* is capable of performing those acts."  *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2019 WL 493962, at *20 (S.D.N.Y. Sept. 8, 2019) (emphases in original).

But this Court need not rely solely on what the Supreme Court said in *McDonnell*— although what it said conflicts with Menendez's claim—because multiple Second Circuit decisions also conflict with his claim.  *See Percoco*, 13 F.4th at 196 (rejecting argument that under

*McDonnell* "an 'official act' can only be performed by an 'official' with de jure authority")[19]; *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*."); *United States v. Boyland*, 862 F.3d 279, 292 (2d Cir. 2017) (affirming conviction of state assemblyman for taking bribes in exchange for helping secure permits from city agencies, explaining the charged acts "involved concrete matters that, in order to proceed, needed to be brought before public officials or agencies that would have to make formal and focused administrative decisions").

These decisions do not stand alone. Far from it. *See, e.g.*, *Lee*, 919 F.3d at 352 ("Defendant's argument that an official cannot 'exert pressure' without holding a position with direct leverage over other officials is similarly uncompelling."); *Kimbrew*, 944 F.3d at 815 (affirming conviction of aide to congresswoman for accepting bribes in exchange for promises to pressure city employees, and explaining, *inter alia*, "the prosecution was not required to prove that [the defendant] could achieve the outcome he promised"); *Percoco*, 2019 WL 493962, at *17-20 (analyzing cases both before and after *McDonnell* and concluding that an argument that only a person with formal power or authority to effect the action sought through bribery may be prosecuted "misreads *McDonnell*, runs afoul of clear precedent, and defies common sense");

---

[19] The Supreme Court subsequently vacated the defendant's honest services fraud conviction on the ground that the jury instructions regarding the duties owed by person alleged to have served as a government agent were incorrect, but the Supreme Court did not express any concern about the long-standing principle that the action a bribe-payor seeks need not be within the formal authority of the bribe-recipient. On the contrary, the Supreme Court expressly "reject[ed] the argument that a person nominally outside public employment can *never* have the necessary fiduciary duty to the public," *Percoco*, 598 U.S. at 329 (emphasis in original), a rejection that is difficult, at best, to square with Menendez's sweeping argument.

*United States v. Burke*, No. 19 Cr. 322, 2022 WL 1970189, at *81 (N.D. Ill. June 6, 2022) (rejecting argument that public official who lacked authority to effect the act sought could not be prosecuted for bribery, explaining such an argument "ignores *McDonnell*'s clear command that an attempt to influence another official [to] act on a pending matter, here the fee increase, could constitute an official act, if proven"); *Keleher*, 505 F. Supp. 3d at 49 (under case law "a briber and bribee may be guilty of bribery even if the bribee lacked authority to accomplish the result the briber desired," and therefore the alleged "deficiency in [the defendant]'s actual authority to cede the [pertinent] land does not warrant dismissal"); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 868-69 (E.D. Pa. 2018) ("Pawlowski's argument that the Government failed to prove an official act under *McDonnell* because he had no authority to take any official action on the parking authority solicitorship contract is also unpersuasive. Pawlowski's statement that he could talk to the board in charge of the parking authority concerning [another]'s appointment could allow a reasonable jury to infer that Pawlowski either intended to 'exert pressure' on members of the board in charge of the parking authority to appoint [that person] or 'advise' them on who to appoint as solicitor, knowing or intending such advice would form the basis of an official act."); *Salahuddin v. United States*, Crim. No. 10-104, 2018 WL 5342766, at *12 (D.N.J. Oct. 29, 2018) (rejecting argument that public official who "lacked actual authority to award contracts" could be convicted of conspiracy to commit extortion under color of official right on the ground that his lack of authority meant he could not have agreed to or have taken an "official act"); *see also United States v. Menendez*, 291 F. Supp. 3d 606, 618 (D.N.J. 2018) (rejecting claim that Menendez could not be prosecuted for seeking to cause or influence an act of the Executive Branch because Menendez did not have authority over the Executive Branch; "Under Defendants' reading, it would be per se legal to give the President a thing of value to influence him to pressure the Senate Majority Leader

68

to vote or not vote for a particular bill.  This cramped reading of *McDonnell* is contrary to the purpose of section 201 and the language of the *McDonnell* Court.").  In short, if Menendez "were correct, then *McDonnell* would have dramatically narrowed the population capable of being prosecuted for bribery offenses—but *McDonnell* would have done so without saying a peep about the decades of precedent that it was implicitly overruling.  That interpretation of *McDonnell* is utterly implausible." *Percoco*, 2019 WL 493962, at *16.

Those decisions squarely support the conclusion that the Indictment's allegations about Menendez's agreement and promise to take actions to seek to influence New Jersey state officials to resolve a criminal prosecution and investigation in a way preferred by a bribe-payor satisfy *McDonnell*.  Indeed, as the Government expects to demonstrate at trial, although Menendez himself lacked the formal power to decide the outcome of those state criminal matters, his position as the senior Senator from New Jersey, by "custom" and as a matter of political reality, enabled him to exercise influence over state officials within New Jersey.  *McDonnell*, 579 U.S. at 573.  His alleged agreement and promise to use that influence to seek have state officials take actions on those criminal matters mirrors the agreements and promises of other officials against whom charges have been upheld for similarly agreeing to take or taking bribes to seek to influence officials' actions over which they had no formal authority.  *See, e.g.*, *Skelos*, 707 F. App'x at 739; *Lee*, 919 F.3d at 352; *Keleher*, 505 F. Supp. 3d at 49.  In sum, at this pretrial stage, there is no basis to grant Menendez's motion where the Indictment alleges precisely the type of agreement and promise to take official action that other courts, including the Second Circuit, have found satisfies *McDonnell*.

The only decision of which the Government is aware that so much as suggests to the contrary is *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017).  Menendez states that

this decision is "[t]he leading case on this point." (Menendez First Mot. 20.)  However, he does not cite in his brief any of the cases in the foregoing two paragraphs, multiple of which are from the Second Circuit, one of which is from this district, one of which is from his prior federal criminal case, and all of which are more recent.  Nor does Menendez acknowledge that *McDonnell* explained that "official action could be established by custom rather than by statute or a written rule or regulation, and need not be a formal part of an official's decisionmaking process," *McDonnell*, 579 U.S. at 573 (internal quotation marks omitted), much less does Menendez explain how that is reconcilable with his sweeping claim.

As to *Jefferson* itself, as described above, *see supra* pp. 57-58, the pertinent portion of that decision rested on certain statutory language in Section 201, not *McDonnell,* and consists of a single sentence without apparent analysis.  To the extent that this sentence might theoretically be read as broadly as Menendez suggests, such a reading should be rejected in light of the language from *McDonnell* discussed above, as well as case law from the Second Circuit and elsewhere.  To the extent that Menendez suggests that *Jefferson* precludes prosecution under Section 201, in particular, for federal officials who agree or promise to seek to influence officials from different sovereigns, such as state or city officials, more persuasive authority, in the form of a circuit opinion containing more than a single sentence of analysis, reached the opposite conclusion.  *See Kimbrew*, 944 F.3d at 814-15 (affirming Section 201 conviction of federal official for accepting bribes in exchange for promises to pressure city employees).  In short, to the extent that the single sentence from *Jefferson* might support an argument as to a Section 201 charge, there is good reason to doubt the validity of such an argument.  But in any event, only Count One involves Section 201, and both it and all other counts rest on multiple official acts, not all of which Menendez challenges under *McDonnell*, and multiple of which involve federal officials and federal action and thus do

not fall within *Jefferson*'s statement.  To be sure, at the appropriate time, the Court will need to determine how the jury instructions as to Count One should differ from those applicable to Counts Two and Three.  However, because, even if Menendez were correct, his motion fails, the Court can and should wait to decide upon jury instructions until the matter is ripe, after briefing from the parties, and development of the record to the extent warranted.

e)      Menendez's Claims Concerning Breaches of Duty

In addition to his "official act" claims, Menendez argues that to the extent the Indictment alleges that he breached one or more official duties—which is an alternative method of proving a Section 201 offense—the Indictment is deficient because it allegedly fails to identify the duty or duties at issue.  (Menendez First Mot. 21, 27, 28-29, 32, 33.)  In a footnote, Hana raises a similar argument.  (Hana Mot. 19 n.6.)  While this argument may be rejected because the Indictment tracks the statute and more than adequately describes what Menendez is charged with having agreed to do and done, this argument is, in any event, moot.  The Indictment tracks the statute's language, and charges in the conjunctive, as has long been the practice in this district and is appropriate.  *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir. 2008)*; United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995).  However, while its investigation is ongoing, on the facts of this case, the Government does not presently intend to ask the jury to convict the defendants under Section 201 on the basis of a breach of official duty.[20]

f)      Hana's *McDonnell* Claims

Hana also raises two *McDonnell* claims, neither of which has merit.

*First*, Hana argues that none of the bribery counts alleges or rests on an "official act."  This

---

[20] Of course, this does not render evidence probative of the duties of Menendez, such as the Senate Ethics Manual, irrelevant, but the Court need not make evidentiary decisions at this juncture.

71

argument appears to rely on one or more of the following stated or unstated propositions: (1) unless the Indictment alleges "how" an offense occurred (Hana Mot. 6), or otherwise provides the details in support of its charges, it fails to state an offense (*see, e.g.*, *id.*; *see also id.* 26); (2) every act a public official is alleged to have undertaken in return for a bribe must itself be an official act (*see id.* 15-17); (3) unless the public official actually made a decision or actually caused the official act actually to occur, the act does not count (*see, e.g.*, *id.* 16, 18); and (4) a public official cannot, as a matter of law, be prosecuted under any federal statute for agreeing to undertake an act that is outside of his or her official and defined authority (*see, e.g.*, *id.* 18), which means not just that a federal-to-state act can never count, but even a federal-to-federal act often cannot count, because there can be no bribery prosecution involving "different departments within the same government" (*id.* 19).   None of these propositions is correct, for the reasons set forth above.   In sum, the Indictment sufficiently tracks the statutory language, and no more is required; to be held accountable for bribery, an official need not perform any act so long as he agrees or promises to take at least one official act; evidence of unofficial acts may still be relevant to a bribery charge; and the official need not be able to actually complete the official act he agrees or promises to undertake.

*Second*, Hana argues that the Indictment "fails to charge that there was an agreement for Senator Menendez to accept the allegedly corrupt payments in exchange for influencing a particular question or matter."   (*Id.* 20.)   In particular, Hana asserts, "the Indictment is deficient because it does not allege an agreement between [him] and Senator Menendez that at the time Senator Menendez accepted, or agreed to accept, anything from Mr. Hana, he promised to influence a focused, concrete, and particular question or matter."   (*Id.* 25.)   But Hana does not dispute that the Indictment alleges such an agreement; indeed, that is precisely what Hana is

charged with doing, entering into an agreement to pay bribes in exchange for official action.  (*See* Indictment ¶¶ 72, 74, 77-78; *see also, e.g.*, ¶ 2.)  In short, Hana does not seriously argue, nor could he, that the Indictment fails to do all that is required, namely, "little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776.  His claim may be rejected on this ground alone.  *See, e.g.*, *Lee*, 919 F.3d at 353.

Hana nevertheless asserts that the charges against him should be dismissed, because while the Indictment alleges that he entered into an agreement to pay bribes in exchange for official action, that agreement is alleged to have involved multiple payments and multiple official acts, such that there is no apparent one-for-one linkage.  (Hana Mot. 25.)  Hana offers no support for the proposition that a bribery scheme cannot involve multiple payments and acts—and the law is the contrary.  *See, e.g., Silver*, 948 F.3d at 554 (a bribery scheme can involve "this for these or these for these, not just this for that" (internal quotation marks omitted)).  Nor would a contrary requirement make sense, especially with respect to a conspiracy, as charged in the Indictment. *See, e.g.*, *Percoco*, 13 F.4th at 191 ("It would be strange indeed to hold that an original deal between an official and payor somehow froze their agreement in time, excluding the possibility that an official could later commit to take more acts in order to maintain a revenue stream.").  And Hana subsequently concedes, as he must, that a "bribery *quid pro quo* does not require a 'link [between] each specific benefit [and] a single official act.'"  (Hana Mot. 29 (quoting *Silver*, 948 F.3d at 554).)[21]

---

[21] Relatedly, although immaterial to his claim, Hana's repeated suggestion in this portion of his brief that he does not understand what acts are alleged to have been sought through bribery (*see, e.g.*, Hana Mot. 26, 27) is difficult to square with the earlier portions of his brief in which he lays

To be sure, as Hana notes (Hana Mot. 27-28), certain other indictments in certain other cases have charged separate schemes in separate counts.  But where the facts demonstrate there was a single scheme, a grand jury can—and here did—allege a single scheme.  Hana is not entitled to dismissal on the ground that, contrary to the allegations, he disputes that he entered into a scheme at all, but if he did, it supposedly was narrower than that alleged.  Nor is he entitled to dismissal based on factual assertions or characterizations about the persuasive value of what is alleged in support of that scheme (*e.g.*, *id.* 26 (the "timing of a payment" purportedly "undermines any suggestion that there was an actual agreement")).

At bottom, Hana's argument is not cogently directed to the facial sufficiency of the Indictment, but rather, as he appears to acknowledge at the close of his argument (Hana Mot. 30), is intended to bolster his separate request for details about how the Government intends to prove the charges against him.  He is not entitled those details for the reasons set forth below, but even if he were so entitled, dismissal of the Indictment would not follow.

> g)    Daibes's *McDonnell* Claims

Finally, Daibes briefly raises two *McDonnell* claims, which fail for the same reasons described above.

*First*, he argues that because the Indictment charges a bribery conspiracy that lasted "over an extended period of time," it supposedly must be dismissed for failure to allege properly a *quid pro quo* agreement.  (Daibes Mot. 6.)  Without elaboration (or citing a particular page), Daibes cites *Silver* in support of this proposition.  That citation is puzzling, since the indictment in *Silver* charged schemes lasting *for more than a decade*, *see Silver*, 864 F.3d at 106-10, far longer than

---

out, in some detail, what the Indictment alleges (*see id.* 4-6; *see also id.* 15 (describing acts related to Egypt and Hana, and citing specific Indictment paragraphs and subparagraphs)).

the scheme charged here.  Indeed, it is all too common for bribery conspiracies to last for years, and when that occurs, the charges can and should reflect that fact.  *See, e.g.*, *Percoco*, 13 F.4th at 186-97.  As with Hana's similar claim, Daibes is not entitled to dismissal on the ground that, contrary to the allegations, he disputes that he entered into a scheme at all, but if he did, it supposedly was shorter than that alleged.

*Second*, he argues that the Qatar-related allegations fail to describe an "official act." (Daibes Mot. 7.)  As explained above, *see supra* pp. 61-62, 73, that is incorrect, and even it were correct, it is not a basis for dismissal.

## II.   THE DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE FOREIGN AGENT CHARGE

Menendez and Hana, joined by Nadine Menendez, also claim that Count Four, which charges a conspiracy to violate 18 U.S.C. § 219, must be dismissed.  They together raise four claims in support of that motion.  Each fails.

### A.    The Speech or Debate Clause Does Not Invalidate Section 219

Menendez first asserts that the Speech or Debate Clause categorically bars the foreign agent charge against him.[22]  According to Menendez, this charge "is a frontal attack on Congress that

---

[22] Menendez incorrectly and repeatedly refers to this charge as a "FARA [*i.e.*, Foreign Agents Registration Act] count," "FARA violation," or "FARA prosecution" (Menendez First Mot. 6, 34, 35, 36, 37, 40; *see also id.* 7), but the nomenclature does not appear to matter for present purposes. Menendez also suggests that, for "most Americans," FARA is a mere "disclosure statute" without any "criminal prohibition."  (*Id.* 35.)  That too is incorrect.  *See* 22 U.S.C. § 618(a) (providing for up to 5 years' imprisonment for willfully violating any of FARA's provisions, including its registration requirement); *see also United States v. Manafort*, 318 F. Supp. 3d 1, 4 (D.D.C. 2018) (FARA and similar statutes are "not just paperwork; their object is to ensure that no person acts to advance the interests of a foreign government or principal within the United States unless the public has been properly notified of his or her allegiance."); (Indictment ¶ 13 (describing letters Menendez sent to the Department of Justice asking for an investigation into a former Member of Congress for allegedly violating FARA).)  In any event, it is unclear what relevance Menendez would have the Court ascribe to his (incorrect) suggestion about FARA generally not having a criminal component.

flouts the Constitution." (Menendez First Mot. 34.) That hyperbolic statement is difficult to reconcile with, among other things, the fact that Congress itself enacted Section 219 and that the Senate has long referenced its prohibition in the Senate Ethics Manual. (*See* Indictment ¶ 12.) In any event, Menendez's Speech or Debate claim as to Section 219 is meritless. Indeed, it is indistinguishable from his above-discussed Speech or Debate claims, and he offers no additional legal authority in support of this particular attack on Section 219. (*See* Menendez First Mot. 36 ("as already explained, [the pertinent] acts are legislative").) It accordingly fails for the same reasons—and Menendez's conclusory assertion that the Indictment's "factual narrative is risible" (*id.*) is not a cognizable claim and should not be considered.

### B.    Section 219 is Consistent with the Separation of Powers

Menendez's next and principal claim is that Section 219, on its face, violates the separation of powers to the extent that the defendant is a Member of Congress. This claim appears to be a reformulation of his Speech or Debate argument (and indeed, Menendez rests this claim on the Speech or Debate Clause (*see* Menendez First Mot. 37)). To accept Menendez's categorical claim as to Section 219 when, as explained above, the Speech or Debate Clause does not bar his prosecution, would be to do what the Supreme Court has said should not be done: "render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office." *Brewster*, 408 U.S. at 520. Indeed, this claim appears even more radical—if Menendez were correct, Section 219, despite its plain language, could not be charged against any Member of Congress regardless of what he or she did, how an indictment were drafted, or what the evidence against him or her was. This claim, in short, is stunningly broad. It is also wrong.

As an initial matter, Section 219 is an act of Congress, and Congress retains the power to alter it at any time.  Courts have repeatedly noted this basic structure of our federal government in rejecting similar separation of powers arguments.  For example, in *United States v. Rose*, the D.C. Circuit rejected a separation of powers challenge to a suit under the Ethics in Government Act because "if Congress as a whole feels threatened by Department of Justice ["DOJ"] actions such as this one, it can amend the Ethics Act to restrict the jurisdiction of the DOJ or to exempt Members of Congress."  *28 F.3d 181, 190 (D.C. Cir. 1994); see also Menendez*, 831 F.3d at 174 (rejecting separation of powers challenge to Ethics in Government Act prosecution).  And in *Myers*, the Second Circuit rejected a separation of powers challenge to a bribery sting because "if the risks of a bribery sting operation outweigh its benefits, Congress always has the power to make the more limited modification of redefining the offense to exclude, in the case of Members of Congress or others, acceptance of bribes offered by undercover agents of the Government."  635 F.2d at 939; *see also Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 224 (D.C. Cir. 2013) ("[W]hatever encroachment upon congressional authority we might engender by applying [the Freedom of Information Act] to congressional communications, it was Congress that passed the Act and Congress that can amend it.").  Similarly, if the Senate—instead of just a particular Senator after being charged—perceived Section 219 as an infringement of its constitutional prerogatives, it would be surprising for it to include the statute's text near-verbatim in the official Senate Ethics Manual and to cite directly to that section (*see* Indictment ¶ 12), much less to do so for years.[23]

---

[23] The Senate Ethics Manual's "intent is to provide a 'single source' of information about ethics-related provisions of the U.S. Constitution, Federal statues, and Senate Rules which regulate the operation of a Senate office and the conduct of Senate Members, officers, and employees."  Senate Ethics Manual at xi (Preface), *available at* https://www.ethics.senate.gov/downloads/pdffiles/manual.pdf.  While of course maintaining the

Notably, Congress also expressly provided that Section 219 applies to any "Member of Congress." 18 U.S.C. § 219(c). Applying it is not a matter of interpretation; literally, that is what the statute says. And just as with bribery, "it is understandable that both Houses [of Congress] deliberately delegated this function [to enforce violations of Section 219] to the courts" and the Department of Justice. *Brewster*, 408 U.S. at 525. Had Congress wished otherwise, it could have enacted Section 219 without a criminal prohibition, or codified its principle only in an ethical code, for Congress alone to investigate and enforce. It also could have exempted Members of Congress. Those are not the decisions it made. "With the policy choice thus fully within the control of Congress, [the court] cannot conclude that the separation of powers doctrine creates a constitutional barrier to" this case. *Myers*, 635 F.2d at 939. Indeed, the separation of powers supports a judicial decision to *respect*, rather than overturn, this legislative decision. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." (internal quotation marks and brackets omitted)).

Menendez's argument to the contrary involves an attempt to combine snippets from *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), and *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587 (2007), to support an entirely novel separation of powers doctrine. First, he asserts that *Rostenkowski* held that the separation of powers doctrine provides "independent shelter" to Members of Congress, and then he attempts to define the scope of this

_____

appropriate "separation of powers does not depend on . . . whether the encroached-upon branch approves the encroachment," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) (internal quotation marks omitted), the enactment and support for the law here underscores that Menendez's invocation of the separation of powers is not based on any coherent theory.

doctrine with quotations from *Hein*. (Menendez First Mot. 37-38.) Neither case stands for the broad propositions he suggests, much less can they reasonably be combined in this way.

*Rostenkowski*'s holding was limited. The D.C. Circuit merely held that the Speech or Debate Clause did not supplant the political question doctrine in cases against Members of Congress. *See* 59 F.3d at 1307. Thus, *Rostenkowski* affirmed the dismissal of certain charges against a Member of Congress where the charges would require a court to interpret ambiguous House rules. Because Article I assigns to the House the power to set its rules, the interpretation of those rules could present a political question. *See id.* at 1306 ("[A] sufficiently ambiguous House Rule is non-justiciable.").

Unlike in *Rostenkowski*, there is no potential political question at issue in this case, and Menendez does not cite any Article I assignment of responsibility to Congress that would preclude a judicial determination that Section 219 has been violated.[24] And even if *Rostenkowski* had suggested protection beyond the political question doctrine, Menendez is wrong in reading the plurality opinion in *Hein* to have defined the scope of that protection. *Hein* was a case about standing, and "Article III standing enforces the Constitution's case-or-controversy requirement." 551 U.S. at 597-98 (internal quotation marks and ellipsis omitted). To be sure, the plurality rejected the plaintiffs' broad theory of taxpayer standing in Establishment Clause cases, in part, due to a concern about the judiciary being called upon to evaluate a wide variety of Executive Branch actions. *See id.* at 611-12. But the quotes Menendez highlights merely explain how the

---

[24] Menendez notes that, as *Rostenkowski* observed, Article I, Section 5, Clause 2 of the Constitution grants Congress the power to "punish its Members for disorderly Behaviour." (*See* Menendez First Mot. 38.) He does not, however, claim this power is exclusive to Congress or that this prosecution infringes on that congressional power. Indeed, any such claim would be baseless. *See Brewster*, 408 U.S. at 520 (rejecting separation of powers argument based on Article I, Section 5); *Myers*, 635 F.2d at 937-38 (same).

standing doctrine promotes the separation of powers; they were not independent bases for the Supreme Court's holding, much less do they support the wide-sweeping proposition that Menendez advances. *See id.* at 612 (criticizing a prior case for "fail[ing] to recognize that this doctrine [standing] has a separation-of-powers component"). The cases *Hein* quoted reinforce this view. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 760 (1984) ("it is not the role of the judiciary, absent actual present or immediately threatened injury," to adjudicate other disputes); *United States v. Richardson*, 418 U.S. 166, 191 (1974) (Powell, J. concurring) (noting that taxpayer standing eliminated the need for "a particular, concrete injury"). Both *Hein* and *Rostenkowski* applied an existing doctrine—standing in *Hein* and non-justiciability in *Rostenkowski*—rather than defining a new constitutional requirement.

The more fundamental flaw in this strand of Menendez's claim is his failure to identify the Article I "authority" that Section 219 allegedly unconstitutionally infringes, and the use of this unstated and implied authority to overturn the balance struck by the constitutional provision that *does* speak to the question: the Speech or Debate Clause. His apparent goal—constitutional protection for nearly "everything that a Member of Congress does on a daily basis" (Menendez First Mot. 38)—is one that the courts, including the Supreme Court, have repeatedly rejected, because such claims go beyond Article I. Indeed, in *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court considered and rejected a similarly expansive claim that judicial review of Congressional actions (in that case, civil suits arising out of employment decisions) would involve "a lack of the respect due coordinate branches of government," *id.* at 235 n.11 (internal quotation marks omitted), *i.e.*, the very themes of Menendez's motion (*cf.* Menendez First Mot. 41). In that case, the Supreme Court held, "[s]ince the Speech or Debate Clause speaks so directly to the separation of powers concerns raised by [the defendant], . . . if [he] is not shielded by the Clause,

80

the question [of liability] falls within the traditional role of the courts." *Id.* (internal quotation marks omitted). This is consistent with the well-established principle that where a more specific constitutional provision governs a particular claim, the standards set forth in that provision govern, rather than the more general and amorphous standards of, for example, the substantive due process clause. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). Menendez should not be permitted to upset the careful balance the courts have struck in interpreting the Speech or Debate Clause by gesturing at general concerns regarding the separation of powers.[25]

In *Brewster*, the Supreme Court addressed an argument nearly identical to the one Menendez now makes. What Menendez calls "routine acts" (Menendez First Mot. 39), *Brewster* termed "activities . . . political in nature," 408 U.S. at 512, which the Supreme Court held were unprotected. Similarly, in *Gravel*, after collecting cases "reflect[ing] a decidedly jaundiced view towards extending the [Speech or Debate] Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate," 408 U.S. at 620, the Supreme Court rejected the idea of "a judicially fashioned privilege [extending] so far as to immunize criminal conduct proscribed by an Act of Congress," *id.* at 627. That is precisely what Menendez seeks to resurrect in separation-of-powers garb.

---

[25] In any event, Menendez's invocation of the separation of powers doctrine is overstated and simplistic. Instead, in both the foreign and domestic realm, "the Constitution enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Zivotofsky*, 576 U.S. at 16 (internal quotation marks omitted).

The Supreme Court in *Brewster* also rejected the very kind of policy concerns about potential Executive Branch abuse that Menendez raises (*see* Menendez First Mot. 39-40). The Supreme Court "consider[ed] remote" the true potential for abuse of the bribery statute, particularly when "balanced against the potential danger flowing from" the possibility of legislators acting in ways the statute forbids. 408 U.S. at 524; *see also Myers*, 635 F.2d at 938-39 (explaining the "[f]orceful arguments" against a separation of powers claim based on the potential for Executive "abuse"). And, even if the Supreme Court "underestimate[d] the potential for harassment, the Congress, of course, is free to exempt its Members from" the statute's reach. *Id.* at 524. So too with Section 219.

Menendez suggests that this Court should nevertheless do what no other court has done, because if it does not, then the "specter of potential prosecution," and in particular, that "by political adversaries," will prevent Congress from doing its job. (Menendez First Mot. 40.) Menendez cites nothing in support of this sweeping claim. And it has no basis: he does not claim in his brief—nor could he—that this case is either a vindictive or selective prosecution, and Section 219 has not been routinely charged against Members of Congress. As explained above, Section 219's prohibition has long been described in the Senate Ethics Manual, yet Congress has, if Menendez is to be believed, heretofore operated without concern about the statute's explicit scope. Nor is the parade of horribles that Menendez lists in support of his extraordinary request (*see id.*) apt—because in none of his examples is the public official agreeing to act as a *foreign agent*, much less accepting bribes. Menendez, as described in a detailed indictment, returned by a grand jury, not by a "political adversar[y,]" did so agree and so accept. He is entitled to deny his guilt, but he

82

is not entitled to avoid a jury of citizens weighing the evidence and reaching its own determination.[26]

### C.   This Court Should Decline to Carve out an "Affirmative Legislative Policy Exception" to Conspiracy Liability for Section 219

Hana asks the Court to dismiss Count Four against him on the ground that Congress purportedly intended to exempt all members of the general public from conspiracy liability in this statute, alone among all federal statutes of which the Government is aware.  He comes nowhere near to showing that this law represents the unusual circumstance where "Congress demonstrates an affirmative legislative policy to leave some type of participant in a criminal transaction unpunished," *United States v. Hoskins*, 902 F.3d 69, 77-80 (2d Cir. 2018), let alone the truly exceptional circumstance where that exempted "type of participant" is not a member of a narrow class, but *any member of the general public*.  On the contrary, conspiring to violate Section 219 is a crime just like any other conspiracy.

The affirmative legislative policy exception is rarely applied, and even when it is, it exempts only narrow classes of individuals.  *See Gebardi v. United States*, 287 U.S. 112 (1932) (exempting women who merely voluntarily consented to their own transportation from prosecution under Mann Act); *United States v. Amen*, 831 F.2d 373, 381 (2d Cir. 1987) (exempting lower-level employees of continuing criminal enterprise from prosecution under "kingpin" statute), *cert.*

---

[26] Of course, Menendez is entitled to the same Constitutional protections as all other citizens.  For instance, Menendez alludes (Menendez First Mot. 37, 39) to the First Amendment, but he (correctly) does not raise a First Amendment challenge.  *See Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 935 (D.C. Cir. 1982) (rejecting First Amendment challenge to FARA and noting "it is well settled that FARA is constitutional"), *cert. denied*, 459 U.S. 1172 (1983).  Similarly, any claim of "selective prosecution" (Menendez First Mot. 40) can be addressed under the established framework for such claims, *see, e.g.*, *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003), although Menendez does not allege such a prosecution here.

*denied*, 485 U.S. 1021 (1988); *Hoskins*, 902 F.3d at 90 (exempting foreign defendants who never acted within the United States from prosecution under Foreign Corrupt Practices Act ("FCPA")). By contrast, Hana seeks a broad and unwritten exception for "[p]ersons who are not public officials," that is, the entire general public.  (Hana Mot. 45.)  No court has ever concluded that conspiracy liability is categorically inapplicable to a statute, and this Court should not be the first.

In any event, Hana has not made the necessary showing that Section 219 contains an affirmative legislative exception of any scope.  The Second Circuit has been clear: the mere fact that "a statute focuses on certain categories of persons at the exclusion of others" is insufficient; there must be "something more."  *Hoskins*, 902 F.3d at 80.  Hana shows, *at most*, that "narrow categories of persons . . . can violate § 219" (Hana Mot. 44), but offers nothing "more."[27]

None of the additional factors courts have relied on in applying the exception are present with respect to Section 219.  For example, in *Gebardi*, the Supreme Court relied on "Congress's silence as to the woman's liability" despite her participation being "'an inseparable incident of all cases in which the woman is a voluntary agent.'"  *Hoskins*, 902 F.3d at 80 (quoting *Gebardi*, 287 U.S. at 121-23).  But members of the general public are not necessary participants in Section 219 violations.  Similarly, in *Amen*, the Second Circuit relied on the statute's specific purpose of enhancing penalties for the "top brass in the drug rings, not the lieutenants and foot soldiers."  *Id.* (quoting *Amen*, 831 F.2d at 381).  Here, Hana offers no indications Congress viewed members of the general public who assist violations of Section 219 to be any less culpable.  On the contrary, as with the similar context of Hobbs Act extortion under color of official right, "'if conspirators

---

[27] Indeed, Hana has not even really shown that, since Section 2 makes liable additional categories of people beyond "principals," under aiding and abetting or willful causation theories.  *See* 18 U.S.C. § 2.

have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.'" *Ocasio v. United States*, 578 U.S. 282, 288 (2016) (quoting *Salinas v. United States*, 522 U.S. 62, 64 (1997)).  Finally, in *Hoskins*, the Second Circuit found "something more" in the extensive concerns about extraterritoriality shown in the FCPA's text and legislative history.  902 F.3d at 98.  No similar concerns or legislative history exist for Section 219.

Hana suggests that the Court should find "something more" in comparing the maximum terms of imprisonment that attach to 18 U.S.C. §§ 219 (two years), 371 (five years), and 951 (ten years).  (*See* Hana Mot. 46.)  But this argument proves too much—under Hana's reasoning, conspiracy liability could never exist for any statute punishable by less than five years' imprisonment.  And Section 219 is not the only such criminal statute.  *See, e.g.*, 26 U.S.C. § 7206 (providing for 3 years' imprisonment for subscribing to a fraudulent tax return).  Congress has acted well within its rights in concluding that a conspiracy "sometimes quite outweigh[s], in injury to the public, the mere commission of the contemplated crime."  *United States v. Rabinowich*, 238 U.S. 78, 88 (1915); *see also United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("[C]onspiracy is an agreement to commit an unlawful act.  That agreement is a distinct evil." (internal quotation marks and citation omitted)).  The differing punishments among these statutes do not satisfy the requirement for "something more."

Instead, Section 219 is similar to those statutes in cases where courts have declined to find such an exception.  For example, in *Ocasio*, the Supreme Court concluded that "there was no affirmative legislative policy to leave the bribe payers unpunished" in the Hobbs Act.  *Hoskins*, 902 F.3d at 83.  This was so even though the "statute's language arguably suggested that certain persons are spared from liability," given the incongruity of an extortion victim's agreeing to their

own extortion.  *Id.*  Here, even that incongruity is absent, and there is nothing "more" justifying the startling conclusion that Congress hid a sweeping carve-out from conspiracy liability—the only such exemption for the general public—in the unlikely vessel of Section 219.

### D.    Section 219 Is Not Vague

Finally, Hana's claim that Count Four is unconstitutionally vague as applied to him is both premature and meritless.  (*See* Hana Mot. 55-59.)  "The void-for-vagueness doctrine requires that 'a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *United States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021) (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015)). While criminal statutes are subject to stringent standards, a "statute 'need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth.'"  *Dawkins*, 999 F.3d at 787 (quoting *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013)).

As an initial matter, Hana's challenge is premature.  Under well-settled law, he "must wait to bring an as-applied vagueness challenge until the facts have been established by evidence introduced at trial and the fact-finder has had an opportunity to weigh in."  *United States v. Raniere*, 384 F. Supp. 3d 282, 320 (E.D.N.Y. 2019) (collecting cases); *see also, e.g., United States v. Alshahhi*, No. 21 Cr. 371 (BMC), 2022 WL 2239624, at *11 (E.D.N.Y. June 22, 2022) (denying as premature a vagueness challenge to 18 U.S.C. § 951), *reconsideration denied*, 2022 WL 3595056 (Aug. 23, 2022).  This is because to evaluate whether the statute as applied to Hana provided fair notice, first "it must be clear what [he] did."  *Raniere*, 384 F. Supp. 3d at 320 (internal quotation marks omitted).  In short, the Court should deny Hana's motion to dismiss because "the

86

resolution of his 'as applied' challenge will require a more expansive factual record to be developed at trial." *United States v. Hoskins*, 73 F. Supp. 3d 154, 166 (D. Conn. 2014).

Hana's vagueness challenge also fails on the merits. His primary contention appears to be that Section 219 is vague because it incorporates FARA's definitions, but not its registration requirement. (*See* Hana Mot. 57-58.) But the omission of a registration requirement makes Section 219 more straightforward, not less. While FARA prohibits acting as a foreign agent without registering, *see* 22 U.S.C. § 618(a), Section 219, for certain individuals, prohibits acting as a foreign agent at all. In other words, while Section 219 adds the element of being a public official (which Hana obviously does not contend is vague), it otherwise prohibits a subset of the crime defined in 22 U.S.C. § 618(a), a crime which "is, and has been since its inception, straightforward and sufficiently precise." *United States v. Michel*, No. CR 19-148-1 (CKK), 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022) (internal quotation marks omitted).[28]

Finally, Hana's claim that Section 219 "prohibits conduct on behalf of a non-existent category of people" (Hana Mot. at 58) is obtuse, at best. Section 219(a) makes it a crime if a public official "is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938." Hana misreads the phrase "required to register" as modifying "foreign principal" rather than the complete term "agent of a foreign principal." (*See* Hana Mot. 58.) This strained parsing is a meritless attempt to manufacture confusion where none can reasonably exist, given the statute's consistent usage of the phrase "agent of a foreign principal." *See* 22 U.S.C.

---

[28] Hana's complaint that Congress cross-referenced FARA's definitions, rather than repeating them (Hana Mot. 57), is obviously not a basis for invalidation of a federal statute. *See, e.g.*, *United States v. Stokes*, 726 F.3d 880, 896 (7th Cir.) (the cross-reference in 18 U.S.C. § 2423 "does not introduce confusion"), *cert. denied*, 571 U.S. 1084 (2013).

§ 611(c); *id.* § 612(a); *id.* § 613; *id.* § 615.[29]  All the more so given its self-evident purpose.  And plainly, Congress did not intend to enact a statute that could not be applied to anyone.

## III.   THE INDICTMENT IS NOT DUPLICITOUS

The collective claims of Menendez, Hana, and Daibes that each count of the Indictment is duplicitous disregard the legal standard and the actual allegations of the Indictment.[30]  As each count expressly alleges a single scheme, these motions should be denied.

### A.   Applicable Law

An indictment is impermissibly duplicitous if (1) it combines two or more distinct crimes into one count, in contravention of Federal Rule of Criminal Procedure 8(a), and (2) the defendant is thereby prejudiced.  *See, e.g.*, *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Duplicitous indictments can present three types of prejudice: (1) lack of notice of the crime charged and its maximum penalty; (2) the possibility that a second trial on the same charge would not be barred by the Double Jeopardy Clause; and (3) potential uncertainty with respect to the jury's verdict and the sentencing implications of that verdict.  *See id.* at 77-78.

That does not mean, however, that an indictment is improper merely because it charges in one count what it could, at least in theory, have charged in multiple counts; "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."  *Vilar*, 729 F.3d at 79 (internal

---

[29] Indeed, at least presently, Hana is obviously not confused as to how to read the statute, since he consistently and correctly uses the full term "agent of a foreign principal" throughout his brief. (*See, e.g.*, Hana Mot. 48, 57.)

[30] Menendez, Hana, and Daibes each challenge a separate set of counts as duplicitous (*see* Menendez Second Mot. 5 (Counts One through Three); Hana Mot. 66 (Counts One, Two, and Four); Daibes Mot. 14 (Counts One and Two)), although Hana and Daibes each join the other's motion (Hana Mot. 131; Daibes Mot. 26).  Nadine Menendez joins each of these motions. (Dkt. 146 at 1-2.)

quotation marks and alteration omitted).  "As long as the essence of the alleged crime is carrying

out a single scheme to defraud, then aggregation is permissible." *United States v. Tutino*, 883 F.2d

1125, 1141 (2d Cir. 1989); *see also United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992);

*United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981) (approving the inclusion of

multiple fraudulent mailings used to carry out one overarching scheme in a single mail fraud

charge).

The Second Circuit has explained that a "conspiracy indictment presents unique issues in

the duplicity analysis because a single agreement may encompass multiple illegal objects." *Aracri*,

968 F.2d at 1518 (internal quotation marks omitted).  That is why "the allegation in a single count

of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and

that is one, however diverse its objects." *Id.* (internal quotation marks and alterations omitted).

Consequently, as long as "the Indictment on its face sufficiently alleges a single conspiracy,

the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for

the jury." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010); *see also United

States v. Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) (same);

*United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("Whether the evidence in a case

establishes single or multiple conspiracies is a question of fact to be resolved by a properly

instructed jury."); *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995) (similar).  Even

"[b]oilerplate allegations" of a single conspiracy survive this "facial test." *United States v. Ohle*,

678 F. Supp. 2d 215, 222-23 (S.D.N.Y. 2010)).  "In other words, facially alleging a single

conspiracy is enough to warrant denial of a motion to dismiss an indictment for duplicity." *United

States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *12 (S.D.N.Y. Dec. 11, 2017)

(internal quotation marks and brackets omitted)).  "Pretrial dismissal is inappropriate so long as

the Court cannot conclude on the basis of the pleadings alone that there is *no* set of facts that could warrant a reasonable jury in finding a single conspiracy." *United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022) (emphasis in original, internal quotation marks and ellipses omitted).  Applying this standard, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." *Ohle*, 678 F. Supp. 2d at 222.

Even when a challenge is considered after trial, the law recognizes that "[t]here is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (citations omitted).  "[A] single conspiracy may include multiple groups of people, and the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies." *United States v. Rigas*, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003).  "A single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Payne*, 591 F.3d 46, 61 (2d Cir. 2010) (internal quotation marks and brackets omitted); *see also id.* ("Changes in membership and/or differences in time periods do not necessarily require a finding of more than one conspiracy." (internal quotation marks, brackets, and ellipsis omitted)).

## B.    Discussion

As described above, under well-settled law, the Indictment's allegations of a single conspiracy are sufficient and any question as to the existence of a single conspiracy is for the jury.  But in any event, the Indictment sets forth ample facts that would support a jury finding a single conspiracy as to each count.

1.       *Each Count of the Indictment Alleges A Single Scheme*

Each count of the Indictment alleges a single scheme, and each of the four counts makes the statutorily prescribed formal allegation of a conspiracy involving each defendant charged in that count.  (*See* Indictment ¶ 72 (Count One alleging that Menendez, Nadine Menendez, Hana, Uribe, and Daibes "willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit bribery of a federal employee"); *id.* ¶ 77 (Count Two alleging same as to honest services wire fraud); *id.* ¶ 80 (Count Three alleging same between Menendez and Nadine Menendez as to extortion under color of official right); *id.* ¶ 82 (Count Four alleging Menendez, Nadine Menendez, and Hana "willfully and knowingly combined, conspired, confederated, and agreed together and with each other to" commit public official as foreign agent offense).)  The Indictment's factual allegations also state that each count relates to an overarching scheme in which Menendez and Nadine Menendez "agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, URIBE, and DAIBES and to benefit the Arab Republic of Egypt and the State of Qatar" (*id.* ¶ 1), and further allege a series of actions that Menendez performed, promised, or agreed to perform, or received things of value knowing he was expected to perform (*id.* ¶ 2), as well as acts on behalf of Egypt that Menendez agreed and promised to take (*id.* ¶ 3).  (*See also id.* ¶ 16 ("HANA and NADINE MENENDEZ worked to introduce Egyptian intelligence and military officials to MENENDEZ for the purpose of establishing and solidifying a corrupt agreement in which HANA, with the assistance from FRED DAIBES and JOSE URIBE, the defendants, provided hundreds of thousands of dollars of bribes to MENENDEZ and NADINE MENENDEZ, in exchange for MENENDEZ's acts and breaches of duty to benefit the Government of Egypt, HANA, and others.").)

91

These allegations render the Indictment facially sufficient under the law, warranting denial of this motion. *See, e.g.*, *Percoco*, 2017 WL 6314146, at *12 ("[F]acially alleging a single conspiracy is enough to warrant denial of a motion to dismiss an indictment for duplicity." (internal quotation marks and brackets omitted)). Any dispute the defendants have with each count's allegation that they were engaged in a single conspiracy is "to be resolved by a properly instructed jury," just like every other factual dispute they may raise. *Friedman*, 854 F.2d at 561. Since it is plainly not the case that "there is no set of facts that could warrant a reasonable jury in finding a single conspiracy," *Greenberg*, 2022 WL 827304, at *11 (internal quotation marks, emphasis, and ellipses omitted), the defendants' motion must be denied.

Hana's related contention that a goal cannot be defined too broadly (Hana Mot. 70), even if true in certain cases, is inapplicable here. These allegations are incomparably more specific than a broad and general goal such as "generically 'evading taxes.'" (*See id.* (quoting *United States v. Killeen*, No. 98 Cr. 143 (AGS), 1998 WL 760237, at *3 (S.D.N.Y. Oct. 29, 1998)).) Indeed, even the language in the first paragraph of the Indictment alone—leaving aside the substantial additional detail that follows—is at least as specific as that approved by the Second Circuit in *United States v. Dawkins*, 999 F.3d at 797. (*Compare* Indictment ¶ 1 ("MENENDEZ and NADINE MENENDEZ agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, URIBE, and DAIBES and to benefit the Arab Republic of Egypt and the State of Qatar") *with Dawkins*, 999 F.3d at 797 (affirming denial of multiple conspiracy instruction where district court instructed jury that purpose of conspiracy was "paying bribes or illegal gratuities to men's college basketball coaches intending to influence and reward those coaches in connection with the business of their respective universities").)

The defendants' claims that the Indictment does not set forth connections between the various components of the scheme are based on misreading or simply ignoring the Indictment's allegations.  The defendants urge that the conduct surrounding each set of acts makes out a separate scheme (Menendez Second Mot. 21-22, Hana Mot. 66, Daibes Mot. 14-15), but far from a series of separate schemes, the Indictment sets forth—and the Government expects to prove at trial—not just overlap in participants (including, as is dispositive of this motion, the participation of all defendants in a series of bribe payments from Hana's halal company IS EG Halal (Indictment ¶¶ 32-34)) and time periods, but interdependence among the requested acts.[31]  *See, e.g.*, *Payne*, 591 F.3d at 61 ("mutual dependence and assistance" sufficient for single conspiracy even if there are two or more "phases or spheres of operation"); *Dawkins*, 999 F.3d at 797 (rejecting multiple conspiracy instruction because, although there were "several conversations among differing groups of people," the evidence showed "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" (internal quotation marks and citations omitted)).  For example:

- **Military Aid to Egypt**: With respect to the approvals of FMS and FMF to Egypt (which the Indictment undisputedly alleges that Menendez, Nadine Menendez, and Hana were involved in (*see* Menendez Second Mot. 21)), Daibes fielded an inquiry from Egyptian Official-3, made through Hana, about whether Menendez had put a hold on $1 billion in FMF to Egypt, and after consulting with Menendez, communicated Menendez's response denying any such hold (which, as explained on pp. 17, 44-45, *supra*, is itself evidence of an agreement fully sufficient to sustain the conspiracies under *McDonnell* and the Speech or Debate Clause) back to Hana, who communicated it to Egyptian Official-3.  (Indictment ¶ 35.)

- **Pressure on the USDA**: With respect to Menendez's attempt to pressure the USDA to acquiesce to the IS EG Halal monopoly (which the Indictment undisputedly alleges that Menendez, Nadine Menendez, and Hana were involved in (*see* Menendez Second Mot.

---

[31] Hana's halfhearted attempt to claim a lack of temporal overlap (Hana Mot. 76-77), is inconsistent with even a casual perusal of the Indictment, as his alternative motion alleging multiplicity effectively concedes (*id.* 96).

21)), the Indictment alleges that Daibes (Indictment ¶¶ 32-34) and Uribe (*id.* ¶ 32) were both involved in facilitating the payments that Hana then made from IS EG Halal to Menendez and Nadine Menendez, meaning that *all of the charged defendants were allegedly involved in these bribe payments*. More fundamentally, this component of the scheme is inextricably tied to the FMS and FMF approvals, since the pressure on the USDA served to allow IS EG Halal to become a revenue source to fund bribe payments from Hana to Menendez and Nadine Menendez, which the Indictment alleges Hana had been promising throughout the time period of the meetings regarding FMS and FMF approvals. (*Id.* ¶¶ 22-23.) There could hardly be a tighter mutual dependence than where one set of acts is intended to allow the payment of bribes promised in exchange for another set.

- **Attempt to Disrupt State Criminal Cases**: With respect to Menendez's attempts to pressure Official-2 to disrupt two pending state criminal cases (which the Indictment undisputedly alleges Menendez, Nadine Menendez, Hana, and Uribe were involved in (*see* Menendez Second Mot. 21)), the Indictment alleges that Hana's company IS EG Halal (which Hana had offered bribe payments through during the same time period) operated with financial support and backing of Daibes (Indictment ¶ 22). Moreover, the Government expects to prove at trial that in early February 2019, *i.e.*, days after Menendez called Official-2, Hana twice asked Daibes to fund Nadine Menendez's purchase of the Mercedes-Benz Convertible before Uribe eventually stepped in and did so. And more broadly, Hana's promises of the Mercedes-Benz Convertible (*see, e.g.*, *id.* ¶ 43) coincided with a time period in which Hana, Menendez, and Nadine Menendez were arranging meetings with Egyptian Official-3, but in which Hana had not paid Nadine Menendez, occasioning complaints (*see, e.g.*, *id.* ¶ 23).[32] Thus the promises of the Mercedes-Benz Convertible served, in part, to sustain the corrupt relationship during the critical time period before Hana could deliver the promised payments from IS EG Halal, further showing interdependence between the schemes.

- **Attempt to Disrupt Federal Prosecution and Request to Act to Benefit Qatar**: With respect to Menendez's efforts to disrupt the federal prosecution of Daibes and Daibes's expectation that he take actions for the benefit of Qatar, those requests for acts were, as an initial matter, wholly intertwined with each other, as some of the *same things of value* were provided in exchange for both requested acts. (*See* Indictment ¶ 45.) Menendez is thus wrong to say that Nadine Menendez is not alleged to have participated in the conduct related to Qatar (Menendez Second Mot. 23). And as to the broader scheme, the provision of things of value related to Daibes's prosecution and Qatar took place during the same

---

[32] For example, the Government expects to prove at trial that Menendez, Nadine Menendez, and Hana met with Egyptian Official-3 days after Nadine Menendez's text to Hana, "All is GREAT! I'm so excited to get a car next week. !!" (Indictment ¶ 43.) The Government further expects to prove that Nadine Menendez's complaint that Hana had "left for Egypt yesterday supposedly and now thinks he's king of the world and has both countries wrapped around his pinky" (*id.* ¶ 23) was made on April 1, 2019, *i.e.*, days before Nadine Menendez actually obtained the Mercedes-Benz Automobile (*id.* ¶ 43(b)), and that in fact Nadine Menendez complained to Hana and to another person that Hana had left for Egypt instead of taking her to the car dealership on that day.

time period when Menendez was performing and promising to perform acts related to Egypt and was receiving payment through IS EG Halal. Indeed, Menendez and Nadine Menendez's notification to Hana that Menendez had to "sign off on" $2.5 billion in FMS to Egypt (Indictment ¶ 37(g)), took place just days after Daibes's driver contacted Nadine Menendez and prompted Nadine Menendez to thank Daibes for "Christmas in January" (*id.* ¶ 53(d)). Even beyond the temporal overlap, Daibes was a financial backer of IS EG Halal (*id.* ¶ 22), and was actually looked to by Menendez and Nadine Menendez when Hana was not forthcoming with bribe payments (*id.* ¶¶ 33-34.) As a result, the success of the bribe scheme as to Hana's Egypt-related conduct was interdependent with Menendez's ability to protect and enrich Daibes, Hana's backer and bribe underwriter.

As shown by the foregoing, each of the alleged acts sought had close relationships of interdependence with at least one other set of alleged acts. *See, e.g.*, *Payne*, 591 F.3d at 61. The USDA acts were an attempt to protect the IS EG Halal monopoly, the revenue stream that would fund the bribe payments originally promised for the Egyptian military aid official acts.[33] The New Jersey state prosecution acts were part of an exchange that involved promises of the Mercedes-Benz Convertible, which helped sustain the corrupt relationship during the time period when Menendez and Nadine Menendez were awaiting the promised payment through IS EG Halal for the Egyptian military aid acts. And the federal prosecution and requested Qatar acts were intended to protect and enrich Daibes, at times a financial backer of IS EG Halal and an underwriter of the IS EG Halal bribe payments.

The significant overlap in participants, goals, and conduct, and this close interdependence among portions of the scheme, far exceed the connections that have been held sufficient in other cases. Given that not all participants in a single conspiracy need to even know each other, *Rooney*, 866 F.2d at 32, here, where they all worked together toward specific common objectives and—in the case of the payments from IS EG Halal to Menendez and Nadine Menendez, *all participated*

---

[33] The IS EG Halal monopoly was also granted to Hana by the Government of Egypt, the main beneficiary of the acts related to Egyptian military aid for which Hana was involved in bribing Menendez.

*in the same transfers of bribe money* (Indictment ¶¶ 32-34)—there is ample basis for the jury to find a single conspiracy. Indeed, single conspiracies have been found based on far less concrete interrelationships between the parties. *See, e.g.*, *Blumenthal v. United States*, 332 U.S. 539, 558 (1947) (holding evidence showed single conspiracy to illegally sell whiskey, explaining, "True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan."); *Dawkins*, 999 F.3d at 797 (affirming denial of multiple conspiracy instruction in scheme to pay bribes to variety of men's college basketball coaches, noting that evidence did not show "separate networks operating independently of each other"). Thus the allegations of the Indictment show that each count alleges a single scheme, and it cannot remotely be said that "there is no set of facts that could warrant a reasonable jury in finding a single conspiracy." *Greenberg*, 2022 WL 827304, at *11.

2.    *There Is No Justification for Dismissal or Other Pretrial Relief*

There is also no justification for dismissal or any other pretrial relief, as the defendants will suffer no prejudice from any arguable duplicity. In the face of the detail set forth in the Indictment, the defendants cannot claim to lack notice of the charges against them or to be unable to protect against double jeopardy in a subsequent prosecution. *See, e.g.*, *Margiotta*, 646 F.2d at 733. And the need for a unanimous verdict, of course, can and should be addressed by jury instructions, rather than dismissal of the Indictment. *See, e.g.*, *United States v. Arguedas*, No. 20 Cr. 135 (JMF), 2021 WL 5567749, at *1 (S.D.N.Y. Nov. 29, 2021) (denying defense motion, noting that "the remedy is not dismissal" even assuming a count was duplicitous, and one option is to "resolve any duplicity problem through jury instructions and the verdict form").

The defendants cite no authority justifying the grant of their motion in this circumstance. Besides conclusory claims that the different portions of the scheme had nothing to do with one

another (which ignore the interconnections alleged in the Indictment, and are fact-based arguments, and thus improper), the defendants point to the Indictment's use of section headings as a reason justifying dismissal. (Menendez Second Mot. 23-24 & n.3; Hana Mot. 78-80 & n.25.) Of course, the Government should not be penalized—let alone *with dismissal*—for attempting to impose organizational clarity on a necessarily complex and interrelated set of facts. The organization of a lengthy description of a complex scheme into sections in no way necessitates the grant of a pretrial motion based on duplicity in this circuit. Indeed, the only in-circuit case cited by the defendants in which a court has looked to an indictment's organization undermines, not supports, the defendants' position. Menendez cites *United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996), in which the court found that the indictment's organization lent support to a claim that a count was duplicitous, but acknowledged it was not "within the power of the Court" to dismiss the count as duplicitous before trial, and denied the motion based on the count's "boilerplate allegations" of a single conspiracy. *Id.* at 504-05. So too here (even assuming *arguendo* that the Indictment's organization lent support to the defendants' claim).

But even taken on their own terms, the out-of-circuit cases that look to an indictment's use of section headings to support a pretrial finding of duplicity are simply inapplicable here. Indeed, far from showing separateness, the organization of the Indictment shows *interrelatedness*, as multiple paragraphs in the Indictment cross-reference portions falling under other section headings. (*See, e.g.*, Indictment ¶ 23 (referencing ¶ 19(a)); *id.* ¶ 28 (referencing ¶ 21); *id.* ¶ 51 (referencing ¶ 37(f)); *id.* ¶ 55 (referencing ¶¶ 46-54); *id.* ¶ 59 (referencing ¶ 51); *id.* ¶ 62 (referencing ¶ 53(h)).)[34] This case is thus nothing like *United States v. Munoz-Franco*, 986 F.

---

[34] Hana's complaint that the Indictment does not "set forth a single integrated chronology" (Hana

Supp. 70 (D.P.R. 1997), cited by Menendez and Hana. That case dealt with the very different situation where "the *only* element of commonality [was] that the two conspiracies were to defraud one same bank and both include the same bank officers." *Id.* at 72 (emphasis added). Similarly, *United States v. Marlinga*, No. Cr. 04-80372, 2005 WL 513494, at *4 n.2 (E.D. Mich. Feb. 28, 2005), dealt with an entirely different situation in which there was no "common goal" and no way in which the different conspiracies "depended on or benefited from the existence of the other," *id.* at *4, and *United States v. Hardy*, 762 F. Supp. 1403 (D. Haw. 1991), dealt with an indictment that failed "to allege any nexus whatsoever, chronological, substantive or otherwise" between two transactions that "involved entirely different actors and circumstances," *id.* at 1408.

None of these cases says anything about the situation here, in which all five defendants participated in one set of bribe payments (*i.e.*, the IS EG Halal bribe payments (*see* Indictment ¶ 32-34)), all five either participated or were requested to participate in another (*i.e.*, the Mercedes-Benz Convertible), and where each of the alleged acts bore a relation of dependence with at least one other set of alleged acts (*see* Section III.B.1, *supra*), thus linking all of the acts together in an unbroken chain of interdependence. *See Payne*, 591 F.3d at 61.

None of the other cases cited by the defense justifies granting the motion. Indeed, many of the defendants' own cases in this circuit either have reversed district court pretrial findings of a duplicitous indictment, *see Margiotta*, 646 F.2d at 733, or else expressly note that the question of

---

Mot. 78) is odd, and his claim that it "simply cannot" do so (*id.*) is odder still. The integrated sequence of events shows that actions related to different acts were taking place during overlapping times, as the internal cross-references and dates set forth in the Indictment show. Obviously these could have all been reordered into strict chronological order, rendering Hana's contention puzzling. The fact that the Indictment grouped certain of these temporally overlapping sets of acts together for ease of understanding does not mean that the acts were not, as a matter of fact, intertwined, and is certainly not a ground for dismissal.

multiple conspiracies is for the jury, not the Court on a pretrial motion, *see, e.g.*, *Payne*, 591 F.3d at 62 (noting existence of single conspiracy is fact issue); *see also, e.g.*, *Rigas*, 281 F. Supp. 2d at 665 (denying pretrial motion to dismiss, stating, "Generally, whether a single conspiracy or multiple conspiracies existed is for the jury."); *United States v. Stein*, 429 F. Supp. 2d 633, 637 (S.D.N.Y. 2006) (denying pretrial motion to dismiss, stating, "Whether defendants engaged in two different conspiracies or a single conspiracy to commit more than one crime is a question of fact for a properly instructed jury and cannot be determined prior to trial."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 552 (S.D.N.Y. 2014) (remarking that the existence of multiple conspiracies is a question of fact for the jury, quoting *Johansen*, 56 F.3d at 350).  Others find—post-trial, with the benefit of a full factual record—that charges based on different facts involving no connection between different schemes are duplicitous.  (*See* Menendez Second Mot. 18-20; Hana Mot. 72-73.)

Very few cases in this circuit cited by the defendants find duplicity before trial, and those cases do not consider indictments alleging anything like the level of joint participation in criminality alleged here.  In one case, Judge Scheindlin found an indictment duplicitous apparently because it involved a single conspiracy to commit multiple different substantive offenses.  *United States v. Abakporo*, 959 F. Supp. 2d 382, 390-91 (S.D.N.Y. 2013).  Whatever the merits of that outlier reasoning, it has no application here, where each count charges a conspiracy to commit a single substantive offense.  In one unpublished order, Judge Woods made a pretrial finding of duplicity—but in that case, which involved no mutual interdependence between a single defendant's tipping various individuals in an insider trading scheme, the government argued duplicity on the merits and barely referenced the Second Circuit's cases holding that this issue was one of fact for the jury.  *See United States v. Sarshar*, No. 21 Cr. 202 (GHW) (S.D.N.Y. Aug. 13,

99

2021) (ECF No. 56 at 7-15) (government opposition to duplicity motion). And in one case in the Western District of New York, a court found a duplicitous indictment pretrial based on reasoning limited to the inapplicable context of aggregating drug sales in a substantive count without including an overarching conspiracy count. *United States v. Hennings*, No. 18 Cr. 28, 2018 WL 4221575, at *5 (W.D.N.Y. Sept. 5, 2018).

Some of the cases on which the defendants rely also resolve issues altogether different from those the defendants cite them for. For example, Menendez entirely misstates the facts and holding of *United States v. Broce*, 488 U.S. 563 (1989), which is an inapposite case involving *multiplicity*, not duplicity. Contrary to Menendez's claims, in that case the government did not charge "one overarching conspiracy" based on two rigged bids (Menendez Second Mot. 24), but instead charged each bid as a separate offense in a separate indictment, *Broce*, 488 U.S. at 565. The defendants' claim there, which the Supreme Court found procedurally barred, was one of *multiplicity*. *Id.* Similarly, Hana incorrectly describes *United States v. Lech*, 161 F.R.D. 255, 257 (S.D.N.Y. 1995), as "finding [the] indictment duplicitous" (Hana Mot. 73), when in fact the only issue in that case was a severance, as the government had not attempted to join three schemes and indeed *conceded* they could not be joined in a single conspiracy count, *Lech*, 161 F.R.D. at 256, a circumstance obviously not present here. Similarly, *United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990), did not find a conspiracy duplicitous—instead, it granted a defendant a severance based not on the two conspiracy counts (which it noted favored joinder) but rather on the presence of *nineteen* additional counts in which the defendant was entirely uninvolved.

In sum, none of the cases on which the defendants rely justifies deviating from the Second Circuit's clear rule that "[w]hether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury." *Friedman*, 854 F.2d at 561. In

sum, because the Indictment has facially alleged a single conspiracy, and has further set forth a number of facts including all defendants' participation in, among other things, the same bribe payments, there is no justification for dismissal or any pretrial relief as to duplicity.  Instead, the proper forum for adjudicating the defendant's factual dispute with the Indictment's allegation of a single conspiracy is the trial of this action.

## IV.   HANA'S MULTIPLICITY CHALLENGE IS PREMATURE AND MERITLESS

Hana's claim that—if they are not duplicitous—the conspiracies charging him are multiplicitous is premature.[35]  In this circuit, questions of multiplicity are to be resolved after trial, both to gain the benefit of a full factual record and because under the law of this circuit there is no constitutional violation unless and until the imposition of a multiplicitous sentence.  In any event, the claim lacks merit.

### A.   Applicable Law

The Double Jeopardy Clause of the Fifth Amendment to the Constitution "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).  Accordingly, a defendant cannot be sentenced for multiplicitous charges covering the same crime.  "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).

Although the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, a defendant does have a right not to be punished twice for the same crime. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).  Accordingly, "[i]f

---

[35] Nadine Menendez and Daibes join in this motion.  (N. Menendez Mot. 2; Daibes Mot. 26.)

the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.* Similarly, where the judgment of conviction has already been entered on multiplicitous counts, that right is protected by vacating the convictions on all but one count. *Id.*

The Second Circuit has explained that, accordingly, district courts should not rule on a motion to dismiss a charge on multiplicity grounds until the time of sentencing. *See Josephberg*, 459 F.3d 355 (vacating district court's dismissal of count as multiplicitous prior to trial, as such a determination before trial is "at best premature"). Among other reasons, courts look to "the record as a whole in determining whether an indictment is in fact multiplicitous," and the record cannot be fully established until trial is complete. *United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009). Additionally, because double jeopardy is meant to protect a defendant from successive punishments for the same offense, a multiplicitous count does not violate the Double Jeopardy Clause unless and until sentence is imposed. *See Josephberg*, 459 F.3d at 355 ("Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed.").

Following the Second Circuit's decisions, courts in this circuit regularly and properly defer ruling on a multiplicity motion until after the conclusion of trial. *See, e.g.*, *United States v. Costanzo*, No. 22 Cr. 281 (JPO), 2023 WL 8451868, at *5 (S.D.N.Y. Dec. 6, 2023) ("[I]t is a regular practice of courts in the Second Circuit to deny pre-trial motions to dismiss potentially duplicitous or multiplicitous counts, reserving decision until after the jury has rendered a verdict."); *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) (denying pretrial

motion to dismiss multiplicitous count and noting that "'[c]ourts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature.'" (quoting *United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014))); *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020) (same); *see also, e.g.*, *United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157, at *15 & n.6 (S.D.N.Y. Dec. 10, 2021) (collecting cases); *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018) (denying pretrial motion to dismiss multiplicitous count in light of "the Circuit's controlling view that the question of multiplicitousness is properly considered only at a later point in the proceedings"); *United States v. Mostafa*, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) ("[M]ultiplicity is properly addressed by the trial court at the sentencing stage."); *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("To the extent that the Indictment alleges more than one conspiracy . . . , Defendants' multiplicity challenge is premature. Should the jury convict Defendants on what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions." (citations omitted)); *United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("Since it is possible that the jury will convict defendants on only one (1) of the respective counts that they allege are multiplicitous, and acquit defendants on all of the counts with which they allege that count is multiplicitous, the issue of whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at the pretrial stage.").[36]

---

[36] The Second Circuit remarked, in a decision predating *Josephberg*, that a court retains discretion to direct the government to elect one of multiplicitous charges to proceed on, but has indicated this is most appropriate "when the mere making of the charges would prejudice the defendant with the

### B.    Discussion

Hana's motion to dismiss Counts One, Two, or Four of the Indictment as multiplicitous is, at best, premature, for multiple reasons.

*First*, the Court cannot properly conduct the multiplicity analysis before hearing all of the evidence regarding the charges in the Indictment.    Prior to trial, the record will not be fully developed, and the Court cannot conduct the necessary analysis to determine whether the counts are in fact multiplicitous.   Consistent with decisions of the Second Circuit and the routine practice in this district, the Court can and should defer conducting any multiplicity analysis until after hearing all of the evidence at trial.   *See Josephberg*, 459 F.3d at 355.

*Second*, the motion may become moot because it is possible that the jury could conclude that Hana is guilty of one of the charged conspiracies, but not guilty of one or more of the others. That is because each charged conspiracy alleges that Hana agreed to violate a different criminal statute which requires proof of elements that the others does not.   Count One alleges that Hana conspired to commit bribery of a federal employee in violation of 18 U.S.C. § 371, which requires, among other things, proof of an overt act (unlike Count Two) and a corrupt *quid pro quo* (unlike Count Four).   Count Two alleges that Hana conspired to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1349, which does not require an overt act but does require, among other things, a scheme to defraud the public and deprive it of its intangible right to Menendez's honest services, and a wire communication in furtherance of the scheme.   Count Four alleges that Hana conspired to have a public official act as a foreign agent, which does not require a *quid pro quo* (as Counts One and Two do), a scheme to defraud, or a wire communication, but

---

jury," as the principal danger of multiplicity—multiple punishment—can be remedied at any time by merging the convictions.   *United States v. Reed*, 639 F.2d 896, 904 n.6 (2d Cir. 1981).

does require an overt act (unlike Count Two) and an agreement, in sum, that Menendez would act as an agent of a foreign principal (unlike Counts One or Two).

Although the Government expects to prove beyond a reasonable doubt each of the charged conspiracies, it is ultimately a question for the jury, which means that a motion to dismiss counts as multiplicitous is premature.  Because the Government has the discretion to present to the jury the theory that the conspirators agreed to commit bribery of a federal employee, the theory that they agreed to deprive the public of Menendez's honest services, and the theory that they agreed to have a public employee serve as a foreign agent, it is both unnecessary and unwarranted to reach this motion now.  *See Josephberg*, 459 F.3d at 355 ("It is well established that '[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion,' and 'a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution . . . .'" (brackets and ellipses in original) (quoting *United States v. Batchelder*, 442 U.S. 114, 124 (1979))).

Hana cites a number of out-of-circuit cases in support of his request for an order forcing the Government now to elect to pursue only one count at trial.  (Hana Mot. 101-02.)  Although a district court may retain discretion to decide a multiplicity motion before trial where the very bringing of the allegedly multiplicitous charge is likely to have an inordinate prejudicial effect before the jury, *see United States v. Reed*, 639 F.2d 896, 904 n.6 (2d Cir. 1981), this rare circumstance is clearly not present here.  Even if the Court ultimately concluded that one or more of the charges was multiplicitous with another, given the wide-ranging and extensive course of conduct represented by each of the conspiracies, it would hardly be unduly prejudicial for a jury to consider three charges (as to Hana or Nadine Menendez) or two (as to Daibes) as a result. There is certainly no prejudice extreme enough to justify deviating from the typical practice in

this district, consistent with the law, of deferring the issue until it can be resolved on a full factual record after trial. *See, e.g.*, *Costanzo*, 2023 WL 8451868, at *5; *Maxwell*, 534 F. Supp. 3d at 322; *Saab*, 2021 WL 5868157, at *15 & n.6; *Halkbank*, 2020 WL 5849512, at *9; *Dumitru*, 2018 WL 3407703, at *1; *Medina*, 2014 WL 3057917, at *3; *Mostafa*, 965 F. Supp. 2d at 464; *Ghavami*, 2012 WL 2878126, at *11.[37]

Only after the Court has heard all of the evidence at trial and received the jury's verdict will the defense motion be ripe. Accordingly, the motion should be denied as premature. But in any event, on the full record, any challenge to multiplicity will fail, including because each of the challenged counts "requires proof of a different element," *Blockburger v. United States*, 284 U.S. 299, 304 (1932). As explained above, each of the counts in the Indictment requires proof of at least one different element. In these circumstances, the charges are not multiplicitous, and any motion to dismiss on that basis fails. *See, e.g.*, *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021) ("Because each offense contains at least one element not contained in the other, we are persuaded that the charging component of the Double Jeopardy Clause is not implicated here.").

## V.    THE DEFENDANTS' MOTIONS FOR SEVERANCE ARE MERITLESS

The defendants collectively seek to sever the case into *three* separate trials. Menendez first seeks to sever his case from Nadine Menendez (and she similarly seeks to sever her case from his), on the apparent premise that spouses should not be tried together where one of them may testify. Menendez then argues that he also would be prejudiced by a joint trial with the individuals who

---

[37] The Government is unaware of any precedent in this circuit for Hana's alternative request for an evidentiary hearing in support of his multiplicity motion, and Hana cites none. (*See* Hana Mot. 102.) There is no summary judgment in criminal cases, a multiplicity motion is not a vehicle to obtain a preview of the Government's evidence or to raise factual defenses to a charge, and the motion should await adjudication after trial.

are alleged to have bribed him (*i.e.*, Daibes, Hana, and Uribe), and he should thus be tried alone. And Daibes contends that he should be severed not just from Menendez but also from all of the other people with whom he allegedly engaged in bribery, and he should be tried alone, as well. All of these requests should be denied.   The defendants are charged with entering into and executing a scheme together, the Indictment makes plain how they worked together, and they should be tried together.

### A.      Applicable Law

#### 1.      *Joinder – Rule 8(b)*

Federal Rule of Criminal Procedure 8(b) governs joinder of offenses and defendants. *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988).   The rule permits the Government to "charge 2 or more defendants" in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."   Fed. R. Crim. P. 8(b).

The Second Circuit has held that Rule 8(b) allows joinder of offenses and defendants where two or more persons' criminal "acts are 'unified by some substantial identity of facts or participants or arise out of a common plan or scheme.'"   *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).   As evidenced by the use of the disjunctive "or," the satisfaction of either prong is sufficient to support joinder.   *See, e.g.*, *United States v. Chalmers*, 474 F. Supp. 2d 555, 571 (S.D.N.Y. 2007) ("joinder is appropriate where, as in this case, the defendants' criminal acts are alleged to arise out of a common plan or scheme"); *United States v. Aronson*, No. 98 Cr. 564 (DAB), 1999 WL 97923, at *3 (S.D.N.Y. Feb. 24, 1999) (joinder was proper where the charges shared a substantial identity of facts and participants).

In this context, courts in this circuit "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either . . . of the defendants resulting from the joinder."  *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotation marks omitted); *see also United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007); *Turoff*, 853 F.2d at 1044.

Joinder is presumptively appropriate where defendants are charged with participating in a single conspiracy.  *See, e.g.*, *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."); *Rittweger*, 524 F.3d at 178 ("[T]he 'simplest case for joinder is where the defendants are charged with having conspired with each other.'" (quoting *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998))).  Rule 8(b) also permits the joinder of defendants charged in distinct conspiracies so long as those defendants share either a substantial identity of facts or participants, or a common plan or scheme.  *See, e.g.*, *Attanasio*, 870 F.2d at 815 (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts"); *Rittweger*, 524 F.3d at 178 (upholding joinder of defendants involved in separate conspiracies even though certain defendants did not participate in or have knowledge of the other scheme).

### 2.    *Severance of Properly Joined Charges – Rule 14(a)*

Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  The Supreme Court has made plain, however, that

there is a "preference in the federal system for joint trials of defendants who are indicted together."

*Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also Feyrer*, 333 F.3d at 114 (citing

"economy, convenience, and avoidance of delay" as some of the reasons underlying the strong

preference for joint trials). This strong preference reflects a settled precept in criminal law: "Joint

trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the

interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506

U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)).

Therefore, any analysis of prejudice under a Rule 14 motion must be viewed through the

lens of the strong presumption in favor of joint trials. As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again,
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand. Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit. Even apart from these
> tactical considerations, joint trials generally serve the interests of
> justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson*, 481 U.S. at 210; *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991)

(joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated with

depriving the jury of making its determinations based on "the full picture")*, aff'd,* 506 U.S. 534

(1993). Thus, even where a joint trial may cause some prejudice to a defendant, "[t]he risks of

prejudice attendant in a joint trial are presumptively outweighed by the conservation of time,

money, and scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F.

Supp. 351, 366 (S.D.N.Y. 1993). The question under Rule 14 is whether that prejudice "'is

sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy

multiple trials.'" *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998)).

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *Turoff*, 853 F.2d at 1042-43. "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999); *see also United States v. Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)).

Moreover, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *see also Cardascia*, 951 F.2d at 483 (A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance."). Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials." *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978); *see also Rittweger*, 524 F.3d at 179; *United States v. Zackson*, 6 F.3d 911, 922 (2d Cir. 1993); *Carson*, 702 F.2d at 367.

The issue under Rule 14 is accordingly not whether a defendant would prefer to be tried alone, or might suffer some prejudice from being tried with his or her co-defendants, but whether

any prejudice to him or her from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted).  A discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

"'[L]ess drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *Page*, 657 F.3d at 129 (quoting *Zafiro*, 506 U.S. at 539).  For example, "'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.'" *United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) (quoting *Carson*, 702 F.2d at 367).  Rather, "to the extent that a category of evidence is irrelevant to [a particular defendant], a limiting instruction will suffice to remove any prejudice." *United States v. Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007); *United States v. Ferguson*, 246 F.R.D. 107, 125 (D. Conn. 2007) ("A limiting instruction may adequately reduce the risk of prejudice to a defendant even in cases where evidence is presented against one defendant that would not be admissible in a separate trial of a co-defendant."); *United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004) ("Such 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial.'" (quoting *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001))). Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

111

### B.     Discussion

#### 1.     *The Defendants Are Properly Joined Under Rule 8(b)*

Daibes alone argues that the defendants are not properly joined in Counts One and Two under Rule 8(b) (Daibes Mot. 18-21), despite being charged in the same conspiracy with the other defendants.  His contention can and should be swiftly rejected.

Joinder of all of the defendants is proper because their offenses share a substantial identity of facts and participants, and also arise from a common plan, and accordingly they are properly charged in a single scheme.  *See* Fed. R. Crim. P. 8(b); *Attanasio*, 870 F.2d at 815 (joinder is appropriate when criminal acts are "unified by some substantial identity of facts or participants or arise out of a common plan or scheme." (internal quotation marks and citation omitted)).  *See supra* Section III.B.1 (explaining why each count in the Indictment is not duplicitous).  This is more than enough to join the defendants.  *See, e.g.*, *Nerlinger*, 862 F.2d at 973 ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).").  Moreover, it is clear that, "in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice" to any defendant.  *Rittweger*, 524 F.3d at 177 (internal quotation marks omitted).  Indeed, the Second Circuit has observed that the criminal justice system's preference for joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme."  *Salameh*, 152 F.3d at 115.

Daibes's arguments in opposition to joinder under Rule 8(b) are meritless.  Daibes argues that he should be granted severance because his actions were purportedly "unrelated" to Uribe's actions (Daibes Mot. 20), that he is not alleged to have had "any significant role in those allegations related to Hana" (*id.*), and that he is not alleged to be "aware" of the efforts to disrupt the New

Jersey prosecution (*id*. 21). This is incorrect as a matter of law and fact. As an initial matter, "the decision to join parties turns on what is 'alleged' in the 'indictment,'" not a defendant's characterization of the facts. *Rittweger*, 524 F.3d at 178. The Indictment contains numerous allegations reflecting the defendants (including Daibes) working together to achieve common objectives, including, among other things, Hana's actions to benefit the Government of Egypt. (*See, e.g.*, Indictment ¶¶ 16, 22, 31-36, 38.) While Daibes is not alleged to have been aware of Uribe's actions, nor are Uribe and Hana alleged to have been aware of all of Daibes's actions, Rule 8(b) does not require such full awareness. Rule 8(b) does not require the *complete* identity of facts or participants, which would rarely be met in a case of any complexity, but only "'some substantial identity.'" *Feyrer*, 333 F.3d at 114 (quoting *Attanasio*, 870 F.2d at 815). The Indictment so alleges. Moreover, it is well-established that defendants do not need to be aware of all other defendants' conduct or even be members of the same conspiracy—although here, they were—to be properly joined under Rule 8(b). *See, e.g.*, *Attanasio*, 870 F.2d at 811 (defendants properly joined even though the indictment charged two different conspiracies with just one overlapping defendant); *United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394, at *20 (E.D.N.Y. Mar. 6, 2018) (where there are two conspiracies "knowledge of the other conspiracy is not necessarily required for joinder").

The cases Daibes cites do not support severance here. For example, Daibes's reliance on *United States v. Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990) (Daibes Mot. 21), is misplaced. In Menashe, the court held joinder of two counts was not appropriate where there was no allegation in the indictment that two other co-defendants (who were charged with conspiracy to sell American made military cargo planes to Iran) were aware of a third defendant's plan also to commit a separate offense (of selling American made anti-aircraft missiles to an undisclosed

country).  Here in contrast, multiple defendants are charged in each of the counts, and as discussed

above, they shared, among other things, a common plan.  Accordingly, neither that case, nor any

other legal authority cited by Daibes, provides a basis for severance under Rule 8(b).

> 2.    *There is No Basis for a Severance Under Rule 14(a) of Menendez and Nadine Menendez*

While not contesting that joinder is proper, both Menendez and Nadine Menendez argue

that their trials should be severed under Rule 14(a), on the ground that they would be unfairly

prejudiced by a joint trial.  (Menendez Second Mot. 26, 27-33; N. Menendez Mot. 1-2, 5-8.)  In so

arguing, Menendez and Nadine Menendez ignore the well-established legal principles articulated

by the Supreme Court and the Second Circuit, which strongly favor joinder and eschew the pitfalls

of repetitive trials, and fail to meet their burden of showing prejudice, much less "*substantial*

prejudice."  *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (internal quotation marks

and citation omitted) (emphasis in original); *see also United States v. Werner*, 620 F.2d 922, 928-

29 (2d Cir. 1980) ("substantial prejudice" must be shown under Rule 14 because a "lesser showing

would undermine the policies behind Rule 8 and essentially read that rule from the books").  Those

same legal principles apply when spouses are charged together.  *See, e.g.*, *United States v. Taggart*,

No. 07 Cr. 142 (JLH), 2008 WL 2705109, at *5 (E.D. Ark. July 8, 2008) (collecting cases of joint

trials of husband and wife where severance was denied).

A spouse "'is not entitled to a severance merely because [the spouse] would rather not

testify against her [spouse] at a joint trial.'"  *United States v. Freeman*, 694 F. Supp. 190, 192 (E.D.

Va. 1988) (denying severance where one spouse stated she wanted to testify but not at a joint trial

because her testimony would be adverse to her co-defendant husband's interest) (quoting *United

States v. Sasso*, 78 F.R.D. 292, 294 (S.D.N.Y. 1977)).  Here, Menendez's and Nadine Menendez's

assertions of potential prejudice from a joint trial are entirely speculative.  They have failed to

sufficiently demonstrate that either one will testify, much less that any proposed testimony or potential defense will be mutually antagonistic to their spouse such that they cannot be fairly tried together.  Under such circumstances, Menendez and Nadine Menendez have not overcome the benefits of judicial economy and efficiency from a joint trial.

Here, a severance would result in two trials in which the Government would invariably introduce virtually the same exact testimony and exhibits—an outcome that would waste judicial and government resources, burden witnesses, delay bringing all defendants to trial, give the second defendant an advantage the first did not have, and run counter to the compelling public interest in trying together jointly indicted defendants who are alleged to have committed their crimes together.  *See, e.g.*, *Richardson*, 481 U.S. at 210 ("It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying."); *Zafiro*, 945 F.2d at 886 (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated with depriving the jury of making its determinations based on "the full picture"); *Jimenez*, 824 F. Supp. at 366 ("The risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits.").

Menendez and Nadine Menendez nevertheless argue that severance is appropriate because Menendez "may elect to testify" (Menendez Second Mot. 30) in a trial, but Nadine Menendez "might assert" (*id*. 29) the marital communications privilege to seek to prevent Menendez from testifying (N. Menendez Mot. 5).  These equivocal assertions of the defendants' alleged intentions—unsupported by affidavits of the defendants themselves—are insufficiently firm to warrant the extreme remedy of severance.  *See, e.g.*, *United States v. Travers*, No. 96 Cr. 477, 1998

WL 36030672, at *2 (S.D. Fla. July 16, 1998) (in denying severance, noting the absence of a sworn affidavit from defendant spouse "indicating that she will in fact testify at trial and describing the scope and nature of her testimony, nor has she explained how such testimony will prejudice her husband"), *aff'd*, 233 F.3d 1327 (11th Cir. 2000); *Taggart*, 2008 WL 2705109, at *5 (denying severance based on claim that one spouse "may" testify and "if" so then other spouse may assert privilege). Indeed, in the analogous circumstance analyzing a severance request based on potential exculpatory testimony being available only at separate trials, courts routinely require a robust factual showing and take into consideration whether the moving party submitted a sworn affidavit from someone with firsthand knowledge. See, e.g., *United States v. Morelli*, No. S1 04 Cr. 391 (DAB), 2005 WL 743062, at *3 (S.D.N.Y. Mar. 29, 2005) (granting severance where defendants submitted a sworn affidavit from co-defendant "in which he states that he would waive his Fifth Amendment Privilege against self-incrimination and testify at the separate trial" and sets forth the specific exculpatory testimony he would offer at trial) (listing cases). On the other hand, courts have found that "[s]elf-serving, conclusory statements [by an attorney] that exculpatory witnesses will not testify at a joint trial are not adequate to compel severance." *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir. 1984).

To the extent the defendants suggest that the Court should rely on their attorneys' *ex parte* declarations in deciding their motions, this Court should decline to do so. *See Alderman v. United States*, 394 U.S. 165, 184 (1969) ("As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable."); *United States v. Barnette*, 644 F.3d 192, 209 (4th Cir. 2011) (Courts "should rarely if ever resort to in camera, *ex parte* examination of evidence or conduct such

116

proceedings.").  Indeed, in substantially similar circumstances involving co-defendant spouses charged with bribery offenses, the district court in *McDonnell* declined to rely upon *ex parte* declarations in support of a severance motion based on the marital communications privilege, and ultimately denied severance.  *See United States v. McDonnell*, No. 14 Cr. 12 (JRS) (E.D. Va. Apr. 17, 2014) (ECF No. 137), *aff'd*, *United States v. McDonnell*, 792 F.3d 478, 494-96 (4th Cir. 2015) (district court properly exercised its distraction in denying request to rely on *ex parte* declarations and denying severance), *vacated and remanded on other grounds*, *McDonnell*, 579 U.S. 500.  In *McDonnell*, to support their severance motion, the attorneys for both husband and wife submitted declarations on an *ex parte* basis because they claimed the declarations would "reveal testimony subject to the marital communications privilege and that allowing the [g]overnment to access the [d]eclarations would impermissibly expose [d]efendants' trial strategy."  *McDonnell*, No. 14 Cr. 12, ECF No. 137 at 1.  The court explained, however, that a severance motion was a "complex determination" and that the "Supreme Court has expressed concern about the accuracy of *ex parte* determinations and has implied that the burden of justifying such proceedings in complex determinations is high."  *Id.* at 2 (citing *Alderman*, 394 U.S. at 184).  Despite the defendants' proffered explanation for filing *ex parte*, the court held that permitting the defendants "to support their Motion to Sever with argument and evidence not available to the [g]overnment would effectively deprive the [c]ourt of an adversarial proceeding in a complex determination," and was not justified on that record.  *Id.* at 2.  The same is true here.

The two cases relied upon by Menendez in support of his *ex parte* submission to the Court (Menendez Second Mot. 28 n.4) are patently distinguishable, because they both involve motions for pre-trial issuance of Rule 17 subpoenas—a materially different context from a motion to sever.  Unlike determinations of whether a Rule 17 subpoena should issue, a motion to sever is a motion

directly impacting the procedural posture and conduct of a criminal trial, and requires a fact-intensive analysis for which an adversarial proceeding and testing of the defendants' claims and assertions are not just appropriate, but necessary. *See Alderman*, 394 U.S. at 184; *see also McDonnell*, No. 14 Cr. 12, ECF No. 137 at 2 (rejecting analogy of declaration in support of severance to motions for Rule 17 subpoenas). The Court should either maintain the defendants' *ex parte* submissions under seal and not rely on them in resolving this motion or, if the defendants prefer, unseal the submissions and permit the Government an opportunity to respond to them. Indeed, given the nature of the fact-specific analysis in a severance motion, the inherent unreliability of information not submitted under oath by the defendants themselves to the Court, and the equivocal representations in the defendants' briefs about both their intentions and the scope of any testimony and potential privilege, if the Court is to consider these declarations, the Government would need to review them in order to effectively respond to any claims they make.

In any event, the defendants' motions appear to rest largely or entirely on the marital communications privilege, and that is not a proper basis for severance, at least in this case. As is relevant here, the marital communications privilege covers private communications between spouses that were "intended to be confidential," *Wolfe v. United States*, 291 U.S. 7, 14 (1934), but it "does not apply to communications having to do with present or future crimes in which both spouses are participants," *United States v. Marashi,* 913 F.2d 724, 730 (9th Cir. 1990) (citing cases); *United States v. Estes*, 793 F.2d 465, 468 (2d Cir. 1986).

Even if the Court were to credit that Nadine Menendez intended to assert the marital communications privilege to seek to prevent her husband from testifying as to certain communications—despite her professed belief that they are both "innocent" (N. Menendez Mot. 2)—her objections would not prevent Menendez from meaningfully testifying in his own

defense at a joint trial, were he to choose to do so.  *See Trammel v. United States*, 445 U.S. 40,  53 (1980) (holding non-testifying spouse cannot foreclose witness-spouse from voluntarily testifying); *United States v. Chen*, 754 F.2d 817, 823-24 (9th Cir. 1985) (rejecting claim that joint trial prevented defendant husband from testifying on his own behalf because of wife's privilege against adverse testimony since that privilege can only be asserted by witness-spouse).  As an initial matter, there is at least some question whether at trial Nadine Menendez could prevent Menendez from testifying about marital communications in his own defense at a criminal trial. (*See* N. Menendez Mot. 6 ("[T]estimony essential to a spouse's defense in a criminal case must be permitted even if it discloses confidential communications from the other spouse." (citing *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983)))); *see also Trammel*, 445 U.S. at 50-51 (testimonial privileges "must be strictly construed" because they "contravene the fundamental principle that the 'public . . . has a right to every man's evidence." (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950))); *but see United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*, 71 F.3d 1067, 1070 (2d Cir. 1995) (marital communications privilege "can be invoked by either spouse to prevent the revelation [of privileged] communications").

Even if Nadine Menendez could prevent Menendez from testifying about privileged marital communications, there is very likely little—if any—admissible testimony that he might potentially offer that would be protected by the privilege for at least four reasons.  First, a significant portion of the conduct here predates their marriage in October 2020 and, therefore, is not covered by the privilege as a matter of law.  *See, e.g.*, *United States v. Mitchell*, 137 F.2d 1006, 1009 (2d Cir. 1943) ("[I]t is clear that communications actually made outside the marriage relation, as before marriage, are not within the rule.").  Second, the privilege also does not protect communications that were not intended to be kept private, *Wolfe*, 291 U.S. at 14, like many of the communications

119

alleged in the Indictment involving Nadine Menendez passing information back and forth between Menendez and her codefendants and foreign officials.  *See, e.g.*, *Pereira v. United States*, 347 U.S. 1, 6 (1954) ("the intention that the information conveyed be transmitted to a third person" negates presumption of confidentiality); *G-Fours, Inc. v. Miele*, 496 F.2d 809, 812 (2d Cir. 1974) (inquiries into business matters like "the existence and location of [spouse's] bank accounts and his ownership and transfer of property" were not confidential).  Third, the privilege does not apply to acts, as opposed to utterances.  *See Estes*, 793 F.2d at 467 (explaining that acts such as counting, handling, and disposing of money are not privileged simply because they are performed in private with a spouse).  And, fourth, perhaps most importantly, the privilege would not cover any communications that this Court found, by a preponderance of the evidence, were in furtherance of the charged joint conduct, as the privilege offers spouses no protections for communications in furtherance of jointly undertaken criminal activity.  *Estes*, 793 F.2d at 468; *see also United States v. Levine*, 750 F. Supp. 1433, 1443 (D. Colo. 1990) (crime-fraud exception "negate[d] any claim of privilege" to the extent one spouse intended to testify that other spouse "did not tell him of her allegedly illegal acts," in order to distance himself "from the activity of his spouse")*, aff'd sub nom. United States v. Schlapman*, 968 F.2d 22 (10th Cir. 1992), and *aff'd*, 970 F.2d 681 (10th Cir. 1992).[38]

Moreover, to the extent Menendez suggests that the marital communications privilege

---

[38] Menendez asserts that this exception applies only "where 'the spouse of an accused' will 'testify willingly concerning [the spouses'] joint criminal activities.'" (Menendez Second Mot. 30 n.5 (citing *Premises Known as 281 Syosset Woodbury Rd.*, 71 F.3d at 1073).)  However, in the scenario Menendez posits, Menendez would be testifying "willingly" in his own defense concerning the joint criminal activity.  This situation is distinguishable from *Premises Known as 281 Syosset*, where the Second Circuit explained, in dicta, that where a testifying-spouse was compelled to answer questions by the court in a civil proceeding, which the testifying-spouse did not want to do, the crime-fraud exception did not apply.  *Id.* at 1069, 1073.

would only be asserted at a joint trial, but not at separate trials (*see* Menendez Second Mot. 31), this would entail inappropriate gamesmanship by the defendants that is inconsistent with the privilege.  Testimonial privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel*, 445 U.S. at 50 (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)); *cf. United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("attorney-client privilege cannot at once be used as a shield and a sword").  Even if either party were entitled to selectively choose when to waive this privilege (to the extent it even could be applicable to Menendez's testimony), severance is not appropriate where the privilege is invoked simply to create the highest likelihood of acquittals.  *See United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) ("It is well established that a defendant cannot avoid the risks of a joint trial simply because he might have a better chance of acquittal in a separate trial.").

Menendez next argues that even if Nadine Menendez did not attempt to assert the marital communications privilege, he would be placed in an inappropriate and untenable "Catch-22" of having to choose between his "right to testify in his own defense" and his "right to refuse to testify against his spouse."  (Menendez Second Mot. 31.)  Nadine Menendez claims a joint trial would place her in a similar situation, which she characterized as a "Hobson's choice."  (N. Menendez Mot. 2.)  Such a situation is neither a Catch-22 nor a Hobson's choice—the defendants fall far short of establishing that a joint trial would force them to put forward mutually antagonistic defenses.  While Menendez and Nadine Menendez do have a privilege (not a constitutional right) to avoid being *compelled* to give testimony against each other, *see Trammell*, 445 U.S. at 53, here no one is seeking to compel Menendez or Nadine Menendez to testify "against" each other, and

121

that privilege is therefore not implicated.  Courts have routinely rejected the premise that severance should be granted merely because a spouse would rather not testify at a joint trial.  *See Freeman*, 694 F. Supp. at 191-92 ("a defendant may be required to make a choice between her right to testify and her option to assert a privilege that implicates no constitutional right"); *United States v. Galvan*, No. 04 Cr. 00403 (LTB), 2006 WL 1659610, at *2 (D. Colo. June 8, 2006) (explaining that no conflict arises between these two choices since defendant spouses can make those decisions freely for themselves).  Just because a spouse is reluctant to give testimony in her defense at a joint trial that could implicate her spouse (either on direct or on cross-examination) does not mean that she is being compelled to testify against her spouse nor does it justify a severance.  *Sasso,* 78 F.R.D. at 294 ("Mrs. Sasso is not entitled to a severance merely because she would rather not testify against her husband at a joint trial.  Just as a criminal defendant must shed the protective cloak of the fifth amendment when taking the witness stand in his or her own defense, Mrs. Sasso may be required to forego her privilege not to testify against her spouse—which implicates no constitutional right—in order to be able to testify on her own behalf."); *United States v. Sneed,* No. 19 Cr. 580-B, 2022 WL 35801, at *14-15 (N.D. Tex. Jan. 4, 2022) (denying pre-trial severance where "[spouse] can decide to exercise her marital testimonial privilege and not testify, or to testify in her own defense and inculpate [her spouse]"); *United States v. Artates*, No. 12 Cr. 826 (SOM), 2012 WL 6597752, at *2 (D. Haw. Dec. 18, 2012) (explaining that the majority of courts have denied a severance simply because a spouse was faced with the situation of testifying in their own defense but that would implicate co-defendant spouse).

Menendez completely fails to set forth any reliable basis to suggest that his testimony— should he even elect to testify, which he expressly does not commit to doing—would actually be materially adverse to his wife and inculpate her.  *See United States v. Levine*, 750 F. Supp. at 1443

(denying motion to sever spouses where defendant's assertion of irreparable injury from spousal testimony was speculative). A defense is mutually antagonistic warranting severance only if "in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Cardascia*, 951 F.2d at 484; *United States v. Volpe*, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) (defenses are mutually antagonistic when they create "a conflict so irreconcilable that acceptance of one defendant's defense will lead the jury to convict the other"). Here, however, Menendez and Nadine Menendez assert that they are not aware of "any unlawful conduct" and are "innocent." (Menendez Second Mot. 27; N. Menendez Mot. 2.) Even if Menendez "intends to present a defense arguing (in part) that he lacked the requisite knowledge of much of the conduct and statements of his wife" (Menendez Second Mot. 27), this is the sort of defense that "co-defendants in criminal trials often present," as Menendez recognizes in his brief (*id.* 27-28). *See United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) ("The mere fact that co-defendants seek to place the blame on each other is not the sort of antagonism that requires a severance."); *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) ("fingerpointing" not sufficient to justify severance). Indeed, this is similar to the defense that former Governor McDonnell advanced at a joint trial with his wife for bribery, after their severance motions were denied. *See, e.g.*, *McDonnell*, 579 U.S. at 560 ("According to Governor McDonnell, however, Mrs. McDonnell acted without his knowledge or permission, and he never made the statements she attributed to him.").

Therefore, this case is entirely unlike *United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019), on which Menendez and Nadine Menendez primarily rely (*see, e.g.*, Menendez Second Mot. 32-33; N. Menendez Mot. 6). *Blunt* concerned the situation where one spouse compellingly asserted a "mutually antagonistic defense" with her spouse. 930 F.3d at 128. Specifically, in *Blunt*, after

123

a motion for severance was denied, the wife testified that her husband threatened violence to force her to participate in the criminal conduct ("he told me that if I didn't make this call that he was going to kill us") and engaged in actual violence against her when she questioned him ("he became angry and pushed her, resulting in her having a chipped tooth"). *Id.* at 122-24. The court held the denial of severance was error for two reasons, first, because the defendant husband was substantially prejudiced by this testimony, *id.* at 125-27, and second, because the defendant wife should not have had to choose between testifying adversely against her spouse and testifying in her own defense, *id.* at 127-29. Here, in contrast to *Blunt*, there is absolutely no reliable suggestion, at least to the Government's knowledge, that Menendez and Nadine Menendez will present mutually antagonistic defenses, such as by accusing one spouse of forcing the other to commit the charged crimes.

Menendez and Nadine Menendez also cite, in passing, a few other cases that granted severance. In those cases, unlike here, either the government did not contest the defendant's assertion that a spouse's potential testimony would implicate the other spouse, *e.g.*, *United States v. Dobson*, No. 02 Cr. 616, 2003 WL 22427984, at *1 (E.D. Pa. Aug. 18, 2003) (cited at Menendez Second Mot. 33, N. Menendez Mot. 7), or the testimony was highly prejudicial or antagonistic to the other spouse, *e.g.*, *United States v. Breinig*, 70 F.3d 850, 852-53 (6th Cir. 1995) (jury was told that one spouse was adulterous, mentally abusive, and manipulative) (cited at N. Menendez Mot. 7). To the extent any of these cases can be read for a broader proposition, as the defendants suggest, they run into conflict with the strong presumption reflected in the cases discussed above that spouses who are also alleged to be co-conspirators can (and should) be tried together.

For similar reasons, if Nadine Menendez wanted to testify (Nadine Menendez Mot. 7), which she raises but does not develop in her brief, that by itself would not warrant severance.

124

3.      *There is No Basis to Sever Menendez from the Other Defendants*

Menendez also argues that, assuming a severance is granted *from* his wife, the other defendants should be tried *with* his wife, not him.   (Menendez Second Mot. 33-34.)   These arguments fail as an initial matter, because, as explained above, Menendez's trial should not be severed from his wife's trial.

Moreover, even if the Court granted severance between spouses (which it should not), there is no justification for then also severing Menendez from all of the bribers such that he would be tried alone first, as he seeks (Menendez Second Mot. 26), and all of the other defendants would wait for a second trial.   Menendez cannot meet his heavy burden to show that he would face a "serious risk" of "substantial prejudice" in a joint trial with the very individuals who bribed him. *United States v. Harwood*, 998 F.2d 91, 95 (2d Cir. 1993) (internal quotation marks omitted); *see also Werner*, 620 F.2d at 928-29 ("substantial prejudice" must be shown under Rule 14 because a "lesser showing would undermine the policies behind Rule 8 and essentially read that rule from the books").

Menendez argues that he would be prejudiced by evidence of Hana's communications with Egyptian officials, including about messages and information that Menendez sought to convey to them through Hana, because—he claims—these communications are not admissible against him. (*See* Menendez Second Mot. 34.)   But such evidence—statements and actions taken in furtherance of the conspiracy by his co-conspirator—would be admissible against Menendez under Federal Rule of Evidence 801(d)(2)(E) even at a separate trial.   Indeed, it is axiomatic that such evidence is properly admissible against all conspirators.[39]   *See, e.g.*, *United States v. Diaz*, 878 F.2d 608,

---

[39] Although Menendez's assertions about the reliability of Hana's statements is premature and bears on the weight the jury should assign to this evidence rather than its admissibility under the

616 (2d Cir. 1989) ("In this conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible . . . ."); *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (explaining that co-conspirator statements made in furtherance of the conspiracy are not hearsay under Fed. R. Evid. 801(d)(2)(E)). While Menendez may argue at trial that he was not in a conspiracy with Hana, as he is entitled to, the grand jury has already alleged in the Indictment that Menendez was in a conspiracy with Hana to commit bribery and to act as an agent of Egypt, and that allegation is well-supported.[40]

In short, evidence of Hana's communications with Egyptian officials would be admissible against Menendez—just as his and his wife's communications with the Egyptian officials would be—even if Hana and Menendez had separate trials. Therefore, a joint trial carries no added risk of prejudice. *See Rosa*, 11 F.3d at 341 ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); *Spinelli*, 352 F.3d at 55-56 (affirming denial of severance where "much of the evidence about [a co-conspirator's]

Rules of Evidence (Menendez Second Mot. 35), the allegations in the Indictment allege numerous facts that corroborate what Hana was communicating to the Egyptian officials, including many of Menendez's communications with Nadine Menendez (his then-girlfriend), who at times served as an intermediary between Menendez and Hana. For example, as alleged in the Indictment, Menendez conveyed by text that he would "sign off" on a specifical foreign military sale first to his wife, who then forwarded that text to Hana, who sent it on to Egyptian officials. (Indictment ¶ 20.)

[40] Evidentiary arguments about the admissibility of particular statements are premature and should await factual development at trial. Nevertheless, the evidence cited by Menendez in his brief demonstrates Menendez's participation in the conspiracy with Hana, not that he was a purported victim of Hana's, as he contends (Menendez Second Mot. 35-36). For example, the recording by a confidential source discussing the bribery scheme reflects that there was no honor among thieves, *i.e.*, Hana "swindled" Menendez and "fucked [over] Nadine" Menendez by not giving them the full value of the bribes they should have received (*id.* 36). Far from undermining that Menendez and Hana were in a conspiracy, the evidence that Hana allegedly took more of what he recognized as bribes and shortchanged the Menendezes is proof that the bribery scheme indeed existed.

126

crimes would have been admissible at a separate trial of [the appellant], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved")).[41]

Menendez also attempts to avoid a joint trial with Uribe and Daibes by arguing that he will be prejudiced by their criminal histories, which he claims have "no relation whatsoever to the now-charged conspiracy." (Menendez Second Mot. 37.) But the fact that Daibes had been charged with a crime is intimately related to the *charged* conspiracy, and thus plainly admissible in a trial even of Menendez alone, because Menendez is alleged to have sought to disrupt that very prosecution. (Indictment ¶ 2 (charging Menendez with "seek[ing] to disrupt" the federal prosecution of Daibes).) Likewise, although Uribe's prior conviction preceded the charged conspiracy (Menendez Second Mot. 37), that conviction too is inextricably intertwined with the charged conspiracy, as Uribe's criminal past explains his actions and motivations in engaging in the charged conduct. (*See* Indictment ¶ 2 (charging Menendez with "seek[ing] to disrupt a criminal investigation and prosecution undertaken by the [NJAG] related to [Uribe] and his associates.").)[42] Even if Menendez could suffer some theoretical risk of prejudice from evidence of Daibes's and Uribe's criminal past or present, such risk is not substantial in the context of the charged matter (where those other cases do not independently implicate Menendez in any wrongdoing) and could adequately be addressed by proper jury instructions. *See Figueroa*, 618 F.2d at 946 (any potential

---

[41] To the extent some evidence may be admissible against Hana but not Menendez—and the Government is not aware of any at this stage—any potential prejudice can be cured, as it usually is, by a limiting instruction directing the jury to consider such evidence against only the relevant defendant. *See Page*, 657 F.3d at 129; *Bennett*, 485 F. Supp. 2d at 515.

[42] For example, Uribe's criminal past explains and provides context for why Uribe set up his company with a relative as the nominal owner (*i.e.*, to keep his name off that company), why Uribe sought to protect that relative from the criminal investigation, and why Uribe would be concerned if another investigation targeted him.

risk of adverse inference against a defendant because of his "association with a [different] defendant shown to have a prior criminal record" is "too insubstantial in most circumstances to survive forceful instructions"); *United States v. Harrelson*, 754 F.2d 1153, 1178 (5th Cir. 1985) ("evidence of the reputation or past crimes of a codefendant does not ordinarily justify severance"); *United States v. Diaz*, 176 F.3d 52, 104 (2d Cir. 1999) (risk of prejudice attendant to a joint trial can be sufficiently cured with "measures less drastic than severance, such as limiting instructions") (internal quotation marks omitted)); *cf. United States v. Key*, No. 12 Cr. 712 (SHS), 2013 WL 12204221, at *2 (S.D.N.Y. Aug. 28, 2013) (severing defendants charged with death-eligible murder offenses from defendants charged with non-violent offenses).

Simply put, none of Menendez's arguments compellingly demonstrates "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro*, 506 U.S. at 539, so as to override the strong preference for and public interest in a joint trial.

4. *There is No Basis to Sever Daibes from the Other Defendants*

For similar reasons, Daibes's request for a severance from the other defendants (Daibes Mot. 18-25) also should be denied. Daibes faces little risk of prejudice from a joinder of his trial with his co-conspirators, and to the extent any potential prejudice exists it can be adequately addressed through measures less drastic than a severance. Daibes first argues that he will be prejudiced by a joint trial because he is not alleged to have engaged with the other defendants in certain actions related to disrupting the New Jersey investigation and prosecution (*id.* 22), and that the similarity of Menendez's conduct with respect to that investigation and prosecution could prejudice him in defending against allegations that he agreed with Menendez to disrupt his own investigation and prosecution (*id.* 25). However, it is well-established that any potential prejudice

can generally be adequately addressed by limiting instructions.  Indeed, "[p]rejudicial spillover warranting severance is, in general, 'an unlikely occurrence when all the defendants are charged under the same conspiracy count.'"  *Ramos*, 346 F. Supp. 2d at 572 (quoting *Salameh*, 152 F.3d at 115).  Moreover, even if Daibes were correct that evidence of Menendez's actions related to disrupting the New Jersey Attorney General's Office state investigation and prosecution were not admissible in a separate trial against Daibes (a contention in support of which Daibes offers little), the fact that evidence may be admissible against one defendant but not another can be adequately addressed by a limiting instruction to reduce the risk of prejudice, as routinely done, and it "'does not necessarily require a severance.'"  *Spinelli*, 352 F.3d at 56 (quoting *Carson*, 702 F.2d at 367); *Zafiro*, 506 U.S. at 539.

Daibes also argues that he would be prejudiced by being tried with the other defendants because Menendez and Nadine Menendez are also charged with separate crimes (Counts Three and Four), with which he is not charged.  However, those charges are premised on substantially similar and overlapping conduct as the charges against Daibes (*see* Indictment ¶¶ 79, 81 (Counts Three and Four repeating, realleging, and incorporating paragraphs 1 through 70 of the Indictment)).  To the extent any evidence is only relevant to Counts Three and Four, the Court can provide a limiting instruction that the jury should evaluate such evidence only as to the defendants charged in those counts.  *See United States v. Ezeobi*, No. 10 Cr. 669 (DLC), 2011 WL 3625662, at *2 (S.D.N.Y. Aug. 17, 2011) ("The Court may presume that the jury is capable of understanding and following limiting instructions provided during the course of and at the conclusion of the trial with regard to the manner in which it may use evidence.").  Nonetheless, Daibes appears to suggest that such limiting instructions would be particularly hard for the jury to follow here because "Daibes speaks Arabic and shares a similar cultural background" with some of the other defendants

129

(apparently referring to Nadine Menendez and Hana).  (Daibes Mot. 24-25.)  Daibes's conclusory assertion that the jurors will be swayed by certain defendants' allegedly similar backgrounds, which would involve the jurors specifically disregarding the Court's expected instructions not to speculate or to take into account the defendants' background at trial, does not meet Rule 14(a)'s "'extremely difficult burden'" of establishing prejudice.  *United States v. Pena*, 932 F. Supp. 2d 464, 466 (S.D.N.Y. 2013) (quoting *United States v. Johnson*, No. S2 10 Cr. 431 (CM), 2013 WL 150104, at *2 (S.D.N.Y. Jan. 10, 2013)).

In sum, Daibes too cannot meet the "extremely heavy burden," *Nerlinger*, 862 F.2d at 974 (internal quotation marks and citation omitted), of establishing that the risk of prejudicial spillover is "so great as to deprive him of his right to a fair trial," *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (citing *Casamento*, 887 F.2d at 1149).  Moreover, even if there was some risk of prejudice, given Daibes's involvement in almost all of the conduct alleged in the conspiracy (including related to actions for the benefit of both the Government of Egypt and State of Qatar, as well as disrupting his own federal prosecution), the interests of efficiency, judicial economy, and avoidance of delay all weigh strongly in favor of a joint trial and against severance.

## VI.    THE DEFENDANTS' MOTIONS TO DISMISS FOR ALLEGED LACK OF VENUE SHOULD BE DENIED

Menendez, Nadine Menendez, Hana, and Daibes next move to dismiss all charges against them for alleged lack of venue in this district.  This request is meritless.  The Indictment expressly alleges that each of the crimes occurred in the Southern District of New York, which alone defeats their motion.  Even if the Court were to look beyond these allegations, which it need not, the alleged overt acts that occurred in this district are more than sufficient to establish venue, because it is well-settled that venue is proper in any district in which an overt act in furtherance of a conspiracy was committed.

130

A.      **Applicable Law**

1.      *General Principles of Venue*

"The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to be tried in the 'district wherein the crime shall have been committed.'" *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).   However, because venue is not an element, at trial, the Government has the burden of proving by only a preponderance of the evidence that venue is proper.   *See, e.g.*, *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005) (citing *United States v. Naranjo*, 14 F.3d 145, 146 (2d Cir. 1994)).

The standard is different when a defendant moves pre-trial to dismiss an indictment based on alleged lack of venue.   "Where venue is challenged on a pre-trial motion to dismiss, the Government's burden is limited to showing that the indictment alleges facts sufficient to support venue."   *Peterson*, 357 F. Supp. 2d at 751.   Indeed, "[t]he Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue."   *Ohle*, 678 F. Supp. 2d at 231 (internal quotation marks and citation omitted).   Where it does so, "[t]he question of whether there is sufficient evidence to support venue is appropriately left for trial."   *Id.*; *see also, e.g.*, *Stein*, 429 F. Supp. 2d at 643 ("as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied").

Accordingly, "it is sufficient to defeat" a motion to dismiss for lack of venue "that the indictment alleges in [each count] that the conduct occurred 'in the Southern District of New York and elsewhere.'"   *United States v. Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842, at *3 (S.D.N.Y. Jan. 10, 2008); *see also, e.g.*, *United States v. Chocron*, No. 20 Cr. 400 (JSR), 2021 WL 3005086,

131

at *1 (S.D.N.Y. July 14, 2021) (same); *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL

5690711, at *1 (S.D.N.Y. Nov. 4, 2019) (same); *United States v. Dupigny*, No. S1 18 Cr. 528

(JMF), 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019) (same); *United States v. Murgio*, 209

F. Supp. 3d 698, 721 (S.D.N.Y. 2016) (same); *United States v. Riley*, No. 13 Cr. 339 (RPP), 2014

WL 53440, at *3 (S.D.N.Y. Jan. 7, 2014) (same); *United States v. Van Hise*, No. 12 Cr. 847 (PGG),

2013 WL 6877319, at *6 (S.D.N.Y. Dec. 31, 2013) (same); *Ohle*, 678 F. Supp. 2d at 231 (same);

*Szur*, 1998 WL 132942, at *9 (same). "Whether such acts alleged in the Indictment in fact occurred

in the Southern District of New York is appropriately left for trial . . . ." *Szur*, 1998 WL 132942,

at *9.

In reviewing a motion to dismiss an indictment for alleged lack of venue, just as with any

other motion to dismiss, "the Court must take the allegations of the indictment as true." *United

States v. Tucker*, No. 16 Cr. 91 (PKC), 2017 WL 3610587, at *1 (S.D.N.Y. Mar. 1, 2017) (quoting

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20,

2015)); *see also supra* Section I.A.1.

### 2.  *Venue in a Criminal Conspiracy*

"When a federal statute defining an offense does not specify how to determine where the

crime was committed, [t]he *locus delicti* must be determined from the nature of the crime alleged

and the location of the act or acts constituting it." *United States v. Tzolov*, 642 F.3d 314, 318 (2d

Cir. 2011) (internal quotation marks and citations omitted). "Venue is proper only where the acts

constituting the offense—the crime's essential conduct elements—took place." *Id.* (internal

quotation marks and citations omitted).

Where "the acts constituting the crime and the nature of the crime charged implicate more

than one location," the Constitution "does not command a single exclusive venue." *United States*

*v. Reed*, 773 F.3d 477, 480 (2d Cir. 1985); *see also United States v. Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018).  Instead, a defendant charged with a "continuing offense"—and it is well-established that a conspiracy is a continuing offense, *see, e.g.*, *United States v. Rutigliano*, 790 F.3d 389, 395-96 (2d Cir. 2015)—may be tried in any district in which the offense occurred, in whole or in part. *See, e.g.*, *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005); *Naranjo*, 14 F.3d at 147; *see also* 18 U.S.C. § 3237(a) (venue for a continuing crime is proper "in any district in which such offense was begun, continued, or completed.").

In particular, with respect to a conspiracy charge, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed." *Tzolov*, 642 F.3d at 319-20 (internal quotation marks and citations omitted); *see also Tang Yuk*, 885 F.3d at 69 ("This observation [that venue may lie in more than one place] is particularly apt where . . . the charged crime is a conspiracy, because 'any district in which an overt act in furtherance of the conspiracy was committed' is properly designated as the 'district where the offense was committed,' so long the act was performed (1) 'by any conspirator,' and (2) was undertaken 'for the purpose of accomplishing the objectives of the conspiracy.'" (quoting *Tzolov*, 642 F.3d at 319-20)); *see also United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228, at *1 (S.D.N.Y. Dec. 18, 2017) ("In a conspiracy case, that means that the Indictment must allege that at least one 'overt act in furtherance of the conspiracy'—that is, 'any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy'—occurred in the district of prosecution." (citing *Tzolov*, 642 F.3d at 319-20)).  Indeed, proof of an overt act by or caused by any of the co-conspirators in a district will support venue there as to all of them.  *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987).  "Thus, a defendant need not himself have ever been

physically present in a district for a conspiracy charge against him to be venued there." *United States v. Rommy*, 506 F.3d 108, 119-20 (2d Cir. 2007); *see also Tang Yuk*, 885 F.3d at 69.

Similarly, a defendant does not need to have "actual knowledge that an overt act will occur in a particular district to support venue at that location." *Rommy*, 506 F.3d at 123. Instead, a defendant merely must have been able to "reasonably . . . foresee[] that part of the offense would take place in the district." *Tang Yuk*, 885 F.3d at 70 (internal quotation marks and citations omitted).

The Second Circuit has "occasion[ally] . . . supplemented" this foreseeability inquiry "with a substantial contacts test that takes into account a number of factors . . . includ[ing] the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Id.* (alteration in original; internal quotation marks and citations omitted). "When an overt act in furtherance of a criminal conspiracy has been committed in the district, however, this supplemental inquiry has no relevance." *Id.*; *see also United States v. Kapirulja*, 314 F. App'x 337, 339 (2d Cir. 2008) ("There was no need to demonstrate 'substantial contacts' with the district; we have required such a showing only where no overt acts occurred in the district." (citing *United States v. Saavedra*, 223 F.3d 85, 89 (2d Cir. 2000))); *cf. United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) (describing "substantial contacts" test as a "supplement[]" to the normal "venue inquiry" and observing that this test has been "alternately applied and ignored").

In any event, the substantial contacts test is not a "formal constitutional test," *Saavedra*, 223 F.3d at 93, and "that inquiry is made only if 'the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial,'" *Rutigliano*, 790 F.3d at 399 (citing *Coplan*, 703 F.3d at 80). "This limitation arises directly

out of the purpose of the substantial contacts test: to safeguard against hardship to the defendant that may arise when a continuing offense lays venue in numerous districts, some of which are remote." *United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *37 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).

**B.      Discussion**

The defendants' arguments for dismissal may be easily rejected.  Indeed, each count of the Indictment expressly alleges that the charged crime occurred "in the Southern District of New York and elsewhere."  (Indictment ¶¶ 71, 75, 77, 80, 82, 83.)  "These allegations alone are sufficient to survive a pretrial motion to dismiss." *Ohle*, 678 F. Supp. 2d at 231; *see also, e.g.*, *Elcock*, 2008 WL 123842, at *3 ("[I]t is sufficient to defeat defendant's venue motion that the indictment alleges in [each count] that the conduct occurred 'in the Southern District of New York and elsewhere.'").

The defendants wholly ignore this consistent, clear, and longstanding law, arguing that "the Indictment relies on fleeting, *de minimis* brushes with the Southern District of New York." (Menendez Second Mot. 6; *see also* Hana Mot. 102 (asserting that the "essential elements of the alleged criminal conduct occurred exclusively outside of the Southern District of New York"); Daibes Mot. 9 (claiming that the "present matter has virtually no relationship to the Southern District of New York other than the fact that the prosecutor's office is located there").)  The defendants contend, in particular, that the five overt acts in the Southern District of New York listed in the Indictment are insufficient to establish venue in this district.  (*See* Menendez Second Mot. 6-7, 11-16; Hana Mot. 107-10; Daibes Mot. 11-12.)  To extent these arguments are factual, they must be disregarded.  And even if the defendants' assertions were correct—and they are not— the defendants still would not be entitled to dismissal.

135

Although not legally necessary, the Indictment alleges specific facts giving a more than sufficient basis for the jury to find venue by a preponderance of the evidence at trial, and in any event, the Government may adduce additional facts at trial bearing on venue, underscoring the prematurity of the defendants' attempt to avoid a jury trial in this district.  *See, e.g.*, *United States v. Griffith*, No. 20 Cr. 15 (PKC), 2020 WL 4369650, at *3 (S.D.N.Y. July 29, 2020) ("The indictment is facially sufficient to survive the motion, and the government may present additional evidence at trial to establish venue in this District."); *see also United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 8649893, at *5 (S.D.N.Y. Dec. 13, 2023) (the defendant "is not, as a general matter, entitled to disclosure of all overt acts that the Government will allege were committed in furtherance of the conspiracy, *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), and the Government's disclosures have provided meaningful direction as to its evidence supporting the charge").

But even leaving aside the inappropriateness of the defendants' second-guessing or dismissing the persuasive value of the expected evidence at this stage, the overt acts set forth in the Indictment amply show that venue is wholly appropriate.  For example, the Indictment lists two dinners in Manhattan as overt acts.  The defendants claim that the Indictment fails to demonstrate that the dinners "were organized 'for the purpose of accomplishing the objectives of'" the conspiracies.  (Menendez Second Mot. 12; *see also* Hana Mot. 109-10; Daibes Mot. 12.)  This claim flatly ignores the Indictment's allegation that the dinners were "[i]n furtherance of the conspiracy and to effect its illegal objects."  (Indictment ¶ 75.)  The defendants' only response is that the lack of *details* about the dinners in the Indictment is a "telling omission, indicating that there was nothing incriminating about the restaurant meetings that the government asserts as a

basis for venue." (Menendez Second Mot. 12; *see also* Hana Mot. 109-110; Daibes Mot. 12.)  But that is not the law.

As an initial matter, the overt act "need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320.  But more fundamentally, the Indictment is not required to specify all of the expected evidence, let alone explain *how* each act furthered the object of the conspiracy, rendering the defendants' entire approach of assuming there must be "nothing incriminating" about the dinners fundamentally flawed.  (Menendez Second Mot. 12; *see also* Hana Mot. 109-10; Daibes Mot. 12.) To the contrary, "[t]he Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue." *Ohle*, 678 F. Supp. 2d at 231 (internal quotation marks and citation omitted).  The Government does not need to *prove* venue by a preponderance of the evidence in the text of the Indictment or at any other time before trial.  *See, e.g.*, *Szur*, 1998 WL 132942, at *9.

In any event, the Government expects to prove at trial that the June 30, 2018 meeting described in Indictment paragraph 75(a) was indeed an overt act in furtherance of the conspiracy. On that date, while dining together in Manhattan, Menendez, Nadine Menendez, and Hana arranged for the July 2018 meeting between Menendez and Egyptian Official-1 (referred to in paragraph 20 of the Indictment).  And as the Indictment alleges, that July 2018 meeting resulted in Menendez's notification of Hana, through Nadine Menendez, that he intended to approve a $99 million FMS for tank ammunition.  (Indictment ¶ 20.)  As such, the Indictment more than adequately alleges that the dinner in Manhattan was in furtherance of the charged conspiracies, establishing venue.  *See, e.g.*, *United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL

2064978, at *6-7 (S.D.N.Y. June 6, 2012) (finding venue over conspiracy where defendants attended dinner meetings where parties' discussions were "primarily social," but on occasion quarterly stocking packages and certain cash payments were also discussed; "[T]he Government need only show one act, which itself may be innocent, occurred in this District that was 'done in furtherance of the object or purpose of the conspiracy.'" (quoting *Tzolov*, 642 F.3d at 319-20)). Indeed, because this dinner in Manhattan included an agreement between the bribe recipient and the bribe payor on a date when the bribe recipient would hear a request for official acts, it is also "essential" conduct that would satisfy the standard applicable to a substantive offense. *Tzolov*, 642 F.3d at 318. Although no substantive offenses are charged in the Indictment, the fact that this meeting also satisfies the standard applicable to substantive charges further shows how misguided the defendants' venue challenge is. This one example alone—among others the Government will prove at trial—shows the appropriateness of venue in this district.

Menendez's assertion that this dinner and the other alleged overt acts must have been a "but for" cause of criminal conduct in the conspiracy (Menendez Second Mot. 9, 12, 14-15) misses the mark. *Tzolov* treated "but for" causation as *sufficient*, but nowhere held it was *necessary*, to prove venue. *See* 642 F.3d at 319. Menendez cites no legal authority holding otherwise. And in any event, but for the June 30 Manhattan dinner scheduling the July 2018 meeting, that meeting and the ensuing promise of an official act (Indictment ¶ 20) would not have happened, easily satisfying the "but for" test to the extent it even applies, which it does not. If Menendez's point is that the July 2018 meeting *could have been* scheduled and the schedule communicated to Egyptian Official-1 through entirely different means not including this district, that simply is not a proper application of the "but for" test. Indeed, if this were the standard, very few, if any, acts could be said to be but-for causes of any effect, and venue would thus be improper in many cases,

notwithstanding actions in this district.  After all, it is almost always possible to imagine entirely different chains of events that could lead to the same effects coming to pass, but that counterfactual possibility alone cannot defeat but-for causation.  For example, the Second Circuit in *Tzolov* held that the act of boarding a plane at JFK International Airport could be the "but for" cause of the meetings at the end of the plane ride, 642 F.3d at 320, even though it is surely the case that the conspirators in *Tzolov* could have flown from another airport, or traveled another way.

As another example, contrary to the defendants' arguments (*see* Menendez Second Mot. 12; *see also* Hana Mot. 109-10; Daibes Mot. 12), the September 21, 2019 dinner attended by Menendez, Hana, Daibes, and another Egyptian official (Egyptian Official-3) provides yet another basis for venue.[43]  Indeed, while any overt act suffices, the Indictment specifically alleges the importance of this dinner, and its role in furthering the conspiracy.  In particular, after that meeting, on or about January 2, 2020, Egyptian Official-3 texted Nadine Menendez that he had been instructed by his boss in Cairo to "start talks" with Daibes "regarding what was discussed in NY about Egyptian investments in USA", *i.e.*, referring to the September 21 meeting, and continuing, "And since i met him through you and Bob, i just want to let you know that i will contact him next week."  Nadine Menendez replied, thanking Egyptian Official-3 for his "honesty and loyalty" and expressing her "hope" that 2020 will "be a fabulous year for all of us."  This text message amply demonstrates that the September 21, 2019 dinner furthered the corrupt relationship and thus, by itself, establishes venue.

As yet another example, the defendants contend that the text message Nadine Menendez sent Uribe on or about September 5, 2019 that was transmitted through a cell tower in Manhattan

---

[43] The Indictment inadvertently states that it was Egyptian Official-4 who met Menendez, Hana, and Daibes at the restaurant on September 21, 2019.  (Indictment ¶ 75(d).)

(*see* Indictment ¶ 75(c)) fails to establish venue.  (Menendez Second Mot. 14; Hana Mot. 108-09; Daibes Mot. 12.)  Their complaint as to this allegation is that the Indictment is "silent" with respect to the "context" of Nadine Menendez's supposedly "random" text message to Uribe (Daibes Mot. 12; Menendez Second Mot. 14; Hana Mot. 108-09).  That gripe does nothing to defeat the allegation of venue and improperly seeks for the Government to enumerate and explain its arguments as to expected evidence, which is not required.  *See, e.g.*, *Ohle*, 678 F. Supp. 2d at 231; *Szur*, 1998 WL 132942, at *9.  The Indictment expressly states that the text message was sent "[i]n furtherance of the conspiracy and to effect its illegal objects."  (Indictment ¶ 75.)  The defendants are not entitled to dismissal on the ground that they disagree or wish the Indictment provided more detail.

In any event, while the Court need not consider it at this time, the September 5, 2019 text message, which the Government produced to the defendants in discovery, was plainly an act in furtherance of the conspiracy, and thus sufficient for venue.  *Tzolov*, 642 F.3d at 319-20.  On that day, in a series of text messages, Nadine Menendez invited Uribe to meet with her and Menendez that evening at their home in Englewood Cliffs, New Jersey, to discuss the September 6, 2019 scheduled meeting between Menendez and Official-2 described in Indictment paragraph 44(c).  In one of those text messages, transmitted through a cell tower in Manhattan, Nadine Menendez told Uribe her address and the approximate time of the meeting (as well as confirming that the meeting would include brandy and cigars, but not dinner).  In short, because this message was an invitation for Uribe to join a meeting to help plan Menendez's attempt to pressure Official-2, including

necessary details for the meeting, and since the meeting was intended to prepare Menendez to perform an act for which he had been bribed, this message alone is sufficient for venue.[44]

Menendez also claims that this text message is a "legally insufficient basis for venue," arguing that a conspirator's "scheme-furthering electronic communication" may establish venue, but only where such a communication is "sent or received, not where the electronic signal is relayed on its way to the recipient." (Menendez Second Mot. 13.)  Not so.  "[V]enue lies where a wire in furtherance of a scheme begins its course, continues or ends." *Rutigliano*, 790 F.3d at 397 (citing *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982)).  Indeed, in *Rutigliano*, the Second Circuit held that venue was proper in this district for conspiracy to commit wire fraud and substantive wire fraud where unlawfully obtained disability benefits "traveled through or over waters within the Eastern District, which are statutorily defined to be part of the Southern District." 790 F.3d at 397; *see also United States v. Mackey*, 652 F. Supp. 3d 309, 326 (E.D.N.Y. 2023) ("Venue is also proper in any district through which electronic communications in furtherance of the conspiracy pass." (citations omitted)).  Just as wire transfers of money that traveled through this district established venue in *Rutigliano*, so too does the wire communication from Nadine Menendez to Uribe supplying information in furtherance of the charged crimes.[45]

---

[44] Again, like many of the acts alleged in the Indictment, this message would likely meet the higher standard for venue for a substantive count, although the Court need not reach this issue, as the direct contact between bribe payor and bribe recipient for the purpose of requesting an official act is plainly "essential" to substantive bribery offenses as well. *Tzolov*, 642 F.3d at 318.

[45] The defendants argue that the overt acts do not constitute "essential conduct" in furtherance of the conspiracy allegations. (*See, e.g.*, Menendez Second Mot. 12.)  But the overt acts described in the Indictment are certainly far more "essential" to the bribery scheme than the act of simply boarding flights without more, which the Second Circuit held was sufficient for venue in a conspiracy. *See Tzolov*, 642 F.3d at 320.

Menendez also argues that the Indictment "alleges no facts to suggest that the text message's alleged connection to the District . . . was reasonably foreseeable" to him.  (Menendez Second Mot. 15.)   But again, the Government does not need to *prove* venue, even by a preponderance of the evidence, until trial.   In any event, the law as to what is reasonably foreseeable is not nearly as narrow as Menendez appears to suggest.  *See United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("The proximity of Manhattan to Brooklyn and Queens and the conspirators' transfer of hundreds of thousands of dollars in cash admitted *a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money* at issue to Brooklyn and Queens from Manhattan." (emphasis added)); *see also, e.g.*, *United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012) ("The proximity of the conspiracy's Brooklyn-Queens base of operation to parts of the Southern District of New York, as well as the need to traverse that district in procuring marijuana from New Jersey, permitted a reasonable jury to make a preponderance finding that the aforementioned acts' occurrence in the Southern District was reasonably foreseeable to [the defendant]."); *United States v. Davis*, 689 F.3d 179, 188-89 (2d Cir. 2012) (proximity of targeted Long Island residence to Southern District of New York, combined with co-conspirators' prior robberies in Bronx, supported venue in Southern District based on foreseeability that robbery target dealt drugs there).  Indeed, in a bribery scheme, venue was held to be proper based on the foreseeability not of any one particular electronic communication, but on the foreseeability that *at least some* communications over the course of a scheme would be made in this district.  *See Gross*, 2017 WL 4685111, at *40 ("Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, . . . a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to Gross that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails

142

from Murgio while Murgio was in this district." (emphasis in original)).  As noted above, all that is necessary at this stage is that the Indictment has alleged that the conduct occurred in the Southern District of New York—and it has.  It will be up to the jury in the first instance to determine if this text message, along with one or more other actions in this district, were at least reasonably foreseeable to the defendants.

The defendants also challenge the sale of gold bars in Manhattan alleged in paragraph 75(e) of the Indictment as an overt act in furtherance of the conspiracy, arguing that the conspiracy's objective "does not include the subsequent sale of the thing of value by a non-conspirator" and that the objective was completed when the gold was received, not when it was "converted to cash." (Menendez Second Mot. 15; Hana Mot. 107 (arguing the jeweler's decision where to ultimately sell the gold bars was "completely disconnected and remote" from the conspiracy); Daibes Mot. 11.)  They are factually incorrect, but this is not the stage at which to decide factual disputes because a jury will decide such questions.  As described in the Indictment, on March 31, 2022, Nadine Menendez asked the jeweler to sell two one-kilogram gold bars that had been provided by Daibes.  (Indictment ¶ 75(d).)  The Government expects the evidence at trial will establish that the jeweler told Nadine Menendez that he was going to sell the gold bars in Manhattan.  After selling the gold bars in Manhattan, the jeweler gave the checks from the sale to Nadine Menendez.  Those checks list a Manhattan address and were deposited by Nadine Menendez in May 2022.  Contrary to the defendants' claims that this occurred after the rest of the offense conduct (Menendez Second Mot. 15; Hana Mot. 107), this sale and Nadine Menendez's deposit of the New York checks took place *before* the Qatari Investment Company signed a letter of intent with Daibes, and Daibes met with Menendez, prompting Menendez to again Google the price of a kilogram of gold (Indictment ¶ 64).  These sales were thus squarely during the period when the scheme was ongoing, while

Menendez and Nadine Menendez still expected to receive things of value from Daibes and while Daibes still expected an investment in his real estate project as a result of Menendez's requested actions.[46] But in any event, transactions to liquidate bribes that were paid in gold—and in a way that concealed the source of this income—were part of the offense conduct. *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (finding single conspiracy continuing through liquidation of fraudulently inflated stock positions and laundering of the defendant's gains); *cf., e.g.*, *United States v. Prevezon Holdings*, 251 F. Supp. 3d 684, 690 (S.D.N.Y. 2017) ("Acts of perpetration and subsequent acts of concealment in wide ranging, complex frauds are often one and the same." (internal brackets, quotation marks, and citation omitted)).[47]

The defendants also invoke the "substantial contacts" test to argue that the overt acts listed in the Indictment cannot establish venue. (Menendez Second Mot. 10; Hana Mot. 106, 110-11; Daibes Mot. 10-12.) But, as described above, that inquiry does not apply here in light of the alleged overt acts committed in this district. *See Tang Yuk*, 885 F.3d at 70 ("When an overt act in

---

[46] Indeed, Nadine Menendez caused two more bars of gold to be sold in Manhattan in June 2022, which was also during the time period of the scheme and before the Qatari Investment Company's actual entry into the joint venture and the receipt of additional Formula One tickets by Nadine Menendez's relative (Indictment ¶ 66), and before the acts of concealment by Menendez and Nadine Menendez (*id.* ¶¶ 68-70). *See United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982) ("[A] conspiracy continues until the conspirators receive their anticipated economic benefits."); *see also Rutigliano*, 790 F.3d at 397 ("'[A] scheme to defraud is not complete until the proceeds have been received.'" (quoting *Vilar*, 729 F.3d at 95)).

[47] Menendez cites *Mennuti* in support of his argument that the conspiracy's objective was completed when a thing of value was received, and not when it was converted to cash. (Menendez Second Mot. 15). But *Mennuti* is inapposite, as in that case the receipt of a piece of real estate was the last act of the conspiracy, and the Government did not even assert that its resale was an overt act. 679 F.2d at 1035 & n.6. It thus says nothing about the situation here, where the conspiracy was ongoing at the time of the March 31, 2022 sale of gold bars in Manhattan, and where the receipt of gold bars was used as a means of concealing the fact that there had even been a transaction, unlike in a recorded real estate sale. (*See* Indictment ¶¶ 64-70.)

furtherance of a criminal conspiracy has been committed in the district . . . , th[e] supplemental [substantial contacts] inquiry has no relevance.").  Moreover, the "substantial contacts" test also "does not even apply . . . unless the defendant establishes that 'prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'"  *Chait*, 2017 WL 6502228, at *1 (citation omitted).  Here, the defendants do not—and cannot—provide any compelling argument as to why trying them in this district instead of across the Hudson River in the District of New Jersey would pose a hardship to them, prejudice them, or undermine the fairness of their trial.  "[T]he Southern District of New York is not far from New Jersey . . . ." *Gross*, 2017 WL 4685111, at *40.  "Indeed, the Second Circuit has previously held that, when defendants who could have been tried in the Eastern District of New York challenged venue in the Southern District, the Defendants could not make a showing of hardship." *Id.* (citing *Rutigliano*, 790 F.3d at 400).  Hana also claims that the "substantial contacts" test "perhaps" "weighs in favor of prosecution in the District of Columbia" (Hana Mot. 110-11), but he does not—and cannot— explain why trying him in this district instead of in the District of Columbia would pose more of a hardship to him when this district is far closer to his New Jersey residence and business, which is presumably why he only says "perhaps" and does not develop this argument.  In any event, even if the "substantial contacts" test were deemed to apply and to have been triggered by a showing of hardship, which it does not, it would be satisfied here by the overt acts alleged in the Indictment. *See Tzolov*, 642 F.3d at 321 (finding the substantial contacts test satisfied where the defendant "committed overt acts in furtherance of the conspiracies in the [district of conviction]").

Accordingly, the defendants' motions to dismiss the Indictment on venue grounds should be denied.[48]

## VII.   THE DEFENDANTS' ALTERNATIVE MOTION TO TRANSFER SHOULD BE DENIED

Menendez moves, in the alternative, to transfer this case to the District of New Jersey. (Menendez Second Mot. 16-17.)  Nadine Menendez, Hana, and Daibes join this motion.  (Dkt. 146; Hana Mot. 131; Daibes Mot. 1.)  The defendants offer no factors sufficient to justify a departure from the general rule that a criminal prosecution should be retained in the original district where the case was charged, as they must to succeed in a motion to transfer.  They utterly fail to show why trial in this Court, which is adjacent to their preferred and home district, would be so unduly burdensome as to require transfer, and their motion should thus be denied.

### A.   Applicable Law

"As a general rule a criminal prosecution should be retained in the original district" where the case was charged.  *United States v. Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982) (internal quotation marks and citation omitted); *see also Tang Yuk*, 885 F.3d at 74 n.5.  Discretionary transfers are governed by Federal Rule of Criminal Procedure 21(b), which provides that, "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the

---

[48] Menendez's request that the Court "resolve factual disputes at this stage of the case with an evidentiary hearing" (Menendez Second Mot. 11) should be swiftly denied.  As described above, there is no summary judgment in criminal cases.  *See supra* Section I.A.1.  That is just as true for venue as for an element of the charged crimes.  *See, e.g.*, *Chalmers*, 474 F. Supp. 2d at 575 ("[W]hether there is sufficient evidence to support venue in this District is appropriately left for trial."); *Szur*, 1998 WL 132942, at *9; *see also United States v. Callahan*, 300 F. Supp. 519, 522 (S.D.N.Y. 1969) (rejecting defendants' request for a preliminary hearing on venue-related grounds as the Government was correct that the "determination of the venue question . . . should await the trial.  The venue question as to each of the challenged counts is a question of fact so entwined with the merits of each count that a decision should not be made prior to trial but postponed until trial." (citations omitted)).

defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Fed. R. Crim. P. 21(b). The "burden is on the moving defendant to justify a transfer under Rule 21(b)." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (internal quotation marks and citation omitted). That burden "is not often or easily met," as the defendant must show that trial in the original district "would be so unduly burdensome that fairness requires the transfer to another district." *United States v. Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411, at *2 (S.D.N.Y. Jan. 16, 2014) (internal quotation marks and citation omitted); *see also United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 703391, at *2 (S.D.N.Y. Feb. 12, 2020) (same).

In *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964), the Supreme Court set forth a list of factors that courts routinely consider in analyzing a defendant's motion to transfer: (1) location of defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district involved; and (10) any other special elements that might affect the transfer. *Spy Factory*, 951 F. Supp. at 455 (citing *Platt*, 376 U.S. at 244). "No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (internal quotation marks and brackets omitted).

Generally speaking, for good reason, "there has been a 'trend in recent years away from granting transfers.'" *Blondet*, 2019 WL 5690711, at *2 (quoting *United States v. Quinn*, 401 F. Supp. 2d 80, 85-86 (D.D.C. 2005) (citing cases and treatises)). This trend recognizes that, since

147

the time that *Platt* was decided in 1964, "the massive expansion of technology and the relative decline in costs for long-distance travel over the past few decades" have greatly reduced the circumstances where transfer is justified. *Id.* (quoting *Quinn*, 401 F. Supp. 2d at 86).

**B.    Discussion**

Application of the relevant *Platt* factors here does not justify deviation from the "general rule" that "a criminal prosecution should be retained in the original district" where the case was charged.  *Posner*, 549 F. Supp. at 477 (internal quotation marks and citation omitted).  Indeed, Menendez does not even make an effort to apply all of the *Platt* factors, but instead conclusorily argues that transfer to New Jersey is "warranted to protect the interests of the people of New Jersey."  (Menendez Second Mot. 17.)  Because all of the *Platt* factors besides the defendants' place of residence are neutral or weigh against transfer, this motion should be denied.

**1.    *Residence of the Defendants***

While there is no dispute that the defendants do not reside in this district, this fact alone does not justify transfer.  It is well-established that "the inconvenience of having to stand trial outside of one's home district, without more, is insufficient to warrant a transfer," *United States v. Coriaty*, No. 99 Cr. 1251 (DAB), 2000 WL 1099920, at *2 (S.D.N.Y. Aug. 7, 2000) (internal quotation marks and citation omitted), and a defendant's residence, standing on its own, "'has no independent significance in determining whether transfer to [a different] district would be 'in the interest of justice,'" *United States v. Christian*, No. 12 Cr. 41 (KBF), 2012 WL 1134035, at *1 (S.D.N.Y. Apr. 2, 2012) (quoting *Platt*, 376 U.S. at 245).  That is because a defendant's desire to be tried in his district of residence is "in tension with the more general presumption that a criminal prosecution should be retained in the original district." *Spy Factory*, 951 F. Supp. at 464 (internal quotation marks and citation omitted).

148

This factor merits less weight than usual in this case, because Menendez and Nadine Menendez reside in Englewood Cliffs, New Jersey, which is located only about 16 to 19 miles from this Court (and indeed, about 20 to 23 miles from the closest federal courthouse in Newark, New Jersey where the case would likely be tried if transferred).  Hana and Daibes reside in Edgewater, New Jersey, which is located only approximately 10 to 11 miles from this Court.  That commute is hardly an inconvenience so unduly burdensome to the defendants as to warrant transfer.  *See United States v. Borker*, No. 10 Cr. 1266 (RJS), 2011 WL 1630344, at *2 (S.D.N.Y. Apr. 28, 2011) (observing that it is "difficult to see how Defendant is inconvenienced by the trial being held here" rather than in the adjacent Eastern District of New York); *United States v. Beeman*, No. 01 Cr. 1141 (DAB), 2003 WL 22047871, at *4 (S.D.N.Y. Aug. 29, 2003) (observing that the defendant lived and worked in Connecticut, "within a few hours' drive of Manhattan, a commute that countless commuters make every work day").  As the Second Circuit put it in another context, travel from New Jersey to Manhattan "d[oes] not involve a trek through remote and foreign climes."  *United States v. DeKunchak*, 467 F.2d 432, 439 (2d Cir. 1972) (describing travel from New Jersey to Long Island to Manhattan).

Menendez's motion sets forth no facts that would distinguish this case from the dozens of cases that have come before where a defendant was tried outside of his or her district of residence.  Indeed, "[e]very life is significantly disrupted during a trial wherever it is held.  Besides the need to be in court every day, the evenings and weekends are usually consumed analyzing the evidence that has been admitted and preparing for the remainder of trial.'"  *Christian*, 2012 WL 1134035, at *1 (quoting *United States v. Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *1 (S.D.N.Y. July 13, 2001)).  The anticipated duration of any disruption here—which would occur regardless of where the defendants are tried—is not nearly so long as in other cases where motions to transfer

149

have been denied.  *See, e.g., Stein*, 429 F. Supp. 2d at 645-46 (denying a motion to transfer where the trial was anticipated to last between six and eight months).

### 2.    *Location of Witnesses*

The location of witnesses who are likely to be called at trial does not weigh in favor of transfer.  A defendant claiming that this factor warrants a transfer of venue bears the burden of "specifically describ[ing] how particular witnesses would be entirely prevented from testifying at trial in the Southern District of New York."  *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *4 (S.D.N.Y. Oct. 9, 2020); *see also Spy Factory*, 951 F. Supp. at 456 (defendants seeking to transfer venue bear the burden of offering the Court "specific examples of witnesses' testimony and their inability to testify because of the location of trial").  The "naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer."  *Id.* at 456 (internal quotation marks and citation omitted); *see also United States v. Juncal*, No. 97 Cr. 1162 (JFK), 1998 WL 473949, *5 (S.D.N.Y. Aug. 7, 1998) ("there is no basis to grant the motion to transfer" where defendant fails to make "a specific proffer of testimony from specific witnesses to allow the court to make an informed decision about the importance of these witnesses to [the defendant's] case").  Rather, "the court must rely on concrete demonstrations of the proposed testimony."  *Spy Factory*, 951 F. Supp. at 456 (quotations and citations omitted).  Moreover, "in this age of easy air travel, this factor is generally much less relevant than it was in 1964, when the Supreme Court decided *Platt*."  *United States v. Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154, at *1 (S.D.N.Y. Oct. 18, 2004).

Menendez baldly asserts that "few if any likely witnesses are expected to be located" in this district.  (Menendez Second Mot. 17.)  Menendez has not identified a single specific witness whom he intends to call at trial or what their likely testimony would be, nor has he made any

allegation that such a witness would be unable to testify, or even so much as materially inconvenienced, if the trial is held in New York.  *See, e.g.*, *United State v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796, at *3 (S.D.N.Y. Dec. 14, 2020) (this factor did not support transfer where defendant did not "identify the witnesses or their testimony, nor [did] he offer any details as to why they cannot travel to New York other than that their 'travel expenditures will be costly and burdensome'"); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2019 WL 4640232, at *3 (S.D.N.Y. Sept. 24, 2019) ("[T]ransfer is unwarranted based on the mere possibility that unnamed, purported character witnesses will be unable to testify because of the location of the trial."); *Christian*, 2012 WL 1134035, at *2 (this factor did not support transfer where defendants "address[ed] the convenience of the witnesses with conclusory averments" that trial in this district would be less convenient and "d[id] not put forward any evidence that potential witnesses would be unwilling and unable to travel to the Southern District of New York"); *United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008) ("bare assertion" of hardship was insufficient to tip this *Platt* factor in favor of transfer); *Stein*, 429 F. Supp. 2d at 646 (location of witnesses did not support transfer where defendants failed to put forward any evidence that potential witnesses would be unable or unwilling to travel to this district).  So too here.

Moreover, here, it would not be unduly burdensome for witnesses to travel to this Court from New Jersey (assuming that is where they are located) to testify at trial.  *See United States v. Thomas*, No. 06 Cr. 365 (DLC), 2006 WL 2283772, at *2 (S.D.N.Y. Aug. 9, 2006) (observing that "there is a well-developed transportation network" that connects the District of Connecticut to this Court); *Beeman*, 2003 WL 22047871, at *4 (travel of a few hours from Connecticut to Manhattan "cannot be said to constitute such a burden upon . . . potential witnesses that the trial should not proceed here").  This factor thus does not support the defendants' motion.

3.      *Location of Events*

Menendez has also failed to demonstrate that the location of pertinent events in this case compels transfer.  He argues that venue should be transferred to the District of New Jersey as the "vast majority of the alleged events took place there."  (Menendez Second Mot. 17.)  Of course, many of the events related to the charged criminal conduct occurred in New Jersey.  But many events occurred elsewhere, including in this district, as discussed above and alleged in the Indictment, as well as JFK International Airport, in Washington, D.C., Egypt, and Qatar.[49] Menendez, in short, appears to ignore that the charged scheme was multistate and international in nature.  While the trial in this case will undoubtedly relate to events that took place outside this district, that would be an inevitability in any district in which this case was tried.  The location of the charged events thus weighs against transfer or, at a minimum, is neutral.

4.      *Location of Documents and Physical Evidence*

The fourth *Platt* factor, the location of documents, does not weigh in favor of transfer, particularly when "[m]odern developments in electronics and computers render documents readily available to a defendant wherever he is located."  *Avenatti*, 2019 WL 4640232, at *4; *see also United States v. Datta*, 797 F. Supp. 2d 448, 450 (S.D.N.Y. 2011) (electronic format of documents "neutraliz[ed] any issue concerning the location of documents"); *Brooks*, 2008 WL 2944626, at *2 ("the location of documents and records is not a major concern in these days of easy and rapid

---

[49] Even if New Jersey were deemed to be the primary location of the scheme, this factor would nevertheless be outweighed by the remaining factors in the *Platt* analysis—particularly given that this Court is adjacent to the defendants' preferred district. *See, e.g.*, *United States v. Pilnick*, 267 F. Supp. 791, 799-800 (S.D.N.Y. 1967) (denying transfer to New Jersey even though defendant's offices were located there and "most of the acts complained of would have occurred there"); *Wilson*, 2001 WL 798018, at *2 ("While significant criminal activities are alleged to have occurred in San Francisco, this was not a crime whose planning, execution, or impact was limited by geography.").

transportation"). Menendez argues that "few if any . . . items of physical evidence are expected to be located" in this district "unless they were already transported here by the government." (Menendez Second Mot. 17.)  In fact, as a result of court-authorized search warrants that were executed in connection with this case, relevant physical evidence—such as cellphones, gold bars, and cash—is indeed located in this district. *See United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990) (presence of documents and recordings in this district favored retaining venue); *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir. 1979) (presence of most of the exhibits in the charging district favored retaining venue).  This factor thus weighs decisively against transfer.

5.     *Disruption of the Defendants' Business*

Menendez does not allege that a trial in this district would disrupt his business.  Indeed, his brief is entirely silent on this factor.  Accordingly, this factor weighs against transfer.  As noted above, "[e]very life is significantly disrupted during a trial wherever it is held." *Wilson*, 2001 WL 798018, at *3.  Menendez never alleges, specifically, nor is there any reason to believe, that a trial in New York will cause more disruption to his ability to conduct Senate business than a trial in New Jersey.  *See Kolfage*, 2020 WL 7342796, at *5 (defendant failed to meet "his burden to demonstrate that this factor weighs in favor of transfer" because he did "not explain . . . why the trial would cause more disruption if he were in New York than in Colorado" or "why remote technology . . . would not permit him to manage his business from afar"); *United States v. Parrilla*, No. 13 Cr. 360 (AJN), 2014 WL 1621487, at *15 (S.D.N.Y. Apr. 22, 2014).  Nor is there any suggestion in the defendants' motions that a trial in New York will cause a greater disruption to any of the other defendants than a trial in New Jersey; indeed, all of the defendants have been able to attend all necessary court appearances, and the Court and Government have accommodated conflicts to the extent possible.

6.      *Expenses to the Parties*

Menendez likewise does not allege that the expenses to the parties warrant a transfer of this case.  Menendez's brief is also silent on this point.  All of the defendants have retained counsel and apparently possess substantial means to pay their legal bills.  Menendez does not claim that the expense of a trial here, rather than New Jersey, would impair his defense, nor could he.  Indeed, Menendez has retained counsel based in New York, Washington, D.C., and California, and not, it appears, in New Jersey.  Where the "[d]efendant has not shown that the additional expense is unduly onerous in light of his circumstances, nor that he would be unable to bear such expense," this factor does not favor transfer.  *Calk*, 2020 WL 703391, at *4; *see also United States v. Riley*, 296 F.R.D. 272, 277 (S.D.N.Y. 2014) (this factor "is generally afforded serious weight only in cases involving indigent defendants" (internal quotation marks omitted)); *United States v. Carey*, 152 F. Supp. 2d 415, 423 (S.D.N.Y. 2001) (defendant "has not demonstrated that the expected expense will infringe on his ability to defend himself").  Moreover, moving the trial to New Jersey would increase, potentially significantly, the costs to the Government, including its agents.  *Cf. Ebbers*, 2004 WL 2346154, at *2 ("It would impose an enormous burden on the government to move the prosecutors, investigators, support staff, court staff, and others familiar with the case . . . to another jurisdiction.").  "Where the effect of a motion to transfer is merely to shift the economic burden to the government, this factor generally weighs against transfer."  *Kolfage*, 2020 WL 7342796, at *5 (internal quotation marks and citation omitted).  For these reasons, the expense to the parties weighs against transfer.

7.      *Location of Counsel*

The location of counsel similarly weighs against transfer.  Menendez does not—and cannot—establish that this *Platt* factor weights in favor of transfer; indeed, his brief does not even

attempt to address this factor.  As noted above, Menendez is represented by lawyers who are located in New York, Washington, D.C., and California.  Nadine Menendez is represented by lawyers who are located in Washington, D.C.  Indeed, to the Government's knowledge, counsel for Menendez and Nadine Menendez do not even have offices in New Jersey.  Only Hana and Daibes are represented by lawyers based in New Jersey.  The only potential inconvenience to the lawyers would be their appearance for the trial in New York, which hardly is an undue burden, especially for the lawyers located in New Jersey, as discussed above.

Furthermore, this factor is not limited to the location of defense counsel.  As the Second Circuit has made clear, the location of the prosecution team, including agents, is an appropriate consideration in denying a motion to transfer venue.  *Stephenson*, 895 F.2d at 875 (considering "location of the prosecutor"); *Keuylian*, 602 F.2d at 1038 (considering location of "the Government attorney and the ATF case agent"); *Kolfage*, 2020 WL 7342796, at *5 (considering location of both defense and Government lawyers). Here, the location of the prosecution team— which is principally Assistant U.S. Attorneys for the Southern District of New York and Federal Bureau of Investigation agents and other personnel from the New York Field Office, and does not include attorneys, agents, or other personnel in New Jersey—weighs against transfer.

8. *Relative Accessibility of the Place of Trial*

The relative accessibility of the two districts similarly does not favor a transfer.  This district is clearly accessible to the defendants, who do not claim otherwise, nor could they.  It is not reasonably subject to dispute that Manhattan is one of the most accessible locations in the United States.  *See Avenatti*, 2019 WL 4640232, at *5 (accessibility of place of trial "does not favor transfer" because "Manhattan is clearly one of the most accessible locations in the United States with three major airports and a variety of other public transportation."); *Percoco*, 2017 WL

6314146, at *17 (denying transfer because, *inter alia*, "New York City is clearly an accessible transportation hub"); *Christian*, 2012 WL 1134035, at *2 (denying transfer because, *inter alia*, "New York is easily accessible by air with three major airports, as well as a variety of other public transportation"). Accordingly, to the extent that any witnesses are required to travel from outside of New York to testify, the inconvenience will be minimal.

9.    *Docket Conditions*

Finally, Menendez makes no suggestion that docket conditions warrant transfer to the District of New Jersey. In fact, this factor weighs against transfer. The Court has already set a date for trial in this matter for May 2024, and "it is highly unlikely that [the defendant] could schedule a trial date sooner in the District of New Jersey." *United States v. Rutkoske*, 394 F. Supp. 2d 641, 647 (S.D.N.Y. 2005). As a result, there is good reason to believe that Menendez will receive a trial sooner in this district, which is in the public interest. *See Kolfage*, 2020 WL 7342796, at *6 (this factor weighs against transfer where defendant "offer[ed] no evidence that he would get an earlier trial in" his preferred venue).

In sum, the circumstances here strongly favor denial of the motion to transfer the case. Even in cases where some of the *Platt* factors "favor or perhaps favor transfer," *Datta*, 797 F. Supp. 2d at 450, courts will deny such motions where defendants do not meet their burden of overturning the presumption that a trial shall be held in the initial district. *See, e.g.*, *id.* (denying motion to transfer even while noting "[i]t appears that more of the events pertinent to the indictment occurred in Texas than here, defendant's business is centered there, and the defendant's family now resides in Texas" and that "it may be that more trial witnesses ultimately will prove to be Texas rather than New York area residents"); *United States v. Pastore*, No. 17 Cr. 343 (NSR), 2018 WL 395490, at *5 (S.D.N.Y. Jan. 11, 2018) (denying transfer where two of the *Platt*

156

factors—residence of defendant and location of counsel—favored transfer and the others were

neutral or militated against transfer); *Percoco*, 2017 WL 6314146, at *18 (denying transfer despite

location of defendants, a number of witnesses, and a number of relevant events in other district);

*Larsen*, 2014 WL 177411, at *3 (denying transfer despite indigent defendant's residence, job, and

child care responsibilities supporting motion where other factors were opposed or neutral).  But

here, it is not a close case: the *Platt* factors, considered in their totality, weigh heavily against a

transfer of the defendants' case to the District of New Jersey and, accordingly, the defendants'

motion to transfer should be denied.

## VIII.   HANA'S AND MENENDEZ'S MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED

In the alternative, Hana asserts that, if the Indictment is not dismissed in its entirety, he is

entitled to detailed information about the ways in which the Government intends to prove the case,

in the form of a bill of particulars identifying "every official act that Senator Menendez was to

take and every official or lawful duty that he was to breach in connection with each alleged

scheme" (Hana Mot. 34-35), the specific matters or questions Menendez promised or agreed to

influence at the time he accepted or agreed to accept bribes (*i.e.*, the *pro* in the *quid pro quo*, and

the timing thereof) (*id.* 34-36), as well as the "identity of the foreign principals as to which he

allegedly conspired for Senator Menendez to act as an agent" (*id.* 61), the identity of every co-

conspirator (*id.* 63-64), and the locations "currently hidden behind the term 'elsewhere' in Count

4" of the Indictment (*id.* at 65).  Similarly, Menendez requests a bill of particulars as to venue

(Menendez Second Mot. 16).[50]

---

[50] Nadine Menendez (Dkt. 146 at 2) and Daibes (Daibes Mot. 1, 26) join in the motions for bills of particulars.

The defendants are not entitled to a bill of particulars under well-established law. The Government has provided the defendants with more than sufficient information to understand the charges against them and to prepare a defense in multiple ways. These include the detailed, 50-page Indictment; extensive electronically-searchable discovery with a detailed index; multiple search warrant affidavits; voluntary disclosures, including a glossary of certain individuals, entities, and locations referenced in the Indictment; and various pretrial filings, including this memorandum. The defendants will also receive trial exhibits, a witness list, and Jencks Act material reasonably in advance of trial. The Court should decline to order a bill of particulars, which is not necessary to serve the limited purpose for which one may be sought under the law.

### A.    Applicable Law

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added) (internal quotation marks omitted), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). Accordingly, "[a] bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Torres*, 901 F.2d at 234); *see United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014).

In determining whether the charges are so general that they require supplementation through a bill of particulars, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendants to date. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States v. Block*, No. 16 Cr.

158

595 (JPO), 2017 WL 1608905, at *6-7 (S.D.N.Y. Apr. 28, 2017) (denying request for bill of particulars as to alleged fraud and unindicted co-conspirators where indictment sufficiently advised defendant of nature of charges against him and described with specificity acts he allegedly committed, nature of conspiracy, and explained in language closely tracking statute crimes alleged); *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *3-4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery and indictment was "sufficient to apprise the defendant of the charge" and to allow him to prepare for trial); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was fifteen pages long and substantial discovery had been provided).

Although the Government cannot provide "mountains of documents to defense counsel" as a substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575, the provision of discovery in combination with guidance about what is most relevant or how to review that discovery can vitiate a need for further particulars, *see, e.g.*, *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was thirty-four pages long and Government had provided voluminous, organized discovery).  In no event should the mere volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial.  *See United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013).

To be sure, a bill of particulars may be helpful to a defendant in any case.  But "the law does not impose upon the Government an obligation to preview its case or expose its legal

theories," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is *necessary*, not whether it is helpful," *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added); *Mahabub*, 2014 WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "'an impermissible attempt to compel the Government to provide the evidentiary details of its case'" (quoting *United States v. Biaggi*, 675 F. Supp. 790, 810 (S.D.N.Y. 1987)).

A bill of particulars also should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'" (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968))). The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34; *Jimenez*, 824 F. Supp. at 363); *see also, e.g.*, *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001))); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret

its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

Indeed, there are very good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and other disclosures, are so general as to render it impossible to prepare am adequate defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."  *Henry*, 861 F. Supp. at 1197; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

Moreover, where the Government's provision of particulars is tantamount to an itemized preview of its proof, it creates the very real danger that a defendant will "tailor her testimony to explain away the Government's case."  *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if the defendant has been given adequate notice of the charges against her and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."  *Id.*

161

**B.      Discussion**

There is no valid basis for any bill of particulars in this case, much less one with the level of detail demanded by the defendants.  The 50-page speaking Indictment, discovery produced to date, including multiple search warrant affidavits, and additional information provided by the Government are far more than sufficient to put the defendants on notice of the nature and specifics of the crimes of which they are accused and to permit them to adequately prepare their defenses. *See, e.g.*, *Bortnovsky*, 820 F.2d at 574.

Indeed, Hana's lengthy and detailed brief (like those of Menendez and Daibes) demonstrate that they fully understand the charges they are facing, and not just on a general level.  Hana makes no serious argument that he has not been apprised of the nature of charges against him, *see Torres*, 901 F.2d at 234, nor could he—the Indictment explains in depth the charged scheme, including specific communications and actions, and discovery provides the relevant documents, electronic communications, recorded statements, and other materials to further understand the allegations. The Indictment sets forth in great detail not just the charges, but also the contours of the defendants' scheme, including the acts sought and promised and the bribes provided in exchange. The Indictment also details the defendants' roles in the crimes charged.  Indeed, the Indictment is organized according to the portions of the scheme corresponding with the types of acts sought, promised, and performed, with extensive and detailed headings and subheadings.[51]

Given the extensive detail within the Indictment's 50 pages, this plainly is not a case in which the allegations in the Indictment "are so general that they do not advise the defendant of the

---

[51] The defendants appear to acknowledge this, in the course of making the (incorrect) argument that the pains the Indictment takes to present the information in an organized fashion somehow shows that the conspiracy counts are duplicitous.  *See supra* Section III.B.2; (*see also* Menendez Second Mot. 23-24 & n.3; Hana Mot. 78-80 & n.25).)

specific acts of which he is accused." *Walsh*, 194 F.3d at 47 (internal quotation marks and citation omitted). On the contrary, the Indictment *itself* provides a sufficient basis to deny the defendants' motions in their entirety. *See, e.g.*, *United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) ("'[E]videntiary detail is not the function of the bill of particulars.' Particulars are necessary only where indictment charges are 'so general that they do not advise the defendant of the specific acts of which he is accused.'" (citation omitted) (quoting *Torres*, 901 F.2d at 234; *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004))); *United States v. Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (denying motion for bill of particulars where "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial").

Of course, additional particularity regarding the counts in the Indictment or the evidence in support might be helpful for the defendants, but that is both true in every case and not the appropriate standard. Instead, as described above, the proper inquiry is whether the information already available to them is so general that a bill of particulars is *necessary* to the preparation of their defenses. *See Mitlof*, 165 F. Supp. 2d at 569 ("The ultimate test must be whether the information sought is *necessary*, not whether it is helpful." (emphasis added)). It is not. In addition to the speaking Indictment, the defendants have received substantial and organized discovery in this case, including, among other things:

- Search warrants and detailed 100+ page affidavits identifying and describing evidence and further detailing the contours of the charged scheme;

- Documents related to the seizure of physical evidence pursuant to those warrants, including inventories, photographs, and laboratory reports of the forensic examination of certain seized evidence;

- Electronic evidence extracted from multiple devices and accounts pursuant to those warrants, including electronic communications among co-conspirators regarding the scheme;

163

- Other electronic evidence such as that obtained by pen registers and orders pursuant to 18 U.S.C. § 2703(d), including phone records and email headers showing communications among co-conspirators;

- Documents obtained from relevant individuals and entities, such as the defendants, the Office of Senator Menendez, IS EG Halal and a number of its employees, a number of other individuals referred to in the Indictment, the State Department, the USDA, and the Qatari Investment Company, as well as third parties, such as accountants, phone companies, and financial institutions;

- Information from a particular confidential source, including recordings made by the source, reports of debriefings with the source, and draft translations of the recordings; and

- Certain witness statements, including redacted interview reports.

To facilitate the defendants' review of the discovery, the Government has also, among other things, produced the discovery in database load-ready format when practicable; produced a detailed, text-searchable index; provided a glossary of certain individuals, entities, and locations referenced in the Indictment; and repeatedly offered to answer any questions defense counsel may have regarding where to find materials in discovery.  (Dkt. 111 at 2-3.)  The Government has also, as a result of conversations with defense counsel, produced a representative search warrant affidavit (which had previously been produced for Attorney's Eyes Only) re-designated under the Protective Order to facilitate defense counsel's ability to discuss it with their clients, and identified—on the record at the arraignment on the S1 Indictment—one discovery production as containing what may be particularly relevant materials for defense counsel to review.  (*Id.* at 3.) And it is clear from the defendants' own substantial motions that they have apparently already reviewed that material (at least in significant part), identified potentially relevant materials therein, and are aware of their relevance.  Moreover, the detail in the Indictment dovetails with the extensive and electronically searchable discovery to facilitate the defendants' review.  For example, the Indictment provides specific dates for particular communications and actions,

164

permitting the defendants to sort and prioritize discovery by relevant date, and quotes a number of electronic communications verbatim, allowing the defendants to readily search the discovery materials for them.

Hana nonetheless claims that the Government should be required now to identify and set forth the particulars of "every official act" that Menendez promised to take, agreed to take, or took in connection with each alleged scheme, including "the conduct, date, place, and substance of each official act forming the basis of each bribery charge."[52]  (Hana Mot. 34-35 (internal quotation marks and citation omitted).)  He is wrong.  "The vehicle of a bill of particulars . . . must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."  *Samsonov*, 2009 WL 176721, at *3.  In any event, the Indictment and discovery provide Hana and his co-defendants with more than sufficient information to put them on notice and prepare their defenses.  (*See, e.g.*, Indictment ¶¶ 1-2, 16, 19-21, 28-30, 35, 37, 39, 40, 42, 44, 46-48, 51-52.)

Moreover, the cases cited by Hana (Hana Mot. 35-36) are readily distinguishable.  For example, in *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the government "produced discovery concerning two thousand Medicare claims, and stated that it would specify which were alleged to be false forty-five days before trial."  *United States v. Tuzman*, 301 F. Supp. 3d 430, 451 (S.D.N.Y. 2017) (summarizing *Nachamie* on this point).  The court in *Nachamie* thus ordered the government to provide a bill of particulars identifying which claims it planned to prove at trial were false and how they were false.  *Nachamie*, 91 F. Supp. 2d at 574.  In short, *Nachamie*

---

[52] Hana also requested this information as to "every official or lawful duty" Menendez was alleged to breach.  (Hana Mot. 34.)  As noted above, *see* Section I.A.2.e), the Government does not presently intend to ask the jury to convict the defendants under Section 201 on the basis of a breach of official duty.

"'presented the quintessential needle in a haystack problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent.'" *Tuzman*, 301 F. Supp. 3d at 451 (quoting *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009)). To the contrary here, the Indictment details the contours of the bribery scheme, including by specifying the various goals of the scheme and acts agreed to be taken in exchange for specific things of value. There is thus no needle in a haystack problem here.

As another example, Hana cites *United States v. Siddiqi*, a case in which the charges against the defendant were set forth in a three-page indictment, No. 06 Cr. 377 (SWK) (S.D.N.Y. Apr. 28, 2006) (ECF No. 13) and in which the court ordered the government to prepare a bill of particulars "identifying which of the requests for payment and change orders were allegedly approved by [the defendant] in return for bribes." No. 06 Cr. 377 (SWK), 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007). The court specified that the government "need not allege that particular requests for payment or change orders were approved in return for particular bribery payments. Requiring this sort of one-to-one mapping of tainted requests for payment or change orders to particular bribes would improperly restrict the Government's proof at trial." *Id.* Here, by contrast, the Indictment is lengthy and provides a detailed outline of the charged bribery scheme. And *Siddiqi* fully undermines the defendants' demand for a "one-to-one mapping" of official acts exchanged for things of value, which "would improperly restrict the Government's proof at trial." *Id.*

*United States v. Aliperti*, 867 F. Supp. 142, 149 (E.D.N.Y. 1994), is also readily distinguishable. There, because the court was unable to determine whether the government's discovery "adequately inform[ed] Defendants of the particulars of any *quid pro quo*," the government was ordered to "provide detailed support . . . for its contention that the materials

heretofore provided to the Defendants satisfy its obligations with respect to the issue of any *quid pro quo*." *Aliperti*, 867 F. Supp. at 149; *see also United States v. Hawit*, No. 15 Cr. 252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (granting motion for bill of particulars in part where the government provided no information about which out of many facially legitimate transactions was alleged to have been part of the conspiracy). As noted above, in this case, the Indictment identifies in detail the *quid pro quos* involved in the scheme, and the well-organized discovery offers all the additional information the defendants need at this time to prepare their defenses.

In sum, this case presents an entirely different posture and picture from the cases Hana cites: the particulars of the conduct giving rise to the charges are pled with specificity in the charging instrument itself, and amplified by detailed and extensive discovery. *See, e.g.*, *United States v. Ng*, No. 15 Cr. 706 (VSB) (S.D.N.Y. Apr. 26, 2017) (ECF No. 452 at 11) (denying defendant's motion for a bill of particulars that would describe, among other things, official acts and the identifies of the defendant's co-conspirators, in light of the detailed nature of the 31-page Indictment and the government's "sufficient disclosures concerning the nature of the charged offenses by other means," including discovery and agent affidavits); *United States v. Issa*, No. 17 Cr. 74 (CM), 2018 WL 461131, at *3-4 (S.D.N.Y. Jan. 9, 2018) (denying motion for bill of particulars and distinguishing *Aliperti* and *United States v. Ganim*, 225 F. Supp. 2d 145 (D. Conn. 2002)—also cited by Hana (*see* Hana Mot. 35 n.12)—where the defendant "had to guess at the nature of the bribery scheme").

Hana also argues that the Government should be required to identify and provide particulars about the *pros* in the *quid pro quos* in this case, because he otherwise is "impermissibly left guessing at which act the Government might argue that he sought to influence by providing

167

these items." (Hana Mot. 37.)  This statement cannot be reconciled with Hana's own brief, which evinces a clear understanding of the charges against him, including the acts sought, promised, agreed to, and undertaken. (*See id.* 4-6, 15.)

The cases Hana cites (*id.* 37-38) in which courts ordered bills of particulars to avoid the need for defendants to guess, as he asserts he must, are inapposite.  For example, in *United States v. Savin*, the court granted a bill of particulars in part where the defendant, an investment advisor, was alleged to have "pilfered his client's money through an unspecified series of 'intercompany transfers,'" but the government had not identified "the amounts, dates, means, corporate entities, or co-conspirators involved." No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001).  The court found that "[a]bsent further information, in order to adequately understand the nature of the charges against him, [the defendant] will be forced to . . . attempt to guess which of the numerous transactions documented therein, and conducted over a six-year period, are alleged by the government to have been improper." *Id.*

Here, by comparison, the Indictment details when Hana provided certain things of value to Menendez and Nadine Menendez and the acts Menendez promised and agreed to take and, at least in certain cases, took in exchange.  In short, even apart from the conflict between his own brief's recitation of the charges and details thereof, Hana cannot seriously claim that he is "left guessing" (Hana Mot. 37).  That is all the more true in light of the discovery materials produced by the Government, including search warrant affidavits that provide great detail about the evidence in support of the charged scheme.  At bottom, Hana's request appears to be an attempt to obtain a preview of the Government's case and legal theories and unduly restrict the evidence and arguments the Government may use at trial.  It should therefore be rejected. *See, e.g.*, *United States v. Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 342352, at *2 (S.D.N.Y. Aug. 5, 2021) ("It is

not the function of a bill of particulars to allow defendants to preview the evidence or theory of the government's case." (internal quotation marks and citation omitted)); *United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) (the government may not be compelled to provide bill of particulars disclosing manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of the evidence or legal theories).

Hana next argues that even if the Court were to deny his motion as to the bribery counts, the Court should order a bill of particulars with respect to Count Four—namely, the "identity of the foreign principals as to which he allegedly conspired for Senator Menendez to act as an agent," (Hana Mot. 61), the identity of every co-conspirator (*id.* 63-64), and the locations "currently hidden behind the term 'elsewhere' in Count 4" of the Indictment (*id.* 65). As to Hana's request relating to the foreign principals, as an initial matter, a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" *D'Amico*, 734 F. Supp. at 335 (quoting *Gibson*, 175 F. Supp. 2d at 537). These are the very "'wheres, whens and with whoms'" that are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569. In any event, the Indictment, as supplemented by discovery and other disclosures, more than adequately provides what Hana is entitled to on these matters. The Indictment contains numerous detailed allegations regarding the Government of Egypt and the Egyptian officials referenced in the Indictment, the names of whom the Government provided to Hana on October 20, 2023. The discovery also provides Hana with more than sufficient information about these and other foreign officials, such that he may prepare for trial.

There is likewise no valid justification for Hana's request for the identity of all co-conspirators at this time, months from trial, especially when the Government's investigation is

ongoing. The cases he cites in making this request (*see* Hana Mot. 63-64) are easily distinguishable. For example, Hana again cites *Nachamie*, in which the court ordered the government to file a bill of particulars in an eight-defendant health care fraud case where the Indictment and discovery did little to identify the roles of each of the eight defendants or the conduct giving rise to the charges. 91 F. Supp. 2d 565. The court found that the Indictment contained few, if any, specific allegations as to the roles played by the eight defendants, who were accused of conspiring to submit Medicaid claims that were alleged to be false in at least five different ways. *Id.* at 571-73. Finding that the Indictment and discovery materials thus gave each defendant little ability to understand his role in or connection to the charged conspiracy—or to other participants in the conspiracy—the court concluded that the government needed to provide further details, including the identities of unindicted co-conspirators relevant to each of the eight defendants. *Id.* at 571-73. Here, by contrast, the Indictment provides a detailed explanation of each defendant's role in the charged scheme, supplemented by detailed search warrant affidavits further outlining the evidence of different co-conspirators' roles.

In *United States v. Lino*, the court granted in part and denied in part motions for a bill of particulars in a RICO case with twenty-three defendants and twenty-six counts, noting that Second Circuit guidance that the government does not fulfill its obligations merely by providing mountains of documents to unguided defense counsel "is particularly true in cases charging criminal offenses under RICO." No. 00 Cr. 632 (WHP), 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001). As repeatedly noted above, this case involves far more specificity within the Indictment and well-organized discovery.

This case is thus not like the cases Hana cites. Rather, this case is instead analogous to circumstances where courts routinely deny requests for the identities of all co-conspirators. *See,*

*e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (citing *Nachamie* before denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial"); *see generally Wedd*, 2016 WL 1055737, at *4 (denying motion for bill of particulars and contrasting *Nachamie* because "here the underlying fraud is . . . adequately described in the Indictment to prevent prejudicial surprise").

Similarly, the Court should deny Hana's request (Hana Mot. 64-65) for a bill of particulars requiring the Government to identify all locations where the conduct charged is alleged to have occurred. This is essentially a demand for evidentiary details and is therefore improper. *See Mitlof*, 165 F. Supp. 2d at 569 (the "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars"); *Torres*, 901 F.2d at 233-34 (affirming denial of motion for bill of particulars seeking, among other things, precise dates and locations, as "ill-disguised attempts at general pre-trial discovery" (internal quotation marks omitted)). Moreover, the Government provided the defendants months ago with a glossary of the addresses of locations referenced in the Indictment.

171

Hana's claim that he is entitled to this information in light of his motion to dismiss on venue grounds (Hana Mot. 65) is meritless.  Relatedly, Menendez's request for a bill of particulars in which the Government "identif[ies] all its alleged bases for venue" (Menendez Second Mot. 16) should also be denied.  As an initial matter, as noted above, *see* Section VI.A.1, and as is entirely proper, the Government "may present additional evidence at trial to establish venue in this District." *Griffith*, 2020 WL 4369650, at *3.  In any event, "[a] bill of particulars is 'appropriate where there is a need, not where [it is] merely a useful means for a defendant to acquire more detailed pre-trial discovery.'" *Id.* (quoting *United States v. Rutkoske*, 394 F. Supp. 2d 641, 648 (S.D.N.Y. 2005)).  Moreover, the Government's proffer as to certain bases for venue, *see supra* pp. 136-44, along with the discovery provided to the defendants and voluntary disclosures, including a glossary, more than adequately inform the defendants of facts supporting venue in this district and "render a bill of particulars unnecessary for [them] to prepare for trial."[53] *Murgio*, 209 F. Supp. 3d at 720-21 (denying request for a bill of particulars with respect to venue where defendant's arguments went to the sufficiency of the Government's evidence—which are "questions reserved for trial"—and finding that a bill of particulars would be unnecessary for the defendant to prepare for trial); *Griffith*, 2020 WL 4369650, at *3 (denying defendant's request for a bill of particulars as it "will not alter the facial sufficiency of the indictment's allegation of venue, which is enough to survive the defendant's motion.").

---

[53] Indeed, in its glossary, the Government provided the addresses of the Manhattan and Bronx-based businesses referenced in the overt acts section of the Indictment (Indictment ¶¶ 75(a), (b), and (d).)  With the identification in this memorandum of law of the precise text message referenced (*see supra* p. 140; *see also* Indictment ¶ 75(c)), the defendants can, through the returns of the cell site warrant on Nadine Menendez's cellphone, identify the precise coordinates of the cell tower the message passed through, which was on the Upper West Side of Manhattan.  Similarly, the checks described above identify the Manhattan business address of the dealer who purchased the gold.

Together, the discovery productions, the contents of this memorandum, and the details contained in the Indictment more than adequately inform the defendants of the charges against them, including the location of events.  This is simply not a case where the "key events [are] shrouded in mystery."  *See Bortnovsky*, 820 F.2d at 575.

## IX.   HANA IS NOT ENTITLED TO HAVE PARAGRAPH 15 OF THE INDICTMENT STUCK AS TO HIM

Hana moves to strike paragraph 15 of the Indictment insofar as it alleges that he "has never registered as a foreign agent or lobbyist."  (Hana Mot. 59 (quoting Indictment ¶ 15) (alterations incorporated).)  According to Hana, this allegation is both irrelevant (*id.* 60) and inflammatory and prejudicial (*id.* 60-61).  Hana's argument is premature, and, in any event, meritless.

### A.   Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed. R. Crim. P. 7(d), '[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments.'"  *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quoting *Jimenez*, 824 F. Supp. at 369).  "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory or prejudicial.'"  *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).  "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'"  *Id.* (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)) (brackets in original); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001), *cert. denied*, 535 U.S. 949 (2002).  "This standard is an exacting one, and only rarely is alleged surplusage stricken from an indictment." *Murgio*, 209 F. Supp. 3d at 724 (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014))

(internal quotation marks omitted); *see also, e.g.*, *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005) ("Given th[e] exacting standard, such motions [to strike] are rarely granted.").

An indictment need not be limited only to the bare elements of a crime; rather, it can provide background to the charged criminal conduct, describe the circumstances, means, and methods of a scheme, and describe evidence that is otherwise admissible either as direct evidence or under Federal Rule of Evidence 404(b). In short, "statements providing background are relevant and need not be struck." *United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 100); *see, e.g.*, *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (affirming denial of motion to strike where "[d]efendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy, and it also tended to establish the nature of the relationship between Defendants and their supplier of heroin, [one of the defendants]," and citing Rule 404(b)).

With respect to the timing of such a motion, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (citing, *inter alia*, *Scarpa*, 913 F.2d at 1012); *see also United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011). "There is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *Smith*, 985 F. Supp. 2d at 612 (quoting *United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004)).

Indeed, as Judge Lynch explained, "motions to strike purported surplusage are largely meaningless, at least in this Court." *Butler*, 351 F. Supp. 2d at 124. This is because "[i]t is not the usual practice of this Court to provide the jury with a copy of the indictment in any event, and if it

174

should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." *Id.*

**B.     Discussion**

Hana's motion to strike should be deferred until after the conclusion of the Government's case-in-chief.  He suffers no current prejudice from the allegation he challenges, and, as is generally the case, "[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges."' *Smith*, 985 F. Supp. 2d at 612 (quoting *Butler*, 351 F. Supp. 2d at 124).  Indeed, Hana does not really argue to the contrary.  Rather, he appears to ground his request on the potential prejudice to him *at trial* if the jury were to learn of this allegation (*see* Hana Mot. 60) and cites three out-of-circuit cases (*id.* 60-61) in asking for this Court nevertheless to reach his request now.

In any event, Hana's argument that the allegation he challenges is simply "irrelevant" is demonstrably wrong.  As described above, Hana is charged, in sum and among other things, with passing information and requests to and from Egyptian officials in connection with the charged bribery and foreign agent schemes.  That he at no point—despite engaging in this conduct for years, and referring to a statement from one such official as "orders" (Indictment ¶ 21)—registered as a foreign agent or lobbyist is relevant to his belief in the wrongfulness of his conduct.  And it is similarly relevant to the belief in the wrongfulness of the conduct of both his charged and uncharged co-conspirators, including because such a registration would be public (*see* United States Senate, *Lobbying Disclosure, Search Registrations,* https://lda.senate.gov/filings/public/filing/search/; U.S Dep't of Justice, *National Security Unit,*

*Foreign Agents Registration Act, Browse/Search Filings*, https://www.justice.gov/nsd-fara/browsesearch-filings).

The Court accordingly need not reach Hana's assertion that the challenged allegation is "inflammatory and prejudicial" (Hana Mot. 60). *See Scarpa*, 913 F.2d at 1013 ("If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." (internal quotation omitted; alteration incorporated)). However, Hana's assertion in that respect is also wrong. Hana is charged with conspiring to corrupt a United States Senator and to have that Senator act as a foreign agent—that Hana did not himself register as a foreign agent is plainly *less* serious and less likely to engender an emotional reaction than the charged crimes. Nor is Hana's failure to register so different from what the jury will have to consider that this fact might somehow distract or confuse the jury. On the contrary, Section 219 expressly refers to and incorporates FARA, as described above. *See* 18 U.S.C. § 219(a). Moreover, any conceivable undue prejudice that might flow from the challenged allegation can be mitigated by an appropriate jury instruction. *See, e.g.*, *United States v. Caglar*, No. 08 Cr. 232 (CFD), 2009 WL 2169232, at *2 (D. Ct. Jul. 20, 2009) (denying motion to strike; "at trial the Court can craft a limiting instruction to shield against possible prejudice"); *United States v. Turoff*, 652 F. Supp. 707, 713-14 (E.D.NY. 1987) (denying motion to strike; "[T]he defendants will be entitled to request limiting instructions during the trial and before the court charges the jury. Such instructions will guarantee that the jury understands with what the defendants are and are not charged, but the defendants are not entitled to preclude the government from pleading and proving conduct that is relevant to the defendants' alleged crimes."). Hana's motion, in sum, fails in every respect.

## **CONCLUSION**

For the reasons set forth above, the defendants' pretrial motions should be denied.

Dated:  New York, New York
        February 5, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

             By:      s/_____
                              Eli J. Mark
                              Daniel C. Richenthal
                              Paul M. Monteleoni
                              Lara Pomerantz
                              Assistant United States Attorneys
                              (212) 637-2431/2109/2219/2343