UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT MENENDEZ, NADINE MENENDEZ, WAEL HANA, and FRED DAIBES,<br><br>       Defendants. | 23-Cr-490 (SHS)<br><br>OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

   On January 10, 2024, defendant Robert Menendez filed his First Motion to Dismiss the Second Superseding Indictment ("S2 Indictment").[1] (*See* ECF No. 119.) Menendez contends that each of the S2 Indictment's four counts must be dismissed on the basis of the Speech or Debate Clause of the United States Constitution, or at a minimum, that the allegations at issue must be purged from the S2 Indictment. The allegations that Menendez contends must be dismissed because they violate the Speech or Debate Clause concern (1) Menendez's process for recommending to the President a candidate for U.S. Attorney for the District of New Jersey, up to and including the recommendation itself (the "U.S. Attorney Scheme"), and (2) Menendez's meetings and actions concerning foreign aid to Egypt, including his alleged disclosure of sensitive non-public information to Egyptian officials (the "Egyptian Aid Scheme"). Menendez further urges that Count Four must be dismissed on the basis of separation of powers.

   For the reasons set forth below, the Court denies Menendez's First Motion to Dismiss the Second Superseding Indictment to the extent it asserts the S2 Indictment violates the Speech or Debate Clause or the separation of powers doctrine.

I. BACKGROUND

   On January 2, 2024, the Government issued the S2 Indictment against Robert Menendez and co-defendants Nadine Menendez, Wael Hana, Fred Daibes, and Jose Uribe.[2] (*See* S2 Indictment, ECF No. 115.) The S2 Indictment charges Robert Menendez

---

[1] The Government filed a further superseding indictment (the "S4 Indictment") on March 5, 2024. (*See* ECF No. 238.) The S4 Indictment contains only three new factual allegations, contained in paragraphs 69, 72, and 73. None of those factual allegations implicate the Speech or Debate Clause or separation of powers. Thus, this Opinion & Order is also applicable to the S4 Indictment.

[2] Uribe has subsequently pled guilty to a superseding information.

with four counts: conspiracy to commit bribery, conspiracy to commit honest services fraud, conspiracy to commit extortion under color of official right, and conspiracy for a public official to act as a foreign agent.

Robert Menendez is the senior U.S. Senator from New Jersey. By virtue of this position, Menendez "had the ability to recommend to the President that a particular individual be nominated to serve as the U.S. Attorney for the District of New Jersey." (S2 Indictment ¶ 5.) At all relevant times, Menendez held a leadership position on the Senate Foreign Relations Committee ("SFRC"). According to the S2 Indictment, this gave Menendez "influence over, among other things, the Executive Branch's decisions to provide foreign military sales, foreign military financing, and other aid or support to or for the benefit of the Government of Egypt." (*Id.*)

## II. THE SPEECH OR DEBATE CLAUSE DOES NOT REQUIRE DISMISSAL OF ANY COUNT

The United States Constitution states that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. This clause, known as the Speech or Debate Clause, immunizes "Congressmen and their aides . . . from liability for their actions within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (quoting *Gravel v. United States*, 408 U.S. 606, 624-25 (1972)).

The United States Supreme Court "has given the Clause a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979). Thus, while "[t]he heart of the Clause is speech or debate in either House," the legislative sphere extends beyond this heartland to include other "legislative acts." *Gravel*, 408 U.S. at 625. "A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it." *United States v. Brewster*, 408 U.S. 501, 512 (1972). Put another way, the legislative sphere extends beyond speech or debate on the floor of either House only insofar as those matters are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

Examples of matters that constitute legislative acts—and which are therefore immune from being questioned by virtue of the Speech or Debate Clause—include voting by Members, the production and use of committee reports, and the conduct of Members at legislative hearings. *See Gravel*, 408 U.S. at 624; *see also Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 (D.C. Cir. 2006) (collecting cases and examples). They

2

also include legislative factfinding and information gathering, "whether by issuance of subpoenas or field work by a Senator or his staff," because acquiring such knowledge "is essential to informed deliberation over proposed legislation." *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) (quoting *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1975), *cert. dismissed,* 438 U.S. 189 (1978)); *see also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504-05 (1975).

On the other hand, the Speech or Debate Clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Brewster*, 408 U.S. at 528. For example, "Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity." *Gravel*, 408 U.S. at 625. Other acts that fall outside of the protected area of "legislative acts" "include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." *Brewster*, 408 U.S. at 512.

Since Menendez "is asserting a legislative privilege, the burden of establishing the applicability of legislative immunity, by a preponderance of the evidence, rests with him." *Government of Virgin Islands v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995).

### A. U.S. Attorney Scheme

Menendez urges that every allegation in the S2 Indictment concerning his process for recommending a U.S. Attorney for the District of New Jersey, up to and including the recommendation itself, is protected by the Speech or Debate Clause. This covers part of paragraph 2 as well as the entirety of paragraphs 46, 47, 48, 49, and 50 of the S2 Indictment.[3] The Court rejects Menendez's argument in full, finding that none of the allegations in the S2 Indictment regarding the U.S. Attorney Scheme are protected by the Speech or Debate Clause.

Menendez contends that recommending a candidate for U.S. Attorney is a legislative act because it is a power granted by the Constitution to the Senate. The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States." U.S. Const. art. II, § 2, cl. 2. Defendant urges that the "Advice" in "Advice and Consent" should be

---

[3] The corresponding paragraphs in the S4 Indictment are the same.

read to cover pre-nomination activities, such as a Senator's recommendation of a candidate and any information gathering that the Senator undertakes in connection with the Senator's recommendation to the President. Since the recommendation is therefore "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to . . . matters which the Constitution places within the jurisdiction of either House," *Gravel*, 408 U.S. at 625, it is thus a legislative act protected from inquiry by the Speech or Debate Clause, according to Menendez.

There is no doubt that the Constitution places within the jurisdiction of Senators the ability to give their "Advice and Consent" to those nominated by the President to be a federal officer. *See Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880). Therefore, the giving of "Advice and Consent" is squarely a legislative act. The question, then, is whether the "Advice" in "Advice and Consent" reaches pre-nomination activities, as Menendez asserts, or whether it concerns only the post-nomination process. The Court determines that it is the latter.

Looking first to the text of the Constitution, the structure of the clause strongly supports the interpretation that the "Advice and Consent" power applies solely post-nomination. The critical section states: "and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States." U.S. Const. art. II, § 2, cl. 2. There are two ways to interpret this clause, neither of which supports defendant's position.

A three-step process is conveyed in one reading as follows: First, the President nominates a candidate to serve as an officer. Second, the Senate provides its "Advice and Consent" as to that candidate. Third, the President appoints the candidate to the office. This is consistent with the Supreme Court's summary of the appointment process from a 168-year-old case, in which it set forth that "[w]hen a person has been nominated to an office by the President, confirmed by the Senate, and his commission has been signed by the President, and the seal of the United States affixed thereto, his appointment to that office is complete." *United States v. Le Baron*, 60 U.S. 73, 78 (1856).

The second reading conveys a two-step process: the President first "shall nominate," and second "shall appoint," with the condition that the appointment be "by and with the Advice and Consent of the Senate." This reading is not materially different from the first reading.

Critically, under both these readings, the nomination of a candidate must of necessity precede the "Advice and Consent" of the Senate. It is both logically and logistically necessary for a President to have first nominated a candidate in order for the Senate to provide the "Advice and Consent" that culminates in that candidate's appointment. This understanding is consistent with historical sources which suggest

that the Framers viewed "Advice and Consent" as an activity requiring the deliberation of the Senate that occurred *subsequent* to a President's nomination, and, further, that the Framers saw the word "advice" not as synonymous with "opinion," but as more akin to "approval." *See* Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 HARV. J. L. & PUB. POL'Y 103, 131, 139-40, 142 (2005); *see also* Jean Galbraith, *Prospective Advice and Consent*, 37 YALE J. INT'L L. 247, 255-56 (2012) (stating that "the text of the Appointments Clause . . . suggests that the Framers consciously viewed 'advice and consent' as a single act," and that "[t]he wording makes clear that the Senate plays a part only in confirming appointments, not in making nominations, and there is thus no meaningful role for advice separate from consent"). *But see* David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 YALE L.J. 1491, 1495 (1992) (stating that the phrase "Advice and Consent" assigns "two distinct roles to the Senate—an advisory role before the nomination has occurred and a reviewing function after the fact").

In support of his interpretation of the clause, Menendez cites language from the U.S. Court of Appeals for the Second Circuit suggesting that recommendations by Senators are part of the constitutionally required "Advice and Consent." *United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962). This contention is unavailing. First, the language identified by Menendez is dicta and is only used for illustrative purposes. Second, as set forth above, the text of the Constitution plainly sets off "Advice and Consent" as a function to be performed by the Senate *after* the President nominates a candidate. The Constitution reads that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States," U.S. Const. art. II, § 2, cl. 2—not that the President "with the Advice of the Senate shall nominate, and with the Consent of the Senate shall appoint . . . Officers of the United States." While the recommendation by a Senator may play a role in who the President later nominates to be an officer, the recommendation itself is not a constitutionally mandated function of a Senator. Therefore, the Court finds that a Senator's pre-nomination activities—including information gathering in determining who the Senator is considering for recommendation to the President plus the recommendation itself—are not legislative acts.

In the alternative, Menendez contends that because the information gathering and the recommendation are integral to the Senate's ultimate vote on an individual nominated by the President, they are properly considered legislative factfinding—and thus legislative acts—protected by the Speech or Debate Clause.

It is uncontested that voting by the Senate on a nominee for appointment as an officer is a legislative act. (*See* ECF No. 176 at 24; ECF No. 180 at 48.) It is also clear that

5

legislative factfinding and information gathering are legislative acts. *See, e.g., Biaggi*, 853 F.2d at 103; *Eastland*, 421 U.S. at 504-05.

What is unclear is how any of the Government's allegations of Menendez's conduct can be said to address "field work by a Senator" that yields information "essential to informed deliberation over proposed legislation," *Biaggi*, 853 F.2d at 103 (quoting *McSurely*, 553 F.2d at 1286), and are thus covered by the Speech or Debate Clause. Even assuming that voting on a nominee constitutes "deliberation over proposed legislation," the purpose of Menendez's information gathering was not to decide on an *appointment*, but to determine *who to recommend to the President*. While it may be reasonable to conclude that details learned by a Senator that inform his recommendation might also inform his vote, it is a stretch too far to say that those details are "essential to informed deliberation." As the Supreme Court has cautioned, "we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process," and that while "the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch," its purpose was not to "make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516.

Extending Speech or Debate Clause protection to a Senator's meetings with a potential candidate for recommendation to the President—not a legislative act—for the President to nominate that candidate—not a legislative act—and present that candidate to the Senate for a vote would implicate the same concern articulated in *Brewster*. The Court therefore declines to extend the Speech or Debate Clause to cover a Senator's pre-nomination conduct while considering candidates to recommend to the President.

The Court concludes that none of the allegations concerning the U.S. Attorney Scheme relate to legislative acts. Menendez has failed to meet his burden of "establishing the applicability of legislative immunity, by a preponderance of the evidence." *Lee*, 775 F.2d at 524. Therefore, Menendez's contention that the Speech or Debate Clause protects activity related to the U.S. Attorney Scheme is denied in full. To the extent that Counts One through Three depend on the U.S. Attorney Scheme, Menendez's First Motion to Dismiss is denied and those counts are not dismissed on Speech or Debate Clause grounds.

### B. Egyptian Aid Scheme

Menendez also urges that every paragraph in the S2 Indictment relating to Menendez's meetings and actions concerning foreign aid to Egypt, including his alleged disclosure of sensitive non-public information to Egyptian officials, is protected by the Speech or Debate Clause. The challenged allegations constitute a significant portion of the Egyptian Aid Scheme, and they are covered by paragraphs 16 through 38 of the S2

Indictment.[4] The Court rejects Menendez's argument in full, finding that none of the allegations in the S2 Indictment regarding the Egyptian Aid Scheme are protected by the Speech or Debate Clause.

As an initial matter, the Court finds that a Senator's decision to approve or disapprove of foreign aid is properly characterized as a legislative act. The Government alleges that "[a]s a matter of longstanding, voluntary practice, the State Department would typically honor so-called 'holds' placed by the Chairman or the Ranking Member of the SFRC on both foreign military financing and foreign military sales." (S2 Indictment ¶ 17.) A Senator's decision whether to place a hold on foreign aid as part of the performance of that Senator's duties as Chairman or Ranking Member of the SFRC appears to be an act "done in Congress in relation to the business before it" and, therefore, meets the definition of a legislative act. *Brewster*, 408 U.S. at 512.

The Government contends that because the Executive Branch—not Congress—has the final say in approving foreign aid, Menendez's decision to either place a hold on or to sign off on foreign aid cannot be a legislative act. However, the Third Circuit has noted that "informal attempts to influence the Executive Branch on policy, for actual legislative purposes, may qualify as 'true legislative oversight' and merit Speech or Debate immunity." *United States v. Menendez*, 831 F.3d 155, 169 (3d Cir. 2016) (quoting *United States v. McDade*, 28 F.3d 283, 304 (3d Cir. 1994) (Scirica, J., concurring)). Given that the purpose of permitting the Chair and the Ranking Member of the SFRC to place holds on foreign aid is to enable Congress to raise concerns and have those concerns addressed by the Executive Branch, the Court concludes that those holds are a constituent part of legislative oversight. *See* PAUL K. KERR, CONG. RSCH. SERV., RL31675 ARMS SALES: CONGRESSIONAL REVIEW PROCESS 1-2 (2024).

The category of true legislative oversight not only captures Menendez's ability to place a hold; it also more broadly captures Congress's ability to weigh in on foreign aid. The S2 Indictment notes that "the Executive Branch was required to notify Congress about [foreign military sales] under certain circumstances prior to going forward with those sales." (S2 Indictment ¶ 17.) Specifically, the Arms Export Control Act "contains provisions for congressional review and disapproval of arms sales," making it so that "[t]he President may not proceed with a proposed [Foreign Military Sales or Direct Commercial Sales of defense equipment] transaction if Congress adopts a joint resolution of disapproval." *See* PAUL K. KERR, CONG. RSCH. SERV., RL31675 ARMS SALES: CONGRESSIONAL REVIEW PROCESS 2 (2024). Indeed, a joint resolution of disapproval would also clearly be an act "done in Congress in relation to the business before it." *Brewster*, 408 U.S. at 512.

---

[4] The corresponding paragraphs in the S4 Indictment are the same.

7

The unavoidable consequence is that the actions Menendez allegedly took as a Senator in deciding whether or not to place a hold on foreign aid to Egypt are legislative acts. So too are the actions that a Senator takes in the formal notification process under the AECA with regard to potential foreign military sales.

However, while Menendez's *performance* of the above-described legislative acts concerning the Egyptian Aid Scheme is protected by the Speech or Debate Clause, his *promise* to do the same is not. The Supreme Court has consistently found that "[p]romises by a Member to perform an act in the future are not legislative acts." *United States v. Helstoski*, 442 U.S. 477, 489 (1979); *see also Brewster*, 408 U.S. at 526. Therefore, to the extent that the indictment alleges that a corrupt agreement was formed in which Menendez agreed—or promised—to use his power to influence foreign military sales or foreign military financing to Egypt, or to the extent Menendez says he will place a hold or sign off on foreign military sales or foreign military financing, the Speech or Debate Clause does not apply.

For example, the S2 Indictment at paragraph 19 alleges that Menendez promised that he would "use his power and authority to facilitate [foreign military] sales and [foreign military] financing to Egypt" in return for Hana's promise that Hana would "put Nadine Menendez on the payroll of his company in a low-or-no-show job." (S2 Indictment ¶ 19.) Thus, the Speech or Debate Clause does not apply to this section of paragraph 19.

Nor are the paragraphs describing meetings that Menendez had with Egyptian officials, or information that Menendez, Nadine, or Hana sought to convey to Egyptian officials, covered by the Speech or Debate Clause. The Speech or Debate Clause has been read to protect legislative factfinding or information gathering conducted by a Senator on the theory that it yields insight "essential to informed deliberation over proposed legislation." *Biaggi*, 853 F.2d at 103 (quoting *McSurely*, 553 F.2d at 1286). At first read, this might lead to the conclusion that meetings Menendez had which plausibly provided him with knowledge to inform his decision to place or not place a hold on foreign aid, or to contribute to deliberation in the Senate concerning a possible joint resolution of disapproval of a foreign military sale, constitute legislative factfinding or information gathering, and are therefore properly characterized as legislative acts.

But this is not so. "While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, *it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts.*" *United States v. Renzi*, 651 F.3d 1012, 1026 (9th Cir. 2011) (quoting *Gravel*, 408 U.S. at 626) (emphasis in original). Thus, when a Member of Congress "is alleged to have done just that,"—i.e., to have violated a criminal law in the

8

preparation for or implementation of legislative acts—that Member's meetings cannot be regarded as legislative acts. *Renzi*, 651 F.3d at 1026. This is because those meetings, in implementing a corrupt bargain, are not legislative factfinding or information gathering meriting the Speech or Debate Clause's protection.

Here, the Government alleges that Wael Hana and Nadine Menendez "arranged a series of meetings and dinners with Menendez—paid for by Hana or his associates—at which Egyptian officials raised, among other things, requests related to foreign military sales and foreign military financing." (S2 Indictment ¶ 19.) The alleged purpose for these meetings and dinners thus dovetails precisely with Menendez's alleged corrupt promise to use his power as Ranking Member or Chairman of the SFRC to assist Egypt in acquiring foreign military sales and foreign military financing. Bribery of a public official is a violation of a valid criminal law. Therefore, the alleged meetings with Egyptian officials are not legislative acts, but rather constitute the "violat[ion of] an otherwise valid criminal law in preparing for or implementing legislative acts," and the Speech or Debate Clause does not protect them. *Renzi*, 651 F.3d at 1026.

Nor can the Speech or Debate Clause be construed to protect information that Menendez, Nadine, or Hana provided Egyptian officials. First, *providing* information to foreign officials is not the same as *receiving* information as part of the legislative act of information *gathering*. Second, the fact that this information sharing is part of a corrupt scheme prevents a characterization of those discussions as legislative acts according to the same logic as delineated above.[5]

Moreover, the Second Circuit has found that even activity that might otherwise sit comfortably within the heartland of the Speech or Debate Clause—speech on the House floor—is denied protection from the Clause when the speech in not made "in the course of the legislative process," but rather functions as a "whispered solicitation[] to commit a crime." *United States v. Myers*, 692 F.2d 823, 860 (2d Cir. 1982). Surely meetings with, and the provision of information to, Egyptian officials in relation to a corrupt bribery scheme must be viewed as occurring outside of the legislative process, and indeed as similar to the activity that was denied Speech or Debate Clause protection in *Myers*.

Accordingly, the Court concludes that none of the allegations in paragraphs 16 through 38 of the S2 Indictment that concern the Egyptian Aid Scheme are protected by the Speech or Debate Clause. Put simply, Menendez has failed to meet his burden of "establishing the applicability of legislative immunity, by a preponderance of the evidence." *Lee*, 775 F.2d at 524. Therefore, Menendez's contention that the Speech or Debate Clause protects activity related to the Egyptian Aid Scheme is denied in full.

---

[5] On this ground alone, the Court also rejects Menendez's contention that the FARA count must be dismissed because it is premised solely on acts foreclosed by the Speech or Debate Clause.

Since evidence concerning the Senator's allegedly corrupt promise to facilitate military aid to Egypt and his sharing of information with Egyptian officials is not foreclosed by the Speech or Debate Clause, Menendez's motion to dismiss Counts One through Four on Speech or Debate Clause grounds is denied.[6]

### III. THE SEPARATION OF POWERS DOCTRINE DOES NOT REQUIRE DISMISSAL OF COUNT FOUR

Menendez also moves to dismiss Count Four of the S2 Indictment on the independent ground that enforcement of Count Four is an unconstitutional violation of the separation of powers.

Count Four of the S2 Indictment alleges that Menendez violated the provisions of 18 U.S.C. § 219, which prohibits a public official from acting as an agent of a foreign principal who is required to register under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611 *et seq.* Pursuant to Section 219(a), "Whoever, being a public official, is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938 . . . shall be fined under this title or imprisoned for not more than two years, or both." Section 219(c) clarifies that "public official" includes a "Member of Congress."

FARA itself sets forth the requirement that certain individuals register with the United States Attorney General as "agents of a foreign principal." 22 U.S.C. §§ 611 *et seq.* These individuals include "any person who acts as an agent, representative, . . . [or] any other capacity at the order, request, or under the direction or control, of a foreign principal" and, *inter alia*, engages within the United States in "political activities" or as a "political consultant" in the interests of the foreign principal, or "represents the interests of such foreign principal before any agency or official" of the U.S. government. 22 U.S.C. § 611(c). A "foreign principal" includes the "government of a foreign country." 22 U.S.C. § 611(b). "Political activities" include any activity intended to "influence any agency or official of the Government of the United States" or the public "with reference to formulating, adopting, or changing the domestic or foreign policies" of the U.S. or "with reference to the political or public interests, policies, or relations of a government of a foreign country." 22 U.S.C. § 611(o). A "political consultant" includes a person who informs or advises others "with reference to [U.S.] domestic or foreign policies" or the political interests of a foreign country. 22 U.S.C. § 611(p).

---

[6] Since none of the challenged paragraphs are foreclosed by the Speech or Debate Clause, this conclusion applies with equal force to the substantive bribery counts and substantive FARA count introduced in the S4 Indictment.

The S2 Indictment alleges in Count Four a conspiracy among defendants Robert Menendez, Nadine Menendez, and Wael Hana for Menendez to act as an agent of a foreign principal, specifically "the Government of Egypt and Egyptian officials," in violation of Section 219.[7] (S2 Indictment ¶¶ 81-83.)

Menendez moves to dismiss Count Four based on a separation of powers argument. His central claim is that Section 219 violates the Constitution's separation of powers doctrine when applied to Members of Congress by "delegating to the Executive and Judiciary the power to supervise the daily functioning of the Legislative." (ECF No. 176 at 41.) According to Menendez, FARA's language is broad enough to encompass nearly all activities of the Legislative Branch, so long as those activities are at the "order" or "request" of a foreign principal. Therefore, Menendez continues, Section 219 effectively—and impermissibly—tasks the Executive Branch and the Judiciary with supervising and prosecuting the day-to-day activities of legislators. Menendez emphasizes that this creates a significant risk of abuse by the Executive. For example, if Section 219 is applicable to Members of Congress, "a President could prosecute any legislative thorn in his side by charging a FARA violation for having promoted military aid at the behest" of the President of Ukraine (ECF No. 176 at 40), or could prosecute "the House Speaker for advocating a standalone aid-to-Israel bill at the request of Prime Minister Netanyahu." (ECF No. 187 at 39.) Menendez urges that, under Section 219, "the only thing standing between a Senator on the Foreign Relations Committee and federal prison is a jury finding that he listened to one of the many foreign 'requests' or 'directions' that he hears out all the time." (ECF No. 187 at 36.) This supervision of Congress by the Executive Branch, he contends, violates the Constitution's separation of powers.

However, it is Congress itself that enacted Section 219, and explicitly provided in that statute that it applies to its Members as follows: "For the purpose of this section, 'public official' means Member of Congress." 18 U.S.C. § 219(c). In other words, Congress specifically decided that its Members should be prohibited from acting as foreign agents and, if they do, should be fined or imprisoned. Indeed, far from being "an affront to congressional autonomy" (ECF No. 187 at 39), the decision to impose criminal sanctions on its Members who act as foreign agents was an *expression* of congressional autonomy. Moreover, while Section 219 may create an opportunity for abuse by the Executive, that risk is substantially mitigated by the fact that the

---

[7] Count Fifteen in the S4 Indictment is identical to Count Four in the S2 Indictment. (S4 Indictment ¶¶ 108-110.) The S4 Indictment also charges Menendez with a substantive violation of Section 219 in Count Sixteen. (S4 Indictment ¶ 112.) This Opinion & Order applies equally to any challenge that Count Sixteen is also unconstitutional as applied to Members of Congress.

11

Legislative Branch is uniquely positioned to amend the statute and exempt Members of Congress if it so chooses.

Three appellate decisions—from the D.C. Circuit, the Third Circuit, and the Second Circuit—strongly support this Court's conclusion that Section 219 does not violate the separation of powers doctrine that is enshrined in the Constitution. In *United States v. Rose*, 28 F.3d 181 (D.C. Cir. 1994), the U.S. Court of Appeals for the District of Columbia Circuit analyzed whether a Department of Justice civil action enforcing the Ethics in Government Act ("Ethics Act") against a congressman violated the separation of powers doctrine. The Ethics Act requires Members of Congress to file certain financial disclosures and contemplates two different avenues for enforcement. First, a designated congressional committee must review the disclosure reports and may take certain actions where disclosures are inadequate. *Id*. at 183. Second, the Act authorizes "the Attorney General [to] bring a civil action" for a knowing and willful violation of the Act. *Id*. Following an investigation by the relevant congressional committee into Congressman Charles Rose's inadequate disclosures, the DOJ filed a civil action against Rose. *Id*. at 184-185. Rose objected that the DOJ's action offended separation of powers, despite the Ethics Act's explicit empowerment of the Attorney General to bring such an action. *Id*. at 189-190. The D.C. Circuit disagreed, finding that "by codifying [the Ethics Act] requirements in a statute, Congress has empowered the executive and judicial branches to enforce them; in bringing this action, then, the DOJ was fulfilling its constitutional responsibilities, not encroaching on Congress's." *Id*. at 190. So too, here, DOJ is "fulfilling its constitutional responsibilities, not encroaching on Congress's."

Similarly, in *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016), which arose out of a prior federal prosecution of Menendez in New Jersey, the U.S. Court of Appeals for the Third Circuit analyzed whether charges of an Ethics Act violation improperly violated the separation of powers doctrine. Menendez argued that the Executive Branch was barred under the Constitution's Rulemaking Clause[8] from punishing conduct regulated by the Ethics Act because the Senate incorporated the Act into one of its own rules, Senate Rule 34. *Id*. at 174. According to Menendez, the Ethics Act was unconstitutional as applied to Senators "because the Rulemaking Clause commits the power to set and enforce ethical standards for Senators to the Senate *alone*." *Id*. (emphasis added). The Third Circuit squarely rejected this argument, finding that "[t]he [Ethics] Act, which was passed by the full Congress and signed into law by the President, is the source of a Senator's obligation to make financial disclosures. [Senate]

---

[8] The so-called Rulemaking Clause provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." U.S. Const. art. I, § 5, cl. 2.

Rule 34 allows the Senate to punish Ethics Act violations; it does not undermine the Executive Branch's authority to prosecute a Senator for those violations." *Id*.

Thus, in *Rose* and *Menendez*, the D.C. Circuit and the Third Circuit determined that a statute passed by Congress regulating the conduct of its Members and empowering the Executive Branch to enforce that conduct did not violate the Constitution's separation of powers doctrine. In those actions, Congress even had the ability to enforce the Ethics Act requirements internally, but the courts nonetheless found that Executive Branch enforcement did not encroach on the legislature. Here, the Government's case is stronger than in those cases because Menendez does not claim that Congress is internally enforcing Section 219 on its Members and that Executive enforcement would interfere with that authority. Indeed, Menendez does not identify any specific constitutionally designated power of Congress that is being encroached upon here by the other branches.

*Rose* is additionally relevant because the D.C. Circuit also considered—and rejected—the defendant's argument that DOJ enforcement of the Ethics Act would impair the congressional committee's work, thereby violating the separation of powers. *Rose*, 28 F.3d at 190. The court rejected this argument, finding that "if Congress as a whole feels threatened by DOJ actions such as this one, it can amend the Ethics Act to restrict the jurisdiction of the DOJ or to exempt Members of Congress." *Id*. That reasoning is equally applicable here.

The third of the Circuit opinions guiding this Court is *United States v. Myers*, 635 F.2d 932 (2d Cir. 1980), where the defendant congressman claimed that a bribery sting directed at legislators—the Abscam sting—violated the separation of powers doctrine. The relevant portion of the defendant's argument "focuse[d] essentially upon the risk of abuse," including that "malevolent officials of the Executive Branch will one day select as targets for a bribery sting particular Senators or Representatives in political disfavor with the President." *Id*. at 938-39. This is the same slippery slope or parade of horribles that Menendez posits here. In an opinion written by Judge Jon Newman, the U.S. Court of Appeals for the Second Circuit rejected this argument, characterizing the risk as "involv[ing] choices of public policy, rather than constitutional imperatives." *Id*. at 939. The court elaborated as follows:

> "If the public policy concerns that have been identified warrant additional restrictions on the prosecution of Members of Congress for bribery, such restrictions are matters for consideration by those with public policy responsibilities, administrators in the Executive Branch and ultimately law-makers in the Legislative Branch. In *Brewster* the Supreme Court pointed out that if that decision underestimated 'the potential for harassment, the Congress, of course, is free to exempt its Members from the ambit of federal bribery laws.' 408 U.S. at 524, 92 S.

13

> Ct. at 2543. By the same token, if the risks of a bribery sting operation outweigh its benefits, Congress always has the power to make the more limited modification of redefining the offense to exclude, in the case of Members of Congress or others, acceptance of bribes offered by undercover agents of the Government. With the policy choice thus fully within the control of Congress, we cannot conclude that the separation of powers doctrine creates a constitutional barrier to the law enforcement technique selected by the Executive Branch."

*Id*. Accordingly, the Second Circuit rejected Congressman Myers's argument that the risk of abuse by the Executive Branch offended the separation of powers doctrine.

In summary, as in *Rose* and *Menendez*, Congress here has passed a law with a certain requirement for its Members—not to act as agents of a foreign government—and has explicitly empowered the Executive Branch to enforce that prohibition. And, as in *Rose* and *Myers*, the risks that any congressional work will be impaired or of presidential abuse are significantly mitigated by the fact that Congress can always amend the statute if it so chooses. These cases strongly support the Government's position that enforcement of Section 219 against a Member of Congress is not barred by the separation of powers doctrine.

Menendez acknowledges that it was Congress itself that chose to allow the Executive Branch to prosecute its Members for acting as foreign agents, but maintains that the ability of Congress to amend its laws does not ameliorate the separation of powers concerns here. For support, Menendez cites to *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*, 561 U.S. 477 (2010) ("PCAOB"), in which the U.S. Supreme Court, in a 5-4 decision written by Chief Justice Roberts, determined that a law restricting the President's ability to remove multiple layers of Executive Branch officers contravened the Constitution's separation of powers. The majority explained that this multilayer insulation of officers "violates the basic principle that the President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it because Article II makes a single President responsible for the actions of the Executive Branch." *Id*. at 496-97 (internal quotation marks omitted). As relevant here, and quoted by Menendez, the court noted that "the separation of powers does not depend on . . . whether the encroached-upon branch approves the encroachment." *Id*. at 497 (internal quotation marks omitted). Menendez also cites *NLRB v. Canning*, 573 U.S. 513 (2014), which held that although the Constitution permits the President to make appointments of public officials without the advice and consent of the Senate when the Senate is in recess,[9] President Obama had inappropriately done so because the recess duration was

---

[9] Although Article II, Section 2 of the Constitution provides that the President shall have the power to appoint officers of the United States "by and with the Advice and Consent of the Senate," the "President

14

not of sufficient length to trigger the Recess Clause. In making that determination, the majority relied in part on the fact that the President's practice of making certain recess appointments was long-standing—"Presidents have made thousands of intra-session recess appointments" over "at least three quarters of a century"—and long-accepted by the Senate. *Id*. at 529, 533. Concurring in the judgment, Justice Scalia responded to the majority's rationale, writing, "it is no answer . . . to say that Congress surrendered its authority by its own hand. One Congress cannot yield up its own powers, much less those of other Congresses to follow. Abdication of responsibility is not part of the constitutional design." *Id*. at 572 (Scalia, J., concurring) (internal citations and quotation marks omitted). Here, Menendez claims that the Supreme Court opinions in *PCAOB* and *Canning* neutralize the Government's argument that the separation of powers concerns are substantially mitigated by the ability of Congress to amend Section 219.

Menendez's argument is unavailing because he misses an important difference between this case and both *PCAOB* and *Canning*. In *PCAOB* and *Canning*, the separation of powers issue stemmed from one branch's encroachment on a specifically designated constitutional power belonging to another branch. In *PCAOB*, the court held that legislation providing for "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." *PCAOB*, 561 U.S. at 484. In *Canning*, the President circumvented the Senate's authority to confirm appointments to the National Labor Relations Board pursuant to Article II, Section 2. *Canning*, 573 U.S. at 522-523. In each case, the court would not permit one branch to consent to an encroachment that was in contravention of a clear constitutional designation of power. But here, there is no "abdication of responsibility" by Congress. *Canning*, 573 U.S. at 572. Menendez has not identified any specific, constitutionally designated authority of Congress that is being yielded to or encroached upon by the Executive Branch.[10] He makes only the general—and wholly unsubstantiated—claim that enforcement of Section 219 by the Executive Branch would "arrogate power over the day-to-day functions" of Congress. (ECF No. 176 at 38.) But in enacting Section 219, Congress did not surrender any authority or "yield up" any of "its own powers," *Canning*, 573 U.S. at

---

shall have Power to fill up all Vacancies that may happen during the Recess of the Senate." U.S. Const., art. II, § 2, cl. 2, 3.

[10] In a citation parenthetical, Menendez claims that according to *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), "Article I's Rulemaking Clause gives each House the *exclusive* power to set rules and punish misbehavior." (ECF No. 176 at 38 (emphasis added).) It is true that Article I, Section 5, Clause 2 of the Constitution grants Congress the power to "punish its Members for disorderly behavior." But it is not correct that this power is *exclusively* designated to Congress or that this prosecution infringes on that power. *See United States v. Brewster*, 408 U.S. 501, 520 (1972) (rejecting separation of powers argument based on Article I, Section 5); *Myers*, 635 F.2d at 938 ("the majority in *Brewster* necessarily rejected any contention that Congressional punishment power in such matters was exclusive").

15

572; as in *Rose* and *Menendez*, Congress here *exercised* the authority it exercises on a quotidian basis that requires enforcement by the Executive.

The principal case relied upon by Menendez—*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007)—is similarly distinguishable. In *Hein*, a plurality opinion of the Supreme Court rejected a broad theory of taxpayer standing which would have permitted taxpayers to sue members of the Executive Branch for spending on programs that allegedly promoted religious organizations in violation of the Establishment Clause. The court explained that expanding taxpayer standing would exacerbate the separation of powers issues already present in related taxpayer standing cases. *Id*. at 611-12. The court was wary of "enlist[ing] the federal courts to superintend, at the behest of any federal taxpayer, the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials" and of "deputiz[ing] federal courts as virtually continuing monitors of the wisdom and soundness of Executive action." *Id*. (internal quotation marks omitted). According to Menendez, Section 219 similarly deputizes the Executive Branch and Judiciary to oversee the day-to-day activities of legislators.

However, in *Hein*, the court was analyzing and enforcing a significant constitutional limitation on its own authority: Article III standing requirements. While the *Hein* court was concerned that loosening Article III standing requirements would result in the Judiciary overstepping its constitutionally imposed role, Menendez has not identified any constitutional requirement that Section 219 has loosened or any constitutionally imposed role that Section 219 would cause the Executive to overstep. Moreover, Section 219 does not empower the Executive to monitor "the wisdom and soundness of [congressional] action," *id.* at 612; rather, it simply empowers the Executive to prosecute Members of Congress for violating a particular law prohibiting the particular activity of acting as a foreign agent.

Accordingly, the Court denies Menendez's motion to dismiss Count Four on separation of powers grounds.[11]

## IV. CONCLUSION

For the reasons set forth above, the Court finds that none of the allegations at issue concerning the U.S. Attorney Scheme or the Egyptian Aid Scheme are protected by the Speech or Debate Clause. Therefore, none of the four counts in the S2 Indictment—

---

[11] Having determined that the separation of powers doctrine does not bar application of Section 219 to Members of Congress, the Court need not reach the Government's alternative argument that Menendez cannot invoke the general protections of the separation of powers because he is entitled only to the specific protections of the Speech or Debate Clause.

consisting of conspiracy to commit bribery, conspiracy to commit honest services fraud, conspiracy to commit extortion under color of official right, and conspiracy for a public official to act as a foreign agent—should be dismissed on Speech or Debate Clause grounds and no allegations should be purged from the S2 Indictment. Menendez's motion is denied to the extent it seeks dismissal of the charges on Speech or Debate Clause grounds. In addition, the Court finds that Section 219 does not violate the separation of powers doctrine as applied to Members of Congress and denies Menendez's motion to dismiss Count Four on those grounds.

Dated: New York, New York
       March 14, 2024

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.