UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
                                             :
UNITED STATES OF AMERICA                     :
                                             :
            -v.-                             :      S4 23 Cr. 490 (SHS)
                                             :
ROBERT MENENDEZ,                             :
WAEL HANA,                                   :
      a/k/a "Will Hana," and                 :
FRED DAIBES,                                 :
                                             :
                        Defendants.          :
                                             :
-----------------------------------------------------------x
```

### THE GOVERNMENT'S MOTIONS *IN LIMINE* <br> TO PRECLUDE CERTAIN PROFFERED EXPERT TESTIMONY

DAMIAN WILLIAMS
United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys
- Of Counsel -

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................ 1

APPLICABLE LAW ............................................................................................... 5

     A.     Expert Testimony -- Generally ............................................................ 5

     B.     Expert Testimony Concerning an Alleged Mental Condition ................ 8

     C.     Notice of Expert Testimony – Generally .............................................. 9

     D.     Notice of Expert Testimony Concerning an Alleged Mental Condition ............. 10

ARGUMENT ........................................................................................................ 11

I.     DR. ROSENBAUM'S TESTIMONY SHOULD BE PRECLUDED IN ITS ENTIRETY ...................................................................................................... 11

     A.     Relevant Background ........................................................................ 13

     B.     Procedural History ........................................................................... 13

     C.     Rosenbaum's Testimony Should be Precluded .................................... 16

           1.     Menendez's Notice is Both Materially Belated and Materially Deficient 16

           2.     Menendez Fails to Establish that Rosenbaum's Proffered Testimony is Admissible Under Rule 702 ........................................................ 20

           3.     Rosenbaum's Proffered Testimony is Based on Inadmissible Hearsay .... 24

           4.     Rosenbaum's Proffered Testimony Fails Under Rule 403 ...................... 27

     D.     At a Minimum, the Court Should Order an Examination of Menendez, Schedule a *Daubert* Hearing, and Preclude Menendez from Mentioning the Proffered Testimony, His Alleged Mental Condition, or the Alleged Causes Thereof until the Court Rules ...................................... 29

II.     RICHARDSON'S TESTIMONY SHOULD BE PRECLUDED IN PART ...................... 31

III.     ALTERMAN'S TESTIMONY SHOULD BE PRECLUDED IN ITS ENTIRETY ......... 35

CONCLUSION ...................................................................................................... 39

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings *in limine* precluding certain proffered expert testimony by defendants Robert Menendez and Wael Hana.

*First*, the Government seeks a ruling precluding in its entirety the proffered testimony of Dr. Karen Rosenbaum, a psychiatrist, who intends to opine that, as a result of Menendez's alleged ███████████████████████████ caused by (i) his family leaving Cuba, and having assets confiscated there, prior to his birth, and (ii) his father's death nearly 50 years ago, Menendez had a "fear of scarcity," which led to "the development of a longstanding coping mechanism of routinely withdrawing and storing cash in his home." (Menendez April 24 Rosenbaum Notice (enclosed as Exhibit ("Ex.") B), at 1-2.)[1]

Menendez's notice of this testimony is materially deficient in multiple ways, and it has not been corrected despite trial starting in less than two weeks and a written request from the Government more than a week ago. This testimony is also miscast by Menendez as run-of-the-mill expert testimony, when, in fact, the proposed testimony would describe an alleged mental disease or defect that must be noticed under Rule 12.2(b). Indeed, his counsel, on the record, recently described the alleged condition from which Menendez allegedly suffers as falling within *The Diagnostic and Statistical Manual of Mental Disorders* (commonly known as the "DSM"). (Apr. 23, 2024 Tr. at 16 (Menendez's counsel: The alleged condition is a "component of the DSM that psychiatrists can describe based on an examination of a person.").) Accordingly, Menendez's

---

[1] At Menendez's counsel's request, and as authorized by the Court at the April 29, 2024 conference, the Government has herein redacted references to Menendez's specific alleged mental condition, in both its memorandum and the exhibits thereto.

notice was highly untimely.  He provided the (deficient) notice weeks after the April 1, 2024 deadline.

In any event, this testimony also appears to be an effort to effect an end-run around the bar against hearsay—in particular, an effort by Menendez to present alleged facts in support of an alleged defense to which he or other lay witnesses could readily testify, without subjecting himself or those other lay witnesses to cross-examination.  And even were such an effort otherwise admissible (and it is not), it should be precluded under Rule 403.  At a minimum, if the Court is inclined to permit this testimony or reserves decision, it should (i) order that, pursuant to Federal Rule of Evidence 12.2(c)(1)(B), Menendez be examined by a psychiatrist retained by the Government; (ii) schedule a *Daubert* hearing for Rosenbaum to explain the bases for and scope of her opinion, and (iii) preclude Menendez both from mentioning such testimony or alleged condition in his opening statement and from mentioning his family history (which is otherwise irrelevant and inadmissible (*see* Gov't Mots. *in Limine* (Dkt. 291), at 20)) unless and until the Court has ruled.

*Second*, the Government seeks a ruling precluding certain of the testimony of Russell Richardson, a certified public accountant, who intends to opine that during the time of the charged offenses, "Menendez lived within his means" and did not "regularly make extravagant purchases" or "excessively transfer funds" to others.  (Menendez April 24 Richardson Notice (Ex. C), at 2.) The notice of this testimony, too, is materially deficient.  The proffered testimony, at least in large part, also appears to be an effort to effect an end-run around the bar against hearsay, and even if otherwise admissible, should be precluded under Rule 403.  The Government has no objection to a witness reviewing and summarizing for the jury pertinent financial and/or other voluminous

admissible records, pursuant to Rule 1006.  But that is not expert testimony.  And no witness, expert or otherwise, should be permitted to provide an opinion as to what is "extravagant" or "excessive[ ]," whether through these words or otherwise.

*Finally*, the Government seeks a ruling precluding in its entirety the testimony of Dr. Jon Alterman, who works at a think tank, and who intends to "testify about the historical context in which Mr. Hana obtained and has maintained IS EG Halal's contract."  (Hana April 16 Notice (Ex. D), at 5.)  While Alterman does not have firsthand knowledge of Hana, IS EG Halal, or the events in this case, he intends to testify that those events "occurred at a time when the Egyptian government under President Abdel Fatah el-Sisi sought to eradicate the Muslim Brotherhood, including by eliminating Muslim Brotherhood-operated and owned businesses and rerouting those assets to non-Muslim Brotherhood affiliated entities and individuals."  (*Id.*)  This "history," Alterman suggests, allegedly "explains the circumstances under which Mr. Hana, a Coptic Christian, replaced Muslim Brotherhood business owners with respect to the Halal contracts at issue."  (*Id.*)

This proposed testimony should be precluded for multiple reasons.  As an initial matter, the notice is materially deficient in a critical way.  As noted above, it appears to assert that Hana's company took over Halal certification from "Muslim Brotherhood business owners" (*id.*), but it does not identify those business owners, or explain *in any way* on what basis Alterman has reached the conclusion that they were members of the Muslim Brotherhood.  That conclusion is serious (and, to the Government's knowledge, false), and it is entirely unexplained.

Second, the proposed testimony appears principally to rest on the proposition that the jury needs to understand the "history" that led to Hana's monopoly because the Government intends to

argue that Hana obtained his monopoly "as a result of bribery and corruption due to Mr. Hana's relationship with Senator Menendez and his wife." (*Id*.) But as the Government explained at the April 23 conference, as is relevant here, the Government intends to prove that Hana paid bribes to Menendez, in part, to seek to stop the U.S. Department of Agriculture (the "USDA") from causing Egypt to *reverse* its already-granted monopoly to Hana. (April 23, 2024 Tr. at 18.) To be sure, what Hana or another defendant was told, understood, or believed about why the Government of Egypt would grant or had granted the monopoly might bear on the defendants' motive and intent, including why Hana wanted to cultivate a relationship with and bribe Menendez. But that does not make the actual internal decision-making of the Government of Egypt—devoid of any connection to a defendant's contemporaneous knowledge or belief—relevant.

Third, as also explained at the conference (*id*.), to the extent that Hana wishes to present evidence that he expected to be or believes he was granted the monopoly for good reasons, that is not a proper subject for expert testimony. On the contrary, Hana could testify. So could other fact witnesses. Indeed, the Government intends to call at least one USDA official, who is expected to testify about the circumstances through which Hana was granted his monopoly, including that Hana had no relevant experience and that the Egyptian officials who traveled to the United States to perform an "audit" of existing halal certifiers—and met with Hana—offered no cogent explanation as to why Hana should be granted a monopoly. To the extent that Hana is interested in presenting evidence, if any exists, that he contemporaneously believed he was qualified or otherwise received the monopoly on the merits, that is a subject for lay witness testimony from persons with firsthand knowledge about the relevant facts, not expert testimony from a historian with no relevant personal knowledge.

4

Finally, even if Hana's proffered expert testimony were otherwise admissible, it should be precluded under Rule 403, because it would turn a trial about whether Hana paid bribes into a trial about the history of Egypt, the Muslim Brotherhood, and complicated and contestable political issues far afield from what the jury has to decide, materially lengthening the trial and distracting the jury—all purportedly to make a point about which the proffered witness has no firsthand knowledge of or ability to make.

## APPLICABLE LAW

### A.      Expert Testimony – Generally

A properly and timely noticed expert witness may be permitted to testify on a relevant subject "if he or she 'is qualified, reliable, and helpful.'"  *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702).  The scope of such permissible testimony is "'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has reliably applied to the case.  Fed. R. Evid. 702.  District courts play an important "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first of these requirements—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"— serves two purposes.  First, "[i]n requiring that expert testimony be directed to 'scientific,

5

technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). In short, the Federal Rules of Evidence preclude a party from offering "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994); *see also, e.g.*, *United States v. Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (district court was "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (affirming preclusion of testimony by lawyers on the materiality of an agreement and "the work of transactional lawyers," where "fact witnesses" covered the same ground).

Second, even testimony that is properly based on scientific, technical, or specialized knowledge must "fit" the particular "facts of the case." *Daubert*, 509 U.S. at 591. This "requirement is really just a specialized relevance inquiry that asks whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *5 (S.D.N.Y. Nov. 11, 2021) (internal quotation marks omitted).

Rule 702 also requires that proffered expert testimony be "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in

determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94.  The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).  The proponent of expert testimony—here, two defendants—bears the burden of demonstrating the admissibility of the testimony.  *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

While an expert may rely on "facts or data" that "otherwise may be inadmissible" under the hearsay rules, Rule 703 does not permit an expert witness "to circumvent rules prohibiting hearsay" by "relying on . . . conversations with non-testifying witnesses . . . in order to prove 'the truth of the matter asserted'" about a fact.  *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003); *see also United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("The expert may not . . . simply transmit that hearsay to the jury.").  "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [defendant] to circumvent the rules prohibiting hearsay." *Id.* (internal quotation marks omitted).

Expert testimony, even if otherwise proper, may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595).

### B. Expert Testimony Concerning an Alleged Mental Condition

By statute, with the exception of the defense of insanity, "[m]ental disease or defect does not . . . constitute a defense." 18 U.S.C. § 17(a). While that "does not preclude a defendant from submitting mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime," *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006), "[t]he district court . . . must police the boundaries between permissible expert evidence that goes to negating the intent element of a crime and impermissible evidence that seeks to 'excuse' the crime," *United States v. Ray*, 583 F. Supp. 3d 518, 534 (S.D.N.Y. 2022). That is because "'[p]sychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea,'" and for jurors, that "'may cause confusion about what the law requires.'" *United States v. Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184, at *7 (S.D.N.Y. May 10, 2007) (quoting *United States v. Pohlot*, 827 F.2d 889, 890 (3d Cir. 1987)). Therefore, "[a] defendant seeking to admit evidence of a mental impairment for this purpose must . . . demonstrate a direct link between such evidence and the *mens rea* that the Government is required to prove." *Cromitie v. United States*, No. 09 Cr. 558 (CM), 2017 WL 1383982, at *5 (S.D.N.Y. Apr. 7, 2017). "'Conclusory statements . . . about the link between

8

psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not render the evidence admissible.'" *Sabir*, 2007 WL 1373184, at *6 (quoting *United States v. Baxt*, 74 F. Supp. 2d 436, 440 (D.N.J. 1999). Rather, "in determining whether evidence of a mental impairment is admissible for this purpose, a defendant is required to demonstrate clearly, in advance of trial, that there is a direct link between such evidence and the specific *mens rea* that the Government must prove." *Id.* at *5.

"Even if the proffered psychological testimony has some relevance to the issue of *mens rea*, it may be excluded for failing the test of admissibility under Rule 403" because "[s]uch evidence presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of *mens rea*." *Id.* at *7 (internal quotation marks and brackets omitted).

### C.     Notice of Expert Testimony – Generally

A defendant seeking to introduce expert testimony must provide a written disclosure for each expert witness, which must contain, among other things, "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). "Disclosure of the 'bases relied upon by the expert . . . should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts.'" *United States v. Weiner*, No. 22 Cr. 19 (PGG), 2024 WL 82729, at *5 (S.D.N.Y. Jan. 8, 2024) (quoting Fed. R. Crim. P. 16 Adv. Comm. Notes, 1993 Amendment). While this requirement "does not require a verbatim recitation of the testimony the expert will give at trial," Fed. R. Crim. P. 16 Adv. Comm. Notes, a "brief summary of the proposed testimony" that does not set forth a "full statement of . . . opinions and reasons for them" is insufficient, *United States v. Dzionara-Norsen*, No. 21-454, 2024 WL 191803, at *4 (2d

Cir. Jan. 18, 2024).  "Where a defendant fails to comply with such disclosure requirements, a court

may prohibit [him] from introducing the evidence at trial."  *Id*.; *see also, e.g.*, *United States v.*

*Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); *United States v.*

*Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007); *United States*

*v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007).

This is for good reason.  The expert disclosure provisions of the Rules exist to allow

opposing counsel the opportunity to challenge the admissibility of testimony, prepare for cross-

examination, and decide whether to retain rebuttal experts.  *See, e.g.*, *United States v. Rajaratnam*,

No. S2 09 Cr. 1184 (RJH), 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of

reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert

testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity

to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R.

Crim. P. 16 Advisory Committee's Note)); *Valle*, 2013 WL 440687, at *5 (same); *United States v.*

*Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same).  This is not possible without timely and proper

notice.  Nor can the Court perform its critical gatekeeping function without adequate information.

### D. Notice of Expert Testimony Concerning an Alleged Mental Condition

Under Rule 12.2(b), a defendant who "intends to introduce expert evidence relating to a

mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of

guilt" must provide written notice to the Government.  Fed. R. Crim. Pro. 12.2(b).  Relatedly,

under Rule 16(b)(1)(B), a defendant must disclose any "reports of any . . . mental examinations,"

and under Rule 12.2, "the court may, upon the government's motion, order the defendant to be

examined under procedures ordered by the court," Fed. R. Crim. P. 12.2(c)(1)(B).  If a defendant

does not give the notice required under Rule 12.2(b) or submit to an examination when ordered,

"[t]he court may exclude any expert evidence from the defendant on the issue of the defendant's mental disease, mental defect, or any other mental condition bearing on the defendant's guilt." Fed. R. Crim. Pro. 12.2(d)(1); *see also, e.g.*, *United States v. Young*, 213 F.3d 627, 2000 WL 687750, at *3 (2d Cir. 2000) (affirming exclusion of expert testimony where the testimony diverged from notice and "thus could have been excluded for failing to comply with Rule 12.2").

## ARGUMENT

### I.   DR. ROSENBAUM'S TESTIMONY SHOULD BE PRECLUDED IN ITS ENTIRETY

Menendez has advised that Dr. Karen Rosenbaum, a psychiatrist, intends to testify that "Menendez experienced two significant traumatic events that resulted in the development of ██████." (Menendez April 24 Rosenbaum Notice (Ex. B), at 1.)   Those two events are (a) Menendez's family's "experience as refugees, who had their funds confiscated by the Cuban government and were left with only a small amount of cash that they had stashed away in their home," and (b) Menendez's "trauma when his father, a compulsive gambler, died by suicide after Senator Menendez eventually decided to discontinue paying off his father's gambling debts." (*Id.*) Rosenbaum intends to opine that, as a result of Menendez's alleged ████, he has a "fear of scarcity," which led to "the development of a longstanding coping mechanism of routinely withdrawing and storing cash in his home." (*Id.* at 1-2.)   Rosenbaum's conclusion, which is not elaborated upon, is based on "evaluations she conducted of Senator Menendez," "a review of discovery produced in the case," "experience and research that demonstrates that such coping mechanisms are a common response to scarcity," and a "review of relevant scientific literature." (*Id.* at 2.)   The notice does not say, but the Government understands that Menendez's family left Cuba prior to his birth, and Menendez was born in the United States.   The notice also does not say

when Menendez's father died, but the Government understands that it was nearly 50 years ago. This proffered testimony should be precluded, in its entirety, for multiple, independent reasons.

*First*, Menendez's notice is both materially belated and falls far short of the requirements of Rule 16(b)(1)(C) and Rule 12.2 because (a) the notice does not adequately state the bases or reasons for Rosenbaum's opinion, (b) the notice does not adequately provide the sources for that opinion, and (c) Menendez has not disclosed any reports of, or any other information regarding, any interviews or examinations by the proffered expert that would supplement the deficient disclosure.

*Second*, Rosenbaum's opinion that Menendez has ████ resulting in a "coping mechanism of routinely withdrawing and storing cash in his home" does not appear to be the product of any reliable scientific principle or method, and therefore is inadmissible under Rule 702.

*Third*, Rosenbaum's explanation of why Menendez stored cash in his home appears to be little more than an impermissible attempt to offer hearsay statements of the defendant, and to seek to engender sympathy based on his family background, in the guise of expert testimony.

*Fourth*, the limited probative value of the proffered testimony of Rosenbaum is substantially outweighed by the danger of jury confusion and distraction, and is therefore inadmissible.

At a minimum, if the Court is inclined to permit the testimony or reserves decision, the Court should order that Menendez promptly be examined by the Government pursuant to Rule 12.2(c)(1)(B); conduct a *Daubert* hearing on the bases and reliability of Rosenbaum's proposed testimony following such examination and before she is permitted to testify before the jury; and preclude Menendez from mentioning to the jury this testimony, his alleged mental

condition, or the causes thereof (including his family history), unless and until the Court rules it admissible.

### A.      Relevant Background

As described in the Indictment, and in greater detail in the Government's memorandum in opposition to the defendants' motions *in limine* (Dkt. 315, at 5-6), the Government intends at trial to offer evidence of two one-kilogram gold bars, eleven one-ounce gold bars, and more than $480,000 in cash that were discovered in Menendez's and Nadine Menendez's home in New Jersey during a court-authorized search in June 2022.  The Government expects to link the gold bars and a meaningful portion of the cash directly to Menendez's charged bribe-payors by, among other things, serial number, fingerprints, and DNA evidence.  Other cash may reasonably be inferred also to be the fruits of the scheme in light of its location, packaging, and dates that the cash went into circulation.

### B.      Procedural History

In connection with negotiating deadlines for mutual pretrial disclosures, the parties agreed that the defendants would provide notice of advice-of-counsel, public authority, and any defense listed in Rules 12.1 through 12.3, on or before April 1, 2024.  (Dkt. 267, at 1-2.)   Menendez noticed no such defenses.

The following day, April 2, 2024, Menendez's counsel confirmed by email he had noticed no such defenses by the deadline.

The next day, April 3, 2024, two days after the deadline, Menendez's counsel advised by email that although Menendez "does not intend to present a defense under Fed. R. Cr. P. 12.2," he was "providing notice of an expert forensic psychiatrist who examined Senator Menendez and will testify regarding events that preceded and explain his conduct with respect to the storage of cash

in his residence." Menendez's counsel further advised that he would "provide a summary of the expert opinions as required by Fed. R. Cr. P. 16(b)(1)(C) on or before April 16, 2024, as agreed by the parties." Menendez did not provide the name or affiliation of his retained expert or any further information about the content of or bases for the expert's opinion(s), including to what "events" the proffered expert would testify.

On April 16, 2024, although Hana provided expert notice as agreed, Menendez did not provide notice of any expert testimony, contrary to what he had advised on April 3, 2024. Nor did he say that he intended to do so at a later time.

Two days later, on April 18, 2024, Menendez's counsel advised by email that "we have withheld our expert notice until we have further clarification on deadlines and trial date." The parties had not agreed on such withholding, nor had the Court authorized such withholding. The Government thereafter requested, and the defendants agreed, that any outstanding expert notices were to be provided on or before the following day, Friday, April 19, 2024. (Dkt. 341.)

Late in the evening of April 19, 2024, Menendez's counsel provided notice, in the form of a letter, of the purported expert testimony of both Rosenbaum and Richardson. (Menendez April 19 Notice (Ex. A).)

The following afternoon, Saturday, April 20, 2024, the Government advised Menendez's counsel by email that the notice was deficient in multiple ways, including that the pertinent disclosures were not signed by either of the noticed witnesses pursuant to Rule 16(b)(1)(C)(v), which requires the witness to "approve and sign the disclosure"; that it appeared that Rosenbaum had met with Menendez and conducted various examinations and/or tests, but the Government had not received the reports of any such examinations and tests pursuant to Rule 16(b)(1)(B); that the

notice did not identify with specificity the "relevant scientific literature" referenced in the letter's description of the bases for Rosenbaum's conclusion; that the notice did not identify the "photographs of the cash seized from Senator Menendez's home, Senator Menendez's bank records, and photographs taken of the interior of Senator Menendez's home" that Rosenbaum reviewed; and that the notice did not identify "the records of Senator Menendez's depository accounts, credit card statements, tax returns, [and] financial disclosures and related financial documents" that Richardson reviewed.  The Government also requested an estimate of the amount of time that each of Rosenbaum and Richardson spent with Menendez, and asked whether Menendez's counsel would make Menendez available to Government expert(s) for an interview and/or evaluation similar to those of Rosenbaum and Richardson.[2]

On April 23, 2024, the Government orally raised certain of those same notice and disclosure issues with the Court.  (Apr. 23, 2024 Tr. at 14-17.)

On the evening of April 24, 2024, Menendez's counsel sent the Government two letters, which were identical to the prior letters, including the date on the letters (April 19, 2024), except that they had been signed by Rosenbaum and Richardson.  (Menendez April 24 Rosenbaum Notice (Ex. B); Menendez April 24 Richardson Notice (Ex. C).)  Menendez's counsel also advised that they would produce to the Government the materials reviewed by each noticed expert, including those drawn from the Government's previous discovery productions.

The following day, April 25, 2024, Menendez's counsel produced those materials, which consisted of certain financial, tax, and related records; photographs of cash; photographs and

---

[2] The Government understands that due to a technical issue with its email systems, Menendez's counsel did not receive the Government's email until the following day, April 21, 2024.

documents concerning the court-authorized search of Menendez's and Nadine Menendez's home; and, as to Rosenbaum, the Indictment.

The next day, April 26, 2024, the Government advised Menendez's counsel that the Government intended to move under Rule 12.2(c)(1)(B) for an examination of Menendez so that the Government could evaluate the alleged mental condition that is the subject of Rosenbaum's opinion, and asked whether Menendez intended to oppose that motion.

On April 29, 2024, Menendez's counsel responded that they "may not object to [such examination] depending on the parties reaching an agreement as to the contours of the examination."[3]

### C.   Rosenbaum's Testimony Should be Precluded

####   1.   *Menendez's Notice is Both Materially Belated and Materially Deficient*

As described above, Menendez did not provide notice of expert testimony on what is indisputably an alleged mental condition on or before April 1, 2024, as agreed, or even on April 16, 2024, as he said he would (and as was the parties' agreement for the deadline for defense expert notices).   Rather, he waited until the evening of April 19, 2024, nearly *three weeks* after the

---

[3] Menendez's counsel also suggested that any examination or the retention of a rebuttal expert might be belated because the parties had previously agreed on an April 23, 2024 deadline for rebuttal expert notice.  But no such agreement was included in the deadlines proposed to the Court by the defendants (*see* Dkt. 341); that deadline was premised on expert notice being provided by April 16, 2024, which Menendez did not do; Menendez did not provide signed notices until April 24, 2024; the Government cannot determine whether a rebuttal expert is necessary, or prepare such a disclosure, without an adequate disclosure from Menendez, which he has not provided; and, in any event, the Government's right to seek an examination under Rule 12.2, which has multiple purposes, including testing the reliability of a defendant's expert's opinion, is separate from the Government's obligation under Rule 16 to provide notice of a rebuttal expert if it determines to present such testimony to the jury, which would not take place until a rebuttal case, if any, not in the Government's case-in-chief.

pertinent deadline.  But even if the Court were to overlook Menendez providing notice of an alleged mental condition so late—which is no small matter, because it requires both the Government and the Court to engage on this issue with precious time to spare—Menendez's notice is materially deficient in multiple ways, and remains so with less than two weeks before trial.  That alone warrants preclusion.

Menendez's notice does not meet the requirements of Rule 16(b)(1)(C) because the notice does not adequately disclose the *bases or reasons* for Rosenbaum's sweeping opinion.  Instead, it merely states Rosenbaum's *conclusion*, which is insufficient.  Further compounding the problem is that Menendez, despite a written request more than a week ago, has not disclosed the reports, results, or notes of any examinations and/or interviews of him by the proffered expert, which she expressly acknowledges is a basis (and, it appears, the principal basis) for her conclusion.

Starting with the expert disclosure rule, Menendez's notice fails to set forth the bases and reasons for Rosenbaum's conclusion.  The notice states that it is her opinion that Menendez has untreated ▮▮▮▮—apparently from events nearly 50 years ago and even events that preceded Menendez's birth—that "resulted in a fear of scarcity . . . and the development of a longstanding coping mechanism of routinely withdrawing and storing cash in his home."  (Menendez April 24 Rosenbaum Notice (Ex. B), at 1-2.)  The notice does not elaborate upon this opinion in any way. It does not explain what else, if anything, this alleged ▮▮▮▮ caused, or how else, if at all, this alleged ▮▮▮▮ manifested itself.  It appears, in short, that, in Rosenbaum's view, the alleged ▮▮▮▮ simply resulted in the storage of cash (and not, apparently, gold or any other items of value) in a home.  This opinion purports to be based on

> [her] experience and research that demonstrates that such coping
> mechanisms are a common response to scarcity among trauma

> victims, especially for those who suffer from intergenerational trauma.
>
> In addition to her experience and research, Dr. Rosenbaum's conclusions are based on evaluations she conducted of Senator Menendez, as well as a review of discovery produced in the case, including photographs of the cash seized from Senator Menendez's home, Senator Menendez's bank records, and photographs taken of the interior of Senator Menendez's home, as well as her review of relevant scientific literature.

(*Id.* at 2.)

To comply with the notice requirement of Rule 16, "[a]n expert opinion requires some explanation as to how the expert came to his [or her] conclusion and what methodologies or evidence substantiate that conclusion." *United States v. Kwok*, No. 23 Cr. 118 (AT), 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024) (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)). The notice here does not do so. There is no explanation whatsoever as to how alleged "intergenerational trauma," *i.e.*, of events partially predating his birth, caused Menendez to develop ▓▓▓, and, in turn, a coping mechanism. To be sure, the notice asserts that occurred, but it does not articulate any *bases* for the conclusion that Menendez actually suffers from ▓▓▓ Nor does it articulate how that alleged condition led him to store "cash in his home"—much less in the manner in which he did so, interspersed with other cash and gold forensically linked to bribe-payors—yet apparently affected no other aspect of his life.

Nor does the notice indicate how many times Rosenbaum examined or interviewed Menendez; the conditions of those examinations or interviews; whether his counsel or anyone else attended the examinations or interviews, and if so, whether they intervened or provided information; how long the examinations or interviews were; what statements Menendez made that purportedly led Rosenbaum to her conclusion; what tests (if any) she performed; what prior

psychological or medical records (if any) she sought to obtain; what role the Indictment, which she reviewed, played in her analysis; and who else (if anyone) she interviewed that allegedly supports her conclusion. Nor does the notice specify what research, scientific literature, or relevant clinical experience supports Rosenbaum's conclusion, despite the notice expressly referring to both "research" and "relevant scientific literature" as bases for her conclusion. As described above, the Government asked Menendez more than a week ago to identify the scientific literature that was the basis for Rosenbaum's opinion, but Menendez declined to provide that—or any similar—information. And simply asserting that unexplained "experience" in an unexplained area at an unexplained time is the basis for an opinion, as the notice does, is a "patent evasion of the Rule's requirements." *United States v. Mrabet*, No. 23 Cr. 69 (JSR), 2023 WL 8179685, at *2 (S.D.N.Y. Nov. 27, 2023). Without the specificity required by Rule 16, it is impossible to fully assess Rosenbaum's opinion—and that is not a mere theoretical matter given the substantial reason to doubt that opinion, and the substantial risk that the jury will be improperly swayed by it.

Moreover, this problem is significantly exacerbated by the fact that Menendez also has not produced reports or results of Rosenbaum's examinations, as is required by Rule 16(b)(1)(B), or notes or any other records of their meetings. After the Government requested the results and reports of Rosenbaum's examinations of Menendez, his counsel stated that all reports had been produced, which seems to mean there are *no* such reports since the Government has received nothing. But at the same time, Menendez declined to produce notes or any other records of Rosenbaum's examinations, or even to provide an estimate of the length of the examinations. Without the results of Rosenbaum's examinations, or any information whatsoever about them,

there is no basis upon which to assess how the examinations purportedly establish that Menendez has ▇▇▇ and that the condition resulted in his storage of cash in his home.

These myriad, meaningful, and uncorrected deficiencies are unfairly prejudicial (particularly given how belated the notice is), because they materially hamper the Government's ability to assess the legitimacy and foundation of Rosenbaum's opinion, to prepare for and bring a *Daubert* challenge to its admissibility, to retain a rebuttal expert, and to cross-examine Menendez's expert, should she be permitted to testify, about her conclusion. At this late stage, such meaningful unfairness warrants preclusion, *see* Fed. R. Crim. P. 16(d)(2)(C), but at a minimum, Menendez should not be permitted to frustrate the Court's critical gatekeeping function under *Daubert* by resting on the barebones notice he has provided.[4]

### 2. *Menendez Fails to Establish that Rosenbaum's Proffered Testimony is Admissible Under Rule 702*

Even if Menendez's notice was both timely and sufficient—and it is neither—Rosenbaum's opinion that Menendez's alleged ▇▇▇ resulted in a "coping mechanism of routinely withdrawing and storing cash in his home" should be excluded because Menendez, who bears the burden, has not shown that it is based on reliable methods, or sufficient facts or data, and is therefore admissible under Rule 702.

To be admissible under Rule 702 and *Daubert*, an expert's analysis must be "reliable at every step" and not "connected to existing data only by *ipse dixit* of the expert." *Ray*, 583 F. Supp.

---

[4] Since receiving Menendez's signed notice and documents on April 24-25, 2024, in the event that Rosenbaum's testimony is not precluded, the Government has worked to identify an expert to assist in evaluating Rosenbaum's opinion and to examine Menendez. The Government expects soon to retain formally such an expert, who has indicated that he will likely need multiple weeks to review documents, to examine Menendez (over approximately 8 hours over one to two days), and to draft a report.

3d at 533 (excluding psychiatrist's opinion) (citations omitted).  Rosenbaum's proffered opinion fails the requirements of Rule 702 for multiple reasons.

First, starting with her opinion that Menendez suffers from ███, it is not clear that (a) Menendez has ever been diagnosed with ███ prior to Rosenbaum's evaluation, or exhibited signs of such a condition, or (b) her diagnosis conforms with the American Psychiatric Association's ███ diagnostic criteria in the fifth edition of its *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5").  The DSM-5 sets forth specific criteria for finding that an individual has ███, and it does not appear, for instance, that the type of "intergenerational trauma" described in Menendez's notice would qualify under the DSM-5 criterion. (*See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013), https://www.ncbi.nlm.nih.gov/books/███.)  A departure from the DSM-5's criteria for ███ necessarily calls into question the reliability of an expert's opinion. *See* ███, at *███ (excluding expert ███ diagnosis where the opinion diverged from the DSM-5 criteria). "███ ███." *Id.* (collecting cases).  Here, in short, there is not a sufficient basis to conclude that Rosenbaum made a ███ diagnosis based on a reliable methodology, and therefore the opinion should be excluded. *See Ray*, 583 F. Supp. 3d at 542 (excluding expert psychiatric opinion based on four hours of interviews with the defendant and records selected by the defendant's counsel as "not drawn from a reliable methodology").  Indeed, given the

conclusory notice, there is no basis to conclude that Rosenbaum used any methodology at all.[5]

Second, even if Rosenbaum's alleged ███ diagnosis itself was assumed to be reliable, her causation conclusion is not.  Menendez has not identified any scientific literature, clinical research, or other basis supporting the conclusion that ███ (a) necessarily results, or at least often results, in a coping mechanism, (b) that the storing of cash in a home is a coping mechanism that could occur from ███, and (c) that the storing of cash here was caused by Menendez's purported undiagnosed ███.  Where, as is the case here, a psychiatrist is retained to focus on a particular inculpatory fact, it can result "████████████████" besides ███.  ████████ at *█.  "[E]ven though an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant."  *Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (internal quotation marks omitted).  Based on the disclosure made by Menendez, there is no evidence at all that Rosenbaum considered and excluded obvious alternative reasons for his storage of cash in his house, such as that he simply wished to conceal it.  If nothing else, as explained below, it is necessary to hold a *Daubert* hearing to determine whether there is any scientific basis for Rosenbaum's claim that ███ caused the cash storing.

Third, to the extent Rosenbaum's causation theory is based on Menendez's own statements that alleged trauma caused him to store cash, it is not a reliable *expert* opinion.  That is because

---

[5] The DSM-5 also describes "Hoarding Disorder."  But Rosenbaum does not say Menendez has such a disorder, and the DSM-5 does not indicate that such a disorder, if present, manifests itself in the storage of cash, or any other single item.  (*See* DSM-5, https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t29/ (describing condition as "Persistent difficulty discarding or parting with possessions, regardless of their actual value.").)

expert testimony on causation cannot be based on little more than the defendant's own supposed opinion as to what caused his behavior.  *See Lane v. Am. Airlines, Inc.*, No. 18 Civ. 6110 (MKB), 2024 WL 1200074, at *12 (E.D.N.Y. Mar. 20, 2024) (excluding expert opinion based on plaintiff's own expressed "traumatic narrative"); *Matthews v. Hewlett-Packard Co.*, No. 15 Civ. 3922 (DAB), 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (precluding the testimony of a psychologist whose "opinion on causation appears to be based on little more than [the p]laintiff's own opinion on this issue, without the benefit of any additional or independent analysis" and thus his opinion on causation "simply does not reflect a methodology reliant upon [the expert]'s specialized knowledge or experience, and thus, cannot be considered reliable" (citations omitted)); *Hernandez v. Leichliter*, No. 14 Civ. 5500 (AJN), 2016 WL 684038, at *2 (S.D.N.Y. Feb. 18, 2016) ("To the extent [the expert] merely repeats or recasts the testimony of [the p]laintiff in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion."). Without independent verification and a reliable methodology, it would be all too easy for a defendant to falsely attribute his conduct to a mental condition, present that story in the guise of an "expert," and avoid cross-examination.  As the Second Circuit has explained, were the law otherwise, a defendant could simply retain an expert to "repeat[] hearsay evidence without applying any expertise whatsoever, a practice that allows the [defendant] to circumvent the rules prohibiting hearsay." *Mejia*, 545 F.3d at 197 (internal quotation marks omitted).

Here, at least according to the notice, Rosenbaum undertook no independent verification whatsoever of what Menendez appears to have told her: there is nothing in her disclosure to indicate that she interviewed Menendez's family members, friends, or co-workers to corroborate

that he allegedly suffered from some form of trauma, notwithstanding that this alleged trauma supposedly has affected his behavior at least for approximately a *half-century*; there was apparently no effort to verify that Menendez's family had "their funds confiscated by the Cuban government" and that it caused trauma to Menendez's family members, which they somehow transmitted to him; and there appears to be no corroboration at all for the assertion that Menendez's cash storage corresponded to the traumatic events decades before.

Menendez's failure to establish the reliability of Rosenbaum's testimony is therefore another independent basis to exclude it.  Indeed, because Menendez—who bears the burden—did not provide a written report from Rosenbaum, there is no basis upon which to assess how the administered examination(s) purportedly established that Menendez has ██████ and that that caused his behavior.  And because Menendez declined to provide sufficient supplementation or information in response to the Government's questions, there is no basis to conclude that Rosenbaum's conclusions satisfy the requirements of Rule 702.

3.   *Rosenbaum's Proffered Testimony is Based on Inadmissible Hearsay*

Rosenbaum's apparent intention to testify about Menendez's statements to her should also be precluded on hearsay grounds.  Under Rule 703, an expert may rely on facts and data that would "otherwise be inadmissible" under the hearsay rules.  But as explained above, that does not permit an expert to "simply transmit that hearsay to the jury."  *Mejia*, 545 F.3d at 197.

Rosenbaum's planned testimony, to the extent it can be discerned from Menendez's notice, runs afoul of that prohibition.  Based on her expert disclosure, it appears that the *exclusive* source for at least the following alleged facts is Menendez alone: (a) his family had funds confiscated by the Cuban government; (b) he was traumatized as a result; (c) he still feels trauma as a result; (d) his father was a gambler who died by suicide after Menendez stopped paying his father's

gambling debts; (e) that experience traumatized Menendez; (f) his trauma was not treated, and still affects him nearly 50 years later; (g) the resulting coping mechanism for him was storing cash in his home in the manner in which he did in this case.  Menendez himself could testify to every one of those alleged facts—making clear that he, and not Rosenbaum, is the appropriate witness to narrate these alleged facts.  Family members or friends could presumably also testify to some or all of the same alleged facts.  And documentation may exist for some of the same alleged facts, too.

Tellingly, when the Court asked Menendez's counsel at the April 23 conference whether Menendez "can testify to that," his counsel acknowledged that "yes," the defendant could. (Apr. 23, 2024 Tr. at 10.)  On the other hand, Rosenbaum's knowledge of these same alleged facts is *exclusively* based on hearsay, and her testimony would therefore simply be transmitting hearsay to the jury in the guise of expertise.  That is not permitted.

At the April 23 conference, Menendez's counsel asserted that the proffered expert's testimony was nevertheless necessary to rebut a suggestion that storing cash is inherently "suspicious."  (*Id.* at 16.)  But the Government does not intend to argue at trial that the jury should find that Menendez's storage of cash is inherently, and without more, suspicious or wrongful (and would not object to an appropriate limiting instruction).  The Government intends to argue—and prove—that Menendez stored cash because he was taking bribes from particular persons for particular purposes, and accordingly wanted to conceal the cash, just as he wanted to conceal the gold also found in his home.

In any event, should Menendez believe there to be an adequate foundation in the admissible record at trial for a witness to be permitted to explain that storing cash is not, without more,

inherently suspicious, hearsay testimony is not needed.  Rather, if Menendez or another witness with first-hand knowledge and admissible testimony were to testify about the relevant facts, Menendez could then seek to call an expert to explain how, under the facts properly in evidence, storing cash at home may be a natural response (provided that Menendez gave timely and appropriate notice and such an opinion satisfied the requirements of Rule 702, and did not fail the balancing test of Rule 403).  Under such a scenario, the Government would have the opportunity to cross-examine Menendez or the other lay witness about the underlying facts, and then cross-examine the expert, should one be permitted to testify, about her conclusions based on those same facts.  But permitting Rosenbaum to simply narrate what Menendez privately told her would preclude interrogation and exploration of the underlying facts through cross-examination—a result that the hearsay rules are intended to prevent.

In sum, to the extent that Rosenbaum's testimony is based on hearsay statements of Menendez, as it largely appears to be, it should be precluded.  And if the Court does not preclude the testimony at this time, the Court should conduct a *Daubert* hearing during which the Court can determine what portions of the testimony are based on the defendant's statements, to ensure that Rosenbaum's testimony, if permitted, is not based on inadmissible hearsay.  *See United States v. Chastain*, No. 22 Cr. 305 (JMF) (S.D.N.Y. Apr. 28, 2023) (Dkt. 137), Trial Tr. 717-20, 724-29 (ordering the questioning of the defendant's expert outside the presence of the jury to determine whether information conveyed by the defendant or his counsel "was a necessary part of his analysis in reaching the conclusion and opinion that he testified to," because if that were the case, "it should not have been offered or admitted").

4.    *Rosenbaum's Proffered Testimony Fails Under Rule 403*

For the multiple reasons set forth above, Menendez fails to meet his burden to demonstrate that Rosenbaum's proffered testimony is proper.  In any event, even if otherwise admissible, the testimony should be precluded under Rule 403, because it has low probative value, and any such probative value is substantially outweighed by its unfair prejudicial effects, particularly the risk of jury confusion and distraction.

As the Court is aware, the primary relevance of the cash and gold bars discovered in Menendez's and Nadine Menendez's home is that they are things of value received as bribes from his co-conspirators.  *Where* the cash and gold were stored is of secondary relevance: had Menendez kept his co-conspirators' cash and gold in a safe deposit box, at his office, or in a car, they would still be things of value from the bribe payors.  To be sure, the purported reason, provided by Rosenbaum, why Menendez kept cash at his house could assist in rebutting the argument that Menendez's decision to store cash at home shows consciousness of guilt.  But for the reasons described above, to the extent that Menendez wishes to rebut that secondary point, Rosenbaum is the wrong person to do it, because her testimony is unreliable and based on hearsay.

Importantly, the threshold for admission is higher where proffered testimony comes through an expert psychiatrist.  To admit psychiatric evidence of a mental condition—as opposed to, for instance, testimony by Menendez or a family member about his storing cash in his home—the defendant must demonstrate a "direct link" between the psychiatric evidence and the defendant's *mens rea*.  *Cromitie*, 2017 WL 1383982, at *5; *see also, e.g.*, *United States v. Dupre*, 339 F. Supp. 2d 534, 540-41 (S.D.N.Y. 2004) (noting the "special concerns for relevance and potential jury confusion in the case of expert testimony regarding mental disease evidence"), *aff'd*, 462 F.3d 131 (2d Cir. 2006).  Menendez has failed to make such a showing here.  Rosenbaum's

opinion would not establish a lack of specific intent to commit the charged bribery offenses—on the contrary, Menendez could store cash allegedly due to ███ *and also* accept and store cash bribes.   At the same time, such expert testimony would risk significant juror confusion and distraction.   The testimony of an expert that Menendez allegedly suffers from ███ could, incorrectly, lead jurors to conclude that some or all of Menendez criminal conduct is excused by the alleged mental condition.   And the testimony would also introduce the purported causes of the ███, which naturally would tend to engender sympathy for Menendez, and could cause the jury to be influenced by factors that have no bearing on the merits of the case.   *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (excluding evidence that the defendant's son had cerebral palsy because it could "cause the jury to be influenced by sympathies having no bearing on the merits of the case").   Of course, those same alleged facts might also be presented if Menendez were to testify, but then he would be subject to cross-examination as to whether, and how, they purportedly explained his actions.   Presenting these alleged "facts" through an expert insulates Menendez from such cross-examination and provides an unbalanced picture for the jury.

To be clear, the Government does not object to Menendez testifying as to why he kept cash and gold in his home.   Nor does the Government object to Menendez presenting the testimony of family members or friends, if they have firsthand knowledge and admissible testimony, regarding Menendez's habit, or lack thereof, of storing cash and/or gold in his home.   However, in weighing probative value against prejudice, the Court must balance not the probative value of Menendez's proffered explanation for storing cash, but the probative value of having a *psychiatric expert* offer that explanation against the substantial risk that the jury will misapprehend or be unfairly swayed by such testimony.   Here, the probative value of Rosenbaum introducing such evidence, based on

28

the hearsay statements of the defendant and without any firsthand knowledge of the facts, is substantially outweighed by the risk of jury confusion and distraction. Accordingly, her testimony should be excluded, even assuming *arguendo* that it were timely noticed, adequately noticed, and otherwise proper—and it is none of those things.

### D.   At a Minimum, the Court Should Order an Examination of Menendez, Schedule a *Daubert* Hearing, and Preclude Menendez from Mentioning the Proffered Testimony, His Alleged Mental Condition, or the Alleged Causes Thereof until the Court Rules

While there are several independent bases to exclude Rosenbaum's opinion outright, if the Court is not inclined to preclude the testimony at this time, at a minimum, the Court should (a) order that Menendez promptly be examined by the Government under procedures ordered by the Court, as permitted by Rule 12.2(c)(1)(B), (b) conduct a *Daubert* hearing on the bases and reliability of Rosenbaum's proposed testimony before she is permitted to testify before the jury, which should be scheduled following such examination and prior to a defense case, if any; and (c) preclude Menendez from mentioning to the jury the proffered testimony, his alleged mental condition, or the alleged causes thereof (including his family history) until such time as the Court rules.

Under Rule 12.2(c)(1)(B), the Court may order a defendant to be examined under procedures ordered by the Court. Consistent with the plain language of and purpose for the Rule, courts regularly order psychiatric examinations of defendants in circumstances such as this. *See, e.g.*, *United States v. Encarnacion*, No 19 Cr. 118 (RA) (S.D.N.Y. Sept. 24, 2019), Dkt. 28 (ordering that defendant submit to an examination by a government expert where defendant noticed that he intended to present evidence of a mental condition); *Id.*, (S.D.N.Y. Oct. 24, 2019), Dkt. 35 (denying defense counsel's request to be present at examination (citing cases)); *United*

29

*States v. Alcantara*, No. 13 Cr. 119 (LTS) (S.D.N.Y. Jan. 16, 2015), Dkt. 42 (ordering that defendant submit to an examination by a government expert where defendant noticed that he intended to present evidence of a mental condition); *United States v. Solomon-Eaton*, No. 12 Cr. 352 (KAM) (E.D.N.Y. Jan. 9, 2014), Dkt. 67 (ordering defendant to be examined by the government's expert without the presence of counsel and not videotaped); *United States v. Alexidor*, No. 11 Cr. 1080 (GBD) (S.D.N.Y. Oct. 21, 2013), Dkt. 37 (ordering defendant to be examined by the government's expert); *United States v. Polouizzi*, No. 06 Cr. 22 (JBW) (E.D.N.Y. Mar. 1, 2007), Dkt. 25 (ordering defendant be examined by the government's expert). The Court should order such an examination here, without the presence of defense counsel. Such an examination, free from interference and without defense counsel's presence (just as the Government was not present for the examination(s) performed by Rosenbaum) is necessary to evaluate in an appropriate scientific manner whether Menendez in fact has ███, the extent of such alleged condition, how it manifests itself, and whether Rosenbaum's opinion is reliable under Rule 702. *See United States v. Trapnell*, 495 F.2d 22, 24-25 (2d Cir. 1974) ("there is no right to counsel at a psychiatric examination," and "the presence of counsel could very well 'destroy the effectiveness of the interview.'" (quoting *United States v. Baird*, 414 F.2d 700, 711 (2d Cir. 1969))); *see also Estelle v. Smith*, 451 U.S. 454, 471 & n.14 (1981) ("[A]n attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination." (internal quotation marks and citations omitted)); *United States v. Wilson*, 920 F. Supp. 2d 287, 304-305 (E.D.N.Y. 2012) (rejecting defense counsel's request to be present for examination and collecting cases); *Encarnacion*, No 19 Cr. 118 (RA) (S.D.N.Y. Oct 24, 2019), Dkt. 35 (denying defense counsel's request to be present at examination (citing cases)).

And to ensure that the Government has the opportunity to evaluate the results of the examination and determine next steps (*e.g.*, seeking to obtain other records, interview other witnesses, or retain a rebuttal expert), the examination should be ordered promptly.[6]

Additionally, while it is not necessary for the Court to hold a hearing to exclude a defendant's expert, *see Williams*, 506 F.3d at 161, if the Court denies or reserves decision on the Government's motion to preclude Rosenbaum's testimony, the Court should conduct a *Daubert* hearing, following Menendez's examination, to evaluate the relevance and reliability of the proposed expert testimony, before it is presented to the jury. As described above, Rosenbaum's opinion is conclusory, and there are significant questions regarding the sources and reliability of the proposed testimony. A *Daubert* hearing is therefore appropriate before any such evidence is mentioned or presented to the jury.[7]

## II.   RICHARDSON'S TESTIMONY SHOULD BE PRECLUDED IN PART

As stated above, the Government has no objection to one or more witnesses reviewing and summarizing for the jury pertinent financial and/or other voluminous admissible records, pursuant to Rule 1006. Indeed, as the Government noted at the April 23 conference, given the volume of materials in this case, it believes that (provided the Rules of Evidence are followed) such testimony, and the use of summary charts, is appropriate and efficient, and respects the jury's time.

---

[6] As noted above, the Government's anticipated expert has indicated that he will likely need multiple weeks to review documents, to examine Menendez (over approximately 8 hours over one to two days), and to draft a report.

[7] Provided that Menendez were precluded from mentioning to the jury the proffered testimony, his alleged mental condition, or the alleged causes thereof (including his family history) until such time as the Court rules, this hearing may be scheduled following Menendez's examination and completion of a report by the Government's expert and prior to a defense case, if any.

(Apr. 23, 2024 Tr. at 12.)   To the extent that Richardson intends to offer such testimony, the Government has no objection.  However, it appears that Richardson intends not merely to describe and summarize admissible financial records, but also to opine as to Menendez's character and behavior with respect to financial matters, namely whether he "lived within his means" and did not "regularly make extravagant purchases" or "excessively transfer funds" to others.  (Menendez April 24 Richardson Notice (Ex. C), at 2.)  That proposed testimony—whether it uses these precise words or otherwise—should be precluded for multiple, independent reasons.

*First*, Menendez's notice regarding this aspect of Richardson's testimony is materially deficient in multiple ways.  The notice baldly asserts that Richardson's opinions are that Menendez "lived within his means," did not "regularly make extravagant purchases," and did not "excessively transfer funds" to others, and says nothing more.  The notice does not explain, among other things, what definition of "regularly," "extravagant," or "excessive" Richardson is using.  Nor does the notice explain what Richardson intends to convey when he opines that Menendez "lived within his means," given, among other things, that Menendez and Nadine Menendez enjoyed trips, meals, and goods—including a luxury car—that they did not pay for.  Nor, in any event, does the notice adequately provide the *bases* for these ambiguous assertions, even if the assertions themselves were clear.

*Second*, Menendez fails to demonstrate that Richardson is qualified to provide such opinions.  To be sure, Richardson appears qualified to analyze financial records.  But nothing in the notice, or his background, indicates that he is qualified to provide an *expert opinion* as to what is "extravagant" or "excessive" or to offer an opinion as to the character of a person's "spending habits," rather than to present the *facts* of those habits.

*Third*, even if Richardson were qualified to so opine, to be admissible under Rule 702 and *Daubert*, an expert's analysis must be expert *analysis*, not merely the "*ipse dixit* of the expert." *Ray*, 583 F. Supp. 3d at 533 (citations omitted).  Menendez fails to demonstrate that Richardson has conducted any expert analysis at all, rather than simply look at certain financial records and talk with Menendez and then declare that Menendez did not engage in "extravagant" or "excessive" conduct.

*Fourth*, Menendez fails to show that such opinions, no matter how they were reached, are a proper subject of expert testimony *at all*.  As described above, the Federal Rules of Evidence preclude a party from offering "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."  *Amuso*, 21 F.3d at 1263; *see also, e.g.*, *Nouri*, 711 F.3d at 145 (district court was "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *Collins*, 581 F. App'x at 60 (affirming preclusion of testimony by lawyers on the materiality of an agreement and "the work of transactional lawyers," where "fact witnesses" covered the same ground).  Menendez fails even to attempt to explain why the average juror cannot be presented with the facts of his finances, and the other evidence at trial, and decide for himself or herself what conclusions to draw.

*Fifth*, Richardson's apparent intention to testify about Menendez's statements to him should be precluded on hearsay grounds.  Indeed, it is unclear why, if he had been retained to analyze financial records, Richardson spoke with Menendez—yet the notice says that is a basis for Richardson's opinions.  It appears, in short, that Menendez told Richardson that Menendez lived within his means, did not enjoy "extravagant" things, and did not engage in any "excessive"

33

transactions, and Richardson intends to pass along those hearsay statements to the jury in the guise of expert testimony.  That is improper.  *See, e.g.*, *Mejia*, 545 F.3d at 197.

*Sixth*, and in any event, even assuming *arguendo* that Richardson's proposed testimony regarding the non-"extravagance" or "excessiveness" of Menendez's lifestyle were timely noticed, adequately noticed, and otherwise proper, it should be precluded under Rule 403.  Menendez's and Nadine Menendez's finances, and their desire to receive certain things of value, including things that they could not otherwise afford, from bribe-payors and their associates, is highly relevant, as explained in the Government's opposition to the defendants' motions i*n limine*.  (Dkt. 315, at 28-31.)  But no witness needs to characterize what such evidence *means*.  Of course, lawyers, as advocates, may ask the jury to draw different conclusions about what the evidence means—but that does not make it proper for a witness to so opine.  In any event, even assuming that there were some relevance to such an opinion, it has exceedingly low, if any, probative value.  And in the form of expert testimony, such an opinion presents a substantial risk of unfair prejudice, jury confusion, and distraction.  This is so because an expert opining as to whether a defendant engaged in "extravagant" or "excessive" conduct with respect to finances could all too easily be seen as a commentary on the defendant's conduct generally.  And this risk is heightened because Richardson has a significant law enforcement background (Menendez April 19 Notice (Ex. A), at 23-24), which he will presumably describe for the jury—who will then hear that someone with that background found nothing "extravagant" or "excessive" in the defendant's behavior.  The risk that the jury misapprehends the minimal, if any, probative value of such an opinion is significant.  That testimony should accordingly be excluded.

*Finally*, to the extent the Court were inclined to permit such testimony (although it should not), to ensure that the testimony, if permitted, is not based on inadmissible hearsay, the Court should conduct a *Daubert* hearing during which the Court can determine what portions of the testimony is based on the defendant's statements. *See Chastain*, No. 22 Cr. 305 (JMF) (S.D.N.Y. Apr. 28, 2023) (Dkt. 137), Trial Tr. 717-20, 724-29.

## III.   ALTERMAN'S TESTIMONY SHOULD BE PRECLUDED IN ITS ENTIRETY

As described above, Alterman's proffered testimony should be precluded in its entirety for multiple, independent reasons.

*First*, while Hana's expert notice was timely and apparently otherwise complete, the notice is materially deficient in a critical way.  It appears to assert, without qualification, that Hana's company, IS EG Halal, took over Halal certification from "Muslim Brotherhood business owners." (Hana April 16 Notice (Ex. D), at 5.)  But it does not identify those business owners, or explain *in any way* on what basis Alterman has reached the conclusion that they were members of the Muslim Brotherhood.  That conclusion is not one that should be reached lightly, and Alterman offers no support for it.  As described above, to be admissible, an expert's analysis must be "reliable at every step" and not "connected to existing data only by *ipse dixit* of the expert."  *Ray*, 583 F. Supp. 3d at 533 (citations omitted).  Hana, who bears the burden to demonstrate the admissibility of this testimony, has provided no basis whatsoever upon which the Court could deem this conclusion reliable.

*Second*, the proposed testimony principally rests on the proposition that the jury needs to understand the "history" that led to Hana's monopoly grant because Hana claims that the Government intends to argue Hana obtained his monopoly "as a result of bribery and corruption due to Mr. Hana's relationship with Senator Menendez and his wife."  (Hana April 16 Notice

(Ex. D), at 5.)  But as the Government explained at the April 23 conference, it does not intend to argue that Menendez took actions that in fact caused Egypt to grant that monopoly.  (April 23, 2024 Tr. at 18 ("[W]e are not alleging that Senator Menendez caused Egypt to give the monopoly to Mr. Hana.  We are alleging that Senator Menendez took actions to stop the United States Department of Agriculture from helping to get Egypt to remove the monopoly, which is a separate point.").)  To be sure, Hana or another defendant's contemporaneous *intentions, expectations, and beliefs* regarding whether or why Egypt would or did grant Hana the monopoly may be relevant to his motive and intent to cultivate a relationship with and bribe Menendez.  But that does not render relevant expert testimony bearing on what reasons, in fact, *actually caused* the Government of Egypt's actions, untethered in any way to a defendant's contemporaneous knowledge or state of mind.  *See, e.g.*, *United States v. Kaplan*, 490 F.3d 110, 121-22 (2d Cir. 2007) (holding district court erred in admitting evidence of one person's knowledge to show defendant's knowledge without evidence that defendant was aware of the same information, expressing doubt that evidence was relevant, and explaining that, in any event, it should have been precluded under Rule 403 because it "required [the jury] to draw a series of inferences, unsupported by other evidence," yet was offered on "the ultimate issue in the case"); *United States v. Martoma*, 993 F. Supp. 2d 452, 455-56 (S.D.N.Y. 2014) (in insider trading case, excluding expert opinion that a stock was overvalued absent evidence that the defendant had himself conducted such analyses or been contemporaneously reading such analyses).[8]

---

[8] Nor should Hana be permitted to offer such evidence in support of an argument that, in hindsight, the monopoly allegedly did not harm anyone or somehow was beneficial because the prior halal certifiers were allegedly affiliated with the Muslim Brotherhood or were somehow bad actors. That is not a defense.  *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S.

*Third*, as also explained at the April 23 conference, to the extent that Hana wishes to present evidence, if any exists, that he contemporaneously expected to be or believes he was granted the monopoly for good reasons, that is not a proper subject for *expert* testimony.  It is settled law that expert witnesses should "not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses," *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 546, or "interpretations of conduct or views as to the motivation of parties," *id.* at 541. A party may not offer "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *Amuso*, 21 F.3d at 1263.  Hana's proffered expert testimony is irreconcilable with this fundamental principle.  His proffered expert has no firsthand knowledge of Hana, IS EG Halal, how IS EG Halal got its monopoly, or any other of the events in this case—yet Hana purports to call his proffered expert in support of the argument that Hana was granted the monopoly for good reasons, which is a subject to which he, or other lay witnesses, could readily testify. *Cf. United States v. Long*, 917 F.2d 691, 701-02 (2d Cir. 1990) (it was an abuse of discretion to permit an expert to testify about "organized crime families" when "the fact" that was relevant, whether an individual was connected to organized crime and demanded a fee, could have been testified to by a lay witness).  And indeed, as described above, the Government intends to call at least one such witness, a USDA official, who is expected to testify about the circumstances through which Hana was granted his monopoly.

---

365, 378 (1991); *United States v. Skelos*, No. S1 15 Cr. 317 (KMW), 2016 WL 1532253, at *6 (S.D.N.Y. Apr. 14, 2016), *vacated on other grounds*, 707 F. App'x 733 (2d Cir. 2017).

*Finally*, and in any event, even if Hana's proffered expert testimony were otherwise properly noticed, reliable, and admissible, it should be precluded under Rule 403.  As is relevant here, the questions before the jury, in sum, are whether Hana agreed to and did pay bribes and agreed to have Menendez act as an agent of Egypt.  Those questions do not turn on the history of Egypt (much less since its "1952 revolution" (Hana April 16 Notice (Ex. D), at 5)), the history of the Muslim Brotherhood, "Egypt's 2011 elections" and developments concerning the Muslim Brotherhood since then (*id.*), and a series of complicated and contestable political and economic issues.  In short, to the extent that the jury needs to be presented with "the circumstances under which Mr. Hana" got his monopoly (*id.*), that is a proper subject of lay testimony, not expert testimony, and any conceivable probative value of the complex history that Hana purports to present is far outweighed by the inevitable jury confusion and distraction that would result, as well as unnecessary and material lengthening of the trial.  *Cf. United States v. Amawi*, 695 F.3d 457, 480 (6th Cir. 2012) (affirming exclusion of Alterman's proposed expert testimony about "politics and cultural norms in the Middle East," and explaining that there was a "very weak link, if any" between his testimony and "the relevant states of mind of the defendants"); s*ee also United States v. Amawi*, 552 F. Supp. 2d 669, 675 (N.D. Ohio 2008) (Alterman's proposed expert testimony "involves matters ancillary to the issues in the case, and to what the jury must decide," and accordingly its probative value, if any, "would be substantially outweighed by the risk of confusion of the issues for the jury").  His proffered expert testimony should therefore be precluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the proffered testimony of Karen Rosenbaum and Jon Alterman should be precluded in their entirety, and the proffered testimony of Russell Richardson should be precluded in part.

Dated:  New York, New York
        May 1, 2024

                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney

        By:     <u>s/ Daniel C. Richenthal</u>
                Eli J. Mark
                Daniel C. Richenthal
                Paul M. Monteleoni
                Lara Pomerantz
                Catherine Ghosh
                Assistant United States Attorneys
                (212) 637-2431/2109/2219/2343/1114