O5S3MEN1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        23 Cr. 490 (SHS)

5   ROBERT MENENDEZ, et al.,

6              Defendants.
                                         Trial
7   ------------------------------x

8                                        New York, N.Y.
                                         May 28, 2024
9                                        9:45 a.m.

10  Before:

11
                         HON. SIDNEY H. STEIN,
12
                                         District Judge
13                                       -and a Jury-

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  PAUL M. MONTELEONI
17       DANIEL C. RICHENTHAL
         ELI J. MARK
18       LARA E. POMERANTZ
         CATHERINE E. GHOSH
19       Assistant United States Attorneys
         -and-
20       CHRISTINA A. CLARK
         National Security Division

21

22

23

24

25
```

O5S3MEN1

1

2                              APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4         Attorneys for Defendant Menendez
BY:  ADAM FEE
5         AVI WEITZMAN
          RITA FISHMAN
6

7  GIBBONS, P.C.
          Attorneys for Defendant Hana
8  BY:  LAWRENCE S. LUSTBERG
          ANNE M. COLLART
9         CHRISTINA LaBRUNO
          RICARDO SOLANO, Jr.
10        ANDREW J. MARINO
          ELENA CICOGNANI
11        JESSICA L. GUARRACINO

12

13  CESAR DE CASTRO
SETH H. AGATA
14  SHANNON M. McMANUS
          Attorneys for Defendant Daibes
15

16
Marwan Abdel-Raman, Interpreter (Arabic)
17  Rodina Mikhail, Interpreter (Arabic)

18

19

20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  One juror's missing.  The juror spoke to

3    my deputy a few moments ago.  It's Juror No. 12.  She went to

4    the ER.  She passed out last night, I presume that's when she

5    went to the ER.  She had stitches, probably can come in

6    tomorrow.

7          I really hate to lose a juror this early in the trial,

8    especially since -- the lawyers were in jury selection -- we

9    have various number of jurors who have individual days where

10   they have issues and they're trying to work them out, but there

11   is no guarantee.  So, you may want to talk to each other now,

12   but what's the view of the parties?  I have not spoken to Juror

13   No. 12.  I do see she lives in Manhattan.

14         Government?

15         MR. MARK:  Do you want us to confer?

16         THE COURT:  Yes.

17         (Counsel conferring)

18         THE COURT:  I really hate to excuse a juror this

19   early.  I also hate to have yet another day off from trial.

20   It's been a week.  And Juror No. 12 was not one of those jurors

21   who had individual day issues.

22         (Pause)

23         THE COURT:  What's the view of the parties?

24         MR. MONTELEONI:  Your Honor, the government feels that

25   we cannot lose a juror this early in the trial, especially one

O5S3MEN1

1    without individual day issues as we keep going.  This would

2    become unmanageable.

3            MR. FEE:  Noting your concern, we think it's

4    appropriate to proceed without her.

5            THE COURT:  Why?

6            MR. FEE:  The trial is going at the pace it's going,

7    your Honor.  And we're concerned about losing an entire day.

8    Also, understanding it's early in the trial, the Court has

9    seated a good number of alternates.  And it appears from what I

10   can observe that it is an attentive, responsible jury.

11           THE COURT:  Yes.

12           MR. FEE:  Even number 12 --

13           THE COURT:  I'm sorry, did you say attentive,

14   responsible jury or retentive, responsible juror?

15           MR. FEE:  Attentive and responsible jury.

16           THE COURT:  Yes, sir.

17           MR. FEE:  In terms of trying to predict if we'll lose

18   more.  We think it's best to relieve Juror 12, continue today,

19   and seat the first alternate, your Honor.

20           THE COURT:  What I am going to do, as you know, I

21   don't announce who is a juror and who is an alternate.  You are

22   asking that I excuse Juror No. 12.

23           MR. FEE:  That's right.

24           THE COURT:  Officially nobody's an alternate.  They

25   are all members of the jury.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          With the permission of the parties, I will call her

2    phone number and speak to her.  I have the permission of the

3    parties to do that?

4          MR. LUSTBERG:  Yes, your Honor.

5          MR. FEE:  Of course, your Honor.

6          THE COURT:  We'll take a break.

7          (Recess)

8          THE COURT:  I spoke to Juror No. 12.  She's able to

9    come in this afternoon.  We'll start the trial at 1 p.m.  I

10   told her that we appreciated it very much.  She'll be here at

11   1 p.m.

12         So we'll go from 1 to 5 and any day -- you may be

13   seated in the courtroom.  Any day that the parties feel they're

14   able to go past 5, they should let me know.  Actually, it is up

15   to the jury.  I'll let my deputy know she should tell the

16   jurors any day they can go past 5, they should let the Court

17   know.  Although, as I told you previously, one or more jurors

18   indicated that they had child care issues.  We'll start today

19   at 1 o'clock.

20         Are there any issues the parties wish me to take up?

21         MR. MARK:  Your Honor, there are some issues related

22   to Jamela Maali.

23         THE COURT:  I'm sorry, we need to tell the jurors

24   something.  Why don't I call them in, just have them line up

25   here, and tell them that Juror No. 12 will be coming in late.

O5S3MEN1

1    No, I won't go into detail.  That we're going to start at 1 due

2    to the absence of a juror.  It's important we have all jurors

3    here.  Bring the jury in.

4              (Jury present)

5              THE COURT:  Ladies and gentlemen of the jury, good

6    morning, thank you for being here in a timely fashion.  I hope

7    after a week's rest everyone is bright eyed and bushy tailed

8    ready to go.

9              Unfortunately, one of the jurors could not be here

10   this morning.  She's quite apologetic.  It is important that

11   you all stay together.  So she is able to come in at 1 p.m.

12   today.  So we'll start the trial at 1 p.m. today.

13             You're free to go wherever you'd like, make calls,

14   back to work or whatever you may want to do, and to please eat

15   before 1.  And be here, we'll start exactly at 1 o'clock.  I

16   really appreciate the fact that she's willing to come in at

17   1 o'clock.

18             Enjoy.  It is a beautiful day.  In fact, there is a

19   patio we have on the eighth floor, outside of the cafeteria,

20   you'll see.  It should be in the sun now.

21             I apologize for the delay.  It is only going to be a

22   slight delay.  As I told you, it is important that everybody

23   stay together here on this jury.  Don't read anything about the

24   case, don't talk to each other about it.  I'll see you at

25   1 o'clock.  Thank you.

1    (Jury excused)

2    THE COURT:  I'm told the patio is part of the

3  cafeteria technically, so they can't go to the cafeteria.  My

4  deputy will tell them that.  Please be seated.

5    What can I do for the parties?

6    MR. MARK:  Your Honor, the first witness today is

7  going to be recalled is Jamela Maali.

8    THE COURT:  She was on direct, right?

9    MR. MARK:  Yes.  She is on direct.  And we wanted to

10  flag for your Honor a few different issues that related to

11  Ms. Maali.

12    First is, just as we noted before, we may ask some

13  leading questions with Ms. Maali, if necessary, given she's

14  identified with an adverse party within the meaning of

15  Rule 611(c)(2) because she's Fred Daibes' longtime executive

16  assistant and had worked with Wael Hana and is still friendly

17  with him.

18    Ms. Maali gave we believe some incomplete and unclear

19  answers when she testified last week.  If she gives evasive or

20  unclear answers today, we may confront her with prior

21  statements to the FBI with respect to them.

22    Second, we understand that Mr. Daibes' counsel and

23  Mr. Hana's counsel on cross-examination intends to elicit from

24  Ms. Maali specific instances of gift giving by either

25  Mr. Daibes or Mr. Hana.  Consistent with your Honor's prior

ruling with Mierna Hanna, Wael Hana's executive assistant who

was the witness before her, we believe such questions are

outside of the scope of permissible cross-examination as your

Honor sustained that objection.  And we also believe this would

be impermissible positive 404(b) evidence introduced to give

propensity for gift giving and that's inappropriate.  Third --

THE COURT:  Wait.  In terms of Ms. Hanna.  Was that

ruling because it was beyond the scope of the direct?

MR. MARK:  Yes.  We raised scope as our objection.  It

is transcript 960.  And we believe at a minimum we would object

on scope here.

THE COURT:  Have you asked questions about gift

giving?

MR. MARK:  We have not and we intend not to.

THE COURT:  Okay.

MR. MARK:  Third is --

THE COURT:  And the basis of my sustaining the

objection, at least on the record, was scope I assume.

MR. MARK:  Yes.  That was all we raised specifically

at that point in time.

THE COURT:  Are you raising something else now?

404(b) propensity.

MR. MARK:  We did.  We understood your Honor pretrial

ruled to permit some character evidence, but not necessarily

specific.  But those two issues are quite different.  Character

O5S3MEN1

1    versus specific instances.

2              THE COURT:  Yes.

3              MR. MARK:  Third is yesterday afternoon and late

4    evening the defense provided notice of multiple exhibits

5    they've indicated they may offer with Jamela Maali.

6              THE COURT:  I thought we had a three-day agreement.

7              MR. MARK:  That's the reason we are raising this.

8              THE COURT:  I gave the defense some leeway last time.

9    I was told the agreement was three days in advance, whatever

10   the parties agreed to, they agreed to.  The defense said,

11   basically, we'll do our best.  I said, basically, do your best

12   because I always like to give parties some leeway initially.

13   But if you are giving your adversary instead of three day

14   notice, when did these things come through?

15             MR. MARK:  We received six exhibits from Robert

16   Menendez sent at 11:24 last night.

17             THE COURT:  11 p.m.

18             MR. MARK:  Yes.

19             THE COURT:  I'm glad the last submission to me was

20   only about 8 o'clock, so that's progress.

21             That's not acceptable, defense, in light of an

22   agreement.  Nobody disagrees that there was an agreement.  Get

23   the exhibits that are within the scope of your agreement,

24   whatever it is, three days in advance.

25             Mr. Weitzman.

O5S3MEN1

1              MR. WEITZMAN:  I wanted to clarify.  I've informed the

2      government we don't plan to offer four of those exhibits.  Two

3      of them were just in case we need to refresh recollection and

4      we're letting them know about that.  One was for

5      identification.

6              So there are two new exhibits.  And as we were

7      formulating our examination yesterday, we decided to add them

8      to the outline.  So I apologize.

9              THE COURT:  We boiled it down to two.  But

10     nonetheless, the agreement apparently doesn't even permit those

11     two.  We'll let it come in this time, assuming it is

12     admissible.

13             MR. MARK:  Your Honor, we want to raise here

14     particularly this poses significant problems for us because we

15     have to research the provenance of these documents, the

16     context.

17             THE COURT:  That's why you have the three-day

18     agreement, sir.

19             MR. MARK:  And we also have objections to those

20     particular exhibits.  But I want to lay out a little bit before

21     that.  Which is these exhibits reflect the defendants

22     apparently are trying to turn Ms. Maali who is aligned with the

23     defendants into a defense witness on cross by introducing all

24     sorts of matters we anticipate will be outside of Ms. Maali's

25     direct examination.  This effort is particularly problematic,

1    given Ms. Maali is aligned with the defendants.  By doing so,

2    they are avoiding other disclosure obligations if they are able

3    to call Ms. Maali as a witness, such as the Rule 26.2

4    disclosure obligations.

5         As a result, the government will be objecting to

6    exhibits and questioning that's outside of the scope.  And as

7    we noted, there are specific objections to those two exhibits,

8    which Mr. Richenthal can address and we'd like to be heard if

9    the defense intends to offer those exhibits.

10        THE COURT:  Apparently, Mr. Weitzman, you do.  I don't

11   know what those exhibits are.  You do intend to introduce them.

12        MR. WEITZMAN:  I mentioned that there are two exhibits

13   that we're reserving the right to introduce.  I don't know that

14   we are going to with Ms. Maali.  It depends on what happens on

15   direct.

16        Both exhibits are documents that were produced by the

17   government, they are not defendant's documents.  So, the

18   provenance is they are their own documents.  I don't know

19   whether the government intends to get into the Qatar

20   allegations with Ms. Maali.  These both documents do concern

21   the Qatar allegations, and in particular the project that

22   Mr. Daibes was developing in Edgewater, New Jersey.

23        Now, if the issue is one of scope, respectfully, I

24   would suggest that there is really no good reason why we should

25   recall a government witness in the defense case to introduce

O5S3MEN1

1    two documents that would be just as easily done in a

2    cross-examination.

3         I've never spoken to Ms. Maali.  We have no 26.2

4    information for her.

5         MR. RICHENTHAL:  We have objections to the exhibits,

6    whether they come to Ms. Maali now or in a week.  We don't

7    think there are appropriate.

8         THE COURT:  Do you intend to question her about Qatar?

9         MR. MARK:  I can represent we do not intend to

10   question Ms. Maali about Qatar during her direct examination.

11        THE COURT:  I think that's the end of it.

12        MR. WEITZMAN:  The only issue then is whether we

13   should be forced to recall what could be a dozen witnesses or

14   more that the government is calling and will object on scope

15   grounds.  Because many of those witnesses are witnesses who the

16   defense would like to call and we don't want to be limited.

17        THE COURT:  I understand.  It seems to me in general,

18   if you want to call them, you should call them on a defense

19   case.  But, specifically, what are we dealing with here?  Let

20   me see.

21        MR. RICHENTHAL:  I'm prepared to have the paralegal

22   call them up.

23        THE COURT:  My inclination is the defense has a choice

24   to make, either call her on the case or not.  That's what it

25   seems to me.

O5S3MEN1

1              Let me take a look at the exhibits nonetheless.  As

2     pointed out, in connection with the defense's motions to

3     transfer this case to the District of New Jersey, New Jersey is

4     not that far away.  One can see it from this courthouse on a

5     clear day.

6              What are the exhibits?

7              MR. RICHENTHAL:  Can you call up DX 386, please.  I'll

8     take them in order.  DX 386 and DX 387.  On the screen right

9     now is DX 386 and DX 387.  As I said, I'll take them in order.

10             386 is on the left-hand side of your screen.  It is an

11    e-mail chain.  We have multiple concerns about this chain.  But

12    I'll start at a high level.

13             What this chain appears to be is a rather extensive

14    back and forth between lawyers on different sides of the

15    pertinent deal.  Ms. Maali of course is not a lawyer.  But even

16    putting aside Ms. Maali for this moment, this introduces before

17    the jury complex questions about what due diligence involves,

18    how parties handle transactions, none of which is relevant --

19             THE COURT:  It's entitled "forward Heritage Edgewater

20    due diligence checklist."

21             MR. RICHENTHAL:  That's correct, your Honor.  So this

22    introduces before the jury complex questions that otherwise

23    have no businesses in this trial.  Like, for example, what due

24    diligence is.  What the parties on different sides of an

25    international investment transaction typically review and why

O5S3MEN1

1      they do so, etc., etc.

2              No one, to my knowledge, had any intention of

3      introducing those concepts to this jury, and they're not

4      relevant to the allegations here.  Which again, as we've

5      discussed before, are that Mr. Daibes wanted Mr. Menendez to

6      take actions to assist Mr. Daibes.  Once the deal actually was

7      consummated, the nature of the involvement of lawyers and how

8      the due diligence was effectuated, if it was, is well beyond

9      the scope of those allegations.

10             The only purpose in our view for putting this in front

11     of the jury would be to confuse the jury.  That is to suggest

12     that because lawyers were involved, and indeed lawyers at at

13     least one reasonably prominent firm, the deal somehow must have

14     been legitimate.

15             But the government is not arguing that the deal is

16     illegitimate, and as the Court is no doubt aware, there is

17     uniform case law to my knowledge that one cannot simply put in

18     front of the jury deal documents and the fact of lawyers'

19     involvement, because juries have difficulty discerning what

20     exactly that's designed to show.

21             THE COURT:  To my knowledge, the issue of lawyer

22     involvement has never come up so far.

23             MR. RICHENTHAL:  Correct.  Literally the first time we

24     saw this.

25             THE COURT:  In various motions.

O5S3MEN1

1          MR. RICHENTHAL:  Correct, your Honor.  And to put a

2     finer put on it, we asked, as the Court knows, for advice of

3     counsel defense, we were told there was no such defense.  The

4     first time we learned there would be any e-mails or other

5     correspondence of this nature, that is back and forth between

6     international counsel, was last night at approximately

7     11:30 p.m.

8          THE COURT:  Thank you.  What about 387?

9          MR. RICHENTHAL:  387 appears to be, for lack of a

10    better word, a deal book or presentation regarding a particular

11    development.  The pertinent development here, the Court is well

12    aware I'm sure, that the fact of that development has already

13    been testified about at a summary level.  The deal book or what

14    I'll call the presentation, however, contains extremely

15    detailed financial type data.

16          I am having the paralegal Mr. Hamill scroll through as

17    the Court is looking.  I'd ask the Court to pay attention in

18    particular, those are photos, that's page 4.  Page 5, page 6,

19    Mr. Hamill, can you go to more text please.  So this is

20    distances to New York, etc.  I'm not sure anything like that

21    has come in, but it is reasonably innocuous.  As we keep going

22    we are now on page 7.

23          Page 8.  So this contains valuation summary, massing,

24    unit mix, etc.  These are complicated real estate terms,

25    including valuation details.  It is entirely unclear to us what

O5S3MEN1

1  purpose this could offer to the jury, except, once again, to

2  suggest somehow that the deal is inherently legitimate, when

3  the government was never arguing it was illegitimate.  There

4  has been no testimony about property valuation.  There is no

5  sense of whether --

6         THE COURT:  The government is arguing, I take it, that

7  the agreement, the conspiracy in this regard was between Daibes

8  and Menendez for Menendez to assist Daibes in consummating the

9  deal.  Is that right?  In exchange for bribes?

10        MR. RICHENTHAL:  To assist Mr. Daibes in getting the

11  deal.  I don't know that I would say consummate.

12        THE COURT:  I think that's right.  He wasn't going to

13  close the deal.  That wasn't the issue.

14        MR. RICHENTHAL:  Yes.  To be more precise, as the

15  Court knows, the allegations are that Mr. Daibes suggested to

16  Mr. Menendez things Mr. Menendez could do, and Mr. Menendez

17  accepted things of value following that suggestion.  We have

18  never alleged that Mr. Menendez in fact caused the deal to

19  occur or somehow was involved in the deal itself.

20        But my point is actually more narrow than that.  Which

21  is even if somehow there was some fair game on the periphery to

22  those things, this is detailed real estate valuation and

23  pricing.  This is confusing.  And the only inference from what

24  I can tell would be to suggest to the jury somehow there is an

25  inherent legitimacy to the deal.

O5S3MEN1

1              We are not arguing the deal is illegitimate.  We are

2    arguing that Mr. Menendez agreed to and promised to take steps

3    to help Mr. Daibes, who was having trouble getting financing.

4              THE COURT:  And again, on direct, you are not going to

5    get into Qatar with her.

6              MR. RICHENTHAL:  My understanding from Mr. Mark is

7    that he is not going to get into Qatar with Ms. Maali.

8              MR. WEITZMAN:  Yes, your Honor.  Thank you.

9              Due diligence is not a complicated topic.  It is done

10   on every deal.  We have one of the more educated juries here.

11   We have, I believe we have consultants, bankers, doctor.  We

12   can define due diligence very easily.

13             THE COURT:  What's the relevance?

14             MR. WEITZMAN:  The relevance --

15             THE COURT:  What is the relevance of due diligence for

16   this jury?

17             MR. WEITZMAN:  The relevance is as follows.  The

18   government would like to paint a very simple picture.  Heritage

19   invested in Daibes' deal, Menendez did these acts, a Senate

20   Resolution and certain chairman statements in order to

21   incentivize Heritage or make it helpful for them to invest in

22   the deal.

23             When in reality, Heritage invested -- and I opened on

24   this, your Honor -- for totally independent reasons, having

25   nothing to do with Senator Menendez.  And that's important

1    because it goes to Mr. Daibes' mens rea and arguably

2    Mr. Menendez's.  But Mr. Daibes knows that they are engaged in

3    18 months of due diligence.  They've hired lawyers from

4    Greenberg Traurig, they've hired financial consultants, they've

5    hired architects.  They are doing a real inquiry into whether

6    to invest.

7              The notion in Mr. Daibes' mind or Mr. Menendez's mind

8    that some chairman statement is going to make Heritage, which

9    is independent of the Qatari government, invest in the deal is

10   nonsensical.

11             So we need to explain to the jury how this deal

12   actually gets put together.  It is not based on a chairman

13   statement.  It is because they investigated it for 18 months.

14   We planned to call --

15             THE COURT:  I assume, I don't know, but I assume -- am

16   I wrong, wasn't 387 put together by Daibes?

17             MR. WEITZMAN:  No.  387 is put together by Heritage.

18   It's put together by their consultants.  I'm happy to redact

19   the page of valuation.  I don't need to get into the valuation.

20   We will get into it in our defense case, because we are going

21   to call witnesses to explain the Heritage process.

22             Make no mistake, it is the government, your Honor,

23   that plans to call a lawyer in their case.  They plan to call

24   someone from Skadden who represents Heritage.  That's what

25   they've informed us.  Now, if that's the case, it is not us

O5S3MEN1

1    injecting a lawyer, although we do intend to do so because we

2    believe that the existence of the due diligence actually goes

3    to the defendant's scienter.

4         There is no reason to bribe -- to issue a chairman

5    statement that everybody and every politician was issuing, when

6    Heritage, an independent entity, was engaged in legitimate due

7    diligence and the jury needs to understand how this works.

8         MR. DE CASTRO:  Judge.

9         THE COURT:  I understand.  Sir, you want to add?

10         MR. DE CASTRO:  If I can add.  So, what the government

11   is calling due diligence and saying this is a term that's so

12   difficult for the jury to understand is really just background.

13   And so, they want this investigation -- excuse me, they want

14   this deal to be in evidence, but yet they don't want any

15   background regarding the deal.  First of all, that's unfair.

16   It's prejudicial.  The fact that there was due diligence

17   done -- forget the term.  Just the fact that the parties got

18   together, they shared information, and they decided one way or

19   the other to go into business together, is relevant and

20   important.  We opened on it as well.

21         And we intended, well, now that we know she's not

22   getting into Qatar, we intended to discuss that with Ms. Maali

23   as well.  I also I wanted to add that point and --

24         THE COURT:  You are not going to do it on cross if

25   it's not gone into on direct.

O5S3MEN1

1          MR. DE CASTRO:  Now no.  I did want to discuss the

2     scope issues that the government brought up earlier.  But I can

3     do that after if you want to finish this thread and we can talk

4     about that.

5          THE COURT:  Yes, sir.

6          MR. RICHENTHAL:  A few things.  First, the lawyer we

7     are calling was not -- let me say again -- not the lawyer on

8     the transaction.  The lawyer we are calling, we are only

9     calling because the defense refuses to stipulate to

10    authenticity of basic documents from Heritage.  So we are

11    calling a lawyer who can authenticate those documents.  The

12    lawyer, to my knowledge, has no knowledge of the transaction

13    itself, and is not being called for that purpose, because as

14    I've said, we are not getting into the nature of the

15    transaction.

16         Second, with respect to the PowerPoint on your right,

17    which is the document we are talking about, I am not aware of

18    any evidence whatsoever that Mr. Menendez at any point prior to

19    receiving discovery in this case literally knew this document

20    existed.  Never mind relied on it.  So it obviously doesn't go

21    to his scienter.

22         And third, the allegation in the indictment could not

23    be more clear.  It is not that Mr. Menendez acted to assist

24    Heritage.  That's not in the indictment.  It is Mr. Menendez

25    promised and agreed to take actions with respect to the country

1    of Qatar, to assist Mr. Daibes getting financing, as it turned

2    out, from Heritage, because Heritage is connected to the

3    country of Qatar.

4         If this went to Mr. Menendez's understanding somehow

5    of what I just said, that is the connection or lack thereof

6    between Heritage and Qatar, perhaps we would be having a

7    different discussion.  This is a document that doesn't go to

8    that.  To my knowledge, again, Mr. Menendez never saw it until

9    we produced it in discovery, so it doesn't go to his scienter.

10        MR. WEITZMAN:  Your Honor, just one quick point.  The

11   government doesn't, as we understand it in their witness list,

12   doesn't plan to call any witnesses with any relevant knowledge

13   about this entire supposed scheme.  They will call one witness

14   which is someone from Skadden to introduce documents, and they

15   will make arguments.  They want the jury and have been dying

16   for the jury to hear nothing about that.  That deprives us of

17   our defense.

18        THE COURT:  I understand.  But what Mr. Richenthal

19   said was the allegations do not concern this deal, they concern

20   efforts that Menendez made in regard to Qatar.  Not the deal.

21   And they're separating out Qatar from the deal.

22        MR. WEITZMAN:  Correct.  Although he did say, your

23   Honor, Heritage is connected to the country of Qatar.  That's a

24   quote.  And that's not accurate.  That's why we wanted the

25   Rule 15 depositions.  Because Heritage, other than the fact

O5S3MEN1

1    that it invests the money of a Qatari national, has no

2    connection to the government of Qatar.

3        THE COURT:  We don't haven't to get into that now.

4    But the Qatari national I think is a Sheikh Sultan or Sultan

5    Sheikh and is a member, a high-ranking member of the Qatari

6    royal family.  I'm not sure you can draw that distinction that

7    you are trying to draw.

8        MR. WEITZMAN:  We are entitled to try in our defense

9    and we are entitled to defend whether it makes sense for these

10   two to conspire, as the government charges, to pass a

11   chairman's resolution in order to incentivize an unconnected

12   entity to invest in a deal when they are engaged in 18 months

13   of due diligence and actual legitimate work, spending what I

14   assume was millions of dollars to get under the hood and kick

15   the tires of this investment.

16       If the jury doesn't understand that, then they will

17   fall prey to an oversimplified narrative, which is what the

18   government wants them to do.

19       THE COURT:  Last round.

20       MR. RICHENTHAL:  One small point.  Chronology matters

21   here.  Mr. Hamill, can you go to the first page of the

22   PowerPoint.  This is October 2022.  Not only is there no

23   evidence to my knowledge Mr. Menendez knew about this

24   PowerPoint, this is after the beginning of the allegations I've

25   talked about.

O5S3MEN1

1          To be clear, Mr. Menendez did play a role in

2   introducing Heritage to Mr. Daibes.  We've always said that.

3   But introducing Heritage to Mr. Daibes and agreeing and

4   promising to take actions to benefit the government of Qatar is

5   very different from a contemporaneous awareness of the

6   specifics of the deal thereafter.  And what happens thereafter

7   in any event cannot bear on what he agreed to do beforehand.

8          MR. WEITZMAN:  Even if that were correct, it doesn't

9   address, which the government has not addressed, it does go to

10  Mr. Daibes' scienter.  Which there has to be a meeting of the

11  minds and those are the two that are charged.

12         THE COURT:  This discussion has been helpful.  It is

13  actually at this point unnecessary.  She's not going to be

14  asked about Qatar, so I would not allow Qatar information come

15  to in on cross-examination.  But this has helped educate me.

16         What other issues are there, if any?  Yes, sir, you

17  wanted to add something.

18         MR. DE CASTRO:  I want to respond to the scope issues

19  on gift giving.  So, first, I want to point out, one, that the

20  government in its direct examination of Ms. Maali brought out

21  at transcripts 962, 965-66 Ms. Maali's job responsibilities at

22  Daibes Enterprises.  They talked about what she does on a daily

23  basis, they talked about her writing checks from bank accounts

24  for him, personal accounts, and I suspect they are going to go

25  into a little greater detail as to the gold he collects.  They

O5S3MEN1

1    already brought that out.  The gold he keeps at his home.

2              THE COURT:  That's a separate issue from gift giving.

3              MR. DE CASTRO:  Well, it could be.  But we intend to

4    bring out that he gives gifts of gold.  Your Honor ruled in the

5    pretrial final pretrial conference and stated the following.

6    "In regard to Mr. Daibes, he argues he wants to put in the fact

7    that he is a habitual gift giver.  It seems to me that can come

8    in.  However, I mean, if it is admissible, I don't have any

9    objection to that.  I assume the government doesn't either.

10   That's my ruling there."  Then the government reaffirmed the

11   relevance issue.

12             They brought out her job responsibilities.  A huge

13   part of her job responsibilities is personally involved, she's

14   personally involved with Mr. Daibes' gift giving on all

15   different fronts.  And so, I don't see a scope objection at

16   all.  I think they brought it out already and we should be

17   entitled to go into it.

18             THE COURT:  I'll look at those pages of the

19   transcript.  Government?

20             MR. RICHENTHAL:  Very quickly.  I think I was the one

21   who responded at the time.

22             Yes, habitual gift giving, which is the quote in the

23   transcript, is a character trait.  The defense is allowed to

24   elicit relevant character traits.  I think at the time we said

25   we agree.

O5S3MEN1

```
 1              The distinction we are trying to draw and the law
 2    draws is between character traits and specific instances in
 3    conformity therewith.  Our understanding is that the defense
 4    does not simply intend to ask Ms. Maali, or for that matter any
 5    other witness, is Mr. Daibes a gift giver.  But to do this
 6    differently, what they intend to do, specifically, as we
 7    understand it, is literally ask her specifics.  Did he give
 8    gifts to this person.  Did he give gifts to that person.  Were
 9    they gold, were they not gold.  That is in our judgment
10    crossing the line between, as was said in the pretrial
11    conference, habitual gift giving that is a character trait, to
12    specific instances in conformity therewith.
13              THE COURT:  Is that 404(b)(1) evidence of any other
14    act is not admissible to prove a person's character in order to
15    show that on a particular occasion, the person acted in
16    accordance with the character.
17              MR. RICHENTHAL:  That's our view, your Honor, yes.
18              MR. DE CASTRO:  Well, Judge.
19              THE COURT:  That's correct.
20              MR. DE CASTRO:  They didn't object to it at pretrial.
21    Second, they are going to bring out on direct that Mr. Daibes
22    bought, for example, Nadine Menendez a purse.  And during that
23    exact transaction, he then bought Ms. Maali a purse as well.
24    They're trying to prevent it because they know it's coming and
25    they want -- they're concerned about it, even though they are
```

1  going to bring out gift giving and they are just calling it a

2  bribe.

3        THE COURT:  Let's see.

4        MR. DE CASTRO:  We're calling it gift giving.

5        THE COURT:  Let's see what they are doing.

6        MR. MARK:  Your Honor, we don't intend to introduce

7  that in her direct.  This is the line that your Honor also drew

8  with Ms. Mierna Hanna, which is we did not object to the

9  question of the character trait of gift giving.  We did object

10 to the specific instances.  And that's the objection your Honor

11 sustained with her, and that's the same line your Honor should

12 draw with Ms. Maali.

13        Page 960 of the transcript.

14        THE COURT:  Thank you.

15        MR. DE CASTRO:  What they are doing now is we are not

16 going to bring that out now, but we'll bring it in through a

17 summary witness where there's messages about Mr. Daibes buying

18 this purse for Ms. Menendez, when we have a witness who was

19 present.  Not only when Ms. Menendez was requesting it, or

20 asked for it, that purchased it with him.  And the thought we

21 can't get into that with the actual witness that's present

22 because they're choosing strategically to not do it is unfair

23 and prejudicial.

24        THE COURT:  I think you can, if need be, make her your

25 witness.  But I have trouble with the 404(b)(1) issue.

1          MR. RICHENTHAL:  If the defense believes specific

2    instances we have elicited is not placed in context, obviously

3    we have no objection to them trying to place the instance in

4    context.

5          But our understanding of what they intend to do is go

6    well beyond anything we are putting in, and essentially and go

7    beyond Rule 405 which I would direct your Honor to, which talks

8    about limitations on proving of character, to try to elicit

9    Mr. Daibes' character through specific instances far afield

10   from this particular purse.

11         THE COURT:  All right.  If those are the issues.

12         MR. MONTELEONI:  Your Honor, and this is a minor

13   housekeeping issue.  Two things.  One, I've talked with defense

14   counsel.  As a way of speeding up the introduction of evidence

15   in connection with our first summary witness, Special Agent

16   Coughlin this afternoon.

17         THE COURT:  He is going to go on this afternoon?

18         MR. MONTELEONI:  Yes.  Depending on I suppose how long

19   Ms. Maali's testimony takes, but he is going next.

20         THE COURT:  How long is the direct, remainder of the

21   direct on Ms. Maali?

22         MR. MARK:  I expect if it goes quickly, it could be 20

23   minutes or less.

24         THE COURT:  Go ahead.

25         MR. MONTELEONI:  So, we are going to be, obviously, in

O5S3MEN1

1   order to allow him to introduce the chart, we are going to be

2   introducing the underlying exhibits and as well as some others

3   he'll be testifying about.  For several of them we are going to

4   offer them into the record in the normal way.  But what we've

5   discussed with defense, they don't object to, is we have

6   prepared a list of a number of them that are being admitted

7   pursuant to stipulation.  We have numbered the list, if we

8   provide the list to the court reporter, then we would propose

9   that we on the record just offer the list and the exhibits and

10  not read.

11          THE COURT:  As long as you have a number for the list.

12          MR. MONTELEONI:  Yes, the list is going --

13          THE COURT:  Agreed.  That's an efficient way to do it.

14          MR. MONTELEONI:  Thank you, your Honor.  And also we

15  intend to put up a board with some photographs.  We would ask

16  the Court's permission to find an appropriate location for it.

17  We would suggest over in that area just to let the jury follow

18  along.

19          THE COURT:  Are there issues about the photographs?

20  They will be in evidence.

21          MR. MONTELEONI:  We understand they will be.  The

22  defense has stipulated to their authenticity.

23          THE COURT:  What's your issue?

24          MR. MONTELEONI:  The mechanics of putting a physical

25  object.  We were proposing to put it over by the interpreters.

O5S3MEN1

1          THE COURT:  It seems to me okay.  I have no idea how

2     big this board is.  We'll make sure we don't block the jurors'

3     way.  What else?

4          MR. MONTELEONI:  That's all I have.

5          THE COURT:  How long is the cross on Maali?  To the

6     extent anyone knows it.

7          MR. WEITZMAN:  From us it be it will be very short,

8     10, 15 minutes.

9          MR. DE CASTRO:  Again, depending on scope, maybe half

10    hour, 40 minutes.

11         MR. LUSTBERG:  Shorter.  15 minutes.

12         THE COURT:  Let's try to get the summary witness on.

13    Who are the witnesses for the next two days?

14         MR. MONTELEONI:  We think it's all going to be Special

15    Agent Coughlin.  We are going to be moving very efficiently,

16    but there is a lot to cover.

17         THE COURT:  Where are we in terms of where the

18    government thought we would be in this trial in terms of our

19    five to six weeks?

20         MR. MONTELEONI:  We're not at schedule yet, but we've

21    been making adjustments during this period to try to get back

22    to schedule.  I think right now it is fair to say we're

23    slightly behind, but we've been doing a tremendous amount of

24    effort to try to catch up.

25         THE COURT:  Let's catch up.

O5S3MEN1

1              MR. WEITZMAN:  There is one issue that I raised with

2     the government but I have not heard a further response, which

3     is that the exhibit that they are offering consistent with your

4     Honor's ruling has blacked out lines where the speech and

5     debate entries would otherwise be.  We think your Honor's

6     ruling was that you should remove the lines and not let the

7     jury speculate as to what was there.  And we've asked them to

8     do so.

9              THE COURT:  You are arguing over something at this

10    level, sir?

11             MR. WEITZMAN:  Well, it will result in speculation.

12    There's just no reason for it.  Other than to want the jury to

13    speculate.  There are some lines they've taken out like "Bob

14    signed off on this."

15             THE COURT:  The government should be consistent.  It

16    seems to me -- I think I already have told the jury what

17    redaction is and it means it is not relevant to them.  And

18    presumably, they are going to be a lot of exhibits that have

19    redactions now.  I don't see why this should be different.  But

20    the government should be consistent in whether it is blacking

21    things out or removing them.

22             MR. MONTELEONI:  Yes, your Honor.  We have been

23    consistent.  The line that Mr. Weitzman is referring to that he

24    thinks we took out, we didn't.  It is actually there were two

25    comments in that line.  "I'm sending you an article" and "Bob

O5S3MEN1

1    had to sign off on this."

2          And our proposal, which in our motion for

3    reconsideration keeps that line, and so therefore we prepared a

4    version with that line.  But then in the version, if the Court

5    does not grant reconsideration, then there is a strike through

6    in that line.

7          And look, there a reason for it, we obviously don't

8    like to present redacted documents to the jury if we have any

9    choice.  But an exhibit of this length, we have to get the

10   pages exactly right in Trial Director.  We can't be messing

11   with the pagination at this late time.  So we thought the only

12   feasible thing to do would be to strike out those lines

13   consistent with the Court's ruling if there is no

14   reconsideration in this manner.  We were not doing this for

15   gamesmanship.

16         THE COURT:  I'm not concerned about the redactions

17   insofar as there have been and presumably will be redactions.

18   The jury knows what redactions are.

19         But the parties really have got to find a modus

20   vivendi, a way of operating here on things of that nature.

21         I'll see everybody at 1 o'clock.  I do want to talk to

22   one lawyer for each side briefly.

23         1 o'clock.  Thank you.

24         (Recess)

25         (Continued on next page)

O5sWmen2

AFTERNOON SESSION

1:00 p.m.

3    (Jury not present)

4    THE COURT:  Bring the jury in.

5    The jury is here.  As always, they're very prompt.

6    MR. FEE:  Your Honor, we have one issue.

7    THE COURT:  You may be seated in the back.

8    MR. FEE:  Mr. Monteleoni said that they wanted to put

9    up a physical, blown-up picture.  It's the first we've heard of

10   it.  We asked him to show it to us.  He did.  It's essentially

11   a series of mug shots or face photos, unframed, and we would

12   object to that.  It's a form of argument.  It's certainly not

13   appropriate through the FBI agent summary witness, who has no

14   personal knowledge of those people.

15   THE COURT:  Let me see it.  This is simple.

16   MR. MONTELEONI:  So, your Honor, this is the board.

17   These are the photographs that have been agreed to.  We're

18   going to put up the photographs.

19   THE COURT:  They're agreed to be in evidence.

20   MR. MONTELEONI:  Sorry.

21   The defendants have stipulated to their authenticity.

22   THE COURT:  OK.

23   MR. MONTELEONI:  And they did not raise any objection,

24   besides Hana's, which you overruled last week, to the photos

25   themselves.  They're DMV or, in some cases, visa record photos;

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

O5sWmen2

1    in Menendez's case it's a public source photo.  And they

2    provide a visual reference to the jury whom we're going to be

3    introducing as we introduce characters in what we expect is

4    going to be a lengthy scheme involving a number of different

5    individuals, including a number of different individuals who

6    share the same first names.  So all of the same reasons --

7            THE COURT:  I understand.

8            MR. FEE:  At a minimum, your Honor, they should not be

9    putting in photos of the defendants.  No one needs a visual

10   reference for the defendants in this courtroom.  It is a form

11   of argument.  They're going to put Senator Menendez at the top.

12           THE COURT:  No, no.  They're not going to do that.

13           MR. FEE:  They are, your Honor.

14           THE COURT:  No.

15           MR. MONTELEONI:  So, we were planning on including the

16   defendants' photos.  Really there's going to be a row of the

17   defendants and Nadine Menendez.  It was going to be the top

18   row.  If it's important for it to be the bottom row, that

19   doesn't really matter.  There's going to be a row of other

20   individuals that are sort of from a different country and then

21   a row of other, domestic individuals, all just so the jury can

22   keep track as, I think, potentially hours of testimony of

23   documents unfold these individuals.  There's no lines.  There's

24   no connections.

25           THE COURT:  I'm going to allow it.  I don't want it as

O5sWmen2

1    Menendez or the defendants at the top of some scheme or

2    anything of that nature.

3              MR. MONTELEONI:  We'll put them on the bottom.

4              THE COURT:  All right.  Bring the jury in.

5              Let me see those pictures again.

6              All right.  They're not your standard mug shots.

7    They're, by and large, smiling.  They're almost publicity

8    photos, PR.  They're not actually, but it's not your standard

9    mug shot.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  You may be seated in the courtroom.

3            Put your witness on the stand.

4    JAMELA MAALI, resumed.

5            THE COURT:  Good afternoon, Ms. Maali, and welcome.

6            You understand you remain under oath.  Is that

7    correct?

8            THE WITNESS:  I do.

9            THE COURT:  Thank you.  Please move your chair up so

10   you can speak directly into the microphone.

11           We now will continue with the direct examination of

12   Ms. Maali by Mr. Mark on behalf of the government.

13   DIRECT EXAMINATION CONTINUED

14   BY MR. MARK:

15   Q.  Good afternoon, Ms. Maali.

16   A.  Good afternoon.

17   Q.  Do you remember testifying last week about who worked at IS

18   EG Halal?

19   A.  I do.

20   Q.  Do you remember testifying that when the business started

21   there were three employees -- you, Wael Hana and Rony Daibes,

22   Fred Daibes's cousin?

23   A.  Correct.

24   Q.  And you testified that when you finished working at IS EG

25   Halal in early 2020, there were about 10 or 15 employees in the

1    United States.  Is that correct?

2    A.  Correct.

3    Q.  You testified last week that you were an office manager for

4    IS EG while you worked there.  Is that right?

5    A.  Yeah.

6    Q.  I want to focus on 2019.  At that time was your

7    understanding that all of IS EG's employees in the United

8    States worked in the same office where you worked in New

9    Jersey?

10   A.  In the United States?

11   Q.  Yes.

12   A.  Yes.

13   Q.  Now I want to switch topics, Ms. Maali.

14       Do you know anyone named Nader Moussa?

15   A.  I know of him.

16   Q.  Were you -- did you meet him?

17   A.  I have.

18   Q.  Who introduced you to Nader Moussa?

19   A.  Mr. Hana.

20   Q.  Based on your conversations with Mr. Hana, did you

21   understand that Mr. Hana and Nader Moussa were friends?

22   A.  From my understanding, yes.

23       MR. MARK:  Mr. Hamill, would you please show for the

24   witness, the parties and the Court only what has been marked

25   for identification as Government Exhibit 2A-22.

O5sWmen2                        Maali - Direct

1    Q.  Ms. Maali, do you recognize who is depicted in this
2    exhibit?
3    A.  I mean I'd like to say that's Nader, but I don't remember.
4    Q.  Does that look similar to the person you knew as Nader
5    Moussa?
6    A.  Yeah.
7            MR. MARK:  The government offers Government Exhibit
8    2A-22.
9            THE COURT:  Admitted, without objection.
10           (Government Exhibit 2A-22 received in evidence)
11           MR. MARK:  Mr. Hamill, could you briefly publish that.
12   Q.  Ms. Maali, last week you also testified that you knew
13   Nadine Menendez.  Is that right?
14   A.  Correct.
15   Q.  And you testified that you wrote several checks from
16   Mr. Hana to Nadine's company, Strategic International Business
17   Consultants LLC, is that right?
18   A.  Correct.
19   Q.  At the time you worked for Mr. Hana, you were not aware of
20   any work Nadine did for IS EG Halal, were you?
21   A.  No, I wasn't.
22   Q.  While you worked for IS EG Halal, you never saw Nadine do
23   any work for IS EG Halal, did you?
24   A.  I did not.
25   Q.  While you worked for IS EG Halal, you never saw any

O5sWmen2                              Maali - Direct

1    documents created by Nadine for IS EG Halal, did you?

2              MR. WEITZMAN:  Objection.  Leading.

3              THE COURT:  I will allow that.  We had a discussion

4    about this earlier today.

5              Go ahead.

6    A.  I'm sorry.  Repeat the question?

7              MR. MARK:  Of course.

8              THE COURT:  Did you ever see any documents created by

9    Nadine for IS EG Halal?

10             THE WITNESS:  I have not.

11   BY MR. MARK:

12   Q.  And while you worked for --

13             THE COURT:  You know what?  At this stage, ask in a

14   nonleading manner.  At this stage.

15             Mr. Weitzman, you're correct.

16             MR. MARK:  Mr. Hamill, please show for the witness,

17   the parties and the Court only what has been marked for

18   identification as Government Exhibit 5A-1001A through C.

19   Q.  Ms. Maali, do you recognize these exhibits?

20   A.  I do.

21   Q.  What are they?

22   A.  Checks that were written out to Nadine's business.

23             MR. MARK:  The government offers Government Exhibit

24   5A-1001A to C into evidence.

25             THE COURT:  Hearing no objection, admitted.

1          (Government Exhibits 5A-1001A, 5A-1001B and 5A-1001C

2   received in evidence)

3          MR. MARK:  Mr. Hamill, could you publish Government

4   Exhibit 5A-1001A.

5   Q.  Ms. Maali, this is one of the checks you signed for

6   Mr. Hana from IS EG Halal to Nadine's company, correct?

7   A.  Yup.

8   Q.  How many checks did you sign for Mr. Hana from IS EG Halal

9   to Strategic International Business Consultants?

10  A.  I believe three, from what I see.  That's what I can

11  remember.

12  Q.  How much were each of these checks for?

13  A.  $10,000.

14  Q.  What did you do with these checks after you signed them?

15  A.  I placed them on Mr. Hana's desk.

16  Q.  Now, Ms. Maali, last week you testified that Mr. Daibes

17  kept gold, is that right?

18  A.  Correct.

19  Q.  To your knowledge, did Mr. Daibes keep an inventory of the

20  gold he had?

21  A.  He did.

22  Q.  Who helped Mr. Daibes prepare the gold inventory?

23  A.  I did.

24  Q.  Who asked you to prepare the inventory of Mr. Daibes's

25  gold?

1    A.  Mr. Daibes.

2    Q.  How did you prepare the inventory of Mr. Daibes's gold?

3    A.  We sat down, he put the gold in front of us and we wrote

4    down serial numbers and the manufacturer.

5    Q.  Did you ever make changes or updates to the inventory of

6    Mr. Daibes's gold that you maintained?

7    A.  When he would tell me about it, I would make changes.

8    Q.  And how would you go about making changes to the inventory?

9    A.  If he would buy more inventory or more gold, he would tell

10   me I purchased ten more coins or 15 wafers, and I would add

11   that to the spreadsheet.

12   Q.  When you recorded information to the gold inventory make

13   changes, did you try to do so accurately?

14   A.  I tried to.

15   Q.  Prior to September 2023, when was the last time you recall

16   updating the gold inventory for Mr. Daibes?

17   A.  2019.

18   Q.  Now, you mentioned that Mr. Daibes asked you to add items

19   to the gold inventory?

20   A.  Correct.

21   Q.  Did he ever ask you to remove items from the gold

22   inventory?

23   A.  Not that I could recall.

24          MR. MARK:  Mr. Hamill, could you please show for the

25   witness, the parties and the Court only what has been marked

1  for identification as Government Exhibit 3D-6.

2  Q.  Ms. Maali, do you recognize this exhibit?

3  A.  I do.

4  Q.  What is this exhibit?

5  A.  That's the gold inventory we created.

6        MR. MARK:  The government offers Government Exhibit

7  3D-6 into evidence.

8        THE COURT:  Admitted.

9        (Government Exhibit 3D-6 received in evidence)

10        MR. MARK:  Mr. Hamill, could you please publish this

11  exhibit.

12  Q.  Ms. Maali, you said this is the gold inventory you prepared

13  for Mr. Daibes?

14  A.  Correct.

15  Q.  Directing your attention to the top left of the document,

16  do you see where it says FAD in all caps?

17  A.  I do.

18  Q.  What does FAD stand for?

19  A.  Fred Assad Daibes, Mr. Daibes's initials.

20  Q.  Directing your attention to the first line, do you see

21  where it says kilo bars?

22  A.  I do.

23  Q.  How many kilogram bars of gold does the inventory list?

24  A.  24.

25  Q.  Directing your attention down the inventory to where it

O5sWmen2                        Maali - Direct

1  says one-ounce wafers, how many one-ounce wafers of gold does

2  the inventory list?

3  A.  412.

4  Q.  Does this inventory also reflect the brand and serial

5  numbers for the gold Mr. Daibes had?

6  A.  It does, further down.

7  Q.  And how did you get the information to list for the brand

8  and serial number for the gold?

9  A.  The serial number's imprinted on the gold bars as well as

10  the manufacturer.

11        MR. MARK:  Mr. Hamill, could you please take us to the

12  middle of page 2 in Government Exhibit 3D-6.

13  Q.  Ms. Maali, could you please read in the middle of the page

14  the words in all caps in the box?

15  A.  Kilo bars.

16        MR. MARK:  Mr. Hamill, could you put up Government

17  Exhibit 1F-1164 to the right side by side with this exhibit.

18        Now, Mr. Hamill, could you zoom in on Government

19  Exhibit 1F-1164 on the big bar on the left.

20  Q.  Ms. Maali, could you read the words in the oval?

21  A.  Swiss Bank Corporation.

22  Q.  And now above the oval, can you read that number?

23  A.  59005.

24        THE COURT:  Do that again, please.

25        THE WITNESS:  590005.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5sWmen2                        Maali - Direct

1    BY MR. MARK:

2    Q.  Now, looking at Government Exhibit 3D-6 on the Fred Daibes

3    gold inventory on the right that you prepared --

4            MR. MARK:  Mr. Hamill, could you please scroll down to

5    the bottom of page 2, top of page 3.

6    Q.  -- Ms. Maali, could you please read the brand that's listed

7    there?

8    A.  Swiss Bank Corp.

9    Q.  And on the second line of the third page under Swiss Bank

10   Corp., in the kilo section, could you please read that number

11   in the second line?

12   A.  590005.

13   Q.  Is that the same serial number you just read from the gold

14   bar in Government Exhibit 1F-1164?

15   A.  It is.

16           MR. MARK:  Mr. Hamill, could you please take down

17   1F-1164 and put up Government Exhibit 1F-1239.

18           Are you able to rotate the exhibit on the left,

19   Mr. Hamill?

20           And Mr. Hamill, could you please zoom in on the big

21   gold bar in the middle and the top.

22   Q.  Ms. Maali, could you read the words at the top of the oval

23   of this bar?

24   A.  Probably wouldn't be able to pronounce it correctly.

25   Q.  Can you just try?

O5sWmen2                          Maali - Cross

1   A.  Metaux -- I don't know.  I'm not even going to mess it up.

2   Q.  Does it look like Metaux Precieux?

3   A.  Uh-huh, I think.

4   Q.  Now, above the oval, can you read the number?

5   A.  890581.

6           MR. MARK:  Now, Mr. Hamill, on Government Exhibit

7   3D-6, could you please scroll to the middle of page 2.

8   Q.  On the right there, do you see the same brand as you saw in

9   the picture of the gold bar?

10  A.  Yes.

11  Q.  And the line below with the serial number, could you please

12  read that number?

13  A.  890581.

14  Q.  Is that the same serial number you just read from the gold

15  bar in GX1F-1239?

16  A.  It is.

17          MR. MARK:  One moment, your Honor?

18          No further questions, your Honor.

19          THE COURT:  Thank you.

20          Is there any cross-examination of this witness?

21          MR de CASTRO:  Just briefly.

22  CROSS-EXAMINATION

23  BY MR de CASTRO:

24  Q.  Good afternoon, Ms. Maali.

25  A.  Hi.  Good afternoon.

O5sWmen2                         Maali - Cross

1   Q.  On direct examination you testified about your job

2   responsibilities working for Mr. Daibes.  Do you remember that?

3   A.  I do.

4   Q.  You worked -- and you've worked for Mr. Daibes for 15

5   years, is that right?

6   A.  As his executive assistant, 13.  Two years prior in

7   management.

8   Q.  For a total 15 years and 13 years working very closely with

9   him?

10  A.  Correct.

11  Q.  Now -- and you sit right outside his office, right?

12  A.  I do.

13  Q.  And do you call him Mr. Daibes, Fred or Freddy?

14  A.  Fred.

15  Q.  Do many people call him Mr. Daibes?

16  A.  Not really.

17  Q.  He either insists on Fred or Freddy, right?

18  A.  Correct.

19  Q.  Now, would you agree with me that you're involved in almost

20  every aspect of Mr. Daibes's professional life?

21  A.  Yes.

22  Q.  And that's, that includes things like keeping his calendar?

23  A.  Yes.

24  Q.  Making sure of his schedule every day and where he's

25  supposed to be?

O5sWmen2                          Maali - Cross

1    A.  I try to, yes.

2    Q.  You answer the phone in the office as well, right?

3    A.  I do.

4    Q.  And you take messages as well?

5    A.  Yes.

6    Q.  Would you agree with me that you make sure that the office

7    has everything it needs?

8    A.  Yes.

9    Q.  And office is pretty big, right; there's a lot of

10   employees?

11   A.  There is.

12   Q.  How many employees would you say?

13   A.  Are you referring to the development side?  There's

14   different sections of the office.  If you're talking as a

15   whole --

16   Q.  As a whole.

17   A.  About 50.

18   Q.  And you also do things like arrange for lunches for

19   everybody as well, right?

20   A.  Yeah.

21   Q.  Which Mr. Daibes generally arranges, right?

22   A.  Correct.

23   Q.  Crazy question, but Mr. Daibes likes doughnuts, doesn't he?

24   A.  Yes.

25   Q.  He likes them a lot, right?

O5sWmen2                          Maali - Cross

1          THE COURT:  Let's move on.  Go ahead.

2    BY MR de CASTRO:

3    Q.  And does he bring them into the office sometimes?

4          MR. MARK:  I object.

5    A.  Yes.

6          THE COURT:  I'll allow it.

7    BY MR de CASTRO:

8    Q.  Now, you also handle some of Mr. Daibes's bank accounts as

9    well, right?

10   A.  I do.

11   Q.  His personal bank accounts, right?

12   A.  Correct.

13   Q.  Now -- and you do shopping for him as well?

14   A.  I do.

15   Q.  Over the holidays, you do a lot of holiday shopping for him

16   and his family, right?

17   A.  I do somewhat for his family.  More for the families that

18   he adopts.

19   Q.  And you help coordinate his charitable donations and causes

20   in which he's involved, correct?

21   A.  Correct.

22         MR. MARK:  Objection.

23         THE COURT:  I'll allow it.  Move on, sir.

24   BY MR de CASTRO:

25   Q.  Now, we've heard on direct examination that you also

O5sWmen2                          Maali - Cross

1    inventoried his personal gold?

2    A.   Correct.

3    Q.   And you also inventory his watches as well, right?

4    A.   Yup.

5    Q.   In fact, it's on that same exhibit?

6    A.   It's not on the same Excel spreadsheet.

7    Q.   You have it as a separate Excel sheet?

8    A.   Correct.

9    Q.   You also inventory his cars?

10   A.   Yup.

11   Q.   And you are involved in funding East-West, right?

12   A.   When I'm asked to.

13   Q.   And can you remind the jury, what is East-West?

14   A.   It's a lending company that Mr. Daibes has.

15   Q.   And he lends money to various individuals and companies,

16   correct?

17   A.   Correct.

18   Q.   And you said that what you do is, when you're directed to,

19   you fund that in order for it to disburse loans?

20   A.   Correct.

21   Q.   And you're aware that there are dozens of loans that

22   East-West has issued?

23   A.   Yes.

24   Q.   And are you aware of the interest rates that are charged on

25   those loans?

O5sWmen2                          Maali - Cross

1    A.  I'm not.

2    Q.  You are aware, though, that interest is charged, correct?

3    A.  I believe so.

4    Q.  Now, would you agree that because you perform all these

5    tasks for Mr. Daibes sort of individually and personally, that

6    you've learned a lot about him?

7    A.  I have.

8    Q.  I think you, on direct examination you testified that he's

9    family, right?

10   A.  Yup.

11          THE COURT:  Let's move on, sir.

12   BY MR de CASTRO:

13   Q.  Is Fred Egyptian?

14   A.  No.

15   Q.  Where is he from?

16   A.  Palestinian, was born in Lebanon.

17   Q.  Do you know what his religion is?

18   A.  Christian.

19   Q.  Is Mr. Daibes highly educated?

20   A.  I believe he graduated from high school.

21   Q.  And do you know how big his family is, his siblings?

22          MR. MARK:  Objection.

23          THE COURT:  Yes.  Let's move on.  Ask what she does,

24   not this --

25          MR de CASTRO:  No problem.

1  Q.  In the 13 years that you've worked closely with Mr. Daibes

2  as his personal assistant, have you observed whether Mr. Daibes

3  is generous?

4  A.  Extremely.

5  Q.  And how would you describe his generosity?

6          THE COURT:  Sustained.

7          MR. MARK:  Objection.

8  BY MR de CASTRO:

9  Q.  In general, is he generous with friends?

10          THE COURT:  Sustained.

11          MR. MARK:  Objection.

12  A.  Yes.

13          THE COURT:  The jury will disregard the answer.

14          MR de CASTRO:  OK.  Sustained means you can't answer.

15          THE WITNESS:  Oh.

16  BY MR de CASTRO:

17  Q.  In terms of his generosity over the years, are you able to

18  say, in total, how much, in general, you've seen him provide?

19          MR. MARK:  Objection.

20          THE COURT:  404(b).  Sustained.

21  BY MR de CASTRO:

22  Q.  You testified on direct examination regarding Nadine

23  Menendez and knowing her.  Remember that?

24  A.  I do.

25  Q.  And were you aware that Nadine Menendez and Fred Daibes

O5sWmen2                          Maali - Cross

1    were friends, friendly?

2    A.  Yes, they are.

3    Q.  And are you aware of a gift that Mr. Daibes gave to Nadine

4    Menendez?

5    A.  I am.

6            MR. MARK:  Objection.

7            THE COURT:  Sustained.

8    BY MR de CASTRO:

9    Q.  Are you aware of an item that Mr. Daibes provided to Nadine

10   Menendez?

11           MR. MARK:  Objection.

12           THE COURT:  Same objection.  Same ruling.

13   BY MR de CASTRO:

14   Q.  Now, has Mr. Daibes been generous with you personally?

15           MR. MARK:  Objection.

16           THE COURT:  404, 405.  Sustained.

17           Ladies and gentlemen, these references are legal

18   references.  You don't have to worry about them.  Don't look

19   them up.  It has nothing to do with the jury's area of

20   responsibility.

21   BY MR de CASTRO:

22   Q.  Does Mr. Daibes pay for things in cash sometimes?

23           THE COURT:  I'll allow that.

24   A.  Yes.

25   Q.  What kinds of things?

O5sWmen2                        Maali - Cross

1    A.  Dinners, gifts.

2    Q.  Does he give out loans sometimes in cash?

3    A.  He has.

4            MR. MARK:  Objection.

5            THE COURT:  I'll allow it.

6    BY MR de CASTRO:

7    Q.  And does he have cash in the office?

8    A.  He does.

9    Q.  Have cash on him?

10           THE COURT:  Now?  What do you mean?

11   BY MR de CASTRO:

12   Q.  While you're working with Mr. Daibes at the office, are you

13   aware of whether he has cash on him or not during work?

14   A.  I do.  He does.

15   Q.  Does?

16   A.  Uh-huh.

17   Q.  And is it a lot of cash or a little bit of cash?

18   A.  Depends.

19           THE COURT:  Go ahead.  Proceed.

20           MR. MARK:  Objection.

21   BY MR de CASTRO:

22   Q.  Thousands of dollars?

23           MR. MARK:  Vague.

24           THE COURT:  Pardon me?

25           MR. MARK:  Objection.  Vague.

```
 1              THE COURT:  Yes, it is.  I'll allow that question and
 2    that answer.
 3              Next.
 4    BY MR de CASTRO:
 5    Q.  Now, on direct examination, you discussed Mr. Daibes's
 6    extensive gold collection and you just showed it to us,
 7    correct?
 8    A.  Correct.
 9    Q.  And you're the one that writes the checks or wires the
10    money for Mr. Daibes's gold purchases.  Am I right?
11    A.  When I'm asked to, yes.
12    Q.  And you helped him create that inventory back in 2018?
13    A.  Prior to 2018.
14    Q.  And would you say he frequently buys gold?
15    A.  Yes.
16    Q.  And since you started working for him, has his gold
17    inventory increased, decreased or stayed about the same?
18    A.  I would say increased.
19    Q.  Has it increased --
20              THE COURT:  Just a moment.
21              Are you talking about what's listed on that inventory
22    or how much gold he has?
23              THE WITNESS:  He had that gold prior to me working for
24    him, but --
25              THE COURT:  The question is over the years, since you
```

O5sWmen2                          Maali - Cross

1    started working for him, has the amount of inventory increased,

2    decreased or stayed about the same?

3            THE WITNESS:  It increased.  He had a majority of it

4    prior to me working for him, and then he would buy more and I

5    would just add to it.

6            THE COURT:  Go ahead.

7    BY MR de CASTRO:

8    Q.  And there came a point in time where you stopped updating

9    the inventory, right?

10   A.  Correct.

11   Q.  But had he purchased more gold and you hadn't updated?

12   A.  Yup.

13   Q.  And what about gifting gold; does he gift gold?

14           MR. MARK:  Objection.

15           THE COURT:  Sustained.

16           MR de CASTRO:  In general, Judge.

17           THE COURT:  In general, sustained.

18   BY MR de CASTRO:

19   Q.  Are you aware of how Mr. Daibes stays on top of or is aware

20   of the price of gold at any given time?

21   A.  There's a website that he checks on his computer.

22   Q.  And are you aware of how often he checks it?

23   A.  Pretty often.  Maybe every day.

24   Q.  And you've personally seen him checking for the price of

25   gold?

O5sWmen2                          Maali - Cross

```
 1   A.   Yeah.
 2   Q.   And incidentally, do you know if gold is sold at Costco?
 3            MR. MARK:  Objection.
 4            THE COURT:  I'll allow that.  She may know.  She may
 5   not.
 6   A.   I've seen it on social media, yes.
 7   Q.   Has Mr. Daibes ever bought gold from Costco that you're
 8   aware?
 9   A.   Not that I'm aware of.
10   Q.   Now, can you say whether Mr. Daibes talks about investing
11   in gold with others?
12   A.   I know he tells people it's a great investment.
13   Q.   And you've seen him try to convince people that it is a
14   good investment?
15            THE COURT:  Sustained as to form.
16            Next question.
17   BY MR de CASTRO:
18   Q.   And who have you heard him tell?
19            MR. MARK:  Objection.
20            THE COURT:  Sustained.
21   BY MR de CASTRO:
22   Q.   Would you say that he often extols the virtues of gold?
23            MR. MARK:  Objection.
24            THE COURT:  Sustained.
25            I think you said he tells people it's a great
```

O5sWmen2                          Maali - Cross

1    investment, correct?

2              THE WITNESS:  Right.

3              THE COURT:  OK.  Move on.

4    BY MR de CASTRO:

5    Q.  And that's because the price of gold sometimes increases,

6    correct?

7              THE COURT:  Sustained.

8              Do you know why he said it's a great investment?

9              THE WITNESS:  Because he said the price of gold

10   doesn't go down.

11             THE COURT:  OK.  It just goes up, up, up, up.

12             THE WITNESS:  Uh-huh.  Correct.

13             THE COURT:  OK.

14             THE WITNESS:  Just keeps increasing.

15   BY MR de CASTRO:

16   Q.  Now, turning to IS EG Halal, you became aware of IS EG

17   Halal in 2019.  Is that about right?

18   A.  Correct.

19   Q.  When it was just starting up?

20   A.  Correct.

21   Q.  And from 2019 to the present, IS EG and Daibes Enterprise

22   has maintained separate office spaces, correct?

23   A.  Correct.

24   Q.  They were in the same building at one point but in

25   different parts of that building, right?

O5sWmen2                          Maali - Cross

1    A.  They're still in the same building.  Different offices.

2    Q.  Now, there's different entrances for each company, right?

3    A.  Correct.

4            THE COURT:  Difference entrances to the building or

5    just different doors that you walk through?

6            THE WITNESS:  It's an office building.  Each office

7    has its own entrance.

8            THE COURT:  Each office has its own entrance on the

9    ground floor to the outside?

10           THE WITNESS:  No.  Just Mr. Daibes's and Mr. Hana's

11   office on the third floor.

12           THE COURT:  I'm sorry.  Just because I've never been

13   there, I can't visualize it, and don't let me put words in your

14   mouth.  Are you saying that when somebody enters the building

15   and goes to the third floor, there are at least two doors off

16   of the elevator, one for Mr. Daibes and one for Mr. Hana?

17           THE WITNESS:  Correct.

18           THE COURT:  OK.

19           THE WITNESS:  From the outside as well, you can enter

20   IS EG Halal office or Fred Daibes's office.

21           THE COURT:  When you say from the outside, what do you

22   mean?

23           THE WITNESS:  Our office building, the main entrance

24   is on the first floor, which goes to all the other offices.

25           THE COURT:  OK.

O5sWmen2                         Maali - Cross

1          THE WITNESS:  On the third floor there's another, like

2     an up ramp that you can go up the ramp, and it goes straight to

3     both offices which have separate entrances from the outside.

4          THE COURT:  OK.  In other words, it's the same as what

5     I was visualizing, if you do the separate ramp --

6          THE WITNESS:  Uh-huh.

7          THE COURT:  -- up to the third floor and you enter the

8     third floor premises, there are at least two doors --

9          THE WITNESS:  Correct.

10         THE COURT:  -- one for Mr. Hana, one for Mr. Daibes?

11         THE WITNESS:  Correct.

12         THE COURT:  OK.  Thank you.  That's helpful.

13    BY MR de CASTRO:

14    Q.  And each one has an awning, right, and has the name of the

15    company?

16    A.  Correct.

17    Q.  So IS EG Halal is on one side and then around the corner is

18    the Daibes Enterprises entrance, right?

19    A.  Right.

20    Q.  Now, each of those businesses has separate entrances, has

21    their own receptionist, right?

22    A.  Yeah.

23    Q.  And in your experience working for both, they are very

24    different businesses, right?

25         MR. MARK:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5sWmen2                            Maali - Cross

```
 1              THE COURT:  Sustained.
 2   BY MR de CASTRO:
 3   Q.  Mr. Daibes's business involves a substantial real estate
 4   portfolio, right?
 5   A.  Correct.
 6   Q.  And he's very knowledgeable in construction -- that is,
 7   Mr. Daibes, in construction and --
 8              THE COURT:  Sustained.
 9   BY MR de CASTRO:
10   Q.  To your knowledge, does Mr. Daibes --
11              THE COURT:  She's not here to praise Mr. Daibes.
12   She's here to present facts through your questioning.
13              Go ahead.
14   BY MR de CASTRO:
15   Q.  Does Mr. Daibes, in your experience, have knowledge about
16   construction?
17              MR. MARK:  Objection.
18              THE COURT:  I'll allow it.
19   A.  He does.
20   Q.  And in your experience, does he have any involvement or
21   knowledge in the halal business?
22   A.  He does not.
23              MR. MARK:  Objection.
24              THE COURT:  I'll allow it.  To her knowledge.
25   A.  He does not.
```

O5sWmen2                          Maali - Cross

1    Q.  And when Mr. Hana was starting, first starting IS EG Halal,

2    Mr. Daibes asked you if you wanted to make some extra money and

3    work part time for Mr. Hana, right?

4    A.  Correct.

5    Q.  But he was clear that he would permit it only if it --

6                THE COURT:  Sustained.

7                MR de CASTRO:  I believe she testified to this on

8    direct.

9                THE COURT:  Yes, but it's the phrasing.  Sustained as

10   to form.  She's not adverse to you.

11               MR de CASTRO:  Yes.

12   Q.  What did he tell you about it?

13   A.  He said that I could work for Mr. Hana and make extra money

14   as long as it doesn't interfere with my job for Mr. Daibes.

15   Q.  Was he going to supervise your work for Mr. Hana?

16               THE COURT:  Sustained.

17   BY MR de CASTRO:

18   Q.  Was Mr. Daibes going to pay you at all for your work for

19   Mr. Hana?

20   A.  No.

21   Q.  Did Mr. Daibes ever ask you to complete any tasks for IS EG

22   Halal?

23   A.  No.

24   Q.  Would you agree with me that Mr. Daibes and Mr. Hana

25   interacted quite a bit around the office?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MR. MARK:  Objection.

2           THE COURT:  Well, sustained as to form.

3           Describe their interactions during the business day,

4   if you can.  That's also objectionable as to form, but I'm

5   trying to move things along.

6           THE WITNESS:  Well, sometimes Will would come over if

7   they have any questions in regards to the real estate that they

8   have together.

9   BY MR de CASTRO:

10  Q.  Was -- did you observe Mr. Hana coming to Mr. Daibes for

11  advice, for example?

12  A.  Yeah.  They're friendly like that.

13  Q.  And Mr. Daibes is in his late 60s, correct?

14  A.  Correct.

15  Q.  Mr. Hana is in his 30s, correct, at the time -- withdrawn.

16      At the time that you were starting to work for IS EG

17  Halal --

18          THE COURT:  Do you know the age of Mr. Hana

19  approximately in 2019?

20          THE WITNESS:  Yeah.  He was in his late 30s.

21  BY MR de CASTRO:

22  Q.  And Mr. Daibes was generous with his time --

23          THE COURT:  Sustained.

24  BY MR de CASTRO:

25  Q.  -- with his time with Mr. Hana?

O5sWmen2                              Maali - Cross

1           THE COURT:  Sustained.  I don't know what that means.

2           They were friendly; they would talk to each other,

3   right?

4           THE WITNESS:  Yeah.

5           THE COURT:  Mr. Hana would sometimes come into your

6   offices.

7           THE WITNESS:  He would.

8           THE COURT:  Do you know if Mr. Daibes sometimes would

9   go into Mr. Hana's offices?

10          THE WITNESS:  Rarely, but he would.

11          THE COURT:  OK.  Next.

12  BY MR de CASTRO:

13  Q.  Now, with respect to East-West Funding, to your knowledge,

14  how long has Mr. Daibes owned East-West Funding?

15  A.  I don't know.  I don't handle that checkbook.  I'm not

16  sure.  It's been years, though.

17  Q.  When you started working for him, was it in existence?

18  A.  I don't remember.

19  Q.  When do you remember the first time writing checks to

20  East-West Funding; was it in the last ten years, the last five

21  years?

22          THE COURT:  You mean checks for East-West Funding?

23          MR de CASTRO:  Yes, Judge.  Sorry about that.

24  A.  Over five years, maybe.

25  Q.  Now, you just testified a minute ago that Mr. Daibes and

O5sWmen2                          Maali - Cross

1    Mr. Hana are involved in some real estate projects together,

2    correct?

3    A.  Correct.

4              MR. MARK:  Objection.

5              THE COURT:  It's been asked and answered.  I'll allow

6    it.  I'm trying to move things along.

7              MR de CASTRO:  I only have about three questions on

8    it, Judge.

9    Q.  In those instances Mr. Daibes was selling an interest in

10   those properties to Mr. Hana, correct?

11   A.  Correct.

12   Q.  And that is that -- so Mr. Daibes would own the properties

13   and Mr. Hana was investing in them?

14   A.  Right.

15   Q.  Now, Mr. Daibes has a private jet as well, correct?

16   A.  He does.

17   Q.  And Mr. Daibes was also very generous with the use of the

18   jet, right?

19             MR. MARK:  Objection.

20             THE COURT:  Sustained.

21   BY MR de CASTRO:

22   Q.  He would let other people use his planes, right?

23             THE COURT:  Sustained.  Relevance.  404.

24             MR de CASTRO:  I think they're going to hear testimony

25   about that later on.

O5sWmen2                         Maali - Cross

1             THE COURT:  They very well may.  Ask your next

2     question.

3     BY MR de CASTRO:

4     Q.  With respect to his plane, does Mr. Daibes pay for the

5     upkeep of it?

6     A.  He does.

7     Q.  And what other expenses are involved in having a private

8     plane?  What do you have to pay for?

9     A.  Fuel, pilot.

10            MR. MARK:  Objection.  Relevance.

11            THE COURT:  Yes.  Relevance.  Move on.

12            MR de CASTRO:  Judge, I'm happy to, at sidebar,

13     explain the relevance.

14            THE COURT:  No, not now.

15            It's expensive to have your own private plane, right?

16            THE WITNESS:  Sure is.

17            THE COURT:  There are a lot of costs involved.

18            THE WITNESS:  There is.

19            THE COURT:  That's why everybody here doesn't have

20     their own private planes, correct?

21            THE WITNESS:  Correct.

22            THE COURT:  All right.  Next.  You've made the

23     point -- or I've made the point.  Next.

24            MR de CASTRO:  There is an additional point.

25            THE COURT:  Move on.

O5sWmen2                          Maali - Cross

```
 1   BY MR de CASTRO:
 2   Q.  Now, you use WhatsApp to communicate?
 3   A.  I do.
 4   Q.  It's an alternative to sort of regular texting, right?
 5           MR. MARK:  Objection.  Scope.
 6           THE COURT:  Sustained.
 7   BY MR de CASTRO:
 8   Q.  Part of your job -- do you ever use WhatsApp as part of
 9   your job?
10           MR. MARK:  Objection.
11           THE COURT:  I'll allow that.
12   A.  I don't.
13           THE COURT:  I thought you said you had three or four
14   questions, sir.
15           MR de CASTRO:  On the prior topic, on the real estate.
16           THE COURT:  All right.
17           MR de CASTRO:  I was not --
18           THE COURT:  That's all right.  Proceed.
19   BY MR de CASTRO:
20   Q.  Mr. Daibes, you would say, is a Democrat, right?
21           MR. MARK:  Objection.
22           THE COURT:  Sustained.
23   BY MR de CASTRO:
24   Q.  He supports -- Mr. Daibes supports democratic candidates in
25   New Jersey, is that correct?
```

```
 1              MR. MARK:  Objection.

 2              MR de CASTRO:  -- fund-raisers --

 3              THE COURT:  I'll allow it.

 4              You may answer.  I'm sorry.

 5   A.  Yes, he is.

 6   Q.  And he helps raise funds for democratic candidates, is that

 7   correct?

 8              THE COURT:  I'll allow it.

 9   A.  Correct.

10   Q.  And those include locally elected office as well as other

11   offices, right?

12   A.  Correct.

13   Q.  I think you testified on direct examination about a

14   fund-raiser that he did for Mr. Menendez?

15              THE COURT:  She did.  What's the next question, sir?

16   A.  I did.

17              THE COURT:  There's no question pending.  The jury

18   will disregard.

19              Next question.  This witness is here to answer your

20   questions.

21   BY MR de CASTRO:

22   Q.  For the 15 years that you've worked for Mr. Daibes, have

23   you known him to travel to Washington, D.C. often?

24              MR. MARK:  Objection.

25              THE COURT:  Scope.  Sustained.
```

1   BY MR de CASTRO:

2   Q.   You testified that you are aware that Mr. Daibes and

3   Senator Menendez have become friends over the years?

4   A.   Yes.

5   Q.   And you've observed -- you have had the opportunity to

6   observe them together, correct?

7   A.   I have.

8   Q.   Like at fund-raisers that we discussed, right?

9   A.   Correct.

10  Q.   And at informal dinners as well, is that right?

11  A.   That is right.

12  Q.   And did they appear to be close friends?

13  A.   They have.

14  Q.   Why would you say that?

15  A.   They have a long history of being friends, and I mean they

16  joke, they laugh, they hang out together.  It's a genuine

17  friendship, I think.

18          MR de CASTRO:  I have nothing else, Judge.

19          THE COURT:  All right.  Thank you, sir.

20          Anyone else?

21          Mr. Lustberg, sir.

22          MR. LUSTBERG:  Thank you, your Honor.

23          THE COURT:  How long?

24          MR. LUSTBERG:  Very brief.

25  CROSS-EXAMINATION

1    BY MR. LUSTBERG:

2    Q.  Good afternoon, Ms. Maali.

3    A.  Good afternoon.

4    Q.  You testified that you worked part time for IS EG Halal,

5    correct?

6    A.  Correct.

7    Q.  And that was for the time period from April 2019 through

8    about January 2020, right?

9    A.  Correct.

10    Q.  And that was right at the beginning of the start-up of IS

11    EG Halal, am I right about that?

12    A.  Correct.

13    Q.  And so what you did is you helped to set up the office, is

14    that right?

15    A.  That's right.

16    Q.  And you hired employees, right?

17    A.  I did help with that, yes.

18            THE COURT:  I take it -- well, did you hire employees,

19    or did you assist in the process of Mr. Hana hiring employees?

20            THE WITNESS:  I assisted in helping hire employees.

21    BY MR. LUSTBERG:

22    Q.  Thank you.  Thank you for that clarification.

23        You were sort of like an office manager at that time,

24    right?

25    A.  Correct.

O5sWmen2                          Maali - Cross

1    Q.  And you had check-writing authority, am I correct?

2    A.  I did.

3    Q.  And that's because Will was always traveling and so he

4    trusted you to write the checks, right?

5    A.  Right.

6             MR. MARK:  Objection.

7             THE COURT:  I'll allow it.  I'll allow it.

8    BY MR. LUSTBERG:

9    Q.  Did you notice Mr. -- just from your own observations, see

10   Will studying about the halal business?

11   A.  From my own observation?

12   Q.  Yes.

13   A.  I did not see him studying.

14   Q.  OK.  OK.  Did he seem to understand the business?

15            THE COURT:  Sustained as to form.

16            MR. MARK:  Objection.

17            MR. LUSTBERG:  Let me ask it a different way then.

18   Q.  What was your impression as to Mr. Hana's expertise with

19   regard to halal?

20   A.  He's --

21            MR. MARK:  Objection.

22            THE COURT:  Wait just a moment.

23            Did you ask halal questions on direct of this witness?

24            MR. MARK:  I did ask --

25            THE COURT:  All right.  I'll allow this.

1    A.  He seemed very knowledgeable.

2    Q.  Thank you.

3        You understood that he had gotten a contract, a sole-source

4    contract to do halal certification to Egypt, right?

5    A.  That's what he said, yes.

6    Q.  And you understood that Egypt got some of the money from

7    that sole-source contract, right?

8    A.  I'm sorry?  You said that I understood that Egypt got --

9    Q.  Yeah.

10   A.  I didn't understand that.

11           MR. LUSTBERG:  OK.  Let me -- if we could pull up

12   what's previously been marked -- admitted into evidence as

13   Government Exhibit 506.

14   Q.  If we could, you see the top part of that is an email from

15   you to Mr. Hana and others, right?

16   A.  Uh-huh.

17   Q.  And if you go to the --

18           THE COURT:  You have to say yes or no.

19           THE WITNESS:  Yes.

20   BY MR. LUSTBERG:

21   Q.  If you could go to the bottom part, if you could -- thank

22   you -- this talks about dividing the payment.  Do you remember

23   that?

24   A.  Vaguely.

25   Q.  OK.  What do you remember?

O5sWmen2                          Maali - Cross

1    A.  Well, now that I read it, I remember the breakdown that

2    they have.

3              MR. LUSTBERG:  OK.  Thank you --

4              THE COURT:  Did you type this?  No.  You received

5    this.

6              THE WITNESS:  I received this -- actually, I didn't

7    receive this.  I was on the -- I was put on the chain, I guess,

8    later on.

9              Can you scroll down?

10             Yeah.  I was asked to send out wire instructions, so I

11   was put on the chain afterwards.

12             THE COURT:  In other words, you understood that

13   because you see it there.

14             THE WITNESS:  Correct.

15             THE COURT:  OK.  Go ahead.

16   BY MR. LUSTBERG:

17   Q.  And I just wanted to clarify or ask a question about one

18   thing you said on direct examination.  Were you aware of the

19   relationship between Mr. Hana's company, IS EG Halal, and the

20   company called Medi Trade in Egypt?

21   A.  I didn't understand the relationship, no.

22             MR. LUSTBERG:  OK.  Thank you.

23   Q.  OK.  So when you came aboard in 2019, you arranged for

24   Mr. Hana to travel to meet all the meat producers around the

25   U.S.  Do you remember your testimony about that?

O5sWmen2                          Maali - Cross

1   A.  I helped with travel arrangements.

2   Q.  You were not on those trips, right?

3   A.  No.

4   Q.  What was the purpose of those trips, as far as you

5   understood?

6          THE COURT:  If she knows, I'll allow it.

7   A.  To make introduction to the new company that's going to be

8   certifying halal meats to Egypt.

9   Q.  As you understood it, Mr. Hana was working with the other

10  meat producers, right?

11  A.  Correct.

12  Q.  And you were asked questions on direct examination about

13  whether you had been involved in the hiring of any blessers,

14  people called blessers, at these meat producers.  Do you

15  remember that?

16  A.  I remember the question.

17  Q.  Yeah.  And you said you didn't know that, right?

18  A.  No, I don't.

19  Q.  Right.  Do you know who hires blessers, whether it's the

20  halal certifier or the meat producer?

21         MR. MARK:  Objection.  Foundation.

22  Q.  If you know.

23         THE COURT:  No.  I'll allow it, if she knows.

24  A.  I don't believe it was Will.  I don't remember --

25         THE COURT:  No, no.  That's not the question.  The

O5sWmen2                          Maali - Cross

1    question is do you know who hires blessers, whether it's the

2    halal certifier or the meat producer?  Do you know?

3    A.  From what I understood it was the meat producer.

4    Q.  Now, were you involved with helping IS EG Halal to open up

5    branches in other countries, like Uruguay, let's say?

6    A.  Was I involved?

7    Q.  Yeah.

8    A.  In what sense?

9    Q.  Were you involved in any way in the process whereby those

10   offices were opened up?

11   A.  I don't remember having any involvement, no.

12   Q.  OK.  Now, you did assist Mr. Hana in terms of having

13   certain communications with people in Egypt.  Am I right about

14   that?

15   A.  When I was asked?

16   Q.  Yes.

17   A.  Yup.

18   Q.  When you were asked.

19   A.  Uh-huh.

20            THE COURT:  You have to say yes.

21   A.  Yes.

22            THE COURT:  Or no.

23   BY MR. LUSTBERG:

24   Q.  Whichever.

25       And you were aware that Mr. Hana had relationships, various

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5sWmen2                    Maali - Cross

1   relationships with people in Egypt, am I right?

2   A.  Yes.

3   Q.  And that he would take direction from people in Egypt,

4   correct?

5   A.  You mean, like, did he answer to anybody?

6   Q.  Well, just whether he, whether there were instructions

7   given to him or, you know, any kind of direction.

8   A.  I know that he communicated a lot with people in Egypt.

9   Q.  OK.  Back for one second to, I asked you a question

10  earlier -- and Mr. Mark did as well -- about Medi Trade and

11  there was, you were asked about how there was, it said Medi

12  Trade on the awning of the IS EG Halal entrance to the

13  building.  Remember that?

14  A.  I do.

15  Q.  Did you know what that Medi Trade referred to?

16  A.  I don't.

17  Q.  OK.  Did you know that Will was setting up a business

18  called Medi Trade in the U.S.?

19          MR. MARK:  Objection.

20          THE COURT:  Sustained.

21  BY MR. LUSTBERG:

22  Q.  Are you aware that Mr. Hana has a business called EG Trade?

23  A.  I am.

24  Q.  Is that, to your knowledge, on the awning?

25          MR. MARK:  Objection.

O5sWmen2                          Maali - Cross

1    A.  I don't recall.

2              THE COURT:  I'll allow it.

3    BY MR. LUSTBERG:

4    Q.  You don't know whether it's on the awning?

5    A.  I don't remember if it's on there, no.

6    Q.  OK.  That EG Trade, though, operates out of that same

7    building, 125 River Road in Edgewater, right?

8    A.  Correct.

9    Q.  The awning also said something about LEG, if you remember.

10   Do you know what that is?

11   A.  I don't.  I don't.

12   Q.  OK.  Now, Will wanted you to stay on as the permanent

13   office manager, but you decided to go back to Mr. Daibes's

14   operation, right?

15             MR. MARK:  Objection to form.

16             THE COURT:  Yes.  Sustained.

17             You never left Mr. Daibes's operation, correct?

18             THE WITNESS:  No, I didn't.

19             THE COURT:  You were doing this part time for IS EG

20   Halal in order to make extra money, if I understand your

21   testimony.

22             THE WITNESS:  Correct.

23   BY MR. LUSTBERG:

24   Q.  And then around January 2020, you ceased working for IS EG

25   Halal and just again were dedicated full time to Daibes

| | |
|---|---|
| 1 | Enterprises, correct? |
| 2 | A.  Correct. |
| 3 | Q.  And that's where you still are, correct? |
| 4 | A.  That's where I still am. |
| 5 | Q.  There were some questions about Nadine Arslanian, and in |
| 6 | particular, were you aware that Mr. Hana had been friends with |
| 7 | Nadine Arslanian for many years? |
| 8 | MR. MARK:  Objection. |
| 9 | THE COURT:  I'll allow that, if she knows. |
| 10 | A.  Yes. |
| 11 | Q.  From long before she was married to Senator Menendez, |
| 12 | right? |
| 13 | A.  Correct. |
| 14 | Q.  Do you know whether Ms. Arslanian spoke Arabic? |
| 15 | A.  I believe she did. |
| 16 | Q.  Did you ever hear Mr. Hana or, for that matter, |
| 17 | Ms. Arslanian describe their relationship as kind of like a |
| 18 | brother-sister relationship? |
| 19 | MR. MARK:  Objection. |
| 20 | THE COURT:  Sustained. |
| 21 | BY MR. LUSTBERG: |
| 22 | Q.  Was it a close relationship? |
| 23 | A.  It was. |
| 24 | THE COURT:  I'll allow it. |
| 25 | A.  He always referred to her as sister. |

1          MR. MARK:  Objection.

2          THE COURT:  I'll allow it.  She has things she wants

3   to say.

4   BY MR. LUSTBERG:

5   Q.  You were asked some questions about three --

6          MR. LUSTBERG:  This is my last set of questions, your

7   Honor.

8   Q.  -- about three checks of $10,000 that were paid to

9   Ms. Arslanian.  Do you remember those questions?

10  A.  I do.

11  Q.  OK.  And you testified that you didn't see her do any work

12  for that $10,000, is that right?

13  A.  I didn't.

14  Q.  Are you aware of what it was that she was supposed to be

15  doing?

16          MR. MARK:  Objection to form.

17          THE COURT:  Sustained as to form.

18          MR. LUSTBERG:  Let me try a different form then.

19  Q.  Isn't it true that Ms. Arslanian was supposed to be helping

20  IS EG Halal to set up foreign offices?

21          MR. MARK:  Objection.

22          THE COURT:  Do you know what Ms. Arslanian's job was?

23          THE WITNESS:  No, I don't know.  She was --

24          THE COURT:  Next.

25  BY MR. LUSTBERG:

O5sWmen2                          Maali - Cross

1   Q.  Were you aware that after being on that job for three

2   months, that her contract was terminated?

3   A.  I was.

4           MR. MARK:  Objection.

5           THE COURT:  I'll allow it.

6   BY MR. LUSTBERG:

7   Q.  Do you know why?

8           MR. MARK:  Objection.

9           THE COURT:  Sustained.

10          MR. LUSTBERG:  I have nothing further, your Honor.

11  Thank you very much.

12          THE COURT:  Thank you.

13  CROSS-EXAMINATION

14  BY MR. WEITZMAN:

15  Q.  Good afternoon, Ms. Maali.

16  A.  Good afternoon.

17  Q.  My name is Avi Weitzman.  I represent Senator Menendez.

18      You and I have never met before, right?

19  A.  No.

20  Q.  You currently work at DBR Management, correct?

21  A.  I currently work at Daibes Enterprises.

22  Q.  And one of the subsidiaries of Daibes Enterprises is DBR

23  Management?

24  A.  Yes.

25  Q.  And that's the managing company of the properties that Mr.

1    Daibes has developed in Edgewater and elsewhere, right?

2    A.  Right.

3    Q.  DBR Enterprises and DBR Management manages approximately

4    11,000 rental units, is that correct?

5    A.  Correct.

6    Q.  Are you familiar with the buildings that they manage,

7    Daibes Enterprises?

8              MR. MARK:  Objection.

9              THE COURT:  I'll allow it.

10   A.  I am.

11   Q.  Would you recognize those buildings?

12   A.  I would.

13             MR. WEITZMAN:  Can we put up for the judge, attorneys

14   and witness Defense Exhibit 101A.

15   Q.  Do you recognize this building?

16   A.  I do.

17   Q.  What is it?

18   A.  That's the St. Moritz.

19   Q.  Is that --

20   A.  Now the Riello.

21   Q.  Is this a fair and accurate picture of the St. Moritz or

22   now the Riello?

23   A.  It is.

24             MR. WEITZMAN:  We offer Defense Exhibit 101A.

25             MR. MARK:  Objection.  Scope.

O5sWmen2                          Maali - Cross

1        THE COURT:  Yes.  Scope?

2        MR. WEITZMAN:  She testified about her job at Daibes

3   Enterprises, and this is the work of Daibes Enterprises.

4        MR. MARK:  Your Honor, we weren't given notice that

5   they were going to offer this exhibit with this witness at this

6   point in time.

7        MR. WEITZMAN:  This was a photograph in a series of

8   exhibits that I gave them last night.

9        THE COURT:  All right.  Let's move on.  Move on.  Next

10  question.

11       MR. WEITZMAN:  Just wondering whether I can go through

12  the photos.  I have five of them.

13       THE COURT:  I think there's an objection to the

14  admission.

15       Is that correct?

16       MR. MARK:  Objection.

17       THE COURT:  Sustained.

18       MR. WEITZMAN:  You may take that down, Mr. Kelly.

19  Q.  Are you familiar with a project that Fred Daibes and Daibes

20  Enterprises was developing at 115-145 River --

21       THE COURT:  All right.  Sidebar.

22       MR. MARK:  Objection.

23       (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5sWmen2                          Maali - Cross

1              (At sidebar)

2              MR. WEITZMAN:  I was just going to show her the

3    rendering and ask her if that's the rendering of the property.

4    I'm not getting into Qatar.  I'm not getting into any

5    applications involving Qatar.

6              THE COURT:  What's the purpose of this line?

7              MR. WEITZMAN:  It's so that we can have a visual as to

8    the project that was being developed.  This is a core piece of

9    their case, and I think a visual is appropriate.

10             THE COURT:  Not through her.

11             What does the government have to say?

12             MR. MARK:  First, it's outside the scope, and on more

13   particular objections, it's irrelevant at this point in time.

14             THE COURT:  It seems to me you can, again, bring it

15   back on your own case.  I don't really see any purpose here.

16   Nobody needs a visual of the project.  The project isn't at

17   issue here with her.

18             Where else are you going with it?  What else do you

19   have?

20             MR. WEITZMAN:  I have a bit on Nadine and the

21   relationship with Nadine, Nadine and Fred and their

22   relationship.

23             THE COURT:  But didn't we just do that?

24             MR. WEITZMAN:  There are some, few questions.

25             THE COURT:  I'd ask you to make sure that you're not

O5sWmen2                         Maali - Cross

1    going constantly over and over the same thing.

2         MR. WEITZMAN:  And I'm trying not to, but I understand

3    your Honor's ruling.  We'll bring her back in our defense case.

4         THE COURT:  All right.  But you have how she really

5    wanted to get out, so I let her get out, everybody's friends

6    and so forth.

7         What else do you have?

8         MR. WEITZMAN:  Another aspect is that Daibes referred

9    a real estate broker to Nadine, and I'd like to elicit the

10   guy's name and her understanding as to what Nadine was looking

11   to sell.  She was looking to sell her home.

12        MR. MARK:  That's the same issue as scope.

13        THE COURT:  I think it is a scope violation.

14        MR. WEITZMAN:  Did you offer the text messages?

15        MR. MARK:  No.

16        THE COURT:  The cross is limited to the scope of the

17   direct.  I know you want to get extra stuff out.  Now is not

18   the time.

19        MR. WEITZMAN:  I have one document that I previewed

20   with them that I was going to have her identify for Daibes's

21   handwriting and signature.

22        MR. MARK:  I think that's the same scope issue as

23   before.

24        MR. WEITZMAN:  She was his executive assistant for 15

25   years.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5sWmen2                         Maali - Cross

1          THE COURT:  What's the purpose of that?

2          MR. WEITZMAN:  It's going to be subject to connection

3     later, because this is a right of first refusal document that

4     Fred Daibes executed with Nadine to purchase her home from her.

5          THE COURT:  You want her to identify his handwriting?

6     I'll allow that.

7          MR. MARK:  There's a little context with that

8     particular exhibit.  I think Mr. Richenthal can address that.

9          MR. RICHENTHAL:  We have very significant concerns

10    about the authenticity of that document.  I think if

11    Mr. Weitzman wants to ask without describing it in any way and

12    with the witness being directed not to describe it in any way,

13    do you recognize the handwriting on this document, that would

14    be fine.  But she should not describe the document.  There is

15    context here that we can get into if the Court would like that

16    is very concerning.

17         THE COURT:  No, I don't need to now.  Just ask --

18         MR. WEITZMAN:  Yes.

19         THE COURT:  What else?  I don't want more sidebars

20    here.  What else.

21         MR. WEITZMAN:  There's one or two questions about her

22    time at IS EG Halal, and that's it.

23         THE COURT:  Let's go.

24         MR. FEE:  Your Honor, can I make one note for the

25    record so we avoid another side bar?  I'm sorry.

O5sWmen2                              Maali - Cross

1          I don't think it's appropriate for the government to

2    stand up in front of the jury and say we didn't give them

3    notice of exhibits.  We did.

4          THE COURT:  I didn't even catch that.  Yes, you're

5    quite right.

6          MR. FEE:  Thank you, your Honor.

7          THE COURT:  This inter stuff is not for the jury.

8          MR. RICHENTHAL:  Can I make a suggestion?

9          When Mr. Weitzman asks the question about the

10   document, given that this witness seems enthusiastic, could he

11   direct her not to describe it?

12         MR. WEITZMAN:  Yes, I will.

13         THE COURT:  Let's go.  How much longer?

14         MR. WEITZMAN:  Five minutes.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. WEITZMAN:

3    Q.  Ms. Maali, you testified briefly about the relationship

4    between Fred Daibes and the senator, correct?

5    A.  Correct.

6    Q.  And about Fred Daibes and Nadine, do you recall that?

7    A.  I do.

8    Q.  Are you aware whether Fred Daibes knew Nadine before she

9    started dating Senator Menendez?

10   A.  I knew that he knew of her.

11   Q.  And are you aware that Nadine and her family used to go for

12   years to his restaurant Le Jardin?

13              MR. MARK:  Objection.

14              THE COURT:  Sustained.

15   BY MR. WEITZMAN:

16   Q.  Are you aware whether Nadine and her family visited Le

17   Jardin before she met Senator Menendez?

18              MR. MARK:  Objection.

19              THE COURT:  I'll allow it.

20   A.  Yes.

21   Q.  Do you know for how long Nadine and her family visited --

22              THE COURT:  Sustained.

23              MR. MARK:  Objection.

24              THE COURT:  Move on.  Clearly hearsay,

25   BY MR. WEITZMAN:

O5sWmen2                         Maali - Cross

1   Q.  After the senator and Nadine started dating, are you aware

2   whether Nadine and Mr. Daibes had phone conversations, just the

3   two of them?

4           MR. MARK:  Objection to form.  Hearsay.

5           MR. WEITZMAN:  I'm not asking about the substance.

6           THE COURT:  Yes.  I'll allow it.

7   A.  They have --

8           THE COURT:  Are you -- I'm sorry.

9           Go ahead.

10  A.  -- had conversations.

11  BY MR. WEITZMAN:

12  Q.  I'm sorry.  I couldn't hear the answer.

13  A.  They have had conversations.

14  Q.  And you've witnessed them having one-on-one conversations

15  without the senator by phone?

16  A.  Yes.

17          THE COURT:  Wait, wait, wait.  If it's a one-on-one

18  and it's by phone, how do you know it's one-on-one?

19          THE WITNESS:  If she would call the office, I would

20  transfer it to his --

21          THE COURT:  You don't know who's on the other end of

22  the line.

23          THE WITNESS:  Of course I do.  I pick up the phone.

24          THE COURT:  I mean there could be other people there,

25  but let's move on.

1  BY MR. WEITZMAN:

2  Q.  Have you seen, have you ever observed Fred and Nadine

3  meeting in private without the senator, like a lunch or dinner

4  or visit to the office?

5  A.  Not that I'm aware of.

6  Q.  How would you describe Fred's relationship with Nadine?

7          MR. MARK:  Objection.

8          THE COURT:  Sustained as to form.

9  BY MR. WEITZMAN:

10  Q.  Were you able to observe a relationship between Fred and

11  Nadine?

12  A.  They had become friendly.

13  Q.  Has Fred told you that he's fond of her?

14          MR. MARK:  Objection.

15          THE COURT:  Sustained.

16  BY MR. WEITZMAN:

17  Q.  Has he told you about whether he wants to help Nadine?

18          THE COURT:  Sustained.

19          MR. MARK:  Objection.

20          MR. WEITZMAN:  I'm showing you what's been -- can we

21  put up on the screen for the witness, the judge and counsel

22  Defense Exhibit 607 for identification purposes only.

23  Q.  I don't want you to read any part of the document.  I'm

24  just going to ask you two very brief questions.

25          First, do you recognize whose handwriting is on the

1    document?

2    A.  Fred's.

3    Q.  OK.  And do you recognize the signature on this document,

4    the one on the left side of the document?

5    A.  Fred's.

6    Q.  And when you say Fred, you mean Fred Daibes?

7    A.  Correct.

8            MR. WEITZMAN:  You can put that down.  Thank you.

9            THE COURT:  Let me look at that.  Just me.

10           All right.  Take it down.

11   BY MR. WEITZMAN:

12   Q.  A few very short questions on your time at IS EG.  I think

13   you've already made clear you were working there part time,

14   correct?

15   A.  Correct.

16   Q.  Where were you working more frequently?  How many more

17   hours -- where were you working more hours in the day -- at IS

18   EG or Daibes -- when you were part time at each?

19   A.  Daibes.

20   Q.  And your primary role when you were working at IS EG, was

21   that to hire the people who worked on the halal certificate?

22           THE COURT:  What was your primary role while you were

23   working at IS EG Halal?

24           THE WITNESS:  I was office manager.  I would only be

25   able to hire somebody that did data entry.  Anything above that

O5sWmen2

1     would be above my pay grade.

2                MR. WEITZMAN:  One moment, your Honor?

3                Thank you, Ms. Maali.

4                THE COURT:  Any redirect?

5                MR. MARK:  No, your Honor.

6                THE COURT:  All right.  Thank you.  You may step down,

7     Ms. Maali.  You're excused.

8                (Witness excused)

9                THE COURT:  Next witness for the government.

10               MR. MONTELEONI:  Your Honor, before we call our next

11    witness, I'd like to offer several items of evidence pursuant

12    to stipulation.

13               THE COURT:  Yes.

14               MR. MONTELEONI:  All right.  So, we have several items

15    of evidence to offer before the next witness, both pursuant to

16    stipulation and some other documents.

17               First, the government offers Government Exhibits 8A1,

18    8B3, 8B6, 8B8, 8B10, 8B12, 8B16, 8B19, 8B20, 8B21, 8B22, 12B1,

19    12B2, 12B3 and 12B4.

20               MR. WEITZMAN:  No objection, your Honor.

21               THE COURT:  Admitted, without objection.

22               (Government Exhibits 8A1, 8B3, 8B6, 8B8, 8B10, 8B12,

23    8B16, 8B19, 8B20, 8B21, 8B22, 12B1, 12B2, 12B3 and 12B4

24    received in evidence)

25               MR. MONTELEONI:  Next, the government offers 8A12,

O5sWmen2

1   8A13 and 8A15.

2           MR. WEITZMAN:  Your Honor, we object.

3           THE COURT:  I thought this was all by stipulation.

4           MR. MONTELEONI:  Well, sorry.  These are the ones not

5   covered by stipulation.  We can offer them subject to

6   connection if the Court requires, but they're actually

7   self-authenticating under 902(1).  If the Court wishes, I can

8   show you.

9           THE COURT:  The representation, I thought, was this

10  was going to be formalistic and everything had been stipulated

11  to.

12          MR. MONTELEONI:  Almost everything.  We're getting to

13  a lot that hasn't been stipulated, but we can offer them

14  subject to connection for now.

15          THE COURT:  All right.

16          MR. MONTELEONI:  All right.

17          Then we have a list of exhibits marked for

18  identification as Government Exhibit 1330 that lists a number

19  of stipulations that each authenticate a number of documents.

20  I believe this list has just been produced today, so you might

21  not have it yet, your Honor.  If you wish, I can give you a

22  copy.

23          There it is.  Sorry.

24          So with the Court's permission, we propose to offer

25  this list, the stipulations cited in this list and the exhibits

O5sWmen2

1  on the list that are authenticated by these stipulations in

2  evidence now pursuant to the list and then to read from the

3  stipulations and from the exhibits, as necessary, during the

4  proceedings.

5        THE COURT:  Yes.  Admitted.  You want me to admit

6  Government Exhibit 1330.

7        MR. MONTELEONI:  All right.  So the defense has raised

8  a question about one particular document, so my understanding

9  is we will offer it subject to a question about Government

10  Exhibit 3A20, which we'll come back to.

11        THE COURT:  What are you asking me to do, sir?

12        MR. MONTELEONI:  Sorry, your Honor.  I'm asking you to

13  admit Government Exhibit 1330.

14        THE COURT:  Admitted.

15        (Government Exhibit 1330 received in evidence)

16        MR. MONTELEONI:  Right.  Subject to a reservation

17  about 3A20 as well as the reservations pursuant to a pending

18  motion about redactions.  It will be subject to that.  That

19  won't come up right now.

20        THE COURT:  All right.

21        MR. WEITZMAN:  Your Honor, I don't want to interrupt

22  the flow, but I will want to discuss this afterwards.  We can

23  do it outside the presence of the jury.

24        THE COURT:  The representation was made to me that

25  this was just pro forma, we're going to now move on.  That's

1    one thing, but it doesn't look like that's the case.  Move on.

2            MR. MONTELEONI:  Finally, the government offers

3    B224-1, B224-2, B224-A, 3C10, which I understand are also

4    without objection.

5            MR. LUSTBERG:  No objection, Judge.

6            THE COURT:  Admitted.

7            (Government Exhibits B224-1, B224-2, B224-A, and 3C10

8    received in evidence)

9            MR. MONTELEONI:  All right.  Thank you, your Honor.

10           Now the government calls Special Agent Michael

11   Coughlin.

12    MICHAEL F. COUGHLIN,

13       called as a witness by the government,

14       having been duly sworn, testified as follows:

15           THE COURT:  Good afternoon, sir, and welcome.  Please

16   speak loudly, slowly and clearly into the microphone.

17           Your witness, sir.

18           MR. MONTELEONI:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MR. MONTELEONI:

21   Q.  Are you currently employed?

22   A.  Yes.

23   Q.  Where do you work?

24   A.  I work for the Federal Bureau of Investigation here in the

25   New York office.

O5sWmen2                     Coughlin - Direct

1   Q.  What is your title with the FBI?

2   A.  I'm a special agent.

3   Q.  How long have you been at the FBI?

4   A.  I've been a special agent for approximately seven and a

5   half years.

6   Q.  What did you do before you were at the FBI?

7   A.  Prior to the FBI I was a high school teacher for about 12

8   years and a very part-time attorney.

9   Q.  What unit are you currently assigned to in the FBI?

10  A.  I work with the public corruption unit.

11  Q.  Have you ever heard of a senator named Robert Menendez?

12  A.  Yes.

13  Q.  Was the public corruption unit that you joined involved in

14  an investigation of Robert Menendez?

15  A.  Yes, that's correct.

16  Q.  What did you primarily do in connection with the

17  investigation?

18  A.  I was -- I was not really involved in the investigation.

19  Q.  What did you do to prepare to testify today?

20  A.  To prepare to testify today, I reviewed various documents,

21  government exhibits as well as some of the actual underlying

22  documents.

23  Q.  Were you asked to review a summary document before

24  testifying today?

25  A.  Yes.

O5sWmen2                        Coughlin - Direct

1    Q.  Who drafted this summary document?

2    A.  The government -- the United States Attorney's Office.

3    Q.  What did you do to review it?

4    A.  I -- it was a lengthy process.  I reviewed the entirety of

5    the document, reviewed the underlying government exhibits that

6    the document is based on, so reviewed the contents of every

7    line of the summary exhibit to determine its accuracy.

8    Q.  And in determining its accuracy, did you verify that all

9    the information in the summary document is drawn from those

10   source exhibits that you referenced?

11   A.  I did, yes.

12   Q.  Are all of the source documents that the summary document

13   refers to cited in the summary document?

14   A.  They are, yes.

15   Q.  About how many of those source documents that are cited are

16   government exhibits?

17   A.  I believe they're all government exhibits, yes.

18   Q.  What types of government exhibits did you review generally

19   in verifying this summary document?

20   A.  So, it included cell phone records, which may be, you know,

21   chats that were extracted from cell phones, full chat

22   conversations.  There were photos that would be attached to

23   things like that.  There were emails.  Yeah.

24   Q.  When you reference phone records, did you also review

25   records of phone calls, voice calls?

O5sWmen2                      Coughlin - Direct

1   A.  Correct, yeah, cell phone carrier records, yeah.

2   Q.  Collectively, just rough ballpark, about how many pages

3   were these text messages?

4   A.  Some of the text message conversations were hundreds of

5   pages.  The cell phone records, some of the PDFs were over a

6   thousand pages, I believe.

7   Q.  Who made the decision what exhibits you would review?

8   A.  The U.S. Attorney's Office.

9   Q.  Do you believe that you reviewed all of the documents in

10  this case?

11  A.  No.

12  Q.  Who made the decision what exhibits would be referred to in

13  the summary document?

14  A.  The U.S. Attorney's Office.

15          MR. MONTELEONI:  Mr. Hamill, could you please show the

16  witness the document that's been marked for identification as

17  Government Exhibit 1302.

18  Q.  Special Agent Coughlin, do you recognize this document?

19  A.  I do.

20  Q.  What type of document is this?

21  A.  This is a summary chart.

22  Q.  Is this the summary document that you were asked to verify?

23  A.  Yes.

24  Q.  Did you verify all of the information in this chart against

25  the government exhibits cited in the chart?

O5sWmen2                          Coughlin - Direct

1    A.  I did, yes.

2           MR. MONTELEONI:  So, subject to the pending motion

3    regarding redactions, we offer Government Exhibit 1302 in

4    evidence.

5           THE COURT:  Admitted.

6           (Government Exhibit 1302 received in evidence)

7           MR. MONTELEONI:  Mr. Hamill, could you please publish

8    the first page.

9    Q.  Special Agent Coughlin, what are we looking at here?

10   A.  This is the summary exhibit, summary document.  As --

11   summary chart.  As you can see, there's one, two, three, four,

12   five, six columns.

13   Q.  Directing your attention first to the top line, where it

14   says December 13, 2017, to January 29, 2022, what does that

15   range mean?

16   A.  That is the range of the chart, meaning the information

17   that's in the chart is from that time period.

18   Q.  Who picked that date range?

19   A.  The United States Attorney's Office.

20   Q.  Do you know why they picked that date range?

21   A.  I don't.

22   Q.  Do you know one way or another whether anything relevant to

23   this case happened outside that date range?

24   A.  I don't know one way or another, no.

25   Q.  So, the date range is from December 13, 2017, to January

29, 2022.  Does the chart list everything that was shown on all
of the records you reviewed that happened between those dates?

A.  No.

Q.  And who made the decisions on which events between those
dates to include on the chart?

A.  The U.S. Attorney's Office.

Q.  Directing your attention to the date column, what does the
date column reflect?

A.  The date column reflects the date of the event that
occurred.  In many cases it's a text or a call or an email.

Q.  Directing your attention to the time column, what does that
column reflect?

A.  Again, the time that that event happened.  In the case of a
phone call, it would be the time it started, if that occurred,
and that's Eastern time.

Q.  And is that what the letters ET after time mean?

A.  That's correct, yes.

Q.  Were all the underlying source documents that you checked
this chart against, were they all already in Eastern time?

A.  They -- not all of them, no, they were not.

Q.  How did you check that the times were correctly converted
to Eastern time?

A.  I manually checked the times.

Q.  Now, were there any entries that did not have a time listed
on that date?

1   A.  There were a few, yes.

2   Q.  So where did those entries go chronologically?

3   A.  If there was no time, we put it at the end of the day for

4   that date.

5   Q.  Now, what do the from and to columns reflect?

6   A.  Fairly self-explanatory, but from is the person who either

7   made the phone call or sent the text message or the email.  The

8   to is the recipient.

9   Q.  Directing your attention to the detail column, and I'm

10  looking at the first row, at that first word, "text," colon,

11  what does it mean that the word "text" is written there with a

12  colon?

13  A.  It means this line, this entry was a text message.

14  Q.  And so we'll come back to what's in the middle of this

15  detail column, but if you look at the end of the detail cell on

16  the first row, there's this parenthetical.  Could you please

17  read that parenthetical at the end of the first row, detail

18  column?

19  A.  Yes.  GXA101-1.

20  Q.  What does that mean?

21  A.  That is the government exhibit that this, this detail or

22  this whole line came from.

23  Q.  So now looking at the middle of the cell after the word

24  "text" and before the citation, there's some words in quotation

25  marks.  What does it mean that they're in quotation marks?

1    A.  The quotation marks came directly from the text message

2    record that we had.

3    Q.  Does this quoted language in this cell include everything

4    that's in Government Exhibit A101-1?

5    A.  Not necessarily, no.

6    Q.  OK.  Who decided what portions of text messages to quote in

7    this chart?

8    A.  The United States Attorney's Office.

9    Q.  Did you verify that these quoted portions were, in fact,

10    found in the text messages?

11    A.  I did, yes.

12         MR. MONTELEONI:  Now, Mr. Hamill, could you please

13    expand the whole page, including the margins.

14    Q.  So, at the bottom left of the first page, where it says

15    additional name attribution, GX1305, what does that mean?

16    A.  That's a -- another summary chart that I reviewed.

17         MR. MONTELEONI:  OK.  Let's take a look at Government

18    Exhibit 1305, but first, Mr. Hamill, could you please put up

19    Government Exhibit 1449, page 1, a stipulation.

20         I will read paragraph one of Government Exhibit 1449:

21         "The document marked for identification as Government

22    Exhibit 1305 is a true and accurate summary of phone numbers,

23    emails and iCloud addresses used by the users identified in

24    Government Exhibit 1305."

25         One moment.  All right.  We offer Government Exhibit

O5sWmen2                           Coughlin - Direct

1    1449 and 1305 in evidence.

2                THE COURT:  Admitted.

3                (Government Exhibits 1305 and 1449 received in

4    evidence)

5                MR. MONTELEONI:  Mr. Hamill, could you please put up

6    Government Exhibit 1305.

7    Q.  Special Agent Coughlin, could you please read the title at

8    the top of the first page?

9    A.  "Names, phone numbers and email and iCloud addresses."

10               MR. MONTELEONI:  Let's look at an example.

11   Mr. Hamill, could you please take us to page 2 and expand the

12   top half of the page.

13   Q.  Special Agent Coughlin, directing your attention to the row

14   for Menendez, Robert, and directing your attention to the phone

15   column for that row, directing your attention to the first

16   listed phone number in that row, ending in 8400, did you rely

17   on the information in this chart as a source in verifying

18   Government Exhibit 1302?

19   A.  Yes.

20   Q.  And does that apply for other of the phone numbers, email

21   addresses, etc., in this chart?

22   A.  Exactly, yes.

23               MR. MONTELEONI:  All right.  Mr. Hamill, could you

24   please put back up Government Exhibit 1302, page 1.

25   Q.  Now, for some of the rows on this chart, Government Exhibit

O5sWmen2                         Coughlin - Direct

1    1302, did you need Government Exhibit 1305 to attribute a name,

2    or did the documents themselves include the name?

3    A.   In some instances, yes, the document itself included the

4    name.  For example, an email might have a signature, something

5    like that.

6              MR. MONTELEONI:  All right.  So before we get started

7    with this chart, I want to read from stipulation, Government

8    Exhibit 1430.

9              Mr. Hamill, can you please put up the end of page 1

10   and the beginning of page 2 of Government Exhibit 1430.

11             I will now read paragraphs one, two, three and four:

12             "The document marked for identification as Government

13   Exhibit 2A-1 is a true and accurate photograph of Robert

14   Menendez.

15             "The document marked for identification as Government

16   Exhibit 2A-2 is a true and accurate photograph of Nadine

17   Menendez.

18             "The document marked for identification as Government

19   Exhibit 2A-3 is a true and accurate photograph of Wael Hana.

20             "The document marked for identification as Government

21   Exhibit 2A-4 is a true and accurate photograph of Fred Daibes."

22             Mr. Richenthal, can you please put up reproductions of

23   Government Exhibit 2A-1, 2A-2, 2A-3 and 2A-4, and when you do

24   so, can you please put up the associated names.

25             THE COURT:  Move on.

O5sWmen2                          Coughlin - Direct

1                    MR. MONTELEONI:  All right.  Thank you.

2                    Mr. Hamill, could you please take us back to

3       Government Exhibit 1302, page 1.

4       Q.  So I'd like to go through the first few rows summarized on

5       the chart and then go into a few in more detail.  Directing

6       your attention to row one, listed as December 31, 2017, at 7:22

7       a.m., who is listed as the sender?

8       A.  Nadine Arslanian.

9       Q.  Who is listed as the recipient?

10      A.  Robert Menendez.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5S3MEN3                          Coughlin - Direct

1   Q.  Can you please read the details cell starting with the word

2   "text."

3   A.  "I want to wish you all the very, very best for the new

4   year.  In four and a half hours it is going to be your

5   birthday.  I will text you happy birthday and I hope it will be

6   the best year ever for you and I would like to take you out for

7   lunch for your birthday.  I am looking forward to catching up.

8   Nadine."

9   Q.  Directing your attention to the next line, row 2.  What's

10  date and time?

11  A.  December 31, 2017, at 8:21 p.m.

12  Q.  About how long is that after the text you just read?

13  A.  About 13 hours.

14  Q.  Can you please read what this line quotes Robert Menendez

15  user as texting to the Nadine Arslanian user.

16  A.  "Would love to get together but as said once before, I

17  don't want to interfere with your boyfriend."

18  Q.  What is the date of row 3?

19  A.  January 31, 2018.

20  Q.  About how long is that after the date of the previous line.

21  A.  A month.

22  Q.  Were there other texts between the Nadine Arslanian user

23  and the Robert Menendez user?

24  A.  Yes.

25  Q.  Could you please read what this line indicates that the

O5S3MEN3                        Coughlin - Direct

1    Nadine Arslanian user texts to the Robert Menendez user at

2    4:45 p.m. on January 31, 2018.

3    A.   "Now reelection" with four exclamation points.

4    Q.   Could you please read what the next lists as Robert

5    Menendez's response.

6    A.   "Yes, are you around on Friday?"

7    Q.   Directing your attention to the next line.  Can you please

8    read what this lists as Nadine Arslanian's response?

9    A.   "Yes, I will be."

10   Q.   So, you just read a text saying are you around Friday.

11   What day of the week was February 2nd, 2018?

12   A.   I don't recall.

13        MR. MONTELEONI:  Mr. Hamill, can you please show just

14   the witness, the parties, and the Court the documents marked

15   for identification Government Exhibits 10J-1 and 10J-2.

16   Q.   Special Agent Coughlin, have you reviewed those prior to

17   testifying?

18   A.   Yes.

19   Q.   What are those?

20   A.   They're calendars from 2018 and '19 I believe.

21        MR. MONTELEONI:  The government offers Government

22   Exhibits 10J-1 and 10J-2 in evidence.

23        THE COURT:  Admitted without objection.

24        (Government's Exhibit 10J-1, 10J-2 received in

25   evidence)

1     MR. MONTELEONI:  Mr. Hamill, can you please publish

2  Government Exhibit 10J-1 and expand February of 2018.

3  Q.  So, Special Agent Coughlin, when the text says "are you

4  around Friday," what day of the week was February 2 of 2018?

5  A.  That was a Friday.

6     MR. MONTELEONI:  Mr. Hamill, can you please put back

7  up Government Exhibit 1302, page 1.

8  Q.  Directing your attention to line 6 listed as February 2,

9  2018, at 6 p.m.  Can you please read the detail cell.

10 A.  Yes.  It the says "call 58 seconds."

11 Q.  What does that mean?

12 A.  It means a phone call was placed, the cell phone records

13 show that.

14 Q.  So the citation for that entry is GX 6A-112.  What type of

15 document is?

16 A.  Those were cell phone records from the carrier.

17 Q.  Let's take a quick look at it.

18     MR. MONTELEONI:  Mr. Hamill, can you please publish

19 what's in evidence as Government Exhibit 6A-112, and go to

20 page 1513 and expand the column headers and also expand the

21 line 27407 under it.

22 Q.  So, Special Agent Coughlin, what is listed in the sixth

23 column under "terminating number"?

24 A.  1-516-395-1745.

25 Q.  So from the exhibits you reviewed, whose phone number was

1   that?

2   A.  Nadine Arslanian's.

3   Q.  Actually, when I ask about the phone numbers, you can just

4   read the last four digits of the phone number.

5          What number's listed in the seventh column under

6   "terminating number"?

7   A.  1745.

8   Q.  So, and sorry, on the fifth column under "originating

9   number," what does that end in?

10  A.  8400.

11  Q.  From the exhibits you reviewed, whose number was that?

12  A.  That was Robert Menendez's phone number.

13  Q.  Directing your attention to the column before that, with

14  the ET header.  What's written there?

15  A.  58 seconds.

16  Q.  From reviewing the records from AT&T, what does that mean?

17  A.  That means how long the call was that was placed.

18  Q.  Is this the call that was listed on Government Exhibit 1302

19  on the line we just looked at?

20  A.  That's correct, yes.

21  Q.  Let's return to the chart.

22          MR. MONTELEONI:  Mr. Hamill, can you please put back

23  up Government Exhibit 1302, page 1, and expand about the middle

24  third of the page.

25  Q.  Special Agent Coughlin, directing your attention to the

O5S3MEN3                    Coughlin - Direct

1   February --

2             THE COURT:  Mr. Monteleoni, if you could slow down a

3   bit.  When people read, they tend to speed.

4   Q.  Special Agent Coughlin, directing your attention to the

5   February 2, 2018, 6:03 p.m. line, line 7.  What type of message

6   does it list as being sent from Robert Menendez to Nadine

7   Arslanian?

8   A.  It is a text message of a link.

9   Q.  Inside the quotation marks, after the www.google.com/search

10  and after the question mark and the letter Q, could you please

11  read just the words after the letter Q.  But when you read it

12  you can just ignore the numbers and special characters in that

13  link that was texted from Robert Menendez.

14  A.  It says Acappella West Restaurant.

15  Q.  Directing your attention to the next line, line 8, what

16  time on February 2, 2018, does this line list Nadine Arslanian

17  as sending Robert Menendez a text message?

18  A.  11:50 p.m.

19  Q.  About how long was that after Robert Menendez texted a

20  Google link containing the words Acappella West Restaurant?

21  A.  That would be almost six hours.

22  Q.  What does Nadine Arslanian write in this text?

23  A.  "Thank you for a great night."

24  Q.  Directing your attention to the next line.  Could you

25  please read the quoted text listed as Robert Menendez's reply.

O5S3MEN3                    Coughlin - Direct

A.  "Glad you're home safe.  Enjoyed your company.  We'll have
to do it again" exclamation point.
Q.  I want to ask about some things that happened the next day.
Directing your attention to row 12 listed as February 3, 2018,
the first 12:01 p.m. line.  Who is the sender listed on that
line?
A.  Wael Hana.
Q.  Who is the recipient listed?
A.  Nadine Arslanian.
Q.  By the way, Special Agent Coughlin, do you have any
personal knowledge of these communications, besides just what
the documents reflect?
A.  I don't.
Q.  Do you have any personal knowledge of any of these events
listed here as occurring between December 13, 2017, and
January 29, 2022, besides just what the documents reflect?
A.  That's correct, yes, I don't have personal knowledge.
Q.  What are your answers to my questions about these events
based on?
A.  Based on the documents that I reviewed in this case, a
record of a text message conversation.
Q.  Could you please read what Wael Hana is listed as texting
to Nadine Arslanian.
A.  "What you doing today."
Q.  Directing your attention to the next couple lines.  Not

1    going to ask you to read them out, but are they messages

2    between Nadine Arslanian and Wael Hana?

3    A.  That's correct.

4    Q.  Directing your attention down to row 15 for the line for

5    February 3, 2018, at 12:06 p.m.  Could you please read what

6    Nadine Arslanian is listed as texting to Wael Hana on this

7    line.

8    A.  "I think we should be done by then.  If so, I will meet

9    you."

10   Q.  Directing your attention to the next line.  Can you please

11   read what Nadine Arslanian is texting as Wael Hana at 1:22 p.m.

12   A.  "I'm done."

13   Q.  Directing your attention to the next line.  What is Wael

14   Hana's reply listed as being sent at 1:23 p.m.?

15   A.  "Be there at 2:45."

16   Q.  Two lines down, at 2:42 p.m. what does Nadine Arslanian

17   text Hana?

18   A.  "I'm back at our table at least for this Saturday LOL."

19   Q.  Two lines down, what does Wael Hana text Nadine Arslanian

20   at 3:01 p.m.?

21   A.  "3 M."

22   Q.  Two lines after that, what does Nadine Arslanian reply by

23   text at 3:02 p.m.?

24   A.  "No rush."

25   Q.  Can you expand the rest of the page.  So now directing your

1    attention to the next line, line 24.  What's the date and time

2    on the next line?

3    A.  That's February 3, 2018, at 4:40 p.m.

4    Q.  About how long is that after the line that we just looked

5    at where the chart reflects Wael Hana texted 3 M and Nadine

6    Arslanian texted "no rush"?

7    A.  It's an hour and 38 minutes.

8    Q.  So on this February 3, 2018, 4:40 p.m. line, who is listed

9    as the sender?

10   A.  Nadine Arslanian.

11   Q.  And who is listed as the recipient?

12   A.  Robert Menendez.

13   Q.  On this line, could you please read the text that's listed

14   as having been sent by Nadine Arslanian to Robert Menendez.

15   A.  "Do you know Albio Sires, what is your international

16   position."

17   Q.  By the way, the source for this line is Government Exhibit

18   A101-4.  What type of document is Government Exhibit A101-4?

19   A.  It is an extraction of a cell phone chat, a conversation.

20   Q.  Let's take a look.

21        MR. MONTELEONI:  But first, Mr. Hamill, could you

22   please put up page 1 of Government Exhibit 1435.  I'll now read

23   paragraph 1.

24        The physical exhibit marked for identification as

25   Government Exhibit A100 is a cell phone assigned the call

O5S3MEN3                        Coughlin - Direct

1    number ending in 8400 which the FBI lawfully seized from Robert

2    Menendez on June 16, 2022, pursuant to a court-authorized

3    search warrant.  Government Exhibit A100 is referred to in this

4    stipulation as the Menendez cell phone.

5            Mr. Hamill, could you please take us to page 2 of

6    Government Exhibit 1435.  I'll now read paragraph 1A.

7            The documents marked for identification as Government

8    Exhibits A101 through A128, including any documents within that

9    range ending with -EX or contained in folders marked with

10   numbers within that range ending in -AF are true and correct

11   copies of records extracted from the Menendez cell phone.

12           So, now, Mr. Hamill, could you please put up

13   Government Exhibit A101-4 which is in evidence.  And could you

14   please show the jury the bottom text on the first page and then

15   the top text on the second page.

16   Q.  Special Agent Coughlin, what are we looking at here?

17   A.  So, as I mentioned, this is an extraction from a phone and

18   it's sort of made to look like a normal chat conversation.  The

19   blue is the incoming messages to the phone, whoever owns that

20   phone.  The green are the outgoing messages.

21   Q.  Looking at the "to" line.  What's the display -- of the

22   blue bubble -- what's the display name listed of the user who

23   is identified as the phone's owner?

24   A.  Bob Menendez.

25   Q.  Is that number, how does that compare to the number for

1    Menendez that we looked at on Government Exhibit 1305?

2    A.  It is the same number.

3    Q.  And now, directing your attention to the "from" line.  Do

4    you recognize the number that's listed in the "from" line?

5    A.  I do, yes.

6    Q.  How does that compare with the numbers listed for Nadine

7    Menendez or Nadine Arslanian in Government Exhibit 1305?

8    A.  It's the same.

9    Q.  What is the display name listed after that number?

10   A.  It says mon fiance parfait.

11   Q.  From your review of these reports, where is that display

12   number drawn from?

13   A.  It's drawn from the contacts of the phone.

14   Q.  Do you know when the contact entry for this particular

15   phone number was last updated?

16   A.  I don't recall.

17   Q.  From reviewing documents in this case, are you aware that

18   there came a time when Nadine Arslanian became engaged to

19   Robert Menendez?

20   A.  Yes.

21   Q.  Had that happened by February 3 of 2018?

22   A.  Had they been engaged?

23   Q.  Yes.

24   A.  I don't recall.

25   Q.  Let's look at the text of that blue bubble reading "Do you

1    know Albio Sires, what's your international position."

2            How does that text compare to what's listed in

3    Government Exhibit 1302 in the line that we've just been

4    looking at?

5    A.   It is the same.

6    Q.   Directing your attention to the green bubble on the top of

7    page 2 of Government Exhibit A101-4.  So first who is listed in

8    the "from" line of this green bubble?

9    A.   It is the Menendez number and it says Bob Menendez.

10   Q.   By the way, is this particular exhibit the only time that

11   you have seen a report with this blue bubble green bubble

12   format?

13   A.   No.

14   Q.   Based on your experience reviewing reports in this format,

15   are the colors of the bubble consistent across the format?

16   A.   Yes.

17   Q.   So for reports in this format, what color is the bubble for

18   texts sent by the device's owner?

19   A.   Green.

20   Q.   What color is the bubble for texts sent to the device's

21   owner by someone else?

22   A.   Blue.

23   Q.   By the way, is that blue bubble green bubble format the

24   only format you've seen text messages in in this case?

25   A.   No.

1   Q.  For right now, could you please read the date and time

2   listed in the bottom-right corner of the green bubble.

3   A.  Yes.  February 3, 2018, 4:49:09 p.m.

4   Q.  How long is that after the text above saying "Do you know

5   Albio Sires, what's your international position."

6   A.  It's nine minutes.

7   Q.  Could you please read the text of the Bob Menendez user's

8   response to the text saying "Do you know Albio Sires, what's

9   your international position."

10  A.  "Yes.  I know him well.  I'm the ranking member which means

11  senior democrat on the Senate Foreign Relations Committee."

12          MR. MONTELEONI:  Mr. Hamill, could you please take us

13  down to the next text on page 2 of Government Exhibit A101-4.

14  Q.  Special Agent Coughlin, could you please read the first

15  sentence of the response of the user of this Nadine Menendez

16  cell phone to the Bob Menendez user.

17  A.  You said the first sentence?

18  Q.  Just the first sentence.

19  A.  "Senator, I'm using Nadine's phone but I'm Andy Aslanian."

20  Q.  Directing your attention after the sentence mentions Albio

21  on to the second line.  Could you please read that next

22  sentence from "I am now" down to "Washington, D.C."

23  A.  "I am now the U.S. attorney for the government of Egypt

24  ministry of defense in EPO office in Washington, D.C."

25  Q.  Could you please read the next two sentences.

A.   "We can definitely help you with your election campaign.
We should get together and those arrangements can be made
through Nadine."

Q.   Directing your attention to the green bubble, one down,
could you please read the first two sentences of the Bob
Menendez user's response from "hello" up to "related."

A.   "Hello Andy.  Based on your last name, I guess you're
related."

Q.   Now, how is Andy Aslanian's last name spelled in the blue
text above?

A.   A-S-L-A-N-I-A-N.

Q.   And Special Agent Coughlin, do you remember how the
previous last name of Nadine Menendez is spelled?

A.   Yes, they're similar, but Nadine Arslanian has an R before
the S.

Q.   Have you seen any document that shows that Nadine Arslanian
is actually related to Andy Aslanian?

A.   No.

          MR. MONTELEONI:  By the way, the jury has seen
Mr. Aslanian's picture last week.  So, Mr. Richenthal, could
you please put up Government Exhibit 2A-8 on the board with the
associated name.

Q.   Special Agent Coughlin, could you please read the rest of
the Bob Menendez user's response in this green bubble.

A.   "Would be happy to meet.  Will arrange through Nadine.

1  Thanks."

2          MR. MONTELEONI:  Let's go back to the summary chart.

3  Mr. Hamill, could you please put back up Government

4  Exhibit 1302 and publish page 1.

5  Q.  So, Special Agent Coughlin, how do these last few texts

6  summarized on this page, apart from the last one, compare to

7  the ones we've just been reading in Government Exhibit A101-4?

8  A.  They are those messages we were just reading.

9  Q.  Can you please read out the time of line 28, the last line

10  that's dated February 3, 2018?

11  A.  Yes.  It says 5:23 p.m.

12  Q.  How does that time compare with the time of the previous

13  line where the chart lists Menendez texting the Nadine

14  Arslanian phone "Would be happy to meet will arrange through

15  Nadine, thanks"?

16  A.  It is the same, same minute.

17  Q.  Can you please read in the last line on February 3, 2018,

18  what the chart lists Nadine Arslanian as texting to Wael Hana

19  at 5:23 p.m.

20  A.  "Senator Robert Menendez."

21          MR. MONTELEONI:  Mr. Hamill, can you please take us to

22  the next page.  Turning to the next line, line 29.

23  Q.  Who does Nadine Arslanian text on February 4, 2018, at

24  10:42 a.m.?

25  A.  She texts Andy Aslanian.

1    Q.   How does that name compare to the name who said he was

2    using Nadine Arslanian's phone the previous day?

3    A.   That's the same name.

4    Q.   Turning to the end of this, line could you please read the

5    quotations from the message Nadine Arslanian sent.

6    A.   "Good morning, Andy.  Yesterday was a lot of fun.

7    Unfortunately when I got home there was no trace of Sabine.  I

8    heard a couple of hours from my sister about how hurt Sabine

9    was.  She had taken an entire day off to spend with me and I

10   wasn't around for a minute of it.  I should have gone home at

11   some point at least after the hospital meeting.  That is

12   100 percent my fault."

13   Q.   Directing your attention to the next line at 11:33 a.m. on

14   February 4, 2018.  Can you please read Andy Aslanian's

15   response.

16   A.   "You have to call her up and apologize.  Tell her about

17   being co-chairperson of the charity and the fact you had been

18   talking to Menendez, which may result to a good job for you.

19   Use Wael and me as people you had to sought out yesterday since

20   we had to help you with Menendez."

21   Q.   Does the text message indicate what type of job Andy is

22   saying Nadine should explain might result to her from talking

23   to Menendez?

24   A.   No.

25   Q.   Does it explain how Wael and Andy could help out Nadine

O5S3MEN3                     Coughlin - Direct

1    with Menendez?

2    A.  No.

3    Q.  That line reflects a message on February 4, 2018.  I want

4    to look at some entries later that month.

5            THE COURT:  Sir, you have to slow down.

6            MR. MONTELEONI:  I'm so sorry.

7            THE COURT:  All people do when asked to slow down is

8    they lower their voice.  We have a reporter, we have

9    interpreters, and they both are having trouble.

10           MR. MONTELEONI:  I'll try to slow down and I'll try to

11   lower my voice.

12   Q.  Directing your attention to the next line dated

13   February 20, 2018.  Could you please read what Nadine Arslanian

14   is listed as texting to Wael Hana on that date?

15   A.  "In case I can reach the senator, what was the title of the

16   Egyptian man that we can meet in Washington."

17   Q.  On the next line, line 32, when is Wael Hana listed as

18   e-mailing a news report to Nadine Arslanian?

19   A.  February 22, 2018, at 4:54 p.m.

20           MR. MONTELEONI:  Let's look at this e-mail.

21   Mr. Hamill, could you please publish what's in evidence as

22   Government Exhibit C401 expand to the top half of the page.

23   Q.  So, Special Agent Coughlin, directing your attention to the

24   "from" line, could you please read the display name and the

25   e-mail address on the "from" line.

1   A.  Yes.  It says W Hana W.Hana@loundeseg.com.

2   Q.  Who is that e-mail address attributed to on that chart of

3   e-mail addresses that we just saw 1305?

4   A.  Attributed to Wael Hana.

5   Q.  Can you please read the display name and the "to" line.

6   A.  The display name is nad070@yahoo.com.  Nad070@yahoo.com.

7   Q.  Who is that e-mail address attributed to on Government

8   Exhibit 1305, that chart?

9   A.  That's attributed to Nadine Arslanian.

10  Q.  Could you please read the large title text right below the

11  sent line.

12  A.  Sure.  "Menendez, Rubio, Cardin and colleagues urge

13  administration to press Egyptian president on human rights,

14  anti-NGO law."

15  Q.  Directing your attention to the middle of the page to the

16  paragraph starting U.S. Senators Bob Menendez.  I'm not going

17  to ask you to read all those names, but how many senators are

18  listed after Bob Menendez?

19  A.  About 8 or 10.  Eight or so.

20  Q.  So could you please read what the paragraph says that all

21  those senators did that day.

22  A.  "They today urged President Trump to press Egyptian

23  President Abdel Fattah El-Sisi on the worsening human rights

24  situation and the restrictions on non-governmental

25  organizations in Egypt."

O5S3MEN3                        Coughlin - Direct

1    Q.  Directing your attention to the line above that paragraph

2    starting Tuesday.  Could you please read that line.

3    A.  "Tuesday, June 20, 2017."

4    Q.  So if the paragraph that we just looked at said that the

5    senators had urged President Trump to press Egyptian President

6    el-Sisi on the worsening human rights situation on June 20,

7    2017, directing your attention to the "sent" line.  How long

8    ago had that happened when Hana sent this e-mail to Nadine?

9    A.  That would be about eight months prior.

10              MR. MONTELEONI:  Mr. Hamill, could you please put the

11   chart Government Exhibit 1302 back up.  Please publish page 2.

12   Q.  Directing your attention to line 34.  The entry for

13   February 23, 2018, at 3:27 p.m., who does Hana send a WhatsApp

14   message to, according to this line?

15   A.  Khaled Shawky.

16   Q.  I'll ask you some more questions about Khaled Shawky in a

17   few minutes.  But in the documents you were asked to review,

18   did you see a business card for this individual?

19   A.  I did, yes.

20   Q.  Let's take a look at that business card first.

21              MR. MONTELEONI:  Mr. Hamill, could you please put up

22   to the right what's in evidence as Government Exhibit B105-A.

23   Q.  Directing your attention to the upper-left corner of the

24   business card.  Could you please read the first two lines.

25   A.  Yes.  It says "Embassy of the Arab Republic of Egypt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Defense Office in Washington, D.C."

2    Q.    Could you please read the name and title information in the

3    center of the business card.

4    A.    Major General Khaled Shawky Defense, Army, Naval and Air

5    Force Attache U.S.A. and Canada.

6    Q.    Directing your attention to the bottom left.  Could you

7    please read out street address that's written on General

8    Shawky's business card.

9    A.    2590 L Street NW Washington, D.C. 20037.

10   Q.    Could you please read both of those e-mail addresses below

11   the street address.

12   A.    Yes.  Egyptiandefence@Verizon.net.

13   Khaled_Osman12@yahoo.CA.

14         MR. MONTELEONI:  Mr. Hamill, can you please take down

15   and put up to the left Government Exhibit 1430 page 3.

16         I'll now read paragraph 18.  The document marked for

17   identification as Government Exhibit 2A-19 is a true and

18   accurate photograph of Khaled Shawky Osman.

19         Mr. Richenthal, could you please put up Government

20   Exhibit 2A-19 on the board, with the accompanying name.

21         And you can take down Government Exhibit 1430,

22   Mr. Hamill.  Thank you.

23   Q.    Let's look at the message that Hana sent to General Shawky.

24   Special Agent Coughlin, could you please read the text inside

25   the quotation marks that the chart lists Hana as having sent to

O5S3MEN3                        Coughlin - Direct

1    General Shawky.

2    A.   Https://www.menendez.senate.gov//committees.

3           MR. MONTELEONI:  Mr. Hamill, could you please put up

4    Government Exhibit 1432, page 5.  I'll now read from

5    paragraph 13.

6           If called to testify, a representative of the Internet

7    Archive would testify as follows.

8           (a) The Internet Archive is a website that provides

9    access to a digital library of internet sites and other

10   cultural artifacts in digital form.

11          (b) The Internet Archive created a service known as

12   the Wayback Machine.  The Wayback Machine makes it possible to

13   browse more than 450 billion pages stored in the Internet

14   Archive's web archive.  Visitors to the Wayback Machine can

15   search archives by URL, i.e. a website address.  If archived

16   records for the URL are available, the visitor will be

17   presented with a display of available dates.  The visitor may

18   select one of those dates and begin browsing an archived

19   version of the web.

20          So then, can we scroll down a little farther

21   Mr. Hamill, please.  You can keep scrolling.

22          So, subparagraph (e).  Documents marked for

23   identification of the following Government Exhibits contain

24   true and correct copies contain of the records of the archived

25   files for the web page URLs and the dates specified below.

```
 1              So can you scroll down to 10G-6.  So GX 10-6 web page

 2      https://www.menendez.Senate.gov/about/committees September 18,

 3      2018.

 4              So Mr. Hamill, could you please now put up what's in

 5      evidence as Government Exhibit 10G-6.

 6      Q.  So, Special Agent Coughlin -- and could you expand the top

 7      half of the page for now.  Special Agent Coughlin, directing

 8      your attention to the top banner in Government Exhibit 10G-6.

 9      How does that web address in that banner compare to the web

10      address that you just read that Hana texted General Shawky in

11      February of 2018?

12      A.  It is the same.

13      Q.  Directing your attention to the black Sep 18, 2018 toward

14      the right of the top banner.  How does the date, September 18,

15      2018, compare to the date that Government Exhibit 1302 lists

16      Hana as texting that web address to General Shawky?

17      A.  I don't recall.  Is it a few days before?

18              MR. MONTELEONI:  You can put up to the left,

19      Mr. Hamill, page 2 of Government Exhibit 1302.  And could you

20      please expand line 34.

21      Q.  So how does the September 18, 2018, date compare to the

22      February 23, 2018, date that Hana texted this URL to General

23      Shawky?

24      A.  Thank you, yes.  That's about seven months later.

25              MR. MONTELEONI:  You can take down Government
```

O5S3MEN3                        Coughlin - Direct

1    Exhibit 13902 for now, Mr. Hamill.  Thank you.

2    Q.  Could you please read the big title under the top banner in

3    Government Exhibit 10G-6.

4    A.  "Committee assignments."

5    Q.  Could you please read the line under "committee

6    assignments."

7    A.  "Foreign Relations Committee."

8              MR. MONTELEONI:  And could you now scroll down past

9    the picture, Mr. Hamill.

10   Q.  And Special Agent Coughlin, could you please read the first

11   sentence of the paragraph under the picture.

12   A.  "Bob Menendez serves as the ranking member most senior

13   Democrat of the powerful Senate Foreign Relations Committee

14   that helps shape foreign policy of broad significance in matter

15   of war and peace and international relations."

16             MR. MONTELEONI:  Mr. Hamill, could you please take us

17   back to Government Exhibit 1302, page 2.

18   Q.  Going down to the next line, line 35, Special Agent

19   Coughlin, what's the date?

20   A.  February 26, 2018.

21   Q.  So about how long is February 26, 2018, after the date that

22   Hana sent that link to General Shawky?

23   A.  Just three days later.

24   Q.  Who does Hana text on February 26, 2018?

25   A.  He texts Nadine Arslanian.

1  Q.  Please read what Hana texts Nadine Arslanian.

2  A.  "Egyptian Defense Office 2590 L Street NW Washington, D.C.

3  20037."

4  Q.  How does that street address compare to the street address

5  that we saw listed on General Shawky's business card a few

6  minutes ago?

7  A.  It's the same.

8  Q.  Directing your attention to the next line.  After Nadine

9  Arslanian receives this address information for the Egyptian

10  Defense Office, what does the chart reflect she does?

11  A.  She texts that address to Robert Menendez.

12          MR. MONTELEONI:  Let's look at this message.

13  Mr. Hamill, could you please put up what's in evidence as

14  Government Exhibit A101-5, and expand the blue bubble on the

15  top.  And now, could you actually expand the top half of the

16  page including that one and the next.

17  Q.  Special Agent Coughlin, can you please read Menendez's

18  response to getting this address.

19  A.  528 Hart Senate Office Building.

20          MR. MONTELEONI:  Mr. Hamill, could you please publish

21  Government Exhibit 1302, page 2.

22  Q.  And directing your attention to line 38, what does Nadine

23  Arslanian do after receiving that text from Menendez?

24  A.  She then sends that same -- possibly a forward of the text,

25  but sends that same information to Andy Aslanian.

1  Q.  A few lines down, at 3:26 p.m., line 43, could you please

2  read what Hana texts to Nadine Arslanian in that line.

3  A.  "Call."

4  Q.  Turning to the next line, line 44.  First of all, what is

5  the time of this next line?

6  A.  4:37 p.m.

7  Q.  About how long is that after Wael Hana texted "call" to

8  Nadine Arslanian?

9  A.  It is a little over an hour.

10 Q.  Directing your attention to the detail cell.  Please just

11 read the first word before the quotation marks.

12 A.  "Voicemail."

13 Q.  Who is the voicemail from?

14 A.  It's from Nadine Arslanian.

15 Q.  Who is the voicemail to?

16 A.  Robert Menendez.

17        MR. MONTELEONI:  So, I'd like to play the voicemail

18 and with the Court's permission I'd like to present Government

19 Exhibit A105-A-TR, a written transcription as an aid to the

20 jury just while the audio file is playing.

21        THE COURT:  So the audio file is in evidence.

22        MR. MONTELEONI:  Yes.

23        THE COURT:  All right, ladies and gentlemen, so the

24 evidence is the audio file.  Apparently the government has

25 prepared a transcript of what they believe is on the audio

O5S3MEN3                    Coughlin - Direct

1    file.  So that's going to be shown to you as an aid to help

2    you, but the transcript is not the evidence.  It is the audio

3    file that's the evidence.  So if you hear something on the

4    audio file that's different than what's on this transcript,

5    remember the transcript is simply an aid to help you understand

6    the evidence but the evidence is the audio file.  Okay?

7    Thanks.  Proceed.

8            MR. MONTELEONI:  Thank you, your Honor.  So if you

9    could please put up Government Exhibit A105-A-TR, Mr. Hamill.

10   And then when you're ready, please play Government Exhibit

11   A105-A.

12           (Audio playing)

13           MR. MONTELEONI:  May I have a moment to consult with

14   Mr. Hamill to see how fast this can be resolved.

15           (Audio playing)

16           MR. MONTELEONI:  Your Honor, we've been going for two

17   hours.  I wonder if this might be a time for a break.

18           THE COURT:  If you can get it up, it would be nice for

19   them to hear it.  Is that the issue?

20           MR. MONTELEONI:  It might take a moment or two.

21           THE COURT:  Why don't we take our midafternoon break,

22   ladies and gentlemen.  10 minutes.

23           (Jury excused)

24           THE COURT:  10 minutes.

25           (Recess)

1          (Jury present)

2          THE COURT:  Do we have that audio up?

3          MR. MONTELEONI:  Yes.  May I proceed, your Honor?

4          THE COURT:  Yes.  Jury, you remember my instruction

5     before in regard to the audio being the evidence.  Play it.

6          MR. MONTELEONI:  Mr. Hamill, before playing it, if you

7     can display -- thank you.

8          (Audio playing)

9          MR. MONTELEONI:  Mr. Hamill, can you please put back

10    up Government Exhibit 1302, page 3.

11    Q.  Now, going to February 27, 2018, at 8:29 a.m.  Special

12    Agent Coughlin, can you please read the text that Nadine

13    Arslanian sends to Menendez according to this chart.

14    A.  "As much as I really wanted to see you today I could hear

15    in your voice it's going to be tight for you and I thank you so

16    much for having said yes, you would do it for half an hour.  I

17    will go to Wael's office and call you at 3:15 p.m. and we can

18    get all the introductions out of the way properly over the

19    phone, and you pick a day you are free for us to fly down to

20    Washington to meet comfortably according to your schedule.  If

21    not next week, then the week after."

22    Q.  So let's go ahead a few days.  Directing your attention two

23    lines down, to line from March 18 -- March 5, rather, 2018,

24    2:51 p.m.  What about does the chart reflect that Wael Hana

25    texts to Nadine then?

1    A.  "Call me."

2    Q.  Directing your attention to the next line, at 5:44 p.m.,

3    first, about how long is that line after Wael Hana texted "call

4    me" to Nadine Arslanian?

5    A.  It is a little less than three hours.

6    Q.  Who does Nadine Arslanian text after 5:44 p.m.?

7    A.  Robert Menendez.

8    Q.  Can you please read what she texts Robert Menendez at

9    5:44 p.m.

10   A.  "General Khaled Shawky Col. Aymen Habib Col. Ahmed Atia."

11   Q.  Directing your attention to the next line, could you please

12   read what the chart reflects she texted Robert Menendez.

13   A.  "Wael Hana, Antranig Aslanian, Nadine Arslanian."

14   Q.  Have you seen any other names listed for Antranig Aslanian

15   in the documents you reviewed?

16   A.  Yes.

17   Q.  What's the more common first name he's referred to as?

18   A.  Andy.

19   Q.  Directing your attention to the line after that, line 59.

20   Could you please read what the chart reflects that Nadine texts

21   Menendez at 5:50 p.m.

22   A.  "We need two different invitations please.  The first three

23   names are for the Egyptian Army and the second three names are

24   us.  Could you please e-mail me the two separate invitations to

25   my e-mail nad070@yahoo.com whenever you get a chance."

1    Q.  Directing your attention to the next line, line 60.  Could

2    you please read what the chart reflects that she texts him at

3    5:57 p.m.

4    A.  "Wael and I would like to meet with you this weekend to

5    discuss the points of the meeting on the 13th.  It's

6    important."

7    Q.  Directing your attention to the line after that.  What does

8    the chart indicate that Menendez texts back at 7:28 p.m.?

9    A.  "Would need the general's direct e-mail."

10   Q.  Turning to page 4.  What do the next two lines reflect?

11   A.  Wael Hana sends Nadine Arslanian a picture of Khaled

12   Shawky's business card, and then Nadine sends that photo to

13   Robert Menendez.

14   Q.  About how long does Nadine send it to Menendez after Nadine

15   gets it from Wael Hana?

16   A.  A minute later.

17   Q.  Is that the business card we looked at earlier for Khaled

18   Shawky?

19   A.  It is, yes.

20   Q.  Now, looking at the second March 5, 2018, 7:32 p.m. line,

21   line 64, what does this list Nadine as texting Menendez?

22   A.  "I just sent you his e-mail."

23   Q.  Going to the next day, the next line, can you please read

24   the quoted text that the chart indicates that Nadine sends to

25   Menendez on March 6 at, 2018 at 11:43 a.m.

1   A.  "Sorry to bother you.  When you send the invite for Wael,

2   Antranig and I.  Could you please e-mail it to Wael and please

3   could you e-mail him or text him the invite for the general so

4   he looks it over.  Thank you." And then attaches image of Wael

5   Hana business card.

6   Q.  And by the way, how did you verify this file was what

7   Nadine attached to this text message?

8   A.  So, this is the government exhibit which I looked at, but

9   you can also look at the sort of original file that's attached

10  to the phone records.

11  Q.  Were you given access to folders of attachments to the

12  reports of these chats to see what files they contained?

13  A.  That's correct, yes.

14  Q.  Turning to page 5.  What's the date of this next line,

15  line 66?

16  A.  March 7, 2018, 2:39 p.m.

17  Q.  So when's that in comparison to the March 6 date that we

18  just saw that Nadine Arslanian sent the text asking Menendez to

19  e-mail or text Hana the invite for the general?

20  A.  It would be the next day.

21  Q.  Directing your attention to the detail cell of this line.

22  Could you please read the first word before or just the first

23  word of the detail cell.

24  A.  "E-mail."

25  Q.  Let's look at this e-mail.

1        MR. MONTELEONI:  Mr. Hamill, can you please publish

2   what's in evidence as Government Exhibit 3A-1.

3   Q.  Special Agent Coughlin, directing your attention to the

4   "from" line.  Could you please read the "from" line.

5   A.  Arkin, Sarah (Menendez).

6   Q.  Could you please read the "to" line.

7   A.  Stroul, Dana (Foreign Relations).

8   Q.  Could you please read the subject line.

9   A.  RM.

10  Q.  Could you please read the body text.

11  A.  "Wrote this and handed to Rob.  Thoughts?"

12  Q.  Directing your attention first to where it says "handed to

13  Rob."  Could you please read the cc line of this e-mail.

14  A.  Yes.  Kelly, Robert (Menendez).

15  Q.  Does this e-mail have an attachment?

16  A.  It does.

17  Q.  What type of file is the attachment?

18  A.  It is a jpeg which is an image.

19  Q.  Let's look at the attachment.

20        MR. MONTELEONI:  Mr. Hamill, could you please turn to

21  page 2 of Government Exhibit 3A-1.  So, and then could you

22  expand the top half of the page.

23  Q.  Special Agent Coughlin, directing your attention first to

24  the upper left and the second line of the lined paper.  Could

25  you please read the salutation starting with "dear."

O5S3MEN3                          Coughlin - Direct

1    A.  Yes.  Dear -- appears to say Major General Shawky.

2    Q.  What was Khaled Shawky's rank from the business card we

3    saw?

4    A.  Major General.

5    Q.  Directing your attention to the upper-right corner.  Does

6    that appear to be an e-mail address?

7    A.  It does, yes.

8    Q.  And how does that e-mail address compare to the address on

9    the business card Nadine Arslanian texted to Robert Menendez?

10   A.  It appears to be one of those e-mail addresses.

11   Q.  Could you remind the jury if, before the break, we looked

12   at the page of committee assignments for Robert Menendez

13   listing him as the ranking member on the Senate Foreign

14   Relations Committee?

15   A.  Yes.

16   Q.  Directing your attention two lines under the salutation.

17   First of all, is this handwriting easy to read?

18   A.  I wouldn't say it's easy.  But it's generally legible.

19   Somewhat legible anyway.

20   Q.  Can you do your best to read that paragraph.

21   A.  Sure.  "From the ranking member of the SFRC I wish to

22   invite you" then you can see it looks like there's edits and

23   "your colleague Colonel Habib and Colonel Atia to a

24   conversation about U.S. Egypt" -- not sure of that word "U.S.

25   Egypt and military relations at my office 528 Hart Senate

1    Office Building on Tuesday, March 13 at 4 p.m."

2              THE COURT:  Is the word that you can't see that you

3    don't know what it was "security"?

4              THE WITNESS:  Yes.  Appears to be.

5    Q.  By the way, you read Colonel Habib and Colonel Atia.  Is

6    that the word written out or an abbreviation?

7    A.  An abbreviation.

8    Q.  What's that abbreviation?

9    A.  It says Col.

10   Q.  Is that a common abbreviation for colonel?

11   A.  To my knowledge, yes.

12   Q.  Directing your attention to the address that's written

13   under the paragraph that you just read.  Not going to ask you

14   to read that all.  But how does that address compare to the

15   street address on the business card for Major General Khaled

16   Shawky that we saw that Hana sent to Nadine and that Nadine

17   sent to Menendez?

18   A.  It appears to be the same address.

19             MR. MONTELEONI:  Now, Mr. Hamill, could you please

20   scroll us down to the bottom half of this page.

21   Q.  Now, on this bottom half of the page, directing your

22   attention to the second salutation that's handwritten here on

23   this page.  Could you please read that line starting "dear."

24   A.  "Dear Mr. Hana."

25   Q.  Please try to read this paragraph.

1    A.  "As the ranking member of the SFRC I wish to invite you and

2    your colleague Antranig Aslanian and Nadine Arslanian to a

3    conversation about U.S. Egypt" and then it appears to say

4    "security and military" which may be is crossed out "relations

5    at my office."

6    Q.  Directing your attention to the address information below.

7    I am not going to ask you to read it all out loud.  How does

8    that compare to the address information on the business card

9    for Wael Hana that Nadine texted to Menendez?

10    A.  It is the same.

11          MR. MONTELEONI:  Mr. Hamill, you can take that down.

12    Put back up Government Exhibit 1302 page 5.

13    Q.  Now, directing your attention to the line for March 8,

14    2018, at 12:39 p.m.  What does the chart reflect that Wael Hana

15    texts to Nadine Arslanian on that date?

16    A.  A picture of an invitation.

17    Q.  Let's look at the invitation.

18          MR. MONTELEONI:  Mr. Hamill, could you please publish

19    what's in evidence as Government Exhibit B105-B.  Then expand

20    the text.

21    Q.  So, directing your attention first to the signature block.

22    Who is the sender?

23    A.  Robert Kelly, Deputy Chief of Staff for Operations U.S.

24    Senator Bob Menendez.

25    Q.  Who is the recipient?

1    A.  It says Dear Mr. Hana.

2    Q.  And looking up above, the image quality is not incredibly

3    crisp, but if you look at the gray letters above the Dear

4    Mr. Hana, can you make out what e-mail address it's directed

5    to?

6    A.  Yes.  It says the user ID says W. Hana and it says

7    W.Hana@loundeseg.com.

8    Q.  Directing your attention to the very top of the page.

9    Could you read the large subject line.

10   A.  "Invitation from Ranking Member Menendez."

11   Q.  Now, directing your attention to the main paragraph.

12   Please read the first sentence up to "relationship."

13   A.  "As the ranking member of the U.S. Senate Foreign Relations

14   Committee, I wish to invite you and any of your colleagues

15   Antranig Aslanian and Nadine Arslanian to a conversation about

16   U.S. Egypt security and military relationship."

17   Q.  After that paragraph, skipping the last couple of lines of

18   that paragraph, could you please just read the two lines

19   starting "sincerely."

20   A.  "Sincerely Senator Bob Menendez."

21   Q.  Before we move on from this e-mail, could you please note

22   the date that this meeting invitation is for.

23   A.  Yes.

24   Q.  What is that date?

25   A.  Tuesday, March 13, at 4 p.m.

1          MR. MONTELEONI:  Mr. Hamill, could you please publish

2    Government Exhibit 8F-9 which is in evidence.  And then expand

3    the text on the top of the page.

4    Q.  So, first, what's the date of this e-mail?

5    A.  This e-mail is Monday, March 12, 2018.

6    Q.  So how does that compare to the Tuesday, March 13 scheduled

7    date of the meeting that we just looked at according to the

8    invitation?

9    A.  It would be the day before.

10   Q.  Please read the "from" line.

11   A.  Stroul, Dana (Foreign Relations).

12   Q.  Could you please read the "to" line.

13   A.  Kelly, Robert (Menendez), then it has the e-mail address

14   Robert_Kelly@Menendez.Senate.gov.

15   Q.  How does the name of the person in the "to" line compare to

16   the individual who just sent the invitation to Wael Hana we

17   were just looking at?

18   A.  It appears to be the same person.

19   Q.  There is a number of names in the cc line.  I am not going

20   to ask you to read all their names or e-mail addresses.  But

21   could you please just read the last portion of their e-mail

22   addresses and tell us what e-mail domains the portions after

23   the @ sign are in these e-mail addresses?

24   A.  Yes.  Most of them have @foreign.senate.gov.  I think there

25   is another @Menendez.senate.gov.

1   Q.  Does this e-mail have any recipients lists who do not have

2   the Menendez.senate.gov or foreign.senate.gov domains?

3   A.  No.

4   Q.  Can you please read the first two words of the subject line

5   in the e-mail in all capital letters?

6   A.  "For RM."

7   Q.  By the way, what are Menendez's initials?

8   A.  RM.

9   Q.  Please read the rest of the subject line after for RM.

10  A.  "Memo for Egypt Defense Attache Meeting Final."

11  Q.  Let's look at the attachment.

12        MR. MONTELEONI:  Mr. Hamill, could you please publish

13  the top half page 2 of Government Exhibit 8F-9.

14  Q.  Special Agent Coughlin, could you please read the title in

15  the top center of the page.

16  A.  "Meeting memo".

17  Q.  Who is this meeting memo listed as from?

18  A.  Dana Stroul and Christopher Barr.

19  Q.  Who is it to?

20  A.  Senator Menendez.

21  Q.  Who is cc'd?

22  A.  Jessica Lewis and Sarah Arkin.

23  Q.  Could you please read the re line.

24  A.  "Meeting with Egyptian Defense Attache General Shawky."

25  Q.  Could you please read the meeting purpose line.

A.  "On Tuesday at 4 p.m., you will meet General Shawky,

Egypt's defense attache in Washington to discuss the U.S. Egypt

relationship."

MR. MONTELEONI:  Mr. Hamill, could you please expand

the whole page.  Now expand the bottom half from background on

down.

Q.  So, directing your attention after the background heading,

and down to the mostly unredacted paragraph starting

assistance.  Could you please read the first sentence up to

FY17.

A.  Sure.  "On January 23, 2018, the administration notified

Congress of its intent to obligate $1.039 billion out of a

total of $1.3 billion in FMF for FY 2017."

Q.  Could you please read the next sentence up to waiver.

A.  "Part of the 260.7 million in withheld is tied to a

certification requirement on human rights and democracy which

Tillerson did not make and did not use the Senate security

waiver."

MR. MONTELEONI:  Mr. Hamill, you could please take

that down.  Put back up Government Exhibit 1302, page 6.

Q.  Special Agent Coughlin, directing your attention to

March 13, 2018 at 4 p.m.  Could you please read the details of

that line.

A.  Yes.  4 p.m. you said, right?

Q.  Yes.

1  A.  "Robert Menendez's schedule contains an entry at 4 p.m. to

2  4:45 p.m. meeting with Major General Khaled Shawky, Egyptian

3  defense attache."

4  Q.  Directing your attention to the next two lines.  71 and 72.

5  What do they reflect that Hana texts Nadine that night?

6  A.  Photos.

7  Q.  Let's take a closer look at one of those photos.

8         MR. MONTELEONI:  Mr. Hamill, could you please put up

9  what's in evidence as Government Exhibit C102-B.

10 Q.  Special Agent Coughlin, do you recognize Menendez in this

11 picture?

12 A.  I do, yes.

13 Q.  Where is he standing?

14 A.  He's third from the left with the light blue tie.

15 Q.  And who is to the left of him in the picture?

16 A.  To our left is Nadine Arslanian.

17 Q.  That's right.  And who is to our left of her in the

18 picture?

19 A.  Wael Hana.

20 Q.  Who is to the right of Menendez in the picture?

21 A.  Khaled Shawky.

22 Q.  Who is to the right of General Shawky in the picture?

23 A.  Andy Aslanian.

24         MR. MONTELEONI:  Mr. Hamill, could you please take us

25 back to Government Exhibit 1302, page 7.

1  Q.  So, directing your attention to the first April 5, 2018

2  line, line 76.  How long is this after this March 13, 2018,

3  scheduled meeting we just discussed?

4  A.  It's a little less than a month.  Three or four weeks or

5  so.

6  Q.  On that line at 4:40 p.m., please read just the first

7  sentence of the quoted text that the chart reflects that Hana

8  sent to Nadine Arslanian.

9  A.  Just the quoted portion?

10  Q.  Well, it's all a quotation.  Just the first sentence of

11  that quotation.

12  A.  Okay.  "The Court of Cassation headed by Counselor Abdel

13  Rahman Mustapha Heikal overturned the 16-year sentence for the

14  foreign financing case in 2011 and re-imitated it before

15  another criminal chamber."

16  Q.  Directing your attention to the line after it.  Line 77.

17  Could you please read what the chart reflects that Nadine

18  Arslanian responds to Hana one minute later.

19  A.  "Do I send this to the senator?"

20  Q.  Directing your attention to the line after that.  Please

21  read Hana's reply after 4:45 p.m.

22  A.  "Give me a minute.  I am going to send you full report to

23  send it to him."

24  Q.  Where it says "I'm going to send you full report," what

25  does the next line says that Hana sends her?

1    A.  An e-mail with an attachment.

2    Q.  Let's look at that e-mail.

3         MR. MONTELEONI:  Mr. Hamill, could you please publish

4    what's in evidence as Government Exhibit C402.  And you can

5    expand the text on that page above the signature graphic.

6    Q.  Looking at that e-mail, could you please read the title of

7    the attachment to the e-mail?

8    A.  Yes.  4.1 PDF.

9    Q.  Let's look at this attachment.

10        MR. MONTELEONI:  Mr. Hamill, could you please show us

11   page 2 of Government Exhibit C402 and expand the top half first

12   page.

13   Q.  Special Agent Coughlin, how do the first few paragraphs

14   compare to the text that you just read portions of roughly?

15   A.  It's very close, a portion of that.

16        MR. MONTELEONI:  Mr. Hamill, could you please expand

17   the bottom of the second page.

18   Q.  So directing your attention to the last paragraph on the

19   second page.  Please read the last sentence of this -- wait.

20   No.  Could we expand the page again.  So going to the second

21   big paragraph on the page.  Directing your attention -- one up

22   from that.

23        Directing your attention, Special Agent Coughlin, to

24   the last sentence of this paragraph starting "in this case."

25   Please read that sentence starting "in this case."

1  A.  "In this case, 43 defendants, including 14 Egyptians and 29

2  American, European and Arab defendants were tried for foreign

3  aid amounting to $60 million through 68 human rights

4  organizations and a non-governmental association operating in

5  Egypt."

6          MR. MONTELEONI:  Now Mr. Hamill, if you could take us

7  down to the bottom paragraph on this page and expand that

8  paragraph.

9  Q.  Special Agent Coughlin, could you please read this

10  paragraph.

11  A.  "The decision included the dissolution of the American

12  Republic Institute, the American Democratic Institute, Freedom

13  House, the American International Center for Journalists, The

14  Conrad German Organization, the closure of all branches of the

15  above and all governorates in Egyptian and the confiscation of

16  their funds in full and all that was seized in those branches."

17          MR. MONTELEONI:  Mr. Hamill, you can put take that

18  down and put back up Government Exhibit 1302, page 7.

19  Q.  Special Agent Coughlin, directing your attention to the

20  5:10 p.m. line at the bottom of the page.  5:10 on April 5,

21  2018.  Could you please read the detail cell describing what

22  Nadine sends to Robert Menendez.

23  A.  It is an e-mail with an attachment 4-1.PDF about the court

24  of cassation decision.  Nadine writes in the e-mail, "Mon

25  amour, I just got this e-mail.  It was part of the conversation

1   that was held at your office in Washington.  I thought you

2   would be interested in reading it."

3       MR. MONTELEONI:  Mr. Hamill, could you please take us

4   to the next page.

5   Q.  Directing your attention to line 81 at the top.  What's the

6   date?

7   A.  April 6, 2018.

8   Q.  Please read what Nadine Arslanian texts to Wael Hana at

9   5:40 p.m. that day.

10  A.  "Senator said that you are such a good friend for

11  everything you did yesterday and the day before to me.  He

12  called me after he left the governor's house just to tell me

13  that, but he had people in the car, so I will find out when he

14  calls me today what happened and ask him about the two deals."

15  Q.  Does anything in her message explain what the two deals

16  that she's saying she is going to ask the senator about are?

17  A.  No.

18  Q.  These last few lines were from April 2018.  I want to ask

19  about some things that happened in May.  Staying on page 8.

20  Directing your attention to line 83 and May 3 line.  With no

21  "to" or "from" listed, what kind of document is described as

22  being published on that date?

23  A.  This relates to an article that was published.

24  Q.  Let's look at the article.

25      MR. MONTELEONI:  Mr. Hamill, could you please publish

1    what's in evidence as Government Exhibit 10A1 and put up

2    page 1.

3    Q.  So, Special Agent Coughlin --

4              MR. WEITZMAN:  Your Honor, can we get an instruction

5    on Senator-1 that it's not Senator Menendez?

6              MR. MONTELEONI:  Absolutely.  We have no objection

7    to --

8              THE COURT:  Senator-1 is not Senator Menendez.

9    Proceed.

10             MR. MONTELEONI:  Thank you.

11   Q.  So, could you please read the large bolded headline.

12   A.  "Congress withholds Egypt aid over injured American."

13   Q.  Could you please read the subtitle sentence.

14   A.  Senator-1 has asked the Donald Trump Administration to hold

15   $300 million in military aid unless Cairo pays reparations for

16   a 2015 attack on tourists and meets a series of human rights

17   conditions."

18   Q.  I'm not going to ask you to read them out loud.  But does

19   the article specify some of these human rights conditions that

20   are referred to in this subtitle you just read?

21   A.  It does, yes.

22             MR. MONTELEONI:  Mr. Hamill, you can then put back up

23   Government Exhibit 1302, page 8.

24   Q.  Special Agent Coughlin, directing your attention to

25   line 87.  The line from May 6, 2018, at 12:32 p.m.  What does

1    Hana text Nadine then?

2    A.  "Are we meeting for dinner today."

3    Q.  A few lines down, line 90 at 2:56 p.m., what does Nadine

4    text to Hana?

5    A.  See you at Forno.

6    Q.  On the next line, line 91, what does Nadine write to Hana

7    at 3:14 p.m.?

8    A.  "On my way."

9    Q.  The line after that, what does she write to Hana at

10   3:31 p.m.?

11   A.  "We are in dining room."

12   Q.  Where it says "we are in dining room," does that text say

13   who the "we" is?

14   A.  It does not.

15   Q.  Let's look at something a few lines up.  You read "See you

16   at Forno."

17           MR. MONTELEONI:  Mr. Hamill, could you please show the

18   witness, the parties and the Court the document marked for

19   identification as Government Exhibit 10H-7.

20   Q.  Special Agent Coughlin, do you recognize this document?

21   A.  I do, yes.

22   Q.  What type of document is this?

23   A.  It's from Google Maps.  It shows walking directions.

24   Q.  Did you personally create this image?

25   A.  I didn't create this, no.

1   Q.  Did you check that it actually reflects what a Google Map

2   shows?

3   A.  I did actually look up the directions myself, yes.

4           MR. MONTELEONI:  We offer Government Exhibit 10H-7 in

5   evidence.

6           THE COURT:  Hearing no objection, admitted.

7           (Government's Exhibit 10H-7 received in evidence)

8           MR. MONTELEONI:  Mr. Hamill, could you please publish.

9   Q.  Directing your attention first to the top-left corner where

10  if says Fornos of Spain.  First, what is Fornos of Spain

11  according to Google?

12  A.  It's a restaurant.

13  Q.  This lists directions between Fornos of Spain and One

14  Gateway Center.  About how far is Fornos of Spain from One

15  Gateway Center according to this map?

16  A.  A six minute walk.

17  Q.  Let's look at what's at One Gateway Center.

18          MR. MONTELEONI:  Mr. Hamill, could you please put up

19  to the right page 2 of Government Exhibit 3A-12.  And could you

20  expand the top third of the page.

21  Q.  So, Special Agent Coughlin, could you please read the top

22  two lines in the center of Government Exhibit 3A-12.

23  A.  "Senator Robert Menendez state offices contact

24  information."

25  Q.  Directing your attention to the box beneath the word "state

1    offices contact information."  On the right, under the word

2    Newark, could you please read the street address.

3    A.  One Gateway Center.

4    Q.  So how does that address compare to the address that

5    Government Exhibit 10H-7 lists as a six minute walk from Fornos

6    of Spain?

7    A.  It's the same address.

8    Q.  Let's return to the chart.

9        MR. MONTELEONI:  Mr. Hamill, could you please put back

10   up Government Exhibit 1302, page 8.

11   Q.  Directing your attention to line 93, the line after Nadine

12   Arslanian texts Hana we are in dining room.  So, then a few

13   lines after she texts Hana see you at Forno.  At 3:33 p.m. on

14   line 39, can you read Hana's response.

15   A.  "15 be there."

16   Q.  The line after that, what does Hana text 14 minutes later?

17   A.  "I'm here."

18   Q.  Could you note the date and time that Hana texted "I'm

19   here."

20   A.  Yes.  May 6, 2018, at 3:47 p.m.

21   Q.  Let's look at something that happens a couple of hours

22   later.

23       MR. MONTELEONI:  Mr. Hamill, could you please publish

24   what's in evidence as Government Exhibit 8A-1.  Publish just

25   the bottom e-mail of this chain.

1    Q.  Special Agent Coughlin, what's the date and time of this

2    e-mail?

3    A.  May 6, 2018, 5:34 p.m.

4    Q.  How does that compare to the 3:34 p.m. time that Hana

5    texted "I'm here" to Nadine Arslanian?

6    A.  A little less than two hours later.

7    Q.  What day of the week does it indicate this e-mail was sent?

8    A.  Sunday.

9    Q.  And who is sender of this e-mail?

10   A.  It says Stroul, Dana (Foreign Relations).

11   Q.  How does that compare to the person who sent the memo, the

12   meeting memo for Menendez in advance of that meeting with Major

13   General Shawky in March 2018 we saw?

14   A.  It's the same.

15   Q.  Could you please read the display name of the recipient of

16   the e-mail.

17   A.  Yes.  Miller, Tiernen.

18   Q.  Could you please read the subject line of the e-mail.

19   A.  "Embassy Cairo."

20   Q.  What country is Cairo the capital of?

21   A.  Egypt.

22   Q.  Could you please read the body of the e-mail.

23   A.  "Any idea how many Americans posted to the embassy?  Don't

24   ask why I'm asking."

25            MR. MONTELEONI:  Mr. Hamill, could you please expand

1  just to the next e-mail up the chain and the bottom one.

2  Q.  So, can you first read the e-mail address.

3  A.  MillerET@state.gov.

4  Q.  Could you remind the jury what department of the U.S.

5  government runs embassies?

6  A.  Department of State.

7  Q.  Can you please read what Tiernen Miller writes in response.

8  A.  "I would have to ask and then someone is going to ask why."

9           MR. MONTELEONI:  Mr. Hamill, could you please expand

10  the full e-mail chain.

11  Q.  Special Agent Coughlin, can you please read Dana Stroul's

12  reply.

13  A.  "Menendez is asking."

14  Q.  Look what happens on the next day.

15           MR. MONTELEONI:  Mr. Hamill, could you please put back

16  up Government Exhibit 1302, page 8.

17  Q.  So Special Agent Coughlin, directing your attention to

18  line 102, the entry for May 7, 2018 at 2:13 p.m.  Who is the

19  sender?

20  A.  Robert Menendez.

21  Q.  Who is the recipient?

22  A.  Nadine Arslanian.

23  Q.  Could you please read the message.

24  A.  "Just FYI, 277 Americans combination of diplomats,

25  commercial service, USAID, others, 1344 Egyptians locally

1  employed staff.  This is what's at American embassy.  Most are

2  Egyptians working at embassy."

3  Q.  Let's just take a look at that for a moment.

4        MR. MONTELEONI:  Mr. Hamill, could you please put up

5  what's in evidence as Government Exhibit A101-6 and expand the

6  middle message.

7  Q.  Special Agent Coughlin, is that what you just read

8  summarized?

9  A.  It is, yes.

10        MR. MONTELEONI:  Mr. Hamill, you can please take us

11  back to Government Exhibit 1302, page 8.

12  Q.  Directing your attention to the line after that text that

13  you just read.  Who does Nadine Arslanian call at 2:19 p.m.?

14  A.  Robert Menendez.

15  Q.  How long does that call last?

16  A.  12 minutes and 21 seconds.

17  Q.  The call starts at 2:19 p.m. lasts for about 12 minutes.

18  About when does it end?

19  A.  It would end at 2:31 or 2:32.

20  Q.  Directing your attention to the next line.  About how long

21  is it between when Nadine Arslanian gets off the phone with

22  Menendez and when she texts Hana?

23  A.  I would assume -- not assume.  It would be within a minute,

24  I think max two minutes.

25  Q.  Could you please read what she texts Menendez within one to

1    two minutes of getting off the phone with Menendez -- what she

2    texts to Hana, rather, within one to two minutes after getting

3    off the phone with Menendez?

4    A.  "He said he's waiting for an answer.  As soon as he gets it

5    he will call me.  And he sent me this information about the

6    American embassy in Egypt."

7                MR. MONTELEONI:  Mr. Hamill, could you take us to the

8    next page, please.

9    Q.  Directing your attention to the top line on page 9.  Could

10   you please read what Nadine Arslanian texts Wael Hana one

11   minute later.

12   A.  "Just FYI.  277 Americans combination of diplomats,

13   commercial service, USAID, others, 1344 Egyptians locally

14   employed staff.  This is what's at American embassy.  Most are

15   Egyptians working at embassy."

16   Q.  How does that text compare to what Menendez texted her

17   previously?

18   A.  It's the same.

19   Q.  Jump ahead for a moment to that evening.

20               MR. MONTELEONI:  Mr. Hamill, could you please take us

21   to page 10.

22   Q.  Directing your attention to the line, line 127 for May 7,

23   2018, at 10:38 p.m.  Who does it say is the sender of the

24   message listed on that line?

25   A.  Wael Hana.

O5S3MEN3                          Coughlin - Direct

1    Q.  Who does it say is the recipient?

2    A.  Ahmed Essam.

3    Q.  On the detail cell, please read the first word in that

4    cell.

5    A.  Viber.

6    Q.  What's Viber?

7    A.  Viber is a third-party app.  An encrypted messaging app.

8    Q.  Let's look at that Viber message.

9          MR. MONTELEONI:  Mr. Hamill, could you please put up

10   what's in evidence as Government Exhibit C112-1.

11   Q.  First directing your attention to the blue bubble.  Does

12   the person that Hana is exchanging Viber messages with have a

13   display name listed?

14   A.  No.

15   Q.  In the chart that we looked at, Government Exhibit 1305, is

16   Ahmed Essam attributed as a name to this phone number?

17   A.  Yes.

18   Q.  Let's go to the bottom of this page.  Let's look at the

19   message that Hana sends at 10:38 p.m. on May 7, 2018.  How does

20   that message compare to the message that Menendez sent to

21   Nadine Arslanian early that afternoon which you just testified

22   about?

23   A.  It's the same.

24   Q.  Let's look at who this Ahmed Essam user receiving the

25   messages.

O5S3MEN3                           Coughlin - Direct

1            MR. MONTELEONI:  Mr. Hamill, could you please put up

2      to the right what's in evidence as Government Exhibit 8A-12.

3      Publish the top two-thirds of the first page.

4      Q.   Special Agent Coughlin, directing your attention to the

5      second paragraph starting the attached documents.  Could you

6      please read the first sentence from the attached documents down

7      to the U.S. embassy in Cairo.  You can skip the control number

8      at the end.

9      A.   The attached documents are true, accurate and complete

10     copies of the information contained in the Consular

11     Consolidated Database maintained by the U.S. Department of

12     State, Bureau of Consular Affairs, for the non-immigrant visa

13     applications submitted by Ahmed Essameldin Mohamed Helmy

14     Abdallah, date of birth and adjudicated at the U.S. embassy in

15     Cairo.

16     Q.   So now is that name that you just read listed as an

17     alternate name for Ahmed Essam in the attribution chart?

18     A.   It is, yes.

19     Q.   Let's go down to page 2.

20            MR. MONTELEONI:  And Mr. Hamill, could you please

21     publish the top half showing the photo.  Mr. Richenthal could

22     you please put up Government Exhibit 2A-30 on the board and the

23     associated name.

24            MR. WEITZMAN:  I don't think this has been accepted

25     into evidence.

1          MR. MONTELEONI:  We moved it subject to connection.

2          MR. WEITZMAN:  I don't think there was a ruling on

3     that.

4          MR. MONTELEONI:  We ask it be admitted now.

5          THE COURT:  Yes, I see the connection.  Admitted.

6          MR. MONTELEONI:  So now, thank you.  Mr. Hamill, could

7     you please take us to page 5 of Government Exhibit 8A-12 and

8     expand the middle of the page.

9     Q.  Special Agent Coughlin, directing your attention to the

10    first line under telephone.  I am not going to ask you to read

11    that number out loud.

12         How does that number listed as home compare to the

13    phone number of the user that Hana texted the number of

14    Americans stationed at the U.S. embassy in Cairo to?

15    A.  It is the same with the addition of in the chat a country

16    code.

17         MR. MONTELEONI:  Now, Mr. Hamill, could you please

18    expand the top half of page 5 of Government Exhibit 8A-2.  Just

19    the top half.

20    Q.  Special Agent Coughlin, could you please read the employer

21    line.

22    A.  Counselor Ministry of Foreign Affairs.

23    Q.  Could you please read the line under occupation.

24    A.  Government.

25    Q.  Could you please read the line under visa type.

1    A.  Official.

2    Q.  And then in the middle paragraph under the telephone

3    number, could you please read the line under contact name?

4    A.  Egyptian embassy Egyptian embassy.

5            MR. MONTELEONI:  Mr. Hamill, could you please take

6    down Government Exhibit 8A-12 and C112-1 and return to what

7    happened the afternoon after Menendez sent that text.  Could

8    you please show us page 8 of Government Exhibit 1302.

9    Q.  Directing your attention, Special Agent Coughlin, to the

10   May 7, 2018, 2:32 p.m. entry at the bottom.  We looked at a few

11   moments ago where Nadine Arslanian texted Hana and said

12   "Waiting for an answer.  As soon as he gets it he'll call me

13   and he sent me the information about the American embassy in

14   Egypt."

15           Could you please scroll down so we see the bottom of

16   page 8 and the top of page 9.

17           So directing your attention down a few lines on the

18   next page to line 107 on May 7, 2018, at 3:06 p.m.  First,

19   about how long is that 3:06 p.m. line after the 2:32 p.m. line?

20   A.  34 minutes.

21   Q.  Could you please read just the first word of the detail

22   cell on this 3:06 p.m. line

23   A.  "E-mail."

24   Q.  Let's look at this e-mail.

25           MR. MONTELEONI:  Mr. Hamill, could you please publish

1    what's in evidence as Government Exhibit A402.  And expand the

2    text on that page.

3    Q.  Special Agent Coughlin, directing your attention to the top

4    line.  Who is this e-mail from?

5    A.  Robert Menendez e-mail address Bobmenendez154@gmail.com.

6    Q.  Does gmail.com indicate a government e-mail account?

7    A.  No.

8    Q.  Who is this e-mail to?

9    A.  Nadine Arslanian e-mail address nad070@yahoo.com.

10   Q.  Could you please read the subject line of this e-mail.

11   A.  "FYI."

12   Q.  Could you please read the first sentence of the first

13   paragraph.

14   A.  "Last week, Senator-1, a frequent critic of the Sisi

15   government, said he would put a hold on up to $300 million in

16   aid to Egypt unless a series of conditions are met."

17            MR. MONTELEONI:  Now, Mr. Hamill, could you please put

18   up to the left Government Exhibit 10A-1, the article we looked

19   at previously.  And now could you take to us page 2,

20   Mr. Hamill, of Government Exhibit 10A-1.

21            THE COURT:  Same Senator-1?

22            MR. MONTELEONI:  All of these references to Senator-1

23   or any senator number do not refer to the senator.

24            Now, Mr. Hamill, could you expand on the right from

25   the middle of the second paragraph starting "these include

1    providing compensation" down to the bottom of the third

2    paragraph ending in "surveillance may disappear in

3    January 2016."

4    Q.  Special Agent Coughlin, directing your attention to the

5    expanded portions of this article on the right and the rest of

6    the first paragraph of Menendez's e-mail to Nadine on the left.

7    How does the text in those paragraphs of the news article

8    compare to the text of the rest of that first paragraph of

9    Menendez's e-mail to Nadine?

10   A.  It is the same.  Appears to be word for word the same.

11   Q.  How do the hyperlinks in Menendez's e-mail compare to the

12   hyperlinks in the article?

13   A.  They are in the same spot.

14        MR. MONTELEONI:  Mr. Hamill, could you please take

15   down Government Exhibit 10A-1 and then put up on the left

16   Government Exhibit 8F-9, page 2 we looked at previously.

17   Expand the mostly unredacted bottom paragraph.

18   Q.  Special Agent Coughlin, how does the paragraph from the

19   meeting memo that we looked at previously in 8F-9 compare to

20   the second paragraph of Menendez's e-mail?

21   A.  It is the same.

22   Q.  Are there slight differences?

23   A.  Yeah, one or two words that are slightly different.

24   Q.  Let's see what happened after Nadine got that e-mail.

25        MR. MONTELEONI:  Mr. Hamill, could you please take

1    those down.  Put back up Government Exhibit 1302.  Take us to

2    page 9.

3    Q.  Special Agent Coughlin, directing your attention to the

4    line on May 7, 2018, at 3:47 p.m.  How does the time of that

5    line compare to the time of -- can you scroll a bit up,

6    Mr. Hamill.  How does the time of that line compare to the time

7    of Menendez sending the e-mail with the subject line FYI to

8    Nadine at 3:06 p.m.?

9    A.  It's 41 minutes later.

10   Q.  So what does Nadine text to Hana at 3:47 p.m.?

11   A.  She texts him screenshots of the previous e-mail, that

12   e-mail we were just discussing.

13   Q.  Let's look at one of those screenshots.

14          MR. MONTELEONI:  Mr. Hamill, could you please put up

15   what's in evidence as Government Exhibit B105-C to the right

16   and put back up Government Exhibit A42 on the left.

17   Q.  So, Special Agent Coughlin, how does the text in this

18   screenshot that Nadine texted to Hana on the right compare to

19   the text in the beginning of the first paragraph of the e-mail

20   that Menendez sent to Nadine on the left?

21   A.  It's the same.

22   Q.  In this screenshot, can you see who sent the e-mail with

23   this text?

24   A.  Not in the screenshot, no.

25   Q.  In any of the three screenshots that Nadine sends, can you

1    see who sent this e-mail?

2    A.  No.

3    Q.  Let's return to the chart.

4         MR. MONTELEONI:  Mr. Hamill, could you please put back

5    up Government Exhibit 1302, page 9.

6    Q.  Now, in the bottom half of this page, Special Agent

7    Coughlin, I'm not going to ask you to read them all.  Are there

8    a number of messages between Hana and Nadine about whether Hana

9    got all of the screenshots?

10   A.  There are, yes.

11   Q.  Turning to the next page, take us there, Mr. Hamill.  On,

12   yes, so on May 7, 2018 at 8:03 p.m., line 126.  What does the

13   chart reflect that Nadine eventually does?

14   A.  Sent those screenshots in an e-mail.

15   Q.  So let's look at the next day.  Directing your attention to

16   line 129.  Could you please read the first word in the details

17   column of this line that's dated May 8, 2018 at 4:27 p.m.

18   A.  "Voicemail."

19   Q.  Who was that voicemail left for?

20   A.  Robert Menendez.

21   Q.  Let's listen ton this voicemail.

22        MR. MONTELEONI:  I'd like to with the Court's

23   permission show the jury Government Exhibit A105-C-TR as an aid

24   to the jury as we play the voicemail.

25        THE COURT:  Same instruction, ladies and gentlemen.

1  The transcript is simply an aid but the evidence is the oral

2  transmission.

3           MR. MONTELEONI:  Thank you, your Honor.  Mr. Hamill

4  could you please --

5           (Audio playing)

6           MR. WEITZMAN:  Your Honor, on Government Exhibit

7  A105-C-TR we would just note at this time she's not Nadine

8  Menendez and we object to that attribution.  She's Nadine

9  Arslanian.

10          THE COURT:  They're not married yet.

11          MR. WEITZMAN:  Correct.

12          THE COURT:  Then it should say Nadine Arslanian.

13          MR. MONTELEONI:  Understood.  This may recur since we

14 didn't hear that until now.  But certainly we have other

15 proposed aids to the jury and we would request that the

16 instruction be given about that.

17          THE COURT:  I don't know when they were married so

18 you'll have to tell me and then I'll give the instruction.  The

19 same person, but obviously she was Nadine Arslanian until she

20 became Nadine Menendez.

21 Q.  So Special Agent Coughlin, where Nadine Arslanian says

22 "Will had asked me about something I forwarded him yesterday,"

23 how does the May 8th, 2018, date of this voicemail compare with

24 the May 7 date that you testified that Nadine Arslanian

25 forwarded Hana the text message of the embassy information and

O5S3MEN3                       Coughlin - Direct

1    screenshots of Menendez's e-mail about aid to Egypt?

2    A.   This voicemail was the next day.

3    Q.   I want to go to a few days later.

4         MR. MONTELEONI:  Mr. Hamill, could you please put back

5    up Government Exhibit 1302, page 10.

6    Q.   Special Agent Coughlin, directing your attention to

7    line 131.  The entry for May 13, 2018 at 5:39 p.m.  Who is the

8    sender and the recipient of this e-mail?

9    A.   Wael Hana.

10   Q.   Is he both?

11   A.   Yes.

12   Q.   So let's look at this e-mail.

13        MR. MONTELEONI:  Mr. Hamill, could you please put up

14   what's in evidence as Government Exhibit C301.

15   Q.   So, directing your attention to numbered point three in

16   this list of numbered points here.  Could you expand that.

17   Special Agent Coughlin, could you please read this whole

18   numbered paragraphs in the e-mail that Hana sends to himself.

19   A.   "The Egyptian state alone bears the burden of securing its

20   western border, which extends to about 1200 kilometers with

21   Libya.  This insurance is supposed to be a joint responsibility

22   between the two sides.  However, we succeeded in monitoring and

23   destroying about 1300 armed SUVs carrying terrorists during

24   July 2013 until the end of 2017."

25        MR. MONTELEONI:  Mr. Hamill, could you please put back

1    up to the left Government Exhibit A402.

2    Q.  Special Agent Coughlin, I'm not going to ask you to read

3    this entire e-mail from Menendez, but directing your attention

4    first to the first paragraph.  After the sentence that reads

5    "Last week Senator-1, a frequent critic of the Sisi government,

6    said he would put a hold on up to $300 million in aid to Egypt

7    unless a series of conditions are met."

8          Can you please read the next sentence.

9    A.  "These include providing compensation for April Corley, a

10   U.S. citizen who was grievously injured when Egyptian forces

11   mistakenly bombed a group of tourists in Egypt's western desert

12   in 2015."

13         MR. MONTELEONI:  Mr. Hamill, on C301 to the left,

14   could you please expand point number 7.

15   Q.  Special Agent Coughlin, could you please read number point

16   seven.

17   A.  "The lawyer of the injured American woman in the western

18   Sahara incident can contact the embassy in Washington for the

19   transfer of his client's point of view to the Egyptian

20   authorities."

21   Q.  By the way, the e-mail sent by Menendez mentions Egypt's

22   western desert.  Is the Sahara a desert that Egypt is part of?

23   A.  Yes.

24   Q.  Let's see what happens next.

25         MR. MONTELEONI:  Mr. Hamill, could you please take us

1    back to Government Exhibit 1302, page 10.

2    Q.   Special Agent Coughlin, directing your attention to May 14,

3    2018, at 12:20 p.m.  What does Wael Hana do?

4    A.   Sends an e-mail to Nadine Arslanian.

5    Q.   What's contained in that e-mail?

6    A.   Those numbered points we were just referencing.

7    Q.   The same numbed points he sent himself?

8    A.   Yes, correct.

9    Q.   And directing your attention to line 133.  Who does Nadine

10   Arslanian send an e-mail to?

11   A.   Robert Menendez.

12   Q.   Let's look at that e-mail.

13             MR. MONTELEONI:  So first, Mr. Hamill, could you

14   please put up Government Exhibit 1435 and take us to the bottom

15   of page 7, top of page 8.

16             Now I am going to read paragraph 7.  The physical

17   exhibit marked for identification as Government Exhibit B100 is

18   a cell phone that was assigned the call number ending in 1745

19   until April 13, 2019, and that the FBI lawfully seized from the

20   residence of Robert Menendez and Nadine Menendez on June 16,

21   2022.  Government Exhibit B100 is referred to in this

22   stipulation as the first Nadine Menendez cell phone.

23             Now Mr. Hamill, could you please scroll down to

24   page 8.  I'll now read paragraph 7(b).

25             The documents marked for identification as Government

1    Exhibits B101 to B103 are true and correct copies of e-mail

2    data extracted from the first Nadine Menendez cell phone.

3             Mr. Hamill, could you please put up what's in evidence

4    as Government Exhibit B101.  Expand the text on that page.

5    Q.  Special Agent Coughlin, directing your attention first to

6    the text on the upper left of the page.  Under the logo and

7    above the orange line, could you please read the title starting

8    extraction.

9    A.  "Extraction report Apple iOS full file system."

10   Q.  Then could you please read under the orange line that word

11   on the left.

12   A.  "E-mails."

13   Q.  In the parties column, could you please read the e-mail

14   address the report indicates this e-mail was sent from.

15   A.  Nad070@yahoo.com.

16   Q.  Below that could you please read the e-mail address the

17   report indicates this e-mail was sent to?

18   A.  Bobmenendez154@gmail.com.

19   Q.  Directing your attention to the other column, could you

20   please read the word on the first line after status.

21   A.  "Sent."

22   Q.  Let's look at the e-mail itself.

23            MR. MONTELEONI:  Mr. Hamill, could you please put up

24   what's in evidence as Government Exhibit B101-A and expand that

25   text.

O5S3MEN3                        Coughlin - Direct

1  Q.  Special Agent Coughlin, who is the sender?

2  A.  Nadine Arslan.

3  Q.  And who is the recipient?

4  A.  Robert Menendez.

5      MR. MONTELEONI:  Mr. Hamill, could you please put up

6  to the left Government Exhibit C 405, the e-mail that Hana sent

7  to Nadine Arslanian earlier that day, the numbered points.

8  Q.  So, Special Agent Coughlin, how does Government Exhibit

9  B101-A, the e-mail data extracted from the first Nadine

10 Menendez cell phone, compare to the first part of Government

11 Exhibit C405, the e-mail from Nadine Arslanian a few minutes

12 earlier?

13 A.  So, the one looks the same.  Exactly the same.  The first

14 numbered point, then there is a portion of that second numbered

15 point, and then it stops.

16 Q.  Does this e-mail data extracted from the first Nadine

17 Menendez cell phone actually stop in the middle of a sentence?

18 A.  Yes.  It does.

19 Q.  Let's jump ahead towards the end of the month we've been

20 looking at May 2018.

21     MR. MONTELEONI:  Mr. Hamill, could you please put up

22 Government Exhibit 1302, page 14.

23 Q.  Special Agent Coughlin, directing your attention to

24 line 183 on May 28, 2018 at 3:49 p.m.  What does Hana send

25 Nadine Arslanian?

1    A.  An e-mail.

2    Q.  What's in that e-mail?

3    A.  It's the e-mail that we've been looking at with the

4    numbered points on it.

5    Q.  Is this the full one or is this one that ends in the middle

6    of the sentence?

7    A.  It's not the full one.

8    Q.  Sorry.  This one, if you look at the end of the detail

9    cell.  The one that Hana sends to Nadine Arslanian, is this

10   full or partial?

11   A.  I'm sorry, thank you, yes.  This was the full e-mail.

12   Q.  Let's look at the next line.  At 4:26 p.m. that day,

13   Special Agent Coughlin, about how long does the chart reflect

14   that the e-mail in this line was sent after the previous line

15   where Hana resends the full e-mail of the numbered points to

16   Nadine?

17   A.  It's about 40 minutes later.

18   Q.  Let's look at this e-mail.

19            MR. MONTELEONI:  Mr. Hamill, could you please first

20   publish the report which is in evidence as Government Exhibit

21   B102.

22   Q.  Special Agent Coughlin, directing your attention to the

23   parties column.  What e-mail address is this e-mail sent from?

24   A.  Nad070@yahoo.com.

25   Q.  What e-mail address was it sent to?

1    A.  Bobmenendez154@gmail.com.

2    Q.  Directing your attention to the other column, what's listed

3    as the status of this e-mail?

4    A.  "Sent."

5    Q.  Let's look at this e-mail data extracted from the device.

6           MR. MONTELEONI:  Mr. Hamill, could you please publish

7    what's in evidence as Government Exhibit B102-A.

8    Q.  So, Special Agent Coughlin, could you please read the first

9    portion of the body paragraph up to "sent from my iPhone."

10   A.  "Love of my life, please could you fix this letter and send

11   it back to, e.  I want to prove a point to the general.  He and

12   Will just got me clearance for a project.  Thank you my love

13   very very very very much" heart emoji.

14   Q.  And now could you please read the text from begin forwarded

15   message to the end of the e-mail.

16   A.  "Begin forwarded message from W. Hana W.Hana@loundeseg.com.

17   Date May 28, 2018, at 3:49:11 p.m. EDT to nad070@yahoo.com,

18   nad070@yahoo.com.  Subject FWD.  1.  The insistence of the

19   Egyptian public opinion, and not only the leadership on the

20   continuation of the ongoing M."

21          MR. MONTELEONI:  Mr. Hamill, could you please put up

22   to the left Government Exhibit C 406.

23   Q.  While that's coming up, it ended with the letter M.  Did

24   the e-mail just stop in the middle of a word?

25   A.  Yes.

1  Q.  So, Special Agent Coughlin, how does this forwarded message

2  from Nadine Arslanian to Menendez that you just read cut off in

3  the middle of a word compare to the first portion of the e-mail

4  that was sent by Hana to Nadine Arslanian earlier that day?

5  A.  It's the same, the very first bullet, a portion of that

6  first bullet.

7       MR. MONTELEONI:  You can take down Government Exhibit

8  C406, Mr. Hamill.  Thank you.

9  Q.  Special Agent Coughlin, directing your attention to the

10  first line of the message where Nadine Arslanian writes "I want

11  to prove a point to the general."  Does she specify who the

12  general is?

13  A.  No.

14  Q.  She writes "He and Will just got me clearance for a

15  project."  Does she specify what the project is?

16  A.  No.

17  Q.  Let's look at what Menendez does after this e-mail where

18  Nadine says "please can you fix this letter and send it back to

19  me."

20       MR. MONTELEONI:  Mr. Hamill, could you please put back

21  up Government Exhibit --

22       MR. WEITZMAN:  I object to the commentary from counsel

23  before he poses questions.

24       THE COURT:  Fair enough.  The jury knows to disregard

25  any comments of the lawyers.  Proceed.

1              MR. MONTELEONI:  Mr. Hamill, could you please put back

2      up Government Exhibit 1302, page 14.

3      Q.  Special Agent Coughlin, directing your attention to May 28,

4      at 8:34 p.m.

5              First, how does that time compare to the time of the

6      fragmentary e-mail we were just looking at?  The one at

7      4:26 p.m.?

8      A.  It's about four hours later.

9              (Continued on next page)

1   Q.  Who is the sender of the email listed in this line?

2   A.  Robert Menendez.

3           MR. MONTELEONI:  Let's look at the email.  Mr. Hamill,

4   could you please publish what's in evidence as Government

5   Exhibit A403.

6   Q.  So, what email address did Menendez send this email from?

7   A.  His Gmail address.

8   Q.  What email address was it sent to?

9   A.  Nadine Arslanian.

10  Q.  How did those compare to the addresses in the previous

11  email, where, that we just looked at, the fragmentary one?

12  A.  Yeah, those are the same email addresses.

13  Q.  Could you please read the subject line?

14  A.  "Letter."

15  Q.  Directing your attention to the first line of the body, the

16  word "dear," is there a name after dear?

17  A.  No.

18  Q.  Is there a comma after dear?

19  A.  Yes.

20  Q.  There's some space between the word "dear" and the comma?

21  A.  Yes.

22          MR. MONTELEONI:  I want to look at the end of the

23  email for a moment.  Mr. Hamill, could you please show us page

24  2 of Government Exhibit A403 and expand just the top half of

25  the page.

O5sWmen4                    Coughlin - Direct

1    Q.  Is there any name written after respectfully and the comma?

2        Is there any name written after respectfully and the comma

3    in this email?

4    A.  No.

5        MR. MONTELEONI:  Go through a few parts of the email

6    in more detail.  Mr. Hamill, please take us back to the first

7    page of Government Exhibit A403 and expand the top half.

8    Q.  Special Agent Coughlin, directing your attention to the

9    paragraph underneath dear and the blank spaces and the comma,

10   please read the first paragraph of the letter.

11   A.  "I write to respond to some of the issues that have been

12   raised by Senator 1 and others which have led to a hold on $300

13   million in appropriated aid to Egypt."

14       MR. MONTELEONI:  Let's pull up the numbered points

15   that Hana sent to Nadine Arslanian earlier that day.

16       Mr. Hamill, could you please pull up to the left

17   Government Exhibit C406.

18   Q.  Special Agent Coughlin, directing your attention first in

19   Government Exhibit A403 to the third paragraph, starting "the

20   government of Egypt alone," could you please read the first

21   sentence of that paragraph?

22   A.  "The government of Egypt alone bears the burden of securing

23   its western border which extends to about 1,200 km with Libya."

24   Q.  Directing your attention to the numbered point three, the

25   email from Hana to Arslanian, could you please read the first

O5sWmen4                        Coughlin - Direct

1    sentence of numbered point three?

2    A.   "The Egyptian state alone bears the burden of securing its

3    western border, which extends to about 1,200 km with Libya."

4    Q.   About how similar is the sentence you just read from the

5    numbered points that Hana sent Arslanian to the sentence that

6    you previously read from the email that Menendez sent to

7    Arslanian?

8    A.   It's very similar.  They changed from Egyptian state to

9    government of Egypt.

10   Q.   Directing your attention back to Government Exhibit A403,

11   same paragraph, please read the next two sentences after what

12   you just read, from "this security effort" to "until the end of

13   2017."

14   A.   "This security effort was supposed to be a joint

15   responsibility between the two sides.  However, notwithstanding

16   that the burden has fallen to Egypt alone, we have succeeded in

17   monitoring and destroying about 1,300 armed SUVs carrying

18   terrorists from July 2013 until the end of 2017."

19   Q.   About how similar are those two sentences that Menendez

20   sent in Government Exhibit A403 to the last two sentences in

21   numbered point three, the email from Hana, C406?

22   A.   Again, it's very similar.  There's a few changes.

23   Q.   As you read the paragraph where it says, "The government of

24   Egypt alone bears the burden of securing its western border"

25   and then later says, "Notwithstanding that the burden has

O5sWmen4                         Coughlin - Direct

1   fallen to Egypt alone, we have succeeded in monitoring and

2   destroying about 1,300 armed SUVs," who do you read the we to

3   refer to?

4   A.   The government of Egypt.

5   Q.   Directing your attention to the next paragraph, starting,

6   "It is not only the government of Egypt," could you please read

7   that whole sentence?

8   A.   "It is not only the government of Egypt that carries out

9   this sovereign right to protect our citizens, as your

10  government does at home and across the world, but it is the

11  demand of the Egyptian people, as evidenced in public opinion

12  poll after another."

13  Q.   As you read the sentence where it says it's not only the

14  government of Egypt that carries out this sovereign right to

15  protect our citizens, who do you read the our to refer to?

16  A.   Egypt, government of Egypt.

17          MR. MONTELEONI:   Please take us to the bottom of page

18  1, Government Exhibit A403, Mr. Hamill.

19  Q.   Special Agent Coughlin, directing your attention to the

20  second-to-last paragraph on that page, please read the sentence

21  from "As it relates to Egyptian authorities."

22  A.   "As it relates to the demands for compensation in the case

23  of April Corley, her claims about being grievously injured in

24  the western Sahara during a terrorist operation, we invite her

25  lawyer to contact the embassy in Washington for the transfer of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  his client's claims to Egyptian authorities."

2          MR. MONTELEONI:  First of all, Mr. Hamill, could you

3  show us numbered point seven in the email from Hana.

4  Q.  And about how similar is the sentence to what you just read

5  that Menendez sent to numbered point seven in the email of

6  numbered points that Hana sent to Nadine Arslanian earlier that

7  day?

8  A.  It's similar.  I would say exhibit A403 has some additional

9  language.

10 Q.  How would you characterize the writing style of A403

11 compared to --

12         MR. WEITZMAN:  Objection, your Honor.

13         THE COURT:  Sustained.

14 BY MR. MONTELEONI:

15 Q.  All right.  Could you read the entirety of Government

16 Exhibit A403?

17         MR. WEITZMAN:  Sorry.

18         THE COURT:  Is that the one on the left or the one on

19 the right?

20         MR. MONTELEONI:  The one on the left.  If I can't ask

21 the witness about this, I'll just ask the jury to compare the

22 writing styles.

23         MR. WEITZMAN:  Objection, your Honor.

24         THE COURT:  Sustained again as to form.

25         What are you asking the jury to do, sir?  I don't know

O5sWmen4                          Coughlin - Direct

1    what it means to compare the writing styles.

2                MR. MONTELEONI:  Oh, I see.

3                THE COURT:  If you don't need the jury to do anything

4    and you have these documents admitted into evidence, it seems

5    to me we can move on.

6                MR. MONTELEONI:  All right.  That's fine, your Honor.

7    Thank you.

8    Q.  So at the time that Menendez sent this email, could you

9    please remind the jury what Menendez's occupation was?

10                MR. WEITZMAN:  Objection, your Honor.

11                THE COURT:  I think it's self-evident, sir.  Under

12   611, move on.

13                MR. MONTELEONI:  All right.  You can take those down,

14   Mr. Hamill, and put back up Government Exhibit 1302, page 15.

15   Q.  Special Agent Coughlin, directing your attention to the

16   line for May 28, 2018, at 9:02 p.m., the top of the page, who

17   is the sender and recipient of the email on that line?

18   A.  It's both Nadine Arslanian.

19                MR. MONTELEONI:  And let's look at that email.

20   Mr. Hamill, could you please put up what's in evidence as

21   Government Exhibit B504 and expand the bottom email.

22                Thank you.

23   Q.  Directing your attention to the text underneath the words

24   "sent from my iPhone" and "begin forwarded," I'm not going to

25   ask you to read it all, but how does this compare to the body

O5sWmen4                         Coughlin - Direct

1   text of the email from Menendez that we just saw?

2   A.  It's the same.

3   Q.  Where it says "begin forwarded," does it list any sender

4   information showing who the email was forwarded from?

5   A.  No.

6   Q.  Does Menendez's name appear anywhere in this email?

7   A.  It does not.

8        MR. MONTELEONI:  Mr. Hamill, could you please expand

9   the top email.

10  Q.  Special Agent Coughlin, who does Nadine Arslanian forward

11  this email to?

12  A.  She then forwards it to Will Hana, Wael Hana.

13       MR. MONTELEONI:  I want to jump ahead in time briefly.

14  Mr. Hamill, could you please take that down.  Put up Government

15  Exhibit 1302, page 25.

16  Q.  Special Agent Coughlin, directing your attention to July 9,

17  2018, at 5:43 p.m., who does it list as sending WhatsApp

18  messages to Wael Hana?

19  A.  Ahmed Helmy.

20       MR. MONTELEONI:  Let's look at who Ahmed Helmy is for

21  a moment.  Now, I believe I previously offered Government

22  Exhibit 8A-15 in evidence subject to connection, but I believe

23  counsel indicated there may not have been a ruling.  We offer

24  Government Exhibit 8A-15 subject to connection.

25       THE COURT:  Admitted, subject to connection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                    (Government Exhibit 8A-15 received in evidence)

2                    MR. MONTELEONI:  Mr. Hamill, could you please publish

3     Government Exhibit 8A-15.  Expand the middle third of the first

4     page.

5     Q.  Special Agent Coughlin, directing your attention to the

6     second full paragraph, beginning "The attached documents,"

7     could you please read the first sentence from "The attached

8     documents."  And you can stop when you get to control number.

9     A.  "The attached documents are true, accurate and complete

10    copies of the information contained in the consular

11    consolidated database maintained by the U.S. Department of

12    State, Bureau of Consular Affairs for the nonimmigrant visa

13    application submitted by Ahmed Helmy Amin Aboel Nor (DOB 1969)

14    and adjudicated at the U.S. Department of the State, Bureau of

15    Consular Affairs, visa office in Washington D.C."

16                    MR. MONTELEONI:  Mr. Hamill, could you please take us

17    to the second page of Government Exhibit 8A-15 and expand from

18    the photo down, down about halfway down the page.

19                    Thank you.

20    Q.  Now, first of all, this name, Ahmed Helmy Amin Aboel Nor,

21    is that listed as an alternate name for Ahmed Helmy in

22    Government Exhibit 1305, the attribution chart?

23    A.  Yes.

24                    MR. MONTELEONI:  Mr. Richenthal, could you please put

25    Government Exhibit 2A-10 on the board, the associated name.

O5sWmen4                              Coughlin - Direct

1  Q.  Here, on Government Exhibit 8A-15, page 2, what is the type

2  of passport listed after the passport number?

3  A.  Diplomatic.

4          MR. MONTELEONI:  Mr. Hamill, could you please publish

5  page 3 of Government Exhibit 8A-15 and expand the top half of

6  the page.

7  Q.  Special Agent Coughlin, directing your attention to the

8  gray box under visa details, can you please read the visa

9  class?

10  A.  "Ambassador, diplomat or Conoff and Inmed family, A1."

11  Q.  At the bottom of that box, could you please read the

12  annotation?

13  A.  "Embassy of Egypt, Washington, D.C., clearance received 27

14  August 2020."

15          MR. MONTELEONI:  Let's go back now and look at the

16  messages from Helmy to Hana that we left off with.

17          You can take this down, Mr. Hamill.

18          Thank you.  And please put back Government Exhibit

19  1302, page 25.

20  Q.  Special Agent Coughlin, directing your attention to July 9,

21  2018, at 5:43 p.m., so, first, what program was Helmy using to

22  communicate with Hana?

23  A.  They were using WhatsApp.

24  Q.  What is WhatsApp?

25  A.  It's similar to Viber.  It's another third-party encrypted

1  messaging app.

2  Q.  Is this commonly commercially available?

3  A.  It is, yeah.

4          MR. MONTELEONI:  Let's take a look at some of these

5  screenshots that Helmy is listed as sending to Hana.

6          Mr. Hamill, could you please publish what's in

7  evidence as Government Exhibit C207-A and expand the bottom

8  half of the page.

9  Q.  Special Agent Coughlin, directing your attention to the

10  bottom bullet on the, before the page break, starting, "We are

11  surprised and confused," can you please read the first sentence

12  of that paragraph?

13  A.  "We are surprised and confused that the case of the murder

14  of Italian researcher, Giuliano Reggini, an Italian citizen, is

15  the subject of U.S. inquiry and a cause for withholding aid to

16  Egypt."

17          MR. MONTELEONI:  Mr. Hamill, can you please pull up to

18  the left Government Exhibit A403, this email that we were

19  looking at that Menendez sent to Nadine.  Publish the third

20  paragraph from the bottom, page 1.

21  Q.  Special Agent Coughlin, directing your attention to this

22  paragraph, starting, "We are surprised and confused," could you

23  please read the first sentence of that paragraph in the letter

24  sent by Menendez?

25  A.  "We are surprised and confused that the case of the murder

1    of Italian researcher Giuliano Reggini, a Italian citizen, is

2    the subject of U.S. inquiry and a cause for withholding aid to

3    Egypt."

4    Q.  About how similar is that with what you just read?

5    A.  Very similar.

6    Q.  So, I'm not going to ask you to read through them all, but

7    are there other similarities in the screenshots sent by Helmy

8    to Hana in July and the email sent by Menendez in May?

9    A.  Yes.

10          MR. MONTELEONI:  Let's look at another of these

11   screenshots.

12          Mr. Hamill, could you please put up what's in evidence

13   as Government Exhibit C207-E.

14   Q.  Special Agent Coughlin, directing your attention to the

15   salutation, is this letter addressed to a senator?

16   A.  Yes.

17   Q.  Redaction for a senator?

18   A.  Yes.

19   Q.  And what -- can you read the line, the two lines under the

20   senator's redaction?

21   A.  "Foreign Relations Committee, United States Senate."

22          THE COURT:  Once again, any senator who has a number

23   by his or her name is not Senator Menendez.

24          MR. MONTELEONI:  Thank you, your Honor.

25          Let's look at who this letter's listed as being from.

O5sWmen4                              Coughlin - Direct

1    Mr. Hamill, could you please put up what's in evidence as

2    Government Exhibit C207-C.

3            All right.

4    Q.  Special Agent Coughlin, directing your attention to the

5    phrase "looking forward to hearing back from you" in this

6    screenshot, please read the rest of the text on the page after

7    that.

8    A.  "Respectfully, Chairman and Members of the Foreign

9    Relations Committee, Parliament of the Arab Republic of Egypt."

10   Q.  By the way, were you ever shown any document indicating one

11   way or another whether this letter shown in these screenshots

12   was or was not ever sent to the Senate Foreign Relations

13   Committee?

14   A.  No.

15           MR. MONTELEONI:  All right.  We jumped ahead to July

16   2018, but now I want to go back and look at something else that

17   happened in May 2018.

18           Mr. Hamill, could you please put back up Government

19   Exhibit 1302, page 11.

20   Q.  Special Agent Coughlin, directing your attention to line

21   159, on May 18, 2018, at 12:49 p.m., please read what Hana

22   texts to Nadine arrest?

23   A.  "But we are in for tonight."

24   Q.  At 12:52 p.m., what does the next line indicate Nadine's

25   response is?

O5sWmen4                          Coughlin - Direct

1    A.   She says yes.

2    Q.   Skipping down a few lines, to May 18, 2018, the first entry

3    for 3:49 p.m., what does Nadine Arslanian write?

4    A.   She writes:  "7 p.m. Ill Villaggio.  I will send you the

5    address shortly."

6            MR. MONTELEONI:  Now, if we could go to the next page,

7    Mr. Hamill, two lines down -- or on line 165, the top line on

8    page 12.

9    Q.   What does Nadine Arslanian send Hana at 3:50 p.m.?

10   A.   She sends a screenshot of Google search results of the

11   restaurant, Ill Villaggio.

12   Q.   Next line, 166, May 18, 2018, at 10:07 p.m., who does the

13   chart reflect that Hana texts?

14   A.   Khaled Shawky.

15   Q.   The same Khaled Shawky that you previously testified about

16   the meeting with Menendez, Nadine and Hana in March?

17   A.   Yes, that's correct.

18   Q.   Please read what Hana texts to Shawky in the next two lines

19   in order.

20   A.   "The ban on small arms and ammunition to Egypt has been

21   lifted.  That means sales can begin.  That will include sniper

22   rifles among other articles.  Call you about it tomorrow."

23   Q.   Few lines down, line 170, at 11:18 p.m., please read what

24   the chart reflects that Shawky emails to two people named

25   Andrew King and Brett O'Brien.

O5sWmen4                    Coughlin - Direct

1   A.  "Dear team, I hope you are having a great weekend.  I was

2   just told privately now that ban small arms on Egypt was left

3   today.  Can you help confirm that.  Please keep it private.

4   Khaled."

5           MR. MONTELEONI:  Now, you just testified that a few

6   hours before Hana texted Shawky about the small arms ban,

7   Nadine Arslanian had texted Hana 7 p.m. Ill Villaggio and sent

8   Google search results for a restaurant.  Let's look at what was

9   sent the next day.

10  Q.  Directing your attention to page 13, Government Exhibit

11  1302, on May 19, 2018, starting at 10:12 a.m., what does -- or

12  10:11 a.m., really, what does Nadine Arslanian text Hana?

13  A.  A number of photographs.

14          MR. MONTELEONI:  Let's look at a few of them quickly.

15          Mr. Hamill, could you please put up Government Exhibit

16  B105-G.

17  Q.  Special Agent Coughlin, who do you recognize in this

18  photograph?

19  A.  On our left, that's Nadine Arslanian.  In the middle is

20  Robert Menendez.  And on the right is Wael Hana.

21          MR. MONTELEONI:  Mr. Hamill, could you please pull up

22  Government Exhibit B105-H.

23          Please put up Government Exhibit B105-I.

24          Please put up Government Exhibit B105-K.

25          All right.  So we've been looking at May 2018.  Let's

1    go to June.

2              Mr. Hamill, could you please publish Government

3    Exhibit 1302, page 19.

4    Q.  Special Agent Coughlin, directing your attention to line

5    248 at 6:46 p.m. on June 28, 2018, who does Hana send a

6    WhatsApp message to?

7    A.  Khaled Shawky.

8    Q.  Directing your attention to the details column, what do the

9    brackets and italics that are in the detail column mean?

10   A.  That means it comes from a translation.

11   Q.  What language was this translated from?

12   A.  Arabic.

13   Q.  Please read the translated message reflected in the detail

14   cell.

15   A.  "Good evening.  The meeting will be on the 26th."

16   Q.  Directing your attention to the next line, who sends an

17   email to Hana on June 29, 2018?

18   A.  Viv Montemayor.

19             MR. MONTELEONI:  Let's look at that email.

20             Mr. Hamill, could you please publish Government

21   Exhibit C407 and put up the email on pages 2 to 3 of that

22   document.

23             OK.

24   Q.  So directing your attention to the signature block at the

25   top of page 3, please read what's written under the words

O5sWmen4                    Coughlin - Direct

1    Vivien G. Montemayor.

2    A.   "Egyptian Defense Office."

3    Q.   And how does the street address compare to the address on

4    Major General Shawky's business card?

5    A.   It's the same.

6            MR. MONTELEONI:  Now, could we go to the bottom of

7    page 2, Mr. Hamill.

8            I think that's page -- OK.

9            Yes.  Thank you.

10   Q.   Directing your attention to the body of this message here

11   on the bottom of page 2, please read the paragraph starting

12   Maj. Gen. Khaled Shawky?

13   A.   "Maj. Gen. Khaled Shawky mentioned that the meeting of the

14   Egyptian military white paper delegation with Senator Menendez

15   will be on July 26, Thursday.  May you kindly let us know what

16   time the meeting will be and the office location."

17           MR. MONTELEONI:  Mr. Hamill, could you please put back

18   up Government Exhibit 1302, page 19.

19   Q.   Special Agent Coughlin, directing your attention to the

20   first entry for June 30, 2018, please read what Nadine texts to

21   Hana.

22   A.   "I am driving.  I will call you in 30 minutes.  My car does

23   not have navigation or noise or radio, so I'm using my phone.

24   I am dictating this to you.  I will call you when I pull over.

25   If you are free for dinner tonight, we can go for duck in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   city at Mr. Chow, 57 Street."

2   Q.  Now, before we move on to some documents from that meeting,

3   could you please note the date of that message, when Nadine

4   said we can go for duck in the city at Mr. Chow, 57 Street?

5   A.  Yes.  That's June 30, 2018.

6          MR. MONTELEONI:  Mr. Hamill, could you please publish

7   what's in evidence as Government Exhibit 7A-4.  Go to the first

8   page.

9   Q.  Special Agent Coughlin, directing your attention under the

10  large word "reservations," and the line starting "diner

11  lookup," under those, looking at the line starting

12  reservations, please read that line, except you can leave out

13  the number at the end.

14  A.  "Reservations information for Will Hana."

15         MR. MONTELEONI:  And Mr. Hamill, could you please show

16  us page 3, Government Exhibit 7A-4, and the bottom set of

17  entries on the page.

18  Q.  Please first read, at the bottom left of the page, the

19  words after date time local?

20  A.  Saturday, June 30, 2018, 7 p.m.

21  Q.  How does that June 30, 2018, date compare to the date when

22  Nadine sent the text you just read, saying if you're free for

23  dinner tonight, we can go for duck in the city at Mr. Chow?

24  A.  Yeah.  It's the same day she invited him.

25  Q.  Looking on the left of the page, the second line from the

1    bottom, just above the date time local, please read the words

2    after restaurant?

3    A.  Mr. Chow, 57th.

4    Q.  One line up from that, can you please read the party size?

5    A.  Three.

6    Q.  One line up from that, can you please read the status?

7    A.  Seated.

8           MR. MONTELEONI:  Mr. Hamill, could you please publish

9    what's in evidence as Government Exhibit 10H-4.

10   Q.  Special Agent Coughlin, what are we looking at here?

11   A.  This is a photo from the Mr. Chow website, the restaurant's

12   website.

13          MR. MONTELEONI:  Mr. Hamill, could you please publish

14   Government Exhibit 7A-3.  And just expand the top half of the

15   page.

16   Q.  Special Agent Coughlin, directing your attention to the top

17   center, what's the company name by the logo?

18   A.  OpenTable.

19   Q.  What's OpenTable?

20   A.  It's -- they have an app or a website you can use to make

21   restaurant reservations.

22   Q.  Directing your attention to the top left, what are the

23   words written after the three lines in the top left corner?

24   A.  Mr. Chow, 57th.

25   Q.  Directing your attention to the center, a bit down from the

1  top between the words "sat June 30" and "shift one," a line

2  down from those, please read the name there.

3  A.  Yes.  Will Hana.

4  Q.  Going from that to the bottom text on the page, the line

5  that says booked, please read the words under booked?

6  A.  7 p.m., party of three.

7  Q.  One line up, where it says arrived, please read the time

8  next to arrived.

9  A.  6:59 p.m.

10  Q.  One line above that, where it says seated, please read the

11  time next to seated.

12  A.  7 p.m.

13  Q.  One line above that, where it says finished, please read

14  the time next to finished.

15  A.  8:57 p.m.

16      MR. MONTELEONI:  And so I want to look at some things

17  that happened between the 7 p.m. seated time reflected on this

18  record and the 8:57 p.m. finished time reflected on this

19  record.

20      Mr. Hamill, could you please take us back to

21  Government Exhibit 1302, page 19.

22  Q.  Special Agent Coughlin, directing your attention to the

23  line that says June 30, 2018, 7:18 p.m., how long is that after

24  the seated time we just saw from the previous records?

25  A.  That's 18 minutes.

1  Q.  Could you please -- who does Hana send a WhatsApp message

2  to at 7:18 p.m., according to this line?

3  A.  Khaled Shawky.

4  Q.  Please read the translation of what Hana texts to Maj. Gen.

5  Shawky in this message.

6  A.  "On the 25th at 2 o'clock."

7  Q.  Directing your attention to the next line, when did Hana

8  send this WhatsApp message to Maj. Gen. Shawky?

9  A.  About a half an hour later.

10  Q.  Please read the translation on this line.

11  A.  "Dinner on the 25th at 8 p.m."

12         MR. MONTELEONI:  Let's look at the end of this dinner.

13         Mr. Hamill, could you please publish what's in

14  evidence as Government Exhibit 7B-1.

15  Q.  Special Agent Coughlin, directing your attention to the top

16  center of Government Exhibit 7B-1 first, can you read the name

17  and address at the top?

18  A.  Yes.  Mr. Chow, 324 East 57th Street, New York, New York

19  10022.

20  Q.  Directing your attention to the right, a bit down, can you

21  please read the date?

22  A.  Yes.  6/30/2018.

23  Q.  Under the date, below the fifth line, please read the time.

24  A.  8:57 p.m.

25  Q.  How does that 8:57 p.m. time on this check compare to the

1    finished time on the OpenTable records we were just looking at?

2    A.  It's the same.

3    Q.  Directing your attention to the left side, under the words

4    "table 4/1," how many guests are listed?

5    A.  Three.

6    Q.  Two lines down, the line that starts total, please read the

7    number written after total.

8    A.  424.61.

9    Q.  All right.  And then near -- well, so, that's one total.

10   And then a line down from there, after all the Xs, what are the

11   four digits after those Xs?

12   A.  1017.

13   Q.  And then two lines down from that, what's the total on that

14   line?

15   A.  524.61.

16          MR. MONTELEONI:  Mr. Hamill, can you please publish

17   what's in evidence as Government Exhibit 5E-101A.

18   Q.  Special Agent Coughlin, directing your attention to the

19   upper left, where it says Antranig Aslanian Jr., is that the

20   same person you testified is often referred to as Andy

21   Aslanian?

22   A.  Yes, that's correct.

23   Q.  And the line below, where it says account number ending in,

24   please read the last four digits.

25   A.  1017.

O5sWmen4                        Coughlin - Direct

1  Q.  How do those last four digits compare to the last four

2  digits on the Mr. Chow's check we just saw?

3  A.  They're the same.

4  Q.  One line down, please read the dates after the words

5  "billing period."

6  A.  06/16/18 to 07/16/18.

7        MR. MONTELEONI:  Mr. Hamill, could you please publish

8  page 3 of Government Exhibit 5E-101A.  Expand the middle third

9  of the page.

10 Q.  Directing your attention to the last two lines before the

11 words "fees charged," please read the description column in

12 that last line that has that 0630 and the trans date.

13 A.  Mr. Chow of New York, New York.

14 Q.  Please read the amount number in the amount line, column

15 for that line.

16 A.  $524.61.

17       MR. MONTELEONI:  And one more thing before we're at a

18 natural stopping point.

19       Mr. Hamill, could you please put back up Government

20 Exhibit 1302, page 20.

21 Q.  Directing your attention to the lines for 10:18 and 10:19

22 p.m. on June 30, 2018, what does Nadine Arslanian send Hana at

23 those times?

24 A.  She texted him photos of Robert Menendez, her -- Nadine --

25 and Wael Hana.

O5sWmen4                          Coughlin - Direct

Q.  Is that a few hours after the finished time that we've just
been looking at on this date?
A.  Yeah, about a -- yeah, almost two hours.

          MR. MONTELEONI:  All right.  Your Honor, this is a
good time to stop.

          THE COURT:  All right.  It is 5 o'clock.

          Ladies and gentlemen, thank you for your attention
today.  You've also asked that you be given some advance notice
of the schedule of the Court.  Tomorrow, Wednesday, we'll go
9:30 to five.  And any day, by the way, that the jury wants to
stay past five, just let my deputy know, but I'm assuming
normally you wish to end at five.  Again, if that's not true,
we'll just continue.

          Tomorrow, 9:30 to five.  Thursday, 9:30 to five.
Friday, ten to five.  And Monday a half day, one to five.  OK?
9:30 to five, 9:30 to five, ten to five, Monday, half a day
starting at one -- again, eat beforehand.  And sorry I gave you
incorrect information.  Apparently the patio is part of the
cafeteria, so we ask that you not go to the patio.  And then
the rest of next week will be every day presumably 9:30 to
five.  I'll give you more information as available.

          Enjoy the evening.  Nowadays there's still light that
you can have.  Don't discuss this case.  Don't listen to any
news reports.  Keep an open mind.  See you tomorrow at 930
Thank you.     (Continued on next page)

O5sWmen4

1           (Jury not present)

2           THE COURT:  You may step down, sir, and out, if you

3   would.

4           (Witness not present)

5           THE COURT:  You may be seated in the courtroom.

6           Was there anything left hanging here in terms of

7   subject to connection, and specifically in regard to, I think,

8   Helmy?

9           MR. MONTELEONI:  Yes, your Honor.

10          My understanding is that the defense is not wanting to

11  stipulate to the authenticity of the State Department records.

12  I think that we are trying to arrange a custodian for the State

13  Department.

14          Under Rule 902(1), these are clearly

15  self-authenticating records because they bear the seal of the

16  United States and they bear a signature and they bear a

17  certification.  So really all of the requisites are satisfied,

18  and we think that they should just be admitted into evidence as

19  self-authenticating documents on the basis of that rule.  But

20  in order to move things along, we submitted them subject to

21  connection to work things out later.

22          THE COURT:  All right.  Try to work it out, gentlemen.

23          MR. WEITZMAN:  Your Honor, if I may?

24          We did tell them we wouldn't stipulate; for the first

25  time they told us today that they're offering it as

1  self-authenticating.  So it is self-authenticating.  There is

2  no need for a stipulation.  However, there is a relevance

3  objection.  For example, your Honor, GX8A-15, which was one of

4  the diplomats, the date on it is 2020.  It's issued August

5  2020, which is two years after the relevant events at the time

6  that they introduced it.  So there's a disconnect here.

7       We have issues with the relevance because it states

8  diplomat on these and then it says diplomat on some Qatari

9  ones, and there's no explanation as to why certain people are

10  called diplomats because it's not just embassy personnel.

11       THE COURT:  No.  I thought it said, if I understood it

12  correctly -- now I forget what the acronym was -- consular

13  officials, ambassadors, consular officials, and something else.

14       MR. WEITZMAN:  And our point is that there needs to be

15  a witness to explain what that means, because they're going to

16  argue in summation, I suspect, that the Qatari, the founder of

17  Heritage, because his visa says diplomat or consular, that he's

18  somehow a government official, when he is not.  So our

19  objection is that this is misleading and confusing, because

20  there is no explanation from anybody from the State Department

21  to explain why.

22       THE COURT:  And you want somebody from the State

23  Department to explain what consular official means, or whatever

24  that designation is.

25       MR. WEITZMAN:  And whether you need to be employed at

O5sWmen4

1    the consulate or embassy in order to --

2            THE COURT:  All right.

3            Government.

4            MR. MONTELEONI:  Your Honor, we expect to be

5    presenting a State Department witness.  We thought that the

6    real issue was with the Qatari visa records, which we're not

7    offering yet.  They're not among these that we're offering.  We

8    didn't really realize that their concerns also included --

9            THE COURT:  That's why the parties need to talk to

10   each either and give advance notice to each other.  How many

11   times do I have to say that?

12           Go ahead.

13           MR. MONTELEONI:  Yes, your Honor.  I will say we've

14   been trying.  There's been a lot going to.  We're certainly

15   attempting to do so.  We think that all these issues that

16   Mr. Weitzman raised go to weight, not the admissibility, but in

17   any event, we're expecting to offer State Department --

18           THE COURT:  Fine.  Taken care of.

19           Now, let me ask another question, and I don't mean

20   this negatively; I'm just trying to understand it.  Why did you

21   spend about 15 or 20 minutes on dinner at Mr. Chow's, including

22   that it took one minute to get them seated and that they had

23   duck and spent a fair amount of money?

24           MR. MONTELEONI:  Well, yeah.  So, the money, right,

25   was spent to them, and we're obviously not saying --

O5sWmen4

1          THE COURT:  The money what?

2          MR. MONTELEONI:  Was spent by Andy Aslanian for them.

3          THE COURT:  Yes.

4          MR. MONTELEONI:  So they were actually receiving a

5     thing of value, obviously not a very valuable one, in the

6     course of the whole scheme.  But this is where the stopping

7     point sort of hurt us.  We would've explained that the texts

8     that were sent --

9          THE COURT:  The stopping point of the questioning

10    today, you mean?

11         MR. MONTELEONI:  Yes, just at 5 p.m.  Tomorrow I think

12    that what you'll hear is that those WhatsApp messages that Hana

13    sends while dining with Menendez in Manhattan that he then

14    electronically sends to Shawky set the date and time for a

15    meeting.

16         THE COURT:  You've already established that, the 25th.

17         MR. MONTELEONI:  Yes, exactly, but we're going to see

18    what happens at the meeting, that the meeting is what leads up

19    to Menendez sending the text that we've heard so much about,

20    the text about the tank ammunition sale, the prospective

21    promise of an official act.  So the fact that this is being

22    worked out and that the date is being confirmed here in

23    Manhattan is relevant to venue as well as the --

24         THE COURT:  All right.  OK.  I'll see everybody

25    tomorrow at 9:30.

O5sWmen4

1            MR. WEITZMAN:  Your Honor, I do have one thing --

2            THE COURT:  Yes.

3            MR. WEITZMAN:  -- and I apologize.

4            As your Honor will recall, we objected to the summary

5       chart because we thought it was going to be an improper

6       summation.  And the point of a summary chart is that you

7       summarize voluminous records that cannot be examined in court

8       easily.

9            What's happened is not only is it a mini summation,

10      where the prosecutor says 50 words for every word of the

11      witness, what happens is they show the underlying document,

12      they show the summary chart entry, they go back to the

13      underlying document, then they go to the next entry, they show

14      the same underlying document, they the show the summary chart,

15      and they're examining -- they're showing all the underlying

16      documents.  That's exactly what a summary chart is supposed to

17      avoid.  And we've done four hours today on this and gotten

18      through 20 pages.  We have a 97-page summary chart.  I know we

19      are trying to keep cross-examinations tight.  You are keeping

20      us on a tight leash.  We understand the reason for doing that,

21      but this --

22            THE COURT:  I'm sorry.  What you've just said in a way

23      assists you --

24            MR. WEITZMAN:  Correct.

25            THE COURT:  -- because they're going into more areas

O5sWmen4

1  and, therefore, less to be, quote, beyond the scope on

2  cross-examination.  So that seems to be, if I understand your

3  argument, helping you.

4         MR. WEITZMAN:  It's not about the substance, although

5  I understand that point.  It's about the repetition and the

6  fact that every -- it feels like they're showing the summary

7  chart and then they're showing the underlying document and

8  they're going back to the summary chart.  The same entries,

9  we're hearing them three or four times.  How many times have we

10  seen --

11         THE COURT:  All right.  The point is repetition.

12         What's the response, sir?

13         MR. MONTELEONI:  Yes, your Honor.

14         We're not repeating things just to repeat them.  We're

15  trying to situate things in time.  The chronological sequence

16  and the interrelatedness between certain events is absolutely

17  critical.  In many ways, this case is, really has a critical

18  focus on the documents, and as the Court knows, this is just

19  for one portion of the case.  There's a lot of documents.  In

20  order for the jury to make sense of them, so it's not a series

21  of atomized actions which, in isolation, some phone call, what

22  does that even mean?  Some email, what does that mean?

23         That's obviously the way that the defense, I think,

24  would like the jury to be assessing the exhibit, but it's very

25  important that we be able to draw the jury's attention to the

O5sWmen4

1    chronological sequence.

2         I will also say --

3         THE COURT:  I don't disagree with that, but I think

4    there's some merit to Mr. Weitzman's point to the extent that

5    you have him read aloud both the document sent to him and then

6    the document that's sent out by him.  And instead, you really

7    can ask this witness, I think, are they essentially identical,

8    without having to go through twice what they, in fact, have,

9    especially because, if I understand it correctly, you've got

10   the underlying documents in evidence.  You can argue in

11   summation from those documents.  I'm not disagreeing with the

12   way you're going about it, but I am agreeing with Mr. Weitzman

13   that there's some unnecessary repetition, especially when you

14   have the witness, who seems to understand where you're going

15   each time.

16         MR. MONTELEONI:  Thank you, your Honor.

17         We'll take a look this evening to tighten it up.  I

18   will say part of this is -- actually it's very important at the

19   beginning of a summary witness things to show the jury

20   documents to an extent so they don't think we're just making

21   up --

22         THE COURT:  No, I understand that.

23         MR. MONTELEONI:  We're going to go more to the chart.

24         THE COURT:  I understand that now.

25         Let me ask a personal question.  Did you happen to

O5sWmen4

1    grow up in New York, sir?

2            MR. MONTELEONI:  I did.

3            THE COURT:  Well, you speak very quickly.  I was

4    getting looks of screaming eyes from the interpreters and the

5    reporters.  Slow down.  All New Yorkers speak too fast, and

6    when you're in a courtroom situation like this, people tend to

7    speed up.  So try to slow down a bit, please.  Both the

8    interpreters and the reporters were signaling distress.

9            MR. MONTELEONI:  Understand, your Honor.  It's my

10   upbringing.  It's my personality.  It's also that I know

11   there's a lot of documents, and I get a little nervous that the

12   jury's getting bored.

13           THE COURT:  I don't think you have to get nervous

14   about that.

15           MR. MONTELEONI:  All right.

16           THE COURT:  You understand.

17           MR. MONTELEONI:  Absolutely, your Honor.

18           THE COURT:  All right.  Let's go forward.

19           MR. MONTELEONI:  Sorry.  There's one thing that's

20   important.  We've, as you know, sought reconsideration or

21   modification of your ruling regarding the speech or debate

22   clause.

23           THE COURT:  Yes.

24           MR. MONTELEONI:  And we offered the summary chart and

25   the exhibits underlying it subject to that motion, where we

O5sWmen4

1  haven't gotten to those issues yet, but we might tomorrow.

2        THE COURT:  I understand.

3        MR. MONTELEONI:  So we need to know.

4        THE COURT:  I understand.  OK.  Thank you.  I must say

5  I'm inclined to deny reconsideration or, rather, grant

6  reconsideration, upon reconsideration, adhere to my earlier

7  ruling, but I want to think about it.

8        OK.  Thank you.

9        MR. RICHENTHAL:  Finally, just for scheduling, your

10  Honor, we intend to respond to Mr. Hana's motion with respect

11  to FARA restrictions.

12        THE COURT:  Yes.

13        MR. RICHENTHAL:  We asked Mr. Lustberg if he was OK

14  with us responding tomorrow, because we don't anticipate the

15  witness testifying any sooner than Friday, if not Monday.  He

16  was fine with that.  I just wanted to give the Court a

17  heads-up.  We'll try to file this evening, if we can, but it

18  may be tomorrow.

19        THE COURT:  All right.  I saw that Mr. Lustberg's

20  motion is rather straightforward, but that's fine.

21        MR. RICHENTHAL:  If the Court doesn't want a response,

22  obviously --

23        THE COURT:  The Court wants a response.

24        9:30 tomorrow.  Thank you.

25        (Adjourned to May 29, 2024, at 9:30 a.m.)

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                               Page

 3    JAMELA MAALI

 4   Direct By Mr. Mark . . . . . . . . . . . . .1114

 5   Cross By Mr de Castro  . . . . . . . . . . .1123

 6   Cross By Mr. Lustberg  . . . . . . . . . . .1147

 7   Cross By Mr. Weitzman  . . . . . . . . . . .1157

 8    MICHAEL F. COUGHLIN

 9   Direct By Mr. Monteleoni . . . . . . . . . .1171

10                       GOVERNMENT EXHIBITS

11   Exhibit No.                               Received

12    2A-22  . . . . . . . . . . . . . . . . . .1116

13    5A-1001A, 5A-1001B and 5A-1001C  . . . . .1118

14    3D-6  . . . . . . . . . . . . . . . . . . .1120

15    8A1, 8B3, 8B6, 8B8, 8B10, 8B12, 8B16, . . .1168

16          8B19, 8B20, 8B21, 8B22, 12B1,

17          12B2, 12B3 and 12B4

18    1330  . . . . . . . . . . . . . . . . . . .1170

19    B224-1, B224-2, B224-A, and 3C10  . . . . .1171

20    1302  . . . . . . . . . . . . . . . . . . .1175

21    1305 and 1449  . . . . . . . . . . . . . .1179

22    10J-1, 10J-2  . . . . . . . . . . . . . . .1183

23    10H-7  . . . . . . . . . . . . . . . . . .1226

24    8A-15  . . . . . . . . . . . . . . . . . .1257

25
```