O5V3MEN1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        23 Cr. 490 (SHS)

5  ROBERT MENENDEZ, *et al.*,

6            Defendants.
                                       Trial
7  ------------------------------x

8                                      New York, N.Y.
                                       May 31, 2024
9                                      1:00 p.m.

10 Before:

11
                       HON. SIDNEY H. STEIN,
12
                                       District Judge
13                                     -and a Jury-

14                      APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  PAUL M. MONTELEONI
17      DANIEL C. RICHENTHAL
        ELI J. MARK
18      LARA E. POMERANTZ
        CATHERINE E. GHOSH
19      Assistant United States Attorneys
        -and-
20      CHRISTINA A. CLARK
        National Security Division

21

22

23

24

25

O5V3MEN1

1

2                              APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         RITA FISHMAN
6

GIBBONS, P.C.
7        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
8        ANNE M. COLLART
         CHRISTINA LaBRUNO
9        RICARDO SOLANO, Jr.
         ANDREW J. MARINO
10       ELENA CICOGNANI
         JESSICA L. GUARRACINO
11

12

13  CESAR DE CASTRO
SETH H. AGATA
14  SHANNON M. McMANUS
         Attorneys for Defendant Daibes
15

16

Marwan Abdel-Raman, Interpreter (Arabic)
17  Rodina Mikhail, Interpreter (Arabic)

18

19

20

21

22

23

24

25

1    (Trial resumed; jury not present)

2    THE COURT:  Good afternoon, please be seated.  All

3    attorneys and defendants are present.  And the last juror just

4    arrived.

5    Ms. Blakely, if you'll line up the jury, I would

6    appreciate it.

7    I understand the government has an issue.

8    MR. MONTELEONI:  Briefly, your Honor.  This is one

9    last thing that arose from the cross-examination yesterday.  I

10    know that the court policed some of the questions the defense

11    was attempting to ask about the witness's interpretation of the

12    chart as opposed to the facts in the chart.  But, there were

13    still a number of questions that the witness was asked that

14    were sort of akin to contention interrogatories.  Were there

15    any lines in the chart that would support the conclusion that

16    X, Y, Z, and the witness very properly, because of his role,

17    wasn't drawing inferences about what the chart meant and gave

18    answers that I think could confuse the jury whose role is to

19    draw inferences obviously.

20    THE COURT:  What's the request of the government?

21    MR. MONTELEONI:  The request would be an instruction

22    similar to after the opening statements, that while this

23    witness was, his role was not to draw inferences, the jury

24    should -- their role is to draw whatever inferences they

25    believe are supported by the evidence.  Just so they understand

O5V3MEN1

1      that's permissible and they're not in the same role as the

2      witness was.

3                  MR. WEITZMAN:  Your Honor, I believe you chastised me

4      in front of the jury multiple times to remember the witness's

5      role.

6                  THE COURT:  I'm not going to give a separate

7      instruction.  Let's bring this jury in.  They will be told that

8      at the end of the case in the jury instructions.

9                  MR. MONTELEONI:  Thank you, your Honor.

10                 THE COURT:  Part of what I was letting the defense do

11     is as a result of what I let you do.

12                 We'll go to 5 o'clock with one midafternoon break.

13     Mr. Lustberg, I believe you're up, correct?

14                 MR. LUSTBERG:  Yes, your Honor.  Thank you.

15                 THE COURT:  Jury entering.

16                 (jury present)

17                 THE COURT:  You may be seated in the courtroom.

18                 Agent Coughlin, I remind you that you are still under

19     oath.  You understand that, correct?

20                 THE WITNESS:  Yes.

21                 THE COURT:  We'll now have the cross-examination of

22     this witness by Mr. Lustberg on behalf of Mr. Hana.

23                 Proceed, sir.

24      MICHAEL F. COUGHLIN,

25         having been previously sworn, testified as follows:

1    CROSS-EXAMINATION

2    BY MR. LUSTBERG:

3    Q.  Good afternoon, Agent Coughlin.

4    A.  Good afternoon.

5    Q.  I want to start with Mr. Hana's relationship with Nadine

6    Arslanian.  And if we could, let's just turn to line 81 of

7    Government Exhibit 1302.  You recall that you testified with

8    regard to line 81 that there was a text message in which Nadine

9    recounts the senator as saying Will is such a good friend to

10   Nadine.  Is that correct?

11   A.  Yes, that's correct.

12   Q.  And you testified about how Mr. Hana provided Nadine and

13   Senator Menendez with an exercise machine, I think it was an

14   elliptical, at the cost of $2,749, right?

15   A.  I don't remember the exact cost.

16   Q.  You don't recall that from your chart, that $2,749?  I can

17   refresh your recollection if you wish.

18   A.  Again, sure.  I don't recall the exact amount.

19   Q.  Just so do you have the chart in front of you there?

20   A.  It's on the screen but I don't have a copy of the full

21   chart.

22   Q.  Let me just direct your attention to line -- 1183.  I'm

23   sorry.  That's the wrong line.  I wanted to do -- actually

24   1197.

25           THE COURT:  Do you see what's on there, sir?

O5V3MEN1                         Coughlin - Cross

1        THE WITNESS:  I do, yes.

2        THE COURT:  Does that refresh your recollection in

3    regard to the cost of the exercise machine?  Yes or no.

4        THE WITNESS:  Yes, that's correct.

5    Q.  And you can see from that as well I believe you testified

6    that this was a receipt for the exercise machine dated

7    February 19, 2021, correct?

8    A.  Yes, a PayPal receipt.

9    Q.  You also testified that about a gentleman named Nader

10   Moussa.  Do you remember his testimony with regard to him?

11   A.  Yes.

12   Q.  And he worked for Mr. Hana; is that right?

13   A.  I don't know their relationship.

14   Q.  So in fact you testified you thought they were friends; is

15   that right?

16       MR. MONTELEONI:  Objection.

17       THE COURT:  Did you testify to that; yes or no?

18       THE WITNESS:  If I did, I don't know their

19   relationship.

20   Q.  Thank you.  You do know, though, that because you testified

21   that Mr. Moussa did certain errands or chores around the

22   Menendez Arslanian house, right?

23       MR. MONTELEONI:  Objection.

24       THE COURT:  Let's stick to the chart, sir.  Ask him a

25   question.

1  Q.  Take a look at line 541, page 42.  You see that entry?

2  A.  Yes.

3  Q.  And it says, does it not, that "Nader called me.  He said

4  Wael will be back on Wednesday.  And he will see what he can do

5  about the carpet this afternoon."

6  A.  Yes, I see that.

7  Q.  And did you understand -- strike that.  Just to stick with

8  the chart.

9      Were there, as you recall it, other entries that indicated

10 that Mr. Moussa was going to be installing carpet or doing

11 something with regard to carpet in Ms. Arslanian's home?

12 A.  I believe there was a few other messages with reference to

13 it, yes.

14 Q.  Do you recall testifying on direct examination as follows

15 and, if you need I can show you the testimony:

16 "Q.  By the way, have you seen documents where Menendez and

17 Nadine Menendez were discussing Nader possibly doing other home

18 improvement for them at other times?

19 "A.  Yes, his name's been mentioned before."

20          Do you recall that?

21 A.  Yes.

22 Q.  That testimony was truthful?

23 A.  That's accurate, yes.

24 Q.  And among those things was that, and just to keep it to the

25 chart, take a look at line 548 on page 43.  And you see there

1   that "Nader decided to stain the stairs and put in the rail rod

2   to go up the stairs so I had to wait for him to finish

3   staining.  It looks so clean and new."

4          Do you see that?

5   A.  Yes.

6   Q.  And as well, if you look at 549, your chart indicates that

7   "he also painted the garage door inside of the wall going

8   upstairs from the garage."  Is that correct?

9   A.  That's correct.

10  Q.  Did you, in your review of documents recall, do you recall

11  whether there were any other things that he did around the

12  house for the Menendezes?

13         THE COURT:  I think the question is whether there were

14  any other documents that referred to that.

15         MR. LUSTBERG:  Thank you, your Honor.  Absolutely.

16  A.  As I testified previously, I did see his name mentioned a

17  few other times.  I don't recall the specifics of those

18  messages as far as what services were being done or anything

19  like that.

20  Q.  Anyway, I want to talk about the sorts of things that you

21  said about Mr. Hana.  You recall -- actually let's stick with

22  the chart.  Page 42, line 540.  Do you have that in front of

23  you?

24  A.  Yes.

25  Q.  See where it says "No.  Nader just called me.  He said he

O5V3MEN1                    Coughlin - Cross

1    will try to bring the guys today but nothing from Will.

2    Supposedly Will left for Egypt last night and will be back

3    Wednesday.  I don't care about Will.  He's a lying asshole."

4            Do you see that?

5    A.  Yes.

6    Q.  And that came from a document that you reviewed, right?

7    A.  That's correct, yes.

8    Q.  And this came up as well yesterday with Mr. Weitzman so it

9    will be quick, if you take a look at page 80, line 1095?

10   A.  Yes, I see it.

11   Q.  You see that was a text message about which you testified.

12   Do you recall?

13   A.  Yes, yes.

14   Q.  And in particular, I want to direct your attention to where

15   it says "I'm not going to get angry."  This is, by the way, a

16   text message from Nadine to Bob?

17   A.  That's correct.

18   Q.  And it says "I'm not going to get angry or get any more

19   upset but one day I really would love to know one of the

20   pyramids collapsed and he is trapped forever."  You see that?

21   A.  Yes.

22   Q.  And you testified yesterday I believe that from context you

23   understood that the "he" that was being referred to is

24   Mr. Hana, correct?

25   A.  Again, I'm not sure, by reading the context of the series

1    of text messages.

2    Q.  As well, just directing your attention to line 536 which is

3    on page 42.  This is a text message from Nadine Arslanian to

4    Robert Menendez?

5    A.  Yes.

6    Q.  And it says, the detail on your chart says "Text:  I've

7    been so upset all morning.  Will left for Egypt yesterday

8    supposedly and now thinks he's king of the world and has both

9    countries wrapped around his pinky.  I really hope they replace

10    him."

11          Is that correct?

12    A.  That was the text message, yes.

13    Q.  That was one of the messages you made sure it accurately

14    reflected what was in the actual text message?

15    A.  Yes, that's correct.

16    Q.  But at the end of the day, do you remember Ms. Arslanian

17    referring to Mr. Hana as her brother?  Remember that?

18    A.  I don't.

19    Q.  Let's take a look at line 1248.

20          THE COURT:  Mr. Lustberg, so far you've highlighted,

21    you directed this witness's attention to 540, 1095, and 536.

22    But I think in essence what you've done is simply pointed the

23    jury to what that said.  That's not the purpose of

24    cross-examination.  Next question.

25          MR. LUSTBERG:  Thank you.  I'm trying to stick to the

1    chart.

2              THE COURT:  I understand.  But, it's to ask this

3    witness questions, not to just restate what's on the chart.  Go

4    ahead.

5              MR. LUSTBERG:  I understand.

6    Q.  So, take a look at, and I'll do that with regard to this

7    one first.  Page 1238.

8    A.  Yes, I see it.

9    Q.  Line 1238, you see where, and you can correct me if I'm

10   wrong, I don't believe you testified as to this.  This is a

11   text message from Nadine Menendez to Mr. Hana?

12   A.  Yes.

13   Q.  And it says "You must be a very special brother.  You have

14   no idea what your sister is going through and went through to

15   make this happen."

16             THE COURT:  "To make this trip happen."

17             MR. LUSTBERG:  I apologize.  "To make this trip

18   happen."  Thank you.

19   Q.  You see the reference there to Government Exhibit B207-3?

20   A.  Yes.

21   Q.  Did you review B207-3 in evidence?

22   A.  I did.

23   Q.  Do you recall it saying anything about where Ms. Menendez

24   says to Mr. Hana "Hope today's the best birthday you've ever

25   had"?

1   A.  I don't recall that.

2   Q.  Let's take a look at some of the -- at some of the e-mails

3   and texts regarding the loan that was provided to Ms. Menendez.

4   You pointed --

5          THE COURT:  Again, the jury will disregard the

6   comments of the lawyers.  Next question.

7          MR. LUSTBERG:  Of course.

8   Q.  You pointed to where she wanted him to pay off her

9   mortgage, to get her mortgage current, correct?

10  A.  I need to look at the document.

11  Q.  You don't recall there were a great number of texts and

12  e-mails about Mr. Hana paying off her, getting her mortgage

13  current?

14  A.  Yes, I recall the general substance of the text messages.

15  Q.  So, let's take a look at line 872 on page 62.  This is an

16  e-mail, I'm sorry, a message -- actually can you tell whether

17  this was an e-mail or a text?

18  A.  Yes.  The first line in the detail indicates it was a text.

19  Q.  Thank you, yes.  And just directing your attention to the

20  third paragraph of it.  It says "I have one favor to ask you.

21  I have to go to my dad now.  I am going to screenshot the

22  information.  If you can please have Wael go to a bank and send

23  an electronica wire to put the house back on normal status."

24          My question to you is, do you know whether that has

25  anything to do with Mr. Hana paying off Ms. Menendez's or

1    Ms. Arslanian's loan?

2            MR. MONTELEONI:  Objection.

3            THE COURT:  Sustained.

4    Q.  So, let me make, I read that correctly though, right?

5    A.  You read that correctly, yes.

6    Q.  And what you can tell from this is that -- and this was

7    faithful to the underlying text?

8    A.  It was, yes.

9    Q.  And then it says in the next paragraph, "If it is done by

10   Monday morning and he can do it from any bank, the electronica

11   wire, everything will be back to normal status, but it has to

12   be done by Monday morning.  If you can maybe forward it to him

13   if you are not seeing him or around him today."

14           Do you remember discussing that on your direct

15   examination?

16   A.  Yes.

17   Q.  And again, you don't know whether that refers to the loan?

18           MR. MONTELEONI:  Objection.

19           THE COURT:  Sustained as phrased.

20   Q.  Fair enough.  Do you know whether that refers to Mr. Hana

21   being asked to bring her mortgage current?

22           MR. MONTELEONI:  Objection.

23           THE COURT:  Sustained.

24   Q.  Do you remember that there were a number of exhibits about

25   which you referred to and discussed in your direct examination

1    about Mr. Hana not in fact coming through with the money?  Do

2    you remember that?

3    A.  Yes.

4    Q.  Just to go to one, take a look at line 938 on page 68.

5            A JUROR:  We're not seeing it if they want us to.

6            THE COURT:  You want the jury to see this?

7            MR. LUSTBERG:  Yes.

8            THE COURT:  It's admitted.  Let's show that to the

9    jury.  Thank you.  I'm sorry.  My deputy isn't here and I was

10   focused on the screen.  Put it up for the jury.

11           MR. LUSTBERG:  Just so the record is clear, these are

12   all from Government Exhibit 1302 in evidence.  So they should

13   all be shown to the jury.

14           THE COURT:  They still don't have it.  Let's have the

15   computer people do their thing.

16           MR. RICHENTHAL:  We're happy to have Mr. Hamill do it

17   if the Court would like.

18           THE COURT:  Counsel, take care of it.

19           Let's proceed without the jury seeing it.  It's in

20   evidence.  Proceed.  And can people be working on this now?

21   Let's proceed.  It's in evidence.  The jury will have access to

22   it during deliberations.  Move on.

23           MR. LUSTBERG:  I'll try and speak nice and slow.

24   Q.  I just pointed out that text that said "I can't believe

25   nothing has been paid yet and I gave all the info bank and

1  amount on the separate paper on Thursday.  I will not bring it

2  up again."

3          Was this among the entries that you discussed with

4  regard to Mr. Hana making payments to bring Ms. Arslanian's

5  mortgage up to date?

6          MR. MONTELEONI:  Objection.

7          THE COURT:  I'll allow it.

8  A.  This is on chart so I certainly reviewed it.  I don't,

9  obviously, Mr. Monteleoni and I didn't go over the entire

10  chart, so I don't specifically recall if we discussed this

11  exact thing.

12  Q.  And let me direct your attention just to line 876 on

13  page 63.  So, I'm sorry.  I meant 875.  Actually I take it

14  back.  It is 876.

15          So, in 876, this is a text exchange between -- this is

16  a text from Nadine Arslanian to Jose Uribe, correct?

17  A.  Yes, I recall this.

18  Q.  And I want to ask you about a couple of things on it.  And

19  do you remember testifying with regard to this?

20  A.  I do, yes.

21  Q.  And in the fourth line it says "This is nothing to him,

22  it's everything to me plus" exclamation point.  Do you see

23  that?

24  A.  I believe that's a letter I or an L perhaps.  I think it is

25  a capital I.

1  Q.  Got it.  "This is nothing to him.  It's everything to me."

2  No exclamation point.

3  A.  Yes.

4  Q.  And then towards the end of the paragraph it says, "What I

5  have done as priceless.  I would never have asked if I wasn't

6  in the situation I am now."

7          You see that?

8          THE COURT:  You see those words?

9          THE WITNESS:  I do, yes.

10 Q.  And those are words that in fact reflect what was in the

11 underlying text, correct?

12 A.  That's correct, yes.

13 Q.  And the underlying text is Government Exhibit B209-10?

14 A.  Yes.

15 Q.  You compared Government Exhibit B209-10 to make sure it was

16 accurate, right?

17 A.  I did, yes.

18 Q.  It says there "I will pay him back."  Do you see that?

19 A.  I do see that, yes.

20 Q.  That's also in that underlying text, correct?

21 A.  Yes.  Again, I reviewed it all.  Certainly, there was a lot

22 to the review.  It's possible I made a mistake.

23 Q.  There were a number of exhibits that you reviewed with

24 regard to this payment that had to do, and just correct me if

25 I'm wrong, with whether there would be a some sort of loan

1  agreement.  Do you remember those?

2  A.  I don't recall specifics of a discussion of a loan

3  agreement.

4  Q.  Let me try to nail that down.  So, take a look at

5  Government Exhibit 1302, line 949.  This is, am I right, a text

6  from Jose Uribe to Nadine Arslanian?

7  A.  Yes, that's correct.

8  Q.  And it says, does it not, "Sister.  You have to go sign the

9  papers and save your home.  Just sign and move on.  Stop the

10  fighting.  You have to go to Clifton."

11      Was that, as far as you understand it, was that in

12  references to papers with regard to the payment of that of --

13  withdrawn.  Terribly phrased.

14      We've been talking about Mr. Hana making payments to bring

15  Ms. Arslanian's mortgage up to date, right?

16          MR. MONTELEONI:  Objection.

17          THE COURT:  Ask a question.

18  Q.  Was this relevant to that?

19          MR. MONTELEONI:  Objection.

20  A.  I believe so, but again, I need to see the context of the

21  whole conversation.

22  Q.  So, you believe that but when you see "you have to go sign

23  the papers and save your home," you are still not sure that's

24  what it had to do with?

25          MR. MONTELEONI:  Objection.

O5V3MEN1                        Coughlin - Cross

1           THE COURT:  Sustained.

2   Q.  So, that text number 949 was on June 27, 2019; am I right?

3   A.  That's correct, yes.

4   Q.  Okay.  And later that day, I'll refer you to line 955, also

5   on June 27, there is another text, this time from Nadine

6   Arslanian to Robert Menendez.  Do you see that?

7   A.  I do, yes.

8   Q.  And it's just in that text, Ms. Arslanian says to Robert

9   Menendez, "I put Will in the same category as asshole."  Do you

10  see that?

11  A.  Yes.

12  Q.  And also on that same day, Ms. Arslanian's having --

13          MR. LUSTBERG:  We're getting thumbs up that they can

14  see.

15          THE COURT:  Ask your question.

16          MR. LUSTBERG:  Thank you.

17  Q.  Line 947, page 69, that's also on June 27, 2019?

18  A.  You said 947?

19  Q.  Yes, sir.

20  A.  Yes, that's correct.

21  Q.  That's a text from John Moldovan to Nadine Arslanian,

22  correct?

23  A.  Yes.

24  Q.  And you are aware that John Moldovan was an attorney

25  working for Mr. Hana?

O5V3MEN1                          Coughlin - Cross

1        MR. MONTELEONI:  Objection.

2   Q.  If you are aware.

3        THE COURT:  Just a moment.  Are you aware, do you know

4   whether or not John Moldovan was an attorney working for

5   Mr. Hana?

6        THE WITNESS:  There may have been references to that

7   in documents.  I would need to review the documents again.

8   Q.  So, in line 947, page 69, the text from Mr. Moldovan to

9   Ms. Arslanian says "Hi Nadine.  I'm at Wael office.  He needs

10  you to sign the note I e-mailed you ASAP."  Correct?

11  A.  Correct, yes.

12  Q.  And do you know what that note was?

13       MR. MONTELEONI:  Objection.

14       THE COURT:  Sustained.

15  Q.  Just asking him whether he knows.  Okay.

16     Then the next day, page, on line 957, page 70, Mr. Moldovan

17  asks Ms. Arslanian, "Nadine, did you review the note I sent

18  you."  Correct?

19  A.  Yes.

20  Q.  And again, you don't know what note that referred to?

21       MR. MONTELEONI:  Objection.

22       THE COURT:  I'll allow it.

23  A.  I believe in the previous text they discussed a note.

24  Q.  What note was that?

25       MR. MONTELEONI:  Objection.

1        THE COURT:  It's the note they referred to, correct?

2        THE WITNESS:  Correct.  I know there is a reference to

3   an e-mail, again, that e-mail, I would need to review the

4   documents to see the e-mail and whether or not I looked at that

5   attachment or if it was there.  I don't recall.

6   Q.  Let's jump a couple of weeks later.  Line 966.  Page 71

7   again in Government Exhibit 1302.  And again, this is from John

8   Moldovan to Nadine Arslanian?

9   A.  That's correct, yes.

10  Q.  And it says, "Hi Nadine.  I called earlier with no answer.

11  I am still awaiting your response on the money from Will."

12        Do you see that?

13  A.  Yes.

14  Q.  Is that on the same subject as the note?

15        MR. MONTELEONI:  Objection.

16        THE COURT:  Sustained.

17  Q.  Just one more on -- line again Government Exhibit 1302,

18  line 971.  Do you recall, and again, this is just to be clear

19  on this one, this is an entry regarding a text message from

20  John Moldovan to Nadine Arslanian, correct?

21  A.  Correct, yes.

22  Q.  And it's based on Government Exhibit B222 according to your

23  chart, right?

24  A.  Correct.

25  Q.  And to the best your knowledge, does the details set forth

1   on your text accurately reflect what was in the text message?

2   A.  Yes.

3   Q.  And that text message says "Hi Nadine.  On June 27 I sent

4   you a promissory note that Mr. Hana asked me to draft and send

5   to you for execution prior to the transfer of funds we

6   discussed."

7           You see that?

8           MR. MONTELEONI:  Not cross.

9           MR. LUSTBERG:  Pardon me?

10          THE COURT:  I don't have a question yet.  Do you see

11  it?

12  Q.  You see it?

13  A.  Yes.

14          THE COURT:  Next question.

15  Q.  That was what was in the text message, correct?

16  A.  In this entry on line 971?

17  Q.  Yes.

18  A.  Yes.

19  Q.  And it also says "I'm not sure if you recall, but we

20  discussed the promissory note over the telephone."

21          THE COURT:  Sir, this the jury has it now.  There is

22  no point in just reading it.  What's the question?

23          MR. LUSTBERG:  I want to make sure this was what was

24  in fact in the text message.

25          THE COURT:  Sir, you see the entry on 971 after text?

O5V3MEN1                          Coughlin - Cross

1           THE WITNESS:  Yes.

2           THE COURT:  Okay.  Do you believe as you sit here now

3    that that is an accurate reflection of what was set forth in GX

4    B222?  Yes or no.

5           THE WITNESS:  As Mr. Weitzman pointed out, I did make

6    a mistake.  But so it's certainly possible.

7           THE COURT:  I understand.  Even Homer nods.  But to

8    the best of your recollection.

9           THE WITNESS:  Yes.

10           THE COURT:  You did your job.

11           THE WITNESS:  Correct, yes.

12           THE COURT:  I think I assume you think you did a good

13    job.

14           THE WITNESS:  Yes.

15           THE COURT:  Next question.

16    Q.  Let me go to a different document.  Take a look if you

17    would at line 987, page 73 of Government Exhibit 1302.  You see

18    that check?

19    A.  Yes.

20    Q.  And you remember testifying with regard to that check on

21    direct examination?

22    A.  I do, yes.

23    Q.  If we could, I'd like to blow up the part, it's very small,

24    beneath the -- let's see.  So the part beneath the amount paid.

25    So if you can just blow up the part that says 23,500.

1  Underneath it says payee address memo.  You see where it says

2  loan auth?

3  A.  I can see it.

4  Q.  What does it say?

5  A.  Loan auth W. Hana I believe there is a slash IS EG to NA.

6  Q.  And that was not something that you testified to on direct

7  examination, correct?

8          MR. MONTELEONI:  Objection.

9  Q.  If you know?

10          THE COURT:  Were you asked a question about that on

11  direct examination?  Yes, no, I don't know.

12          THE WITNESS:  I don't recall about the specific of the

13  memo.

14  Q.  Let's move to a different topic.

15          THE COURT:  How much longer do you have, sir?

16          MR. LUSTBERG:  I'm making great progress, Judge.

17          THE COURT:  How much longer do you have, sir?

18          MR. LUSTBERG:  Maybe 10 minutes.

19          THE COURT:  Let's move.

20          MR. LUSTBERG:  I'm doing the best I can, your Honor.

21  Q.  You testified about three checks of $10,000 each that were

22  paid to Strategic International Business Consultants, SIBC,

23  correct?

24  A.  I recall I believe it was three.  I don't remember for sure

25  if it was three, but that sounds right.

1  Q.  And you were asked even before that about a communication

2  in which you discussed an e-mail from Mr. Hana to somebody

3  called HH HH.  And just to look at line 759 on page 55.

4  A.  I see it.

5  Q.  And you were asked a question about where it says Nadine

6  Arslan 120K vice president.  Do you see that?

7  A.  Yes.

8  Q.  Do you know who HH HH is?

9  A.  No.

10  Q.  And did you review any documents showing that somebody with

11  those initials was on the board of a company in Egypt with

12  which IS EG Halal had a contract?

13            MR. MONTELEONI:  Objection.

14            THE COURT:  Sustained.

15            MR. LUSTBERG:  Can I --

16            THE COURT:  What do you know about HH HH?  Anything,

17  based on those documents?

18            THE WITNESS:  I reviewed the other chart, the

19  attribution chart, there was an e-mail address with the

20  initials HH HH.  There was I believe it was a WhatsApp user

21  name with HH HH.  But beyond that, I don't have any other

22  recollection.

23  Q.  Just take a look at line 1122 on page 84.  You see I think

24  you in fact you testified as to this.  You see this financial

25  claim from Medi-Trade cosigned by General Ahmad Sharif Lufty

1    seeking from Mr. Hana and IS EG Halal a million dollars?  Do

2    you see this?

3    A.  I see the line entry, yes.

4    Q.  Do you know what Medi-Trade Company is?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  Based on the documents, do you have any

7    idea of what Medi-Trade is?

8            THE WITNESS:  No.

9    Q.  Anyway, you read earlier when we looked at an exhibit

10   earlier that said Nadine Arslan 120K vice president.  In your

11   chart you indicated and take a look at line 522, page 40, you

12   see at the end of that, this is from somebody named Howard

13   Dorian to Nadine Arslanian that's a text?

14   A.  Correct, yes.

15   Q.  Do you know who Howard Dorian is based on your review of

16   the documents?

17   A.  I don't recall.

18   Q.  Do you see that it says that he should be in a position to

19   meet with you, that being Nadine, on Monday, as well as with

20   Wael so we can talk about your job description and start

21   getting a contract together for you?

22            Do you see that?

23   A.  Yes.

24   Q.  Did you ever see such a contract?

25            MR. MONTELEONI:  Objection.

O5V3MEN1                    Coughlin - Cross

1          THE COURT:  Sustained.

2  Q.  Let me ask you this.  Page 5 -- take a look at line 521,

3  page 40.  And this is again from Mr. Dorian to Ms. Arslanian.

4  Do you remember testifying as to this?

5  A.  I don't recall testifying about this specifically.

6  Q.  I want to direct your attention to a couple lines at the

7  bottom.  That says "I know there will be a lot of hard work

8  ahead for all of us."

9          THE COURT:  I'm sorry.  It begins "once."  Go ahead.

10          MR. LUSTBERG:  Pardon me?

11          THE COURT:  It begins with the word "once."  I'm just

12  pointing that out.  Were you reading somewhere else?

13          MR. LUSTBERG:  Yes, I'm sorry, your Honor.

14          THE COURT:  I apologize.  You were reading from

15  somewhere else.

16  Q.  "I know there will be a lot of hard work ahead for all of

17  us but hopefully it will come to fruition."

18          You see that?

19  A.  Yes.

20  Q.  Then at the bottom, it says "Once I know that everything is

21  in place and he tells me exactly what your role in the new

22  corporation is going to be, I will get your contract prepared."

23          Do you know who, based on the context and your review

24  of documents, who the "he" is referred to in that passage?

25          MR. MONTELEONI:  Objection.

1           THE COURT:  Sustained.

2    Q.  Do you remember your testimony about Ms. Arslanian getting

3    a form consulting agreement?

4    A.  Yes.

5    Q.  And do you recall that thereafter, an actual agreement was

6    drafted by Mr. Moldovan?

7           MR. MONTELEONI:  Objection.

8           THE COURT:  Sustained.

9    Q.  Let me direct your attention then to line 1,000 on page 75.

10   Line 1,000 is, do you remember testifying as to this?

11   A.  Yes.

12   Q.  This is an e-mail that includes a description at the end.

13   I want to ask you if this is your description that the

14   agreement has a three-month term beginning September 1st, 2019,

15   and states as compensation for the consulting services that may

16   be rendered by consultant hereunder, the company shall pay

17   consultant a fee of $10,000 per month during the term.

18           Do you see that?

19           THE COURT:  I think you asked if it was his

20   description.  It can't be his description.

21           MR. LUSTBERG:  Okay.

22           THE COURT:  You can ask whether it is in the

23   underlying documents.

24   Q.  Was it in the underlying document?

25   A.  So the quoted portion was.

1  Q.  The part that says "The agreement has a three-month term

2  beginning September 1st, 2019" was your description, correct?

3  A.  It is a summary of what was in the document.

4  Q.  And you recall that thereafter there were three checks of

5  $10,000 per month.  And if you need me to I can show those to

6  you to refresh your recollection.  That were paid to this

7  consultant Strategic International Business Consultants,

8  correct?

9            MR. MONTELEONI:  Objection.

10           THE COURT:  If he knows I'll allow it.

11  A.  What was the question again?  I'm sorry.

12  Q.  There were three checks of $10,000 paid pursuant to this

13  contract?

14           MR. MONTELEONI:  Objection.

15           THE COURT:  Sustained.  Did you see three checks of

16  $10,000 made out to Strategic International Business

17  Consultants?  Yes or no.

18           THE WITNESS:  It was either two or three.

19  Q.  Let's go through it.  Line 1010 on page 76 is one check.

20           THE COURT:  Why don't you just ask him.

21  Q.  What is it?

22  A.  Yes, I recall the check 1055.

23  Q.  How much is it?

24  A.  It's for 10,000.

25           MR. FEE:  The jury is signaling.

1           A JUROR:  We lost the display.

2           THE COURT:  Let's continue.  Go ahead.  Thank you for

3    letting me know.  The IT people will work on it.  Proceed.

4    Q.  Line 1117 on page 83, take a look at that one.  What is it?

5    A.  Yes, that's the September check for $10,000.

6    Q.  And then line 1128 on page 84, what's that?

7    A.  Correct.  Yes.  That's a 10,000 check.

8    Q.  In your review, did you see any other $10,000 checks?

9    A.  I don't recall.

10   Q.  So you may have and just don't remember them?

11          MR. MONTELEONI:  Objection.

12          THE COURT:  Sustained.  Wrap it up, sir.

13   Q.  Just a couple more things on this subject.

14          THE COURT:  A couple more things, proceed.

15          MR. LUSTBERG:  I have a few more moments.  I just need

16   a few more moments.  I'm going more slowly.

17   Q.  You were asked questions about whether there was more money

18   than this $30,000 that was owed to Ms. Arslanian; do you

19   remember that?

20          MR. MONTELEONI:  Objection.

21          THE COURT:  Sustained.

22   Q.  Let me show you line 1098, page 80.  Do you see where

23   Ms. Arslanian is asking Mr. Daibes whether she can pick up a

24   check that should be $36,431.46?  Do you see that?

25   A.  Yes.

1  Q.  And that again, that text actually accurately reflects what

2  your summary accurately reflects what was in the text message,

3  right?

4  A.  That's correct.

5  Q.  Now, did you ever see in your review of documents, did you

6  ever see any documents that indicated that this SIBC consulting

7  agreement was coming to an end?

8          MR. MONTELEONI:  Objection.

9          THE COURT:  Sustained.

10         MR. LUSTBERG:  I wonder if he saw any documents.

11         THE COURT:  Sustained as to form.

12 Q.  You reviewed a whole lot of documents, right?

13 A.  I did, yes.

14 Q.  And in none of them did you see anything with regard to

15 whether Ms. Arslanian's contract was being terminated?

16         MR. MONTELEONI:  Objection.

17         THE COURT:  Do you recall any reference to the

18 termination of a contract involving Ms. Arslanian?  Yes or no

19 or I don't know.

20         THE WITNESS:  I don't recall.

21         THE COURT:  You don't recall one way or the other, is

22 that it?

23         THE WITNESS:  Correct, yes.

24 Q.  Just one last question on this subject.  Then we'll wrap up

25 with a couple quick things.  Line 956 on page 70, please.  Do

1   you recall listening to a voicemail left by Ms. Arslanian for

2   Mr. Daibes?

3   A.  Yes.

4   Q.  And do you recall that at the end of that voicemail where

5   it says a whole bunch of -- sorry.  Let me read the whole

6   sentence.

7           "I'm sure we'll see you after that, but if you could

8   please one time only do me the favor of talking to Will.

9   Because, uh, he said he doesn't need me for anything and I

10  haven't done anything to help him and a whole bunch of other

11  stuff, that I need to be in the office eight hours a day and he

12  refuses to return any phone calls or see me, um, see me or

13  anyway, thank you, Fred."

14          Do you remember that part of that voice message?

15  A.  I don't remember it specifically.  But it is reflected in

16  the chart.

17  Q.  Thank you.  Just really a couple more quick areas.

18          You read a lot of messages between Mr. Hana and

19  contacts that he had in Egypt in advance of his company IS EG

20  Halal getting the halal certification contract with Egypt.  Do

21  you remember testifying as to all those contacts?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  Sustained as to form, ask a question.

24  Q.  I am asking him whether he remembers -- I'll just go

25  through them then.

O5V3MEN1                        Coughlin - Cross

1            Do you remember communications, let me show you.  Take

2    a look at lines 462-465.  Page 37.  You see WhatsApp

3    communications and texts between Mr. Hana and somebody named

4    Ahmed Abdel Kareem?  Do you see that?

5    A.  Yes.

6    Q.  And were you aware that Ahmed Abdel Kareem was the director

7    of veterinary services for Egypt?

8            MR. MONTELEONI:  Objection.

9            THE COURT:  Do you know that, sir?  Yes or no.

10           THE WITNESS:  I don't recall.  There were documents

11   but I don't recall specifics.

12   Q.  Take a look at line 504, page 39.  Do you see this is a

13   WhatsApp communication between Ahmed Essam and Mr. Hana?

14   A.  Yes, that's correct.

15   Q.  Based on your review of documents, do you know who Ahmed

16   Essam was?

17   A.  At this moment, I don't recall.

18   Q.  And you've already testified about communications between

19   Mr. Hana and HH HH, but you don't know who that is, right?

20           THE COURT:  Sustained.  Asked and answered.  Next.

21   Q.  Do you recall, I can go through these, but there were

22   communications between Mr. Hana and somebody named Khaled

23   Shawky?

24   A.  Yes, I recall.

25   Q.  And somebody named Ahmed Helmy?

1  A.  That's correct.

2  Q.  And somebody named Ahmed Essam, correct?

3  A.  Yes.

4  Q.  And was it your understanding these were Egyptian persons?

5          MR. MONTELEONI:  Objection.

6          THE COURT:  Do you have an understanding one way or

7  the other?  Besides the fact that their name may have sounded

8  Egyptian to you?

9          THE WITNESS:  I would need to -- some of them had

10  titles I believe related to Egypt.  But again, I would need to

11  review those documents.

12  Q.  In connection with Mr. Hana's connections with Egypt, you

13  also testified with regard to certain activities that he took

14  in terms of responding to, for example, human rights concerns

15  that were being raised with regard to Egypt?

16          THE COURT:  Ask a question please.  The jury will

17  disregard the comments of the lead ups of the lawyers.

18          What's the question?

19  Q.  Take a look at line 131-33 on page 10.  This was testimony

20  you gave with regard to Mr. Hana e-mailing number points

21  referring to the Egyptian government in the first person.  Was

22  that your characterization referring to the Egyptian government

23  in the first person?

24          MR. MONTELEONI:  Objection.

25          THE COURT:  I'm not sure I understand the question,

 1    sir.

 2    Q.  This says e-mail and I don't see quotes.  It says "A series

 3    of numbered points referring to the Egyptian government in the

 4    first person."

 5          That's what's in the chart about which you testified,

 6    correct?

 7    A.  Correct.

 8    Q.  It says "responding to human rights concerns," correct?

 9    A.  Correct.

10    Q.  And is that an accurate description of what Mr. Hana was

11    e-mailing to himself?

12    A.  Yes.

13    Q.  It is an accurate description of what he then sent to

14    Ms. Arslanian and she then sent to Robert Menendez, correct?

15    A.  Yes.  Just as it mentions in that second one, the e-mail

16    from Nadine to Robert was fragmentary.

17    Q.  And you recall a bunch of e-mails where Mr. Hana was

18    involved in setting up meetings with Egyptian personnel in

19    Washington?

20    A.  Where Mr. Hana was involved in --

21    Q.  Yes.

22    A.  I need to review the messages.

23    Q.  Let's just show you one.  Line 249, page 19.

24    A.  Yes, I recall this, yes.

25    Q.  And some of these meetings, well let me -- rather than

O5V3MEN1                        Coughlin - Cross

1    asking you to characterize, take a look at line 574, page 44.

2    This is an e-mail from Nadine Arslanian to Senator Menendez and

3    it says the meeting is about the relations or how to maintain a

4    strong relation.  Do you see that?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  Sustained.  What are you asking him about

7    this e-mail?  He sees line 574.  What do you want to know?

8    Q.  Is that accurate as to what -- that's a quote, right?

9    A.  Correct, yes.

10   Q.  Just very briefly.  Your testimony involved a number of

11   photographs about which you testified.

12           THE COURT:  Did you testify concerning a number of

13   photographs, sir?

14           THE WITNESS:  Yes.

15           THE COURT:  Next.

16   Q.  And just to be clear, these were photographs at

17   restaurants, for example?

18   A.  That's an example, yes.

19   Q.  And people having dinner together or standing together in

20   social situations?

21   A.  Yes.

22   Q.  As well, there were a number of passages that you testified

23   to that were about people scheduling those sorts of occasions.

24   Do you remember that?

25           MR. MONTELEONI:  Objection.

1    THE COURT:  I'll allow it.  Do you remember e-mails

2    that involved scheduling of whatever was happening in the

3    pictures that you saw?

4    THE WITNESS:  Yes.

5    Q.  Just for an example, I'll just do the one on page 1 of

6    Exhibit 1302.  Take a look at lines 12-23.  And these are texts

7    between Nadine Arslanian and Will Hana?

8    A.  Correct.

9    Q.  And you can see, it's texts about a meeting now.  What are

10   you guying doing.  So forth.  And they're setting up getting

11   together, right?

12   MR. MONTELEONI:  Objection.

13   THE COURT:  Do you know what they're doing here, sir,

14   besides what the words say?

15   THE WITNESS:  I don't think we went over these on

16   cross, so I don't recall exactly the specific details of these.

17   I'm sorry on direct.  On direct.

18   THE COURT:  I am going to ask you to finish up, sir.

19   MR. LUSTBERG:  I'm almost done.  I'm on the very last

20   part.

21   Q.  Do you know what -- actually, let me stop right there.

22   You would agree that there were a number, as you said,

23   that there were a number of pictures and that there were a

24   number of e-mails throughout describing people setting up those

25   various occasions where those pictures were taken, right?

1           MR. MONTELEONI:  Objection.

2           THE COURT:  I'll allow it.

3           THE WITNESS:  Yes.

4           MR. LUSTBERG:  Thank you.  That's all I have.

5           THE COURT:  Thank you.

6           Mr. De Castro, anything, sir?

7           MR. DE CASTRO:  Yes, Judge.  Thank you.

8           THE COURT:  How long?

9           MR. DE CASTRO:  Five, 10 minutes.

10          THE COURT:  All right.

11   CROSS-EXAMINATION

12   BY MR. DE CASTRO:

13   Q.  Mr. Kelly, could you put up Government Exhibit 1302,

14   line 474 on page 38.

15          Good afternoon, sir.

16   A.  Good afternoon.

17   Q.  My name is Cesar De Castro.  I represent Mr. Daibes.

18   A.  Good afternoon.

19   Q.  You see that entry that's on the screen, right?

20   A.  I do, yes.

21   Q.  And that is a message from February 7 of 2019 from Mr. Hana

22   to Mr. Daibes, correct?

23   A.  Correct, yes.

24   Q.  It says "Hey Fred, can you please help Nadine" maybe not

25   spelled right "with car.  Thanks."  Right?

O5V3MEN1                      Coughlin - Cross

1   A.  Correct.

2   Q.  Now, that comes from Government Exhibit 209-3; is that

3   right?

4   A.  Yes.

5   Q.  Now you don't have any idea why that entry was included on

6   the chart, correct?

7   A.  I didn't select it.

8   Q.  Right.  So you don't have any idea why it was on the chart,

9   right?

10  A.  Correct.

11  Q.  So if we could expand out the messages before that on the

12  chart, lines 471-473.  They don't seem to have anything to do

13  with Nadine's car, correct?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Sustained.

16          MR. DE CASTRO:  Mr. Kelly, can you put up GX 209-3,

17  the exhibit that was referenced in that line.  And can you blow

18  up the first one.

19  Q.  And this is GX 209-3, this is the underlying exhibit that

20  was on the chart, right?

21  A.  Correct, yes.

22  Q.  And can you pull back out.  And so, there's no response

23  from Mr. Daibes to that text, correct?

24  A.  Not immediately, no.

25  Q.  Well, can we blow up the second -- thanks.  That first

1    message is on 2/7/2019 at 4:24, right?

2    A.  Yes.

3    Q.  The next message in that chain is on 2/9, two days later,

4    right?

5    A.  Yes.

6    Q.  Fair to say he didn't respond to that message?

7             MR. MONTELEONI:  Objection.

8             THE COURT:  I'll allow it.  He sees the two things and

9    they're two days apart.  Next question.

10   Q.  The only question is did Mr. Daibes respond to that message

11   in the chain.  I'm happy to blow up the bottom half.

12   A.  I don't know.

13            MR. DE CASTRO:  Can you pull out and blow up the blue.

14   Q.  And that's the response, right?

15            MR. MONTELEONI:  Objection.

16            THE COURT:  That's in the chain, correct?

17            THE WITNESS:  That's the next communication via this

18   method on this chain.

19   Q.  As part of your summary sheets, you included photos that

20   were texted between individuals, right?

21   A.  Yes.

22   Q.  And by and large they were photos of meetings or dinners

23   with people, right?

24            MR. MONTELEONI:  Objection.

25            THE COURT:  I'll allow it.  They are what they say

1    they are, what they show.  But go ahead.  You can answer that

2    question if you can.

3    A.  What was the question again?

4    Q.  By and large, they were photos of either meetings or people

5    at dinner?

6    A.  There were photos of meetings and people at dinner.

7    Q.  For example in March of 2018, there were photos of a

8    meeting in Senator Menendez's office.  Do you remember that?

9    A.  I don't.

10             MR. DE CASTRO:  Can we pull up, Mr. Kelly, Government

11   Exhibit 1302, lines 71 and 72 and 73, pages 6 and 7.

12   Q.  So do you remember looking at these photos on these lines?

13   A.  I recall the photos, yes.

14   Q.  Mr. Daibes is not in those photos, correct?

15   A.  No.

16   Q.  In May of 2018, there were a series of photos shared

17   between Nadine Arslanian and Mr. Hana.  Do you remember those?

18   A.  I don't.

19   Q.  Can we pull up lines 171 through 177.  They're on pages 12

20   and 13 of Government Exhibit 1302.  Can you go -- well, you see

21   those photos, right?

22   A.  Yes.

23   Q.  And then on the next page is a series of photos as well.

24   A.  Yes, I recall the photos.

25   Q.  And Mr. Daibes is not in those photos as well, correct?

1  A.  I don't believe so.

2  Q.  Last one.  In June of 2018, there was another series of

3  photos shared between Nadine Arslanian and Mr. Hana at lines

4  239 to 246.  Do you remember these?

5  A.  If you can go to the photos.

6  Q.  Sure.

7  A.  Yes, I recall those.

8  Q.  Mr. Daibes is not in those photos either, right?

9  A.  No.

10  Q.  Now, there are other photos in GX 1302, correct?

11  A.  Yes.

12  Q.  None of them had Mr. Daibes in them, correct, to your

13  recollection?

14  A.  I don't recall.

15  Q.  Now, I think you testified either on -- definitely on

16  direct and a little bit of cross yesterday that you were new to

17  the public corruption unit at the FBI, right?

18  A.  That's correct, yes.

19  Q.  And when you were asked to be the summary witness here,

20  you've been in the squad a few months.  That sound right?

21  A.  When I was asked?

22  Q.  Yes.

23  A.  To be a summary witness?

24  Q.  Yes.

25  A.  I don't even think it was that long.

1  Q.  But not only were you new, but you weren't involved or

2  familiar with any of the squad's ongoing investigations, other

3  than any you were assigned to.  Is that fair to say?

4  A.  So, I was on the health care fraud squad.  We were on the

5  same branch as public corruption.  Sometimes a canvass might go

6  out if there is an operation to assist.  So I was sort of

7  vaguely aware of some of the investigations, but I didn't have

8  any involvement.

9  Q.  You certainly weren't involved in this investigation?

10  A.  That's correct, yes.

11  Q.  And you've been, because you were in health care fraud

12  before, you've been a case agent, right?

13  A.  Yes.

14  Q.  And can you tell the jury what does it mean to be the case

15  agent on cases?

16       MR. MONTELEONI:  Scope.

17       THE COURT:  I'll allow that.

18  A.  It means you're one of the investigators, typically there's

19  a few for a large investigation, but, you know, you're

20  investigating the case.

21  Q.  You are sort of the lead agents on the case?

22  A.  I personally don't like to refer to a lead.  But if there's

23  two or three, you're usually co-case agents.

24  Q.  Would it be fair to say you have a more administrative role

25  on top of your investigative role?

1          THE COURT:  Sustained.

2   Q.  When you're the case agent or actively involved in the

3   investigation, would you agree with me that you endeavor to

4   learn everything you can about the targets of your

5   investigation?

6          THE COURT:  Scope.  Sustained.

7   Q.  Well, is it fair to say that the case agents are more

8   involved in the actual facts of the investigation?

9          THE COURT:  Scope.  Sustained.

10  Q.  In this case, there are case agents, correct?

11         MR. MONTELEONI:  Objection.

12         THE COURT:  Same ruling.

13  Q.  Well, none of the case agents in this case were chosen to

14  be the summary witness for GX 1302, correct?

15         THE COURT:  Sustained.  The issue of who the

16  government has as witnesses is not for the jury.

17  Q.  But for this chart, you had to learn about who the people

18  charged were, for example?

19         MR. MONTELEONI:  Objection.

20         THE COURT:  Sustained.

21  Q.  For his work on this case, you had to learn about who the

22  people were, right?

23         THE COURT:  Sustained as to form.  Make it more

24  specific.  Did you have to learn anything about the defendants

25  in this case in order to perform your chart?

1              THE WITNESS:  No.

2     Q.  You certainly had to know their names, right?

3              THE COURT:  Do you know the names of the defendants in

4     this case, sir?  That seems to be the question.

5              THE WITNESS:  I know who Robert Menendez is, but to be

6     honest with you, I didn't know, I didn't really know who the

7     defendants were or were not.

8     Q.  You had to know to identify them in photographs.  That's

9     what the government asked you to do, right?

10             MR. MONTELEONI:  Objection.

11             THE COURT:  Sustained.  You are asking if he knew

12    there were defendants?

13    Q.  You had to learn about individuals that were involved in

14    the investigation, correct?

15             MR. MONTELEONI:  Objection.

16             THE COURT:  Move on, sir.  New area.

17    Q.  You had to learn a lot of information about the phones that

18    you were reviewing messages from, correct?

19             MR. MONTELEONI:  Objection.

20             THE COURT:  I'm not sure what you mean.

21    Q.  You had to learn who were the subscribers of the individual

22    phone numbers, right?

23             THE COURT:  From the documents?

24    Q.  From the documents.

25             THE COURT:  Did you have documents that reflected who

O5V3MEN1                    Coughlin - Cross

1    subscribers of various phones were?

2              THE WITNESS:  Yes.

3    Q.  You had to review all those messages, right?

4    A.  Yes.

5    Q.  Would you agree with me that that is something that the

6    case agents would have known?

7              THE COURT:  Sustained.

8              MR. DE CASTRO:  Nothing further.

9              THE COURT:  Is there any redirect on this witness?

10             MR. MONTELEONI:  No, your Honor.

11             THE COURT:  Thank you.  Agent Coughlin, you are

12   excused.  You may step down, sir.

13             (Witness excused)

14             THE COURT:  Next witness for the government.

15             MR. MARK:  Government calls as its next witness Ted

16   McKinney.

17             THE COURT:  Ladies and gentlemen, were you getting the

18   feed or no?

19             A JUROR:  Yes.

20             THE COURT:  At the end?  Okay.

21             Until very recently, until the last couple of years,

22   we didn't have these monitors and things weren't done

23   electronically.  So the jury just didn't have the means of

24   seeing it.  This is all it's new.  It's nice.  But the things

25   that are admitted into court you'll have an opportunity to see

O5V3MEN1                           McKinney - Direct

1    during your deliberations.

2                I agree, or at least I can gather from your body

3    language, that you prefer to have it up in front of you.  And I

4    understand that.  It's much better.  But, I'm trying to move

5    things along, and if there are technical difficulties, I want

6    to move forward.  You'll have a full opportunity to review all

7    of these documents when deliberations start.

8                Good afternoon, Mr. McKinney, and welcome.  Please

9    speak loudly, slowly and clearly into the microphone in front

10   of you.

11               Your witness, Mr. Mark.

12    TED McKINNEY,

13         called as a witness by the Government,

14         having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. MARK:

17   Q.  Good afternoon, Mr. McKinney.

18   A.  Good afternoon.

19   Q.  Are you currently employed right now?

20   A.  Yes, I am employed.

21   Q.  Where do you currently work?

22   A.  I work for a member-based organization of state elected and

23   appointed officials.  It's called NASDA.  National Association

24   of State Departments of Agriculture.

25   Q.  What is the National Association of State Departments of

O5V3MEN1                         McKinney - Direct

1    Agriculture?

2    A.   NASDA is a 108-year-old association that represents all of

3    the elected and appointed secretaries, directors, and

4    commissioners of agriculture.  Three titles, same role.  For

5    the 50 U.S. states and four U.S. territories.  We represent all

6    kinds of agricultural issues.

7    Q.   What is your position at the National Association of State

8    Departments of Agriculture?

9    A.   I serve as the chief executive officer.

10   Q.   Have you held any full-time positions in public service,

11   sir?

12   A.   Yes, two full-time positions in public service.

13   Q.   Which ones?

14   A.   Chronologically, the first one was when I was appointed as

15   the state director of agriculture for the Indiana State

16   Department of Agriculture.

17   Q.   When did you serve as the director of the Indiana State

18   Department of Agriculture?

19   A.   That was January 2013 to October of 2017.

20   Q.   What was the second full-time position in public service

21   that you held?

22   A.   The second one followed immediately where I served as the

23   under secretary for trade and foreign agricultural affairs at

24   the United States Department of Agriculture or USDA.

25   Q.   How long did you serve as the under secretary for trade and

1  foreign agricultural affairs?

2  A.  From October 2017 until Inauguration Day, which would be

3  January of 2021.

4  Q.  Who appointed you for the position of under secretary of

5  agriculture for trade and foreign agricultural affairs?

6  A.  I was appointed by the President then Donald Trump.

7  Q.  What role, if any, did the Senate have in your appointment

8  as an under secretary for agriculture?

9  A.  Sure.  All appointed officials at our level, we were

10  reviewed by a specific committee of the Senate, only of the

11  Senate, not the House.  Mine was the Senate Agriculture

12  Committee that I was interviewed by, reviewed by, and then met

13  with several of them, so the Senate Ag Committee.

14         Once they approve of a nomination, it goes to the full

15  Senate, where you are reviewed and confirmed or not.  And I was

16  confirmed.

17  Q.  Generally, what were your responsibilities as the under

18  secretary of agriculture for trade and foreign agricultural

19  affairs?

20  A.  Sure.  This role was the first of its kind.  The

21  responsibilities I covered in the past had been handled by an

22  under secretary who had both domestic and international roles.

23  For the first time, we had an under secretary focused entirely

24  outside of the United States, so my role was to promote

25  agricultural food and ag products from the U.S. to markets

1  around the world.  And that involved a lot of things from

2  problem solving to trust building to networking.  All the

3  things you might go with that might associate with creating and

4  delivering a product.

5  Q.  In your role as under secretary of agriculture, did you

6  oversee any agencies within the U.S. Department of Agriculture?

7  A.  I did.  There were two agencies in my portfolio.

8  Q.  Which were those agencies?

9  A.  The first one is the Foreign Agricultural Service, FAS we

10  called it.  The second one was the Codex Alimentarius Office.

11  Q.  So my questions today are going to generally focus on the

12  Foreign Agricultural Service.  What is that agency?

13  A.  Foreign Agricultural Service has been around a long time.

14  And it is the organization that basically takes U.S. product

15  and helps make it work.  Helps the exports happen, helps make

16  them get imported, helps them in all ways, find their way to a

17  destination in other countries.

18         This involves two groups.  There's a large group in

19  D.C., a lot of analysts, economists, people who are watching

20  markets around the world and knowing where we might focus

21  products, where we might not, what's likely to happen, barriers

22  that might come up.  All of those things.  And then

23  importantly, there's a large group that are out at posts around

24  the world, and they would be foreign service officers, much

25  like the U.S. State Department has.

O5V3MEN1                        McKinney - Direct

1   Q.  You referred to a post.  What's a post?

2   A.  Post almost always include an embassy, but in some

3   countries, we have people and State Department people have

4   people outside the embassy, other large cities.  And so all of

5   them collectively would be called a post.  It is a common term

6   across U.S. government.

7   Q.  Approximately how large by employees was the Foreign

8   Agricultural Service when you served as its under secretary?

9   A.  It's always right about 1,000 with about two-thirds of

10  those being in Washington, and a third in external markets.

11  Q.  How is the Foreign Agricultural Service funded when you

12  were under secretary?

13  A.  It is almost exclusively funded by the allocations from the

14  U.S. Farm Bill, which is an every five-year renewal.  We are

15  going through that right now.  So the Farm Bill funds the

16  Foreign Ag Service.

17  Q.  Given the size of the Foreign Ag Service, what types of

18  matters would you have gotten involved in as under secretary?

19  A.  Would I have gotten involved with?  Most certainly

20  strategy.  Every administration has a different take, a

21  different area of focus on strategy.  So I led the effort on

22  that strategy, and that's strategic work.

23          I liked to be involved in a lot of things, but my time

24  prevented that.  So I was very focused on new technologies and

25  innovation.  That was part of it.  I had a special committee

1     that would meet once a month with me.

2              I would say a lot of the time would be big problems or

3     big issues that came up.  Things like tariffs that we might

4     impose on a foreign country or they might impose on us.  The

5     numbers of barriers and difficult obstacles to trade are

6     frequent.  They're numerous.  So, usually would be my team that

7     would do that either at post or in Washington.

8              But many times those arose to my level and I would

9     undertake those and engage with the team.

10    Q.  Were any of those matters or problems you talked about

11    related to decisions foreign governments made that affected

12    trade with the United States or U.S. business interests?

13    A.  Yes, most certainly and frequently.

14    Q.  In the course of your duty as under secretary, did you try

15    to influence a decision made by a foreign government?

16    A.  Yes, I did.

17    Q.  In what circumstances would you try to influence a foreign

18    government's decision?

19    A.  Sure.  Well, there can be misunderstanding on how the U.S.

20    treats its food and its safety, the safety and quality

21    parameters we put on ours.  And we're very proud of that.  It's

22    probably the standard of the world.  And so lots of times when

23    a country would want to impose a certain regulation or

24    requirement, it was not infrequent, in fact it was quite

25    frequent we would try to help them understand that maybe there

1    is a better way.

2            We always did that with respect for what they wanted

3    to do.  We found common ground a lot of the times.  So, it was

4    not infrequent that we did that on things like food quality,

5    food safety, because there are a lot of barriers and

6    misunderstandings on how U.S. or other countries produce their

7    food.

8    Q.  In the course of your duties as under secretary, when you

9    would try to influence a foreign government's decision that

10   affected trade, what sort of actions could you take to do that?

11   A.  Well, it's almost anything you might have in any home or

12   corporation.  In our case, it was very common to pick up the

13   phone and call the agricultural attache in the embassies in

14   Washington.  Attaches are basically people that have, among

15   other responsibilities, the agriculture portfolio.  So a phone

16   call.  We would see them at social events.  We're invited to

17   their embassies, they're invited to the USDA building.  That

18   would be probably the most common.

19           When we needed to elevate something, we would elevate

20   that to an ambassador located in the embassy in Washington,

21   D.C., and that could be done by personal interface, a phone

22   call, a letter.

23           When it got more serious, or we wanted to raise that

24   for whatever reason, it would involve phone calls, e-mails, or

25   formal letters to the country and the appropriate leadership of

O5V3MEN1                        McKinney - Direct

1    that country.

2            And so depending on the nature of the issue, you could

3    use any number or a combination of those different options.

4            (Continued on next page)

1    Q.  Mr. McKinney, you've testified that your job was, in part,

2    to help promote the U.S. exports of agricultural products.  Did

3    the U.S. export any products to the country of Egypt?

4    A.  Yes, they did.

5    Q.  How large a share of total U.S. agricultural exports were

6    exports to Egypt?

7    A.  And you said total exports, didn't you?

8    Q.  Total exports, yes.

9    A.  Total U.S. --

10            THE COURT:  Total agricultural exports.

11            MR. MARK:  Yes.

12            THE WITNESS:  Total agricultural --thank you.

13   A.  Total agricultural exports, Egypt would be relatively

14   small.

15   Q.  Despite being small, were the exports to Egypt important in

16   any way?

17   A.  Absolutely, yes.  We had a unique position of having -- I

18   may be wrong by a little bit, but about 60 percent of the

19   market share for beef livers.  60 percent of Egypt's

20   consumption of beef livers came from the U.S.

21       What many people don't realize is that oftentimes those

22   offals, we call them -- those organs, like livers, like lung,

23   tongue, those kinds of things -- oftentimes were the -- the --

24   profitability for the U.S. processor and, by extension, the

25   farmer or the rancher.  So when you had a share like that, you

1    really took care of those special organs or special cuts, and

2    in their case, it was livers.

3    Q.  During your time as under secretary, about how much of your

4    time did you personally spend on matters pertaining to Egypt?

5    A.  Relatively little.

6    Q.  Do you remember ever being personally involved in any

7    matters related to exporting agricultural products to Egypt

8    during your time as under secretary?

9    A.  Yes, there were two.

10   Q.  Which matters do you remember being personally involved in?

11   A.  The first one was with a broad stroke.  It was not

12   infrequent that I would travel to Dubai, in the United Arab

13   Emirates, which hosted an annual enormous food show; it's where

14   a lot of buying and selling would take place.  And while there,

15   I would usually go over to the offices of the Gulf Cooperation

16   Council, which represented many of the Middle Eastern states.

17   Didn't represent Egypt, who is not a member, but by

18   approximation, by geography, they would share a lot of that.

19   So I would visit there, and that would be the first one.

20   Q.  And what was the second matter that you were personally

21   involved in?

22   A.  The second one occurred in late April, when we learned that

23   the government of --

24              THE COURT:  Late April of what year, sir?

25              THE WITNESS:  I'm sorry.  Thank you, sir.

O5vWmen2                          McKinney - Direct

1    A.  Late April of 2020 -- 2019.  Late April of 2019, when we

2    learned that the country of Egypt had delisted or stopped the

3    services of a number of halal certifiers in the U.S.  These are

4    certifiers that are at the beef plants certifying the halal

5    process is followed, and they would be delisting or not using

6    any of their services.

7    Q.  And what did you learn that Egypt was going to do after it

8    delisted the services of certain halal certifiers?

9    A.  They were going to replace the several with one halal

10   certifier.

11   Q.  What was the name of the single certifier that was going to

12   replace the others?

13   A.  I didn't know initially, but I believe it was IS EG, and

14   there's a space between the S and the E.  IS EG, I believe, was

15   the name of it.

16   Q.  How did you learn of this decision by the country of Egypt?

17   A.  I may have learned verbally from staff, but most

18   definitively when I received an email that wrapped up and

19   summarized that.

20        MR. MARK:  Ms. Wechsler, would you please publish for

21   the jury what is already in evidence as Government Exhibit

22   8B-3.

23        You can enlarge the top half.  Thank you.

24   Q.  Mr. McKinney, do you recognize this exhibit?

25   A.  Yes, I do.

O5vWmen2                                McKinney - Direct

1    Q.  What is this email?

2    A.  Well, this is an email that's entitled TFAA alert, and that

3    was basically one of the most significant alerts or notices

4    that I could get on something that was breaking open, a new

5    issue, an issue that needed my immediate attention.

6    Q.  And it refers to an acronym, TFAA.  What does that refer

7    to?

8    A.  Sure.  That was my portfolio.  Trade and Foreign

9    Agricultural Affairs is associated, or was, with my under

10   secretary title.  So TFAA was for all who are involved in my

11   portfolio.

12   Q.  And generally speaking, what did this TFAA alert relate to?

13   A.  Well, the headline describes it.  That was when we learned

14   officially, at least I learned the first time, that Egypt was

15   going to delist most halal, U.S. halal-based certifiers and,

16   most critically, was going to replace them with a single one,

17   which we learned had never certified halal in their history.

18   Q.  When you were alerted that Egypt had proceeded to go with a

19   single halal certifier, how important, if at all, did you

20   consider this issue?

21   A.  Very, very important.  We immediately swung into action

22   just because of the very unique and highly unusual nature of

23   the decision.  This was very, very unusual in the practices of

24   TFAA.

25   Q.  And why did you consider this issue important?

O5vWmen2                              McKinney - Direct

1    A.  Well, the first one is the fact that the new certifier had

2    not had any experience.  This can be a very delicate process,

3    and so for a single halal certifier to be displacing several

4    and had no experience.  So the no experience was part one.

5        Part two is there's a certain efficiency that comes with

6    the production and the processing of products; in this case,

7    beef and beef livers.  There were reasons there were several.

8    It's so that they could be timely, and when you go to one you

9    might find very easily a single halal certifier can't get to a

10   processing plant in time, and therefore, they have to shut down

11   or hold off on their halal certification line.  And the end

12   result is the risk of loss of a market.  Remember, we had a 60

13   percent, thereabouts, market share with livers.

14       The third one is the fact that it was going to be quick.

15   We'd never, ever heard about that.  I've been in agriculture my

16   whole life.  I've never heard of a delisting and a

17   re-enrollment of one inside of one week.  It was unheard of,

18   and so we were very concerned with the loss of an entire market

19   and, with that, the ramifications to farmers and ranchers, the

20   processors and even all the way to the consumers that might be

21   purchasing those in Egypt.

22   Q.  After learning about Egypt's decision to grant a monopoly

23   to a single halal certifier, did you personally take any action

24   regarding this matter?

25   A.  Yes, absolutely.

1    Q.  What actions did you take?

2    A.  Well, the first thing is I wanted the team to all be alert

3    on that, and that included the foreign agricultural service

4    personnel at our post in Cairo, Egypt, at the embassy.  So we

5    said be alert.  Try to figure out what you can learn.

6         From our end, we placed calls, or my team placed a call to

7    the agricultural *attaché* in the Egyptian embassy based in

8    Washington, D.C., because we wanted to talk to the ambassador

9    and whoever was appropriate on staff to fully understand what

10   caused this rapid, sudden change.

11              MR. MARK:  Ms. Wechsler, could you please publish

12   what's already in evidence as Government Exhibit 8B-35.

13   Q.  If I could direct your attention to the bottom email, what

14   is the date of this email?

15   A.  This is May the 2nd, 2019.

16   Q.  And do you see in this email that in the first line it

17   refers to a phone call?

18   A.  Yes, I see that.

19   Q.  What phone call does that refer to?

20   A.  As it says there, it reflects the phone call I had had with

21   the ambassador from Egypt to the U.S. the day prior, on May 1.

22   Q.  What was discussed on that phone call?

23   A.  Well, May 1 was the date that had been set by the country

24   of Egypt to go live on the delisting or nonuse of the many

25   certifiers and going live with the one chosen certifier that

```
 1    had had no experience.  So we were urgently trying to

 2    facilitate change, a rethink, a slowdown, anything that would

 3    let us not have a big gap or have a disruption in the flow of

 4    beef entirely, but in this case beef livers to Egypt.

 5    Q.  Who did you send this email to?

 6    A.  It was sent to the ambassador, and I believe the cc, in

 7    addition to myself, was the Deputy Minister of Agriculture in

 8    Egypt, whom I had met about a month prior in my offices in

 9    Washington.

10    Q.  In your position as under secretary, approximately how

11    often would you interact with a foreign ambassador?

12    A.  Foreign ambassador, infrequently.  I would say once every

13    two, maybe even three months.  The holidays might be a little

14    more because there are social parties and things, but easily

15    once every couple months.

16              THE COURT:  Can you ballpark it; half a dozen times a

17    year?

18              THE WITNESS:  Yes, sir.  That would be right.

19              THE COURT:  I don't want to put words in your mouth.

20              THE WITNESS:  No.  That's about right.

21              THE COURT:  And of those half a dozen times, some of

22    them are just social events; is that what you're saying?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  All right.

25              THE WITNESS:  I can expand on that.
```

O5vWmen2                           McKinney - Direct

```
 1          Rarely would I have a call in this form, where we had
 2   an urgent, strident issue at hand.  That was rare.  That was
 3   maybe once during my entire time at U.S.D.A., sir.
 4          THE COURT:  Well, I take it as under secretary for
 5   Trade and Foreign Agricultural Affairs, there are problems that
 6   arise all the time?
 7          THE WITNESS:  That's correct, sir.
 8          THE COURT:  All right.
 9          MR. MARK:  Thank you.
10   Q.  So just generally, when would you typically deal with a
11   foreign ambassador in your position?
12   A.  Well, there were social events and then there were issues
13   that we would raise and communicate with them in Washington.
14   When I traveled -- and I traveled a fair amount, about a half a
15   million international air miles -- it was not uncommon that we
16   would meet with the ministries of people there and our own
17   ambassador.  But in terms of ambassadors from foreign countries
18   to the U.S., it was usually Washington, D.C., maybe even
19   exclusively Washington, D.C.
20   Q.  How often did you interact with the Egyptian ambassador
21   during your time as under secretary?
22   A.  I believe this was the first.  I cannot recall if the
23   ambassador accompanied the deputy minister when they visited in
24   late March.  So I think this was the first time.
25   Q.  And generally, what did this email from you to the
```

O5vWmen2                          McKinney - Direct

1    ambassador on May 2, 2019, discuss?

2    A.  Yes.  We were -- we were urgently trying to get the

3    government's attention to at least visit with us on what was

4    transpiring with this delisting of several halal certifiers.

5         Remember, May 2 is the day after we had been told they were

6    going live with the decision, meaning several certifiers were

7    out of business and here's one remaining certifier who had no

8    experience.  So you have the potential risk of a lot of lag

9    time and nobody being there to certify a product that we saw

10   great value in and that was being exported to Egypt.

11            MR. MARK:  Ms. Wechsler, if we could bring up the top

12   of page 2 of this email.  Enlarge this half.

13   Q.  In sum, what requests did you make in this email to the

14   ambassador?

15   A.  Sure.  We wanted to try to find some way to stop or

16   transition, because we still had not been told why they were

17   delisting so many certifiers.  It's just unheard of.  I've

18   never heard of that, and I'd asked the foreign ag. service, has

19   this ever happened in your careers, and none could remember

20   anything like it.  So we were working very quickly because of

21   the date, now passed one day, to find out what happened and

22   could we find some sort of transition time or a fix.  And so

23   the four bullet points there that you see were our specific

24   asks.  You can tell we were elevating the urgency to this just

25   a bit.

1   Q.  Now, let's focus on the third bullet point here, where you

2   requested Egypt not limit eligible halal certifiers to one

3   entity, as that potentially has a market-distorting effect.

4   What did you mean by market-distorting effect in this context?

5   A.  Well, it's pretty simple.  If you go with one entity in any

6   industry -- in this case, halal certification -- you've created

7   a monopoly.  And we were very concerned that prices would rise

8   significantly that would harm the entire value chain, the end

9   consumer in Egypt and most certainly our farmers, ranchers and

10  processors.  So we were trying to find a way, much like we find

11  competition in the U.S., to retain a certain number so there

12  was some competition and price could be kept down,

13  notwithstanding keeping that void filled while this new

14  certifier got up to curve.

15  Q.  When you're talking about price, what impact on price were

16  you concerned about?

17  A.  Well, halal certifiers charge by container.  A container is

18  about the size of a semi-tractor-trailer vessel, you know, on

19  the backside.  That's a container.  That's the kind of

20  container when refrigerated would be used to ship meat,

21  including livers, to countries around the world.

22      Well, if you've got one certifier, the risk of the cost

23  going up is quite real, and it did.  It bore out the truth,

24  just as we suspected it would, very shortly.

25  Q.  Now, in your email you refer a few times to seven delisted

1    certifiers.  Would your request have been any different if you

2    had noted that there were four existing halal certifiers --

3              MR. FEE:  Objection.

4    BY MR. MARK:

5    Q.  -- delisted or suspended instead of saying seven delisted

6    certifiers?

7              MR. FEE:  I apologize.

8              THE COURT:  Sustained as to form.

9              Sir, that means you're not to answer, when I sustain

10   an objection, and the lawyer will ask another question.

11             THE WITNESS:  Very good.  Thank you.

12   BY MR. MARK:

13   Q.  Would your request have been any different if you had

14   written four delisted certifiers instead of seven delisted

15   certifiers?

16             THE COURT:  Sustained.

17             The defense is rising to object.

18   BY MR. MARK:

19   Q.  Directing your attention to where you wrote the backdrop to

20   the decision is very confusing, what did you mean by that?

21   A.  Well, I've said in so many words, but let me be more clear.

22   We had never seen or heard anything like this in my history in

23   the ag. industry and in the foreign agricultural services'

24   time.  And again, I go, the suddenness.  We were given one week

25   to learn that several halal certifiers would be going out of

O5vWmen2                          McKinney - Direct

business and a brand-new one with no experience was coming in.
We were very proud of having earned that 60 percent market
share, and we wanted very much to keep it.  Remember, that kind
of cut can be the sole profitability when a processer would
sell the product.  That's the second third.

     The third is we'd never heard of transition times that
quickly.  Sometimes halal certifiers or other inspectors come
and go.  Never had we learned or been faced with a situation of
one-week transition time.

     And finally, we had what we thought was a very good
relationship with Egypt.  The visit in late March or April with
the deputy minister was quite good.  We talked about ways we
could continue to collaborate.  so this came out of the blue
and was unheard of.

          THE COURT:  Sir, you say we had never seen or heard
anything like this in my history in the ag. industry and in the
foreign agricultural services' time.  Say a little more about
your history, because as near as I can tell, you became under
secretary for trade and foreign agricultural administrative
affairs in October of 2017.

          THE WITNESS:  Yes.

          THE COURT:  The way you're speaking, it sounds as if
you have a history beyond that, before that.  So when you say
you've never heard of it in your history, what's your history?

          THE WITNESS:  Sure.  When -- growing up, our family

O5vWmen2                    McKinney - Direct

 1    raised --

 2                 THE COURT:  I need a sense of the time frame that

 3    you're talking about.

 4                 THE WITNESS:  Well, from a teenager on.  Our family

 5    raised pork.  We would frequently take pork to processing

 6    plants in Indiana.  I had friends who worked at those

 7    processing plants.  Growing up, an organization where I worked

 8    with 4H and FFA, I had a lot of friends in the beef industry.

 9    So I knew something about how those worked.

10                 THE COURT:  I gather you wouldn't be attuned, a

11    17-year-old working on a farm I don't think would be attuned to

12    the niceties of halal certifications in Egypt.

13                 THE WITNESS:  Well, sir, I beg to differ.  I did know.

14                 THE COURT:  All right.  That's fine.

15                 THE WITNESS:  I did know.  And then I did a deeper

16    dive when I was the director of the Department of Agriculture,

17    where we really took this under keep, and we had pork and beef

18    processing plants, poultry processing plants in Indiana.  And I

19    visited most of them.

20                 THE COURT:  And when were you director of the

21    Department of Agriculture?

22                 THE WITNESS:  That was 2013 to 2017.

23                 THE COURT:  Oh, that's the Indiana.

24                 THE WITNESS:  Yes, sir.

25                 THE COURT:  Got it.

O5vWmen2                      McKinney - Direct

1           THE WITNESS:  Yes, sir.

2   BY MR. MARK:

3   Q.  Were you in ag. industry before you were the director for

4   the Indiana state Department of Agriculture?

5   A.  Yes, sir, I spent a number of years in the crop science,

6   biotechnology and seeds industry and then three and a half

7   intense years in the animal veterinary products industry.  So

8   yes, fairly familiar with a lot of those things.

9   Q.  Now, going down in this email, can we direct your attention

10  to where you wrote the decision reflects, could you read that

11  sentence?  Read that sentence only.

12  A.  Yes.  Let me get my glasses on.

13          THE COURT:  And sir, I'm going to ask you to slow

14  down, only because we have interpreters and we have a court

15  reporter, and they need to keep up.  So slow down in terms of

16  your cadence.

17          THE WITNESS:  Yes, your Honor.  I will.  Thank you.

18  A.  Reading the sentence --

19          THE COURT:  I won't ask if you grew up in New York.

20          Go ahead.

21  A.  Reading the sentence, "Then, the decision reflects the

22  rather draconian decision to oust existing certifiers and

23  replace with a single one.  We need your help in the

24  explanation and forward action."

25  Q.  What did you mean when you wrote the decision was

1    draconian?

2    A.  Well, I use that word occasionally when it's a very

3    serious, impending issue, and I felt that this was a draconian

4    issue.  I'll repeat again.  My history and that of the foreign

5    ag. service had never experienced a government, in one week,

6    removing all certification of whatever might need to be

7    certified and replacing it with a single nonexperienced entity.

8    And so we wanted to make sure we were protecting a market for

9    our farmers, our ranchers, our processors, and a viable, lower

10   cost product to the consumers.

11             THE COURT:  The Egyptian consumers.

12             THE WITNESS:  Yes, sir.

13             I can expand if you wish.

14   BY MR. MARK:

15   Q.  How did the price to Egyptian consumers matter, if at all?

16   A.  It's very common, when we have commodities in the United

17   States, whether it's corn or soybeans or beef and beef livers,

18   to care about the end user.

19             THE COURT:  Slow down.

20             THE WITNESS:  Sorry.

21   A.  -- to care about the end user.  After all, they are the

22   ones that ultimately are going to make the decision.  And

23   although price is usually forwarded on after the point of

24   sale -- in this case the price of a higher cost of shipments

25   would be borne by the consumer -- it ultimately affected our

O5vWmen2                          McKinney - Direct

1    farmers and ranchers and processors as well because if the cost

2    goes too high, there are many other countries who would like to

3    have that market.  So we were concerned that we were at risk of

4    losing a market with the dramatic increase in cost of the halal

5    certification with a single certifier.

6    Q.  And this sentence referred to existing certifiers.  Did the

7    precise number matter?

8    A.  Absolutely it did.  When you go to one, it's a monopoly.

9    When you have several, you bring competition, very much the

10   essence of our country.

11   Q.  And you referred to forward actions, needing your help in

12   explanation and forward actions.  What were you referring to

13   there?

14   A.  That had two intentions.  We did not know what forward

15   actions the Egyptian government might be contemplating.  After

16   all, we had made several asks by that time of change, so it

17   included actions they might take, and we didn't yet know what

18   actions we might take.  We were still hoping for a change in

19   heart, a change in mind, a realization of the logic of this

20   decision.  So any forward actions, either by us or by them in

21   their decisions, we were concerned about.  We wanted an

22   explanation.  We wanted to be able to work with them.

23   Q.  After you sent this email to the Egyptian ambassador, do

24   you recall receiving any reply from him?

25   A.  I did not receive a reply.

O5vWmen2                        McKinney - Direct

1  Q.  And you mentioned that the deputy minister was cc'd on this

2  email.  Did you receive any reply from her?

3  A.  No.  No reply from her.

4  Q.  Based on your experience as under secretary, did you

5  typically receive a reply when you reached out to a foreign

6  ambassador.

7  A.  Yes.  I can't remember a time we didn't.  There's a certain

8  level of diplomacy and respect that goes between countries,

9  particularly countries where you have a pretty good

10  relationship, as we thought we did, and I still think we do,

11  and hope we do, with Egypt.  So even if it's just an

12  acknowledgment that I got your letter and I'm responding was

13  very common.  We did that, and then in due course, we would get

14  back with a longer, thorough explanation.

15      We received nothing.

16  Q.  After receiving no response from the Egyptian ambassador to

17  your email, did you then send a formal letter?

18  A.  We did.

19  Q.  Who did you send that formal letter to?

20  A.  We sent the next letter to the deputy minister of the

21  Egyptian ministry of agriculture.  This is the same person with

22  whom I had met in late April of 2019.

23  Q.  Who was the deputy minister of agriculture in Egypt at the

24  time?

25  A.  I believe it was Deputy Minister Dr. Mona Mehrez.

1    Q.  And why did you reach out to Deputy Minister Mona Mehrez?

2    A.  Well, in the world of protocol, you try to show respect,

3    but you can, if the urgency is there, elevate that issue.  And

4    this was a fairly quick elevation, because we had not yet

5    received any reply from my personal discussion by phone and the

6    email to the ambassador in Washington, D.C.

7    Q.  Was Deputy Minister Mona Mehrez effectively your

8    counterpart in the Egyptian government?

9    A.  As close as you can get.

10   Q.  And you mentioned that you wrote a formal letter to Deputy

11   Minister Mehrez.  Is a formal letter like this part of the

12   United States official diplomatic relations with other

13   governments?

14   A.  Absolutely.  It's common.

15        MR. MARK:  Ms. Wechsler, would you please publish page

16   2 of Government Exhibit 8B-20, which is already in evidence.

17   Q.  Mr. McKinney, what is this?

18   A.  This is a cover letter to which we attached the more formal

19   letter to Deputy Minister Mehrez.  You can see it's dated May

20   10.  That's an internal marker.  So this would accompany the

21   letter that I sent to the deputy secretary -- deputy minister.

22   Q.  And this is a letter to the ambassador of Egypt at this

23   time?

24   A.  It is.  It's the same ambassador that we had sent an email

25   to and that I had spoken with by phone.

1  Q.  Why did you send the enclosed letter to Dr. Mona Mehrez to

2  the ambassador's attention?

3  A.  This is a respectful protocol.  If we're going to send

4  something back to the homeland -- in this case, Egypt -- it is

5  appropriate and it's courtesy to let the embassy know what we

6  are sending.  That's for two reasons:

7       Usually, the embassy will quickly move that on back to the

8  right people in their home country, in this case Egypt.

9       The second reason is to make sure we personally, the

10  foreign ag. service people in Egypt, got the letter itself

11  directly delivered so that there was no risk that it might be

12  delayed because of absences, deliberate delays, whatever the

13  case might be.

14           MR. MARK:  Ms. Wechsler, could we please go to page 3

15  of this exhibit.

16  Q.  Is this the enclosed letter to Dr. Mona Mehrez?

17  A.  That is correct, same date.

18  Q.  Mr. McKinney, could you please read aloud for the jury the

19  first sentence, beginning I am deeply concerned?

20  A.  Yes.  "I am deeply concerned that the Egyptian ministry of

21  agriculture has suspended or terminated all seven of the

22  existing U.S.-based halal certifiers that were authorized to

23  certify U.S. beef shipments to Egypt and has instead appointed

24  a new organization to provide that certification."

25  Q.  During your time as under secretary, did you usually start

O5vWmen2                          McKinney - Direct

1    formal letters to foreign officials with similar language?

2    A.  No.  This was a first.

3    Q.  Why did you do that here?

4    A.  Well, back to the elevation of the issue, we were now ten

5    days into the decision to no longer utilize the services of

6    seven certifiers and replace them with one who had no

7    experience.  So we were taking this to the highest level that

8    we had at the time.  It doubled that she and I had met and had

9    a very good discussion, I thought, and so we use these words

10   because the issue was getting serious.

11              MR. MARK:  Now, Ms. Wechsler, if we could scroll down

12   to lower on the letter.

13              Thank you.

14   Q.  Now, directing your attention, Mr. McKinney, to the

15   second-to-last paragraph, would you please read the second

16   sentence aloud for the jury?

17   A.  Starting with addition, sir?

18   Q.  Starting with effective immediately.

19   A.  OK.  Sure.  "Effective immediately, please reinstate the

20   seven U.S. halal certifiers."

21   Q.  Did the precise number of existing halal certifiers matter

22   to this request?

23   A.  Say again, sir?

24   Q.  Did the existing number of -- did the precise number of the

25   existing halal certifiers matter to this request?

O5vWmen2                         McKinney - Direct

1    A.  No, it did not.  It did not.

2    Q.  Why did you request that Dr. Mona Mehrez reinstate the

3    existing U.S. halal certifiers effective immediately?

4    A.  Several reasons.  We had now been notifying them, through

5    different channels, about how seriously we took the decision

6    that had been made, and we wanted it addressed before it was

7    ingrained, before it took hold and before we lost markets.

8    That was the first thing.

9         Second thing is we had not heard from anyone, which was

10   highly unusual.  So I elevated to the person I knew who was my

11   counterpart of sorts.

12        Finally, we wanted to make sure that if they wanted to add

13   a halal certifier, fine, but please let's don't disrupt trade

14   in the process.  And so that's why we made this specific

15   request, please reinstate them.

16             MR. MARK:  Now, Ms. Wechsler, if we could scroll down

17   to the end of the letter on the next page.

18   Q.  Mr. McKinney, did you sign this letter in ink?

19   A.  Yes, I did.

20   Q.  What did you write next to your signature?

21   A.  In my own writing, I said:  Thank you, Her Excellency.  It

22   was good having you to U.S.D.A. for a visit.  Please, let's fix

23   this unexpected problem.  Always ready to take your call."

24   Q.  Did you receive any response from Mona Mehrez to this

25   letter?

O5vWmen2                          McKinney - Direct

1    A.  No.  No response.

2    Q.  Did you receive a response from any other Egyptian official

3    to this letter?

4    A.  No.  No response.

5    Q.  Changing gears a little bit, in the course of your duties

6    as under secretary, did you ever receive calls from members of

7    Congress?

8    A.  I did.

9    Q.  How frequently did you receive calls from members of

10   Congress when you were under secretary?

11   A.  I would say on the average one or two a month, no more than

12   that.

13   Q.  What types of matters did members of Congress contact you

14   about when you were under secretary?

15   A.  Most of them were encouraging.  They liked what we were

16   doing.  We were giving a lot more attention to trade and

17   foreign visits than ever before, so I would say usually they

18   wanted to make sure that a certain commodity or animal protein

19   was included in our discussions with various countries.  So it

20   was encouraging, hey, are you going to add X or Y in your

21   discussions, and so we would take those into consideration.

22       Sometimes there were issues they wanted to face.  For

23   example, when tariffs were applied to some countries, I heard,

24   among others, objections to that.  So we dealt with some of

25   those.  So it was a little bit of both, but most of them were

1    people wanting me to take further action, be more inclusive,

2    make sure that we had something from their respective state or

3    congressional district on my radar, in my inclusion, in my

4    discussion.

5    Q.  What influence, if any, did U.S. senators have over matters

6    that involved the U.S. Department of Agriculture?

7            MR. FEE:  Objection, your Honor.

8            MR. MARK:  It goes to *McDonnell*, your Honor.

9            MR. FEE:  Objection.  And speaking objection.

10           THE COURT:  Gentlemen.

11           Sustained as phrased.

12   BY MR. MARK:

13   Q.  Did you receive ever any contacts from United States

14   senators?

15   A.  Yes, I did.

16   Q.  What influence, if any, did United States senators have

17   pertaining to matters involving the Department of Agriculture?

18           MR. FEE:  Objection.

19           THE COURT:  Sustained as phrased.

20           What was the reason U.S. senators would be calling

21   you, sir?

22           THE WITNESS:  For the same reason, and others, they

23   wanted to make sure that their farmer and rancher and

24   processors' products were on my radar and we were thinking

25   about that.  If they had objection, they wanted me to know

1  about that.  If they -- I mean think that's a good, broad

2  description, sir.  I can think of specific examples if you'd

3  like.

4  BY MR. MARK:

5  Q.  Mr. McKinney, did you have an understanding from your time

6  as under secretary whether U.S. senators had any influence over

7  matters involving the Department of Agriculture?

8          THE COURT:  I'll allow that.

9  A.  Yes, well aware.

10  Q.  What was your understanding?

11  A.  Well, in the case of the Senate, there was a lot of

12  interface by me but mostly our congressional affairs office at

13  U.S.D.A. with the Senate agriculture committee, because they

14  had direct oversight of U.S.D.A. and the many, many things that

15  we had going on.

16  Q.  Did you understand from your time as under secretary

17  whether U.S. senators had any other sort of influence?

18  A.  Yes.  They looked after constituents.  Many times they

19  would have a question or concern about a constituent that they

20  were worried about or wanting to provide help to.  So yes,

21  familiar with that kind of thing.

22      I would add that there's also the oversight capacity, where

23  funding -- you know, it's the combined House and Senate that

24  determines what the farm bill looks like, funding for the

25  entirety of the foreign ag. service, funding for different

1    projects.  So we took that very seriously.

2              THE COURT:  Well, Congress, I gather, sir, has the

3    power of the purse over the executive branch.  Is that correct?

4              THE WITNESS:  Yes, sir.  That's correct.

5              THE COURT:  What does that mean?

6              THE WITNESS:  Well, they fund -- they funded my

7    agency.  They funded my travel.  Anything that my foreign ag.

8    service and Codex Alimentarius office might want to undertake

9    was in some form funded by Congress.

10             THE COURT:  What branch of government is the U.S.D.A.

11   and your office?

12             THE WITNESS:  It's part of the executive branch, sir.

13             THE COURT:  Thank you.

14   BY MR. MARK:

15   Q.  And you mentioned earlier that when you were nominated by

16   the president, did you have to be confirmed by the Senate?

17   A.  Yes, and I was confirmed.

18   Q.  Did that apply to any other positions within the U.S.

19   Department of Agriculture?

20   A.  Well, I could -- yes, the secretary down through and

21   including under secretaries were all confirmed.

22             THE COURT:  How many under secretaries were there at

23   the time you were an under secretary?

24             THE WITNESS:  Initially six and eventually seven, sir.

25   BY MR. MARK:

1  Q.  Now, you had mentioned that in the course of your duties as

2  under secretary, you did receive calls from members of

3  Congress.  Were you ever contacted by any members of Congress

4  about Egypt's grant of a halal certification monopoly to IS EG?

5  A.  Yes, I was.

6  Q.  How many members of Congress contacted you about this

7  monopoly?

8  A.  One.  One senator.

9  Q.  Which member of Congress contacted you about this monopoly?

10  A.  Senator Robert Menendez.

11  Q.  Approximately when did Robert Menendez contact you about

12  the halal certification monopoly?

13  A.  It was late May of 2019.

14  Q.  Was this after you had called and emailed the Egyptian

15  ambassador about the halal issue?

16  A.  Yes, this was after all of those communications to the

17  embassy and to Deputy Minister Mehrez in Egypt.

18  Q.  As of that time, were you familiar with who Robert Menendez

19  was?

20  A.  Yes, I knew of him.

21  Q.  Had you ever personally met him?

22  A.  No, I had not.

23  Q.  Before Mr. Menendez contacted you about this halal

24  certification monopoly, had you ever spoken to him?

25  A.  No.

1    Q.  How did Mr. Menendez contact you in May of 2019?

2    A.  I believe it was a staff member that notified my chief of

3    staff to expect a call on my cell phone, and I was informed

4    that he would be calling.

5    Q.  Did you know to expect the call -- you knew to expect this

6    call from your chief of staff, you said?

7    A.  Yes.  I came back from a meeting and she said in about an

8    hour Senator Menendez would be calling, and he did.

9    Q.  Approximately how long was your call in May 2019 with

10   Mr. Menendez?

11   A.  It was fairly short.

12   Q.  Did anyone else appear to be on the phone call, other than

13   him?

14   A.  Not that I knew.

15   Q.  Was anyone else from the U.S. Department of Agriculture on

16   the phone call with you?

17   A.  No.  I wanted to take this alone.

18   Q.  Do you remember every single word Mr. Menendez said during

19   the call?

20   A.  No, I don't.

21   Q.  Do you remember the substance of the phone call?

22   A.  Absolutely I do.

23   Q.  What, in sum, did Mr. Menendez say to you during the call?

24   A.  Well, there were three topics.  First, he referenced a news

25   article that had been brought to his attention.  It was written

1    in Arabic but had English translation, and so he made reference

2    of that.  That led then to him saying would you please quit

3    interfering with my constituent.  And after that, I wanted to

4    explain why my team and I were undertaking the actions we were,

5    including all of the letters.

6        I started into that discussion.  I was interrupted and

7    stopped, and then the call ended shortly thereafter because it

8    didn't have much more to go.

9    Q.  You testified that you don't remember every word

10   Mr. Menendez used?

11   A.  Correct.

12   Q.  Do you remember some specific words or phrases that

13   Mr. Menendez used?

14   A.  I will never forget the words.

15   Q.  What words or phrases do you remember?

16   A.  Stop interfering with my constituent.

17   Q.  Did you understand from the call what constituent

18   Mr. Menendez was talking about?

19   A.  Yes, I did.

20   Q.  What constituent did you understand Mr. Menendez to be

21   referring to?

22   A.  It was the single halal certifier, IS EG.

23   Q.  What did you understand Mr. Menendez to mean when he said

24   he wanted you to stop interfering?

25              MR. FEE:  Objection.  His understanding is not

1    relevant, your Honor.

2                THE COURT:  Sustained.

3    BY MR. MARK:

4    Q.  Did you have an understanding from participating in the

5    call what he was referring to when he said stop interfering?

6                MR. FEE:  Objection.

7                THE COURT:  I will allow it.

8                You may answer.

9                THE WITNESS:  Did you say allow?

10                THE COURT:  You may answer.

11   A.  Yes, I felt very clearly he was referencing to the halal

12   certifier that was mentioned in the news article and that he

13   was asking me to stop all the activities that we were

14   undertaking to seek clarification, add back some halal

15   certifiers, continue some, the things that were listed in those

16   emails and that letter that were shown earlier.

17   Q.  Did he use the word "please" in the phone call?

18   A.  Not that I recall.

19   Q.  Did Mr. Menendez discuss -- you said Mr. -- strike that.

20        You mentioned that Mr. Menendez referenced a press article?

21   A.  Yes, sir.

22   Q.  Did he ask you about the accuracy of that article during

23   the call?

24   A.  He did not -- I do not recall he asking about the accuracy.

25   He referenced its contents.

O5vWmen2                          McKinney - Direct

1    Q.  What was the focus of the call, the press article or what
2    you said he said about stop interfering with IS EG?
3    A.  When I walked away, I felt very strongly that it was the
4    message, the action I was to take, which was stop interfering.
5    Q.  During the call, how did you respond to Mr. Menendez's
6    request that you stop interfering with IS EG?
7    A.  Well, I started to try to explain why we were undertaking
8    the actions, get at the points, like monopolization, disruption
9    of flow of market, perhaps loss of market share, those kinds of
10   things, and didn't get very far in until I was interrupted,
11   sir.
12   Q.  Why did you try to explain those matters to Mr. Menendez on
13   the call?
14   A.  Because they were very serious.  I used the word
15   "draconian" in the letter.  We'd never heard that before.
16       Lots of times when a country would entertain or change like
17   this, others might follow suit.  The precedent was very
18   important here.  All the things that were involved, as we
19   discussed in the documents before, were at hand, and we felt
20   like we had to address this right now.  And that's why we
21   escalated it so relatively quickly and took the actions or were
22   attempting to take the actions that we did.
23   Q.  How did Mr. Menendez respond when you tried to explain
24   these negative impacts of Egypt's decision?
25   A.  I was interrupted very early into my explanation.  I didn't

O5vWmen2                              McKinney - Direct

1    get very far.

2    Q.  What did Mr. Menendez say when he interrupted you?

3            THE COURT:  Wait.  Wait.  Who interrupted you?

4            THE WITNESS:  When I was trying -- the senator

5    interrupted me when I was trying to explain, sir.

6            THE COURT:  I see.

7    BY MR. MARK:

8    Q.  And I just was asking you what did Mr. Menendez say when he

9    interrupted you?

10   A.  I don't remember exactly, sir.  I recall, though, he said

11   let's not bother with that or that's not important or let's not

12   go there, something of that nature.  But he stopped my

13   explanation.

14   Q.  What was Mr. Menendez's tone during the phone call with

15   you?

16   A.  It was serious.  I would say, at least in a couple cases,

17   curt.  Again, I was cut off.  Serious to maybe even very

18   serious are the best words I can describe, sir.

19   Q.  Based on Mr. Menendez's tone and demeanor during the call,

20   and what he said to you, did you understand that he was

21   expressing his concerns or that he was making a demand?

22           MR. FEE:  Objection.

23           THE COURT:  Sustained as to form.

24   BY MR. MARK:

25   Q.  Based on Mr. Menendez's tone and demeanor, what was your

O5vWmen2                          McKinney - Direct

1    understanding of the message he was conveying to you?

2              MR. FEE:  Objection.

3              THE COURT:  Did you believe he was attempting to

4    convey a message to you, sir?  Yes or no.

5              THE WITNESS:  Yes.

6    BY MR. MARK:

7    Q.  What was that message?

8    A.  Stop.  Stop interfering.

9    Q.  How influential in the Senate -- actually --

10             THE COURT:  Did he say what the alleged interference

11   was?

12             THE WITNESS:  Well, by virtue -- sir, by virtue of

13   opening with the news article, which got at this issue and

14   mentioned the company in question, I felt very clearly that's

15   what he was referencing.  And so when words like "stop

16   interfering with my constituent" -- and it was that, stop

17   interfering with my constituent -- in my mind there was no

18   doubt who that was and what the issue involved.

19             THE COURT:  Who was involved and what was the issue

20   involved of which there was no doubt in your mind?

21             THE WITNESS:  That we stop undertaking the activities

22   that we'd been working on to try to bring back halal

23   certifiers, to rethink the decision made by the U.S. -- by the

24   Egyptian government and see about instituting practices that

25   would not interrupt the flow of beef and beef livers.

1    BY MR. MARK:

2    Q.  At the time of this call, how influential in the Senate did

3    you consider Mr. Menendez to be at the time?

4              MR. FEE:  Objection.

5              THE COURT:  Sustained as to form.

6    BY MR. MARK:

7    Q.  At the time you were under secretary, did you have an

8    understanding of how influential Mr. Menendez was?

9              THE COURT:  Sustained as to form.

10             What was the senator's role at that time, if you knew,

11   in the Senate?

12             THE WITNESS:  I did.  At the time he was the ranking

13   member of the Senate foreign affairs committee, ranking being

14   the most senior in the minority at the time.  And that would be

15   the Democrat at the time.  It's now changed.

16             THE COURT:  And what did that position mean to you, if

17   anything?

18             THE WITNESS:  Well, I knew from my experience with my

19   own senator, Richard Lugar, that the foreign affairs committee

20   has a broad oversight of just about anything they want to dive

21   into in foreign affairs, and I knew for a fact that in previous

22   practice that included agriculture, even though the Senate ag.

23   committee has the primary oversight.  So this was an

24   influential person and an influential call.

25   BY MR. MARK:

1    Q.  During your conversations with other members of Congress

2    when you were serving as under secretary, had any member of

3    Congress ever cut you off when you were trying to explain your

4    agency's actions and decisions?

5               MR. FEE:  Objection.  Relevance.

6               THE COURT:  No.  I will allow that.

7               Did any member of Congress ever interrupt an

8    explanation by you, if you can recall one way or the other?

9               THE WITNESS:  No.  I had never had an interruption

10   like that.

11   BY MR. MARK:

12   Q.  Based on Mr. Menendez's tone and demeanor during the call

13   and what he said to you --

14               THE COURT:  Well, he doesn't know his demeanor.  He

15   only knows his tone, unless it was a video call.

16               Go ahead.

17   BY MR. MARK:

18   Q.  Based on Mr. Menendez's tone and what he said to you, what,

19   if anything, did you feel pressured to do?

20               MR. FEE:  Objection.  No relevance to his feelings.

21               THE COURT:  Pardon me?

22               MR. FEE:  His feelings are not relevant to this case.

23               THE COURT:  That was not asking feelings.

24               In your interpretation, what was, if anything, the

25   senator asking you to do?

1              THE WITNESS:  He was telling me --

2              THE COURT:  -- that you perceived?

3              THE WITNESS:  I felt he was telling me to stand down

4    and stop doing all of the things that we were doing to try to

5    revive some sense of competition in the U.S. beef market.

6    BY MR. MARK:

7    Q.  Now, Mr. McKinney, you said that you recall that he said to

8    stop interfering with his constituent.  About how many times

9    did he say to stop interfering to you during that call?

10   A.  At least two and possibly a third.  I believe that is how

11   the conversation ended after I was interrupted.  So I don't

12   know if it was two or three, but I know it was at least two and

13   perhaps that third.

14   Q.  When he said stop interfering to you, from participating on

15   the call, did you understand that he was trying to convince you

16   or telling you to do that?

17              MR. FEE:  Your Honor --

18              THE COURT:  Sustained as to form.

19   BY MR. MARK:

20   Q.  Did you have an understanding from being at that call what

21   he was trying to do?

22              MR. FEE:  Objection.  No foundation.  Calls for

23   speculation.

24              THE COURT:  Just a moment.

25              What was your understanding of what Mr. Menendez was

1    asking you to do?  Your understanding.

2              THE WITNESS:  My understanding was that he was telling

3    me, in so many words, stand down, stop all the effort to try to

4    figure out how to keep the several halal certifiers and let lie

5    the fact that there was now one.  That is exactly how I felt,

6    and I relayed that to several of my team afterwards.

7    BY MR. MARK:

8    Q.  During the call did he discuss the merits of the decision

9    to go to a single halal certifier?

10   A.  No.  That was the part I was trying to explain and was

11   interrupted.

12   Q.  And how did the call with Mr. Menendez end?

13   A.  Well, when I couldn't explain and he had referenced the

14   article, he closed by saying please stop interfering with my

15   constituent.

16             THE COURT:  When he referenced the article, had you

17   seen this article previously?

18             THE WITNESS:  I had not seen it.  I was aware it was

19   there.  It was still coming to me by way of my team.

20             THE COURT:  That I don't understand.  The article

21   itself was coming to you by way of your team?

22             THE WITNESS:  Yeah -- to answer your question, I had

23   not seen that article.  I had not read it yet by that time.

24             THE COURT:  What did Mr. Menendez -- so I take it,

25   therefore, he described the article to you if you hadn't seen

O5vWmen2                          McKinney - Direct

1   it.

2           THE WITNESS:  Very briefly.  Very briefly.

3           THE COURT:  What, if anything, did he say in

4   referencing that article?  I think you said he referenced the

5   contents of an article that was in Arabic but had been

6   translated.  I think that's your word.

7           THE WITNESS:  That is correct, sir.

8           THE COURT:  So what did he say in that connection?

9           THE WITNESS:  Well, he referenced the GAIN report that

10  had come from the foreign ag. service.  That was the content.

11  That was the basis by which that article was written.  And in

12  that U.S.D.A. GAIN report, the contents were what was

13  happening.  Seven or so were being delisted.  One was replaced;

14  they had no experience.  The foreign service officer referenced

15  the risk of there being a monopoly created.

16          Let me think what else.

17          It basically described the situation, as we have here

18  in the court today, and the concern that U.S.D.A., all of us,

19  had with the decision that had been made.

20          THE COURT:  The decision that had been made to have a

21  single halal supplier.

22          THE WITNESS:  That is correct, sir.

23          THE COURT:  So why would he be referencing that?  It

24  sounds to me that that article accurately reflected what was

25  occurring; that is, several U.S. certifiers of halal meat to

1  Egypt had been decertified and one, IS EG, was going to take

2  its place immediately.

3          So why would he be referencing that?

4          THE WITNESS:  I'll answer the question.  We thought

5  maybe we had found the solution and the cause of that decision

6  and that we thought something nefarious was going on.

7          MR. SOLANO:  Objection, your Honor.

8          THE COURT:  Yes.  Sustained.

9          MR. FEE:  Objection.  Strike that testimony.

10          THE COURT:  Sustained.

11          The jury will disregard that adjective.

12          THE WITNESS:  I tried to answer your question, sir.

13  I'm sorry.

14          THE COURT:  No.  I understand.  I understand.

15          Go ahead.

16  BY MR. MARK:

17  Q.  Mr. McKinney, are you generally a polite person?

18          MR. FEE:  Objection, your Honor.

19  A.  Try to be.

20          THE COURT:  I'll allow it.  Everyone is polite.

21          If you're done with the call, I'd like to give the

22  jury a break.  Are you done with the call?

23          MR. MARK:  Just one last --

24          THE COURT:  Go ahead.  Go ahead.

25  BY MR. MARK:

1  Q.  -- which is you said that when Mr. Menendez called you,

2  before you said that he didn't use the word "please," but then

3  when you related what he said to you, you made a reference to

4  the word "please."  Did Mr. Menendez --

5  A.  No.  If I said that, that was an error.  I didn't mean

6  that.

7            MR. FEE:  Objection.

8            THE COURT:  Just a moment.  Wait, wait.

9            MR. RICHENTHAL:  (inaudible).

10           MR. FEE:  I'm sorry?

11           THE COURT:  Gentlemen, talk to me.

12           MR. FEE:  I am.

13           THE COURT:  In turn.

14           MR. FEE:  I am, your Honor.

15           THE COURT:  What's your question, sir?  Let me hear

16  the question.

17  BY MR. MARK:

18  Q.  To be clear, did Mr. Menendez use the word "please" during

19  his call with you?

20           THE COURT:  I will allow that.

21  A.  Not that I recall.

22           THE COURT:  We're done with the call?

23           MR. MARK:  We're done with the call.

24           THE COURT:  All right.

25           MR. MARK:  This is a good time for a break.

O5vWmen2                          McKinney - Direct

1           THE COURT:  All right.  Ten minutes, ladies and

2    gentlemen.

3           You gentlemen are usually polite.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5vWmen2                              McKinney - Direct

1                   (Jury not present)

2                   THE COURT:  Ten minutes.

3                   You may step down, sir.

4                   THE WITNESS:  Thank you.

5                   (Recess)

6                   THE COURT:  The jury is entering.  Put the witness on

7        the stand.

8                   The parties should address appropriate redactions to

9        the order that was filed today.

10                   MR. WEITZMAN:  I apologize, your Honor.  What was

11        that?

12                   THE COURT:  Mr. Richenthal, turn around.  Tell him

13        what I said.

14                   Mr. McKinney, take the stand again, sir.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1                  (Jury present)

 2                  THE COURT:  You may be seated in the courtroom.

 3                  Mr. Mark, you may continue with your direct

 4     examination.

 5                  MR. MARK:  Thank you, your Honor.

 6     Q.  After the call from Mr. Menendez that you just testified

 7     about, did Mr. Menendez's office contact you again?

 8     A.  They did, yes.

 9                  MR. MARK:  Ms. Wechsler, would you please publish what

10     is already in evidence as Government Exhibit 8B-16.

11                  Enlarge the top half of this email, please.

12     Q.  What is the date of this email?

13     A.  May 23, 2019.

14     Q.  How soon after Mr. Menendez's call was this email?

15     A.  It was either the same day or the next day.  I can't recall

16     which.

17                  MR. MARK:  Oh.  Your Honor, it appears that the

18     display is not going to the jurors.

19                  THE COURT:  Yes.  This is in evidence, right?

20                  MR. MARK:  In evidence.

21                  THE COURT:  Next question.

22                  MR. MARK:  Your Honor, I have hard copies.  Would it

23     be OK to pass it to the jurors?

24                  THE COURT:  Yes.

25                  Question.

O5vWmen2                          McKinney - Direct

1   BY MR. MARK:

2   Q.  Do you see that Mr. Kelly wrote to you please find attached

3   the article that Senator Menendez and you discussed with

4   English translation?

5   A.  Yes, sir.

6           THE COURT:  Now this is dated May 23.  Do you remember

7   when the phone call you had that you just testified to took

8   place?

9           THE WITNESS:  Yes, sir.  It was either the same day or

10  the prior day.  But the follow-up here was rather immediate.

11  BY MR. MARK:

12  Q.  And this references an article.  What was the focus of the

13  phone call with Mr. Menendez?

14  A.  The focus -- the focus of my, the call Mr. Menendez had

15  with me?

16  Q.  Yes, sir.

17  A.  The focus was the issue involving the delisting of several

18  halal facilities by the country of Egypt and the replacing of

19  that with a single and inexperienced halal certifier and his

20  request that I stop interfering with his constituent.

21  Q.  What did you do after --

22      Since we can't see, this email is from somebody referred to

23  as Robert Kelly, is that right?

24  A.  Yes, sir.  He is -- or was at the time -- the deputy chief

25  of staff for operations.

O5vWmen2                          McKinney - Direct

1    Q.  And what did you do after --

2              THE COURT:  Where?  Where?  Deputy chief of staff for

3    operations where?

4              THE WITNESS:  In the senator's office.  The subscript

5    here is deputy chief of staff for operations, dot, U.S. Senator

6    Bob Menendez.

7              MR. MARK:  Thank you.

8    Q.  What did you do after Mr. Menendez's staffer sent you this

9    email?

10   A.  I forwarded this to the administrator of the foreign ag.

11   service under whom all foreign ag. service people report.

12   Q.  Did you discuss the call with Mr. Menendez with anyone

13   else?

14   A.  I did.

15   Q.  With whom?

16   A.  With Ken Isley.  It might have been my chief of staff and

17   one other, but I discussed it with a few.

18             MR. MARK:  Ms. Wechsler, could you please publish

19   what's already in evidence as Government Exhibit 8B-12.

20             And your Honor, if I may, just pass out the copies?

21             THE COURT:  Yes.  Why don't you do all the passing

22   that you're going to do now.

23             MR. MARK:  Thank you.

24             THE COURT:  As long as they're admitted.

25             MR. MARK:  There is one other exhibit that is not

1    admitted yet, but if it is without objection, I can pass that

2    out too.

3              MR. FEE:  It is, your Honor.  That's fine.

4              THE COURT:  It is without objection?

5              MR. FEE:  Correct.

6              THE COURT:  What is the document?

7              MR. MARK:  It is GX 8B-49.

8              THE COURT:  Admitted, without objection.

9              MR. MARK:  Thank you.

10             (Government Exhibit 8B-49 received in evidence)

11             MR. MARK:  Going old school and new school here.

12             THE COURT:  Question.

13   BY MR. MARK:

14   Q.  On what's marked as Government Exhibit 8B-12, directing

15   your attention to the second page of that email, do you see an

16   email from yourself to Ken Isley on May 23, 2019, at 5:34 p.m.?

17   A.  I do.  I see it.

18   Q.  Was this approximately three minutes after Menendez's

19   staffer sent you the email that we just looked at?

20   A.  Yes, sir.

21   Q.  Who did you forward the article that you received to?

22   A.  To the three most senior people who reported to me, the

23   first being Ken Isley, who is the -- was the administrator of

24   the foreign ag. service.  The other one, Zhulieta Willbrand,

25   was my chief of staff at the time, and Jason Hafemeister was

1    then the trade specialist, I guess I'd call it, for Secretary

2    Perdue.  So he and I were colleagues in the same office.

3          THE COURT:  Secretary Perdue was the secretary of

4    agriculture?

5          THE WITNESS:  Yes, sir.  I'm sorry.  Secretary Sonny

6    Perdue was the secretary of agriculture at the time.  Sorry.

7    BY MR. MARK:

8    Q.  And is that who you reported to, Mr. McKinney?

9    A.  I reported to Sonny Perdue, the secretary.

10   Q.  Now, you mentioned that Ken Isley was a FAS administrator.

11   What were his responsibilities at the time?

12   A.  He had responsibilities for everything the foreign

13   agricultural service did, including issues like we're

14   discussing.

15   Q.  And in this email you wrote I took a call from Senator

16   Menendez of New Jersey, is that right?

17   A.  Correct.

18   Q.  And at the end of this email you wrote you would call Ken?

19   A.  Yes.

20   Q.  Did you speak with Mr. Isley after this email?

21   A.  I did.

22   Q.  As a result of the call with Mr. Isley, were there any

23   action items?

24   A.  Yes.  I asked him to follow up in a certain way with

25   members that had been involved in this issue, managing this

1    issue.

2    Q.  How did you ask him to follow up in a certain way?

3    A.  By way of a separate email.

4            THE COURT:  You said in a certain way with members

5    that had been involved in this issue.  What are members?

6            THE WITNESS:  I'm sorry.  These would be foreign

7    agricultural service staffers, ranging from staff members in

8    the embassy in Cairo to members right there in Washington,

9    D.C., all of the staff members who had been working on this,

10   sir.

11           THE COURT:  All right.  So members are staff.

12           THE WITNESS:  Yes.  Sorry.  I'll use a different word,

13   "staff."

14   BY MR. MARK:

15   Q.  What was the follow-up that you wanted him to take with

16   staff?

17   A.  Is it here?

18   Q.  Would it help if we go up the chain on this email?

19   A.  If you don't mind.

20           MR. MARK:  OK.

21           THE WITNESS:  Thank you, sir.

22           MR. MARK:  Of course.

23           And Ms. Wechsler, could we follow up the chain to the

24   top email.

25           THE WITNESS:  There.

1          MR. MARK:  If you could enlarge that top email.

2          Thank you.

3   Q.  And is this an email from you to Ken Isley?

4   A.  Yes.  It was the next day, Friday, May 24, 2019.

5   Q.  What was your email to Mr. Isley about?

6   A.  Well, I first, in the first sentence there, asked him to

7   continue gathering all the relevant facts.  Although we had

8   been asked to stop interfering, we had a number of things in

9   motion that we still hoped might bring result, mostly the

10  communications with the government of Egypt.  So if there were

11  relevant facts to come in, I wanted them because I had intended

12  to follow up with the secretary -- with Senator Menendez, and I

13  wanted to make sure anything that was going on out there I

14  could put into that email of follow-up to the senator.

15  Q.  Now, Mr. McKinney, would you please read for the jury what

16  you wrote in the second paragraph, beginning with also

17  important?

18  A.  Sure.  "Also important to me is that you reassure post in

19  Egypt that we have their back.  They should not worry about

20  this call from the senator.  It is what it is, and the very

21  strange -- the very nature of this strange issue was bound to

22  generate some interesting questions or calls.  Thanks for

23  reassuring them."

24  Q.  What did you mean when you wrote that it was important to

25  you to reassure post in Egypt that we have their back?

O5vWmen2                          McKinney - Direct

1    A.  Sure.  Well, it's kind of a big deal when you're working on

2    an issue like this, cannot find the answer, repeatedly cannot

3    find the answer, and you're about to perhaps risk losing a

4    major market.  By that time they had heard that I had taken a

5    call from the senator, and I wanted them to not worry about the

6    fact that a senator had called and was working on this or

7    asking me to stand down.  And I wanted to make sure that they

8    understood that I was concerned about their well-being.  I

9    wanted them to be relieved of that concern, keep doing what

10   they've been doing, at least for a while, and if there was any

11   heat to take I would take it.

12   Q.  What do you mean if there was any heat to take you would

13   take it?

14   A.  Well, I'd been asked to stop interfering, and I was telling

15   them let's finish out what we have, but we're going to be

16   cognizant of the request.  So if there was any pressure, if

17   there was any word about us continuing the work, I was ready to

18   take that pressure, ready to take that heat, is what I meant.

19   Q.  Now, earlier you testified that you had other contacts with

20   members of Congress during your time as under secretary?

21   A.  Yes.

22   Q.  Approximately how often did you later direct your staff to

23   reassure posts that you had their back?

24           MR. FEE:  Objection.

25           THE COURT:  I'll allow that.

1           THE WITNESS:  Did you say you'll allow that, sir?

2           THE COURT:  Yes, sir.

3           THE WITNESS:  Oh.

4    A.  Never.  I've never had that happen before or after.

5           MR. MARK:  Ms. Wechsler, would you please publish

6    what's already in evidence as Government Exhibit 8B-49.

7    Q.  Mr. McKinney, do you recognize this exhibit?

8    A.  I do recognize it.

9    Q.  What is this exhibit?

10   A.  This is a draft -- importantly, draft email that had been

11   prepared by my chief of staff, at my request.  This was

12   essentially my intent to follow up on the call and the email

13   I'd received from the senator and his office staff.

14   Q.  And Mr. McKinney, I see some yellow highlights here.  What

15   do the yellow highlights refer to?

16   A.  Those are my edits.  For example, email doesn't allow the

17   normal track and change as if you were in a Word document.  So

18   it was very common of me when I was editing something to

19   highlight in yellow or green or some color so it was obvious to

20   them what the differences were, what I was adding, what I was

21   editing.

22          MR. MARK:  Ms. Wechsler, can you just scroll down just

23   so that we can see the whole bottom email, and then we can

24   scroll back up.

25   Q.  For instance, in that last paragraph, was that some of your

1  highlights of your changes to the draft email at the time?

2  A.  Yes.  All that is highlighted in yellow were my additions

3  or my edits.

4          MR. MARK:  Ms. Wechsler, you can scroll back up to the

5  top.

6  Q.  Around the time of this draft email, were you considering

7  getting back to Mr. Menendez?

8  A.  Yes.  It was very common, particularly for me personally,

9  that we have what I called a second bite at the apple, a second

10  opportunity to communicate with clarity to whoever might have

11  called or emailed or contacted us.

12  Q.  Why did you want a second bite at the apple or a second

13  opportunity here?

14  A.  Well, two or three reasons.

15      First of all, the issue was very serious, and I wanted to

16  recap it in the words that I knew to be truthful.

17      The second reason, most importantly, I had been cut off.  I

18  had not had the opportunity to explain why we were doing what

19  we were doing and, most importantly, the impact on our farmers,

20  ranchers, processors and even the Egyptian consumers.

21  Q.  Did you get back to Mr. Menendez?

22  A.  I did not send this.

23  Q.  Without getting into any detail, did there come a time when

24  you became aware of an FBI investigation pertaining to the sole

25  halal certifier for Egypt?

1    A.  That is correct.  I had heard that.

2    Q.  Did you become aware of the FBI investigation before or

3    after your call with Mr. Menendez?

4    A.  After the call with the senator.

5    Q.  How, if at all, did learning of the FBI investigation

6    impact your decision to get back to Mr. Menendez?

7    A.  It is the sole reason we did not send this and finish it

8    out.

9    Q.  How, if at all, did learning of the FBI investigation

10   impact your decision regarding whether to take any more

11   follow-up steps with Egypt on the monopoly issue?

12   A.  It stopped it cold.  I put the word out within foreign ag.

13   service to please stand down; it was in the hands of the FBI at

14   this point.

15   Q.  And just a couple more questions.  How clear is your

16   recollection of Mr. Menendez's call to you about the sole halal

17   certifier?

18              MR. FEE:  Objection.  Bolstering.

19              THE COURT:  I'll allow it.

20              I'll allow it, sir.  You may answer.

21              THE WITNESS:  Sure.

22   A.  The essence of the message, the action being asked of me

23   was very clear and it has never left.  It was to stop

24   interfering with his constituent.

25   Q.  Why do you have a good recollection of it five years later?

O5vWmen2                          McKinney - Direct

 1              THE COURT:  Sustained.

 2    BY MR. MARK:

 3    Q.  You testified that, in your words, it had never left.  Why?

 4              MR. FEE:  Objection.

 5              THE COURT:  Sustained.

 6    BY MR. MARK:

 7    Q.  What did you mean when you said it had never left?

 8              THE COURT:  Sustained.

 9              MR. MARK:  One second, your Honor?

10              THE COURT:  Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  During the call, were you asked or told to do something?

2            MR. FEE:  Objection.  Asked and answered.

3            THE COURT:  I will allow that.

4    A.  I was told.  I was told to stop interfering with his

5    constituent.

6            MR. MARK:  No further questions.

7            THE COURT:  Any cross-examination, Mr. Fee?

8            MR. FEE:  Yes.

9    CROSS-EXAMINATION

10   BY MR. FEE:

11   Q.  Hi, Mr. McKinney, how are you?

12   A.  Hello, sir.  Fine.

13   Q.  Your current job is with an organization that has the

14   acronym NASDA?

15   A.  That's correct.

16   Q.  And that's a group that aims to advocate on behalf of state

17   Departments of Agriculture right?

18   A.  Yes, in part.

19   Q.  What's the other part.

20   A.  We are co-regulators with many federal agencies, EPA, FDA,

21   USDA hand off a lot of the federal regulations which are

22   enacted in the states by members of the state Departments of

23   Ag.

24   Q.  You are the CEO of NADA, correct?

25   A.  That's correct.

O5V3MEN3                     McKinney - Direct

1    Q.   NASDA is funded in large part by the USDA; is that correct?

2    A.   It's funded in three parts.  Member dues would be the

3    biggest part.  We have contractual relationships with agencies

4    as in the Food Safety Modernization Act, which we inspect

5    produce and feed to make sure there's no e. coli, salmonella,

6    escherichia, and we have sponsorships.  So three parts to our

7    funding mechanism.

8    Q.   Some of that money comes from USDA, correct?

9    A.   Yes, but not very much.  It's mostly FDA at this time.  The

10   U.S. Food and Drug Administration.

11   Q.   That's a federal agency?

12   A.   I believe.  I don't know what you mean by scheduled.

13   Q.   Federal.

14   A.   Federal, I'm sorry.  Yes, they are a federal agency.

15   Q.   You had mentioned before NASDA, before the USDA, before the

16   Indiana Department of Agriculture, you worked for some private

17   companies, right?

18   A.   That's correct.

19   Q.   And help me out here.  So Dow AgroSciences was one?

20   A.   Going in reverse chronological order, it was the Elanco

21   Animal Health, this is the animal veterinary products company,

22   then a division of Eli Lily & Company, now independent.  Before

23   that, it was Dow AgroSciences, seeds, crops, crop protection

24   chemicals, other products.

25              And so, those were the two in reverse chronological

1    order, sir.

2    Q.  How many years at Elanco and at Dow before that?

3    A.  It morphed so Elanco through the end of Dow AgroSciences

4    would have been 1981 to 2009.  So, about 20, 30 years in there.

5    Q.  I'm sorry.  That was at both Dow and Eli Lily/Elanco?

6    A.  It's confusing.  Elanco had an ag, chem and an animal

7    health.  They were both in the same umbrella.  I was with the

8    company at its outset, but it spun off the agriculture chemical

9    seeds group, and I went with that to become a joint venture

10   called Dow Elanco, seven years later, Lily sold its 40 percent

11   and it became Dow AgroSciences.  So same products, but it was

12   morphing through mergers and acquisitions.

13   Q.  And then Governor Pence put you on his cabinet in Indiana?

14   A.  That's correct.

15   Q.  And then after that is when you took this new role with the

16   USDA, right?

17   A.  That is correct.

18   Q.  What I mean by that, you were literally the first person to

19   ever hold the position, the Senate confirmed position of under

20   secretary for Trade and Foreign Agricultural Affairs right?

21   A.  That's correct although the content of my work had been

22   done by previous under secretaries, it was just a different

23   job.

24   Q.  Right.  But now it's merged into this one job for the first

25   time?

1   A.  Yes, sir.  Correct.

2   Q.  Correct.

3   A.  Yeah.

4   Q.  Your primary goal as the under secretary for Trade and

5   Foreign Agricultural Affairs or TFAA?

6   A.  Hmm-hmm.

7   Q.  The primary goal was to increase and to keep moving U.S.

8   foreign products.  Is that fair?

9   A.  I would say that you're right that's the primary.  But a

10  secondary is also very important, which is to make sure the

11  regulatory field, the operation of global institutions was

12  operating on a sound science basis.  So that was the Codex

13  Alimentarius, and a big part of foreign ag service as well.  It

14  was both of those.

15  Q.  And when you say science basis?

16  A.  Yes.

17  Q.  You mean scientific research informing how you export farm

18  products?

19  A.  I would say the scientific piece is more making sure it's

20  safe and efficacious.  The act of trade is a policy

21  free-for-all at times, so they were a bit different.  But you

22  wanted your product to be found as safe, based on efficacious

23  manner and based on good science.

24  Q.  You testified on direct about trying to lower barriers to

25  trade.  Remember that?

O5V3MEN3                          McKinney - Direct

1    A.  Yes, sir.

2    Q.  So that maybe it is the sister of your primary goal?

3    A.  Yes.

4    Q.  Meaning, to move exports, U.S. foreign products, you need

5    to make sure there is not unfair obstacles in foreign countries

6    to getting those products sold; is that correct?

7    A.  That's correct.  And I might add, I believe very strongly

8    in two-way trade, so I was working hard on behalf of other

9    countries on what they perceived as barriers that existed in

10   the U.S.  It's very much a two-way street and I did act in both

11   capacities.

12   Q.  And you worked for the U.S. Department of Agriculture, to

13   ask an obvious question, right?

14   A.  That's correct.

15   Q.  We talked about your primary goals, which meant there were

16   certain things that was not your job to consider on a

17   day-to-day basis in your position.  Fair to say?

18              MR. MARK:  Objection.

19   A.  I need clarification.  That's very broad.

20   Q.  Absolutely.  So let me be more specific.

21              In your job, it was not one of your primary goals to

22   be concerned about the human rights records of other countries

23   like Egypt, right?

24   A.  No.  No.  We took guidance on that from groups like the

25   State Department.  But inherently, ag gets along pretty well.

1    We want to make sure those kind of things are fair and

2    equitable.  But no, it was not primary.

3    Q.   Understood.  So, meaning that even though there is other

4    folks who might criticize Egypt's human rights record, or other

5    U.S. agencies that are engaged on that subject, ag is trying to

6    move ag products, right?

7              MR. MARK:  Objection, commentary.

8              THE COURT:  I'll allow it.

9              Your primary goal was to increase the market for

10    American agricultural products, correct?

11             THE WITNESS:  Yes.  Along with the exchange and

12    offering the same service to other countries coming into the

13    U.S., trade is a two-way street, sir.

14             THE COURT:  Fine.

15    Q.  And one of your goals was to make sure, in this new

16    position, that trade was a two-way street, meaning other

17    countries weren't creating a double standard, right?

18    A.  Yes, sir.

19    Q.  And in fact, Egypt was one of those countries in 2019 that,

20    in your view, was trying to set up a double standard for trade;

21    fair to say?

22    A.  Let me see.  A double standard for trade.  No, no.  I don't

23    think I'd call that a double standard.  They were imposing a --

24    they were not changing their rules.  They were just changing

25    the numbers of people and how they went through the halal

1      certification.

2              So, we were seeking to make sure that we were

3      equitable and that we were not harming anybody, ranging from

4      our ranchers and farmer to their consumers.  That's what it was

5      about.  So, double standard didn't resonate with me, sir.  So I

6      hope that helped.

7   Q.   Understood.  You are the witness.

8   A.   Okay.

9   Q.   And so, human rights is one thing that is not your primary

10     focus.  Let me ask another one.

11             MR. MARK:  Objection.

12             THE COURT:  The jury will disregard the comments of

13     the lawyers.  Question, answer.

14             MR. FEE:  Thank you, your Honor.

15             THE COURT:  Question, answer.

16             MR. FEE:  Thank you, your Honor.

17  Q.   Your primary focus at the USDA was not, for example, U.S.

18     military objectives, right?

19  A.   No.

20  Q.   So for example with Egypt in 2019, even if other parts of

21     the U.S. government had certain priorities about military

22     objectives, you would still focus on moving agricultural

23     products, correct?

24             THE COURT:  Sustained as phrased.

25  Q.   Your primary focus was not military objectives?

1          THE COURT:  He said what his primary focus was.  He

2    said it several times.  Move on.

3    Q.  Your boss, you testified on direct, in the Department of

4    Agriculture was the Secretary of Agriculture, right?

5    A.  That's correct.

6    Q.  And was it throughout your entire tenure that Sonny Perdue

7    was the secretary?

8    A.  That's correct.

9    Q.  You worked for the ag secretary who works for the

10   president, right?

11   A.  Yes, that's correct.

12   Q.  So you take your orders from the president through the ag

13   secretary.

14   A.  Yes, although, there was a lot of respect, we had freedom

15   to operate, and there was not a lot of interference.  So, the

16   organizational chart would reflect that.  But in practice,

17   there wasn't much interference, wasn't a lot of interface at

18   that level.  Secretary to the president.

19   Q.  You mean not a lot of interference from the president with

20   your boss, the ag secretary?

21   A.  Correct.

22   Q.  So, just to state the obvious, you don't work for anyone

23   else in the Executive Branch other than technically the

24   president and the ag secretary, right?

25   A.  That's correct.  Except for the people I served.  I took

O5V3MEN3                          McKinney - Direct

1    that seriously.

2    Q.  And the people you serve are American meat producers,

3    farmers, and exporters.  Not just meat.  American farmers,

4    producers, and exporters?

5    A.  The entire food value chain.  Farmers, ranchers, all the

6    way to processor and the exporter.

7    Q.  Those are your constituents in a sense.  Those would be

8    considered constituents.  And you obviously don't work for the

9    United States Congress or any of its members, correct, sir?

10   A.  That is correct.

11   Q.  You would agree, in your experience at the USDA, there can

12   be times, including this one, where the ag department and a

13   member of Congress might have a disagreement, correct?

14   A.  That is correct.

15   Q.  And in fact, one area where you might disagree is with

16   which countries the U.S. should be trading with, correct?

17   A.  Well, I don't know that I was ever directed away from

18   working with any country.  Now we had our priorities, sir, but,

19   I was never directed away from any country.  I mean, as case in

20   point, we had a very significant deal made with China during my

21   operation.  So --

22   Q.  Before you made that deal with China, there was a trade war

23   with China, right?

24            MR. MARK:  Objection.

25            THE COURT:  Pardon me.  I didn't hear that answer.

1          THE WITNESS:  I said actually, a trade war came during

2     those negotiations.

3     Q.  What is a trade war?

4          THE COURT:  Sustained.  Sustained.

5          MR. FEE:  He brought up China.  I'm following up.

6          THE COURT:  Move on.

7     Q.  Do you personally, sir, believe the United States should be

8     trading agricultural products with Cuba?

9          MR. MARK:  Objection.

10          THE COURT:  Sustained.

11    Q.  Have you traveled to Cuba recently, sir?

12          MR. MARK:  Objection.

13          THE COURT:  Sustained.

14    Q.  You testified that Senator Menendez was on the Senate

15    Foreign Relations Committee.  Do you remember that?

16    A.  Yes, sir.

17    Q.  Sir, isn't it correct that the U.S. Senate Agricultural

18    Committee, that group of senators, has jurisdiction over the

19    Farm Bill that you mentioned?

20    A.  That is correct.  With the entire Senate then having to

21    confirm what the Senate Ag Committee and the House would

22    propose.  So everybody has a stake in it.

23    Q.  You are unaware of the Senate Agricultural Committee making

24    a recommendation about the Farm Bill that was then rejected by

25    the full Senate, correct?  In your experience, sir.

1    A.   Rejected by the full Senate?

2    Q.   Correct.

3    A.   I know that some -- I believe there has been in history.

4    Q.   In your tenure with the USDA, sir?

5    A.   No, no.  Not in my tenure.

6    Q.   And are you aware whether Senator Menendez himself has ever

7    held a hearing on an agricultural issue?

8            MR. MARK:  Objection.

9    A.   I am unaware of that.

10           THE COURT:  I'll allow that.

11   Q.   What was your answer, sir?

12   A.   I am unaware of that.

13   Q.   You had testified about the two components of your

14   portfolio at the ag department.  One was the foreign service,

15   the FAS, right?

16   A.   Correct.

17   Q.   And the other was this Codex, right?

18   A.   Codex Alimentarius, yes.

19   Q.   And when you took this job, you said or you believed that

20   there was a lot of obstruction and cheating related to

21   agricultural trade with other countries at the time you assumed

22   the position, correct?

23           MR. MARK:  Objection.

24           THE COURT:  I'll allow it.

25   A.   Yes.  I did say that.

1    Q.  And in fact, your belief was that other countries were

2    often trying to cheat the U.S. as a trade partner?

3    A.  That's correct.

4    Q.  And in fact, isn't it correct that you viewed the way Egypt

5    was managing its halal certification process as effectively

6    cheating U.S. meat producers and exporters?

7    A.  No, I would not say that.  Are you referencing when I

8    entered before the incident where the halal certification

9    agencies changed?

10   Q.  Went you entered you had the belief --

11        THE COURT:  What do you mean when you entered?

12   Q.  When you entered the position.

13   A.  Not at all.  I did not know how halal certification process

14   was being handle.  I knew generally the process, but I had -- I

15   had no view, no knowledge of how Egypt was managing halal

16   certification.  That didn't occur until late March or

17   April 2019.

18   Q.  So at Dow AgroSciences and Eli Lily and Elanco, you were

19   not working with halal certifiers, correct?

20   A.  That's correct.  But I knew about how they operated.  I

21   knew how they worked operationally, sir.

22   Q.  You had grown up on a pork farm, correct?  That's how you

23   learned about it?

24   A.  I grew up on a pork farm, but I had had affiliations and

25   friends who worked and around those, so I generally was aware.

1  As I stated earlier, my knowledge and involvement with halal

2  and certification like that really deepened a great deal when I

3  serve as the director of the Indiana state Department of

4  Agriculture because I visit those plants.

5  Q.  You witnessed halal slaughter?

6  A.  No, I witnessed the process by which they are started at.

7  I was there for the prayer and then I stepped out, for example.

8  Q.  Understood.  And just so I'm clear though.  When you

9  personally were growing up on this pork farm, the pork was not

10 being certified as halal, correct?

11 A.  No, but I was generally aware of how it works, sir.

12         MR. MARK:  Argumentative.

13         THE COURT:  Pardon me?  Let's move on.

14         MR. FEE:  I didn't hear.

15         THE COURT:  I didn't either.  Let's move on.

16 Q.  The Codex -- what's the second word?

17 A.  Alimentarius.

18 Q.  That's an international set of food standards, right?

19 A.  Human food safety standards, that's correct.

20 Q.  Human?

21 A.  Human food safety standards.

22 Q.  And so there you supervised or were the boss of the U.S.

23 body, the U.S. government body that worked on those standards?

24 A.  That's correct.

25 Q.  And those standards are science-based standard, right?

O5V3MEN3                          McKinney - Direct

1    A.  For human food safety; that is correct.

2    Q.  Can you tell me what a science-based human food standard is

3    in the simplest language you are able to use.

4    A.  Maybe the best way is to explain why it exists.

5          In 1953 many, many countries in the world did not have

6    an EPA, a USDA, they didn't have any way to determine --

7                THE COURT:  Slow down, sir.

8                THE WITNESS:  Sorry, sir.

9          They did not have the knowledge of how to go about

10   ensuring human food safety for their own products produced or

11   that which might be brought in by way of imports.

12         So, what was set was the Codex process whereby the

13   world came together and said let's set up a seven-step process

14   that if a company had a product, if a university had a product,

15   they could submit it to the Codex process, and then those

16   experts, which come from many parts of the world, it's usually

17   a committee of five to seven, sometimes 10, they could then

18   review that product, and on behalf of other countries in the

19   world not competent or capable in those areas, ascertain is

20   this product safe for use.

21         So and the predicate is it had to be approved, those

22   products had to be approved by several countries OECD type

23   countries, larger, mature countries.

24         So the science-based standards were based on the

25   scientific authorities from different countries that assembled,

1   each a different group for each product that might want to go

2   through the Codex process.

3   Q.  Got it.  So the Codex, the big countries make a set of

4   standards for what your food should contain or not contain,

5   basically, correct?

6   A.  They had their own standards, correct.

7   Q.  And they agree on one standard together?

8   A.  No, there are some differences, but they're all fairly

9   consistent, sir.

10  Q.  Then you said the less mature countries had to decide

11  whether they're going to accept this Codex rule or not.

12  A.  Yes.  But boy, they sure were part of the review and they

13  got to vote on the acceptance of it.  It was not just a

14  committee decision.  It was absolutely a global decision on the

15  acceptance or not of those human food safety standards and

16  those products.

17  Q.  Meaning there was a group that voted on it?

18  A.  Yes.  They tend to work on consensus, but a couple times it

19  has been a vote.

20  Q.  A couple of times it has come to the vote?

21  A.  Yes.

22  Q.  And Egypt in 2019 was one of these, in your words, less

23  mature countries that was thinking about what parts of the

24  Codex rules to accept or not, correct?

25              MR. MARK:  Objection.

1           THE COURT:  I'll allow that.

2   A.  Specific human food safety.  This is important.  They had

3   their own sense of how to go about other things and we

4   respected that.  But human food safety is what this is all

5   about.

6   Q.  So we'll get back to that with Egypt.  One other thing you

7   said when you took this position is that you have experience

8   first-hand the issues of non-scientific trade barriers,

9   correct?

10  A.  Yes, sir.

11  Q.  And I assume that's kind of what it sounds like.  Something

12  that slows trade and isn't based on science?

13  A.  Yes.

14  Q.  Right?

15          And you were focused on reducing non-scientific trade

16  barriers in your role as under secretary, correct?

17  A.  I wouldn't say I was focused.  It was a part of the things

18  that I was looking at.  So yes, it was included, but it was not

19  the sole focus.

20  Q.  Okay.  And one example of a science-based trade barrier is

21  if, say, a country like Egypt says we don't want American beef

22  that has any growth hormones in it, correct?

23  A.  That's a good example.

24  Q.  Okay.  Or some country say we don't want any pork that has

25  steroids in it.  That's another science-based trade barrier?

1   A.  Yes.  They don't use steroids in pork but...

2   Q.  Sorry.

3   A.  But additives might be a better word, sir.  But yes, that

4   would be an example of a trade barrier.

5   Q.  Got it.  And Egypt did that in 2019 when you were engaged

6   with them, right?  They actually set up a rule about not taking

7   beef from the U.S. with additives, right?

8   A.  I believe that's right.  That's different from halal.  But

9   that gets up to human food safety rules.  And yes, they

10  accepted the rules, the proposal that the U.S. put forward.

11  That would be a sister agency, sir.

12  Q.  Got it.  So in 2019, the U.S. had the position and the

13  Codex rules permitted U.S. beef to have these synthetic

14  additives, correct?

15  A.  At the time, well, at that time, one product had been

16  approved that would be considered an additive.  Others have

17  since been approved.  So, and by the way, you should not

18  characterize larger companies as dictating.  Remember, all

19  companies get to vote on these or consense is the better word

20  around whether these are accepted.

21  Q.  Companies or countries?

22  A.  Countries, countries.  Governments.

23  Q.  That one food additive is something called Ractopamine?

24  A.  Yes, sir.  Ractopamine hydrochloride.

25  Q.  One of these trade barriers that in your view is not based

O5V3MEN3                          McKinney - Direct

1   on science would be halal or kosher, religious food barriers?

2   A.  Yes, but we treated that differently.  Halal, just like

3   kosher in the Jewish faith, is a faith-based derivative.  It is

4   faith-based focus, completely different from food safety.

5   Whether it is human or animal food safety protocols we were

6   working on, it was all considered different.

7            There were times that there was gamesmanship with

8   halal in our view, and some countries admitted that straight

9   out to me.

10  Q.  So to pick up on that, even before your encounter with

11  Egypt on this IS EG Halal issue, you held the view that halal

12  certifiers sometimes used to engage in shenanigans; fair to

13  say?

14           MR. MARK:  Objection.

15           THE COURT:  I'm not sure what that question is.  Why

16  don't you rephrase it.

17  Q.  Sir, sure.  Your belief was that halal certifiers were

18  always a pain, correct?

19  A.  No.

20           MR. MARK:  Objection.

21  Q.  Sir, did you prepare for your testimony by meeting with the

22  FBI and these prosecutors?

23  A.  I wouldn't use it that way.  I met with them because I am

24  unfamiliar with this process and I wanted to know what I was

25  getting into.  So in that sense, I met to understand the

O5V3MEN3                        McKinney - Direct

1   process.

2   Q.  Okay.  Whatever you want to call it.

3              MR. MARK:  Objection.

4              THE COURT:  Disregard the comments of the lawyers.

5   Q.  I didn't mean that anything other than I think we're

6   talking about the same thing.  You met with them?

7              THE COURT:  You'll disregard that comment as well.

8   Question, answer.  Question, answer.

9   Q.  Do you remember telling the FBI that halal certifiers are

10  always a pain?

11  A.  I do not remember that.

12             MR. FEE:  Can you please show the witness 3527-003,

13  page 3.  Just the witness and the attorneys.

14             THE COURT:  The way you said you wanted to learn how

15  this process works.  You said you couldn't recall something.

16  So, Mr. Fee is entitled to show you something, anything at all.

17  You should look at it.  It may be true, it may not be.  An

18  example I use and I've used before in this case is he's

19  entitled to show you a banana.  It may be that looking at that

20  banana gives you a new recollection.  It refreshes your

21  recollection.

22             So look at whatever he's showing you.  And if it

23  refreshes your recollection, in regard to whether or not you

24  ever told the FBI that halal certifiers are always a pain, you

25  can say either yes or no.  It does refresh your recollection or

1    it does not.

2             Does looking at that banana refresh your recollection

3    in regard to whether or not you ever told the FBI that halal

4    certifiers are always a pain?  Yes or no?

5             THE WITNESS:  Yes, I recall a discussion.  I don't

6    remember some of these words, but I remember the discussion.

7    Q.  You remember telling FBI that halal certifiers are always a

8    pain?

9    A.  What I remember is talking about how halal is often times

10   used as trade barriers.  For example, company or countries will

11   change halal rules every few years, and often times that was

12   under the view that they wanted to deny a product for coming in

13   or slow a product coming in.

14            So I don't remember the words in the quotes, but I did

15   talk about how halal is used as a trade barrier at times.

16   Q.  And that's what you believed you observed with respect to

17   Egypt in 2019, correct?

18   A.  Not necessarily.  We did not know the change and why.  But

19   we had this backdrop, so we were very curious as to why the

20   change was made and why it was made so suddenly, and so

21   drastically.

22   Q.  Sir, in your experience, with engaging with agricultural

23   trade and halal, have you come to understand the term haram?

24   Do you know what that means?

25   A.  I'm sorry.  I don't.

1  Q.  Do you understand that the halal dietary rules come from

2  the Muslim holy book called the Koran?

3  A.  Yes.

4  Q.  Do you understand that if they are not followed, and a

5  Muslim knowingly eats non-halal food, they may be committing a

6  mortal sin?

7  A.  I am aware of that kind of thing.

8  Q.  During these events about which you testified in 2018 and

9  '19, did any of your USDA team tell you whether the prior

10  certifiers were in fact passing off haram or non-halal meat as

11  halal in Egypt?

12          MR. MARK:  Objection.

13          THE COURT:  I'll allow that.  Did anyone tell you

14  that?  Yes or no.

15          THE WITNESS:  No, I was unaware of that.

16          THE COURT:  Well, there is an assumption there.  His

17  question doesn't mean it was in fact happening.  The question

18  was simply did anyone tell you that.  And apparently no one

19  told you that.

20          THE WITNESS:  No.

21          THE COURT:  Whether or not that was happening is not

22  in this record and in fact was just an assumption in the

23  question.  This jury knows that questions aren't evidence.

24  Only answers are evidence.

25          THE WITNESS:  And I would be surprised if that were

1    true.

2    Q.  Can we please put up what's in evidence as Government

3    Exhibit 8 B-10.  Page 10, please.  Actually page 1.

4          You remember looking at this?

5    A.  Yes, sir, I do.

6    Q.  Let me finish the question.  I'm sorry, sir.  You remember

7    looking at this during your direct testimony?

8    A.  Yes.

9    Q.  You described this as an e-mail you forwarded?

10   A.  Yes.

11   Q.  This has the Alborsaa article in Arabic that references the

12   USDA GAIN Report, correct?

13   A.  That's as I recall what it was about.

14   Q.  It also has, you said, an English translation, correct?

15   A.  As I recall, yes.

16   Q.  And Senator Menendez's staff sent this to you, right?

17   A.  Yes, yes.

18          MR. FEE:  Let's just cycle through this to get to the

19   English translation, please, Mr. Kelly.

20          THE COURT:  This was sent to you after the Menendez

21   phone call that you testified about?

22          THE WITNESS:  I'm sorry, sir.  Say it again?

23          THE COURT:  Was the Alborsaa article sent to you after

24   the telephone call with Menendez that you testified about?

25          THE WITNESS:  Yes, sir.

1    Q.   Is this page 10?  Thank you.  So this is the last page of

2    the translation, Mr. McKinney.  I want to circle in yellow.  It

3    states "Sources told the stock exchange that the procedures

4    applied by the Egyptian Ministry of Agriculture came after

5    confirming that the rest of the centers did not work in the

6    correct Islamic way."

7              You see that, Mr. McKinney?

8    A.   I do see that.

9    Q.   Your testimony is that you were unaware at the time,

10   despite receiving this article, that the prior certifiers were

11   not meeting halal standards?

12             THE COURT:  Sustained.  Again, there is an assumption

13   in your question.  Just ask a direct question.

14   Q.   You were not aware at the time, sir, after reading this

15   article, that the center, the prior halal centers did not work

16   in the correct Islamic way?

17             THE COURT:  Same objection.

18   Q.   Were you aware of the substance of this article at the

19   time, Mr. McKinney?

20   A.   No, I was not aware of this.  And I still stand that I

21   would be surprised if that's the case.  I want to know whose

22   source this is.

23   Q.   Absolutely.  Let's put up what's been admitted by the

24   government as GX C107-AT.  Go to page 1, please.

25             You focus on the report on Islamic centers that

1   supervise slaughter through the dealing with the Islamic

2   centers.  This reads "The centers" it says "1. Halal

3   Transactions of Omaha.  The center's halal slaughter was

4   attended at slaughterhouse est 969 Swift Beef Company, and the

5   following was noted:

6           "A.  After being stunned unconscious, a large number

7   of calves were piled up and it took more than six and a half

8   minutes to get them to the butcher, which led to their death

9   before slaughter.  No method was proposed to separate the halal

10  slaughtered animals from the others.  Therefore, dealing with

11  the Islamic Center is suspended due to non-compliance of

12  products."

13          Do you see that, Mr. McKinney?

14  A.  I do see that.

15  Q.  And no one on your team ever alerted you to the fact that

16  these were the findings of the audit?

17          MR. MARK:  Objection.

18          THE COURT:  Sustained.  Same thing.  Assumption in

19  your question.

20  Q.  Mr. McKinney, were you ever alerted to the findings of the

21  Egyptian audit of the halal certifiers?

22          THE COURT:  I'll allow that.

23  A.  I had not seen this.

24  Q.  Understood.  We can put that down.  So in any event, you

25  would agree, though, that your focus after being alerted to

1  this issue about IS EG Halal was to get the prior certifiers

2  back to work, right?

3  A.  I wouldn't quite agree with that.

4  Q.  Go ahead.

5  A.  I wanted competition, and whether it was the same ones or

6  others, I wanted to make certain that we had competition so a

7  monopoly would not result.

8  Q.  Right.  Because you said the very essence of our country

9  was competition, right?

10  A.  That is correct.

11  Q.  But the Egyptians, as you understood it, did not want

12  competition for halal certification, correct?

13  A.  I did not understand that.

14  Q.  Well, they had decided to use one certifier, correct?

15  A.  And we interfaced with them to challenge that, on the

16  wisdom of competition raises price.  So we wanted to talk with

17  them.  Hence all the interface and the communication to discuss

18  this more thoroughly.

19      THE COURT:  Sir, I think you said the wisdom of

20  competition raises price.  Is that what you meant?

21      THE WITNESS:  I'm sorry, sir.  Say that part again?  I

22  missed the first word.

23      THE COURT:  You said and we interfaced -- I think you

24  misspoke but you may not have.  This is what the reporter took

25  down.  You said, and we interfaced with them to challenge that

1  on the wisdom of competition raises price.

2          THE WITNESS:  Yes.  That was one reason.  But yes,

3  that was a primary reason we were pursuing that.  That's one of

4  those bullet points.

5          THE COURT:  Competition raises price?

6          THE WITNESS:  No, competition keeps price down.  To go

7  from several to one inevitably was going to raise prices and it

8  did.

9  Q.  Sir, the Egyptians had decided to use one halal certifier,

10  correct?

11          MR. MARK:  Objection.

12          THE COURT:  I'll allow that, if he knows.

13  A.  That is correct.

14  Q.  And you didn't like that because prices might go up,

15  correct?

16  A.  That was one reason.  The second reason, very importantly,

17  is this company had no halal experience.

18  Q.  I understand your position, sir.  My question is, you

19  didn't like that?

20          MR. MARK:  Objection.

21          THE COURT:  Just a moment.  Again, cut the commentary,

22  please, just questions.  Go ahead.

23          MR. FEE:  Yes, your Honor.

24  Q.  You didn't like Egypt using one certifier because prices

25  for American beef would go up, correct?

1      MR. MARK:  Objection.

2      THE COURT:  I'll allow that.

3   A.   That was not the only reason we objected, if that's what

4   you're getting at.

5   Q.   Was one of the reasons you objected was because the use of

6   one halal certifier would make prices go up for American beef?

7      THE COURT:  You can answer that, sir.

8      THE WITNESS:  I can answer that?

9      THE COURT:  I'm sorry.  If you are able, you may

10  answer that.

11  A.   I'll repeat that was one of several reasons, sir.  Context

12  is important.

13     THE COURT:  Sir, do you think you'll be able to finish

14  by 5?

15     MR. FEE:  No.

16     THE COURT:  How much longer do you think you have?

17     MR. FEE:  Much longer.

18     THE COURT:  Continue.

19  Q.   Let me show you what's been put in evidence as Government

20  Exhibit 8B-7.

21     MR. FEE:  So, if we zoom in on the top e-mail and get

22  context here.  Put the signature line as well.  I'm sorry,

23  Mr. Kelly, the person who sent this.  All the way down.

24  Q.   So, Mr. McKinney, just to orient us, some of the people on

25  this e-mail are Bret Tate.  Do you recognize that name, sir?

1    A.  Yes.  I know Bret.

2    Q.  He is one of your FAS team at post in Cairo?

3    A.  He was, not now.  But was.

4    Q.  Right.  When you were under secretary, he was in Cairo?

5    A.  Yes.  I had forgotten he was in Cairo.  But yes, he was a

6    member of the U.S. Foreign Agricultural Service.

7    Q.  Abdi Ali who sent this e-mail, he was also the top FAS guy

8    in Cairo at that time, right, Mr. McKinney?

9    A.  That's correct.

10   Q.  And if we can go to page 2 of this e-mail chain.  So, the

11   bottom e-mail from Mr. Abdi Ali.  Now, Mr. McKinney, you are

12   not copied on this one.  But, it's dated Thursday, April 11,

13   2019.  You see that?

14   A.  Yes, I see that.

15   Q.  It's from Abdi Ali.  You see that?

16   A.  Yes.

17   Q.  This is before I believe, Mr. McKinney, all the outreach

18   about which you testified to Egypt on the IS EG Halal issue,

19   correct, this e-mail?

20   A.  I believe that is correct.

21   Q.  I am going to point you to the body where Mr. Abdi Ali

22   tells many of his FAS colleagues, "Colleagues, we're hearing

23   that the leadership of the audit team provided recommendations

24   to the Minister of Agriculture which might be unfavorable with

25   respect to U.S. halal certifiers."

1              Do you see that?

2    A.  Yes, I see that.

3    Q.  And then the subject line is "Egypt audit update."  You see

4    that as well?

5    A.  Yes, I do.

6    Q.  You interacted with Mr. Ali Abdi about this IS EG issue in

7    2019, correct?

8    A.  I don't recall interfacing with him.  It was his superiors

9    that I interfaced with.

10   Q.  Who?

11   A.  What?

12   Q.  Who?

13   A.  Oh gosh.  I've forgotten names.  My chief of staff, my

14   trade counselor, Jason Hafemeister, Ken Isley, I've forgotten

15   names.  They've now retired.  Bob -- but I'm looking here at

16   these names, well, Laura Anderson interfaced by e-mail, so

17   Laura was on that list.  But I don't recognize the other ones

18   as part of the group that was briefing me.

19   Q.  So none of those people made you aware of the issues with

20   the prior halal certifiers that are reflected in the last three

21   exhibits we've reviewed, sir?

22              MR. MARK:  Objection.

23              THE COURT:  Did any of the people on this list make

24   you aware of the contents of the exhibits you've looked at?

25              THE WITNESS:  I was unaware that there was concern

1    about exactly how the audits were being conducted.

2              THE COURT:  All right.

3              THE WITNESS:  And the results from that.

4    Q.  So, you would agree, sir, that it should give you pause as

5    the under secretary for trade if you're insisting on

6    reinstituting halal certifiers who are not following halal

7    rules, correct?

8    A.  I wouldn't agree with that.

9    Q.  Tell me.

10   A.  Well, the word hearing could be just about anything.  So, I

11   would want to know exactly what the concerns were.  I'd like to

12   see, and I never did see, the written reports and then the

13   feedback in those written reports to those plants.

14             I mean, this could be said by anybody, and so I wanted

15   to make sure -- I would want to make sure and see the exact

16   ones.  So this is possible and it could still be good reason to

17   sustain some use of those halal certifiers.

18   Q.  So it's not good enough for you if the Egyptian government

19   says our chosen halal certifiers are doing a bad job and need

20   to be replaced?

21             MR. MARK:  Argumentative assumption.

22             THE COURT:  Sustained.

23   Q.  Sir, you would not accept it if the Egyptian government

24   rejected a halal certifier as inadequate?

25             MR. MARK:  Objection.

1          THE COURT:  Was the Egyptian government able to reject

2     a halal certifier as inadequate?

3          THE WITNESS:  They have that right.  But it's

4     important for the jury and others to know that the Food Safety

5     Inspection Service, another arm of USDA, validates the

6     compliance of halal certification.  They are there to adjudge

7     meat safety, of course human safety, but also compliance with

8     that.

9          So, this is basically saying that FSIS was not doing

10    their job, and I know the quality of work they do.  I would

11    want to dive into this before I would agree with this.

12    Q.  The FSIS was responsible for telling the Egyptian

13    government whether its halal certifiers were doing their job,

14    sir?

15    A.  No, no, no.  The Egyptian government gives the U.S. their

16    halal certification requirements.  That is then taken by the

17    Food Safety and Inspection Service inspector, and they are at

18    every processing line, at every processing plant of any size in

19    the United States.  They then certify.

20         So knowing the double check, the quality control on

21    compliance with halal, I would want to dive into this to know

22    the truth.

23    Q.  Sir, putting aside your own desire to know the truth as you

24    put it --

25         THE COURT:  Sustained.  The jury will disregard the

1    comments.

2              MR. FEE:  I'm trying to focus on the issue, your

3    Honor, which is this.

4              THE COURT:  Then focus on the issue.

5    Q.  Mr. McKinney.

6    A.  Yes.

7    Q.  The Egyptian government has the sole authority to decide

8    who certifies meat as halal for Egyptian people, correct?

9    A.  That is true.  But it is not uncommon at all for countries

10   to work out the details and fully understand how those operate

11   when it's new or when it's in operation.

12   Q.  Sir, your testimony is that you were not provided

13   information about the concerns raised in this exhibit and

14   others about the audit of halal certifiers, correct?

15             MR. MARK:  Objection.

16             THE COURT:  I'll allow that.

17   A.  I was not made aware with this e-mail.  But I knew

18   something was going on, so that's why we undertook the actions

19   that we took.

20   Q.  Well, you didn't ask FSIS for example, hey, have you

21   noticed that these old certifiers are letting non-halal meat be

22   certified as halal?  You did not do that, right?

23             THE COURT:  Sustained.  Assumptions.

24   Q.  You did not inquire with the FSIS, the U.S. agency about

25   the FSIS's views of the quality of halal certification,

1    correct?

2    A.   I was relying on my staff to deliver me the information I

3    needed.  And that's who was providing me information, sir.

4    Q.   So you did not inquire about the FSIS's views about the

5    quality of halal certification, correct?

6    A.   I did not.

7    Q.   By the way, the United States has only one organization

8    that vets food safety, correct?

9    A.   Well, no.

10   Q.   On a national level, sir.  Excuse me.

11   A.   No, the Food and Drug Administration looks after a lot of

12   food safety.  The Food Safety Inspection Service looks after a

13   lot of food safety.  A separate agency in USDA called the

14   Animal Plant Health Inspection Service, Codex has its role.  So

15   there are many.  And a lot of those manifest themselves in the

16   states.

17   Q.   So on the national level, everything you just named is a

18   part of the U.S. federal government, correct?

19   A.   That is correct.

20   Q.   And it would be bad if there were 15 different food safety

21   organizations in the United States that had different

22   standards, correct?

23              MR. MARK:  Objection.

24              THE COURT:  Sustained.

25   Q.   Sir, do you want competition in the U.S. food safety

O5V3MEN3                         McKinney - Direct

 1  vetting area?

 2              MR. MARK:  Objection.

 3              THE COURT:  I'll allow that.

 4  A.  I want competition.  And I want them to follow the rules as

 5  has been provided to the Food Safety Inspection Service, and

 6  FSIS or to the FAS.  That's what I wanted.

 7  Q.  I'm sorry, sir.  In the United States, do you want

 8  competition between the national food vetting safety bodies?

 9              THE COURT:  Sustained.

10  Q.  Sir, do you want your goal of having many halal certifiers

11  to be replicated with the U.S. food safety administration?

12              MR. MARK:  Objection.

13              THE COURT:  Sustained.  I really don't know where we

14  are, sir, in these questions.

15  Q.  You would agree, Mr. McKinney, that there are some benefits

16  to having one group certifying food as halal, correct?

17  A.  I wouldn't go there, sir.

18  Q.  So, let's -- so, you would agree that if you had multiple

19  halal certifiers who were doing their jobs in different ways,

20  it would be better to have just one that did a good job, right?

21  A.  I would not agree with that either, sir.

22  Q.  Are you Muslim, sir?

23              MR. MARK:  Objection.

24              THE COURT:  That's irrelevant.

25  Q.  I'll keep going.

1          THE COURT:  Next question.

2   Q.  Sir, did you ever convene a meeting in 2019 about whether

3   U.S. exporters were hiding non-halal meat into exports in

4   Egypt?

5   A.  Say that again, sir?  I want to make sure I understand.

6   Q.  Sure.  Did you ever convene a meeting in 2019 about whether

7   U.S. exporters were hiding non-halal meat into exports into

8   Egypt?

9   A.  I don't recall any such meeting.

10  Q.  In any event, your focus was on increasing trade, not on

11  religious dietary guidelines, correct?

12          MR. MARK:  Objection.

13  A.  No, sir.  I took all that seriously.  We respected a great

14  deal if countries had religious practices, and we wanted very

15  much to comply with them.  So as a baseline, making sure that

16  was the case, we wanted absolutely then to make sure it was

17  safe, it was provided in the volumes they wanted, it was

18  efficacious and, oh, yes, it complied with their rules, in this

19  case halal.

20  Q.  Are you able to point to any portion of any of the exhibits

21  you just reviewed with the prosecutors where you express a

22  concern about the quality of halal certification?

23          MR. MARK:  Objection.

24          THE COURT:  Sustained.  You can talk about exhibits

25  you showed.

1   Q.  So you advocated aggressively to the Egyptian government to

2   reinstate the prior certifiers, right?

3   A.  Yes, sir, I did.

4   Q.  About as aggressive as you have ever gotten in your role

5   with the USDA, right?

6   A.  Well, I got pretty angry a couple other times.  But I

7   stayed in the diplomatic respect and concern for others.  But

8   yes, we pressed that to a limit in the norms of diplomacy, we

9   did.

10  Q.  And the reason for your diplomatic aggression was because

11  you were concerned the U.S. could lose that 60 percent market

12  share for beef liver in Egypt, right?

13  A.  And perhaps the other beef products going with liver at the

14  fore, hmm-hmm.

15  Q.  And part of your diplomatic aggression was directed to your

16  counterpart, you testified, Dr. Mona Mehrez, correct?

17          MR. MARK:  Objection.

18          THE COURT:  I'll sustain the objection about his

19  diplomatic aggression.  He said he wasn't aggressive.  Don't

20  put those two at the same time as being diplomatic.  Go ahead.

21  Be diplomatic in your question.

22          MR. FEE:  Sorry.

23  Q.  Part of your advocacy, Mr. McKinney, was directed to your

24  counterpart in Egypt's Agricultural Ministry, Dr. Mona Mehrez,

25  correct?

1  A.  That was the final step, yes.

2  Q.  But many of the things or some of the things you said to

3  Dr. Mehrez in connection with this advocacy were not factually

4  accurate you now realize, right?

5          MR. MARK:  Objection.

6          THE COURT:  I'll allow it.  Was some of the things you

7  said to Mehrez in connection with your advocacy not factually

8  correct?

9          THE WITNESS:  Is that a question, sir?

10          THE COURT:  Yes.

11          THE WITNESS:  I'd have to see again what I said to

12  her.  I thought everything we said was correct.  But let's take

13  a look at it.

14  Q.  You are ahead of me.  Government's Exhibit 8B-20, please.

15  Which I think was just admitted.

16          Is that right, Mr. Mark?

17          MR. MARK:  That's correct.

18  Q.  So, again, just to orient, Mr. McKinney, this is somebody

19  forwarding on one of the letters you sent to Deputy Minister

20  Mehrez on May 10, 2019.  You see that, Mr. McKinney?

21  A.  Yes, I do see that.

22  Q.  And they flagged the concern.  If we can scroll down

23  through the letter.  Let's go to page 3.  And just very

24  briefly, you sent this to Dr. Mehrez before she was terminated

25  and replaced in Egypt, right?

O5V3MEN3                        McKinney - Direct

1  A.  I didn't know.

2         THE COURT:  Did you send it to her while she was

3  Deputy Minister of Agriculture?

4         THE WITNESS:  Yes, I believe she was still there.

5         THE COURT:  Did she subsequently take another

6  position?

7         THE WITNESS:  I don't know.  I moved on.  I don't

8  know.

9  Q.  If we can go to the second-to-last paragraph, please.

10  A.  Yes.

11  Q.  And these are your words, right, Mr. McKinney?  You are the

12  signer of this letter?

13  A.  Hmm-hmm.

14  Q.  Did you draft it or did someone on your staff help you

15  draft it?

16  A.  I don't remember exactly.  But I know I contributed to

17  this, because I see and recognize the words, and then you'll

18  see on the next page my handwritten note.  So I'm very familiar

19  with this letter.

20  Q.  Right.  And is it your practice to get help from your staff

21  on drafting letters that go out of the office?

22  A.  They would often times take a first cut at it.

23  Q.  Understood.  It states here "I respectfully request that

24  you take measures to prevent any disruption in our halal

25  industry.  Effectively immediately, please reinstate the seven

1  U.S. halal certifiers."

2  A.  Hmm-hmm.

3  Q.  You see that, Mr. McKinney?

4  A.  I see them.

5  Q.  What authority did you have to tell the Egyptian government

6  to do anything immediately?

7  A.  Sure.  In the world of trade, you can feel free to express

8  those.  I have already gone through the reasons why we were so

9  compelled to write this letter.  And this was the last of the

10  escalation in letters and communications and e-mails.

11       So, yes, absolutely, I felt that they could very

12  likely be harmed, and most certainly the U.S. could be harmed,

13  if they went the draconian route of eliminating all and

14  replacing it with one who, by the way, had never had experience

15  in halal certification.

16  Q.  You said that, sir.  And you learned that from your staff

17  about the level of experience that IS EG Halal had in halal

18  certification?

19  A.  I don't remember where I learned that.  It had to be from

20  staff, but I didn't know IS EG or the companies involved.

21  Q.  Would you agree, sir, it's better to have a rookie point

22  guard than someone passing to the other team?

23       THE COURT:  Sustained.

24  Q.  Did the U.S. have any actual ability to force Egypt to

25  reinstate the prior halal certifiers?

1    A.  No.  But the power of persuasion is always there and used

2    widely.  Both ways I might add.

3    Q.  And the tools of your persuasion here were, as you said,

4    phone calls, letters, correct?

5    A.  Phone calls, e-mails, letters, yes.

6    Q.  You never threatened to cut off U.S. aid to Egypt, correct?

7    A.  No, I did not.

8    Q.  You never threatened to elevate this issue to the Secretary

9    of Agriculture Sonny Perdue?

10   A.  I did not.  But it could have gotten there had it

11   continued.

12   Q.  You never did elevate the issue?

13   A.  I never did, no.

14   Q.  You didn't threaten to alert the State Department so that

15   they would take action against Egypt because you were so upset

16   about this issue, right?

17   A.  We had not reached that point.

18   Q.  In any event, at the time you sent this letter, did you

19   really expect Dr. Mehrez to immediately comply with your

20   request?

21           THE COURT:  Sustained as phrased.

22           Did you expect a response to your letter, sir?

23           THE WITNESS:  Yes, sir, I did.  It's very common that

24   you reply and show the courtesy of a reply.  Even if it's a

25   "we're getting back to you."

1   Q.  Absolutely.  Did you expect her to reinstate the prior

2   certifiers after you sent this letter?

3   A.  I didn't know that, but I sure hoped for it.

4   Q.  By the way you write seven, you say "reinstate seven U.S.

5   halal certifiers."  Which means there used to be seven

6   certifiers, correct, as I understand this letter?

7   A.  Seven was the number that my staff had provided to me.  It

8   wouldn't have made a difference if it was seven or four or

9   three.  It's just more than one.

10  Q.  It wouldn't have made a difference whatever number you put

11  in this letter?

12  A.  I did not say that, sir.  I said if we had several that

13  could provide competition, that's important.  We wanted the

14  seven because they had been there.  We'd never heard anything

15  of ill will about them.  We had no indication they were

16  performing poorly.  We had the Food Safety Inspection Service

17  there watching that, representing that, validating that.

18  That's why I put seven.  That's the number I was given.  That's

19  how many we had been working with, as I was told, to certify

20  halal.

21  Q.  If you received a letter from the Egyptian Ministry of

22  Agriculture that had false information in it, would you be more

23  or less likely to comply?

24          MR. MARK:  Objection.

25          THE COURT:  Sustained as a hypothetical.

1  Q.  Let's put up what's been admitted as Government's Exhibit

2  8B-32.  This is the GAIN Report that your team put out about

3  this issue, correct, Mr. McKinney?

4  A.  That is correct.

5  Q.  And it's dated May 13, 2019.

6  A.  Yes.

7          MR. FEE:  If we can go to page 2, please.  Under audit

8  outcomes.  And highlight the second-to-last -- actually both

9  the two last.

10  Q.  You see there, Mr. McKinney, it says "Prior to this

11  announcement, four," meaning the change to IS EG, "four firms

12  had provided halal certification services for U.S. beef

13  products to Egypt for many years."

14          You see that, sir?

15  A.  I see that, yes.

16  Q.  Are you aware whether or not that four firms figure is

17  accurate?

18  A.  Was I aware of what, sir?

19  Q.  Whether or not there were four prior halal certifiers?

20  A.  I had been told seven all along.  That's why I used that

21  number.

22  Q.  So given that you put seven and not four, does that change

23  how you understand Dr. Mehrez's reaction to your letter?

24          MR. MARK:  Objection.

25          THE COURT:  I'll allow it.

1    A.  No, not really.  If I had received a letter like that, I

2    would have wanted to address their primary concern, and not

3    tussle over whether it was four or seven.

4    Q.  Does the USDA oversee any religious dietary guidelines?

5    A.  Oversee -- if what you mean is do we interpret that and

6    enforce those, that's what the Food Safety Inspection Service

7    does at every meat plant in the U.S.  Is that what you meant?

8    Q.  Does the FSIS certify meat as halal?

9    A.  They do.

10   Q.  Do you oversee the FSIS?

11   A.  No, I don't.

12   Q.  Have you ever received a letter about halal certification

13   supervised by the USDA?

14   A.  Not that I recall.

15   Q.  In any event, you repeated this statement about the seven

16   prior certifiers in other communications with the Egyptian

17   government, right?

18   A.  Yes, I believe that's right.

19   Q.  Let me just show you that and I am going to talk about

20   other portions of it.  Government Exhibit 8B-35.  So again, if

21   we go down to the bottom e-mail, this is the e-mail you talked

22   about on direct, Mr. McKinney, to the embassador.  That's the

23   Egyptian ambassador in the United States; is that right?

24   A.  That's correct, yes.

25   Q.  And then the Maha@ESC, that's Dr. Mehrez you testified?

1   A.  I believe that is.

2   Q.  And you sent this e-mail on May 2.

3   A.  Yes, sir.

4   Q.  And again you state, I think it is the third sentence, that

5   they delisted seven halal certifiers and designated a new one

6   that had no prior affiliation with the -- you use the term U.S.

7   beef industry?

8   A.  Yes.

9   Q.  Can you just help me understand and perhaps it's very

10  obvious.  What is the U.S. beef industry?

11  A.  Well, we generally characterize the beef industry as the

12  combination of the ranchers and farmers that raise beef.  And

13  then the continuation of them, lots of times they'll be raised

14  on pasture like in my state of Indiana.  Then they will be

15  shipped off to be finished with grain at a feed lot, then they

16  are sent off to processing.  That entire chain is what I

17  referenced today as the U.S. beef industry.

18  Q.  Then the beef industry, you tell me, also has a bunch of I

19  would say lobbyists and advocacy groups that sit atop those

20  ranchers, producers, exporters; fair to say?

21          MR. MARK:  Objection to form.

22          THE COURT:  Well, I don't know what atop is.  Why

23  don't you break it down.

24  Q.  Would you also consider as part of the U.S. beef industry

25  the lobbyists, advocacy, and trade associations focused on

1    beef?

2    A.   I wouldn't put it that way.  The cattle industry, the beef

3    industry, the processing industry do have lobbyists, but that's

4    a small part of what they do.  They're much more interested in

5    food safety and all those kinds of things complying to deliver

6    a good product.  If you're referencing lobbying, that can be

7    part of each of those.  But it doesn't sit atop or doesn't

8    drive the organization by any stretch.

9    Q.   In connection with this engagement with Egypt in 2019, do

10   you remember the involvement of members of something called the

11   USMEF?

12   A.   I know USMEF, that's the U.S. Meat Export Federation.  I

13   don't know what their involvement with this, other than feeding

14   to my staff that they had great concerns about where we might

15   be going if we eliminated seven or four, whatever number you

16   want to use, to go to one.

17   Q.   Got it.  So you don't know if it is seven or four any

18   longer.  Is that what you are saying?

19            THE COURT:  Sustained as to form.

20            It's 5 o'clock.

21            MR. FEE:  Absolutely.  Last point.

22   Q.   If we can go to the next sentence, "Given there is no prior

23   industry relationship with this new certifier, beef exports

24   produced on or after May 1 have effectively halted."

25            Do you see that, sir?

1   A.  I do see that.

2   Q.  That was not true, correct?

3   A.  I thought it was true.  I did not know it was not true.

4           MR. FEE:  We'll leave it there.

5           THE COURT:  As you sit here now, do you know it was

6   not true?

7           THE WITNESS:  No, I moved on after this issue.  I

8   thought that was true at the time, sir.

9           MR. FEE:  That's a good point, your Honor.

10          THE COURT:  Ladies and gentlemen, enjoy the weekend.

11  You know on Monday, we're going to have start at 1 o'clock.  We

12  are going to go from 1 to 5.  And then I am going to try to

13  have full trial 9:30 to 5 every day for the rest of the week.

14          Enjoy the weekend.  Keep an open mind.  Don't read any

15  publicity.  Don't discuss this case.

16          (Jury excused)

17          (Continued on next page)

18

19

20

21

22

23

24

25

O5V3MEN3

1          THE COURT:  You may step down, sir.

2          (Witness excused)

3          THE COURT:  Do you have an estimate now, Mr. Fee?

4    Let's let the witness leave.

5          MR. FEE:  Have a good weekend, Mr. McKinney.

6          THE COURT:  It's your examination, but where do you

7    think you are here in this?  I'm not sure it's worth that much

8    more time worrying about four or seven.

9          It's your examination.  I don't want to tell you how

10   to do it.  But I'm what I'm asking you to do is be efficient

11   moving forward.

12         MR. FEE:  I'll try to be efficient.  I would say at

13   least an hour.  The only thing I'll note is he's not a yes/no

14   witness.  Every answer is a yes or no but, so I'm budgeting at

15   least an hour.

16         THE COURT:  Give me the other end of that "at least."

17         MR. FEE:  One to two hours.

18         THE COURT:  Be as efficient as you can.

19         Enjoy the weekend.

20         (Continued on next page)

21

22

23

24

25

O5vWmen4

```
 1                  MR. LUSTBERG:  Your Honor, can I be heard?

 2                  THE COURT:  Yes, of course.

 3                  You may be seated in the courtroom.

 4                  MR. LUSTBERG:  And I say this with absolute respect

 5      for your Honor.

 6                  THE COURT:  Well, I think what you were doing, sir,

 7      really is -- and again, you had double the time you estimated.

 8                  MR. LUSTBERG:  I didn't, your Honor.  That's not true.

 9                  THE COURT:  I'm not pushing anybody.

10                  What I thought you were doing was almost entirely

11      having him point out areas of the texts that you wanted to

12      emphasize.  It seemed to me that that's what you were doing,

13      rather than getting answers on cross-examination.

14                  MR. LUSTBERG:  Respectfully, your Honor, I think

15      that's appropriate cross-examination, but either way, we may

16      disagree.

17                  THE COURT:  Again, you gentlemen and lady are all

18      going to do it the way you want.  It seems to me a lot of this

19      is probably more effective or as effective, and you certainly

20      can save it all for summation, because it's all in the record.

21      I don't know that they're going to be remembering particular

22      emphasis weeks before the summation once you have it in the

23      record.

24                  I don't mean to stop you from speaking, sir.

25                  Go ahead.
```

O5vWmen4

1    MR. LUSTBERG:  I don't mean to stop you either, your

2    Honor.

3    This is my concern, and we may agree or disagree with

4    regard to that set of issues, but the government examined that

5    witness court for three days.  My colleagues here examined that

6    witness for a day.  I would have been finished in the 30 -- in

7    fact, I think I went 35 minutes --

8    THE COURT:  Who's arguing?  I had an hour.  Who is

9    arguing?

10    Go ahead.

11    MR. LUSTBERG:  Well, it wasn't.

12    But the point is I just think for the Court to convey,

13    on a Friday afternoon, to the jury its impatience with how I'm

14    moving along is not fair.  And my client's liberty is equally

15    at stake as Senator Menendez's.

16    THE COURT:  No question.

17    MR. LUSTBERG:  And I just think that we should be

18    given the opportunity to engage in meaningful cross-examination

19    as we see it.

20    THE COURT:  I don't disagree at all with that.  I'm

21    asking, however, that the parties be as efficient as possible

22    and move forward expeditiously.  And I haven't cut anybody off.

23    And I understand your point.

24    MR. LUSTBERG:  Well, let me say I did feel cut off.

25    And beyond that, your Honor, yesterday, I really tried to

O5vWmen4

1    tailor this to be as efficient as possible.  Yesterday you

2    admonished Mr. Weitzman repeatedly for not staying within the

3    four corners of Government Exhibit 1302.  Today, I tried to

4    stay solidly within those four corners.

5              THE COURT:  And I criticized you for that.

6              MR. LUSTBERG:  Yes.

7              THE COURT:  I understand your point.  All right.

8              MR. LUSTBERG:  Thank you, your Honor.

9              THE COURT:  I understand the point.

10             Let's proceed and make sure we proceed apace.

11             MR. MONTELEONI:  Your Honor, can I just raise one

12   thing to make you aware of?

13             As you know, we talked about the fact that we've done

14   one summary witness now.

15             THE COURT:  And I have a juror with an issue in the

16   middle of the week next week.  This is what I'm working with,

17   trying to deal with, and keep evidence in at the same time as

18   accommodating these -- I won't say it's an emergency, but these

19   issues that arise.

20             MR. MONTELEONI:  Understood, your Honor.  And we are

21   all trying to move fast.

22             THE COURT:  And I would hate to have another half day

23   in the middle of next week off.

24             Go ahead.

25             MR. MONTELEONI:  Yes.

O5vWmen4

```
 1                As the Court directed, I've been talking with counsel

 2    for the defense about the next summary chart.  We've been

 3    narrowing disagreements.  We've been talking productively, but

 4    there are going to be some issues that are going to require the

 5    Court's resolution.  We are proposing to write the Court about

 6    that over this weekend in hopes that we can try to resolve it,

 7    perhaps on Monday.  I think it's unlikely that the witness

 8    could get on on Tuesday.  Wednesday's more likely, but possibly

 9    Tuesday.  I know that's a somewhat compressed time frame, but

10    we have taken the time partly to narrow down the issues

11    somewhat.  So we wanted to let you know that we would be filing

12    that over the weekend.

13                THE COURT:  All right.  Thank you.

14                Enjoy the weekend.

15                (Adjourned to June 3, 2024, at 1:00 p.m.)

16

17

18

19

20

21

22

23

24

25
```

1          INDEX OF EXAMINATION

2    Examination of:                              Page

3     MICHAEL F. COUGHLIN

4    Cross By Mr. Lustberg . . . . . . . . . . . .1723

5    Cross By Mr. De Castro . . . . . . . . . . .1755

6     TED McKINNEY

7    Direct By Mr. Mark . . . . . . . . . . . . .1764

8    Cross By Mr. Fee . . . . . . . . . . . . . .1825

9          GOVERNMENT EXHIBITS

10   Exhibit No.                              Received

11    8B-49   . . . . . . . . . . . . . . . . . .1816

12

13

14

15

16

17

18

19

20

21

22

23

24

25