O6C5men1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          23 Cr. 490 (SHS)

 5    ROBERT MENENDEZ,
      WAEL HANA, a/k/a "Will Hana,"
 6    and FRED DAIBES,

 7              Defendants.
                                           Trial
 8    ------------------------------x

 9                                         New York, N.Y.
                                           June 12, 2024
10                                         9:58 a.m.

11

12    Before:

13                    HON. SIDNEY H. STEIN,

14                                         District Judge
15                                         -and a Jury-

16                        APPEARANCES

17    DAMIAN WILLIAMS
           United States Attorney for the
18         Southern District of New York
      BY:  PAUL M. MONTELEONI
19         DANIEL C. RICHENTHAL
           ELI J. MARK
20         LARA E. POMERANTZ
           CATHERINE E. GHOSH
21         Assistant United States Attorneys
           -and-
22         CHRISTINA A. CLARK
           National Security Division
23

24

25
```

O6C5men1

                        APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:  Marwan Abdel-Rahman
               Bachar Alhalabi
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

1    (Trial resumed; jury not present)

2    THE COURT:  Please be seated.

3    The jury is here.  The government wants to talk to me?

4    MR. RICHENTHAL:  Yes, your Honor.  We have a few

5    different issues.  They don't all need to be resolved up front

6    but I wanted to flag them.

7    THE COURT:  Flag them.  I won't resolve them.  We will

8    get the jury in here.  Go ahead.

9    MR. RICHENTHAL:  Some may occur, nearly all of them, I

10    think, throughout the day, unfortunately.

11    THE COURT:  Some?  In the morning?  Then I need to

12    resolve them.

13    MR. RICHENTHAL:  That depends, I think, on the scope

14    of cross.

15    THE COURT:  Well, Mr. Fee said, I think you said,

16    about an hour.  Is that what you had?

17    MR. FEE:  Yes, your Honor.

18    THE COURT:  All right.

19    MR. RICHENTHAL:  I suspect we may get to the lunch

20    break before these come up.

21    THE COURT:  Yes, please.  Have you talked to the other

22    side?

23    MR. RICHENTHAL:  We have on all but one.

24    THE COURT:  In other words you have two issues so you

25    have talked to them about one and not the other.

O6C5men1

1          MR. RICHENTHAL:  We have more than two issues.  We

2     have talked with them about all but one.  On that one we traded

3     he e-mails but haven't yet had a chance to confer in person.  I

4     will flag that one last.

5          In no particular order, so, first last night the

6     defense filed a letter motion with respect to exhibits that

7     were discussed at side bar.

8          THE COURT:  Yes, at 11:32 p.m.  I am really getting

9     very tired of midnight submissions.  It makes it difficult for

10    me to get a decent night's sleep.  Go ahead.

11         MR. RICHENTHAL:  I wasn't going to comment on the time

12    of night except to say we haven't had a chance to fully review

13    it yet.

14         THE COURT:  Go ahead.

15         MR. RICHENTHAL:  We would ask the Court to defer

16    ruling because it is not intended to be impeachment for

17    Mr. Uribe anyway.  Until we have a chance to respond I

18    expect --

19         THE COURT:  You don't have to respond because I don't

20    agree with Mr. Menendez' position.  I am going to put it on the

21    record.  And I have read the midnight submission and thought

22    about it.  Go ahead.

23         MR. RICHENTHAL:  Number two on my list, I am trying to

24    move quickly here --

25         THE COURT:  The parties really have to avoid late

O6C5men1

1    night submissions.  I don't want to set a formal rule but it is

2    getting ridiculous.  At least I moved the parties off of

3    1:30 a.m., but still, they need to be on before 11:30.  Next.

4              MR. RICHENTHAL:  Number two on my list, today I don't

5    know the exact time yet, but we intend to call, among other

6    individuals a United States Attorney's office paralegal.  To be

7    clear, we intend to call two paralegals.  The paralegal to

8    which I am referring right now is the second of the two.  That

9    paralegal is going to be called to testify, in sum, that he

10   received a PowerPoint presentation from Senator Menendez' then

11   counsel, Winston & Strawn, and he was asked to set that

12   PowerPoint presentation up on his own laptop because the

13   defense laptop, for some reason, just didn't work.  This was a

14   presentation to present to the United States Attorney's office

15   prior to Mr. Menendez being charged.

16             THE COURT:  Yes.

17             MR. RICHENTHAL:  The defense, last night, raised two

18   different objections to this testimony in its entirety.  I

19   don't think the Court wants to rule now because the jury is

20   waiting but I just wanted to flag this issue.

21             The first objection they raised is that, in their

22   view, and I can't speak for them, the paralegal was unable to

23   establish any non-hearsay basis for the PowerPoint; and second,

24   they've advised us that they intend to introduce other parts

25   the PowerPoint, not parts we intended to introduce.  That seems

O6C5men1

1    like classic hearsay to us.  They've told us they think it goes

2    to state of mind; that is a puzzling assertion, but they

3    haven't told us which parts.  And they've also told us they

4    intend to cross-examine the paralegal, at least in part, on

5    what was said during the presentation.  The paralegal had no

6    role in the presentation --

7            THE COURT:  Was he or she present?

8            MR. RICHENTHAL:  He was present but he had no role

9    other than to literally facilitate the PowerPoint being

10   projected onto the screen.  And, he is not a lawyer.  I am

11   happy to talk about those objections now but I wanted to flag

12   the issue for the Court.

13           THE COURT:  No.  Next.

14           MR. RICHENTHAL:  The third issue is we --

15           THE COURT:  And talk to each other.  It sounds like

16   that is not at an end yet.

17           MR. RICHENTHAL:  So on this issue we have talked at

18   some length this morning and we also traded e-mails last night.

19   I think the parties are at meaningful impasse and I do not

20   expect it will be resolved.

21           THE COURT:  Go ahead.

22           MR. RICHENTHAL:  The third issue, we expect to call

23   our final chronological summary witness, Special Agent Paul

24   van Wie as soon as tomorrow, although that may slip.

25           THE COURT:  Well, I have over 30 objections that the

O6C5men1

1    government submitted to me I think two days ago.  I am still

2    going through those.

3              MR. RICHENTHAL:  Understood, your Honor.  I just

4    wanted to tell you where we hope he will be in the order.

5              THE COURT:  Where do you hope he will be in the order?

6              MR. RICHENTHAL:  We hope he will be in the order

7    tomorrow.  I recognize it may not be possible.  It also could

8    slip in light of cross-examination today.

9              MR. RICHENTHAL:  Relatedly, we expect to call a

10   Department of Justice FARA representative.  There was a motion

11   by Mr. Hana, I think about a week or week and a half ago,

12   seeking to preclude this testimony.

13             THE COURT:  This is JJ Gilday?

14             MR. RICHENTHAL:  Yes, sir.

15             It is possible Mr. Gilday testifies as soon as Friday,

16   that is two days from now.  Again, it could slip to Monday or

17   so.  We just wanted to flag that is -- I don't want to say

18   imminent, but that it is coming up in the next couple days.

19             THE COURT:  Go ahead.

20             MR. RICHENTHAL:  And then two more issues, really

21   quickly.  The last issue, when I said, your Honor, we hadn't

22   had a chance to confer other than e-mails, the following:

23   Mr. Menendez' team has told us they want to provide a laptop

24   for a particular witness so that the witness can search through

25   exhibits in real-time.  I am candidly not sure that is

1    technically possible, but if it is possible, we want to ensure

2    the jury can see what the witness is being asked to do.  We are

3    a little puzzled by this request.  Obviously the witness can

4    look through the exhibit.  We have conferred by e-mail on this

5    but, as I said, this is not one we have had a chance to confer

6    about live.

7            THE COURT:  Then do so.  Next.

8            MR. RICHENTHAL:  Happy to do so.

9            The final issue, we received 15 exhibits -- excuse me,

10   20 exhibits between 9:40 p.m. and 11:23 p.m.  Of those 20

11   exhibits, 15 were given to us after 11:00 p.m.  This is a

12   continued issue.  Frankly, we don't know what to do about it.

13   It is incredibly disruptive to our case because we have

14   objections to some of those exhibits.

15           THE COURT:  What are they to be used for?

16           MR. RICHENTHAL:  As we understand it, they're to be

17   used for non-impeachment with respect to multiple of our

18   witnesses.  There is one exhibit in particular, when I asked

19   Mr. Menendez' team to explain their view of relevance and

20   admissibility I was told, and this is a quote:  You'll see.

21           THE COURT:  That's not acceptable.

22           MR. WEITZMAN:  Yes.

23           Your Honor, just to be clear, because the government

24   continues to complain that we haven't produced impeachment

25   exhibits which they claim are non-impeachment exhibits, most of

O6C5men1

1    the exhibits I have provided last night are actually

2    impeachment exhibit.  So the exhibit that they're referring to

3    is an impeachment exhibit, I do not intend to offer it as a

4    non-impeachment exhibit.  And I do believe that I need not

5    disclose my impeachment strategy until I see what the witness

6    says on direct.  That was the reason why I am not disclosing it

7    at this time.  As to all the other exhibits I have been

8    engaging in conversation.

9          THE COURT:  Yes, but don't bring exhibits, 20

10   exhibits; 15 after 11:00 p.m. is not acceptable.

11         MR. WEITZMAN:  Yes, your Honor.

12         THE COURT:  Albeit everybody is working hard.  Let's

13   go back to your statement about, oh, you're -- not

14   overmanned -- overpeopled by the government, which I found not

15   to be credible.  You have got plenty of lawyers who can get

16   this stuff in on time.

17         MR. WEITZMAN:  Your Honor, I emailed the government on

18   Friday, on Saturday, and on Sunday asking for their witnesses

19   and witness order.  Each time -- each time -- that I emailed

20   they declined to provide because they insisted that Uribe will

21   testify through Wednesday.  We have gotten notice of these

22   witnesses, it is true, this week, but we are working on other

23   witnesses.  I turned to these witnesses that they disclosed to

24   us the order of yesterday.  I turned to them yesterday and

25   they're just a few exhibits.  This is not -- these are -- most

O6C5men1

1   of the 20 exhibits are pictures of cash that we have long

2   disclosed that they had in connection with the therapist's

3   report.

4           THE COURT:  All right.  All I can say -- I am not

5   going to look at the exhibits now and see how many are of cash,

6   how many aren't, what time, all of that.  I am saying, both

7   sides, stop with the gamesmanship.  The idea is to get evidence

8   before this jury, to get the evidence before them so that they

9   can deliberate and do their job.  They are an excellent jury.

10  The gamesmanship and the contention is just over the top here.

11          Here is my ruling on the 806 issue:

12          Menendez asserts that pursuant to Federal Rule of

13  Evidence 806 he can offer two e-mail communications between

14  Hana and Anton during his cross-examination of Uribe, which is

15  ongoing, in order to impeach certain statements, not of Uribe,

16  but of Hana, that have been admitted through Uribe.  806

17  provides that when a hearsay statement or statement described

18  in 801(d)(2)(C), (D), or (E) -- and this is a co-conspirator

19  statement under 801(d)(2)(E) -- has been admitted into

20  evidence, the declarant's credibility may be attacked and

21  supported by any evidence that would be admissible for those

22  purposes.  If the declarant had testified as a witness the

23  Court may admit evidence of the declarant's inconsistent

24  statement or conduct, regardless of when it occurred or whether

25  the declarant had an opportunity to explain or deny it.  That's

O6C5men1

1    806.

2              Menendez asserts that since the co-conspirator

3    statement of Hana -- here Hana is telling Uribe that Nadine and

4    Menendez were involved in Hana's offer to kill the

5    investigations -- has been admitted into evidence.  Hana's

6    credibility may be attacked by any evidence that would be

7    admissible for the purpose of attacking Hana's credibility had

8    Hana testified as a witness.

9              806 sets out that this evidence may be of the

10   declarants, here, Hana's inconsistent statement or conduct

11   regardless of when it occurred or whether the declarant --

12   Hana -- has an opportunity to explain or deny it.  Menendez

13   urges that evidence showing that Hana met with Anton, who

14   allegedly had said he could kill the investigations for

15   $20,000, and later allegedly followed up by e-mail to Hana with

16   the things he did to try to kill the investigations, is

17   "statement or conduct" of Hana that is "inconsistent" with

18   Hana's statements to Uribe that Nadine and Menendez would help

19   him stop and kill the investigations.

20             First, it is not clear how the alleged activity and

21   statements between Hana and Anton are at all inconsistent with

22   Hana's statement that Nadine and Menendez were going to help

23   Hana stop and kill the investigations.  Enlisting

24   co-conspirators to try to accomplish a task does not create an

25   either/or scenario where Hana would be limited to utilizing

O6C5men1

1   only one set of co-conspirators and not to using two sets or

2   more.  Rather, it is entirely feasible that Hana sought the

3   assistance of Nadine and Menendez on one hand, and of Anton on

4   the other, as part of a two-pronged approach to carry out a

5   scheme.  There is no mutual exclusivity problem here.  Thus,

6   contrary to Menendez' assertion at side bar at the end of trial

7   yesterday, this is not "exactly 806" as Menendez' attorneys

8   asserted as it is not impeachment revealing a statement or

9   conduct of Hana inconsistent with his 801(d)(2)(E) statement

10  presented during Uribe's testimony.  That's 3442 of the

11  transcript.  Moreover, as conceded by Menendez, the purpose of

12  bringing these e-mails in as evidence is not to impeach Uribe

13  but to impeach Hana.  Menendez' lawyers specifically said that.

14  Pursuant to the agreement between the parties, the defendants

15  were to disclose to the government all non-impeachment exhibits

16  intended for use in the government's case-in-chief by, as near

17  as we can tell on the record, April 26.  ECF no. 341 at pages 1

18  to 2.

19          The e-mails between Hana and Anton that are at issue

20  here, as material used to impeach Hana, the 801(d)(2)(E)

21  declarant, constitute non-impeachment exhibits vis-à-vis Uribe

22  and, as such, should have been provided to the government

23  substantially in advance of Uribe taking the stand pursuant to

24  the agreement of the parties.  The government asserts it had no

25  notice of this exhibit and, indeed, "got exactly zero exhibits

O6C5men1

1    with respect to Mr. Uribe." transcript 3442.  Menendez has not

2    contested that assertion.  Thus, Menendez' request to use this

3    evidence in his cross of Uribe is rejected, both as a matter of

4    the rules of evidence and it is violative of the agreement

5    between the defendants and the government setting forth

6    defendants' required disclosure of non-impeachment exhibits

7    that are intended for used in the government's case-in-chief.

8            That's my decision.  Let's bring the jury in.

9            MR. FEE:  Your Honor, on that last point I need to

10   make the record.

11           That is not the agreement.  Impeachment as to a

12   hearsay declarant elicited through a witness is impeachment.

13   We didn't know what Mr. Uribe would say until he took the

14   stand.  That is impeachment.  Our agreement did not define it

15   to exclude 806 impeachment.  And, if we need to, we will brief

16   this further, your Honor.

17           THE COURT:  You have my decision.

18           Jury entering.

19           (Continued on next page)

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  You may be seated in the courtroom.

3              Thank you, ladies and gentlemen, for being here.  We

4    had some late-breaking matters that I had to take up with the

5    lawyers.

6              Mr. Uribe, I remind you, as I do each day, that you

7    remain under oath.  You understand that; correct.

8              THE WITNESS:  Yes, I do, your Honor.

9    JOSÉ DOLORES URIBE, resumed.

10             THE COURT:  Mr. Fee, you may continue and conclude

11   your cross-examination of this witness.

12             MR. FEE:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. FEE:

15   Q.  Mr. Uribe, you remember testifying yesterday about the call

16   you received on October 29 of 2019 from the 202 number used by

17   the senator?

18   A.  Yes, I do.

19   Q.  In the weeks leading up to that October 29 call from the

20   senator, you reached out to Nadine several times, over text, to

21   try to get updates from her; correct?

22   A.  Yes, I remember that.

23   Q.  And we talked yesterday -- or you testified yesterday about

24   that one text that you described as sent as a joke where you

25   said:  You don't love me anymore.  To Nadine.  Do you remember

1    that?

2    A.  Yes, I do.

3    Q.  Is if you remember, that was sent on October 3, that text?

4    A.  I don't remember the exact date of the text but I know a

5    text like that exists.

6    Q.  Fair enough.

7            MR. FEE:  Let's move forward in time to October 14 and

8    put up what is in evidence as Government Exhibit B209-23, page

9    172, Mr. Kelly, for everyone, and if we can focus on the second

10   message beginning -- the bottom two messages, please,

11   Mr. Kelly.  I'm sorry.

12   Q.  So we looked at this one from October 12, if you remember.

13   You see here, Mr. Uribe, you say:  Hello Hermana.  You got me

14   worried, you never reply to me for over two weeks.  And it

15   continues.  Then the next message on the bottom is sent on

16   October 14.  Do you see that, Mr. Uribe?

17   A.  Yes, I do, sir.

18   Q.  And you write to Nadine:  *Hola* Hermana.  Hope you have a

19   wonderful week.  I hate to do this to you but I have no peace.

20   Do you know anything?

21           Do you see that, Mr. Uribe?

22   A.  Yes, I do, sir.

23           MR. FEE:  And then we can flip to page 175 of the same

24   exhibit, it continues, if we can focus on the top 2.

25   Q.  This is now October 17, Mr. Uribe, and you write to Nadine:

1    Good morning, any news?  I don't have any peace, My Hermana.

2                And she replies on the same day:  Good morning.  I am

3    doing fundraising for Grant School in Dumont.  I will call you

4    at 1:15 or so.

5                Do you see that, Mr. Uribe?

6    A.  I am looking at it, sir.

7    Q.  Do you remember if she called you on that day?  Sitting

8    here today, do you have memory of that?

9    A.  I don't have recollection of that.

10   Q.  And when you are referring to peace, Mr. Uribe, just so I

11   am clear, your concern was you testified your Ana being

12   harassed by this unfair investigation; correct?

13   A.  Yes.

14   Q.  And I believe you testified, and correct me if I am wrong,

15   you were concerned about Ana actually being charged and

16   convicted of a crime because you thought Ana had not committed

17   a crime; right?

18   A.  Correct.

19   Q.  So your concern, your ask to help get peace was about this

20   unfair investigation of Ana; correct?

21   A.  My concern is of an investigation ongoing into Prestige

22   Trucking Express, Bien Hernandez, as I said before, could have

23   led to an investigation into Ana and Phoenix Risk Management.

24   Q.  And that is what you conveyed to Nadine and as well to the

25   senator that it wasn't -- that you were concerned about Ana

1    having committed a crime, you were concerned about an unfair

2    investigation that could lead to her; correct?

3    A.   I have not used the word "unfair" investigation several

4    times.  I don't recall using those words when speaking of

5    texting with Nadine.  I am concerned about the investigation

6    into Prestige Trucking Express that could have led into my Ana.

7    Q.   Thank you, sir.

8         Do you remember hearing this question and giving this

9    answer yesterday:

10   "Q  That part 2, what you are saying, is because you are

11   concerned that your daughter Ana was going to continue to be

12   bothered by Detective Lopez?

13   "A  An unfair investigation could have been opened about her

14   and my poor lady -- my poor girl -- and that was my way to

15   protect my daughter."

16        Do you remember giving that testimony yesterday,

17   Mr. Uribe?

18   A.   I don't have exact recollection of every word I used

19   yesterday but if you want to show me, I will be glad to look at

20   it, sir.

21   Q.   You don't remember giving that testimony yesterday?

22   A.   I don't have a full recollection right now but I wouldn't

23   mind if you have to show me the transcript.

24   Q.   Let's keep going.

25        MR. FEE:  October 28 and 29, let's put up Government

1  Exhibit B209-24, page 177.  The bottom message, if we can focus

2  in on that, Mr. Kelly?

3  Q.  You text her on October 28, 2019; do you see that,

4  Mr. Uribe?

5  A.  I see that there, yes.

6  Q.  So that is one day before you get the call from Senator

7  Menendez that you testified about?

8  A.  Yes, it is.

9  Q.  And again, you text Nadine:  Buenos dias, Hermana.  Happy

10  and blessed week.  I always text you on Monday in case you have

11  an update.  I just need peace.  Sorry to bother you.

12          Do you see that, Mr. Uribe?

13  A.  Yes, I do, sir.

14          MR. FEE:  Let's flip to the next page of this exhibit,

15  the very next messages, and focus on -- let's put all three on

16  the page for Mr. Uribe.

17  Q.  So Nadine responds:  Good morning.  This entire week I have

18  dedicated to volunteering with the kids with cancer at the

19  hospital.

20          And that is sent on October 29, at 11:38 a.m.  Do you

21  see that?

22  A.  Would you mind blow up the text for me?

23  Q.  Of course.  I'm sorry.

24          MR. FEE:  Mr. Kelly, why don't you focus in on just

25  that message.

1   A.   Thank you.  I have read it.

2   Q.   So, Mr. Uribe, you would agree that you keep sending these

3   requests for updates to Nadine because you are not getting

4   updates about the deal you had made with her; right?

5   A.   Correct.

6   Q.   And are you aware whether or not after she sent this text

7   message to you at 11:38 a.m. that she spoke to Senator

8   Menendez?

9   A.   I'm not aware of the conversation; no, sir.

10          MR. FEE:   Let's look at what is in evidence as

11   Government Exhibit 1303, page 57.  Focus in on rows 113 to 119,

12   please, Mr. Kelly.

13   Q.   And so, Mr. Uribe, you see there is an exchange between

14   Nadine and you in rows 113 and 114 of the exhibit on your

15   screen?

16   A.   Yes, I see it, sir.

17   Q.   And that's the text she sent and you respond that we just

18   looked at; right?

19   A.   113 it is the text.

20   Q.   And then at row 115 you see it states October 29 at

21   1:01 p.m. ET, Robert Menendez to Nadine Arslanian call, 53

22   seconds.

23          Do you see that, Mr. Uribe?

24   A.   I see it, sir.

25   Q.   And then the next entries -- two entries here is row 116

1    there is a calendar that says block RM office time, and then

2    the one after that is at 3:06 p.m. call from Senator Menendez

3    to you; correct?

4    A.  I see that, sir.

5    Q.  And that call on October 29 was the one and only phone call

6    you ever had with Senator Menendez; correct?

7    A.  Yes, sir.

8    Q.  So this phone call at 1:01 p.m., between Senator Menendez

9    and Nadine Arslanian, sir, did Nadine later tell you that she

10   had in fact asked Senator Menendez to call you so you would

11   stop bothering her?

12            MS. POMERANTZ:  Objection.

13            THE COURT:  Well, I.

14            THE WITNESS:  I --

15            MR. FEE:  Wait for the Judge to rule, Mr. Uribe.

16            THE WITNESS:  I'm sorry.

17            THE COURT:  I will allow that.  Not for the truth of

18   the matter.

19            Go ahead.

20   A.  Would you ask me the question again, sir?

21   Q.  Sure.  Did Nadine in fact tell you that she had asked

22   Senator Menendez, on October 29, to call you so you would stop

23   bothering her?

24            THE COURT:  And I'm sorry, before you answer.  My

25   limiting instruction was incorrect.  I take that back.  Go

O6C5men1                              Uribe - Cross

1     ahead.

2     Q.  Did you hear the question, Mr. Uribe?

3     A.  If you don't mind repeating it again, sir.

4     Q.  Sure.

5              THE COURT:  Yes.  I interrupted.  Go ahead.

6     Q.  Did Nadine in fact tell you that she had asked Senator

7     Menendez, on October 29, to call you, Mr. Uribe, so you would

8     stop bothering her?

9              MS. POMERANTZ:  Your Honor, objection.  Assumes a

10    fact.

11             THE COURT:  Argumentative, yes.  Break it down.

12    BY MR. FEE:

13    Q.  Mr. Uribe, did Nadine Menendez tell you the reason why she

14    called Senator Menendez on October 29 before he spoke to you?

15    A.  I don't recall having a conversation with Nadine prior to

16    getting the phone call from Mr. Menendez in where she said to

17    me that she called Mr. Menendez to stop bothering her.

18    Q.  And then you see that he calls you at 3:06 p.m. for two

19    minutes and 41 seconds, Mr. Uribe; right?

20    A.  I see the text, yes.

21    Q.  And during that conversation you testified there was no

22    discussion of any deal or car or anything having to do with

23    your agreement with Nadine; correct?

24             MS. POMERANTZ:  Objection.

25             THE COURT:  Sustained.

1          Was there any discussion during that telephone call of

2   a deal or a car?

3          THE WITNESS:  There was no discussions about the car.

4   Q.  You didn't use the word "deal" on that phone call with

5   Senator Menendez, correct?

6   A.  The senator, in his conversation to me on that call said

7   that that you asked me about, there is nothing there, I give

8   you your peace.  So that would be in reference to what I have

9   asked for from Mr. Menendez.

10  Q.  He didn't tell you that he had spoken to any particular

11  state official on that call, correct?

12  A.  You are correct, sir.

13  Q.  He didn't tell you that the case was closed, correct?

14  A.  He used the term "there is nothing there."

15  Q.  So he didn't tell you the case was closed, correct.

16  A.  He did not use the words that you are using right now, sir.

17  Q.  And you did not say on that call, you held up your end of

18  the bargain Senator Menendez; correct?

19  A.  I did not reply in such a way.

20  Q.  You just said thank you; correct?

21  A.  Yes, sir.

22          MR. FEE:  You can put that down, Mr. Kelly.

23  Q.  We talked about the fundraiser in July of 2018 yesterday.

24  Do you remember that testimony, Mr. Uribe, or that subject

25  coming up during your testimony?

O6C5men1                          Uribe - Cross

1    A.  I remember the subject.

2    Q.  And we did not talk about after the fundraiser there was an

3    afterparty; correct?

4    A.  I don't recall we talking about -- yesterday about, yes.

5    Q.  I'm sorry.  I am just asking from your memory.  After that

6    fundraiser in July of 2018, do you remember going to an

7    afterparty at The Waterside?

8    A.  Yes, I do remember, sir.

9    Q.  And Senator Menendez was there?

10   A.  Yes, he was.

11   Q.  Nadine was there?

12   A.  Yes.

13   Q.  You were there?  Will Hana was there?

14   A.  Yes.  Yes.

15   Q.  And many of those same business owners, Latino trucking

16   business owners that had attended the fundraiser also came to

17   the afterparty at The Waterside Restaurant, correct?

18   A.  Would you repeat that question for me, please?

19   Q.  Sure.

20          Many of the same Latino small business owners who

21   attended the fundraiser also attended the party at The

22   Waterside Restaurant; correct?

23   A.  I will say that some of the Latinos, truckers that were at

24   the fundraiser were there.  You made it sound like to many was

25   almost all, so, and there was a few of them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  So some of them attended?

2    A.  Some of them, yes.

3    Q.  And you did not have any one discussion with Senator

4    Menendez at that afterparty, correct?

5    A.  I did not.

6    Q.  Let's turn to the September 5, 2019 meeting on the backyard

7    patio.  You remember talking about those events in your

8    testimony; correct, Mr. Uribe?

9    A.  Yes, I do, sir.

10   Q.  And you testified that you sat in the backyard with Senator

11   Menendez for about one hour that evening; correct?

12   A.  Give and take, sir, yes.

13   Q.  You said give or take?  Approximately one hour?

14   A.  Approximately one hour.

15   Q.  And during that meeting you spoke with Senator Menendez --

16   actually, let me ask this.  You said it was one hour but on

17   your direct you said two things happened.  One, the Senator

18   said he was going to meet some people in his office in Newark

19   the next day; right?

20   A.  I referred to some officials.

21   Q.  Some officials, he didn't name or specify the positions,

22   but you remember him saying that to you?

23   A.  You are correct.

24   Q.  And then the second thing in your direct that you testified

25   about happening was that you wrote down the names of the folks

O6C5men1                            Uribe - Cross

1    who were your concern; is that fair to say?  The folks you were

2    worried about:  Parra, E & K, Prestige, Ana.  Is that fair?

3    A.  Bien Hernandez, Prestige, Ana, and Phoenix.

4    Q.  OK.  So that happened but that didn't take an hour, those

5    two pieces of information, it did not take an hour to convey

6    that to the Senator, fair to say?

7    A.  That is correct.

8    Q.  And the rest of that hour you were discussing the subjects

9    you have brought to attention here, and what I mean is family

10   values, hard-working Latinos, and the unfairness, as you

11   believed it, of the investigation.  Is that what filled the

12   rest of the hour?

13   A.  I don't remember the words of hard-working Latinos in the

14   terms of the conversations, and even using the word

15   "unfairness" is not to my recollection at this point, sir.

16           THE COURT:  What did you discuss during that hour?  If

17   you remember.

18           THE WITNESS:  It was family values and expressing the

19   names of the parties that are under investigations and I

20   remind -- and I repeat, please, Prestige Trucking Express, Bien

21   Hernandez, that could have led to my Ana Peguero and Phoenix

22   Risk Management.  The gentleman, the senator, with all due

23   respect to him, was smoking a cigar and we were having a Grand

24   Marnier.  The details, more details about the conversation I

25   don't have at this time, sir.

1            THE COURT:  Thank you.

2   BY MR. FEE:

3   Q.  Do you remember telling the prosecutors during one of your

4   meetings that you kept saying to Menendez during this meeting

5   on the backyard patio that, "we are working people" when

6   talking about Bien Hernandez and the others involved in these

7   investigations?

8   A.  That is some of the things that I could have used.  I don't

9   have a recollection right now.

10           MR. FEE:  Let's show the witness and the lawyers

11  3542-033, page 12, the second full paragraph.  Please zoom in

12  on that Mr. Kelly.

13  Q.  Just read that, Mr. Uribe, and let us know when you are

14  done reading.

15  A.  I have read it, sir.

16  Q.  Does this refresh your recollection that during the meeting

17  on the patio, you kept saying to Menendez that "we are working

18  people."

19  A.  It says it on the --

20           THE COURT:  No.  No, no, no.  Remember the banana.

21           Doesn't matter what that says, the question is whether

22  looking at that, whatever it may be, gives you a new

23  recollection about whether or not you said to the senator "we

24  are working people" on that backyard patio meeting.  Do you

25  have a recollection one way or the other now?

1          THE WITNESS:  I don't have a full recollection of the

2    whole conversations but words like "we are working people" is

3    something that I would have said.

4          THE COURT:  All right.  Thank you.

5          MR. FEE:  Put that down, Mr. Kelly.

6    BY MR. FEE:

7    Q.  Do you remember giving this answer during your direct

8    testimony:

9    "A  I am sitting on Nadine's patio talking to Mr. Menendez,

10   asking for help for my family.  I don't think I would have

11   gotten there if I am not the one complying with part 1 of my

12   agreement with Nadine.

13   "Q  When you say complying with part 1 of my agreement with

14   Nadine, what do you mean?

15   "A  I'm sorry.  I take that back.  Complying with my commitment

16   to Nadine as the agreement we sealed by March 12, 2019, at the

17   Villa Amalfi."

18         Do you remember giving those answers during your

19   direct testimony, Mr. Uribe?

20   A.  Yes, I do.

21   Q.  And so, your testimony is that you made it to the patio

22   meeting because you held up your end of the bargain with Nadine

23   to give her a car; correct?

24   A.  Yes.

25   Q.  And just so I understand the timeline, you said in your

O6C5men1                          Uribe - Cross

1  direct you reached a deal with Nadine in March of 2019; right?

2  A.  Yes, sir.

3  Q.  And your testimony is that Nadine understood what you

4  wanted in exchange for that car; right?

5  A.  Yes, sir.

6  Q.  And you never spelled out the terms of the deal for Senator

7  Menendez but you testified you did spell them out for Nadine.

8  That's your testimony; right?

9  A.  You just used the word "never".  In encounters, I will say,

10  sir, in other communications with Mr. Menendez, I did this

11  because part of the deal with Nadine with Mr. Menendez,

12  elements I will call them at this point --

13  Q.  The elements of the deal you discussed with Mr. Menendez

14  was the request to have him do what he could within his power

15  to help stop this unfair investigation; correct?

16  A.  You keep using the word "unfair" which I don't remember

17  using while speaking to Mr. Menendez but I -- if you will allow

18  me to finish my statement -- my commitment with Nadine, sealed

19  commitment with Nadine that I call it, included Mr. Menendez

20  taking actions to get these resolutions of Parra's

21  investigation and stopping the prosecution and investigation

22  towards Prestige, that could lead into an investigation into my

23  daughter.

24  Q.  That's right.  That's what you told Nadine that you wanted;

25  correct?

O6C5men1                         Uribe - Cross

1    A.  Right, and --

2          THE COURT:  Mr. Fee, this witness repeatedly says he

3    didn't use the word "unfair" so the questioning will go more

4    smoothly if you simply don't use that adjective.

5          MR. FEE:  Your Honor, he has used the word "unfair"

6    and I am happy to keep refreshing him on it.

7          THE COURT:  The jury will disregard the statement of

8    the lawyers.

9          You do whatever you like.

10          MR. FEE:  Yes, your Honor.

11          THE COURT:  But at this point don't use the word

12    "unfair."  If you want to establish that he used that, fine.

13          MS. POMERANTZ:  Your Honor, I would also note he was

14    in the middle of answering and he was cut off in his answer.

15          THE COURT:  By me or by Mr. Fee?  Cut off by me or by

16    Mr. Fee?

17          MS. POMERANTZ:  It is a little unclear, your Honor.  I

18    just wanted to to note that.

19          THE COURT:  All right.

20          Did you finish your answer, sir?  Mr. Uribe, did you

21    finish your answer?

22          THE WITNESS:  I'm sorry.  I were just thinking about

23    that as well.

24          THE COURT:  Yes.  Take your time.

25          THE WITNESS:  Thank you, sir.

1           The point I am making is when I had a chance to talk

2   to Mr. Menendez in person I brought about elements of the deal

3   which is stopping the investigation to Mr. -- to prestige and

4   looking into, if that investigation was going to reach to

5   Phoenix Risk Management, Ana Peguero, and to please stop that,

6   if it was in his power to do so.

7   BY MR. FEE:

8   Q.  So, you testified that you reached an agreement with Nadine

9   in March of 2019; correct?

10  A.  Yes, sir.

11  Q.  And then you had many other interactions with Nadine

12  between March and September 2019; is that your recollection,

13  Mr. Uribe?

14  A.  I would like to refresh recollection for me.

15  Q.  I am asking you, do you remember having other interactions

16  with Nadine Arslanian between March and September 2019?

17  A.  I remember texting and perhaps speaking to her on the phone

18  and -- yes, we met.

19  Q.  And then on September 5 of 2019 you claim that you wrote

20  down on a piece of paper the names involved in these

21  investigations, yes?

22  A.  Yes, I do claim that.

23  Q.  Why would Senator Menendez need you to write down those

24  names if Nadine already knew them?

25  A.  That I cannot --

1            MS. POMERANTZ:  Objection.

2            THE COURT:  Sustained.

3    Q.   Do you have any understanding why you are telling this jury

4    that Senator Menendez needed you to write down those names in

5    September --

6            MS. POMERANTZ:  Objection.

7            THE COURT:  Sustained.

8    Q.   -- of 2019?

9            THE COURT:  Sustained.

10   Q.   Let's look at what is in evidence as Government Exhibit

11   1F-1334.  This is the backyard patio where you met with Senator

12   Menendez, correct?

13   A.   General, I showed up at Nadine's property, late night, it

14   was dark.  For example, if I tell you that that is exactly the

15   backyard, I could be lying at this point and I am took an oath.

16   So I don't recall, like, even the color paint of the walls.

17   Q.   So you don't know if you met at this patio that you are

18   looking at on your screen right now?

19   A.   I remember meeting at a patio and I remember the chair

20   situation.  I am just trying to be fair to as to the color of

21   the walls.

22   Q.   Putting aside the color of the walls, does this resemble

23   the patio and the chairs in which you sat and met with Senator

24   Menendez in September of 2019?

25   A.   I -- I don't have a full description of the patio set.  I

1    don't want to make a statement that is that a hundred percent

2    the patio where I sat at.

3    Q.  So you met outside with just the Senator for about an hour;

4    correct?

5    A.  Yes.

6    Q.  Nadine went back inside of the home when you were speaking

7    to the Senator; correct?

8    A.  Yes, she did.

9    Q.  And so she went in through the doors similar to what we see

10   here; correct?

11          MS. POMERANTZ:  Objection, your Honor.  He has already

12   testified about his recollection and in terms of what he knows

13   about the photo or not.

14          THE COURT:  He said "similar to."  I will allow it.

15   Q.  So Nadine went inside through doors similar to what you are

16   seeing on this photo before you, Mr. Uribe; right?

17   A.  I will say in a better way to my knowledge that she went

18   inside through a door.

19   Q.  Got it.

20          So she's inside, and while you are speaking to Senator

21   Menendez do you know what she is doing inside?  Any idea?

22   A.  No, sir.

23          MS. POMERANTZ:  Objection.

24          THE COURT:  Sustained.

25          You weren't inside with her, were you?

1          THE WITNESS:  No, sir.

2          THE COURT:  You were outside?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  She was inside?

5          THE WITNESS:  Yes.

6  BY MR. FEE:

7  Q.  You couldn't see her while you were outside talking to

8  Senator Menendez; right?

9  A.  That is correct.

10 Q.  Because she was behind a door inside the home?

11         THE COURT:  Next question.  Let's move forward, sir.

12 Q.  You talked about Senator Menendez ringing a little bell to

13 summon Nadine Menendez back outside with a piece of paper;

14 right?

15 A.  Refresh that to me, please.

16 Q.  I am asking you, do you remember testifying about Senator

17 Menendez ringing a little bell during your meeting on the

18 backyard patio?

19 A.  You are using a word there that I don't get.  That's why I

20 ask you, ringing or using that, that I am missing there.  Would

21 you repeat your question slowly, please, for me?

22 Q.  Sure.  One second.

23         THE COURT:  There came a time when Nadine came back

24 onto the patio; correct?

25         THE WITNESS:  Yes, sir.

1         THE COURT:  Did Senator Menendez call her or summon

2    her or ask her to come in any way, to your recollection?

3         THE WITNESS:  He yelled or -- yelled, it would be, *mon

4    amour*, and there was a bell, a little bell on that table, and

5    he rang the bell.  That is my recollection.

6         THE COURT:  OK.  Thank you.

7    BY MR. FEE:

8    Q.  Then your testimony is that she came outside with a piece

9    of paper and that is the piece of paper on which you wrote the

10   names; right?

11   A.  My recollection is that she came outside.  Whether she came

12   outside immediately with a piece of paper or at this point the

13   senator asked her to bring a piece of paper and then she came

14   back outside, it is something to that substance, sir.

15   Q.  Do you remember giving this answer in response to this

16   question during your direct:

17   "Q  What happened that led Nadine to bring you a piece of paper

18   in the backyard?

19   "A  Mr. Menendez allow, called for Nadine by something like

20   *mon amour*," and he also rang a bell, a little bell that he had

21   on the table.

22   "Q  After he rang the bell and called out *mon amour*," did

23   Nadine bring you a piece of paper?

24   "A  Yes, she did."

25        Is that testimony not correct?

1            MS. POMERANTZ:  Objection.

2            THE COURT:  Sustained.

3   Q.  I want to understand, are you changing that testimony now?

4   A.  I'm not.

5            MS. POMERANTZ:  Objection.

6            THE COURT:  Sustained.  Sustained.

7            Mr. Fee.

8   Q.  I am genuinely asking, Mr. Uribe, is there something that

9   you want to add to that?

10           MS. POMERANTZ:  Objection, your Honor.

11           THE COURT:  Yes.  Sustained.

12           MR. FEE:  OK.

13  Q.  So your direct testimony, Mr. Uribe, you did not say that

14  Senator Menendez rang the little bell and said bring paper;

15  right?

16  A.  Sir, in a step-by-step situation that is what I feel you

17  are looking for as of the actions in the backyard.  I don't

18  have that recollection full.  I am telling you, to the best of

19  my recollection, what made Nadine brought the piece of paper is

20  the fact that, first, the senator call her, she showed up.  Did

21  she ask to bring a piece of paper and she went back inside and

22  then bring the piece of paper and the pen, sir?  My

23  recollection said that the piece of paper was brought into that

24  backyard into the table by Ms. Menendez, and then was given to

25  me where I wrote the names; as I said many times, sir.

1    Q.  So what you are telling me is your recollection of those

2    events have some gaps in it.  Fair to say?

3            THE COURT:  Sustained.

4            Mr. Fee.

5    Q.  Mr. Uribe, when you were answering the questions for the

6    prosecutors, do you remember saying:  I don't remember exactly

7    what happened?

8            MS. POMERANTZ:  Objection.

9            THE COURT:  I will allow that.

10   A.  I don't have to say I don't remember exactly what happened.

11   I am giving you substance of what happened without putting,

12   minute by minute, of the details when didn't come to my

13   recollection, sir.

14   Q.  During the direct testimony of the prosecutor, when you

15   were asked the questions about the events in the backyard

16   patio, you did not say:  I don't have a precise recollection.

17   Correct?

18           THE COURT:  Sustained.

19   Q.  You knew, as of September 2019, when you sat with Senator

20   Menendez, that he didn't live at 41 Jane, correct?

21   A.  I don't have the knowledge of that, sir.

22   Q.  Well, the very next day you went to see Senator Menendez at

23   his apartment building; right?

24   A.  Where Mr. Menendez spend his living time at the

25   girlfriend's house or his personal apartment is not to my

1  knowledge, sir.  I don't have any other way to determine where

2  does he spend the majority of his time.

3  Q.  Mr. Uribe, do you remember hearing these questions and

4  giving these answers during direct:

5  "A  She directed me to meet with Senator Menendez at his

6  apartment building in New Jersey.

7  "Q  Did you go to his apartment building?

8  "A  Yes, I did.

9  "Q  Had you been to his apartment building before?

10  "A  Never before.

11  "Q  How did you know how to get there?

12  "A  Nadine gave me the address and I drove there."

13          Do you remember testifying about that on direct,

14  Mr. Uribe?

15  A.  Yes, I do.

16  Q.  So you would agree that as you understand these events,

17  Senator Menendez lived at an apartment building; correct?

18  A.  I understand his apartment building, sir.  I am trying to

19  say by my previous answers that I don't have a way to say where

20  does Mr. Menendez spends his time when in New Jersey, the

21  girlfriend's house or his, what was called his apartment

22  building, sir.

23  Q.  And when the prosecutor asked you on direct if you visited

24  his apartment building, your answer was yes, I did; correct?

25  A.  That's the way Ms. Nadine referred to where I was meeting

O6C5men1                              Uribe - Cross

1    Mr. Menendez.

2    Q.  Got it.

3         So Nadine set up that meeting between you and Senator

4    Menendez at his apartment building.  That's your recollection?

5    A.  Yes, sir.

6    Q.  And Senator Menendez took that meeting because he knew you

7    to be a friend of Nadine.  That was your understanding, right?

8         MS. POMERANTZ:  Objection.

9         THE COURT:  Sustained.

10   Q.  Sir, you understood that you got that meeting due to your

11   friendship and your deal with Nadine, correct?

12        MS. POMERANTZ:  Objection.

13        THE COURT:  Sustained.

14        MR. FEE:  Your Honor, I am asking for his

15   understanding.

16        THE COURT:  Move on.

17   Q.  So your testimony is that at the time you were sitting on

18   this backyard patio there was already a little bell sitting on

19   that table; correct?

20   A.  Recollection there was a little bell on the table.

21   Q.  Was the little bell sitting on the table when you sat down

22   or did Senator Menendez carry it out with him?

23   A.  Sir, my recollection there was a bell on the table.

24   Q.  But the bell was just appeared on the table.  You don't

25   remember if it was there?

O6C5men1                          Uribe - Cross

 1              THE COURT:  Sustained.

 2              You have his recollection.  We have the bell outside.

 3    Move on.  We have the little bell.

 4    Q.  The little bell, and let's talk about that.  How little of

 5    a bell was it?  Was it bigger than the microphone head or

 6    smaller?

 7    A.  Bigger than the microphone head.

 8    Q.  Is it bigger than my fist or smaller?

 9    A.  I cannot see the size of your fist.

10    Q.  Why don't you hold up your fist and tell me if --

11              THE COURT:  Mr. Fee, move on.

12              MR. FEE:  Your Honor, this is important.

13              THE COURT:  The size of the bell is important, sir?

14              MR. FEE:  His recollection of these events is

15    important, your Honor.

16              THE COURT:  His recollection of the size of the little

17    bell is important?

18              MR. FEE:  Yes.

19              THE COURT:  Is that what you are telling this jury?

20              MR. FEE:  Yes, your Honor.  I will continue.

21              THE COURT:  Proceed.  And lower your voice.

22    BY MR. FEE:

23    Q.  Mr. Uribe, when he rang this bell --

24              THE COURT:  Lower your voice.

25    Q.  When he rang this bell, Mr. Uribe, how could Nadine hear it

1    if she was inside the home behind a closed door?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.

4    Q.  There were no other guests there that night, right,

5    Mr. Uribe, besides you, Senator Menendez, and Nadine, at 41

6    Jane?

7              MS. POMERANTZ:  Objection

8              THE COURT:  I will allow it.

9              Was there anybody else in that house, to your

10   knowledge, when you were on the patio meeting with Senator

11   Menendez?  To your knowledge.

12             THE WITNESS:  To my knowledge, Nadine was inside, sir,

13   and we were -- Senator Menendez and myself were outside.

14   BY MR. FEE:

15   Q.  So as far as you understand, no one else heard this little

16   bell ring besides you, Senator Menendez, and Nadine, from

17   inside the house.  Your understanding, right?

18   A.  I just said that I don't have any knowledge.  I said that

19   Nadine is outside, I'm outside with the senator.  If there was

20   somebody else inside I have no knowledge of that that could

21   hear the bell, sir.

22   Q.  And when you left that night, you did not send a text

23   message to Will Hana, for example, saying, hey, it was super

24   weird when Senator Menendez rang a bell to summon Nadine?

25             THE COURT:  Sustained.

O6C5men1                        Uribe - Cross

1    Q.  Mr. Uribe, did you tell anyone after you left that house,

2    in text or e-mail, about observing Senator Menendez ring a

3    bell?

4    A.  Not to my recollection, sir.

5    Q.  Do you remember the first time you informed the U.S.

6    government about observing this little bell?

7    A.  I don't have a recollection of the date and time, sir.

8    Q.  Do you ever remember a prosecutor or an FBI agent

9    challenging your story about the bell?

10            THE COURT:  Sustained.

11   Q.  Were you ever questioned about whether that event with the

12   little bell actually happened?

13            MS. POMERANTZ:  Objection.

14            THE COURT:  Sustained.

15            Were you asked by any prosecutor or FBI agent about

16   the bell?

17            THE WITNESS:  May I ask you, your Honor, if you are

18   asking me if the prosecutors asked me about the existence of

19   the bell, whether there was a bell there?

20            THE COURT:  Yes.  All right.  Did they ever ask was

21   there a bell there?

22            THE WITNESS:  They asked me and I said to the best of

23   my recollection there was a bell there.

24   BY MR. FEE:

25   Q.  And that was it, there was no further discussion about the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    bell, that you remember?

2                MS. POMERANTZ:  Objection.

3                THE COURT:  Do you remember any discussion about the

4    bell with the prosecutors, apart from the fact that of what

5    your testimony was, that is, the senator rang the little bell?

6                THE WITNESS:  Sitting here, under oath, in

7    conversations with the prosecutors, it was told that it was

8    very rare that a bell -- that somebody in today's age has a

9    bell.

10                THE COURT:  You are saying the prosecutors said that

11    you believe --

12                THE WITNESS:  We made a comment about the existence of

13    the bell in details to call somebody.

14                THE COURT:  OK.  Fine.

15    BY MR. FEE:

16    Q.  The very next day Nadine arranged for you to go meet the

17    senator in the lobby of his apartment building; correct?

18    A.  Yes, sir.

19    Q.  And your testimony is that you went there to get an update

20    from the senator on his meeting with the officials; right?

21    A.  Yes, sir.

22                MR. FEE:  And if we put up what is in evidence

23    Government Exhibit 1303, rows 1048 through 59?

24    Q.  You say here that you are on my way, in row 1048,

25    Mr. Uribe, on my way to big meeting with the Amigo.  You are

1  referring to Senator Menendez as "the amigo"?

2  A.  Yes, sir.

3  Q.  Friend.  Not family, Mr. Uribe?

4  A.  I referred to the senator as "mi amigo" in this context,

5  sir.

6  Q.  Then you call -- Jorge Martinez calls you "brother" and

7  says:  Good luck.  Right?  Do you see that?

8  A.  That would be the next line.  Yes, sir, I see it.

9  Q.  And then row 1058, if you go down, at 2:45 p.m., it shows

10  you sending a text to George or Jorge Martinez stating:  I

11  think it is a good meeting.  No final, but positive.

12          Do you see that, Mr. Uribe?

13  A.  Yes, I do, sir.

14          MR. FEE:  And if we put up what is in evidence as

15  Government Exhibit 2B-25, Mr. Kelly?

16  Q.  This is the lobby where you caught Senator Menendez; right?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  Sustained to "caught," yes.

19          Is this the lobby where you met Senator Menendez?

20          THE WITNESS:  Yes, your Honor.

21          THE COURT:  When you walked into the building, was he

22  sitting in the lobby?

23          THE WITNESS:  No, not in that section of the lobby.

24  He was not sitting at any point.

25          THE COURT:  All right.

O6C5men1                          Uribe - Cross

 1   BY MR. FEE:

 2   Q.  When you arrived he was speaking to the receptionist.  That

 3   was your testimony, right?

 4   A.  Ask me the question again, please, sir.

 5          THE COURT:  When you arrived, was Senator Menendez

 6   speaking to a receptionist?

 7          THE WITNESS:  Best of my recollection he was standing

 8   by the reception area and the receptionist was there.

 9          THE COURT:  OK.

10   Q.  Do you remember getting this question and giving this

11   answer during your direct testimony:

12   "Q  And when you got to his apartment building, what did you

13   do?

14   "A  I remember parking outside.  I didn't know the building has

15   parking area for visitor.  I ran to the main entrance, passing

16   the main entrance.  I saw Mr. Menendez in the lobby talking to

17   the receptionist."

18          Do you remember giving that that testimony on direct?

19   A.  Yes.

20   Q.  And so there was a receptionist nearby only about 10 to 15

21   feet away from when you spoke to Senator Menendez; correct?

22   A.  Best of my recollection, yes, sir.

23   Q.  And fair to say that she could overhear what you two were

24   talking about, right?

25          MS. POMERANTZ:  Objection.

1            THE COURT:  Yes.  Sustained.

2   Q.  Based on your experience as a human being, do you think she

3   could hear anything you were saying?

4            MS. POMERANTZ:  Objection.

5            THE COURT:  Sustained.

6   Q.  You said you were about 10 to 15 feet away from the

7   receptionist when you were talking to Senator Menendez; right?

8   A.  In my best calculation of distance.

9            THE COURT:  Mr. Uribe, for example, could you say she

10  was closer than juror no. 1 to you, or farther, or about the

11  same?  If you can say.

12           THE WITNESS:  A little bit further, I would say, your

13  Honor.

14           THE COURT:  Juror no. 1 is a little bit farther from

15  you than the receptionist was that day?  Oh no.  I'm sorry --

16  yes.  You are saying juror no. 1 is a little farther from you

17  than the receptionist was from you that day.  Is that your

18  testimony?

19           THE WITNESS:  I would say the receptionist -- the

20  receptionist would be a little bit farther than that distance.

21           THE COURT:  The receptionist was farther from you than

22  juror no. 1?

23           THE WITNESS:  Correct.

24           THE COURT:  OK.  Now I understand.  Thank you.

25  BY MR. FEE:

O6C5men1                          Uribe - Cross

1   Q.  You don't remember anyone else being present in the lobby

2   other than you, Senator Menendez, and the receptionist; fair?

3              MS. POMERANTZ:  Objection.

4              THE COURT:  I will allow it.

5              Was anybody else in the lobby at that time, to your

6   recollection.

7              THE WITNESS:  There was nobody else, to my

8   recollection.

9   Q.  And so you could not rule out that the receptionist might

10  overhear some of this conversation; correct?

11             MS. POMERANTZ:  Objection.

12             THE COURT:  Sustained.

13  Q.  In any event, the receptionist wasn't too far away and you

14  had a brief conversation with Senator Menendez; correct?

15             MS. POMERANTZ:  Objection.

16             THE COURT:  Well, the receptionist was however far

17  that he said she was.

18             Was your conversation with Senator Menendez brief?

19             THE WITNESS:  Very brief.

20  Q.  He told you things looked promising and that was about it;

21  right?

22  A.  Told me that you asked me about doesn't seem to be nothing

23  there and it looks promising.

24  Q.  And so in this event, where there is the receptionist also

25  in the lobby, there is no reference to saving your ass; right?

1          MS. POMERANTZ:  Objection.

2          THE COURT:  No, I will allow it.

3          Did the Senator, in that meeting, make any reference

4    to his saving your ass?

5          THE WITNESS:  No, your Honor.

6    Q.  No recollection of him ringing a little bell during this

7    meeting?

8          MS. POMERANTZ:  Objection.

9          THE COURT:  Sustained.

10         Please, Mr. Fee.  The little bell is on the table on

11   the patio, it is not on the reception desk.  Proceed.

12   Q.  And then you remember texting your friend George afterwards

13   what we just looked at, that there was nothing final, that it

14   was positive; right?

15   A.  Yes, sir.

16   Q.  So you would agree that Senator Menendez, during this brief

17   interaction, did not promise any outcome for the investigation

18   about which you were concerned, Mr. Uribe?

19         MS. POMERANTZ:  Objection.

20         THE COURT:  I will allow it.

21         Did Mr. Menendez promise anything in that very brief

22   conversation?

23         THE WITNESS:  Your Honor, with respect to you and the

24   Court, would I like to repeat, the words "promise" was not used

25   in that conversation and -- can I finish, please?

1           THE COURT:  Of course.

2           THE WITNESS:  And, the best of my recollection, that

3    thing that you asked me about, doesn't seem to be anything

4    there, it looks promising.

5           THE COURT:  Thank you.

6    Q.  So the next encounter you had with Senator Menendez was a

7    celebratory dinner at the River Palm.  Do you remember the

8    dinner at the River Palm, Mr. Uribe?

9    A.  Yes, I do, sir.

10   Q.  And as you understand it, Nadine organized that dinner

11   because she wanted to celebrate her recent engagement to

12   Senator Menendez; right?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  Sustained.

15   Q.  Did you understand that that dinner was for the purpose of

16   celebrating her engagement to Senator Menendez?

17   A.  Give me a minute.  Nadine told me that she would like to

18   see me and share with me her happiness because they got

19   engaged.

20          (Continued on next page)

21

22

23

24

25

O6cWmen2                              Uribe - Cross

1   Q.  And that dinner, as you testified, happened after the

2   October 29, 2019, phone call with Senator Menendez, correct?

3   A.  Yes, sir.

4   Q.  And you brought to that dinner your friend Jorge Martinez,

5   right?

6   A.  Yes, I did.

7   Q.  And you had testified that Jorge Martinez and Senator

8   Menendez enjoyed each other's company, fair to say?

9   A.  They -- they enjoy each other company.  They were very good

10  at throwing jokes at each other, sir.

11  Q.  So two funny guys who liked to tell jokes over a meal?

12          THE COURT:  Sustained.

13          MS. POMERANTZ:  Objection.

14  BY MR. FEE:

15  Q.  And again, the purpose of bringing Jorge Martinez was you

16  wanted everyone to enjoy that dinner, fair to say?

17  A.  I had said before that George Martinez is like a brother to

18  me, like a real close brother to me.  And I like to remind that

19  Jorge Martinez was first on the Sofia's meeting or

20  get-together, where Martinez and the senator were very good at

21  each other throwing jokes and ever, with all due respect to the

22  senator here, made good jokes and Martinez does the same.

23  Might as well bring my good, close brother and have a good time

24  together, celebrating their engagement, sir.

25  Q.  And Jorge Martinez had nothing to do with the deal you had

O6cWmen2                            Uribe - Cross

1   made with Nadine, right?

2           MS. POMERANTZ:  Objection.

3           THE COURT:  I'll allow it.

4   A.  Mr. Martinez, he has nothing to do with my dealing with

5   Nadine.

6   Q.  Your goal is just to leave a good impression and have a

7   good time celebrating this good news at that dinner, correct?

8           MS. POMERANTZ:  Objection.

9           THE COURT:  Sustained.

10  BY MR. FEE:

11  Q.  What was your goal at that dinner, Mr. Uribe?

12  A.  To go celebrate, be happy for friends that got engaged,

13  bring my brother Martinez to come along, make company to me and

14  help me and enjoy the moment and be happy with the senator and

15  throwing to jokes with the senator because they both way better

16  than me on making jokes, sir.

17  Q.  Fair enough.

18      And there was no discussion at that dinner about the

19  arrangement you had made with Nadine, correct?

20  A.  You are correct.

21  Q.  All right.  I just want to jump back to September 5 not to

22  talk about that patio meeting but to ask you what you did

23  before.

24      Do you remember what you did in the hours before you went

25  to 41 Jane Drive on September 5 of 2019?

O6cWmen2                          Uribe - Cross

1    A.  Can I ask you if you looking for any hour before in

2    particular, sir?  Because there was many hours before 11 or 10

3    that I show up at their home.

4    Q.  Fair enough.

5         The one hour before you arrived at 41 Jane, where were

6    you?

7    A.  I was at the Marriott.  I remember being at the Marriott

8    hotel.

9    Q.  And you went to the Glenpointe Marriott in Teaneck, New

10   Jersey, for about one hour before you arrived at 41 Jane,

11   correct?

12   A.  Don't have the correct recollection of the amount of time,

13   but it could be in that range of time, yes.

14        MR. FEE:  Let's look at Government Exhibit 1325 in

15   evidence, row 12, please.  Let's start at 11 and go down to 14.

16   Q.  See here in row 11, September 5 at 8:43 p.m., Nadine tells

17   you, we will have cigars and I have Grand Marnier but no beer,

18   and she gives that address and it continues.

19        Do you see that, Mr. Uribe?

20   A.  I'm looking at it, sir.

21   Q.  Yes, sir.  Let me know when you're done.

22   A.  I see it.

23   Q.  And at row 12, at 9:03 p.m., you write to Nadine, I stop at

24   the Marriott.  Do you see that?

25   A.  Yes.

O6cWmen2                        Uribe - Cross

1   Q.  And then at 10:16 p.m., the same night, you tell Nadine, I

2   am here.  That's a reference to arriving at 41 Jane?

3   A.  Correct.

4   Q.  About how far, if you know, is the Glenpointe Marriott from

5   41 Jane Drive in Englewood Cliffs, by driving, by car?

6   A.  I cannot estimate a distance, sir.  A mile, half a mile,

7   ten minutes.  I would be lying.  The purpose why I stop at the

8   Marriott is because it's close, closer to Nadine home than

9   running from my office into Nadine's home.

10  Q.  So fair to say you spent roughly, approximately one hour at

11  the Glenpointe Marriott before you get to 41 Jane Drive?

12          MS. POMERANTZ:  Objection.

13          THE COURT:  I'll allow it, if he has a recollection.

14          Do you recall how long?  After this discussion, do you

15  now recall how long you were at the Glenpointe Marriott?

16          THE WITNESS:  Your Honor, I like to say it's fair to

17  say that I do not time myself as of the amount of minutes I

18  spend at the Marriott before I move over to Nadine's home, sir.

19          THE COURT:  OK.  Can you estimate it?  I don't want

20  the jury to have a guess.  If you can't estimate it, you can't

21  estimate it.

22          THE WITNESS:  The best way that I can put it, your

23  Honor, would be give and take an hour time.

24          THE COURT:  OK.  Give or take an hour.

25  BY MR. FEE:

1    Q.  And when you said you stopped at the Glenpointe Marriott,

2    you went to the bar at the Glenpointe Marriott, correct?

3    A.  Yes.

4    Q.  And in fact, would you characterize yourself as a regular

5    at the bar at the Glenpointe Marriott?

6    A.  I don't like the characterization the way you made it

7    sound, but I will say that I have been at the Glenpointe

8    Marriott a number of times.

9    Q.  And the Glenpointe Marriott is actually the place you

10   testified about having one of the early meetings about this

11   arrangement with Will Hana, Elvis Parra and Bien Hernandez,

12   correct?

13   A.  I agree with you, sir.

14   Q.  And you said at that meeting you actually discussed how

15   much Elvis and Bien would pay Will for help stopping and

16   killing the investigation, is that fair?

17   A.  That is fair to say.

18   Q.  And so that discussion happened at a bar, right?

19   A.  Yes.

20   Q.  And a bar is a public place, you would agree?

21   A.  Yes.

22   Q.  When you had that first discussion with Will, Elvis and

23   Bien, do you remember if there was anyone else at the bar,

24   other customers, other patrons?

25   A.  Best answer I can give you is I recall that we were not by

O6cWmen2                          Uribe - Cross

1    ourselves in the entire bar.

2    Q.  And sir, would you agree with me that a bar or a restaurant

3    is actually a good place to have discussions about an illicit

4    agreement?

5              THE COURT:  Sustained.

6              MS. POMERANTZ:  Objection.

7    BY MR. FEE:

8    Q.  Do you remember testifying that there were times when you

9    were at a dinner with Senator Menendez where you felt it wasn't

10   the appropriate setting to discuss your deal with Nadine?

11   A.  Yes.

12   Q.  And would you agree that you discussed the details of this

13   arrangement with Will Hana, Elvis Parra and Bien Hernandez at a

14   public place, the bar, at the Glenpointe Marriott?

15   A.  Assuming that you are not being at that Glenpointe Marriott

16   bar or lounge, that ambience, on this particular day, was not

17   as crowd and loud and a smoking cigar like the place of Sofia,

18   where I had a chance to meet with Nadine, the senator,

19   Mr. Martinez, myself.  This two ambience were not the same.

20   Q.  In any event, you're certain that at that dinner at the

21   Sofia, as you've testified, there was no discussion of the

22   details of your arrangement with Nadine, correct?

23   A.  And I sustain that, sir.

24   Q.  So this Glenpointe Marriott, do you recall that between

25   2018, 2019, you went there at least once a month?

O6cWmen2                         Uribe - Cross

1   Approximately.

2   A.  OK.  I will -- I will like to say I went to the Marriott a

3   number of times.  If I tell you that it was once a month or

4   twice a month or I spent two months without going, that will be

5   my best answer to you, sir.

6   Q.  And your best estimate, when you went to the Glenpointe

7   Marriott, you would spend between $50 to $200 at the bar each

8   time, correct?

9   A.  I did not took the time to calculate how much money I spend

10  in each one of my visits, sir.

11  Q.  Well, it is fair to say you went to the Glenpointe Marriott

12  bar to drink, right?

13  A.  I tell you what will be fair to say to your question.

14  You're referring to the night before getting to Nadine's home?

15  Q.  My question to you is that the times you went to the

16  Glenpointe Marriott bar, you went there to have drinks,

17  alcoholic drinks?

18  A.  I went there to meet with acquaintances and very dear

19  friends of mine, such Andy Aslanian, because he lives very

20  close to that particular place.  And yes, we had a cocktail

21  after work.

22  Q.  What is your relationship to the company called Route One

23  Transport Inc.?

24  A.  It's the company that I manage, control and is registered

25  to my sister Raisa Uribe.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  You use a debit card associated with Route One Transport

2    Inc.'s TD Bank checking account, right?

3    A.  Yes, I had a debit card from TD Bank.

4    Q.  And sometimes when you went to the Glenpointe Marriott to

5    have drinks with friends or associates, you would pay using

6    your Route One Transport Inc. debit card, correct?

7    A.  You are correct.

8             MR. FEE:  Could we show the witness and the lawyers

9    what's been marked as DX 1115 -- '14, excuse me.  1114.

10   Q.  Mr. Uribe, without reading it aloud, do you see that this

11   is a TD Bank statement?

12   A.  That a way you can blow it up a little bit?

13            MR. FEE:  Can you blow up the top third, Mr. Kelly.

14   The top third, Mr. Kelly.

15            Thank you.

16   Q.  Do you see the name TD Bank there?

17   A.  Yes, I do, sir.

18   Q.  Do you see statement of account?

19   A.  Yes, I see it.

20   Q.  And you see the name Route One Transport Inc. operating

21   account?

22   A.  As well.

23            MR. FEE:  Your Honor, may I approach to hand him

24   exhibits?

25            THE COURT:  Yes.

O6cWmen2                           Uribe - Cross

1              MR. FEE:  I'll give a copy to the government.

2              Just take a moment and look at that.

3              THE WITNESS:  Can I ask you, sir, something?

4              MR. FEE:  No.  No, I don't want you to talk about the

5    exhibit.  It's not in evidence.  I'll ask you questions when

6    you have had a chance to look at it.

7              Mr. Kelly, could we go to page 2 of that exhibit, just

8    to highlight the purpose here.  The entry on 2/02, blow that

9    up, the $40 one.  Can you highlight that.

10             Your Honor, we're going to offer this.  It is a

11   selection of charges on this account for that entity that's

12   highlighted.

13             THE COURT:  You're going to offer this line?

14             MR. FEE:  This exhibit is a collection of portions of

15   the statements where there are charges at that place, and it's

16   been authenticated through stipulation marked as Government

17   Exhibit 1405.  And we're offering this for impeachment

18   purposes, your Honor.

19             MS. POMERANTZ:  Your Honor, we are just -- we need a

20   chance to go through all of it.

21             THE COURT:  All right.  Go ahead.

22             MS. POMERANTZ:  OK.  Thank you.

23             THE COURT:  How much longer do you have, Mr. Fee?

24             MR. FEE:  I'll keep going, your Honor.  About a half

25   hour, I'd say.

1           THE COURT:  Go ahead.  Keep going.

2           I'm sorry, Mr. Fee.  Wait.

3           MS. POMERANTZ:  Your Honor, we don't have an

4   objection, but we might have proposed redactions.  We would

5   need an opportunity to confer with the defense.

6           THE COURT:  All right.

7           MR. FEE:  May I show just what's on this screen then

8   for the witness and the jury?  And nothing else.

9           THE COURT:  Government.

10          MS. POMERANTZ:  No objection.

11          THE COURT:  All right.  Go ahead.

12          MR. FEE:  Mr. Kelly, can you publish it.

13          THE COURT:  Right now I'm not admitting it.

14          Go ahead.

15  BY MR. FEE:

16  Q.  Mr. Uribe, if you just look at what's on your screen, fair

17  to say that this is a statement from your Route One Transport

18  Inc. TD Bank operating account?

19  A.  It is a copy of my statement with TD Bank account.

20  Q.  And you see here, from a date in February, a debit card

21  purchase at the Marriott Teaneck in Teaneck, New Jersey, and

22  that one's for $40?

23  A.  Yes.

24          MR. FEE:  We can put that down, Mr. Kelly.

25  Q.  Mr. Uribe, do you have any recollection of how much money

O6cWmen2                          Uribe - Cross

1   you spent at the Glenpointe Marriott bar between 2018 and 2020?

2   A.  I have no idea.

3   Q.  Are you able to offer any sort of estimate?

4   A.  I didn't understand your question.

5   Q.  Are you able to estimate how much money you spent at the

6   Glenpointe Marriott bar using this Route One Transport card

7   between 2018 and 2020?

8   A.  I don't have a way to do that.

9   Q.  Do you remember that you stopped at the Marriott on

10  September 5, 2019, to first have some beer before you went to

11  the meeting at 41 Jane?

12  A.  I remember I stop at the Marriott before I went there, and

13  you have just said to have some beers.  I remember at least

14  having a beer before going there.

15  Q.  So you spent, you said, give or take, an hour there, and

16  your testimony is you had one beer?

17  A.  Yes.

18          MS. POMERANTZ:  Objection.

19          THE COURT:  No.  I'll allow that.

20  A.  Yes, best of my recollection.

21  Q.  And then after you spent an hour at the Glenpointe Marriott

22  bar, you drove to Nadine's house, you said, a relatively short

23  distance away, correct?

24  A.  Yes.

25  Q.  And sir, have you driven drunk before?

1              MS. POMERANTZ:  Objection.

2              THE COURT:  Sustained.

3    BY MR. FEE:

4    Q.  During this time in your life, in 2019, isn't it correct

5    that you would go out to dinner about twice a week and, at

6    those dinners, have more than three or four drinks?

7    A.  Would you repeat a time that you referring to?

8    Q.  Sure.

9              Isn't it correct that during this time period, in

10   2019, in general, you would go out to dinner about twice a

11   week, and during those dinners you would have more than three

12   or four drinks?

13   A.  I will go out during this period of time and perhaps

14   periods before that or after; I often go out for dinner.  I do

15   not count the number of drinks.  On average is one to two beer.

16   Q.  You don't remember telling these prosecutors that you would

17   go out and have more than three or four drinks?

18   A.  In occasion.

19   Q.  So you sometimes would have more than three or four drinks?

20   A.  Yes.

21   Q.  And you also sometimes would leave dinner drunk, right?

22   A.  I have -- I have -- yes, I have been drunk.  Yes.

23   Q.  And during 2018 and 2019, you were also using the drug

24   Xanax, correct?

25   A.  I sometime use Xanax when I have a stomachache, yes.

O6cWmen2                              Uribe - Cross

1    Q.  You didn't have a prescription for Xanax, but you got it

2    from one of your family members, right?

3    A.  Yes.

4    Q.  And you have, what you did was when you felt stressed, you

5    would take Xanax, correct?

6    A.  Sometime I use Xanax in the morning when I'm stressed, yes.

7    Q.  And you were very stressed out during the time that these

8    investigations were happening, correct?

9    A.  Yes.

10   Q.  And in fact, almost every time you saw Senator Menendez,

11   you had been drinking heavily before you saw him, isn't that

12   correct?

13   A.  That is incorrect, sir.

14   Q.  Well, you drank before you saw the senator at Nadine's home

15   on September 5, 2019, right?  Correct, sir?

16   A.  This is the way I like to answer your question, if you

17   allow me.

18           If you using this exhibit where $40 was spent on

19   two -- two -- two of 2018, I like to remind you that my meeting

20   at Nadine's home happened on 2019.  So is that your basis for

21   me being drunk before I got to Mr. Menendez home?

22   Q.  My question is you spent an hour at the Glenpointe Marriott

23   bar --

24   A.  Yes.

25   Q.  -- before you went to 41 Jane, correct?

O6cWmen2                    Uribe - Cross

1    A.  That is correct.

2    Q.  And you had at least, as you said, one beer at the bar

3    before you went over, right?

4    A.  That is correct.

5    Q.  And then as you were leaving 41 Jane, the senator actually

6    expressed concern about your level of intoxication, right?

7              MS. POMERANTZ:  Objection.

8              THE COURT:  Sustained.

9              MR. FEE:  Basis.

10             THE COURT:  Is there a factual basis for your

11   question, sir?

12   BY MR. FEE:

13   Q.  Do you remember hearing this question and giving this

14   answer during direct, Mr. Uribe:

15   "Q. And what happened next?

16   "A. At this time Mr. Menendez suggested I should be going.  He,

17   we just had a glass of Grand Marnier and he advised me that

18   area was, has a lot of cops and it would be smart for me not to

19   be drinking and driving in that area."

20             Do you remember giving that testimony to this

21   prosecutor during direct, Mr. Uribe?

22   A.  I do remember that 100 percent, sir.

23   Q.  And isn't it the case that you were visibly intoxicated

24   when you came to see Senator Menendez on September 5?

25   A.  Incorrect, sir.

1           MS. POMERANTZ:  Objection.

2           THE COURT:  Just a moment.

3           Were you intoxicated when you went to 41 Jane Drive on

4    September 5, 2019?

5           THE WITNESS:  No, your Honor.

6           THE COURT:  All right.  Next question.

7    BY MR. FEE:

8    Q.  You also were drinking heavily when you saw --

9           THE COURT:  Sir, go ahead.

10   BY MR. FEE:

11   Q.  You also were drinking heavily when you saw the senator and

12   Nadine at Sofia's restaurant on May 3, 2019, isn't that

13   correct, sir?

14   A.  I will not say that, sir.

15   Q.  Well, the purpose for you to go to Sofia's restaurant was

16   to get a drink, right?

17   A.  The purpose was I had sat in the bar for Nadine to spend

18   some time with them, and we had drinks.

19   Q.  Do you remember getting this question and giving this

20   answer:

21   "Q. Directing your attention to row 17 of an exhibit Nadine

22   responds just got out of meeting.  Do you want to have cigar or

23   drink with Bob?  Mr. Uribe, who did you understand Bob to be?

24   "A. Senator Menendez.

25   "Q. Directing your attention to the next row, what was your

O6cWmen2                        Uribe - Cross

1    response?

2    "A.  Let's have a drink."

3          Do you remember giving that answer during direct?

4    A.  Yes, I do.

5    Q.  And so you could have said, you agree, in response to

6    Nadine I would rather have a cigar in private at your home,

7    Nadine, with Bob, right?

8          THE COURT:  Sustained.  He could have said anything.

9          Next.

10   BY MR. FEE:

11   Q.  You didn't choose to go have a cigar at 41 Jane; you chose

12   to go have a drink at Sofia's, right?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  I'll allow it.

15   A.  At this point, sir, Sofia period, I don't have any -- let

16   me find the right word for a minute, with your permission.

17          I don't have any, such a good friendship or such a

18   level of -- I can't find the right word in English to say right

19   now, but I know what I'm trying to say.  In other words, I not

20   somebody to tell Nadine instead of meeting at a bar for a

21   cigar, let me go to your house.  I am not that kind of person,

22   sir, nor I have that kind of -- geez, the right word don't come

23   up.

24      I don't have that friendship at that level to say somebody

25   let me go and go to your house and have a cigar.  Plus that's

O6cWmen2                          Uribe - Cross

1    not my kind of person I am.  I'm not somebody to be at

2    somebody's house that often, sir.

3    Q.  So your testimony is that you passed up a meeting in

4    private with Senator Menendez and chose instead to go to

5    Sofia's?

6            THE COURT:  Sustained.

7            MS. POMERANTZ:  Objection.

8    BY MR. FEE:

9    Q.  You also were drinking when you had dinner with the senator

10   and Nadine at Il Villaggio on August 7, 2019, isn't that

11   correct?

12   A.  Yes, we had dinner and drink.

13   Q.  And you had testified that this was the first time, this

14   dinner, that you actually expressed your concerns to Senator

15   Menendez about your family, about Prestige trucking, and about

16   Phoenix at that dinner, right?

17   A.  Yes.

18   Q.  And you also recall that that conversation only came after

19   you had started drinking at that dinner, right?

20   A.  I don't remember making a statement where I said what did I

21   do first, talk or drink, or have a drink with Mr. Menendez.

22           MR. FEE:  Let's show the witness what's marked as

23   3542-033.  I think it's page 11, the top of page 11.  Zoom in

24   on that top paragraph, and it's the fourth sentence from the

25   end I'd ask you to highlight, Mr. Kelly.

O6cWmen2                              Uribe - Cross

1          You can read the entire thing, of course, Mr. Uribe,

2     but let me know when you're done.

3          THE WITNESS:  You were going to highlight a

4     particular --

5          MR. FEE:  Yeah, yeah.

6          Got it, Mr. Kelly?  There we go.  Just that one

7     sentence.  That's fine.  Go ahead.

8          THE WITNESS:  I read it.

9          MR. FEE:  Thank you.

10    Q.  Does this refresh your recollection that you did not

11    express your concerns about Prestige and Phoenix at that dinner

12    until after you had your first drink?

13    A.  Yes.

14         THE COURT:  And what is your refreshed recollection?

15    What do you now remember?

16         THE WITNESS:  Your Honor, it refresh the recollection

17    that we had a drink before we entered into details of a

18    conversation.

19         THE COURT:  All right.  Thank you.

20    BY MR. FEE:

21    Q.  And you also were drinking in the summer of 2020 when you

22    saw the senator, Nadine and Nadine's daughter at a restaurant

23    called Segovia, correct, Mr. Uribe?

24    A.  I had a drink or I was -- I had a drink, yeah, on that

25    dinner as well.

O6cWmen2                         Uribe - Cross

1    Q.  Right.  Well, during your direct, you testified that you

2    went to see Nadine at Segovia's.  Do you remember stating that?

3    A.  Refresh -- ask me the question again, please?

4    Q.  Sure.

5            During your direct testimony with the prosecutor, do

6    you remember testifying that you went to see Nadine at

7    Segovia's?

8    A.  Yes.

9    Q.  And I don't think this came up during -- well, let me ask

10   you.

11           But isn't it true that before you actually joined

12   Nadine and her family at the table, you were already at

13   Segovia's drinking with a friend?

14   A.  I was at Segovia, and I had a cocktail with a friend, yes.

15   Q.  So you were already at Segovia having, you said, a cocktail

16   with a friend and then joined Nadine, her daughter and Senator

17   Menendez, correct?

18   A.  Yes.

19   Q.  And sir, in your recollection, were you intoxicated when

20   you joined their meal?

21   A.  Not to my recollection.

22           And if I may add, sir, in the one, two or three dinners or

23   private dinners with the senator or meetings with the senator,

24   I did not recall being intoxicated before I air my

25   conversations with the senator.  In fact, if you allow me to

O6cWmen2                         Uribe - Cross

 1    finish, one of the main reasons is, out of respect too, the

 2    senator's not even a heavy drinker himself.  The gentleman,

 3    what I have noticed, among other things I notice when I have

 4    dinner with him, had at least, the most two drink, and usually

 5    just one.  I am not sitting with a U.S. senator to discuss a

 6    serious matter when I'm intoxicated, sir.

 7    Q.  So that's why you drank before you saw him, right?

 8            MS. POMERANTZ:  Objection.

 9            THE COURT:  Sustained.

10    A.  That's not what I said.

11            THE COURT:  Sustained.

12    BY MR. FEE:

13    Q.  In your experience, sir, what effect does it have on your

14    memory when you use Xanax and alcohol at the same time?

15            MS. POMERANTZ:  Objection.  Misstates.

16            THE COURT:  Yes.

17            When you used Xanax, sir, what time of day was it

18    usually?

19            THE WITNESS:  When I wake up in the morning at home.

20            THE COURT:  Is that always when you use Xanax?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  All right.

23            THE WITNESS:  That's my rule.

24            THE COURT:  Proceed.

25    BY MR. FEE:

O6cWmen2                          Uribe - Cross

1   Q.  This dinner at Segovia's, you testified, was when the

2   senator told you that he had saved your ass -- specifically,

3   you said he used the word *culito*; that was your testimony,

4   right, sir?

5   A.  Yes, sir.

6   Q.  And you also testified that that dinner, that comment was

7   made in the summer of 2020, right?

8   A.  Best of my recollection, yes.

9   Q.  So between the time you had the conversation by phone in

10  October of 2019 with the senator, it had almost been nine to 12

11  months until this dinner at Segovia, right?

12  A.  I like to say something over ten months may be comfortable,

13  over, over eight months.

14  Q.  Eight months?

15  A.  Yeah.

16  Q.  And based on your testimony and your recollection, sir, you

17  had no conversations with Senator Menendez at all about the

18  investigation about which you had expressed concern between

19  October 29 and this summer 2020 dinner at Segovia, right?

20  A.  You are correct.

21  Q.  But then in the summer of 2020, you're drinking at Segovia,

22  Nadine is there and you join their meal, right?

23          MS. POMERANTZ:  Objection.  Compound.  Misstates.

24          THE COURT:  I'll allow that.

25  BY MR. FEE:

O6cWmen2                          Uribe - Cross

1    Q.   Do you disagree with anything I just described about that

2    sequence of events, Mr. Uribe?

3              THE COURT:  Sustained.  Ask your question, sir.

4    BY MR. FEE:

5    Q.   The summer of 2020, Mr. Uribe, you're at Segovia having a

6    drink with a friend?

7              THE COURT:  Is that correct so far?

8              THE WITNESS:  Yes, it is.

9              THE COURT:  Go ahead.

10   BY MR. FEE:

11   Q.   Nadine is there having a meal with the senator and her

12   daughter, correct?

13   A.   Nadine and the senator.  And Sabine, Nadine's daughter,

14   showed up after I was there.

15   Q.   And then you joined them for the meal, is that your

16   testimony?

17   A.   I was invited to have dinner, yes.

18   Q.   They invited you over to eat with them?

19   A.   Yes.

20   Q.   And then your testimony is that at some point Nadine and

21   her daughter get up and go to the bathroom, right?

22   A.   Yes.

23   Q.   And that's when you get -- excuse me.

24             That's when you describe the senator saying to you, I

25   saved your *culito* not once but twice; that was your testimony,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6cWmen2                          Uribe - Cross

1    right?

2    A.   Yes.

3    Q.   And during this exchange about *culito*, was there a waiter

4    nearby?

5    A.   Not to my recollection.

6    Q.   Were there any other diners, let's say, closer than an

7    arm's length to Senator Menendez?

8    A.   Not to my recollection.

9    Q.   And after you heard this comment eight months after your

10   last interaction with Senator Menendez about this, did you

11   leave the restaurant and share with any of your friends -- or

12   anyone -- what had just happened?

13   A.   Don't have a correct recollection of doing that, no.

14   Q.   You don't recall texting, say, Elvis Parra or Ana Peguero

15   that the senator just remarked that he saved my ass?

16   A.   You are correct.

17   Q.   You would agree that there's no record, to your knowledge,

18   of this 30-second or so interaction beyond your memory, sir?

19               THE COURT:  Sustained.

20               MS. POMERANTZ:  Objection.

21               THE COURT:  How much longer do you have, sir?

22               MR. FEE:  Ten minutes, your Honor.

23               THE COURT:  All right.  Let's go.

24               There is a record of this interaction, sir.

25               Go ahead.

O6cWmen2                              Uribe - Cross

1              MR. FEE:  Let's move very briefly back to one point

2     Mr. Solano made just to admit an exhibit.  Let's put up just

3     for the witness and the attorneys what's been marked as DX

4     1037.

5     Q.  Mr. Uribe, you remember testifying with Mr. Solano about

6     the hearing where you testified in New Jersey in 2011; do you

7     remember that?

8     A.  Yes, I did.

9     Q.  And your testimony, I believe, was that you did not recall

10    testifying in that 2011 proceeding that you were married,

11    right?

12    A.  You're referring a testimony I made one -- when?

13    Q.  Let me ask you directly.

14         Do you remember testifying at this 2011 New Jersey State

15    court proceeding where you were trying to restore your

16    insurance license?

17    A.  This proceeding in 2011, it was not about the restoration

18    of my license.

19    Q.  Tell me what it was about.

20    A.  Best I recall this when I was being accused by the

21    commissioner of the charges of insurance fraud.  It's my

22    understanding that this is the hearing about.

23    Q.  And this is in 2011, right?

24    A.  That's correct.

25    Q.  And do you recall testifying under oath at that proceeding?

O6cWmen2                        Uribe - Cross

1    A.  Yes.

2    Q.  You divorced your wife in 2009, correct?

3    A.  You are correct.

4    Q.  Do you remember stating under oath at that hearing that you

5    were, in fact, married?

6    A.  I don't have a recollection so that a statement, but if you

7    allow me, I can ask, please?

8          THE COURT:  What do you want to say, sir?

9          THE WITNESS:  Sir, I divorced my wife in 2009.  I

10   never left my house.  We never separated.  And in fact,

11   yesterday I remember being asked a question what I just said,

12   my wife, because as of today I've been together with the mother

13   of my kids for 40 years.

14         MR. FEE:  Understood, Mr. Uribe.

15         Your Honor, we offer DX 1037, and I can provide a copy

16   to the government.  It's just the portions that contain the

17   relevant statement.  We would only offer the cover and portions

18   of pages 21 through 25.  I don't need to publish it right now,

19   your Honor.

20         I'm sorry.  It's portions of 21 through 25 and page 33

21   of the exhibit.

22         MS. POMERANTZ:  Your Honor, we object.  It's not

23   inconsistent with his testimony, and it's a multiple-page

24   exhibit with far more than what he was just asked about.  And

25   it's not permitted under Rule 608(b).

O6cWmen2                          Uribe - Cross

 1              MR. FEE:  I'm happy to propose a redacted version and

 2      deal with it after this is all done, your Honor.

 3              THE COURT:  We'll deal with it at a break.

 4      BY MR. FEE:

 5      Q.  The conclusion of that proceeding in New Jersey State court

 6      was that there was a consent order signed by you, right?

 7      A.  Yes.

 8      Q.  And the consent order stated that you may not be a partner,

 9      officer, director, or owner of a licensed insurance producer.

10      Do you remember that?

11      A.  Yes.

12      Q.  And your understanding of that, that you offered during the

13      direct testimony, was that that meant you cannot operate a

14      licensed insurance business in New Jersey, right?

15      A.  Correct.

16      Q.  But when you first -- in your meetings with the government,

17      you falsely stated that you thought it was only a five-year ban

18      on you operating an insurance business, right?

19              MS. POMERANTZ:  Objection.

20              THE COURT:  Did you tell the government that it was a

21      five-year ban on you operating in the insurance business?

22              THE WITNESS:  That was my understanding.

23              THE COURT:  All right.  Thank you.

24              THE WITNESS:  Yeah.

25      BY MR. FEE:

O6cWmen2                          Uribe - Cross

1   Q.  So you offered that understanding to the government once or

2   more than once during your meetings?

3   A.  I don't have a recollection of the number of times.

4   Q.  And when you said that to the government, my understanding

5   is I was banned for five years, the government -- they

6   challenged you about the accuracy of that, fair to say?

7             MS. POMERANTZ:  Objection.

8             THE COURT:  Sustained as phrased.

9   BY MR. FEE:

10  Q.  Well, they responded and said something to the substance

11  of, Mr. Uribe, we don't think that's accurate.  Is that fair?

12            MS. POMERANTZ:  Objection.

13            THE COURT:  I'll allow it.

14  A.  I don't have a recollection of the answer from the

15  government.

16  Q.  Understood.

17            You said -- you offered your understanding it was a

18  five-year ban, but on the witness stand during direct, you did

19  not say that was your understanding, right?

20  A.  I don't remember at -- being asked the question in the

21  witness stands, and I don't remember my answer neither.

22  Q.  I'm going to be very direct.

23      Sitting here today, do you think that was a five-year ban

24  or a lifetime ban?

25  A.  Sitting here right now, when I lost my license in 2011,

1    without breaking my privilege with my lawyer, I was told, I

2    understood, that after five years I have a right to apply for

3    my license.

4    Q.   Did that understanding change after you started meeting

5    with the prosecutors?

6    A.   No, sir.

7    Q.   So sitting here today, do you think you have a lifetime ban

8    or a five-year ban on operating a licensed insurance business

9    in New Jersey?

10   A.   According to my understanding, there's a federal rule that

11   was explained to me and ask -- I seen both of the discussion

12   with lawyers, I think it's privileged.

13   Q.   I'm not asking about any privilege.  Here's my question.

14          Did your discussions with the prosecutors cause you to

15   change your understanding of the duration of the ban?

16   A.   Yes.

17   Q.   How?  What did they say that changed your understanding?

18   A.   It was not the prosecutors that brought it in.  It was

19   conversations with my attorney.

20          MR. FEE:  I don't want to hear about those, Mr. Uribe.

21   I'm going to cut you off.

22          THE COURT:  As you sit here now, sir, what is your

23   current understanding of the ban in New Jersey?  Is it in

24   effect now?

25          I'm sorry.  Is your current understanding that the New

1   Jersey entity imposed a lifetime ban on you or a five-year ban

2   on you or something else?

3            THE WITNESS:  Are we limiting this question to the

4   understanding of the state of New Jersey?  Because I have other

5   understanding, sir.

6            THE COURT:  What is your understanding?

7            THE WITNESS:  My understanding is during the meetings

8   with counsel, there is a federal law out there that prohibit me

9   from being in the insurance industry for which I have no

10  knowledge of, sir.

11           THE COURT:  All right.

12  BY MR. FEE:

13  Q.  Briefly, Mr. Uribe, you testified on direct that you had

14  your prior attorneys go meet with the government and tell them

15  that you had not evaded paying taxes?  Is that your

16  understanding, there was a meeting between your attorneys and

17  the government where your attorneys conveyed that information?

18  A.  I will ask -- ask you to please ask me the question again,

19  please.

20           THE COURT:  Just a moment.

21           MR. FEE:  Yes.

22           THE COURT:  If you know, did your prior attorneys tell

23  the government that you had not evaded paying taxes?

24           THE WITNESS:  I don't have a recollection of what they

25  conveyed to the --

O6cWmen2                          Uribe - Cross

1              THE COURT:  OK.

2    BY MR. FEE:

3    Q.  You do recall, I believe you testified, attending a meeting

4    where the prosecutors explained to you some of the evidence the

5    prosecutors had that was going to prove you had evaded taxes?

6    A.  I recall the meeting.

7    Q.  And after that meeting, you changed your position, fair to

8    say?

9    A.  That is unfair to say.

10   Q.  Well, after that meeting, you eventually pled guilty to

11   committing the crime of tax evasion at some point, correct?

12   A.  I going to help you be more specific with your question.  I

13   pled guilty to tax evasion after I was charged with federal

14   crimes in September.  Then I change attorneys, and that

15   conversation with my attorneys will be privileged.

16   Q.  And part of the reason that you, sir, decided to plead

17   guilty to tax evasion was because the prosecutors had presented

18   to you the evidence to prove that you had done it, right?

19   A.  It was advised by my attorney and it will be privileged.

20              MR. FEE:  Don't tell me about your attorney's advice,

21   sir.

22              THE COURT:  Why did you plead guilty to tax evasion,

23   sir?

24              THE WITNESS:  Because I was guilty, sir.

25              THE COURT:  All right.

O6cWmen2                          Uribe - Cross

```
1    BY MR. FEE:
2    Q.  Last few questions.  When this case was first indicted, you
3    understood that the defendant listed on the top of the
4    indictment was Senator Menendez, right?
5              MS. POMERANTZ:  Objection.
6              THE COURT:  Sustained.
7    BY MR. FEE:
8    Q.  Did you have any understanding of the focus of the
9    government's indictment?
10             THE COURT:  Same ruling.  Sustained.
11   BY MR. FEE:
12   Q.  Sir, did you come to understand during your meetings with
13   the prosecutors that they were focused on your interactions
14   with Senator Menendez?
15             MS. POMERANTZ:  Objection.
16             THE COURT:  I'll allow that.
17   A.  My understanding, sir, and my focus was that I was being
18   investigating for my wrongdoings on paying a car for Nadine
19   Menendez.
20   Q.  Sir, your one-on-one interactions with Senator Menendez,
21   you discussed those with the prosecutors at length, correct?
22             THE COURT:  Did you discuss the interactions you had
23   with Senator Menendez with the prosecutors?  Yes or no.
24             THE WITNESS:  Yes, your Honor.
25   BY MR. FEE:
```

O6cWmen2                          Uribe - Cross

1    Q.  And your descriptions of those events, including the

2    backyard patio meeting and this one-on-one conversation that

3    you claim happened at Segovia, did the prosecutors ever

4    challenge those accounts?

5             MS. POMERANTZ:  Objection.

6             THE COURT:  Sustained.

7    BY MR. FEE:

8    Q.  Did the prosecutors ever present evidence to you that

9    contradicted the accuracy of those accounts?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  Sustained.

12   BY MR. FEE:

13   Q.  Sir, do you remember any conversations with the prosecutors

14   where you saw evidence that contradicted the account you've

15   offered here?

16            MS. POMERANTZ:  Objection.

17            THE COURT:  Sustained.

18   BY MR. FEE:

19   Q.  Mr. Uribe, is your goal here to do anything necessary to

20   protect you and your family?

21            THE COURT:  Sustained.

22            MS. POMERANTZ:  Objection.

23            MR. FEE:  Your Honor, nothing further.

24            THE COURT:  Ladies and gentlemen, 15-minute break.

25            (Continued on next page)

O6cWmen2                              Uribe - Cross

1                    (Jury not present)

2                    THE COURT:  If you would step out, sir; you may step

3     down.

4                    (Recess)

5                    THE COURT:  Put the witness on the stand, please.

6                    Do you have an estimate on your redirect?

7                    MS. POMERANTZ:  I don't, but I don't expect it to be

8     lengthy.

9                    THE COURT:  Mr. de Castro, I'll ask you if you have

10    any cross.

11                   MR de CASTRO:  OK.

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.

3          Mr. De Castro, is there any cross-examination on

4     behalf of Mr. Daibes?

5          MR de CASTRO:  We have no cross-examination.

6          THE COURT:  Thank you.

7          Is there any redirect by the government?

8          MS. POMERANTZ:  Yes, your Honor.

9          THE COURT:  Please.

10          THE WITNESS:  Your Honor, with your permission, I left

11     my glasses in the witness --

12          THE COURT:  You left your glasses?  Please go ahead

13     and get them -- oh, somebody is doing that.  Let's wait until

14     the witness has his glasses.

15          Thank you.

16          You may proceed.

17          MS. POMERANTZ:  Thank you, your Honor.

18     REDIRECT EXAMINATION

19     BY MS. POMERANTZ:

20     Q.  Mr. Uribe, do you remember being asked questions on

21     cross-examination about whether you lied in your testimony in

22     this court?

23     A.  Yes.

24     Q.  Do you know what other evidence is being presented at this

25     trial?

O6cWmen2                      Uribe - Redirect

1    A.  No.

2    Q.  Do you know what messages beyond those you were shown in

3    testifying have been admitted into evidence at this trial?

4    A.  No.

5    Q.  Do you know who else is testifying for the government?

6    A.  No.

7    Q.  Do you know whether your testimony is consistent or

8    inconsistent with other testimony in the case?

9    A.  I don't know.

10   Q.  Have you seen any cell site records in this case?

11              MR. FEE:  Objection.  Scope.

12              THE COURT:  Sustained.

13              MS. POMERANTZ:  Your Honor, this is a predicate for

14   showing corroboration.  They attacked his credibility.

15              MR. FEE:  Objection.  Scope.

16              THE COURT:  Just a minute.

17              I'll sustain the objection.

18              (Continued on next page)

19

20

21

22

23

24

25

O6C5men3                        Uribe - Redirect

1    BY MS. POMERANTZ:   (Continuing)

2    Q.   Before the defense attorney showed you them on

3    cross-examination, had you seen any of the texts that you were

4    not a part of?

5    A.   No.

6    Q.   More generally, before today did you review text messages

7    that you were not a part of?

8    A.   No.

9    Q.   Do you remember being asked questions about what Menendez

10   said to you at Segovia?

11   A.   Yes.

12   Q.   Do you remember, was there anyone else at the table besides

13   you and Menendez when he made the comment:   That he saved your

14   ass twice.   Not once, but twice.

15   A.   There was nobody else at the table.

16   Q.   Would you remind the jury where Nadine and her daughter

17   went before Menendez said that?

18   A.   They said they were going to the bathroom.

19        MS. POMERANTZ:   I am going to pull up Government

20   Exhibit 1327.   I am going to direct your attention to row 15.

21   First, let me direct your attention to row 7 where you write,

22   on August 8:   How about Segovia.

23        Do you see that?

24   A.   I see that, yes.

25   Q.   You testified on direct that you didn't meet with Robert

1    Menendez and Nadine Menendez and her daughter that night but on

2    August 10th; correct?

3    A.   Correct.

4    Q.   I am going to direct your attention to row 15 where Nadine

5    texts you:  Bob made a reservation.  See you 7:45.

6         Do you see that?

7    A.   Yes, I do.

8    Q.   Is that the night you met with them at Segovia?

9    A.   Yes, it is.

10   Q.   Can you please read the date?

11   A.   August 10, 2020.

12   Q.   We can pull that down.

13        Do you remember being asked questions about the

14   meeting with Robert Menendez in the back yard of 41 Jane Drive,

15   on cross-examination?

16   A.   Yes.

17   Q.   You testified on direct that when you were in the back yard

18   you did not directly tell Menendez that you paid for the

19   Mercedes.  Do you remember testifying on direct examination

20   that you had no doubt to believe that Menendez knew you were

21   paying for the car?

22   A.   Yes.

23   Q.   While you were in the back yard, what did you ask Menendez

24   to do?

25   A.   To look into -- to see if there was an investigation that

1    could have jumped from the ongoing investigation from Prestige

2    Trucking Express and Elvis Parra that could have led to my

3    daughter Ana and to please do anything in his power to stop

4    that investigation and do not let it hurt my family.

5    Q.  Did that relate to part 2?

6    A.  Yes.

7    Q.  And after that meeting in the back yard, what was your

8    understanding of the status of part 2?

9    A.  That I was hoping to get a resolution of the investigation

10   into Prestige, and hopefully that there was nothing against my

11   Ana.

12   Q.  When you went to 41 Jane Drive and met with Robert

13   Menendez, was the Mercedes parked in the driveway?

14   A.  Yes.

15   Q.  Did you then meet with Menendez in the back yard,

16   one-on-one, for an hour?

17   A.  Give and take an hour, yes.

18   Q.  Was Nadine also home at the time?

19   A.  Yes.

20   Q.  Did you see Nadine alone in the driveway before you saw

21   Robert Menendez?

22   A.  Nadine welcomes me to the house to the driveway, yes.

23   Q.  Did she say to you, 'don't say anything to Menendez about

24   how she got the car in the driveway.'

25              MR. FEE:  Objection.  Leading.

1          THE COURT:  Did she say anything in the driveway about

2    the car?

3          THE WITNESS:  No.

4    Q.  Did she say anything in the driveway about the car and

5    whether you should say anything to Robert Menendez?

6          MR. FEE:  Objection.  Leading.

7          THE COURT:  Sustained.

8    Q.  Did you meet with Robert Menendez one-on-one the following

9    day when you went to his apartment building in New Jersey?

10   A.  Yes.

11   Q.  Did you sit alone with him at Segovia when Nadine and her

12   daughter went to the bathroom?

13   A.  Yes.

14   Q.  During each of those times you were alone with Robert

15   Menendez, who was making the payments on the Mercedes for

16   Nadine?

17         MR. FEE:  Objection.

18         THE COURT:  I will allow it.  "At that time" she said.

19         You may answer.

20         THE WITNESS:  I was.

21   Q.  Before any of those one-on-one meetings, did Nadine ever

22   tell you not to tell Menendez that you were making payments on

23   her Mercedes?

24   A.  She never did.

25   Q.  Before any of those one-on-one meetings, did Nadine ever

1  tell you not to talk about certain topics with Robert Menendez?

2  A.  She never did.

3  Q.  Before any of those one-on-one meetings, did Nadine ever

4  tell you to keep any secrets from Robert Menendez?

5  A.  She never did.

6  Q.  Do you recall being asked questions about why you paid for

7  the car?

8  A.  Yes.

9  Q.  Did you pay for Nadine's Mercedes just to meet Robert

10 Menendez or for something more?

11             MR. FEE:  Objection.

12             THE COURT:  I will allow it.

13 A.  I paid for the car as an arrangement with Nadine that I

14 will provide a car, in return for her getting Mr. Menendez to

15 use his power to stop the investigation into Prestige Trucking

16 Express, and perhaps stopping an investigation that could have

17 led into my daughter Ana, and Phoenix Risk Management.

18 Q.  You testified that you paid to get peace.  Do you remember

19 being asked questions about peace on cross-examination?

20 A.  Yes.

21 Q.  Was peace just meeting with Menendez or was peace stopping

22 and killing the investigation?

23 A.  The basis of stopping this investigation and being sure

24 that my daughter was safe.

25 Q.  Do you remember testifying on direct examination that when

O6C5men3                          Uribe - Redirect

1   you met with Menendez at Il Villaggio in August 2019, you told

2   Menendez you wanted peace?

3   A.  Yes.

4   Q.  You also testified that you met with Menendez in the

5   backyard of 41 Jane Drive.  When you were in the backyard, did

6   Menendez say that you had peace now?

7   A.  No.

8   Q.  When Menendez met with you in the lobby of his apartment

9   building, did Menendez say:  You have peace now?

10  A.  No.

11  Q.  When did Menendez say he gave you your peace?

12  A.  When he called me from his office in Washington, D.C.

13  Q.  And on that call, how did you respond?

14  A.  In substance:  Thank you.

15  Q.  On that call when you said thank you, did Menendez ask you

16  what you were thanking him for?

17  A.  No.

18  Q.  Do you recall being asked questions about what you said to

19  the government about the Mercedes payment and whether they were

20  loans?

21  A.  Ask me that question one more time?  I'm sorry.

22  Q.  Do you recall being asked questions about what you said to

23  the government about the Mercedes payments and whether they

24  were loans?

25  A.  Yes.

O6C5men3                          Uribe - Redirect

1    Q.   Before you were charged and before you started cooperating,

2    did you authorize your former lawyers to tell the prosecutors

3    that the payments on the Mercedes for Nadine were a loan?

4    A.   Yes.

5    Q.   Was that a lie?

6    A.   Yes.

7    Q.   When you personally met with the government, did you ever

8    tell the government that the payments on the Mercedes were a

9    loan?

10   A.   Ask me that question again, please?

11   Q.   When you personally met with the government, did you,

12   yourself, ever tell the government that the payments on the

13   Mercedes were a loan?

14   A.   Can I ask you, please, if that meeting with the government

15   refers after my agreement or before?

16   Q.   After you decided to cooperate and you personally met with

17   the government, did you ever tell the government that the

18   payments on the Mercedes were a loan?

19   A.   No.

20   Q.   Were they a loan?

21   A.   No.

22   Q.   Do you remember being asked questions on cross-examination

23   about who decides if you are telling the truth?

24   A.   Yes.

25   Q.   To the best of your understanding, who ultimately decides

O6C5men3                          Uribe - Redirect

1    if you are telling the truth in this case?

2    A.  The truth is the truth.

3    Q.  Mr. Uribe, what is the only thing the prosecutors in this

4    case have ever asked you to do?

5    A.  To tell the truth.

6    Q.  What is your only job on the stand?

7    A.  To tell the truth.

8               MS. POMERANTZ:  No further questions.

9               THE COURT:  Thank you.

10              You are excused, Mr. Uribe.  You may step down.

11              THE WITNESS:  Thank you, your Honor.

12              THE COURT:  Thank you, sir.

13              (Witness excused)

14              THE COURT:  Next witness for the government.

15              MR. MONTELEONI:  The government calls Olivia Sebade.

16   OLIVIA SEBADE,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19              THE DEPUTY CLERK:  Please state your full name and

20   spell your full name for the record.

21              THE WITNESS:  Olivia Sebade.  O-L-I-V-I-A,

22   S-E-B-A-D-E.

23              THE COURT:  Good afternoon and welcome.

24              Your witness.

25              MR. MONTELEONI:  Thank you, your Honor.

1    DIRECT EXAMINATION

2    BY MR. MONTELEONI:

3    Q.  Good afternoon.  Are you currently employed?

4    A.  I am.

5    Q.  Where do you work?

6    A.  The U.S. Attorney's office in the Southern District of New

7    York.

8    Q.  What's your position at the U.S. Attorney's office?

9    A.  I'm a paralegal.

10    Q.  What do you do, generally, as a paralegal at the U.S.

11    Attorney's office?

12    A.  I assist in administrative tasks.

13    Q.  Were you asked to review several documents in advance of

14    your testimony today?

15    A.  I was.

16         MR. MONTELEONI:  Mr. Hamill, can you please put up

17    what is in evidence as Government Exhibit 1327?

18    Q.  Ms. Sebade, directing your attention to row 15, which lists

19    Nadine Arslanian as writing to José Uribe:  Bob made a

20    reservation.  See you 7:45.

21         Could you please read the date?

22    A.  August 10, 2020.

23         MR. MONTELEONI:  Mr. Hamill, could you please put up

24    to one side what is in evidence as Government Exhibit D209-26

25    and take us to page 5?  And then, Mr. Hamill, if you could

1    expand the last text on that page?

2    Q.  Ms. Sebade, is that the same text message that you just

3    testified on 1327 is August 10th?

4            MR. FEE:  Your Honor, I would object.  There is no

5    summary chart being offered.  I am not sure what we are doing

6    here.

7            MR. MONTELEONI:  We are reading portions of a document

8    in evidence, I will take down 1327 in a moment.  I just wanted

9    to reorient.

10           THE COURT:  Proceed.

11           MR. MONTELEONI:  Thank you.

12   Q.  Ms. Sebade, can you please read the display name of the

13   user that this text on Government Exhibit B 209-26, is to?

14   A.  Nadine Menendez.

15   Q.  And can you please read the first display name and user

16   that the text is to after the "Nadine Menendez"?

17           MR. FEE:  Your Honor, I would object again,

18   respectfully.  This is just --

19           THE COURT:  Side bar.

20           MR. FEE:  Yes.

21           (Continued next page)

22

23

24

25

O6C5men3                          Sebade - Direct

1                    (At side bar)

2                    THE COURT:  What are you having her do,

3      Mr. Monteleoni?

4                    MR. MONTELEONI:  Yes.  So, there are essentially three

5      documents that corroborate Mr. Uribe on issues in which he was

6      attacked.  One is a text message that relates to the Segovia

7      dinner that we have heard about that the witness does not know

8      about that we could not have introduced through Mr. Uribe but

9      that directly corroborate and responds to Mr. Fee's

10     cross-examination.

11                   THE COURT:  Wait.  Is it on the chart?

12                   MR. MONTELEONI:  No, no.  These are just documents in

13     evidence.  That chart was just to orient them, I will take that

14     chart down in a moment.  These are documents that are in

15     evidence.  Another is, as he was putting in evidence pursuant

16     to a stipulation, texts that show Sabine was going to the

17     dinner so the jury can see it is the same dinner.  And then a

18     text message from Menendez to Nadine that corroborates Uribe's

19     account.

20                   It is already in evidence, just want to read it to the

21     jury.

22                   THE COURT:  What is the purpose of this?  It is

23     already in evidence, what is the purpose of this?

24                   MR. MONTELEONI:  The jury is not going to understand

25     that Uribe's account is corroborated if this doesn't come now.

O6C5men3                          Sebade - Direct

 1                THE COURT:  But it is in evidence, you said.

 2                MR. MONTELEONI:  But they just spent a long time

 3     talking about how this account of Nadine and her daughter going

 4     to the bathroom --

 5                THE COURT:  Yes.

 6                MR. MONTELEONI:  -- was unreliable, that he fabricated

 7     what happened there.  Menendez actually sent a text during the

 8     dinner telling Nadine to go to the bathroom.

 9                THE COURT:  Ah-ha.

10                MR. MONTELEONI:  So we need to bring that out when the

11     jury will understand.  It is in evidence.

12                THE COURT:  It is in evidence?

13                MR. MONTELEONI:  Yes.

14                THE COURT:  Go ahead.

15                MR. MONTELEONI:  Then there is also two withdrawal

16     slips that corroborate Uribe's withdrawal of the cash for the

17     car.  Those should take just a minute to put in.

18                THE COURT:  And that is in evidence as well?

19                MR. MONTELEONI:  Yes, those are in evidence as well.

20                Then additionally, another text, also in evidence,

21     about Nadine telling Fred Daibes that she was going to purchase

22     a bell, on account of the bell which was subject to extremely

23     lengthy cross-examination so showing that this is --

24                THE COURT:  I apologize for the reference --

25                MR. FEE:  I welcome it.

1          THE COURT:  -- someday you will aspire to a lifestyle

2    of having a bell to summon people.

3          MR. FEE:  For sure.

4          MR. MONTELEONI:  So the point is, your Honor, this is

5    about 10 minutes of testimony, and if it doesn't happen now,

6    the jury is going to have a lot of trouble understanding it.

7          MR. FEE:  This is not how it works.  This is summation

8    argument about evidence that's already in the record.

9    Ms. Sebade has nothing to do here.  This is an endless black

10   hole where they just put on witnesses to review evidence.  She

11   doesn't belong in --

12         THE COURT:  I got it.

13         MR. MONTELEONI:  We are not going to do an endless

14   black hole.  We are just reading a few documents in evidence.

15         THE COURT:  It is quite unusual -- I mean the use of

16   summary charts here to the extent they have been used is quite

17   unusual.  If it is in evidence, you argue from the evidence in

18   summation.  Nonetheless, I understand your position and you can

19   take 10 minutes, that's it.  Let's not do it again.

20         MR. SOLANO:  Your Honor, just for the record, I

21   understand your ruling.  On behalf of Mr. Hana, we object to

22   this because it is a summation that is being allowed in the

23   middle of the prosecution's case.  So just for the record, I

24   understand your ruling.

25         THE COURT:  OK.  Fine.

1              For 10 minutes I am going to allow it, especially -- I

2    didn't realize he had sent her the text saying go to the

3    bathroom.

4              MR. MONTELEONI:  Fine.  I will be very quick.

5              THE COURT:  What is next?

6              MR. MONTELEONI:  What is next is I think Janice

7    Grasty, the Bureau of Engraving and Printing witness.

8              THE COURT:  What is she going to testify to and about

9    how long?

10             MR. MONTELEONI:  I believe about 20 minutes regarding

11   some of the currency tracing.

12             THE COURT:  That will take us to lunch.

13             MR. FEE:  Your Honor, I actually think the proffered

14   reason makes this even more inappropriate.  They could not get

15   in evidence that they say pushes back on a line of cross.

16   There is no practice or rule that permits them to put on any

17   old human being to just review exhibits in front of the jury.

18   It is pure summation argument.  One hundred percent.  She

19   should not be permitted to continue.

20             THE COURT:  I understand.

21             MR. MONTELEONI:  There is very clear law, your Honor,

22   that the reading of documents in evidence is not argument.

23   There is no commentary.  This is something that has been

24   routinely permitted.  We cited the cases in the --

25             THE COURT:  Let me cut this short.

O6C5men3                              Sebade - Direct

1          I have thought, throughout this case, that there was a

2    great deal of waste of the jury's time by people getting up

3    there and reciting and that goes to the summary chart witnesses

4    as well as the other witnesses, simply reciting words that are

5    already in evidence.  There has already been too much of it but

6    both sides have been doing it.

7          10 minutes, I'm going to allow it.

8          MR. MONTELEONI:  Thank you, your Honor.

9          MR. FEE:  Your Honor, am I permitted to cross this

10   witness about the evidence that contradicts the arguments?

11         THE COURT:  They're just putting --

12         MR. FEE:  This is the problem.

13         THE COURT:  They're just putting it in.  You have

14   already done that.

15         Let's go.  10 minutes.  It is the same issue we have

16   had with FBI agents who just select, use what the government is

17   selecting.  10 minutes, I am going to allow it.

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. MONTELEONI:  Mr. Hamill, can you please take down

3   Government Exhibit 1327 and put up to one side Government

4   Exhibit A101-103, which is in evidence, and take us to page 3

5   and expand the middle text on the page?

6   BY MR. MONTELEONI:

7   Q.  Ms. Sebade, what is the display name of the user that this

8   text is from?

9   A.  Bob Menendez.

10  Q.  How does the phone number of the user that this text is to,

11  compare to the phone number of the Nadine Menendez user in the

12  other text on this page?

13  A.  It is the same phone number.

14  Q.  What is the date of this text?

15  A.  August 10, 2020.

16  Q.  What is the time of this text?

17  A.  9:23:42 p.m.

18  Q.  Can you please read what the Bob Menendez user texted the

19  user with the Nadine Menendez cell phone number at 9:23 p.m. on

20  August 10, 2020?

21  A.  "Can you go to bathroom?"

22          MR. MONTELEONI:  Mr. Hamill, can you please take those

23  down and please put up what is in evidence as Government

24  Exhibit D102-9 and expand the middle text on the page?

25  Q.  Ms. Sebade, can you please read the display name of the

O6C5men3                          Sebade - Direct

1    user that this text is from?

2    A.   Nadine.

3    Q.   Do you recognize the phone number that this text is from?

4    A.   I do.

5    Q.   How does it compare to the number of the Nadine Menendez

6    cell phone that we just looked at?

7    A.   It is the same phone number.

8    Q.   Ms. Sebade, can you please read the first few sentences of

9    this text from "happy birthday" to "but I will"?

10   A.   "Happy birthday, Fred.  It is two days.  I am looking for

11   the perfect bell.  I have not found it yet, but I will."

12   Q.   Ms. Sebade, can you please read the date on which Nadine

13   sends the text saying:  I am looking for the perfect bell, I

14   have not found it yet, but I will?

15   A.   August 8, 2019.

16   Q.   Directing your attention to the "to" line, is this text by

17   Nadine saying I am looking for the perfect bell -- withdrawn.

18            So about when is this date on which Nadine sends the

19   text saying:  I am looking for the perfect bell, have not found

20   it yet but I will, in relation to September 5 of 2019?

21   A.   It is just shy of one month prior.

22            MR. MONTELEONI:  No further questions.

23            THE COURT:  Any cross?

24            MR. FEE:  Yeah.

25   CROSS-EXAMINATION

1    BY MR. FEE:

2    Q.  Hi, Ms. Sebade.  Sebade?

3    A.  Yes.

4    Q.  How are you?

5    A.  Good, thanks.  How are you?

6    Q.  I'm OK.

7              When did the prosecutors ask you to come and testify?

8    A.  Just a few days ago.

9    Q.  Do you know what was happening in court when they reached

10   out to you and asked you to come here?

11   A.  No.

12   Q.  Are you aware of a collection of antique Greek bells that

13   don't ring that are stored at 41 Jane Drive, Ms. Sebade?

14             MR. MONTELEONI:  Objection.

15             THE COURT:  I will allow it.

16             THE WITNESS:  No, I'm not.

17             MR. FEE:  Have a nice day, Ms. Sebade.  Thank you.

18             MR. SOLANO:  No questions.

19             MR. DE CASTRO:  No.

20             THE COURT:  Redirect?

21             MR. MONTELEONI:  No, your Honor.

22             THE COURT:  You may step down, thank you.

23             Next witness for the government?

24             MS. GHOSH:  The government calls Janice Grasty.

25   JANICE KAREN GRASTY,

1        called as a witness by the Government,

2        having been duly sworn, testified as follows:

3                THE DEPUTY CLERK:  Please state your full name and

4    spell your full name for the record.

5                THE WITNESS:  Janice Karen Grasty.  G-R-A-S-T-Y.

6                THE COURT:  Good afternoon, Ms. Grasty.  Welcome.

7    Please, be seated.

8                THE WITNESS:  Thank you, sir.

9                THE COURT:  If you would move the microphone down

10   toward your face?

11               Your witness, Ms. Ghosh.

12               MS. GHOSH:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MS. GHOSH:

15   Q.  Good afternoon, Ms. Grasty.  Where do you work?

16   A.  I work at the Bureau of Engraving and Printing.

17   Q.  How long have you worked at the Bureau of Engraving and

18   Printing?

19   A.  34 years.

20   Q.  What is the Bureau of Engraving and Printing?

21   A.  It is where we print the dollar bills.

22   Q.  Is it sometimes called the BEP?

23   A.  Yeah.  For sure.

24   Q.  Where is the BEP located?

25   A.  In Washington, D.C., Southwest.

1    Q.   What is your position at the Bureau of Engraving and

2    Printing?

3    A.   I'm supervisor and program analyst.

4    Q.   What does that job consist of?

5    A.   I supervise a number of people to create the master

6    schedules that the Federal Reserve Board sends us.

7    Q.   And what do those schedules relate to, generally?

8    A.   We have -- the Federal Reserve boards sends us the amount

9    of money they want printed in a particular year.  And once that

10   comes in, we have to level out for that year period of time and

11   that's when they print the money.

12   Q.   Are you familiar with Bureau of Engraving and Printing

13   records relating to the printing and distribution of currency?

14   A.   Yes.

15         MS. GHOSH:  Mr. Hamill, if you could display for just

16   the witness what are marked for identification as Government's

17   Exhibits 8L-1 through 8L-4?

18   Q.   Ms. Grasty, do you recognize those documents?

19   A.   Yes, I do.

20   Q.   And generally, what are they?

21   A.   These are our series code reports -- our series closeout

22   report that come through -- that are retrieved through our

23   database.

24   Q.   Are records like these regularly made by the BEP for the

25   currency that prints and distributes?

O6C5men3                          Grasty - Direct

1    A.  Yes.

2    Q.  Are these records created around the time that the currency

3    is distributed?

4    A.  Yes.

5    Q.  Are they kept in a database by the Bureau of Engraving and

6    Printing?

7    A.  Yes.

8    Q.  Are these four exhibits true and accurate copies of

9    closeout records maintained by the Bureau of Engraving and

10   Printing?

11   A.  Yes, they are.

12          MS. GHOSH:  Your Honor, the government offers

13   Government's Exhibits 8L-1 through 8L-4.

14          MR. WEITZMAN:  No objection.

15          THE COURT:  Admitted, without objection.

16          (Government's Exhibits 8L-1 through 8L-4 received in

17   evidence)

18          MS. GHOSH:  Mr. Hamill, could you please put up what

19   is admitted in evidence as Government Exhibit 8L-1?

20   BY MS. GHOSH:

21   Q.  Ms. Grasty, generally, what does this document show?

22   A.  It shows the amount of $20 series 2017s that have been

23   printed and delivered to the Federal Reserve Board.

24   Q.  And you mentioned, you see it says series 27G at the top?

25   A.  Yes.

O6C5men3                          Grasty - Direct

1    Q.   What does series mean in this context?

2    A.   It is a series of whenever the Secretary or Treasurer are

3    in office, and the G is for the design of the $20 which is next

4    gen.

5    Q.   So the G you said refers to next gen?

6    A.   Yes.

7    Q.   Is all currency being printed today next gen?

8    A.   All except the 1s and the 2s.  They're still standard.

9    Q.   And going back to what 2017 refers to --

10            THE COURT:  When you say the 1s and the 2s, you mean

11   bills in the denomination of one dollar and the denomination of

12   two dollars?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  Thank you.

15   BY MS. GHOSH:

16   Q.   You referred to the secretary or the treasurer, could you

17   just explain to the jury again what 2017 series means?

18   A.   This is when the Secretary Mnuchin and the Treasury

19   Carranza were elected into office for that time.

20   Q.   So when they were elected it became the new series, in this

21   case, 2017?

22   A.   Correct.

23            THE COURT:  Do you mean when they were appointed to

24   their office?

25            THE WITNESS:  Yes, sir.

1  Q.  Does the 2017 series mean that the bills were printed in

2  2017?

3  A.  No.  It doesn't mean that they were printed, that is just

4  the series that they were in.

5  Q.  The design series?

6  A.  Yes.

7  Q.  Does the 2017 series indicate that the bill was put into

8  circulation in 2017?

9  A.  No, it doesn't.

10  Q.  Ms. Grasty, are you generally familiar with a website

11  called uscurrency.gov?

12  A.  Yes, I know of it.

13  Q.  And, generally, what types of information are on that

14  website?

15  A.  They have the, when each denomination is printed, when it

16  is printed, and we send those reports to our office of external

17  relations, and which they would then send to the currency for

18  website.

19  Q.  So a department within the BEP sends some information to

20  the people who run the website?

21  A.  Yes, ma'am.

22          MS. GHOSH:  Mr. Hamill, could you please put up for

23  just the witness, what is marked for identification as

24  Government Exhibit 10M, as in Mary, 1, and could you scroll

25  down to page 3, please?

O6C5men3                              Grasty - Direct

1   Q.  Ms. Grasty, is this a portion of part of the web page for

2   uscurrency.gov?

3   A.  I actually don't know if this is for the system, I don't

4   know if they put this on the website or not, but this is

5   accurate as far as the series letters is concerned.

6   Q.  So you are saying that the series letters on page 3 here

7   are consistent with your understanding of the series letters?

8   A.  Yes.

9   Q.  OK, but you are not sure of the source of this?

10  A.  Correct.

11          MS. GHOSH:  The government offers page 3 of Government

12  Exhibit 10M-1.

13          MR. WEITZMAN:  Objection, your Honor.

14          THE COURT:  Basis.

15          MR. WEITZMAN:  Hearsay.  It is not a business record.

16  She didn't create the document.

17          MS. GHOSH:  Your Honor, she said it is consistent with

18  her recollection and she -- this is from 803(8), we would say

19  it is a public record, and we are offering a page that she said

20  is consistent with her recollection, just for the ease of the

21  jurors to see it.

22          MR. WEITZMAN:  Your Honor, it is not a public record,

23  it is some website that she did not -- she did not say is the

24  public record.

25          THE COURT:  Is it a government website?

1              THE WITNESS:  Yes, it is a government website.

2              THE COURT:  I am going to allow it.

3              (Government's Exhibit 10M-1 received in evidence)

4              MS. GHOSH:  Could we publish page 3 for the jury,

5     please?

6     BY MS. GHOSH:

7     Q.  Ms. Grasty, before it is published to the jury, you were

8     referring to this being consistent with your understanding of

9     certain series letters.  Could you explain what is shown on

10    this document?

11    A.  OK.  First, the first column is the year and then it shows

12    the series letter for that year.

13    Q.  And where does the series letter, if anywhere, appear on a

14    printed U.S. bill?

15    A.  It will be the first -- it will be the first letter with

16    the series.  Like we see the "I" the 8, that "I" is a series

17    letter.

18    Q.  So in the document that is up on the screen in front of

19    you, the snippet of the $5 bill that has a number starting with

20    "I", are you saying that "I", in that case is the series

21    letter?

22    A.  Yes.

23    Q.  And so what year does that correspond to?

24    A.  2006.

25    Q.  And again, that just means that that is the year that that

1   design series was introduced, 2006?

2   A.  Yes.

3   Q.  Going back to Government Exhibit 8L-1, if we could, I would

4   like for you to explain to the jury how it should read this

5   record that we were looking at before.  So, starting with the

6   first column, and just to reorient yourself, you said this

7   relates to $20 bills in the 2017 series; is that correct?

8   A.  Correct.

9   Q.  So starting with the first column called "Bank" what does

10  that column show?

11  A.  Those are Federal Reserve banks.

12  Q.  Each of those cities listed is a different Federal Reserve

13  bank?

14  A.  Yes.

15  Q.  What do the next two columns labeled first serial number

16  and last serial number indicate?

17  A.  The first serial number begins with "A1A", and then as far

18  as Boston is concerned it begins with "A" and the F series, the

19  suffix number.

20  Q.  What does the letter "A" refer to in that first row?

21  A.  The bank.

22  Q.  So every bill that is from the Boston Federal Reserve will

23  begin with an "A"?

24  A.  Yes.  Correct.

25  Q.  And New York is "B"?

1    A.  Yes.

2    Q.  And then you said that there is a serial number that is

3    within that range beginning on the second column and going to

4    the third column?

5    A.  Yes, starting at 1.

6    Q.  Going to the next two columns, the First Note Delivered and

7    Last Note Delivered; what do those refer to?

8    A.  Those are when the BEP first delivered to the Federal

9    Reserve Board, and the last note which is the A384000F, that

10   was when it was last sent to the Federal Reserve Board.

11   Q.  So it fair to say that is the date range that those

12   serial-numbered bills going to the Boston Fed Reserve were

13   delivered by the BEP going to the Boston Federal Reserve Bank?

14   A.  Correct.

15          MS. GHOSH:  We have been looking, in 8L-1, at the 2017

16   series 20s.  Can we please go now to 8L-2?

17   Q.  What bills does this document relate to?

18   A.  This is the $20 2017 A series.

19   Q.  What does the letter "A" in the series year indicate?

20   A.  It meant that it was a change in the material from 2017, so

21   it is now 2017 A.

22   Q.  A change in what material?

23   A.  In ink.  This was an ink change.

24   Q.  And is this record in 8L-2 otherwise read the same as we

25   looked at in 8L-1?

1    A.   Correct.

2              MS. GHOSH:  Can we please go to 8L-3?

3    Q.   What does 8L-3 show?

4    A.   8L-3 is the $50 2017 series, and because it is blank there

5    weren't any ran, we didn't print any $50 2017s.

6              MS. GHOSH:  Can we go to 8L-4?

7    Q.   What does 8L-4 show?

8    A.   This shows the $50 that were printed for the series 2017 A.

9    Q.   So just to be clear, there were no 2017 series $50s but

10   there were 2017 A series $50 bills printed?

11   A.   Correct.

12   Q.   Now, we have been discussing these four records related to

13   2017 and 2017 A series for $50 and $20 bills.  Did the BEP

14   choose which records to provide or did the prosecutors request

15   these specific records.

16   A.   The prosecutors requested these specific records.

17             THE COURT:  Let me see if I understand this.  Looking

18   at this document, it is for $50 bills, series 2017 TGA, but

19   according to this chart the first $50 bills of the 2017 GA

20   series were delivered to a regional Federal Reserve Bank in

21   2020; correct?

22             THE WITNESS:  Correct.

23             THE COURT:  So even though it says is 2017 GA, there

24   were no 2017 GA bills in circulation until, at the earliest,

25   May of 2020; is that correct?

O6C5men3                          Grasty - Direct

1          THE WITNESS:  That's correct.

2          THE COURT:  And is there any way of your telling from

3    this chart, or knowing, when those bills are no longer in

4    circulation?

5          THE WITNESS:  No, sir.  I can't tell you whether or

6    not they're in circulation.

7          THE COURT:  All right.  Thank you.

8          MS. GHOSH:  Mr. Hamill, can we please pull up what is

9    already in evidence Government Exhibit 1F-1200 and walk through

10   one example to see how these records are used?  And could we

11   please zoom in on the last full row, the bottom bill there I

12   guess, if we can zoom in on that?

13   BY MS. GHOSH:

14   Q.  Ms. Grasty, what is the series year for this particular

15   bill that we are looking at right now?

16   A.  This is a 2017 A $50.

17   Q.  How you do you know it is a 2017 A?

18   A.  Because the first letter that is P, and P is for 2017 A.

19   Q.  And where did the Bureau of Engraving and Printing send

20   this particular bill?

21   A.  It says New York.

22   Q.  And where are you getting New York from this bill?

23   A.  The B, the second letter, and it says B2 so that is the

24   second bank is New York.

25   Q.  If we could put back up 8L-4, the records for $50 bill in

O6C5men3                          Grasty - Cross

1   2017 A series, what is the earliest time that that bill could

2   have been sent to the New York federal Reserve Bank?

3   A.  May of 2020.

4   Q.  Are you aware of what tracking, if any, the Federal Reserve

5   banks do once they receive notes from the Bureau of Engraving

6   and Printing?

7   A.  No, ma'am, I do not.

8   Q.  Other than the fact that it was sometime after May 2020,

9   what, if anything, are you able to say about when a particular

10  person received that $50 note we just looked at?

11  A.  I have no knowledge.

12  Q.  Now, we just discussed a 2017 A $50 bill.  If I were to

13  show you additional bills with older series years, such as

14  2009, 2006, 1996, what, if anything, are you able to say about

15  when a particular person received those particular $50 notes?

16  A.  I would have no knowledge of that.

17          MS. GHOSH:  No further questions.

18          THE COURT:  Thank you.

19          Any cross-examination?

20          MR. WEITZMAN:  Yes, your Honor.

21          THE COURT:  All right.  Go ahead.

22          MR. WEITZMAN:  I will be brief.

23  CROSS-EXAMINATION

24  BY MR. WEITZMAN:

25  Q.  Good afternoon, Ms. Grasty.

O6C5men3                      Grasty - Cross

1    A.  Good afternoon.

2    Q.  You were just asked a question about older series bills

3    before 2017.  Do you recall that?

4    A.  Yes.

5    Q.  Yes.

6            And there are series bills that precede 2017; right?

7    A.  Yes.

8    Q.  There is 1996 bills?  There is 1999 bills?  Right?

9    A.  Yes.

10   Q.  There is 2001 and 2003 bills; right?

11   A.  Yes.

12   Q.  There is, you know, every couple of years there is a new

13   series; right?

14   A.  Well, yes, whenever they elect new -- the appointments for

15   secretary and treasurer.

16   Q.  So after a presidential election or after let's say a

17   Secretary of Treasury or the -- what is the other secretary?

18   A.  United States Secretary and the Treasurer.

19   Q.  And the treasurer, after they're reappointed and

20   reconfirmed by the Senate, in the middle of an administration

21   there could be a new series?

22   A.  Correct.

23            THE COURT:  I'm sorry.  As an example, if the

24   Secretary of Treasury is in office during a president's first

25   administration and the same secretary of the treasury is in

O6C5men3                          Grasty - Cross

 1    office during the president's, that same president's second

 2    administration, is there a different series for the second

 3    administration?

 4              THE WITNESS:  No, sir.  It would stay the same.

 5              THE COURT:  So it is when there is a new -- if I

 6    understand you, there is a new series when there is either a

 7    new secretary of the treasury in place or a new treasurer of

 8    the United States in place; is that correct?

 9              THE WITNESS:  That's correct.

10              THE COURT:  Thank you.

11    BY MR. WEITZMAN:

12    Q.  So a replacement of either of them, either secretary would

13    result in a new series; right?

14    A.  Correct.

15    Q.  Now, at the BEP you have records similar to the records you

16    showed with respect to the 2017 series, you have those records

17    going all the way back to the 1996 series and beyond; right?

18    A.  Correct.

19    Q.  So if the government wanted you to be able to date the

20    printing and distribution to the Federal Reserve banks of

21    various series beyond 2017, you could have provided that to the

22    government, right?

23              THE COURT:  Sustained.

24    Q.  You did not provide to the government -- I should rephrase

25    that.

O6C5men3                        Grasty - Cross

1          The government did not ask you for the distribution

2     dates on series older than 2017; correct?

3          MS. GHOSH:  Objection.

4          THE COURT:  Sustained.

5          Ladies and gentlemen, your job is to determine at the

6     end of this case whether the guilt of the defendant you are

7     considering has been proven beyond a reasonable doubt, it is

8     not to concern yourself with what else may or may not have been

9     in evidence, it is only to concern yourself with what is in

10    evidence or the lack of evidence.

11         Proceed.

12    BY MR. WEITZMAN:

13    Q.  What documents did you obtain at the government's request?

14    A.  I gave them what they requested was the date that the $20

15    2017 and 2017 A, $50, 2017 series, and 2017 A series.

16    Q.  So the 2017 series; right?

17    A.  Yes.

18         MS. GHOSH:  Objection.

19         THE COURT:  I will allow it.

20    Q.  One of the reasons, in addition to the new series, there is

21    also often redesigns of bills; correct?

22    A.  Correct.

23    Q.  And those redesigns are often done, let's say with a $100

24    bill, in order to add new security features; correct?

25    A.  Correct.

1   Q.  And when a redesign occurs, is it fair to say that the

2   older design is no longer printed?

3   A.  No, I'm not going to say that.

4   Q.  Let's take for example a 1996 $100 bill.  A 1996 $100 bill

5   looks very different from the 2017 $100 bill, right?

6           MS. GHOSH:  Objection.

7           THE COURT:  I will allow it.  If she knows.

8   Q.  Is that correct?

9   A.  Yes, it is different.

10  Q.  And the Ben Franklin is a lot larger in the 2017 --

11  A.  Yes.

12  Q.  -- $100 bill and there are security features, right?

13  A.  Yes, sir.

14  Q.  Is there a hologram?

15  A.  Not in the 2017.

16  Q.  But there is a security ribbon, a 3-D security ribbon?

17  A.  Yes.

18  Q.  And a bell was added into the ink; is that right?

19  A.  Yes.

20  Q.  And there is a watermark, not a hologram?

21  A.  Watermark.

22  Q.  Yes; that doesn't exist on the 1996 --

23  A.  No, it doesn't.

24  Q.  -- $100 bills.

25          And so, do you know whether the 1996 $100 bill can

1   still be printed today?

2   A.   No.  We don't print the 1996 bill.

3   Q.   Those are taken out?

4   A.   Yes.

5   Q.   By the BEP, correct?

6   A.   Yes.

7              THE COURT:  No, no.  If I understand your testimony,

8   they're no longer printed; is that right?

9              THE WITNESS:  Correct.  No longer printed, right.

10             THE COURT:  But they may still be in circulation.

11             THE WITNESS:  In circulation, yes.

12  BY MR. WEITZMAN:

13  Q.   Do you know the circulation, the average lifespan of older

14  bills?  I am just asking if you know.

15             MS. GHOSH:  Objection.

16             THE COURT:  I will allow it.

17  Q.   Do you have any knowledge as to the average lifespan of

18  older bills?

19  A.   No, sir, I don't.

20  Q.   Now, your record only identifies -- 2017 records identify

21  what banks, Federal Reserve banks the bills are sent to from

22  the BEP; correct?

23  A.   Yes.

24  Q.   It doesn't identify which banks the Federal Reserve

25  branches send the bills to; correct?

1   A.  I don't understand what you are saying.

2   Q.  Retail banks, or like Citibank or like JP Morgan.  Your

3   records don't how who got those bills?

4   A.  No.

5   Q.  And it doesn't show whether banks, let's say in New York,

6   might be getting bills from the Boston regional bank in any

7   way?  It doesn't show the circulation of them; right?

8           MS. GHOSH:  Objection.

9           THE COURT:  Does it show the circulation -- do your

10  records show how those bills circulate?  Yes or no.

11          THE WITNESS:  No.

12  BY MR. WEITZMAN:

13  Q.  You reviewed a document now on direct of cash laid out.  Do

14  you recall testifying to that?

15  A.  Uh-huh.

16  Q.  Were you told where that cash was found?

17  A.  No.

18  Q.  Let me show you some other photos.

19          MR. WEITZMAN:  Can we see -- can you put up

20  GX 1F-1263?  And if you can zoom in on the top bundle on the

21  left.

22  Q.  Do you see that as a series 1996 bill?

23  A.  Yes.

24  Q.  And you would agree with me --

25          THE COURT:  Just a moment.  I am trying to see it.  Is

O6C5men3                          Grasty - Cross

1   that just to the left of --

2              THE WITNESS:  Yes.  Right there.

3              THE COURT:  You can read that?

4              THE WITNESS:  That's 1996.

5              THE COURT:  OK.

6   BY MR. WEITZMAN:

7   Q.  Would you agree with me that the series 1996 bills are not

8   still being printed by the BEP; correct?

9   A.  Correct, they're not being printed.

10  Q.  Do you know when the series 1996 bills stopped being

11  printed by the BEP?

12  A.  No.  No.

13  Q.  Can you estimate whether it was before 2013?

14  A.  It was before 2013, yes.

15  Q.  Because there is a new 2013 series $100 bills with the

16  redesign; right?

17  A.  Yes.

18  Q.  You don't know when, between 1996 and 2013, BEP stopped

19  printing?

20  A.  No, I don't.

21             MR. WEITZMAN:  Why don't we take a look as well at the

22  stack to the right of that.    Thank you.

23  Q.  Can you make out the series there on the bottom left?

24  A.  2006.

25  Q.  Do you know when the 2006 series bills stopped being

1    produced by the BEP?

2    A.  No, sir, I do not.

3    Q.  And again, would they have stopped at some point around

4    2013 with the redesign?

5    A.  Yes.

6            MR. WEITZMAN:  Let's zoom in on the bottom bills, the

7    stack, and if we can zoom in on the -- let's go from the left

8    to the right, zoom in on each one, the top portion.

9    Q.  The first one in this stack, you see that is a series 2006

10   $100 bill?

11   A.  Yes.

12   Q.  And the next one to the right of that, is that a series

13   2001?

14   A.  2001.

15   Q.  And again, do you know when the BEP stopped printing the

16   2001 series?

17   A.  No, sir.

18   Q.  But definitely by 2013?

19   A.  Yes.

20   Q.  Go to the right of that one, again, what year is that?

21   A.  2001.

22   Q.  OK.  Next one?  What year is that?

23   A.  2006.

24           MR. WEITZMAN:  And the record should reflect we are

25   moving on the stack from the left to the right, and the next

O6C5men3

1    one to the right of that you can't see that, let's go one more.

2    Q.   What is that last one?

3    A.   2009 A.

4    Q.   The 2009 A, we haven't talked about that stack.  Does that

5    have all the redesign features from the 2013?

6    A.   Yes.

7    Q.   And so do you know when the 2009 $100 bills, whether

8    they're still being printed or not?

9    A.   They're not.

10   Q.   Do you know when those stopped being printed?

11   A.   No, sir, I don't.

12   Q.   Would it have been around 2013?

13   A.   Yeah.

14              MR. WEITZMAN:   One moment, your Honor?

15              (Counsel conferring)

16              MR. WEITZMAN:   Nothing further.  Thank you, ma'am.

17              THE WITNESS:   You're welcome.

18              MR. LUSTBERG:   Nothing, your Honor.  Thank you.

19              MR. DE CASTRO:   Nothing.

20              MS. GHOSH:   No, your Honor.

21              THE COURT:   You may step down.  Thank you.

22              THE WITNESS:   Thank you.

23              THE COURT:   You are excused.

24              (Witness excused)

25              THE COURT:   Ladies and gentlemen, it is 1:04.  I

O6C5men3

1    declare it to be 1:10 and I declare you to have a one hour,

2    twenty minute lunch.  We will see you back at 2:30.  You have

3    been an excellent jury in terms of the time limits.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6C5men3

1              (Jury not present)

2              THE COURT:  Please be seated.

3              This is addressed to all of the parties.  Are you

4     going to be able to deal with the issues that Mr. Richenthal

5     raised at the beginning of today over lunch so I can deal with

6     them at the end of the lunch -- not at the end of the lunch,

7     one hour from now?

8              MR. RICHENTHAL:  I think some of them we have reached

9     an impasse.  I think others probably will be resolved today or

10    maybe even the appropriate subject of a letter.  The only one

11    that I am aware of, which I think your Honor could probably

12    just deal with right now, is a single exhibit that I expect

13    will come up on our second witness this afternoon if we were to

14    reach that witness, and that is DX 495.

15             THE COURT:  Before we deal with that, who is your next

16    witness?

17             MR. RICHENTHAL:  Philip Sellinger, your Honor.

18             THE COURT:  How long is that going to take on direct?

19             MS. POMERANTZ:  Your Honor, I'm not totally sure.  I

20    would estimate somewhere between, I don't know, an hour, hour

21    and change.  I am just not sure, your Honor.

22             THE COURT:  All right.  Who is after that?

23             MR. RICHENTHAL:  Michael Soliman.

24             THE COURT:  How do you spell is that.

25             MR. RICHENTHAL:  S-O-L-I-M-A-N.

1           THE COURT:  What is he testifying to.

2           MR. RICHENTHAL:  Mr. Soliman was, during the pertinent

3    time period, a political advisor to Mr. Menendez and had

4    conversations with him and one or more staff members concerning

5    certain individuals under consideration for, and ultimately put

6    forward for the position of United States Attorney for the

7    District of New Jersey.

8           MR. WEITZMAN:  Your Honor, yesterday they sent us an

9    e-mail stating that they would be calling Mr. Soliman on

10   Thursday.  They gave us an order for witnesses today and it did

11   not involve Mr. Soliman and I didn't bring my materials with me

12   for the cross-examination of Mr. Soliman.

13          There were three other witnesses -- Geoffrey Mearns --

14   I don't know about three, but Geoffrey Mearns and I thought

15   there was another witness but I may be misrecalling but I do

16   not recall Mr. Soliman being on the list for today.

17          THE COURT:  Government, was Soliman on the list for

18   today?

19          And again, you have really got to cooperate with each

20   other.

21          MR. RICHENTHAL:  I will go and check e-mails.  Human

22   error is always possible but I believe he was, and one reason I

23   believe he was is last night, among the exhibits we received,

24   was defense exhibits for Mr. Soliman, by name.  I believe the

25   defense did that because they understood he was testifying.  I

O6C5men3

 1    will go back and look at e-mails.

 2             THE COURT:  Check the records and, Mr. Weitzman, you

 3    have somebody send to you your materials if you get that far.

 4             MR. WEITZMAN:  Yes, your Honor.

 5             MR. RICHENTHAL:  Your Honor, I have the e-mail right

 6    here.  Yes.  Last night we confirmed that the witnesses we

 7    expect to testify today included Michael Soliman and it says

 8    specifically Michael Soliman for Wednesday.  Today is

 9    Wednesday.

10             THE COURT:  All right.  Who are your next witnesses?

11    Today, Sellinger and Soliman.  If we can do the next person,

12    who is the next person?

13             MR. RICHENTHAL:  I think that's going to close us out

14    to today but --

15             THE COURT:  Who do you have for tomorrow?

16             MR. RICHENTHAL:  So the next person probably would

17    have been Mr. Mearns, this is the paralegal that I alluded to

18    this morning where there is an objection between the parties.

19    I think we reached an impasse.  We can confirm more if it is

20    useful, but it also may be the appropriate subject for a

21    letter.  So, putting aside Mr. Mearns for a second.

22             THE COURT:  A letter.  Today is Wednesday.  This man

23    is supposed to be on Thursday so you are sending me a letter

24    today for tomorrow?

25             (Continued on next page)

1          MR. RICHENTHAL:  I'm happy to handle it orally.  I

2     don't think it will be a one-minute conversation, given the

3     nature of the defense objections.

4          What I was going to say is that if Mr. Mearns needs to

5     be moved, we'll have to regroup and decide who will be

6     testifying next.  We did give the defense notice last night of

7     four additional individuals.  I'm happy to list those if the

8     Court would like.

9          THE COURT:  Yes.

10          MR. RICHENTHAL:  And we specifically said that one, in

11     sum, has to testify tomorrow because he's from the United

12     Kingdom.  He's going to be flying to the United States for the

13     purpose of testimony.  That individual is Andrew Good.  And the

14     other three individuals -- as I said, we gave notice of four --

15     are Joseph Catania.  I can spell that if the Court would like.

16          THE COURT:  Who else?

17          MR. RICHENTHAL:  Isabel -- excuse me, Isabella Fuchs.

18          THE COURT:  Who else?

19          MR. RICHENTHAL:  And Paul van Wie.  Mr. van Wie, or

20     Agent van Wie, is the summary witness that I mentioned this

21     morning.

22          THE COURT:  And that there are over 30 objections to.

23     That's the person, right?

24          MR. RICHENTHAL:  Yes, there are a number of

25     objections, your Honor.

O6cWmen4

1          THE COURT:  Are you going to get to him tomorrow?

2          MR. MONTELEONI:  I think it's quite possible, your

3     Honor.  It depends, obviously, on the length of the next few

4     witnesses, but I think there's a real possibility.

5          THE COURT:  All right.

6          What is Mr. Good testifying to and how long is his

7     direct?

8          MR. RICHENTHAL:  Mr. Good is the records custodian for

9     a Heritage Advisors affiliate.  I think it's several days

10    ago --

11         THE COURT:  Are there issues in regard to his

12    testimony that I need to handle?

13         MR. RICHENTHAL:  I believe the defense is taking the

14    position that Mr. Good is unable to authenticate the documents.

15    We don't agree.

16         THE COURT:  That will just depend on what his

17    testimony is, I take it.

18         Mr. Weitzman.

19         MR. WEITZMAN:  Your Honor, you'll recall we tried to

20    get testimony from Heritage.

21         THE COURT:  Rule 15.

22         MR. WEITZMAN:  Correct, your Honor.

23         THE COURT:  Yes.

24         MR. WEITZMAN:  The government is now doing everything

25    it can to avoid calling a Heritage Advisors witness, so they're

O6cWmen4

1    calling a partner from the law firm Skadden that collected

2    documents from Heritage and individuals and trying to

3    authenticate documents that way.  I don't know whether that's

4    appropriate in this case.  I don't know if this witness can

5    authenticate the documents, what his involvement was and what

6    he knows.  We'll have to wait and see.

7            THE COURT:  All right.

8            MR. RICHENTHAL:  Just for the record, the first part

9    of what Mr. Weitzman just said is false.  We're not trying to

10   avoid anything.

11           As to the second part, we've provided 3500.  They've

12   declined to stipulate.

13           THE COURT:  You provided what?

14           MR. RICHENTHAL:  3500 material, making very, very

15   clear what Mr. Good will say.  They declined to stipulate, as

16   is their right, so he's flying here from the United Kingdom.

17           THE COURT:  OK.

18           MR. WEITZMAN:  And on this individual, Geoffrey

19   Mearns, just so that you understand who this individual is, I

20   don't think he's a paralegal.  I think he's an intern at the

21   U.S. Attorney's Office who attended a presentation at which ten

22   assistant U.S. attorneys were present.  He attended a

23   presentation by former counsel for Mr. Menendez.  You'll recall

24   that this is the subject of pretrial motion practice regarding

25   the obstruction of justice.

O6cWmen4

1           THE COURT:  Yes.

2           MR. WEITZMAN:  And they interviewed that former

3   counsel.  I understand that they may not call that counsel, but

4   they are now trying to get in select pages, four or five, from

5   a lengthy PowerPoint presentation that is heavily redacted,

6   trying to get it in through their intern.  I'm not sure that's

7   the best way to do it.  They should call his former counsel,

8   who's on their witness list, who they've interviewed, and

9   authenticate it that way or authenticate it through one of the

10   lawyers or agents or whomever else actually has admissible

11   testimony about this document.

12           MR. RICHENTHAL:  Mr. Mearns is a paralegal, not an

13   intern, but be that as it may, this objection is puzzling to

14   us.  Rule 901 says what it says.  Mr. Mearns literally

15   personally received an email from the law firm of a PowerPoint

16   and then literally personally was asked to load it to our

17   system for a presentation because there were technical issues

18   by then-counsel's computer.

19           THE COURT:  And what are you just asking him about?

20           MR. RICHENTHAL:  What I just said, in order to

21   authenticate that that is, in fact, the presentation that was

22   transmitted to and made available to the United States

23   Attorney's Office.

24           THE COURT:  Wait.  If I understand it, somebody sent

25   him the presentation that the former counsel for Menendez was

O6cWmen4

1    going to make to the U.S. Attorney's Office.  He's a para.

2    It's now on Americans' laptop, and he's going to authenticate

3    that this is what was sent to him.

4            MR. RICHENTHAL:  He was emailed it, so it's also in

5    his email.  It's not just on his laptop, but in sum and

6    substance, that's correct.  He'll authenticate.  Mr. Weitzman's

7    correct.

8            THE COURT:  I don't see an issue with that.  Go ahead.

9            MR. RICHENTHAL:  I'm sorry.

10           Mr. Weitzman's correct.  We don't intend to offer

11   all -- I believe it's 44, but I'd have to go back and look,

12   pages.  Of course, as to the defense, it's inadmissible

13   hearsay.  We don't have that bar.  We're permitted to put

14   statements in, although to be clear, our view is the statements

15   are false, so they're not hearsay anyway.

16           We provided the redacted PowerPoint to the defense.

17   My understanding is they're of the view they may have the right

18   to put more in.  We disagree.  That's what I would call the

19   nonauthenticity piece of their objection, which is why I said

20   it would take more than a minute; I think the Court's probably

21   going to have to look at the exhibit.  So there's both an

22   authenticity objection, as I understand it, and there's -- I'm

23   not entirely sure what it is, to be candid.  There's an

24   admissibility objection, I guess, as to the PowerPoint itself.

25           THE COURT:  All right.  Let me have letters on that

O6cWmen4

1    tonight.

2            MR. WEITZMAN:  Your Honor, just so it's clear, we

3    don't dispute the authenticity of the document.  They don't

4    need to call a paralegal or intern regarding its authenticity.

5    The question is its admissibility.  They can't establish --

6            THE COURT:  Wait, wait, wait.  It's statements, as I

7    understand it, of the counsel for an adverse party being

8    offered against that adverse party.

9            MR. WEITZMAN:  It's a PowerPoint presentation.

10   Whether the statements were made he cannot establish and

11   whether it was authorized by Mr. Menendez, whether he knew the

12   statements --

13           THE COURT:  Well, his counsel.  Again, I'm unfamiliar

14   with the specifics here, but if his counsel forwarded it, then

15   it's authorized.

16           MR. WEITZMAN:  I'm not sure that's correct.

17           THE COURT:  OK.

18           MR. WEITZMAN:  Counsel make many statements.

19           THE COURT:  Are you taking the position that it was

20   not authorized?

21           MR. WEITZMAN:  I'm taking the position that they have

22   to establish that it was authorized with knowledge of Mr.

23   Menendez.

24           THE COURT:  But doesn't the fact -- I may be wrong.

25   I'll take law on it, obviously.  But doesn't the fact that it

O6cWmen4

1    was sent by Menendez's former counsel in the course of that

2    former counsel representing Menendez, isn't that a

3    representation that it was appropriately authorized by the

4    client?

5         MR. WEITZMAN:  Well, I think we can debate that,

6    whether it qualifies as a hearsay exception.  I think that the

7    scope of the agency has to be established and so on.  I agree

8    with all of that.  I don't understand why they're not calling

9    the witness.

10         THE COURT:  Wait.  If it's a PowerPoint presentation

11    that's going to be made in a proposal, a proffer by defense

12    counsel, it's certainly within the scope of the representation.

13         MR. WEITZMAN:  They have the competent witness to

14    call.  He's on their witness list.  His name is Abbe Lowell.

15    They've interviewed him, your Honor, and for whatever reason,

16    they are now avoiding calling him.

17         They may be able to get over the hearsay hump on this,

18    but the relevance and 403 problems pervade, which is that until

19    they have competent evidence that Mr. Menendez, Senator

20    Menendez authorized this -- putting aside the hearsay issue --

21    Mr. Menendez authorized these statements and what statements

22    were actually made at the proffer as opposed to what is written

23    on paper, they can't establish this as reliable evidence.

24         THE COURT:  Yes, but presumably they can establish

25    that this was the PowerPoint presentation that was sent.

O6cWmen4

1      MR. WEITZMAN:  But the indictment, your Honor, states

2  that Menendez --

3      THE COURT:  I take it Abbe Lowell is probably

4  otherwise occupied.  I think he's counsel for the president's

5  son.

6      MR. WEITZMAN:  I think there was a verdict yesterday,

7  so he may have some time on his hands.

8      In any event --

9      THE COURT:  Have you ever heard of posttrial motions?

10  But put that aside.

11      MR. WEITZMAN:  I agree, your Honor, wholeheartedly.

12      Paragraph 116(e) states, and this is their burden to

13  prove, that Menendez caused his then-counsel to make false and

14  misleading statements to the United States Attorney's Office.

15  They have to meet that burden, and until they have a proffer of

16  proof to establish how Menendez caused this to happen, it

17  should not come in.  Now, if they want to authenticate it

18  through the witness and then offer it later --

19      THE COURT:  Wait just a moment.  I'm trying to

20  understand it.

21      He caused it to happen by having his counsel send that

22  to the government.

23      MR. WEITZMAN:  They can't make that assumption, your

24  Honor.  They can't put in evidence -- they've interviewed Abbe

25  Lowell for hours on this.  They've gotten from a number of

O6cWmen4

different defense lawyers -- this was the subject of their

motion.  We need this, they said, desperately, in order to

establish that the clients were aware, and now they're refusing

to establish it and just putting the document in evidence and

hope to make their case that way.

I don't know why they're avoiding live testimony on

the very meeting that is the crux of their objection of justice

testimony.  If they want to establish their charge, they can

call their witnesses.  They can't just put in random four pages

from the PowerPoint and say we've now proven it.  So I have no

problem with the authenticity of the document.  We'll stipulate

to its authenticity.  Whether it gets shown to the jury at this

point is a different issue, and until they establish, at least

represent that they plan to establish, represent that they're

committing to calling that witness so it's subject to

connection, until they do so, the jury should not see these

documents.

MR. RICHENTHAL:  I honestly do not understand.  The

document says on its face -- it's on your Honor's screen --

"Senator Robert Menendez, presentation to U.S. Attorney's

Office, Southern District of New York, September 11, 2023."

Mr. Mearns will testify, although this is the first we

heard they're willing to stipulate, and if they are, fantastic,

if Mr. Mearns needs to testify, he will testify he got an email

on this date from a lawyer from this law firm with this

O6cWmen4

1  presentation.  It is self-evidently transmitted to us.

2          THE COURT:  Wait.  He can testify that it came from a

3  lawyer from, you say, Skadden.

4          MR. RICHENTHAL:  No, your Honor.  From Winston &

5  Strawn, Mr. Menendez's former law firm, or counsel for

6  Mr. Menendez at the time.

7          THE COURT:  That was Mr. Menendez's law firm at the

8  time it was sent?

9          MR. RICHENTHAL:  I can represent to the Court that it

10 was.  I don't know whether Mr. Mearns personally knows that.

11 He knows that it was transmitted to him.  He then attended the

12 meeting, because in fact, as I said, there was some sort of

13 technical glitch, and he was asked -- let me back up.

14         The reason it was transmitted to him is because

15 Mr. Menendez's counsel was in our office in person.  They were

16 having trouble loading the presentation.

17         THE COURT:  This is Mr. Lowell?

18         MR. RICHENTHAL:  Mr. Lowell was there, but the

19 transmission of the email was by one of his associates, your

20 Honor.

21         THE COURT:  All right.

22         MR. RICHENTHAL:  So there's an email -- if need be, we

23 can put it into evidence, which seems utterly unnecessary --

24 from a Winston & Strawn associate to Mr. Mearns with this

25 presentation.  The jury can more than adequately determine it

O6cWmen4

1    was given to us.  It literally says it was given to us.

2            Now, if Mr. Weitzman would like to stand up in

3    summation, or any of his colleagues, and say the jury should

4    acquit Mr. Menendez of this charge on the ground that somehow

5    the presentation is insufficient, that we presented no more

6    evidence, they can make that argument.

7            THE COURT:  What about Mr. Weitzman's position that

8    you need to show it was authorized?

9            MR. RICHENTHAL:  Well, there's two problems with that.

10            First, I'm an advocate.  The jury can disagree, I

11    suppose.  It certainly looks authorized.

12            But second, we don't actually have to show

13    authorization.  It would be admissible as an agency statement.

14    It is plainly, at minimum -- minimum -- a statement of his

15    agents -- that is, his lawyers -- and admissible on that basis,

16    but we think a jury could more than find it authorized,

17    including, by the way, because there are statements in the

18    presentation itself, which we intend to offer that are entirely

19    consistent with certain arguments defense counsel is making in

20    this case and evidence in this case.  But we don't have to show

21    authorization.  Agency's good enough.

22            As to Mr. Lowell, he obviously can testify to more

23    than Mr. Mearns.  We haven't made a final decision whether to

24    call him.  The defense could call him if they wish.  That's an

25    entirely separate issue.  We're just looking at Rule 901, Rule

O6cWmen4

1    401 and, to the extent applicable, Rule 801 and 803.  In other

2    words, is it relevant?  Yes.  Is it authentic, 901?  Yes.  Is

3    it hearsay as to us?  No.  It's admissible.

4            The defense can argue about weight, if it wishes.

5    They can make arguments at the Rule 29 stage, if we get there,

6    if it wishes.  It's an admissible document.

7            MR. WEITZMAN:  Your Honor, I disagree.  I think that

8    they need to establish that this was seen, approved, authorized

9    by Senator Menendez.

10           THE COURT:  I've just never heard that argument before

11   in a presentation made by somebody's lawyer.  I'm not saying it

12   may not be the law, but I certainly have never encountered

13   that.  If you want to send me something, go ahead.

14           MR. WEITZMAN:  We will, your Honor.

15           The other thing is this is a cherry-picked document.

16           THE COURT:  Well, but again, it's a statement of a

17   party opponent and it's certainly under agency, as we've dealt

18   with before, but it's hearsay as to you.  Mr. Richenthal's

19   right on that.

20           MR. WEITZMAN:  I'm not even talking about that, your

21   Honor.  I'm talking about two things.

22           The first is they're redacting, cleverly redacting,

23   the last few words on each page at the bottom, where it says

24   "not to be used in litigation."  And that's important, your

25   Honor, because the point of an attorney proffer is that you're

O6cWmen4

1   presenting a hypothetical.  You always present it in a

2   hypothetical.  If the client was to come in, he would likely

3   say something like X, and you always say, in every attorney

4   proffer, this is based on our knowledge at present, not based

5   on all our investigations.  We're still continuing the

6   investigation.

7          The notion that this supports an obstruction charge,

8   and then they can take out from this PowerPoint "not to be used

9   in litigation," which shows the intent here, that this isn't

10  supposed to be binding statements that can be held against us,

11  that's one thing.

12         The second thing is there are other portions here,

13  where it's cherry-picked under the rule of completeness.

14         THE COURT:  That's a separate issue entirely.

15         MR. WEITZMAN:  Yes, your Honor.  I agree.  That's a

16  separate issue.  I agree.  We can address that.

17         THE COURT:  Let's hear the first point.

18         MR. RICHENTHAL:  So, this is the first I've heard that

19  they object to our removing from the document the words "not to

20  be used in litigation."  Why did we do it?  Because it's going

21  to be incredibly confusing to the jury.  It cites Rule 408 at

22  the bottom of the presentation.

23         THE COURT:  That's settlement?

24         MR. RICHENTHAL:  I'm sorry?

25         THE COURT:  That's settlement proffers.

O6cWmen4

1        MR. RICHENTHAL:  Correct.  Correct, and Rule 408

2   expressly -- to be precise, Rule 408(b) as in boy -- contains

3   an exception for, among other things, and I'm quoting, proving

4   an effort to obstruct a criminal investigation or prosecution.

5   That's Federal Rule of Evidence 408(b), as in boy.

6        That's why we're permitted to do this, but the jury is

7   not, your Honor.  The jury's seeing "not to be used in

8   litigation" may come to the view that somehow we've done

9   something improper.  That's not for the jury to consider, so we

10  thought it was appropriate to redact.  Until this moment, we

11  didn't know the defense had a concern about that.  I think

12  candidly it should still be redacted.

13       THE COURT:  408(b).

14       MR. RICHENTHAL:  Yes, your Honor.

15       THE COURT:  The court may admit this evidence for

16  another purpose, such as proving an effort to obstruct a

17  criminal investigation and prosecution.

18       But Mr. Weitzman, isn't that exactly why the

19  government is offering it?

20       MR. WEITZMAN:  Your Honor, I don't dispute 408(b).

21  That doesn't mean that we can't include in the document those

22  lines that negate any corrupt intent.  It doesn't mean that it

23  must be admitted with redactions.  It just means, I think, that

24  the redactions are inappropriate, because it's the same -- it's

25  evidence that the jury's entitled to --

O6cWmen4

1          THE COURT:  No, but if it says -- it's blacked out,

2     but I assume, based on what you said, it says not to be used in

3     litigation --

4          MR. WEITZMAN:  Correct.

5          THE COURT:  -- then they're not going to understand

6     why; they're going to think that the government is using it

7     improperly, and I'm not going to start instructing the jury on

8     the terms of 408(b).

9          MR. WEITZMAN:  I understand your position, your Honor.

10    However, it does go to, to the extent that the jury attributes

11    these statements to Senator Menendez and his agent, it goes to

12    their intention.  It still goes to their intention, whether

13    they had a corrupt intent to obstruct a grand jury

14    investigation.

15         THE COURT:  Wait.  Wait just a second.  How does the

16    phrase "not to be used for litigation," if that's what is

17    blacked out, go to intent to obstruct or not?

18         MR. WEITZMAN:  Because the way these attorney proffers

19    are done, there's often -- often -- misstatements.  Things

20    happen.  Investigations proceed.

21         THE COURT:  Right.

22         MR. WEITZMAN:  No one is obstructing a grand jury

23    investigation.  There was no intent for this document even to

24    go to the grand jury.  And to my knowledge -- the government

25    can correct me if I'm wrong -- until their obstruction

O6cWmen4

1    investigation, this document wasn't presented to the grand

2    jury.  It wasn't presented to the grand jury in connection with

3    the September 2023 indictment.  There was never an intent to

4    obstruct that grand jury investigation.  That's why the

5    redaction's improper, because that's not what this PowerPoint

6    representation is intended for, and assumes the government's

7    questions about certain facts.

8            MR. RICHENTHAL:  The answers that were given were

9    false.  The jury's entitled to conclude that falsity was

10   intentional.  Mr. Weitzman, or his colleagues, in summation can

11   if they wish say no, the falsity was by accident, or they can

12   say, if they wish, it was false.

13           THE COURT:  OK.  I'm going to hear this -- to the

14   extent there was an authentication issue, is there still an

15   authentication issue?

16           MR. WEITZMAN:  No, we don't dispute authenticity, your

17   Honor.

18           THE COURT:  OK.  Then it seems to me that it comes in.

19   I just don't see the issue of authorization.  You can send me

20   whatever it is you want so I can take a look at the cases.

21           MR. WEITZMAN:  Thank you, your Honor.

22           THE COURT:  OK.

23           MR. RICHENTHAL:  And then, as I noted, there's the one

24   other exhibit that I think may come up this afternoon.  This is

25   an exhibit that the defense indicated last night they may seek

O6cWmen4

```
1    to offer in the cross-examination of Mr. Soliman.  Would the

2    Court like to take that up now or after lunch?

3              THE COURT:  Let's do it now, if I can.

4              MR. RICHENTHAL:  It's DX 495.  I don't think our

5    paralegal has yet loaded it to our system.  Perhaps the defense

6    could.

7              THE COURT:  You know what just showed up, that always

8    seems to be the default of one side or the other.  I'm not sure

9    that should really be shown to the jury multiple times a day.

10             MR. RICHENTHAL:  It's not shown to the jury because of

11   how the system works.  It does seem to be somehow the first

12   exhibit on Mr. Hamill's screen.

13             THE COURT:  All right.  If it's not shown to the jury,

14   then I don't care about it.

15             MR. WEITZMAN:  Your Honor, this is the same document

16   that we discussed this morning, where I said I don't plan to

17   offer this as substantive evidence, it's only for impeachment,

18   and we'll have to see what Mr. Soliman says.

19             MR. RICHENTHAL:  Mr. Weitzman did say that.  That does

20   not ameliorate our concern.

21             THE COURT:  How so?

22             MR. RICHENTHAL:  Well, so, what this document is --

23   can someone put it up?

24             THE COURT:  All right.  You know what?  We can take it

25   up -- the jury's coming back at 2:30 -- so let's meet here at
```

O6cWmen4

1   2:15 then.  But wait just a moment.

2            MR. RICHENTHAL:  Your Honor, Mr. Hamill is signaling

3   to me that he can put it on the Court's screen, but obviously

4   we're happy to come back.

5            THE COURT:  Let's see how far we can get.

6            MR. RICHENTHAL:  It's up.

7            So, we had never seen this before, to my knowledge,

8   until last night.  It's a press release, dated September 6,

9   2023, which means it obviously postdates, to my knowledge, the

10  relevant actions in this case, announcing or, I guess, you

11  know, expressing happiness, applauding, according to the press

12  release, the nomination of one Jamel Semper to a United States

13  district judge in New Jersey.

14           We don't understand the relevance of this.

15  Mr. Soliman is not testifying about Mr. Semper's nomination,

16  which is years, literally years, after what he's testifying

17  about.  This is the exhibit that, as I said, Mr. Weitzman said

18  to me that I would see -- quote, you'll see.  We would prefer

19  not to see it in real time, your Honor.  This does not seem

20  relevant.  We don't understand the purpose of it.

21           As to the defense, it would be hearsay if offered for

22  the truth.  Even if it's not offered for the truth, it doesn't

23  seem appropriate.  We'd like some understanding of what's going

24  on here.

25           MR. WEITZMAN:  Your Honor, it's impeachment.  This is

O6cWmen4

1    not going to come out of the blue.  It will either impeach

2    testimony of Mr. Soliman or it will not as to a relevant issue.

3    I assure you it will either be clear or it will not be clear,

4    and if you don't let it in -- I'm not sure I'm even going to

5    need it, frankly, if it's not necessary for impeachment.

6            THE COURT:  All right.

7            MR. WEITZMAN:  So it's a nonissue, I think.

8            THE COURT:  Can somebody print this out for me now?

9    Does anyone have that capability?

10            MR. WEITZMAN:  We can print it.

11            THE COURT:  All right.  I'll take a look at it, but

12    I'm prepared to assume it's not going to come up.

13            Let's see where we are.  We've got a number of things.

14    We have Mearns, Good, Catania, Fuchs, van Wie, Soliman,

15    Sellinger, basically in reverse order.

16            When does the government think they're going to be

17    ending here, an estimate?

18            MR. RICHENTHAL:  We were just talking about that, and

19    I was actually going to give the Court our best estimate.  We

20    think it could occur as soon as June 24.  We gave notice of

21    that to the defense last night, because that triggers the

22    reciprocal obligations under the ten-day agreement for June 14.

23            THE COURT:  Defense, what's the length of the

24    projected -- we're running up against jury issues at that

25    point.

O6cWmen4

1            MR. WEITZMAN:  I think we're likely to have a week,

2     week and a half, maybe two, in the defense case.  Part of it

3     depends, your Honor.  We still don't know all the witnesses

4     that they are withdrawing.  For example, your Honor, they've

5     given us notice of -- I don't know how many -- five witnesses

6     that they're no longer intending to call.  There are still, I

7     think, three cooperators on their list.  And I can name them,

8     but I don't want to name them in public.

9            THE COURT:  All right.  Talk to the government and

10    narrow down the list as much as you can, but that's a real

11    problem.  Two weeks for a defense case and June 24, that will

12    be a real problem, because this jury was asked for a six-week

13    trial, which would have ended June 21, and a couple of weeks

14    thereafter, which ends July 5, but we've got that July 4th

15    weekend in there, and people are going to get jammed up with

16    July 4th and subsequent issues.

17           I think everybody needs to be considerably more

18    efficient than they have been so far.  There's a lot of

19    duplication on the cross.  Again, it was an important cross, so

20    I gave you some leeway, but we were on that patio for an

21    awfully long time.  And for that matter, as I've said, both

22    sides are doing a lot of putting in things that are in, and

23    you're just repeating for the jury things that have been in.

24    Now, I allowed that for ten minutes simply because it was ten

25    minutes and there were two points that I thought made sense for

O6cWmen4

1    the jury to hear now, lest they be under a misimpression.  But

2    I urge you to cut down a lot of the simple presentation of

3    things that are already in evidence and save them for the

4    summations, where they more properly belong, as the defense was

5    arguing.

6         Let me just get rid of one item.  And we'll pick it up

7    again at -- do we have things that we can discuss before the

8    jury comes back?

9         MR. RICHENTHAL:  I think there's nothing that needs to

10   be, and therefore, we can return at 2:30.

11        THE COURT:  All right.

12        MR. RICHENTHAL:  But as I said, we're happy to --

13        THE COURT:  No.  I want this jury to have as much time

14   under its belt as possible, and everyone needs to have lunch

15   here.

16        But I do want to handle the Menendez motion to strike

17   the evidence from Ms. Maali concerning GX 3D-2, the Eastern

18   Mediterranean Security and Energy Partnership Act of 2019.  It

19   was a couple of lines from her plus the introduction of that GX

20   30-2, which was an email from Mr. Daibes to, in effect, Ms.

21   Maali, which had as an attachment the bill, the Eastern

22   Mediterranean Security and Energy Partnership Act of 2019.  I

23   guess it was an act at that point.  And that was the

24   attachment, and it was received by Mr. Daibes from Mr. Menendez

25   in an email from Menendez to Daibes, subject S1102.docx, and

O6cWmen4

1    that attachment, based on the evidence, is simply the Eastern

2    Mediterranean Security and Energy Partnership Act of 2019.  And

3    Menendez has moved to strike that as well as the references in

4    the summary chart of Daibes forwarding it on to Hana and then

5    Hana forwarding it on to Helmy, or not.

6         The public sharing of a piece of legislation is not a

7    legislative act subject to speech or debate protections.  The

8    mere mentioning of a piece of legislation is not a legislative

9    act.  The text itself and sending the text itself is not a

10   legislative act; that is, the text of an act.  There's not a

11   reference to a legislative act in the testimony or the chart or

12   the exhibit, so there's no speech or debate issue with this

13   evidence.  I cite *Gravel*, 408 U.S. 625*; Hutchinson v. Proxmire*,

14   443 U.S. 111, at 133*; Doe v. McMillan* 412 U.S. 306, at 313-14.

15        There's no speech or debate issue in this

16   transmission.

17        Is Ms. Arkin going to testify anywhere along here?

18        MR. RICHENTHAL:  Yes, your Honor, possibly as soon as

19   Monday.  It's a little hard to predict.  Our hope is that

20   Ms. Arkin can take the stand early next week.

21        THE COURT:  What questions are you going to ask her

22   about this act?

23        MR. RICHENTHAL:  About the act itself?

24        THE COURT:  Yes.

25        MR. RICHENTHAL:  Not very much, your Honor.

1          THE COURT:  What are you going to ask her?

2          MR. RICHENTHAL:  Beyond the act, I can answer, but I

3    want to make sure I answer accurately to the Court's first

4    question.

5          THE COURT:  Yes.

6          MR. MARK:  So, we haven't decided definitively, but

7    there are a couple of references in the act, not to the

8    substance of the act but references in the act to the Eastern

9    Mediterranean gas forum.  She can explain what the Eastern

10   Mediterranean gas forum is.  So she can give context to some of

11   those words.

12         THE COURT:  She can explain.  It seems to me she can

13   explain, if she has knowledge, what the Eastern Mediterranean

14   gas forum is.  Yes.

15         Go ahead.  What else?

16         MR. MARK:  That is going to be pretty focused.  There

17   are just a couple of references like that to words and language

18   in it.  She's not going to testify about the nature of that or

19   anything to that extent.

20         THE COURT:  I don't want her testifying to the

21   development of the act, the votes on the act or anything of

22   that nature.

23         MR. MARK:  And we were not going to elicit that sort

24   of testimony.

25         THE COURT:  All right.  What else, outside of the act,

O6cWmen4

1    were you going to ask her?

2          MR. RICHENTHAL:  So, Ms. Arkin interacted with Mr.

3    Menendez on a variety of subjects over time.  She helped brief

4    him.  She helped have conversations with him about setting up

5    the CODEL that the Court has heard about; that is, the trip.

6          THE COURT:  Yes.  I don't have a problem with that.

7          Go ahead.

8          MR. RICHENTHAL:  If the Court is asking about speech

9    or debate, I don't think anything is even going to come close

10   to speech or debate besides the act that Mr. Mark just

11   described.

12         THE COURT:  All right.  Well, the parties have

13   different views on that, but I'll take that representation.

14         All right, everybody, 2:30.  Thank you.

15         (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

O6C5men5

```
 1                  A F T E R N O O N   S E S S I O N

 2                            2:40 p.m.

 3              THE COURT:  Jury entering.  Please rise.

 4              Is the witness ready?

 5              MS. POMERANTZ:  Yes, your Honor.

 6              THE COURT:  All right.

 7              (Jury present)

 8              THE COURT:  Thank you for being here, ladies and

 9    gentlemen.

10              Please be seated in the courtroom.

11              Call your next witness, government.

12              MS. POMERANTZ:  The government calls Philip Sellinger.

13    PHILIP SELLINGER,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16              THE DEPUTY CLERK:  Please state your name and spell

17    your full name for the record.

18              THE WITNESS:  Philip Sellinger.  S-E-L-L-I-N-G-E-R.

19              THE COURT:  It is Philip with one L or two Ls, sir?

20              THE WITNESS:  One L.

21              THE COURT:  Good afternoon, sir.  And welcome.

22              THE WITNESS:  Good afternoon, your Honor.  Thank you.

23              THE COURT:  Your witness, Ms. Pomerantz.

24              MS. POMERANTZ:  Thank you, your Honor.

25    DIRECT EXAMINATION
```

1    BY MS. POMERANTZ:

2    Q.  Good afternoon, Mr. Sellinger.

3    A.  Good afternoon.

4    Q.  How far did you go in school?

5    A.  I have a JD degree.

6    Q.  When you say a JD degree, is that a law degree?

7    A.  Yes.

8    Q.  For approximately how long have you been a lawyer?

9    A.  45 years.

10   Q.  Where did you get your law degree?

11   A.  New York University.

12   Q.  Where did you get your undergraduate degree?

13   A.  University of Massachusetts.

14   Q.  Have you held any positions in public service?

15   A.  I'm currently the United States Attorney for the District

16   of New Jersey, and I have held other positions; yes.

17   Q.  What is a United States Attorney?

18   A.  I am the chief federal law enforcement officer for the

19   district, which is the State of New Jersey.

20          THE COURT:  In other words, the district over which

21   you are the chief federal law enforcement officer is the

22   geographic boundaries of the State of New Jersey; correct?

23          THE WITNESS:  Yes.

24          THE COURT:  But it is not a New Jersey office, it is a

25   federal office; is that correct?

1          THE WITNESS:  Correct.  I am responsible for the

2     federal legal issues in New Jersey.  There is a state attorney

3     general responsible for the state law issues.

4          THE COURT:  And that is not you.

5          THE WITNESS:  That is not me; correct.

6          THE COURT:  Proceed.

7     BY MS. POMERANTZ:

8     Q.  Who, if anyone, typically appoints or selects the U.S.

9     Attorney for a district?

10    A.  The senators of the state will recommend nominations to the

11    president, the president will formally nominate, and it is

12    subject to the advice and consent of the United States Senate.

13         THE COURT:  When you say the president, I take it you

14    mean the president of the United States?

15         THE WITNESS:  Yes.

16         THE COURT:  All right.

17    Q.  I'm going to ask you more about your current job as the

18    U.S. Attorney but I first want to ask you about other jobs you

19    have held.  What was your last job prior to becoming the United

20    States Attorney for the District of New Jersey?

21    A.  I was the managing shareholder of a approximately

22    2,000-lawyer international law firm for a number of years.  At

23    that firm I was chair of the international litigation

24    department and on the executive committee of the law firm.

25    Q.  What kind of work did you do, in sum?

1    A.  I was a litigator, so I handled contested matters.  Mostly

2    civil, some criminal.

3    Q.  Besides your current job as the U.S. Attorney, have you

4    held other positions in public service?

5    A.  Yes.  I was an Assistant United States attorney in the same

6    office in the early 1980s, I was a federal law clerk for a

7    United States district court judge also in the District of New

8    Jersey before that, and when I was in college, I was elected to

9    the Amherst Town Meeting, which is the local legislative body.

10   Q.  You said you were an assistant United States attorney in

11   the District of New Jersey in the early 1980s?

12   A.  Yes.

13   Q.  What kind of cases did you generally handle?

14   A.  I handled a vast array of cases.  I had a principal focus,

15   particularly in the latter years, on international narcotics

16   conspiracy cases, but I also handled tax, fraud, organized

17   crime, hijacking, bank robbery, food stamps, general narcotics,

18   and a host of -- counterfeiting, and a host of other cases.

19   Q.  Were those civil or criminal cases?

20   A.  They were all criminal.

21   Q.  Now, you testified that you are currently the U.S. Attorney

22   for the District of New Jersey.  When did you become the United

23   States Attorney?

24   A.  December 16, 2021.

25   Q.  What are your general responsibilities as the United States

1    Attorney for the District of New Jersey?

2    A.   So I run the entire office, which is approximately 170

3    lawyers and 120 non-lawyer personnel.   My principal

4    responsibilities are oversight of the major litigation cases in

5    the office, selecting the leadership of the office, meeting

6    with the various heads of each of the units that supervise very

7    specialized practices within the office as well.   I'm the

8    principal liaison with our federal law enforcement partners --

9    FBI, DEA, ATF, IRS -- the state and local law enforcement

10   partners as well.   And, there is a fair amount of community

11   outreach, meeting with community leaders and members of the

12   community, in order to help build trust between law enforcement

13   and the community.

14   Q.   What kind of cases does the U.S. Attorney's office for the

15   District of New Jersey handle?

16   A.   We have nine specialized units within the criminal division

17   which range from cyber crime, healthcare, forfeiture and money

18   laundering, narcotic, gangs, a general crimes unit for our

19   newer lawyers, fraud, security, healthcare, and opioids, and

20   political prosecutions on the criminal side.   And then, the

21   civil side is everything ranging from defending the United

22   States government when there are constitutional or other

23   challenges to federal statutes, or defending the federal

24   government in any kind of case which could be a United States

25   postal office truck in a car accident.   So, everything in

O6C5men5                        Sellinger - Direct

1   between.  As well as all appeals.

2   Q.  Approximately how many criminal cases does the U.S.

3   Attorney's office for the District of New Jersey handle, per

4   year?

5   A.  We have approximately filed cases, 1,500 criminal cases and

6   approximately 2,500 civil cases.  These are filed cases.  There

7   are also investigations, but because that's non-public I am not

8   at liberty to get into the numbers on that, but there are many.

9   Q.  When you say filed cases, filed criminal cases, what do you

10  mean by that?

11  A.  Criminal charges have been filed, which is either a

12  criminal complaint or an indictment that has been returned by a

13  grand jury.  There are also appeals in addition to the criminal

14  and civil cases, a smaller number.

15  Q.  And I believe you said that was about 1,500 charged

16  criminal cases?

17  A.  I believe that's right.

18  Q.  Of those charged cases, approximately how many do you get

19  personally involved in at any given time?

20  A.  It's a relative minority.  I'm briefed on all the

21  significant cases in the office but it is a small fraction of

22  the 1,500, but I meet very regularly with each of the

23  supervisors, as I mentioned, for each of the units, and in that

24  capacity each of them brief me on the major cases within their

25  units.  And then there are other matters that, for various

1  reasons, come before me.  But it is still a fraction of the

2  total number.

3  Q.  When people outside of your office have concerns about a

4  particular case, how do those concerns typically get addressed

5  within your office?

6  A.  We have line-level attorneys who are handling the

7  day-to-day of cases, and then several supervisory levels above

8  them.  So, if there are concerns about cases they'll be

9  addressed in the first instance at the line-level, and then can

10  get elevated through each of the supervisory levels, and

11  ultimately to the front office of the U.S. Attorney's office,

12  which is me and my four top advisors.

13  Q.  Now, when you say each of the supervisory levels, can you

14  explain what you mean?

15  A.  Yes.  The way that we are organized is United States

16  Attorney is at the top of the organizational chart, and then

17  there are four key advisors, a First Assistant U.S. Attorney,

18  an Executive U.S. Attorney, counsel to the U.S. Attorney, and

19  the deputy, they each have various functions, but then

20  underneath them are chiefs of each of the divisions.  Under the

21  chiefs are deputy chiefs of each of the divisions, and

22  certainly in the criminal division there are then supervisors

23  of each of the nine units that I mentioned earlier.

24  Q.  When you say each of the divisions, are you referring to

25  civil and criminal divisions?

O6C5men5                        Sellinger - Direct

1    A.  Yes, plus more.  Civil, criminal, appeals, special

2    prosecutions, which is political corruption, and I created a

3    civil rights division which was a fifth division.

4    Q.  Who, if anyone, do you understand recommended you to be the

5    United States Attorney for the District of New Jersey?

6    A.  Both senators Menendez and Booker recommended me.  Senator

7    Menendez was the principal among the two.

8    Q.  When you say he was the principal among the two, what do

9    you mean?

10   A.  My understanding was among the two senators, he had

11   principal responsibility, although both of them were part of

12   the process to recommend me.

13   Q.  You mentioned Senator Booker, who is Senator Booker?

14   A.  Senator Booker is the junior senator from New Jersey, and

15   by junior I simply mean shorter tenure than Senator Menendez.

16   Q.  Are you familiar with the term senior senator?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  I believe senior senator is simply the senator with the

20   most longevity in the Senate and junior senator is the one with

21   less longevity.

22          THE COURT:  For each state?

23          THE WITNESS:  Yes, your Honor.

24   Q.  To be clear, who was the senior senator when you were

25   nominated to be the U.S. Attorney for the District of New

1    Jersey?

2              THE COURT:  You are asking about the senior senator

3    from New Jersey, I take it?

4              MS. POMERANTZ:  Yes, your Honor.

5              THE COURT:  All right.

6    A.   Senator Menendez.

7    Q.   Other than being interviewed and testifying as a witness,

8    have you had any role in the investigation or prosecution of

9    this case?

10   A.   No.

11   Q.   I'm going to ask you more about the process of becoming

12   U.S. Attorney for the District of New Jersey in a bit but I

13   first want to ask you more about your relationship with Robert

14   Menendez.

15   A.   Yes.

16   Q.   Approximately when did you first meet Robert Menendez?

17   A.   In the early 2000s, during his last campaign for United

18   States Congress, before he became a United States senator.

19   Q.   How did you first meet him?

20   A.   In connection with his campaign.  I was involved in a

21   fundraiser for him.  I may have met him earlier at other events

22   but I began to get to know him more precisely during that last

23   campaign for Congress.

24   Q.   What was the nature of your relationship with him when you

25   first met him?

1   A.   When we first met it was professional and in connection

2   with his campaigns as a contributor and to somebody who held

3   fundraisers.

4   Q.   And approximately when was that?

5   A.   That began, as I said, in the early 2000s, and probably

6   continued that way for three, four, five years.   Something

7   along that line.

8   Q.   How did your relationship with Robert Menendez change over

9   time?

10  A.   We began to socialize with dinners more often, or

11  breakfasts less often, periodically.   The meals increased

12  somewhat over time.   As time went on, we started playing golf

13  together.   As time progressed further, we would sometimes have

14  both of our sons join us for golf.   And in the latter years

15  prior to 2020, on three or four occasions we had dinner with my

16  wife Barbara and the senator's wife Nadine.

17  Q.   Now, you mentioned you were involved in Menendez'

18  Congressional campaigns.   Did there come a time when you became

19  involved in his Senate campaigns?

20  A.   Yes.   Yes, I was involved in each of his campaigns after I

21  met him.

22  Q.   What was your involvement in his Senate campaigns?

23  A.   As I -- same as I described.   Contributing and holding

24  fundraisers.

25  Q.   You mentioned socializing with Robert Menendez and his

O6C5men5                      Sellinger - Direct

1   wife; is that right?

2   A.  Yes.

3   Q.  Remind me, approximately when did Robert Menendez and

4   Nadine marry?

5   A.  I believe it was in the fall of 2020.

6   Q.  How did you know they married then?

7   A.  I was there.

8            THE COURT:  You were there at the wedding?

9            THE WITNESS:  I was a guest, yes.

10  Q.  Approximately how many people attended their wedding?

11  A.  I would estimate 65 to 70.  Something along that number.

12  Q.  Approximately when did you first meet Nadine?

13  A.  I believe that I met Nadine once in 2020 earlier, in

14  advance of their wedding.

15  Q.  Now, you testified that -- withdrawn.

16           In approximately what year did the topic of you

17  becoming the United States Attorney for the District of New

18  Jersey first come up with Robert Menendez?

19  A.  It first came up sometime in or around 2016.

20  Q.  How did it first come up?

21  A.  I believe that over time we had had conversations when I

22  expressed an interest, but as we approached the presidential

23  election of 2016, which was between Hillary Clinton and Donald

24  Trump, as we got close to that election we sat down and had a

25  more serious discussion about the opportunity -- the potential

1    opportunity.

2    Q.   Where did you sit down and have that more serious

3    conversation?

4    A.   It was at a -- either a pancake house or a breakfast

5    restaurant, somewhere in Hudson County or possibly Union

6    County.   I think Hudson County.

7    Q.   What, if anything, did Robert Menendez explain to you in

8    2016 about the process for being appointed as the U.S. Attorney

9    in the District of New Jersey?

10   A.   Over time, he and his staff explained to me that the two

11   New Jersey senators would recommend a candidate to the

12   president.   At that point we were talking about a potential

13   election of Hillary Clinton, that had not occurred, and

14   obviously it did not occur, but that the two senators would

15   make a recommendation and that the president would nominate and

16   the Senate will confirm.

17   Q.   Besides Robert Menendez, did you speak with anyone else in

18   2016 about your interest in becoming the U.S. Attorney for the

19   District of New Jersey?

20   A.   Yes.   I also spoke with Senator Booker.

21   Q.   Did you speak with him in person or by phone?

22   A.   I met with Senator Booker at his office in Washington.

23   Q.   Who, if anyone, told you to meet with Senator Booker?

24   A.   Senator Menendez recommended that I meet with Senator

25   Booker, and I did.

1    Q.  Did he explain why?

2    A.  I'm sorry?

3    Q.  Did he explain why?

4           THE COURT:  Who is he?

5    Q.  Excuse me.  Senator Menendez.

6    A.  As I mentioned, my understanding, from he and his staff

7    members who were, I also spoke with, was that both senators had

8    to assent to a recommendation pursuant to a process called blue

9    slips, which when you have a president of one party and

10   senators from the same party, in that state that both senators

11   need to assent, approve to -- nominees to senior federal

12   positions like U.S. Attorney.

13   Q.  Based upon your conversations with Menendez in 2016, who

14   did you understand to be taking the lead in the nomination

15   process?

16   A.  I understood Senator Menendez would be taking the lead.

17   Q.  You mentioned that you were involved in fundraising and

18   donating for Robert Menendez.  What, if any involvement, did

19   you have in fundraising for Cory Booker?

20   A.  I was involved in fundraising for him as well.

21   Q.  What happened after you expressed interest in becoming the

22   U.S. Attorney in 2016?

23   A.  Ultimately there was an election, Hillary Clinton was not

24   elected, and it was clear that the discussions about my

25   potentially becoming U.S. Attorney were at an end, because with

O6C5men5                      Sellinger - Direct

1    a president of a different party I was not likely to be

2    nominated.  That's probably an overstatement.  I was not going

3    to be nominated.

4    Q.  Directing your attention to the year 2020, what, if any

5    jobs or political appointments, did you first seek that year?

6    A.  Again, I was interested and sought to become a U.S.

7    Attorney.

8    Q.  What, if anything, happened in the United States that

9    caused you to seek the job of U.S. Attorney in 2020?

10   A.  Well, in 2020 Joseph Biden was elected president.  I am

11   certain that I expressed interest were that to occur in advance

12   of the election, but given what had happened in 2016, it became

13   clear there was no point in sitting down and having a formal

14   meeting so that didn't occur before the election.  But, after

15   the election I expressed an interest in having that occur.

16   Q.  To whom did you express an interest?

17   A.  Senator Menendez.

18   Q.  How did you express an interest?

19   A.  I can't recall the conversation.  I am sure we had several

20   conversations along the way where I indicated that if President

21   Biden was elected, I was still interested in becoming the U.S.

22   Attorney and ultimately we met.  But further discussions, I

23   can't recall the details.

24   Q.  You said that you met?

25   A.  Yes.

1   Q.   Approximately when did you meet with Robert Menendez?

2   A.   I believe it was December 16, 2021.

3   Q.   Where did you meet with Robert Menendez?

4   A.   At his office in Washington.

5   Q.   Who was present for the meeting?

6   A.   Just the two of us.

7             MS. POMERANTZ:   Mr. Hamill, can you please show the

8   witness what's been marked for identification as Government

9   Exhibit 12A-2?

10  Q.   Mr. Sellinger, do you recognize this?

11  A.   Yes.   This is a calendar entry for myself from the law firm

12  I was working at, Greenberg Traurig, which I mentioned earlier,

13  at the time.

14            MS. POMERANTZ:   The government offers Government

15  Exhibit 12 A-2.

16            THE COURT:   Admitted, without objection.

17            (Government's Exhibit 12A-2 received in evidence)

18            MS. POMERANTZ:   We can publish that.

19  BY MS. POMERANTZ:

20  Q.   Mr. Sellinger, was your meeting with Robert Menendez in

21  December of 2020 or December of 2021?

22  A.   December of 2020.   If I said 2021, I misspoke.

23  Q.   Now, I want to direct your attention to the top of the page

24  what is TPA to BWI 2HROBX flight 2107.

25  A.   That is a flight I took that morning from Tampa to

1  Baltimore, I believe it was the Baltimore airport, for that

2  day.

3  Q.  Approximately what time was the flight?

4  A.  It looks to be approximately 8:30 a.m.  That's takeoff.

5  Q.  Directing your attention to the bottom of the page, what is

6  flight UA 3644 from IAD to SRQ?

7  A.  That was a return flight from Washington Dulles to -- SRQ

8  is Sarasota, both Sarasota and Tampa, Florida, where I was at

9  the time.

10         MS. POMERANTZ:  If we can zoom back out?

11 Q.  On what day was this meeting with Robert Menendez?

12 A.  December 15, 2020.

13 Q.  Now, is your meeting with Robert Menendez on your

14 December 15, 2020 calendar?

15 A.  No.

16 Q.  Why not?

17 A.  I had discussed with the senior leadership in my law firm

18 that I was in the process of applying to become U.S. Attorney,

19 but because I ran the entire Greenberg Traurig office from day

20 one -- I opened the office 16, 17 years earlier -- I thought it

21 would be disruptive to have it known that I was pursuing this

22 position until it became more certainty, so my secretaries had

23 access to my calendar and chose not to list it for that reason.

24 Q.  You mentioned Greenberg Traurig.  What is that?

25 A.  Sorry.  That's the name of the firm that I was working

1    with -- working at, at the time.

2    Q.  What was your understanding of the purpose of the meeting

3    with Robert Menendez on December 15, 2020?

4    A.  The purpose was to pursue my interest in becoming U.S.

5    Attorney under President Biden.

6    Q.  What did you and Menendez generally discuss in the meeting?

7              THE COURT:  Before you get to that, I gather Biden had

8    been elected but he wasn't yet -- the inauguration had not yet

9    taken place; is that right?

10             THE WITNESS:  Correct, your Honor.  The inauguration

11   was on or about January 20th, I believe, is typically

12   Inauguration Day.

13             THE COURT:  Thank you.  Ms. Pomerantz asked what did

14   you and Menendez generally discuss in the meeting.

15             THE WITNESS:  We started talking about my priorities

16   if I became U.S. Attorney, talked by my vision for the office.

17   I ran through the generally -- the various units within the

18   office that I would focus on, certainly spoke about civil

19   rights and other general priorities, violent crime and the

20   like.  We then moved to discussing the selection of leadership

21   within the office and the approach.  The senator asked me what

22   my approach would be to selecting leaders and I told him some

23   of the things that I had been looking for that -- personality

24   traits and other characteristics that would be important to me,

25   and thereafter he mentioned Fred Daibes.

1  Q.  Did any particular cases come up during the meeting?

2  A.  Yes.  Senator Menendez mentioned that Fred Daibes had a

3  case before the United States Attorney's office and Senator

4  Menendez believed that he was being treated -- he,

5  Mr. Daibes -- was being treated unfairly, and Senator Menendez

6  hoped that if I became U.S. Attorney that I would look at it

7  carefully.

8  Q.  How many particular cases came up during that meeting?

9  A.  One.

10  Q.  Who brought up the case?

11  A.  Senator Menendez.

12  Q.  Were you talking about particular cases at the time he

13  brought up the Daibes criminal case?

14  A.  No.  It was towards the tail end of the meeting and we were

15  talking, as I said, about the -- we had talked about my

16  priorities for the office, my vision for the office, selecting

17  leadership for the office and the like.

18  Q.  Did Senator Menendez explain what he meant by unfairly?

19  A.  No.

20  Q.  To take a step back, when he brought up the Daibes criminal

21  case, what case did you understand him to be referring to?

22  A.  I didn't know.  I didn't know anything about it.

23  Q.  How did you respond to Menendez?

24  A.  I told the senator that any cases that came before me as

25  United States Attorney I would look at carefully, and I said

1    that either then or in a call we had the following day, or

2    both, and that was the end of that conversation.

3    Q.  Can you remind the jury about how many charged criminal

4    cases does the U.S. Attorney's office for the District of New

5    Jersey have ongoing at any given time?

6    A.  Approximately 1,500.

7    Q.  Before that conversation with Menendez on December 15,

8    2020, had you heard of Fred Daibes?

9    A.  Yes.

10   Q.  How had you heard of him?

11   A.  I was involved in a lawsuit at my former firm, Greenberg

12   Traurig, where I represented a real estate developer adverse to

13   Mr. Daibes and his bank and in connection with that lawsuit.  I

14   believe that was the first time I heard of Mr. Daibes.

15   Q.  Were there other ways that you had heard of him?

16   A.  Yes.  Separate and apart from that, at one point many

17   months earlier than December 2020, in a conversation before we

18   were having any discussions about becoming U.S. Attorney in

19   2020, he commented that he had spoken to the prior United

20   States Attorney about a case involving Mr. Daibes, was unhappy

21   about the way it was resolved, and that -- when I say it was

22   resolved, the conversation -- and that the prior U.S. Attorney

23   had placed responsibility on the resolution of whatever the

24   conversation was on his then First Assistant United States

25   Attorney.

1    Q.  You said that -- I'm going to come back to that.  I'm going

2    to first ask you about the lawsuit you mentioned.

3    A.  Yes.

4          MS. POMERANTZ:  Mr. Hamill, can you please show the

5    witness what's been marked for identification as Government

6    Exhibit 12E-1?

7    Q.  Mr. Sellinger, I want to direct your attention to the

8    e-mail where it says:  Begin forwarded message.

9    A.  Yes.

10   Q.  Do you recognize this?

11   A.  Yes.  This is an e-mail sent from my prior law firm --

12   myself at my prior law firm GTlaw, Greenberg Traurig, to Fred

13   Turner, who was -- excuse me Senator Menendez' chief of staff.

14   Q.  Is there an attachment?

15   A.  Yes.  It says:  Fred, as discussed, thanks.  And attached

16   to that you can see at the very top is a filed complaint.

17         MS. POMERANTZ:  The government offers Government

18   Exhibit 12E-1.

19         THE COURT:  Admitted without objection.

20         MR. WEITZMAN:  One moment, your Honor?

21         THE COURT:  Sorry.

22         (Counsel conferring)

23         MR. WEITZMAN:  No objection, your Honor.

24         THE COURT:  Admitted without objection.

25         (Government's Exhibit 12E-1 received in evidence)

O6C5men5                        Sellinger - Direct

1          MS. POMERANTZ:  We can publish that.

2     BY MS. POMERANTZ:

3     Q.   Mr. Sellinger, on what date did you send this e-mail?

4     A.   The e-mail indicates that it was sent on May 8, 2018.

5          MS. POMERANTZ:  I'm sorry.  Mr. Hamill can we please

6     blow up where it says:  Begin forwarded message.  And down?

7     Q.   Who did you send this e-mail to?

8     A.   Fred Turner.

9     Q.   In May 2018, what did Fred Turner do?

10    A.   He was the chief of staff to Senator Menendez.

11    Q.   At the time you sent this e-mail in May 2018, based on your

12    conversations with Robert Menendez, what was your understanding

13    of Menendez' relationship with Fred Daibes?

14    A.   I understood that they were friends.  I cannot say that

15    that was based on the conversation with Senator Menendez.

16    Q.   Why did you send this to Fred Turner?

17    A.   I don't recall the e-mail but it is obvious that I sent

18    that in response to a request for it.

19         MS. POMERANTZ:  Mr. Hamill, let's turn to page 2.

20    Q.   What is this?

21    A.   This appears to be the first page of the complaint that I

22    was referring to that my law firm, Greenberg Traurig, filed on

23    behalf of the developer against -- the defendant is the Borough

24    of Edgewater, but as I mentioned earlier, the case involved

25    Mr. Daibes and a bank that he controlled, in some fashion.

1        THE COURT:  As in some way being adverse to your

2    client?

3        THE WITNESS:  Yes, your Honor.  As I recall it, the

4    core allegation in the complaint was that Mr. Daibes --

5        MR. DE CASTRO:  Your Honor, I'm sorry.  We are going

6    to object to this.

7        (Counsel conferring)

8        THE COURT:  Yes.  Let me just ask, was Daibes, in some

9    way, adverse to your client?  Yes or no.

10       THE WITNESS:  Daibes was not a defendant in the case,

11    no.

12       THE COURT:  Were his interests adverse to the

13    interests of your client?

14       THE WITNESS:  Very much so.

15       THE COURT:  All right.

16   BY MS. POMERANTZ:

17   Q.  Is this a criminal or civil complaint?

18   A.  It is a civil complaint.

19   Q.  Is that another word for a lawsuit?

20   A.  I'm sorry.  I didn't hear the question.

21   Q.  Is this a lawsuit?

22   A.  One more time?

23   Q.  Is this a lawsuit?

24   A.  Yes.  I'm sorry.  It is a lawsuit.

25   Q.  What was your role in the lawsuit?

1   A.  I was involved in the strategy behind the development of

2   the legal theories.  I reviewed this document, the complaint

3   and a number of its drafts and the early case development

4   strategy.  Before the complaint was filed I was very active.

5   Thereafter, I was consulted from time to time on the complaint

6   but I was not hands-on active in the litigation.

7   Q.  Remind us, what did you do for work in May 2018?

8   A.  I was the managing shareholder of the New Jersey office of

9   Greenberg Traurig, which I had opened in 2002 and ran and

10  managed and built and developed over the 16 years between them.

11  Q.  At the time you sent this e-mail to Fred Turner, did you

12  know what Fred Turner did with it?

13  A.  I had no -- actually, no.  No.

14  Q.  Let's go back to the first page of this exhibit and look

15  above where it says:  Begin forwarded message.

16  A.  I see that.

17  Q.  Prior to this month, did you know that Turner forwarded it

18  to Robert Menendez?

19  A.  No.  I did not, until I saw this document in the last few

20  weeks.

21          THE COURT:  Ladies and gentlemen, in the prior

22  document you saw, you saw the black lines.  You have seen that

23  before.  It just means things have been redacted, taken out,

24  because they're of no concern to the jury.

25          MS. POMERANTZ:  Let's go back to page 2, Mr. Hamill.

1   Q.  Mr. Sellinger, directing your attention to the top where it

2   says the text in blue, where it says "filed"?

3   A.  Yes.

4   Q.  What date does it say there?

5   A.  December 6, 2017.

6   Q.  During your December 15, 2020 meeting with Robert Menendez,

7   what, if anything, did Robert Menendez say about this civil

8   lawsuit?

9   A.  Nothing.

10  Q.  During your December 15, 2020 meeting with Robert Menendez,

11  what, if anything, did he say about the e-mail you sent to Fred

12  Turner on May 8, 2018?

13  A.  Nothing.

14  Q.  During your December 15, 2020 meeting with Robert Menendez,

15  what, if anything, did he say about your ability to be fair and

16  impartial regarding the Daibes criminal case?

17  A.  Nothing.

18  Q.  Now, you testified --

19          Just on this lawsuit, was this a public lawsuit?

20  A.  Yes.

21          THE COURT:  Now, earlier you testified that in your

22  December 15, 2020 meeting with Mr. Menendez that Mr. Menendez,

23  my notes at least say, that Mr. Menendez mentioned Fred Daibes

24  had a case in the District of New Jersey.  Did he say it was a

25  criminal case or were you led to believe it was a criminal

1    case?

2            THE WITNESS:  I don't recall the exact words but I

3    understood it to be a criminal case.

4            THE COURT:  All right.

5    BY MS. POMERANTZ:

6    Q.  You also testified that Robert Menendez brought up Daibes

7    to you sometime before that December 15, 2020 meeting.  Do you

8    recall that?

9    A.  Yes.  I wouldn't quite use the words "brought up" but in a

10   discussion he mentioned what I said to you earlier.

11   Q.  Can you just remind us what that was?

12   A.  He said that he had had a conversation with the prior

13   United States Attorney about a matter involving Mr. Daibes, and

14   Senator Menendez was not particularly pleased with the

15   resolution of it.

16   Q.  I believe you mentioned that the prior U.S. Attorney -- in

17   that conversation what, if anything, did Robert Menendez say

18   about the prior U.S. Attorney in connection with this Daibes

19   case?

20   A.  He really said nothing about the case or the U.S. Attorney

21   other than what I testified to before -- that the senator had

22   raised the case with the prior U.S. Attorney, that he was

23   unhappy with the discussion, he did not get into any details

24   what it was, and that the prior U.S. Attorney had placed

25   responsibility on his first assistant U.S. Attorney and no

1   other details of any kind.

2   Q.  You said that the prior U.S. Attorney placed the blame on

3   his first assistant?

4   A.  Responsibility, yes.

5   Q.  Did Robert Menendez mention the first assistant by name?

6   A.  I believe he did.

7   Q.  And who was the first assistant then?

8   A.  At that time it was Rachael Honig.

9   Q.  Approximately when did this conversation happen?

10  A.  It was many months so it would have been sometime between

11  2018 and 2020.  I really can't recall.

12  Q.  Have you ever seen Fred Daibes in person?

13  A.  Once.

14  Q.  Where?

15  A.  At Senator Menendez' wedding.

16  Q.  Now, you testified earlier that when, in 2016, when you

17  first expressed interest in becoming a U.S. Attorney you spoke

18  with both Robert Menendez and Cory Booker.  Did you speak with

19  Cory Booker about the position of the U.S. Attorney for the

20  District of New Jersey in 2020?

21  A.  Yes.  Yes, I believe it was December 18, 2020.

22  Q.  How did you speak with Cory Booker on December 18, 2020?

23  A.  It was a video conference.

24  Q.  Who was present for the meeting?

25  A.  I believe it was just he and me, but I don't know if there

 1    was anyone else with him.

 2            MS. POMERANTZ:  Mr. Hamill, can we please show the

 3    witness what's been marked for identification a Government

 4    Exhibit 12A-3?

 5            THE COURT:  Was this during COVID, sir?

 6            THE WITNESS:  Yes.

 7            THE COURT:  Was that the reason that it was by video?

 8    If you know.

 9            THE WITNESS:  I really don't know.  It was proposed by

10    Senator Booker, or actually his chief of staff.  I would have

11    done whatever they wanted.

12            THE COURT:  OK.  Thank you.

13    BY MS. POMERANTZ:

14    Q.  Mr. Sellinger, on your screen do you have Government

15    Exhibit 12A-3 --

16            THE WITNESS:  I'm sorry.  I'm sorry.

17            Just, your Honor, when I say I would have done

18    whatever they wanted, I mean in terms of having a meeting via

19    video versus in-person.

20            THE COURT:  I think the jury understood that.  You

21    were indifferent between telephone, in-person, and video?

22            THE WITNESS:  Yes.

23            THE COURT:  OK.

24    BY MS. POMERANTZ:

25    Q.  Mr. Sellinger, you should have on your screen Government

1    Exhibit 12A-3.

2    A.   Yes.

3    Q.   Do you recognize this?

4    A.   Yes.   This is my calendar entry from my former firm

5    Greenberg Traurig, on December 18.

6              MS. POMERANTZ:   Your Honor, the government offers

7    Government Exhibit 12A-3.

8              THE COURT:   Hearing no objection, admitted.

9              (Government's Exhibit 12A-3 received in evidence)

10             MS. POMERANTZ:   Can we publish that for the jury?

11   BY MS. POMERANTZ:

12   Q.   Directing your attention to the middle of the page where it

13   says CB, what is CB?

14   A.   Cory Booker.

15   Q.   What does this CB entry show?

16   A.   It shows that I had a -- if you can enlarge it a little bit

17   for me?   It shows that I had a meeting scheduled, it looks like

18   at 10:30 to 11:30.   Oh, I'm sorry.   As I look at it, it

19   actually looks like it is from 11:00 to 12:30.   That is what is

20   blocked out in my calendar.

21   Q.   What was your understanding of the purpose of your meeting

22   with Cory Booker?

23   A.   Again, as with Senator Menendez, the application process to

24   become U.S. Attorney.

25   Q.   What did you and Cory Booker discuss in the meeting?

O6C5men5                          Sellinger - Direct

1    A.  We certainly discussed my vision for the office, my

2    priorities and the like.  We talked a fair amount about civil

3    rights.  And we also spoke a fair amount about criminal justice

4    reform legislation that Senator Booker had sponsored.  One such

5    piece of legislation passed into law but I believe there were

6    seven other bills that Senator Booker had sponsored on criminal

7    justice reform and I believe we had a reasonably detailed

8    discussion about that.

9    Q.  What, if any advice, did Robert Menendez give you before

10   your conversation with Booker on December 18, 2020?

11   A.  Senator Menendez had told me about the various bills that

12   Senator Booker had sponsored or co-sponsored and thought it

13   would be good for me to be prepared to talk about those in my

14   meeting with Senator Booker.

15   Q.  During your December 18, 2020 conversation with Booker, did

16   any particular cases come up during the meeting?

17   A.  No.

18   Q.  Now, you testified that when you met with Robert Menendez

19   on December 15, 2020, he brought up the Daibes criminal case to

20   you.  Did you speak with Robert Menendez about Daibes again?

21   A.  Yes, just can I have the question read back, please?

22           THE COURT:  Why don't you state it again.

23   Q.  Did you speak with Robert Menendez about Daibes again after

24   December 15, 2020?

25   A.  Yes.  On, I believe it was the following day, I called

O6C5men5                          Sellinger - Direct

1    Senator Menendez back and I said to him that if I became U.S.

2    Attorney, I would look at all cases carefully but I want him to

3    know that I had this prior representation of developers in a

4    case that was adverse to Mr. Daibes that might lead to my

5    potentially being recused or removed from any case in the U.S.

6    Attorney's office, and I explained to him that the process was,

7    which I intended to follow, was to disclose to him the

8    circumstances of my prior representation, the details of the

9    case and the adversity, and that that disclosure would be made

10   to the Department of Justice and either the Department of

11   Justice process somebody else at the department would make the

12   decision whether I am not -- I should be recused.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6cWmen6                         Sellinger - Direct

1          THE COURT:  When you say somebody else, what do you

2    mean?  Somebody other than you?

3          THE WITNESS:  Somebody other than me.  I really didn't

4    know at that time who, who it was.

5          THE COURT:  If you know, is there a separate unit or

6    division or office within the Department of Justice that

7    handles these issues?

8          THE WITNESS:  I now know, since I've become U.S.

9    Attorney, that there's a small group of very senior attorneys

10   within the Department of Justice who make that determination.

11   I really didn't know anything about the details at the time.

12         THE COURT:  So if I understand you, the determination

13   of whether or not you are to be recused -- that is, to not have

14   anything to do with the proceeding -- is not made by you or

15   anyone in the District of New Jersey.  Is that what you're

16   saying?

17         THE WITNESS:  Correct.  The process is very clear,

18   that if there's a potential conflict of interest, that I make

19   disclosure of that and I do not make any decision as to whether

20   or not I would be recused.

21         THE COURT:  All right.

22         THE WITNESS:  And I communicated that to Senator

23   Menendez.

24         THE COURT:  Thank you.

25   BY MS. POMERANTZ:

O6cWmen6                    Sellinger - Direct

1   Q.  When you said recused from any case in the U.S. Attorney's

2   Office, does that mean you would be recused from any case

3   involving Daibes or any case at all?

4   A.  If I said any case, I misspoke.  I don't recall where that

5   terminology came, but I was speaking only, obviously, about the

6   Daibes case, that because of my prior involvement in the case

7   adverse to Daibes, that I might be recused from any case in the

8   U.S. Attorney's Office involving Fred Daibes.

9           THE COURT:  All right.  And for the benefit of the

10  jury, you said recused from, you might be recused from any case

11  in the U.S. Attorney's Office involving Fred Daibes.  Tell the

12  jury what recused or being recused from any case means.

13          THE WITNESS:  Yeah.  Being recused means completely

14  removed, out of the decision-making authority.  Another

15  attorney, the next most senior attorney becomes designated as

16  the attorney for the United States in lieu of the United States

17  Attorney.  Zero involvement.

18  BY MS. POMERANTZ:

19  Q.  What did Robert Menendez say in response?

20  A.  He indicated that he understood what I was saying.  It's

21  possible he asked a question or two.  I couldn't recall.  But

22  he made no substantive comment.

23  Q.  Did you and Robert Menendez discuss Daibes any further on

24  that case?

25          THE COURT:  You said on the case.

1          MS. POMERANTZ:  Excuse me.  On that call.  My

2      apologies.

3      Q.  Did you and Robert Menendez discuss Daibes any further on

4      that call?

5      A.  No.  I did, on that call, as I mentioned, say that any case

6      I was involved in, that I was involved in, I would look at,

7      obviously, carefully.  But we had no other discussion about

8      Daibes, no.

9      Q.  You testified that you called Robert Menendez to say you'd

10     have to disclose this civil litigation to the Department of

11     Justice if you were going to be appointed?

12     A.  Yes.

13     Q.  Why did you think that was -- withdrawn.

14         Is it your understanding that being recused means

15     you're actually biased?

16     A.  No.  No.

17     Q.  What is your understanding of the standard of recusal?

18     A.  The standard of recusal could be -- it certainly could be

19     somebody who was partial, but it can be, and much more often

20     would be, the appearance of impartiality.  So if a member of

21     the public might perceive a set of circumstances to create any

22     lack of objectivity, that on that basis somebody could be

23     recused.

24     Q.  Without getting into specific cases, is the Daibes case the

25     only case you're recused from as the U.S. Attorney?

1    A.  No.  I've been recused from many cases.

2    Q.  From your work as U.S. Attorney, do you have an

3    understanding as to how common or uncommon it is for a federal

4    prosecutor to be recused based on past work in the private

5    sector?

6              MR. WEITZMAN:  Objection, your Honor.

7    A.  It's --

8              THE COURT:  Just a moment.

9              MR. WEITZMAN:  Offered for the truth, and it would be

10   hearsay.

11             THE COURT:  I'll allow his understanding.

12             If you understand the question, you may answer.

13   A.  It's very common for prosecutors to be recused.  There are

14   many different bases for recusal, but one of them, a

15   significant one, is the one you mentioned -- prior work at a

16   law firm.

17   Q.  In any of your conversations with Robert Menendez before

18   you were nominated to be the U.S. Attorney, did Menendez

19   express any concerns that you were biased against Daibes?

20   A.  No.

21   Q.  In any of your conversations with Menendez before you were

22   nominated to be the U.S. Attorney, did Menendez express any

23   concerns about you supervising the criminal prosecution of

24   Daibes?

25   A.  No.

O6cWmen6                              Sellinger - Direct

1    Q.   In any of your conversations with Robert Menendez before

2    you were nominated to be the U.S. Attorney, did Menendez

3    express any concerns about your nomination process because of

4    the Daibes criminal case?

5    A.   No.

6    Q.   In any of your conversations with Robert Menendez before

7    you were nominated, what, if anything, did Menendez say to you

8    about any impact on your nomination process from your

9    involvement in the civil lawsuit?

10   A.   Nothing.

11   Q.   Now, did you speak with Robert Menendez about the position

12   of U.S. Attorney for the District of New Jersey again?

13   A.   Yes.  In the latter part of November, we had a series of

14   discussions in which we talked about the process of my

15   potentially being nominated -- the conversations he had had

16   with the White House, the White House process, the fact that

17   the White House had asked for a number of candidates to be put

18   forward for U.S. Attorney and other positions, federal

19   positions, and ultimately that the White House was not going to

20   be nominating me for the U.S. Attorney and that, therefore, he

21   was not going to be recommending me.

22           THE COURT:  The question was in the latter part of

23   November.  I don't understand that.  That was prior to your

24   meeting in December '16?

25           THE WITNESS:  Was the question November?

O6cWmen6                    Sellinger - Direct

1          THE COURT:  What was your question?  That's how it's

2    recorded.

3          MS. POMERANTZ:  Perhaps I can clarify, your Honor.

4          THE COURT:  Yes.

5    BY MS. POMERANTZ:

6    Q.  Is it correct that you met with Robert Menendez on December

7    15, 2020?

8    A.  Yes.  And the conversations I've just discussed were all

9    the latter part of the month afterwards.

10   Q.  So you're talking about the latter part of December of

11   2020?

12   A.  Yes.

13   Q.  Not November 2020?

14   A.  If I said November, I misspoke.

15         THE COURT:  I believe the question may have been

16   November, but it doesn't matter.  I want your recollection.

17         I gather, and I don't mean to put words in your mouth,

18   but I gather your recollection is that the discussion you just

19   talked about -- about the White House had asked for names of

20   others and so forth -- that occurred in the latter part of

21   December, after you had this December 15 conversation, correct?

22         THE WITNESS:  Yes, with a minor modification, which is

23   I don't remember at what point exactly he and I started talking

24   about the White House process.  But the conversations about my

25   becoming U.S. Attorney, the challenges and that I was not going

O6cWmen6                    Sellinger - Direct

1   to -- the challenges in getting me approved and ultimately, and

2   having me approved, those were all after the meeting.

3            THE COURT:  The December 15 meeting.

4            THE WITNESS:  Correct, your Honor.

5            THE COURT:  OK.  So it was sometime between December

6   15 and the end of 2020 when Menendez told you that he was not

7   going to nominate you to the president.  Is that what you're

8   saying?

9            THE WITNESS:  Yes.

10           THE COURT:  All right.

11  BY MS. POMERANTZ:

12  Q.  Did Robert Menendez tell you why you were not going to be

13  nominated?

14  A.  No.  He told me that he was unable to have the White House

15  nominate me, and therefore, he wasn't going to recommend me.

16  He did not say specifically why, but he talked about the

17  process at the White House, that they wanted several

18  candidates, and we had discussed along the way various --

19  various things that the White House was looking at in 2020 as

20  part of its process.  But when he told me that I was not going

21  to get nominated, he didn't get into any specifics.

22  Q.  Was the conversation when he told you that you were not

23  going to be nominated after the call when you told him about

24  the recusal or potential recusal?

25  A.  Yes.  It was towards the end of December.

1    Q.  Now, when Robert Menendez told you that you were not going

2    to be put forward, did he tell you who he was going to

3    recommend?

4    A.  No.

5    Q.  Did there come a time when you learned who he recommended

6    to be the U.S. Attorney for the District of New Jersey?

7    A.  Yes.  There was scuttlebutt in the legal community and

8    there were articles at some point reporting on it.

9    Q.  And who did you learn he had recommended?

10   A.  Esther Suarez.

11   Q.  After you learned that Robert Menendez had recommended

12   Esther Suarez, did you have any conversations with him about

13   the position of U.S. Attorney for the District of New Jersey?

14   A.  For several months I did not, but again, sometime in the

15   spring, there was scuttlebutt in the legal community that the

16   Suarez nomination, potential nomination, was hitting

17   roadblocks.  At some point I said to the senator that if that

18   process was not consummated and if she was not nominated, I

19   would be interested in speaking again about becoming U.S.

20   Attorney, continuing our discussion.

21   Q.  What was Robert Menendez's response to you?

22   A.  At that time he told me that Ms. Suarez was going back for

23   a second interview -- I believe it was a White House

24   interview -- and we could speak after that, depending on how it

25   went.

1   Q.  Approximately when did you have this conversation with

2   Robert Menendez?

3   A.  I think it was probably around early April or sometime

4   during that month.

5           THE COURT:  April 2021?

6           THE WITNESS:  I'm sorry.  Yes, your Honor.

7   BY MS. POMERANTZ:

8   Q.  Are you familiar with someone named Michael Soliman?

9   A.  Yes.

10  Q.  And who is that?

11  A.  He had been the director of Senator Menendez's New Jersey

12  office for a number of years but had left a number of years

13  before 2020 and became a political consultant of some kind.

14  Q.  How did you meet Michael Soliman?

15  A.  I probably met Mr. Soliman around the same time that I met

16  the senator.  So in connection with help that I was providing

17  to the senator's campaigns, I developed a relationship with

18  Mr. Soliman as well.

19  Q.  Did there come a time when you spoke with Soliman about the

20  position of U.S. Attorney for the District of New Jersey?

21  A.  Yes.

22  Q.  And approximately when?

23  A.  Late March.  Now I'm recalling the calendar entry for that

24  day, I believe.  So I may have been a little late in my

25  conversations with Senator Menendez relative to my interest if

1  the Suarez nomination did not go forward, because those

2  conversations preceded my conversation with Mr. Soliman.  If

3  you show me the calendar entry, I can pinpoint that day.

4  Q.  Just focusing on your conversation with Michael Soliman,

5  was that in person or on the phone?

6  A.  Telephone.

7  Q.  Did you call Soliman or did he call you?

8  A.  He called me.

9  Q.  What, if anything, did Soliman say about why he was

10  calling?

11  A.  He said he was following up on my conversation with Senator

12  Menendez that I just described.

13  Q.  What did you and Soliman discuss on the phone call?

14  A.  We discussed -- I believe we discussed my vision for the

15  office.  We discussed leadership, my approach to leadership

16  issues for the office, and the fact that I intended to follow

17  the DOJ process to disclose my prior adverse representation to

18  Mr. Daibes and that the Department of Justice or an official in

19  the Department of Justice would make the determination as to

20  whether I should be recused.

21  Q.  And did you say that you would be recused or that you would

22  share facts and the DOJ would decide -- excuse me, and the

23  Department of Justice would decide if you were recused?

24  A.  I didn't know whether or not I'd be recused.  I had the

25  same conversation, in essence, that I had with Senator

 1  Menendez, although it was longer.  But my understanding of that

 2  process was the same, that I would make a disclosure of my

 3  adversity and somebody else at the department, an official,

 4  would make a determination as to whether or not I would be

 5  recused.  I didn't know how that was going to get determined.

 6          THE COURT:  Now, when you say your adversity, I assume

 7  you're not talking about you personally being adverse in some

 8  way to Mr. Daibes but, rather, talking about the fact that you

 9  represented somebody in litigation who you believe was adverse

10  to Mr. Daibes in the litigation.  Is that right?

11          THE WITNESS:  A much better way of stating it, yes.

12  BY MS. POMERANTZ:

13  Q.  Were those conversations, was that conversation with

14  Soliman sometime in the spring of 2021?

15  A.  Yes.

16  Q.  After your conversation with Soliman, did you speak with

17  Robert Menendez again about the position of U.S. Attorney for

18  the District of New Jersey?

19  A.  There came a point sometime later in the spring where

20  Senator Menendez told me that he was going to be recommending

21  me to the White House and that the White House would begin the

22  nomination process.  So we had many conversations over many

23  months as that process continued.

24  Q.  And approximately when did Robert Menendez tell you that

25  you were being put forward as the nominee?

O6cWmen6                      Sellinger - Direct

1   A.  I believe that was the very late spring or the early

2   summer.  Not sure exactly more precisely than that.

3           THE COURT:  Ms. Pomerantz, when you said when did

4   Menendez tell you that you were being put forward as the

5   nominee, I take it what you meant was when did Menendez tell

6   you that he was going to recommend Mr. Sellinger to the

7   president for nomination.  Is that what you meant?

8           MS. POMERANTZ:  Yes, your Honor.

9           THE COURT:  Did you understand it that way, sir?

10          THE WITNESS:  I did.

11          THE COURT:  All right.

12  BY MS. POMERANTZ:

13  Q.  You testified earlier that you were sworn in as the U.S.

14  Attorney for the District of New Jersey in December 2021?

15  A.  Correct.

16  Q.  Between late spring, early summer 2021, when Robert

17  Menendez told you that you were the nominee, and December 2021,

18  when you were sworn in, can you just explain at a high level

19  what happened in the nomination process?

20  A.  There were many questionnaires that I filled out, first for

21  the White House.  Then there was an interview with a member of

22  the White House, I believe.  Then application forms for the

23  Senate Judiciary Committee were filled out.  There was an FBI

24  interview.  I was interviewed by senior leaders of the

25  Department of Justice in two separate interviews.  I was -- had

O6cWmen6                         Sellinger - Direct

1   security interviews with the FBI.  I was interviewed by the --

2   together by both the Democratic and Republican counsel for the

3   Senate Judiciary Committee.

4   Q.  Did you communicate with Robert Menendez about your

5   progress in the process?

6   A.  Yes.  All along the way I was giving him updates or he was

7   giving me updates.  But much more often, it was me giving him

8   updates.

9   Q.  Once you were sworn in as the U.S. Attorney for the

10  District of New Jersey, on December 16, 2021, did you disclose

11  to the Department of Justice the December 2017 civil lawsuit

12  that your law firm had filed against the borough of Edgewater?

13  A.  Yes.  On my very first day in the office, which was a

14  Friday, December 17, I reviewed a memo of the major cases in

15  the office, and I advised counsel to the United States Attorney

16  of four cases that created potential conflicts.  And one of

17  those four cases was the Daibes case and three other cases that

18  I saw in the memo that were potential issues for disclosure.

19  Q.  What was the result of the disclosure you made?

20  A.  Early -- the middle of the following week, I think, three

21  days, Wednesday of the following week, I was advised by the

22  Department of Justice that I was recused; that determination

23  had been made.

24          THE COURT:  Recused from all four cases?

25          THE WITNESS:  No.  No, your Honor.  I was recused from

1    the Daibes case.  And of the other three, I believe I was

2    recused from two of the three but not all of the three.

3            MS. POMERANTZ:  Mr. Hamill, would you please pull up

4    for just the witness what's been marked for identification as

5    Government Exhibit 8M-1.

6    Q.  Mr. Sellinger, do you recognize this?

7    A.  Yes, this is the official memorandum that I received from

8    the Department of Justice, advising me that I was recused from

9    the Daibes case as well as, I believe, certain other cases.

10           MS. POMERANTZ:  The government offers Government

11   Exhibit 8M-1.

12           THE COURT:  Admitted, without objection.

13           (Government Exhibit 8M-1 received in evidence)

14           MS. POMERANTZ:  Mr. Hamill, can you please publish

15   that for the jury.

16   Q.  Mr. Sellinger, directing your attention to the top of

17   Government Exhibit 8M-1, what is the subject of the email?

18   A.  Formal notice of USA-only recusal.

19   Q.  What does USA in USA-only recusal refer to?

20   A.  That means that the United States Attorney is recused, but

21   the office of the New Jersey United States Attorney's Office is

22   not recused, which means that my office continues in those

23   cases, but without my involvement.

24   Q.  What is the date of the email?

25   A.  December 22.

O6cWmen6                    Sellinger - Direct

1    Q.  Is that 2021?

2    A.  Yes.

3    Q.  About how long after you were sworn in as the U.S. Attorney

4    did you get this email?

5    A.  I was sworn in late in the afternoon on Thursday, December

6    16, so I made my disclosure on Friday, the 17th.  And this was

7    five days later, including a weekend.

8    Q.  Directing your attention to where it says memorandum for,

9    what names are listed?

10   A.  Myself and Rachael Honig, who was then the First Assistant

11   U.S. Attorney.

12   Q.  And remind us.  What is the role of the First Assistant

13   United States Attorney?

14   A.  The First Assistant U.S. Attorney -- it can differ, based

15   on decisions the U.S. Attorney makes.  But it's typically the

16   No. 2 adviser and certainly in, for me, key, key confidante,

17   part of all major decisions.

18   Q.  Directing your attention to where it says from, if we can

19   scroll down a bit, what name is listed?

20   A.  William Way, Assistant General Counsel, General Counsel's

21   Office of the Executive Office for U.S. Attorneys.

22   Q.  What is the Executive Office for United States Attorneys?

23   A.  That's the Administrative Office within the Department of

24   Justice that takes care of the support and administration of

25   all 93 U.S. Attorneys' offices across the country.  Included

O6cWmen6                          Sellinger - Direct

1    within that office is a general counsel's office, human

2    resources, and many other corporate functions.

3    Q.   Directing your attention to where it says, under where it

4    says re formal notice of USA-only recusal for the District of

5    New Jersey, I want to ask you to read where it says this is

6    formal notice through No. 1.

7    A.   "This is formal notice that Bradley Weinsheimer, Associate

8    Deputy Attorney General, has approved the recusal of United

9    States Attorney Philip R. Sellinger in the District of New

10   Jersey, from the following, as well as any related matters."

11   Q.   And then do you see it says U.S. v. Fred Daibes, *et al.*,

12   case No. 18 Cr. 655 (SDW)?

13   A.   Yes.

14   Q.   Were there other cases unrelated to the Daibes case that

15   you were also recused from?

16   A.   Yes.  Looking at this, it appears that there are two other

17   cases, just from the way the blocks are set up, that I was

18   recused from.  And that accords with my general recollection.

19   Q.   I direct your attention to the next, if you can read the

20   next sentence, starting with the ADAG authorized?

21   A.   "The Assistant Deputy Attorney General" -- it says ADAG --

22   "authorized this recusal in accordance with Justice Manual

23   3-1.140 based upon existing conflicts of interest or the

24   appearance of conflicts of interest pertaining to the matter."

25   Q.   What was your understanding of why you were recused?

O6cWmen6                    Sellinger - Direct

1    A.  I disclosed the nature of my representation of a developer

2    in the lawsuit that you showed me earlier, and based on my role

3    in that case, that the public could perceive a lack of

4    partiality, making recusal appropriate.

5            THE COURT:  I take it you don't mean a lack of

6    partiality.

7            THE WITNESS:  I'm sorry.

8            THE COURT:  You said that the public could perceive a

9    lack of partiality.

10            THE WITNESS:  I apologize.  That the public might

11    perceive partiality, as a result of which recusal would be

12    appropriate.

13            Thank you.

14    BY MS. POMERANTZ:

15    Q.  What is your understanding of what the appearance of

16    conflicts of interest means?

17    A.  It's simply that, that a member of the public might

18    perceive somebody not to be unbiased.  Whether or not they were

19    unbiased, or not, the simple concern is that the public may be

20    concerned about it.

21    Q.  I'm going to direct your attention to the next sentence.

22    A.  "Pursuant to 28 U.S.C. Section 515, ADAG Weinsheimer has

23    directed and authorized the First Assistant United States

24    Attorney for the District of New Jersey to have the status and

25    perform all of the authorized functions of a United States

O6cWmen6                        Sellinger - Direct

1    Attorney with respect to the matter."

2    Q.   Once you were recused, who had ultimate supervisory

3    authority over the Daibes criminal case?

4    A.   The First Assistant U.S. Attorney.

5    Q.   And did that mean the first assistant handled the case him

6    or herself on a daily basis?

7    A.   I know nothing about this particular case, because once I

8    was recused, I had zero conversations about it.  But what it

9    typically means is there's a case team and they handle the

10   day-to-day functions in the normal course of a case.  And

11   there's a supervisory chain, and it simply means that the first

12   assistant steps in as the U.S. Attorney to perform the

13   functions relating to that case that I described earlier.

14   Q.   If we scroll up a bit, where it says Rachael Honig as the

15   First Assistant United States Attorney, did Rachael Honig stay

16   on as the first assistant?

17   A.   I didn't hear the question.  You said step down?

18   Q.   Did she stay on --

19   A.   Did she stay on?

20   Q.   -- as the first assistant?

21   A.   No.  She -- I asked -- she told me that she would be

22   leaving on my first -- on my first day in the office, I met

23   with each of the senior members of the front office.  I

24   announced that an individual named Vikas Khanna was going to be

25   the First Assistant U.S. Attorney, and she told me, in

1    conversations then and over the next several days, that she

2    would be leaving.  I asked her to stay to transition to Vikas

3    Khanna, and she agreed to do that.

4              MS. POMERANTZ:  Let's turn to the next page of this

5    exhibit.

6    Q.  I'm going to direct your attention to the first full

7    paragraph and ask you to read the first sentence.

8    A.  "Please note that once it has been determined that the

9    United States Attorney must be recused from a particular

10   matter, the United States Attorney not only should be recused

11   from decision-making responsibility in the matter but also

12   should not review any status reports or receive any briefings

13   on the progress of the matter."

14   Q.  What did you understand that to mean?

15   A.  I was completely out and was to have no conversations with

16   anyone in the office about the matter.

17   Q.  And let's look at the next paragraph, if you can read that.

18   A.  "This formal notice of recusal shall be provided to all

19   personnel of the United States Attorney's Office for the

20   District of New Jersey whose duties touch upon this matter so

21   they are aware that the United States Attorney has been recused

22   and must be walled off."

23   Q.  What did you understand that to mean?

24   A.  That anybody who's been involved in the case needs to know

25   about the recusal, because we have briefings, as I mentioned

1    earlier, for the front office, the senior leaders in the United

2    States Attorney's Office, and if somebody is recused from the

3    matter, they have to -- they've got to be told in advance so

4    they can leave.  And this happens, as I said, all the time,

5    that a leader is told that the next case we're discussing, you

6    can't be involved in and somebody, whoever it is who's recused,

7    leaves the meeting.

8              MS. POMERANTZ:  Your Honor, I see the time.  I was

9    about to switch and go into a new topic.

10             THE COURT:  All right.  Let's take ten minutes, ladies

11   and gentlemen.

12             (Jury not present)

13             THE COURT:  You may step down, sir.

14             (Witness not present)

15             THE COURT:  Ten minutes.

16             (Recess)

17             (Jury present)

18             THE COURT:  Please be seated.

19             You may continue with your examination.

20             Ladies and gentlemen, we'll go until 5 o'clock today.

21             MS. POMERANTZ:  Thank you, your Honor.

22   Q.  Mr. Sellinger, after you became U.S. Attorney for the

23   District of New Jersey, without identifying the lawyer, did a

24   lawyer for Fred Daibes contact you?

25   A.  Yes.  Early in January of 2022, the lawyer called me and

1   asked me if he could come in to meet on a case.  I asked him if

2   it was the Daibes case, because I was aware that he represented

3   Mr. Daibes.  And he said yes.  And I told him that I'd been

4   recused from the case and that my first assistant would be

5   handling the matter.

6   Q.   How did that lawyer contact you?

7   A.   Telephone.

8   Q.   Was that your personal cell phone?

9   A.   I believe it was my personal cell phone, because it was

10  short, he had that number.

11  Q.   After you became the U.S. Attorney for the District of New

12  Jersey --

13          THE COURT:  I'm not sure I understood that, sir.  You

14  said "I believe it was my personal cell phone, because it was

15  short, he had that number."

16          THE WITNESS:  Because he had -- we knew each other, so

17  he had my number.  It was not uncommon, in my early days as

18  U.S. Attorney, my -- my business cell phone -- I do all

19  official business on my business cell phone.  If I get any

20  calls on my personal cell phone, any follow-up calls I tell

21  them have to be my official cell phone, and I write an email to

22  my official address, memorializing the call so -- so that way,

23  if it's business, obviously, that way it's memorialized.

24          So it was not uncommon for people to call my personal

25  cell phone if they had that, because I did not list my official

1    cell phone on my business cards or on the website.

2              THE COURT:  Thank you.

3    BY MS. POMERANTZ:

4    Q.  After you became the U.S. Attorney for the District of New

5    Jersey, did you and Robert Menendez speak?

6    A.  We spoke two more times.

7    Q.  Directing your attention to January 2022, do you recall

8    speaking with Menendez around that time?

9    A.  Yes.

10   Q.  Was this conversation with Robert Menendez in person or on

11   the phone?

12   A.  On the phone.  He called me.

13   Q.  And did Robert Menendez call you before or after your call

14   with Daibes's lawyer?

15   A.  So, I believe it was several weeks later.

16   Q.  What, if anything, did Robert Menendez ask you about during

17   this call?

18   A.  This was our first conversation after I'd become U.S.

19   Attorney, so it was a social call, to my mind.  He discussed

20   what was going on in his life.  He had had an accident, and

21   then we turned to how's the new job going?  Have you made your

22   leadership decisions?  And he asked whether I had selected a

23   First Assistant U.S. Attorney.

24   Q.  Who was your first assistant at that time?

25   A.  Vikas Khanna.

1  Q.  Who had supervisory authority over the Daibes criminal

2  case?

3  A.  Yes.

4  Q.  Who --

5  A.  Oh.  Who had.  I'm sorry.  I have a little difficulty

6  hearing.

7          He had supervisory responsibility, yes.

8  Q.  Did any other specific names come up during the call?

9  A.  I believe he asked what Rachael Honig was doing, and I

10 believe he asked me whether an assistant U.S. attorney in the

11 office, Mr. Semper -- what position -- we were in the midst of

12 making decisions -- what position he was getting.

13 Q.  You said Mr. Semper?  What's his full name?

14 A.  Yes.

15 Q.  What is his full name?

16 A.  Oh.  I'm sorry.  Jamel, J-A-M-E-L, Semper, S-E-M-P-E-R.

17         MS. POMERANTZ:  Mr. Hamill, can you please show just

18 the witness what's been marked for identification as Government

19 Exhibit 12A-1.

20         THE COURT:  Do you have a hard copy?

21         MS. POMERANTZ:  I don't believe so.  Let me just, if I

22 may inquire about what's happening?

23         THE COURT:  Yes, sure.  Of course.

24         Something is up.  Is that it?

25         MS. POMERANTZ:  Yes.  Thank you, your Honor.

O6cWmen6                              Sellinger - Direct

 1              THE COURT:  All right.

 2   BY MS. POMERANTZ:

 3   Q.  Mr. Sellinger, do you recognize this?

 4   A.  I do.  This is my calendar.  This is my calendar at the

 5   U.S. Attorney's Office from March 30, 2022.

 6              MS. POMERANTZ:  Your Honor, the government offers

 7   Government Exhibit 12A-1.

 8              THE COURT:  Admitted, without objection.

 9              (Government Exhibit 12A-1 received in evidence)

10              MS. POMERANTZ:  If we could publish this, Mr. Hamill.

11   Q.  Mr. Sellinger, earlier you referenced a calendar entry in

12   connection with the call you had with Michael Soliman before

13   you were nominated.  Is this the calendar entry you had been

14   thinking of?

15   A.  No.  No.  This is -- this is -- yeah, I -- so, no.  So this

16   refreshes my recollection that I have no calendar entry for the

17   earlier call.  I was thinking of this calendar entry, which is

18   several months after I became U.S. Attorney.  My mistake.

19   Q.  What day did you meet Michael Soliman?

20   A.  March 30, 2022.

21   Q.  Where did you meet Michael Soliman?

22   A.  We met at Chateau of Spain restaurant in Newark, right

23   across the street from my office.

24              THE COURT:  I'm not sure I understand, sir.  Is your

25   testimony now that the conversation you testified to earlier

O6cWmen6                        Sellinger - Direct

1   with Michael Soliman as having taken place in late March 2021,

2   your recollection now is that it took place on March 30, 2022?

3   Is that what you're saying?

4              THE WITNESS:  No, your Honor.

5              THE COURT:  All right.

6              THE WITNESS:  Two completely separate conversations.

7   I had a conversation with Mr. Soliman in the spring of 2021,

8   and I don't remember exactly what the time frame was.  And I

9   don't have any calendar entry for that.

10             This is a separate conversation, in March of 2022, and

11  I inadvertently, in my earlier testimony, was thinking of the

12  date March 30.  But it was based on this entry, which is an

13  entirely different conversation.

14             THE COURT:  All right.

15  BY MS. POMERANTZ:

16  Q.  Mr. Sellinger, to be clear, this meeting was in March 2022.

17  Is this a different from the spring 2021 call with Michael

18  Soliman before you were nominated?

19  A.  Exactly, yes.

20  Q.  Why did you meet with Michael Soliman at Chateau of Spain

21  restaurant?

22  A.  He called me, asked me if I wanted to get together for

23  lunch, and I said yes.

24  Q.  What, if anything, did Soliman say to you during the lunch?

25  A.  It was a social meeting.  He was asking me about how the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    job was going, how I liked it.  I'm sure he was telling me what

2    was going on in his life.  And at one point in the

3    conversation, he says let me ask you a question.  And I stopped

4    him.

5        I said let me stop you there.  I said I want to -- I want

6    you to know that as U.S. Attorney, I'm not allowed to have any

7    conversations about the official business of the office, and

8    I'm required to report any such conversations to the Department

9    of Justice.  So I just want to make sure you're aware of that.

10   Q.  What did Soliman say in response?

11   A.  He indicated that he understood.

12   Q.  Did he then ask you the question that it appeared he had?

13   A.  No.

14        THE COURT:  Sir, I think you said let me stop you,

15   that you said to Mr. Soliman let me stop you there.  I want you

16   to know that as U.S. Attorney, I'm not allowed to have any

17   conversations about the official business of the office.  Is

18   that what you said?

19        THE WITNESS:  Yes.  I probably, to make it, to expand

20   upon that, with any elected federal officials or their

21   representatives.

22        (Continued on next page)

23

24

25

O6C5men7                          Sellinger - Direct

1    BY MS. POMERANTZ:  (Continuing)

2    Q.  After your lunch with Michael Soliman in March 2022, did

3    you speak with Robert Menendez?

4    A.  Yes.

5    Q.  Did you speak with him in person or on the phone?

6    A.  On the phone.

7    Q.  Did you call Menendez --

8    A.  Ms. Pomerantz, I'm sorry.

9            Your Honor, because of clarification, could I just

10   sort of make the statement once that has the addition so the

11   record is clear.

12           THE COURT:  Well, why don't you say what you said.

13           THE WITNESS:  Yes.  Exactly.  Yes.

14           So I said to Mr. Soliman, in our meeting on

15   March 30th:  Let me stop you there.  As the United States

16   Attorney, I'm not allowed to have any conversations about the

17   official business of the office with any federal elected

18   official or their representatives.

19   BY MS. POMERANTZ:

20   Q.  And just to remind us, what did he say in response?

21   A.  He indicated that he understood.

22   Q.  Did he then ask you the question that it appeared he had?

23   A.  No.

24   Q.  After your lunch with Michael Soliman in March of 2022, did

25   you speak with Robert Menendez?

1   A.  Yes.

2   Q.  Did you speak with him in-person or on the phone?

3   A.  I telephoned him.

4   Q.  What did you speak with him about?

5   A.  I called him to invite him to speak at the investiture

6   ceremony for my becoming U.S. Attorney, which was scheduled for

7   May of 2022.

8   Q.  You said an investiture ceremony.  What is an investiture

9   ceremony?

10  A.  An investiture ceremony is a ceremonial recognition of

11  somebody taking an official position, so I was technically

12  sworn in, as I mentioned, on December 21, 2021, before a United

13  States district judge for whom I clerked in a court like this

14  so I was able to start performing work the next day.  The

15  investiture is a large ceremony and often times with a couple

16  hundred people, a number of speakers.  It is really a

17  recognition of the accomplishment of the person assuming a

18  public role.

19  Q.  I believe you said your investiture was scheduled for May

20  of 2022?

21  A.  Yes.

22  Q.  Approximately when did you speak with Menendez?

23  A.  In the time period approximately one month before

24  mid-April, give or take a week or two.

25  Q.  What did Robert Menendez say in response to your request

1   that he speak at your investiture?

2   A.  He said, I'm going to pass.  The only thing worse than not

3   having a relationship with the United States Attorney is people

4   thinking you have a relationship with the United States

5   Attorney, and you don't.

6   Q.  What did you understand him to be saying?

7   A.  We no longer had a relationship.

8   Q.  At that time, what, if any criticisms, had Menendez

9   communicated to you about your job performance?

10  A.  There had not been any criticisms but I had, when I became

11  U.S. Attorney, put distance between myself and any elected

12  officials because it was appropriate in my position, so I had

13  been in a position where I really put a lot of distance between

14  anybody I knew in official, elected positions, but I heard no

15  criticism.

16  Q.  Between when you were notified that you had been recused

17  from the Daibes prosecution and when Robert Menendez told you

18  that he was going to not come to your investiture, had you

19  taken any action to participate in Daibes' criminal case?

20  A.  Absolutely none.

21  Q.  Why was that?

22  A.  Why?  Because that was required by the Department of

23  Justice's recusal and I was following the rules.

24  Q.  Did you have an investiture in May 2022?

25  A.  No.  The night before it was scheduled I came down with

1    COVID so I had to cancel it.

2    Q.  Did you ultimately have an investiture?

3    A.  I did, in September of 2022.

4    Q.  Did Cory Booker attend your investiture?

5    A.  He spoke by video.

6    Q.  Did Robert Menendez attend your investiture?

7    A.  No.

8    Q.  Did he speak at your investiture?

9    A.  No.

10             MS. POMERANTZ:  May I have just one moment?

11             THE COURT:  Yes.

12             (Counsel conferring)

13             MS. POMERANTZ:  No further questions.

14             THE COURT:  Thank you.

15             Is there any cross-examination of this witness?

16             MR. WEITZMAN:  Yes, your Honor.  Thank you.

17             THE COURT:  Mr. Weitzman, sure.

18   CROSS-EXAMINATION

19   BY MR. WEITZMAN:

20   Q.  Good afternoon, Mr. Sellinger.

21   A.  Good afternoon.

22   Q.  My name is Avi Weitzman, I represent Senator Menendez.  You

23   and I have never met before, right?

24   A.  We have not.

25   Q.  We have never spoken before, right?

O6C5men7                          Sellinger - Cross

1    A.  Correct.

2    Q.  You have known Senator Menendez for decades, right?

3    A.  Yes.

4    Q.  Two decades?

5    A.  Yes.  A little more, yes.

6    Q.  And that's decades before you became the U.S. Attorney for

7    the District of New Jersey, right?

8    A.  Correct.

9    Q.  You first got to know him in the early 2000s, you said?

10   A.  Yes.

11   Q.  And over the years you socialized with him, right?

12   A.  We did.

13   Q.  You would go to dinners, right?

14   A.  Yes.

15   Q.  You would play golf with him?

16   A.  Yes.

17   Q.  Your sons got to know each other too, right?

18   A.  Yes.

19   Q.  They joined you on your golf trips sometimes?

20   A.  They did.

21   Q.  And they were in the same profession, in fact?

22   A.  Yes.  Yes.

23   Q.  Both lawyers?

24   A.  Yes.

25   Q.  Congratulations.  Or my condolences.

O6C5men7                         Sellinger - Cross

1   A.   No, congratulations.   Thank you.

2   Q.   In any event, you would socialize with Senator Menendez and

3   also with your wives together; right?

4   A.   Yes.

5   Q.   And Senator Menendez would bring Nadine, right?

6   A.   Yes.   Three or four times, as couples, we had dinner; yes.

7   Q.   And you attended Senator Menendez' wedding; correct?

8   A.   Yes.

9   Q.   It was a COVID wedding, right?

10  A.   It was during COVID.

11  Q.   It was in October 2020.

12  A.   That sounds right.

13  Q.   And it was, I think you said, a small wedding, 65 to 70

14  people in New Jersey, right?

15  A.   That's my best estimate.   I'm not -- did you say New

16  Jersey?   It was not -- the reception was in New Jersey, I

17  believe.   The wedding itself was I think in Queens.

18  Q.   Fine.   Thank you very much.

19          Now, you would go to dinners with the senator and

20  Nadine, right?

21  A.   As I mentioned three or four times, yes.

22  Q.   And Nadine and your wife actually developed a bit of a

23  friendship, right?

24  A.   They liked each other, yes.

25  Q.   And they would text each other and call each other, right?

O6C5men7                          Sellinger - Cross

1    A.  Yes.

2    Q.  And by the way, in any of the dinners or any of your

3    interactions what with the senator and Nadine, would you agree

4    with me that the senator seemed very much in love with Nadine?

5           MS. POMERANTZ:  Objection.

6           THE COURT:  Rephrase.

7    Q.  Did you get an opportunity to observe the senator's

8    demeanor and affection and interactions with Nadine?

9    A.  Yes.

10   Q.  Would you agree with me that he was affectionate towards

11   Nadine?

12   A.  Yes.

13   Q.  Did he seem in love to you?

14   A.  He did.

15          THE COURT:  And were you affectionate with your wife,

16   sir?

17          THE WITNESS:  I try to be.  I do my best.

18   Q.  Did you ever see him boss her around?

19   A.  No.

20          MS. POMERANTZ:  Objection, your Honor.

21          THE COURT:  Sustained.  Jury will disregard.

22   Q.  Had you ever seen him give her instructions as to what to

23   do or when to do it?

24          MS. POMERANTZ:  Objection.

25          THE COURT:  I will allow it.

1                 THE WITNESS:  Allow it?

2                 THE COURT:  I will allow it, sir.

3                 THE WITNESS:  No, I never saw him do that.

4    Q.  Fair to say he was respectful to his wife?

5    A.  Yes.

6                 MS. POMERANTZ:  Objection, your Honor.

7                 THE COURT:  We will allow it.  One would hope one is

8    respectful to one's spouse.

9                 MR. WEITZMAN:  I agree with that, your Honor.

10   Q.  During your entire friendship with Senator Menendez you

11   have been a practicing lawyer; right?

12   A.  Yes.

13   Q.  And you were in fact -- you achieved the pinnacle of the

14   career at one of the top law firms in America; right?

15   A.  I was accomplished, yes.

16   Q.  Greenberg Traurig is one of the premiere law firms in

17   America, right?

18   A.  I think so.

19   Q.  2,300 attorneys?

20   A.  At least, today.

21   Q.  Dozens of offices on multiple continents?

22   A.  Scores of offices.  Actually, dozens I think is more

23   accurate; yes.

24   Q.  Revenues, approximately $2 billion?

25   A.  When I was there it had not reached $2 billion but it was

O6C5men7                              Sellinger - Cross

1    well over $1 billion.

2    Q.   And you were the head of litigation of the entire firm,

3    right?

4    A.   For a five-year period I was -- approximately five years I

5    was head of litigation for the entire firm.

6    Q.   You were on the management committee of the firm, correct?

7    A.   Technically, at Greenberg Traurig it was called the

8    executive committee, but for a number of years I was on the

9    executive committee.

10   Q.   And that means you are on the leadership committee of the

11   firm; right?

12   A.   Yes.

13   Q.   Would you agree with me that both in private practice and

14   in government you have always held yourself out to be an

15   ethical lawyer; right?

16   A.   Yes.

17   Q.   You have never been sanctioned by any court, have you?

18   A.   No.

19   Q.   It is important to you, sir, that the legal community and

20   the public see you as a U.S. Attorney that's above reproach;

21   right?

22   A.   Yes.

23   Q.   Someone who follows the letter and the spirit of the law;

24   right?

25   A.   Yes.

O6C5men7                          Sellinger - Cross

1   Q.  You would agree with me that acting in a principled manner

2   furthering the interest of justice is a core value of who you

3   are; right?

4   A.  Yes.

5   Q.  And you made those core values known to the people who you

6   know; right?

7   A.  I did.

8   Q.  From your many conversations with Senator Menendez over the

9   decades-long friendship, you have made clear to Senator

10  Menendez, have you not, that these are your core values?

11            MS. POMERANTZ:  Objection.

12            THE COURT:  I will allow it.

13  A.  I think it's -- I think that's fair, although I can't tell

14  you that it was a conversation about core values, but I try and

15  convey that to everyone I know.

16            THE COURT:  You believe you act in an ethical manner,

17  correct?

18            THE WITNESS:  Yes.

19            THE COURT:  Next.

20  Q.  Your integrity and your good name are paramount to you;

21  right?

22  A.  Yes.

23  Q.  And there is no doubt in your mind that Senator Menendez

24  knows that about you?

25            MS. POMERANTZ:  Objection.

1        THE COURT:  Sustained.

2   Q.  Sir, did you communicate to Senator Menendez, over your

3   decades-long friendship, that your integrity, your good name,

4   are paramount to you?

5        MS. POMERANTZ:  Objection.

6        THE COURT:  Sustained.

7   Q.  Sir, have you had conversations --

8        THE COURT:  I take it you act in a way consistent with

9   your integrity being important to you, correct?

10        THE WITNESS:  Yes, your Honor.

11        MR. WEITZMAN:  Thank you, your Honor.

12   BY MR. WEITZMAN:

13   Q.  You have never suggested to Senator Menendez that you would

14   be willing to compromise your integrity or ethics as a favor to

15   a friend; right?

16   A.  Never.

17   Q.  And he has never suggested to you that he would use you as

18   someone who would compromise his integrity and ethics if he

19   asked you to; right?

20        MS. POMERANTZ:  Objection.

21        THE COURT:  Sustained as phrased.

22   Q.  He has never suggested to you that he thinks you would

23   compromise your integrity; right?

24        MS. POMERANTZ:  Objection.

25        THE COURT:  I will allow it.

O6C5men7                        Sellinger - Cross

1              Has he ever said to you, or in any manner indicated,

2       that he believed you would compromise your integrity?

3              THE WITNESS:  No.

4       Q.  Has he ever suggested to you that he believes you or

5       someone would compromise your ethics?

6              MS. POMERANTZ:  Objection.

7              THE COURT:  I will allow it.

8       A.  No.

9              THE COURT:  I take it, have you ever had a

10      conversation with him, per se, about ethics?

11             THE WITNESS:  I can't recall.

12             THE COURT:  All right.

13      Q.  During the time that you have known Senator Menendez over

14      the past 20 years, he has never asked you to do anything that

15      you perceived to be improper or unethical; isn't that right?

16      A.  I never --

17             MS. POMERANTZ:  Objection.

18             THE COURT:  I will allow that.

19      A.  I never believed him to be asking me to do anything

20      unethical or improper.

21      Q.  OK.  Now, we have heard some testimony about your

22      nomination to the U.S. Attorney position in New Jersey in about

23      2021.  I think your testimony was that you originally sought

24      that position in 2016; is that correct?

25      A.  Yes.

O6C5men7                         Sellinger - Cross

1   Q.  And, in fact, as early as 2016 you communicated with

2   Senator Menendez your desire to become the U.S. Attorney in New

3   Jersey; right?

4   A.  Yes.

5   Q.  And at the time when you communicated that I think you said

6   it was still in the election cycle so it was Hillary Clinton

7   versus Donald Trump, right?

8   A.  Correct.

9   Q.  And Senator Menendez was seriously considering you at that

10  time, in 2016, to recommend you for a U.S. Attorney position;

11  right?

12          THE COURT:  Sustained.

13  Q.  Did Senator Menendez -- withdrawn.

14          You Met with Senator Menendez in 2016 to discuss a

15  potential nomination as U.S. Attorney; correct?

16  A.  Yes.

17  Q.  And in that meeting, Senator Menendez told you that he

18  would support that nomination if Hillary Clinton were to win,

19  correct?

20  A.  Yes.

21  Q.  He told you that he would speak to members of the judiciary

22  committee on your behalf, right?

23  A.  I don't -- I'm not quarreling with you.  I don't

24  specifically recall that.  I do specifically recall him talking

25  about speaking to the head of the transition committee.

1  Q.  The transition committee is Hillary Clinton's transmission

2  committee for, let's say, top DOJ positions or positions in the

3  Department of Justice or U.S. Attorney's office, right?

4  A.  Correct.

5  Q.  You understood, in 2016, essentially, that you were his top

6  choice for U.S. Attorney in New Jersey if a democrat were to be

7  elected, correct?

8              MS. POMERANTZ:  Objection.

9              THE COURT:  Did you have any such understanding?

10             THE WITNESS:  I did have an understanding, yes.

11  Q.  And what was your understanding, sir?

12  A.  That he would be recommending me.

13  Q.  But he didn't get the opportunity to recommend you for that

14  position in 2016, right?

15  A.  Correct.

16  Q.  And that's because a republican won the election, right?

17  A.  Sure.

18  Q.  And the tradition is the senators get to put forge a U.S.

19  Attorney recommendation if they're from the same party as the

20  president; right?

21  A.  Yes.

22  Q.  But if they're not from the same party, the president will

23  look elsewhere for his recommendation, right?

24  A.  Yes.

25  Q.  So Senator Menendez and Cory Booker didn't have the

1    ability, in 2016, to recommend you for the U.S. Attorney

2    position; right?

3    A.    Correct.

4          THE COURT:  Well, I take it that they had the ability

5    but the practice was not amenable to their making the

6    recommendations; is that correct?

7          THE WITNESS:  More accurately stated; yes, your Honor.

8    Q.    And in fact, in 2016, when Senator Menendez was supporting

9    you before the election was concluded, he had you meet with

10   Cory Booker too, right?

11   A.    He recommended that I speak to Senator Booker, yes.

12   Q.    Did he make that introduction to Senator Booker?

13   A.    I had a relationship with Senator Booker.  I can't recall

14   how the arrangements were made but -- he probably facilitated

15   the meeting, I would say.

16   Q.    He gave you tips or recommendations about how to approach

17   that meeting with Senator Booker?

18   A.    I don't recall that in 2016, no.

19   Q.    To be clear, 2016, when Senator Menendez was considering

20   you as the next U.S. Attorney for the District of New Jersey,

21   is years before Mr. Daibes had been indicted by the District of

22   New Jersey; correct?

23   A.    I actually don't know whether Mr. Daibes was indicted.  I

24   know nothing about the case.  But personally, but from what I

25   have read in the paper, I think you are right.

1  Q.  2018 or so is when the case was filed by the U.S.

2  Attorney's office?  Does that ring a bell?

3  A.  I have no personal knowledge but that is consistent with

4  what I have read in the paper.

5  Q.  In any event, you understood that your potential

6  nomination -- I will rephrase that.

7         You understood, sir, in 2016, when Senator Menendez

8  was considering you to be the U.S. Attorney in New Jersey, that

9  had nothing to do with Fred Daibes; right?

10         MS. POMERANTZ:  Objection.

11         THE COURT:  Sustained.

12  Q.  Senator Menendez told you that he was going to recommend

13  you for the nomination if Hillary Clinton won, on your merits;

14  right, sir?

15  A.  My understanding was it was on the merits, yes.

16  Q.  And he didn't mention anything about a Daibes case because

17  there was no Daibes case at that time; correct?

18         THE COURT:  Sustained as phrased.

19         Was there a criminal action against Mr. Daibes in

20  2016, to your knowledge?

21         THE WITNESS:  I'm not aware of any.

22  BY MS. POMERANTZ:

23  Q.  Now, speaking on Mr. Daibes, there did come a time at

24  Greenberg Traurig where you worked on a civil case that

25  involved Mr. Daibes; right?

O6C5men7                          Sellinger - Cross

1   A.  Yes.

2   Q.  And I think you have said that the civil case, the civil

3   lawsuit was adverse to Mr. Daibes' interests; right?

4   A.  Correct.

5   Q.  And by that you mean he wasn't an actual defendant in the

6   case but the outcome of the case could affect his financial

7   interests.  Is that what you mean?

8   A.  What I meant was that the -- my recollection was that the

9   core allegation in the case related to improper --

10  Q.  Well, let's not get into the allegations.  The allegations

11  that were made in that case could have an effect on his

12  financial interests, right?  It was a civil lawsuit?

13          THE COURT:  What is your question?

14          MR. WEITZMAN:  Well, I'm trying to understand what

15  adversity meant, and so I am trying to --

16          THE COURT:  Let's ask.

17          When you said, I think you said something like very

18  much adverse or very adverse, that Mr. Daibes' interests were

19  very much adverse or adverse to the interests of your client in

20  that civil case.  What did you mean?

21          THE WITNESS:  I know there was an objection to an

22  earlier question but -- when I used the word improper.  So I

23  don't want to foreclose any objection, but I'm happy to explain

24  that but I have got to get into what was objected to before.

25          THE COURT:  I understand.  You mean you have to get

O6C5men7                          Sellinger - Cross

1  into the specifics of the underlying litigation.

2              THE WITNESS:  To explain what I meant, yes.

3              THE COURT:  All right.  And there was an objection to

4  that.  Go ahead.

5  BY MR. WEITZMAN:

6  Q.  Let's put it this way.  Allegations in the complaint

7  weren't favorable to Mr. Daibes, fair enough?

8  A.  Very true.

9              THE COURT:  I take it, again based on your testimony,

10  in fact they were adverse to Mr. Daibes?

11              THE WITNESS:  Correct.

12  Q.  And you were involved in drafting that?

13  A.  I wasn't a drafter.  I reviewed and edited and commented

14  upon the drafts that others prepared.

15  Q.  You conceived some of the legal theories or commented on

16  some of the legal theories?

17  A.  I was part of that process, yes.

18  Q.  Is it fair to say you approved the filing of the lawsuit by

19  Greenberg Traurig or had some involvement in approving that

20  lawsuit?

21  A.  I just don't know if "approve" is the correct word but I --

22  actually, let me restate that.  Yes, I had reviewed and signed

23  off on the complaint so, yes, I did approve it.

24  Q.  I think the government showed you this e-mail -- can you

25  put up Government Exhibit 12E-1 in evidence?  This is an e-mail

1    in which you forward the copy of the complaint -- which you

2    forward in full but we only have the caption -- you forwarded

3    the full copy of the complaint to Fred Turner on May 8, 2018,

4    correct?

5    A.  That's what the e-mail suggests, yes.

6    Q.  And you understood at this time, sir, that Mr. Daibes and

7    Senator Menendez were friends; right?

8    A.  Yes.

9    Q.  You knew, as well, that Fred Daibes was a democratic

10   contributor?  Did you know that?

11           THE COURT:  You mean contributor to democratic

12   candidates.

13           MR. WEITZMAN:  Correct, your Honor.  Better said than

14   I.

15   A.  I am not sure if I knew that, no.

16   Q.  And Fred Turner was the chief of staff to Senator Menendez,

17   right?

18   A.  Yes.

19   Q.  So this was a heads-up --

20           THE COURT:  I thought you said -- I may be mistaken

21   or, no, that was the Soliman, go ahead.

22   Q.  Fred Turner was chief of staff to Senator Menendez,

23   correct?

24   A.  Yes.

25   Q.  You forward this to him as a heads-up to the senator?

1    A.  No.

2    Q.  You expected Fred Turner to share the complaint you sent

3    with Senator Menendez; is that fair?

4    A.  I had no expectation.

5    Q.  In reality, that is what Fred Turner did?

6    A.  I don't know that.  I have seen the document that suggests

7    that.

8    Q.  The document shows that Fred Turner forwarded your e-mail

9    with the complaint to Senator Menendez; right?

10   A.  I have seen that over the last couple weeks.

11   Q.  Right.

12   A.  I wasn't aware of that.

13   Q.  I understand.  But you now know that?

14   A.  Yes.

15   Q.  And I think you said you did know about the relationship

16   between Senator Menendez and Fred Daibes; right?

17   A.  I knew that they had a relationship.

18   Q.  Looking at this now, it is clear to you that Senator

19   Menendez knew that you were involved and your law firm were

20   involved in a lawsuit against, that implicated interests of

21   Fred Daibes; right?

22            MS. POMERANTZ:  Objection.

23            THE COURT:  Sustained.

24   Q.  Based on your review of this document, is it fair to say

25   that the lawsuit was brought to Senator Menendez' attention at

1  least in this e-mail?

2  A.  No.  I -- I got a -- I don't even remember the e-mail but

3  it is obvious to me that Mr. Turner called me, asked me about

4  the complaint, and I forwarded it.  That's the beginning and

5  the end of what I know about any communications in the

6  senator's office.

7  Q.  Fair enough.  I appreciate that.

8         The complaint that was filed by your law firm,

9  Greenberg Traurig, on behalf of the client involving

10  Mr. Daibes, that was a publicly filed document; right?

11  A.  Yes.

12  Q.  And publicly filed for anybody to see?  Was there press

13  reporting on it?

14  A.  I believe that I saw a little press.  I can't recall.  I

15  really don't know.

16  Q.  You would agree with me that, in general, going forward two

17  years -- let me rephrase this.

18         You would agree with me that in 2020, and you were to

19  proceed as U.S. Attorney in that nomination overseeing a

20  criminal case in which you had previously filed a civil suit

21  that implicates the same defendant, could pose an appearance of

22  impropriety or partiality.  You agree with that, right?

23         MS. POMERANTZ:  Objection.

24         THE COURT:  I will allow it.

25         THE WITNESS:  I made a disclosure to the Department of

O6C5men7                          Sellinger - Cross

1   Justice so the Department of Justice could determine exactly

2   that issue.

3   BY MR. WEITZMAN:

4   Q.  And you would agree that operating under a conflict of

5   interest or an appearance of impropriety as U.S. Attorney would

6   be a bad thing for you to do, right?

7                MS. POMERANTZ:  Objection.

8                THE COURT:  I will allow it.

9                You don't want to be involved in a conflict of

10  interest or appearance of impropriety; correct?

11               THE WITNESS:  You used the word "impropriety."  I

12  think of it as impartiality.

13  BY MR. WEITZMAN:

14  Q.  OK, impartiality, yes.

15  A.  I would not want to be involved to the judge's reframed

16  question, either if I had an actual partiality or an appearance

17  of partiality; correct.

18               THE COURT:  And I take it that's pursuant to

19  Department of Justice rules which have been referred to in this

20  afternoon's testimony; correct?

21               THE WITNESS:  Yes.  I have to make the disclosure and

22  the department makes a determination as to whether recusal is

23  appropriate, based on all the circumstances.

24  BY MR. WEITZMAN:

25  Q.  Let's understand the reasons.  It is bad optics, right, if

O6C5men7                        Sellinger - Cross

1    there is an appearance of partiality and you were the U.S.

2    Attorney; correct?

3                MS. POMERANTZ:  Objection.

4                THE COURT:  I will allow that.

5    A.   Yes, I would agree with that.

6    Q.   It diminishes the respect that the U.S. Attorney's office

7    might have in the eyes of the public?  It risks that, right?

8    A.   What is the "it" that you are referring to?

9    Q.   Fair enough.

10               If you were to proceed supervising a criminal case in

11   which there was either an actual conflict of interest or an

12   appearance of partiality, that could diminish the respect of

13   the office in the eyes of the public; right?

14   A.   Yes.

15   Q.   And that would be bad for you, personally, and for the

16   system, the criminal justice system; right?

17               MS. POMERANTZ:  Objection.

18               THE COURT:  I will allow it.

19               I take it it is not permitted by the criminal justice

20   system?

21               THE WITNESS:  Right.  Look, there are -- there are

22   potential conflicts of interest which are deemed so minor that

23   the Department of Justice could approve of them, but if the

24   potential conflict of interest suggested you couldn't be

25   impartial, then the Department of Justice would recuse you and

 1   that's why they require disclosure of everything and then they

 2   decide when you get recused.

 3           THE COURT:  And just so I understand your testimony,

 4   when you say they're so minor that the Department of Justice

 5   approves of them, I take it you don't mean that -- what you

 6   mean is so minor that the Department of Justice does not recuse

 7   the attorney involved.

 8           THE WITNESS:  Correct.

 9           THE COURT:  All right.

10   BY MR. WEITZMAN:

11   Q.  When you met with Senator Menendez in 2020 to discuss your

12   potential recommendation as a U.S. Attorney -- I'm sorry, in

13   2021 to discuss that, you recall he was frustrated by the

14   political issues that arose surrounding Esther Suarez?

15           MS. POMERANTZ:  Objection.

16           THE COURT:  Sustained.

17   Q.  Did Senator Menendez express to you, in 2021, some

18   frustration with what happened with Esther Suarez' nomination?

19   A.  I know that he had nominated her and it was running into

20   problems.  I don't remember exactly how he expressed his

21   perspective on that.

22   Q.  You would agree with me, sir, that the vetting of a

23   candidate for U.S. Attorney is an important aspect that has to

24   be done properly and completely before a senator recommends a

25   U.S. Attorney to the White House; correct?  Vetting is an

O6C5men7                          Sellinger - Cross

1    important part of that process?

2    A.   That's a long question.  I agree with the part of it where

3    you said that vetting is a very important part of becoming U.S.

4    Attorney.  The part where you try and link that to before

5    somebody is recommended, I can't comment on that.

6    Q.   Fair enough, but there is multiple layers of vetting.

7    There is the senator's vetting, correct, and then there is the

8    White House's vetting?

9    A.   Yes.

10   Q.   So the senator has his own obligation to vet -- forget

11   obligation -- the senator has his own process by which he vets

12   potential U.S. Attorney candidates, right?

13   A.   Right.  I don't know about obligation but certainly,

14   correct, he has got a -- the senators have a process.

15   Q.   And you would agree with me, sir, that if the vetting is

16   inadequate or incomplete, that could result in colloquially egg

17   on face; right, for the senator?

18            MS. POMERANTZ:  Objection.  Speculation.

19            THE COURT:  If you know what egg on face is.  If the

20   vetting is incomplete or inadequate, what would the result --

21   no.

22            You do it, sir.

23            MR. WEITZMAN:  Let me rephrase it.

24            THE COURT:  You do it.

25   BY MR. WEITZMAN:

1   Q.  If things come up as a result of poor vetting that

2   embarrass the candidate or cause the White House to not

3   nominate the candidate, that could result in some level of

4   embarrassment for the senator.  Would you agree with that?

5           MS. POMERANTZ:  Objection.

6           THE COURT:  I will allow it.

7   A.  I can use logic but I don't know.

8   Q.  OK.  Would you agree with me that nominating or

9   recommending a U.S. Attorney that has conflicts of interests

10  can result in embarrassment for the senator; correct?

11          THE COURT:  Sustained as phrased.

12  Q.  Did the senator -- withdrawn.

13          You would agree with me, sir, that if you hadn't

14  handled conflicts of interests that you potentially could have

15  labored under in an appropriate manner, that could have been

16  very embarrassing to the senator; correct?

17          THE COURT:  Sustained.

18  Q.  Sir, you and the senator discussed potential conflicts of

19  interest; right?

20          MS. POMERANTZ:  Objection.

21          THE COURT:  No, let's see if they did.

22  A.  As I mentioned, I called Senator Menendez on December 16, I

23  believe, and told him that I had a potential conflict of

24  interest that I would have to disclose to the Department of

25  Justice.

O6C5men7                        Sellinger - Cross

1    Q.  It is important that you made that clear to the senator

2    because you understood that the senator would want to know

3    about your conflicts of interests; right?

4              MS. POMERANTZ:  Objection.

5              THE COURT:  Sustained.

6    Q.  Sir, why did you disclose that to the senator on

7    December 16 or thereabouts?

8    A.  I wanted the senator to know that I was going to treat all

9    cases the same and follow the Department of Justice process in

10   this case, as in all cases, and in this case the process was

11   that I had to make -- it was appropriate for me to make a

12   disclosure and let the Department of Justice make a

13   determination as to whether recusal was warranted.

14   Q.  And Senator Menendez didn't seem upset by that, in any way;

15   right?

16             MS. POMERANTZ:  Objection.

17             THE COURT:  What was his reaction to that statement

18   from you, if any?

19             THE WITNESS:  He indicated he understood what I was

20   saying.

21   Q.  And based on his tone, he didn't seem upset with what you

22   said; correct?

23   A.  He indicated he understood.  The tone was not remarkable.

24   Q.  He was calm, right, in that call?

25   A.  Yes.

O6C5men7                      Sellinger - Cross

1    Q.   He didn't say, no, don't do that; right?

2    A.   He certainly did not.

3    Q.   You said there was an unremarkable tone; correct?

4    A.   Correct.

5    Q.   He just acknowledged your statement?

6    A.   Yes.

7              MR. WEITZMAN:  Your Honor, it is I think a few minutes

8    past 5:00.

9              THE COURT:  It is.  How much longer do you have?

10             MR. WEITZMAN:  We definitely have to go to tomorrow.

11             THE COURT:  How much longer do you have?

12             MR. WEITZMAN:  I have 40 minutes, 30 minutes.

13             THE COURT:  Ladies and gentlemen, let's conclude for

14   the evening.  Once again, we have had a full day of testimony.

15   I appreciate your being here.

16             Don't discuss this case amongst yourselves or with

17   other people.  Keep an open mind, you have not heard all of the

18   testimony.  We will see you tomorrow at 9:30.  If you are here

19   at 9:30, I will be.

20             (Continued on next page)

21

22

23

24

25

O6C5men7                          Sellinger - Cross

1                    (Jury not present)

2               THE COURT:  You may step down, sir.  We will see you

3     tomorrow morning.

4                    (Witness steps down).

5               THE COURT:  You may be seated in the courtroom.

6               I have another matter.  Before we do that, tell me

7     again as of now who is on for tomorrow.

8               MR. MONTELEONI:  So, your Honor, after we conclude the

9     testimony of Philip Sellinger we will be calling Andrew Good,

10    Michael Soliman -- let me wait until the witness leaves?

11              THE COURT:  Yes.  Of course.

12              MR. MONTELEONI:  Andrew Good, Michael Soliman, Joseph

13    Catania, Isabella Fuchs and Paul van Wie, if we get to all of

14    them, and possibly Mr. Mearns, depending on the outcome of the

15    letters and the discussion with the defense about a

16    stipulation.

17              THE COURT:  All right.  Tell me who Mr. Catania and

18    Ms. Fuchs are.

19              MR. MONTELEONI:  So Mr. Catania is a New York Federal

20    Reserve bank employee who is going to talk about tracing of

21    bank notes in order to determine when certain bills were first

22    placed into circulation and Isabella Fuchs is going to relate

23    some of the particular bank note serial numbers that were

24    photographed in connection to the search of the house to those

25    payout date information that Mr. Catania will be introducing.

O6C5men7                              Sellinger - Cross

1          THE COURT:  All right.  Thank you.

2          I will see everybody at 9:30 tomorrow.  I am going to

3  step off the bench and I will take the other matter.

4          Mr. Weitzman, it looked like you wanted to say

5  something.

6          MR. WEITZMAN:  I don't want to burden you but I

7  believe --

8          THE COURT:  You don't want to further burden me.  Go

9  ahead.

10         MR. WEITZMAN:  Always.  Always.  I believe we got a

11 summary chart from the government last night relating to

12 Ms. Fuchs and I am not sure we previously have seen it.

13         THE COURT:  Handle this, gentlemen.  I will step back

14 up in a few minutes to take the 5:00 matter.  Thank you.

15              (Adjourned to June 13, 2024, at   9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   JOSÉ DOLORES URIBE

4   Cross By Mr. Fee . . . . . . . . . . . . . .3458

5   Redirect By Ms. Pomerantz  . . . . . . . . .3526

6   OLIVIA SEBADE

7   Direct By Mr. Monteleoni . . . . . . . . . .3536

8   Cross By Mr. Fee . . . . . . . . . . . . . .3545

9   JANICE KAREN GRASTY

10  Direct By Ms. Ghosh  . . . . . . . . . . . .3546

11  Cross By Mr. Weitzman  . . . . . . . . . . .3557

12  PHILIP SELLINGER

13  Direct By Ms. Pomerantz . . . . . . . . . .3596

14  Cross By Mr. Weitzman  . . . . . . . . . . .3654

15                   GOVERNMENT EXHIBITS

16  Exhibit No.                            Received

17   8L-1 through 8L-4  . . . . . . . . . . . .3548

18   10M-1  . . . . . . . . . . . . . . . . . .3552

19   12A-2  . . . . . . . . . . . . . . . . . .3609

20   12E-1  . . . . . . . . . . . . . . . . . .3614

21   12A-3  . . . . . . . . . . . . . . . . . .3622

22   8M-1  . . . . . . . . . . . . . . . . . . .3638

23   12A-1  . . . . . . . . . . . . . . . . . .3648

24

25