O6i5men1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7              Defendants.
                                           Trial
8   ------------------------------x

9                                          New York, N.Y.
                                           June 18, 2024
10                                         9:50 a.m.

11

12  Before:

13
                      HON. SIDNEY H. STEIN,
14
                                           District Judge
15                                         -and a Jury-

16                        APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division
23

24

25

O6i5men1

                         APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:  Marwan Abdel-Rahman
               Bachar Alhalabi
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

O6i5men1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated in the

3     courtroom.

4          What do the parties suggest I tell the jury about when

5     this will end?  Because in terms of their jury selection

6     process, I was telling them, I was getting their schedules

7     through the week ending July 5.  We discussed that a little

8     yesterday, and it seems to me I should tell them that we will,

9     and the occurrence intention is that they will have their case

10    for deliberations the week of July 15.  I think that is what we

11    settled on yesterday.  Disagreement?

12         MR. MONTELEONI:  I think we are hopeful that they will

13    have it at some point the week before that, the week of July 8.

14         THE COURT:  I see the aim is to have summations

15    July 10, 11, 12.  Do the parties think -- I don't want to

16    overstate here.  Are the parties comfortable then with my

17    saying that we hope to have it to them by the end for their

18    deliberations by the end of the week of July 8?

19         MR. FEE:  That's right, your Honor.  We are

20    comfortable with that.  I think the first thing you said may be

21    more accurate, if it may elicit some groans, only because I

22    don't know if the jury understands that means they will then be

23    deliberating you the following week.

24         THE COURT:  I will say the intentions are to have it

25    for their consideration.

O6i5men1

1            MR. FEE:  The only other question for the Court, I

2     don't know if you intend to tell them your schedule, the

3     Court's schedule for the week of July 4.  I just don't know

4     what the Court plans to do.

5            THE COURT:  I want to get my calendar, but my

6     recollection is that Thursday and Friday, one day is a legal

7     holiday and the Friday, has off.  It may not be a legal

8     holiday. I will tell them that.

9            Ms. Blakely, can you print out a calendar for me,

10    please?

11           Let's bring this jury in.

12           Mr. Weitzman, on June 12, at the end of the day, you

13    indicated you had 30 to 40 minutes left.  I take it that is

14    still your best estimate?

15           MR. WEITZMAN:  So in looking this over, I think I

16    probably have 45 to an hour left, as I mentioned yesterday on

17    the call.

18           THE COURT:  Just try to be as efficient as possible.

19    I am sure you will be.

20           Now, do I have the permission of the parties to speak

21    individually with those jurors who now may have a problem with

22    that timing?

23           MR. MONTELEONI:  Yes, your Honor.

24           MR. FEE:  Of course, your Honor.

25           MR. LUSTBERG:  Yes, your Honor.

O6i5men1

1              MR. DE CASTRO:  Yes, your Honor.

2              THE COURT:  You can put the witness on the stand.

3              Jury entering.  Please rise for the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6i5men1

1           (Jury present)

2           THE COURT:  Please be seated in the courtroom.

3           Good morning, ladies and gentlemen, and welcome back.

4    It is nice to see you and thank you for being here in a timely

5    fashion.  I do wish to inform the jury that one of the

6    participants in this trial came down with COVID in the middle

7    of last week.  He has been completely cleared by his doctor to

8    appear in court and he is no longer symptomatic.  He meets all

9    of the requirements set forth by the CDC for return to normal

10   activities on the CDC's recently updated respiratory virus

11   guidance.  I wish to inform you of that.

12          Our schedule has been set back a little because we had

13   Thursday, Friday, and Monday off.  I can tell you -- and these

14   things change -- but it is everybody's expectation that we will

15   have this case into your hands for your deliberation by the end

16   of the week of July 8.  All right?  It may be sooner, I guess

17   it may be later, but everyone's expectation now is it will be

18   in your hands for deliberation around the end of the week of

19   July 8.

20          Let me also tell you our schedule through that.  I

21   think you know that tomorrow, the 19th, is Juneteenth, it is a

22   federal holiday, there will be no court.  We will have court on

23   June 20th, and then we won't have court on June 21.  I promised

24   you that Friday off so we will have that Friday off.  So this

25   week it is just today and Thursday.

1          Next week it will be the entire week, Monday to

2     Friday, 9:30 to 5:00.  The following week, that is, the week of

3     July 1, it will be July 1, 2, and 3 -- that's Monday, Tuesday,

4     Wednesday.  And the 4th and 5th there will be no trial; the 4th

5     is a legal holiday and the 5th is a court holiday, it may be a

6     legal holiday, I don't know, but we will not, cannot have trial

7     on July 4 and July 5th.  And then it is the entire next week

8     will be trial.  All right?  I hope that helps.  Thank you.

9          Let's continue now with the cross-examination of

10    Mr. Sellinger.

11          Mr. Sellinger, welcome back, sir

12          THE WITNESS:  Thank you, your Honor.

13          THE COURT:  And I remind you that you remain under

14    only.  You understand that; correct?

15          THE WITNESS:  I do.

16    PHILIP SELLINGER , resumed.

17          THE COURT:  Thank you.

18          Mr. Weitzman, your witness, sir.

19          MR. WEITZMAN:  Thank you, your Honor.

20    CROSS-EXAMINATION (Continued)

21    BY MR. WEITZMAN:

22    Q.  Good morning, Mr. Sellinger.

23    A.  Good morning.

24    Q.  When we last left off, you testified about your

25    conversation with Senator Menendez on June 16.  Do you recall

O6i5men1                          Sellinger - Cross

1    that?

2    A.  On June 16th?

3    Q.  I'm sorry.  I meant December 16.

4    A.  Yes, I do recall that.

5    Q.  Thank you, Mr. Sellinger.  We are in June, talking about

6    December.

7        And you had mentioned that you might have to recuse

8    yourself from the Daibes case in that conversation?

9    A.  Yes.

10   Q.  And you had testified that the senator understood and his

11   tone was not remarkable; correct?

12   A.  Correct.

13   Q.  And that he was calm and he acknowledged your statement.

14   Do you recall this?

15   A.  I do.

16   Q.  I would like to go back one day to your meeting with

17   Senator Menendez on December 15, OK, 2020.

18   A.  Yes.

19   Q.  Now, during the interview or your meeting with Senator

20   Menendez he raised a number of topics with you; correct?

21   A.  Yes.

22   Q.  He asked you about your vision and your priorities for the

23   U.S. Attorney's office in New Jersey?

24   A.  Yes.

25   Q.  And he shared his policy priorities with you as well?  Do

O6i5men1                         Sellinger - Cross

1    you recall that?

2    A.  I'm not recalling that right now.

3    Q.  Do you recall what you told him your policy priorities and

4    vision for the office were?

5    A.  Generally, yes.

6    Q.  What was that?

7    A.  I talked about the various divisions in the office.  I told

8    him which divisions I thought were particularly strong, which I

9    intended to focus on, and new priorities, which included civil

10   rights.

11   Q.  And which divisions did you intend to focus on?

12   A.  I think I ran through most of the criminal divisions, if

13   I'm not mistaken.  I recall specifically talking about violent

14   crime and civil rights in particular.

15   Q.  From your discussion with him, do you recall him wanting

16   the U.S. Attorney's office to focus on gun violence and gun

17   trafficking and opioids?

18   A.  I know those subjects.

19              MS. POMERANTZ:  Objection, your Honor.  Wanting.

20              THE COURT:  I will allow it.

21              You can answer.  Go ahead.

22              THE WITNESS:  I know those subjects came up.  I'm not

23   sure what, if anything, Senator Menendez said about them.

24   BY MR. WEITZMAN:

25   Q.  From your conversation and your interaction with him, did

O6i5men1                        Sellinger - Cross

1    you reach any conclusions about whether you and he shared

2    similar policy priorities?

3              MS. POMERANTZ:  Objection.

4              THE COURT:  Sustained as phrased.

5    BY MR. WEITZMAN:

6    Q.  From your conversations with him, did he indicate to you

7    that he shared the same policy priorities you had articulated?

8              MS. POMERANTZ:  Objection.

9              THE COURT:  I will allow it if you understand the

10   question.

11             THE WITNESS:  He certainly didn't disagree with any of

12   the priorities I articulated.

13   BY MR. WEITZMAN:

14   Q.  Did he indicate to you that he wanted to make New Jersey

15   safer for constituents?  For New Jerseyans?

16             MS. POMERANTZ:  Objection.

17             THE COURT:  Sustained.

18   Q.  You were committed to making New Jersey safer for New

19   Jerseyans; correct?

20   A.  Very much.

21   Q.  Senator Menendez also raised diversity within the U.S.

22   Attorney's office during that meeting?  Do you recall that?

23   A.  I know that I raised diversity and we had a conversation

24   about it.

25   Q.  And in that conversation Senator Menendez raised the name

O6i5men1                        Sellinger - Cross

1    Jamel Semper; right?

2    A.  I believe that he raised the name of Mr. Semper.

3    Q.  Now, Mr. Semper was a long-term federal prosecutor at the

4    U.S. Attorney's office, correct?

5    A.  Yes.

6    Q.  And he was a -- he is African American?

7    A.  Yes.

8    Q.  And he was a well-regarded and well-respected prosecutor,

9    right?

10              MS. POMERANTZ:  Objection.

11              THE COURT:  If you know that.

12              THE WITNESS:  I do know that.  At the time I didn't,

13   but it is certainly true.

14   BY MR. WEITZMAN:

15   Q.  Do you recall Senator Menendez asking you whether you would

16   name Jamel Semper as your no. 2, the first assistant?

17   A.  No.

18   Q.  Did he indicate to you, did he state that he wanted Jamel

19   Semper to have a leadership position in the office, the U.S.

20   Attorney's office?

21   A.  I don't recall that.  I do recall that he made favorable

22   comments about Mr. Semper, generally.

23   Q.  Did he inform you, did Senator Menendez inform you that he

24   had been contacted by a number of African American ministers

25   and pastors in New Jersey regarding Jamel Semper?

O6i5men1                        Sellinger - Cross

 1                MS. POMERANTZ:  Objection.  Assumes a fact.

 2                THE COURT:  Did he say that?

 3                THE WITNESS:  I can't recall.  We definitely spoke

 4    about Mr. Semper.  I'm not sure.

 5    BY MR. WEITZMAN:

 6    Q.  Do you recall seeing press favorable to Mr. Semper that

 7    said that Black minsters were pushing for Semper to be the next

 8    U.S. Attorney?

 9                MS. POMERANTZ:  Objection.  Assumes a fact.

10                THE COURT:  Sustained.  Sustained.

11                MR. WEITZMAN:  Let's put up Defendant's Exhibit 1035,

12    just for the witness, thank you, and counsel.  Can we go down

13    to the next page?

14    BY MR. WEITZMAN:

15    Q.  Mr. Sellinger, do you see this article?  I won't ask you to

16    read it but do you see it?

17    A.  Just give me a moment.  I do.

18    Q.  Does this refresh your recollection that Black -- there

19    were articles about Black ministers pushing for Semper to be

20    the next U.S. Attorney?

21                MS. POMERANTZ:  Objection.

22                THE COURT:  Sustained.

23    BY MR. WEITZMAN:

24    Q.  Sir, do you recall whether Black minsters, whether there

25    was press indicating that Black ministers were pushing for

O6i5men1                           Sellinger - Cross

1   Semper to be the next U.S. Attorney?

2              MS. POMERANTZ:  Objection.  Asked and answered.

3              THE COURT:  I will allow it.

4   Q.  Do you recall that?

5   A.  Just one more time so I know I have the question.

6   Q.  Do you recall that there was press around the time of your

7   interview with Senator Menendez and thereafter, where Black

8   ministers were pushing for Semper to be the next U.S. Attorney?

9              MS. POMERANTZ:  Your Honor, objection.  And I would

10  note the time frame, the time frame on the document, your

11  Honor.

12             THE COURT:  You can answer it, sir, if you are able.

13             THE WITNESS:  I remember that there was press to that

14  effect.  I don't remember the exact time frame, but yes.

15             MR. WEITZMAN:  You can take that down.  Thank you.

16  BY MR. WEITZMAN:

17  Q.  So you understood, sir, that there was pressure, political

18  pressure on Senator Menendez, to name a diverse candidate as

19  U.S. Attorney; is that correct?

20             THE COURT:  Sustained.

21             MS. POMERANTZ:  Objection.

22  Q.  Did you have an understanding, sir, whether there was

23  political pressure to name a diverse candidate as the next U.S.

24  Attorney?

25             MS. POMERANTZ:  Objection.

1           THE COURT:  Sustained.  Political pressure.

2           MR. WEITZMAN:  Thank you, your Honor.

3    BY MR. WEITZMAN:

4    Q.  Sir, do you have an understanding as to whether there was a

5    request of the senator to name a diverse candidate as the next

6    U.S. Attorney?

7           MS. POMERANTZ:  Objection.

8           THE COURT:  To your knowledge, yes or no, was the

9    senator asked to name a diverse candidate as the next U.S.

10   Attorney.

11          THE WITNESS:  What I know is that I read press that --

12          THE COURT:  No, no.

13          THE WITNESS:  So no, I do not.

14   BY MR. WEITZMAN:

15   Q.  Senator Menendez didn't indicate to you that diversity was

16   important to him, correct?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  Did Senator Menendez say diversity was

19   important to him?  Yes?  No?  I don't recall?

20          THE WITNESS:  I can't recall whether or not he raised

21   it.

22   BY MR. WEITZMAN:

23   Q.  During your meeting with Senator Menendez he did raise the

24   Daibes case, correct?

25   A.  Yes.

1  Q.  And he told you that he believed that Fred Daibes was being
2  treated unfairly by the U.S. Attorney's office.  Is that your
3  testimony?
4  A.  Yes.
5  Q.  And he told you that he believed that Fred Daibes was being
6  prosecuted for partisan politics reasons; right?
7  A.  No.
8  Q.  Do you recall that he was displeased, he told you that he
9  was displeased with the way the former republican U.S. Attorney
10  had handled, was handling the Daibes case?
11            MS. POMERANTZ:  Objection.  Assumes a fact.
12            THE COURT:  No, I will allow it.
13            THE WITNESS:  At that meeting he said nothing about,
14  other than what I testified to last time, that he thought that
15  Mr. Daibes had been treated unfairly.  Nothing else.
16  BY MR. WEITZMAN:
17  Q.  Did he mention Craig Carpenito, the republican U.S.
18  Attorney, in that conversation?
19  A.  No, he did not.
20  Q.  Are you aware, sir, whether Daibes donated to democratic
21  politicians?
22  A.  I am not.
23  Q.  Would you agree with me, sir, that it is important that the
24  U.S. Attorney's office be above partisan politics?
25  A.  Yes.

O6i5men1                        Sellinger - Cross

1    Q.  And it would be improper to prosecute someone based on

2    partisan politics; correct?

3    A.  Yes.

4    Q.  Do you agree that you and Senator Menendez have had

5    discussions, have you not, about how improper it is to

6    weaponize the U.S. Attorney's office or DOJ for partisan

7    politics?

8               MS. POMERANTZ:  Objection.

9               THE COURT:  Sustained.

10   BY MR. WEITZMAN:

11   Q.  Have you and Senator Menendez had discussions about

12   problems involving the use of Department of Justice and the

13   U.S. Attorney's office prosecutions for partisan politics?

14   A.  I don't recall a conversation about partisan politics, no.

15   Q.  In any event, Senator Menendez asked you to look into the

16   Daibes case, correct?

17   A.  Yes.

18   Q.  And you said that you would look into that case like you

19   would look into all cases; correct?

20   A.  That's not the way I said it.  What I said was if I became

21   U.S. Attorney, I would look at all cases that came before me or

22   the front office, carefully.

23   Q.  And that would be your duty, correct, as U.S. Attorney?

24   A.  Yes.  That's the job.

25   Q.  Is it correct to say that what he asked you to do was to

O6i5men1                          Sellinger - Cross

1    execute your duty as U.S. Attorney?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.  Sustained.

4    BY MR. WEITZMAN:

5    Q.  Did you perceive his request to look into the Daibes case

6    as doing anything other than your official duty?

7              MS. POMERANTZ:  Objection.

8              THE COURT:  I will allow it.

9              THE WITNESS:  I did not believe he was asking me to do

10   anything other than my official duty.  In fact, I didn't

11   believe he was asking me to do anything.

12   BY MR. WEITZMAN:

13   Q.  That was my next question.

14             Senator Menendez didn't ask you to resolve or handle

15   the Daibes matter in any particular way, correct?

16   A.  Correct.

17   Q.  He didn't pressure you, correct?

18   A.  He did not.

19   Q.  He didn't threaten you, correct?

20   A.  No.

21   Q.  He didn't say that your recommendation to be the next U.S.

22   Attorney was in any way conditioned on decisions you would make

23   in the Daibes case?

24   A.  No.

25   Q.  He didn't use aggressive language when he spoke to you

1    about this, right?

2    A.   No.

3    Q.   He was calm; correct?

4    A.   Yes.

5    Q.   Respectful?

6    A.   Yes.

7    Q.   Deferential?

8            THE COURT:  That's a hard one.

9            MR. WEITZMAN:  That is withdrawn.

10   BY MR. WEITZMAN:

11   Q.   After you said you would take a look at all cases that come

12   before you, the conversation moved on; right?

13   A.   Yes.

14   Q.   During the entire time -- I'm sorry -- during the entire

15   U.S. Attorney vetting process this is the only time Senator

16   Menendez permanently mentioned the Daibes case to you; correct?

17           MS. POMERANTZ:  Objection.

18           THE COURT:  No.

19           Is this conversation the only time that Mr. Menendez,

20   himself, raised the Daibes case with you?

21           MR. WEITZMAN:  During the vetting process, your Honor.

22           THE COURT:  During the vetting process.

23           THE WITNESS:  Yes.

24   BY MR. WEITZMAN:

25   Q.   He never mentioned the Daibes case to you once you became

O6i5men1                        Sellinger - Cross

1   U.S. Attorney, correct?

2   A.   Correct.

3   Q.   Fair to say that in that December 15th conversation, you

4   didn't believe he was asking you to put your thumb on the scale

5   of justice in the Daibes case; correct?

6   A.   Correct.

7   Q.   And in fact, Senator Menendez has never asked you to put

8   your thumb on the scale of justice in connection with any case

9   as U.S. Attorney; correct?

10              MS. POMERANTZ:  Objection.

11              THE COURT:  Sustained as phrased.

12  BY MR. WEITZMAN:

13  Q.   Has Senator Menendez ever asked you to put your thumb on

14  the scale of justice in connection with any case pending before

15  the U.S. Attorney's office?

16              MS. POMERANTZ:  Objection.

17              THE COURT:  Sustained as phrased.

18  Q.   Has Senator Menendez ever asked you to weigh in,

19  improperly, in any case pending before the U.S. Attorney's

20  offers.

21              MS. POMERANTZ:  Objection.

22              THE COURT:  I will allow it.

23              THE WITNESS:  You will allow that?

24              THE COURT:  Yes.

25              THE WITNESS:  The only conversation about any case

O6i5men1                          Sellinger - Cross

 1  that I have had with the senator was the case that -- the

 2  conversation that we have just spoke about.

 3  BY MR. WEITZMAN:

 4  Q.  Now, you had mentioned that at an earlier time before you

 5  were being considered for U.S. Attorney, Senator Menendez had

 6  mentioned the Daibes case to you, correct?

 7  A.  He had mentioned -- he had mentioned a matter involving

 8  Mr. Daibes.

 9  Q.  And he had mentioned, many months before you were being

10  considered for U.S. Attorney, that he had spoken to the prior

11  U.S. Attorney about the Daibes case; correct?

12  A.  Yes.

13  Q.  And that prior U.S. Attorney was Craig Carpenito, correct?

14  A.  Correct.

15  Q.  He was a Trump appointee, correct?

16  A.  Correct.

17  Q.  And he wasn't asking you to weigh in on his conversation

18  with Craig Carpenito, right?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  I don't know what that means.

21  Q.  Did he ask you to intervene on behalf of Fred Daibes and

22  Craig Carpenito?

23  A.  No.

24  Q.  This was a social conversation between you two?

25          MS. POMERANTZ:  Objection.

O6i5men1                          Sellinger - Cross

1           THE COURT:  Who two?

2           MR. WEITZMAN:  I'm sorry.

3           Yourself and Mr. Menendez, when he mentioned this

4    prior conversation with Craig Carpenito.

5           THE COURT:  Sustained.

6    Q.  Were you guys engaged in a social conversation at the time

7    that the topic came up?

8           THE COURT:  What were you discussing when the topic

9    came up, if you remember?

10          THE WITNESS:  I believe it was certainly in the social

11   context, and I believe that Senator Menendez was commenting on

12   a number of different lawyers and that was one of the comments

13   he made.

14   Q.  So he was sharing frustration with you?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  I will allow it.

17   A.  He made the comment that I testified to as part of talking

18   about a number of different lawyers.

19   Q.  And I think you had said that he mentioned that Carpenito

20   said it wasn't his decision but his first assistant's decision;

21   is that correct?

22   A.  In substance.

23   Q.  And his first assistant at the time was Rachael Honig; is

24   that correct?

25   A.  Yes.

O6i5men1                        Sellinger - Cross

1   Q.   Now, he didn't tell you what he specifically said to

2   Carpenito, right?

3   A.   Correct.

4   Q.   He didn't tell you whether he made any requests of

5   Mr. Carpenito or just asked for information; right?

6   A.   He didn't tell me anything.

7   Q.   And he didn't tell you where that conversation occurred or

8   how it occurred; right?

9   A.   Nothing about it.

10  Q.   He didn't tell you whether it was a short or long

11  conversation?

12  A.   No.

13  Q.   In person or by phone?

14  A.   No.

15  Q.   In passing at some political event or whether he, it was a

16  specific outreach regarding Mr. Daibes; right?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  I will allow it.

19  A.   He didn't say anything one way or the other about where,

20  how, anything about it.

21  Q.   Let me back away from that conversation and just ask you,

22  in general, would you agree with me that Mr. Daibes, like all

23  criminal defendants, deserves due process?

24          MS. POMERANTZ:  Objection.

25          THE COURT:  Well.  You can answer that, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                          Sellinger - Cross

1    A.   Yes.

2    Q.   You would agree that every criminal defendant deserves all

3    due process of law; right?

4    A.   Yes.

5    Q.   And you would agree with me, sir, that if a senator were to

6    say that a defendant deserves all due process of law, there

7    would be nothing improper in that statement?

8               MS. POMERANTZ:  Objection.

9               THE COURT:  Sustained.

10   Q.   Sir, would it be surprising to you --

11              THE COURT:  Sustained.

12   Q.   Sir, did Senator Menendez ever ask you to give any criminal

13   defendant due process of law?

14              MS. POMERANTZ:  Objection.

15              THE COURT:  Did the senator ask this witness to give

16   due process of law to a criminal defendant?

17              MR. WEITZMAN:  This is subject to connection, your

18   Honor, with another witness; yes.

19              THE COURT:  I'm not sure I understand the question.

20   Rephrase it.

21   BY MR. WEITZMAN:

22   Q.   Sir, did you ever get a request from Senator Menendez to

23   give due process of law -- to guarantee due process of law to

24   Fred Daibes?

25              THE COURT:  In those words?

O6i5men1                              Sellinger - Cross

1           MR. WEITZMAN:  Yes.

2           THE COURT:  OK.

3   A.  No.

4   Q.  If you had received such a request, would you have viewed

5   that as an improper request?

6           THE COURT:  Sustained.

7   Q.  Sir, in your job as U.S. Attorney, do you endeavor to give

8   guaranteed due process of law to criminal defendants?

9   A.  I do.

10  Q.  Now, you testified about a call you made to Senator

11  Menendez on December 16 regarding potential recusal; correct?

12  A.  Yes.

13  Q.  Now, the decision on recusal is not one that you could make

14  yourself; correct?

15  A.  Correct.

16  Q.  It is one that main justice, the Department of Justice in

17  Washington, D.C., needs to make for you; correct?

18  A.  Correct.

19  Q.  You just have to bring the relevant facts to the Department

20  of Justice's attention; correct?

21  A.  Yes.

22  Q.  And you told Senator Menendez all that, right?

23  A.  I did.

24  Q.  You never told Senator Menendez at any point in time, *Don't*

25  *worry, I won't have to be recused from the Daibes matter.*

1    Correct?

2    A.  Correct.

3    Q.  You never told anybody else who worked for Senator

4    Menendez, *Don't worry, I won't have to be recused in the Daibes*

5    *matter.*  Right?

6    A.  Correct.

7    Q.  Because that would not be a judgment call that you,

8    yourself could make; correct?

9    A.  The process is I make disclosure and an official at the

10   Department of Justice makes the determination.

11             THE COURT:  And you follow whatever that determination

12   is, correct?

13             THE WITNESS:  Of course.  Yes.

14   BY MR. WEITZMAN:

15   Q.  Now, after you told Senator Menendez about this potential

16   conflict and potential recusal, he continued to try to -- he

17   continued to discuss the U.S. Attorney position with you;

18   correct?

19   A.  Yes.

20   Q.  And in fact, he helped set up a meeting between you and

21   Cory Booker, right?

22   A.  He did help facilitate my meeting with Senator Booker, yes.

23   Q.  Do you recall that meeting occurred on December 18, 2020?

24   A.  Yes.

25   Q.  And that was two days after you discussed the potential

O6i5men1                          Sellinger - Cross

1   conflict with Senator Menendez; right?

2   A.   Yes.

3   Q.   The purpose of that meeting, sir, was that in order to get

4   Senator Booker's buy-in on your potential recommendation to be

5   the next U.S. Attorney?

6   A.   In substance.

7   Q.   And did the meeting go well?

8   A.   Yes.  I thought it did.

9   Q.   Now, in late December 2020, you got a call from Senator

10  Menendez; right?

11  A.   I had a number of conversations with him, he and the staff

12  in late December.

13  Q.   And there was one particular call where Senator Menendez

14  told you that the White House was not going to accept your

15  recommendation as U.S. Attorney; correct?

16  A.   Yes.  The recommendation of me to be U.S. Attorney.

17  Q.   And instead the White House went with Esther Suarez; is

18  that correct?

19  A.   He did not mention the name of who the nominee or the

20  suggested recommended nominee would be.

21  Q.   You learned, though, that it was Esther Suarez; right?

22  A.   Yes.  There came a time when I learned that.

23  Q.   And during the call when Senator Menendez told you that you

24  would not be the nominee, did he tell you that the president

25  was interested in a diverse candidate?

O6i5men1                        Sellinger - Cross

1           MS. POMERANTZ:  Objection.  Assumes a fact.

2           THE COURT:  Did he ever tell you that?

3           THE WITNESS:  We did have discussions late in the year

4      about the White House process and diversity was one of the

5      considerations.

6      BY MR. WEITZMAN:

7      Q.  Did he tell you that there was a memo from the White House

8      counsel's office, Dana Remus, to all senators, specifically

9      seeking and requesting diverse candidates in late December,

10     2020?

11          MS. POMERANTZ:  Same objection.

12          THE COURT:  You can answer that.  Did he tell you

13     there was such a memo?

14          THE WITNESS:  He told me there was such a memo --

15     well, either he or his staff told me -- I believe he -- I think

16     they both told me, I should say, and they sent me a copy of the

17     memo.  Mr. Turner sent me a copy of the memo.

18          MR. WEITZMAN:  Let's put up Defendant's Exhibit 193,

19     and if you can zoom in?  This is for the witness.

20     BY MR. WEITZMAN:

21     Q.  Is this the memo that you received a copy of, if you

22     recall?

23     A.  Give me a moment to read it, please?

24     Q.  Yes.

25     A.  Is there a way to make it darker?

1    Q.  I'm not sure we can make it darker but we can enlarge it

2    further.

3            THE WITNESS:  I can read it.

4            THE COURT:  Make it larger, counsel.

5            MR. WEITZMAN:  Can we scroll through the rest of the

6    memo?

7            THE WITNESS:  Yes.  Thank you.  Yes, this is the

8    memo --

9            THE COURT:  The question is:  Is that the memo that

10   you received a copy of?  Yes, no, or I don't remember.

11           THE WITNESS:  Yes.

12           MR. WEITZMAN:  Defense Government Exhibit 193.

13           MS. POMERANTZ:  Your Honor, we hadn't previously

14   received a copy, but no objection.

15           THE COURT:  It is not for the truth of what is set

16   forth there.  Accepted.  Admitted.

17           (Defendant's Exhibit 193 received in evidence)

18           MR. WEITZMAN:  Can we publish Defendant's Exhibit 193?

19           THE WITNESS:  Sorry.  Can you just blow that up, the

20   top part, so I can see the date?

21   BY MR. WEITZMAN:

22   Q.  Sir, do you recognize this as a memo from Dana Remus, the

23   White House counsel designate?

24   A.  That's what it says.

25   Q.  And it is dated December 22, 2020; correct?

O6i5men1                         Sellinger - Cross

1    A.  Correct.

2    Q.  That is four days after your interview with Senator Booker,

3    right?

4    A.  Yes.

5    Q.  And if I can just read the first couple of paragraphs:

6    Dear senator, as the incoming White House counsel, I look

7    forward to working with you on many shared priorities during

8    the Biden-Harris Administration.  Today I am writing to invite

9    you to provide recommendations for highly-qualified and diverse

10   candidates for U.S. Attorney, U.S. Marshal, and U.S. District

11   Court nominations in your state.  With respect to each of these

12   positions, President-Elect Biden is eager to nominate

13   individuals who reflect the best of the America and who look

14   like America.  We are confident this is a shared goal.

15           THE COURT:  Sir, I don't think there is any need for

16   you to read the whole paragraph.

17           MR. WEITZMAN:  Just one more sentence.  Thank you,

18   your Honor.

19   Q.  (Continuing) We therefore ask that you propose talented

20   individuals who would bring to these critically important roles

21   a wide range of life and professional experiences, including

22   those based on their race, ethnicity, national origin,

23   gender -- so on, and so on, and so on.

24       This memo requested from the White House that Senator

25   Menendez nominate a diverse candidate; correct?

1          MS. POMERANTZ:  Objection.

2          THE COURT:  Sustained.

3   Q.  You understood from your conversations with Senator

4   Menendez and his staff that they felt that they needed to

5   nominate or recommend a diverse candidate?

6          MS. POMERANTZ:  Objection.

7          THE COURT:  Sustained.

8          Do you have an understanding of the purpose of this

9   memo, sir?

10          THE WITNESS:  I did.

11          THE COURT:  What was your understanding?

12          THE WITNESS:  That the White House was suggesting that

13   the senators take into account a wide range of factors,

14   including diversity in race, ethnicity, and also with respect

15   to background.

16          MR. WEITZMAN:  You can put that down, Mr. Kelly.

17   Thank you.

18   BY MR. WEITZMAN:

19   Q.  Now, after Esther Suarez received the nomination, you

20   continued to lobby for the U.S. Attorney position, correct?

21   A.  No.

22   Q.  Did you continue communicating with the senator and his

23   staff regarding the U.S. Attorney position?

24   A.  I did not, until such time as I learned that the Suarez

25   nomination was encountering significant roadblocks.

1    Q.  And what happened at that point?

2    A.  As I testified, at that point I advised Senator Menendez

3    that if that nomination ended up failing, that I would be

4    interested in continuing our discussion.

5    Q.  And do you recall there was a significant amount of

6    negative press about Ms. Suarez?

7    A.  There was negative press.

8    Q.  And so is that when you learned that there was some

9    roadblocks to the nomination of Ms. Suarez?

10   A.  I think I probably heard about it before in the legal

11   community, generally, but I saw the press as well.

12   Q.  Now, after Esther Suarez was nominated, Senator Menendez

13   continued to support your career; correct?

14   A.  Yes.  I think that's fair.

15   Q.  And in fact, he recommended you for an ambassadorship;

16   correct?

17   A.  He and I discussed that potential when the opportunity to

18   become U.S. Attorney was not available and he certainly took

19   steps to help promote that; yes.

20   Q.  He wrote a letter to the president recommending you for

21   ambassadorships; right?

22   A.  I think that's right.

23        MR. WEITZMAN:  Can we show the witness Defendant's

24   Exhibit 554?  Have you seen this letter before, sir?

25        THE WITNESS:  If you can scroll quickly just so I can

O6i5men1                         Sellinger - Cross

```
 1   see it?  I am sure I have.
 2              MR. WEITZMAN:  We offer Defendant's Exhibit 554.
 3              MS. POMERANTZ:  No objection.
 4              THE COURT:  Admitted.
 5              (Defendant's Exhibit 554 received in evidence)
 6   BY MR. WEITZMAN:
 7   Q.  We won't read this letter, but this is a March 3, 2021
 8   letter from Senator Menendez to President Biden recommending
 9   you, in the letter he writes that he is providing the strongest
10   possible recommendation of Philip Sellinger to be appointed as
11   an ambassador to the United States.
12              Did I read that correctly, stir?
13   A.  Yes.
14   Q.  And in the letter --
15              THE COURT:  This is recommending you, in this letter,
16   for a particular ambassadorship, sir?
17              THE WITNESS:  Not in this letter.
18              THE COURT:  Right.
19              MR. WEITZMAN:  Thank you.  You can take that down.
20   BY MR. WEITZMAN:
21   Q.  Now, at the same time that you were being recommended by
22   Senator Menendez for an ambassadorship, you and he were still
23   talking about a potential U.S. Attorney position; correct?
24   A.  No.
25   Q.  Shortly after this letter, in March, did you have a
```

O6i5men1                              Sellinger - Cross

1    conversation with Senator Menendez about becoming, potentially,

2    the U.S. Attorney in New Jersey?

3    A.   As I testified last week, there came a time when it became

4    clear there were significant roadblocks to a Suarez nomination.

5    At that point we began discussing U.S. Attorney again.   I

6    believe it was in the spring.   I can't put it in relationship

7    to this.

8              THE COURT:  Spring of '21?

9              THE WITNESS:  Yes.

10   BY MR. WEITZMAN:

11   Q.   Do you recall that it was a conversation in March or April

12   of 2021 that you had with Senator Menendez about potentially

13   becoming the U.S. Attorney nominee if Esther Suarez' nomination

14   fails?

15   A.   I don't remember exactly when it was but it was certainly

16   in the spring.

17             MR. WEITZMAN:  Can we put up 3536-003, and if you

18   would turn to page 4 and if you would highlight the last two

19   bullet points?  Just that one, thank you.

20   Q.   Let me ask you whether that refreshes your recollection

21   that it was in March or April 2021 that you called Senator

22   Menendez and told him that if Suarez does not receive the

23   nomination, that you would still be interested in the position.

24   A.   Not really.

25   Q.   Do you recall --

O6i5men1                          Sellinger - Cross

1           MR. WEITZMAN:   If you can zoom that out?

2    Q.  Do you recall sitting for an interview with the U.S.

3    Attorney's office on February 22, 2023?

4    A.  I had meetings with the U.S. Attorney's office.  I don't

5    recall the date.  I am not questioning it.

6    Q.  You met with the FBI and the U.S. Attorney's office at that

7    meeting; correct?

8    A.  Yes.

9    Q.  Do you recall telling them that in March or April 2021, you

10   called Senator Menendez and told him that if Suarez does not

11   receive the nomination, you would still be interested in the

12   position?

13   A.  Well, as I have testified, I know that said that to the

14   senator.  I know that I said it in the spring.  I don't recall,

15   as I am sitting here, whether it was March or April and whether

16   I said that.  It is certainly possible.  I just don't recall.

17   Q.  In any event, whenever you spoke to the senator about your

18   interest in the position if Suarez' nomination fails, was the

19   senator encouraging in that conversation?

20   A.  No.  It was really, initially, it was more I was simply

21   letting him know, so if it failed I didn't want to not have the

22   opportunity to have a discussion.

23           THE COURT:  And -- I'm sorry.  Go ahead, sir.

24   A.  But her process was going to continue to the end and we had

25   no conversations about, other than in the event it fails, that

O6i5men1                          Sellinger - Cross

```
 1   I was interested.
 2              THE COURT:  And when you referred to it fails, I take
 3   it you were referring to meaning if the Suarez nomination
 4   failed; is that correct?
 5              THE WITNESS:  Correct.  I'm sorry.
 6   BY MR. WEITZMAN:
 7   Q.  Do you recall during an interview with the U.S. Attorney's
 8   office on February 22, 2023, telling the U.S. Attorney's office
 9   that on that call with Senator Menendez, Menendez was
10   encouraging of you in the call?
11   A.  I don't recall the interview.
12   Q.  So you don't recall telling the U.S. Attorney's office that
13   Senator Menendez was encouraging after you mentioned that you
14   would still be interested in the U.S. Attorney's office
15   position?
16              MS. POMERANTZ:  Objection; asked and answered.
17              THE COURT:  Well, that's true.
18   Q.  You don't recall, sir?  I just want to be -- just to
19   complete.
20              THE COURT:  Do you recall, sir, whether or not the
21   senator was encouraging of you in the call with his office?
22              THE WITNESS:  That's just not the word that I would
23   use to describe my conversations with the senator at that time.
24   BY MR. WEITZMAN:
25   Q.  Do you recall telling the government that Senator Menendez
```

O6i5men1                          Sellinger - Cross

1   was encouraging?

2   A.  I don't recall.

3          MS. POMERANTZ:  Objection.

4          MR. WEITZMAN:  Let's put up 3536-003, page 4, and zoom

5   in on the third bullet point on the bottom -- fourth bullet

6   point at the bottom.  That one.  Thank you.

7   Q.  If you would read that to yourself, does that --

8   A.  Is this the same one we just looked at it?

9          THE COURT:  Yes, it is, sir.  The question is simply

10  whether that refreshes your recollect.  Yes or no.

11         THE WITNESS:  No.

12  BY MR. WEITZMAN:

13  Q.  Did Senator Menendez tell you during that call that he was

14  pushing for the White House to get Esther Suarez a second

15  interview?

16         MS. POMERANTZ:  Objection; assumes a fact.

17         THE COURT:  I will allow that.

18         THE WITNESS:  I don't recall the word "pushing."  I

19  recall him telling me that Ms. Suarez was going to have a

20  second interview with the White House.

21  BY MR. WEITZMAN:

22  Q.  Did he tell you that if she doesn't get through, then he

23  would strongly consider you for the U.S. Attorney's position?

24  A.  He said that if she didn't go through that -- excuse me.

25  The senator said that if that nomination did not go through, he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                    Sellinger - Cross

1   would be receptive to our continuing our discussions.

2   Q.  And that was after you had already told him that you might

3   have to be recused from the Daibes case; correct?

4   A.  Correct.

5   Q.  And Senator Menendez, on that call, did not bring up the

6   Daibes case, correct?

7   A.  Correct.

8   Q.  Nor your potential recusal from the Daibes case, correct?

9   A.  Correct.

10  Q.  He didn't condition, in any way, whether he would recommend

11  you for the U.S. Attorney's position on anything to do with

12  Mr. Daibes on that call; correct?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  Yes.  Sustained.

15  BY MR. WEITZMAN:

16  Q.  Did he condition, in that call, in spring 2021, did he

17  condition his potential recommendation of you as U.S. Attorney

18  on anything to do with the Daibes case?

19          THE COURT:  Did he bring up Daibes in that call at

20  all?

21          THE WITNESS:  No.

22          THE COURT:  Next question.

23          MR. WEITZMAN:  Thank you, your Honor.

24  BY MR. WEITZMAN:

25  Q.  At some point in late April, early May, do you recall

O6i5men1                    Sellinger - Cross

1   getting a call from Senator Menendez informing you that you

2   would be formally recommended as the U.S. Attorney?

3   A.  I recall he told me that sometime in the late spring.  I

4   don't recall whether it was on the phone or in person.

5   Q.  And is late spring like late April, early May?  Mid May?

6   Do you recall?

7   A.  Somewhere around that time frame.  Sounds about right.

8   Q.  And he decided -- he told you that he decided to put your

9   name forward after the White House refused to proceed with

10  Esther Suarez as the nominee; is that correct?

11  A.  I don't believe that Ms. Suarez' name came up in the

12  conversation, if that's what you are asking.

13  Q.  Do you recall that your call with Senator Menendez

14  regarding his formal recommendation of you as the U.S. Attorney

15  occurred in April or May, 2021?

16  A.  That sounds like the right time frame.

17  Q.  And have you reviewed your own phone records to see when

18  that call occurred precisely?

19  A.  No.

20          MR. WEITZMAN:  Can we put up Government Exhibit 1434,

21  page 3?

22          And just to read into the record, this is a

23  stipulation by and between the parties, all documents marked

24  with control numbers within the following ranges consist of

25  true and accurate copies of the records of Verizon, and then

O6i5men1                         Sellinger - Cross

1   there is a series of ranges including SDNY R 0406417481 to

2   06512659.  At this point we put up Defendant's Exhibit 834,

3   which is within that range, at page 332, for the witness.

4           Let's stay on the first page.  Can we stay on the

5   first page?

6   Q.  Why don't you look at that for yourself, Mr. Sellinger.

7           THE COURT:  Can you blow that up, please, for the

8   Court?

9           MR. WEITZMAN:  Yes.

10          THE WITNESS:  All right.

11          MR. WEITZMAN:  And if we can turn to page 332 and if

12  we can zoom in on the middle?

13  Q.  Sir, do you recognize the phone number that ends in last

14  four 4744, with the full number being 202-224-4744?

15  A.  No.

16          MR. WEITZMAN:  Then let's put up, to refresh

17  recollection, Defendant's Exhibit 1305, and that can be for the

18  Court and the jury as well.  And if you would turn to page 2 of

19  that document?

20  Q.  Do you see the line that says Robert Menendez?

21  A.  Yes.

22  Q.  Do you see the phone number 202-224-4744?

23  A.  I do.

24          MR. WEITZMAN:  Now if we can put up Defendant's

25  Exhibit 834?

1          Your Honor, we would offer page, the first page and

2     page 332 of Defendant's Exhibit 834.  And if we can go to page

3     332.

4          MS. POMERANTZ:  Your Honor, we didn't get a copy prior

5     to this but we don't have objection.

6          MR. WEITZMAN:  This was a government exhibit, your

7     Honor.  We are just marking one page as a defense exhibit.

8     They have a copy.

9          THE COURT:  Admitted, without objection.

10          (Defendant's Exhibit 834, page 332 received in

11     evidence)

12     BY MR. WEITZMAN:

13     Q.  Do you see that this is a phone number for Greenberg

14     Traurig, this a phone number, Verizon records for 201-259-2994?

15     A.  Yes.

16     Q.  Is that your phone number at Greenberg Traurig when you

17     worked there?

18     A.  It is my personal cellphone, which Greenberg Traurig billed

19     for when I was there.

20     Q.  And do you see that on April 20 at 5:17 p.m. there was an

21     incoming call from Senator Menendez to you that was nine

22     minutes long?

23     A.  I see that.

24     Q.  Does this refresh your recollection that the timing of the

25     call from Senator Menendez to you, that you would be formally

O6i5men1                         Sellinger - Cross

1   recommended as the U.S. Attorney, occurred on April 20?

2              MS. POMERANTZ:  Objection.  Misstate and assumes a

3   fact.

4              MR. WEITZMAN:  Your Honor, he testified that it

5   occurred either in April or May.

6              THE COURT:  Does that refresh your recollection in

7   regard to exactly when the telephone call with Menendez was,

8   the telephone call we have been talking about when he told you

9   he was going to nominate you?

10             THE WITNESS:  As I mentioned, I don't know whether it

11  was in person or on the phone so, no, it does not refresh my

12  recollection.

13             MR. WEITZMAN:  Thank you.  You can take that down.

14  BY MR. WEITZMAN:

15  Q.  Did Senator Menendez explain to you why he was recommending

16  you in light of the White House memo stating that they

17  preferred diverse candidates?

18             THE COURT:  Sustained.

19  Q.  Did Senator Menendez explain to you why he was recommending

20  you as the next U.S. Attorney?

21  A.  I don't recall the specific conversation at the time, as I

22  have testified.  I have discussed the subject many times over

23  many years.

24  Q.  You would agree with me that you were a former assistant

25  U.S. Attorney; correct?

O6i5men1                           Sellinger - Cross

1   A.  Yes.

2   Q.  You were a well respected lawyer in the community, correct?

3          THE COURT:  We have been through this, sir.  He said

4   in response to all the praise that he was -- he felt he was

5   accomplished.  Move on.

6          MR. WEITZMAN:  Thank you, your Honor.

7   BY MR. WEITZMAN:

8   Q.  After the conversation with Senator Menendez in which he

9   said he would formally recommend you for the U.S. Attorney

10  position, did you get vetted by or did you have conversations

11  with Mike Soliman?

12  A.  I'm not recalling them right now.

13  Q.  You do know who Mike Soliman is?

14  A.  I do, yes.

15  Q.  And you know that he is a political consultant -- he was a

16  political consultant for Senator Menendez?

17         THE COURT:  There has been testimony to that, also.

18  How much longer do you have, sir?

19         MR. WEITZMAN:  Not much, your Honor.  I'm trying to

20  wrap it up.

21         THE COURT:  OK.  Then do it.  I believe the testimony

22  was that -- well, I shouldn't say.

23         Sir?

24         THE WITNESS:  He was a former chief of the New Jersey

25  office for the senator, was a political consultant for a

O6i5men1                    Sellinger - Cross

1    consulting company, and my understanding was that at times he

2    was a spokesperson of some sort for the senator, the details of

3    which I don't know.

4    BY MR. WEITZMAN:

5    Q.  Do you have an understanding as to whether Senator Menendez

6    asked Mike Soliman to vet you as a U.S. Attorney candidate?

7              MS. POMERANTZ:  Objection.

8              THE COURT:  Change the wording from "vet".

9    Q.  Do you have an understanding, sir, as to whether Senator

10   Menendez asked Mike Soliman to interview you to figure out

11   whether there is anything in your background or any issues that

12   would come up during the U.S. Attorney nomination process?

13             MS. POMERANTZ:  Objection.

14             THE COURT:  Do you know whether or not the senator

15   asked Mr. Soliman to assist in determining whether he should

16   recommend you as a candidate for U.S. Attorney?  He being the

17   senator.

18             THE WITNESS:  I don't know one way or the other.

19   BY MR. WEITZMAN:

20   Q.  Do you know Mike Soliman's phone number offhand?

21   A.  I do not.

22             MR. WEITZMAN:  Let's put up Defendant's Exhibit 1305,

23   page 2, which is in evidence -- I'm sorry -- Government Exhibit

24   1305.  Apologies.

25             THE COURT:  Previously you referred to it a couple of

O6i5men1                    Sellinger - Cross

1   times as Defendant's Exhibit.

2          MR. WEITZMAN:  It is a mistake.

3          THE COURT:  1305 is a Government Exhibit.

4          MR. WEITZMAN:  Correct, your Honor.

5          THE COURT:  Thank you.

6   BY MR. WEITZMAN:

7   Q.  This is a stipulation with a chart of phone numbers, and

8   for Michael Soliman he has phone number 862-248-4285.  Do you

9   see that?

10  A.  I see that.

11         MR. WEITZMAN:  Can we do it side by side?  Actually,

12  take that down, just remember those last four, sir, and then if

13  we can put up Defendant's Exhibit 834.

14  Q.  These are your phone records again?

15  A.  Yes.

16         MR. WEITZMAN:  Correct?  And if we can put up page 335

17  for the witness alone and page 336 side by side?

18         We would offer pages 335 and 336 of Mr. Sellinger's

19  phone records as well.

20         MS. POMERANTZ:  No objection.

21         THE COURT:  Admitted.

22         (Defendant's Exhibit 834, pages 335 and 336 received

23  in evidence)

24         MR. WEITZMAN:  Now, if you can highlight or zoom in on

25  the top of page of the April 29th and the bottom highlighted

O6i5men1                        Sellinger - Cross

1    entries and the top highlighted entries on the next page?

2    BY MR. WEITZMAN:

3    Q.   Sir, do you see here a number of phone calls with that

4    phone number assigned to Mike Soliman, 4285?

5    A.   I see these, yes.

6    Q.   And those are for April 29; correct?

7    A.   Yes.

8    Q.   And that is nine days after the nine-minute call you had

9    with Senator Menendez; correct, which is April 20th?

10   A.   Apparently that's what the records show.

11   Q.   Do you recall the substance of these calls?

12   A.   I testified about, in detail, about one call I had with

13   Mr. Soliman in the spring.  I don't know when that was so I

14   don't know -- I don't know what these calls are.

15             MR. WEITZMAN:   Thank you, sir.  You can take that

16   down.

17   Q.   Let's talk about that conversation that you recall with

18   Mr. Soliman, OK?

19   A.   Yes.

20   Q.   In that conversation you told Mr. Soliman you would have to

21   disclose your Daibes conflict of interest or potential conflict

22   of interest to the Department of Justice; correct?

23   A.   Yes.

24   Q.   Did you mention that there may be other matters that might

25   require your recusal as well?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                          Sellinger - Cross

1    A.  I don't recall.

2    Q.  There were other matters that might require your recusal

3    though, right?

4    A.  Yes.  As I testified -- well, as I testified, on my first

5    full day in the office I identified four.

6    Q.  And one of the matters was a political corruption case you

7    testified, I think?

8    A.  I don't believe I testified to what any of them were.

9    Q.  Let me ask you, were one of the other matters a political

10   corruption case?

11             MS. POMERANTZ:  Objection.

12             THE COURT:  I will allow it.

13             If you know.

14             THE WITNESS:  I have not reviewed them -- I have not

15   reviewed the memo.

16             THE COURT:  The memo you sent to the Department of

17   Justice?

18             THE WITNESS:  Yes, the memo that I sent to the

19   Department of Justice.  There were four matters.  I remember at

20   least for three of them I remember the individual or company

21   that was involved.  All I knew about the matters were what was

22   in my office major case summary that they provided to me, and

23   as soon as I identified a potential conflict, I essentially

24   stopped reading it to identify -- to advise counsel to the U.S.

25   Attorney.  But one of the four matters that was listed involved

O6i5men1                          Sellinger - Cross

1    a -- somebody involved in politics.

2    BY MR. WEITZMAN:

3    Q.   Another one of the matters involved a healthcare company?

4    We don't need to discuss the name of the company, correct?

5          MS. POMERANTZ:  Objection.  May I have a moment to

6    confer with Mr. Weitzman?

7          THE COURT:  Yes.

8          (Counsel conferring)

9    BY MR. WEITZMAN:

10   Q.   We don't need to get into the details but it involved a

11   healthcare company, correct?

12   A.   Yes.

13   Q.   And you didn't mention to Mr. Soliman on this call which

14   matter, in particular, you would have to disclose a conflict of

15   interest -- a potential conflict of interest to with respect to

16   DOJ; correct?

17         THE COURT:  I'm not sure I understand that.  Phrase it

18   more directly, sir.

19   Q.   On your call with Mike Soliman, when you mentioned that you

20   would have to make a disclosure to DOJ, you didn't mention

21   which of the four matters you were referring to; correct?

22   A.   Your question confuses two different time frames.

23   Q.   OK.  Let me try to break it down.

24        You testified that you recalled a call with Mike Soliman in

25   which you mentioned potential recusal to Department of Justice;

O6i5men1                              Sellinger - Cross

```
 1   correct?

 2   A.   Correct.

 3   Q.   On that call you didn't mention which case you were

 4   referring to; correct?

 5   A.   I did.

 6   Q.   You did.  You mentioned which case.  Which case did you

 7   refer to?

 8   A.   At that time I was only aware of the Daibes case, I wasn't

 9   aware of the other three cases.

10            THE COURT:  So this conversation took place before

11   your first day as U.S. Attorney?

12            THE WITNESS:  Yes.  It was in the spring of 2020.

13   BY MR. WEITZMAN:

14   Q.   You have a clear recollection, sir, as you sit here that

15   you did not tell --

16            THE COURT:  Wait, wait, wait.  The spring of 2020?

17            THE WITNESS:  2021.  I'm sorry.  Excuse me.

18            THE COURT:  That's all right.

19   BY MR. WEITZMAN:

20   Q.   Sir, do you have a clear recollection, as you sit here,

21   that you did not tell Mr. Soliman that you believed you would

22   not have to be recused from the Daibes case?

23            MS. POMERANTZ:  Objection.

24            THE COURT:  Too many negatives, at least for me.

25            MR. WEITZMAN:  Yes, your Honor.  I confused myself on
```

O6i5men1                        Sellinger - Cross

1    that one.

2    Q.  Sir, you never told Mr. Soliman that you did not have to be

3    recused from the Daibes case, correct.

4    A.  I told Mr. Soliman what the process was; that I would make

5    disclosure to the Department of Justice and that another

6    official would make a decision.  I was not the deciding

7    official.  That is what I told him.

8    Q.  And you didn't tell Mr. Soliman your belief that DOJ would

9    not recuse you, did you?

10   A.  I told him what the process was.  That's what I knew.  I

11   didn't know anything else.

12   Q.  I just want to be clear for the record.  You didn't express

13   to Mr. Soliman any belief as to how the outcome -- how the

14   process would result within your recusal or non-recusal; right?

15   A.  I discussed the facts of my recusal, disclosure, I

16   discussed the circumstances that I would disclose, my

17   involvement in the prior Daibes case, and my understanding of

18   the process, and that I did not know.

19   Q.  You did not know?

20   A.  I did not know what the resolution would be.

21   Q.  So you never told Mr. Soliman that you believed you would

22   be permitted to handle the Daibes case; correct?

23   A.  I told him I didn't know what the resolution of the

24   disclosure would be.

25   Q.  My question is a very specific one.

O6i5men1                          Sellinger - Cross

1          THE COURT:  Move on.  Move on, sir.

2          MR. WEITZMAN:  This is an important one, your Honor,

3    if I may just ask it, if I can get a yes or no.

4          THE COURT:  I think you have asked it but go ahead.

5    BY MR. WEITZMAN:

6    Q.  If I can get a yes or no; you never told Mr. Soliman that

7    you believed you could still oversee or supervise the Daibes

8    case, correct?  Yes or no, if you can answer that.

9          MS. POMERANTZ:  Objection.

10         THE COURT:  If you can.

11   A.  I told him what the process was and that the deciding

12   official was somebody in the Department of Justice in

13   Washington.

14   Q.  You did not tell Mr. Soliman that you had already discussed

15   with main justice the potential conflict of interest regarding

16   the Daibes case in this conversation; correct?

17         MS. POMERANTZ:  Objection.

18         THE COURT:  Sustained.

19         Had you discussed with main justice the potential

20   conflict of interest regarding Mr. Daibes at that time?

21         THE WITNESS:  I had not discussed that with the

22   Department of Justice.

23   BY MR. WEITZMAN:

24   Q.  In fact, you had not been nominated by the president yet,

25   correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                    Sellinger - Cross

1    A.   Correct.

2    Q.   And at no time before becoming U.S. Attorney did main

3    justice tell you whether you would have to be recused from the

4    Daibes case or not; correct?

5    A.   Correct.

6    Q.   You testified that you were recused from three of the four

7    matters that you brought to Department of Justice's attention;

8    correct?

9    A.   I believe so.  Because the documents have been redacted I

10   haven't reviewed the unredacted version but I believe that's

11   right.

12   Q.   And you disclosed the potential conflict in connection with

13   the Daibes case because you thought it might be a matter that

14   requires your recusal, right?

15   A.   I thought that it was a matter that it was appropriate for

16   me to disclose and the Department of Justice would make a

17   determination as to whether recusal was appropriate.

18           THE COURT:  We have been over this now, sir.  Why

19   don't you move on and conclude.

20   Q.   The recusal memo makes clear that you have to be recused

21   from all decision making in connection with the Daibes case;

22   right?

23   A.   Yes.

24   Q.   And you never made any decisions in connection with the

25   Daibes case; right?

1    A.  None.

2    Q.  You had no involvement in the case whatsoever?

3    A.  No.

4    Q.  Now, in January 2020, do you recall receiving a call -- I'm

5    sorry.

6            In January 2022, do you recall receiving a call from

7    Senator Menendez?

8    A.  Yes.

9    Q.  And that was about one month after you became U.S.

10   Attorney?

11   A.  Yes.

12   Q.  And you spoke about a number of things including a surgery

13   the senator had on his shoulder, right?

14   A.  Yes.

15   Q.  And he asked you about Jamel Semper's role at the U.S.

16   Attorney's office?  Do you recall that?

17   A.  I believe he did.

18   Q.  And did he ask you whether Jamel Semper would be named the

19   first assistant, your no. 2, in the office?

20   A.  No.  I had named the first assistant already.

21   Q.  And he asked you who that was; right?

22   A.  Yes.

23   Q.  And you mentioned it was Vikas Khanna; right?

24   A.  Yes.

25   Q.  He was still interested in Jamel Semper on that call?

1      THE COURT:  Sustained.  Sustained.

2   Q.  He still asked you about Jamel Semper on that call?

3   A.  I believe he did.

4   Q.  And did he tell you that Black ministers in New Jersey were

5   upset that Jamel Semper had not been promoted to first

6   assistant?

7      MS. POMERANTZ:  Objection; assumes a fact and asked

8   and answered.

9      THE COURT:  I will allow that.

10      Did he say that to you?  Yes or no.

11      THE WITNESS:  No.

12  Q.  Now, on this call with Senator Menendez, you didn't mention

13  anything about being recused from the Daibes matter; correct?

14  A.  Correct.

15  Q.  And by then, in January 2022, you had already been recused;

16  right?

17  A.  I had.

18  Q.  You never told Senator Menendez that you had been recused

19  from the Daibes matter in fact?

20      MS. POMERANTZ:  Objection.  Time frame.

21  Q.  At any point in time you never told Senator Menendez that

22  you had been recused from the Daibes matter, correct?

23  A.  I think that's right.

24  Q.  Did you come to learn that Senator Menendez called Vikas

25  Khanna?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                         Sellinger - Cross

```
 1              MS. POMERANTZ:  Objection.

 2              THE COURT:  At what time?  What time are you asking

 3   about?

 4   Q.  After your call with him in January 2022, or thereabouts.

 5              THE COURT:  Did you know that Senator Menendez, do you

 6   know whether or not Senator Menendez called Vikas Khanna after

 7   the January 2022 call you have been testifying about?

 8              THE WITNESS:  I did not know anything until reports of

 9   this case were in the paper.

10   BY MR. WEITZMAN:

11   Q.  I don't want you to repeat any reports.  Thank you, sir.

12        Now, there did come a time in March 2022 where you had

13   lunch with Mr. Soliman; correct?

14   A.  Yes.

15   Q.  This is a few months after you became U.S. Attorney?

16   A.  Yes.

17   Q.  And it was a social engagement?

18   A.  Yes.

19   Q.  Senator Menendez wasn't involved in scheduling that lunch

20   for you; correct?

21              MS. POMERANTZ:  Objection.

22              THE COURT:  Do you know if whether or not Senator

23   Menendez was involved in scheduling that lunch with Mr. Soliman

24   that you had in March of 2022?

25              THE WITNESS:  All I know is that Mike Soliman called
```

1   me and asked me if I wanted to have lunch.

2   Q.  At the outset of the lunch you told Mr. Soliman -- you

3   wanted to table set, you would have to disclose to the U.S.

4   Attorney's office any discussion related to Senator Menendez;

5   correct?

6   A.  It was not at the outset of the lunch and I told

7   Mr. Soliman that I was not allowed to have any discussions with

8   federal elected officials or their representatives about the

9   official business of the office and that I would have to

10  disclose any such attempts at communication.

11  Q.  And you would have to disclose it to others in your office,

12  correct?

13  A.  I probably wasn't specific as to who.  I was talking about

14  the Department of Justice.

15          THE COURT:  When you say the Department of Justice,

16  the U.S. Attorney's office is part of the Department of

17  Justice.  I take it that you were referring to the Department

18  of Justice in Washington; is that it?

19          THE WITNESS:  Yes.  I mean, there is a provision in

20  the justice manual that U.S. attorneys are subject to that

21  states exactly what I said, that sitting U.S. Attorneys are not

22  permitted to have such discussions and if there are attempts at

23  such discussions, that they need to be disclosed to Washington.

24  BY MR. WEITZMAN:

25  Q.  And the reason you said that, sir, is because Mr. Soliman

O6i5men1                            Sellinger - Cross

1    is a political consultant; right?

2    A.  I said it because I was communicating that to a number of

3    people I knew who were in the political world because I wanted

4    the politicians, with whom I had had relationships, to

5    understand that those were the restrictions that applied to me

6    and I wanted them to all be aware of it, and I wanted Senator

7    Menendez to be aware of it as well.

8    Q.  But you didn't say that having anything to do with concerns

9    about the Daibes case in particular; right?

10   A.  No.

11   Q.  And you had no expectation on that, at that lunch, that

12   Mr. Soliman would raise any criminal case; right?

13   A.  Correct.

14   Q.  At some point after your lunch with Mr. Soliman you called

15   Senator Menendez to ask him to speak at your investiture;

16   correct?

17   A.  Yes.

18   Q.  And Senator Menendez said he could not, correct?

19              THE COURT:  What did Senator Menendez say?

20              THE WITNESS:  Senator Menendez said I think I will

21   pass, and went on to say the only thing worse than not having a

22   relationship with the United States Attorney is people thinking

23   you have a relationship with the United States Attorney, and

24   you don't.

25   Q.  And we are going to talk about that statement in just a

O6i5men1                         Sellinger - Cross

1    moment, but first, your initial investiture was scheduled for

2    May 23rd, 2022; correct?  Do you recall that.

3    A.  It was in May.  I'm not quarreling with you about the date.

4    Q.  Let me see if I can refresh your recollection, though, so

5    we can have a precise date.

6              MR. WEITZMAN:  Can you put up Defendant's Exhibit 304

7    for the witness and zoom in on the bottom?

8    A.  I see that.

9    Q.  Does this refresh your recollection that originally your

10   investiture ceremony was scheduled for May 23rd?

11   A.  Yes.

12   Q.  2022, correct?

13   A.  Yes.

14   Q.  And if you can -- and neither Senators Booker nor Senator

15   Menendez were able to attend on that date when it was

16   scheduled --

17             THE COURT:  Did either senator attend on that date?

18             MR. WEITZMAN:  The date didn't occur, your Honor.

19             THE COURT:  Oh.  I'm sorry.

20   Q.  Were you informed, sir, that neither Senator Booker nor

21   Senator Menendez were able to attend on that date?

22             MS. POMERANTZ:  Objection.  Assumes a fact.

23             THE COURT:  Sustained.

24             Were you informed that they were not going to attend

25   on that date?

1              THE WITNESS:  Well, I told you about my conversation

2     with Senator Menendez.  I don't believe that you're accurate

3     about Senator Booker.

4              MR. WEITZMAN:  If we can zoom up to the top of the

5     e-mail?

6     Q.  If you would just read that to yourself?  This is

7     Defendant's Exhibit 304.  Does this refresh your recollection

8     as to Senator Booker?

9              MS. POMERANTZ:  Your Honor, we object to this.

10             THE COURT:  Just a moment.  Let me read it.  I don't

11    think this is a failure of recollection.  Why don't you ask

12    your question.

13             MR. WEITZMAN:  Thank you, your Honor.

14             You can take that down.

15    BY MR. WEITZMAN:

16    Q.  Sir, do you recall learning that Senator Booker could not

17    attend the May 23rd investiture?

18             MS. POMERANTZ:  Objection.

19             THE COURT:  Sustained.

20             Do you recall learning that Senator Booker would not

21    attend the May 23rd investiture?

22             THE WITNESS:  My recollection -- my best recollection

23    is that Senator Booker was going to participate.  I cannot

24    recall whether in May he was scheduled to participate in person

25    or by video because I testified he ultimately participated by

O6i5men1                    Sellinger - Cross

1   video.

2   BY MR. WEITZMAN:

3   Q.  Do you recall, sir, that Senator Menendez was out of the

4   country, scheduled to be out of the country on May 23rd, 2022?

5           MS. POMERANTZ:  Objection.

6           THE COURT:  Do you know whether or not Senator

7   Menendez was scheduled to be out of the country on May 23rd,

8   2022?

9           THE WITNESS:  I don't know either way.

10          MR. WEITZMAN:  Let's put up Defendant's Exhibit 496.

11          If you would review this for yourself.

12      We offer Defendant's Exhibit 496.

13          MS. POMERANTZ:  Your Honor, we object.  It is not

14  impeachment.  It is hearsay.

15          THE COURT:  Sustained.

16  BY MR. WEITZMAN:

17  Q.  Let me ask you, sir, if you would just read the top

18  paragraph and then --

19          MS. POMERANTZ:  Your Honor, we object to this.

20          MR. WEITZMAN:  I am going to refresh recollection.  If

21  we can go to the next page?

22          MS. POMERANTZ:  Your Honor --

23          THE COURT:  Just a moment.

24          MS. POMERANTZ:  There isn't failed recollection.

25          THE COURT:  Just a moment.

O6i5men1                              Sellinger - Cross

 1              There is no failure of recollection, sir.

 2    BY MR. WEITZMAN:

 3    Q.  Do you have a recollection as to where Senator Menendez was

 4    on May 23rd, 2022, sir?

 5              MS. POMERANTZ:  Objection.  Asked and answered.

 6              THE COURT:  I will allow it.

 7              Do you know where he was on May 23rd, 2022?

 8              THE WITNESS:  I have no idea.

 9              THE COURT:  The jury will disregard my comment.

10              Go ahead.

11    Q.  And if you would look at this document, Defendant's Exhibit

12    496, read it to yourself?

13              MS. POMERANTZ:  Objection.  There is no failure of

14    recollection.

15              THE COURT:  I agree, but there is no question, either.

16    BY MR. WEITZMAN:

17    Q.  Does this refresh your recollection?

18              THE COURT:  There is no failure of recollection.

19              MR. WEITZMAN:  He said he did not know.

20              THE COURT:  That's right he did not know.  There is no

21    failure of recollection.  Next question.

22    BY MR. WEITZMAN:

23    Q.  Are you aware, sir, that there was a U.S. delegation that

24    attended the world economic forum in Davos, Switzerland, from

25    May 22nd to 25th 2022?

O6i5men1                    Sellinger - Cross

 1              THE COURT:  Do you know whether or not there was such

 2  a delegation?

 3              THE WITNESS:  I don't know either way.

 4  Q.  You are familiar with the world economic forum in Davos?

 5              MS. POMERANTZ:  Objection.

 6              THE COURT:  Sustained.  Sustained.  Let's move on.

 7  Q.  Now, you testified that the senator said the only thing

 8  worse than not having a relationship with the U.S. Attorney is

 9  people thinking you have one and you don't; correct?

10  A.  Correct.

11  Q.  Now, Senator Menendez mentioned Jamel Semper in two

12  different conversations to you, correct?  At least?

13  A.  I believe in two different conversations.  Not that

14  conversation, but yes.

15  Q.  And you are aware, sir, because I think you testified to

16  it, that there were African American ministers pushing for a

17  promotion of Jamel?

18              THE COURT:  Asked and answered several times.  Move

19  on.

20  Q.  Is it possible, in your mind, sir --

21              THE COURT:  Sustained.

22  Q.  Fair to say Senator Menendez wasn't able to promote Jamel

23  Semper in your office, correct?

24              MS. POMERANTZ:  Objection.

25              THE COURT:  Just a moment.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6i5men1                        Sellinger - Cross

1              Is any senator able to promote people in your office?

2              THE WITNESS:  The decision about promotions in the

3    U.S. Attorney's office is solely the province of the U.S.

4    Attorney.

5              THE COURT:  Meaning when you were the U.S. Attorney.

6              THE WITNESS:  Correct.

7    BY MR. WEITZMAN:

8    Q.  Do you know what Senator Menendez was referring to when he

9    said people thinking you have a relationship and you don't?

10             MS. POMERANTZ:  Objection.  Speculation.

11             THE COURT:  Did you have an understanding as to what

12   the senator meant that was a part from the words he said.

13   A.  Just the main meaning of the words.

14   Q.  So you don't know whether the people he was referring to

15   were the African American ministers?

16             THE COURT:  Sustained.

17   Q.  Now, your investiture didn't occur in May, it occurred in

18   September; correct?

19   A.  Yes.

20   Q.  And Senator Menendez didn't speak at that investiture,

21   correct?

22   A.  Yes.  Correct, he did not.

23             THE COURT:  Did he attend?

24             THE WITNESS:  No.

25   Q.  You didn't reinvite him after the first invitation, to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                         Sellinger - Cross

1    speak at your September investiture, correct?

2    A.  I did not.

3    Q.  Is it your testimony --

4           THE COURT:  Are you testifying that you did not invite

5    him to attend the September investiture?

6           THE WITNESS:  Correct.

7           THE COURT:  And why did you not invite the sitting

8    United States senator to your investiture.

9           THE WITNESS:  I think he had made it clear that he was

10   not attending my investiture when I had invited him to the May

11   scheduled investiture.

12          THE COURT:  Thank you.

13   BY MR. WEITZMAN:

14   Q.  Now, you and Senator Menendez don't have a strong

15   relationship at this point; correct?

16   A.  Correct.

17   Q.  And that's one of the reasons is because you believe it is

18   important, as U.S. Attorney, to distance yourself from

19   political officials; correct?

20   A.  As I testified, I do believe that it's important for me to

21   keep distance from elected officials.

22   Q.  And so you haven't wanted to continue that relationship,

23   that friendship while you are U.S. Attorney; correct?

24          MS. POMERANTZ:  Objection.

25          THE COURT:  Have you wanted -- no, I will sustain -- I

O6i5men1                    Sellinger - Cross

1    will permit that question.

2              Go ahead.  You may answer, sir.

3              THE WITNESS:  I wanted to keep distance between myself

4    and any elected officials, including Senator Menendez.

5    BY MR. WEITZMAN:

6    Q.  And that had nothing to do with the Daibes case, correct?

7    A.  Correct.

8              MS. POMERANTZ:  Objection.

9              THE COURT:  I will allow it.

10             (Counsel conferring)

11             MR. WEITZMAN:  Nothing further, your Honor.

12             THE COURT:  Thank you.  Is there any redirect?

13             MR. DE CASTRO:  Judge?

14             THE COURT:  Oh, I'm sorry.

15             MR. LUSTBERG:  I will say for the record, no questions

16   on behalf of Mr. Sellinger on behalf of Mr. Hana.

17             THE COURT:  Thank you.  That is not the first time I

18   skipped.  I apologize Mr. de Castro, anything, sir.

19             MR. DE CASTRO:  I do, your Honor.

20             THE COURT:  Yes, sir.

21   CROSS-EXAMINATION

22   BY MR. DE CASTRO:

23   Q.  Good morning, Mr. Sellinger.

24   A.  Good morning.

25   Q.  My name is Cesar de Castro, I am representing Mr. Daibes.

1   A.  If you could keep your voice up for me?  I would appreciate

2   it.

3   Q.  I will.  My apologies.

4       I want to talk briefly about the wedding you attended,

5   Senator Menendez' wedding you attended.  OK?  Would you agree

6   with me that you understood -- withdrawn.

7       You testified that you understood that Mr. Menendez and

8   Mr. Daibes were friends; correct?

9   A.  I had that general understanding.

10  Q.  And one of the reasons you understood that was because you

11  saw Mr. Daibes at the senator's wedding; correct?

12  A.  I'm sure that's contributed to it.

13  Q.  Because the wedding was a very intimate wedding; right?

14  A.  It was.

15  Q.  There was, I think you testified, around 65 guests?

16  A.  Approximately.

17  Q.  And that was still in the middle or coming out of the

18  COVID-19 pandemic before all the variants; right?

19  A.  Yes.

20  Q.  And as you understood it, it was only attended by those

21  close to the senator or to Nadine?

22  A.  Yes.

23  Q.  And you were invited, of course; right?

24  A.  Yes.

25  Q.  Is and Mr. Daibes was invited; right?

O6i5men1                         Sellinger - Cross

1    A.  Apparently.

2    Q.  And as is custom, you gave a gift to the senator and

3    Nadine, correct?

4    A.  I did.

5    Q.  And do you know if Mr. Daibes gave a gift to the newlyweds?

6    A.  I have no idea.

7              THE COURT:  In the normal course, when one attends a

8    wedding, one normally gives a gift to the couple; correct?

9              THE WITNESS:  Yes.

10             THE COURT:  OK.

11             Next.

12   BY MR. DE CASTRO:

13   Q.  Now different topic.  I know you testified that you met

14   with the senator in December, it was December 15 of 2020 down

15   in Washington, D.C.; correct?

16   A.  Yes.

17   Q.  I'm not going to go over that meeting again, that is just

18   to orient you.  A couple days or the next day I think you

19   testified that you realized that you may have a conflict as it

20   related to Mr. Daibes; correct?

21   A.  Yes.  I actually realized it, I believe, the evening of the

22   15th.  I believe I called him the following day, the 16th.

23   Q.  And you told him that it was possible that you may have to

24   recuse yourself from that matter if you were to become U.S.

25   Attorney?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6i5men1                          Sellinger - Cross

1    A.  Your terminology of I might have to recuse myself is not

2    really the process.  I told him, as I have testified

3    repeatedly, that I would have to make disclosure to the

4    Department of Justice about my potential conflict and that the

5    Department of Justice would make a decision as to whether or

6    not I would be recused.

7    Q.  Thank you.  My apologies.  That was my question phrasing.

8        Now, the senator did not react negatively to what you said;

9    correct?

10             MS. POMERANTZ:  Objection.

11             THE COURT:  Did he have a reaction to that, to your

12   knowledge?

13   A.  He only indicated that he understood in some fashion.

14   Q.  He didn't try to change your mind in any way?

15   A.  Correct.

16   Q.  Now, at the end of December of 2020, at some point you

17   learned that the senator was going to recommend Esther Suarez

18   as the nominee for U.S. Attorney; correct?

19   A.  I'm not sure when I learned that it was Ms. Suarez that he

20   was nominating.  In late December I learned that he was not

21   recommending me.

22   Q.  But at some point you learned, you learned somehow that it

23   was Ms. Suarez that he had recommended to the president to be

24   nominated?

25   A.  Correct.

1    Q.  And you understood at that time that President Biden's --

2    at least one of President Biden's priorities were to encourage

3    diversity as one of the factors that go into that decision;

4    correct?

5            MS. POMERANTZ:  Objection.

6            THE COURT:  I will allow it.

7            THE WITNESS:  Yes.

8    BY MR. DE CASTRO:

9    Q.  And when you learned it, you knew who Esther Suarez was,

10   right?

11   A.  I did.

12   Q.  And while she had not worked in the U.S. Attorney's office

13   before as a federal prosecutor, she was still being potentially

14   nominated; right?

15   A.  My understanding was that Senator Menendez had recommended

16   her to be nominated.

17           THE COURT:  Recommended her to the president for

18   nomination by the president to the Senate; correct?

19           THE WITNESS:  Yes.

20   Q.  Now, she had been a judge; correct?

21   A.  Yes.

22   Q.  She had been a state prosecutor as well; correct?

23   A.  I did not know Ms. Suarez.  I don't believe I had met her

24   at that time.  I have since met her.

25   Q.  At the time you knew she was the Hudson County prosecutor;

O6i5men1                          Sellinger - Cross

1   right?

2   A.  Yes.

3   Q.  Which that means she was the head of the entire Hudson

4   County prosecutor's office; right?

5   A.  Yes.

6   Q.  And did you know that she was the first female Hudson

7   County prosecutor?

8           MS. POMERANTZ:  Objection.  Assumes a fact.

9           THE COURT:  I will allow it.

10          Do you know whether or not she was the first?

11          THE WITNESS:  I didn't.  I didn't know a lot about

12  Ms. Suarez.

13  BY MR. DE CASTRO:

14  Q.  Did you know that if she had been nominated -- withdrawn.

15     If she had become the United States Attorney for the

16  District of New Jersey she would have been the first Hispanic

17  United States Attorney in New Jersey history?

18  A.  That I would have known, yes.

19  Q.  Now, you didn't harbor any ill will towards the senator as

20  a result of him recommending Ms. Suarez' nomination, did you?

21  A.  None.

22  Q.  Now, skipping ahead to April or May of 2021 when either

23  Senator Menendez called you or you met with him, he told you

24  that he would be recommending you as the potential nominee?

25  This is after the Esther Suarez nomination.

O6i5men1                              Sellinger - Cross

1    A.  Yes.

2    Q.  And of course it was after you had expressed a renewed

3    interest but only when you heard the Suarez nomination wasn't

4    going well?

5    A.  Yes.

6    Q.  Now, would you describe that as a congratulatory call?

7              MS. POMERANTZ:  Objection, your Honor.

8              THE COURT:  Sustained, yes.

9    Q.  Was the senator congratulating you?

10   A.  Which call are you referring to now?

11   Q.  When he is -- whether it is in person or a call, I am not

12   sure if you recall, but where he told you he would be

13   recommending that you be nominated as U.S. Attorney?

14             THE COURT:  What is the question, sir?

15   Q.  Did he congratulate you?

16   A.  He was bringing me what was obviously good news to me.  I

17   don't remember the language.

18   Q.  You took it as good news, right?

19   A.  Of course.  Yes.

20   Q.  And he did not mention Mr. Daibes at that point?

21   A.  He did not.

22   Q.  And he didn't say to you that he believed Mr. Daibes was

23   being treated unfairly at that point?

24   A.  Correct.

25   Q.  Now, after you became United States Attorney, I think you

1   testified that you received a call from Mr. Daibes' lawyer.  Do

2   you remember that?

3   A.  Yes.

4   Q.  And that call, in and of itself, didn't surprise you; you

5   knew that counsel well; correct?

6   A.  I did.

7   Q.  And I think you mentioned that he had your personal

8   cellphone number?

9   A.  Yes.  Yes, he did.

10  Q.  And his counsel was a very well known lawyer in New Jersey

11  that you had known for many years; right?

12  A.  Yes.

13  Q.  And it was not unusual, in your mind, to have received a

14  call from him?

15  A.  Not at all.

16  Q.  And would you agree with me that it wouldn't even be

17  unusual for counsel in a case to request a meeting with the

18  front office either?

19  A.  That's not unusual, no.

20  Q.  And you actually have an open door policy, don't you?

21  A.  We will generally try to accommodate requests by counsel to

22  come talk to the front office if they seek to.

23  Q.  And I think you had mentioned earlier that of course you

24  don't exclude the prosecution team, you involve the team if you

25  are going to take a meeting?

O6i5men1                        Sellinger - Cross

1    A.  We would always include both the prosecution team and every

2    supervisory level above them if the front office was meeting.

3    Q.  And so it was not unusual for defense counsel even to call

4    you to even -- to seek leniency for a client either; right?

5    A.  Well, any time a defense attorney would reach out to me it

6    would be to request a meeting and asking me to help facilitate

7    setting up a meeting, and then the substance of any such

8    meeting would be -- would occur with the entire prosecution

9    team.

10   Q.  And the substance of it, the request from that defense

11   counsel can vary, correct?

12   A.  Completely.

13   Q.  And it wouldn't be unusual for a defense lawyer to have a

14   meeting with you and the whole team to ask or try to convince

15   you and your team to look at a case a little bit differently?

16   A.  It happens all the time.

17   Q.  Now, when Mr. Daibes' lawyer called you, he told you -- or

18   you told him that you were recused from the case; right?

19   A.  Yes.

20   Q.  Now, that lawyer didn't protest; correct?

21   A.  No.

22   Q.  He didn't express any disappointment?

23   A.  No.

24   Q.  And he didn't mention Senator Menendez?

25   A.  No.

O6i5men1                        Sellinger - Cross

1    Q.  In substance, he sort of indicated he understood and that

2    he would call Mr. Khanna?

3              MS. POMERANTZ:  Objection.  Vague.

4              THE COURT:  Did he say he understood and he would call

5    Mr. Khanna?

6              THE WITNESS:  I don't think he said either of those

7    things.

8    BY MR. DE CASTRO:

9    Q.  You had told him the person handling him would be Vikas

10   Khanna, your first assistant.

11   A.  Correct.

12   Q.  Are you aware whether or not the meeting happened between

13   Mr. Khanna and the prosecution team and Mr. Daibes' counsel?

14   A.  I have read, in connection with press reports and the like

15   relating to this case but I was not aware of what was

16   happening, who was meeting with whom.

17   Q.  Now, back to what you just finished testifying about which

18   was your January 2022 call with Senator Menendez.  Now, I think

19   you testified that you discussed the makeup of your executive

20   staff on that call?

21   A.  I don't think that is quite accurate.  He asked -- he asked

22   me questions, there were certain decisions that had not been

23   made, non-public information.  Obviously I couldn't discuss any

24   of that but we talked about what was public which was first

25   assistant.  Vikas Khanna had been selected.

O6i5men1                        Sellinger - Cross

1   Q.  Did you also discuss diversity in that call, meaning --
2   withdrawn.
3       Did you also discuss your view of diversity in the office?
4           THE COURT:  In that call.
5   Q.  In that call.
6   A.  I'm not recalling but I very well might have because I was
7   in the middle of making decisions on supervisors in the office
8   and diversity was an important consideration.
9   Q.  And so it is possible that Jamel Semper came up in that
10  call, correct?
11          MS. POMERANTZ:  Objection.
12  Q.  If you recall.
13          THE COURT:  Do you know whether or not Mr. Semper's
14  name came up in the January 2022 conversation you had with
15  Senator Menendez?
16          THE WITNESS:  I believe I testified that I thought
17  Senator Menendez had asked about him, yes.
18  BY MR. DE CASTRO:
19  Q.  Now, Jamel Semper was an exceptional federal prosecutor,
20  correct?
21  A.  Yes.
22  Q.  And he happened to be African American?
23  A.  I didn't hear you.
24  Q.  He happened to be African American as well?
25  A.  Yes.

O6i5men1                    Sellinger - Redirect

1   Q.  And you actually elevated him to oversee three important

2   units in the office; right?

3   A.  Correct.

4   Q.  And later, President Biden nominated him to be a federal

5   district court judge?

6   A.  Correct.

7   Q.  And he is now a judge?

8   A.  Correct.

9   Q.  And in this call, January 2022 with Senator Menendez, he

10  also made no mention of Mr. Daibes, correct?

11  A.  Correct.

12          MR. DE CASTRO:  Nothing further.

13          THE COURT:  Is there redirect?

14          MS. POMERANTZ:  Just very briefly.

15          THE COURT:  Is the jury OK?

16          JUROR:  Yes.

17          THE COURT:  We will hold off.

18  REDIRECT EXAMINATION

19  BY MS. POMERANTZ:

20  Q.  Mr. Sellinger, do you recall being asked about your duties

21  as U.S. Attorney on cross-examination?

22  A.  Yes.

23  Q.  If you had treated the Daibes case differently from other

24  cases because Robert Menendez asked you to look into it, would

25  that have been consistent with your duty?

O6i5men1                     Sellinger - Redirect

1    A.  No.

2    Q.  When you met with Robert Menendez on December 15, 2020, how

3    many cases did he mention?

4    A.  One.

5    Q.  Which case was that?

6    A.  Daibes.

7              MS. POMERANTZ:  No further questions.

8              THE COURT:  You are excused, Mr. Sellinger.  You may

9    step down.

10             THE WITNESS:  Thank you, your Honor.

11             THE COURT:  Of course.

12             Ladies and gentlemen, I think it is appropriate we

13   take a mid-morning break.  Take 15 minutes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O6i5men1                    Sellinger - Redirect

1                 (Jury not present)

2                 THE COURT:  15 minutes.

3                 (Recess)

4                 THE COURT:  Can I see counsel, please, at side bar.

5                 (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6i5men1                     Sellinger - Redirect

1              (At side bar)

2              THE COURT:  First of all, the White House memo clearly

3    it was not impeachment, you should have given it to the

4    government.  That wasn't impeachment, the White House memo.

5              MR. WEITZMAN:  I believe we -- I will check again,

6    it's attached to a government exhibit that they're using in the

7    Soliman case, so I just marked one page from the government

8    exhibit.

9              THE COURT:  If it was a government exhibit, that's

10   different.

11             MR. RICHENTHAL:  I can respond to that.

12             THE COURT:  It is just I'm suggesting he watch that,

13   but go ahead.

14             MR. RICHENTHAL:  I appreciate the suggestion.

15             It is true that there is a text message that contains

16   what appears to be a photograph or image of that letter.  It is

17   not true, in our view, that that means that defense can treat

18   it as if it's a impeachment exhibit when it is not an

19   impeachment exhibit.  Two things don't equal.

20             THE COURT:  OK.  Talk to each other.

21             Perhaps I am missing something.  There is a line of

22   objections from the government that assumes a fact not in the

23   record.  I will give you several examples here.  Did he tell

24   you he was pushing for the White House to give Suarez a second

25   interview?  Did he tell you that diversity was a concern?  Did

1    he tell you Black ministers were upset -- certainly you pressed

2    on that point -- did he inform you that he had been contacted

3    by others?

4            I'm not sure that that is assuming a fact not at issue

5    and it seems to me those are appropriate.  I am saying this

6    only because I don't understand the nature of the objection.

7            MR. RICHENTHAL:  I appreciate it, your Honor.

8            The distinction we were drawing was between those

9    questions with the word "that" and those questions with the

10   word "whether".  In other words, the question, if the witness

11   says yes or no, the jury could be left with the misimpression

12   that it occurred and the witness is simply not aware.

13           THE COURT:  OK.  That I understand but it is not

14   assumes a fact that is not in the record, it seems to me.

15           MR. RICHENTHAL:  It may be that the verbiage we are

16   using is imprecise.  Our concern is it's --

17           THE COURT:  I understand the phrasing, you prefer

18   that.

19           MR. RICHENTHAL:  Yes, your Honor.

20           THE COURT:  Less loaded phrasing.

21           MR. RICHENTHAL:  Yes, your Honor.

22           THE COURT:  But do you think that this is

23   evidentiarily improper with that phrasing?

24           MR. RICHENTHAL:  Those questions I think were within

25   the scope and were proper, our concern was the phrasing; yes.

O6i5men1                          Sellinger - Redirect

1              THE COURT:  OK, thank you.  Let's bring in the jury.

2              MR. WEITZMAN:  Your Honor, one thing I would note.  I

3    understand the government's position about that we have not

4    disclosed non-impeachment and sometimes it is unpredictable, I

5    will acknowledge that.  I don't think it is appropriate to put

6    that before the jury because it requires a retort on my part

7    and I don't think it is fair for the jury to see that, that

8    response.  So I think --

9              THE COURT:  You have stated it.  Let's go.

10             MR. WEITZMAN:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6i5men1                          Sellinger - Redirect

1                  (In open court)

2                  THE COURT:  Jury entering.

3                  (Jury present)

4                  THE COURT:  You may be seated in the courtroom.

5                  Government call your next witness.

6                  MR. RICHENTHAL:  The government calls Michael Soliman.

7                  (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6iWmen2                          Soliman - Direct

1   MICHAEL SOLIMAN,

2        called as a witness by the government,

3        having been duly sworn, testified as follows:

4             THE COURT:  Good morning, sir, and welcome.  Please

5   speak loudly, slowly and clearly.  The microphones are

6   directional.  If you'll move that down towards your mouth, that

7   will be helpful.

8             Your witness, Mr. Richenthal.

9   DIRECT EXAMINATION

10  BY MR. RICHENTHAL:

11  Q.  Good morning, Mr. Soliman.

12  A.  Good morning.

13  Q.  What's your educational background?

14  A.  I have a master's degree in public administration and

15  politics and a bachelor's degree in political science.

16  Q.  Where do you work?

17  A.  Mercury Public Affairs.

18  Q.  What kind of company is that?

19  A.  It's a bipartisan public affairs firm.

20  Q.  What's a public affairs firm?

21  A.  We do everything from public relations, media to lobbying

22  and government-related clients.

23  Q.  Does Mercury Public Affairs have one office or more than

24  one office?

25  A.  More than one office.

O6iWmen2                        Soliman - Direct

1    Q.  In which office do you work?

2    A.  New Jersey.

3    Q.  For approximately how long have you worked there?

4    A.  Ten years.

5    Q.  What is the nature of the work that you personally do at

6    Mercury Public Affairs?

7    A.  I'm a partner.  I service with my clients in any public

8    affairs issues.

9    Q.  With respect to public sector clients -- that is,

10   nonprivate entities -- without naming any particular names or

11   identifying them, what are the types of positions or roles that

12   some of those clients have or have had?

13   A.  Members of Congress, state assemblymen, U.S. senators.

14   Q.  Do you know Robert Menendez?

15   A.  I do.

16   Q.  For approximately how long have you known Mr. Menendez?

17   A.  17 years.

18   Q.  Prior to the charges in this case, what was the nature of

19   your relationship, in sum, with Mr. Menendez?

20   A.  It was professional, and we also cared about each other.

21   Q.  Cared about each other, meaning you were friends; can you

22   expand on that?

23   A.  Yeah, I would say we were friends.  I mean professional

24   first in terms of I was his top political adviser, but I think

25   there was a genuine care for each other and our lives.

O6iWmen2                           Soliman - Direct

1   Q.  I think you said you were his top political adviser --

2   A.  Correct.

3   Q.  -- is that right?

4   A.  Yes.

5   Q.  I'll get back to that in a moment, but first, how did you

6   first meet Mr. Menendez?

7   A.  He was looking for a state director in 2007.  I was called

8   for an interview, and I met him for that interview.

9   Q.  I think you used the phrase "state director"?

10  A.  Yes.

11  Q.  What is that?

12  A.  Basically, a state director runs a U.S. senator's offices

13  and staff in New Jersey, or in their home state.

14  Q.  Did you, in fact, become Mr. Menendez's state director?

15  A.  I did.

16  Q.  For what approximate period of time or periods of time did

17  you serve as his state director?

18  A.  2007 until 2012.  I took a leave for -- for almost a year

19  and then came back in 2013 for about nine months.

20  Q.  You said you took a leave?

21  A.  Yes.

22  Q.  What, if anything, did you do while you took a leave?

23  A.  I became his campaign manager for his reelection.

24  Q.  I'm sorry, Mr. Soliman.  I didn't mean to cut you off.

25  A.  I became his campaign manager for his reelection.

O6iWmen2                    Soliman - Direct

1   Q.  Reelection to what?

2   A.  U.S. senator.

3   Q.  When you say you became his campaign manager, what was your

4   role in that capacity?

5   A.  I ran his reelection campaign, his staff on the political

6   side, his consultants.

7   Q.  Now, when you were state director, to whom did you report?

8   A.  The senator and the chief of staff in Washington.

9   Q.  And when you were campaign manager, to whom did you report?

10  A.  Mostly the senator.

11  Q.  And just for clarity, sir, when you say the senator, you

12  mean Mr. Menendez?

13  A.  Yes.

14  Q.  Now, did you work for any of Mr. Menendez's other

15  campaigns?  You mentioned one.  Have you worked on one or more

16  than one?

17  A.  I worked on more than one.

18  Q.  What other campaigns, in short?

19  A.  I worked for a campaign that he had in 2006 at a more

20  junior level, and then I worked on his 2018 campaign.  He was

21  our client, and I served as a chairman of that campaign.

22  Q.  You just used the word "chairman."  What's a chairman in

23  the context of a campaign?

24  A.  It's a -- basically, there's a campaign manager.  A

25  chairman is sort of overseeing everything, putting out fires,

O6iWmen2                      Soliman - Direct

1    but he's not doing the day to day that a campaign manager does.

2    Q.  Now, A minute or two ago, I believe you used the words

3    "political adviser."  Do you recall that?

4    A.  Yes.

5    Q.  In this context, what is a political adviser?

6    A.  Political adviser is someone who advises the senator on

7    politics in the home state, gives him advice on, you know,

8    certain events that he should or should not go to, certain

9    statements that he should put out and briefs him generally on

10   the politics of the state.

11   Q.  For approximately what period of time or periods of time

12   did you serve as a political adviser to Mr. Menendez?

13   A.  Officially, you know, it would be -- it would have been

14   about 2016 to the end of 2018, and then again from the end of

15   '23 until -- I'm sorry, the end of '22 until September or

16   October of '23.

17   Q.  When you say '23, 2023?

18   A.  Yes.

19   Q.  On what types of matters in the course of your work with

20   Mr. Menendez did you provide him advice?

21   A.  It -- you know, anything that related to politics, things

22   that were generally unofficial to government business in

23   nature.

24   Q.  Did that include advising him with respect to the media?

25   A.  Yes.

O6iWmen2                        Soliman - Direct

1    Q.   In what capacity?  What do you mean by that?

2    A.   Whether there's any political articles or articles with

3    political implications, I would give him advice on messaging

4    and/or I would interface with the media mostly on background to

5    try to shape the narrative of an article.

6    Q.   You just used a few other words or phrases.  Let me pause

7    for a second.

8         You said interface with the media, what did you mean by

9    that?

10   A.   Speak with them.

11   Q.   And I think you said on background.  What do you mean by

12   that?

13   A.   Generally, I'm off the record.

14   Q.   Meaning what, sir?

15   A.   Meaning I'm not quoted.  I'm trying to educate the

16   reporter.

17   Q.   And I believe you also might have said shape the narrative,

18   is that right?

19   A.   Yes.

20   Q.   What do you mean by shape the narrative?

21   A.   Every elected official has a narrative they want to put

22   out, and so I would try to help, you know, put forward the

23   narrative that, you know, the elected official -- in this case,

24   the senator -- would want.

25   Q.   I want to shift from your background to something more

O6iWmen2                        Soliman - Direct

1    specific.

2           Did there come a time when you began to talk with

3    Mr. Menendez about the potential appointment of a U.S. Attorney

4    for the District of New Jersey?

5    A.   Yes.

6    Q.   Was your role as political adviser with respect to U.S.

7    Attorney for New Jersey to advise on policy positions or

8    qualifications of potential candidates or something else?

9    A.   Something else.

10   Q.   What?

11   A.   My role would be more of how the candidate would be

12   received politically and in the press.

13   Q.   Was your role to advise on the merits of policies?

14   A.   No.

15              MR. WEITZMAN:  Objection.  Leading.

16              THE COURT:  I'll allow the answer.

17              It was leading.  Proceed.

18   BY MR. RICHENTHAL:

19   Q.   With respect to the potential appointment of a U.S.

20   Attorney, who, if anyone, beyond Mr. Menendez did you talk to

21   about that appointment on his staff?

22   A.   His chief of staff.

23   Q.   Who was his chief of staff at the time?

24   A.   Fred Turner.

25   Q.   What was your understanding of Mr. Turner's relationship

1   with Mr. Menendez?

2   A.  It was a very close relationship.  He ran his offices.

3   Q.  And what about your relationship with Mr. Turner; how was

4   your relationship with him?

5   A.  It was close.

6   Q.  I'd like to show you what's been marked as Government

7   Exhibit A408.  Is that up on your screen, Mr. Soliman?

8   A.  Yes.

9   Q.  Do you recognize this?

10  A.  Yes.

11  Q.  Without describing it in detail, what is this?

12  A.  It's an email that I forwarded to the senator.

13  Q.  On what subject?

14  A.  On the U.S. Attorney short list.

15          MR. RICHENTHAL:  The government offers A408.

16          MR. WEITZMAN:  No objection.

17          THE COURT:  Admitted, without objection.

18          (Government Exhibit A408 received in evidence)

19          MR. RICHENTHAL:  Ms. Wechsler, can we put that up on

20  the jury's screen now.

21  Q.  Mr. Soliman, first, just to orient ourselves, do you see

22  the top of the email?

23  A.  Yes.

24  Q.  What is the date of this email?

25  A.  August 25, 2020.

O6iWmen2                        Soliman - Direct

1   Q.  And it is from whom and to whom?

2   A.  It's -- it's from me to Senator Menendez.

3   Q.  Now, do you see next to your name there appears to be a

4   black box?

5   A.  Yes.

6   Q.  Prior to testifying today, did you review a copy of this

7   exhibit without the black box?

8   A.  Yes.

9   Q.  Was it your personal email address or your work email

10  address?

11  A.  My personal.

12  Q.  Now, in at least this period of time, why did you use your

13  personal email address?

14  A.  We just always communicated on personal email.  It was

15  political.  It wasn't official.

16  Q.  I've asked you about your email address.  If I could now

17  have you look up to Mr. Menendez's email address --

18  A.  Yes.

19  Q.  -- was that, to your knowledge, his official email address

20  or his personal email address?

21  A.  Personal.

22  Q.  And I think you may have said you sent this email to

23  Mr. Menendez.  If I could just ask you again, who sent the

24  email and who received the email?

25  A.  I'm sorry.  Yeah, I sent the email to Mr. -- to Senator

1    Menendez, and he replied back to me.

2    Q.  When you say he replied back to you, are you referring to

3    the top email?

4    A.  Yes.

5    Q.  Now, I'm going to ask about the email in a moment, but

6    first, what is the subject line of the email?

7    A.  Wildstein U.S. Attorney short list article.

8    Q.  Short list article?

9    A.  Yes.

10   Q.  What did this email concern, in sum?

11   A.  David Wildstein, the publisher of New Jersey Globe, wanted

12   to write an article about who the next U.S. Attorney would be.

13   He had a few sources telling him who those candidates may be

14   and, you know, he had an angle to write on.  He wanted to write

15   on it, and I was alerting the senator about it.

16   Q.  Let me just pause for a second.

17       In the course of your work, would you send Mr. Menendez on

18   occasion information or articles before they were published or

19   potential articles?

20   A.  Not articles, but information about articles.

21   Q.  Before they were published?

22   A.  Yes.

23   Q.  What was the purpose of that?

24   A.  To help shape the narrative.

25   Q.  Now, I want to look down at the email itself.  Do you see

O6iWmen2                          Soliman - Direct

1    that you wrote senator:  "David called me today" -- excuse me,

2    "David called me saying he's working on a story -- not today --

3    about the next U.S. Attorney short list under a new

4    administration."  Do you see that?

5    A.  Yes.

6    Q.  Who was David?

7    A.  David Wildstein.

8    Q.  What did you understand short list to mean?

9    A.  Short list of candidates for U.S. Attorney.

10   Q.  And new administration, what did you understand that to

11   refer to?

12   A.  The Biden administration.

13   Q.  Now, at the time of this email, August 24, 2020, was there

14   yet a Biden administration?

15   A.  No.

16   Q.  This was before the presidential election --

17   A.  Yes.

18   Q.  -- of 2020?

19   A.  That's correct.

20   Q.  Now, I direct your attention below that.  Do you see where

21   it says, "he also says that he wants to write that this may be

22   an opportunity for the first Hispanic to be appointed to U.S.

23   Attorney, especially since you're involved"?  Do you see that?

24   A.  Yes.

25   Q.  Now, below that, you wrote:  "David is also telling me that

O6iWmen2                           Soliman - Direct

1   he hears two people are campaigning for the job, Henry

2   Klingeman and Philip Sellinger."  Do you see that?

3   A.  Yes.

4   Q.  Now, what did you understand Mr. Wildstein to mean by first

5   Hispanic to be appointed to U.S. Attorney?

6   A.  It would be the first Hispanic in New Jersey history to be

7   appointed to the U.S. Attorney position.

8   Q.  Now, if you could look at the bottom of the email, the

9   second-to-last line -- if I could ask Ms. Wechsler to

10  highlight -- you wrote:  "I didn't give David any inclination

11  as to if he's right or wrong on anything that he said.  Happy

12  to if you want me to but I just said to him that it's a

13  premature story, we need to first win in November."

14      What did you mean by we need to first win in November?

15  A.  That Biden would need to win the presidency first in order

16  for any of this to be a reality.

17  Q.  And then you wrote:  "Let me know if you want me to do

18  anything here."  Do you see that?

19  A.  Yes.

20  Q.  What did you mean by that?

21  A.  If you want me to -- if you want me to help push a certain

22  narrative to the reporter.

23  Q.  Now let's look at the top of the email.  Senator Menendez

24  responded:  "I hope he doesn't write the Hispanic idea as it

25  will only add pressure for me to do something which I don't

O6iWmen2                        Soliman - Direct

1    intend to."  Do you see that?

2    A.  Yes.

3    Q.  What did you understand him to mean by the Hispanic idea

4    and I don't intend to?

5    A.  That, you know, that he does not intend to put forward to

6    the White House a name of someone who's Hispanic.

7    Q.  And do you see the next line:  "I don't know that Philip is

8    saying this to anyone because he's smarter than that.  But his

9    name has been out there before"?

10        So, first, who did you understand Philip to be?

11   A.  Philip Sellinger.

12   Q.  And what did you understand Mr. Menendez to be saying by

13   smarter than that and name out before?

14   A.  That Sellinger is not talking to reporters.

15   Q.  Meaning what?

16   A.  Meaning he's not leaking that he might be under

17   consideration.

18   Q.  Just to pause for a second, Mr. Soliman.  Did you know

19   Philip Sellinger at the time?

20   A.  Yes.

21   Q.  How did you know him?

22   A.  I knew him through Senator Menendez.

23   Q.  For approximately how long had you known him?

24   A.  Probably about, probably about 12 years.

25   Q.  What was the nature at this time -- that is, summer 2020 --

O6iWmen2                              Soliman - Direct

1    of your relationship with Mr. Sellinger?

2    A.   I -- I had not really seen him much.  I probably -- you

3    know, before the pandemic, I probably saw him once a year, if

4    that.  Maybe spoke with him twice a year.

5    Q.   And did you have an understanding of the senator's

6    relationship with Mr. Sellinger?

7    A.   Somewhat.

8    Q.   What was your understanding?

9    A.   Mr. Sellinger was someone who supported the senator for

10   years, and I think they golfed together occasionally.

11   Q.   I asked you about the reference to November in the email.

12   Do you recall that?

13   A.   Yes.

14   Q.   Did a Democrat win the presidency in November?

15   A.   Yes.

16   Q.   Who?

17   A.   Joe Biden.

18   Q.   Now, based on your experience, what effect, if any, did the

19   election of Mr. Biden have on the ability of Senator Menendez

20   to influence the selection for the U.S. Attorney for the

21   District of New Jersey?

22   A.   That the White House would be deferential to the senators

23   from their own party.

24   Q.   What do you mean by the senators from their own party?

25   A.   The Biden White House is Democrat.  Senator Menendez and

O6iWmen2                          Soliman - Direct

1    Senator Booker are both Democrats, so generally the rule is

2    that the White House would look to them for names to forward.

3          THE COURT:  And those were the two senators from New

4    Jersey, is that correct?

5          THE WITNESS:  That's correct.

6    BY MR. RICHENTHAL:

7    Q.  Now, after the presidential election -- that is, after

8    November 2020 -- did you discuss with Senator Menendez any

9    potential candidates to serve as the U.S. Attorney for New

10   Jersey?

11   A.  At some point, yes.

12   Q.  Now, there's a binder in front of you, Mr. Soliman, but I'm

13   also going to ask Ms. Wechsler to put a series of exhibits on

14   your screen one at a time.  OK?

15   A.  Yes.

16   Q.  They're marked for identification as GX A113-PH1 through

17   PH13, GX A114-PH, GX A131, GX A421 and GX A422.  Whether you

18   want to use the binder or the screen is entirely up to you,

19   sir.  Just let me know when you're done leafing through those

20   exhibits.

21   A.  Are you scrolling -- OK.

22        Can you go back one?  Or I could do it over -- I could look

23   at the binder.

24        OK.

25   Q.  Have you had a chance to leaf through all of those?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yes.

2    Q.  Without describing them in detail, what, in short, are

3    these 17 exhibits?

4    A.  Text messages between Senator Menendez and I.

5    Q.  Did they also include emails?  Take your time, Mr. Soliman.

6    A.  Yes.

7             MR. RICHENTHAL:  The government offers those 17

8    exhibits.  I can read the list again if the Court would like.

9             MR. WEITZMAN:  Your Honor, we have no objection,

10   except we'd note that Government Exhibits A421 and A422, which

11   are press articles, should not be offered for the truth of the

12   matter asserted.

13            MR. RICHENTHAL:  I don't disagree.

14            THE COURT:  Ladies and gentlemen, they're admitted,

15   but the press articles are not for the truth of what's set

16   forth in the articles, simply for the fact that that's what the

17   articles said.

18            (Government Exhibits A113-PH1 through A113-PH13,

19   A114-PH, A131, A421 and A422 received in evidence)

20            THE COURT:  OK.  Proceed.

21            MR. RICHENTHAL:  Mr. Soliman, I'm going to take some,

22   but not all of these, one at a time.  Let's start with the

23   first.  It's Government Exhibit A113-PH1.

24            Ms. Wechsler, can you put that on everyone's screen,

25   please.

1   Q.  Is that on your screen, Mr. Soliman?

2   A.  Yes.

3   Q.  All right.  Let's just orient ourselves.  What is this?

4   What are we looking at, in sum?

5        THE COURT:  Does the jury have it?  All right.

6   A.  It's a text message from myself to the senator and the

7   senator responding.

8   Q.  And just to orient how to read it, there's words in sort of

9   an off-white and there's words in blue.  Who is who?

10  A.  I'm the off-white.  Senator Menendez is the blue.

11  Q.  OK.  What's the date of the first part of this exchange;

12  that is, the top of the text exchange?

13  A.  November 10, 2020.

14  Q.  Approximately how long after the presidential election of

15  2020 was this text message?

16  A.  Either six days or two days, depending on when the election

17  was.

18  Q.  If you recall, how was this text message sent or received;

19  that is, using what application or software?

20  A.  Signal.

21  Q.  For anyone who may not know, what is Signal?

22  A.  It's an encrypted messaging application.

23  Q.  Why did you use Signal?

24  A.  The senator's office was once hacked, and since then we

25  generally communicated by Signal because we thought it was

1    safer.

2    Q.  Now, I'm going to read the first part of the text message,

3    that is, the top.  It says:  "Wildstein is asking about that

4    U.S. Attorney story since the election is done."

5         So, first, what U.S. Attorney story?

6    A.  The one about Wildstein wanting to write that Senator

7    Menendez would have the choice of who the U.S. Attorney would

8    be.

9    Q.  Is this the story you testified about a couple of minutes

10   ago, Mr. Soliman?

11   A.  Yes.

12   Q.  Then it says:  "If you remember he wanted to write about

13   the fact that it would be your decision, as Cory will defer to

14   the senior senator."

15        So, first, in this text message or others I may show you,

16   who is Cory?

17   A.  Senator Cory Booker from New Jersey.

18   Q.  And second, it uses the phrase "senior senator."  Who or

19   what is the senior senator?

20   A.  Senior senator is Senator Menendez.  Senior senator is

21   someone who's served the longest in the U.S. Senate from the

22   state.

23   Q.  What were you saying here when you wrote, as Cory will

24   defer to the senior senator?

25   A.  David wanted to write -- Mr. Wildstein wanted to write that

1    Senator Booker would defer to Senator Menendez's pick.

2    Q.   Pick for what?

3    A.   For U.S. Attorney.

4    Q.   Did you understand that to be accurate?

5            MR. RICHENTHAL:   I can ask it -- withdrawn.

6    Q.   Did you have an understanding as to the relationship

7    between the senior senator and the junior senator when it came

8    to a pick for U.S. Attorney?

9    A.   Yes.

10   Q.   What was your understanding of that relationship?

11   A.   That Senator Menendez would put a name forward but that if

12   Senator Booker had an objection or issue with it, that they

13   would have to go back to the drawing board.

14   Q.   Now, the next sentence says:  "He also had heard that

15   Sellinger was a top choice (but I haven't verified that to

16   him)."  What did you mean by that?

17   A.   I have -- that I had not confirmed that with Mr. Wildstein.

18   Q.   Not confirmed whether Mr. Sellinger was a top choice?

19   A.   Correct.

20   Q.   And again, sir, a top choice for what?

21   A.   U.S. Attorney.

22   Q.   What was your understanding at the time as to whether

23   Mr. Sellinger was, in fact, the top choice?

24   A.   That he was the top choice.

25   Q.   Now, this text message is November 10, 2020.  Prior to this

1    time, had Mr. Menendez ever said anything to you negative about

2    Mr. Sellinger?

3    A.  No.

4    Q.  Could you read Mr. Menendez's response; that is, the blue?

5    A.  "Please try and delay it.  I'm meeting with Cory next week

6    and I don't want him to think I'm jamming him.  Very

7    important."

8    Q.  What did you understand Senator Menendez to mean by that?

9    A.  He didn't want an article out there basically saying that

10   it was his pick and he didn't want to box in Senator Booker

11   publicly.

12   Q.  Box in, meaning what?

13   A.  Meaning -- meaning to push Senator Booker to go a certain

14   way.  If it's out there publicly, Booker would sort of be

15   obliged in some ways or feel the pressures.

16   Q.  How did you respond to that statement?

17   A.  I said, got it.  OK.

18           MR. RICHENTHAL:  Let's go to two exhibits later, if we

19   could, Ms. Wechsler, A113-PH3.

20   Q.  All right.  So, first, what's the date of this text

21   exchange?

22   A.  December 14, 2020.

23           MR. RICHENTHAL:  Ms. Wechsler, can we just go back to

24   the prior exhibit for one second.  I'm going to ask Mr. Soliman

25   to compare the dates.

O6iWmen2                      Soliman - Direct

1   Q.  Approximately how long after the first text exchange is the

2   second one?

3            MR. RICHENTHAL:  Maybe you could put them both on the

4   screen, Ms. Wechsler.

5   A.  Approximately 35 days.

6   Q.  Now, this second set of text exchanges is December 14,

7   2020.  Do you see you wrote:  "Carpenito made public that he's

8   leaving by a press release from DOJ"?

9        First, who is Carpenito?

10  A.  Craig Carpenito was the U.S. Attorney at the time from New

11  Jersey.

12  Q.  And it says leaving.  Leaving what?

13  A.  Leaving the U.S. Attorney position.

14  Q.  Then you wrote:  Wildstein called me asking if he can now

15  write a story, since other reporters will likely write now."

16       A story about what?

17  A.  Story about, about the, the same subject we spoke about

18  earlier, the senator's pick.

19  Q.  When you say the senator's pick, you mean Mr. Menendez's

20  pick for United States Attorney for New Jersey?

21  A.  Yes.

22  Q.  Again, at this time, roughly 35 days later, who did you

23  understand the pick was going to be?

24  A.  Mr. Sellinger.

25  Q.  Was that based on speaking with Mr. Menendez?

O6iWmen2                         Soliman - Direct

1    A.  And/or Fred Turner, chief of staff.  One of them.

2    Q.  Now you wrote:  "Do you want me to guide him a certain way

3    on what to include and what not to?"

4         What did you mean by that?

5    A.  Shaping the narrative of the article.

6    Q.  Again, Mr. Soliman, what do you mean by shaping the

7    narrative of the article?

8    A.  Meaning you want to advocate on your client's behalf to

9    have the article published in a certain way, so you push your

10   side of the story.

11              THE COURT:  That's your job, right?  That's your job,

12   sir, correct?

13              THE WITNESS:  Yes.

14              THE COURT:  And were you on his staff then, or were

15   you at the Mercury Public Affairs?

16              THE WITNESS:  No.  I was at Mercury -- I was at

17   Mercury Public Affairs.

18              THE COURT:  And he had retained you to assist him, is

19   that correct?

20              THE WITNESS:  Not during this period of time, but he

21   had retained me during other periods of time, while I was at

22   Mercury.

23              THE COURT:  All right.  Thank you.

24   BY MR. RICHENTHAL:

25   Q.  If I want to direct your attention to the blue in the

1    middle; that is, Mr. Menendez's response:  "Let me sleep on

2    that tonight.  Who's Carpenito's first assistant, meaning who

3    takes over the office until there is a new U.S. Attorney?"

4        What did you understand him to be asking you?

5    A.  Who is the acting U.S. Attorney that will replace

6    Mr. Carpenito in the interim.

7    Q.  Did you respond?

8    A.  Yes.

9    Q.  How did you respond?

10   A.  By --

11   Q.  What did you convey?

12   A.  By cut and paste or putting in quotes the press release

13   that addressed that part of his question.

14   Q.  And who was going to be the acting U.S. Attorney, according

15   to the press release?

16   A.  Rachael Honig.

17       MR. RICHENTHAL:  Ms. Wechsler, can you scroll to the

18   remaining part of the text exchange.

19   Q.  How did Senator Menendez respond to being advised that

20   Rachael Honig would be announced as the new acting U.S.

21   Attorney?

22   A.  With an OMG and emoji.

23   Q.  For anyone who may not know, what did you understand OMG to

24   mean?

25   A.  Oh, my God.

1   Q.  What did you understand Senator Menendez to be saying with

2   respect to Ms. Honig?

3               MR. WEITZMAN:  Objection, your Honor.

4               THE COURT:  Sustained as phrased.

5   BY MR. RICHENTHAL:

6   Q.  What did you understand Senator Menendez to be indicating?

7               MR. WEITZMAN:  Objection, your Honor.

8               THE COURT:  Just a moment.

9               MR. WEITZMAN:  It's an emoji.

10              THE COURT:  Just a moment.

11              MR. RICHENTHAL:  I can lay a foundation, if the Court

12  would like.

13              THE COURT:  Go ahead.

14  BY MR. RICHENTHAL:

15  Q.  Mr. Soliman, at the time of this exchange, 2020,

16  approximately how long had you communicated with Senator

17  Menendez, roughly?  In your career.

18  A.  Oh.

19              THE COURT:  How many years, you mean?

20              MR. RICHENTHAL:  Yes, sir.

21  A.  13 years.

22  Q.  Did that include text exchanges?

23  A.  Yes.

24  Q.  Did that include in-person conversations?

25  A.  Yes.

1    Q.  Did that include phone calls?

2    A.  Some, yes.

3    Q.  Did it occasionally include emojis or emoticons?

4    A.  Yes.

5    Q.  Did you feel you had an understanding of how Senator

6    Menendez communicated with you, sir?

7              THE COURT:  I'm going to ask you to slow down because

8    we have the interpretation.

9    BY MR. RICHENTHAL:

10   Q.  Based on your interactions with the senator, did you come

11   to an understanding as to how he communicated, at least with

12   you?

13   A.  Yes.

14   Q.  Did you come to an understanding about how he communicated

15   in words?

16   A.  Yes.

17   Q.  Did you come to an understanding about how he communicated

18   nonverbally; that is, in other ways?

19   A.  Yes.

20   Q.  Did you reach an understanding as to what he meant by OMG?

21             MR. WEITZMAN:  Objection, your Honor.  Calls for

22   speculation.

23             THE COURT:  No.  I'll allow it.

24             What was your understanding as to what OMG with that

25   face meant, if anything?

1          THE WITNESS:  You know, I --

2          THE COURT:  If you did understand.

3          THE WITNESS:  You know, I think part of it was in jest

4    and another part of it was oh, God, out of all people, that's

5    the person.  You know, just sort of banter.

6    BY MR. RICHENTHAL:

7    Q.  Mr. Soliman, did you understand Senator Menendez to be

8    expressing happiness, unhappiness, or something else about

9    Ms. Honig?

10          MR. WEITZMAN:  Objection, your Honor.

11          THE COURT:  Yes.  Sustained.

12   BY MR. RICHENTHAL:

13   Q.  Mr. Soliman, can you explain what you meant in the answer

14   you just gave?  I'm not putting words in your mouth.  Explain

15   what you meant that you understood Senator Menendez to mean by

16   OMG.

17          MR. WEITZMAN:  Objection, your Honor.

18          THE COURT:  No.  I will allow it.

19          Mr. Soliman, you said I think part of it was in jest

20   and another part of it was oh, God, out of all people.  What

21   did you mean to express just now when you said your

22   understanding was that Senator Menendez meant oh, God, out of

23   all people?

24          THE WITNESS:  Yes, that's --

25          THE COURT:  What did that mean, oh, God, out of all

O6iWmen2                        Soliman - Direct

1    people?

2              THE WITNESS:  I mean out of everyone who could take

3    over the U.S. Attorney's Office, I think he wasn't very excited

4    that it was her.

5              THE COURT:  OK.

6    BY MR. RICHENTHAL:

7    Q.  Mr. Soliman, wasn't very excited, meaning what?

8    A.  I think that's really it.

9    Q.  Positive or negative, Mr. Soliman?

10   A.  Negative.  But he wasn't someone who really used a lot of

11   emojis, so I kind of -- I think it was half joking.

12   Q.  How did you respond to the emoji and the OMG?

13   A.  I laughed.

14   Q.  How else did you respond?

15   A.  I said, I know.

16   Q.  Meaning what?

17   A.  I was just agreeing with him.

18   Q.  Now, we're looking at a text message from December 14,

19   2020.  Prior to this date, did you have an understanding as to

20   whether Mr. Menendez intended to recommend anyone other than

21   Mr. Sellinger?

22   A.  No.

23   Q.  No, meaning he did or no, meaning he did not?

24   A.  That he did not.

25   Q.  Did there come a time after this text message -- that is,

1    after December 14, 2020 -- when that understanding changed;

2    that is, you understood he was seriously considering

3    nominating -- excuse me, recommending for nomination someone

4    else?

5    A.  Yes.

6    Q.  Did you understand at that time -- that is, mid-December --

7    why he was seriously considering someone else?  Just at that

8    time itself.

9    A.  I don't think in mid-December, no.

10   Q.  Did you later come to an understanding as to why he was

11   seriously considering someone else?

12   A.  Yes.

13           MR. WEITZMAN:  Objection to form.

14           THE COURT:  I'll allow it.

15   BY MR. RICHENTHAL:

16   Q.  How did you come to a different understanding as to why he

17   was -- excuse me, withdrawn.

18       How did you come to an understanding as to why he was

19   considering someone else; with whom did you speak?

20   A.  It was most likely Fred Turner.

21   Q.  And again, what was Fred Turner's role at the time?

22   A.  Chief of staff.

23   Q.  What do you recall Mr. Turner telling you about why someone

24   else was now being seriously considered?

25           MR. WEITZMAN:  Objection.

1   A.   That --

2              MR. WEITZMAN:  Objection.  Hearsay, your Honor.

3              THE COURT:  Sustained.

4              MR. RICHENTHAL:  It's an agent statement, your Honor,

5   I'm happy to lay a foundation.

6              THE COURT:  No.  I think that's correct.  He's chief

7   of staff.  Agency.  I'll allow it.

8              You may answer, sir.

9   BY MR. RICHENTHAL:

10  Q.   Mr. Soliman, just to back up, for clarity, I think you said

11  in mid-December you did not have an understanding as to why

12  Senator Menendez was seriously considering someone else, is

13  that correct?

14  A.   Correct.

15  Q.   Did you later come to an understanding as to why he was

16  seriously considering someone else?

17  A.   Yes.

18  Q.   Was that based on a conversation you had with Mr. Turner?

19  A.   Yes.

20  Q.   The chief of staff?

21  A.   Yes.

22  Q.   What did you learn from your conversation with Mr. Turner?

23  A.   That the senator and Mr. Sellinger had a falling out and

24  that the senator was going to go in a different direction.

25  Q.   Now, you just said falling out.  Did you have an

O6iWmen2                        Soliman - Direct

1    understanding as to what the falling out was?

2    A.   No.

3    Q.   Whom did you understand Senator Menendez seriously

4    considered next; that is, after Mr. Sellinger?

5    A.   Esther Suarez.

6    Q.   Now, prior to this time, had Mr. Menendez ever raised

7    Ms. Suarez with you as a potential candidate for U.S. Attorney?

8    A.   Not with me.

9    Q.   Did you know who Ms. Suarez was?

10   A.   Yes.

11   Q.   For approximately how long had you known of her?

12   A.   I've known of her since she was installed as Hudson County

13   prosecutor.

14   Q.   To your knowledge, had she ever been a federal prosecutor?

15   A.   No.

16   Q.   Now, sticking with the same approximate time frame --

17   mid-December 2020 or thereabouts -- what, if anything, did

18   Mr. Menendez ask you to do with respect to Ms. Suarez?

19   A.   He asked me -- he or -- I don't think he asked me, but

20   someone on his behalf asked me to help her with the press.

21        MR. RICHENTHAL:  Ms. Wechsler, can you go to the next

22   exhibit, A113-PH4.

23   Q.   Is that on your screen, Mr. Soliman?

24   A.   Yes.

25   Q.   What's the date of this exchange, at least starting at the

1   top?

2   A.  December 15, 2020.

3           MR. RICHENTHAL:  Can we scroll down now, please.

4           I'm sorry.  Ms. Wechsler, can you go back up.  Stop.

5   Q.  Do you see the exchange beginning December 17, 2020?

6   A.  Yes.

7   Q.  And again, just to orient ourselves, who is blue and who is

8   off-white?

9   A.  Senator Menendez is blue and I'm off-white.

10  Q.  Do you see where he wrote:  "Please do a little checking on

11  Salas time as superior court judge and prosecutor, thanks"?

12  A.  Yes.

13  Q.  And you responded:  "Will do.  Just to be clear, do you

14  mean Suarez -- Hudson"?

15  A.  Correct.

16  Q.  Why did you respond that way?

17  A.  Because there -- because he said Salas, who was a different

18  person, so I wanted to make sure we were talking about the same

19  person.

20  Q.  Now, you continued:  "The person we spoke about"; that's

21  the bottom of the page --

22          MR. RICHENTHAL:  Ms. Wechsler, can you just scroll

23  slowly to the next.

24  Q.  -- do you see that?

25  A.  Yes.

O6iWmen2                          Soliman - Direct

1    Q.  Are you referring to a conversation you had with

2    Mr. Menendez separate from this text exchange?

3    A.  I don't remember.

4    Q.  And how did he respond?

5    A.  He said, yes, Suarez, Hudson.  He was answering my first

6    question.

7                THE COURT:  So it wasn't Salas; it was Suarez --

8                THE WITNESS:  Correct.

9                THE COURT:  -- is that correct?

10               THE WITNESS:  That's correct.

11               THE COURT:  All right.

12               MR. RICHENTHAL:  If we could just go back up for one

13   moment, Ms. Wechsler.  Stop.

14   Q.  What did you understand Senator Menendez to be asking you

15   to do by, quote, a little checking, end quote?

16               MR. RICHENTHAL:  And you can now go to the next page,

17   Ms. Wechsler.

18   A.  To vet her, to figure out what has been written negatively

19   about her in the press, positively about her, what could come

20   up about her publicly.

21   Q.  You just used the term "vet."  In the context of your work,

22   what did you mean by vet?

23   A.  To do a little bit of research on her, on what's in the

24   public domain about her.

25   Q.  Public domain, meaning what?

O6iWmen2                          Soliman - Direct

1    A.   Press, media.

2              MR. RICHENTHAL:  Can we go down, Ms. Wechsler.

3    Q.   You then wrote:  "Sent you the Suarez articles.  Other than

4    the Katie Brennan issue and a comment about the news media,

5    there wasn't much else I could find that sticks out but will

6    keep searching."

7         Let's just pause there.  First, what did you mean by the

8    Suarez articles?

9    A.   There was a series of clips, newspaper articles that I had

10   emailed to the senator so he could read through them about her.

11   Q.   Clips about what?

12   A.   About Esther Suarez.

13   Q.   You also referred to the Katie Brennan issue?

14   A.   Yes.

15   Q.   What was the Katie Brennan issue?

16   A.   There was a senior staff member on Governor Murphy's

17   election campaign that was accused of rape by Katie Brennan,

18   and the case was moved to Esther Suarez's jurisdiction as

19   prosecutor of Hudson County.  And she was heavily attacked on

20   her handling of that case.  So it was, the series of articles

21   that I sent to him were in and around that time period.

22   Q.   In your judgment, were they positive articles or negative

23   articles or something else?

24   A.   Negative.

25   Q.   Why did you send them to him?

1    A.  I wanted him to be aware of the negative exposure that

2    could come out if he put her name forward.

3    Q.  Now looking at the second part of what you wrote, you

4    wrote: "She's a stack person but also viewed as an ally of

5    Donald, since she used to work at his firm."

6        Let's just stop there.  Who was Stack and who was Donald?

7    A.  Stack is a mayor and state senator from Union City, New

8    Jersey.  Donald, Donald Scarinci is -- he runs a law firm in

9    New Jersey, and he's a friend of the senator's.

10   Q.  I'm sorry.  Donald's last name is Scarinci?

11   A.  Yes.

12   Q.  What was your understanding at the time of the relationship

13   between Mr. Menendez and Mr. Scarinci?

14   A.  They were childhood best friends.

15   Q.  What role, if any, did Mr. Scarinci have in Mr. Menendez's

16   wedding?

17   A.  He was his best man.

18           MR. RICHENTHAL:  Now, if we could just scroll up

19   briefly.  This exchange we've been talking about is December

20   17, 2020.  Prior to this time -- strike that.  Withdrawn.

21   Q.  Was this the first time you became aware that Ms. Suarez

22   was under consideration for U.S. Attorney?

23           MR. WEITZMAN:  Objection.  Asked and answered.

24           MR. RICHENTHAL:  I can ask it a different way.

25   Q.  Prior to this time, did you have any understanding that

1    Ms. Suarez was under consideration for U.S. Attorney?

2    A.  No.  I -- I don't know if it's exactly this date, but prior

3    to this time, no.

4              MR. RICHENTHAL:  Now, I'm going to ask you about

5    Mr. Scarinci and articles.  I want to focus on the articles for

6    a second.  Ms. Wechsler, can you put on Mr. Soliman's screen

7    Government Exhibits 421 and 422, side by side if you can.

8    Q.  You don't have to read these, Mr. Soliman, but in general,

9    what are each of these?

10   A.  They're articles from 2019 about Ms. Suarez coming under

11   fire.

12   Q.  Sorry, sir.

13   A.  Sorry.

14   Q.  Were these the articles you referred to in the text

15   exchange, or at least some of them?

16   A.  Some of them.

17   Q.  What are the dates of each of these articles?

18   A.  December 17, 2020.

19   Q.  Is that the same date as the text exchange?

20   A.  Yes.

21   Q.  Now, separate from these articles, did you provide any

22   advice to Senator Menendez regarding Ms. Suarez in this time

23   period?

24   A.  I had told him that -- that if he put her name forward,

25   there would be a lot of negative press around her candidacy.

1   Q.  Why did you tell him that?

2   A.  Because I was aware of these articles.

3   Q.  How, if at all, did he respond to you telling him that?

4   A.  He just took it in.

5   Q.  Now, following this time -- that is, mid-December 2020 or

6   so -- did any articles appear in the New Jersey press regarding

7   potential candidates for U.S. Attorney beyond Ms. Suarez?

8   A.  I think so, yes.

9   Q.  What role, if any, did you have in at least certain of

10  those articles?

11  A.  I provide -- it depends which articles.

12          MR. RICHENTHAL:  Let's go to the next exhibit,

13  Ms. Wechsler, GXA131.  And if we can go to the bottom, please.

14  I'm sorry.  The first page but the bottom of the first page.

15  Q.  Mr. Soliman, do you see an article on your screen here

16  entitled "Black Ministers Push for Semper to be Next U.S.

17  Attorney"?

18  A.  Yes.

19  Q.  And it appears that you forwarded that.  Do you see that,

20  sir?

21  A.  Yes.

22  Q.  What role, if any, did you have in this article?

23          THE COURT:  You mean apart from forwarding it?

24          MR. RICHENTHAL:  Yes.

25  A.  I -- I had -- I had been the person who suggested Semper's

1    name to the publisher of the NJ Globe.  This article

2    specifically I had no role.  I didn't tell the black ministers

3    to put out a statement.

4    Q.  Let me just back up.  You said the NJ Globe.  What's the NJ

5    Globe?

6    A.  That is the -- that is the media outlet that Wildstein

7    runs.

8    Q.  What's the date of this email at the top?

9    A.  January 11, 2021.

10              THE COURT:  It says New Jersey Globe.  Is that the

11   same thing?

12              THE WITNESS:  That's correct.

13   BY MR. RICHENTHAL:

14   Q.  To whom did you forward this article, Mr. Soliman?

15              MR. RICHENTHAL:  We can go up, Ms. Wechsler.  Stop.

16   A.  To the senator.

17   Q.  Mr. Turner as well, or no?

18   A.  Yes.  Initially, yes, that's correct.

19              MR. RICHENTHAL:  Now, we can go back to the article,

20   Ms. Wechsler.  Could you go to the second page.

21   Q.  Do you see the paragraph at the bottom?

22   A.  Yes.

23   Q.  It says:  "The New Jersey Globe first reported on Friday

24   that the other six candidates on the short list are experienced

25   prosecutors."  And then it lists a series of names and then has

O6iWmen2                          Soliman - Direct

1    a separate sentence about Ms. Suarez.  Do you see that?

2    A.  Yes.

3    Q.  What role, if any, did you have in sharing those names with

4    the media?

5    A.  I am the one who shared them.

6    Q.  Why?

7    A.  Because there was -- Mr. Wildstein had a source that told

8    him that it was a group of less names than what was on this,

9    and I wanted to broaden the list a little bit.

10   Q.  Did you share with Senator Menendez or Fred Turner that you

11   were doing that?

12   A.  Yes.

13   Q.  Why did you do that?

14   A.  I always shared the strategy with them, or I always

15   conferred with them.

16           MR. RICHENTHAL:  Let's go back up for a moment.

17   Q.  Do you see the date on your email is January 11, 2021?

18   A.  Yes.

19           MR. RICHENTHAL:  Let's go back now to the second page,

20   if we could.

21   Q.  Now, at the time of this email, had you talked with

22   Mr. Menendez about all of these individuals as potential

23   candidates or only some?

24   A.  It was a combination between Senator Menendez and Fred

25   Turner.

O6iWmen2                          Soliman - Direct

1   Q.  Based on your conversations with Senator Menendez, who did

2   you understand at this time, January 11, 2021, was the serious

3   candidate for consideration to be recommended for U.S.

4   Attorney?

5   A.  Esther Suarez.

6   Q.  Did you understand at this time, January 11, 2021, that

7   anyone else on this list was a serious candidate?

8          MR. WEITZMAN:  Objection, your Honor.  Calls for

9   speculation.

10         THE COURT:  He may have an understanding.

11         MR. WEITZMAN:  I'd ask, your Honor, that it be what

12  the senator told him then.

13         MR. RICHENTHAL:  I'll take it one at a time.

14  Q.  Did you talk to Senator Menendez in this time period --

15  January 2021 -- about who he intended to recommend as U.S.

16  Attorney for New Jersey?

17  A.  Yes.

18  Q.  Who was that person?

19  A.  Esther Suarez.

20  Q.  Did you talk to Mr. Turner at this time -- January 2021 --

21  about who he understood Senator Menendez intended to recommend

22  to serve as U.S. Attorney in New Jersey?

23  A.  Yes.

24  Q.  Who?

25  A.  Esther Suarez.

1                MR. RICHENTHAL:  Now can we go back to the top of this

2      article.

3      Q.  I asked you about a series of names.  Do you recall that,

4      sir?

5      A.  Yes.

6      Q.  Now, this article was actually about a different person,

7      right?  Mr. Semper, is that correct?

8      A.  Yes.

9      Q.  At this time, January 2021, based on your conversations

10     with Senator Menendez, did you understand Mr. Semper to be a

11     serious candidate for U.S. Attorney?

12     A.  No.

13     Q.  At this time, January 2021, did you understand from

14     conversations with Mr. Turner that Mr. Semper was a serious

15     candidate for U.S. Attorney?

16     A.  No.

17     Q.  And to be clear, sir, by serious candidate, I don't mean

18     his qualifications.  I mean did you understand the senator

19     intended to recommend him?

20     A.  No.

21                MR. RICHENTHAL:  Now, if we could go up, Ms. Wechsler.

22     Q.  Do you see the email in the middle?

23     A.  Yes.

24     Q.  This is from Mr. Menendez to you?

25     A.  Yup.

O6iWmen2                          Soliman - Direct

1    Q.   Same date; that is, January 11, 2021?

2    A.   Right.

3              MR. RICHENTHAL:   Could we just zoom out for a second,

4    Ms. Wechsler.

5    Q.   Now, sir, Mr. Soliman, at what time on January 11, 2021,

6    did you forward this article?

7              MR. RICHENTHAL:   Ms. Wechsler, if you could --

8    A.   4:43 p.m.

9    Q.   How quickly did Senator Menendez respond?

10   A.   19 minutes.

11   Q.   How did he respond?

12   A.   He said:  This is just great, a reason lesson why you can't

13   let Wildstein drive your decisions.

14   Q.   What did you understand him to be saying?

15   A.   Wildstein had suggested that the initial short list wasn't

16   diverse enough, so Fred Turner and I spoke and Fred Turner

17   reached out to someone, came up with Jamel Semper's name, we

18   threw Semper in the mix.  As a result the black ministers were

19   then publicly pushing for Semper.

20   Q.   Did you understand him to mean, this is just great, as in

21   it's actually great?

22   A.   No.  I think he was being sarcastic.

23   Q.   What did you understand him to mean by, you can't let

24   Wildstein drive your decisions?

25             MR. WEITZMAN:   Objection.

1          THE COURT:  Did you have an understanding, sir?  You
2     can answer.
3     A.  Did I have an understanding?  Yes.
4     Q.  What was your understanding of, you can't let Wildstein
5     drive your decisions?
6     A.  That the reason why we put the name forward was because of
7     what Wildstein had said.
8     Q.  Now, if you could look up at the top email exchange, do you
9     see that?
10    A.  Yes.
11    Q.  Is that also the same day; that is, January 11, 2021?
12    A.  Yes.
13    Q.  Do you see where you wrote:  "You're right but if you
14    remember he was pushing to do a story about this since before
15    the election and we kept pushing him off and he had Sellinger's
16    name back then, as he told us"?
17         Mr. Soliman, do you see that?
18    A.  Yes.
19    Q.  What story were you referring to in this sentence?
20    A.  The story about it being the senator's pick and, you know,
21    him being the senior senator.
22    Q.  Now, you continued:  "And then Friday he said he had a very
23    reliable source that it was Esther Suarez and that he was
24    running with it.  So this was an attempt to not get all the
25    daggers out against Esther by mixing it up."  Do you see that?

O6iWmen2                          Soliman - Direct

1    A.  Yes.

2    Q.  What did you mean by that?

3    A.  That if we gave Mr. Wildstein a number of names to publish

4    instead of Mrs. Suarez's alone, that she would face less

5    criticism.

6    Q.  Why did you undertake an effort to seek to have Ms. Suarez

7    get less criticism?

8    A.  Because of the articles that we spoke about earlier.  I

9    knew that they would generate negative -- a negative reaction.

10   Q.  And what understanding, if any, did you have as to why the

11   senator would want Ms. Suarez to get less criticism?

12   A.  Well, I think it was just managing the process.  If you

13   have a candidate, you want to make sure they get less

14   criticism.

15   Q.  And you continued:  "The calculation was that if we don't

16   confirm or deny it, then Esther's name would be out there on

17   its own -- she would get attacked -- and all these other groups

18   would say what about me?  It wasn't the perfect solution, but

19   we weren't exactly given a choice.  He is friendly to us, yes,

20   but he's also very competitive with other journalists and I

21   can't always just stop him."

22        What were you explaining to Senator Menendez?

23   A.  That Mr. Wildstein was very competitive in nature.  He

24   wants to be first.  He had a scoop through other sources.

25   We've held him off -- I've held him off from writing this for

1   as long as possible, and you know, I could try to sway him, but

2   we certainly don't control him.

3   Q.  The date of this is January 11, 2021, is that right?

4   A.  Yes, that's correct.

5          THE COURT:  When you said, we don't control him, who

6   is we?

7          THE WITNESS:  The senator's orbit.

8          MR. RICHENTHAL:  Ms. Wechsler, can we go to the next

9   exhibit, A114-PH.

10  Q.  Mr. Soliman, when did this exchange take place?

11  A.  January 26, 2021.

12  Q.  About two weeks later?

13  A.  That's correct.

14  Q.  Who was part of this exchange; that is, who participated in

15  the exchange?

16  A.  Fred Turner, myself and Senator Menendez.

17         MR. RICHENTHAL:  Now, if I could have Ms. Wechsler go

18  to the second page.  Let's stop there.

19  Q.  You wrote -- excuse me.  Mr. Turner wrote:  "Senator, Mike

20  and I have talked several times today about the USAtty

21  position."  Just first, who is Mike here?

22  A.  That's me.

23  Q.  And USAtty is what?

24  A.  United States Attorney.

25  Q.  He continued:  "I also have two missed calls and a VM from

1   Sellinger."  Do you see that?

2   A.  Yes.

3   Q.  "I have not yet returned his call.  I also got a lengthy

4   text from Jenny Kramer.  Do we want to put her back in the

5   mix."

6       Do you see that?

7   A.  Yes.

8   Q.  Now, let me pause for a second.  What did back into the mix

9   mean?

10  A.  To put her on the short list for U.S. Attorney.

11  Q.  Now, you've used the phrase "short list" a few times.  What

12  did you mean by that?

13  A.  The top contenders that the senator had.

14  Q.  Now, Mr. Soliman, when you say the short list of the top

15  contenders, do you mean actually the top contenders or those

16  you were informing the media were the top contenders?

17  A.  Both.

18  Q.  Explain what you mean by that.

19  A.  Well, if there's one real person, but the short list is

20  four people, then it's both the real person and four people.

21  Q.  Let's take that one at a time.  There's the real person and

22  then there's the short list; yes?

23  A.  Yes.

24  Q.  At this time, January 26, 2021, who was the real person?

25  A.  Esther Suarez.

1          THE COURT:  Please slow down.

2          MR. RICHENTHAL:  Now, I want to ask Ms. Wechsler to

3   continue a bit down the page, down the text exchange, to the

4   next page.  I think it's page 3, Ms. Wechsler.

5          Please stop there.

6   Q.  Mr. Soliman, do you see your message in the middle?

7   A.  Yes.

8   Q.  You wrote:  "Fred also had a good idea on how to handle

9   Phil"?

10  A.  Yes.

11  Q.  Who was Phil?

12  A.  Philip Sellinger.

13  Q.  And you wrote:  "We can say something along the lines of

14  blaming it on the White House without further explanation if we

15  need to, 'they asked us to make more than one recommendation

16  and they chose XXX person.'"  Do you see that.

17  A.  Yes.

18  Q.  What did you mean by that?

19  A.  What we would say to Mr. Sellinger as the reason why he

20  wasn't picked.

21  Q.  Mr. Soliman, was that the reason why he wasn't being

22  picked, to your knowledge?

23  A.  No.

24          MR. RICHENTHAL:  If we could go down a little more.

25  Actually, we can stop there.

1    Q.  Do you see you wrote:  "This of course assumes he doesn't

2    have intel on the WH"?

3    A.  Correct.

4    Q.  What did you mean by that?

5    A.  The white House.

6    Q.  What did you mean by, this of course assumes he doesn't

7    have intel into?

8    A.  That he doesn't have sources at the White House that he

9    could speak to himself.

10   Q.  What connection, if any, did that have to the idea of,

11   quoting, blaming it on the White House, end quote?

12   A.  Can you ask that again?

13   Q.  You mentioned -- I'll just quote you:  "We can say

14   something along the lines of blaming it on the White House."

15   Do you see that?

16   A.  Yes.

17   Q.  At the end of that message, you wrote:  This, of course,

18   assumes he doesn't have intel into the White House?

19   A.  Yes.

20   Q.  Do you see that?

21   A.  Yes.

22   Q.  Why did you say, this, of course, assumes he doesn't have

23   intel into the White House?

24   A.  Well, he could check -- he could check what we're saying to

25   him if he has intel into the White House.

1              MR. RICHENTHAL:  Now, Ms. Wechsler, can we keep going

2    with it.

3              One moment, your Honor?

4    Q.  And the "he" is Mr. Sellinger in that text, is that

5    correct?

6    A.  Yes.

7    Q.  Now, two days lower, January 28, 2021, see that message on

8    your screen?

9    A.  Yes.

10   Q.  This is Fred Turner again:  "I chatted with Philip this

11   morning as we discussed."

12             First, again, who was Philip?

13   A.  Philip Sellinger.

14   Q.  Then he wrote:  If we ultimately pull the plug on him, and

15   I didn't indicate we were, he would likely understand that it's

16   because of the White House and not because of any other

17   intervening events/conversations, etc."  Do you see that?

18   A.  Yes.

19   Q.  What did pull the plug mean?

20   A.  Take him out of the mix for U.S. Attorney.

21   Q.  Meaning inform him he was not going to be recommended?

22   A.  That's correct.

23             MR. RICHENTHAL:  Now, I want to scroll down a little

24   more.  Ms. Wechsler, can we go to the next page.

25             Stop there.

O6iWmen2                    Soliman - Direct

1   Q.  Now, do you see that at the bottom here, that it says --

2   this is from Mr. Turner:  "As a reminder, here's the letter we

3   got from WH counsel last month"?  Do you see that?

4   A.  Yes.

5            MR. RICHENTHAL:  Can we scroll down again,

6   Ms. Wechsler.

7            Stop there.

8   Q.  Is that the letter you understood Mr. Turner to be

9   referring to?

10  A.  Yes.

11           MR. RICHENTHAL:  Ms. Wechsler, can you blow it up, or

12  can I ask the defense to put on the screen DX 193.

13  Q.  OK.  Do you see that, Mr. Soliman?

14  A.  Yes.

15  Q.  Approximately how long before the text exchange we've been

16  talking about was this memo dated?

17  A.  A month.

18  Q.  Now, do you see the memo says --

19           MR. RICHENTHAL:  Ms. Wechsler, can we actually blow up

20  the second paragraph.

21  Q.  Do you see that, Mr. Soliman?

22  A.  Yes.

23  Q.  And do you see the last sentence:  "We are particularly

24  focused on nominating individuals with legal experiences that

25  have been historically underrepresented"?

1  A.  Yes.

2  Q.  And do you see also, earlier in that paragraph, it says,

3  and this is the third sentence:  "We therefore asked the

4  proposed talented individuals who would bring to these

5  critically important roles a wide range of life and

6  professional experiences, including those based on their race,

7  ethnicity, national origin, gender, sexual orientation, gender

8  identity, religion, veteran status and disability"?

9  A.  Correct.

10  Q.  Do you see that?

11  A.  I do.

12        MR. RICHENTHAL:  Now I'd like to direct you to direct

13  your attention to the bottom of the memo.

14        Ms. Wechsler, can you zoom out and go back in.

15  Q.  Mr. Soliman, do you see that it says here, in the second

16  sentence -- I'm now in the penultimate paragraph; that is, the

17  second-to-last paragraph -- "for each position we ask that you

18  send us at least three candidates"?  Do you see that?

19  A.  Yes.

20        MR. RICHENTHAL:  You can get that back out of there,

21  Ms. Wechsler.  Thank you.

22  Q.  Did you talk with Mr. Menendez or Mr. Turner about the

23  request for three candidates?

24  A.  I did not.

25  Q.  From speaking with Mr. Menendez or Mr. Turner, did you come

1    to an understanding as to whether Senator Menendez intended to

2    advance three candidates or only one?

3            MR. WEITZMAN:  Objection, your Honor.  He said he did

4    not speak to him about that.

5            MR. RICHENTHAL:  I can ask it another way.

6    Q.  Mr. Soliman, did you have conversations with Mr. Turner

7    about the process for selection of U.S. Attorney in general?

8    A.  Yes.

9    Q.  Did that conversation include the White House's request in

10   this memo that three candidates be put forth?

11           MR. WEITZMAN:  Objection.  Asked and answered.

12           THE COURT:  I'll allow it.

13   A.  Not that I recall.

14   Q.  Do you recall talking with Mr. Turner as to whether Senator

15   Menendez intended to recommend one person or more than one

16   person?

17   A.  It was always just one person.

18   Q.  At any point did Senator Menendez tell you that he intended

19   to recommend three?

20           MR. WEITZMAN:  Objection.  Asked and answered.

21           THE COURT:  I'll allow it.

22   A.  No.

23   Q.  At any point did Mr. Turner tell you that Senator Menendez

24   intended to recommend three?

25   A.  No.

O6iWmen2                        Soliman - Direct

1            MR. RICHENTHAL:  Now, I want to go back for a moment.

2   If you can go out, Ms. Wechsler, just go to the top of the

3   exchange.  Top, there.  Thank you.

4   Q.  This exchange is late January 2021, is that right,

5   Mr. Soliman?

6   A.  Yes.

7   Q.  And I've asked you about, a few questions about this memo

8   you were forwarded, is that right?

9   A.  Yes.

10  Q.  Do you recall lines in the memo about persons of different

11  backgrounds?

12  A.  Yes.

13            MR. RICHENTHAL:  Ms. Wechsler, can we go back to the

14  exhibit from a few minutes ago, A131, please.  And could we go

15  to the bottom.  The second page -- excuse me.

16            You can pause there.

17  Q.  Mr. Soliman, of the individuals listed here, including

18  Mr. Semper, was Ms. Suarez the only person of color?

19  A.  Yes.

20  Q.  I'm sorry.  Including Mr. Semper.

21  A.  Oh.  I'm sorry.  No.

22            MR. RICHENTHAL:  I'll ask it again.

23  Q.  Of the individuals listed here plus Mr. Semper, was

24  Ms. Suarez the only individual of color?

25  A.  No.

O6iWmen2                          Soliman - Direct

1          MR. RICHENTHAL:  We can take that down.

2     Q.  Now, we're in late January 2021.  At or around the same

3     approximate time period, did any negative press come out about

4     Ms. Suarez?

5     A.  Yes.

6     Q.  Now, just to be clear, sir, do you mean the articles we

7     talked about a few minutes ago or new articles?

8     A.  New articles.

9     Q.  Now, without commenting on whether you think the articles

10    were true or false, in sum, what did these articles generally

11    concern?

12    A.  Ms. Suarez's handling of the Katie Brennan case and a few

13    other things from her past as a prosecutor.

14    Q.  This is the same case you referred to earlier in your

15    testimony?

16    A.  Yes.

17    Q.  Did you send any of those negative articles to

18    Mr. Menendez?

19    A.  I did, yes.

20    Q.  Why did you send them to Mr. Menendez?

21    A.  So that he was aware of what was happening.

22    Q.  How did he respond generally to you sending those negative

23    articles?

24    A.  At some point he was frustrated, but generally he did not

25    respond.

1   Q.  Generally did not respond, meaning what?

2   A.  Meaning he didn't -- he generally did not respond to a

3   newspaper clip.

4   Q.  Now, during the course of this same time period -- so

5   January, February 2021 -- did you ever talk with Ms. Suarez

6   directly?

7   A.  Yes.

8   Q.  Did you inform Mr. Menendez you were going to do that?

9   A.  I mean he -- his -- his friend asked me to, so I assumed he

10  knew, but yes.

11  Q.  Well, let's take it one at a time.  You said his friend

12  asked you to.  Who?

13  A.  Donald.

14  Q.  Mr. Scarinci?

15  A.  Scarinci, yes.

16  Q.  Did you ever talk, inform Senator Menendez you were also

17  speaking --

18  A.  Yes.

19  Q.  -- or had spoken with Ms. Suarez?

20  A.  Yes.

21  Q.  What, if anything, did Mr. Menendez say in response to

22  learning that you were speaking directly to Ms. Suarez?

23  A.  He just wanted to be kept abreast of the situation.

24  Q.  What situation?

25  A.  How she was being received in the press, what reporters

1    were asking, etc.

2    Q.  What was your purpose of speaking directly with Ms. Suarez

3    in this time period?

4    A.  She was getting a lot of incoming inquiries from reporters.

5    She didn't know how to respond, and I was asked to get involved

6    to help her screen those, help advise her on how she should

7    respond, if at all.

8    Q.  Now, separate from news articles, did you hear from anyone

9    in the legal community about Ms. Suarez?

10    A.  Yes.

11    Q.  Did you share what you heard with Mr. Menendez?

12    A.  Yes.

13    Q.  What did you tell him?

14    A.  That a lot of people didn't think she was the right person

15    for the job.

16    Q.  How, if at all, did he react to that?

17    A.  He just took it in.

18    Q.  What do you mean by, he just took it in?

19    A.  It was unremarkable.  He didn't really react.

20            MR. RICHENTHAL:  Now, Ms. Wechsler, can you put up

21    Government Exhibit A130.

22            THE COURT:  Did you hear from anyone who said that

23    Suarez was the right person for the job?

24            THE WITNESS:  I don't remember that.

25            THE COURT:  All right.

O6iWmen2                         Soliman - Direct

1   BY MR. RICHENTHAL:

2   Q.  Mr. Soliman, do you now see what's been marked as

3   Government Exhibit A130?

4   A.  Yes.

5   Q.  What is this?

6   A.  It's an email from myself to Senator Menendez.

7   Q.  And directing your attention to the bottom half, what's in

8   the bottom half; that is, what are you forwarding on?

9   A.  It's an endorsement from a local women's organization in

10  Bergen County, endorsing Ms. Suarez for U.S. Attorney.

11  Q.  What's the date of this email?

12  A.  February 13, 2021.

13          MR. RICHENTHAL:  Could we go back up, please.

14  Q.  To whom did you forward this?

15  A.  To Senator Menendez and Fred Turner.

16  Q.  On what date?

17  A.  February 13, 2021.

18  Q.  Is that the same date as the article or endorsement?

19  A.  Yes.

20  Q.  Why did you forward this?

21  A.  Because I wanted them to be aware that there was a local

22  women's group that endorsed Esther Suarez.

23  Q.  Now, in earlier testimony you discussed advice you gave

24  Senator Menendez regarding Ms. Suarez.  Do you recall that?

25  A.  Yes.

1    Q.  Did your advice change in January and February of 2021?

2    A.  No.

3    Q.  Why not?

4    A.  Because the articles on her were just a continuation of

5    negative articles.  I mean --

6    Q.  Did this endorsement change your advice?

7    A.  No.

8    Q.  Why not?

9    A.  It was a drop in the bucket relative to the negative news

10   that we were getting on her.

11            MR. RICHENTHAL:  The government offers A130, not for

12   the truth.  I think it may not have been in already, your

13   Honor.

14            THE COURT:  Hearing no objection, admitted, but not

15   for the truth of what's set forth.

16            (Government Exhibit A130 received in evidence)

17   BY MR. RICHENTHAL:

18   Q.  Now, I asked you just now about the advice you gave Senator

19   Menendez.  Do you recall that?

20   A.  Yes.

21   Q.  Did you also give any advice to Mr. Turner regarding

22   Ms. Suarez?

23   A.  The same advice I gave Senator Menendez.

24   Q.  Which was what?

25   A.  Which was if you put her name forward, there's going to be

1   a lot of negative press around her.

2   Q.  Now, once the name -- let me back up.  You said put her

3   name forward?

4   A.  Meaning if Senator Menendez and Senator Booker put Esther

5   Suarez's name forward to the White House that the reaction from

6   the press would be negative.

7   Q.  How, if at all, did Mr. Turner react to you telling him

8   that?

9   A.  He didn't disagree.

10  Q.  Do you recall what he said?

11  A.  He said, I know, but this is what the senator wants.

12  Q.  Now, a few moments ago I think you mentioned Mr. Scarinci

13  as someone you'd spoken with --

14  A.  Yes.

15  Q.  -- do you recall that?

16  A.  Yes.

17  Q.  Did you continue to speak with him about Ms. Suarez in this

18  time period; that is, winter 2021?

19  A.  From time to time, yes.

20  Q.  Was that something you shared with Mr. Menendez?

21  A.  Probably -- not every specific occasion, but yes, I would

22  have shared that.

23  Q.  What did Mr. Scarinci say to you related to Ms. Suarez?

24  A.  He --

25          MR. WEITZMAN:  Objection.  Hearsay.

1          MR. RICHENTHAL:  The witness just testified he shared

2    it with Mr. Menendez.

3          MR. WEITZMAN:  He said not every time.

4          THE COURT:  Just a moment.

5          MR. RICHENTHAL:  I'm happy to back up.

6          THE COURT:  Go ahead.

7    BY MR. RICHENTHAL:

8    Q.  Mr. Soliman, you testified that you spoke with Mr. Menendez

9    about the fact that you were speaking with Mr. Scarinci about

10   Ms. Suarez.  Do you recall that?

11   A.  Yes.

12   Q.  What did you tell Mr. Menendez about what Mr. Scarinci had

13   said to you?

14   A.  I don't remember.

15   Q.  Do you remember the subject matter, not necessarily the

16   details, that you spoke to Mr. Scarinci about?

17   A.  It would have been the -- yeah, it was the negative

18   articles.

19   Q.  And do you recall Mr. Menendez's reaction in learning that

20   you'd spoken to Mr. Scarinci about the negative articles?

21   A.  No.

22         MR. RICHENTHAL:  I want to go forward a bit.

23   Ms. Wechsler, go to A113-PH6.

24   Q.  So, first, Mr. Soliman, what date is this exchange?

25   A.  February 24, 2021.

1    Q.  So about a month after the prior text messages that I

2    showed you?

3    A.  That's correct.

4    Q.  Do you see where it says:  "Hello.  This is from Esther's

5    husband"?

6    A.  Yes.

7    Q.  And then there's a long quote?

8    A.  Yes.

9    Q.  Without necessarily reading all of this, what, in sum, were

10   you sharing here?

11   A.  So, Tom Moran, who was the editorial page editor of the

12   Star-Ledger in New Jersey, was making calls to different

13   people.  Esther's husband got wind of it.  He sent me that text

14   message that I shared with the senator, and these were the

15   three points that Tom was asking about.

16   Q.  If you look at the third point, it says:  "Attorneys

17   throughout the state don't like Esther Suarez (obviously

18   without mentioning any names)."  Do you see that?

19   A.  Yes.

20           MR. RICHENTHAL:  Could we go now to the next part of

21   the exchange.

22           OK.  Stop there.

23   Q.  To whom did you send that quoted material?

24   A.  The senator.

25   Q.  How did he respond?

1    A.  He said OK.

2    Q.  Now, did you respond in turn; that is, did the exchange

3    continue?

4    A.  Yes.

5    Q.  I'll read what you wrote:  "What do you think of Esther's

6    lawyer sending a letter to the Star-Ledger laying out all the

7    facts of what actually happened in that Katie Brennan case to

8    show that if Tom Moran writes something he's hurting her

9    career?  The letter's already done.  I think it's a good idea

10   because if it gives them pause, that buys us time, which is

11   helpful.  Thoughts?"

12        Do you see that?

13   A.  Yes.

14   Q.  What were you explaining here?

15   A.  Esther -- Esther and/or -- Ms. Suarez and/or her husband

16   had the idea of having their lawyer send the letter to the

17   Star-Ledger, specifically to Mr. Moran, so that they can share

18   with him details of her investigation.  And the idea was to buy

19   time before he writes negative articles about her or columns

20   about her.

21   Q.  Why did you want to buy time?

22   A.  It was my job to protect the senator, so I just cared about

23   his optics.  And so if there was a negative article about a

24   name that he was putting forward, I wanted to stop that.

25   Q.  How did the senator respond?

O6iWmen2                          Soliman - Direct

1    A.  Get me a copy of the letter.

2    Q.  Now, I think that I'd asked you, the date of this was about

3    a month after the text exchange I showed you before.  Is that

4    right?

5    A.  Yes.

6    Q.  So February 24, 2021?

7    A.  Yes.

8    Q.  At this time, who did you understand he intended to

9    recommend as U.S. Attorney?

10   A.  Esther Suarez.

11           THE COURT:  Why don't you find a logical time to break

12   for lunch, sir.

13           MR. RICHENTHAL:  I'm almost there, your Honor.

14           THE COURT:  Yes.

15           MR. RICHENTHAL:  If I could do one more, your Honor.

16           THE COURT:  Yes.

17           MR. RICHENTHAL:  Ms. Wechsler, can we look at A129.

18   Actually, before we go there -- I'm sorry.  Just very quickly.

19   Q.  Mr. Soliman, you testified that over this period of time

20   there were negative articles about Ms. Suarez, is that right?

21   A.  Yes.

22   Q.  And there were also negative comments about Ms. Suarez, is

23   that right?

24   A.  Yes.

25   Q.  Did the negative articles continue?

O6iWmen2                          Soliman - Direct

1    A.  Yes.

2    Q.  Once or more than once?

3    A.  More than once.

4           MR. RICHENTHAL:  Ms. Wechsler, go to A129.

5    Q.  Directing your attention now to the bottom --

6    A.  OK.

7    Q.  So we're now on March 28, 2021.  Do you see that?

8    A.  Yes.

9    Q.  Is this about a month after the prior text exchange I just

10   showed you?

11   A.  Yes.

12   Q.  Now we're in late March, is that right?

13   A.  That's correct.

14   Q.  In short, what's at the bottom of this email?

15   A.  It's another column by Mr. Moran going after Ms. Suarez.

16   Q.  What do you mean by going after?

17   A.  Writing -- he wrote an opinion column, one of several, as

18   to why she wasn't the right pick for U.S. Attorney.

19          MR. RICHENTHAL:  Your Honor, I can't recall if I did

20   this earlier, so just in abundance of caution, the government

21   offers A129.

22          THE COURT:  Hearing no objection, A129 admitted.

23          MR. WEITZMAN:  Not for the truth, of course.

24          THE COURT:  Not for the truth.

25          (Government Exhibit A129 received in evidence)

1          MR. RICHENTHAL:  Ms. Wechsler, can you put this up on

2     the jury's screen.

3     Q.  My apologies, Mr. Soliman.  Can I ask you just to repeat

4     what you just said about what's on the bottom.

5     A.  Sure.  I was forwarding him an article.  It was a column by

6     Mr. Moran, a negative column about Esther Suarez.  And that's

7     it.

8          MR. RICHENTHAL:  Can we go up.

9     Q.  You said forwarding him.  Who is him?

10    A.  Senator Menendez.

11    Q.  How did he respond?

12    A.  He said:  "It can't get worse, or can it?  If he's right,

13    then she hasn't been forthcoming."

14    Q.  What did you understand him to be saying?

15    A.  That he was referencing a conversation that must have taken

16    place at some point.

17    Q.  And how did you respond?

18    A.  I said:  "I'm going to have a very honest conversation with

19    her and Keith today, and if it can't go worse, then I think we

20    move forward on the other thing."

21    Q.  First, who was Keith?

22    A.  Keith Furlong was Esther Suarez's husband.

23    Q.  Is this the same individual you mentioned, I think, an

24    exhibit or two ago that you sent on some information from?

25    A.  That's correct.

1  Q.  What is, quote, the other thing?

2  A.  I don't know.  Probable -- I don't -- I don't know exactly.

3          MR. RICHENTHAL:  Your Honor, it's 1:05.  I'm happy to

4  do one more, or we can break for lunch.

5          THE COURT:  Why don't we break for lunch.

6          Ladies and gentlemen, I'll see you at 2 o'clock.

7  Remember to keep an open mind.  Remember not to discuss this

8  case with anyone, including among yourselves.

9          (Jury not present)

10         THE COURT:  You may step down, sir.  2 o'clock.  Thank

11 you.

12         (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6i5men3                        Soliman - Direct

1                      A F T E R N O O N   S E S S I O N

2                                 2:05 p.m.

3               THE COURT:  The jury is all here.

4               How much longer do you think you have, Mr. Richenthal?

5               MR. RICHENTHAL:  Probably under a half hour, if that.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.  You

3    may continue, Mr. Richenthal, with your direct examination of

4    Mr. Soliman.

5    BY MR. RICHENTHAL:

6    Q.  Welcome back, Mr. Soliman.

7    A.  Thank you.

8    Q.  I think that when we broke I had shown you an exhibit in

9    approximately late March of 2021.  Just to step back for a

10   moment, in that approximate time period, from February to March

11   in February 2021, did Mr. Menendez in fact recommend someone to

12   the White House to be nominated as United States Attorney for

13   New Jersey?

14   A.  Yes.

15   Q.  Who?

16   A.  Esther Suarez.

17   Q.  Now, before the break I believe you testified that negative

18   articles were a drop in the bucket.  Do you recall saying that?

19   A.  Yes.

20   Q.  Did that continue, those negative articles?

21          THE COURT:  Did you say negative articles were a drop

22   in the bucket?

23          MR. RICHENTHAL:  I said I believe Mr. Soliman

24   testified to that and I asked him whether he had said that.

25          THE COURT:  All right.

1    Q.  Let me go back.  Mr. Soliman, before the break, did you

2    testify that negative articles in the winter of 2021 were a

3    drop in the bucket?

4            MR. WEITZMAN:  Objection.

5            MR. RICHENTHAL:  I can ask it a different way.

6            THE COURT:  Go ahead.

7    BY MR. RICHENTHAL:

8    Q.  Mr. Soliman, in the winter of 2021, were there negative

9    articles about Ms. Suarez?

10   A.  Yes.

11   Q.  Did that continue?

12   A.  Yes.

13   Q.  Did it continue into spring of 2021?

14   A.  Yes.

15   Q.  Is that something you talked to Mr. Turner about?

16   A.  Yes.

17   Q.  Is that something you talked to Mr. Menendez about?

18   A.  Yes.

19           THE COURT:  Slow down, sir.  The interpreters have

20   trouble keeping up.

21           MR. RICHENTHAL:  I apologize.

22   Q.  Did you and Mr. Turner talk generally about the

23   recommendation for Ms. Suarez for U.S. Attorney?

24   A.  Yes.

25   Q.  What did you say to each other in this time period, spring

O6i5men3                          Soliman - Direct

1   of 2021?

2   A.  I think like any top advisors to a U.S. senator, we were

3   frustrated and we didn't like the negative press that he was

4   receiving as a result of Ms. Suarez' name being out there.  We

5   wanted to stop the bleeding, we wanted to mitigate it, and so

6   we were sharing frustration.

7   Q.  You just used the phrase "stop the bleeding."  What did you

8   mean by that?

9   A.  Stop the negative press around her and how the senator's

10  name was injected into that.

11  Q.  What, if anything, did you do to try to stop the bleeding?

12  A.  Can you ask that a different way or more specific?

13  Q.  Sure.  What steps, it any, did you take to try to

14  ameliorate the negative press you just referred to?

15  A.  We talked to reporters, helped coach Ms. Suarez on how she

16  answers or doesn't answer reporters, and so on.

17          MR. RICHENTHAL:  Now, Ms. Wechsler, can you put up

18  what is in evidence Government Exhibit A113-PH7.

19  Q.  Mr. Soliman, is that on your green?

20  A.  Yes.

21  Q.  This is an exchange, April 20, 2021?

22  A.  Yes.

23  Q.  Roughly three weeks or so after the last exhibit I showed

24  you?

25  A.  That's correct.

O6i5men3                         Soliman - Direct

1   Q.  Now, again, sir, are you the off-white or the blue?

2   A.  I am the off-white.

3   Q.  So reading the top:  Hi.  Just heads up from Esther Suarez

4   that she released the OPRA request yesterday to northjersey.com

5   regarding those e-mails she sent to herself and also apparently

6   her husband was cc'd Keith Furlong.  If I'm the reporter, I'd

7   probably do a story about why is her husband getting that info

8   and then presumably leaking it, but not sure how much more than

9   can say.

10       Do you see that?

11  A.  Yes.

12  Q.  What were you saying here, Mr. Soliman?

13  A.  She received OPRA requests from northjersey.com, which is a

14  media outlet in North Jersey, and she released the e-mails that

15  the publication was requesting and she cc'd her husband, who is

16  not part of her prosecutor staff, and so I thought optically

17  that looked bad.

18  Q.  I'm sorry.  I think you said OPRA requests?

19  A.  Yes.

20  Q.  What is an OPRA request?

21  A.  It is basically a mechanism by which you can request from a

22  government entity like a town hall or prosecutor's office any

23  information that has specific words or subjects.

24       THE COURT:  Is it like a freedom of information

25  request?

O6i5men3                      Soliman - Direct

1              THE WITNESS:  I believe so, yes.

2    Q.  How did Mr. Menendez respond?

3    A.  "I can't believe she included her husband!"

4    Q.  And then you wrote:  I know.  Sloppy.  Hopefully nothing

5    more after this.

6    A.  Yes.

7    Q.  What did you mean by:  Hopefully nothing more after this?

8    A.  This was after a series of negative articles so hopefully

9    that was it, there was nothing more to come.

10   Q.  Are those the negative articles you testified about before

11   the lunch break?

12   A.  Yes.

13   Q.  And that you testified about a minute ago that had

14   continued?

15   A.  Yes.  That's correct.

16   Q.  Now Senator Menendez responded:  I won't hold my breath.

17           To which you said:  Do you think she is still OK on WH

18   front?

19   A.  Correct.

20   Q.  What is WH front?

21   A.  The White House.

22   Q.  What did you mean by that?

23   A.  Given all the negative news articles that were coming out

24   around Ms. Suarez, was the White House going to look favorably

25   upon her name.

1    Q.   Now, Ms. Wechsler, could you continue with the exhibit and

2    go down a little further?  Do you see Senator Menendez's

3    response there, Mr. Soliman?

4    A.   Yes.

5    Q.   "Don't know, but I'm trying to find out.  Also beginning

6    plan B just in case."

7         Do you see that?

8    A.   Yes.

9    Q.   What did you understand "plan B" to refer to?

10   A.   That he was going to come up with a new name.

11   Q.   A new name for what, Mr. Soliman?

12   A.   For U.S. Attorney.

13             MR. RICHENTHAL:  Now let's continue, if we could, Ms.

14   Wechsler.  Stop there.  Thank you.

15   Q.   You responded:  Got it.

16         And now you said:  Curious, and you refer to another

17   person.

18         Do you see that?

19   A.   Yes.

20   Q.   Who was that person?

21   A.   Henry Klingeman.

22   Q.   Who is Mr. Klingeman?

23   A.   He is an attorney in New Jersey.

24   Q.   Do you now see Senator Menendez' response?

25   A.   Yes.

1    Q.  I will read it:  I called him and told him that the White

2    House was not going to proceed with him, that I had spent

3    months trying and we were unsuccessful.

4         Let me just pause there.  What did you understand

5    Mr. Menendez to be saying here?

6    A.  That he called Mr. Klingeman to let him know that he wasn't

7    going to be the U.S. Attorney, that he had tried with the White

8    House and that they were not going to move forward with his

9    name.

10    Q.  Was that true, Mr. Soliman?

11              MR. WEITZMAN:  Objection, your Honor.

12              MR. RICHENTHAL:  I will be more precise.

13    Q.  Based upon your conversation with Mr. Menendez, had

14    Mr. Klingeman in fact been recommended by Mr. Menendez to be

15    U.S. Attorney?

16              MR. WEITZMAN:  Objection.  That's not what the --

17              THE COURT:  It is a separate question.  I will allow

18    it.

19    BY MR. RICHENTHAL:

20    Q.  Mr. Soliman, based on your conversations with Mr. Menendez,

21    had Mr. Menendez recommended Mr. Klingeman to be U.S. Attorney?

22    A.  No.

23    Q.  Had Mr. Menendez spent "months trying"?

24    A.  No.

25    Q.  Had Mr. Klingeman been recommended to the White House and

1    was that in fact unsuccessful?

2              MR. WEITZMAN:  Objection.  Foundation.

3              MR. RICHENTHAL:  Happy to lay foundation.

4              THE COURT:  Go ahead.

5    BY MR. RICHENTHAL:

6    Q.  Mr. Soliman, in this time period, did you talk with

7    Mr. Menendez about who he had recommended to serve as U.S.

8    Attorney?

9    A.  From time to time, yes.

10   Q.  Did you talk with him about other people who had expressed

11   an interest in being U.S. Attorney?

12   A.  Yes.

13   Q.  Did you come to an understanding as to who he had

14   recommended to be U.S. Attorney?

15   A.  Yes.

16   Q.  Did you come to an understanding about who he had not

17   recommended to be U.S. Attorney?

18   A.  Yes.

19   Q.  Did you understand that he had recommended Mr. Klingeman to

20   the White House?

21   A.  No.

22   Q.  Did you understand that he had spent months trying to

23   support Mr. Klingeman?

24   A.  No.

25   Q.  Now, earlier in this text message at the top Mr. Menendez

1    said:  Also beginning plan B, just in case.

2              Do you see that?

3    A.  Yes.

4    Q.  On April 20, 2021, did there come a time when Mr. Menendez

5    turned to plan B?

6    A.  If plan B means another person, then yes.

7    Q.  Who did he turn to?

8    A.  Mr. Sellinger.

9    Q.  Prior to turning to Mr. Sellinger, what did you understand

10   had occurred with respect to Ms. Suarez' potential nomination?

11   A.  That Senator Menendez put her name forward to the White

12   House, that the White House interviewed her, rejected her,

13   Senator Menendez went back, asked for a second interview, but I

14   don't believe the White House granted one?

15             THE COURT:  You said he asked for a second interview,

16   who did he ask -- I take it a second interview of Ms. Suarez?

17             THE WITNESS:  Of Ms. Suarez by the White House.

18             THE COURT:  OK.  Thank you.

19   Q.  I think you just said that Mr. Sellinger ended up being

20   plan B; is that right?

21   A.  Yes.

22   Q.  Now, in 2021, spring 2021, to be precise, did you have the

23   opportunity to discuss the U.S. Attorney position with

24   Mr. Sellinger?

25   A.  At some point in the spring or summer, yes.

O6i5men3                        Soliman - Direct

1    Q.  Just to pause and ask you one background question.  Are you
2    a lawyer, Mr. Soliman?
3    A.  No.
4    Q.  Did you have an understanding at the time, at least in
5    general, about what the word "recusal" meant?
6    A.  Yes.
7    Q.  In the context of a federal position?
8    A.  I mean, a layman's interpretation, yes.
9    Q.  What was your interpretation, what was your understanding
10   at the time?
11              MR. WEITZMAN:  Objection.
12              THE COURT:  I will allow his view of what the word
13   "recusal" means.
14   Q.  Mr. Soliman, in spring 2021 or summer 2021, what did you
15   understand the word "recusal" meant?
16   A.  To insulate yourself from subject matter.
17   Q.  Did there come a time, in that time period, when you spoke
18   about potential recusal with Mr. Sellinger?
19   A.  Yes.
20   Q.  What did you talk with him about?
21   A.  We spoke by phone.  He told me that he was trying to reach
22   the senator, that he could not reach the senator.  He wanted me
23   to let the senator know that he checked with Main Justice and
24   that in fact he did not have to recuse himself from an issue.
25   Q.  Let me pause for one second.  What did you understand the

O6i5men3                        Soliman - Direct

1    bottom line to be from this conversation with Mr. Sellinger as

2    to whether he was going to recuse himself?

3              MR. WEITZMAN:  Objection, your Honor.

4              THE COURT:  I will allow it.

5    A.  That he did not have to recuse himself.

6    Q.  Did you share that understanding of your conversation with

7    anyone, Mr. Soliman?

8    A.  Yes.

9    Q.  With whom did you share it?

10   A.  With the senator.

11   Q.  Senator Menendez?

12   A.  Yes.

13   Q.  What did you tell Senator Menendez about the conversation

14   with Mr. Sellinger?

15   A.  I told him that Mr. Sellinger said he was having a

16   difficult time reaching him and that the issue -- he wanted to

17   let him know that the issue that he thought he had to recuse

18   himself from, that he checked with Main Justice and that, in

19   fact, he did not have to recuse himself from it.

20             THE COURT:  When was this, sir, approximately?

21             THE WITNESS:  It was in the spring or summer of 2021.

22             THE COURT:  Thank you.

23             THE WITNESS:  Sure.

24   BY MR. RICHENTHAL:

25   Q.  Mr. Soliman, you just used the words "the issue"?

1    A.  Yes.

2    Q.  Do you recall saying that?

3    A.  Yes.

4    Q.  At the time when you had this conversation with

5    Mr. Sellinger and then Mr. Menendez, did you know what case or

6    cases Mr. Soliman was talking about?

7    A.  No.

8    Q.  Did you come to an understanding later, based on

9    conversations with Mr. Menendez, about what case or cases

10   Mr. Sellinger was talking about?

11   A.  Yes.

12   Q.  What case or cases?

13           MR. WEITZMAN:  Objection.  Time frame.

14           THE COURT:  Yes.

15   Q.  Subsequent to your conversation with Mr. Sellinger in

16   spring or summer of 2021, did you talk with Mr. Menendez about

17   the issue of potential recusal of Mr. Sellinger?

18   A.  Yes.

19   Q.  Approximately when was the second conversation, that is --

20   let me back up.

21       You conveyed to Mr. Menendez your conversation with

22   Mr. Sellinger?

23   A.  Yes.

24   Q.  In or before spring or summer 2021?

25   A.  Yes.

1   Q.  At the time, did you know what case Mr. Sellinger was

2   talking about?

3   A.  No.

4   Q.  Did you later come to an understanding?

5   A.  Yes.

6   Q.  Was that based on an understanding -- excuse me.

7       Was that understanding based on another conversation you

8   had with Mr. Menendez?

9   A.  Yes.

10  Q.  That second conversation, approximately when did it take

11  place?

12  A.  January of 2022.

13  Q.  Based on that second --

14          THE COURT:  I'm sorry.  January of 2022?

15          THE WITNESS:  Yes.

16          THE COURT:  OK.

17          THE WITNESS:  Correct.

18  Q.  Based on that second conversation, what matter did you

19  understand Mr. Sellinger had been talking about?

20          MR. WEITZMAN:  Objection, your Honor.  He can't

21  testify to what Mr. Sellinger had been talking about.

22          THE COURT:  No, he is testifying to his understanding.

23  I will allow that.

24  Q.  Mr. Soliman --

25  A.  Yes.

1    Q.    -- based on your second conversation with Senator

2    Menendez, what case did you understand Mr. Sellinger had been

3    talking about?

4    A.    The Daibes case.

5    Q.    What did you understand the Daibes case was?

6    A.    It regarded bank fraud.

7    Q.    Was it a criminal case, sir?

8    A.    Yes.

9    Q.    Now, to go back in time for a second, when you conveyed to

10   Mr. Menendez the conversation you had with Mr. Sellinger in

11   spring or summer of 2021, did Mr. Menendez express any

12   confusion about what Mr. Sellinger had been referring to?

13   A.    Can you give me the time frame again?  I'm sorry.

14   Q.    Mr. Sellinger and you had a conversation in spring or

15   summer of 2021?

16   A.    Right.

17   Q.    You then conveyed your understanding of that conversation

18   with Senator Menendez.  When you conveyed that understanding,

19   that is, that Mr. Sellinger did not have to recuse, did Senator

20   Menendez express any confusion to you?

21   A.    No.

22   Q.    Did he seem to not understand what Mr. Sellinger was

23   talking about?

24               MR. WEITZMAN:  Objection.

25               THE COURT:  Sustained.

1   Q.  What was his demeanor in the conversation?

2           MR. WEITZMAN:  Objection.

3           THE COURT:  Was this a telephone conversation or in

4   person?  If you know.

5           THE WITNESS:  I don't remember.

6   Q.  Withdrawn.

7       What was his tone in the conversation?

8   A.  It was unremarkable.

9   Q.  Did he express any confusion to you about what you were

10  saying to him?

11  A.  No.

12  Q.  Did he ask any questions?

13  A.  No.

14          MR. RICHENTHAL:  Ms. Wechsler, can you put on the

15  screen A113-PH8?  And when I say the screen for everyone,

16  please, it is in evidence.

17  Q.  Mr. Soliman, is that on your screen?

18  A.  Yes.

19  Q.  This is dated May 2, 2021; is that right?

20  A.  That's correct.

21  Q.  Do you see the second message here that is beginning:

22  Thanks?

23  A.  Yes.

24  Q.  And is that you or Senator Menendez?  That is the

25  off-white?

1    A.  The off-white is me, sorry.

2    Q.  You wrote:  Thanks.  Also, I think if you call Sellinger,

3    you will be comfortable with what he says.

4            Do you see that?

5    A.  Yes.

6    Q.  How did Senator Menendez respond?

7    A.  "OK.  We'll talk."

8    Q.  How did you respond?

9    A.  *Thumbs up.*

10   Q.  When you referred here to "Sellinger," was that Philip

11   Sellinger?

12   A.  Yes.

13   Q.  And when you wrote:  If you call Sellinger, you will be

14   comfortable with what he says.  To the best of your

15   recollection, what were you referring to?

16   A.  I mean, this was on the heels of the Esther Suarez negative

17   news event so either it could have been that the senator wanted

18   me to make sure that Mr. Sellinger didn't have anything

19   negative in his history and to have that conversation with him

20   or it was the message Mr. Sellinger relayed to me about the

21   recusal.

22           MR. WEITZMAN:  Objection, your Honor.  Move to strike.

23   He doesn't recall.

24           THE COURT:  Request denied.

25   Q.  Mr. Soliman, regardless of whether this message --

1          THE COURT:  You don't know which it was, one or the

2   other?

3          THE WITNESS:  Correct.

4          THE COURT:  It was one or the other.

5          THE WITNESS:  That's correct.

6   BY MR. RICHENTHAL:

7   Q.  Could it also have been both?

8          MR. WEITZMAN:  Objection, your Honor.  Leading?

9   Q.  Was it necessarily one or the other or could it have been

10  both?

11         MR. WEITZMAN:  Objection, your Honor; leading.

12         THE COURT:  No.  That's all right.

13  A.  It could have been both.

14  Q.  Now, regardless of what you were referring to in this text

15  message, do you recall informing Senator Menendez about your

16  conversation with Mr. Sellinger in spring or summer of 2021?

17  A.  Yes.

18  Q.  Did Mr. Menendez, thereafter, recommend someone for the

19  position of the U.S. Attorney for New Jersey?

20  A.  Yes.

21  Q.  Who did he recommend after that conversation?

22  A.  Mr. Sellinger.

23  Q.  Was Mr. Sellinger in fact thereafter nominated by the

24  president?

25  A.  Yes.

1    Q.  Was he confirmed?

2    A.  Yes.

3    Q.  Did he take office?

4    A.  Yes.

5    Q.  Approximately when, if you recall, did he take office?

6    A.  December of 2021.

7    Q.  Now, directing your attention to that time period, in other

8    words after Mr. Sellinger took office, did you have an

9    opportunity to speak again with Mr. Menendez about

10   Mr. Sellinger?

11   A.  Yes.

12   Q.  What, if anything, did Mr. Menendez ask you to do with

13   respect to Mr. Sellinger?

14   A.  He said to me that the issue that Mr. Sellinger said he did

15   not have to recuse himself from, that in fact he recused

16   himself from it and he wanted to understand why, so he wanted

17   me to call him and ask him why.

18   Q.  Senator Menendez wanted you to call Mr. Sellinger?

19   A.  Yes.

20   Q.  I think you again used the phrase "the issue."

21   A.  Yes.

22   Q.  What was the issue?

23   A.  The Daibes matter.

24   Q.  Approximately when did this conversation take place,

25   Mr. Soliman?

1    A.   January of 2022?

2    Q.   To the best of your recollection, did this conversation

3    occur in person or on the phone?

4    A.   I don't remember.

5              THE COURT:  You are talking about the conversation

6    with Mr. Menendez?

7              MR. RICHENTHAL:  Yes, your Honor.

8              THE COURT:  All right.

9    Q.   What was your principal means of communication between you

10   and Mr. Menendez in that approximate time period, that is,

11   January 2022?

12   A.   Text messaging, sometimes phone calls.

13   Q.   You say phone calls.  Are you referring to the same

14   application you testified about before lunch, that is Signal,

15   or some other one?

16   A.    It would be Signal if it was convenient or regular -- a

17   regular phone call.

18             THE COURT:  I take it Signal, based on what you said,

19   I take it Signal is simply the normal way of communicating with

20   the office of Senator Menendez; is that correct?

21             THE WITNESS:  Yes.

22             THE COURT:  OK.

23   Q.   You testified about Mr. Menendez asking you to contact

24   Mr. Sellinger.  How did Mr. Menendez sound when he made that

25   request to you?

O6i5men3                         Soliman - Direct

1          MR. WEITZMAN:  Objection.

2          THE COURT:  Sustained.

3   Q.  What was his demeanor when he made that request?

4          MR. WEITZMAN:  Objection.  He hasn't said whether --

5          THE COURT:  Let's establish.  Was it in person?

6   Telephone call?

7   Q.  Do you recall, Mr. Soliman, whether it was in person or a

8   telephone call?

9   A.  I don't recall.

10  Q.  Forget demeanor.  What was his tone when he said this to

11  you?

12  A.  Inquisitive, confused.

13  Q.  Did you in fact call Mr. Sellinger, as Mr. Menendez asked

14  you to do?

15  A.  I did not.

16  Q.  Did you tell Mr. Menendez you called Mr. Sellinger?

17  A.  Yes.

18  Q.  What did you tell him?

19  A.  I told him that I tried Mr. Sellinger and that he didn't

20  call me back.

21  Q.  Was that true?

22  A.  No.

23  Q.  In the course of your work for Mr. Menendez, had you ever

24  previously told him you did something for him that you did not

25  in fact to do?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    A.  No.

2    Q.  Now, going forward a bit, directing your attention to

3    March 2022, so approximately two months later, did there come a

4    time when you and Mr. Menendez again discussed the Daibes

5    matter?

6    A.  Yes.

7    Q.  How did that come back?

8    A.  I had called Mr. Sellinger proactively on a different

9    issue, and within the course of that conversation we both

10   accepted we hadn't seen each other, it was a little bit after

11   the pandemic but he was still being careful, as was I, and we

12   said why don't we have lunch we set up a date.  And I let the

13   senator know that I was having lunch with Mr. Sellinger.

14   Q.  Why did you let the senator know you were having lunch with

15   Mr. Sellinger?

16   A.  I had a relationship with him, I knew Mr. Sellinger through

17   the senator, and often times if I met with high-ranking

18   officials in the state I would let him know.

19   Q.  In that conversation with Mr. Menendez what, if anything,

20   did he say about the Daibes matter?

21   A.  He said that he wanted me to speak with Mr. Sellinger about

22   it.

23   Q.  What, if anything, did he say he wanted you to tell

24   Mr. Sellinger about it?

25   A.  He said that he wanted Mr. Sellinger to give Mr. Daibes all

1    due process.

2    Q.  What, if anything, did he say about the U.S. Attorney's

3    handling at the time of the Daibes matter?

4    A.  That they were being unresponsive to Mr. Daibes' counsel.

5    Q.  How did Senator Menendez say this to you?

6              MR. WEITZMAN:  Objection.  Vague.

7              THE COURT:  Sustained.

8    Q.  What was Mr. Menendez' tone in saying this to you?

9    A.  Frustrated.

10   Q.  Just to be clear, sir, frustrated with you or frustrated

11   with the U.S. Attorney's office?

12   A.  With the U.S. Attorney's office.

13   Q.  In your conversation, did you understand him to want the

14   Daibes matter to be handled as it had been handled or a

15   different way?

16             MR. WEITZMAN:  Objection.

17             THE COURT:  Sustained.

18   Q.  What did you understand Mr. Menendez to want to occur with

19   respect to the Daibes matter?

20             MR. WEITZMAN:  Objection.

21             THE COURT:  I will allow it.  If anything.

22   Q.  If anything?

23   A.  Can you ask the question again?

24   Q.  Based on your conversation and Mr. Menendez' request to

25   you, what did you understand him to want to occur, if anything,

1    with respect to the Daibes matter?

2             MR. WEITZMAN:  Objection.  Your Honor, the words speak

3    for themselves.  This is improper opinion.

4             THE COURT:  I will allow his understanding.

5             You may answer, sir, if you had an understanding.

6             THE WITNESS:  That it was treated with all due

7    process.

8    BY MR. RICHENTHAL:

9    Q.  Did you understand Mr. Menendez to be happy, unhappy, or

10   something else, with how it had been treated, to date?

11            MR. WEITZMAN:  Objection.

12            THE COURT:  Sustained.  He has testified already on

13   that.

14   Q.  Prior to this lunch, did Mr. Menendez ever ask you to bring

15   up a particular criminal matter with a prosecutor before?

16   A.  I don't recall him asking me, no.

17   Q.  After this lunch, did Mr. Menendez ever ask you to bring up

18   a particular criminal matter with a prosecutor before?

19   A.  No.

20   Q.  Prior to this lunch, did Mr. Menendez ever complain to you

21   about any handling of a case in the U.S. Attorney's office

22   other than the Daibes matter?

23   A.  No.

24   Q.  After this lunch, did Mr. Menendez ever complain to you

25   about the handling of a case by the U.S. Attorney's office

 1  other than the Daibes matter?

 2  A.  No.

 3  Q.  Did the lunch occur?

 4  A.  Yes.

 5  Q.  Now, during the lunch what, if anything, did Mr. Sellinger

 6  say about reporting obligations he understood he might have

 7  had?

 8  A.  As soon as we sat down he said before we have lunch, I just

 9  want you to know that because you -- something along the lines

10  of because you are affiliated with a member of Congress, if you

11  bring up any case that's before my office, I have to report

12  that to DOJ.

13  Q.  By "DOJ" did you understand to mean the Department of

14  Justice?

15  A.  Yes.

16  Q.  Did you in fact raise the Daibes matter with Mr. Sellinger

17  during the lunch?

18  A.  I did not.

19  Q.  After the lunch, did you talk to Mr. Menendez about the

20  lunch?

21  A.  Yes.

22  Q.  What, if anything, did you say to Mr. Menendez about

23  whether you had raised the Daibes matter?

24  A.  I told him that we, as we were sitting down, before we even

25  began to speak, Mr. Sellinger said that if I bring up any case

O6i5men3                         Soliman - Direct

1   before his office, because of my relationship with a member of

2   Congress, that he would have to report it to the Department of

3   Justice.

4   Q.  What, if anything, did Mr. Menendez say in response?

5   A.  He said, OK, and I'm sorry you had to go through that.

6   Q.  By this time, for approximately how long had you known

7   Robert Menendez?

8   A.  About 15 years.

9   Q.  In that time period had he ever apologized to you before?

10          MR. WEITZMAN:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  How common or uncommon was it for Mr. Menendez to apologize

13  to you --

14          MR. WEITZMAN:  Objection.

15  Q.  Let me finish the question.  How common or uncommon was it

16  for Mr. Menendez to apologize to you for things you were doing

17  on his behalf.

18          MR. WEITZMAN:  Objection.

19          THE COURT:  Sustained.

20  Q.  After this lunch, did Mr. Sellinger have an investiture

21  ceremony?

22  A.  Yes.

23  Q.  Did you provide any advice to Mr. Menendez about whether he

24  should attend the ceremony?

25  A.  Yes.

1   Q.  What advice did you give him?

2   A.  I told him he should go to the investiture.

3   Q.  What, if anything, did you explain about why you thought he

4   should go to the investiture?

5   A.  Just that the optics were that Sellinger was his choice and

6   that I thought it would be a good event for him to show a face

7   in and, you know, be seen by everyone who was in attendance.

8   Q.  Did he go to the investiture ceremony?

9   A.  No.

10  Q.  Now, up until this point, other than the Daibes matter, had

11  Mr. Menendez ever expressed any concern to you about the

12  performance of the U.S. Attorney's office?

13  A.  No.

14  Q.  Had he ever expressed any concern to you, other than the

15  Daibes matter, about Mr. Sellinger?

16  A.  Not that I remember.

17  Q.  I think you said that in the conversation you had with him

18  he was confused or frustrated.  Do you recall saying that?

19  A.  Yes.

20  Q.  Other than confusion or frustration about the Daibes

21  matter, had he ever expressed frustration to you about the U.S.

22  Attorney's office in the District of New Jersey in this time?

23          MR. WEITZMAN:  Objection.  Time frame.

24          THE COURT:  Yes, I think that's correct.

25  Q.  Subsequent to Mr. Sellinger taking office, other than the

1    Daibes matter, had Mr. Menendez ever expressed frustration to

2    you about Mr. Sellinger?

3    A.   I don't remember him doing so.

4                MR. RICHENTHAL:  No further questions.

5                THE COURT:  Thank you.

6                Cross-examination, Mr. Weitzman.

7                MR. WEITZMAN:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. WEITZMAN:

10   Q.   Good afternoon, Mr. Soliman.  You have known Senator

11   Menendez a long time, correct?

12   A.   Yes.

13   Q.   Since 2007?

14   A.   That's correct.

15   Q.   You two have had a friendly and professional relationship?

16   A.   Yes.

17   Q.   He calls you every year on your birthday, right?

18   A.   Yes.

19   Q.   He sings to you *Happy Birthday*, right?

20   A.   Yes.

21   Q.   You attended his wedding?

22   A.   Yes.

23   Q.   There was a COVID era wedding, right?  Small?  Intimate?

24   A.   Yes.

25   Q.   Approximately 60, 80 people; right?

O6i5men3                          Soliman - Cross

1    A.   That's correct.

2    Q.   You were on his list of his closest friends to attend that

3    wedding; right?

4    A.   Correct.

5    Q.   And that was in October 2020; right?

6    A.   Yes.

7    Q.   It was before the 2020 election which was in November?

8    A.   Yes.

9    Q.   So before anybody knew that President Biden would win;

10   right?

11   A.   Yes.

12   Q.   And before Senator Menendez knew whether he had an

13   opportunity to recommend a U.S. Attorney for New Jersey; right?

14          MR. RICHENTHAL:  Objection.

15          THE COURT:  You may answer.

16   A.   Yes.

17   Q.   While at the wedding you saw Mr. Sellinger?  Do you recall

18   that?

19   A.   I do, yes.

20   Q.   And do you recall that you saw Fred Daibes too, right?

21   A.   Yes.

22   Q.   Did you SEE Fred Daibes and Philip Sellinger speaking?

23   A.   Yes.

24   Q.   You saw they were introduced to each other, right?

25   A.   Yes.

1   Q.  Just a casual, friendly introduction though, right?

2   A.  Yes.

3   Q.  You didn't overhear any discussion of a criminal case,

4   right?

5   A.  No.

6   Q.  Now, there were some questions asked of you about the use

7   of gmail accounts by you and by Senator Menendez.  Do you

8   recall that?

9   A.  Yes.

10  Q.  It was typical, after 2020, for you to communicate with

11  Senator Menendez on his gmail account, not his Senate e-mail

12  account; right?

13  A.  Yes.

14  Q.  And that's because you were no longer employed by the

15  senator's office; right?

16  A.  Yes.  I wasn't employed after 2013 so it was typical after

17  2013.

18  Q.  And you weren't involved in policy making or legislative

19  affairs, right?

20  A.  That's correct.

21  Q.  And so he, Senator Menendez, used his Senate account for

22  official business; right?

23  A.  Right.

24  Q.  Not for campaign?

25          MR. RICHENTHAL:  Objection.

O6i5men3                              Soliman - Cross

1              THE COURT:  Do you know how he used his Senate

2      account?

3              THE WITNESS:  Yes.

4              THE COURT:  How did he use his Senate e-mail account?

5              THE WITNESS:  For official business.

6              THE COURT:  OK.

7      BY MR. WEITZMAN:

8      Q.  And so when he was working with you on political issues he

9      typically used his Google, his gmail account; right?

10     A.  That's correct.

11     Q.  And that was on a range of topics, not just this topic of

12     the U.S. Attorney nomination; right?

13     A.  Yes.

14     Q.  You would agree with me there was no effort, on your part,

15     to e-mail Senator Menendez on his gmail account in order to

16     hide communications from anybody; right?

17     A.  No.

18     Q.  And there were also instances where you and he communicated

19     via what is called Signal.  Are you aware of that?

20     A.  Yes.

21     Q.  And what is signal?

22     A.  It is an encrypted messaging application.

23     Q.  When you were working for the senator, Senator Menendez on

24     his staff, was it common for staff and senators to communicate

25     via Signal?

O6i5men3                              Soliman - Cross

 1                THE COURT:  You are talking about was it common for

 2       Menendez staff?

 3                MR. WEITZMAN:  Correct.

 4                THE COURT:  And Menendez to communicate with each

 5       other?

 6                MR. WEITZMAN:  Correct.

 7                THE COURT:  Using Signal?

 8                Can you answer that, sir?

 9                THE WITNESS:  Yes, it was common, certainly for --

10       yes, it was.

11       BY MR. WEITZMAN:

12       Q.  And you had mentioned something about a hack?

13       A.  Yes.

14       Q.  What was that?

15       A.  At some point i remember the senator's office being hacked,

16       there was news about it being hacked or potentially being

17       hacked by a foreign government, and since that time we all took

18       precautions on how we communicated with one another.

19       Q.  And was that just Senator Menendez' office that was hacked

20       or was it a broader problem of other senators as well, to your

21       knowledge?

22                MR. RICHENTHAL:  Objection.

23                THE COURT:  I will allow it, if he knows.

24                THE WITNESS:  I don't remember.

25       BY MR. WEITZMAN:

O6i5men3                              Soliman - Cross

1    Q.  Do you know whether other senators communicated with each

2    other using Signal?

3    A.  I don't know.

4    Q.  Do you recall whether there was a democratic caucus Signal

5    chain --

6              MR. RICHENTHAL:  Objection.

7    Q.  -- when you were working for the senator?

8              THE COURT:  Do you know whether or not there was a

9    democratic caucus Signal chain?

10             THE WITNESS:  I wouldn't know.

11   Q.  Do you know whether the Hispanic caucus used its own Signal

12   chain?

13             MR. RICHENTHAL:  Objection.

14             THE COURT:  Sir, do you know of anyone using a Signal

15   chain apart from Senator Menendez' office?

16             THE WITNESS:  Yes.

17             THE COURT:  All right.

18   Q.  And what do you know about that?

19   A.  I mean, there is many people who use signal.

20   Q.  I am talking about in the Senate, Mr. Soliman.

21   A.  Other staff members within the senator's office would use

22   Signal.

23   Q.  And what about WhatsApp?  Is that also poplar among the

24   Senate staff?

25   A.  I think so, but I did not use it.

O6i5men3                      Soliman - Cross

1   Q.  We spent some time today talking about the process for

2   nominating a U.S. Attorney and recommending a U.S. Attorney to

3   the White House.  You testified Senator Menendez was the senior

4   senator in New Jersey, right?

5   A.  Yes.

6   Q.  Now that doesn't mean that he had unilateral authority to

7   recommend a U.S. Attorney nominee; right?

8   A.  Right.

9   Q.  Cory Booker, the junior senator, was involved in that

10  process as well; right?

11  A.  That's correct.

12  Q.  And you understood that as the junior senator, Cory Booker

13  could veto any recommendation that Senator Menendez put before

14  him; right?  Should I rephrase that?

15  A.  Yes.

16          THE COURT:  Was it your understanding that Senator

17  Menendez would take into consideration Senator Booker's views

18  when Senator Menendez would make a recommendation to the

19  president as to who the president should appoint as a U.S.

20  Attorney for the District of New Jersey?

21          THE WITNESS:  Yes.

22  Q.  And you understood that if Cory Booker did not want a

23  particular candidate be recommended Senator Menendez, by

24  protocol and custom, would not recommend that candidate; right?

25          MR. RICHENTHAL:  Objection.

O6i5men3                        Soliman - Cross

1       THE COURT:  Sustained.

2  Q.  Did you have an understanding as to how Cory Booker and

3  Senator Menendez would reach agreement on recommendations of

4  U.S. attorneys?

5  A.  Yes.

6  Q.  And did you understand that if Cory Booker did not want a

7  particular recommendation to go forward, they would not

8  collectively recommend that person?

9  A.  Yes.

10  Q.  And that was an arrangement that preceded Senator Menendez

11  being the senior senator.  Do you know that?

12       MR. RICHENTHAL:  Objection.  Assumes a fact, contrary.

13       THE COURT:  Yes.  Sustained.

14  Q.  Do you know whether that was an arrangement that preceded

15  Senator Menendez being the senior senator?

16  A.  I had always heard that, yes.

17  Q.  Right.  When the senior senator was Frank Lautenberg it was

18  the same arrangement.  Is that your understanding?

19       MR. RICHENTHAL:  Objection.  Testifying based on

20  hearsay.

21       THE COURT:  Just a moment.  It couldn't have been the

22  same arrangement because it was different people but rephrase

23  it.

24  BY MR. WEITZMAN:

25  Q.  When Frank Lautenberg was the senior senator and Senator

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Menendez was the junior senator, they had that same type of

2    arrangement where the senior senator would push forward a

3    recommendation and the junior senator would have a veto power;

4    right?

5              MR. RICHENTHAL:  Objection.  Calls for hearsay based

6    on his prior answer.

7              THE COURT:  I will allow it.

8              Did you have any understanding as to how Lautenberg

9    and Menendez worked on these nominations?

10             THE WITNESS:  Yes.

11             THE COURT:  If so, what is that understanding?

12             THE WITNESS:  That Lautenberg, as the senior senator,

13   would put forward a name and the senator would look at it as

14   well, and if there were an issue with it he would raise it but

15   Lautenberg would pick the name first.

16   BY MR. WEITZMAN:

17   Q.  So when Senator Menendez had this arrangement after the

18   2020 presidential election, that was the continuation of an

19   arrangement that had begun many years prior; right?

20             MR. RICHENTHAL:  Objection.  Form.

21             THE COURT:  Well, I think the arrangement in the

22   question is different than the arrangement that was given in

23   the answer so why don't you clear that up, sir.

24             MR. WEITZMAN:  Yes.

25   Q.  So the arrangement, sir, was that the senior senator gets

1    to put forward recommendations and the junior senator has veto

2    power; is that correct?

3    A.  Yes.

4    Q.  And that arrangement began long before 2020; correct?

5    A.  Yes.

6    Q.  And do you know when Frank Lautenberg -- I can't remember

7    exactly what year he passed, but do you recall when he was no

8    long in the Senate?

9    A.  Yes.

10   Q.  What year was that?

11   A.  I think it was 2014.

12   Q.  OK.  Thank you.

13        And, in fact, you described the arrangement as one where

14   Senator Menendez has to work in conjunction with Cory Booker to

15   recommend a nomination; correct?

16   A.  Yes.

17   Q.  Now, you testified that Senator Menendez began considering

18   candidates for U.S. Attorney position shortly after the

19   November 2020 election; is that correct?

20   A.  That's correct.

21        MR. RICHENTHAL:  Objection.  Misstates it.

22        THE COURT:  He just said it was.  Go ahead.

23   Q.  And the reason is because there is no point vetting people

24   unless you know that you are going to have a democratic

25   president in office; right?

O6i5men3                        Soliman - Cross

1   A.   Right.

2   Q.   Because if Trump had won the election, Senator Menendez

3   wouldn't have a say in who would be the U.S. Attorney; right?

4   A.   That's correct.

5   Q.   And initially I think you testified Mr. Sellinger was top

6   on Senator Menendez' list of potential U.S. attorneys; right?

7   A.   Yes.

8   Q.   And you understood that both the senator and Philip

9   Sellinger were close friends; right?

10  A.   Yes.

11  Q.   And we already established Sellinger was at his wedding to

12  Nadine?

13           THE COURT:  You have done that.  Go ahead.

14  Q.   But you didn't view Senator Menendez' consideration of

15  Sellinger based solely on their friendship; right?

16  A.   Right.

17           THE COURT:  I will allow it.

18  Q.   You understood, sir, that Senator Menendez greatly

19  respected Philip Sellinger as a lawyer, right?

20  A.   Yes.

21  Q.   Thought he was a very talented lawyer, right?

22           MR. RICHENTHAL:  Objection.  Personal knowledge.

23           THE COURT:  I will allow it.

24  A.   I don't know, but I know he respected him.

25  Q.   He thought he would make a good candidate for U.S.

O6i5men3                        Soliman - Cross

1    Attorney?

2                MR. RICHENTHAL:  Same objection.

3    A.  Yes.

4                THE COURT:  I will allow it.

5    Q.  You have known Philip Sellinger for many years now, right?

6    A.  Yes.

7    Q.  Fair to say that Philip Sellinger has wide respect in the

8    legal community in New Jersey?

9    A.  Yes.

10   Q.  You are familiar with the law firm that Phil Sellinger

11   worked at right?

12   A.  Yes.

13   Q.  Greenberg Traurig, right?

14   A.  Yes.

15   Q.  Is it one of the premiere law firms nationally?

16   A.  Yes.

17   Q.  And he was the head of the litigation department, right?

18   A.  Correct.

19   Q.  He was clearly qualified for the job of U.S. Attorney;

20   right?

21   A.  I any so.

22   Q.  Now, in addition to being U.S. Attorney, you and Senator

23   Menendez, there was also a discussion of nominating Phil

24   Sellinger to become a federal judge.  Do you recall that?

25   A.  Yes.

1   Q.  And Senator Menendez considered whether Mr. Sellinger

2   should be a federal judge as well; right?

3           THE COURT:  Do you know whether or not Mr. Menendez

4   considered Mr. Sellinger for a position as a federal judge?

5   Yes or no.

6           THE WITNESS:  I know he suggested it.

7   BY MR. WEITZMAN:

8   Q.  And you recall that he also suggested the possibility of

9   Mr. Sellinger becoming an ambassador; right?

10  A.  I don't remember that.

11  Q.  In any event, after President Biden won the November 2020

12  election, Senator Menendez and his staff started interviewing a

13  number of U.S. Attorney candidates, correct?

14  A.  Correct.

15  Q.  Let's go through some of the names.  You recall Jamel

16  Semper?

17  A.  Yes.

18  Q.  You recall Vikas Khanna?

19  A.  I recall reading his name.

20          THE COURT:  No, no.  Not whether you recall reading

21  his name.  Do you know that Senator Menendez and his staff

22  interviewed Mr. Khanna as a U.S. Attorney candidate?

23          I think that is your question.

24          MR. WEITZMAN:  That is.

25          THE WITNESS:  I don't know.

1    BY MR. WEITZMAN:

2    Q.   Do you know the name Lee Vartan?

3    A.   Yes.

4    Q.   Do you recall he was interviewed?

5    A.   No.

6    Q.   What about Jenny Kramer?

7    A.   I know her name.

8    Q.   And do you recall that she was interviewed as well for the

9    U.S. Attorney position?

10   A.   I don't know if she was or not.

11   Q.   Did you speak to any -- what about Dan Goldman, now

12   Congressman Dan Goldman, then just lawyer Dan Goldman?

13   A.   I never heard that name.

14   Q.   Were you involved in any of those interviews by his staff

15   or by him, to the extent they occurred?

16   A.   No.

17   Q.   At any point in time, did Senator Menendez ask you to reach

18   out to any of those individuals that I just named to discuss

19   the Daibes case?

20   A.   No.

21   Q.   You never spoke to any of those individuals I just named

22   about the Daibes case; correct?

23   A.   That's correct.

24   Q.   Now, Senator Menendez' first pick, ultimately, was not Phil

25   Sellinger; right?

1    A.  That's correct.

2              MR. RICHENTHAL:  Objection.  Time frame.

3    Q.  In late 2020, in December 2020, do you recall that Senator

4    Menendez changed his view and decided to put forward Esther

5    Suarez for U.S. Attorney to the president?

6    A.  Yes.

7    Q.  And fair to say, that followed shortly or around the time

8    of the White House memo seeking diverse candidates?  Do you

9    recall that?

10             MR. RICHENTHAL:  Objection.  Misstates.

11             THE COURT:  Let's see what he recalls.

12             Do you know whether or not it followed shortly or

13   around the time of the White House memo seeking diverse

14   candidates?

15             THE WITNESS:  It was around the time.

16             MR. WEITZMAN:  Can we put up GX A113-PH1?

17   Q.  This is a text exchange with the senator that you testified

18   about on direct.  Do you recall that?

19   A.  Yes.

20   Q.  And in the bottom on November 11, 2020, you text Senator

21   Menendez and you say:  Lee Vartan called me, correct?

22   A.  Yes.

23   Q.  And Lee Vartan was one of the candidates or one of the

24   individuals who wanted to be considered U.S. Attorney, correct?

25   A.  Right.

1    Q.  And that's the reason he was calling you, correct?

2              THE COURT:  Do you know whether or not that was the

3    reason he was calling?

4    A.  I don't know from this text message if that is what it is

5    about.

6    Q.  Did you speak to Lee Vartan?

7    A.  I am sure we did.

8    Q.  And did he mention that he would like to have his name

9    floated as a potential U.S. Attorney?

10   A.  I don't remember.

11             MR. WEITZMAN:  Next can we turn to the next page?

12   Q.  Again, at the top of the e-mail you mention:  Lee Vartan

13   called me.  And then you continue with a reference to Craig

14   Carpenito.

15             Senator Menendez says:  You are right about Lee.  I

16   will tell him that we are waiting to hear from the Biden team

17   as to how they intend to proceed on these issues.

18             What did you understand that to mean?

19   A.  He wanted me to tell Lee that he is waiting on direction

20   from the White House.

21   Q.  And what do you understand he was referring to when he said

22   that he was awaiting on direction from the White House?

23   A.  Direction on what types of candidate they were looking for.

24   Q.  Because even in November 2020, those in politics understood

25   that the Joe Biden White House was going to push forward

O6i5men3                          Soliman - Cross

1   diverse candidates; right?

2          MR. RICHENTHAL:  Objection.

3          THE COURT:  Sustained as phrased?

4   Q.  Sir, in November 2020 --

5          THE COURT:  That e-mail, the White House announcement

6   that we looked at said that the Biden White House encouraged

7   senators to put forward diverse candidates; is that true?

8          THE WITNESS:  That's correct.

9          THE COURT:  OK.

10  BY MR. WEITZMAN:

11  Q.  Even prior to receiving that memo, did you have an

12  understanding that diversity would be important to the White

13  House?

14         MR. RICHENTHAL:  Objection.

15         THE COURT:  I will allow it.  Did you know one way or

16  the other.

17         THE WITNESS:  I did not know.

18  Q.  Did you know whether Senator Menendez had spoken to the

19  White House even before receiving that December 20th or 22nd

20  memo?

21  A.  I don't know.

22  Q.  But he was looking, based on this text message, for a

23  communication and direction from the Biden team; correct?

24  A.  Correct.

25         THE COURT:  Does Senator Menendez take direction from

1    the White House on this issue?

2            THE WITNESS:  I would say the White House would create

3    a certain framework that the senator would work within.

4            THE COURT:  All right.  Thank you.

5    BY MR. WEITZMAN:

6    Q.  And by the way, the framework that the senator was trying

7    to work in is one of recommend diverse, qualified candidates;

8    right, for U.S. Attorney?

9    A.  I don't know if that is from the White House.  I know that

10   he wanted diversity.

11   Q.  You talked at some length about Esther Suarez and about how

12   others viewed her.  Let's talk about her qualifications for a

13   moment.  Are you aware of her professional background?

14   A.  Yes.

15   Q.  You are aware that she served as Bergen County's chief

16   counsel; correct?

17   A.  I don't remember that.

18   Q.  You are aware that she served as the top prosecutor in

19   Hudson County, right?

20   A.  Yes.

21   Q.  And by the way, that's a New Jersey State Senate confirmed

22   position; right?

23   A.  Yes.

24   Q.  So she had to go before 40 senators in the New Jersey State

25   Senate and get through a confirmation hearing to get that

O6i5men3                        Soliman - Cross

1    position; right?

2    A.  Correct.

3    Q.  By the way, the New Jersey State Senate, they're not

4    shrinking violets, they can put people through the ringer;

5    right?

6              THE COURT:  Sustained.

7    Q.  And she also was a state court judge in New Jersey; right?

8    A.  I think so.

9    Q.  And that, too, is a position confirmed by the New Jersey

10   State Senate; correct?

11   A.  That's correct.

12   Q.  Those are some rigorous vetting?

13             THE COURT:  Sustained.

14   Q.  Do you recall that in connection with the senator's

15   recommendation of her to be the U.S. Attorney of New Jersey,

16   she was endorsed by the State Prosecutors' Association in New

17   Jersey?

18   A.  I don't remember.

19   Q.  Do you recall that she was endorsed by the Hudson County

20   Prosecutors' Association?

21   A.  Yes.

22   Q.  That one you recall; right?

23   A.  Yes.

24   Q.  Now, the prosecutor asked you whether she had served as a

25   former federal prosecutor.  She had not served as a former

O6i5men3                              Soliman - Cross

1   federal prosecutor, correct?

2   A.  She had not.

3   Q.  There is no requirement for U.S. Attorneys or people in the

4   Department of Justice to serve as federal prosecutors; correct?

5            MR. RICHENTHAL:  Objection.

6            THE COURT:  I will allow it.

7            If you know.

8            THE WITNESS:  I don't know.

9   Q.  Were you aware that there are others who have served as

10  U.S. Attorney who have never served as a federal prosecutor

11  before?

12           THE COURT:  Sustained.

13  Q.  Do you know, sir, Chris Christie's professional background

14  before he became U.S. Attorney?

15           MR. RICHENTHAL:  Objection.

16           THE COURT:  I will allow it.

17           THE WITNESS:  Generally.

18  Q.  He was never a prosecutor of any type, state or federal;

19  correct?

20           THE COURT:  Do you know whether --

21           THE WITNESS:  I don't know.

22  Q.  Are you aware that he was never a federal prosecutor before

23  he became the U.S. Attorney in New Jersey?

24           THE COURT:  Do you know whether or not Mr. Christie

25  was a federal prosecutor before becoming U.S. Attorney in New

O6i5men3                         Soliman - Cross

1    Jersey?

2              THE WITNESS:  I don't -- I don't know.

3    Q.  Do you know someone by the name John Bash, who is the

4    former U.S. Attorney in the Western District of Texas?

5              THE COURT:  Sustained.

6              MR. WEITZMAN:  I would like to --

7              THE COURT:  Relevance.  Absolute relevance.  Proceed.

8              MR. WEITZMAN:  Your Honor, can we have a side bar on

9    this?

10             THE COURT:  No.

11             MR. WEITZMAN:  OK.

12             THE COURT:  You can come back to it at an appropriate

13   time.

14   BY MR. WEITZMAN:

15   Q.  Do you know Attorney General Alberto Gonzalez?

16             THE COURT:  Same line, same objection, same ruling.

17             Go ahead.

18   Q.  Do you know who the U.S. Attorney is in the Western

19   District of Texas today, Jaime Esparza?

20             THE COURT:  Sir, you understand my ruling.  Move on at

21   this point.

22   Q.  You testified that you had a conversation with Fred Turner

23   about the change in the recommendation from Sellinger to Esther

24   Suarez.  Do you recall that?

25   A.  Yes.
                    (Continued on next page)

Q. OK. And that change occurred after the White House, after receipt of the White House memo in December of 2021, correct?

MR. RICHENTHAL: Misstates again.

THE COURT: Let's see what his recollection is.

BY MR. WEITZMAN:

Q. Let me ask. The formal recommendation of Esther Suarez to be the U.S. Attorney occurred after receipt of the White House memo, correct?

MR. RICHENTHAL: Vague.

THE COURT: I'll allow it.

A. Yes.

Q. OK. And you testified today that Fred Turner told you that Senator Menendez had some sort of falling out with Sellinger; is that your testimony?

A. Yes.

Q. OK. Now, you didn't hear that from Robert Menendez, right?

A. No.

Q. He never told you that he had a falling out with Sellinger, right?

A. Right. No.

Q. And in fact, you had a relationship with Mr. Sellinger as well, right?

A. Yes.

Q. And he didn't tell you at that time that he had a falling out with Mr. Menendez, right; with Senator Menendez?

1    A.  Correct.

2    Q.  You heard about it, you claim, from Fred Turner, right?

3    A.  Right.

4    Q.  Do you recall the context in which that came up --

5    withdrawn.

6        Were you present with Fred Turner, or was this a phone

7    call?

8    A.  It was probably a phone call, but I don't remember.

9    Q.  So you don't recall whether it was by phone, text or in

10   person?

11   A.  I think it was by -- Fred is in D.C.  I'm in New Jersey,

12   generally, so it was probably by phone.

13   Q.  And was this a long conversation or short conversation?

14   A.  I don't remember.

15   Q.  Did Fred Turner tell you how he came to learn or suspect

16   that there had been a falling out between Senator Menendez and

17   Sellinger?

18              MR. RICHENTHAL:  Objection.

19              THE COURT:  Sustained.

20   BY MR. WEITZMAN:

21   Q.  What did Fred Turner tell you about the relationship

22   between Senator Menendez and Phil Sellinger at this time?

23   A.  I don't -- I mean what I remember is that he was telling me

24   there was a falling out, the senator was going to go in a

25   different direction.

O6iWmen4                          Soliman - Cross

1    Q.  The only words you remember is that there was a falling

2    out?

3    A.  Yes.

4    Q.  And did he tell you whether that's something he's surmising

5    and guessing or whether he heard that from Senator Menendez?

6    A.  He didn't say.

7    Q.  So you don't know how he came to believe that there was a

8    falling out, right?

9    A.  Correct.

10   Q.  Now, you were interviewed by the U.S. Attorney's Office in

11   August of 2023, correct?

12   A.  Yes.

13   Q.  Now, in that interview -- you spent a couple of hours with

14   the U.S. Attorney's Office, didn't you?

15   A.  Yes.

16   Q.  You were represented by counsel?

17   A.  Yes.

18   Q.  Isn't it accurate, sir, that at no point in time during

19   that interview did you mention this conversation with Fred

20   Turner about learning of a falling out between Senator Menendez

21   and Mr. Sellinger?

22   A.  I don't remember.

23          MR. WEITZMAN:  OK.  Well, let's put up 3537-003 just

24   for the witness.  I'm not going to ask you to read everything,

25   but I'm going to ask you to read certain sentences and

O6iWmen4                        Soliman - Cross

 1  paragraphs.  Can we go to page 2, and if you would highlight

 2  the bottom half of that middle paragraph over to the next

 3  sentence.

 4  Q.  Read that to yourself.  I'm just going to show you certain

 5  sections.  OK?

 6  A.  OK.

 7  Q.  Now let's go to page 5 and the middle two paragraphs.

 8  A.  OK.

 9  Q.  Page 8, the first full paragraph and the last paragraph.

10      Page 9 -- if you're done with that, sir.  I'm sorry.

11  A.  OK.

12  Q.  Page 9, the middle paragraph, that starts with as of.

13  A.  OK.

14  Q.  And then the second-to-last full paragraph, the

15  second-to-last paragraph.  Thank you.

16  A.  OK.

17  Q.  Sir, do you recall that you spoke, multiple times you

18  mentioned in that first interview that lasted hours, you

19  referenced Fred Turner to the U.S. Attorney's Office and the

20  FBI?

21  A.  Yes.

22  Q.  And does this refresh your recollection that at no point in

23  time did you reference this conversation with Fred Turner about

24  a falling out between Senator Menendez and Phil Sellinger?

25  A.  In that meeting?

O6iWmen4                        Soliman - Cross

1    Q.  In that meeting.

2    A.  I -- if that's what it says, I don't --

3              THE COURT:  No, no.  It's not if it says.  The

4    question is whether looking at that -- don't worry about

5    whether what's on that is true or not.  Does looking at that

6    refresh your recollection in regard to whether you mentioned

7    this Turner conversation at that meeting with the U.S.

8    Attorney's Office.

9              THE WITNESS:  It does not, no.

10             THE COURT:  OK.

11   BY MR. WEITZMAN:

12   Q.  It's actually the opposite.  Does it refresh your

13   recollection that you did not mention the conversation with

14   Fred Turner --

15   A.  It does not.

16   Q.  -- at that meeting?

17   A.  It does not.

18   Q.  Do you recall that the first time you mentioned this

19   conversation with Fred Turner to the U.S. Attorney's Office was

20   just last week, on June 13, 2024?

21   A.  It may have been.

22   Q.  OK.  You recall meeting with the U.S. Attorney's Office

23   last week, correct?

24   A.  Yes.

25   Q.  And by the way, how many meetings in total have you had

O6iWmen4                          Soliman - Cross

1    with the U.S. Attorney's Office?

2    A.  I don't know for sure.  We've had several.

3    Q.  More than five?

4    A.  Yes.

5    Q.  More than ten?

6    A.  I don't know.

7    Q.  OK.  Somewhere between five and ten?

8    A.  I think so.

9    Q.  And last week, you mentioned to them that Fred Turner gave

10   you a sense that Senator Menendez and Sellinger had a falling

11   out, correct?

12            MR. RICHENTHAL:  Objection.  Misstates.

13            THE COURT:  Is that true, sir?

14   A.  I remember Fred Turner telling me that they had a falling

15   out.

16            MR. WEITZMAN:  OK.  Well, let's put up 3537-027.  You

17   can zoom in on the fourth bullet point.

18            No.  The one above that.  Thank you.

19   Q.  Sir, for the first time, last week, you told the government

20   that Fred Turner gave you a sense that Menendez and Sellinger

21   had a falling out, correct?

22            MR. RICHENTHAL:  Objection.

23            THE COURT:  Sir, put aside what's on that.  Did you

24   tell the government last week for the first time that Fred

25   Turner gave you a sense that Menendez and Sellinger had a

O6iWmen4                          Soliman - Cross

 1    falling out?  Yes, no, I don't know.

 2                THE WITNESS:  I don't know.

 3    BY MR. WEITZMAN:

 4    Q.  Reading this, just if you would read the document to

 5    yourself, let's see if that refreshes your recollection.  I'm

 6    not asking you what's on the document.  I'm just asking if you

 7    have a recollection having had --

 8    A.  Yes.

 9                THE COURT:  Sir, you're not a lawyer, so I want to

10    make sure you understand.  The question is simply whether

11    looking at this thing, whatever it is, refreshes your

12    recollection.  The example that this jury has heard me give to

13    witnesses a number of times at this trial is Mr. Weitzman could

14    show you a banana.  It may refresh your recollection, it may

15    not.  With that in mind, look at this, and does that refresh

16    your recollection?  Yes or no.

17                THE WITNESS:  Yes.

18    BY MR. WEITZMAN:

19    Q.  OK.  And do you now have a recollection that you described,

20    when you referenced this conversation, you described getting a

21    sense from Fred Turner?

22                MR. RICHENTHAL:  Objection.  Misstates.

23                THE COURT:  What is your refreshed recollection, sir?

24                THE WITNESS:  That Fred Turner told me that the

25    senator and Mr. Sellinger had a falling out.

O6iWmen4                         Soliman - Cross

 1    BY MR. WEITZMAN:

 2    Q.  Prior to last week's conversation with the U.S. Attorney's

 3    Office, had you ever told anybody in the U.S. Attorney's Office

 4    or the FBI about this conversation?

 5              MR. RICHENTHAL:  Asked and answered.

 6              THE COURT:  I'll allow it.

 7    A.  I don't remember.

 8    Q.  OK.

 9    A.  I don't think I did.

10    Q.  In fact, you and I have spoken before, right?

11    A.  Yes.

12    Q.  You recall that you agreed to be interviewed by me and my

13    team on May 30, 2024 --

14    A.  Yes.

15    Q.  -- right?

16        And you never mentioned this conversation during that

17    interview either, right?

18    A.  Depends on what you asked me.

19              THE COURT:  Were you asked about this conversation --

20              THE WITNESS:  I don't --

21              THE COURT:  -- to your recollection?

22              THE WITNESS:  No.

23    BY MR. WEITZMAN:

24    Q.  Do you recall being asked questions about the reasons why

25    Senator Menendez went from Phil Sellinger to Esther Suarez, and

O6iWmen4                         Soliman - Cross

1   we talked about it?

2              MR. RICHENTHAL:  Objection.

3   BY MR. WEITZMAN:

4   Q.  Do you recall that, sir?

5              THE COURT:  I'll allow it.

6   A.  Not specifically.  Maybe if you give me a little bit more

7   detail.

8   Q.  Generally, the topic of Esther Suarez's nomination and Phil

9   Sellinger's nomination --

10  A.  Yes.

11  Q.  -- was the principal subject matter of our discussion?

12  A.  Yes.

13  Q.  And you never mentioned --

14             MR. RICHENTHAL:  Objection.

15             THE COURT:  I'll allow it.

16  BY MR. WEITZMAN:

17  Q.  You never mentioned this conversation you told the

18  government about last week for the first time regarding Fred

19  Turner, right?

20             THE COURT:  Sustained.

21             Were you asked about it, sir?

22             THE WITNESS:  No, I was not asked about it.

23             THE COURT:  All right.

24  BY MR. WEITZMAN:

25  Q.  You testified on direct about -- actually, you testified on

1    cross-examination a few minutes ago about Senator Menendez's

2    own interests in diverse candidates.  Do you recall that?

3    A.  Yes.

4    Q.  Fair to say that when one recommends a diverse candidate,

5    other constituents -- there are multiple constituents of

6    diversity, is the way I would put it, correct?

7              MR. RICHENTHAL:  Objection.  Vague.

8              THE COURT:  I'll allow that.

9              If you understand it.

10             THE WITNESS:  I don't understand it.

11   BY MR. WEITZMAN:

12   Q.  OK.  There's the Latino American community, correct?

13   A.  Yes.

14   Q.  There's the African American community, correct?

15   A.  Yes.

16   Q.  There's female American -- there's female communities?

17   A.  Yes.

18   Q.  There are lots of constituents that are different within

19   the diversity rubric, right?

20   A.  Sure, yes.

21   Q.  South Asian, correct?

22   A.  Yes.

23   Q.  And do you understand that someone in politics, that when

24   you put forward one diverse candidate, other diversity

25   constituents might feel slighted or like they should have had

O6iWmen4                          Soliman - Cross

```
 1   the opportunity to put forward a candidate?

 2               MR. RICHENTHAL:  Objection.

 3               THE COURT:  Sustained.

 4   BY MR. WEITZMAN:

 5   Q.   Do you have to balance as a political operative the

 6   interests of various diverse constituencies?

 7   A.   Yes.

 8               THE COURT:  As a political operative, do you balance

 9   various constituencies in determining -- in advising

10   Mr. Menendez?

11               THE WITNESS:  Yes.

12   BY MR. WEITZMAN:

13   Q.   And Senator Menendez had to decide whether to put forth

14   Jamel Semper or Esther Suarez, right, for example?

15               MR. RICHENTHAL:  Objection.

16               THE COURT:  Sustained.

17               Does Senator Menendez have to decide who to propose to

18   the president, who to recommend to the president for the

19   president to nominate for the position of U.S. Attorney in New

20   Jersey?

21               THE WITNESS:  Yes.

22               THE COURT:  OK.

23   BY MR. WEITZMAN:

24   Q.   And do you recall that -- are you aware that he interviewed

25   Jamel Semper?
```

1   A.  Yes.

2   Q.  And are you aware that he also interviewed a woman named

3   Tona Boyd?

4   A.  I am not.

5   Q.  Do you know who Tona Boyd is?

6   A.  I do not.

7   Q.  Do you not recognize that name as Senator Booker's chief

8   counsel, former chief counsel?

9           MR. RICHENTHAL:  Objection.  Assumes a fact.

10          THE COURT:  Well, do you know who she is?

11  A.  When you said Senator Booker's chief counsel, I have a

12  vague recollection now.

13  Q.  OK.  And do you know whether she was also in the running to

14  be U.S. Attorney?

15  A.  I don't think that she was.

16  Q.  OK.  You do know that Vikas Khanna was in the running,

17  right?

18  A.  I do not know that.

19  Q.  In any event, you would agree with me that Senator Menendez

20  has long endorsed qualified diverse candidates for federal

21  positions, correct?

22          MR. RICHENTHAL:  Objection.  Scope.  Positions.

23          THE COURT:  I'll allow it.

24          You may answer.

25  A.  Yes.

O6iWmen4                         Soliman - Cross

1   Q.  He recommended the first Hispanic U.S. Marshal, Juan Matos,

2   in New Jersey?

3           MR. RICHENTHAL:  Objection.  401.  403.

4           THE COURT:  Sustained.  Relevance.

5           Move on.

6   BY MR. WEITZMAN:

7   Q.  He did recommend and push forward Jamel Semper as a federal

8   judge, correct?

9   A.  He did, yes.

10  Q.  And that was after the U.S. Attorney -- this U.S. Attorney

11  nomination of Phil Sellinger, correct?

12  A.  That's correct.

13  Q.  Now, Ms. Suarez wasn't just a diverse candidate; she was

14  also pushed forward by Don Scarinci, right?

15  A.  Yes.

16  Q.  And I think you described Don Scarinci as Senator

17  Menendez's best friend or childhood friend?

18  A.  If I could just clarify the last answer.  I don't know if

19  Donald pushed for that.  I know Donald was absolutely for her,

20  but I don't know the origins of how her name came about.

21  Q.  OK.  Do you know that Esther Suarez formerly worked at

22  Donald Scarinci's law firm?

23  A.  Yes, yes.

24  Q.  And he has a law firm called Scarinci Hollenbeck?

25  A.  Yes.

O6iWmen4                        Soliman - Cross

1   Q.  And you know that Donald Scarinci was very supportive of

2   her candidacy as U.S. Attorney, right?

3   A.  Yes.

4   Q.  You had multiple conversations with Mr. Scarinci about that

5   matter, correct?

6   A.  Yes.

7   Q.  And even as the negative press was piling on, he was asking

8   you to save her nomination, right?

9   A.  Yes.

10  Q.  And again, Donald Scarinci was Senator Menendez's longtime

11  best friend, right?

12          THE COURT:  Asked and answered.

13          MR. WEITZMAN:  I don't think he gave an answer to that

14  one.  He went back to his prior answer.  I apologize, your

15  Honor.

16          THE COURT:  How would you describe the relationship of

17  Senator Menendez and Donald?

18          THE WITNESS:  Childhood, lifetime best friends.

19  BY MR. WEITZMAN:

20  Q.  Ms. Suarez was also recommended and endorsed by a number of

21  other important political players in New Jersey, right?

22          THE COURT:  Sustained.

23          Were there other endorsements, that you're aware of,

24  of Ms. Suarez?

25  A.  For U.S. Attorney?

O6iWmen4                         Soliman - Cross

```
 1   Q.  Correct.
 2   A.  I know there were a few groups that endorsed her, yes.
 3   Q.  Put aside endorsements.  Political supporters.  Do you
 4   recall that the mayor of Union City, Brian Stack, was pushing
 5   forward her nomination?
 6            MR. RICHENTHAL:  Objection.
 7            THE COURT:  Sustained.  Pushing.
 8   BY MR. WEITZMAN:
 9   Q.  OK.  Do you recall that the mayor of Union City, Brian
10   Stack, supported her nomination for U.S. Attorney?
11   A.  Yes.
12   Q.  Do you recall that the North Bergen mayor, Nicholas Sacco,
13   supported Esther Suarez's nomination for U.S. Attorney?
14   A.  Yes.
15   Q.  What about Ralph Lamparello, the former president of the
16   New Jersey State bar association; he supported her nomination
17   for U.S. Attorney as well?
18   A.  I don't remember.
19            MR. RICHENTHAL:  Your Honor, just for clarity, don't
20   remember one way or another.
21            THE WITNESS:  Correct.
22            THE COURT:  The question is whether you -- well, you
23   understood.
24            THE WITNESS:  Yes.
25            THE COURT:  Go ahead.
```

1           THE WITNESS:  Yeah.

2   BY MR. WEITZMAN:

3   Q.  Now, you had a lot of conversations with Senator Menendez

4   surrounding, or communications with Senator Menendez

5   surrounding the U.S. Attorney nomination, correct?

6   A.  Yes.

7   Q.  And as his -- you were his chief political operative or

8   adviser, is that right?

9   A.  I was his top political adviser.

10  Q.  OK.  He would clue you in on his thinking when it was

11  relevant, right?

12          MR. RICHENTHAL:  Objection.  Compound.  Vague.

13          THE COURT:  Rephrase.

14  BY MR. WEITZMAN:

15  Q.  Did you and Senator Menendez --

16          THE COURT:  I take it he would ask for your advice on

17  political matters, correct?

18          THE WITNESS:  Yes.

19          THE COURT:  That was your job, to give him your best

20  advice?

21          THE WITNESS:  Yes, that's correct.

22          THE COURT:  When asked.

23          THE WITNESS:  When asked.

24          THE COURT:  All right.

25  BY MR. WEITZMAN:

O6iWmen4                           Soliman - Cross

1    Q.  In fact, sometimes he hired you to do what's called crisis

2    management in politics, right?

3    A.  That's correct.

4    Q.  And so in that context, it was important that you

5    understood his decision-making processes, right?

6              MR. RICHENTHAL:  Objection.  Form.

7              THE COURT:  Sustained.

8    BY MR. WEITZMAN:

9    Q.  Was it important for you to understand his decision-making

10   process to do your job?

11             MR. RICHENTHAL:  Objection.

12             THE COURT:  I'm not sure how this witness can answer

13   that question.

14             MR. WEITZMAN:  Well, I'm asking --

15             THE COURT:  After working with Senator Menendez for so

16   many years, I take it you felt that you understood --

17             No.  I won't ask that.

18             Go ahead.

19             MR. WEITZMAN:  That's fine.

20   Q.  At no point in time did Senator Menendez tell you that he

21   spoke to Esther Suarez about the Daibes case, correct?

22   A.  That's correct.

23   Q.  And that you spoke to Esther Suarez too, right, and her

24   husband?

25   A.  As it relates to --

1    Q.   The nomination.

2    A.   The public relations.

3    Q.   OK.   I understand that, but you communicated with Esther

4    Suarez and her husband about this potential U.S. Attorney

5    nomination, right?

6    A.   As it relates to the news, yes.

7    Q.   OK.   And at no point in time did Senator Menendez ask you

8    to talk to Esther Suarez about the Daibes case, right?

9    A.   That's correct.

10   Q.   And he never asked you to relay a message about the Daibes

11   case to Esther Suarez or her husband, right?

12   A.   That's correct.

13   Q.   Now, did Senator Menendez tell you what he thought of

14   Esther Suarez's qualifications?

15   A.   Yes.

16   Q.   He told you that he thought she was a qualified candidate,

17   right?

18            THE COURT:   Did he tell you he believed she was

19   qualified to be the U.S. Attorney?

20            THE WITNESS:   I don't remember those words.

21   BY MR. WEITZMAN:

22   Q.   OK.   He discussed with you her prior experience as a judge

23   and as a state prosecutor, right?

24   A.   Yes.

25   Q.   Now, to be sure, while Senator Menendez recommended Esther

O6iWmen4                          Soliman - Cross

1   Suarez, there was an issue of timing as to when that news would

2   come out, right?

3           MR. RICHENTHAL:  Objection.  Compound.  Vague.

4           THE COURT:  Rephrase it.

5   BY MR. WEITZMAN:

6   Q.  Do you recall --

7           THE COURT:  I think this is what you're asking.

8           Did you discuss the timing of when Senator Menendez

9   would announce that he had forwarded Ms. Suarez's name to the

10  president for his consideration?

11          MR. WEITZMAN:  It's a different question, actually,

12  your Honor.

13          THE COURT:  Go ahead.

14          MR. WEITZMAN:  I can phrase this a bit better.

15          THE COURT:  Go ahead.

16          MR. WEITZMAN:  Can we put up Government Exhibit A408.

17  Q.  This was an email, a set of emails you discussed in your

18  direct examination with the top email dated August 25, 2020.

19  Do you recall testifying about this?

20  A.  I do, yes.

21  Q.  And this was about an article that David Wildstein wanted

22  to write about the possibility of the opportunity for Senator

23  Menendez to recommend the first Hispanic nominee to be U.S.

24  Attorney, correct?

25  A.  Correct.

1    Q.  And Senator Menendez responded:  "I hope he doesn't write

2    the Hispanic idea, as it will only add pressure for me to do

3    something which I don't intend to do."  Do you see that?

4    A.  Yes.

5    Q.  And your testimony on direct was that that meant he didn't

6    intend to nominate a Hispanic candidate; is that your

7    testimony?

8    A.  Yes.

9    Q.  Isn't it a fact, sir, that the issue he's referring to, as

10   you understood it back then, was that he didn't intend to

11   announce any such recommendation before the election of 2020?

12           MR. RICHENTHAL:  Objection.  Argument.

13           THE COURT:  No.  I will allow it, if that's his

14   understanding or not.

15   A.  Can you ask that again?

16   Q.  Yes.  Wasn't your understanding at the time, in August

17   2020, that the issue Senator Menendez wasn't intending to do

18   was announce a Hispanic candidate before the election of

19   November 2020?

20   A.  I don't know -- I don't know that.  I mean I just know that

21   Mr. Wildstein wanted to write this narrative.  The senator did

22   not want to be boxed in to it and to say that he was, you know,

23   for sure nominating a Hispanic candidate, so he wanted me to

24   push off the story.

25   Q.  OK.  Well, sir, do you recall that the issue was that you

O6iWmen4                           Soliman - Cross

 1    asked Mr. Wildstein to wait until after the election to issue
 2    that story?
 3            MR. RICHENTHAL:  Objection.  Vague and misstates.
 4            THE COURT:  I'll allow it.
 5    BY MR. WEITZMAN:
 6    Q.  Do you recall that, sir?
 7    A.  I asked him to wait, yes.
 8    Q.  Yes.  And it was to wait until after the election in
 9    particular, right?
10    A.  Yes.
11            MR. WEITZMAN:  OK.  Let's put up GX A113-PH1.
12    Q.  And in the top email, on November 10, 2020 -- I'm sorry,
13    top text message on November 10, 2020, you're referring to that
14    same David Wildstein, right?
15    A.  Yes.
16    Q.  And you say, in the second-to-last sentence of that top
17    text, we had asked him to wait until after the election,
18    correct?
19    A.  Yes.
20    Q.  And the reason, sir, you had asked him to wait until after
21    the election is because breaking the news before the election
22    of a potential diverse candidate could be a hot-button issue in
23    an election, right?
24            MR. RICHENTHAL:  Compound and misstates the witness's
25    testimony.  He's already explained the --

1          THE COURT:  Sir, why did you ask him to wait until

2    after the election?

3          THE WITNESS:  I mean there would have been several

4    reasons.

5    BY MR. WEITZMAN:

6    Q.  OK.  Well, one of the reasons, sir, is because the issue of

7    diversity, affirmative action, wokeness, that's a hot-button

8    issue in elections, right?

9          THE COURT:  Sustained.

10   BY MR. WEITZMAN:

11   Q.  The issue of diversity, sir, can be a hot-button issue in

12   election, is that correct?

13   A.  It can be, yes.

14   Q.  OK.  And so Senator Menendez wasn't against the idea of

15   Hispanic, Latino U.S. Attorney; he just didn't want it

16   announced before the election, isn't that correct?

17         MR. RICHENTHAL:  Objection.  Asked and answered.

18   Vague.  Misstates.

19         THE COURT:  Sustained.  Compound.  Ask it directly.

20         MR. WEITZMAN:  Yes.

21   Q.  Sir, the senator didn't oppose a Hispanic U.S. Attorney

22   nomination, isn't that correct, from all your dealings and

23   conversations with him?

24   A.  He did not oppose one, no.

25   Q.  He just didn't want the news to break and affect the

O6iWmen4                         Soliman - Cross

1   election cycle, isn't that correct?

2              MR. RICHENTHAL:  Objection.  Misstating.  Argument.

3              THE COURT:  Sir, is the reason you asked Wildstein

4   to -- is one of the reasons you asked Wildstein to wait until

5   after the election that you did not want the news to break and

6   affect the election cycle in regard to his nominating an

7   Hispanic person?

8              THE WITNESS:  No.

9   BY MR. WEITZMAN:

10  Q.  Sir, you understood that if news broke before the election

11  about a potential Hispanic candidate, it would be big news in

12  New Jersey, right?

13             MR. RICHENTHAL:  Objection.

14             THE COURT:  Sustained.  You've asked it a number of

15  times.  Move on.

16             MR. WEITZMAN:  Your Honor, if this is a good time for

17  a break, I'm happy to take it, as I'm moving on, but I'm happy

18  to continue as well.

19             THE COURT:  Does the jury want to break now?

20             The jury is undecided.  Let's continue.  That's what

21  happens when you ask 18 people.  I shouldn't do that.  Continue

22  for about ten or 15 more minutes.

23             MR. WEITZMAN:  Yes, your Honor.

24             Now, you were asked some questions about a text

25  message exchange.  We can put it up, GX A113-PH3.  And if you

O6iWmen4                          Soliman - Cross

1   can go to the next page.  I'm sorry.  Go to the prior page.

2   Q.  You were asked questions about this one, where the senator

3   says, who takes over the office until there's a new U.S.

4   Attorney?  You state it's going to be Rachael Honig.  And then

5   the next page, he says OMG with a wide-eyed emoji, to which you

6   laugh and you say, I know.

7        Do you recall testifying about that?

8   A.  Yes.

9   Q.  Sir, do you know who Rachael Honig is?

10  A.  I -- I vaguely knew of her.

11  Q.  You're aware, sir, that she worked under governor, under

12  then U.S. Attorney Chris Christie, correct?

13  A.  I don't know.

14  Q.  Are you aware from your many conversations with Senator

15  Menendez that Senator Menendez thought that Chris Christie

16  engaged in partisan politics as the U.S. Attorney?

17            MR. RICHENTHAL:  Objection.

18            THE COURT:  Sustained.

19  BY MR. WEITZMAN:

20  Q.  Did you have conversations with Senator Menendez about his

21  views of Chris Christie when he was U.S. Attorney?

22            MR. RICHENTHAL:  Scope.  401, 403.

23            THE COURT:  I think that's right.

24            MR. WEITZMAN:  Your Honor, they elicited this.  I'm

25  trying to explain it.

O6iWmen4                        Soliman - Cross

 1              THE COURT:  They did not elicit Chris Christie.
 2    BY MR. WEITZMAN:
 3    Q.  Sir, when you said, I know, what were you referring to?
 4    A.  I was -- it's just something -- you know, he gave me a
 5    reaction.  I reacted, laughing, and said I know.  It's sort of
 6    like a banter.  It's a conversation point.
 7    Q.  Well, you knew who Rachael Honig was, right?
 8    A.  Vaguely.
 9    Q.  And you understood that there were people within the legal
10    community who did not think Rachael Honig was up for the job as
11    U.S. Attorney?
12              MR. RICHENTHAL:  Objection.
13              THE COURT:  Were you aware of that at this time?
14              THE WITNESS:  No.
15    BY MR. WEITZMAN:
16    Q.  Sir, you didn't think Rachael Honig was up for the job as
17    U.S. Attorney, right?
18    A.  No.
19    Q.  Then why did you --
20              THE COURT:  I'm sorry.  No, meaning what?
21    A.  I was not aware that she -- I'm sorry.  You're saying,
22    like, recommended to the White House.
23    Q.  No.  I'm saying that she was going to be the acting U.S.
24    Attorney, according to your text message, right?
25              THE COURT:  Did you have a view?  I think this is

 1  Mr. Weitzman's question.  Do you have a view as to whether or

 2  not Rachael Honig was up for the job as U.S. Attorney?

 3          THE WITNESS:  No, I did not have a view.

 4  BY MR. WEITZMAN:

 5  Q.  So when you said, I know, that was -- you actually didn't

 6  mean anything by that?

 7          MR. RICHENTHAL:  Objection.

 8  A.  Yeah, I'm just --

 9          THE COURT:  I'll allow it.

10  A.  -- closing the conversation.

11          THE COURT:  I'm sorry.  I didn't mean to speak over

12  you, sir.  What did you just say?

13          THE WITNESS:  I'm just closing the conversation.

14  That's all.

15          THE COURT:  And you said banter, is that it?

16          THE WITNESS:  That's correct, yes.

17  BY MR. WEITZMAN:

18  Q.  Did you and Senator Menendez have conversations about

19  ensuring that partisan politics stay out of the U.S. Attorney's

20  Office?  Do you recall those conversations?

21          THE COURT:  Do you recall having such conversations?

22  Yes or no or I don't recall.

23          THE WITNESS:  I recall the senator saying that he

24  wanted a U.S. Attorney that would focus on, you know, gang

25  violence and drugs and not somebody who was partisan.

O6iWmen4                          Soliman - Cross

1            THE COURT:  OK.

2   BY MR. WEITZMAN:

3   Q.  And do you know what the senator's, Senator Menendez's view

4   was of prosecutions that Rachael Honig supervised of

5   politicians and whether that was partisan politics?

6   A.  I do not know.

7   Q.  OK.  You'd agree with me, though, that lawyers in New

8   Jersey around this time, in late 2020, were pushing for a

9   nomination by the president of a new U.S. Attorney in New

10  Jersey, right?

11           MR. RICHENTHAL:  Objection.

12           THE COURT:  Sustained.

13           Did you know whether or not lawyers in late 2020

14  wanted the President of the United States to nominate somebody

15  for the position of U.S. Attorney?

16           THE WITNESS:  I do not know.

17  BY MR. WEITZMAN:

18  Q.  OK.  Did you hear, did you talk to any lawyers who said

19  something to the effect of until we have a U.S. Attorney who's

20  confirmed, we can't negotiate deals?

21           MR. RICHENTHAL:  Objection.  Vague.  Hearsay.

22           THE COURT:  I'll allow it.

23           Did you have conversations of that sort?

24           THE WITNESS:  I don't -- I don't even understand the

25  question.  I'm sorry.

1              MR. WEITZMAN:  OK.  That's fair enough.

2   Q.  Do you recall seeing a text message where the senator

3   referred to Esther Suarez as Salas --

4   A.  Yes.

5   Q.  -- S-A-L-A-S?

6   A.  Yes.

7   Q.  Now, before that text message, you and he had spoken about

8   Esther Suarez, right?

9   A.  I think so, yes.

10  Q.  Because you knew who he was referring to when the text

11  message said Salas, right?

12  A.  Yes.

13  Q.  OK.  So you don't know whether the word "Salas" was a

14  fat-finger error or an auto-correct error, right?

15  A.  No.

16  Q.  OK.  At some point in time, the recommendation of Esther

17  Suarez became a political issue for the senator, right?

18  A.  Yes.

19              MR. RICHENTHAL:  Objection.

20              THE COURT:  I'll allow it.

21  BY MR. WEITZMAN:

22  Q.  And in fact, I think you testified about this, on March 28,

23  2021, Tom Moran published a fairly critical editorial about

24  Esther Suarez, right?

25  A.  Yes.

O6iWmen4                          Soliman - Cross

1    Q.   Now, one of the issues that was raised in Tom Moran's

2    editorial was the issue of Katie Brennan, correct?

3    A.   Correct.

4    Q.   And you described this issue as Ms. Brennan having accused

5    a staffer in Governor Phil Murphy's campaign of raping her,

6    right?

7    A.   Right.

8    Q.   And Esther Suarez was the one who investigated that, right?

9    A.   I think it was moved under her jurisdiction.

10   Q.   It was moved to her --

11          THE COURT:  She investigated it as Hudson County

12   prosecutor, is that what you mean?

13          THE WITNESS:  Yes.

14          THE COURT:  OK.

15   BY MR. WEITZMAN:

16   Q.   And she ultimately decided not to bring charges, right?

17   A.   That's right.

18   Q.   But this was still kind of a heated topic, a lightning rod

19   issue, right?

20   A.   Yes.

21   Q.   Now, are you aware that the New Jersey Attorney General,

22   Gurbir Grewal, investigated Esther Suarez's own investigation?

23          MR. RICHENTHAL:  Objection.  401, 403.

24          THE COURT:  Sustained.

25          MR. WEITZMAN:  Let's put up Government Exhibit 492 for

1    the witness -- I'm sorry, Defense Exhibit 492.

2    Q.  Actually, before we put that up, sir, are you aware whether

3    there was an investigation by New Jersey Attorney General

4    Gurbir Grewal of the Katie Brennan case?

5            MR. RICHENTHAL:  Same objection.

6            THE COURT:  I'll allow it.  There was testimony in

7    regard to Katie Brennan.

8            You may answer, sir, if you know one way or the other.

9    A.  I remember vaguely reading about it.

10   Q.  And do you recall that Gurbir Grewal found no wrongdoing by

11   Ms. Suarez?

12           MR. RICHENTHAL:  Objection.

13           THE COURT:  Do you recall what the conclusion of

14   Mr. Grewal's investigation was?

15           MR. RICHENTHAL:  It's calling for hearsay.

16           THE COURT:  Are you aware of what the conclusion, if

17   any, was?

18           THE WITNESS:  I am not.

19           THE COURT:  All right.

20   BY MR. WEITZMAN:

21   Q.  Sir, as a political adviser advising Senator Menendez, was

22   it important for you to understand the various ways you can

23   defend Senator Menendez's candidates?

24           MR. RICHENTHAL:  Objection.

25           THE COURT:  Sustained.

1              Just be more specific.

2      BY MR. WEITZMAN:

3      Q.   Was it important for you to do background research as to

4      the various ways that Republicans or others could attack

5      Senator Menendez's candidates?

6              THE COURT:   Was part of your job, sir, to do

7      background investigation?   I think, in fact, you testified

8      earlier about your sending background information to Senator

9      Menendez on one or more people.   Is that correct?

10             THE WITNESS:   Yes.

11             THE COURT:   OK.

12             THE WITNESS:   Background, meaning information that's

13     in the public domain.

14             THE COURT:   And information that would assist him in

15     his reaching a decision as to who to recommend, correct?

16             THE WITNESS:   That's correct.

17             THE COURT:   OK.

18             MR. WEITZMAN:   Could we put up Defense Exhibit 492,

19     just for the witness.   And if you can turn to page 4.   I'm just

20     going to ask you if you recall reviewing this article as part

21     of your background research.

22             MR. RICHENTHAL:   Your Honor, same objection.   401,

23     403, and this is not impeachment.

24             MR. WEITZMAN:   I'm not offering the document, your

25     Honor.

O6iWmen4                          Soliman - Cross

1          MR. RICHENTHAL:  Any testimony on this is not

2     impeachment.

3          THE COURT:  I'll allow this question.

4     BY MR. WEITZMAN:

5     Q.  Sir, as part of your background research, did you review

6     this article?  Do you recall?

7     A.  I don't recall.

8          MR. WEITZMAN:  We can put that down.

9     Q.  Sir, you testified that one of the ideas in order to defend

10    Esther Suarez was to have her lawyer write a letter to the

11    Star-Ledger or whomever Tom Moran works for, correct?

12    A.  Yes.

13    Q.  And was that letter going to include findings from Gurbir

14    Grewal, New Jersey attorney general's investigation of the

15    Katie Brennan matter?

16    A.  I don't -- I don't know.

17    Q.  OK.  Sir, are you aware that Tom Moran didn't like Esther

18    Suarez?

19          MR. RICHENTHAL:  Your Honor --

20          THE COURT:  Sustained.

21    BY MR. WEITZMAN:

22    Q.  Sir, are you aware that Esther Suarez accused, publicly,

23    Tom Moran of improperly grabbing her?

24          THE COURT:  Sustained.

25    BY MR. WEITZMAN:

1  Q.  Sir, would you agree with me that the Tom Moran editorial

2  was a political hit job?

3            MR. RICHENTHAL:  Your Honor --

4            THE COURT:  Sustained as to phrasing.

5  BY MR. WEITZMAN:

6  Q.  Would you agree with me that the Tom Moran editorial was an

7  unfair criticism of Esther Suarez?

8            MR. RICHENTHAL:  Objection.

9            THE COURT:  I'll allow that.

10           Do you know whether or not it was unfair?

11           THE WITNESS:  There were several.

12           THE COURT:  Several what, sir?

13           THE WITNESS:  There were several columns.  I don't

14  know which one you're referring to.  He wrote many articles

15  about Esther Suarez.

16  BY MR. WEITZMAN:

17  Q.  He was fixated on her, right?

18           THE COURT:  Sustained.

19           The jury will disregard.  Remember, the questions that

20  have no answers give you no testimony -- no evidence.  I'm

21  sorry.

22  BY MR. WEITZMAN:

23  Q.  Senator Menendez wasn't deterred by Tom Moran's articles,

24  correct?

25           THE COURT:  Sustained as to phrasing.

O6iWmen4                          Soliman - Cross

1    BY MR. WEITZMAN:

2    Q.  Senator Menendez didn't back down after reading Tom Moran's

3    articles, correct?

4            THE COURT:  Sustained.

5    BY MR. WEITZMAN:

6    Q.  Senator Menendez continued to fight for Esther Suarez's

7    nomination after the Tom Moran articles, correct?

8    A.  Yes.

9            THE COURT:  If this is the end of that line, I'll give

10   the jury its break.

11   BY MR. WEITZMAN:

12   Q.  He wasn't someone, in your experience, who was easily

13   swayed by the press, correct?

14           MR. RICHENTHAL:  Objection.

15           THE COURT:  I'll allow it.

16           Was your boss easily swayed by the press?

17           THE WITNESS:  No.  No, he was not.

18           MR. WEITZMAN:  I'm ready for the break now.

19           THE COURT:  All right.  And so is the jury.

20           15 minutes, ladies and gentlemen.  Thank you for your

21   patience.  It's almost two hours.

22           (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6iWmen4                          Soliman - Cross

 1                (Jury not present)
 2                THE COURT:  You may step down, sir.
 3                15 minutes.  Thank you.
 4                MR. WEITZMAN:  Your Honor, if I can just have one
 5     moment after the witness leaves?
 6                THE COURT:  Yes.
 7                (Witness not present)
 8                THE COURT:  Yes, sir.
 9                MR. WEITZMAN:  Yes, your Honor.  There were a number
10     of objections by the government that were -- I think they were
11     misstates testimony.
12                THE COURT:  Yes.
13                MR. WEITZMAN:  This is cross.  I'm impeaching his
14     testimony, and so I don't think I'm misstating testimony.
15                THE COURT:  No, no.  But you can't say something, that
16     he said something that he did not say.
17                MR. WEITZMAN:  I agree with that 100 percent.  That's
18     not when the objections came up, your Honor.  I agree with that
19     100 percent, but there were times when I was telling him that
20     what he means by that message is something different than he
21     testified to, and that's impeachment.  And that's fair game.
22                THE COURT:  All right.
23                MR. RICHENTHAL:  Impeachment is an attempt to
24     demonstrate that the witness is biased or incredible or
25     mistaken.  That was none of that.  That was just asserting

1    you're wrong.  That's argument.  We're going to have summations

2    in this matter.  It's an improper form of cross-examination.

3              MR. WEITZMAN:  I just think that that's flat-out

4    incorrect.

5              THE COURT:  All right.  Let's do it on a

6    question-by-question basis.

7              MR. WEITZMAN:  Yes.  Thank you, your Honor.

8              THE COURT:  I'm more concerned about the relevance of

9    Alberto Gonzalez and people from around the United States.  You

10   can pick out any number of random people who are not United

11   States Attorneys.  I don't think you're going to adduce

12   relevant or admissible information by listing 15 people from

13   the United States who may or may not have been U.S. Attorneys

14   in the past.

15             MR. WEITZMAN:  Thank you, your Honor, for that

16   reminder.  I appreciate it.

17             THE COURT:  I'm not quite sure how you meant that,

18   sir.

19             MR. WEITZMAN:  No.  I mean it genuinely.

20             Here's the issue, your Honor.  The government will

21   make the argument -- we've seen it in 3500 -- that it's

22   unprecedented to recommend someone to be the U.S. Attorney who

23   has no federal prosecution experience; that it could only

24   happen if the guy was bribed.

25             THE COURT:  All right.  I understand.

O6iWmen4                         Soliman - Cross

1          MR. WEITZMAN:  And so I think that we need to create

2     the record.

3          THE COURT:  I understand.

4          Sir.

5          MR. RICHENTHAL:  We're not going to argue that,

6     because it's not true.

7          THE COURT:  All right.  That's the end.  You're not

8     going to argue it.

9          15 minutes.

10          MR. MONTELEONI:  Your Honor, with apologies, one

11     timing matter.  I don't know how much more cross-examination

12     Mr. Weitzman has or other defense lawyers, but if we do get to

13     Paul Van Wie, we will need a ruling on the outstanding

14     objections.

15          THE COURT:  Yes, I understand that.  Mr. Failla and

16     actually I have all of my work on that, and I'm prepared to

17     discuss it with the parties.

18          As I understand it, the government has given me its

19     position and the defense wished to say whatever they wanted to

20     say.  I would hope that on some of the objections the defense

21     isn't pressing them, but I'll take whatever objections the

22     defense has under consideration.  And I've already developed

23     views on it -- of course, just with having had only the

24     government's view.  So let's see where we stand.

25          Mr. Weitzman, how much longer?

1          MR. WEITZMAN:  I'm guessing it's going to be another

2     hour, and that he'll probably conclude the day.

3          THE COURT:  OK.  At the end of the day, we'll take a

4     break and then this afternoon, we'll go through the objections.

5          MR. MONTELEONI:  Thank you, your Honor.

6          THE COURT:  All right.  Thank you.

7          Ten minutes, or thereabouts.

8          (Recess)

9          THE COURT:  Put the witness on the stand, please.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (Jury present)

 2                  THE COURT:  Please be seated.

 3                  You may continue with your cross-examination.

 4                  MR. WEITZMAN:  Thank you, your Honor.

 5   Q.  Mr. Soliman, when we last left off, I think I had asked you

 6   whether Senator Menendez was someone who backs down as a result

 7   of the press, and you said no.

 8       After the negative press regarding Esther Suarez, do you

 9   recall whether the senator asked the White House to interview

10   Ms. Suarez again?

11   A.  Yes.

12   Q.  What do you recall about that?

13   A.  That he asked them to interview her again.

14   Q.  For what purpose?

15   A.  He wanted them to give her another chance.

16   Q.  Is it fair to say that Senator Menendez was surprised by

17   some of the negative press against Ms. Suarez?

18   A.  Yes.

19   Q.  And in fact, he questioned whether Esther Suarez had been

20   forthcoming in the vetting process with you all, right?

21                  MR. RICHENTHAL:  Objection to the "you all."

22   BY MR. WEITZMAN:

23   Q.  OK.  He questioned whether Esther Suarez had been

24   forthcoming, correct?

25   A.  Correct.

O6iWmen4                          Soliman - Cross

```
 1    Q.  And in fact, he was surprised by some of the things that

 2    she had done during the consideration and vetting process by

 3    the White House, correct?

 4    A.  Correct.

 5    Q.  For example, she had released some emails as a result of

 6    sunshine laws, open records laws, in which she had cc'd her

 7    husband, correct?

 8    A.  Yes.

 9    Q.  And he said he could not believe that she had cc'd her

10    husband on those emails, right?

11    A.  Yes.

12    Q.  Fair to say from your interactions with her -- I'm sorry,

13    with Senator Menendez that he was fairly disappointed with how

14    the Esther Suarez nomination played out, correct?

15    A.  Correct.

16    Q.  And you were disappointed as well?

17    A.  Yes.

18    Q.  You thought that the bad press looked unfavorably on

19    Senator Menendez, correct?

20    A.  That's correct.

21    Q.  And he felt the same way, correct?

22              MR. RICHENTHAL:  Objection to how he felt.

23    BY MR. WEITZMAN:

24    Q.  He told you --

25              THE COURT:  OK.
```

```
 1   BY MR. RICHENTHAL:
 2   Q.  Senator Menendez expressed the same frustrations that you
 3   were feeling, correct?
 4   A.  He was frustrated that she wasn't forthcoming and more
 5   negative press was coming out.
 6   Q.  OK.  Ultimately, it was the Biden White House that decided
 7   not to proceed with her nomination, correct?
 8   A.  That's correct.
 9   Q.  Senator Menendez didn't pull her name, correct?
10   A.  Senator Menendez --
11   Q.  Did not pull her name from the nomination.
12   A.  No.
13           THE COURT:  In other words, he didn't tell the White
14   House not to proceed with the nomination.
15           THE WITNESS:  Correct.  No.
16           THE COURT:  OK.
17           THE WITNESS:  My understanding is the White House said
18   they're not moving forward with her.
19   BY MR. WEITZMAN:
20   Q.  Now, you were asked some questions about whether the
21   senator recommended three names to the White House as a result
22   of the White House memo, correct?
23   A.  Correct.
24   Q.  Now, the White House memo didn't have a directive requiring
25   three names, correct?
```

O6iWmen4                          Soliman - Cross

1   A.  I believe so, yes.

2   Q.  OK.  It was a request, correct?

3   A.  Yes.

4   Q.  You don't know whether senators were providing three names,

5   one name, two names or five names, do you?

6   A.  I wouldn't know.

7   Q.  OK.  And are you aware, sir, that Senator Menendez and his

8   staff were having discussions with the White House about U.S.

9   Attorney nominations and recommendations?

10           THE COURT:  At what time?

11  BY MR. WEITZMAN:

12  Q.  In late 2020, early 2021.

13  A.  I don't remember.

14  Q.  You weren't privy, you weren't on any calls with the White

15  House, right?

16  A.  No.

17  Q.  And you weren't necessarily privy to the discussions that

18  Senator Menendez and his team and his staff had with the White

19  House, correct?

20  A.  That's correct.

21  Q.  So you don't know whether they floated other names, other

22  than Esther Suarez, do you?

23           THE COURT:  Who, when you say they?

24           MR. WEITZMAN:  Fair enough.  Thank you, your Honor.

25  Q.  You don't know whether Senator Menendez and his staff, in

1  discussions with the White House, floated other names as

2  potential U.S. Attorney candidates, do you?

3  A.  I do not know.

4  Q.  So you don't know whether Henry Klingeman was a name that

5  Senator Menendez floated as a potential U.S. Attorney nominee,

6  do you?

7         MR. RICHENTHAL:  To whom?

8  BY MR. WEITZMAN:

9  Q.  To the White House.

10  A.  I mean what I was told was that, in the totality of this

11  whole time period, there were two names.

12  Q.  Two names that were recommended to the White House,

13  correct?

14  A.  Right.

15  Q.  OK.  That's different than what I'm discussing, which is

16  the discussion with the White House as to potential names to

17  float --

18         THE COURT:  You weren't privy to any discussions --

19         THE WITNESS:  No.

20         THE COURT:  -- that the Menendez staff had with the

21  White House, correct?

22         THE WITNESS:  That's correct.

23  BY MR. WEITZMAN:

24  Q.  And are you aware that before recommending a name, the

25  senator's office would float several names by the White House?

1          MR. RICHENTHAL:  Objection.

2          THE COURT:  Sustained.

3   BY MR. WEITZMAN:

4   Q.  When you were a staffer for Senator Menendez, were you

5   involved in discussions with the White House about potential

6   judicial and other nominations?

7   A.  Not with the White House.

8   Q.  You were involved in discussions internally about those

9   types of nominations?

10  A.  Yes.

11  Q.  And are you aware that the discussion was often a dialogue

12  with the White House about potential names?

13          MR. RICHENTHAL:  Objection.  Vague.  Misstates.

14          THE COURT:  I'll allow it.

15  A.  I'm not aware.

16  Q.  You recall reviewing a text message about a plan B,

17  correct?

18  A.  Yes.

19          MR. WEITZMAN:  Can we put up government A113-PH7.  And

20  if you can go to the next page.

21  Q.  And on April 20, 2021, Senator Menendez texts you, "also

22  beginning to do a plan B just in case," correct?

23  A.  Yes.

24  Q.  And you understood plan B to be a recommendation that would

25  replace Esther Suarez as a potential U.S. Attorney nomination,

O6iWmen4                        Soliman - Cross

1   correct?

2   A.  Correct.

3   Q.  Are you aware, sir, that on April 20, 2021, Senator

4   Menendez spoke to Phil Sellinger, that very day?

5           MR. RICHENTHAL:  Assumes a fact.

6           THE COURT:  No.  Do you know whether or not the

7   senator spoke with Phil Sellinger on April 20, 2021?

8           THE WITNESS:  I do not.

9   BY MR. WEITZMAN:

10  Q.  OK.  In any event -- you can take that down -- in the

11  process of choosing or recommending Sellinger, it was important

12  for you to vet Sellinger in connection with a potential

13  nomination, is that correct?

14          MR. RICHENTHAL:  Vague.

15          THE COURT:  I'll allow it.

16  A.  To vet him on --

17  Q.  As a potential nominee.

18          THE COURT:  Well, let's establish, if you're using the

19  word "vet," what you mean by vet.

20          THE WITNESS:  Yes.  Thank you.

21          Vetting is the optics, what's in the press about him,

22  what potentially could be in the press about him.  It's not

23  case law or his public policy positions.

24          MR. WEITZMAN:  Agreed.  Agreed.

25          MR. RICHENTHAL:  Objection.  Commentary.

O6iWmen4                          Soliman - Cross

1          MR. WEITZMAN:  Yes.  I didn't mean to say agreed.

2    Thank you, I meant.

3    Q.  From your perspective as a political consultant, were you

4    involved in vetting Phil Sellinger for a potential U.S.

5    Attorney nomination?

6    A.  To the extent that he needed vetting, yes.

7          MR. WEITZMAN:  OK.

8          THE COURT:  Now, again, when you -- is part of vetting

9    determining what somebody's qualifications or lack of

10   qualifications are?

11         THE WITNESS:  No.

12         THE COURT:  OK.

13         THE WITNESS:  Not from my perspective.

14         THE COURT:  Not from your perspective, from the

15   standpoint of your job.

16         THE WITNESS:  Yes.

17         THE COURT:  OK.

18         THE WITNESS:  From the standpoint -- I'm sorry.  From

19   the standpoint of my job, I'm looking at it from a political

20   media perspective.  His chief, senator's chief counsel in his

21   government office is looking at whether or not he's qualified.

22         THE COURT:  All right.  Just so that I understand --

23   I'm not quite sure I realized that -- your perspective is not

24   on the merits.  And I don't want to put words in your mouth, so

25   just tell me if I'm correct.

O6iWmen4                           Soliman - Cross

1              From your perspective, the issue is not whether or not

2      somebody is qualified, or not.  It's what the nomination would

3      look like from a media standpoint.  Is that essentially right?

4              THE WITNESS:  As it relates -- as it reflects on

5      Senator Menendez, yes.

6              THE COURT:  Your focus is Senator Menendez.

7              THE WITNESS:  Yes.

8              THE COURT:  All right.

9              THE WITNESS:  That's correct.

10             THE COURT:  Thank you.  That helps.

11             MR. WEITZMAN:  Thank you.

12             THE COURT:  It helps my understanding.

13     BY MR. WEITZMAN:

14     Q.  You understood, sir, that after the negative media

15     surrounding the Esther Suarez nomination, Senator Menendez

16     wanted a noncontroversial nominee to be U.S. Attorney --

17             MR. RICHENTHAL:  Objection to wanted.

18     Q.  -- correct?

19             THE COURT:  After the negative media surrounding

20     Esther Suarez's nomination or recommendation by you to the

21     White House, do you know what Senator Menendez was seeking in a

22     U.S. Attorney?

23             THE WITNESS:  No.

24             THE COURT:  Is it fair to say, if you know, that he

25     wanted to avoid further controversies surrounding any

1    recommendation by him to the White House for appointment by the

2    White House?

3              THE WITNESS:  Yes.

4              THE COURT:  OK.

5    BY MR. WEITZMAN:

6    Q.  And he didn't want there to be any negative issues,

7    publicity issues to arise with the recommendation of Phil

8    Sellinger, correct?

9              MR. RICHENTHAL:  Same with wanted.  Same objection.

10   BY MR. WEITZMAN:

11   Q.  Senator Menendez communicated to you that he wanted -- this

12   is my word, not his word -- a safe nomination, one that wasn't

13   going to raise the same types of negative publicity, right?

14   A.  Yes.

15             THE COURT:  Again, just so I understand it, safe

16   nomination from the standpoint of the publicity and the optics

17   surrounding that.

18             THE WITNESS:  That's correct.

19             THE COURT:  OK.

20   BY MR. WEITZMAN:

21   Q.  And one of the things that is a potential publicity problem

22   for a nominee is if the nominee has biases or conflicts of

23   interest, isn't that correct?

24   A.  I don't really understand.

25   Q.  Well, if a U.S. Attorney nominee had conflicts of interest

```
 1   with cases being prosecuted in the office, that could become a
 2   media issue during the nomination process.  Are you aware of
 3   that?
 4            MR. RICHENTHAL:  Objection.  Vague.  Assumes a fact.
 5   Compound.
 6            THE COURT:  Be more specific.
 7            MR. WEITZMAN:  Yes.
 8   Q.  Sir, are you aware -- let me rephrase.
 9        One of the things that Senator Menendez was concerned about
10   with the U.S. Attorney nomination was issues of conflict of
11   interest, correct?
12            MR. RICHENTHAL:  Objection to what he was concerned
13   about.
14            THE COURT:  I will allow that.
15   A.  I don't know.
16   Q.  Would you agree with me that one of the issues that could
17   arise with any U.S. Attorney candidate is if the candidate has
18   conflicts of interest that make it difficult for him to do his
19   job?
20            MR. RICHENTHAL:  Calls for speculation and vague.
21            THE COURT:  Sustained.
22            Do you know whether or not conflicts of interest were
23   an issue that the senator was concerned about, the existence of
24   conflicts of interest, or is that too general for you?
25            THE WITNESS:  It's not general.  It's that it's not
```

O6iWmen4                        Soliman - Cross

1    something that I would be aware of.

2              THE COURT:  It's not within --

3              THE WITNESS:  Yeah.

4              THE COURT:  -- what you did.

5              THE WITNESS:  Correct.  I'm not looking for conflicts

6    of interest, and if he had conflicts of interest, he wouldn't

7    share that with me.

8              THE COURT:  All right.

9    BY MR. WEITZMAN:

10   Q.  Sir, you'd agree with me that whether a U.S. Attorney is

11   predisposed in favor or against a particular target or

12   defendant could be a media issue that you need to deal with in

13   your job?

14             MR. RICHENTHAL:  Objection.  Vague.

15             THE COURT:  I'll allow it.

16             MR. RICHENTHAL:  Asked and answered.

17             THE COURT:  I'll allow it.

18             Move forward.

19   A.  Yes.

20   Q.  Fair to say that the New Jersey press can be unrelenting?

21   A.  Yes.

22   Q.  And if they believe that a candidate has a conflict of

23   interest or was predisposed in favor or against a particular

24   defendant, that could result in bad press for the senator,

25   correct?

1          MR. RICHENTHAL:  Objection.

2          THE COURT:  Sustained.  This one's sustained.

3   BY MR. WEITZMAN:

4   Q.  Sir, are you aware that Phil Sellinger's law firm had

5   previously filed a suit against Fred Daibes -- I'm sorry, had

6   previously filed a suit adverse to Fred Daibes?  Were you aware

7   of that?

8   A.  Not at the time.

9   Q.  Were you aware that Phil Sellinger personally was involved

10  in that lawsuit that was adverse to Fred Daibes?

11  A.  Not at the time.

12  Q.  From your perspective, as a political consultant, political

13  operative, a consultant, however you phrase it, would you agree

14  with me that Sellinger's personal involvement in a lawsuit

15  against a particular criminal defendant being prosecuted in his

16  office could be a media issue for Senator Menendez?

17          MR. RICHENTHAL:  Objection.

18          THE COURT:  Sustained.

19          MR. RICHENTHAL:  Misstates and argument.

20          THE COURT:  Sustained.

21  BY MR. WEITZMAN:

22  Q.  Are you aware that there were multiple cases that Phil

23  Sellinger had potential conflicts of interest in?

24  A.  I was not aware of that.

25  Q.  You are aware, sir, that Senator Menendez thought that

1   Sellinger was a good candidate because he would be tough on

2   drugs and gang violence, correct?

3           MR. RICHENTHAL:  Objection to what Menendez thought.

4           THE COURT:  To the extent he shared it with this

5   witness, I'll allow it.

6   A.  Yes.

7   Q.  And he was going to be tough on guns, too, and gun

8   violence, correct?

9           MR. RICHENTHAL:  Objection.  He, who, when?

10          THE COURT:  Yes.

11          MR. WEITZMAN:  OK.  Fair enough.

12  Q.  Senator Menendez communicated to you that he liked

13  Sellinger because Sellinger would also be tough on gun violence

14  in New Jersey, correct?

15  A.  Yes.

16  Q.  Now, in the spring of 2021, you had a call with Phil

17  Sellinger.  Do you recall testifying to that?

18  A.  Yes, I do.

19  Q.  And I think you testified on direct that Sellinger said

20  something like he didn't have to recuse himself from some case,

21  and he spoke to main justice about it, correct?

22  A.  That's correct.

23  Q.  Now, this was before Senator Menendez -- before Phil

24  Sellinger had actually been nominated by the president as U.S.

25  Attorney, correct?

1    A.  Yes.

2    Q.  And just so I understand, do you recall what time of day

3    this call was?

4    A.  I do not.

5    Q.  Do you know whether it was day or nighttime outside?

6    A.  I do not.

7    Q.  Do you recall whether there was light outside, or -- you

8    don't recall?

9    A.  No.

10   Q.  OK.  Do you recall who initiated the call, whether you

11   called him or he called you?

12   A.  I don't -- I don't remember.  I do remember him saying I've

13   been trying to reach the senator and I can't.

14   Q.  Do you recall how long the call was?

15   A.  Yes.  It might have been a minute and 30 seconds, if that.

16   Q.  OK.  And was it on your cell phone or your work phone?

17   A.  I don't remember that.

18   Q.  Was it on a workday or a weekend?

19   A.  I don't know.  I -- I work all the time, so I -- I'm always

20   on the phone.  I really don't remember that.

21   Q.  Was it in your home or outside your home?

22   A.  I don't remember.

23   Q.  Do you remember what you were doing when you received the

24   call?

25             MR. RICHENTHAL:  He doesn't remember.

 1              THE COURT:  Yes.

 2              MR. WEITZMAN:  I think I'm entitled to exhaust, your

 3     Honor.

 4              THE COURT:  Yes, you are exhausting.

 5              MR. WEITZMAN:  Exhausting, never been accused of

 6     anything less.

 7     Q.  Do you remember what you were doing when you received this

 8     call?

 9              MR. RICHENTHAL:  Asked and answered, that specific

10     question.

11              MR. WEITZMAN:  I didn't get an answer.  I'm sorry.

12     A.  I don't remember.

13     Q.  OK.  Do you recall if you were alone at the time?

14              THE COURT:  What do you recall about the circumstances

15     of receiving that call, sir?

16              THE WITNESS:  I remember that Mr. Sellinger had a

17     message for the senator, and I wanted to get the message to

18     him.

19     BY MR. WEITZMAN:

20     Q.  Did you take any notes during the call?

21     A.  No.

22     Q.  Did you relay the substance of the call in a text message

23     to anybody?

24     A.  To the senator.  Either text message or by phone.

25     Q.  OK.  Have you seen a text message relaying the substance of

O6iWmen4                        Soliman - Cross

1    this call?

2    A.  No.

3    Q.  So you did not relay the substance of this call to the

4    senator?

5              THE COURT:  Do you know whether or not you relayed the

6    substance of the call to the senator?  Period.

7              THE WITNESS:  Yes, I did.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6i5men5                          Soliman - Cross

 1   BY MR. WEITZMAN:   (Continuing)

 2   Q.  What do you recall?

 3   A.  I relayed the substance of the call to the senator.

 4   Q.  Had you been shown any such text message in your prep for

 5   your examination?

 6             MR. RICHENTHAL:  Objection.

 7             THE COURT:  I will allow it.

 8             Had you been shown a text message relaying the call to

 9   the senator?

10             THE WITNESS:  No.

11             THE COURT:  I take it you don't know whether you -- do

12   you know whether or not you sent a text?

13             THE WITNESS:  I don't know.  I don't know if we did

14   it -- we spoke by phone or I saw him in person or I texted him.

15   I don't remember that.

16             THE COURT:  OK.

17   BY MR. WEITZMAN:

18   Q.  Was there anybody else on the call other than you and Phil

19   Sellinger?

20   A.  No.

21             MR. RICHENTHAL:  To the witness' knowledge.

22             THE COURT:  Yes, correct.

23             MR. WEITZMAN:  I'm sorry.  Say that again?

24             THE COURT:  To the witness' knowledge.

25             You understood that was the question?

O6i5men5                         Soliman - Cross

1              MR. WEITZMAN:  Yes.

2              THE COURT:  You weren't aware of anybody else on the

3      call?

4              THE WITNESS:  No, I was not.

5      BY MR. WEITZMAN:

6      Q.  The call was three years ago this season?  Spring?

7      A.  Yes.

8      Q.  And other than your recollection, there are no documents

9      that refresh your recollection about the substance of the call?

10             THE COURT:  That he can't know.  He can't know one way

11     or the other.  Unless you show him a banana.

12     Q.  In that call Mr. Sellinger didn't refer to any particular

13     matter is your testimony, correct?

14     A.  He did not.

15     Q.  He did not say the Daibes matter; is that your testimony?

16     A.  That's correct.

17     Q.  And you don't know which matter he was referring to when

18     you --

19             MR. RICHENTHAL:  Objection.  Time frame.

20             MR. WEITZMAN:  When you were on that call.  I said

21     when you were on that call.

22     A.  No.

23     Q.  You said the call lasted approximately a minute, minute and

24     a half?

25     A.  That's my guess.  It was short.

1  Q.  And you said that you relayed the substance of the call to

2  Senator Menendez?

3  A.  Yes.

4  Q.  Did you do your best to relay the substance of the call in

5  real-time, moments after, or minutes later?  Or was it days

6  later or hours later?

7  A.  No --

8          THE COURT:  How soon after the call did you relay it

9  to the Senator?

10          THE WITNESS:  Generally, it would have been the same

11  day.

12  Q.  Did you do your best at that time to relay the substance of

13  the call as accurately as you recalled it right then?

14  A.  Yes.

15  Q.  Do you recall that whatever you told Senator Menendez, his

16  response, his reaction was unremarkable?

17  A.  Yes.

18  Q.  Would you agree with me that he was calm when you said what

19  you told him?

20  A.  Yes.

21  Q.  And you didn't mention the Daibes case to Senator Menendez;

22  correct?

23  A.  That's correct.

24          MR. RICHENTHAL:  Objection.  Time frame.

25  Q.  In that call, when you related it to Senator Menendez.

1    A.  Correct.

2    Q.  Do you have a recollection, however, that Phil Sellinger

3    told you he had spoken to Main Justice about this matter?

4    A.  About a matter.

5    Q.  And that Main Justice had told him he need not recuse

6    himself?

7    A.  Correct.

8    Q.  And your testimony is that that all happened before

9    Sellinger was recommended to be U.S. Attorney; correct?

10   A.  Yes.

11   Q.  Would it surprise you to learn, sir, that Philip Sellinger

12   had not reached out to Main Justice?

13           MR. RICHENTHAL:  Your Honor --

14           THE COURT:  Sustained.

15   Q.  Are you aware that the decision of whether Mr. Sellinger

16   would have to recuse himself or not was one for Main Justice to

17   make and not for him to make, Phil Sellinger?  Are you aware of

18   that?

19   A.  I never thought about that.  I don't know.

20   Q.  You are not familiar with the protocols, the procedures,

21   and the rules regarding recusal of the U.S. attorneys, are you?

22   A.  I am not.

23   Q.  Fair to say that between you and Mr. Sellinger, he is more

24   familiar with that than you are?

25           MR. RICHENTHAL:  Objection.

O6i5men5                        Soliman - Cross

1          THE COURT:  If you know.

2   A.  Yes.

3   Q.  Are you aware that Main Justice eventually told

4   Mr. Sellinger that he does have to recuse himself from the

5   Daibes case?

6          THE COURT:  Sustained.

7          Are you aware whether or not main justice eventually

8   told Mr. Sellinger that he does have to recuse himself from the

9   Daibes case?  Yes or no.

10  A.  This now after reading articles or at the time?

11         THE COURT:  At the time.

12         THE WITNESS:  At the time, no.

13  Q.  Did Senator Menendez, when you relayed the message to

14  Senator Menendez, did he respond referencing the Daibes matter?

15  A.  No.

16  Q.  Did he respond in any way, substantively, to the content of

17  your message?

18  A.  No.

19  Q.  Do you have an understanding as to which matter he thought

20  you were referring to?

21         MR. RICHENTHAL:  Objection to asked --

22         THE COURT:  Yes.  Yes.

23  Q.  Did he relay to you which matter he thought you were

24  referring to?

25  A.  Not at that time.

O6i5men5                          Soliman - Cross

1    Q.  We talked a bit about or you talked a bit about Jamel

2    Semper in your direct examination.  Do you recall that?

3    A.  Yes.

4    Q.  Do you know whether Jamel Semper was interviewed for the

5    U.S. Attorney position?

6    A.  Yes.

7    Q.  And ultimately, the senator decided to go with Phil

8    Sellinger; correct?

9    A.  Yes.

10            THE COURT:  Now, you were asked do you know whether

11   Jamel Semper was interviewed for the U.S. Attorney position and

12   you said yes.  I gather not only do you know but you know he

13   was interviewed; is that correct?

14            THE WITNESS:  That's correct.

15            THE COURT:  OK.

16   Q.  Did Senator Menendez tell you why he decided to nominate

17   Phil Sellinger instead of Jamel Semper?

18   A.  No.

19   Q.  Do you know whether he was eyeing Jamel Semper for the

20   federal judgeship at that time?

21            MR. RICHENTHAL:  Objection.

22            THE COURT:  Sustained.

23            Did he say anything in that regard?

24            THE WITNESS:  He was very impressed by Mr. Semper and

25   he wanted to find a position for him.

1    Q.  Did he also express to you that he was hoping that Phil

2    Sellinger would choose Jamel Semper as his no. 2 in the office,

3    first assistant?

4            THE COURT:  Did he say that in words or substance?

5            THE WITNESS:  He said the front office.

6            THE COURT:  What is the front office, as you

7    understand it?

8            THE WITNESS:  Mr. Sellinger's top lieutenants.  I

9    don't know that he used the word "first assistant" but he was

10   interested in Mr. Semper getting a promotion within the U.S.

11   Attorney's office.

12   BY MR. WEITZMAN:

13   Q.  And did he tell you that that would be helpful to him in

14   connection with an important constituent base in New Jersey?

15   A.  I think he was just impressed by Mr. Semper.

16           MR. WEITZMAN:  If we can just go to Defendant's

17   Exhibit 1035.  I think it may have been admitted as a

18   government exhibit which is Government Exhibit -- I don't know

19   which one it is but can we put up Defendant's Exhibit 1035?

20   Q.  You testified about this document, correct?

21           I'm sorry Mr. Richenthal, no?  I apologize.

22   A.  The bottom half, not the top half.

23   Q.  I see, I see.  Correct.

24       Do you recognize this e-mail chain as one that you

25   participated in from the top e-mail?

O6i5men5                          Soliman - Cross

1   A.  Yes.  Let me just read it.  Yes.

2            MR. WEITZMAN:  We offer Defendant's Exhibit 1035.

3            MR. RICHENTHAL:  This is not impeachment, we weren't

4   given it, but no objection.

5            THE COURT:  Admitted.

6            (Defendant's Exhibit 1035 received in evidence)

7   BY MR. WEITZMAN:

8   Q.  Turning to page 2, do you recall testifying about this

9   article, Black Ministers Push for Semper to be next U.S.

10  Attorney?

11  A.  Yes.

12  Q.  And if you go back to page 1, the government exhibit I

13  think cut off at the January 11th bottom e-mail from you to

14  Senator Menendez, correct, and this is the remainder of the

15  conversation?

16            MR. RICHENTHAL:  Objection.  Characterizing the

17  government exhibit as cut off.  We didn't cut off anything.

18            MR. WEITZMAN:  The government exhibit didn't include

19  the top half of this page, correct?

20            MR. RICHENTHAL:  It is a chain, your Honor.

21            THE COURT:  Yes.

22            Ask your question.

23  BY MR. WEITZMAN:

24  Q.  Can we focus your attention, sir, on the bottom half?  You

25  testified about that on direct, correct?

1   A.  Yes.

2   Q.  So let's focus in on the top half.  Senator Menendez, in

3   response to your e-mail says:  I spoke to LeRoy.

4        Who is LeRoy?

5   A.  LeRoy Jones is an Essex County and state party democratic

6   chairman.

7   Q.  And you responded:  Sounds good.  Maybe I should see if

8   Fred or I talk to Cechhi and have him tell Jamel not to do a

9   campaign, that it's not helpful.

10       What do you mean by it is not helpful to do a

11  campaign?

12  A.  That if he was to be considered for the position of U.S.

13  attorney, that the way Senator Menendez works is that he is not

14  easily swayed by public campaigns.

15  Q.  Then you said at the top e-mail:  I told Mo to get a

16  message to the pastors and tone it down, that they got their

17  message out to Menendez and Booker, but to tone it down now

18  because games for positions like this don't work?

19  A.  That's correct.

20  Q.  Who is Mo?

21  A.  He is my business partner.  He is also Cory Booker --

22  Senator Booker's top political advisor.

23  Q.  And I think you said that campaigns for positions like this

24  don't work.  What did you mean by that?

25  A.  That Senator Menendez is not swayed by campaigns like this.

O6i5men5                          Soliman - Cross

1    To the extent that, you know, the community was going to try to

2    pressure him publicly, it wasn't going to work.

3    Q.   Those types of campaigns can backfire on a candidate,

4    correct?

5    A.   That they don't work.

6              MR. WEITZMAN:   Can we put up Government Exhibit A113?

7              THE COURT:   I'm not sure what you mean, sir.  Does the

8    senator, if people are supporting a particular candidate I take

9    it, to your knowledge, the senator is aware of that

10   information; correct?

11             THE WITNESS:   Yes.

12             THE COURT:   And I assume he incorporates that into

13   whatever he is going to do?

14             THE WITNESS:   Yes, but he is not going to be bullied

15   into choosing someone because of public pressure.

16             THE COURT:   All right.   Thank you.

17   BY MR. WEITZMAN:

18   Q.   Actually, before you put up the next government exhibit, so

19   the issue is the public pressure campaign, correct?

20   A.   Yes.

21   Q.   Nonetheless, Senator Menendez was supportive of Jamel

22   Semper; correct?

23   A.   For?

24   Q.   For a front office position, as you testified?

25   A.   Yes.

O6i5men5                    Soliman - Cross

1    MR. WEITZMAN:  If we can turn to Government Exhibit

2   A113-PH 8?

3         Now, in May 2021, early May and throughout April, or

4   in April -- late April 2021, you were having conversations with

5   Phil Sellinger; correct?

6   A.  I think it was a conversation, one conversation, yes.

7   Q.  Only one conversation?

8   A.  I think so.

9   Q.  You don't recall speaking to him by phone?

10  A.  I do.  With Mr. Sellinger, yes.

11  Q.  OK.  I'm sorry, then let me ask again.

12        In late April 2021 you were communicating with

13  Mr. Sellinger by phone, correct?

14  A.  Yes.

15  Q.  And you were speaking to him about the nomination as U.S.

16  Attorney; right?

17  A.  Yes.  Yes, to the extent that I testified.  That was the

18  depth of it.

19  Q.  And one of the things that Senator Menendez was keen on

20  that we just talked about this, was increasing diversity in the

21  front office of the U.S. Attorney's office to?

22        MR. RICHENTHAL:  Objection to "keen on" and "just

23  talked about this."

24        MR. WEITZMAN:  Let me rephrase.

25  Q.  One of the things that Senator Menendez indicated to you

1    was his desire for there to be more diversity in the front

2    office of Phil Sellinger's U.S. Attorney's office; correct?

3              MR. RICHENTHAL:  Objection.  Misstates.

4              THE COURT:  I will allow it.

5              THE WITNESS:  Yes.

6    Q.  In this government exhibit you said:  Thanks.  Also I think

7    you'll call Sellinger, you'll comfortable with what he says.

8         Sir, isn't it correct that the thing that you were telling

9    Senator Menendez that he would be comfortable Sellinger saying

10   was his commitment to diversity at the U.S. Attorney's office?

11             MR. RICHENTHAL:  Objection.  Argument.

12             THE COURT:  Sustained.

13   Q.  Sir, do you recall that in connection with Senator

14   Menendez' desire for additional diversity at the U.S.

15   Attorney's office, you had such a conversation with Phil

16   Sellinger?

17   A.  I don't.

18   Q.  You don't have that recollection as you sit here?

19   A.  No.

20   Q.  When you say in this text chain "you will be comfortable

21   with what he says," you don't have a clear recollection of what

22   you are referring to; isn't that correct?

23   A.  Right.  Correct.  There is one of two things I mentioned.

24   Q.  Could it be one of three things, including diversity?

25             MR. RICHENTHAL:  Objection.  Asked and answered,

O6i5men5                          Soliman - Cross

 1   argument.

 2              THE COURT:  Sustained.

 3   Q.  You say it could be one of two things.  You don't know

 4   which of those two things it could be; correct?

 5   A.  Correct.

 6   Q.  And despite all the interviews you had with the government,

 7   you can't narrow which of the two things it is, correct?

 8              MR. RICHENTHAL:  Objection.

 9              THE COURT:  Sustained.

10   Q.  This line doesn't refer to the Daibes case; correct?

11   A.  Which line?

12   Q.  This line, this text message.  You are not referring to the

13   Daibes case in this, are you?

14              MR. RICHENTHAL:  Objection.

15              THE COURT:  Sustained.

16              What are you referring to when you say:  I think you

17   if you call Sellinger, you will be comfortable with what he

18   says.

19              THE WITNESS:  As I testified earlier, it is Sellinger

20   wanted to get this message to the senator so he was, it seemed

21   like good news so it was either that about the recusal or that

22   there was nothing in his history that we should be worried

23   about because we were just coming off the Esther Suarez series

24   of negative articles.

25   Q.  And your job, in connection with the senator, was to make

O6i5men5                              Soliman - Cross

1    sure that there is nothing in Sellinger's history that would

2    result in bad press, correct?

3           MR. RICHENTHAL:  Objection.  Asked and answered.

4    There was a whole line of inquiry on this.

5           THE COURT:  Sustained.

6    Q.  Sir, was that the principal job you had?

7           MR. RICHENTHAL:  Same objection.

8           THE COURT:  Sustained.  You have established it, sir.

9    Q.  Sir, this May 2 text message, was it after your phone call

10   with Senator Menendez in which you claim to have relayed the

11   substance of your phone call with Phil Sellinger about recusal?

12          MR. RICHENTHAL:  Again, asked and answered.

13          MR. WEITZMAN:  It's not.  I didn't ask whether this --

14          THE COURT:  I will allow it.

15          THE WITNESS:  I don't remember.

16   Q.  You don't know whether this is before or after that phone

17   call?

18   A.  No, but it, to the best of my memory, would be after.

19   Q.  Is there any context in this text chain that could refresh

20   your recollection as to whether you are talking about

21   background research or Mr. Daibes?

22          MR. RICHENTHAL:  Objection.

23          THE COURT:  Yes.

24          Looking at this does that refresh your recollection in

25   any regard?

1          THE WITNESS:  About whether or not I'm talking

2    about --

3          THE COURT:  What you are talking about.  Whether you

4    are talking about the reference as to what Justice said or the

5    fact that there was nothing in Sellinger's background that

6    would cause concern, in his view.

7          THE WITNESS:  No.

8    BY MR. WEITZMAN:

9    Q.  Sir, Senator Menendez was -- withdrawn.

10         Do you know whether Senator Menendez was being lobbied

11   by Black ministers to push for Mr. Semper to be in the front

12   office of the U.S. Attorney's office?

13         MR. RICHENTHAL:  Asked and answered.

14   Q.  At this time?

15         THE COURT:  At that time.  I will allow it.

16   A.  He was -- he was being lobbied for Mr. Semper to become the

17   U.S. Attorney.

18   Q.  And at some point in time when Phil Sellinger was

19   nominated?

20   A.  Yes.

21   Q.  Was he being lobbied by Black ministers to have Mr. Semper

22   promoted to the front office of the U.S. Attorney's office?

23   A.  Yes.

24   Q.  I take it you testified about this but just to refresh my

25   recollection, Senator Menendez recommended Jamel Semper to

1   become federal judge, correct?

2                MR. RICHENTHAL:  I think that is the third time.

3                THE COURT:  There has been testimony on it.  Really.

4   Q.  And that occurred in 2023?

5                MR. RICHENTHAL:  I think that's at least the second

6   time.

7                THE COURT:  When was it?

8                THE WITNESS:  2023.

9   Q.  Mr. Sellinger ultimately became U.S. Attorney in

10  December 2021; correct?

11               THE COURT:  That's been established.  Next.

12               MR. WEITZMAN:  I am just putting time on it, your

13  Honor?

14               THE COURT:  Yes.  It has been established.  Next.

15  Q.  In January of 2022 you had a conversation with Senator

16  Menendez about Sellinger's recusal; correct?

17  A.  Yes.

18  Q.  And you testified on direct that after Mr. Sellinger was

19  sworn in, Senator Menendez learned that Mr. Sellinger did have

20  to recuse himself from the Daibes case, correct?

21  A.  Correct.

22  Q.  Was that a phone call you had with the senator or an

23  in-person meeting?

24  A.  I don't remember.

25  Q.  Do you recall the length of that conversation, whether it

O6i5men5                        Soliman - Cross

1    was by phone or in person?

2    A.  All of my conversations were short with the senator.

3    Q.  Do you recall specifically what the senator said on that

4    call, the precise words you used in that conversation, not

5    call?

6    A.  He said that the issue that Mr. Sellinger said that he did

7    not have to recuse himself from that in fact he has recused

8    himself and he wanted to understand why.

9    Q.  Fair to say Senator Menendez was, in your recollection,

10   confused?

11   A.  Yes.

12   Q.  And he was confused because, as you recalled, what he was

13   telling you was different than what you had told him

14   previously?

15          MR. RICHENTHAL:  Objection to asking to opine why at

16   all Mr. Menendez was confused.

17          THE COURT:  Do have you an understanding why he was

18   confused?

19          THE WITNESS:  Because Mr. Sellinger said that he did

20   not have to recuse himself and then in fact he did recuse

21   himself.

22          THE COURT:  And so the senator wanted to find out why.

23          THE WITNESS:  Yes.

24          THE COURT:  That's what he asked you, correct?

25          THE WITNESS:  That's correct.

O6i5men5                          Soliman - Cross

```
 1                 THE COURT:  Find out why.

 2                 THE WITNESS:  Yes.

 3                 THE COURT:  In words or substance.

 4                 THE WITNESS:  Yes.

 5                 THE COURT:  Next.

 6   BY MR. WEITZMAN:

 7   Q.  In your experience Senator Menendez is detail oriented;

 8   correct?

 9                 MR. RICHENTHAL:  Vague.

10                 THE COURT:  I will allow it.

11   A.  Yes.

12   Q.  He is precise in his questions and he wants precise

13   answers?

14                 MR. RICHENTHAL:  Objection to wants.

15                 THE COURT:  I will allow it.

16   A.  Yes.

17   Q.  Inconsistency in responses is something that he harps on;

18   correct?

19                 MR. RICHENTHAL:  Objection.

20                 THE COURT:  Sustained.

21   Q.  Mr. Sellinger's recusal, when Senator Menendez referenced

22   Mr. Sellinger's recusal, he didn't chastise you; correct?

23   A.  That's correct.

24   Q.  He wasn't angry at you, correct?

25                 MR. RICHENTHAL:  Objection.
```

1          THE COURT:  Was he angry in that conversation, sir, to

2    your recollection?

3          THE WITNESS:  No.

4    Q.  He was calm?

5    A.  Yes.

6    Q.  But confused?

7    A.  Yes.

8    Q.  In fact, you were confused, too, given what you recall

9    Sellinger told you, right?

10   A.  I didn't have much of an opinion.

11   Q.  Senator Menendez didn't say that he wanted Sellinger to

12   handle the Daibes case in any particular way?

13   A.  I'm sorry.  Can you ask that again?

14   Q.  Yes.  At no point in time --

15         THE COURT:  Did Senator Menendez say, at any point in

16   time, that he wanted Sellinger to handle the Daibes case?

17         THE WITNESS:  No.

18   Q.  In this conversation with him he didn't express to you that

19   he thought Sellinger should handle the Daibes case in a

20   particular way, correct?

21   A.  No.  Correct.

22   Q.  And he didn't express to you that he preferred Sellinger to

23   be the U.S. Attorney overseeing the Daibes case; correct?

24   A.  Correct.

25   Q.  From your many interactions with Senator Menendez, would

O6i5men5                              Soliman - Cross

1   you agree that Senator Menendez respected Phil Sellinger?

2                MR. RICHENTHAL:  Objection.

3                THE COURT:  Sustained.  Asked and answered.

4   Q.  You told Senator Menendez that you had called Phil

5   Sellinger in an effort to relay this question; correct?

6   A.  Yes.

7   Q.  But you never did, right?

8   A.  Correct.

9   Q.  And you did because you are not a lawyer and so --

10               THE COURT:  He did what?  You said he did.

11  Q.  You didn't ask Sellinger the question because you are not a

12  lawyer; correct?

13  A.  Yeah.  I didn't have enough facts.  I didn't feel prepared

14  for it so I didn't want to make that call.

15  Q.  You didn't think there was anything improper in making that

16  question?

17               MR. RICHENTHAL:  Objection.

18               THE COURT:  Sustained.

19  Q.  Did you think there was anything improper or illegal in the

20  question that Senator Menendez asked you to ask --

21               THE COURT:  Did you think there was anything illegal

22  in making that call?

23               THE WITNESS:  No.

24  Q.  Now, in March 2022 you met with Phil Sellinger, correct?

25  A.  Yes.

O6i5men5                         Soliman - Cross

1   Q.  That was March 30th, do you recall?

2   A.  It was the end of March.

3   Q.  And that was a lunch unrelated to your work with Senator

4   Menendez; right?

5   A.  That's correct.

6   Q.  And it had nothing to do with Senator Menendez or the

7   Daibes case; right?

8          MR. RICHENTHAL:  Objection.

9          THE COURT:  Sustained.

10  Q.  It was a friendly lunch between you -- two friends, you and

11  Phil Sellinger; right?

12  A.  Yes.

13  Q.  You testified that you told Senator Menendez about the

14  lunch?

15  A.  Yes.

16  Q.  And it was common for you to tell Senator Menendez when you

17  were meeting with politicians, elected officials, or other

18  people who were important in his orbit; correct?

19  A.  That's correct.

20  Q.  And I think you testified that Senator Menendez asked you

21  to pass along a message to Phil Sellinger?

22  A.  Yes.

23  Q.  And the message was:  Provide Daibes all due process?

24  A.  Yes.

25  Q.  When the senator asked this of you, was his tone calm?

1    A.  He was frustrated.

2    Q.  He was frustrated.  He wasn't angry, though?

3    A.  No.

4    Q.  And he was frustrated because he said the U.S. Attorney's

5    office was non-responsive to Daibes' lawyer?

6            MR. RICHENTHAL:  Objection to why he was --

7            THE COURT:  Yes.

8            To your knowledge, do you have an understanding as to

9    why he was frustrated?

10           THE WITNESS:  No.

11   Q.  Did he express to you that there was some

12   non-responsiveness?

13   A.  Yes.  Yes, he did.

14   Q.  We did that on direct, right?

15   A.  Yes.

16   Q.  And so he thought the U.S. Attorney's office was

17   non-responsive to Fred Daibes' lawyer.  That's what he told

18   you, right?

19           MR. RICHENTHAL:  Objection to what he thought versus

20   what he said.

21           THE COURT:  Sustained.

22   Q.  He told you that he thought that the U.S. Attorney's office

23   was non-responsive to Daibes' lawyer; correct?

24   A.  Correct.

25   Q.  So he just wanted process, due process?

O6i5men5                      Soliman - Cross

 1              MR. RICHENTHAL:  Objection, your Honor, to asking this

 2    witness to opine what another person wanted.

 3              THE COURT:  What did he say he wanted?  The question

 4    is what he said he wanted.

 5              THE WITNESS:  He wanted Mr. Daibes to get all due

 6    process.

 7    BY MR. WEITZMAN:

 8    Q.  He didn't ask you to relay to Phil Sellinger that he wanted

 9    any particular treatment or result in the Daibes case; correct?

10    A.  Correct.

11    Q.  He didn't ask you to relay that he wants Daibes to get a

12    particular plea offer in that case from Phil Sellinger;

13    correct?

14    A.  Correct.

15    Q.  Or that the case should be dismissed, correct?

16    A.  Correct.

17    Q.  You didn't perceive Senator Menendez' request as an effort

18    to interfere with Daibes' case, did you?

19              MR. RICHENTHAL:  Objection.

20              THE COURT:  Did you perceive it that way?  Did you see

21    what Senator Menendez told you to do as an effort to interfere

22    with the case involving Daibes at the U.S. Attorney's office at

23    that time?

24              THE WITNESS:  No.

25    Q.  You didn't perceive the message that you were asked to

1  relay as an effort to pressure Phil Sellinger, did you?

2  A.  No.

3  Q.  Or to threaten Phil Sellinger, right?

4  A.  No.

5  Q.  You didn't perceive it as a threat?

6      Now, when you arrived at the lunch with Mr. Sellinger you

7  didn't bring up the Daibes cause, correct?

8  A.  Correct.

9  Q.  That's because Mr. Sellinger told you that if you are going

10  to talk about the senator or any cases, he would have to report

11  back; correct?

12  A.  I don't know if it is because of it.  I mean I would have

13  brought it up anyway because I'm not a lawyer but I did not

14  bring it up.

15  Q.  You didn't discuss Mr. Daibes' case at all in that lunch,

16  correct?

17  A.  Correct.

18  Q.  Or since that lunch with Phil Sellinger, correct?

19  A.  That's correct.

20  Q.  You have never mentioned the Daibes case to anybody who

21  works at the U.S. Attorney's office, correct?

22  A.  Correct.

23  Q.  In fact, the 2022 lunch was the last time you spoke to

24  Mr. Sellinger; right?

25  A.  I ran into him here and I said hello, so.

O6i5men5                        Soliman - Cross

1    Q.  Outside?

2    A.  Yes.  Otherwise, yes.

3    Q.  Now, after the lunch you did tell Senator Menendez what

4    happened; correct?

5    A.  Yes.

6    Q.  And how Phil Sellinger said that you can't discuss Senator

7    Menendez or any cases, correct?

8                MR. RICHENTHAL:  Objection misstates.

9                THE WITNESS:  Correct.

10               THE COURT:  I will allow it.

11   Q.  And Senator Menendez wasn't upset with you at that,

12   correct?

13               MR. RICHENTHAL:  Objection.

14               THE COURT:  To your knowledge, did he appear upset?

15               THE WITNESS:  With me?

16               THE COURT:  Yes.

17               THE WITNESS:  No.

18   Q.  He was calm when you relayed what happened in the lunch?

19   A.  Yes.  Yes.

20   Q.  And in fact he was apologetic, right?

21   A.  Yes.

22   Q.  He said I'm sorry I put you in an uncomfortable position,

23   basically?

24   A.  Yes.

25   Q.  After this lunch you never spoke about the Daibes case

1   again with Senator Menendez; correct?

2   A.   Correct.

3   Q.   You never discussed Mr. Sellinger's recusal again with

4   Senator Menendez; right?

5   A.   Correct.

6   Q.   Now, you were asked a few questions about Sellinger's

7   investiture ceremony.  Do you recall that?

8   A.   Yes.

9   Q.   Senator Menendez didn't tell you why he couldn't go to the

10  investiture, did he?

11             MR. RICHENTHAL:  Objection.  Misstates couldn't.

12             THE COURT:  Yes.

13  Q.   Did Senator Menendez tell you why he was not going to the

14  investiture ceremony when invited to the May investiture?

15  A.   No.

16  Q.   Are you aware whether Senator Menendez was in the country

17  or outside the country --

18             THE COURT:  Do you know where the senator was when the

19  May investiture took place?

20  A.   I do not.

21  Q.   Are you familiar with the World Economic Forum in Davos?

22             THE COURT:  Sustained.

23  Q.   Just generally.  Have you ever been to --

24             THE COURT:  Irrelevant.

25             MR. WEITZMAN:  If we can put up Defendant's Exhibit

O6i5men5                         Soliman - Cross

1   496?  Do you read press releases about Davos -- this is not in

2   evidence so not for the jury.

3   Q.  Have you ever seen this press release before, sir?

4              MR. RICHENTHAL:  Objection.  401, 403, hearsay.

5              THE COURT:  I will allow it.

6   A.  I don't remember this press release at all.

7   Q.  Have you ever seen press releases about the World Economic

8   Forum in Davos?

9              MR. RICHENTHAL:  Objection.  Relevance.  Ever?

10             THE COURT:  I will allow it.

11  A.  I have seen articles but not press releases.

12  Q.  Do you know whether Senator Menendez has ever attended the

13  World Economic Forum in Davos?

14             THE COURT:  I will allow it.

15  Q.  In Switzerland?

16  A.  I believe I remember him attending, yes.

17  Q.  Do you know whether he attended the Davos Switzerland World

18  Economic Forum on May 23rd, 2023?

19             MR. RICHENTHAL:  Asked and answered.

20             THE COURT:  I will allow it.

21  A.  I don't know.

22             MR. WEITZMAN:  If I may have a moment, your Honor?

23             THE COURT:  Yes:

24             MR. WEITZMAN:  Nothing further, your Honor.

25             THE COURT:  Thank you.

O6i5men5                          Soliman - Cross

1          Mr. Lustberg?

2          MR. LUSTBERG:  No questions.

3          THE COURT:  Mr. de Castro?

4          MR. DE CASTRO:  Yes.

5    CROSS-EXAMINATION

6    BY MR. DE CASTRO:

7    Q.  Good afternoon, Mr. Soliman.

8    A.  Good afternoon.

9    Q.  My name is Cesar de Castro.  I represent Fred Daibes.  OK?

10   A.  Yes.

11   Q.  Now, I think you testified that it was your understanding

12   that both Senators Booker and Menendez wanted a diversity

13   selection for the U.S. Attorney for the District of New Jersey;

14   is that right?

15          MR. RICHENTHAL:  Objection.

16          THE COURT:  Did you have that understanding, sir?

17          THE WITNESS:  I know Senator Menendez wanted

18   diversity.

19   Q.  And you were shown, and in fact you testified, I think you

20   were shown, that also the White House supported candidates that

21   came from diverse background?

22   A.  That's right.

23          THE COURT:  I will allow it.

24   Q.  Now, you were shown, I think it was, an e-mail and you were

25   asked some questions about the senator not wanting to be boxed

1   in, I think you described it.  Do you remember that?

2               MR. RICHENTHAL:  Misstates.

3               THE COURT:  No, actually there are two separate lines

4   of inquiry.

5   Q.  Let me ask it this way to make it clear for you.

6       Do you remember seeing an e-mail where the senator was not

7   intending to appoint somebody Hispanic?

8   A.  Yes.

9   Q.  Now, you understood that message to mean that he did not

10  want to be boxed in; is that correct?

11  A.  Yes.

12  Q.  And you described being boxed in as being sort of pressured

13  or pushed in one direction or the other; is that right?

14  A.  That's correct.

15  Q.  And at that moment there was going to be, potentially, a

16  story out that he was going to nominate a Hispanic for the

17  District of New Jersey U.S. Attorney position; right?

18              MR. RICHENTHAL:  Objection.  Misstates.

19              THE COURT:  I will allow it.

20  A.  I think what you are referencing is that Mr. Wildstein, the

21  publisher of the NJ Globe, wanted to write that.

22  Q.  Contemplating a story --

23  A.  Yes.

24  Q.  -- in that regard?

25  A.  That is correct.

O6i5men5                          Soliman - Cross

1   Q.  And the concern was that that could box him in and pressure

2   him into making that exact appointment?

3           MR. RICHENTHAL:  Objection.

4           THE COURT:  Is that Senator Menendez' concern, to your

5   understanding?

6           THE WITNESS:  Yes.

7   BY MR. DE CASTRO:

8   Q.  And was it your understanding that the Senator wanted to

9   think about Hispanic candidates, other minorities and

10  non-minorities as well?

11  A.  I think at the time of that interaction he had somebody in

12  mind.

13          THE COURT:  To recommend to the president?

14          THE WITNESS:  Yes.

15          THE COURT:  And who was that?

16  A.  Mr. Sellinger.

17  Q.  But he was not close-minded to other potential candidates,

18  to your understanding?

19          MR. RICHENTHAL:  Objection.

20          THE COURT:  Sustained.

21  Q.  Was it your understanding that he would consider other

22  candidates as well?

23          MR. RICHENTHAL:  Objection.

24          THE COURT:  I will allow it.

25          Had he made up his mind who to recommend to the

O6i5men5                        Soliman - Cross

 1   president at that time?

 2              THE WITNESS:  Yes.  That was my understanding.

 3   Q.  But you did learn that the White House did encourage

 4   diversity selection, correct?

 5              THE COURT:  Sustained.  We have been over it.

 6   Q.  And at some point he changed his mind, right?

 7   A.  Yes.

 8   Q.  And he put forth a candidate that had a diverse background?

 9   A.  Yes.

10   Q.  And that was Esther Suarez, right?

11   A.  That's correct.

12   Q.  And was it your understanding that someone like Esther

13   Suarez, coming from a diverse background, was something that

14   both Senators Booker and Menendez could support?

15              MR. RICHENTHAL:  Objection.  Asked and answered.

16              THE COURT:  Sustained as phrased.

17   Q.  Was someone like -- withdrawn.

18        Was your understanding that her background was something

19   that both Senators Booker and Menendez would be interested in

20   supporting for U.S. Attorney?

21              THE COURT:  You mean the fact that she was Hispanic?

22   Because her background includes a lot more than that.

23   BY MR. DE CASTRO:

24   Q.  That she was Hispanic; yes, Judge.

25   A.  I really can't speak for Senator Booker.

O6i5men5                          Soliman - Cross

1   Q.  But for Senator Menendez you would agree with me?

2   A.  Yes.

3          MR. RICHENTHAL:  Agree with what?

4          MR. DE CASTRO:  I'm sorry?  I didn't hear.

5          THE COURT:  The objection is what agree with what?

6   Why don't you adduce.

7   BY MR. DE CASTRO:

8   Q.  You would agree with me that Senator Menendez, that your

9   understanding was that Senator Menendez would support a

10  candidate who had the diverse background of Esther Suarez?

11         MR. RICHENTHAL:  Time frame?  Scope?

12  Q.  When Esther Suarez was put up as U.S. Attorney?

13         THE COURT:  I will allow it.

14  A.  Yes.

15  Q.  Now, the idea to recommend Esther Suarez as the potential

16  candidate came from Donald Scarinci; is that right?

17         MR. RICHENTHAL:  Objection.  Asked and answered.

18         THE COURT:  I will allow it.  Let's move it forward.

19  A.  I don't know.

20  Q.  Do you remember meeting with the U.S. Attorney's office in

21  August, August 4 of 2023?

22  A.  Yes.

23  Q.  And do you remember telling the U.S. Attorney's office that

24  the idea for Ms. Suarez came from Donald Scarinci?

25  A.  I may have.  My recollection is that Donald was very

1  involved in wanting updates on the public relations effort that

2  I was working on for Ms. Suarez.

3  Q.  And that would make sense that it came from him since he

4  worked with her before, right?

5          THE COURT:  Sustained.

6  Q.  And he had worked with her in the past, correct?

7          THE COURT:  I will allow it.

8  A.  He had, yes.

9  Q.  In fact, she had worked for him in the past?

10         THE COURT:  That's been established.

11  Q.  Now, Ms. Suarez would have been a historic appointment,

12  isn't that correct?

13  A.  Yes.

14  Q.  And she would have been an historic appointment because she

15  would have been the first Hispanic U.S. Attorney for the

16  District of New Jersey; right?

17  A.  That's correct.

18  Q.  And then, after all of the bad press Mr. Scarinci calls

19  you, right?

20  A.  Yes.  I'm sorry.  It is not after the bad press.

21  Q.  During?

22  A.  Or before.

23  Q.  Well, did Mr. Scarinci call you because he was unhappy

24  about the bad press that Ms. Suarez was receiving in the

25  nomination process?

1    A.  He said Ms. Suarez is getting a lot of reporter inquiries,

2    she is freaking out about it.  She doesn't know how to deal

3    with the press.  Can you help her?

4    Q.  I know you remember being at the U.S. Attorney's office in

5    August of 2023, you already answered that.  Do you remember

6    telling the U.S. Attorney's office that he called you after bad

7    press to sort of express frustration?

8    A.  Yes.  He called me several times, so after would be

9    accurate.

10   Q.  He also called you after her name was pulled?

11   A.  Yes.

12   Q.  To express his unhappiness as well, right?

13   A.  Yes.

14   Q.  Switch topic.  You first heard of Mr. Daibes and the

15   senator's friendship about 14 years ago, does that sound right?

16   2010?

17   A.  Yes.

18   Q.  And this was when you were working for Senator Menendez;

19   correct?

20   A.  Yes.

21   Q.  And I think you learned that he was meeting with Mr. Daibes

22   at some point; is that right?

23   A.  Yes.

24   Q.  And you understood at the time that they were friends?

25   A.  I don't know what I understood at the time.

O6i5men5                        Soliman - Cross

1    Q.  You did see him at the senator's wedding later in 2020?

2    A.  Yes, I did.

3    Q.  And I think it has already been established that was only

4    close friends were at that wedding, right?

5             MR. RICHENTHAL:  Objection.  Misstates.

6             THE COURT:  Sustained.

7    Q.  That was a very intimate wedding, right?

8    A.  Yes.

9    Q.  Did you recognize a lot of people at the wedding?

10   A.  I did not, but it was his close friends, so.

11   Q.  Now, the senator was divorced in or around 2004 or 2005;

12   right?

13            MR. RICHENTHAL:  Objection.

14            THE COURT:  Sustained.

15   Q.  Are you aware that the senator was divorced in or around --

16            THE COURT:  Sustained.  Beyond the scope.

17   Q.  You had never met Mr. Daibes; is that right?

18   A.  I met him at the wedding.

19   Q.  Before the wedding -- my apologies.  Before the wedding you

20   had never met him?

21   A.  No.

22   Q.  Now, at the time at the wedding you also saw Mr. Sellinger

23   at the wedding; correct?

24   A.  Yes.

25   Q.  And at that time Mr. Sellinger was working at a large law

1    firm, Greenberg Traurig?

2    A.  Yes.

3    Q.  And Donald Trump was still the president of the United

4    States?

5    A.  That's correct.

6    Q.  The election in which Biden was elected was about a month

7    or a little bit more away?

8    A.  Yes.

9    Q.  And at the time you understood that Craig Carpenito was the

10   U.S. Attorney for the District of New Jersey; right?

11   A.  That's correct.

12   Q.  So Mr. Sellinger would not be appointed as U.S. Attorney

13   for more than a year after the wedding; right?  The wedding was

14   in October of 2020.  Mr. Sellinger --

15   A.  That's what ended up happening, right.

16   Q.  Now, to your lunch with Mr. Sellinger in March of 2022 I

17   just have a couple questions.  OK?  That lunch, you set it up

18   as a social lunch, right?

19   A.  Yes.

20   Q.  But you had called Mr. Sellinger because a colleague of

21   yours had been a victim of fraud; right?

22   A.  Yes.

23   Q.  You wanted to ask his advice, right?

24   A.  Yes.

25   Q.  And you ultimately set up this meeting?

1   A.  Yes.

2   Q.  Now, would you agree with me that it is generally a small

3   group that advises the senator in terms of the U.S. Attorney's

4   office appointment?

5   A.  That it is a small group?

6   Q.  Yes.

7   A.  Yes.

8   Q.  And you would say you are part of that group advising him

9   on the public relations front; right?

10  A.  Yes, public relations lane that's -- yes, my involvement.

11  Q.  I'm sorry?

12  A.  The publication relations lane is my involvement.

13  Q.  You are in that lane?

14  A.  Yes.

15  Q.  Now, you are not aware of Mr. Daibes being anyone in which

16  Senator Menendez consults with respect to appointments?

17  A.  No.

18          MR. DE CASTRO:  Thank you very much.

19          THE COURT:  Is there redirect?

20          MR. RICHENTHAL:  There is, if I can beg your and the

21  jury's indulgence, I can get this done fast.

22          THE COURT:  All right.

23  REDIRECT EXAMINATION

24  BY MR. RICHENTHAL:

25  Q.  Mr. Soliman, do you recall being asked questions about

1    alleged conflict of interest?

2    A.   A few minutes ago?

3    Q.   Yes.

4    A.   Yes.

5    Q.   At any point in the conversations with Senator Menendez

6    about choosing Mr. Sellinger, did Mr. Menendez ever express a

7    concern he had a conflict of interest?

8            THE COURT:   Whom had a conflict of interest?

9    Q.   Mr. Sellinger.

10   A.   No.

11   Q.   At any point in talking with Fred Turner about the

12   selection of Mr. Sellinger, did Mr. Turner ever express a

13   concern that Mr. Sellinger had a conflict of interest?

14   A.   No.

15   Q.   At any point in selecting Mr. Sellinger, did anyone in the

16   small circle advising on this express a concern that

17   Mr. Sellinger had a conflict of interest?

18           MR. WEITZMAN:   Objection.   Argumentative.

19           THE COURT:   No, I will allow it.

20   A.   No.

21   Q.   At any point in the conversations with Senator Menendez

22   regarding Mr. Sellinger, did Mr. Menendez ever express a

23   concern to you that Mr. Sellinger might have trouble being

24   confirmed?

25   A.   No.

O6i5men5                      Soliman - Redirect

1    Q.  At any point in your conversations with Mr. Menendez, did

2    Mr. Menendez ever express a concern to you that Mr. Sellinger

3    might be blocked by the White House?

4    A.  No.

5    Q.  At any point in your conversations with --

6           THE COURT:  Slower, sir.  Slower.

7    Q.  At any point in your conversations --

8           THE COURT:  Not lower.  Slower.

9    Q.  At any point in your conversations with Fred Turner, did

10   Mr. Turner ever express a concern that Mr. Sellinger would not

11   have a successful nomination?

12   A.  No.

13   Q.  Or a successful confirmation?

14   A.  No.

15   Q.  Or could not get through the White House?

16   A.  No.

17          MR. RICHENTHAL:  Next subject.  Now I want to go back

18   to Government Exhibit A113-PH1.  Ms. Wechsler, if you can put

19   it on the screen?  Can we go to the second page, please?  Thank

20   you.

21   Q.  Do you recall being asked questions about this back and

22   forth with Senator Menendez on November 11, 2020?

23   A.  Yes.

24   Q.  Do you recall being asked about what an individual named

25   Lee would be told about the Biden team and how they intend to

O6i5men5                          Soliman - Redirect

1    proceed?

2    A.   Yes.

3    Q.   As of the date of this message, would the individual named

4    "Lee" under serious consideration by Senator Menendez for

5    appointment?

6              MR. WEITZMAN:  Objection.  Beyond the scope.

7              MR. RICHENTHAL:  It is literally what they asked.

8              THE COURT:  Just a moment.  I will allow it.

9    A.   Can you ask the question?

10   Q.   Mr. Soliman, as of the date of this message in your

11   conversations with Senator Menendez, did you understand the

12   individual named Lee to in fact be something Mr. Menendez was

13   waiting to hear about from the Biden team?

14   A.   No.

15   Q.   As of the date of this message, was there an individual

16   that you understood Senator Menendez intended to recommend for

17   U.S. Attorney?

18   A.   Mr. Sellinger.

19             MR. RICHENTHAL:  Now, let's go to Government Exhibit

20   A113-PH4.  If we can go down to the bottom, please?

21   Q.   Do you recognize this test message, Mr. Soliman?

22   A.   Yes.

23   Q.   As of the date of this message that is December 17, 2020,

24   was Mr. Menendez asking you to look into a different person,

25   not Mr. Sellinger?

1   A.  Yes.

2   Q.  Who?

3   A.  Esther Suarez.

4   Q.  Prior to this approximate date, had Mr. Menendez ever

5   mentioned Esther Suarez to you as a potential candidate for

6   U.S. Attorney?

7            MR. WEITZMAN:  Objection.  Asked and answered.

8            THE COURT:  Of I will allow it.

9   Q.  Mr. Soliman?

10  A.  No.

11  Q.  Prior to this date, approximately, had Mr. Menendez ever

12  mentioned to you Esther Suarez as potential candidate for U.S.

13  Attorney?

14  A.  No.

15           MR. WEITZMAN:  Objection.  Asked and answered.

16           THE COURT:  I will allow it.

17  A.  No.

18  Q.  No, he had not?

19  A.  He had not.

20  Q.  Do you recall being asked on cross about a number of other

21  people under alleged consideration for U.S. Attorney?  Do you

22  recall the series of questions?

23           MR. WEITZMAN:  Objection to allege.

24  Q.  Withdrawn.

25       Do you recall being --

1           THE COURT:  Slower.  Slower.

2   Q.  Do you recall being asked a series of questions by other

3   people who were potential candidate for U.S. Attorney?

4   A.  Yes.

5   Q.  To be clear, sir, other than Mr. Sellinger and Ms. Suarez,

6   from your conversations with Senator Menendez, was anyone else

7   ever under serious consideration for U.S. Attorney by

8   Mr. Menendez?

9           MR. WEITZMAN:  Objection.

10          THE COURT:  Yes, sustained.

11          MR. WEITZMAN:  Foundation.  Argumentative.

12          THE COURT:  Argumentative.

13  Q.  Mr. Soliman, on cross just now you said there were two

14  candidates.  Do you recall saying that?

15  A.  Yes.

16  Q.  Who were the two people?

17  A.  Philip Sellinger and Esther Suarez.

18  Q.  Who came first?

19  A.  Philip Sellinger.

20  Q.  Who came next?

21  A.  Esther Suarez.

22  Q.  Who came after that?

23  A.  Philip Sellinger.

24  Q.  Now, this is December 17, 2020.  Do you recall being asked

25  about a White House memo?

O6i5men5                          Soliman - Redirect

1   A.  Yes.

2                   MR. RICHENTHAL:  Can we go to Government Exhibit

3   A114-H8.

4   Q.  Mr. Soliman, is this on your screen?

5   A.  Yes.

6   Q.  Can we go to the last page with the letter, please?  Make

7   it the second to last page.  Keep going please?  One more?

8                   MR. WEITZMAN:  Objection, scope.  We didn't use this.

9                   MR. RICHENTHAL:  Oh, I can call up DX 193 if they

10  prefer, your Honor.

11                  MR. WEITZMAN:  Objection.

12                  THE COURT:  Yes, please.  Are you going to focus on

13  this which we have seen?

14                  MR. RICHENTHAL:  I am, your Honor.

15                  THE COURT:  That's OK.

16                  MR. RICHENTHAL:  Ms. Wechsler, can you blow up the

17  top?

18                  THE COURT:  Focusing on this page which is from the

19  White House.  You can ask questions about that, sir.

20  BY MR. RICHENTHAL:

21  Q.  Mr. Soliman, do you recall being asked questions about this

22  document?

23  A.  Yes.

24  Q.  Do you recall it being referred to as the White House memo?

25  A.  Yes.

O6i5men5                         Soliman - Redirect

1    Q.  What is the date on this?

2    A.  December 22, 2020.

3    Q.  Is that before or after December 17, 2020?

4    A.  After.

5    Q.  Do you recall being asked questions about the conversation

6    in which you learned from Mr. Turner that there had been a

7    falling out between Philip Sellinger sell and Mr. Menendez?

8    A.  Yes.

9    Q.  In your conversation with Mr. turner, did he refer to this

10   memo explaining why Senator Menendez shifted from Mr. Sellinger

11   to Ms. Suarez?

12           MR. WEITZMAN:  Objection.

13           THE COURT:  Sustained.

14   Q.  Did he refer in this memo, at all, to that conversation?

15           MR. WEITZMAN:  Objection.

16           THE COURT:  I will allow it.

17   A.  No.

18   Q.  Did Mr. Menendez, in talking with you about why he shifted

19   from Mr. Sellinger to Ms. Suarez?

20           THE COURT:  Change.  Don't use "shift."

21   Q.  When Mr. Menendez told you he was going to select Esther

22   Suarez, did he refer to this memo?

23   A.  No.

24   Q.  Finally, sir, you were asking questions about a statement

25   Mr. Menendez made to you regarding all due process.  Do you

O6i5men5                          Soliman - Redirect

1    recall those questions?

2    A.   Yes.

3    Q.   Now, at the time Mr. Menendez made that statement,

4    approximately how long had you been working for him?

5    A.   15 years.

6    Q.   In that 15-year period, had he ever asked you to reference

7    a particular criminal case with a prosecutor?

8              MR. WEITZMAN:   Objection, your Honor.

9              THE COURT:   I will allow it.

10   A.   No.

11   Q.   And what was that case that he asked you to reference?

12   A.   The Daibes case.

13   Q.   When he referenced that case, did you understand him to

14   want it to be handled exactly how it had been handled or

15   differently?

16             MR. WEITZMAN:   Objection.

17             THE COURT:   Sustained as phrased.

18   Q.   What did you understand Mr. Menendez to want to be conveyed

19   to Mr. Sellinger about whether the case should be handled the

20   same or differently?

21             MR. WEITZMAN:   Objection.

22             THE COURT:   I will allow it.

23   A.   He wanted all due process.

24   Q.   And what did you understand that to mean, Mr. Soliman?

25             MR. WEITZMAN:   Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        THE COURT:  Sustained.

2   Q.  When Mr. Menendez said all due process, how did he say it?

3   A.  How?

4   Q.  Yes, sir.

5        MR. WEITZMAN:  Objection.

6        THE COURT:  I will allow it.

7   A.  I would like you to ask Mr. Sellinger to give Mr. Daibes'

8   case all due process.

9   Q.  Did he seem happy, unhappy, or something else?

10       THE COURT:  What was his tone?

11  Q.  What was his tone?

12  A.  He was frustrated because Mr. Daibes' counsel was not

13  getting responses from the U.S. Attorney's office.

14  Q.  Frustrated with the handling of the case?

15  A.  Yes.

16  Q.  Now since that much has he ever mentioned another criminal

17  case?

18  A.  No.

19       MR. WEITZMAN:  Objection, your Honor.

20       THE COURT:  I will allow it.

21  Q.  Mr. Soliman?

22  A.  No.

23  Q.  Was that the only case Mr. Menendez ever mentioned to you

24  in the entire history of your interactions with him?

25       THE COURT:  Sustained as phrased.  We have been over

O6i5men5                          Soliman - Redirect

1   this.  There is evidence here already.

2   Q.  Mr. Soliman, was the Daibes case the only case you were

3   asked to talk to a prosecutor about ever?

4               MR. WEITZMAN:  Objection.

5               THE COURT:  Well, that's a broader question.  I will

6   allow that one.

7               MR. RICHENTHAL:  I will narrow it.

8   Q.  By Mr. Menendez or anyone on his behalf, was the Daibes

9   matter the only case you were ever asked to talk to a

10  prosecutor about?

11  A.  Yes.

12              MR. RICHENTHAL:  No further questions.

13              THE COURT:  Thank you.  You are excused, sir.  You may

14  step down.  Thank you.

15              (Witness excused)

16              THE COURT:  Ladies and gentlemen, tomorrow is

17  Juneteenth.  We are off.  We will see you on Thursday at 9:30.

18  We will have another full day of testimony.

19              Keep an open mind, don't discuss this case, enjoy

20  Juneteenth, I will see you Thursday morning at 9:30.

21              (Continued on next page)

22

23

24

25


                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O6i5men5                          Soliman - Redirect

1              (Jury not present)

2              THE COURT:  Counsel, when the jury leaves take 10

3     minutes and then we will come back for the issue we discussed,

4     the chart.

5              MR. FEE:  Can we let our clients go?

6              THE COURT:  Oh yes.  This will be a legal discussion.

7     Thank you.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6iWmen6

1          THE COURT:  Please be seated.

2          All right.  I have exhibit A, ECF-455.  I have

3     ECF-455, and it sets forth the government's views of the

4     objections of the defendants to specific entries on GX 1304.

5     This is, I take it, GX 1305, because it has the addition of the

6     two columns on the end.

7          I'm not quite sure how the parties want to do this.

8     Perhaps the easiest way is to just go through the government's

9     letter from start to finish.

10          MR. MONTELEONI:  The government has no objection, but

11     just for clarity of the record, Government Exhibit 1305 is a

12     different exhibit entirely.  This is just exhibit A, which is

13     essentially an annotated 1304.  So we don't have a special

14     exhibit number for it.

15          THE COURT:  I'm sorry.  You're right.  1305 was used

16     today, if I remember correctly, and it was different.

17          OK.  So this is 1304 with the two columns added.

18          All right.  Let's start then.

19          MR. WEITZMAN:  Your Honor, just to simplify things,

20     there are a number of line items on the chart that we are

21     withdrawing our objections from.

22          THE COURT:  Well, I know that Mr. Hana has withdrawn

23     all of his objections, but yes, if you would, that will help.

24          MR. WEITZMAN:  Yes.  I will tell you we're withdrawing

25     all of our objections to all the line items up to line 93.

O6iWmen6

1          THE COURT:  That's very helpful, sir.  Thank you.

2          MR. WEITZMAN:  Categorically, I'll tell you the

3   category of objections that we're sustaining and what we're

4   withdrawing.

5          To the extent that the objection was to hearsay

6   involving, for example, communications with Mr. Soliman, we're

7   withdrawing those objections under the agent exception to the

8   hearsay rule.

9          The principal objections at this point are twofold.

10          The first is we object to the documents produced by

11   Heritage.  Your Honor will recall we sought to depose Heritage.

12   The government has interviewed Heritage but has not requested

13   that they appear for trial, and we were denied the Rule 15

14   deposition.  The government stated that they would call Andrew

15   Good, a partner at Skadden, to authenticate the Heritage

16   documents.  Based on the witness list that they identified the

17   other day -- I guess yesterday -- I didn't see Andrew Good on

18   that witness list.

19          MR. MONTELEONI:  Your Honor, if I can address that, we

20   are planning to call Andrew Good, and we certainly would be

21   offering these documents subject to connection with respect to

22   authenticity until his international travel gets sorted.  We

23   expect that that's going to be early next week.  Whether Monday

24   or Tuesday, we're still working out the details.

25          THE COURT:  And he's limited to the authenticity of

O6iWmen6

1        the documents.

2                MR. MONTELEONI:  That is exactly what we'll be calling

3        him about.

4                MR. WEITZMAN:  Your Honor, I'm not sure that that's

5        really a "subject to connection" issue.  Subject to connection

6        would be, for instance, on a hearsay exception, coconspirator.

7        This is the bulk of our objections, and I think that they need

8        to establish the authenticity and that this witness can

9        authenticate the documents before they offer this.  They've had

10       five weeks to call Andrew Good.

11               MR. MONTELEONI:  Your Honor, he was here on Thursday.

12       If there had not been a medical reason that court could not

13       proceed on that day, we would have done it this way.  And for

14       arranging a witness's international travel, when we didn't know

15       that we'd be proceeding even today until yesterday at 2:30,

16       it's just not realistic.

17               THE COURT:  Where is he coming from?

18               MR. MONTELEONI:  London.

19               THE COURT:  And you're going to get him here when?

20               MR. MONTELEONI:  Tuesday.  We could perhaps do Monday,

21       but we think Tuesday makes more sense.

22               MR. WEITZMAN:  Your Honor, we don't object to video

23       testimony.  We can do this, but I think the documents should be

24       authenticated before we show dozens of documents to the jury,

25       and I think that we have some serious questions about whether

O6iWmen6

1    he can authenticate all of them.

2            MR. MONTELEONI:  Your Honor, we've put forth our basis

3    for authenticity here, and we think that that's a sufficiently

4    strong showing, based on the cases that we've cited here, that

5    this is precisely the situation where admissions subject to

6    connection --

7            THE COURT:  I'm going to allow it as long as you get

8    him here as soon as you can.

9            MR. MONTELEONI:  Thank you, your Honor.

10            THE COURT:  What else, Mr. Weitzman?

11            MR. WEITZMAN:  The second category, this one is very

12    important.  They offer a number of communications that are

13    purely internal Heritage communications or communications

14    between Sheikh Sultan Al Thani and others in Qatar.

15            THE COURT:  Those, if I remember correctly, are

16    basically between Sheikh Sultan, who is the investor, and then

17    Al Thawadi, who is his right-hand man.

18            MR. WEITZMAN:  I don't know that he's his right-hand

19    man.  He works at Heritage.

20            THE COURT:  OK.

21            MR. WEITZMAN:  But he is someone that he consults

22    with.

23            THE COURT:  Yes.

24            MR. WEITZMAN:  The issue, your Honor, is that the

25    government made very specific representations in objecting to

O6iWmen6

1    our Rule 15 deposition of this very individual, Sheikh Al

2    Thani, as well as others at Heritage, and the specific

3    representations were that these deponents have no relevant

4    information to this case.  I will identify some of those

5    representations, but it's at pages 7 through, I believe, 11 of

6    Dkt. 369.

7              THE COURT:  I don't have that in front of me.

8              MR. WEITZMAN:  I understand, your Honor.

9              There can be no greater unfairness or prejudice that

10   they want to put in evidence, documents that concern these

11   individuals' statements and yet we have been deprived of the

12   opportunity to obtain their testimony.  For example, and I

13   think this is critical, your Honor, lines 124 through 126 --

14   sorry, 123 through 126.  It's a forward of a press release.

15             THE COURT:  Wait.  Just let me look at it.

16             Go ahead, sir.

17             MR. WEITZMAN:  In lines 123 through 126, these two

18   individuals, Al Thawadi and Al Thani, are texting or forwarding

19   a chairman's statement applauding the Qatari government's --

20             THE COURT:  But it's not for the truth.  It shows a

21   relationship between the parties, and it is relevant.  It's not

22   for the truth, context.

23             MR. WEITZMAN:  Your Honor, the question is why -- it's

24   one thing to forward it.  It's another thing to offer 124, 125

25   and 126.  124 is, Al Thawadi says to Al Thani it's very good.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6iWmen6

```
 1   That's for the truth that Al Thawadi thought this was a good
 2   press statement, so it is for the truth.  But there's no
 3   relevant purpose given what the government has articulated its
 4   theory of the case is.
 5           The government has said that all that matters is Fred
 6   Daibes's and Senator Menendez's state of mind.  As a result,
 7   this can have no relevant purpose, because it suggests that the
 8   Qatari state of mind is somehow relevant or material to the
 9   jury's determination.
10           THE COURT:  OK.
11           MR. WEITZMAN:  They've disavowed that.
12           THE COURT:  I understand.
13           MR. MONTELEONI:  Your Honor, if I may be heard on
14   that?  We certainly don't believe that the four topics that
15   they sought Rule 15 testimony on were relevant to the case, but
16   in denying that --
17           THE COURT:  Well, the standard for Rule 15 deposition
18   is high.  It's materiality and a variety of other things.
19   We're not dealing with that now.  We're not revisiting the Rule
20   15 deposition.
21           My notes from my opinion said there has to be a
22   showing of unavailability and materiality and necessary to
23   prevent a failure of justice.  That's a very high standard.
24   The determination of whether or not the Rule 15 deposition
25   should have been granted, we're past that.
```

O6iWmen6

1              Go ahead.

2              MR. MONTELEONI:  Absolutely, your Honor.

3              So I want to get to exactly why this is relevant, why

4    this is known to Menendez and Daibes and their state of mind,

5    but first, if you'll give me a moment, I just want to sweep out

6    of the way this hearsay issue.

7              Obviously a statement that reflects someone's state of

8    mind, whoever that declarant is, that is a hearsay exception,

9    and there's not any unfairness in admitting hearsay that is

10   subject to an exception without the witness being available;

11   that's just standard.  That's why there is an exception for it,

12   to allow that admission.  So it's really not a hearsay issue.

13             The only issue is, is it relevant to Menendez and

14   Daibes that Sheikh Sultan and Ali Al Thawadi, while they're

15   considering a multi-million dollar investment with Daibes, like

16   and appreciate the actions that Menendez are taking.  And that

17   is absolutely relevant because there's ample evidence that the

18   jury can infer that Menendez and Daibes were aware of this

19   general disposition that they had, this appreciation that they

20   had for actions like this press release.  Doesn't mean that

21   they were aware of the internal decision-making of ultimately

22   why they made the investment.  Doesn't mean that they were

23   privy to all their inner deliberations, but it does mean that

24   the basic facts, that when Menendez puts out a glowing

25   statement on the Qatari government that the two investors who

O6iWmen6

1    are linked to the government, who are considering the

2    investment, will appreciate that, is absolutely something that

3    Menendez and Daibes were well aware of.  And you know that

4    they're well aware of it because 18 days later, Menendez sends

5    another press release text to Daibes and specifically says, you

6    might want to send to them, I'm just about to release.

7            He is intending to give Daibes a prerelease copy of

8    the press release for the purpose of Daibes communicating it to

9    them before it goes out publicly precisely because he knows

10   they want it.  So there is ample evidence that the jury can

11   conclude that Menendez --

12           THE COURT:  He, Menendez, knows that the Qataris want

13   it.

14           MR. MONTELEONI:  Exactly.  Menendez's and Daibes's

15   texts to each other, where Menendez is --

16           THE COURT:  And presumably to show that the

17   conspiracy, as alleged by the government, is that Menendez

18   would say good things about the Qataris in an effort to assist

19   Daibes.  And this, your argument is, I take it, shows that's

20   exactly what was happening, but not offered for the truth.

21           MR. MONTELEONI:  Yes, that's exactly right.  We're not

22   using it to show that it was actually a good press release.

23   We're using it to show the state of mind, not any truth of the

24   matter offered.

25           THE COURT:  Mr. Weitzman.

O6iWmen6

```
 1            MR. WEITZMAN:  Yes, your Honor.  Two things.

 2            The first is, and indulge me as I read from the

 3   government's Rule 15 opposition brief for one moment.

 4            THE COURT:  Yes.

 5            MR. WEITZMAN:  On page 9, the last paragraph, this is

 6   a quote:  "Moreover, whether Menendez, in fact, was connected

 7   with the Qatari investment company and the Qatari investor or

 8   influenced the Qatari investment company to make the Daibes

 9   investment is irrelevant."

10            They took a position that whether Menendez influenced

11   the Qatari investor to invest in Daibes is not relevant to

12   their case, and yet these communications seek to do just that,

13   to explain -- to suggest, I should say, that the Qatari

14   investor, Heritage, decided to invest because of these chairman

15   statements.  They've staked a position --

16            THE COURT:  No.  I see what you're saying, but I don't

17   think that's so.  That's not why they sought to invest.  It's

18   to show that they liked the fact that Menendez was saying good

19   things about them; in other words, that Menendez had done his

20   part of the bargain -- I will say good things about the Qataris

21   and you will give me money, at least that's how I understand

22   the government's theory.

23            MR. WEITZMAN:  Then under that theory, your Honor,

24   there's no reason why the internal communications of the

25   Qataris is relevant.  Those communications don't go to Senator
```

O6iWmen6

Menendez.  They don't go to Fred Daibes.  There's no forward.
There's no from Al Thani or Al Thawadi, great job, so those
communications can't be relevant, nor does it become relevant.

          THE COURT:  Wait just a second.

          It doesn't have to go Menendez.  The idea is that it
reflects that the Qataris were indeed receptive to Menendez
saying good things about them.

          MR. WEITZMAN:  That would only be relevant if the
government's theory was that it swayed the Qataris in
connection with the investments.  Otherwise, why would the
Qataris' receptivity to Menendez's statements be relevant?

          If they were to stipulate, for example, consistent
with what they've written, that the Qatari investment had
nothing to do with the chairman statements, that would at least
be a consistent approach.  But there's no way they're going to
stipulate, because they're going to stand up in summation and
point to these very communications and say the Qataris were
pleased.

          THE COURT:  They can't for the truth of that, what's
in the statements.

          MR. WEITZMAN:  Your Honor, there's no relevant purpose
for those statements, internal communications between the
Qataris, other than to suggest that the Qataris were looking
favorably upon the Daibes investment in order to curry favor
with Senator Menendez.  What happens 18 days later is not a

O6iWmen6

1    reflection of these communications between Al Thani and Al

2    Thawadi.  Senator Menendez told a friend of his, hey, you may

3    want to let him know that there's a statement coming out on

4    Qatar.  That's not a bribe.  It's not illegal.  It's done

5    routinely, that you tell constituents.

6            THE COURT:  Why isn't the jury allowed to draw an

7    inference from that, that Menendez was carrying out his part of

8    the allegedly illicit bargain; that is, I will say good things

9    about Qatar?

10            MR. WEITZMAN:  We're not objecting to the later

11    communications from Menendez to Daibes.  I agree.  They can

12    offer that.  I'm objecting to internal communications between

13    these Heritage folks as to a state of mind that the government

14    has staked in its litigation is not relevant to this case.  It

15    can only be used to confuse and prejudice the parties and

16    confuse the jury to believe that somehow the Daibes investment

17    occurred because of the chairman's statements.

18            THE COURT:  Well, I take it you are still going to try

19    to show, at least based on conversations we had in open court,

20    that there were independent reasons why the investment was

21    going forward.  Correct?

22            MR. WEITZMAN:  We'd like to, your Honor.  However,

23    we've been stymied in those efforts in cross-examinations, but

24    we will --

25            THE COURT:  Not in regard to Qatar.

O6iWmen6

1          MR. WEITZMAN:  Yes, your Honor, we have been.  We

2     tried to ask Jamela Maali about that.  We did try to elicit

3     testimony about consultants that were hired by Heritage, and

4     there are limits to what we can do, because we don't have

5     access to any Heritage witnesses.  And in fact, the government

6     isn't calling them even to authenticate.  They're going to call

7     a Skadden partner, and I assure you if and when we try to

8     question the Skadden partner about Heritage, they will object

9     on scope.

10          THE COURT:  Well, probably.  Wait.  As I understand

11     it, much like the FBI agents, this person in London's

12     involvement is simply in assembling the materials and

13     testifying that yes, indeed, they come from Heritage.

14          MR. WEITZMAN:  No, your Honor.  He's been involved in

15     debriefings with the client.  He is a client contact.  He knows

16     about Heritage.  He knows about this deal.  I don't use this

17     term lightly, your Honor --

18          THE COURT:  Well, I assume the direct will only be on

19     authentication.

20          MR. WEITZMAN:  And how do we get Mr. Good back on our

21     case in chief?  He's in London.  We can't have limited scope,

22     scope objections when people are taken out of the jurisdiction

23     and aren't going to come back.  That is the game here, your

24     Honor.  They don't want Heritage to tell the truth to this

25     jury -- that Senator Menendez had nothing to do with --

O6iWmen6

1          THE COURT:  Slower.  Everybody goes so fast here.  At

2     least we don't have the interpreters to be concerned.

3          Our reporter is raising her hand.

4          Go ahead.

5          MR. WEITZMAN:  I don't say this lightly, your Honor.

6     We have our client's criminal indictment in our hands, and the

7     jury needs to hear the true account.  We've been deprived of

8     that ability because the government has done everything in its

9     power to prevent this jury from hearing testimony from

10    Heritage.

11         THE COURT:  How is that, when I found that the high

12    standard of Rule 15 was not met?  Certainly, I assume you could

13    have them come here.  I don't know whether they'd be willing

14    to.  I guess not.  As I recall the papers on Rule 15, they said

15    they would not come.

16         MR. WEITZMAN:  Correct.  They came here when the

17    government asked for interviews.  They voluntarily arrived for

18    government interviews.  They participated in government

19    interviews.  If the government were to ask them to appear in

20    court, they would.  In fact, they're sending their lawyers from

21    Skadden to appear on their behalf.  We have been deprived of

22    telling the true story here regarding Heritage, because the

23    government is making --

24         THE COURT:  What is the true story?  What is the true

25    story?

O6iWmen6

1          MR. WEITZMAN:  The true story, your Honor, is that

2     Heritage is independent of the Qatar government.

3          THE COURT:  I know a very little bit about it, but

4     based on the documents I've read, that's a very hard road to

5     make.  I don't have the Al Thawadi background paper in front of

6     me, but these men are royal, at least Sheikh Sultan is high

7     royalty within Qatar, and the other gentleman sits on some

8     executive committee of the investment group, to my

9     recollection.

10         MR. WEITZMAN:  Your Honor, with all due respect, when

11    Shaun Doherty, the COO of Heritage, spent hours with the

12    government, he said the opposite to them.

13         THE COURT:  That I don't know.

14         Go ahead.

15         MR. WEITZMAN:  Well, it's the 302 that we provided as

16    part of our Rule 15.  He said that Sheikh Al Thani --

17         THE COURT:  I held on the 302s that you were vastly

18    overstating what the 302s said.

19         MR. WEITZMAN:  Your Honor, respectfully I completely

20    disagree with you.

21         THE COURT:  Fine.  That's all right.  If there's a

22    conviction, you'll be able to appeal all of these, if there is

23    a conviction.

24         MR. WEITZMAN:  Sheikh Al Thani has no position,

25    official position in the Qatari government.  Heritage invests

O6iWmen6

purely his money.  It's approximately $900 million.  He does
not take any, not one dollar, or whatever the currency is, from
the Qatari government.  It's not a sovereign wealth fund of the
Qatari government.

          Shaun Doherty stated in his 302 that the investment
decision had nothing to do with any of these statements or the
resolution, that it was all on the merits of the investment in
Daibes.  Didn't even know -- and he's the person who's the COO,
who is making the decision, making the recommendation to Sheikh
Al Thani, didn't even know that Senator Menendez and Daibes
knew each other.  They grappled with the due diligence for 18
months in order to get under the hood of this investment, and
they decided it was a good investment.  The story the
government is telling is that Senator Menendez decided to toss
Daibes a bone, issued these press releases, somehow got a
Senate resolution passed that he wasn't a sponsor of or a
cosponsor of, in order to help Fred Daibes in an investment
that was being judged on its own merits, having nothing to do
with Senator Menendez.

          THE COURT:  But the alleged illicit deal was not that
Menendez would get the investment for him but simply that
Menendez would say good things about the Qataris and in
exchange would get money.  That's how I understand what the
government is alleging.

          MR. WEITZMAN:  And where is the evidence of that, your

O6iWmen6

1    Honor?  Where is the evidence of any communication between

2    Senator Menendez and Fred Daibes reaching this deal?  We've

3    been promised over and over again that they will prove a

4    promise.

5            What they're doing, your Honor, is proving the promise

6    through these other, external facts, is what they're going to

7    argue.  They're going to say it's so illogical that Qatari

8    Heritage would invest in a real estate development that is run

9    by someone who is under indictment, that the only reason it

10   could have been done was to curry favor with Senator Menendez.

11   And look here --

12           THE COURT:  Just a moment.  I don't think that's the

13   argument.  I mean the Qataris themselves, and I've got to get

14   back to this chart.  But the Qataris themselves or Heritage

15   said that because he's under indictment they can get better

16   terms on this deal.

17           MR. WEITZMAN:  And yet they offer documents that

18   suggest that Shaun Doherty recommended against a meeting with

19   Fred Daibes because he's under indictment.  And so this is

20   hotly disputed.  They're going to take a different story, and I

21   assure you the story, in summation, is going to look much

22   closer to what I'm saying than what they've suggested.

23           THE COURT:  That what?  That what?  Look much closer

24   to what?

25           MR. WEITZMAN:  That Senator Menendez, that you know

O6iWmen6

1    there's an illicit deal here because the Qataris are investing

2    in a real estate project by someone who is under indictment,

3    and the only reason they would do that is to curry favor with

4    Senator Menendez, his friend, in order to get these favorable

5    press statements and Senate resolutions.

6        THE COURT:  All right.

7        Let me hear from the government.

8        MR. MONTELEONI:  Thank you, your Honor.

9        We really disagree with a number of the statements

10   that Mr. Weitzman has just made both about the procedural

11   history that's brought us to here and what Shaun Doherty said

12   and what that means.  I think I can make this a little simpler.

13   I think that what we are focusing on, what we are offering

14   these line items that are at issue here for, relates to, just

15   as your Honor has said, the bargain between Menendez and Daibes

16   and what Menendez and Daibes reasonably expected.

17       We also do think that it is fair to introduce some

18   evidence that rebuts their statement in the opening statement

19   about why the Heritage did make the investment.  This is not

20   going to be a trial about why Heritage ultimately decided to do

21   it.  The fact that Heritage was moving forward with the deal

22   despite red flags is something that will probably be argued

23   over between the parties.  That's something that the jury can

24   draw inferences about.  It goes to the weight, not to the

25   admissibility of any of this evidence.  But the ultimate

O6iWmen6

1    decision of whether they pull the trigger or not is not

2    something the jury's going to have to render a verdict on.  And

3    it's especially not what's at issue here.

4              What's at issue here is just do Sheikh Sultan and Ali

5    Al Thawadi sufficiently, is their disposition to the positive

6    things that Menendez is saying favorable in a way that is known

7    and reasonably anticipated to Menendez and Daibes.  And the

8    answer to that is absolutely.

9              THE COURT:  But Mr. Weitzman's point is 123 to 126 is

10   all internal.  It doesn't deal with -- it's only later, when

11   Menendez sends something to Daibes and gives him a heads-up

12   about something that's about to happen.

13             MR. MONTELEONI:  Well, right, but we don't have to

14   have direct evidence that a particular communication was sent

15   to a particular person for the jury to be able to

16   circumstantially infer that the person was aware of it.

17   There's evidence in this chart that in June of 2021, Daibes and

18   Sheikh Sultan had direct meetings, face to face, and there's

19   also histories of WhatsApp calls, WhatsApp voice calls, the

20   content of which is not available, of course, in between them

21   so that it is extraordinarily easy for the jury to infer that

22   whether a particular message was forwarded to them, the basic

23   fact of their disposition -- that they will appreciate positive

24   statements about Qatar -- was communicated to Daibes and from

25   Daibes to Menendez and that this is something that Daibes and

O6iWmen6

1    Menendez were aware of.

2         Even if it wasn't, it would still be fair rebuttal,

3    that these three lines would certainly be perfectly admissible

4    just to rebut their statements in their opening about why the

5    Qatari company did, in fact, make the deal.  But we don't think

6    that you need to get to that because, again, this isn't really

7    very internal.  It is a text that is not directly forwarded to

8    them, but it is absolutely the type of basic orientation and

9    disposition information that is very reasonable for the jury to

10   infer Menendez and Daibes totally anticipated it.

11        THE COURT:  All right.

12        Mr. Weitzman, last go-round.

13        MR. WEITZMAN:  Last go-round.

14        I think we just heard from the government exactly what

15   I suggested they would say, and I quote, these three lines,

16   124, 125 and 126, rebut the opening statement as to why the

17   Qatari government made the deal.  That's exactly what they said

18   they would not argue, and they can't help themselves, to make

19   that argument, that the Qatari government, which Heritage is

20   not, but even saying the Qatari investor made the deal because

21   these chairman statements.  They're now making the argument

22   they said they would not.

23        Secondly --

24        THE COURT:  Just a moment.

25        No.  The investment never happened, right?

O6iWmen6

1          MR. WEITZMAN:  It did happen, your Honor.  They

2    reached a deal.

3          THE COURT:  OK.

4          MR. WEITZMAN:  The second thing is he said that the

5    reason you can infer that Menendez and Daibes know about these

6    August 2 communications is because months earlier Daibes had --

7    in June, Daibes had a meeting with Sheikh Sultan Al Thani,

8    which only proves the unfairness, your Honor, in this process,

9    where we've been deprived of the ability to obtain a deposition

10   from the critical witness who could have said we never

11   discussed that; that had nothing to do with this.  And now they

12   want to ask the jury to reach inferences that we've been denied

13   the opportunity to rebut, because we don't have those

14   depositions.

15         I understand your Honor's ruling.  I'm not challenging

16   the ruling.  There will be appellate issue if we have to, but

17   this only magnifies the prejudice to the defense.

18         MR. MONTELEONI:  Your Honor, these are very basic

19   inferences that the people who are acting as if the Qatari

20   investors are going to appreciate these statements about Qatar

21   are aware that the Qatari investors will appreciate the

22   statements about Qatar, that this wasn't just some crazy

23   coincidence, but that they, as sophisticated investors, a

24   sophisticated politician, had enough basic understanding of who

25   they were dealing with and of what those people's positions

1   were to render them able to anticipate this.  It's not just

2   some meeting months before.  There's a history of WhatsApp

3   calls.  There's a meeting later.  There's a lot of

4   circumstantial evidence that the jury can use to make an

5   inference.  It's no more unfair than in any case where the Rule

6   15 standard is not met and admissible documentary evidence is

7   used to allow juries to make circumstantial inferences.  That's

8   exactly the rules that we're asking the Court to apply, just

9   the ordinary ones.

10          THE COURT:  All right.  I'm allowing 123 to 126; that

11  is, the ones that Mr. Weitzman was asking me to admit.  They're

12  not for the truth, though.

13          All right.  What else, Mr. Weitzman, did you want to

14  bring up?

15          MR. WEITZMAN:  Just one moment, your Honor?

16          There's one issue, which is line 260, your Honor.  I

17  don't know if there are other lines, but there's the David

18  Axelrad series of communications.

19          THE COURT:  Just a moment.  When the parties want a

20  limiting instruction to the jury on any particular exhibit that

21  it's not for the truth, just let me know.

22          What number are you on?

23          MR. WEITZMAN:  I'm referring to --

24          THE COURT:  I remember Axelrad.  Where are we?

25          MR. WEITZMAN:  Line 260.  David Axelrad --

O6iWmen6

1          THE COURT:  He's the real estate broker.

2          MR. WEITZMAN:  Your memory is good, your Honor.

3          He's the real estate broker.

4          THE COURT:  No.  I've just done some work on the

5    chart.  That's what the parties asked me to do.

6          Go ahead.

7          MR. WEITZMAN:  He's the real estate broker.  He's

8    forwarding some sort of --

9          THE COURT:  Isn't this the lifestyle issue that I

10   decided in the *in limine*s?  Talk about memory.

11         MR. WEITZMAN:  Yeah.  It might be, except this isn't

12   it, your Honor.

13         THE COURT:  OK.

14         MR. WEITZMAN:  What he's doing is he's sending Nadine

15   some real estate viewings.  Nadine and Senator Menendez don't

16   actually put a bid on any homes, nor is there evidence that

17   they were contemplating a bid on any of these homes.  This is,

18   you know, there are people who search on Zillow for castles in

19   Burgundy because that's what they like to look at.

20         THE COURT:  Yes, but he's setting up an appointment

21   with her for Saturday.

22         MR. WEITZMAN:  Right.  I agree.  Lots of people --

23         THE COURT:  You can make the argument that there's no

24   evidence that they were serious about this, that they were

25   just -- there are indeed people who like to see what's out

O6iWmen6

1   there in the real estate market, especially in New York.  I

2   take it you can make that argument from these.

3        MR. WEITZMAN:  At a minimum, we'll have to make the

4   argument.  We may have to introduce additional evidence to this

5   trial.  It is what it is.

6        THE COURT:  You keep on holding that up as a boogeyman

7   here.  You do what you have to do.  I don't think anybody wants

8   to have this jury stay longer than absolutely necessary.

9        MR. WEITZMAN:  Absolutely, your Honor.

10        THE COURT:  There are a number of these jurors who

11   have had individual issues.  You saw that in the selection

12   process, and as I said today, when it came up, we're already a

13   couple of weeks longer than I had asked them for their

14   conflicts.  Remember?  I think I asked them for the conflicts

15   up through the week that ends in July 4th and 5th, and now

16   we're talking about the fact that we expect the case to be in

17   their hands for their consideration in the end of the week July

18   8.  We may start to run into problems with these jurors.

19        I don't think it's in anybody's interest, and I for

20   one would not want to guess which side they take their ire out

21   on, if anyone.  Everyone has said, and I think it's true, this

22   is an excellent jury.  They seem to be paying -- they're rapt

23   at some points, and several of them have gone through several

24   books.  I think that's to everybody's advantage, but nobody

25   wants to keep them longer than absolutely necessary, but the

O6iWmen6

1    defense is constantly holding out, Judge, we may have to hear

2    more testimony here.

3             MR. WEITZMAN:  Your Honor, I apologize if I've been

4    perceived that way.  I don't recall saying it often, but I take

5    your point, your Honor.  But we may have to hear from David

6    Axelrad.

7             THE COURT:  You have a defense case.

8             Well, again, Axelrad, if you're questioning 260, I

9    do -- well, let me hear from the government.

10            MR. WEITZMAN:  If I could just for the record?

11            THE COURT:  Yes, of course.

12            MR. WEITZMAN:  The objection is to lines 260, 262,

13   264, 295 to 298 and 303.  I think they're all the same issue,

14   which is whether --

15            THE COURT:  Go ahead.  Then I won't look at each

16   individual one.

17            MR. WEITZMAN:  -- real estate viewings are probative

18   of lifestyle or not.

19            MR. MONTELEONI:  Yes.

20            THE COURT:  I think the government, if I remember

21   this, the government in some way connects it with the receipt

22   of gold, if I'm not mistaken.  But government, tell me.  Speak

23   to me.

24            MR. MONTELEONI:  Yes, your Honor.

25            So, I mean, look, I think that, as the Court's

O6iWmen6

1    question suggests, argues that this issue of well, they didn't

2    actually put down an offer on the house, that really goes to

3    the weight, not to the admissibility.  Obviously it's not the

4    case that evidence short of going into contract on a house just

5    can't come in because, hey, maybe they weren't going to

6    actually go buy the house.

7         THE COURT:  Yes, but by the same token, I'm not quite

8    sure that these get you very far.  But it seems to me that's

9    not the issue before me.

10        MR. MONTELEONI:  Yes.  I don't think that we're going

11   to, honestly, be spending a lot of time on them.  However, what

12   they were expecting to receive -- this is during a time period

13   where their activities -- there were meetings that we're going

14   to be showing with this evidence and other evidence, their

15   search histories strongly suggest that they were amassing

16   significant quantities of bribes and that they were looking to

17   convert these bribes into improved living situations for them

18   is absolutely part of their motive and shows their anticipation

19   of more benefits from the scheme.

20        I think that this is not going to be the principal

21   piece of evidence of Mr. Van Wie's testimony, and I don't think

22   that it is something we're going to be spending a lot of time

23   on.  There's not a lot of time here, but just to exclude it

24   because they didn't put down an offer on the house --

25        THE COURT:  I'm not going to exclude it.  I'm not

O6iWmen6

1   quite sure what the government can make out of it.  I'm not

2   quite sure how you can say they were basically trying to

3   convert bribes into real estate, but they're admissible.

4   They're certainly relevant.

5           Go ahead.  I'm admitting them.

6           MR. MONTELEONI:  OK.

7           THE COURT:  And I don't think they're for the truth

8   either.

9           All right.  Mr. Weitzman, anything else?

10          MR. WEITZMAN:  Nothing else on this chart.

11          THE COURT:  OK.

12          MR. WEITZMAN:  Just wondering, I think, if we can get

13  an update as to the schedule on witnesses for Thursday.

14          THE COURT:  Well, I'm afraid with one day of testimony

15  we're already running behind, because I tried to take pretty

16  good notes and I think everybody has to be cognizant of that.

17  Both sides were doing a fair amount of repetition.  I think

18  I've got to cut down on that or have the parties cut down on

19  that.  What I was told for Tuesday is it would be Sellinger, an

20  hour left on cross; then Soliman for less than two hours; and

21  then Van Wie to start, and Thursday would be the balance of the

22  three to four hours plus cross.  Well, we haven't even started

23  Van Wie, so it very well may be that Thursday turns out to be

24  all Van Wie, and we're already in the hole based on the

25  projections of the parties.

O6iWmen6

1          The projections of the government were hopefully that

2    Thursday would be Van Wie, Mearns, Copeland, Corizon and

3    Khanna.

4          MR. MONTELEONI:  So, yes, your Honor.  I don't want to

5    do any type of big tit for tat or anything like that.  We think

6    that we have hit our marks of what we anticipated our direct

7    would be today, and you know, we understand why this type of

8    thing happens, but we did get estimates of the defense of their

9    cross lengths, which were shorter than how it turned out.

10   These things happen, but we think it is going to be the

11   witnesses that you've said.

12         We're going to, now that we are looking at where we

13   are, we'll think about the order.  We'll get back to the

14   defense sort of shortly if we're rejiggering the order based on

15   what we said.  We certainly anticipate that we will start with

16   Van Wie.  When we get out of court, we'll talk about it, but we

17   think it's going to be the same individuals.  We are, as the

18   Court is, very concerned.

19         THE COURT:  I don't care about the order.  I care

20   about how much testimony we get before this jury.

21         MR. MONTELEONI:  We do too, your Honor.  We're

22   concerned about the length of time it's taking.  We're going to

23   be endeavoring to shorten.  We are constantly doing that.  I

24   think that right now where we are is the same names.  This

25   does --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6iWmen6

1          THE COURT:  All right.  And I am going to want what I

2     understand is the three day in advance agreement; that is,

3     three trial days in advance agreement of who the witnesses are

4     going to be.  Is that what the parties' agreement is?  My

5     recollection.

6          MR. MONTELEONI:  Yes.  We told them on Monday of, you

7     know, through this week.

8          THE COURT:  No.  I'm talking about also for the

9     defense, when the defense case starts.

10          MS. POMERANTZ:  Your Honor, if we may be heard on

11     that?

12          When we spoke with your Honor, we previewed that we

13     had received a list of defense witnesses from all three

14     parties, but we have not yet received a narrowed-down list, and

15     as your Honor knows, that list is particularly unmanageable,

16     and defense counsel represented not actually the real list.  We

17     need a real list.  It's not appropriate.  It's not fair at this

18     point.

19          THE COURT:  OK.

20          Defense, I think that's right.  You now have more

21     people under your belt.  It can't possibly be 48 that you're

22     thinking about.

23          MR. WEITZMAN:  Your Honor, they have 18 witnesses on

24     their list.  We still don't know which witnesses they're

25     calling.  We have to identify more witnesses to reserve

O6iWmen6

1   depending on who they call.  When they finish their case, we

2   will have a better idea what our defense is.  But they're not

3   even close to being done.  They're not going to finish on the

4   25th.  They represented over and over again that they're going

5   to finish on the 25th because they wanted our witness list ten

6   days in advance, but they have 18 witnesses on their list.

7            How can we narrow and prejudice our defense until we

8   know which witnesses they're actually calling?

9            MR. MONTELEONI:  We've had a lot of communications

10  with the defense in an effort to work this stuff out and not to

11  be constantly bringing this to the Court.  What we've tried to

12  say is that we do anticipate dropping some witnesses.  We're

13  not in a position to say exactly who until we see some more

14  developments.

15           THE COURT:  What does that mean?  What does that mean?

16  You'll know Thursday?  By Thursday, at the end of the testimony

17  on Thursday, you'll know who you're dropping?  You really ought

18  to, because you have very few witnesses left.

19           MR. MONTELEONI:  No.  I think that that's true, your

20  Honor.  We will see if there's anyone that we can tell the

21  defense in a serial fashion before Thursday.

22           I do think that they have plenty to work with and

23  focus on in just the ones that we have said that we're lining

24  up for Thursday and Monday.  We don't really know that they're

25  that greatly prejudiced by a few that are hanging out that are

O6iWmen6

```
 1   going to be towards the end that might depend on such

 2   developments still hanging out there.  But we'll try to have

 3   fewer people hang out.  But we have really tried to provide

 4   them with as much information as we can.  We don't want to be

 5   pulling someone and then giving them back.  We'll see if

 6   there's more that we can tell to them.

 7            MR. WEITZMAN:  I'm sorry, your Honor.  They know who

 8   they're calling.  They've identified five witnesses for

 9   Thursday and Monday.  There's 13 additional on their list.  You

10   know what?  If they don't want to tell us, that's fine, but

11   they can't use the same game that they're playing and then

12   complain that we're reserving rights to call additional

13   witnesses when we don't know how their case is going to end up.

14            MR. MONTELEONI:  Just to be clear, Menendez's list for

15   his defense case is almost as long as our initial witness list

16   for our entire case, and we have narrowed that substantially.

17   We have had, I think, engagements with other defense counsel,

18   who have been in a position to provide more focused

19   information, and we've appreciated that.  We will provide more

20   information too.

21            THE COURT:  I want a substantial narrowing of the

22   government list by the end of the day on Thursday.

23            MR. MONTELEONI:  Yes, your Honor.

24            THE COURT:  Substantial.  And a reciprocal response

25   from the defense on Thursday.  Understood, gentlemen?
```

O6iWmen6

1          MR. WEITZMAN:  Your Honor, I do understand that you'd

2     like a reciprocal response, but we need to be able to analyze

3     who they're taking off.

4          THE COURT:  I understand that.  It's not a

5     simultaneous exchange.

6          MR. WEITZMAN:  Yes, your Honor.

7          THE COURT:  OK.  Thursday, 9:30 a.m.

8          Thank you, all.

9          (Adjourned to June 20, 2024, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   PHILIP SELLINGER

 4   Cross By Mr. Weitzman . . . . . . . . . .3785

 5   Cross By Mr. De Castro . . . . . . . . . .3842

 6   Redirect By Ms. Pomerantz . . . . . . . .3853

 7    MICHAEL SOLIMAN

 8   Direct By Mr. Richenthal . . . . . . . . .3860

 9   Cross By Mr. Weitzman . . . . . . . . . .3952

10   Cross By Mr. De Castro . . . . . . . . . .4055

11   Redirect By Mr. Richenthal . . . . . . . .4064

12                    GOVERNMENT EXHIBITS

13   Exhibit No.                           Received

14    A408   . . . . . . . . . . . . . . . . .3867

15    A113-PH1 through A113-PH13, A114-PH, . . . .3875

16           A131, A421 and A422

17    A130   . . . . . . . . . . . . . . . . .3916

18    A129   . . . . . . . . . . . . . . . . .3922

19                    DEFENDANT EXHIBITS

20   Exhibit No.                           Received

21    193   . . . . . . . . . . . . . . . . .3806

22    554   . . . . . . . . . . . . . . . . .3810

23    834, page 332  . . . . . . . . . . . . .3818

24    834, pages 335 and 336   . . . . . . . .3822

25    1035   . . . . . . . . . . . . . . . . .4035
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300