O783MEN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7              Defendants.
                                           Trial
8   ------------------------------x

9                                          New York, N.Y.
                                           July 8, 2024
10                                         9:30 a.m.

11

12  Before:

13
                         HON. SIDNEY H. STEIN,
14
                                           District Judge
15                                         -and a Jury-

16                       APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

O783MEN1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
      Attorneys for Defendant Menendez
BY:   ADAM FEE
      AVI WEITZMAN
      PAUL GROSS
      RITA FISHMAN



GIBBONS, P.C.
      Attorneys for Defendant Hana
BY:   LAWRENCE S. LUSTBERG
      ANNE M. COLLART
      CHRISTINA LaBRUNO
      ANDREW J. MARINO
      RICARDO SOLANO, Jr.
      ELENA CICOGNANI
      JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
      Attorneys for Defendant Daibes



Also Present:
Marwan Abdel-Rahman, Interpreter (Arabic)
Rodina Mikhail, Interpreter (Arabic)

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  We have a number of matters

3     to cover.  I'll just deal with the things that have come across

4     in the last 36 hours or so, including at 8 a.m. this morning.

5          I think it's appropriate that I add the jury charge

6     that the government has requested regarding Daibes to reflect

7     that Daibes was released on bail as per the parties'

8     stipulation.  I think that's appropriate.

9          I'm going to use the jury verdict form submitted by

10    the government with the addition that I want or the change I

11    want 12 lines, rather than simply a signature by the

12    foreperson.  Just 12 lines that each juror will sign.

13         Now, I have a letter from Ms. Collart at 3 p.m.

14    yesterday, not filed.  I see no reason why it shouldn't be

15    filed publicly.  So I'm directing Ms. Collart to file it

16    publicly, assuming there is no objection.

17         Really, Employee Number 2 hasn't gotten a visa for I

18    don't know why, nobody says why he hasn't been able to get a

19    visa.  Apparently it was approved in June.  And the request of

20    Mr. Hana's attorneys is to take his testimony by audio visual.

21    They call it a Rule 15 deposition.  I don't think it's a

22    Rule 15 deposition.  I simply think it's testimony taken

23    remotely.

24         So, I don't know what the position of government is on

25    that except for a single reference in the letter that says the

1    government opposes it.  Let me hear.

2              MR. RICHENTHAL:  We do.

3              THE COURT:  I should say also, I think I said last

4    week that my general rule is that if you don't have a witness,

5    you rest.  That really is an overstatement.  Obviously I'm

6    going to make whatever accommodations I can to have a witness

7    here.  At some point, though, we just can't wait around.

8              Government, speak to me.  Hana wants to put on the

9    witness that I said could come on to testify, but he hasn't

10   gotten his visa yet.

11             MR. RICHENTHAL:  We don't know why this individual has

12   not gotten his visa.  We've made our best efforts to assist.

13   We obviously don't control the State Department.

14             Our position, which Ms. Collart I think accurately

15   described in her letter, is we do oppose video testimony for

16   this witness.  We think this is the type of witness that needs

17   to be subject to cross-examination.  He works for the Egyptian

18   government, there are potential bias issues, there are

19   potential other issues.  We have been consistent with these

20   witnesses from the beginning.

21             THE COURT:  Wouldn't you be able to cross-examine him?

22             MR. RICHENTHAL:  Certainly we can.  In my experience,

23   video testimony, I mean live video testimony, at best, is

24   difficult.  It is far more challenging I think for the jury to

25   judge credibility on a video screen without the human dynamic

1    in the courtroom.  That gives us concern, so we've been

2    consistent about these witnesses.

3         Now let's be clear.  It is true we've consented to

4    video for other witnesses.  We're trying to be witness-specific

5    here, not just take an across-the-board position.  But this is

6    a witness who we think opposition is appropriate.

7         THE COURT:  Let me hear from Mr. Hana's attorneys.

8         MR. LUSTBERG:  Your Honor, I really don't have a lot

9    to add.  This Court considered a motion by the government to

10   preclude all of our, basically all of our witnesses.  You

11   allowed some limited witnesses, one of them testified.  This is

12   the other one.

13        This is not a situation where we've been dilatory.  As

14   you noted, this gentleman got approved for a visa on June 10.

15   I know that the Department of Justice does not control the

16   State Department.  I also agree that members of the prosecution

17   team did make efforts to assist us in this regard, but those

18   failed.

19        This is a matter that's within the control of the

20   United States of America, which is our adverse party here, and

21   they have not permitted our client, our witness to appear.  And

22   it is the government, the government, qua government, the whole

23   thing.

24        THE COURT:  No, but this prosecution team hasn't

25   stopped it in any way.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. LUSTBERG:  Not in any way.

2          THE COURT:  In fact, you indicated that Ms. Clark has

3     been assisting I believe.

4          MR. LUSTBERG:  That's absolutely correct, your Honor.

5     So I'm not blaming them.  But on the other hand, government is

6     the government.  And somehow our witness isn't here.  We don't

7     know the reason why, once the visa was approved, it wasn't

8     issued, which seems to be providing a piece of paper.  Seemed

9     like progress was being made.

10          We are not, your Honor, just to be clear, asking for

11     any kind of adjournment.  We heard your Honor loud and clear.

12     So, it was with that in mind that we requested an opportunity,

13     assuming we could make the necessary technological

14     arrangements, which hopefully we can this morning, to have

15     Dr. Sayed appear.

16          THE COURT:  Is he available now?

17          MR. LUSTBERG:  Yes.

18          THE COURT:  What's the difference in time?

19          MR. LUSTBERG:  It doesn't matter.  He's available.

20     Seven hours.  We spoke to him this morning, he's available,

21     we'll make it happen.

22          You should note one other thing Mr. Richenthal's point

23     about difficulties of cross-examination as well, we'll need an

24     interpreter for him, but we've spoken to the interpreters about

25     that and that can be done.

O783MEN1

```
 1            MR. RICHENTHAL:  I don't think it changes materially
 2   what we're talking about.  But just for the record, there is a
 3   distinction as we understand it between approved and issued.
 4   Approved is the final step prior to a screening interview.
 5   Various visa applicants are subject to screening interviews.  I
 6   think this applicant has been rejected for a visa in the past.
 7   I can't speak to whether there is issues with perceived
 8   veracity.  This is one of the issue concerns we have.  When we
 9   say it is approved, that's technically correct, but it doesn't
10   mean it can be imminently issued.
11            THE COURT:  I understand.  I thought the approval was
12   back in June.
13            MR. LUSTBERG:  That approval did occur after an
14   interview, so it was further along in the process.
15            THE COURT:  This is what I'm going to do.  I'm not
16   going to adjourn the trial here.  This is the beginning of the
17   ninth week of the trial, the eighth week of testimony.
18   Everyone has seen the jury, you know, wants to conclude its
19   business here.
20            If it can be done technologically, and I've spoken to
21   the circuit executive, we're going to do it.  But only if it
22   can be done today.  Somebody from the audio visual department
23   has already come up and is here.  Who is that?
24            Will?  Now, do you know who to speak to on the defense
25   side, Will, to set this up?  Mr. Lustberg who is right there.
```

O783MEN1

1    He is standing up.  Deal with him.  If it can be done, we're

2    going to do it today.

3              I propose 11 o'clock our time.  The jury is supposed

4    to be in at 10:30, that will give them a little time.

5    11 o'clock our time.

6              What's important, just so everybody knows, is that

7    Dr. Sayed can see the jury, and that the jury can see

8    Dr. Sayed, and that the connection is such that he can easily

9    be heard, especially with the issue of an interpreter here.  So

10   it has to be clear, that he can see everybody -- that he can

11   see the jury and the jury can see him and the transmission has

12   to be clear.  That's the only circumstances in which I'm going

13   to allow it.  If that can't be done, we're not going to have

14   it.  All right.

15             Will, if you'll talk to Mr. Lustberg or his designee,

16   we'll get that moving.

17             MR. LUSTBERG:  It will be my designee, Judge, because

18   this is way over my head.

19             THE COURT:  It will have to be something facing the

20   jury.  A big screen facing the jury.

21             MS. COLLART:  Understood, your Honor.

22             MR. JARRETT:  The image would appear on the jury's

23   screens.  Not a large screen.

24             THE COURT:  Thank you.  I'm not up to date on the

25   technology.  Thank you.

1            By ECF 501, reconsideration of my determination that

2    the years since 2019 are relevant for whether IS EG Halal is a

3    viable entity.

4            I had earlier held for that witness, I forget which

5    number he is, that he was precluded on the grounds that he did

6    not have testimony relevant to 2019 or the months thereafter.

7    I do not find it is relevant as to whether or not IS EG Halal

8    has been a viable or thriving entity in any event.  The defense

9    already has some of that in evidence because we had the witness

10   from Latin America talk about the various offices that IS EG

11   Halal has.  But, I'm adhering to my prior determination that

12   that witness was precluded.

13           I have a submission from 8:30 last night, it's ECF

14   502, the government is seeking preclusion on the summations of

15   four areas, I don't think there is any issue -- or five areas.

16   Each of the government's positions is correct.

17           No personal stories or vouching for your clients.  I

18   think quoting from, as I say, famous people is unnecessary.

19   And to the extent somebody like Dr. Martin Luther King, it adds

20   an element that's not relevant here.

21           The consequences of conviction or whether or not it's

22   fair for the government to do what the government did, all of

23   that is out of bounds.

24           The government is correct, again, in regard to Mr. De

25   Castro's opening there, inferences are certainly permissible.

O783MEN1

 1    As a matter of fact, that's what a lot of the charges talk

 2    about.  They can't make guesses, but what's important is they

 3    have to decide on the basis of the evidence or lack of

 4    evidence, but inferences certainly can be used.

 5         Certain investigative techniques, again, I've talked,

 6    I've issued several rulings on that.  That's not for the jury.

 7    The jury determination is whether the government has proven its

 8    case beyond a reasonable doubt.  And law enforcement techniques

 9    used is not relevant.  So, in essence I'm granting the

10    government's requests there.  That's in 502.

11         MR. LUSTBERG:  Judge, if I might.  I think there was

12    also part of that application was to preclude something I said

13    in my opening which had to do with, so the government has

14    argued, as you know, that Mr. Hana was a failed businessman,

15    and I argued that it was a good thing that he could pick

16    himself up by his bootstraps and succeed.  This wasn't meant to

17    be a big commentary on American success stories, but if the

18    government's going to argue that he didn't deserve this

19    contract because he was a failed businessman, I should be able

20    to argue.

21         THE COURT:  Let's see if the government is going to

22    argue that.  I assume they're not.

23         MR. RICHENTHAL:  We might well say he is a failed

24    businessman.  Our preclusion was not to preclude Mr. Lustberg

25    from making factual assertions about his client.  What

1    Mr. Lustberg did was paired factual assertions with a broader

2    statement about American values and the prosecution's unfair.

3    That's our concern.  If he wants to argue Mr. Hana was

4    qualified, he can obviously argue Mr. Hana is qualified.  What

5    he shouldn't say is he was qualified and therefore this

6    prosecution is un-American or he was qualified and this is a

7    Horatio Alger story and the jury should acquit him.  It is the

8    second part.

9            MR. LUSTBERG:  I will not argue that the prosecution

10   was unfair, your Honor.

11           MR. FEE:  I'm sorry, I think this is unnecessary but

12   just to state the obvious, we are going to refer to techniques

13   that the government's used to point out the lack of evidence

14   arising from them.

15           THE COURT:  That's all right.  But you can't do they

16   should have done this and they didn't do that.  You can talk

17   about what they did do, and how that's not adequate in your

18   view.

19           MR. FEE:  Yes, your Honor.

20           THE COURT:  All right.  Now, let's do the charge.

21   We'll do it until 10:30 or probably around quarter of 11, we'll

22   see.  Hopefully the jury will be in by then and we'll see where

23   we are on the technological aspects.

24           In terms of the charge, what I think is important is

25   if the parties tell me what they think is important here, or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    really what their concerns are.  That's the way to handle this,

2    it seems to me.

3             Why don't we start with the 8 a.m. submission of the

4    government which I've only had an opportunity to skim.  And

5    it's saying that the multiple conspiracy charge, they think

6    it's not warranted, but if it is given, it should be revised.

7             Government, why don't you tell me, just so it's clear

8    to the defense and to the Court what your argument is and let

9    me turn to the multiple conspiracies charge that I do have in

10   the drafts that you received.

11            MR. RICHENTHAL:  I'll start with why we don't think

12   it's warranted, although I take it from the Court's remarks you

13   may be more interested in why we think it should be revised.

14            THE COURT:  Correct.

15            MR. RICHENTHAL:  I'll briefly say why it's not

16   warranted and I'll shift.

17            We don't think it's warranted because, as the Second

18   Circuit has made clear going back actually for decades, it is

19   not warranted by the mere fact there are different phases of an

20   operation, different participants, different shifts in

21   emphasis, different shifts in locations.  That's not what a

22   multiple conspiracy is about.  And we just don't think that the

23   factual predicate here is met.

24            I will shift to why we think it should be revised.

25   Although I am happy to expand one what I just said if the Court

O783MEN1

1        would like.  Why should it be revised.

2                THE COURT:  Go ahead.  I think it should be multiple

3        conspiracy, but I want to hear your best argument why it should

4        not be.

5                MR. RICHENTHAL:  The best argument here is, at most,

6        meaning trying to draw inferences for this purpose in the

7        defendants' favor, what occurred in the record in this case,

8        meaning the evidence before the jury, not extra record things,

9        are, is a single conspiracy with Mr. Menendez at the center

10       with Mr. Hana and Mr. Daibes bribing him to achieve multiple

11       ends.

12               Now, I did just say to achieve multiple ends.  But our

13       understanding of the law is that in and of itself is not

14       sufficient to warrant a multiple conspiracy charge.  Nor is it

15       sufficient if those ends were achieved over time, or if the

16       ends were more important to certain conspirators and not

17       others.

18               So, for example, there is the case that talks about

19       how goals, plural, need not be congruent, meaning need not be

20       identical.  Those facts are facts or at least the evidence can

21       give rise to those facts.  But those are not sufficient.  As we

22       understand it, it I think the *Dawkins* case is a good example of

23       this.  *Dawkins* is from 2021.  What a multiple conspiracy

24       charge, indeed multiple conspiracies are about are independent

25       networks operating separately.  That's a near verbatim quote

O783MEN1

1    from *Dawkins* which is quoting either *Berger* or another case.

2    It's in our letter.

3         Our view is the record before the jury does not show

4    independent networks.  It may again, as I said, show shifts in

5    emphasis.  It certainly I think shows temporal changes, that is

6    phases of operation as facts developed in the world.  But it

7    was always to bribe Mr. Menendez.  It always involved Mr. Hana

8    and Mr. Daibes and it involved overlapping participants,

9    overlapping methods, and overlapping goals.

10        Even the goals themselves, to the extent they're

11   discrete, occurred at the same time or substantially the same

12   time.  Our view, that's not just independent networks.

13        Now the defense can argue there was no conspiracy.  Of

14   course.  But we don't think there is a sufficient factual

15   predicate in the record for them to argue there was independent

16   networks of conspiracies, that is, independent conspiracies.  I

17   can talk more specifically about that.

18        I'll note finally, I don't think this fact is

19   dispositive, but I think it bears on the analysis.  There is no

20   allegation, indeed, I don't think we expect the defense will

21   argue in summation, that the goals here were at cross purposes

22   or inconsistent.  In fact, the record's to the contrary, just

23   to use IS EG Halal as an example.  IS EG Halal, once the

24   monopoly came into place, was then used to pay bribes.  So it's

25   granted by the Egyptian government.  Mr. Menendez is alleged to

1    taking actions to advance the agenda of the Egyptian

2    government.  That includes trying to keep the monopoly in

3    place.  The monopoly profits are then used to funnel back to

4    Mr. Menendez or Nadine.  So that's certainly not inconsistent.

5          Obviously Qatar is not inconsistent either with taking

6    actions for Egypt.  And the various schemes to seek to

7    interfere with criminal prosecutions are not inconsistent.

8          Again, as I've said, the lack of inconsistency is not

9    in and itself mean there is not multiple conspiracies.  That's

10   off the table.  What we really have at most is multiple

11   non-incongruent goals achieved over time in overlapping ways

12   with one man at the center.  That doesn't seem like independent

13   networks.

14         This is a confusing and lengthy charge.  We think it

15   should be only given when it's warranted, and in our view it's

16   not warranted.

17         MR. WEITZMAN:  Your Honor, the government's proposed

18   edits make it more confusing and twice as long as it was when

19   you proposed it.  It is a warranted charge.  There is ample

20   inferences to be drawn that there is no hub and spoke.  "Spoke"

21   words he didn't say spoke conspiracy here.  Having someone at

22   the hub and no spoke combining the objectives of the parties

23   warrants a multiple conspiracy charge for the same reason we

24   moved to dismiss on a multiple conspiracies theory.

25         The fact that Mr. Daibes' counsel didn't have to

O783MEN1

1   cross-examine most of the witnesses I think speaks amply about

2   why he doesn't at least believe he's part of multiple spokes of

3   the charged offense.  Similarly with Will Hana.

4           I acknowledge that under the government's theory

5   Senator Menendez is certainly a hub or at least Nadine is the

6   hub and maybe Senator Menendez is on the side of Nadine.

7           But, this is certainly a warranted charge, and the

8   case law, none of the cases that the government cites says it

9   should not be given.  It is certainly within your Honor's

10  discretion to give, and I think your Honor is exercising that

11  discretion wisely.

12          I will keep it short, even though the government has

13  put in a letter we did not have an opportunity to respond to.

14  I think your instruction was appropriate, and as drafted, the

15  right instruction.

16          THE COURT:  Thank you.

17          MR. RICHENTHAL:  I'm happy to respond to that or to

18  shift to how we think it should be revised.

19          THE COURT:  I'm going to give it.  The question is the

20  revision.  Let me look at your revisions here.  Because I think

21  there is something to what Mr. Weitzman says about the length

22  of your revision makes it somewhat more convoluted.

23          MR. WEITZMAN:  From our position, we're fine with

24  their edits on page 1 and 2 of their rider.  It is the last

25  paragraph, the full --

O783MEN1

1           THE COURT:  What I'm looking at is the Exhibit B, in

2    other words, where they've redlined my charge.  Is that, when

3    you say 1 and 2, is that what you're referring to?

4           MR. WEITZMAN:  Yes, your Honor.  So the edits, the one

5    edit on page 1 that we don't agree with is the deletion of and

6    15 -- Count 15 should be included.

7           The other edits we're fine with on page 1 and page 2.

8    We're fine with the first paragraph they edited in full

9    starting with "In determining whether a series of events."  I'm

10   just speaking on behalf of Senator Menendez of course.  It is

11   the next page I think is getting to be redundant and confusing,

12   and we would propose you delete that full paragraph.

13          THE COURT:  Let me look at it.

14          MR. RICHENTHAL:  If I may briefly, I wanted to make a

15   broader point.

16          We still maintain Count 15 plainly is not the multiple

17   conspiracy charge.  Being a public official operating in Egypt

18   is a status offense.  It is a continuing offense over time.

19   Once one is in that status, one is in that status.

20          I don't understand how there could ever be multiple

21   conspiracies to put one in that status at same time.  Either

22   one is either in the status or one is not.

23          Whatever the Court thinks about the other counts, and

24   obviously we respect the Court's decision, in our view the jury

25   wouldn't even know what to do with multiple conspiracies as to

1    make him an agent.  Either he is an agent or he isn't an agent.

2    That is the same goal.  There are no multiple goals.

3         MR. WEITZMAN:  Your Honor, our response to that is

4    this is a conspiracy count.  It's not a status.  It is a

5    conspiracy to violate a statute.  Whether it's actualized or

6    not is not the point, which I think is Mr. Richenthal's

7    argument.

8         The reason it's appropriate is because all of this

9    conduct is included in the overarching conspiracy counts that

10   they've charged earlier.  There is a way to look at the

11   evidence where Count 15, perhaps some people have one goal,

12   which might be to make someone an agent of the Egyptian

13   government, and others may not have that goal, but might have a

14   different objective.

15        So I think it's important to keep Count 15 in the

16   instruction.

17        MR. RICHENTHAL:  Just to be clear, I don't mean to be

18   doing ping pong on this.  Mr. Daibes is not in Count 15.  So

19   the argument that they had different goals just doesn't make

20   any sense.  It is Mr. Hana and Mr. Menendez and his wife.

21        THE COURT:  We just had Egypt too.

22        MR. RICHENTHAL:  Exactly, your Honor.  It is a single

23   country, and Mr. Daibes is not in the count.  I don't think

24   there is a reasonable reading of the record that the jury could

25   find multiple networks among Mr. Hana, Ms. Menendez, and

O783MEN1

 1    Mr. Menendez with respect to a single country.

 2              THE COURT:  I see that.  Let me take a look.

 3              This is what I'm going to do.  I think the government

 4    is right.  We'll take 15 out of charge 84 on multiple

 5    conspiracies.  So that's one.

 6              I will add in the changes that are on page 1 of

 7    Exhibit B as well as all of page 2 of Exhibit B.  That is ECF

 8    504-2.

 9              That's on multiple conspiracies.

10              MR. RICHENTHAL:  Your Honor, if I may be heard.  There

11    is a single sentence on page 3 which, I think given the record,

12    is reasonably apparent why it's important to us, and frankly

13    reasonably apparent why the defense doesn't like it, as is

14    their right.

15              THE COURT:  Just a moment.  Yes.

16              MR. RICHENTHAL:  That's the sentence beginning the

17    participants' goals.  That language.

18              THE COURT:  Let me find it.

19              MR. RICHENTHAL:  The final sentence of the redlined

20    paragraph.

21              THE COURT:  Yes, I see it.

22              MR. RICHENTHAL:  On page 3.  That sentence is nearly

23    verbatim from *Beech-Nut Nutrition Corp*., a Second Circuit case

24    from 1989.

25              THE COURT:  I know it.

O783MEN1

| | |
|---|---|
| 1 | MR. RICHENTHAL:  We have no objection with the Court |
| 2 | literally using the language from the Second Circuit if it |
| 3 | wishes.  The only change we made, is our view is that |
| 4 | "congruent" may be a word the lay jury does not understand. |
| 5 | And therefore as Judge Engelmayer did, and I think other judges |
| 6 | did -- it may not have been Judge Engelmayer -- we suggested |
| 7 | the word "coincide exactly." |
| 8 | The mere existence of multiple goals is not itself |
| 9 | multiple conspiracies.  We plainly have multiple goals here. |
| 10 | That's why the defense doesn't like this sentence, as is their |
| 11 | right.  But the jury needs to understand that that fact alone |
| 12 | is not dispositive.  They can consider it, of course.  But it |
| 13 | does not in and of itself demonstrate multiple conspiracies. |
| 14 | MR. WEITZMAN:  Your Honor. |
| 15 | THE COURT:  Just a moment.  Yes, sir. |
| 16 | MR. WEITZMAN:  I think the problem with the sentence |
| 17 | is that it is confusing when you add in the portion, for |
| 18 | example, that says "So long as their goals are not at cross |
| 19 | purposes."  It sets up a standard that everybody can have |
| 20 | different goals, different objectives, different conspiracies, |
| 21 | so long as they're rowing in the same direction. |
| 22 | THE COURT:  Isn't that true? |
| 23 | MR. WEITZMAN:  I don't think that's correct.  I |
| 24 | think -- Mr. Richenthal I know wants the last word, but I am |
| 25 | going to insist that I finish. |

O783MEN1

1          THE COURT:  Neither of us are stopping you, sir.

2          MR. WEITZMAN:  I don't think that's correct.  I think

3    that the entire purpose of multiple conspiracies is the hub and

4    spoke issue.  If, for instance, Mr. Daibes had one conspiracy

5    involving, let's say, Sellinger, and Mr. Hana had a different

6    conspiracy involving Egypt, and neither knew about the other,

7    or joined with the other, they may not be at cross purposes,

8    but they certainly are not in the same overarching conspiracy.

9          So the quote from a 1989 case I don't think is the law

10   of the land today where multiple conspiracies is.

11         MR. RICHENTHAL:  So, I don't get the last word, but on

12   this, but for the Supreme Court of the United States, the

13   Second Circuit does.  This is the law in this circuit.  It is

14   precedential, it is binding.  Mr. Weitzman doesn't have to like

15   it.  We're not writing the law here.  That is the law.  It is

16   critical in this case that the jury understand it.

17         We would have no objection to the Court literally

18   quoting the case.  Our suggestion to change language was to

19   simply make it more comprehensible to the lay jury.

20         MR. WEITZMAN:  It is hard to understand what multiple

21   conspiracies is if this language stands.

22         THE COURT:  No, that is not true.  Because their

23   goals, it's just their goals could be different, but they can't

24   be at cross purposes.

25         MR. WEITZMAN:  So if they're not at cross purposes,

O783MEN1

1    there is no multiple conspiracies is the way this language

2    reads.  So long as they're not inconsistent undermining each

3    other, they're not multiple conspiracies.  And that seems very

4    hard to square with the law.

5              MR. SOLANO:  Your Honor, if I may.

6              THE COURT:  Just a moment.  Yes.

7              MR. SOLANO:  I have a slightly different point to

8    make, which is I'm not going to argue with the *Beech-Nut*

9    application to this case, but that the gist of it, what the

10   prosecutors are arguing for is already covered by your Honor's

11   addition to which Mr. Weitzman has agreed to on page 2, where

12   you instruct the jury that "In determining whether a series of

13   events constitute a single conspiracy or a separate and

14   unrelated conspiracy or a conspiracies, you should consider

15   whether there is a common goal or goals among the alleged

16   co-conspirators."  And that should be sufficient to address

17   this additional point being made currently.

18             MR. RICHENTHAL:  I'm not a logic major, but that's not

19   the case as a matter of logic.  The first statement that

20   Mr. Solano is referring to is asking the jury consider whether

21   it is the same goal.

22             THE COURT:  This is what I'm going to do.  I'm going

23   to add the language from *Beech-Nut*.  I agree with the

24   government that "congruent" may be a step too far.  So

25   "coincide" is fine, but the English doesn't track in what I was

given.  It says "The participants' goals need not be coincide."
So, I need to strike the word "be."  So it will read "The
participants' goals need not coincide exactly for a single
conspiracy to exist, so long as the goals are not at cross
purposes and co-conspirators need not agree in all of the
details of conspiracy where the essential nature of the plan is
agreed upon."

That's language from *Beech-Nut*.  That will be a
separate paragraph after the addition I have on the bottom of
page 2.

MR. RICHENTHAL:  We would also note there is a
references to paragraph 15 at the very end of the instruction.
I understand the Court intends to remove all the references.

THE COURT:  15 is stricken.

MR. RICHENTHAL:  I wanted to advise the Court it is
also at the very end.  Not just at the beginning.

THE COURT:  Thank you.

Let's turn to paragraph 2 of the government.
Unanimity of theory.  Let me turn to it.  All right,
government.

MR. RICHENTHAL:  On this instruction, we don't think
this is required either.  Although that's not our principal
point, and we will concede that the law in this area frankly is
a little messy.

Just for the record, the reason we don't think it's

O783MEN1

1    required is a number of cases, including *United States v.*

2    *Martha Stewart*, which talks about the jury doesn't have been to

3    be unanimous about the means through which a crime was

4    committed.

5           Our principal issue here is the instruction -- I don't

6    think this was the Court's intention -- appears to take a

7    position as to whether it's one scheme or two schemes.  The

8    government's view, and we briefed this prior to trial, is it is

9    just one scheme.  We don't think the Court needs to take that

10   view either.  We think there should be a revision that

11   basically says, in sum, ladies and gentlemen, the government

12   says, it is one scheme, the defense says it's two.  If you find

13   it's one and you find the elements proven, that's fine.  If you

14   find it's two, you have to either be unanimous as to one

15   version or the other or both.  Just a neutral instruction.

16          We think there is more than one way to do that, and

17   this I assume will not be objectionable.  One way is to simply

18   say defendants engaged in bribery with two goals.  I've just

19   not used the word "scheme."  That's all.  But there is probably

20   more than one way with respect to verbiage to avoid the Court

21   taking a position with a contested factual matter.

22          THE COURT:  What about this.  In this count,

23   defendants -- the third sentence.  Rather than the government

24   has alleged that the defendants engaged in two bribery schemes,

25   in this count defendants contend that the government's proof

O783MEN1

1    supports the existence of two bribery schemes.

2            MR. RICHENTHAL:  I agree that would be a neutral

3    instruction.

4            THE COURT:  Mr. Weitzman, I think that does it.

5            MR. WEITZMAN:  This is not a count in which our client

6    is charged, but I think the verbiage is a bit too aggressive in

7    saying the defendants contend that the government's proof

8    supports two bribery schemes.  That seems to be an

9    acknowledgment that the government's proof suffices, and I'm

10   not sure.

11           THE COURT:  No.  It says defendants contend that the

12   government's proof supports --

13           MR. WEITZMAN:  I would say the government has alleged

14   two bribery schemes, rather than talking about government's

15   proof.

16           THE COURT:  That's how I started it.  That's how I

17   have it, but you heard government's position.

18           MR. WEITZMAN:  The defendants, I would put it the

19   defendants contend that the government has alleged or charged

20   two bribery schemes, rather than the government's proofs

21   supports two bribery schemes.

22           MR. RICHENTHAL:  The Court can hear from anyone it

23   wishes.  Mr. Menendez has no standing as to this instruction.

24   He's not in this count.  It is Mr. Hana and Mr. Daibes.

25           THE COURT:  Mr. Weitzman, what's that language again?

1          MR. WEITZMAN:  I would suggest the defendants contend

2     that the government has charged two bribery schemes.

3          MR. RICHENTHAL:  The problem with that, your Honor, is

4     juries don't consider what we charged.  They consider the

5     evidence.  So the question is whether the evidence shows one or

6     two, or I suppose in the defendants' preferred version of the

7     world, zero.  So charge is the wrong language.

8          THE COURT:  Just a moment.

9          MR. RICHENTHAL:  I would also say if the instruction

10    will say what the defendants believe the proof is, it should

11    say what we believe, which again, is there is one scheme.

12         THE COURT:  This is what I'm going to do.  That third

13    sentence will read:  "In this count, the defendants contend

14    that the government has alleged that the defendants engaged in

15    two bribery schemes."  And then go on.

16         The next sentence will read, it is a new sentence:

17    "The government contends that the defendants engaged in a

18    single bribery scheme."

19         MR. RICHENTHAL:  That's fine with the government, your

20    Honor.

21         THE COURT:  Defense?

22         MR. SOLANO:  Yes, that's acceptable, your Honor.

23         MR. AGATA:  Yes, your Honor.

24         THE COURT:  The third sentence will read, "In this

25    count, the defendants contend that the government" and then you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    pick up the sentence "has alleged that the defendants engaged

2    in two bribery schemes."  The rest of that sentence.  Then we

3    add a sentence, "The government contends that the defendants

4    engaged in a single bribery scheme."  And then it goes on "you

5    cannot convict."  All right.

6            Proposed 219 instructions.

7            MR. RICHENTHAL:  Just for clarity, I take it the Court

8    would make the same edits as to the second unanimity

9    instruction that matches.  That's instruction 53 on page 78.

10            THE COURT:  Thank you.  We will.  Yes.

11            Proposed 219 instruction.  What are the positions of

12    the parties?  Yes, I did use that guidance, and yes, it's not

13    in and of itself the law.  But the parties used the guidance as

14    well.

15            Have you talked to each other about this?  It just

16    came in this morning at 8 o'clock.

17            MR. RICHENTHAL:  We have not talked about it this

18    morning.  Our effort here was not frankly to change the

19    substantive meaning.  It was to avoid a misinterpretation in

20    our view as to what the meaning is.  Indeed, our first edit is

21    literally to combine two sentences without changing the

22    meaning.

23            THE COURT:  Just to talk to each other now off the

24    record to see if the parties agree.  I think the idea everyone

25    agrees on the thrust.

1          (Counsel conferring)

2          THE COURT:  Counsel, why don't we come back to that

3    later when you've had a chance to talk to each other.  I'm sure

4    the parties will remind me.  So let's go to the last in the

5    government's point which is the obstruction of justice should

6    be revised.

7          Government?

8          MR. RICHENTHAL:  The issue here in our view is

9    actually reasonably narrow.  We understood the Court to be

10   explaining to the jury that an act of obstruction requires

11   acts, knowledge or belief it will influence the grand jury.

12         As drafted it appeared to tell the jury you literally

13   cannot consider an act for any purpose, unless it achieves

14   acts.  Which is not I assume what the Court intended.

15         To put a fine point on it, under this instruction, the

16   Court I think is intending for the jury to understand that the

17   mere interaction with the prosecutor, without more, is not an

18   obstructive act.  That is, Mr. Menendez must intend to

19   influence the grand jury.  We don't quibble with that

20   proposition of law.

21         But the jury is entitled to consider Mr. Menendez's

22   interactions with prosecutors through counsel, or for that

23   matter, any other third party, for any other legitimate purpose

24   such as consciousness of guilt about the scheme.

25         So our worry here is even though this instruction is

O783MEN1

1    within the obstruction of justice charge, read on its all

2    fours, the sentence on its own, it seems to tell the jury they

3    literally cannot consider these interactions for any purpose,

4    unless they find they were intended to influence the grand

5    jury, which we don't think is, we assume, what the Court

6    intended and not our understanding of the law.

7            We've proposed an instruction that I think

8    accomplishes what the Court intended.  It is not designed to

9    alter the meaning.  And again, there is probably more than one

10   way with respect to verbiage to get there.

11           MR. WEITZMAN:  Your Honor, I think there is a simpler

12   way to clean this up.  Which is to in the proposed language

13   that you have, just add the word --

14           THE COURT:  Let me turn to it.  Yes, sir.

15           MR. WEITZMAN:  Your second paragraph in charge 66 I

16   would just add a few words.  You wrote "A defendant's

17   interactions with third parties, including prosecutors, are

18   therefore relevant." And I would add to the obstruction charge

19   "or charges, only if the defendant knew" and continued the rest

20   of the sentence.  I think the addition that they are asking

21   for, that the interactions may be relevant for other purposes,

22   goes too far in inviting inferences.

23           MR. RICHENTHAL:  That's also wrong, and in fact it's

24   devastatingly wrong.  Here's why.  The jury can consider that

25   Mr. Menendez lied to his lawyers who then passed on falsehoods

1    to the government in considering whether there is a scheme to

2    obstruct.  It is the case under your Honor's reading of the law

3    that those interactions in and of themselves cannot be deemed

4    obstruction.  But they are plainly relevant to whether

5    Mr. Menendez had the requisite mental state.

6            Imagine a different case in which the defendant lied

7    to the FBI agent on day one, and gave documents to the grand

8    jury on day two.  Under Mr. Weitzman's instruction, the jury

9    could not consider what happened on day one.  This is on all

10   fours with that concept.  The jury can consider it.  It is

11   relevant.  It just isn't in and of itself, that is without

12   more, obstruction.

13           MR. WEITZMAN:  I think the issue, your Honor --

14           THE COURT:  Hang on.

15           MR. WEITZMAN:  I think the issue is that what they're

16   arguing is inconsistent with the Supreme Court authority and

17   Second Circuit authority that your Honor's already discussed at

18   length including the *Schwarz* decision.  The relevance of these

19   interactions.

20           THE COURT:  That goes to knowledge.  That's the issue

21   with *Schwarz*, seems to me.

22           MR. WEITZMAN:  Well, this sentence does go to

23   knowledge.  That's correct.  This sentence goes to knowledge.

24           THE COURT:  I'm supporting where you're going I think.

25   Go ahead.

O783MEN1

1              MR. WEITZMAN:  So, I think it just goes too broad in

2     suggesting that they can consider all this evidence for other

3     purposes.  The question is whether they've satisfied the

4     knowledge requirement and they can consider the evidence to the

5     extent it satisfies the knowledge requirement.  The knowledge

6     requirement has to be to affect the judicial or grand jury

7     proceeding.  I think --

8              THE COURT:  I think that is *Aguilar* and *Schwarz*.

9              MR. RICHENTHAL:  Let me try a different way.  If we

10    are to stand up in summation and rebuttal and say -- which to

11    be clear, we might say -- ladies and gentlemen, one reason you

12    should know that Mr. Menendez intended to affect the grand

13    jury, that is, in other words, your Honor, consistent with

14    *Aguilar* and *Schwarz*, is that his false production of documents

15    didn't stand alone.  He asked his lawyers to make substantially

16    similar false statements to the government.  That is, it wasn't

17    accidental.  It was intentional and it was part of a broader

18    scheme to avoid being prosecuted.

19             Our view is that statement I just made is plainly

20    supported by the evidence.  The defense can disagree, that's

21    fine, but it is also plainly legally proper to make that

22    argument.  But if the jury heard that argument and then read

23    this, the jury would think what I said is not true.  That it

24    cannot consider.

25             THE COURT:  Why?  Why would they think it's not true?

1          MR. RICHENTHAL:  Because the instruction as drafted is

2     it can only consider this stuff relevant if Mr. Menendez

3     intended to affect the proceeding.  But it can consider it

4     relevant, for example, for consciousness of guilt that he

5     engaged in bribery.  It can consider it relevant that he had

6     the requisite mental state to try to avoid prosecution through

7     multiple avenues.

8          Now to be clear, one avenue we've charged is

9     obstruction.  And lies to his lawyers, without more, are not

10    obstruction.  But that doesn't make it irrelevant.  It just

11    means in and of itself it isn't the crime.  The word "relevant"

12    is the operative word here that's giving us such great concern.

13         MR. WEITZMAN:  Your Honor, you know, the remarkable

14    thing is the extent to which they will rely on argument that

15    has no support in the evidence.  This isn't a hypothetical.

16    This is contrary to the evidence.  There is no evidence, there

17    is no evidence that Senator Menendez lied to his lawyers.  They

18    didn't put any of that evidence in.  They put four pages from

19    the PowerPoint.  They can't make that argument for other

20    reasons, having nothing to do with this charge.

21         I'm lost at the suggestion they can argue that Senator

22    Menendez lied to his lawyers when they didn't introduce his

23    lawyer's statements.

24         MR. RICHENTHAL:  Your Honor, it is plainly a

25    reasonable inference that Mr. Menendez, himself a lawyer, hired

O783MEN1

lawyers and told them or authorized what they would say to the
government.  Mr. Weitzman can say there is a paucity of
evidence on that point.  That's fine.

        But one reason it's a reasonable inference, beyond
what I just said, is that the same lies were supported by his
wife, the same lies were supported by a conversation with
Mr. Uribe.  The defendants can say Mr. Uribe's incredible, but
that's not for the defendants to decide.  That's for the jury.
And the same lies were supported by documents that Mr. Menendez
produced to the grand jury.  Literally the checks about the
purported loan.

        The jury's entitled to consider all of that and decide
whether Mr. Menendez's counsel made false statements with
Mr. Menendez's authorization or not.  That's why we're having a
trial.  But it is not the law that we cannot argue the jury can
draw that inference because the defense has a response.  That's
why we have trials.

        MR. WEITZMAN:  The number of times the government
objects to inferences --

        THE COURT:  Just a moment.

        MR. RICHENTHAL:  For what it's worth, I would also
note that *Schwarz* on page 109 refers and this is a quote, to
the intention "being in the defendant's mind."  In other words,
this whole count in many ways is about what Mr. Menendez was
thinking.

O783MEN1

1          Our point, which I didn't think was controversial, is

2    we are allowed to ask the jury to consider, in considering what

3    he's thinking, what his lawyers said to the government.

4    Mr. Weitzman can respond, no, that's ridiculous, don't consider

5    it, no evidence.  That's fine.  He can make that argument.  We

6    just don't think we should be prevented from making that

7    argument.

8          I also believe a minute ago I referenced checks.  If I

9    said Mr. Menendez, I meant to say Ms. Menendez.  She is the one

10   who produced the checks.  But the argument is the same.

11         MR. WEITZMAN:  That was what I was just about to

12   mention, which is that the distortion of the facts that we just

13   heard undermines the inferences they're trying to argue.

14         There is no evidence that Mr. Menendez provided those

15   checks.  he did not provide them.  Mrs. Menendez provided them.

16   There is no evidence as to where Abbe Lowell, what he said to

17   the grand jury and where he got the information from that he

18   included in the PowerPoint.  He could have gotten it from

19   Mrs. Menendez.  He could have gotten it from Mr. Uribe.

20         THE COURT:  He was offering it, as the PowerPoint

21   says, on behalf of Mr. Menendez.

22         MR. WEITZMAN:  I understand that.  So to the extent

23   they want to argue a defendant's lawyers' statements can be

24   used, can be looked at, that's fine.  But there is no evidence

25   for the argument that they just said they are going to make in

O783MEN1

1   summation, that Mr. Menendez lied to his lawyers.

2              THE COURT:  Why can't they draw the inference?

3              MR. WEITZMAN:  Inference based on what?  Based on the

4   fact that the lawyer made a statement?  I don't think you can

5   draw the inference.

6              THE COURT:  Which was done on his behalf.

7              MR. WEITZMAN:  That's fine.  They can say it's done on

8   his behalf.  But they can't say there is evidence in the

9   record, because there is none, that Senator Menendez lied.

10             THE COURT:  But the -- well, let me hear.

11             MR. RICHENTHAL:  This is summation.  If either one of

12  my colleagues wants to make this argument, we'll make it.  If

13  Mr. Weitzman wants to respond it is not a good argument, he'll

14  make it.

15             THE COURT:  That seems to me it's right.  It is an

16  inference to be drawn from the evidence and that's up to the

17  jury.  I'm concerned about this sentence.

18             MR. WEITZMAN:  I still think that the sentence is

19  accurate as written with the additions that I proposed.

20             THE COURT:  And give me your addition again.  Are

21  therefore relevant.

22             MR. WEITZMAN:  The obstruction charge.

23             MR. RICHENTHAL:  So, I know we are going back and

24  forth.  That's just not true.

25             THE COURT:  No, I got that point.  I'm not adding

O783MEN1

1    that.  I'm going to keep it the way it is based on my view of

2    *Schwarz* and *Aguilar*.

3          That handles all of the government's.  Now let me see

4    where we stand in terms of the audio visual.

5          MR. RICHENTHAL:  Your Honor, I can tell when I've

6    lost, but can I ask the Court to at least adopt the suggestion

7    that Mr. Weitzman said he didn't have a problem with which is

8    are only relevant to this charge?  We have a substantial worry

9    the jury reading this sentence will think it can't consider the

10   interactions in this case at all.

11         THE COURT:  "To this charge" is fine.  I'm adding

12   "therefore relevant to this charge only if the defendant."

13         I'm told that the audio visual people need to do a

14   test, they need access to the courtroom, and they need to test

15   the connection.  Do we know if at the other end Dr. Sayed is

16   available now?

17         MS. COLLART:  Yes, he is, your Honor.

18         THE COURT:  We'll continue for a few more moments

19   because the jury isn't here yet with the charge.  Then we have

20   to take a break for the test.  If the test is successful, I

21   guess what we do is I bring the jury in, ask if there is

22   another witness, I'll explain it's being done remotely.  And

23   again, I repeat, only if it is a good connection where they can

24   really hear and see the witness.  We'll do direct, we'll do

25   cross.  I then will ask if there is another witness.  I take it

1    there is no other witness.

2              MR. LUSTBERG:  No, we'll have a couple of

3    stipulations.

4              THE COURT:  Stipulations, let me put that in.  We'll

5    give the jury a break.  I'll allocute Mr. Hana, and then

6    Mr. Hana will rest.  Is that how we foresee it, Mr. Lustberg?

7              MR. LUSTBERG:  Yes, your Honor.

8              MR. RICHENTHAL:  Agree with one small addendum.  I had

9    understood, maybe misunderstood, the Court had granted our

10   request for a brief voir dire of this witness to ensure, as we

11   put in our letter, that his knowledge of the audit in 2019 is

12   not based on hearsay.

13             THE COURT:  You're very correct.

14             MR. RICHENTHAL:  I don't know it will take long,

15   although I don't know exactly what he's going to say, but

16   otherwise we agree with what the Court said.

17             I will note, and this is now expanding the lens and

18   this is not disagreeing.  We also have two government exhibits

19   we intend to offer in a rebuttal case.  I believe they total

20   four pages.  Excuse me.  Two pages.  That is one page each.

21             THE COURT:  And have you passed them by the defense?

22             MR. RICHENTHAL:  We sent them to the defense yesterday

23   by e-mail.  My understanding is that they may be objecting

24   allegedly on belated notice.  I would note again they're

25   literally two pages long.

1          MR. WEITZMAN:  Every time the defense tries to put in

2     evidence, there is an objection on process grounds by the

3     government, often false accusations where we've provided the

4     notice.

5          Here we asked for notice on Saturday morning of a

6     rebuttal case.  They didn't provide it.  They were obligated to

7     provide us the evidence they planned to introduce today on

8     Friday, on Friday by 7 p.m. under the parties' agreement.  They

9     didn't provide it.  They provided it to us last night at

10    9:30 p.m. while we are frantically preparing our summations.

11         What's good for the goose is good for the gander.

12    This is a process objection.  They shouldn't be permitted to

13    put in the rebuttal case.

14         THE COURT:  Just a moment.  Is there objection on the

15    substance, what are these things?  Sir, I take it it's process

16    as you say.  Simply process.

17         MR. WEITZMAN:  It's process.

18         THE COURT:  I got it.

19         MR. RICHENTHAL:  Just so the Court knows, the parties'

20    agreement did not cover this.  That's just not true.  I can

21    show to it to the Court if the Court would like.

22         We gave notice yesterday when we decided yesterday to

23    do it, in part based on the charge, that is the Court's charge

24    led us to conclude two pages was useful for our case.  We

25    immediately e-mailed the two pages to the defense.

O783MEN1

1          MR. WEITZMAN:  This has nothing do with the jury

2    charge.  That's just false.  This is in rebuttal to line

3    entries in our summary chart.  That's all it is.

4          THE COURT:  Let me see what they are.

5          MS. POMERANTZ:  May I pass them up?

6          THE COURT:  Yes.  That's the only way I can see them.

7          MR. RICHENTHAL:  We can also put them on the screen if

8    the Court would prefer.

9          THE COURT:  Let me see the agreement of the parties.

10         MR. RICHENTHAL:  I am going to have to pull it up by

11   e-mail.  It's from some time ago.  It has absolutely nothing to

12   do with the rebuttal case whatsoever.  In any event, as I said,

13   we didn't hold these back.  We got the jury charge --

14         THE COURT:  You know, let me cut through it.

15   Everybody has been working assiduously here and providing the

16   Court with multiple submissions on very short notice.  I don't

17   think there is any bad faith here on the part of the

18   government.  It's pretty consistent with what both sides have

19   been doing.  I am going to allow these two in a rebuttal case.

20         MR. WEITZMAN:  Just to note, when we provided a

21   summary chart with admittedly 40 exhibits that had been

22   produced weeks prior on the Friday before the Monday or the

23   Tuesday or the Wednesday, whatever it was, it was excluded for

24   violating process.

25         THE COURT:  Are you talking about 2500?

O783MEN1

1              MR. WEITZMAN:  Yes, your Honor.

2              THE COURT:  Totally different.  Thank you.  You made

3      the case.

4              MR. WEITZMAN:  There is one more point, your Honor.

5      On June --

6              THE COURT:  2500 is completely different.

7              MR. WEITZMAN:  On June 26, your Honor told the

8      government when they are moving 700 exhibits en masse they need

9      to advise the defense on what they planned to offer in

10     summation.  Last night at about 9 p.m., while we are

11     frantically preparing our summation, they provided notice of

12     about a dozen or 10, whatever it is, exhibits that they plan to

13     use in summation.  I think from that 700 list.

14             THE COURT:  I'm sorry.  Are you talking about

15     demonstrative exhibits here in summation?

16             MR. WEITZMAN:  No, this is about the -- you'll recall

17     they had some clean up exhibits, as they called it.  It was

18     about 600 or 700.

19             THE COURT:  We've been through that.

20             MR. WEITZMAN:  Your Honor said, government, tell the

21     defense which ones of those you plan to use in summation.

22     Between June 26 and yesterday at 9 p.m., they didn't say one

23     word about a single one of those documents.  Last night they

24     provided it to us at 9 p.m. that they have, I don't know how

25     many, it was 8 or 10 documents that they now plan to use in

1    their summation.

2              I think it's belated.  I think they should have done

3    it when your Honor suggested it.  And again, legal doctrine of

4    goose and gander.

5              MR. RICHENTHAL:  The summation wasn't written.

6    Mr. Monteleoni can respond.  This is not worth the Court's

7    time.

8              MR. MONTELEONI:  Your Honor, we're talking about 8 or

9    10 documents, almost all of which were actually published

10   briefly to the jury.  But I included this nevertheless because

11   they didn't come in through a witness.  If you recall, there

12   was a discussion about could we be surprising and pulling a

13   fast one where we're now summing up on some document no one's

14   ever heard of.

15             There is maybe -- the only ones I can think of of

16   these 8 or 10 that actually weren't even seen by the jury and

17   highlighted for the jury are a single wire transfer for the

18   interstate wire, which I believe Mr. Weitzman said is in the

19   category they wouldn't object to, and three text messages about

20   the scheduling of a surgery which Mr. Weitzman put at issue.

21             THE COURT:  All right.  I am going to allow it.

22             Let's take a break.  I don't know how long this will

23   take.  Let's assume it's, Ms. Blakely, 15 minutes?

24             MR. RICHENTHAL:  I don't want to overstay our welcome.

25   We do have one other thing that --

O783MEN1

```
 1          THE COURT:  What?

 2          MR. RICHENTHAL:  We noticed after Defense

 3   Exhibit 1304, which is a summary chart had been moved into

 4   evidence, that it contains a press release subsequent to the

 5   charges in this case involving Qatar and the war in Gaza.  We

 6   said to the defense --

 7          THE COURT:  You mean the October 7, the war in Gaza

 8   which commenced on or about October 7?

 9          MR. RICHENTHAL:  Yes, your Honor.

10          THE COURT:  I don't see how that can come in.

11          MR. RICHENTHAL:  That's our view.  We advised the

12   defense, we understand your Honor let in press releases for

13   context.  That's the direct word.  We did not understand that

14   context to include the war in Gaza, which began after the

15   charges in this case.

16          THE COURT:  I quite agree.  What's the position?

17          MR. WEITZMAN:  Your Honor, we're fine with that.

18   We've offered -- hold on a second.  We've told the government

19   we'll redact any references to the Gaza war in the press

20   release.  It will just say thanking Qatar for its humanitarian

21   aid without reference to Gaza.

22          The government's position is that doesn't go far

23   enough.  They want to strike the entry from the summary chart

24   and the underlying exhibit, which has already been moved into

25   evidence, and not include any reference to --
```

O783MEN1

1          THE COURT:  What we're talking about with the Gaza

2     reference is already part of the evidence?

3          MR. WEITZMAN:  Correct, your Honor, it's --

4          THE COURT:  Okay.

5          MR. WEITZMAN:  We're willing to redact the words in

6     Gaza.

7          THE COURT:  I got it.

8          MR. RICHENTHAL:  It wasn't published.  The jury

9     doesn't know.  It is a November 12, 2023, press release.

10         THE COURT:  If it's been moved into evidence already,

11    I'm keeping it.  Redact Gaza.

12         15 minutes.

13         MR. SOLANO:  Your Honor, we just had one thing.  We

14    could do it after the break, but so it's not lost.  We did have

15    some very minor comments in response to your Honor's jury

16    charge that we can raise after the break at some point.  But as

17    part of the jury charge conference, we do have some objections

18    we wanted to note.

19         THE COURT:  Thank you.

20         (Recess)

21         THE COURT:  I'm informed the audio visual set up has

22    been completed, and actually the last juror has just arrived.

23    What I propose we do, given the fact that the government has

24    asked to voir dire this witness, Mr. Lustberg, is to have my

25    deputy swear him in, to allow him to do the voir dire without

1    the jury, and then we'll proceed accordingly, bring the jury

2    in, yes.

3              Is there any objection, sir, Mr. Lustberg?

4              MR. LUSTBERG:  No, your Honor.

5              THE COURT:  What I think I also should do is after my

6    deputy administers the oath to him, ask him if he understands

7    that he is sworn to tell the truth, and that he is subject to

8    perjury for not telling the truth.

9              Any objection?

10             MR. LUSTBERG:  No.

11             MR. RICHENTHAL:  That's perfectly fine.  We conferred

12   with Mr. Lustberg.  We're comfortable with him asking the

13   questions.  We've accepted his good faith representation they

14   are based on personal knowledge.  We think we understand the

15   scope of the questions.  So we're preserving our right to

16   object, they don't control the witness, but I think we're

17   comfortable going forward.

18             THE COURT:  Without a voir dire?

19             MR. RICHENTHAL:  We had a chance to talk during the

20   break.  We think this should be fine.  We reserve the right to

21   object depending on what happens.

22             THE COURT:  Mr. Weitzman, do you have any objections

23   on the charge that you want to lodge?

24             MR. WEITZMAN:  Yes, your Honor.  We have a number of

25   objections.  We are going to need some time.

O783MEN1

| | |
|---|---|
| 1 | THE COURT:  How much time?  What does that mean? |
| 2 | MR. WEITZMAN:  I think it's going to be at least an |
| 3 | hour or hour and a half. |
| 4 | THE COURT:  Let's bring this jury in. |
| 5 | MR. RICHENTHAL:  Just so the Court knows, I think your |
| 6 | Honor's deputy knows.  We've been advised the nature of the |
| 7 | video system does not permit the witness to see a document |
| 8 | without the jury seeing it.  To the text we need to refresh the |
| 9 | witness or for that matter even seek to impeach the witness, |
| 10 | our choices are either the jury sees the document or the |
| 11 | witness is e-mailed the document.  We're trying to make this |
| 12 | efficient.  What I have done is I've e-mailed Ms. Collart a |
| 13 | document I might use to refresh -- |
| 14 | THE COURT:  It should be by e-mail so the jury doesn't |
| 15 | have to see it. |
| 16 | MR. RICHENTHAL:  Yes. |
| 17 | THE COURT:  How does this witness see -- I don't know |
| 18 | how the technology works.  How do I know, obviously the jury |
| 19 | will see him.  How do I know he sees the jury? |
| 20 | MS. COLLART:  We've tested that out on the break and |
| 21 | he has a split screen view where he can see the jury box and |
| 22 | the lectern where the questioner is. |
| 23 | THE COURT:  Where do I go so he can see me?  Because I |
| 24 | want to make sure he understands the nature of the oath. |
| 25 | MS. COLLART:  If you are at the lectern, he will see |

O783MEN1

1    you.

2                THE COURT:  I'll go to the lecturn.

3                MR. LUSTBERG:  You're welcome, Judge.  We're happy to

4    have you here.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O783MEN1

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, we are going to have

3     a witness who is going to be testifying from Egypt.  I believe

4     you can see him on your screens.

5          Ms. Blakely will administer the oath to him, and then

6     I need it go to that lecturn myself, so he can see me and ask a

7     few questions.

8          All right.  The last time we were here, which was

9     Wednesday, there was a witness on behalf of Mr. Hana.  That

10    witness has left the stand.  Mr. Lustberg, is there another

11    witness on behalf of Mr. Hana?

12         MR. LUSTBERG:  Yes, your Honor.  Mr. Hana calls

13    Dr. Moustafa Hossein Abel Majeed Sayed.

14         THE COURT:  Dr. Sayed, if you would rise, sir, and

15    raise your hand.

16         (Witness sworn)

17         THE COURT:  You may be seated, Dr. Sayed.  Can you see

18    me, sir?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Can you see the jury?

21         THE WITNESS:  Yes.

22         THE COURT:  Ladies and gentlemen of the jury, can you

23    see the witness?

24         A JUROR:  Yes.

25         THE COURT:  The jury has indicated yes.

O783MEN1                          Sayed - Direct

1              Dr. Sayed, do you understand that you are now sworn,

2      that the testimony you are going to give this court is the

3      truth, the whole truth, and nothing but the truth?

4              THE WITNESS:  Of course, of course, for sure.

5              THE COURT:  Do you understand, sir, if you do not tell

6      the truth, you can be subject to penalty under United States

7      law?

8              THE WITNESS:  Of course.

9              THE COURT:  Your witness, Mr. Lustberg.

10             Thank you, Dr. Sayed.

11      MOUSTAFA HOSSEIN ABEL MAJEED SAYED,

12          called as a witness by the Defendant,

13          having been duly sworn, testified through the Arabic

14          interpreter as follows:

15      DIRECT EXAMINATION

16      BY MR. LUSTBERG:

17      Q.  Dr. Sayed, I'm just going to wait for Judge Stein to go

18      back to the bench.

19      A.  Okay.

20      Q.  Thank you.

21             MR. LUSTBERG:  May I proceed, Judge?

22             THE COURT:  Yes.

23      Q.  Dr. Sayed, how are you currently employed?

24      A.  I am a senior veterinarian at the Central Administration of

25      Research Quarantine, at the General Authority of Veterinarian

O783MEN1                         Sayed - Direct

1    Services within the Egyptian Ministry of Agriculture.

2    Q.   Do you also have a role with IS EG Halal?

3    A.   Yes, minister resolution by the minister of agriculture for

4    me in October of 2021 to supervise the offices of IS EG Halal

5    in South America, in Brazil, Uruguay, Paraguay, and Argentina.

6    And I was notified by the head of the agency, the late

7    Dr. Abdel Hakim Mahmoud, to be a supervisor for the technical

8    team, being the most senior member next in the team.

9                   (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78Wmen2                        Sayed - Direct

1    BY MR. LUSTBERG:

2    Q.   And what are your job responsibilities in that capacity?

3    A.   My job is totally confined to the technical part of the

4    halal slaughter in terms of -- we have different scopes of

5    work, one of which covers meat and others cover things like

6    gelatin products and dairy products.  And my job is confined to

7    the authorization of documents to make sure that they conform

8    with sanitary and technical specification and to conduct field

9    visits and to issue certificates of validity side by side with

10   the sheikhs who are delegated by the Egyptian Ministry of

11   Endowments.

12   Q.   Thank you.

13        Just briefly, what is your educational background?

14   A.   I received a bachelor degree of veterinarian --

15   veterinarian sciences from Cairo University in 2002, and I have

16   a diploma in the supervision of health products from Benha

17   University in 2013.

18   Q.   Thank you.

19        I'd like to direct your attention to March of 2019 and ask

20   you this.  Was there a time when you came to the United States

21   as part of an Egyptian delegation to audit slaughterhouses here

22   in the United States?

23   A.   That's correct.

24   Q.   And when was that?

25   A.   I believe that was between the 13th and the 28th of March

O78Wmen2                          Sayed - Direct

1    of 2019.  OK.  I'm not sure if it started on the 13th or the

2    17th.  That was five years ago.

3    Q.  OK.

4         And what was your role during that audit?

5    A.  We were divided into two teams.  Every team, every team --

6    or each team had a veterinarian from the current team and one

7    from the laboratories and one from the slaughterhouses.

8    Q.  Go ahead.  I'm sorry.

9         And what role were you playing?

10   A.  A ministerial decision was issued for us to go check on the

11   status of the slaughterhouses in America and how -- how they

12   conform to the specifications that are set by the Egyptian

13   Ministry of Agriculture.

14   Q.  OK.  Sorry.

15   A.  And also to certify or to validate the slaughterhouses that

16   conform with the Islamic Sharia ways of slaughtering animal.

17   Q.  I want to ask you about your own observations with regard

18   to that audit.  Please just confine your answers to what you

19   yourself observed as opposed to what anybody told you.

20   A.  OK.

21   Q.  I want to direct your attention to the audit of a certifier

22   called Ifanca.  Do you recall that?

23   A.  Yes.  (in English)

24        Yes, I do.

25   Q.  And did you attend an audit of Ifanca?

O78Wmen2                          Sayed - Direct

1    A.  I did.

2    Q.  Please tell the jury what happened when you observed the

3    audit at Ifanca.

4    A.  I was assigned by Dr. Ahmed Abdel Karim, the head of the

5    delegation, to visit the Ifanca company for halal meat because

6    it was geographically close to the location of our visit as a

7    team.  It was located in Illinois.  We conducted a field visit,

8    and our team consisted of myself, Dr. Zaghloul Khedr and

9    Dr. Alsayed Alhassaneen.  And from the American side appeared

10   Mr. Bret Tate from the U.S. embassy in Cairo, the Arab Republic

11   of Egypt.  And there was -- that was also the presence of

12   Ms. Brittany from the U.S.D.A.  And she was assigned to

13   accompany the delegation with Mr. Bret Tate.

14        We visited the center, and we met with Mr. Muhammed

15   Chaudry, who was the head of the Islamic center, and he had his

16   assisting team.  They showed us how the documentation process

17   works in the company, and they offered a presentation showing

18   us the way they worked.  But we want to -- we wanted to

19   ascertain whether or not what they said on paper was actually

20   applied in reality, so insisted on making a field visit one of

21   the slaughterhouses.

22        When we made that request to him, he told us that he was

23   not able to accommodate that request at that time.  And instead

24   he proposed to show us by video a live process of slaughtering

25   animals the way they do it in the slaughterhouse.  In order to

O78Wmen2                         Sayed - Direct

1    show flexibility, we accepted that proposal so we can start the

2    process of inspection and also to give them a hand, offer help,

3    if needed.  So they put us in the external hallway, my team and

4    Mr. Bret Tate and Ms. Brittany, and they started playing a

5    video telling us that this was a live broadcast of a slaughter

6    that was taking place in real time.

7         I was sitting right in front of the screen, and behind me

8    the team and Mr. Bret, and I noticed that the timing of the

9    screen was different from the time that we were at at the time.

10   It was about 10 o'clock in the morning, and the timing of the

11   screen said 1 p.m. in the afternoon.

12        At that point I asked the administrator at the center how

13   far the slaughterhouse was located from where we were, and he

14   said about 30 minutes away.  And I asked a second question:  Is

15   there any difference in the time zone between the area where we

16   were and the area where the slaughterhouse was?  And they said

17   no, there was no time difference.

18        At that point I brought the matter to the attention of Mr.

19   Tate.  I told him that doesn't make any sense; the time was not

20   the same.  And he smiled back to me and said no comment.

21   That's what happened with the -- and we wrote a report to the

22   head of the delegation, Ahmed Abdel Karim, and explained what

23   happened.

24   Q.  OK.  Did you go to any other slaughterhouses during that

25   audit?

1    A.  We visited three slaughterhouses in order to audit and

2    ascertain the adherence to the specifications in the

3    slaughterhouses in the United States.

4    Q.  I'm sorry.  What was that?

5    A.  But I was assigned to visit two Islamic centers with my

6    team.

7         Yes.  (in English)

8    Q.  And by your own observations, is there anything that you

9    observed at those other centers that caused you concern?

10   A.  In terms of the technical issues, adherence to veterinarian

11   standards with the Egyptian international, we noticed they

12   adhered to the standards so we had no problem with them in

13   terms of approving them in that regard.  And on that ground, we

14   accepted them as a facility that adhered to the standards of

15   the United States food and safety procedures.

16   Q.  OK.

17   A.  Yes.  (in English)

18   Q.  What about with regard to halal standards?

19   A.  Regarding halal standards, in the last slaughterhouse I

20   visited, I noticed that the slaughtering was done by the

21   Islamic Society of California.  I noticed that the method of

22   slaughtering was vertical slit to throat of the animal to cut

23   the carotid artery, vertical cut across -- yes (in English),

24   and that violates the rules of halal slaughtering, which has to

25   be transverse, transverse cut.  That's what I noticed about

1  this particular Islamic center.

2       And there was a visit also that was paid to another center

3  called the Islamic Society of America.  We visited the center

4  with the same team, and we conducted a document verification

5  process, but what we learned at that point is that they do not

6  directly supervise the process of slaughtering animals --

7  whether cows, lamb and other animals; they don't do that

8  directly.  But they obtain the halal products from another

9  Islamic center called Halal Transactions of Omaha.

10       And when we asked to see the actual slaughtering process,

11  they showed us a video that turned out to be an old one that

12  goes back to 1987.

13  Q.  How did you know that it was an old video that went back to

14  1987?

15  A.  We were sitting watching the video, and we noticed the

16  quality of the picture was very old, and that video was

17  actually -- was also on YouTube.

18  Q.  One last question.  Did you have -- did you make any

19  observations with regard to the question of the time between

20  stunning cattle and slaughter?

21            MR. RICHENTHAL:  Objection.  Leading.

22            THE COURT:  Sustained.  Leading.

23  BY MR. LUSTBERG:

24  Q.  OK.  What, if anything, did you observe with regard to

25  issues of stunning?

O78Wmen2                          Sayed - Cross

1   A.  The stunning process in the United States is different from

2   stunning some other countries.  In the United States they use

3   what they call perforated needle.  And according to Egyptian

4   specifications and standards, that method of stunning did not

5   comply with the halal Egyptian standard.

6              MR. LUSTBERG:  Thank you.  I have no further

7   questions.  Thank you very much.  Thank you, sir.

8              THE COURT:  Is there any cross-examination of this

9   witness?

10             MR. RICHENTHAL:  Yes, your Honor, but I don't know if

11  any of the other defendants want to --

12             THE COURT:  Oh, I am sorry.  I've done that before.

13             MR de CASTRO:  Not for Mr. Daibes.

14             MR. FEE:  No, your Honor.

15             THE COURT:  OK.

16  CROSS-EXAMINATION

17  BY MR. RICHENTHAL:

18  Q.  Good morning from New York, and good evening in Egypt,

19  Dr. Sayed.

20  A.  Good morning.

21  Q.  If you have any trouble understanding me, just let me know,

22  because we're using an interpreter.  OK?

23  A.  Will do.

24  Q.  Now, you work for the Egyptian government, is that right,

25  sir?

O78Wmen2                              Sayed - Cross

1   A.  Correct.

2   Q.  Now, the part of the government that you work for, in

3   English, is sometimes referred to as the General Organization

4   for Veterinary Services, is that right?

5   A.  Correct.

6   Q.  I'm going to refer to that as GOVS, G-O-V-S.  Is that all

7   right with you?

8   A.  Yes.

9   Q.  Now, you've worked for GOVS for over a decade, correct?

10  A.  Correct.

11  Q.  And you're paid by GOVS -- that's right; your salary, in

12  other words, is paid by the part of the Egyptian government

13  known as GOVS?

14  A.  Yes.

15  Q.  Do you get a salary from anyone else for your work?

16  A.  No.

17  Q.  And that includes IS EG Halal, correct?

18  A.  OK.  So per the ministerial decree, IS EG pays us a daily

19  per diem.

20  Q.  IS EG Halal pays money when you do work for IS EG Halal, is

21  that correct?

22  A.  OK.  So this money gets paid per a ministerial decree, it

23  is -- certain fees are paid in that decision --

24      Interpreter's correction:  So the ministerial decree states

25  that IS EG Halal will pay for travel, lodging and per diem.

O78Wmen2                           Sayed - Cross

1   Q.  And just to be clear, sir, when you say ministerial decree,

2   you mean a decree of the government of Egypt, correct?

3   A.  Yes, it was a ministerial decision issued by the ministry,

4   because the company that requested was IS EG Halal Egypt.

5   Q.  And IS EG Halal Egypt is the only company certified to

6   export meat to Egypt, right?

7   A.  Correct.

8   Q.  Now, you recently applied for a visa to travel to the

9   United States, is that right, in fact, in early June?

10  A.  Yes.  (in English)

11      Correct.

12  Q.  And you said on the visa that you worked for IS EG Halal,

13  right?

14  A.  Yes.  (in English)

15      Correct.

16  Q.  But in fact, you work for the Egyptian government, right?

17  A.  Yes.  (in English)

18      Correct.

19  Q.  Now, you also applied for a visa last year to travel to the

20  United States, is that right, sir?

21  A.  Yes.  (in English)

22      Correct.

23  Q.  And when you applied -- I'm sorry.

24          THE INTERPRETER:  There's a second lag.

25  BY MR. RICHENTHAL:

O78Wmen2                         Sayed - Cross

1    Q.  And when you applied for the visa recently, you were asked

2    if you'd ever been denied a visa before, correct?

3    A.  Yes.  (in English)

4         Correct.  Yes.

5    Q.  And you answered no, right?

6    A.  Yes.  (in English)

7         Yes.

8    Q.  But in fact, your visa last year was denied, wasn't it?

9    A.  Can I answer?

10   Q.  Sir, is it true that your visa last year was denied?

11   That's true, isn't it?

12   A.  OK.  So I was informed by the consular of Uruguay that my

13   visa was under administrative process.  They said

14   administrative process refused but is not denied.

15   Q.  OK.  Now, you testified about participating in part of a

16   2019 audit of certain beef slaughterhouses in the United

17   States, right?

18   A.  Correct.

19   Q.  Now, that audit was not led by you, correct; it was led by

20   Dr. Ahmed Abdel Karim?

21   A.  Correct.

22   Q.  And he was your boss, right?

23   A.  Yes, he was the head of the veterinarian delegation.

24   Q.  And Dr. Karim knew Wael Hana before the audit, did he not?

25   A.  Correct.

1    Q.  But you did not know Mr. Hana, did you?

2    A.  No, I did not know him.

3    Q.  Now, at the end of the audit, Egypt approved all of the

4    beef slaughterhouses that you had visited; that is, the beef

5    slaughterhouses in the United States were approved to export

6    beef to Egypt, right?

7    A.  Correct.

8    Q.  And not just the slaughterhouses you visited, other

9    slaughterhouses too, right?

10   A.  We approved the system for all the slaughterhouses, the

11   system itself, same as when the system in Australia was

12   approved and the one in New Zealand.

13   Q.  Now, let me switch from slaughterhouses to halal

14   certifiers.  All right?

15   A.  OK.  (in English)

16   Q.  Now, Egypt approved the entire system -- that is, all

17   slaughterhouses -- but it did not approve all halal certifiers,

18   right?

19   A.  Correct.

20   Q.  In fact, it unapproved -- that is, decertified -- all of

21   the existing halal certifiers, right?

22   A.  Correct.

23   Q.  And it then approved a brand-new one, IS EG Halal, right?

24   A.  Correct.

25   Q.  Now, that company, IS EG Halal, had never certified halal

O78Wmen2                         Sayed - Cross

1    food previously, had it?

2    A.  Correct.

3    Q.  Not for Egypt?

4    A.  Correct.

5    Q.  Not for any country?

6    A.  Correct.

7    Q.  Now, I want to talk about the companies that you visited.

8        Now, first, just to be clear, you only visited some of the

9    existing companies that were certifying meat as halal, correct,

10   sir?

11   A.  Correct.  Yes.  The agreement was from the General

12   Administration for Veterinary Services and the American

13   agricultural *attaché*, and we were going to see a representation

14   sample of the companies that do the certification.

15   Q.  And just to be clear, when you say representation sample,

16   what you mean is you only visited or interacted with some, but

17   not all, of the existing certifiers, right?

18   A.  Yes.  (in English)

19       So, the representative sample was for slaughterhouses and

20   not halal certifiers.

21   Q.  And in fact, the other halal certifiers had meetings in

22   Washington, D.C., after you'd returned to Egypt, right?

23   A.  That's a meeting that was held through Dr. Ahmed Abdel

24   Karim.

25   Q.  Exactly, but you weren't in those meetings, were you,

1   Dr. Sayed?

2   A.  Yes.  I did not attend these meetings.

3   Q.  Dr. Karim attended those meetings?

4   A.  Yes.

5   Q.  And those are the meetings that IS EG Halal was in, right?

6           MR. LUSTBERG:  Objection.

7           THE COURT:  We'll find out.

8           You may answer.  Was IS EG Halal in the meetings in

9   D.C. with Dr. Karim?

10          THE WITNESS:  I do not know.  I don't know.  Honestly,

11  I don't know.

12  BY MR. RICHENTHAL:

13  Q.  Well, in any event, you never met with IS EG Halal during

14  the audit, right?

15  A.  No, I did not meet them.

16  Q.  And you never met with Mr. Hana during the audit?

17  A.  No.

18  Q.  Now, I want to talk to you a minute about Ifanca.  That's

19  the company where you said you saw a video of a slaughterhouse

20  that was supposed to be 30 minutes away, and it looked to you

21  like it was not live, is that right?

22  A.  OK.  Yes.

23  Q.  Now, this was a presentation the company was making to you,

24  correct?

25  A.  It was not a presentation.

O78Wmen2                                  Sayed - Cross

1    Q.  Let me be more precise.  They were showing you their

2    operations, but not at their literal place of operation,

3    correct?

4    A.  No.  They said that the slaughtering takes place in the

5    slaughterhouse through them, and that's why they would

6    broadcast a live video of the slaughtering for us to see the

7    process.

8    Q.  That was actually exactly my question.  They showed you a

9    live video, but there was no slaughtering at the time, and then

10   they also showed you a recording video, right?

11   A.  No.  They only showed us one video, and they said that that

12   was a live feed.  But it was not a live feed.  But verifying

13   the time on the video it was not -- the discrepancy, it was not

14   a live feed.

15   Q.  Sir, at this time what language were you speaking with Mr.

16   Tate?

17   A.  English.

18   Q.  English.  And English is not your first language, is it?

19   A.  Yes.  (in English)

20        Yes.

21   Q.  In fact, you're testifying right now through an

22   interpreter, correct?

23   A.  Correct.

24   Q.  And that's because English is not a language you're

25   perfectly fluent in, is it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Correct.

2    Q.   Now, at the end of the audit, I think you said earlier IS

3    EG Halal was the only company certified, right?

4    A.   Correct.

5    Q.   Now, you didn't decide that that should be a company that

6    gets a monopoly, right?

7    A.   Correct.

8    Q.   That was made above your level, right, sir?

9    A.   I'm only a team member, but the decision would be made by

10   the General Administration for Veterinary Services and the

11   minister of agriculture.

12   Q.   That is, the head of that part of the government of Egypt,

13   right?

14   A.   And -- yes.  I would also like to add something, please.

15        OK.   And also, I would like to add something.  Our team was

16   mostly concerned with verifying the system generally used in

17   the United States to ensure food safety in slaughterhouses, and

18   that's what our team was concerned with and that's what we

19   ended up approving.

20   Q.   Thank you for adding that, sir, because that was actually

21   my next question.

22        The focus of your visit, to be clear, was not on halal

23   certification, right; it was on food safety -- that's why you

24   referred a few minutes ago you referred to the system in the

25   United States?  Correct?

1    A.  Yes.  (in English)

2         Correct.  Exactly.

3    Q.  The focus on halal certification was others, not you?

4    A.  Correct.  Exactly.

5    Q.  Now, I've been asking you a series of questions about the

6    2019 audit.  I just want to step back for a moment.

7         That was not the first time you visited the United States

8    for the Egyptian government, correct?

9    A.  Yes.  (in English)

10        Correct.

11   Q.  In fact, you visited in 2013 as part of a different audit,

12   right?

13   A.  Yes.  (in English)

14   Q.  Now, that audit -- that's the 2013 audit, for that one, you

15   were actually the head of the delegation, not Dr. Karim, right?

16   A.  No.  It was Dr. Ahmed Fathy who was the head of the

17   delegation.

18   Q.  OK.  But not Dr. Karim, right?

19   A.  No.

20   Q.  Now, in 2013, multiple halal certifiers continued to be

21   certified after the audit, right?

22   A.  Exactly.

23   Q.  And one of those was Amana of New York, right?

24   A.  Yes.

25             MR. RICHENTHAL:  Thank you for your time, sir.

O78Wmen2                        Sayed - Redirect

1              THE WITNESS:  Thank you.  (in English)

2              MR. LUSTBERG:  Your Honor, brief redirect?

3              THE COURT:  Yes, sir.

4              MR. LUSTBERG:  Thank you.

5    REDIRECT EXAMINATION

6    BY MR. LUSTBERG:

7    Q.  Dr. Sayed, you speak some English, right?

8    A.  Yes.  (in English)

9         Yes.

10   Q.  You can understand, during your trip to -- strike that.

11        During your trip to the United States for the audit, you

12   could communicate in English with Mr. Tate?

13   A.  Yes.  (in English)

14        Yes.  We didn't have a translator in the mission.  (in

15   English)

16   Q.  Thank you.  Just two other questions.

17        One, Mr. Richenthal asked you some questions about who pays

18   your salary as between IS EG Halal and the government of Egypt.

19   Can you explain to the jury what the relationship is between IS

20   EG Halal and the government of Egypt?

21   A.  OK.  So, I want to explain two aspects.

22        First, IS EG is a company that was established per the

23   decision of the prime minister of Egypt, decision No. 35 for

24   the year 2020.  And it is -- OK, and it's a contributing

25   company that has three ministries under which -- three

O78Wmen2                          Sayed - Redirect

1    ministries, the Ministry of Agriculture and the Ministry of

2    Endowment and general establishment to oversee trade, exports

3    and imports for the Ministry of Trade and Commerce.

4    Q.  Let me stop you there.  One moment.

5        So what you're describing is IS EG Halal in Egypt, correct?

6    A.  Yes.  (in English)

7            MR. RICHENTHAL:  Leading.

8            THE COURT:  I'll allow it.

9    A.  Egypt, yes.

10   Q.  And is that or isn't it different than IS EG Halal in the

11   United States?

12   A.  OK.  So, it is a company that is established in the Arabic

13   Republic of Egypt and it's not a government company.  It is a

14   private company.  It is considered an independent entity, but

15   it does declaration to the Egyptian government.

16   Q.  Right.  What I'm trying to understand --

17   A.  Operation.  Operation.  OK.

18           THE INTERPRETER:  Interpreter will correct the word:

19   Not declaration.  Operation.

20   A.  So it is -- all these companies that operate overseas, they

21   operate under Egyptian government.

22   Q.  OK.  And IS EG Halal in the United States is something

23   different, right?

24           MR. RICHENTHAL:  Objection.  Personal knowledge and

25   asked and answered.

1          THE COURT:  Yes.

2    BY MR. LUSTBERG:

3    Q.  What's the relationship between IS EG Halal in the United

4    States and the entity you've been describing in Egypt that's

5    composed three ministries?

6          MR. RICHENTHAL:  Scope, hearsay, personal knowledge.

7          THE COURT:  I'll allow it.

8    A.  OK.  So, the company in Egypt, the membership of the board

9    has the three ministries that I mentioned.  However, in the

10   operation overseas, whether by America, it all operates under

11   the Egyptian government.

12         THE COURT:  And is that true of the IS EG Halal that

13   operates in the United States as well?

14         THE WITNESS:  Correct.

15   BY MR. LUSTBERG:

16   Q.  One last question.  You were asked some questions about a

17   company called Amana of New York.  Do you remember that?

18   A.  Yes, of course.

19   Q.  Did Amana of New York certify any beef products to go from

20   the United States to Egypt as halal?

21         MR. RICHENTHAL:  Objection.

22         THE COURT:  I'll allow it.

23   A.  OK.  So, when we did, when we conducted the visit in 2013,

24   under the leadership of Dr. Ahmed Fathy, Amana did not certify

25   any beef.  It was solely for poultry, and since 2016, they did

O78Wmen2

```
 1    not export to Egypt anything other than poultry until maybe
 2    2019.
 3              MR. LUSTBERG:  Thank you, your Honor.  I have nothing
 4    further.
 5              THE WITNESS:  And something about the salary.
 6              MR. RICHENTHAL:  I just have one question.
 7              THE COURT:  Yes.
 8    RECROSS EXAMINATION
 9    BY MR. RICHENTHAL:
10    Q.  Hello again, sir.
11         How many conversations did you participate in between Wael
12    Hana and a man named General Ahmed?
13    A.  What?  (in English)
14    Q.  How many conversations did you participate in between Wael
15    Hana and an individual known as General Ahmed?
16              MR. LUSTBERG:  Objection.  Beyond the scope of
17    redirect.
18              THE COURT:  No.  I'll allow it, given the questioning
19    on redirect.
20    A.  Not even once.
21              MR. RICHENTHAL:  Thank you.
22              THE COURT:  All right.  Thank you, sir.  You are
23    excused.  Thank you, Dr. Sayed.
24              (Witness excused).
25              THE COURT:  Let's cut that connection, please.
```

O78Wmen2

1          Is there another witness on behalf of Mr. Hana?

2          MR. LUSTBERG:  No, your Honor.  But I have a couple

3    of -- one stipulation to read in and we also, just to be clear,

4    with the consent of the government, we would offer Hana Exhibit

5    211, which is a list of all the other exhibits that Mr. Hana

6    has admitted, and I won't read all those to save time unless

7    the Court wants me to.

8          THE COURT:  All right.  Admitted.

9          (Defendant's Exhibits Hana 211, Hana-013, Hana-013-T,

10   Hana-030 to Hana-036, Hana-095 to Hana-101, Hana-101-T,

11   Hana-102 to Hana-110, Hana-112 to Hana-115, Hana-117 to

12   Hana-122, Hana-124 to Hana-129, Hana-130-100, Hana-131-100,

13   Hana-132, Hana-141 to Hana-165, Hana-167 to Hana-169,

14   Hana-170-R, Hana-171-R, Hana-172, Hana-175 to Hana-178,

15   Hana-180 to Hana-181, Hana-190 to Hana-191, Hana-191-T,

16   Hana-192 to Hana-194, Hana-197 to Hana-200, Hana-202, Hana-204

17   to Hana-205, Hana-205-T, Hana-207 to Hana-209, Hana-210,

18   Hana-1000, Hana-1001, Hana-1002, Hana A101-100 to Hana

19   A101-104, Hana A103-100, Hana B205-100 to B205-106, Hana

20   B207-100 to Hana B207-102, Hana B209-100, Hana B213-100 to Hana

21   B213-101, Hana B224-100, Hana C102-100, Hana C102-101, Hana

22   C102-103 to Hana C102-108, GX A109-B-TR, GX 10C-6 received in

23   evidence)

24          MR. LUSTBERG:  I do want to read one exhibit, one

25   stipulation.  This is Hana Exhibit 1004, in which the following

O78Wmen2

1    is stipulated:

2              "If called as a witness at trial, a special agent of

3    the Federal Bureau of Investigation ('FBI') would testify that

4    in a search executed on November 25, 2019, cash in the amount

5    of $5,943 was located in Mr. Hana's residence."

6              I believe we have one -- do we have --

7              We also offer Defendant's Exhibit 2207, which I

8    believe has been shown to the government.  I don't know --

9    thank you.

10             THE COURT:  Is there an objection?

11             MR. RICHENTHAL:  No, your Honor.  Some of these are

12   pursuant to a limiting instruction.  I think what might make

13   sense, for efficiency, is we can talk to defense counsel and

14   the Court can note that on the record.

15             THE COURT:  OK.

16             MR. RICHENTHAL:  That's for the exhibits that

17   Mr. Lustberg was just referring to.

18             Separate, we do have a potential issue with one of the

19   exhibits Mr. Lustberg referred to.  But I want to respect the

20   time of the jury.  We can deal with that separately,

21   specifically 2227.

22             MR. LUSTBERG:  2207, you mean?

23             MR. RICHENTHAL:  2207.  Excuse me.

24             MR. LUSTBERG:  We can address that after.  Other than

25   that, Mr. Hana rests.

O78Wmen2

| | |
|---|---|
| 1 | THE COURT:  I need to admit that.  What exhibits are |
| 2 | you admitting now? |
| 3 | MR. LUSTBERG:  So, we've admitted all the exhibits. |
| 4 | We've admitted Hana Exhibit 1004, which is the stipulation I |
| 5 | read, and we've admitted Hana Exhibit 211 and all the exhibits |
| 6 | that are listed on 211, none of which, I understand, have any |
| 7 | objections to them. |
| 8 | THE COURT:  All right.  Admitted. |
| 9 | (Defendant's Exhibit 1004 received in evidence) |
| 10 | MR. LUSTBERG:  And I think all that's left is Exhibit |
| 11 | 2207, which we can address later. |
| 12 | THE COURT:  All right. |
| 13 | Ladies and gentlemen, why don't I excuse you.  It will |
| 14 | be just about 10 or 15 minutes.  We need to deal with some |
| 15 | legal matters. |
| 16 | (Continued on next page) |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

O78Wmen2

```
 1                 (Jury not present)
 2                 THE COURT:  All right.  Please be seated.
 3                 Should we handle 2207?  What's the issue?
 4                 MR. RICHENTHAL:  So, 2207 we were given notice of this
 5       morning.  I believe this was actually an exhibit that Mr.
 6       Menendez wanted to put in before he rested and has now provided
 7       to Mr. Hana's team, which is fine, but just to be clear, it's
 8       not, to our knowledge, relevant to Mr. Hana at all.
 9                 This is a partial bank record, as we understand it.
10                 THE COURT:  Let me see it.  Do you have a copy,
11       anyone?
12                 MR. LUSTBERG:  Oh, sorry.
13                 THE COURT:  Go ahead.
14                 MR. RICHENTHAL:  So, as I understand it, and we
15       haven't had much time with this, so I may get it wrong.  But as
16       I understand it, this is a partial bank record of 2013 of
17       Nadine Arslanian, the woman later known as Nadine Menendez,
18       appearing to indicate one or more debits of an unclear nature.
19       It's not entirely clear to us why Mr. Menendez's team wanted to
20       offer this, why it's appropriate in Mr. Hana's case and,
21       frankly, what it means.  Again, it's 2013 -- that's five years
22       before the charges.  The debit's entirely unclear.  It doesn't
23       indicate it's cash, for example, if that's the theory.  It just
24       says debit.
25                 Without a witness to put this in context, we think
```

1    it's confusing.  It's unclear it's even relevant at all, and it

2    should be precluded including because it's being offered in

3    Mr. Hana's case, when it has nothing to do with Mr. Hana.

4              THE COURT:  All right.

5              Mr. Lustberg.

6              MR. LUSTBERG:  Thank you, your Honor.

7              Obviously, if it's one big conspiracy -- everybody's

8    sort of in it together, as the government alleges, this is an

9    exhibit that shows -- it's true -- debits.  They appear to be

10   cash withdrawals, although I understand --

11             THE COURT:  It's 2013.

12             MR. LUSTBERG:  I understand.  So this is all about

13   where cash came from that was located in the home.

14             THE COURT:  No.  I'm going to preclude it.

15             MR. WEITZMAN:  Your Honor, can I be heard for a

16   moment?

17             THE COURT:  Yes.  You want to be heard on behalf of

18   Mr. Hana?

19             MR. WEITZMAN:  Well, I would like to be heard only

20   because we are in the same conspiracy charge, and the question

21   of the money and what it's doing in the house is relevant to

22   all defendants, your Honor.

23             THE COURT:  In 2013.

24             MR. WEITZMAN:  Yes, because for the same reason that

25   the government offered records of Senator Menendez and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  defense offered records of Senator Menendez that go back to the

2  1990s and 2000s showing cash withdrawals that go back in years

3  to the dates of when the cash actually is dated in the house is

4  relevant.

5          THE COURT:  Precluded as offered by Mr. Hana.

6          Now, Mr. Lustberg, if you have no other witness, I

7  think I should allocute Mr. Hana.

8          MR. LUSTBERG:  Yes, your Honor.  I agree.

9          THE COURT:  All right.

10          Mr. Hana, if you would rise, sir.

11          Mr. Hana, I wish to inform you of a couple of things,

12  and I believe you already know them because you've heard my

13  questioning of Mr. Menendez and of Mr. Daibes as well, but I

14  wish to go through them with you.

15          Do you understand, sir, that in American law, the

16  defense in a criminal case has no obligation to prove anything?

17          DEFENDANT HANA:  Yes, your Honor.

18          THE COURT:  The obligation is always on the government

19  to prove its case beyond a reasonable doubt.

20          Do you understand that?

21          DEFENDANT HANA:  Yes, your Honor.

22          THE COURT:  And you and your team can put on no

23  witnesses or introduce any evidence; you have no obligation

24  whatsoever to put forward a case.

25          Do you understand that?

1                    DEFENDANT HANA:  Yes, your Honor.

2                    THE COURT:  Do you also understand, sir, that you are

3      presumed to be innocent at all times until such time, if ever,

4      that the jury believes the government has proved its case

5      beyond a reasonable doubt?

6                    Do you understand that?

7                    DEFENDANT HANA:  Yes.

8                    THE COURT:  And do you also understand, sir, that

9      there are a number of decisions that really, at the end of the

10     day, are for your lawyer to make, such decisions as who to call

11     as witnesses, what questions to ask, what motions to make,

12     those sorts of things.  But there are certain very important

13     decisions that are not for the lawyer to make but for you, the

14     defendant, to make.

15                   Do you understand that?

16                   DEFENDANT HANA:  Yes, your Honor.

17                   THE COURT:  And among those decisions that are for you

18     to make is the decision of whether or not to testify in your

19     own defense.

20                   Do you understand that?

21                   DEFENDANT HANA:  Yes.

22                   THE COURT:  And do you also understand that if you do

23     decide to testify, that anything you say can be used against

24     you?

25                   DEFENDANT HANA:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O78Wmen2

1              THE COURT:  Have you discussed this issue of whether

2    or not you should testify with your attorneys?

3              DEFENDANT HANA:  Yes, I have.

4              THE COURT:  Did they answer any questions you may have

5    had?

6              DEFENDANT HANA:  Yes.

7              THE COURT:  Do you have any questions of me in that

8    regard?

9              DEFENDANT HANA:  No, your Honor.

10             THE COURT:  Do you understand, sir, that the decision

11   of whether or not you are going to testify in your defense is

12   solely your decision to make?

13             Do you understand that?

14             DEFENDANT HANA:  Yes, I do.

15             THE COURT:  And what is that decision, sir?

16             DEFENDANT HANA:  I'm not.

17             THE COURT:  You're not what, sir?

18             DEFENDANT HANA:  I'm not going to testify.

19             THE COURT:  All right.  Thank you.

20             Any further questions you wish me to ask,

21   Mr. Lustberg?

22             MR. LUSTBERG:  No, your Honor.

23             THE COURT:  Government, any questions you wish me to

24   ask?

25             MR. RICHENTHAL:  No, your Honor.

O78Wmen2

1          THE COURT:  All right.

2          Thank you, Mr. Hana.

3          All right.  I think I should call the jury back.  And

4    I take it, Mr. Lustberg, you'll rest at that time.

5          Then what's the government rebuttal?

6          MR. RICHENTHAL:  Just on the exhibits Mr. Lustberg

7    just moved in, as I said, some or all of them are, I think,

8    with the standard limiting instruction.  They weren't

9    published.  I don't think the Court needs to give the

10   instruction.  But we'll can confer with the defense and we can

11   advise the Court separately.

12         THE COURT:  Do that right now.

13         MR. RICHENTHAL:  I think this actually doesn't need to

14   be dealt with.  So, several of the exhibits were only offered

15   for purposes other than for the truth, but they weren't

16   published to the jury.  We understand Mr. Lustberg's team is

17   going to respect that limitation in their closing.  We'll

18   reserve the right to object if it's not respected, but I don't

19   think we need to take more of the Court's time on this.

20         THE COURT:  All right.  Will there be a government

21   rebuttal case in which you say what exhibits you're

22   introducing?

23         MR. RICHENTHAL:  Yes.  Ms. Pomerantz has two exhibits

24   to offer, your Honor.

25         THE COURT:  All right.  Fine.  And then I'll excuse

O78Wmen2

```
1   the jury.  It's now 12:15.  We have more of the charge to go

2   through.  What I suggest is we do that and the parties need to

3   have lunch as well.  Why don't I, with the assumption that it

4   will take about an hour to go through the charge -- I mean the

5   remaining objections of the parties -- shall I give the jury

6   two hours so that the lawyers will have an hour for lunch?

7   Does that make sense?

8           Counsel.

9           MR. WEITZMAN:  I'd be comfortable with a shorter lunch

10  for the lawyers so that we have enough time.

11          THE COURT:  Let's make it an hour and a half then.

12          MR. WEITZMAN:  I was suggesting two hours for the

13  jury, but the lawyers can have a shorter lunch so that we have

14  enough time for the jury charge.

15          THE COURT:  We'll take the time necessary for the

16  charge.  I'll give the jury two hours.

17          MR. WEITZMAN:  Thank you.

18          MR. RICHENTHAL:  I would just say, and I think the

19  Court is sensitive to this, we do need a little time between

20  the end of the charge conference and the commencement of the

21  summation, because to the extent that things change --

22          THE COURT:  Why?

23          MR. RICHENTHAL:  -- we need to be able to reflect that

24  in our slides or our remarks.

25          THE COURT:  I understand.  You can call that lunch.
```

O78Wmen2

1          OK.  Let's bring the jury in.

2          I'll give the government time.  I appreciate all the

3     parties are helping move toward a resolution here, move toward

4     the jury having this case.

5          How long is the proposed initial government summation?

6          MR. MONTELEONI:  Your Honor, I think that I'm going to

7     try to keep it to under five hours.

8          THE COURT:  Mr. Lustberg, I don't think you've rested

9     in front of the jury, correct?  So we'll do that.

10         MR. LUSTBERG:  I might have, but it was pretty

11    quietly, so I'm happy to do it again.

12         THE COURT:  All right.  I think actually you may have

13    before the allocution.

14         MR. LUSTBERG:  Yes.

15         THE COURT:  So we'll do it now.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

O78Wmen2

1           (Jury present)

2           THE COURT:  Please be seated in the courtroom.

3           Mr. Lustberg, is there another witness for Mr. Hana?

4           MR. LUSTBERG:  No, your Honor.  And with that,

5    Mr. Hana rests.

6           THE COURT:  All right.  Thank you.

7           Ladies and gentlemen, you have seen that all three

8    defendants have rested.  Now the issue is whether the

9    government wishes to put on a rebuttal case.

10           Government, is there going to be a rebuttal case?

11           MS. POMERANTZ:  Just briefly, your Honor.

12           THE COURT:  Yes, ma'am.

13           MS. POMERANTZ:  The government offers Government

14    Exhibits E102-17 and E105-41 pursuant to stipulation,

15    Government Exhibit 1435.

16           THE COURT:  All right.  Those are admitted pursuant to

17    stipulation and without objection.

18           (Government Exhibits E102-17 and E105-41 received in

19    evidence)

20           THE COURT:  Anything else?

21           MS. POMERANTZ:  No.  The government rests.

22           THE COURT:  All right.  You've seen the government

23    rest in its rebuttal case.

24           You have heard all of the evidence in the case.

25    There's no more evidence that can come in.  I need some time

O78Wmen2

 1    with the lawyers to go over some legal matters.  I'm going to

 2    give you a two-hour lunch because we need to handle these legal

 3    matters.  So be back at 2:20, and we then will start the

 4    government summation.

 5            The order of summations are set by law.  The

 6    government goes first, then each defendant goes, and then the

 7    government has the right to a rebuttal summation.  Because the

 8    government has the burden of proof, it's the last one to

 9    address you.

10            At the end of that, I will then read to you my charge,

11    and then you will begin your deliberations.  It will take a

12    couple of days for that entire process, but we are still on

13    track.  So continue to keep an open mind.  You've not heard --

14    you have heard all of the evidence.  I repeat, you have heard

15    all the evidence.

16            Don't discuss this case amongst yourselves or with

17    anyone else.  I'll see you back at 20 after two.

18            Thank you.

19            (Continued on next page)

20

21

22

23

24

25

O78Wmen2

```
 1                    (Jury not present)
 2                    THE COURT:  All right.  You may be seated.
 3                    Mr. Weitzman, what can I do for you, sir?
 4                    MR. WEITZMAN:  I think, depending on how you'd like to
 5          proceed, we can go through it page by page.  I can give you my
 6          first proposed edit, or comment, which is page 43 of the
 7          charge, or at least it's my version of the charge.  So this is
 8          charge 28, dual intent, no defense.
 9                    MR. RICHENTHAL:  We have a scrivener's error just
10          prior to that.
11                    THE COURT:  Yes, sir.
12                    MR. RICHENTHAL:  Page 37, proposed instruction 25,
13          opinion of defendant's character or reputation.
14                    THE COURT:  Just a moment.
15                    Yes.
16                    MR. RICHENTHAL:  It says "the defendant."  There are
17          three.  It also says "has called a witness who's given an
18          opinion of his character or reputation."  I suppose that's true
19          in the sense that certain witnesses called for another purpose
20          also gave an opinion.
21                    THE COURT:  Yes.
22                    MR. RICHENTHAL:  But at a minimum, I think it should
23          be plural, because I think more than one defendant elicited
24          such testimony.
25                    THE COURT:  I have no objection to that.
```

O78Wmen2

1              Any objection?

2              All right.  Then on page -- let me let my clerk get

3      the system up.

4              Now we tried to be consistent in saying defendants.

5      Sometimes it will be defendant because it just slipped through,

6      but I'll read it appropriately as defendants.

7              On page 37, "the defendants have called one or more

8      witnesses who have given an opinion of his character or

9      reputation."  OK.  37.

10             Mr. Weitzman.

11             MR. WEITZMAN:  Yes.  On charge 28, dual intent, we

12     believe the charge is inappropriate here, and I can give you an

13     example, your Honor, specific to the FARA charge.

14             THE COURT:  Wait.  Let me read it.

15             Go ahead, sir.

16             MR. WEITZMAN:  Your Honor, in the first instance, we

17     think no such instruction is necessary.  The example would be,

18     for example, a senator in connection with a FARA charge may be

19     asked to approve by, let's say, the Ukrainian president, who

20     says we need more aid and the senator might say, well, that is

21     good for Ukraine and it's good for the United States.  That's

22     both a good and a bad motive under the government's theory, and

23     the fact that there is the good motive, that he's doing it in

24     aid of the United States's foreign interests is sufficient in

25     that regard.

O78Wmen2

1              So I think this is an overstatement.  But at a

2     minimum, your Honor, at a minimum, it needs to be more

3     balanced.

4              What we proposed, if your Honor were to give this

5     instruction, on page 44 of the defendant's proposed jury

6     charge, is a more balanced one, where it says at the end:

7     "That said, evidence of a good motive is, of course, relevant

8     in determining whether a defendant also possessed a

9     sufficiently bad motive.  What matters is whether it is clear

10    beyond a reasonable doubt that a defendant, in fact, acted

11    because of an improper motive even if he also harbored other

12    intents."

13             And so at a minimum, if it's going to be given, it

14    should be balanced, but we don't think it needs to be given at

15    all.

16             MR. RICHENTHAL:  So, taking those in order, with

17    respect to what Mr. Weitzman referred to the FARA charge, but I

18    assume he means the 219 charge, the 219 charge already

19    incorporates the principle he's talking about; namely, if an

20    action benefits the foreign principal but is not taken as

21    agency, it's actually the fourth sentence within instruction

22    70, on 97, which reads, and I'm now quoting --

23             THE COURT:  Just a moment.

24             Yes, sir.  Go ahead.

25             MR. RICHENTHAL:  So, if your Honor looks at the

O78Wmen2

1    foreign agent request explained, the sentence to which I was

2    referring, which is the third from the bottom, I believe it's

3    the fourth from the top.

4                THE COURT:  What page?

5                MR. RICHENTHAL:  Page 97.

6                THE COURT:  Yes.

7                MR. RICHENTHAL:  Instruction 70.

8                THE COURT:  Yes.

9                MR. RICHENTHAL:  The instruction, and I'm now quoting,

10   reads:  "So a foreign principal does not make a qualifying

11   request merely by asking or persuading another person for his

12   own reasons to do something even if the request, if fulfilled,

13   would benefit the foreign principal."

14               So in that example, it's not agency, for the reason

15   Mr. Weitzman's explaining.  That's encapsulated here and also

16   encapsulated more generally within the definition of agency.

17               With respect to dual intent itself, the instruction

18   that the Court is proposing to use has literally been standard,

19   to my knowledge, for more than 50 years.  It was most recently

20   approved by the Second Circuit in the *Calk* case.  I believe the

21   defense is getting this from a Seventh Circuit case in 1971.

22   That's not the law here and hasn't been for a very, very long

23   time.

24               MR. WEITZMAN:  Your Honor, we're only proposing that

25   the judge instruct the jury, which I think is correct -- I

O78Wmen2

```
1    don't think there's any law contrary to this -- that they can
2    look at good motives to evaluate whether there are bad motives.
3    We're not changing the law in any way.
4            THE COURT:  Isn't that, first of all, as it is now,
5    pretty standard in a number of cases?  What do you gain with
6    that last sentence?
7            MR. WEITZMAN:  The charge, as it currently reads,
8    suggests that any modicum, any minimal amount of bad motive
9    suffices, and I don't think that's an accurate statement of the
10   law.  And so I think the jury can look at the totality of the
11   circumstances to determine whether the good motives undermine
12   an inference of bad motive.
13           MR. RICHENTHAL:  So that hasn't been the law in more
14   than 50 years.  I'm now going to quote Calk, 87 F.4th 164, 181
15   (2d Cir. 2023).  This is it; everything I'm about to say is a
16   direct quote:
17           "In the context of public official bribery, we have
18   stressed that a valid purpose that partially motivates a
19   transaction does not insulate participants in an unlawful
20   transaction from criminal liability."
21           That is not Mr. Weitzman's position.  I respect that,
22   but that is the binding precedent in this circuit.
23           THE COURT:  I'm going do keep it the way I have it.
24           MR. WEITZMAN:  Just to be clear, I did not suggest
25   that there's insulation in any way, but I understand your
```

O78Wmen2

1    Honor's ruling.  I just think it suggests that a good motive

2    has no relevance to a finding of whether there's a bad motive.

3             THE COURT:  It's been used many times before.

4             Next.

5             MR. WEITZMAN:  From me, the next change is, or next

6    objection is charge 38.  In particular, on the page that's --

7    the paragraph that starts "to qualify as an official act."

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O783MEN3

1          THE COURT:  Just a moment.

2          MR. WEITZMAN:  In the third sentence, it says the

3    decision or action may include using one's official position to

4    exert pressure on another official to perform or not perform an

5    official act.  That sentence and the next sentence, next two

6    sentences, I think are an incorrect statement of the law.

7          The suggestion here is that an official act can be

8    satisfied by a third-party official conducting the official

9    act.  That is not the law under *McDonnell*.  It requires Senator

10   Menendez undertake an official act or agree to take an official

11   act.  A third party taking an official act is not what is

12   required under *McDonnell*.

13         MR. RICHENTHAL:  That's irreconcilable.  This was

14   briefed extensively before trial.  In fact, to my knowledge,

15   literally every court has rejected it uniformly, soundly, and

16   thoroughly for really good reason, including *McDonnell* itself

17   that quite literally talks about how the act can be taken by

18   someone else.  This is to my knowledge every instruction since

19   *McDonnell* says this.  I know why the defense doesn't like it,

20   but it's not the law.

21         MR. WEITZMAN:  I don't think it is correct.

22         THE COURT:  Just a minute, gentlemen.  Go ahead,

23   Mr. Weitzman.

24         MR. WEITZMAN:  Your Honor.

25         THE COURT:  Clearly a third person can be involved

O783MEN3

1    here.

2        MR. WEITZMAN:  A third person.

3        THE COURT:  Can take the act.

4        MR. WEITZMAN:  That's not how I read *McDonnell*, your

5    Honor.  If you look at *McDonnell*, the language is quite clear

6    that it was McDonnell himself that needed to engage in the

7    official action.  I'll quote.

8        THE COURT:  Wait just a moment.  Let me get it.  No,

9    it looks like I don't have it in front of me.

10        MR. WEITZMAN:  So the jump cite is page -- the pin

11    cite is page 47 of the ruling, and the paragraph at the top of

12    page 47, the Court analyzes the problem with the District

13    Court's instructions regarding official act.  And I quote, "The

14    testimony at trial described how Governor McDonnell set up

15    meetings, contacted other officials, and hosted events.  It is

16    possible the jury thought that a typical meeting, call, or

17    event was itself a 'question, matter, cause, suit, proceeding

18    or controversy.'"

19        THE COURT:  That's taken care of.  Call, meeting, so

20    forth.  They're not official acts.

21        MR. WEITZMAN:  Correct.  Then the Court continues, "If

22    so, the jury could have convicted Governor McDonnell without

23    finding that he committed or agreed to commit an official act

24    as properly defined."  It continues two paragraphs below, "The

25    District Court did not instruct the jury that to convict

O783MEN3

 1    Governor McDonnell it had to find he made his decision or took

 2    an action or agreed to do so on the identified question,

 3    matter, cause, suit, proceeding, or controversy, as we have

 4    construed that requirement.  If the testimony reflects what

 5    Governor McDonnell agreed to do at the time he accepted the

 6    loans and gifts from Williams, then he did not agree to make a

 7    decision or take an action on any of the three questions or

 8    matters described by the Fourth Circuit."

 9         In *McDonnell* itself, the question was whether he set

10    up meetings with state university officials.  And the Court is

11    saying it's not what the state university officials will do and

12    whether they're in their public official capacity taking

13    official acts.  It is whether Governor McDonnell is taking an

14    official act.

15         Under the theory that this instruction permits, a

16    non-public official who causes another public official to take

17    some action would be guilty of bribery or honest services

18    fraud.  It doesn't make any sense.  Senator Menendez has to be

19    the one who is engaged in official action.  Otherwise *McDonnell*

20    has no teeth.  It means he can arrange meetings and someone

21    else can engage in official action.

22         THE COURT:  I understand.

23         MR. RICHENTHAL:  I think Mr. Weitzman made his record.

24    He should keep reading the case.  Because --

25         THE COURT:  Please.  Just --

1          MR. RICHENTHAL:  This has been rejected for a very

2     long time because it would immunize our public officials

3     against bribery prosecutions.  I am going to quote from 573.

4          THE COURT:  Just a moment.  I now have it.

5          572.  "For example, a decision or action to initiate a

6     research study -- or a decision or action on a qualifying step,

7     such as narrowing down the list of potential research topics --

8     would qualify as an 'official act.'  *United States v. Birdsall*,

9     (finding "official action" on the part of subordinates where

10    their superiors "would necessarily rely largely upon the

11    reports and advice of subordinates ... who were more directly

12    acquainted with" the "facts and circumstances of particular

13    cases.")

14         What do you want me to look at in 573?

15         MR. RICHENTHAL:  I'm sorry, your Honor.  That is 573.

16    That is what I was going to direct the Court to.

17         THE COURT:  I have it as 572.  But I guess it doesn't

18    matter.  Is that what you were going to refer me to?

19         MR. RICHENTHAL:  Yeah.  It appears in multiple places.

20         THE COURT:  I think that answers it.  All right.  I'm

21    keeping the government's charge.

22         Next?

23         MR. WEITZMAN:  Your Honor, just one addition, though I

24    think this only refers to, if I read it correctly, advice, and

25    there is no discussion of pressure here, which is I think what

O783MEN3

1    the government has charged.  It may be elsewhere here but I'm

2    not seeing it.

3            MR. RICHENTHAL:  The sentence before says the advice

4    or action may include using one's official --

5            THE COURT:  Where are you?

6            MR. RICHENTHAL:  I was --

7            THE COURT:  In the charge, yes.

8            MR. RICHENTHAL:  There are two sentences.  The first

9    refers to pressure.  The second refers to advice.  Just like

10   *McDonnell*, it can be executed through pressure or executed

11   through advice.

12           THE COURT:  What page?

13           MR. WEITZMAN:  Your Honor, I see it.  The issue I have

14   though is there is no definition of what pressure means.

15           THE COURT:  Government, I see it.  The decision or

16   action may include using one's official position to exert

17   pressure on another official to perform or not perform an

18   official act.  I'm going to leave it as it is.

19           MR. WEITZMAN:  There's no context or definition of

20   what pressure and advice mean.  I'd like to preserve.  And I

21   would refer your Honor to page 76 through 79 of the defendant's

22   proposed charge which has a definition of pressure and advice.

23   And what it makes clear is that the pressure and advice have to

24   be an exercise of official action itself, which I think is

25   correct.  You have to use the public office of the senator to

O783MEN3

1  exert that the pressure or advice.  It can't just be a phone

2  call which is exactly what -- a phone call that doesn't

3  actually exert pressure or advice.

4          THE COURT:  No, but a phone call -- that's correct.

5  But a phone call that does exert pressure is actionable.

6          MR. WEITZMAN:  Correct, but --

7          THE COURT:  But that's what the parties are going to

8  debate here.

9          MR. WEITZMAN:  I agree with your Honor.  But there is

10  no guardrails or definition of what pressure or advice means,

11  so we refer to our proposed instruction there.

12          THE COURT:  Government?

13          MR. RICHENTHAL:  Your Honor's sentence literally says

14  using one's official position to exert pressure.  I believe

15  that is also lifted directly from *McDonnell*.  If Mr. Weitzman

16  wants to argue the senator didn't use his official position, he

17  can so argue.

18          THE COURT:  The question is pressure.  What is

19  pressure.

20          MR. RICHENTHAL:  Oh.  Well, that is your Honor's

21  pressure sentence.  The sentence reads "The decision or action

22  may include using one's official position to exert pressure on

23  another official to perform or not perform an official act."

24  That's a legally correct sentence taken directly from

25  *McDonnell*.

O783MEN3

1           THE COURT:  There is no definition of pressure.

2           MR. RICHENTHAL:  That's true.

3           THE COURT:  On page 76.

4           MR. RICHENTHAL:  There is no definition in *McDonnell*

5      either.  It is a layperson's term.  It is for the parties to

6      ask the jury to decide.

7           THE COURT:  I am going to keep it the way it is.

8           What else?

9           MR. RICHENTHAL:  We have our own comment with respect

10     to the Court's official act instruction.  It is slightly

11     earlier.

12          Page 56 of the instruction says "The question or

13     matter must be something specific and focused that is pending

14     or may be by law be brought before any public official."

15     That's the final full sentence on page 56.

16          That sentence I think is largely or entirely taken

17     from *McDonnell*.  But what the Court writes next is as follows.

18     "That means something within the specific duties of an

19     official's position, the function conferred with the authority

20     of his or her office."  That's also from *McDonnell*.  The

21     problem is using the word "that" seems to modify both pending

22     and may be, may by law be brought.

23          As we read the decision, there are two types of

24     conduct at issue.  One that can be pending, and one that may be

25     by law brought.  The sentence about official duties as we

O783MEN3

1    understand it refers to the may be by law.  The reason that has

2    to be so is two fold.  So first, pending or --

3                THE COURT:  No, I understand.  But what's your

4    proposal to change that?

5                MR. RICHENTHAL:  We would have the beginning of the

6    sentence that reads "that means" changed to "may by law be

7    brought means."  Because we understand *McDonnell* to be talking

8    about that.  Otherwise the "or" would be an "and."  The pending

9    would be rendered superfluous or meaningless.

10               MR. WEITZMAN:  I don't really understand it would be

11   superfluous.

12               THE COURT:  Just a moment.  Go ahead.

13               MR. WEITZMAN:  I don't understand the proposed edit,

14   because a matter that is pending has to be within the specific

15   duties of an official's position if it is official action.  The

16   notion that something can be pending and outside an official's

17   official duties.

18               THE COURT:  Yes, I think that's right.

19               MR. RICHENTHAL:  If I can direct the Court to

20   page 570.  I think this is an error.  We should try to track

21   the Supreme Court's decision as close as we can.  I'm now going

22   to quote page 570 of *McDonnell*.

23               THE COURT:  Just a moment.

24               MR. RICHENTHAL:  I'm looking at the paragraph that

25   begins "In addition to the requirements we have described."

O783MEN3

1                THE COURT:  Yes, I see it.

2                MR. RICHENTHAL:  So, this is now a quote three

3     sentences below.  "In particular, 'may by law be brought'

4     conveys something within the specific duties of an official's

5     position -- the function conferred by the authority of his

6     office." We have no problem with your Honor literally quoting

7     the case.  That is different, with respect, from what's written

8     here, which refers we think, grammatically speaking, to both

9     pending and may be by law be brought.

10               MR. WEITZMAN:  I don't think that's the proper reading

11    of *McDonnell*.

12               THE COURT:  That's what the words say.  May by law be

13    brought conveys something within the specific duties of an

14    official's position.  That's literally from *McDonnell*.

15               MR. WEITZMAN:  Correct.  But you've got to look at the

16    reason why they're saying -- what *McDonnell* was saying in this

17    paragraph, it is defining what pending and may be law be

18    brought.  And in defining the two of them, it's using one of

19    the terms, may by law be brought, conveyed something within the

20    specific duties of an official position.  And it is using that

21    to say that pending and in the sentence before pending and may

22    by law be brought suggests something that is relatively

23    circumscribed.  So the circumscribed thing that applies to both

24    of them is it has to be within the official duties of the

25    official's position.  That's why it's only using one example to

1    define the broader set.

2              THE COURT:  I understand.

3              MR. RICHENTHAL:  Our view is if that were right, the

4    word "pending" has no meaning at all.  Because everything would

5    fall in the other category.  Pending would have no meaning.  It

6    has to have a meaning.  And indeed, *McDonnell* itself, just to

7    step back, cites *Birdsall*, which is a case from 1914 which

8    talks about how things that are in the public official's power

9    that comes from duty or custom.

10             THE COURT:  This is what I'm going to do.  I'm going

11   to use the direct quote from *McDonnell*.  So, all I'm going to

12   do is change that where it says that means something within to

13   say "may by law be brought" means something within the specific

14   duties and so on and so forth.  That's an exact quote and I'm

15   going to use it.

16             Next.

17             MR. WEITZMAN:  So, my next one is the same

18   instruction, in the quid pro quo section, the paragraph -- and

19   I'm sorry, my pagination is different from your Honor so I

20   can't refer to page number.  The paragraph that starts with

21   keep in mind that.  The second sentence is it is not --

22             THE COURT:  Wait.  I need to find that paragraph.

23             MR. WEITZMAN:  Page 59, your Honor.

24             THE COURT:  Yes.  Keep in mind that.

25             MR. WEITZMAN:  In the sentence that says "It is not a

 1    defense that the public official would have performed a

 2    particular official act without the influence of a thing of

 3    value."  We would request the instruction that we proposed on

 4    page 73 of the defendant's requested charge.  It reads --

 5              THE COURT:  Just a moment.  Go ahead.

 6              MR. WEITZMAN:  What we had proposed was "If, however,

 7    you conclude that the public official would have taken the same

 8    action, regardless of anything of value, you may consider that

 9    as evidence that the public official did not demand, accept, or

10    agree to accept a thing of value in exchange for being

11    influenced in the performance of any official act."

12              We agree it is not a defense, but it is a relevant

13    piece of evidence.

14              MR. RICHENTHAL:  So the defense can argue it is a

15    relevant piece of evidence.

16              THE COURT:  Just a moment.

17              MR. RICHENTHAL:  I'm sorry.

18              THE COURT:  Go ahead.

19              MR. RICHENTHAL:  If the defense wants to argue that

20    alleged evidence that Mr. Menendez would have done something

21    anyway shows he didn't have corrupt intent, they can make that

22    argument.

23              The problem is this instruction is legally wrong.

24    What it's asking is for the jury to engage in a counterfactual

25    hypothetical of what would have occurred.  Implicit in that is

O783MEN3

1    that the bribe has to have actually influenced his conduct,

2    which is not true.  As the Second Circuit has made clear ever

3    since at least *Meyers*, which is cited in the list of

4    authorities we put in our RTC, it doesn't actually matter if

5    the official's influenced at all.  Literally it doesn't matter.

6    The official could be play acting.  That's a direct quote from

7    *Meyers*.

8            So to ask the jury to perform a counterfactual as an

9    argument matter, meaning in summation, Mr. Weitzman can do

10   that.  But to tell the jury if it performs the counterfactual

11   and concludes that the defendant would have taken the action

12   anyway, it may consider him not guilty, is wrong.  It doesn't

13   matter whether the bribe influenced him.

14           THE COURT:  Mr. Weitzman, isn't that true?  It doesn't

15   matter as a matter of law, it does not matter whether the bribe

16   influenced him or not.

17           MR. WEITZMAN:  That is correct, your Honor.  I'm

18   just -- I think that the jury is entitled to consider whether a

19   public official was going to do that in any event as evidence

20   of whether he accepted the bribe.  Your question assumes there

21   is a bribe.  And we're using the argument, what Mr. Richenthal

22   describe as counterfactual, I just think that's not true.  He

23   is coming from a position of an assumption there is a bribe.

24   If you don't assume there is a bribe, and you look at the

25   senator's conduct, that's what we're asking the jury to look

O783MEN3

1          at.

2                    MR. RICHENTHAL:  So the problem here is the charge

3          shouldn't have any assumptions at all.  This is a defense

4          argument.

5                    THE COURT:  I'm going to keep it the way it is.  If

6          anyone else has anything, they should, as we go along, state

7          it.  We're up to I guess page 60 of my charge.

8                    MR. AGATA:  There is one matter we'd like to bring up

9          on the quid pro quo portion.  That's on 58 on my copy.

10         Paragraph begins, "Government must prove that the defendant you

11         are considering" it is the last sentence.  "At a minimum, the

12         government must prove the public official promised to take

13         official action on a particular question or matter as the

14         opportunity to influence the same question or matter arose."

15                   In light of *McDonnell*, we ask that that sentence be

16         removed.  *McDonnell* places into doubt whether something that is

17         unconcrete as a matter arose really satisfies that standard.

18         The government has to assert that, using *McDonnell*'s language,

19         something that's focused and concrete, the question and matter

20         etc. is identified at the time of the alleged quid pro quo.

21         This theory allows this to be identified at some later time, at

22         least the way this language is phrased, so we would ask that

23         last sentence be removed or certainly revised so that theory is

24         removed from the charge.

25                   THE COURT:  Let me read the introduction to that.

O783MEN3

| 1 | MR. RICHENTHAL:  I just have a very brief response.  I |

1          MR. RICHENTHAL:  I just have a very brief response.  I

2    think it will make it more efficient.  I think Mr. Agata is

3    trying to preserve their argument that the Court's already

4    rejected.  Namely that the as opportunities arise theory does

5    not exist after *McDonnell*.  The Second Circuit has concluded

6    repeatedly to the contrary.  Every circuit has repeatedly

7    concluded to the contrary.  I think the Court has already

8    rejected as opportunities arise no longer exists.

9          THE COURT:  I'm keeping it as I have it.

10          Next, Mr. Weitzman.

11          MR. SOLANO:  We have one.  To the extent that the

12    attorneys for Mr. Menendez or Senator Menendez or Mr. Daibes

13    raise objections, we're all raising them.  We are not going to

14    reargue them.

15          THE COURT:  Yes, sir.

16          MR. SOLANO:  On page 59, the second full paragraph

17    ends, "This element can be satisfied regardless of whether the

18    parties to the exchange had a prior relationship, nor does it

19    matter who initiated the exchange."

20          We don't quibble with that sentence.  But we would ask

21    that the prior relationship can be probative of whether or not

22    there is a corrupt intent, essentially.  That is, the

23    parties -- the jury shouldn't be led to believe that they

24    should disregard the existence of a prior relationship.

25          MR. RICHENTHAL:  I think is similar to what I said

O783MEN3

1  with respect to Mr. Weitzman's most recent comment.  That's a

2  perfectly fine defense argument, but this is a charge.  It's

3  legally accurate as written.  It is standard.  It comes from

4  *McDonnell* and its progeny.  It doesn't say the jury can't

5  consider --

6          THE COURT:  Mr. Solano, do you have a disagreement

7  that this paragraph -- are you saying this paragraph does not

8  state the law?

9          MR. SOLANO:  No, your Honor.  I think the paragraph

10  accurately states the law.  But what it can do is suggest to

11  the jury that the prior relationship between the parties is not

12  relevant.  And all we would ask is that the jury be instructed

13  that a prior relationship between the parties can be considered

14  in determining whether the requisite intent exists.

15          MR. RICHENTHAL:  Again, that's not a balanced charge.

16  But also literally the next charge, charge 39, is an entire

17  charge on good will gifts and prior relationships.

18          THE COURT:  I think since this states the law, we're

19  all agreed with that, I'm going to keep it as it is.  I don't

20  think that prior relationship, really lack of a prior

21  relationship or existence of a prior relationship, I don't need

22  to put that in.  We can be satisfied regardless of whether they

23  had a prior relationship.  I think that's fine as it is.  You

24  have your objection.

25          MR. WEITZMAN:  Yes.  Charge instruction 40, the

O783MEN3

definition of corrupt intent we believe is too narrow.  In your

proposed charge it says "Corrupt intent means to act with an

improper motive or purpose."

         THE COURT:  Isn't that absolutely standard?

         MR. WEITZMAN:  It may be standard, but it's not the

way the government has been defining it or the court has been

defining it for years in many cases, your Honor.  So in the

*Arthur Andersen* case --

         THE COURT:  I gave you your corrupt intent as the

fourth element.  That's throughout this.  That's a major, seems

to me --

         MR. WEITZMAN:  It is, your Honor, and we appreciate

that but the definition of corrupt intent --

         THE COURT:  I thought that was the right way to go.

         MR. WEITZMAN:  Definition of corrupt intent in the

case law is corrupt intent means to act with a wrongful,

immoral, depraved or evil motive or purpose.  That's directly

from the *Arthur Andersen* case and directly what the solicitor

general argued in connection with another bribery case which

was the *Snyder* case that just recently came out.  And if you

look at the solicitor general's brief, it states that --

         THE COURT:  I have not done that, sir.

         MR. WEITZMAN:  I understand.  I'll just quote it.

"Congress did not define corruptly for purposes of Section 666,

which is the gratuity statute, but this court has explained

O783MEN3

1    that the natural meaning of that term is 'normally associated

2    with wrongful, improperly depraved or evil conduct.'".  Quoting

3    *Arthur Andersen*.  So we would ask for that instruction.

4              MR. RICHENTHAL:  Two responses.  With tremendous

5    respect for the office of the solicitor general of the United

6    States, that's a brief.  What your Honor's doing is tracking

7    case law, and I think this is the safer course to track case

8    law.  And second, even the brief, I am not saying it is

9    necessarily wrong, even the brief uses the word "or."  If it is

10   "or," it is utterly unnecessary to put more words in if the

11   defense is conceding the words here is correct.

12             MR. WEITZMAN:  The solicitor general is citing from

13   the case.  That's corrupt intent.

14             MR. RICHENTHAL:  It is quoting in part, but it is also

15   referring, as Mr. Weitzman said, to a statute that's not

16   charged in this case.

17             THE COURT:  I think I've taken this basically from

18   Sand.  I think this is fine as it is.

19             All right.  What else?  Next.

20             MR. WEITZMAN:  Just to preserve our objection, at the

21   end of instruction 40, again there is essentially a dual motive

22   instruction which we object to.  I understand your Honor's

23   ruled on that.

24             THE COURT:  Okay.

25             MR. WEITZMAN:  The end of instruction 58.

O783MEN3

1          MR. RICHENTHAL:  We have a small matter right before

2     that.  Not right before that.  Prior to that.

3          THE COURT:  What is it?

4          MR. RICHENTHAL:  Page 65, instruction 42.  The final

5     paragraph refers to the government's evidence.  I think this is

6     the only time in the charge the Court used that phrase.  We

7     think it should be "the evidence."  There is evidence we didn't

8     put on.

9          THE COURT:  Let me see it.  I think that's correct.

10    Let's keep it as the evidence.  Just strike the word

11    government's.  Okay.  That's on page 65.

12          Mr. Weitzman, back to you, sir.

13          MR. SOLANO:  Your Honor, I think we have one on

14    page 73, jury charge 49.  Page 73.

15          THE COURT:  Sir.

16          MR. SOLANO:  Just at the end of this charge, the Court

17    is going to give the jury two examples, and our objection is to

18    including the last two sentences of the last paragraph as

19    examples, given how close they track to the alleged facts in

20    this case.  So we think the law is accurately stated.

21          THE COURT:  Let me look at it.

22          MR. RICHENTHAL:  I have a proposal that may ameliorate

23    some or all of the defense concern as I understand it.  The

24    reason the Court is doing this, which we think is not just

25    accurate, but essential, is to distinguish an honest services

O783MEN3

1    fraud from the other bribery charges who the act or the

2    official act can be.  These are examples are to make clear to

3    the lay jury what the Court is doing.

4            If Mr. Solano is concerned that these examples are too

5    close to this case, one way to deal with it, indeed, perhaps

6    the best way, would be to change state official to non-federal

7    official.  Simply make it more generic.  That's the point, so

8    the lay jury understands what's going on.  Or state or local,

9    for example.  State or municipal.

10           In other words, if you make it more generic, then it

11   no longer looks like this case, but the lay jury still

12   understands what the Court is saying, which is there is an

13   important distinction in these charges.

14           MR. SOLANO:  I think that's accurately captured by the

15   Court's prior sentence in which it says "For purposes of honest

16   services fraud, an official act may also be performed or caused

17   by a non-government federal official."

18           THE COURT:  I'm sorry.  I don't see that.

19           MR. SOLANO:  A couple of sentences.

20           THE COURT:  Aren't we on page 73?

21           MR. SOLANO:  Yes, and a couple of sentences up.

22           THE COURT:  Oh, I was looking immediately up.  I see

23   it now.  "For the purposes of honest services fraud, an

24   official act may also be performed or caused by a non-federal

25   government official."

O783MEN3

1          MR. SOLANO:  So our concern is, again, the last

2     sentence starts, "So, for example, the use of one's official

3     position to exert pressure on a state official to perform an

4     official act is itself official action for purposes of honest

5     services fraud." Again, it tracks what the allegations are in

6     this case.

7          So, I appreciate Mr. Richenthal's suggestion, but I

8     don't think it cures the overall problem when you read it as a

9     whole.

10          MR. WEITZMAN:  Your Honor, I have one more point to

11     add to that because we join in this request.  I think the last

12     sentence in particular is problematic, I don't believe --

13          THE COURT:  That's what we're talking about.

14          MR. WEITZMAN:  There are two last sentences.  I'm

15     saying the last sentence goes beyond what *McDonnell* authorized.

16     I can see a theory where pressure on a state official can

17     constitute official act, if you're using your official office

18     to exert that pressure.  I don't know of any case where advice

19     to a state official can constitute an official act.

20          So I join that as well.  I think this is a disputed

21     issue and I think that the sentence you have already earlier in

22     the paragraph suffices.

23          MR. RICHENTHAL:  So, they now changed arguments, which

24     is fine.  But this last argument is deeply wrong.  Again,

25     *McDonnell* could not be more clear.  It can be advice or

O783MEN3

1   pressure.  The defense is not entitled to only ask the jury to

2   consider one theory.  I don't know I need to say more on that.

3          As to the argument Mr. Solano first made, I think it

4   is ameliorated by changing the verbiage, which we're open to.

5   But to strike it entirely as crafted we have very, very serious

6   concern the jury will not understand what the Court is saying.

7   What the Court is saying is for these counts, the action can be

8   performed by a non-federal official.  By the action we mean the

9   action sought through pressure or advice.  Without linking

10  those two things, that is the second thing I just said, we

11  think the lay jury won't understand --

12         THE COURT:  I got it.  Let me look at it.  Rather,

13  make your record.

14         MR. RICHENTHAL:  I'm saying only the reason we think

15  the jury won't understand is the sentence that Mr. Solano

16  quoted beginning "for the purposes"isn't the last sentence even

17  under his own theory.  The sentence would continue, "in all

18  other respects, however, the official act for the purposes of

19  honest services wire fraud is the same act for the purposes of

20  bribery." For the lay jury to know what that means, the jury

21  will have to flip back a number of pages, read the other

22  official act instruction.

23         THE COURT:  This is what I'm going to do.  I think

24  there is no harm in using examples, and I will make it a little

25  less track the evidence here.  State or local in all three

O783MEN3

1    cases.  So it will say, "So, for example, use of one's official

2    position to exert pressure on a state or local official."  And

3    then later, similarly, "Using one's official position to

4    provide advice to a state or local official."  And then "Such

5    advice will form the basis for an official act by a state or

6    local official."  That's 73.  Next.

7         MR. AGATA:  Just if I can state for the record that,

8    like Mr. Hana's counsel, we're joining in all, for the record,

9    defense's objections, so it's clear we join in them.

10         THE COURT:  Absolutely.  Any objection raised by a

11    defendant is deemed to be raised by all the defendants.  Go

12    ahead.

13         MR. WEITZMAN:  So the same issue arises I think, your

14    Honor, in connection with the extortion count, charge 58.  At

15    the end states in the last sentence, "That is, like with the

16    honest services wire fraud counts, the official act may involve

17    a non-federal official, unlike in the bribery counts, which

18    relate only to official acts by federal officials."

19         I think that's an incorrect statement of law.  In each

20    of the counts, every single one of these counts, there has to

21    be official action by the federal official.  That's what

22    *McDonnell* stands for.

23         MR. RICHENTHAL:  I think they're just making a record,

24    but I'm happy to respond.

25         MR. WEITZMAN:  It's more than making a record, your

1  Honor.

2              THE COURT:  A substantive request.  Go ahead.

3              MR. WEITZMAN:  *McDonnell* involved honest services wire

4  fraud, bribery, and extortion.  All counts were reversed

5  because the instruction was incorrect as to whether there has

6  to be a use of official power in exerting advice or pressure.

7  There has to be a use of official power before you get to any

8  conviction.

9              THE COURT:  So how does that last sentence differ,

10  what you just told me?

11             MR. WEITZMAN:  Because the last sentence suggests that

12  there need not be, for either honest services wire fraud or

13  extortion, use of official power by the federal official.

14             MR. RICHENTHAL:  So, docket no. 180, pages 66-67, this

15  has been rejected no fewer than three times by the Second

16  Circuit.  It has been rejected in *Boyland*, in *Skelos*, rejected

17  in *Percoco*.  It's also been reject by every other court in the

18  United States to ever consider it.  It's just not the law.

19             MR. WEITZMAN:  Under the government's theory --

20             THE COURT:  Just a moment.

21             MR. WEITZMAN:  Under the government's theory there

22  need not be any use of official action in order to convict for

23  honest services fraud or extortion.

24             So, I'll give you a hypothetical, your Honor.  A

25  senator's good friends with the governor and says, unless you

O783MEN3

1    pass certain state legislature, I'm not inviting you to dinner

2    at my house any longer.

3            That will not be pressure as *McDonnell* identifies it.

4    It has to be official use of the office pressure.  It has to be

5    something connected to his office to be pressure or advice.  If

6    you are not linking the two, it could be something totally

7    personal and outside of the use of the office, which is not

8    what *McDonnell* authorizes.

9            MR. RICHENTHAL:  Which is why the Court's charge

10   doesn't say that.  The Court charge literally says use of

11   official position.  They're making a different argument here.

12   It is an argument the Second Circuit has rejected three times.

13   It is an argument that Judge Caproni said in *Percoco*, which was

14   affirmed, is an argument -- and I'm now quoting -- that

15   misreads *McDonnell*, runs afoul of clear precedent, and defies

16   common sense.

17           THE COURT:  Tell me what argument, how she states what

18   the argument was.

19           MR. RICHENTHAL:  What she states, and this case was

20   affirmed by the Second Circuit, one of the three cases, this is

21   page 67 of docket 180.  What she is he talking about is the

22   argument which I now think the defense is making, they've made

23   before in briefs, that only a person with formal power or

24   authority over the actions sought may be convicted of bribery.

25   In other words, as Mr. Weitzman keeps saying, only the

O783MEN3

1    senator's own actions count.

2              That was rejected by *McDonnell* itself.  We talked

3    about that 10 or 15 minutes ago.  And it's been rejected

4    repeatedly by the Second Circuit and every other court to

5    consider it for really good reasons.  It would immunize huge

6    swaths of conduct against corrupt charges.

7              When I said the Court already made this point, the

8    "this" that I'm referring to is the idea that it has to be

9    official.  The Court actually does this a few times, but we're

10   talking about the extortion charge right now.  So in the

11   extortion charge itself, which is page 83, charge 58, the

12   first --

13             THE COURT:  That's what we're dealing with.

14             MR. RICHENTHAL:  The first sentence in the charge

15   reads "The third element that the government must prove beyond

16   a reasonable doubt is that Robert Menendez used the authority

17   of his public office."  And then the sentence continues.

18             That's correct.  We have to prove that.  We think we

19   have.  It will be up to the jury.  But there is no doubt the

20   jury's being told that.  What the defense wants is that only

21   action that he personally formally --

22             THE COURT:  I've already ruled on that.

23             MR. WEITZMAN:  That is not what I just asked for, and

24   I think he's intentionally distorting it.  I'm asking --

25             THE COURT:  Let's keep it on a professional level.

O783MEN3

1        MR. WEITZMAN:  Yes, your Honor.  I apologize.

2            I think what I'm asking is that you need to reinforce

3    that it has to be a use of the official authority in that last

4    sentence.  Otherwise when you read it, it suggests that

5    non-official acts, non-official authority would suffice.

6            THE COURT:  No, it doesn't.  I don't see that.  I'm

7    going to keep it as it is.  Next.

8            MR. WEITZMAN:  So, on instruction 65, the definition

9    of corruptly I think is too narrow and we would propose the

10   definition that we included in our instruction which is --

11           THE COURT:  Let me take a look.

12           MR. RICHENTHAL:  This is the argument your Honor

13   rejected 10 minutes ago.

14           MR. WEITZMAN:  It is a different statute.

15           MR. RICHENTHAL:  It is the same definition.

16           THE COURT:  Let me find it, gentlemen.  Where is your

17   request, sir, in the defendant's charge?

18           MR. WEITZMAN:  Charge 75, the first paragraph, last

19   two sentences.

20           THE COURT:  Haven't I just decided this, sir?

21           MR. WEITZMAN:  I mean, you decided it with respect to

22   that language in connection with corrupt intent for purposes of

23   a different statute.

24           THE COURT:  Got it.  And all right.  Government?

25           MR. RICHENTHAL:  You did decide it with respect to a

O783MEN3

1    different part of the charge.  I think the reasoning is equally

2    applicable.  This is standard language.

3          THE COURT:  It seems to me it is a different statute,

4    but it's still the same element, same issue.  I'm keeping it as

5    I have it.

6          MR. WEITZMAN:  My next one is charge 67.  So, in the

7    second paragraph, where it says "FARA requires the registration

8    with the Department of Justice of anyone who is or acts as an

9    agent of a foreign principal."  In the next sentence I would

10   propose striking "owes a duty of honest and faithful duty to

11   the public he serves."

12         So it reads, "However a public official cannot act as

13   an agent." I think that's the point.  And I think conflating

14   honest services with FARA is confusing to the jury.

15         THE COURT:  Government?

16         MR. RICHENTHAL:  The reason we asked for this, and we

17   don't typically ask for purposes, is non-public officials can

18   engage in conduct if they register.  Public officials can't.

19   That is, registration is not an out.  That is maybe

20   comprehensible to a lawyer, I think it's probably a difficult

21   concept to a lay jury.  This was an attempt just to explain at

22   a fundamental level what's going on, and it is not meant to put

23   a thumb on the scale.  It is not meant to describe facts.  It

24   is just meant for the jury not to be confused.

25         THE COURT:  Let me just check something.

O783MEN3

| | |
|---|---|
| 1 | MR. WEITZMAN:  By the way, I'm not suggesting striking |
| 2 | that whole sentence.  Just the words -- |
| 3 | THE COURT:  I understand.  I'm going to grant the |
| 4 | defense request here.  I'm going to strike the phrase "owes a |
| 5 | duty of honest and faithful service to the public he serves |
| 6 | and" so that sentence will now read, "However, a public |
| 7 | official cannot act as an agent of a foreign principal, even |
| 8 | though someone who is not a public official can, if he or she |
| 9 | registers with the Department of Justice." |
| 10 | Next. |
| 11 | MR. WEITZMAN:  Skipping ahead, others may have |
| 12 | something beforehand, but my next instruction is 81. |
| 13 | MR. RICHENTHAL:  I think next in order is the subject |
| 14 | of our letter.  We've only conferred in part, so maybe we can |
| 15 | narrow those objections and we can proceed. |
| 16 | THE COURT:  Let me go back to the letter. |
| 17 | MR. RICHENTHAL:  Specifically, the first part of our |
| 18 | letter refers to instruction 70 which starts on page 97.  We |
| 19 | have no -- |
| 20 | THE COURT:  I've got to find the letter. |
| 21 | MR. RICHENTHAL:  We have no objection if Mr. Weitzman |
| 22 | wants to continue with the other objections. |
| 23 | THE COURT:  Talk to each other now.  You don't need me |
| 24 | for that.  You were conferring, correct? |
| 25 | MR. RICHENTHAL:  We were conferring.  We had not |

O783MEN3

1    completed it, so I don't know how much we'll be able to narrow,

2    but let's try.

3             THE COURT:  Try it right now.  I am going to step off

4    the bench.  I'll be right back.

5             (Counsel conferring)

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Where do we stand, counsel?  Are we

2     getting close?

3          All right.  We're back.

4          MR. SOLANO:  Your Honor, we can put on the record at

5     least the two that we have reached agreement on, if you want.

6          THE COURT:  Go ahead.

7          MR. SOLANO:  The first one was the first issue raised

8     by the government's letter on ECF-504, and the instruction No.

9     70 at page 97.

10          THE COURT:  You're talking about foreign agent,

11     request explained, correct?

12          MR. SOLANO:  Correct.

13          The very last sentence starts currently with "the

14     ultimate question" and then goes on from there.  The parties

15     have all agreed if we can insert at the beginning of that

16     sentence, "to that end, the ultimate question."

17          THE COURT:  All right.  "To that end, the ultimate

18     question, including based on the request."

19          MR. SOLANO:  Yes.

20          THE COURT:  I see.  Let me just read it to see if it's

21     all right with me.

22          MR. SOLANO:  Understood.

23          THE COURT:  That's fine.

24          Next.

25          MR. SOLANO:  And the next request, No. 71, page 98,

O78Wmen4

```
1    I'll go to the areas of disagreement, and then, we have agreed
2    on the --
3              THE COURT:  Let me look at my chart.
4              Yes, sir.
5              MR. SOLANO:  In the instructions, the third and fourth
6    paragraphs set forth factors that may support or may count
7    against a finding of agency, and so for that reason, we've
8    agreed, and we'd suggest to the Court, if the Court's willing
9    to accept it, adding the word "may" in both paragraphs, so that
10   paragraph No. 3 would start, "factors that may support finding
11   an agency," and then go on from there.  And paragraph No. 4,
12   would start, "conversely, the following factors may count
13   against finding an agency."
14             THE COURT:  I have no objection to those two
15   additions.  All right.  We'll add those two mays.
16             MR. SOLANO:  The last area of agreement, to make it
17   balanced, the government has requested, and we do not object,
18   to adding to paragraph 3 among the list of factors the
19   following.
20             THE COURT:  Wait.  This follows "receives feedback on
21   his work from the foreign principal"?
22             MR. SOLANO:  Yes.  I think we could add there -- I'm
23   not sure the government has a position on where they want it in
24   that paragraph, but as long as one of the factors listed is the
25   following:  "The foreign principal's goals do not align with
```

O78Wmen4

1    the alleged agent's own interests or subjective viewpoint."

2             THE COURT:  Why don't we just make that -- we'll

3    strike the word "and" where it says "and where the person seeks

4    to receive feedback on his work" and then after foreign

5    principal, "if the foreign principal's goals do not align with

6    the alleged agent's own interests or subjective viewpoint."

7             Does that do it, gentlemen?  I guess put "and" before,

8    "and if the foreign principal's goals do not align."

9             MR. SOLANO:  I believe it does from our end, your

10   Honor.

11            THE COURT:  OK.  Fine.  That's what we'll do.

12            MR. SOLANO:  That was the extent of our agreement on

13   the two charges.

14            I think there was a third issue that the government

15   raised which they may want to argue on the bottom of page 4 of

16   their filing.

17            THE COURT:  The bottom of page what?

18            MR. SOLANO:  4 of the filing, ECF-504.

19            THE COURT:  Oh.

20            MR. SOLANO:  The government has proposed additional

21   language to the second paragraph of instruction 71, to which

22   the defendants object.

23            THE COURT:  All right.

24            Government, let me hear you.

25            MR. RICHENTHAL:  Given the nature of this case, we had

O78Wmen4

1    asked for the sentence on the bottom of page 4 of our letter to

2    be added about payment giving rise to a sense of obligation.

3    The reason we made that request is that --

4            THE COURT:  Where would that go?

5            MR. RICHENTHAL:  It would go in the paragraph

6    beginning "in determining whether."

7            THE COURT:  Yes.

8            MR. RICHENTHAL:  And here's why we're making that

9    request.

10           THE COURT:  Let me read it.  This is the one that came

11   in this morning.

12           Yes, sir.  Go ahead.

13           MR. RICHENTHAL:  So we're trying to think like

14   laypeople, and what's in that sentence, meaning the sentence

15   beginning "in determining," is the phrase "sense of

16   obligation."  Our concern is that the average layperson would

17   not think that sense of obligation includes a compensation

18   relationship.  People don't normally think of obligation as

19   driven by money.  They think of it as driven by philosophical

20   factors, for example, and so what we suggested at the bottom of

21   page 4 was language, which is permissive, not directive, can

22   give rise, that makes clear that obligation could include a

23   compensation relationship.

24           The exact language, I will say, is not the point for

25   us.  It's to avoid the misimpression that obligation refers to

O78Wmen4

 1    something outside of a compensation-based relationship.

 2          MR. WEITZMAN:  Your Honor, I think that this is a

 3    directive.  It's effectively saying if there's any finding of

 4    compensation, then that creates an agency relationship.  And

 5    it's unnecessary, your Honor, because when you look at the

 6    factors that you've already included, one of them is

 7    compensation, the second in the third paragraph, "if

 8    instructions or requests are coercive or are accompanied by an

 9    offer of the provision of compensation."

10          THE COURT:  All right.  I'm not going to add the

11    government's request here.  I'll add what we just put on the

12    record but not this sentence that says accepting payment can

13    give rise to a sense of obligation such that, etc.

14          All right.

15          MR. WEITZMAN:  My next one is charge 81.  And I think

16    this is consistent with where the parties are at, although I've

17    not run it by the government, what I'm asking for is an

18    instruction at the end of paragraph 81 that states that no

19    codefendant is or can be a foreign principal.  I think the law

20    is that a U.S. citizen cannot be a foreign principal.

21          MR. RICHENTHAL:  That's true, but a U.S. citizen can

22    be an intermediary for a foreign principal.  So if we add that,

23    I think we need to add what I just said; that is, Mr. Hana can

24    be, indeed, we believe the evidence shows, that he was an

25    intermediary for a foreign principal and same with

O78Wmen4

| | |
|---|---|
| 1 | Ms. Menendez.  The Court's instructions don't get to that |
| 2 | level.  My only point is that the jury will have the |
| 3 | misimpression it's binary, foreign principal or not.  In fact, |
| 4 | it's in between, an intermediary. |
| 5 | MR. WEITZMAN:  Your Honor, this is why we requested in |
| 6 | our instruction that the government be required to identify who |
| 7 | they're alleging is the foreign principal. |
| 8 | THE COURT:  I just don't think that's the law.  You |
| 9 | want specificity.  I don't see anywhere that that's the law. |
| 10 | MR. WEITZMAN:  I understand, your Honor.  We're |
| 11 | preserving that issue.  Right now the ambiguity in the |
| 12 | instruction is that maybe Mr. Hana is the foreign principal |
| 13 | because he's Egyptian or maybe Ms. Arslanian, because she's |
| 14 | Lebanese.  And that's not the law.  They cannot be the foreign |
| 15 | principal.  Whether they're acting on behalf or as an |
| 16 | intermediary is a different issue, but I think the jury needs |
| 17 | to understand who can or cannot be a foreign principal. |
| 18 | MR. RICHENTHAL:  So just to be clear, the Court's |
| 19 | instruction says -- this is the penultimate sentence on the |
| 20 | bottom of 15 -- As to Count Fifteen, the government charges |
| 21 | that the goal of the conspiracy was to have a public official, |
| 22 | Robert Menendez, act as an agent of a foreign principal; that |
| 23 | is, the government of Egypt and Egyptian officials. |
| 24 | We're not going to argue that Ms. Menendez or Mr. Hana |
| 25 | was the government of Egypt.  We're not going to argue that Ms. |

O78Wmen4

1    Menendez or Mr. Hana are Egyptian officials, because they're

2    not.  It's just not going to be said to the jury.  So to the

3    extent there's a definition, it's right here.  The government

4    of Egypt and its officials.  What we're resisting is saying the

5    negative, suggesting --

6            THE COURT:  I understand.

7            Mr. Weitzman, Mr. Richenthal is correct.  The

8    government charges that the goal of the conspiracy was to have

9    a public official, Robert Menendez, act as an agent of a

10   foreign principal; that is, the government of Egypt and

11   Egyptian officials.  I think that really does it for you.

12           MR. WEITZMAN:  Yes.  I think the addition of a U.S.

13   citizen may not be -- whether we identify codefendants or

14   not --

15           THE COURT:  But what this says is that the foreign

16   principal alleged is the government of Egypt and Egyptian

17   officials.  It's right there.  I think you have it.

18           MR. WEITZMAN:  The next one I've got is --

19           THE COURT:  I'm not adding what the defense is

20   requesting.

21           Sir, go ahead.

22           MR. WEITZMAN:  Venue.

23           THE COURT:  Yes, sir.

24           MR. WEITZMAN:  Charge 87, I think there are references

25   throughout to any act, and I think it should just say any overt

O78Wmen4

1    act.

2           THE COURT:  Government.

3           MR. RICHENTHAL:  So, it depends what reference we're

4    talking about.  Right?  There are times when overt act is

5    what's required.  There are times --

6           THE COURT:  That certain counts have overt act

7    requirements --

8           MR. RICHENTHAL:  Right.

9           THE COURT:  -- and others don't.

10           Now your turn.

11           MR. RICHENTHAL:  Since we're talking about venue, I

12    will just say we also have our own suggestion.  When the case

13    law talks about --

14           THE COURT:  Wait.  Let's deal with Mr. Weitzman's

15    first.

16           I think that's correct, sir.  It depends on the

17    statute.

18           MR. WEITZMAN:  While it is correct, your Honor, I

19    think that in the first sentence, for example, there is no

20    reference to overt act, and so when you're discussing acts in

21    furtherance of the crimes charged, I think you're referring to

22    overt act in that context.

23           THE COURT:  Government.

24           MR. RICHENTHAL:  So, the problem is there are counts

25    here that don't have overt acts, and so the word "overt" has no

O78Wmen4

1    meaning to the jury for those counts, because they don't --

2              THE COURT:  I think given the fact that some of the

3    counts require overt acts and others don't, it's cleaner if we

4    just say any act.  Yes, I agree with the government on that.

5              MR. WEITZMAN:  OK.  Then when you're discussing the

6    substantive counts --

7              THE COURT:  Yes, sir.

8              MR. WEITZMAN:  -- with respect to the substantive

9    counts resting on a bribe being demanded, so on and so on and

10   so on, at the end of the paragraph, you have "including acts

11   that were part and parcel of this conduct," and I don't think

12   that's correct statement of law of venue with respect to

13   substantive counts.  So it appears twice in that paragraph and

14   in the next paragraph, and it's an undefined issue.  What is

15   part and parcel of conduct?

16             MR. RICHENTHAL:  That language is from *United States*

17   *v. Stephenson*, which is a Second Circuit case.  It's cited as

18   one of the several authorities in our requests to charge.

19             THE COURT:  All right.  Let me pull up *Stephenson*.

20             MR. RICHENTHAL:  We're looking for the cite right now,

21   your Honor.

22             THE COURT:  What's the citation?

23             MR. RICHENTHAL:  *United States v. Stephenson*, 895 F.2d

24   867, at pages 874 to 875.  In that section of the decision, the

25   Second Circuit is upholding venue where phone calls to New

O78Wmen4

1    York -- let me start by giving the quote.  The quote begins:

2    "Calls to New York were part and parcel of the offense of

3    demanding, seeking and agreeing to receive a bribe."

4         I incorporated certain alterations when I said that.

5    the case says demand, seek and agree instead of demanding,

6    seeking and agreeing, but that's a quote.  It's a bribery case

7    from -- I believe I can give the year.  It's a Second Circuit

8    case from 1990.

9         THE COURT:  All right.  I'll pull that up.

10        Just so the parties know, I think I may have something

11   in the concluding instructions -- I may have taken it out --

12   saying that if they want any evidence they can ask for it.

13   What we now do, assuming the parties agree, is put everything

14   on a thing that can then go into a computer that's put in the

15   jury room.  So they will have all of the evidence on these --

16   I'm not sure what they're called --

17        MR. FEE:  USB.

18        THE COURT:  That's it, USBs.  That makes it a lot

19   easier, and the computer will only be able to access that.

20        All right.  Government, any issue?

21        MR. RICHENTHAL:  No.  We think that's fine.

22        THE COURT:  OK.  Mr. Lustberg, Mr. De Castro.

23        MR. LUSTBERG:  No issue, your Honor.

24        MR de CASTRO:  No issues, your Honor.

25        MR. SOLANO:  No issue, your Honor.

O78Wmen4

1              MR. WEITZMAN:  No issue, your Honor.

2              THE COURT:  All right.  Fine.  That's what we'll do.

3              All right.  I'm reading *Stephenson* now.  874, 875.

4              Yes, it's there.  OK.  I'm going to keep that language

5      in.

6              MR. WEITZMAN:  I have one more to propose on venue.

7              THE COURT:  Yes, sir.

8              MR. WEITZMAN:  Your Honor, in the paragraph that

9      starts "With respect to conspiracy offenses," and it ends with

10     the foreseeability standard, I would just add -- and I think

11     this is noncontroversial -- at the end of the last sentence of

12     that paragraph "to the defendant you are considering."  So it

13     should say:  "The act need not be taken by a defendant or a

14     conspirator as long as the act is caused by the conduct of the

15     defendant or conspirator and was reasonably foreseeable to the

16     defendant you are considering."

17             THE COURT:  Absolutely.  I have no objection.

18             MR. RICHENTHAL:  Agreed, and this actually dovetails

19     nicely with the only comment we have on venue.

20             THE COURT:  Let's make sure that we have that.  That

21     sentence will now read:  "The act need not be taken by a

22     defendant or a conspirator as long as the act was caused by the

23     conduct of the defendant or conspirator and was reasonably

24     foreseeable to the defendant you are considering."

25             Thank you, Mr. Weitzman.

O78Wmen4

1              MR. RICHENTHAL:  And this dovetails nicely with the

2      only comment we had on venue.  There are a few times,

3      including, I think, the first sentence, where the proposed

4      charge says foreseeable but doesn't have the word "reasonably"

5      before it.  We think it should always be reasonably

6      foreseeable, as it is here.

7              THE COURT:  I have no objection.  So when foreseeable

8      occurs in charge 87, venue, we'll put reasonably foreseeable.

9              MR. RICHENTHAL:  And I think it comes up a few times.

10             THE COURT:  All right.  Tell me where.

11             MR. RICHENTHAL:  We noticed the first sentence.

12             THE COURT:  Reasonably foreseeable occurred within the

13     Southern District of New York.

14             MR. RICHENTHAL:  And then in the second paragraph, the

15     sentence beginning "a preponderance of" ends by saying

16     foreseeably occurred.  So again, it would be reasonably

17     foreseeably occurred.

18             THE COURT:  Reasonably foreseeably occurred.

19             MR. RICHENTHAL:  Then in the next sentence, that's the

20     last sentence that ends on page 126, it right now ends

21     "foreseeably occurred," so it's the same phrasing.

22             THE COURT:  Oh, add in reasonably there.

23             MR. RICHENTHAL:  Correct.  I think those are the only

24     times, if we caught it, other than the sentence beginning "with

25     respect to conspiracy offenses," which we just talked about.

O78Wmen4

```
1    So on page 127, the first, the paragraph that begins "with
2    respect to the conspiracy offenses," that sentence, the word
3    "reasonably" should be inserted before foreseeably occurred.
4              THE COURT:  Now I'm not sure where you are.  The
5    paragraph that begins "with respect to the substantive counts
6    resting on the bribe."  Go ahead.
7              MR. RICHENTHAL:  No.  The prior paragraph, your Honor.
8    The one beginning "with respect to the conspiracy offenses."
9              THE COURT:  We already have in reasonably foreseeable
10   to the defendant you are considering.
11             MR. RICHENTHAL:  No.  The first sentence in the
12   paragraph that begins "with respect to the conspiracy offenses,
13   as I said."
14             THE COURT:  That's right.  Reasonably --
15             MR. RICHENTHAL:  Exactly.
16             THE COURT:  -- Foreseeably occurred.  OK.  Done.
17             MR. AGATA:  If I can just ask one question.  I may
18   have missed it.  That paragraph with respect to the conspiracy
19   offenses, did we insert the word "overt" act?
20             THE COURT:  No.  We're not using overt act.
21             MR. AGATA:  With respect to conspiracy?  OK.
22             MR. RICHENTHAL:  I thought this was the issue we
23   resolved.  I'm sorry.  There are conspiracy counts here that
24   don't have overt acts so we think it's going to mislead the
25   jury.
```

O78Wmen4

1          THE COURT:  Exactly.  You've preserved that.

2          MR. AGATA:  Thank you, your Honor.

3          THE COURT:  All right.

4          That's it?

5          MR. SOLANO:  Your Honor, I think there are a couple

6     more.  We have one.  On 84, multiple conspiracies.

7          THE COURT:  Yes, sir.

8          MR. SOLANO:  We had just asked, your Honor did this

9     elsewhere when you described the elements, you reminded the

10    jury from time to time that it has to be found beyond a

11    reasonable doubt.

12         THE COURT:  Yes.

13         MR. SOLANO:  And so here, we would just ask that that

14    be done.

15         THE COURT:  Where?

16         MR. SOLANO:  I think the logical place would be the

17    second paragraph, towards the end it says "is a question of

18    fact for you, the jury, to determine" and insert "beyond a

19    reasonable doubt."  The second full paragraph, second sentence.

20         THE COURT:  What's the view of the government?

21         MR. RICHENTHAL:  So, Mr. Solano and I conferred at the

22    break about this.  We didn't reach agreement.  I appreciate

23    him, therefore, raising for the Court.

24         It's obviously the case that to the extent we have a

25    burden it's beyond a reasonable doubt other than with respect

O78Wmen4

1    to venue.  The problem here is we don't have to prove, or to

2    put a finer point on it, the jury doesn't have to find any

3    particular number of counts for conspiracy.  What they have to

4    find is that the charged conspiracy existed.

5           Mr. Solano's language, I think it's unintentional, to

6    my ear, suggests the jury must be unanimous on the number of

7    conspiracies.  That's not so.  They simply have to be unanimous

8    as to whether we've proven the ones we've charged.  If several

9    of the jurors thought there was some other conspiracy and their

10   colleagues didn't think so, that's fine, as long as they're

11   unanimous on the one we've charged.  So the language Mr. Solano

12   proposed, in our view, would inadvertently, I think, mislead

13   the jury into thinking it must be unanimous as to the precise

14   number of conspiracies.  That's not so.  They just have to be

15   unanimous that we've met our burden that the charged ones

16   existed.

17          MR. SOLANO:  It's certainly not intended to reach that

18   conclusion.  It was more direct, to simply say that there has

19   to be a single conspiracy found beyond a reasonable doubt.

20          Let me see if there's another place to put it.

21          MR. RICHENTHAL:  One way to do that -- I'm doing this

22   in the moment.  I suppose if that's the concern, the sentence

23   beginning "whether there existed" could read "whether the

24   government has proven there existed."

25          We fully embrace our burden.  We just don't want to go

O78Wmen4

1    beyond our burden.

2            MR. SOLANO:  Actually, I think that would be

3    acceptable.  Can we add "whether the government has proven

4    beyond a reasonable doubt a single unlawful agreement"?  That

5    would be acceptable.

6            MR. RICHENTHAL:  Well -- sorry.

7            THE COURT:  Yes.

8            MR. RICHENTHAL:  This is the danger of thinking in the

9    moment.  I apologize.

10           So, I'm going to take back my suggestion, and here's

11   why.

12           The rest of this sentence refers to whether the jury

13   concludes there's multiple agreements.  We don't have to prove

14   multiple agreements.  Actually, unfortunately, I have suggested

15   something that creates the very problem I'm trying to avoid.

16           Put differently, we have to prove the charged

17   conspiracies existed and the defendant they're considering was

18   a member.

19           THE COURT:  I'm going to keep it the way it is,

20   gentlemen.

21           All right.  Next?  Anything?

22           MR. WEITZMAN:  Yes, your Honor.

23           We'd request a missing witness instruction, which we

24   had proposed.

25           THE COURT:  What's the theory?

O78Wmen4

1          MR. WEITZMAN:  Your Honor, we subpoenaed a number of

2     potential witnesses.  We've subpoenaed the two AUSAs who

3     handled the Daibes case.  We subpoenaed someone from the State

4     Department.  We subpoenaed someone from the U.S.D.A.  We made

5     *Touhy* requests to the U.S. Attorney's Office and of those

6     agencies, and they were declined.

7          THE COURT:  I don't think I was aware of that.

8          MR. WEITZMAN:  Yes.  And so there's at least four or

9     five witness, plus there's the Heritage witnesses, which we

10    believe -- I understand your Honor may view it differently.

11         THE COURT:  I'm shaking my head negatively because

12    we've been over that with Heritage, but go ahead.

13         MR. WEITZMAN:  Yes, but I think if the government had

14    asked for their testimony, they would have received it.

15         THE COURT:  No, sir.  There's nothing in the record to

16    suggest that.

17         MR. WEITZMAN:  In any event, the *Touhy* requests, at a

18    minimum, that we've made for numerous witnesses from the

19    U.S.D.A., U.S. Attorney's Office and U.S. State Department are

20    clearly not equally unavailable.  They're in the control of the

21    government, as are the ten AUSAs who attended the Abbe Lowell

22    presentation but who were not called.

23         THE COURT:  Let me see.  I took that out.  Let me see

24    that charge in your draft, sir.

25         MR. WEITZMAN:  It's page 36 of our draft.

O78Wmen4

| | |
|---|---|
| 1 | MR. RICHENTHAL:  I'm happy to respond whenever the |
| 2 | Court would like. |
| 3 | THE COURT:  Missing witnesses including not available |
| 4 | to the defendant, is that what you're referring to? |
| 5 | MR. WEITZMAN:  Correct, your Honor. |
| 6 | THE COURT:  This is basically Sand. |
| 7 | MR. WEITZMAN:  Yes. |
| 8 | THE COURT:  Let me just read it. |
| 9 | Yes.  Government. |
| 10 | MR. RICHENTHAL:  There's a process for *Touhy*.  The |
| 11 | defense engaged in it as to some but notably not all of the |
| 12 | people he just identified.  The process was completed.  We, the |
| 13 | prosecution team, do not control it.  To our knowledge, the |
| 14 | defense was satisfied with the process.  Indeed, they were able |
| 15 | to call the witnesses they believed offered material testimony |
| 16 | in their case, including Mr. Khanna, who we chose to call |
| 17 | instead but who testified when subject to cross, including |
| 18 | Sellinger. |
| 19 | The other people, to the extent they were denied, were |
| 20 | denied because they have utterly immaterial and inadmissible |
| 21 | evidence. |
| 22 | THE COURT:  What was denied? |
| 23 | MR. RICHENTHAL:  So, I'm not intimately familiar with |
| 24 | the ins and outs of the *Touhy* process, but I can say, in sum, |
| 25 | my understanding is what was denied was, for example, calling |

O78Wmen4

1    to testify the line assistant U.S. attorneys in the District of

2    New Jersey about not being influenced by Mr. Sellinger's

3    recusal.  Of course, that's already in the record.  That's

4    nothing the jury needs to hear about.  It's not even disputed.

5    I think they tried to call two different line assistant U.S.

6    attorneys for that purpose.  Mr. Sellinger himself testified.

7              THE COURT:  You said they tried to call.  Under this

8    process what happened.

9              MR. RICHENTHAL:  So, the civil division of the U.S.

10   Attorney's Office leads the *Touhy* process with respect to the

11   Department of Justice.  Other agencies of the United States

12   have their own general counsel's offices and their own

13   processes.  We don't control the U.S. Department of

14   Agriculture, for example, but those departments, to my

15   knowledge, had a liaison role with the U.S. Attorney's Office

16   civil division.

17             If Mr. Weitzman had been unhappy with the result of

18   this process, he could have raised it -- I'm not

19   exaggerating -- months ago.  To raise it at the charge

20   conference suggests out there there's witnesses with material

21   testimony.  That's the quote, material testimony.

22             THE COURT:  This is something I was unfamiliar with in

23   terms of the specifics until this moment.

24             Go ahead.

25             MR. RICHENTHAL:  My point, with respect, is even if

O78Wmen4

1    *Touhy* did not exist -- that is, even if there were no process

2    at all -- the defense correctly, in the footnote, says this

3    instruction should only be given if applicable.  The "if

4    applicable" refers to a proper basis in evidence or the record

5    before this Court that there is material testimony -- that's a

6    direct quote -- that could have been given that the defense

7    could not procure.  They have identified none because there

8    isn't any.  It would be wildly improper at the last minute to

9    suggest there's some magic witness out there they couldn't get,

10   even if there were no process, which, of course, they actually

11   went through and, to my knowledge, didn't object to.

12           MR. WEITZMAN:  We did object, your Honor.  We

13   subpoenaed the witnesses and then --

14           THE COURT:  Before me?

15           MR. WEITZMAN:  No, not before you, your Honor.  We

16   objected with the U.S. Attorney's Office and with the agencies.

17   We subpoenaed the witness, I believe it was Mr. Abdi, from the

18   U.S.D.A.  We subpoenaed a witness from the State Department,

19   Ms. Cressy.  We subpoenaed the two AUSAs who were in charge of

20   the Daibes prosecution, and we were told that Vikas Khanna

21   would be able to answer all questions regarding the Daibes

22   prosecution, and instead he pled ignorance.

23           We also were denied the opportunity, your Honor, to

24   question an employee of the U.S. Attorney's Office regarding

25   the substance of the presentation by Abbe Lowell, and I am sure

O78Wmen4

1    that if we sought to subpoena Damian Williams or any of the

2    AUSAs who were present there, that would have been denied.

3              The charge just says that if you believe that there

4    are witnesses who were in the control of the government and you

5    didn't hear from them, you can hold it against the government.

6              THE COURT:  But presumably you're going to argue those

7    individuals in the summation.

8              MR. WEITZMAN:  Correct, your Honor, and they need to

9    be told that that's a proper inference for them -- just in the

10   same way that, right now, there's only one charge on missing

11   witnesses and it's equally unavailable.

12             THE COURT:  Right.

13             MR. WEITZMAN:  But not all missing witnesses were

14   equally unavailable.  There were some available to the

15   government and not available to the defense.  We tried

16   subpoenaing them and we were refused.

17             MR. RICHENTHAL:  That's just so false it's offensive.

18   That is not the process.

19             THE COURT:  Gentlemen, gentlemen --

20             MR. RICHENTHAL:  I'm sorry.

21             THE COURT:  Gentlemen, gentlemen --

22             MR. RICHENTHAL:  Your Honor, this instruction is

23   designed to put the people at this table on trial.  It is

24   wrong.  It is misleading.  It should have no business before

25   this jury.  There is none -- none -- anything in the record at

O78Wmen4

1    all about what these people, some of whom they didn't even

2    attempt to procure a subpoena for, would have said that this

3    jury has any business hearing about.  If the defense wants to

4    argue that Mr. Sellinger's recusal had no effect on the case,

5    there is abundant evidence, including from the mouth of Mr.

6    Sellinger.  The assistant U.S. attorneys they wanted to call --

7              THE COURT:  Sellinger did say there was no effect.

8    That's correct.

9              MR. RICHENTHAL:  So did Mr. Khanna.  It's not actually

10   even just Mr. Sellinger, and it's not disputed.  We don't

11   intend to argue it.  So they purport to want the jury to think

12   there are witnesses out there with exculpatory information

13   when, in fact, they know it does not exist.  It is wildly

14   improper.  It is wildly belated.  It should be denied.

15             MR. WEITZMAN:  Histrionics aside, your Honor --

16             THE COURT:  Yes.

17             MR. WEITZMAN:  -- the fact that we were denied the

18   opportunity to question a witness about what was said by Mr.

19   Lowell, the fact that there were numerous AUSAs --

20             THE COURT:  We've been over that.  Go ahead.

21             MR. WEITZMAN:  -- and U.S. Attorney and the deputy

22   U.S. Attorney and the chief of the criminal division, none of

23   which we could have called, are missing witnesses in the

24   government's control.  We're not putting the government on

25   trial here, but it's an accurate statement.

O78Wmen4

1              THE COURT:  Well, I think you are.

2              MR. WEITZMAN:  It's an accurate statement.

3              THE COURT:  You're making that argument, and I

4     certainly would have appreciated knowing of this issue before

5     2:10 in the end of the charging conference.

6              MR. WEITZMAN:  Yes, your Honor.  I apologize for that.

7     We did request the instruction.  I understand that we did not

8     alert your Honor to the numerous *Touhy*s that were refused.

9              THE COURT:  All right.  I'm not going to grant the

10    request.  You have the witness charge that's in there.

11             All right.  Does that do it?

12             MR. RICHENTHAL:  Just for the record, the *Touhy*s that

13    were allegedly denied, that's not an accurate statement -- it's

14    a mixed bag because of the process -- that all happened before

15    trial.  When I said months, the date of the documents I'm

16    referring to is May 10, 2024.

17             MR. WEITZMAN:  They were denied.  They were denied.

18             THE COURT:  Gentlemen, enough.

19             MR. SOLANO:  One last issue.

20             THE COURT:  Yes.

21             MR. SOLANO:  I think it will be noncontroversial.

22             We started beyond this, but instruction No. 4 -- I'm

23    sorry, No. 6.

24             THE COURT:  You're going to instruction No. 6.  All

25    right.

O78Wmen4

1          MR. SOLANO:  This is the last one we have.

2          On page 13, where the Court is going to instruct the

3     jury on reasonable doubt --

4          THE COURT:  Yes.

5          MR. SOLANO:  -- our request.

6          THE COURT:  Reasonable doubt.  My reasonable doubt

7     charge has not, assuming this is my usual reasonable doubt

8     charge, which I believe it is, not a single word has changed.

9     It was specifically approved by the Second Circuit in another

10    case.  But go ahead, sir.

11         MR. SOLANO:  I appreciate where this is going to go

12    for me then, but the request was a single sentence that said a

13    reasonable doubt may arise from the evidence or the lack of

14    evidence.  I think your Honor has given that sentiment

15    elsewhere, but it's particularly important and supported by the

16    case law in this instruction, so that would be it, to add a

17    sentence that said "a reasonable doubt may arise from the

18    evidence or the lack of evidence."

19         THE COURT:  Government.

20         MR. RICHENTHAL:  I think your Honor's charge, which

21    has been given since time immemorial, is good and consistent

22    with the case law, and there's no reason to mess with it.

23         THE COURT:  Well, I haven't been on the bench since

24    time immemorial, although in this case it seems like I have

25    been.  I'm going to keep the charge as I've always had it.

O78Wmen4

1           Thank you, Mr. Solano.

2           All right.  We have a charge.  It's ten after.  Get

3   some lunch.  The jury's coming at 20 after.  Be back at 2:40.

4   All right?  And we'll go into the government's summation.

5           Thank you, all.

6           (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78Wmen4

```
1                        AFTERNOON SESSION

2                             2:40 p.m.

3            THE COURT:  All right.  Bring the jury in.

4            You may be seated in the courtroom.

5            MR. MONTELEONI:  In terms of trying to plan when to

6      take a break --

7            THE COURT:  I think with the jury probably it is a

8      little awkward, but it would be two and a quarter hour stints,

9      so I think they do need a break, yes.

10           MR. MONTELEONI:  I'll try to look for a good time when

11     I'm switching, if that's all right.

12           THE COURT:  Yes, sure.  Probably around -- it's now

13     quarter to three -- around 4:15, something like that, between

14     four and 4:15.

15           MR. MONTELEONI:  Understood, your Honor.  And then

16     there's also in terms of where we break for the day, I think

17     that there's a point that I can identify that I think we're

18     likely to hit at five.  It's a little before or a little after.

19           THE COURT:  All right.  The jury has indicated on a

20     couple of occasions that they want to go home at five, but you

21     have some leeway, of course.

22           MR. MONTELEONI:  All right.  Thank you, your Honor.

23           THE COURT:  As a matter of fact, probably at the

24     break, I'll have my deputy ask if they could stay a little

25     later tonight.
```

1          MR. MONTELEONI:  That's fair.  It might be a couple

2    minutes before five also.

3          THE COURT:  I understand.  I want as few interruptions

4    as possible for all summations.

5          (Jury present)

6          THE COURT:  You may be seated in the courtroom.

7          Good afternoon, ladies and gentlemen.

8          Now, you know you have heard all of the evidence.

9    What remains are the summations.  You know several things about

10   the summations.  You know the order of summations is set by

11   law.  The parties have no say in it.  The government gets the

12   first summation, and then each of the defendants will have his

13   own summation, by his attorneys.  And then the government gets

14   a rebuttal summation.  As I said, I think that derives from the

15   fact that the government bears the burden of proof at all

16   times, and you know what that burden of proof is.

17         The government bears the burden of proving its case

18   against each defendant beyond a reasonable doubt, and you must

19   presume each defendant to be innocent until such time, if ever,

20   you determine that the government has met its burden of proof

21   in proving the defendant you are considering to be guilty

22   beyond a reasonable doubt.

23         You also know that what these lawyers are going to

24   tell you is not evidence.  That's important.  They will tell

25   you, I think, what they think, what they believe the evidence

O78Wmen4                    Summation - Mr. Monteleoni

showed and almost certainly what conclusions they ask you to
draw from that evidence.  But it is not evidence.  I want you
to listen to what they have to say, but you decide what the
evidence is.  They don't.

         Also, I'm the one who gives you instructions on the
law.  The lawyers don't.  Now, they may say in the course of
their summations that they believe the judge will instruct you
later on thus and so.  That's perfectly OK.  But what's
important is that you indeed listen to my instructions, not
what they say the instructions are going to be or they think
they're going to be.

         All right.  The first summation is by Mr. Monteleoni
on behalf of the government.

         Sir.

         MR. MONTELEONI:  Thank you.

         THE COURT:  And what we'll do is take a short break at
some point, because otherwise it would be two and a quarter
hours.  That's too long.  And around five, a little before or a
little after, we'll find a logical time in Mr. Monteleoni's
presentation to break.  And then we'll pick it up tomorrow.

         Sir.

         MR. MONTELEONI:  Thank you, your Honor.

         On June 16, 2022, the FBI searched the home of Robert
Menendez and his wife Nadine.  They found envelope after
envelope of cash -- cash stuffed in bags, cash stuffed in the

O78Wmen4                    Summation - Mr. Monteleoni

1    pockets of Menendez's jackets, cash stuffed in Menendez's

2    boots.  They found a Mercedes-Benz convertible in the garage.

3    They found 11 one-ounce gold bars worth about $20,000, two

4    one-kilogram gold bars worth almost $60,000 each.  And that

5    day, other FBI agents seized phones from Menendez and his wife.

6    You saw what they found on those phones.  They found evidence,

7    like photos of more gold, two more kilo bars, five more

8    one-ounce bars -- on top of the ones that were found in the

9    house -- and messages about more payments, payments to

10   Menendez's wife for a fake job, payments to the company holding

11   the mortgage on the very house that the FBI was searching, and

12   they found evidence of Menendez directing and receiving reports

13   from his wife as she collected those things for them.

14           At this trial, you learned where these things came

15   from.  You learned that they were bribes that Menendez took

16   from Wael Hana and Fred Daibes in exchange for promises of

17   official action.  Those payments to the mortgage company and to

18   Nadine for the fake job, Wael Hana made them through the halal

19   company that the government of Egypt set him up with during

20   this scheme.  Envelope after envelope of the cash that was

21   found at the Menendezes' home, Fred Daibes gave it.  His

22   fingerprints were all over the tape sealing up those envelopes,

23   sometimes Menendez's fingerprints too.  Other envelopes of cash

24   were from people close to Hana.  That Mercedes in the garage,

25   Hana first promised it, but it was finally delivered by José

1    Uribe, texts and payment records make clear as day.  And that

2    gold, that gold came from both Hana and Daibes.  You saw the

3    serial numbers match up.  Hana gave seven one-ounce gold bars.

4    Daibes gave nine one-ounce gold bars.  And he also gave the

5    four big ones, the one-kilo gold bars.

6         Why?  Why did Daibes and Hana shower Menendez and his

7    wife with these valuables?  What were they getting when they

8    parted with hundreds of thousands of dollars of gold, cash and

9    other payments?

10        The promise of power.  Robert Menendez, the senior

11   U.S. senator from the state of New Jersey, the ranking member

12   and then chairman of the Senate Foreign Relations Committee,

13   put his power up for sale.  It wasn't enough for him to be one

14   of the most powerful people in Washington.  It wasn't enough

15   for him to be entrusted by the public with the power to approve

16   billions of dollars of U.S. military aid to foreign countries.

17   It wasn't enough for him to have the ability to recommend who

18   the president nominates to be the chief federal law enforcement

19   officer for New Jersey.

20        No.  Robert Menendez wanted all that power, but he

21   also wanted to use it to pile up riches for himself and his

22   wife.  So Menendez sold the power of his office.  He promised

23   to take actions for Hana and Daibes in exchange for those

24   bribes.  He promised to approve military aid to Egypt, to

25   provide Egypt with sensitive information about Americans

1    stationed abroad and to help Egypt in other ways.  He promised

2    to pressure a U.S. Department of Agriculture official to stop

3    opposing the monopoly that Egypt was giving to Hana's halal

4    certification company.  He promised to pressure the New Jersey

5    attorney general to disrupt a criminal investigation and

6    prosecution of associates of Hana and Uribe.  He promised to

7    recommend a candidate for U.S. Attorney for the District of New

8    Jersey who he thought he could influence to affect Daibes's

9    federal criminal prosecution, and Daibes asked him to advance a

10   resolution praising the government of Qatar, which Daibes

11   thought would help him land a multi-million dollar investment.

12           Through the course of this trial, you've seen exactly

13   how they did it.  You heard all the evidence.  You heard how a

14   sitting U.S. senator took hundreds of thousands of dollars of

15   bribes from two businessmen in exchange for the promise to use

16   his official power to enrich them and to protect them and their

17   associates from anyone in the government who would stand in

18   their way.  You saw again and again a clear pattern of

19   corruption.  Again and again, from promises of military aid to

20   requests to advance a Senate resolution, from seeking to

21   influence the Department of Agriculture to influencing the New

22   Jersey U.S. Attorney's Office, seeking to influence that or the

23   New Jersey attorney general's handling of a state insurance

24   fraud prosecution, the pattern was the same.  Menendez was in

25   charge.  His wife, Nadine, was his go-between, demanding

1    payment, receiving payment and passing messages, but always --

2    always -- keeping him informed, and in which Hana and Daibes,

3    sometimes along with José Uribe, they would identify the people

4    they wanted to protect, identify the acts they wanted performed

5    for foreign governments to advance their own businesses and

6    provide the bribes that ended up in Menendez and Nadine's

7    house, one scheme to protect and enrich the people who were

8    paying bribes to Menendez.

9            What I'm going to do in this closing argument is go

10   through each of the charges.  And I'm going to go through each

11   element -- that is, each part of each charge -- and I'm going

12   to show how the evidence that you've seen at trial proves each

13   element beyond a reasonable doubt.  There's been a lot of

14   evidence, and there are a number of counts.  So I'm going to be

15   going through them for the rest of the day today and for some

16   tomorrow to explain how every part of every count is proven.

17   And after getting through that last count, I'll sum up a few

18   points that apply to all the counts.

19           Now, let's talk about these elements.

20           Judge Stein will instruct you on the law, and those

21   instructions control, but I'm going to talk today about what I

22   expect he'll instruct you.  I'm going to go count by count,

23   talk about how the evidence that you've seen in this trial

24   establishes each of the elements beyond a reasonable doubt.

25   And I'm just going to talk about the most relevant portions of

1   the evidence here, but if there's something you want to see

2   more of, you'll have it all available to you in the jury room.

3           First, let's go over what the counts of the indictment

4   are.  There are 18 counts, but they fall into a few general

5   groups.

6           First, there are corruption counts related to the

7   Egypt conduct.  That includes both Menendez's promise to aid,

8   promises to aid the government of Egypt in various ways and

9   also to protect Hana's halal monopoly that the government of

10  Egypt gave him.  This group of counts includes charges against

11  all of the defendants.

12          So, second, there are corruption counts related to the

13  New Jersey attorney general conduct; that is, Menendez's

14  promise to disrupt the New Jersey State prosecution and

15  investigation by contacting the New Jersey attorney general,

16  Gurbir Grewal.  These include charges against Menendez and

17  Hana.

18          Third, there are corruption counts related to the New

19  Jersey U.S. Attorney and Qatar conduct; that is, Menendez's

20  promise to disrupt Daibes's federal prosecution and his

21  attempts to help Daibes get the investment from this company

22  linked to Qatar.  These include charges against Menendez and

23  Daibes.

24          Now, fourth, there are the corruption conspiracy

25  counts, which include between them agreements to commit all of

1    those corruption offenses.  As I expect the judge will instruct

2    you, a conspiracy to commit a crime is just an agreement to

3    commit a crime, and that's a separate charge from the charges

4    for the underlying crimes in those first three groups.  And

5    those are what the law calls substantive offenses.  So these

6    corruption conspiracy counts include charges against all the

7    defendants.

8            Fifth, there are the foreign influence counts.  Those

9    relate to Menendez's actions and promise to act on behalf of

10   Egypt while he was a U.S. senator.  These include charges

11   against Menendez and Hana.

12           And finally, there are the obstruction counts.  Those

13   relate to Menendez's agreement with Daibes to obstruct Daibes's

14   federal prosecution and also to Menendez's own attempt to

15   obstruct the Southern District of New York's investigation into

16   this conduct.  These include charges against Menendez and

17   Daibes.

18           So it's a lot of charges.  It's a lot of evidence,

19   because this was a years-long scheme.  It had a lot of

20   overlapping players and parts.  And I'm going to go charge by

21   charge and break it down for you so you can see how each part

22   is proven beyond a reasonable doubt.

23           First, we're going to add in some blank lines to this

24   chart for each of the counts so that we can keep track of the

25   counts that we've been through as we go.

1              The first pair of counts that I want to talk to you

2    about is the substantive bribery charges, Counts Five and Six,

3    related to Egypt.  Count Five relates to Menendez receiving

4    bribes from Hana and Daibes, and Count Six relates to Hana and

5    Daibes offering and giving bribes to him.  So since these two

6    bribery offenses -- they're basically sort of different sides

7    of the same coin -- I'm going to talk about them together, and

8    I'm going to spend some of the most time on these two counts

9    because, in a way, they're the building block of most of the

10   rest of the other counts.

11             The first element of both counts is that Menendez was

12   a public official.  This one is undisputed.  No dispute that

13   Menendez was a member of Congress, and I expect that Judge

14   Stein will instruct you that members of Congress are public

15   officials.  So we're done with element one.  They're not all

16   going to be quite this fast.

17             All right.  Second is a thing of value.  Now, here, I

18   expect the judge will instruct you that for Count Five,

19   Menendez must have directly or indirectly demanded, sought,

20   received, accepted or agreed to receive something of value or

21   else for another person or entity at his direction or for his

22   indirect benefit to receive something of value.  I'm just going

23   to use receive and accepted as a shorthand for all those verbs

24   here.

25             And then similarly, for Count Six, for Hana and

1   Daibes, they must have offered, promised or given money or

2   something else of value either to a public official or for the

3   benefit of a public official.  I'm going to refer to that as

4   offering or giving.  So it's important to note here that for

5   both of those counts the thing doesn't have to go to Menendez

6   directly.  It's enough if a thing of value is offered or given

7   to or received or accepted indirectly.  So that is by someone

8   else that Menendez wants it given to.  And here, as you know,

9   for a lot of those things of value that other person was

10  Nadine, his wife.

11         Now, here, there is some dispute.

12         First, there's no real dispute that Menendez accepted

13  things like meals from Hana, like you see in the guest check on

14  the left of the screen or transportation from Daibes, which you

15  see Daibes offering in the center image, and then you see the

16  cell site records showing that that transportation was given

17  over on the right.  There's no dispute that Menendez got these

18  things, that Hana and Daibes provided these things.  That

19  actually is enough just to find this element.  I expect Judge

20  Stein will instruct you that a thing of value includes things

21  like intangibles, and you know, that they just have to be

22  something that the giver or recipient considers to be worth

23  something.  Doesn't have to be a lot, just something.  But

24  obviously, these minor things are only a tiny piece of the

25  things of value that Menendez received and that Hana and Daibes

1    provided.

2            So let's look at the ways that the evidence proves

3    that Menendez received and accepted things of value and that

4    Daibes and Hana gave them to him, directly and indirectly,

5    through Nadine.  We're going to be coming back, by the way, to

6    the implications of the giving of some of these things of value

7    later, but for now let's just focus on how you know that

8    Menendez, in fact, received and accepted them, either

9    personally or indirectly through Nadine.

10           First, there was the sham job.  Right from the

11   beginning of the scheme, Hana offered payment to Nadine in the

12   form of a job, and Nadine made sure Menendez knew it, like she

13   made sure that he knew a lot of things you're going to see

14   throughout the scheme.  So here, as far back as April of 2018,

15   very early on in the scheme, she told Hana that she was talking

16   to Menendez and that she was going to ask him about the two

17   deals.  So right from the beginning there's a discussion of

18   some sorts of things that are going to result in her getting

19   paid in some way.

20           Now, what you're looking at here, you may recognize,

21   is just one line from one of the government's summary charts,

22   which you may recall were featured at some length during this

23   trial.  We're not going to go through all the evidence with you

24   today, because you sat through the trial, but if you want to go

25   through any of it as you deliberate, you can just write down

the exhibit numbers and it's going to be there for when you
deliberate if you want to look at it again.

        This one is from Government Exhibit 1302.  That's the
chronological summary chart that's been focused mainly on this
Egypt conduct that we went over.  All right.  So that was
April.

        Now, May 2018, here, Nadine is sending an email to
Menendez telling Menendez that Will and the general, this
general, got her clearance for a project.  Is this a volunteer
project?  Obviously not.  This is something that's going to get
her paid.  We're going to come back to this message in a bit,
but right now just note how early this is that she's telling
him about things that are going to get her paid.

        So menendez also knew that Hana might actually get her
some sort of job with the Egyptian government.  This is a
message that he sends in January 2019, when she's on her way,
you saw from the summary chart, with Hana to talk to an
Egyptian embassy official about work doing some import-export
to Egypt.  So this is all right from the beginning.  But you
really find out about just what Hana had been promising her a
few months later when he fails to deliver.

        So here, in the spring of 2019, Nadine is very
explicit that Hana promised her a job and a job paying about
$10,000 a month.  Here, in this version, it's 2,500 every week,
which is a bit more than $10,000 a month, but it's close.  And

she's saying she kept every promise to Will.  That's not

because she's done work for the halal company.  It's not in

operation by this point.  No.  The promises that she kept to

Will are because she got Menendez to help Egypt and to promise

help to Egypt, as you've seen and as we'll go over.  So Hana

obviously knew about these promises of payment to Nadine.  And

here, Nadine is telling Hana's lawyer, Howard Dorian, and

Howard Dorian is desperately trying to keep her happy in the

messages around this time period.  These promises are not just

to Nadine.  Hana's also telling his Egyptian contacts about

these promises that he's making to pay her.

Here, he is sending his Egyptian contact, HH HH, a

salary list, and this is a list of salaries for this new halal

company that is just getting set up.  And in the salary list,

he is telling his Egyptian contact that Nadine is getting

$120,000.  That obviously is the same as the $10,000 a month

that she wants.  And it also makes her the second highest paid

employee in the company.  So, of course, Hana knows that he's

offering her something of value -- $10,000 a month.  But did

Menendez know about this job?

Of course he did.  Nadine, here, gets inside

information that Hana is going to have a halal certification

monopoly handed to him.  This is April 8, 2019, before the U.S.

Department of Agriculture got notified that there was going to

be a monopoly.  Nadine learns from Hana, and right away she

1    passes it on to Menendez.  Menendez knew before Bret Tate.  She

2    says "seems like halal went through."  She doesn't explain more

3    about what that means because she doesn't need to.  Menendez

4    already knows.  Says "it might be a fantastic 2019 all the way

5    around" -- fantastic for Hana because he's going to start

6    raking in huge monopoly profits, and that fantastic 2019 is

7    going to make its way all the way around to Nadine and

8    Menendez, because they're going to get paid from those profits.

9          So it's not just that Menendez hears this directly

10   texted to him, he also takes actions to get Nadine paid.  Gets

11   a lawyer to set up her company.  He's getting her the lawyer to

12   do that.  He gives her advice on looking online for a

13   consulting contract to paper it when she can't find a contract

14   for her consulting company at Staples.

15         He knows that a check is coming in, either from Hana

16   or from Daibes.  You see here, June 13, 2019, this shows you

17   that by this point Daibes, who's been financially backing

18   Hana's business, Daibes is part of this bribe scheme too.  Even

19   as early as June 13, 2019, he's so much a part of it that in

20   this message Nadine is actually worried about his vacation

21   schedule when she's trying to figure out when she's going to

22   get paid.  It's not just talk.  It's not just talk for Menendez

23   or for Daibes.

24         The first $10,000 check for the sham job, August 2019,

25   Daibes personally puts into Menendez's hand:  "Nadine, I

1    personally gave Bob a check for September."  And you know

2    Daibes is right when he says to Nadine he personally gave Bob a

3    check for September, because Nadine, who's been asking for

4    money and saying that she has a list of demands for how much

5    she's owed, she then goes and checks.  She sends Daibes back

6    this handwritten rundown of what she believes that she's owed.

7    And this rundown is $10,000 less than what she had originally

8    asked Fred Daibes for, because after Fred Daibes clarified that

9    he had personally gave Bob a check for September, she thanks

10    him for clarifying.  She says, "thank you very much for

11    clarifying," subtracts that $10,000 check.  $10,000 check from

12    Hana handed by Daibes to Menendez.

13            That right there is the thing of value.  Element done.

14    And there's no reasonable dispute that Menendez knew about this

15    payment.  He held it in his own hand.  And by the way, that May

16    1 date that she's sort of listing as the first of the month

17    when she's owed payment, if you remember, May 1 is the date

18    that this halal company monopoly started.  So right from the

19    beginning she's talking about getting money for this company.

20    But we could be done with this element if that was the only

21    thing of value, but there is so much more.

22            Another $10,000 check is coming in late September.

23    And again, Daibes, Hana and Menendez, they all know about it.

24    Menendez knows about it because, as you see here, Nadine

25    complains to him about the check not coming fast enough.  She

1    leaves him a voice mail, saying I really want my check.  This

2    is also the check that Menendez tells Nadine not to put

3    anything in writing about, because he knows what they are doing

4    is wrong, because he does not want to get caught.  He says no,

5    you should not text or email.

6            We'll come back to that.  But Daibes knows about this

7    check too because Nadine calls him about it.  She leaves him a

8    long voice mail on September 27 of 2019, and then after that

9    call, Daibes gets Hana to write it because the check is issued,

10   as you see here, the next day, another $10,000 check that

11   Daibes and Hana provide to Nadine, with Menendez's approval,

12   another proof of a thing of value element.  But there's more.

13           A third check.  Daibes again offers to give this one

14   right to Menendez.  I have the envelope for Nadine.  Menendez

15   tries to distance himself from it.  You see here he's saying

16   well, actually, just mail it to her.  But obviously the point

17   isn't whether he gets Daibes to send it by mail rather than by

18   accepting another hand delivery.  The point is Menendez knows

19   that hana writes the check, Daibes is involved in the

20   delivering of it, and Nadine is receiving it with Menendez's

21   approval, another thing of value.

22           But it's not just the checks to Nadine's sham

23   consulting company.  Hana also pays to bring Nadine's mortgage

24   current.  He doesn't want to, but he does it.  Does Menendez

25   know that?  Of course he does.

1            Now, at first, she keeps it from him, and so you see

2    here, this is what it looks like when Menendez doesn't know

3    something.  This is on the few occasions when something is

4    being kept from Menendez, he complains, he asks, he brings it

5    up.  As you see here, he's complaining that she's not telling

6    him what's going on here.  Remember, like Michael Soliman told

7    you, he is detail-oriented.  You don't get to be the chairman

8    of Senate Foreign Relations Committee by being clueless.

9            But we also see from this it's actually out of the

10   ordinary.  This particular thing, her delinquency on the

11   mortgage she keeps from him for a while.  But as you see, again

12   and again and again, she's looping him in on big things and on

13   little things.  So, about the mortgage, she keeps it from him

14   for a while, but then she realizes she's going to have to tell

15   Menendez when they get back from a vacation on July 5.  She

16   leaves this long message for Daibes and says that she's going

17   to tell Bob on Friday, that's July 5, after they get back.

18           Well, that's what she says, but does she do it?  She

19   sure does.  A few days after getting back, she has told Bob all

20   about it so that she could just mention in this text message to

21   Bob.  Just in the course of a message about how she's having a

22   productive day, she says that she double-checked about the

23   payments.  She doesn't have to explain what the payments are

24   for, and Menendez doesn't ask her what she's talking about

25   because she has already explained it.  And then Menendez stays

1    on top of this.

2            Menendez calls her in July and tells her to call

3    Daibes.  You see the call from Menendez to Nadine there, and

4    then a few minutes later, the call from Nadine to Daibes.  And

5    what she says here is -- she's actually a little cagey about

6    who called.  She says, I just got a phone call asking me to

7    give you a call.

8            We'll come back to that sort of cageyness there, but

9    Daibes clearly gets the message.  He immediately calls Nadine,

10   who immediately reports back to Menendez.  You can see this is

11   just minutes later.  Daibes is calling her back, and she's

12   immediately keeping Menendez posted.  And then Menendez keeps

13   following up.  And so when nothing has been done, he has Nadine

14   call Daibes back to get the payment made:  Bob called me today

15   to find out if everything's been taken care of.  Bob insisted

16   on me letting you know.

17           So, obviously, Nadine benefits from claiming that

18   Menendez has been following up about it, but that's what the

19   records show.  She was keeping him in the loop every step of

20   the way.  And Daibes is an old friend of Menendez.  She's

21   telling Daibes that Menendez knows about this payment.  And

22   she's telling Daibes that Menendez has been following up about

23   this payment.

24           If that wasn't true, if Daibes thought that Menendez

25   knew about this and Menendez didn't actually know, how could

1    she stop Menendez from finding out about it the next time he

2    has dinner with Fred Daibes or has a phone call with him or

3    texts with him?  She can't.  She didn't.  Menendez knew all the

4    along.  Hana and Daibes's bribe payments were secret, but they

5    weren't secret from Menendez.  Another thing of value from

6    Hana, with Daibes's help, with Menendez's approval.  Another

7    way that this element is proven.  But there's more.

8            Hana sends them an elliptical exercise machine.  It's

9    worth thousands.  It's for Bob.  Your elliptical we put

10   together at 9 a.m. Monday morning, and it's there in their

11   bedroom, while they're married.  Obviously, Hana sent it and

12   Menendez received it.

13           Then there's the gold.  Hana gave Nadine a total of

14   about $12,000 in one-ounce Asahi gold bars.  These are bars

15   that he bought in June 2021, months after they were married.

16   So again, he knew that they were both going to benefit from

17   them.  And Daibes -- Daibes gives Menendez one of the kilo gold

18   bars when Menendez and Nadine Menendez come back from a trip to

19   Egypt and Qatar, on October 18, 2021.  They land on October 17.

20   Daibes stops by with doughnuts the next day.  And right after

21   Daibes has left, Menendez googles the price of a kilo of gold

22   for the first time.  This wasn't just curiosity.  Menendez

23   never googled the price of gold at all before 2018.

24           And here, in 2019, this might be just curiosity.

25   Here, he's just googling for the price of gold without a

1  quantity, just a commodity, spot price of gold.  But here, this

2  is just when Fred Daibes happened to stop by with doughnuts.

3  This is the first time Menendez's search history reflects a

4  search for a kilo of gold.  A few things on this.  This is

5  Menendez doing the searching.  One minute before he was

6  searching for how much is one kilo of gold he was sending out a

7  letter of recommendation.  So the things that you heard the

8  defense sort of suggesting about trying to blame his wife for

9  his Google searches and the gold is just plain wrong.

10        Now, let me be clear.  The defense has absolutely no

11  burden in this case.  The burden is on us at all times, and we

12  embrace it.  Defense counsel does not have to ask any questions

13  of any witnesses.  They do not have to make any arguments, but

14  when they do, like they did here, you can and you should

15  scrutinize them and ask if they're consistent with the evidence

16  that you've seen and heard.  When you do, you find that the

17  idea that Menendez's wife is to blame for the gold does not

18  make sense and does not square with the evidence.  This is him

19  searching, not her.

20        And when is he searching for the price of a kilo of

21  gold for the first time in his life?  Right after Fred Daibes

22  stops by.  You know that from the cell site records, like the

23  records that you see in the bottom corner of the slide.  You

24  also know that from the text about how he brought doughnuts too

25  when he came.

1          By the way, the point of the doughnut text isn't that

2    doughnuts is code for gold.  It's that Daibes actually came by

3    in person, bringing doughnuts with the gold.  So menendez is

4    searching for the price of a kilo of gold right after Fred

5    Daibes comes by.  And what did the FBI find in Menendez's house

6    a few months later, in June?  Two kilos of gold.  And what did

7    Nadine take pictures of?  Just before selling two kilos of gold

8    to Vasken Khorozian, which you heard about, she takes a picture

9    of two more kilos of gold.

10          What do all of these four kilos of gold have in

11   common?  They had serial numbers showing that they belonged to

12   Daibes, the man who stopped by just when Menendez googled the

13   price of a kilo of gold for the first time in his life.

14          So all of this talk about Nadine having family gold is

15   a distraction.  This case doesn't have to do with jewelry.  It

16   doesn't have to do with gold coins.  It has to do with

17   something very specific, which is kilo bars of gold.  There's

18   actually no evidence that Nadine ever had kilo bars of gold

19   from her family.  Even that handwritten family inventory that

20   you saw just said that the gold bars added up to three kilos,

21   but it didn't say that they're actually one-kilogram bars.  And

22   even if Nadine's sister Katia didn't remember if she ever saw

23   Nadine with any kilo gold bars, but even if Nadine did have any

24   kilo bars from her family around the time when she was in

25   college in the 1980s, she obviously didn't have them in 2021,

O78Wmen4                    Summation - Mr. Monteleoni

1    after she had been struggling to pay her bills and almost lost

2    her house.

3            And the only kilo bars which have serial numbers that

4    are in evidence, the only ones have serial numbers matching

5    Daibes's gold inventory.  And if Menendez was googling Nadine's

6    family gold, why did he do it for the first time in his life

7    when Daibes, who was, in fact, the source of the kilos of gold

8    that were found in Menendez's house and found pictured on

9    Menendez's wife's phone when he stopped by?  And why did he do

10   it again, here, after meeting up with Daibes in 2022, right

11   after a dinner?  He's doing another kilo of gold search.  Again

12   and again, Menendez is googling the price of a kilo of gold

13   after meeting in person with Daibes, and Daibes is the actual

14   source of the kilo bars of gold that are found in Menendez's

15   house and found pictured on his wife's phone.

16           It's not a coincidence.  It's a bribe.  It's a thing

17   of value.  It's another way that you know this element is

18   proven.

19           We'll talk more about the gold when we come to some of

20   the later counts, but right there, you know that Menendez is

21   getting yet another thing of value.  That's not even all the

22   things of value.  Hana sent over things like an air purifier.

23   Early in the scheme, Hana promised that his business associate,

24   Nader Moussa, would do some carpeting for Nadine.  That fell

25   through, but Hana's lawyer, Howard Dorian -- you may remember

1    him.  He's the one who asked Bret Tate, the U.S.D.A. official,

2    for what halal certification was right before Hana's company

3    was about to get the monopoly on all halal certification.  This

4    is Howard Dorian.  He sent Moussa over to do some household

5    tasks so that Nadine and Menendez wouldn't cancel their

6    meetings with the Egyptian officials.  And some of the cash in

7    the house, including what we see here in Menendez's boot, that

8    was in envelopes with Moussa's fingerprints on them or some

9    with fingerprints of Gus Lita, one of Hana's employees.  So

10   more things of value from Hana to Menendez.  So we're done with

11   the thing of value element.  You only need one thing of value

12   for this element, but you have one after another after another.

13          Now on to the third and the fourth elements of these

14   bribery counts, because the same evidence proves the third and

15   the fourth element.  I'm going to talk about them together.

16          The third is whether the thing of value is given or

17   received in exchange for official action, what the law calls a

18   *quid pro quo*, and the fourth is whether the defendants had

19   corrupt intent.

20          Corrupt intent I expect the judge will instruct you is

21   conscious wrongdoing.  It's a bad state of mind.  I expect the

22   judge will instruct you the defendant doesn't have to be aware

23   of the specific law he's violating.  He can have corrupt intent

24   even if he has both an unlawful intent to seek a bribe but also

25   some other noncriminal intent in part.  And for the *quid pro*

1    *quo*, I expect that Judge Stein will instruct you that what

2    matters is whether a thing of value is offered, given or

3    received in exchange for a promise to take what is known as

4    official action.

5          To be clear, the public official doesn't have to take

6    any action at all.  The promise alone is enough.  And you know

7    that from your common sense.  If a politician is promising to

8    abuse his power for money, that right there is corruption.  And

9    if what he's promising instead is actually good, if he's

10   promising to do something good in exchange for money, then he

11   shouldn't be demanding money for it either.  The promise itself

12   is the crime.  But the promise does have to involve official

13   action, which the judge will instruct you on.  And I expect the

14   judge will instruct you that could either be action Menendez

15   takes with his own powers or an attempt by Menendez to advise

16   or pressure another public official to take official action.

17         So for these counts, if Menendez promised to approve

18   military aid to Egypt, like a foreign military sale or a grant

19   of foreign military financing money, that's a promise of

20   official action.  Or if Menendez promised or attempted to

21   pressure or advise the U.S.D.A. to stand down on their efforts

22   to stop the monopoly, to change the official position of the

23   United States on a matter related to U.S. foreign policy, well,

24   that's a promise of official action, or that's an attempt to

25   take official action.

1          Now, obviously, on this point, I expect Judge Stein to

2     instruct you that just having a meeting or picking up a phone,

3     having a meeting or a phone call without more, that's not

4     official action.  But when the official makes a promise of

5     official action at a meeting or uses a phone call to advise or

6     pressure another official to take action, well, that is

7     official action.  Satisfies the *quid pro quo* elements.

8          So these two elements regarding a corrupt *quid pro*

9     *quo*, those are the ones we're going to spend the most time on,

10    because they're really at the heart of the dispute between the

11    parties here.  The question for you is when Menendez and Nadine

12    were receiving and accepting these things of value from Daibes

13    and Hana, did Menendez have, or did he convey to Hana and

14    Daibes that he had, corrupt intent to be influenced in the

15    performance of an official act?

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1           MR. MONTELEONI:  On the flip side, when they were

2    offering and giving things of value to Menendez and Nadine, did

3    Hana and Daibes have the corrupt intent to influence an

4    official act?  You know they did.  Your common sense tells you

5    that they did.  And the overwhelming evidence at trial has

6    proven that they did beyond a reasonable doubt.

7           Let's go through six different reasons why you know

8    that these elements are satisfied, and Menendez, Hana, and

9    Daibes are guilty.

10          How do we know they had corrupt intent and engaged in

11   a quid pro quo?  The first reason is the timeline.  You've

12   heard the saying "actions speak louder than words."  Watch the

13   defendants' actions.  Again and again, when he knew that there

14   was money on the line, for him and Nadine, Menendez sprung into

15   action to take or promise official action.  And Hana and Daibes

16   sprung into action to pay him for it.

17          Let's start with the very early stages.  May 28, 2018.

18   Nadine and Hana by this point have already arranged a meeting

19   with Menendez and General Shawky, the Egyptian defense attache,

20   two months previously.  And a few weeks ago, Menendez has given

21   Egypt through Hana sensitive information about the personnel at

22   the U.S. embassy.  By this point, Menendez has also given Hana

23   information on holds that another U.S. senator had placed on

24   aid to Egypt based on human rights concerns.

25          But now, in this message here, Nadine has a new

request.  She wants Menendez to polish up a response by Egypt
to those very same human rights concerns.  So, what does she do
to motivate him?  She says she's going to get paid.  The
General and Will have given her clearance for a project.  What
type of project do you need clearance for?  You don't need
clearance for a volunteer project.  You need clearance for
something that will get you paid.

          So May 28, 2018, 4:26 p.m., what does Menendez do when
he gets this?  8:34 p.m. that day, he writes the Egyptian
government's response.  He is a U.S. senator.  One of his
colleagues said let's not send so much aid to Egypt because of
their human rights record.  And for years Senator Menendez had
a reputation as a critic of Egypt.  All of a sudden, when he
hears Nadine could get paid, within hours, Menendez writes up a
response from Egypt based on some talking points that Hana had
sent through Nadine.

          He writes up this response saying don't worry about
these human rights concerns.  Give us -- that means give us,
Egypt -- our money.  We're going to come back to this later in
the quid pro quo, and we'll come back to this when we talk
about the charges that Menendez was acting as an agent of
Egypt.

          Right now consider just the way this timing shows a
corrupt quid pro quo.  Is this letter itself an official act?
No.  You know what it is?  It is a promise of one.  Remember,

1    this funding is going to come before him as the ranking member

2    of the SFRC.  These human rights concerns will come before him,

3    too.  Here, what he's saying by writing this letter is I'm not

4    going to give you too hard a time on these human rights

5    concerns because, look, I'm writing your rebuttal to them.  He

6    does it just like that.

7            A few weeks later his promises of official action get

8    much more specific.  So, Hana and Nadine set up a meeting on

9    July 25, 2018, between Menendez and General Shawky, that Egypt

10   defense attache, the same Egyptian general they'd arranged the

11   meetings with before.  This meeting was part of a delegation

12   that was making the rounds to a lot of different people in

13   Washington asking for military aid.  But the dinner afterward

14   was special.  So first, Hana and Menendez arranged the July

15   dinner a few weeks before, in June.  What you see here is this

16   June dinner that they're having at Mr. Chow, a Chinese

17   restaurant here in Midtown Manhattan.  And while they're here

18   in Midtown at Mr. Chow in June, while he's there with Menendez,

19   Hana texts the date and time for this July meeting and for the

20   July dinner to Shawky.  He did it while he was out at Mr. Chow

21   setting the time and date for that meeting.

22           So in July, then, after the meeting, when the time

23   came for the dinner, this is a dinner that General Shawky was

24   hosting, what you see here is General Shawky is expressing to

25   Wael Hana how he is really stressed out and worried he

1    committed a gaff by not seating Menendez next to Nadine at the

2    dinner.  But it turns out, Shawky didn't have to worry.

3    Because the next day, Menendez texts Nadine to tell Hana he's

4    going to approve Egypt's tank ammunition.  Nadine takes a

5    screenshot.  Screenshot of another promise of an official act.

6    Again, after Menendez had heard back in May that Nadine was

7    going to get paid.  Going to work on that project for the

8    general and Hana.

9            But then when we get to the spring of 2019, the timing

10   is even clearer.  In March 2019, Nadine hasn't been paid yet.

11   And she makes clear she's been getting promises of a job by

12   Hana for a year.  All the way back to that first meeting she

13   set up for Hana and the Egyptian defense attache with Menendez.

14   She says it's been a year of broken promises from March 2019

15   That takes you back to March 2018.  And that is the month when

16   there was that first meeting that General Shawky had at

17   Menendez's office set up by Hana and Nadine.

18           So, she's complaining about this to Howard Dorian,

19   Hana's lawyer, but she doesn't just complain about it to him.

20   She's also obviously talking to Menendez about it.  She's

21   leaving messages the next day, talking about how she refuses to

22   set up dinners for Hana.

23           In this voice messages you'll see she doesn't explain

24   why in this message she's refusing to set up a dinner for Hana.

25   She doesn't have to.  Menendez knows about Hana's promises to

1    pay her already.  So this is one of a huge number of calls and

2    texts that you have seen about Nadine keeping Menendez updated.

3    She is not keeping him in the dark.  She's letting him know

4    something as basic as the fact she is not planning a dinner.

5    That's the level of detail in her updates.  You can tell from

6    the context she's told him a lot more too.

7            In April, Nadine still hasn't gotten paid by Hana, but

8    she does tell Menendez she's going to.  Seems like halal went

9    through.  Now, remember, Menendez has worked on Nadine's

10   résumé.  He understands she does not have consulting

11   experience.  She doesn't have a consulting track record.  He

12   knows that this is not a real job for the company.  That it is

13   a way to collect payments in exchange for Menendez's promises.

14           A few weeks later, Menendez takes another meeting with

15   Ahmed Helmy.  This is one of the Egyptian officials that Hana

16   has been setting him up with.  Someone you can see from the

17   text Hana has regularly been taking orders from this Helmy.

18           Hana is saying the quiet part loud.  He's talking

19   about the halal company, the company that's going to pay the

20   Nadine in the meeting.  It appears from what Nadine is telling

21   Menendez that Helmy is actually angry at Hana for talking about

22   the halal in the meeting, while Menendez and Helmy want to talk

23   about issues related to military aid.  They want to talk about

24   things like the case of April Corley.  April Corley is the

25   American who is injured in an Egyptian air strike.

1                And here's another thing about this meeting with Helmy
2       and Hana and Nadine.  Not on the calendar that Menendez's staff
3       keeps for him.  This is not an ordinary meeting.  This is a
4       meeting that Menendez wants kept off the books because it's
5       another meeting in which he's putting his power up for sale.
6       Maybe it was smart for him to keep it off the calendar, because
7       the halal business came up.  But you know he doesn't want Sarah
8       Arkin, who is pressing on him to be more vocal about human
9       rights, at this meeting.

10               What do they do after the meeting?  Well, that
11      evening, the evening of this meeting, is when they go out to
12      Morton's.  That's when the FBI catches Nadine offering what
13      else can the love of my life do for you.  Turns out, we find
14      out what in the next two days.

15               Hana gets mad the day after that Morton's steakhouse
16      dinner.  Mad about the USDA criticizing his monopoly.  That
17      criticism is getting press in Egypt, and he sends an article
18      reporting on the criticism and a translation to Nadine.  Nadine
19      sends it to Menendez, and within minutes, Menendez has his
20      staff send it to Undersecretary McKinney.  Not just Menendez's
21      staff.  The article was following up on a call Menendez
22      personally made to Ted McKinney, the undersecretary of
23      Agriculture.  And not just any call.

24               Before we talk about the call itself, I want to pause
25      here for a moment.  As you've seen throughout this trial, the

1    Egypt part of the scheme involved many players, multiple

2    bribes, different kinds of actions Menendez promised, all

3    spanning about 4 years.  But this one incident, the McKinney

4    call, and the bribes surrounding it, is all you need to convict

5    on the Egypt bribery counts.  If you consider what Menendez

6    said on the call, in the context of what happened in the few

7    days before and after the call, it includes everything you need

8    to find him guilty on Counts Five and Six, just this one brief

9    chapter.  Thing of value, in exchange for a promise of official

10   action, and Menendez following through on that promise.  That's

11   a corrupt quid pro quo.

12        So if you find that Menendez in fact made that call in

13   exchange for Hana's promises of payments to Nadine, that's all

14   you need to convict Menendez and Hana of Counts Five and Six,

15   and as we'll see, it becomes enough to convict Daibes as well a

16   few months later when Daibes actually delivers one of those

17   bribes to Menendez.

18        Of course, you have a ton more because there were

19   plenty of other bribes and promises of action related to Egypt,

20   which we'll talk about.  But the McKinney piece alone makes

21   each defendant guilty on these counts.

22        So turn back to the timeline of events surrounding

23   this McKinney call.  So we just talked about how a few weeks

24   before Menendez got texts from Nadine she's going to get paid

25   from the halal monopoly, might be a fantastic 2019 all around,

 1   and then we've also looked at Menendez's incredibly swift

 2   actions to make the call, right after meeting with Hana and

 3   Ahmed Helmy, right after that steakhouse dinner where Nadine

 4   offers Menendez's help, and then minutes after getting this

 5   article texted to him.

 6          So what happened on that call?  You already know a lot

 7   just from the timeline of hard evidence.  This is a call that

 8   McKinney needs to reassure his staff about.  A call that makes

 9   the undersecretary of agriculture for trade and foreign

10   agricultural affairs feel that he needs to tell the staff at

11   the embassy that he has their back.

12          So just from the documents, just from the timeline,

13   you can tell what's happening.  But you don't just have to look

14   at the documents.  McKinney testified, and he told you what

15   happened on that call, he told you.  And what happened on that

16   call was exactly what Hana wanted.

17          Menendez demanded that McKinney stop interfering, stop

18   interfering.  Those words were stuck in McKinney's memory.  Cut

19   out his efforts to make Egypt change its mind about Hana's

20   monopoly.  Reverse the USDA's policy position and just let Hana

21   have his monopoly.

22          It was a shocking call that you could tell clearly

23   left an impression on McKinney.  And that's because Menendez

24   was being as forceful as he could to help Hana keep that

25   monopoly.  Using his power as a senator to try to pressure

1    McKinney to change the USDA's position.

2              Remember, doesn't matter whether the pressure on

3    McKinney actually worked.  What matters is Menendez tried to

4    pressure him.

5              So the timeline leading up to that call shows that

6    when Menendez knows there is money in it for Nadine, he swings

7    into action.  From zero to making a call that alarms the

8    undersecretary of agriculture enough that he has to tell his

9    professional staff that he has their back.

10             Menendez gets the request from Hana.  He gets right on

11   it like it's his job, because it is.  Because he's getting paid

12   for it through Nadine.

13             You can tell that with what happens after with the

14   sham job.  The follow through after the job makes the corrupt

15   quid pro quo undeniably clear.  Not even a week after

16   Menendez's call to McKinney that you see Hana here telling his

17   Egyptian contact Nadine is going to be getting $120,000 a year.

18   Not even a week after that official act attempted that there is

19   this thing of value being promised and set up.  You can stop

20   right here in the timeline and that's all you need to convict

21   Menendez and Hana on these counts.  This text tells you Hana is

22   making good on these promises of payment in exchange for

23   Menendez's call to McKinney just days earlier.  You have even

24   more.

25             Week after that is when Menendez set up Nadine with

1    the lawyer to form her consulting company.  The week after

2    that, later in June is when Nadine's asking Menendez if the

3    check coming from Daibes or from Hana.  Then by mid July Nadine

4    has told Menendez about the mortgage company payment, and

5    Menendez is urging her to follow up with Daibes to get it paid.

6    Bob insisted on letting me know.  On me letting you know,

7    rather.

8            But he doesn't stop there.  At the end of July,

9    Menendez is telling Nadine to tell Fred Daibes her company name

10   so that Daibes can write the check.  And then one month later,

11   Fred Daibes is personally putting a $10,000 check into

12   Menendez's hand.  And at that point, when Daibes is delivering

13   one of the bribe payments himself, is where you get all you

14   need to convict Daibes on these counts, too.  Just this

15   sequence.

16           From Nadine texting seems like halal went through in

17   April, to Menendez calling McKinney to protect Hana's halal

18   monopoly in May, Hana beginning to put Nadine on the payroll

19   days later, Menendez setting up a sham consulting company for

20   Nadine in June, pressing Daibes to get Hana to pay the mortgage

21   from that company in July, and getting a $10,000 check from

22   Hana put into his hand by Daibes in late August.  That sequence

23   gives you all you need to prove Counts Five and Six against all

24   the defendants.  You can begin and end with this sequence

25   surrounding the McKinney call to convict all the defendants on

1    the Egypt bribery counts.  But of course there is so much more.

2              The timeline alone shows you this whole time Menendez

3    is still promising more help to Egypt.  Right after calling

4    McKinney, he is fielding a request which comes from Ahmed Helmy

5    to Hana, passed from Hana to Nadine, to him.  To help out in

6    Egypt's negotiations with April Corley, who is injured in an

7    Egyptian air strike.  Ahmed Helmy is saying our decision is we

8    already gave our final offer.  2 million and not a single

9    dollar more.  They don't want to offer more money to this

10   injured plaintiff, and that is the case that Helmy sends Hana

11   images of a document from, Hana sends them to Nadine, and

12   Nadine sends them to Menendez.

13             Doesn't stop there.  In September, Helmy has a

14   question for Menendez.  So he asks Hana is this true?  Hana

15   tries to get through to Nadine.  Then he connects with Daibes

16   who calls Menendez.  Daibes reports back to Hana who gets the

17   message back to Helmy.  All in less than 20 minutes.  What was

18   Helmy asking about?  First of all, doesn't matter.  That kind

19   of immediate access to a U.S. senator already shows how serious

20   Menendez was about his promises to be helpful to Egypt, even if

21   in this case what Helmy was asking about was something minor.

22   But second of all, you know from the evidence and your common

23   sense what Helmy was asking about.  He was asking about the

24   things that Egypt always cared about.

25             And look, couple days later, Helmy is letting Hana

1    know they're getting promises from Menendez's staff about,

2    quote, having things go well in what relates to Egypt.  They're

3    getting the same kinds of promises of assistance to Egypt that

4    Menendez has been giving all along.

5              A few days after that, Menendez is back at it, sending

6    a bill about things in the region through Daibes to Hana to

7    Helmy.  Why does Menendez do it?  For the money to Nadine.

8              All of that, what we've just been through, is days,

9    days before Menendez is again telling Nadine how to collect her

10   money.  In particular, is telling her she should not text or

11   e-mail Fred Daibes, a phrase we'll come back to in a moment.

12             Quid pro quo.  This for that.  Promises made to Egypt

13   and protection of the monopoly Egypt gave Hana, for checks from

14   that very monopoly right into Menendez's hand.

15             The timeline tells you what happened.  When Menendez

16   hears Nadine is going to get paid, he springs into action again

17   and again.  The exhibits in this chart are everything you need

18   to prove the corrupt quid pro quo.  You've heard the evidence,

19   but if you want to see it again, you can write down the number

20   of this chart and then look at every exhibit in it that you

21   want.  Government Exhibit 1302.  Just based on the evidence in

22   this timeline alone, even if there were nothing more than what

23   we've just been through, we would be done with these elements.

24   But there is so much more.

25             Beyond when he acted, look at the kinds of things that

1   Menendez did or promised.  Again and again, he did things or he

2   promised things that were not just ordinary.  That's the second

3   way that you know these elements are met.

4           Now, to be clear, this is absolutely not necessary for

5   you to find these elements proven.  In fact, I expect that

6   Judge Stein will instruct you, even if Menendez would have done

7   all these things anyway, even if all these things were in the

8   U.S.'s interest, these elements can be proven, so long as part

9   of his motivation for doing so or promising to do so or

10  attempting to do so was a corrupt quid pro quo.  In fact,

11  Menendez didn't even have to do anything at all, let alone do

12  anything out of the ordinary.  Even if you thought everything

13  Menendez did or promised to do was the most normal thing in the

14  world for him, the kind of thing he should be doing, should be

15  doing in the public interest, these elements are still proven

16  if there was the promise of an official act, and if he made

17  that promise, even in part, because of things of value he was

18  getting with corrupted intent.

19          You can't take a bribe for promising to perform an

20  official act, even if it's an ordinary and routine act.  But

21  you know from this trial that what Menendez promised was not

22  ordinary.  That's another reason you know it was a corrupt quid

23  pro quo.

24          Let's take a look.  So you've seen this before.

25  Menendez is promising an official act here.  The approval of a

1  sale of $99 million in tank ammunition.  Now, of course, you've

2  heard the actual sale itself was supported by the State

3  Department.  Was supported by the administration.  Planning on

4  approving on a sale like that is not out of the ordinary.

5       What is out of the ordinary?  First of all, obviously,

6  why is he texting this to his girlfriend?  Why is Nadine

7  getting involved with anything about $99 million of tank

8  ammunition?  For that matter, why is he asking her to send it

9  to Will Hana, who you heard was at that time a failed trucker.

10  Not that becoming a halal meat certifier would give him any

11  particular reason to know about $99 million of tank ammunition,

12  but he wasn't even a halal meat certifier at this point.

13       All right.  But what else was out of the ordinary

14  about this promised approval?  The speed of the promise to

15  approve.  Menendez is saying here's going to sign off today.

16  That's July 26, 2018.  That's within the 40-day period.  And

17  you know that that is unusually fast.  Joshua Paul, the former

18  State Department employee, told you it is extremely uncommon

19  for a sale to Egypt to clear within that time period.

20       What you're seeing here, by the way, is a quote from

21  some of his testimony.  What you see being stated here with the

22  white letters TR, those are the page numbers of the transcript

23  from his testimony.  If you want to take notes on that, if you

24  want to request those transcript pages, if you'd like to see

25  them again when you deliberate, just like anything on these

1    slides.

2          So Menendez is promising not just an approval, which

3    is ordinary, he's promising a quick approval, which is anything

4    but.  And Hana and Shawky, they knew this was unusual.  After

5    getting the promise, here they are, you know, Shawky sending a

6    bunch of thumbs up emojis and talking about who will get the

7    credit for it.  Saying the people should repay the kindness.

8    Another reason you know that this promise of an official act

9    was part of a corrupt quid pro quo.

10          But that's not even the most unusual official act or

11    promise Menendez took.  Let's talk about what he did to protect

12    the monopoly that his bribes will be paid from.  Not just his

13    bribes, also the monopoly, it was going to make Hana rich and

14    was going to put millions of dollars of investments into

15    Daibes' business through joint ventures, which we're going to

16    talk about.  This monopoly was going to be a payday for all

17    three of them, Menendez, Hana, and Daibes.

18          So what did Menendez do to protect that payday?  You

19    heard it from Undersecretary McKinney.  Menendez's call was the

20    only time, the only time he had ever gotten a call from a

21    member of Congress that was advocating for a constituent at the

22    expense of the rest of the United States.  You know it was

23    unusual, and you know it was an attempt to pressure McKinney.

24    Menendez didn't raise his voice, and Menendez didn't say he was

25    going to retaliate against McKinney about this.  He didn't need

1    to.  Menendez was the ranking member of the SFRC.  He didn't

2    have primary jurisdiction over the farm bill that funded

3    McKinney's agency, but parts of that bill came before him.  You

4    heard that from Sarah Arkin who worked for Menendez at the

5    SFRC.  And McKinney knew that Menendez was powerful and

6    influential in Washington.  He told you that.  And he also told

7    you how he responded.  You saw he had to reassure his staff

8    that he had their backs.  And that's the only time that after

9    getting a call from a member of Congress that McKinney had to

10   reassure his staff.

11            This is not an ordinary call.  It is not just McKinney

12   that says a call like this is unusual.  It's Menendez.  It is

13   his own website.  "Our office cannot overturn or influence

14   matters involving private businesses."  That's what he told the

15   world.  That's what he told the people who weren't paying him.

16   But for Hana, it was totally different.  For Hana, Menendez

17   sprang into action to try to do exactly that.  He tried to

18   overturn or influence what the USDA was doing involving Hana's

19   private halal business.  A business that just so happened to be

20   generating money that was promised to Nadine.

21            That's another reason you know there was a corrupt

22   quid pro quo.  An official act to protect the monopoly of a

23   business that had promised to put some of those monopoly

24   profits right into the pocket of Menendez's girlfriend.

25   Another way you know these elements are proven.

1            That monopoly, by the way, doesn't just show you

2    Menendez's intent.  It also shows you Hana's intent and shows

3    you Daibe's intent also.  For Hana, it is obvious this was his

4    payday.  None of his businesses had succeeded until Egypt

5    dropped this lucrative monopoly in his lap so of course he's

6    going to pay Menendez to protect it.  But this monopoly will

7    pay Daibes too.  Daibes signs, a few years after this monopoly

8    gets up and running, signs a multimillion dollar joint ventures

9    with Hana.  Hana only has this money from the monopoly.  That's

10   where the money he invests with Daibes comes from.

11           Daibes puts checks from the halal monopoly right into

12   Menendez's hand, and Daibes in turn got millions of dollars

13   from that monopoly invested into his business.  That shows

14   Daibes knew all about Menendez's promises of official acts.

15           He's Menendez's friend.  He's backing Hana's business.

16   He is the guy that Menendez sends Nadine to get Hana to pay up

17   the bribes from the business.  And Menendez's right to send her

18   to him because Daibes does in fact help Hana pay Menendez the

19   bribes from that business.  And Daibes is getting millions of

20   dollars of investments from that business.  Of course he knows

21   what Menendez is doing for that business.

22           In any event, Daibes sure knows about the information

23   that Menendez is sending around about promises of official

24   acts, because he uses Daibes to pass that information along to

25   others in the scheme.  Right.  We just saw where Daibes

O783MEN5                    Summation - Mr. Monteleoni

1   answered Helmy's questions of Menendez that were passed through

2   Hana really quickly.  And here.  Here he got a draft of a bill

3   from Menendez.  He got that from Menendez, and he passed it

4   along from Hana to Helmy.

5           The evidence is clear that Daibes knew about

6   Menendez's promises of official act.  So this special treatment

7   to protect a monopoly that benefits both Hana and Daibes, and

8   both Hana and Daibes used to put payments into Menendez's hand,

9   is another powerful reason you know there was a corrupt quid

10  pro quo.  Again, this is all you need to convict each defendant

11  on Counts Five and Six.  There is so much more still.

12          So maybe the most unusual special treatment of all,

13  the ghostwritten letter, here is Menendez using his personal

14  e-mail account to write a letter for the Egypt government

15  against the position of one of his own fellow U.S. senators.

16  It is even against his own public position and the position

17  that Sarah Arkin knows.  As I've said before, it is a way of

18  promising official acts.  Obviously he's not saying he is

19  joining in the objections that's writing a response to.  But

20  even leaving that aside, it is obvious special treatment.  Your

21  common sense tells you that.

22          The special treatment isn't just things that are

23  official acts or a promise of official acts themselves.  The

24  whole pattern of giving Egypt special treatment so that they

25  know that when he does promise them official acts, he means it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    This ghostwritten letter didn't come out of nowhere.  It is a

2    response to the facts that Menendez himself sent to Hana.

3           He was handing out a summary of the concerns that led

4    another senator to hold up aid to Egypt, and then he was

5    helping write a response to those concerns.

6           But that's not all the information that Menendez

7    provided to Egypt.  Here he is, the same day, giving out

8    sensitive, non-public information about the number of Americans

9    stationed abroad and the number of foreign nationals working at

10   the U.S. embassy in Egypt.

11          You heard from Bret Tate early in this trial that this

12   information was highly sensitive because it could help foreign

13   governments identify people working for the U.S. embassy.  Now,

14   eventually, that information would go stale and the number of

15   the employees at the embassy changed.  So, the historical

16   information about what those numbers had been in the past, that

17   wouldn't be sensitive anymore.  It could be publicly released

18   after the fact, as you saw in the trial.

19          But that's not what Menendez was doing.  He was giving

20   them real-time information.  That's what's at American embassy

21   present tense.  You heard from Bret Tate why this information

22   was so sensitive.  It could be combined with other information

23   to allow foreign governments to identify and locate people

24   working with the embassy.  As Bret Tate explained, even if the

25   foreign government knows where to find some of the people

1   working with the embassy, they shouldn't get a roadmap to find

2   the rest.  But that is exactly what Menendez texted out here.

3          Everyone involved knew that this was out of the

4   ordinary.  "Don't ask why I'm asking."  They know this

5   information is sensitive.  If you look up to the middle e-mail,

6   Tiernen Miller at the State Department said she needed a reason

7   to disclose it.  In order to get this information, I would have

8   to ask and someone is going to ask why.

9          But the reason, if you look at the top, is Menendez is

10  asking.  That's how much responsibility he was trusted with.

11  His name was reason enough to disclose sensitive information.

12  Information that Menendez then texted out through Nadine to

13  Hana, and it went to Hana, from Hana to Ahmed Essam, one of the

14  Egyptian government officials that Hana was always texting

15  with.

16          This wasn't just a one-time thing.  Hana sits down to

17  dinner with Menendez.  Next thing he's texting the Egyptian

18  defense attache that the State Department has given a heads up

19  that they're lifting a ban on small arms to Egypt.

20          He keeps doing this even years later.  The head of

21  Egyptian intelligence is coming to meet with U.S. senators in

22  2021.  That's usual enough.  But the day before the meeting,

23  what does Menendez do?  He meets with them at the hotel for a

24  special meeting his staff didn't know about.  And then, he

25  sends the Egyptian government an article through Nadine that

1    his own fellow U.S. senators are planning to ask about reports

2    that Egypt was involved in a human rights abuses.  In this

3    case, the notorious murder of the U.S. resident Jamal Khashoggi

4    by Saudi Arabia.  Why?  He's doing it so that the Egyptian

5    government can prepare their answers.  Wanted to give you a

6    heads up so you can prepare your answers is what Nadine says

7    when she's sending along what Menendez sent her.  So the head

8    of Egyptian intelligence can better defend himself against

9    questions Menendez's own fellow U.S. senators have about

10    whether Egypt committed a human rights abuse.

11            By the way, remember those small Asahi 1-ounce bars of

12    gold from Hana, some of which found their way into Menendez's

13    house?  Hana bought them the day after this meeting with the

14    senators.  The special treatment was frankly obvious.

15    Menendez's SFRC staffer Sarah Arkin knew it when Menendez told

16    her he was changing approaches right during this spring 2019

17    timeframe when Hana's halal company was just in the process of

18    getting approved.  Right when Hana was becoming in a position

19    that he would be able to deliver on the promised bribes.

20            And you saw it in the text messages.  Menendez along

21    with Nadine and Mai Abdelmaguid tried to plan a special trip to

22    Egypt.  Not a normal CODEL planned by the U.S. government.

23    This would be a trip that would be planned by Abdelmaguid.

24    When Sarah Arkin followed the normal procedure, Mai said she

25    would lose her job.  She said SOS.  SOS now it has to be a

1   normal CODEL.  SOS because the State Department learns about

2   the trip and gets involved.

3          This wasn't just Nadine and Abdelmaguid saying this to

4   each other.  Nadine forwarded this to Menendez, SOS and all.

5          So how does Menendez respond.  Does he say why should

6   Abdelmaguid lose her job just because the CODEL has to be

7   planned in the ordinary way?  Does he say why does the State

8   Department finding about my trip to Egypt an SOS?  No.  "Taken

9   care of."  He knew exactly what was going on.  He took care of

10  it.

11         Sarah Arkin wasn't even on these messages.  She never

12  saw these messages and she still knew the way Menendez was

13  behaving about Egypt was weird.  It wasn't just her.  Damian

14  Murphy, Menendez's own staff director knew it.  "All of this

15  Egypt stuff is very weird.  I've never seen anything like it."

16  I've never seen anything like it.

17         Sarah Arkin told you this wasn't just about the CODEL.

18  It was in connection with the CODEL and beyond.  And beyond.

19  Damian Murphy and Sarah Arkin knew Menendez was acting weirdly,

20  but they didn't know why.

21         After hearing and seeing the evidence at this trial,

22  you know what they didn't.  The softening of his public

23  statements, the secret meetings, the sharing sensitive

24  information, secretly advising and defending Egypt, even while

25  trying to hold onto his public reputation as one of its

1    toughest critics.  Menendez wasn't acting weirdly.  He was

2    acting corruptly.  He was acting like a bribed man, because

3    that's what he was.

4          Which bring us to the next reason you know it was a

5    corrupt quid pro quo.  The bribes themselves.  We've already

6    talked about this in the second element, but let's state the

7    obvious.  The fact that Menendez knew Nadine was getting these

8    things of value is powerful evidence that this was a corrupt

9    quid pro quo.

10         We've been through some of the evidence that Menendez

11   knew about the things of value.  What I want to focus is what

12   that means about the quid pro quo.  Why are Hana and Daibes

13   giving Nadine these sham job payments?  And why is Menendez

14   accepting them?  Menendez knows Nadine is not a consultant.  He

15   knows she's not getting paid for her consulting skills.  You

16   even got confirmation of that from her sister.  Nadine didn't

17   have a job, she didn't work, and IS EG's own office manager

18   confirmed she never saw Nadine do work.

19         Why is Nadine getting paid by IS EG?  What does she

20   bring to the table?  She brings Menendez's power and influence.

21   Menendez knows it.  He's been working on her résumé.  He has

22   helped her through every stage of setting up this supposed

23   consulting business.  Hana knows it too.  When his contact asks

24   him for job titles and descriptions, he gives other people real

25   responsibilities, but Nadine he just makes a vice president.

He doesn't know what she's going to do, he just knows she is going to be his second highest paid employee.

You heard from one of Hana's employees about Nadine sending a few text messages and e-mail about looking at office space in India. That's obviously not what she was getting paid $30,000 for. You heard Hana asked her to look at offices, she sent an e-mail about looking at a few offices, and a few weeks later she got another $10,000 checks.

That's not a real consulting job. That was a fig leaf. Nadine wasn't getting hired to doing real work. She wasn't fired either. She didn't act fired. Nobody took any action to fire her. Hana just paid her the last of the agreed-upon checks and she stopped pretending to do work. The job was a sham, and Hana knows it.

Howard Dorian, Hana's lawyer, he knows it too. If we don't keep Nadine happy, she'll cancel the meetings with Menendez. And obviously who would have to agree in order for these meetings to get canceled? Menendez himself. She doesn't have the ability to reach in and cancel Menendez's own meetings against his will. Howard Dorian knows Menendez is in on it.

Who else knows? Fred Daibes. Nadine complains to him about not getting paid, and she complains that Hana wants her to come into the office. This is one of the first times that Nadine has ever spoken to Daibes on the phone, and she doesn't have to explain any context. Daibes already knows. The idea

1    that Nadine would have to come into the office and do some work

2    for the money, that's obviously not what they agreed to.  So,

3    that's why the fact that Hana is saying now in late June of

4    2019, oh, you got to be in the office eight hours a day, that

5    doesn't mean he thinks it's a real job.  That means he's

6    already gotten what he wants from Nadine, he's gotten the

7    monopoly, and he's gotten Menendez to protect it.  Now he

8    doesn't want to have to pay, so of course he's throwing up

9    barriers.  But in the end, he ends up paying her for no real

10   work.

11          Just like the other things of value, gold bars, payout

12   on the mortgage, these checks are another reason you know it is

13   a quid pro quo.

14          The next reason is the secrecy.  Menendez, Hana,

15   Daibes, and even Nadine, they don't act like these things of

16   value are unrelated to Menendez's promises or his official

17   position.  They act like they have something to hide.

18          Because this is a new section, this might be a good

19   time for a break.

20          THE COURT:  10 minute, ladies and gentlemen.

21          (Jury excused)

22          THE COURT:  Let me see counsel at sidebar very

23   briefly.

24          (At the sidebar)

25          THE COURT:  I'm just going to ask once again that

 1   counsel have a game face on.  Don't show skepticism,

 2   disapproval or approval, for that matter, of what a lawyer is

 3   saying.  Game face for everyone.  Thank you.

 4              (Recess)

 5              (Jury present)

 6              THE COURT:  Mr. Monteleoni, you may continue.

 7              MR. MONTELEONI:  Thank you, your Honor.

 8              So as we left off before the break, the next reason

 9   that you know that there was a corrupt quid pro quo is the

10   secrecy.  Look at how Nadine reaches out to Daibes about

11   getting her mortgage payment here.

12              After Menendez calls her, she says, I just got a phone

13   call asking me to give you a call.  A phone call from who?

14   Well, from Menendez.  But why not just say it.  Daibes and

15   Menendez have been friends for years.  Why not just tell Daibes

16   that Bob told her to call.  Because she knows Menendez wants

17   his fingerprints off it.  And Daibes, of course, understands

18   this perfectly.

19              Why do Daibes and Menendez want Menendez's

20   fingerprints off of it?  Because it's part of a corrupt quid

21   pro quo and because they don't want to get caught.

22              The secrecy isn't just Nadine's idea.  It comes

23   straight from Menendez.  Here, in September of 2019, Nadine

24   wants her next bribe check.  She wants to follow up with

25   Daibes, but she knows she has to clear it with Menendez if

1   she's going to text Fred.  And what does Menendez tell her?

2   Wait.  Don't text Fred.  But Nadine still really wants her

3   check.  I really want my check.  So, she asks Menendez again,

4   let me know if I should text Fred.  And again, she wants to

5   text Fred, but needs permission.  Please let me know if I

6   should text Fred.  This sequence is happening within minutes of

7   each other.  Nadine's really following up.  What does Menendez

8   say?  No.  You should not text or e-mail.  He doesn't want this

9   in writing because these aren't consulting checks, they're

10  bribe checks.  And he knows it.  And that's one more reason

11  that you know it.  This message alone is devastating evidence

12  of Menendez's consciousness of guilt.  His awareness that

13  putting something in writing about the checks could create

14  evidence of a crime.

15          It also shows that Menendez was calling the shots.  As

16  you see from this sequence, Nadine needs to get his permission,

17  and she needs to get his instructions before reaching out to

18  demand more bribe payments, even when these payments are

19  supposedly for her job about her consulting services.

20          But they don't stop with the secrecy there.  She says

21  she sent the picture of the guy who orders the elliptical.  If

22  this elliptical is a totally innocent gift of friendship from

23  Hana, why not just use his name?  Why use code?  Because it's a

24  bribe.  The lady who gave me the scarf.  Again, why not just

25  say Mai when you're texting to Menendez.  Because they're a

1    part of a criminal conspiracy with her.

2           Hana and Daibes do the same thing.  Our friend would

3    like to have dinner on Thursday night.  This is Menendez.  But

4    when Daibes texts Hana, he's "our friend."  Giving the perfect

5    amount of deniability for when Hana then forwards that text to

6    Helmy, which you can see he does minutes later.

7           This kind of secrecy is another reason why you know

8    that they know that there is a corrupt quid pro quo.  Why not

9    mention Menendez's name?  Why take so much care to avoid

10   putting it in texts?  You know why.  Because they know these

11   are bribes.

12          And that brings us to the next reason why you know

13   there was a corrupt quid pro quo.  After Menendez finds out

14   about the investigation, he lies.  He pretends he didn't know

15   about any of this.

16          Let's start with the checks.  You remember this

17   PowerPoint presentation presented to the U.S. Attorney's

18   Office.  Well, he has his lawyers say that he didn't know about

19   that first check, even though Daibes handed it to him.  For the

20   second check, again, he had his lawyers say he didn't know

21   anything about it, even though Nadine told him all about how

22   much she wanted it on her way to getting it, so much that, as

23   we've just seen, he told her not to put it in writing.  And

24   then for the third check, he had them say that he didn't know

25   about that one either, even though that's the one that Daibes

1   offered to hand him.

2         Remember, he didn't have his lawyers say he knew about

3   the checks and they were fine because they were just legitimate

4   consulting payments that have nothing to do with any quid pro

5   quo.  He didn't have his lawyers say there's no problem with

6   picking up the first check from Daibes because it wasn't part

7   of a quid pro quo.  No, he had his lawyers say he didn't know

8   about the checks at all.  A complete lie.  Because he knew it

9   was part of a quid pro quo, he knew they were bribes.

10        It wasn't just the checks.  Same thing with the

11  mortgage company payment.  He had his lawyers say he didn't

12  know anything about it and that it was a loan.  But that wasn't

13  true either.  Nadine told him about the mortgage payment when

14  she got back from a trip with Menendez, just like she had told

15  Daibes she would.  And then Menendez followed up to make sure

16  that she followed up with Daibes to get that payment.

17        And let's be clear.  There is no reason a loan cannot

18  be a bribe.  If there had been an agreement that Hana would get

19  paid back, a 2 years zero interest loan would still be a bribe,

20  would still be a thing of value, if it was made as part of a

21  quid pro quo.  But here it wasn't even a loan.  How do you know

22  that?  Because Nadine put that in writing.

23        Nadine here is deducting the amount of that mortgage

24  company payment, that's the top red box, from the amount that

25  she is saying that Hana has to pay her as part of the paychecks

1    she's wanted.  She's deducting the payment from the paychecks

2    she wants.  Obviously, Nadine is not planning on paying her

3    paychecks back.  So, by deducting the mortgage company payment

4    from the paychecks, she's saying she's not planning on paying

5    that back either.

6          This was never a loan.  It was a bribe.  A bribe that

7    Menendez lied about, pretending he didn't know anything about

8    it, when he very clearly did.  But there's more.

9          Remember those financial disclosure forms?  So those

10   were lies, too.  Menendez had to file financial disclosure

11   forms because the public has a right to know where public

12   officials are getting their money.  This is part of the basic

13   transparency that our laws require.  And once he married

14   Nadine, he had to report what she received.

15         So, when he received a kilo of gold in October 2021,

16   from Fred Daibes stopping by with gold and doughnuts like we

17   talked about, he had to disclose that as income.  If it was a

18   gift, he would have gotten permission from the ethics committee

19   and disclose it as a gift.  Did he do that?  No.  What did he

20   do instead?

21         Well, in early 2022, he and Nadine were getting ready

22   to sell the gold.  And you heard why.  They wanted to pay down

23   their mortgages so that he could either buy a new house or

24   build a new house, but you can't buy a house with gold bars.

25   You can't pay a construction company with gold bars.  They had

1    to get the money into their bank accounts.  They had to go into

2    the financial system, but there is a problem.  Putting money

3    from the sale of gold would create a paper trail showing that

4    they received tens of thousands of dollars.  A paper trail that

5    risks raising questions about where that gold and money came

6    from.

7            So, what did Menendez do?  He went to the ethics

8    committee, but he didn't tell them he had gotten this gold in

9    October 2021 as a gift and it was fine because it wasn't part

10   of a quid pro quo.  No.  He knew he had to hide how he had

11   really gotten the gold, so he claimed that he had just learned

12   about it more than a year after his marriage to Nadine, and

13   that it was old gold from his wife's family before their

14   marriage.  Those were lies.  As we've seen, it was from Fred

15   Daibes.

16           Now, like the best lies, this is built around a kernel

17   of truth.  Nadine had gotten some gold in some form from her

18   family in the past.  But the gold that Menendez was Googling on

19   October 18, 2021, wasn't Tabourian family gold.  It was gold

20   that Daibes had just stopped by with.  Family gold is just

21   where they got the idea for the lie.

22           And see right there?  How he told Shannon Kopplin, the

23   ethics counsel, how he needed to use it to pay down the

24   mortgage.  That's why he was disclosing it at the time.  But he

25   doesn't stop at lying to the ethics counsel.  He then filed an

O783MEN5                    Summation - Mr. Monteleoni

1    amended form for 2020, a form trying to build a paper trail

2    that this was Nadine's old family gold from before the

3    marriage.

4              So when the time to came to file for 2021, he didn't

5    list the gold that Daibes gave him that year as income, and he

6    didn't list it as a gift.  He didn't list that he had received

7    it at all.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              MR. MONTELEONI:  And he said this form was complete

 2     and accurate.  He lied.  He lied to hide the fact that he and

 3     Nadine had gotten a kilo of gold from Fred Daibes.  That's

 4     another reason you know that there was a corrupt *quid pro quo*.

 5              Here's one more.

 6              Everything that we've talked about is just one part of

 7     the broader scheme, the broader pattern of corruption you've

 8     seen from the start to the finish of this case.  McKinney isn't

 9     the only government official that Menendez reached out to on

10     behalf of someone who was paying him.  I'll go over the others

11     in a minute, but when I get to the New Jersey attorney general

12     conduct, you can ask yourself.  If Menendez is reaching out to

13     the attorney general of New Jersey on behalf of someone who

14     just happens to be paying his girlfriend, how can it be a

15     coincidence that he's doing the exact same thing with Under

16     Secretary McKinney on behalf of someone who just happens to be

17     paying her too?

18              And when we get to the New Jersey U.S. Attorney

19     conduct, how can it be a coincidence that he's trying to help

20     the case of someone who just happens to be paying him when he's

21     also trying to help the business here of someone who also just

22     happens to be paying him?

23              When we get to Qatar, when Menendez is trying to

24     please people he thinks are connected to a foreign government

25     that might benefit the business of someone who just happens to

1    be paying him, how can that be a coincidence when he's trying

2    to do the exact same thing with the government of Egypt?

3            Common sense tells you when Menendez did the same

4    thing again and again, it wasn't a coincidence.  It was a

5    corrupt *quid pro quo* -- this for that, money, gold and

6    valuables from Hana and Fred Daibes for promises of official

7    acts to protect and enrich Hana and Daibes and their

8    associates, another reason that you know it was a corrupt *quid*

9    *pro quo*.

10           So that's six reasons, six reasons that you know it

11   was a corrupt *quid pro quo*, six reasons that you know the third

12   and fourth elements are proven.  Six reasons that you know of

13   Menendez is guilty of Count Five.  Six reasons that you know

14   that Hana and Daibes are guilty of Count Six.

15           Let me also talk about something called venue for a

16   minute.  It's not an element.  It's something that the judge

17   will instruct you has to be proven.  Venue, unlike the

18   elements, only has to be proven by a preponderance of the

19   evidence.  It doesn't have to be beyond a reasonable doubt,

20   just that it's more likely than not.  And venue just means that

21   for some essential part of the offense, something that's part

22   and parcel of the core offense conduct, whether that's an

23   element or something that's part and parcel of an element, it

24   has to have happened in the Southern District of New York.

25   Doesn't have to be known to all defendants, but it does have to

1    be foreseeable.  They have to foresee that an act that's part

2    and parcel of the offense is going to be done in the district.

3         So there's plenty of bases for venue on these counts,

4    but here's one obvious one.  When Menendez and Nadine are in

5    Mr. Chow in Manhattan at the dinner in June that we saw, Hana

6    pays for their dinner.  So that's actually a thing of value

7    right there.  That's enough, but also, when Hana from Mr. Chow

8    sends Shawky a WhatsApp message that's scheduling that July

9    meeting and dinner, that July meeting's right before Menendez

10   sends that promise about the tank ammunition, that's part and

11   parcel of Menendez's promises and of what leads to Menendez's

12   promises.  So that right there is also enough for venue without

13   even getting to the other bases like Khorozian selling gold in

14   New York for Nadine.

15        Then, finally, so for this count and for several of

16   the other counts that Fred Daibes is charged with, you're going

17   to be called upon to find that he was on bail at the time of

18   the offense.  So here, there's a stipulation that you can look

19   at, where the parties agree that he was released, since back in

20   November 2018.  That covers the time period of what we've been

21   talking about that Daibes did in these offenses, so this is

22   proven for Count Six.  I'm not going to keep mentioning it,

23   since it's the same for each count, but this is also proven for

24   the other counts that Daibes is charged with, where you're

25   going to be asked to find whether or not he was on bail at the

O78Wmen6                        Summation - Mr. Monteleoni

1      time.

2              So we are done with Count Five and Count Six.

3              Menendez, Hana and Daibes are guilty.  So those are

4      among the longest counts.  I'm not going to spend as much time

5      on those three others.

6              The next three counts in particular are going to go

7      much more quickly.  So let's go to the next count.

8              Count Seven, honest services wire fraud.  This is

9      against Menendez, Hana and Daibes.  Remember, this also relates

10     to the Egypt part of the scheme.  Honest services fraud is a

11     federal law that makes it a crime for an elected official to

12     deprive the people, the citizens he represents, of his honest

13     services.  And providing people with honest services means you

14     can't take official actions in return for bribes.  So we've

15     already covered the key evidence for this part of the scheme.

16     I'm going to go much faster here.

17             The first element is that there's a scheme to defraud

18     the public of its right to the honest services of Menendez as a

19     U.S. senator and the chair or ranking member of the SFRC

20     through bribery.  Here, the same evidence we were just looking

21     at -- that Menendez is a public official, that he received

22     things of value from Hana and Daibes and he did so as part of a

23     corrupt *quid pro quo* with Hana and Daibes in exchange for

24     promises to take official acts -- those satisfy this element

25     for Count Seven.  I expect that Judge Stein will instruct you

the same instructions on *quid pro quo* apply to this element of

honest services fraud.  This count is based on the same *quid*

*pro quo* as those counts we just looked at, Counts Five and Six,

so the same proof that we just went through proves this element

too.  So we're done with the first element.

       The next element is intent to defraud.  I expect Judge

Stein will instruct you that this can include things like

hiding things of value.  So was there intent to defraud here?

Of course there was.  Remember the secrecy that we were just

talking about?  All of that is evidence of intent to defraud.

The sham job, the lies on the financial disclosure forms, the

lies to the U.S. Attorney's Office for the Southern District of

New York, that's all proof of Menendez's intent to defraud.

       And it wasn't just Menendez.  All three defendants

were all trying to hide the bribe payments.  Menendez lied on

the disclosure forms, told Nadine not to text or email and

helped her set up the sham company to collect the paychecks.

Hana paid that sham company paychecks for a bogus job, and

Daibes handed off some of those checks for the bogus job.  And

the whole job, remember, was a sham but didn't disguise the

fact that Hana was paying Menendez, and Hana and Daibes both

knew Nadine wasn't planning on doing real work.  They all had

intent to defraud.  That element is proven.

       That takes to element three.  The scheme must have

involved a material misrepresentation, false statement, false

1    pretense or concealment of fact.  Was there here?  Of course

2    there was.  The same proof of intent to defraud proves that

3    here -- the false financial disclosure forms and the efforts to

4    set up the sham company for Menendez; Hana and Daibes, the

5    bogus paychecks that Hana issued and that Daibes delivered, all

6    to hide from the public that they were not receiving the honest

7    and faithful services of Robert Menendez.

8            Brings us to the last element of Count Seven, an

9    interstate or international wire.  That means a wire that can

10   include a phone call or a text message across state lines.

11   This one's easy.  So hana's right here in Midtown Manhattan,

12   June 2018, and he sends WhatsApp messages to Shawky, setting up

13   a meeting and a dinner with Menendez in July.  I expect that

14   Judge Stein will instruct you that the wire itself doesn't have

15   to contain any fraudulent representation, doesn't have to

16   contain any request for money.  All that's needed is that it

17   furthers or assists in carrying out the scheme.  And that's

18   what these messages do.

19           They set up the July meeting and dinner.  And again,

20   as you heard, that's not just any meeting or dinner.  That's

21   the meeting or dinner right before Menendez promises to do a

22   speedy approval of that tank ammunition sale.  So those

23   WhatsApp messages from Mr. Chow setting up those meetings are

24   wires in furtherance of the scheme.  OK, they're wires, but did

25   they go interstate?

1      Yes, they did.  They were actually WhatsApp messages,

2   and WhatsApp messages are all processed by servers located out

3   of New York State.  You see the stipulation here establishing

4   that.  So any WhatsApp message from New York is going to have

5   to be interstate.  So those wires right there are all you need.

6   Last element for honest services wire fraud is proven, and that

7   wire is enough for venue for this count since it was sent from

8   right here in Manhattan, from midtown.

9      So we're done with Count Seven.  Menendez, Hana and

10   Daibes are guilty.

11      Let's look at the next count.

12      Count Eight, extortion under color of official right.

13   Just against Menendez.  This charge, again, relates to the

14   Egypt part of the scheme.  And extortion under color of

15   official right essentially means Menendez used his official

16   position to get payments he wasn't otherwise entitled to.

17   Again, we can do this one quickly.

18      Public official, that's undisputed.

19      Let's go to the next element.  Menendez must have

20   obtained property for himself or another person other than just

21   the salary and benefits he was entitled to as a senator.  So

22   here, the exact same proof of a thing of value that we

23   discussed for Count Five and Count Six proves this element too.

24   We don't have to go over it again.

25      The third element essentially requires a *quid pro quo*.

1    I expect the judge will instruct you *quid pro quo* here has the

2    same definition as it does for honest services fraud.  And so

3    that means the same proof that we were just talking about for

4    Counts Five, Six and Seven satisfy this element too.

5           Now this fourth element, the interstate commerce

6    element, just has to prove that interstate commerce or an item

7    moving in interstate commerce was delayed, obstructed or

8    affected in any way or degree.  And I expect the judge will

9    instruct you this effect can be minimal.  So if a single

10   payment obtained by a defendant went through interstate

11   commerce, that's enough.

12          Here, that's easy.  If you look here, when IS EG Halal

13   was paying to make Nadine's mortgage current, they sent a wire

14   transfer to John Moldovan, the lawyer, for him to essentially

15   write the cashier's check from New Jersey to California in a

16   wire that is processed by the Federal Reserve Bank of New York.

17   So that is a payment through interstate commerce.

18          It's not the only one, of course.  When Vasken

19   Khorozian went to Manhattan to sell gold bars and brought a

20   check back to New Jersey for Nadine, that's also an effect on

21   interstate commerce, but just one is all you need.  So this

22   element is proven as well.

23          Venue is also easy.  The Mr. Chow payment or the

24   Vasken Khorozian selling the gold in New York, either one of

25   those is enough.

1              Menendez is guilty of Count Eight.  Menendez is guilty

2    of extortion, and he, Hana and Daibes are all guilty of bribery

3    and honest services fraud.  Menendez was entrusted with

4    oversight of our nation's foreign policy and all the powers

5    that come with it, and he sold all of that trust and all of

6    that power for the benefit of Hana and of Egypt for money and

7    gold, money and gold that Hana and Daibes, who both wanted to

8    share in the profits of a monopoly that Egypt gave Hana, they

9    were all too willing to pay.

10             Let's move on from Egypt to another part of the

11   scheme.  Count Nine, this is honest services fraud.  This

12   relates to Menendez's promise to disrupt the New Jersey

13   attorney general's prosecution and investigation of José

14   Uribe's associates.  This count is against Menendez and Hana.

15   We haven't talked much about this part of the scheme yet, so

16   this is one of the counts we're going to spend more time

17   discussing.

18             Let's look at the first element, which is what we're

19   going to spend the most time on -- scheme or artifice to

20   defraud.  Essentially, was there a corrupt *quid pro quo* for

21   promises of official action?

22             So before we get started, I want to point out one

23   little aspect of the law that differs here from the bribery

24   charge we talked about.  I expect that Judge Stein will

25   instruct you that for honest services fraud, if Menendez

promised or agreed to pressure a state official, not just a

federal official, that can be honest services fraud if all the

other elements are satisfied.  So that means that if you find

that Menendez attempted and promised to advise or pressure

Gurbir Grewal, then that can be a component of a corrupt *quid*

*pro quo* even if he was a state official.  In fact, if he just

promised to advise or pressure Grewal but never even tried.

So let's start.  How do you know that there was a

corrupt *quid pro quo* for promises of official action in this

part of the scheme?

Well, each of the same reasons that prove the *quid pro*

*quo* for the Egypt counts applies here -- the timeline, special

treatment, the things of value, the secrecy, the lies and the

scheme.

Let's go through each of them.

The first reason you know is the timeline.  Now, this

timeline is, if anything, even more overwhelmingly obvious than

the last.  Take a look at just a few key moments.  January 15,

2019, this is after Menendez and Nadine broke up for a month or

two at the end of 2018, but they're back together now.

Nadine's lost her car in an accident in December, a month

before this.  She's telling Hana she doesn't have a car.

January 15.  What does Hana do?  Well, the next day he starts

sending her information about the Elvis Parra prosecution.

Is Hana the only one who knows that Nadine needs a

1   car?  Of course not.  Look at this.  Menendez and Nadine went,

2   also in January, and test drove a Mercedes C-300, but the

3   prices are too high monthly to finance, and Menendez knows

4   this.  He knows she can't afford it.  You see in this message,

5   he tells Nadine to ask her friend who knows somebody in the

6   business.

7           What kind of car does she want?  A Mercedes-Benz C-300

8   convertible.

9           Well, what does Menendez do?  He sees how much he

10  could sell another car for, and he looks at how much a Mercedes

11  C-300 costs.  So he knows what she can afford and what she

12  can't afford.

13          What does he do next?  He meets Nadine at the auto

14  body shop to empty her old car out, and the very same day, he

15  invites Uribe and Hana to a meeting.  This is not a

16  coincidence.  He invites them to solve the very same problems

17  they spent the last few days on.  Nadine wants a new Mercedes.

18  Menendez invites Hana and Uribe over the very same day he and

19  Nadine go to the auto body shop so that he can use them to get

20  a car for Nadine?  How?  By promising to intervene in Elvis

21  Parra's case.

22          How do you know that?  Menendez, Nadine and Hana have

23  the meeting, and hours after the meeting, Hana is resending

24  Nadine info about the Parra case.  He knows what they talked

25  about at this meeting.  Parra's case.  Nadine doesn't respond

1    and say, what's this about?  Why are you sending me this?  She

2    knows.

3            And what happens just two days after that meeting?

4    Menendez calls Nadine's flip phone, January 29, 2019, 11 a.m.

5            Talk more about the flip phone later, but here, he

6    calls it and he asks for the info about what case he should

7    intervene into.  How do you know that?  You can see it.

8    Immediately after getting off the phone with Menendez, Nadine

9    calls Hana.  Hana asks Parra for Parra's address.  Hana gets

10   that and sends it to Nadine.

11           What does Nadine do?  She asks what the charges are.

12   And look what Hana sends -- the case number and a very basic

13   description that it's a small case.  He doesn't send evidence

14   of discrimination.  He doesn't send evidence that anyone has

15   been treated differently than anyone else.  He doesn't send any

16   of that.  Why?  Because Menendez couldn't care less about that.

17           How do you know that?  Well, look at what Menendez

18   does.  He talks to Nadine on the flip phone for less than two

19   minutes, and then he calls the New Jersey attorney general, the

20   ultimate boss of the law enforcement officers handling Parra's

21   case -- later that same day, just hours after first calling

22   Nadine on her flip phone that day, days after meeting with

23   Hana, less than a week after googling the price of the car

24   Nadine wants.  What you didn't see in that timeline was any

25   evidence of any research Menendez did into whether there was

1    any discrimination in Parra's case at all.  He didn't make the

2    call to Grewal based on careful consideration of evidence of

3    discrimination.  He made the call based on careful

4    consideration of the Google search results for how much does a

5    Mercedes C-300 cost.

6          By the way, why is Menendez looking to Nadine as the

7    one to send him information about this case?  Menendez has a

8    robust staff.  He has professionals to handle issues about

9    policy.  He could look -- he could ask them to look into

10   criminal justice issues.  What does Nadine know about the

11   policy issues involved in insurance fraud prosecutions?  The

12   only reason she's involved, the only reason he is communicating

13   directly with her about this is the scheme.

14         Look what happens right after.  Now that Menendez made

15   the call, it's time for Hana to deliver.  So Hana goes to Fred

16   Daibes, just two days after the call.  Two days after that,

17   what does Nadine think?  All is great.  I'm so excited to get a

18   car next week, a car that she couldn't afford, the car that

19   Menendez knew that she couldn't afford.  All of a sudden she's

20   going to get it.  Why?  Because Menendez promised to interfere

21   in a criminal prosecution in exchange for Hana's promises of a

22   car.

23         But the same problem that we saw in the Egypt part of

24   the scheme comes up.  Hana's not following through.  Remember,

25   he hasn't gotten his monopoly yet, so he's still broke.  So

1    what does he do?  Hana tries again to get Daibes to step up

2    with the car.  But Daibes isn't doing it.  So look what happens

3    next.  Look who sets in motion what's going to lead to Nadine

4    actually getting that car.  Look who's involved in this.  Watch

5    this part carefully.

6           First, José Uribe says to Bienvenido Hernandez, tell

7    them that we're ready.  Hernandez and Uribe both have an

8    interest in the investigation.  We're ready to pay the

9    necessary bribe.  Well, later that day, Andy Aslanian, Ana

10   Peguero's lawyer, and close with Uribe, calls Nadine late at

11   night, talks for 25 minutes, starting 11:21 p.m.  He's laying

12   out to Nadine that it's not just Parra.  The deal is to kill

13   and stop all investigation, just like Uribe has been texting

14   about with Hana since last year.  And that's why Nadine hasn't

15   gotten her car yet.

16          How do you know that that's what Andy said?  Well,

17   look what happens next.  The next day Menendez calls Nadine.

18   They don't talk for long, but you know exactly what they talk

19   about.  How?  Look what happens when they get off the phone.

20   Nadine calls Hana literally the minute she gets off the phone

21   with Menendez.  Menendez calls Michael Critchley literally the

22   minute he gets off that same call with Nadine.  What do

23   Critchley and Hana have in common?  Elvis Parra's case.

24          This, by the way, this call that you're seeing in this

25   timeline, that's the call you saw Michael Critchley testify

1    about by video.  We'll come back to that.

2              And just like that, Hana is reminding Nadine of what

3    case Menendez is supposed to influence.  Now let's see what

4    happens later that day.

5              Nadine checks with Andy Aslanian, and then for the

6    first time in her life, she picks up the phone and calls José

7    Uribe.  Talks to him for over 20 minutes at ten at night.  What

8    do they talk about?  Well, you know just from the timeline,

9    just from the text that they sent:  I am real.  I will stand by

10   my word.  After getting off the phone with her, Uribe gave his

11   word on the call.  He promised a car.  It's not just Uribe who

12   made promises on the call.  Uribe tells Hernandez the next day:

13   I received a call with good news.  Let's keep the faith.

14             It's good news for Uribe because Nadine made promises

15   on that call too, promises that Menendez would kill and stop

16   all investigation.  And you know from that call with Menendez

17   earlier that day, followed immediately by Menendez calling

18   Parra's lawyer, you know that Menendez knew all about it.  And

19   that -- that -- is how the process of Nadine getting the car

20   starts.  And it only gets more explicit from there.

21             A few days later, while Uribe's on the phone with

22   Hana, while he's on the call with Hana, he texts Nadine the

23   address of the Mercedes-Benz dealership.  So you know Hana was

24   involved with Uribe providing the car because he's literally

25   talking with Uribe as Uribe sets up plans to get Nadine a car.

1          You know who else knew about it?  Menendez.  Nadine

2    leaves him a voice message saying she's going to go get a car

3    on Monday in Edison.  She's going to go see if Will is going to

4    step up and do anything on Monday, but even if Will doesn't

5    help, Uribe is.  So she's definitely going to get a car on

6    Monday -- Nadine's words to Menendez.  She doesn't explain why.

7    She doesn't have to.  He already knows.  Common sense and the

8    evidence tell you that Nadine and Menendez have already talked

9    about the plan for Uribe to get Nadine her car.  Menendez knows

10   Uribe's providing the car and he knows that Will has offered to

11   help, but they don't know if he's going to step up and actually

12   do it.

13          I can talk more about the car and how Menendez knew

14   that Uribe was providing it, but for now I want to go to one

15   other part of the timeline that makes crystal clear -- crystal

16   clear -- that there was a corrupt *quid pro quo*.  That's the

17   summer and fall of 2019.  Let's look.

18          So Det. Lopez is back asking to talk to Peguero.

19   Uribe reaches out to Nadine right away.  Nadine and Uribe meet,

20   and she, of course, tells Menendez, because he's a critical

21   part of the scheme.  And you see her throughout telling

22   Menendez what she's doing.  And the day after the meeting, once

23   Uribe has explained what is going on, Uribe starts following

24   up:  I don't want these people to bother my Ana.  Please help.

25          And Nadine makes very clear what she's going to do to

1    help and who is going to do it:  I will address it first thing

2    tomorrow morning or tonight depending on when he is home -- he,

3    Menendez, the one with the power.  We need to make things go

4    away.  We need to move fast.

5          How is Nadine going to move fast?  Through Menendez

6    making calls.  He will be home first thing tomorrow.  I will

7    address it first thing tomorrow and have the phone calls go

8    out.

9          Phone calls to do what?  To stop this.  Promises

10   Menendez will use his power and influence by picking up the

11   phone and stopping a criminal investigation.  Did Menendez know

12   about this?  Of course he did.  After meeting up with Nadine

13   that night, the night that those texts were sent, he googles

14   NJDCJ, the end of Det. Lopez's email address, New Jersey

15   Division of Criminal Justice.  He's figuring out who is

16   investigating.  He's figuring out whose boss he has to call.

17   He's figuring out who he's going to have to lean on.

18         Actions speak louder than words.  And you know when

19   Menendez's actions speak even louder?  Look what happens the

20   next month.

21         September 3, one month later, by this point, Menendez,

22   Nadine and Uribe have met.  Uribe's kept paying for the car,

23   but nothing has been done.  So Uribe, he reaches out and he

24   puts the whole *quid pro quo* in writing.  Please don't forget

25   about me.  I will never forget about you.  You see what he's

1    saying here.  Please stop the investigation.  I will keep

2    paying for the car.  *Quid pro quo*.  This for that.  Car

3    payments for Menendez's promise to disrupt a criminal

4    investigation.

5            How's Nadine respond?  You will never be forgotten.

6    That's a promise.  It is a promise.  It's a promise of an

7    official act.  And that's exactly what Uribe says.  He says:  I

8    need peace.  He's saying I need you to deliver on that official

9    act.  I need you to stop this investigation.

10           But how do you know that Menendez knows about this

11   *quid pro quo*?  He tells you with his actions the next day.  The

12   next day, after Uribe says please don't forget about me, I will

13   never forget about you, Menendez is on the phone with Grewal,

14   summoning him to his office.  Actions speak louder than words,

15   and Menendez's actions are shouting from the rooftops.  Uribe

16   tells Nadine I'll keep paying for the car if you stop the

17   investigation, and Menendez is on the phone the very next day

18   trying to do just that.

19           And it's not just a call.  On September 6, three days

20   after Uribe has sent the please don't forget about me, I'll

21   never forget about you text, Menendez has Grewal in his office.

22   And look what happens right after.  Menendez meets with Uribe

23   to report back.  On my way to big meeting with the *amigo*.

24           What does Menendez tell Uribe at the big meeting?

25   Menendez tells Uribe it's very positive, but not final.  That's

1    because he knows Uribe's not just looking for a meeting.  He's

2    looking for an official act.  He's looking for Menendez to make

3    the investigations go away.  And that's exactly what Menendez

4    is promising Uribe he's trying to accomplish.

5            One more part of the timeline.

6            Uribe keeps following up, asking for peace, because he

7    doesn't just want a meeting.  He wants results.  Here he is

8    saying he's going to keep following up until he gets results:

9    I always text you on Monday in case you have an update.  I just

10   need peace.

11           Look what happens when Nadine gets the message.  She

12   reads that message the next day, at 11:37 a.m.  Who does she

13   tell after reading that text?  She talks to Menendez about an

14   hour and a half later.  You know that during that conversation

15   Nadine is telling Menendez he needs to reassure Uribe that he's

16   kept his end of the bargain, because Uribe's not going away,

17   otherwise Uribe might stop the car payments.

18           So what does Menendez do?  Next block of office time

19   Menendez gets he calls Uribe, basically assumes he learns that

20   Uribe is going to keep following up until he gets results.

21           What does he tell Uribe?  Menendez tells Uribe what he

22   wants to hear.  You can read it from the text.  I just got a

23   call, and I'm a very happy person.  God bless you and him

24   forever.  You and him.  Uribe knows this isn't just a scheme

25   with Nadine.  This is a scheme with Nadine and Menendez.

1           And look what Uribe does.  He says he's going to put

2     the car into auto pay, and then two minutes later -- two

3     minutes later -- he says:  I have so much peace.  *Gracias adios*

4     and to you guys*.  Quid pro quo*.  This for that.  Car payments

5     for promises of disrupting a criminal investigation.

6           As if it's not clear enough, look who he thanks.

7     Uribe thanks three people:  God, Nadine and Menendez.  You know

8     from looking at this evidence this is just what happened.  Even

9     based just on the evidence cited in this chart, Government

10    Exhibit 1303, the *quid pro quo* is proven against Menendez and,

11    it's proven against Hana.  Even if there were nothing more than

12    this, the *quid pro quo* would be open and shut.  But again,

13    there's so much more that it might make sense to do tomorrow.

14          THE COURT:  Ladies and gentlemen, be here tomorrow at

15    9:30.  There are no more legal issues that I'm aware of that

16    the parties can raise.  So if you're here at 9:30, we'll

17    continue with Mr. Monteleoni's summation, and then we'll go

18    into one of the defense summations.

19          9:30.  Thank you.  Keep an open mind.

20          (Jury not present)

21          THE COURT:  Who's giving the first defense summation,

22    on behalf of whom?

23          MR. FEE:  I am.

24          THE COURT:  Mr. Fee.  And how long is that going to

25    be, approximately?

1          MR. FEE:  Three and a half hours.

2          THE COURT:  Thank you.

3          I'll see everybody tomorrow at 9:30.

4          MR. FEE:  Thank you.

5          (Adjourned to July 9, 2024, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3     MOUSTAFA HOSSEIN ABEL MAJEED SAYED

4    Direct By Mr. Lustberg . . . . . . . . . . .6269

5    Cross By Mr. Richenthal  . . . . . . . . . .6277

6    Redirect By Mr. Lustberg . . . . . . . . . .6287

7    Recross By Mr. Richenthal  . . . . . . . . .6290

8                    GOVERNMENT EXHIBITS

9    Exhibit No.                         Received

10     E102-17 and E105-41   . . . . . . . . . . .6302

11                    DEFENDANT EXHIBITS

12   Exhibit No.                         Received

13     Hana 211, Hana-013, Hana-013-T, . . . . . .6291

14              Hana-030 to Hana-036, Hana-095

15              to Hana-101, Hana-101-T,

16              Hana-102 to Hana-110, Hana-112

17              to Hana-115, Hana-117 to

18              Hana-122, Hana-124 to

19              Hana-129, Hana-130-100,

20              Hana-131-100, Hana-132,

21              Hana-141 to Hana-165, Hana-167

22              to Hana-169, Hana-170-R,

23              Hana-171-R, Hana-172, Hana-175

24              to Hana-178, Hana-180 to

25              Hana-181, Hana-190 to
```

```
 1              Hana-191, Hana-191-T, Hana-192

 2              to Hana-194, Hana-197 to

 3              Hana-200, Hana-202, Hana-204

 4              to Hana-205, Hana-205-T,

 5              Hana-207 to Hana-209,

 6              Hana-210, Hana-1000,

 7              Hana-1001, Hana-1002, Hana

 8              A101-100 to Hana A101-104,

 9              Hana A103-100, Hana B205-100

10              to B205-106, Hana B207-100 to

11              Hana B207-102, Hana B209-100,

12              Hana B213-100 to Hana

13              B213-101, Hana B224-100, Hana

14              C102-100, Hana C102-101, Hana

15              C102-103 to Hana C102-108, GX

16              A109-B-TR, GX 10C-6

17   1004    . . . . . . . . . . . . . . . . . .6293
```