**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ, *et al.*,

Defendants.

Criminal Action No. 23-490 (SHS)

*Document Electronically Filed*

---

**OMNIBUS BRIEF IN SUPPORT OF**
**DEFENDANT WAEL HANA'S POST-TRIAL MOTIONS**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iv

PRELIMINARY STATEMENT ............................................................................................ 1

LEGAL STANDARD............................................................................................................ 2

    A.    Federal Rule of Criminal Procedure 29 ................................................. 2

    B.    Federal Rule of Criminal Procedure 33 ................................................. 5

ARGUMENT ....................................................................................................................... 7

I.    THE GOVERNMENT'S USE OF SUMMARY CHARTS AND RELATED
    WITNESS TESTIMONY WAS IMPROPER. .................................................. 7

    A.    The Government's Use Of Summary Charts And Summary Agent
        Testimony. ............................................................................................ 8

    B.    The Government Improperly Used Summary Charts And Summary Agent
        Testimony To Further An Inaccurate, One-Sided Narrative In Support Of
        Its Own Theory Of The Case, In Violation Of Rule 1006................................... 18

    C.    The Government Improperly Used Summary Evidence To Pile Inference
        On Inference In Order To Establish The Necessary Elements Of Their
        Case. ....................................................................................................... 29

    D.    The Manner In Which The Government Presented Its Summary Evidence
        Effectively Denied Mr. Hana Of His Constitutional Right To Confront
        The Witnesses Against Him............................................................................ 44

II.    NO REASONABLE JURY COULD FIND THAT SENATOR MENENDEZ
    UNDERTOOK OR PROMISED TO UNDERTAKE AN "OFFICIAL ACT"
    UNDER EITHER FEDERAL BRIBERY OR FRAUD LAW. ....................................... 51

    A.    Procedural History ................................................................................. 51

    B.    *McDonnell* Standard .............................................................................. 54

    C.    Actions To Benefit IS EG Halal ........................................................... 56

    D.    Actions To Benefit Egypt ...................................................................... 62

        1.    Military Sales ........................................................................... 62

        2.    "Ghostwritten" Letter............................................................. 63

        3.    Embassy Figures ..................................................................... 64

    E.    Actions To Disrupt New Jersey State Criminal Matters....................................... 65

III.    NO RATIONAL JURY COULD FIND THAT MR. HANA PROVIDED
    ANYTHING OF VALUE TO SENATOR MENENDEZ IN EXCHANGE FOR
    SENATOR MENENDEZ TAKING ACTION ON A PARTICULAR MATTER
    OR QUESTION WITH RESPECT TO THE SCHEME TO BENEFIT MR.
    HANA AND EGYPT. .......................................................................................... 67

    A.    Legal Standard ....................................................................................... 67

    B.    Procedural History ................................................................................. 69

Table of Contents (continued)

Page

C.   The Government Failed To Prove A *Quid Pro Quo* at Trial ............................... 72

D.   Mortgage Payment ........................................................................... 75

E.   IS EG Halal Employment ................................................................. 79

F.   Other Things Of Value...................................................................... 84

IV.   NO RATIONAL JURY COULD FIND THAT MR. HANA ENTERED INTO ANY AGREEMENT IN CONNECTION WITH THE SCHEME TO BENEFIT URIBE AND URIBE'S ASSOCIATES. ........................................................ 88

A.   The Government Failed To Prove An Agreement To Sustain The Conspiracy Convictions. ................................................................... 88

1.   Legal Standard ........................................................... 89

2.   The Government Failed To Prove A Mutual Understanding Or Meeting Of The Minds................................................. 90

B.   The Government Failed to Prove a *Quid Pro Quo* Involving Mr. Hana and the Scheme to Benefit Uribe and Uribe's Associates. ......................... 96

V.   THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR CONSPIRACY TO HAVE SENATOR MENENDEZ ACT AS AN AGENT OF A FOREIGN PRINCIPAL.................................................................... 101

A.   The Government Failed To Sustain Its Burden In Proving The Existence Of A Scheme To Have Senator Menendez Act As A Foreign Agent.............. 104

1.   "Agent of a Foreign Principal" ...................................... 107

2.   Absence of "Orders," "Requests," or Authority .................... 109

i.   Embassy Figures .................................... 113

ii.   Military Sales ...................................... 115

iii.   "Ghostwritten" Letter.............................. 122

B.   The Government Failed To Sustain Its Burden With Respect To Mr. Hana's Willful Participation In Any Such Conspiracy........................... 125

VI.   THE GOVERNMENT DID NOT PROVE THE OVERARCHING CONSPIRACY CHARGED IN THE INDICTMENT IN COUNTS 1 AND 2. ........... 131

A.   Factual Background ......................................................................... 132

B.   Legal Standard ............................................................................... 134

C.   The Government Failed To Prove A Single Overarching Conspiracy. ............ 137

D.   There Was  Variance Between the Conspiracy Charged in the Indictment and that Proven At Trial................................................................... 142

E.   The Court Should Find Retroactive Misjoinder And Vacate Mr. Hana's Convictions On The Substantive As Well As The Conspiracy Counts. ............ 146

Page

F.  The Court's Failure to Use Defendants' Verdict Sheet Requires A New Trial...................................................................................... 150

VII.  MR. HANA IS ENTITLED TO A NEW TRIAL BECAUSE OF THE IMPROPER OF EXCLUSION OF EVIDENCE UNDER RULE 404(B). ................... 152

A.  Legal Standard .................................................................... 152

B.  Procedural Background.......................................................... 154

C.  The Preclusion Of Mr. Hana's Evidence Was Erroneous.................................. 154

VIII.  THE COURT SHOULD ENTER JUDGMENT ON ONLY ONE OF THE § 371 CONSPIRACY COUNTS BECAUSE THEY ARE MULTIPLICITOUS. ................... 159

A.  Factual Background ............................................................. 160

B.  Legal Standard ................................................................... 163

C.  The Proof At Trial Established, At Most, A Single Conspiracy........................ 165

CONCLUSION............................................................................ 169

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alifax Holding SpA v. Alcor Sci. LLC,*
　22-cv-1641, 2024 WL 2932910 (Fed. Cir. June 11, 2024) .......................................7

*Att'y Gen. of United States v. Irish N. Aid Comm.,*
　530 F. Supp. 241 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982) ..............................110

*Att'y Gen. of United States v. Irish N. Aid Comm.,*
　668 F.2d 159 (2d Cir. 1982) ...................................................................103, 110

*Ball v. United States,*
　470 U.S. 856 (1985) .......................................................................169

*Blumenthal v. United States,*
　332 U.S. 539 (1947) ...................................................................136, 137

*Brand v. Comcast Corp.,*
　302 F.R.D. 201 (N.D. Ill. 2014) .......................................................20

*California v. Green,*
　399 U.S. 149 (1970) .......................................................................45, 47

*Citizens United v. Federal Election Comm'n,*
　558 U.S. 310 (2010) .......................................................................60

*Crawford v. Washington,*
　541 U.S. 36 (2004) ................................................................. *passim*

*Davis v. Alaska,*
　415 U.S. 308 (1974) .......................................................................45

*Dawkins v. Artuz,*
　152 F. App'x. 45 (2d Cir. 2005) .......................................................40

*Dickson v. Microsoft Corp.,*
　309 F.3d 193 (4th Cir. 2002) ...................................................135, 136

*Direct Sales Co. v. United States,*
　319 U.S. 703 (1943) .......................................................................4

*Fagiola v. Nat'l Gypsum Co. ACS., Inc.,*
　906 F.2d 53 (2d Cir. 1990) .......................................................19

*Fanelli v. Centenary Coll.*,
 211 F.R.D. 268 (D.N.J. 2002) ............................................................................27

*Giles v. California*,
 554 U.S. 353 (2008) .................................................................................45, 46

*Goldberg v. United States*,
 789 F.2d 1341 (9th Cir. 1986) .........................................................................19

*Gordon v. United States*,
 438 F.2d 858 (5th Cir. 1971) ..........................................................................19

*Ingram v. United States*,
 360 U.S. 672 (1959) ......................................................................................149

*Kotteakos v. United States*,
 328 U.S. 750 (1946) ...............................................................132, 134, 136, 137

*Langston v. Smith*,
 630 F.3d 310 (2d Cir. 2011) ..........................................................................3, 31

*Lavender v. Kurn*,
 327 U.S. 645 (1946) ........................................................................................43

*Maryland v. Craig*,
 497 U.S. 836 (1990) ........................................................................................46

*McCutcheon v. Fed. Election Comm'n*,
 572 U.S. 185 (2014) ........................................................................................60

*McDonnell v. United States*,
 579 U.S. 550 (2016) ................................................................................ *passim*

*Melendez-Diaz v. Massachusetts*,
 557 U.S. 305 (2009) ........................................................................................47

*In re Nat'l Prescription Opiate Litig.*,
 17-md-2804, 2021 WL 4341317 (N.D. Ohio Sept. 23, 2021) ..........................20, 47

*Patterson v. New York*,
 432 U.S. 197 (1977) ........................................................................................28

*Pointer v. Texas*,
 380 U.S. 400 (1965) ........................................................................................50

*Ramos v. Louisiana*,
 590 U.S. 83 (2020) ........................................................................................152

*Schlep v. Delo*,
  513 U.S. 298 (1995)......................................................................................................1

*Siewe v. Gonzales*,
  480 F.3d 160 (2d Cir. 2007)...........................................................................................3

*Smith v. Arizona*,
  602 U.S. --, 144 S. Ct. 1785 (2024) ...........................................................................45

*Smith v. Lightning Bolt Prods., Inc.*,
  861 F.2d 363 (2d Cir. 1988)...........................................................................................6

*Smith v. United States*,
  568 U.S. 106 (2013)....................................................................................................134

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
  811 F.2d 511 (10th Cir. 1987) .....................................................................................31

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..........................................................................35

*Thompson v. Spota*,
  14-cv-02473, 2022 WL 17253464 (E.D.N.Y. Nov. 28, 2022) ..................................24

*United State v. Rosnow*,
  977 F.2d 399 (8th Cir. 1992) ......................................................................................136

*United States Sec. & Exch. Comm'n v. Qin*,
  20-cv-10849, 2024 WL 1342803 (S.D.N.Y. Mar. 29, 2024)........................................7

*United States v. Abdelaziz*,
  68 F.4th 1 (1st Cir. 2023) ....................................................................................*passim*

*United States v. Aboumoussallem*,
  726 F.2d 906 (2d Cir. 1984)........................................................................................153

*United States v. Aguiar*,
  737 F.3d 251 (2d Cir. 2013)...........................................................................................5

*United States v. Ahaiwe*,
  21-cr-2491, 2023 WL 4196954 (2d Cir. June 27, 2023) ..............................................7

*United States v. Aiyer*,
  470 F. Supp. 3d 383 (S.D.N.Y. 2020), aff'd, 33 F.4th 97 (2d Cir. 2022)....................5

*United States v. Akers*,
  19-cr-7, 2019 WL 4934948 (E.D. Ky. Oct. 7, 2019).................................................155

vi

*United States v. Ali,*
    870 F. Supp. 2d 10 (D.D.C. 2012) ........................................................156

*United States v. Allums,*
    15-cr-153, 2018 WL 2128372 (S.D.N.Y. May 9, 2018)..........................27

*United States v. Alston,*
    899 F.3d 135 (2d Cir. 2018).....................................................................5

*United States v. Ansaldi,*
    372 F.3d 118 (2d Cir. 2004)..................................................................164

*United States v. Aracri,*
    968 F.2d 1512 (2d Cir. 1992)...............................................134, 138, 142

*United States v. Araujo,*
    17-cr-438, 2018 WL 3222527 (S.D.N.Y. July 2, 2018) ........................164

*United States v. Archer,*
    977 F.3d 181 (2d Cir. 2020).....................................................................6

*United States v. Arguedas,*
    20-cr-135, 2021 WL 5567749 (S.D.N.Y. Nov. 29, 2021) .....................133

*United States v. Arras,*
    373 F.3d 1071 (10th Cir. 2004) ..........................................................4, 32

*United States v. Aubrey,*
    800 F.3d 1115 (9th Cir. 2015) ................................................................20

*United States v. Avenatti,*
    81 F.4th 171 (2d Cir. 2023) ..............................................................67, 97

*United States v. Ayers,*
    20-cr-239, 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) ......................66

*United States v. Badalamenti,*
    663 F. Supp. 1542 (S.D.N.Y. 1987).............................................143, 150

*United States v. Bankman-Fried,*
    22-cr-0673, 2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023)...................157

*United States v. Barnwell,*
    15-cr-620, 2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) ......................22

*United States v. Behrens,*
    689 F.2d 154 (10th Cir. 1982) ................................................................20

vii

*United States v. Bell*,
    584 F.3d 478 (2d Cir. 2009)........................................................................5

*United States v. Berenguer*,
    562 F.2d 206 (2d Cir. 1977)......................................................................35

*United States v. Bertolotti*,
    529 F.2d 149 (2d Cir. 1975)....................................................................142

*United States v. Birdsall*,
    233 U.S. 223 (1914)................................................................................55

*United States v. Blackwood*,
    366 F. App'x 207 (2d Cir. 2010) .......................................................19, 20

*United States v. Borelli*,
    336 F.2d 376 (2d Cir. 1964)....................................................................134

*United States v. Boyland*,
    862 F.3d 279 (2d Cir. 2017)............................................................. *passim*

*United States v. Bray*,
    139 F.3d 1104 (6th Cir. 1998) .......................................................21, 22, 23

*United States v. Calderone*,
    982 F.2d 42 (2d Cir. 1992)..............................................................167, 168

*United States v. Canady*,
    126 F.3d 352 (2d Cir. 1997).......................................................................2

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000)..............................................................153, 157

*United States v. Chacko*,
    169 F.3d 140 (2d Cir. 2009)....................................................................164

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) .......................................................137, 142

*United States v. Conlin*,
    551 F.2d 534 (2d Cir. 1977)........................................................19, 21

*United States v. Conrad*,
    760 F. App'x 199 (4th Cir. 2019) (per curiam) .............................54, 57

*United States v. Coonan*,
    839 F.2d 886 (2d Cir. 1988)....................................................................151

*United States v. Coriaty*,
    99-cr-1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001) .......................................................6

*United States v. Correia*,
    55 F.4th 12 (1st Cir. 2022)...............................................................................150

*United States v. Crisci*,
    273 F.3d 235 (2d Cir. 2001)..............................................................................152

*United States v. Cruz*,
    363 F.3d 187 (2d Cir. 2004).................................................................................35

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011)...........................................................................32, 41

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)........................................................................3, 104

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021)..............................................................................136

*United States v. Dixon*,
    509 U.S. 688 (1993)..........................................................................................164

*United States v. Doe*,
    903 F.2d 16 (D.C. Cir. 1990) ..............................................................................40

*United States v. Drougas*,
    748 F.2d 8 (1st Cir. 1984) ...................................................................................21

*United States v. Ekwuruke*,
    372 F. App'x 521 (5th Cir. 2010) .......................................................................22

*United States v. Eppolito*,
    543 F.3d 25 (2d Cir. 2008)...............................................................2, 67, 135

*United States v. Escalona*,
    22-cr-20423, 2023 WL 3093630 (S.D. Fla. Apr. 25, 2023) ...............................158

*United States v. Evans*,
    970 F.2d 663 (10th Cir. 1992) ..........................................................................132

*United States v. Fahnbulleh*,
    752 F.3d 470 (D.C. Cir. 2014) ............................................................................49

*United States v. Fattah*,
    914 F.3d 112 (3d Cir. 2019)........................................................................60, 65

*United States v. Ferguson*,
  246 F.3d 129 (2d Cir. 2001)..................................................................5, 6, 7

*United States v. Gallo*,
  654 F. Supp. 463 (E.D.N.Y. 1987) ..............................................................38

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005)........................................................................22

*United States v. Garvin*,
  565 F.2d 519 (8th Cir. 1977) ....................................................................156

*United States v. Gaskin*,
  364 F.3d 438 (2d Cir. 2004)....................................................164, 165, 167

*United States v. Geibel*,
  369 F.3d 682 (2d Cir. 2004)....................................................137, 138, 139

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006)....................................................................................50

*United States v. Goodrich*,
  12 F.4th 219 (2d Cir. 2021) ......................................................................125

*United States v. Gotti*,
  457 F. Supp. 2d 403 (S.D.N.Y. 2006).........................................................35

*United States v. Graziano*,
  616 F. Supp. 2d 350 (E.D.N.Y. 2008) ............................................4, 30, 31

*United States v. Greer*,
  285 F.3d 158 (2d Cir. 2002)......................................................................143

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004).......................................................................22

*United States v. Guttenberg*,
  07-cr-141, 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2017) ....................134

*United States v. Halloran*,
  664 F. App'x 23 (2d Cir. 2016) ....................................................54, 57, 64

*United States v. Hamilton*,
  334 F.3d 170 (2d Cir. 2003)....................................................147, 149, 150

*United States v. Harrison*,
  942 F.2d 751 (10th Cir. 1991) ..................................................................136

*United States v. Hawkins,*
  547 F.3d 66 (2d Cir. 2008).................................................................5

*United States v. Hayes,*
  219 F. App'x 114 (3d Cir. 2007) ......................................153, 155, 156

*United States v. Haynes,*
  22-cr-4738, 2024 WL 2206500 (4th Cir. May 16, 2024) .......................7

*United States v. Hemphill,*
  514 F.3d 1350 (D.C. Cir. 2008) .........................................................47

*United States v. Hernandez,*
  09-cr-625, 2009 WL 3169226 (S.D.N.Y. Oct. 1, 2009) ....................168

*United States v. Hill,*
  629 F. Supp. 493 (D. Del. 1986) .....................................................157

*United States v. Ho,*
  984 F.3d 191 (2d Cir. 2020)..............................................................29

*United States v. Hoskins,*
  902 F.3d 69 (2d Cir. 2018)..............................................................103

*United States v. Hughes,*
  505 F.3d 578 (6th Cir. 2007) ..........................................................138

*United States v. Jackson,*
  849 F.3d 540 (3d Cir. 2017)..............................................................26

*United States v. James,*
  607 F. Supp. 3d 246 (E.D.N.Y. 2022) .............................................155

*United States v. Jefferson,*
  289 F. Supp. 3d 717 (E.D. Va. 2017) ..............................56, 62, 63, 65

*United States v. Johansen,*
  56 F.3d 347 (2d Cir. 1995)...........................................132, 134, 142, 143

*United States v. Jones,*
  291 F. Supp. 2d 78 (D. Conn. 2003) .................................................30

*United States v. Jones,*
  482 F.3d 60 (2d Cir. 2006)..............................................................163

*United States v. Josephberg,*
  459 F.3d 350 (2d Cir. 2006)............................................................168

*United States v. Kapelioujnyj,*
   547 F.3d 149 (2d Cir. 2008).........................................................................135

*United States v. Kaufman,*
   19-cr-0504, 2021 WL 51521 (S.D.N.Y. Jan. 6, 2021).........................................158

*United States v. Khalupsky,*
   5 F.4th 279 (2d Cir. 2021) ..........................................................................135

*United States v. Killeen,*
   98-cr-143, 1998 WL 760237 (S.D.N.Y. Oct. 29, 1998) ......................................135

*United States v. Kimbrew,*
   944 F.3d 810 (9th Cir. 2019) ........................................................................58

*United States v. Korfant,*
   771 F.2d 660 (2d Cir. 1985).................................................................164, 166

*United States v. Landesman,*
   17 F.4th 298 (2d Cir. 2021) ................................................................. *passim*

*United States v. Lekacos,*
   151 F.2d 170 (2d Cir. 1945)..........................................................................138

*United States v. Lemire,*
   720 F.2d 1327 (D.C. Cir. 1983) ......................................................................22

*United States v. Levy,*
   594 F. Supp. 2d 427 (S.D.N.Y. 2009)................................................................6

*United States v. Lopez,*
   356 F.3d 463 (2d Cir. 2004)..........................................................................165

*United States v. Lorenzo,*
   534 F.3d 153 (2d Cir. 2008)......................................................................25, 83

*United States v. Macchia,*
   35 F.3d 662 (2d Cir. 1994)..........................................137, 164, 165, 166

*United States v. Maldonado-Rivera,*
   922 F.2d 934 (2d Cir. 1990).........................................................................135

*United States v. Malkus,*
   696 F. App'x 251 (9th Cir. 2017) ................................................................55, 57

*United States v. Manarite,*
   448 F.2d 583 (2d Cir.1971)..........................................................................134

*United States v. Markovich,*
   95 F.4th 1367 (11th Cir. 2024) ........................................................20, 47

*United States v. Marlinga,*
   457 F. Supp. 2d 769 (E.D. Mich. 2006)................................................155

*United States v. Martinez,*
   54 F.3d 1040 (2d Cir. 1995)................................................2, 4, 31, 146

*United States v. Martinez,*
   921 F.3d 452 (5th Cir. 2019) ..............................................................4, 43

*United States v. Martinez,*
   994 F.3d 1 (1st Cir. 2021)................................................145, 146, 149

*United States v. Maxwell,*
   20-cr-330, 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022)....................165, 167, 168

*United States v. Mazkouri,*
   945 F.3d 293 (5th Cir. 2019) ..............................................................20

*United States v. McDermott,*
   245 F.3d 133 (2d Cir. 2001)..................................................... *passim*

*United States v. McNair,*
   605 F.3d 1152 (11th Cir. 2010) ..........................................................157

*United States v. Melgen,*
   967 F.3d 1250 (11th Cir. 2020) ..........................................................20

*United States v. Michel,*
   446 F.3d 1122 (10th Cir. 2006) ....................................................32, 41

*United States v. Mohel,*
   604 F.2d 748 (2d Cir. 1979)..........................................................31, 41

*United States v. Moleski,*
   12-cr-811, 2014 WL 197907 (D.N.J. Jan. 13, 2014) ..........................153

*United States v. Morin,*
   538 F. App'x. 1 (2d Cir. 2013) ............................................................48

*United States v. Mustafa,*
   753 F. App'x 22 (2d Cir. 2018) ..........................................................89

*United States v. Nasher-Alneam,*
   399 F. Supp. 3d 561 (S.D. W.Va. 2019)..............................................156

*United States v. Neumann,*
    21-cr-439, 2023 WL 8700974 (S.D.N.Y. Dec. 14, 2023)........................................19

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019)..........................................................................67, 158

*United States v. Nguyen,*
    504 F.3d 561 (5th Cir. 2007) ........................................................................21, 22

*United States v. Nouri,*
    711 F.3d 129 (2d Cir. 2013)....................................................................................97

*United States v. Ogando,*
    968 F.2d 146 (2d Cir. 1992)..................................................................................151

*United States v. Ortiz-Orellana,*
    90 F.4th 689 (4th Cir. 2024) ....................................................................................7

*United States v. Ouedraogo,*
    531 F. App'x 731 (6th Cir. 2013) ..........................................................................4, 31

*United States v. Padilla,*
    208 F. App'x 476 (7th Cir. 2006) ............................................................................35

*United States v. Palmeri,*
    630 F.2d 192 (3d Cir. 1980)..................................................................................151

*United States v. Paredes-Cordova,*
    S8 03, 2010 WL 11507538 (S.D.N.Y. Feb. 17, 2010)..........................................151

*United States v. Pauling,*
    256 F. Supp. 3d 329 (S.D.N.Y. 2017)..................................................................136

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019).............................................................. *passim*

*United States v. Pica,*
    692 F.3d 79 (2d Cir. 2012)....................................................................................89

*United States v. Pierce,*
    785 F.3d 832 (2d Cir. 2015)..................................................................................142

*United States v. Pinson,*
    860 F.3d 152 (4th Cir. 2017) (per curiam)..........................................................56

*United States v. Powell,*
    469 U.S. 57 (1984)............................................................................................1, 36

*United States v. Praddy,*
    725 F.3d 147 (2d Cir. 2013)...........................................................89, 134

*United States v. Quality Formulation Labs, Inc.,*
    512 F. App'x 237 (3d Cir. 2013) ...........................................................155

*United States v. Reichberg,*
    5 F.4th 233 (2d Cir. 2021) .........................................................68, 85, 153

*United States v. Repak,*
    852 F.3d 230 (3d Cir. 2017)...................................................................59

*United States v. Rivera,*
    372 F. Supp. 3d 311 (E.D.N.C. 2019)....................................................45

*United States v. Robinson,*
    430 F.3d 537 (2d Cir. 2005)....................................................................6

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977)...........................................................89, 95, 96

*United States v. Rufai,*
    732 F.3d 1175 (10th Cir. 2013) ..............................................................35

*United States v. Ruggiero,*
    726 F.2d 913 (2d Cir. 1984)..................................................................151

*United States v. Ruiz,*
    105 F.3d 1492 (1st Cir. 1997) ..................................................................4

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998)................................................................49, 89

*United States v. Sanchez,*
    969 F.2d 1409 (2d Cir. 1992)...............................................................6, 7

*United States v. Sattar,*
    314 F. Supp. 2d 279 (S.D.N.Y. 2004).........................................163, 164

*United States v. Seals,*
    419 F.3d 600 (7th Cir. 2005) ...............................................................153

*United States v. Shahane,*
    517 F.2d 1173 (8th Cir. 1975) ................................................................33

*United States v. Sierra,*
    923 F. Supp. 2d 501 (S.D.N.Y. 2013).......................................................2

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017)................................................................ *passim*

*United States v. Silver*,
  948 F.3d 538 (2d Cir. 2020)................................................................ *passim*

*United States v. Sittenfeld*,
  20-cr-142, 2022 WL 2192955 (S.D. Oh. June 17, 2022)....................................155

*United States v. Skelos*,
  707 F. App'x 733 (2d Cir. 2017) ........................................................54, 57, 64, 65

*United States v. Skelos*,
  988 F.3d 645 (2d Cir. 2021)................................................................67

*United States v. Spalding*,
  894 F.3d 173 (5th Cir. 2018) ..............................................................21

*United States v. Spayd*,
  19-cr-111, 2022 WL 4367621 (D. Alaska Sept. 20, 2022)...................................156

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992)................................................................89

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006)................................................................143, 150

*United States v. Stone*,
  852 F. Supp. 2d 820 (E.D. Mich. 2012)....................................................28

*United States v. Suhl*,
  885 F.3d 1106 (8th Cir. 2018) ............................................................55, 57

*United States v. Summers*,
  414 F.3d 1287 (10th Cir. 2005) ..........................................................33, 40

*United States v. Sureff*,
  15 F.3d 225 (2d Cir. 1994)................................................................135

*United States v. Svoboda*,
  347 F.3d 471 (2d Cir. 2003)................................................................102

*United States v. Taggert*,
  09-cr-984, 2010 WL 532530 (S.D.N.Y. Feb. 11, 2010)....................................135

*United States v. Tellier*,
  83 F.3d 578 (2d Cir. 1996)................................................................147

*United States v. Temple*,
  447 F.3d 130 (2d Cir. 2006).................................................................2

*United States v. Thomas*,
  32 F.3d 418 (9th Cir. 1994) .............................................................156

*United States v. Thomas*,
  981 F. Supp. 2d 229 (S.D.N.Y. 2013)..............................................36

*United States v. Thompson*,
  518 F.3d 832 (10th Cir. 2008) ...........................................................19

*United States v. Tines*,
  70 F.3d 891 (6th Cir. 1995) ...............................................................26

*United States v. Triumph Capital Grp., Inc.*,
  544 F.3d 149 (2d Cir. 2008)..........................................................2, 72

*United States v. Ulbricht*,
  14-cr-68, 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858 F.3d 71 (2d
  Cir. 2017) ...........................................................................................38

*United States v. Ulbricht*,
  31 F. Supp. 3d 540 (S.D.N.Y. 2014)........................................ *passim*

*United States v. Valle*,
  807 F.3d 508 (2d Cir. 2015)....................................................3, 25, 83

*United States v. Vanwort*,
  887 F.2d 375 (2d Cir. 1989)...................................................135, 137

*United States v. Varanese*,
  417 F. App'x 52 (2d Cir. 2011) .........................................................31

*United States v. Waguespack*,
  935 F.3d 322 (5th Cir. 2019) .............................................................43

*United States v. Webb*,
  41 F.3d 1515 (9th Cir. 1994) ...........................................................157

*United States v. White*,
  545 F. App'x. 69 (2d Cir. 2013) ........................................................49

*United States v. Whitfield*,
  590 F.3d 325 (5th Cir. 2009) .............................................................20

*United States v. Wilson*,
  879 F.3d 795 (7th Cir. 2018) .........................................................4, 31

*United States v. Yannotti*,
    415 F. Supp. 2d 280 (S.D.N.Y. 2005)...........................................................34, 40, 96

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003)...........................................................................20

*United States v. Zabare*,
    871 F.2d 282 (2d Cir. 1989)........................................................................135

*United States v. Zackson*,
    12 F.3d 1178 (2d Cir. 1993)........................................................................157

*UPS Store, Inc. v. Hagan*,
    14-cv-1210, 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) ...........................19, 20, 28

*Upstate Jobs Party v. Kosinski*,
    106 F.4th 232 (2d Cir. 2024) ....................................................................60, 64

*Valdez v. United States*,
    475 F.3d 1319 (D.C. Cir. 2008) (en banc) ...................................................59

*Vogt v. State Farm Life Ins. Co.*,
    963 F.3d 753 (8th Cir. 2020) ......................................................................20

*Washington v. Schriver*,
    255 F.3d 45 (2d Cir. 2001)..........................................................................50

**Statutes**

18 U.S.C. § 201.............................................................................................56, 168

18 U.S.C. § 201(a)(3)...........................................................................................54

18 U.S.C. § 219 ......................................................................................... *passim*

18 U.S.C. § 371 ......................................................................................... *passim*

22 U.S.C. § 611....................................................................................................102

**Other Authorities**

FARA Unit, Dep't of Justice, *The Scope of Agency Under FARA* (May 2020),
    https://www.justice.gov/media/1070276/dl?inline ................................................110

**Rules**

Federal Rule of Criminal Procedure 29 ................................................................ *passim*

Federal Rule of Criminal Procedure 33 ................................................................ *passim*

Federal Rule of Evidence 107 .................................................................................................19

Federal Rule of Evidence 401 ...............................................................................................144

Federal Rule of Evidence 403 .................................................................................................66

Federal Rule of Evidence 404(b) ..................................................................................... *passim*

Federal Rule of Evidence 613(b) .............................................................................................77

Federal Rule of Evidence 1006 ........................................................................................ *passim*

**Treatises**

3 Fed. Prac. & Proc. Crim. § 589 n. 11, 12 (4th ed.) .................................................................5

**Regulations**

28 C.F.R. § 5.100(b) ...............................................................................................................103

**Constitutional Provisions**

Fifth Amendment ....................................................................................................................163

Sixth Amendment .......................................................................................................... *passim*

Fourteenth Amendment ............................................................................................................50

## PRELIMINARY STATEMENT

Defendant Wael Hana respectfully submits the within brief in support of his motion for post-trial relief under Federal Rules of Criminal Procedure 29 and 33. For the reasons set forth below, such relief is necessary in order to redress the worst thing that can happen in any system of justice: the conviction of an innocent man. *See Schlep v. Delo*, 513 U.S. 298, 325 (1995) ("[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring))). And for a criminal defense attorney, when that happens, one searches for reasons: how can a jury have reached such an unjust result? The reasons emerge from the way in which this case was tried, and especially the truly inappropriate and unsupportable inferences that the jury—overwhelmed by often highly inflammatory evidence against others—was asked by the Government to, and apparently did, make.

Fortunately, the jury does not get the last word: our system of justice recognizes that sometimes, juries get it wrong and gives life-tenured, Article III Judges, like this Court, the opportunity to assure that a verdict is in accord with the law, and not just with emotion, whether that emotion be outrage or sympathy. *See United States v. Powell*, 469 U.S. 57, 67 (1984) ("[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."). That law and its application to this case is set forth below; it goes to every count of the Indictment[1] against

---

[1] Hereinafter, unless otherwise noted, the Fourth Superseding Indictment is referred to as the "Indictment" and citations to the same take the form "Ind." Additionally, unless otherwise noted, all internal citations and quotation marks are omitted from paraenthical citations.

Mr. Hana and both to whether the jury's verdict was the result of a fair and constitutional process, but most significantly to whether the evidence adduced here, even if fully believed, really was sufficient to support the verdict that was reached. For the reasons that follow, it was not, and Mr. Hana's post-trial motion should accordingly be granted.

## LEGAL STANDARD

### A.     Federal Rule of Criminal Procedure 29

Under Federal Rule of Criminal Procedure Rule 29(c), after the jury returns a guilty verdict "[a] defendant may move for a judgment of acquittal," and the court may set aside the verdict and enter an acquittal. *See, e.g.*, *United States v. Sierra*, 923 F. Supp. 2d 501, 502 (S.D.N.Y. 2013) ("Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may move for a judgment of acquittal, following a jury verdict of guilty, on the ground that the evidence was insufficient to sustain a guilty verdict."). "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008). The court must make this determination with "the evidence against a particular defendant . . . viewed in a light that is most favorable to the government . . . and [with] all reasonable inferences . . . resolved in favor of the government." *Id*. To view the evidence in "the light most favorable to the government," the court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006), and "resolve all issues of credibility in the government's favor," *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997).

But the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is established beyond a reasonable doubt." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)); *accord United States v. Landesman*, 17 F.4th 298,

320 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States*, 143 S. Ct. 86 (2022).  "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)); Leonard B. Sand et al., Modern Federal Jury Instructions § 6.01 (2011) ("The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction or conclusion which . . . the jury [is] permitted to draw . . . from facts which have been established by either direct or circumstantial evidence.").  Although the Court "must defer to a jury's reasonable inferences, [the Court] give[s] no deference to impermissible speculation."  *Pauling,* 924 F.3d at 656 (citing *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).  And "specious inferences [should] not [be] indulged."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  Indeed, "a conviction based on speculation and surmise alone cannot stand, and courts cannot credit inferences within the realm of possibility when those inferences are unreasonable."  *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) (cleaned up).  "At times it may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable.  Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist."  *Pauling*, 924 F.3d at 656 (citing *Langston*, 630 F.3d at 314, 319).

Moreover, "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible."  *Id.* at 657.  The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the

element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Martinez*, 54 F.3d at 1043).

Nor, of course, may a conviction be obtained by "stack[ing] 'inference upon inference.'" *United States v. Graziano*, 616 F. Supp. 2d 350, 371 (E.D.N.Y. 2008) ("[T]he Court is 'loath to stack inference upon inference in order to uphold the jury's verdict.'" (quoting *United States v. Ruiz*, 105 F.3d 1492, 1500 (1st Cir. 1997))); *see also Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (warning against the "piling [of] inference upon inference"); *United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019) ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."); *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) ("In a case that hinges on circumstantial evidence, we must not permit a verdict based solely on the piling of inference upon inference."); *United States v. Ouedraogo*, 531 F. App'x 731, 739-40 (6th Cir. 2013) ("Although the evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against piling inference upon inference."); *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference.").  In this regard, "[a]n inference which is based solely and entirely upon another inference, and which is unsupported by an additional fact or an inference from other facts is an inference upon an inference."  Stephen E. Arthur & Robert S. Hunter, 2 Federal Trial Handbook: Criminal § 52:6 (2022-2023 Edition).  Thus, a jury "may not . . . treat a fact inferred as a fact established that, in turn, can serve as the basis for a further inference and thereby spin out a chain of inferences into the realm of pure conjecture." *Id.*

Perhaps most significantly, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Landesman*, 17 F.4th at 320 (quoting *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008)). "[I]t would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Pauling*, 924 F.3d at 657 (emphasis in original). As is set forth below, these standards require that the Court set aside the guilty verdict as against Mr. Hana and enter the a judgment of acquittal that justice, and the evidence, demand.

### B.    Federal Rule of Criminal Procedure 33

A motion for a new trial permits courts to correct erroneous legal or evidentiary rulings that were made during the parties' case-in-chief. *See, e.g.*, *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (reviewing motion for new trial based upon two legal errors made at trial); *see also* 3 Fed. Prac. & Proc. Crim. § 589 n. 11, 12 (4th ed.). In evaluating a defendant's request for a new trial, courts must engage in an "objective evaluation" of "[a]ll the facts and circumstances" presented at trial. *United States v. Aiyer*, 470 F. Supp. 3d 383, 409 (S.D.N.Y. 2020), aff'd, 33 F.4th 97 (2d Cir. 2022). Under Rule 33, the Court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). Specifically, Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The "ultimate test" for a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). In other words, a new trial is warranted where the "evidence preponderates heavily against the verdict to such an extent that it

would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

The Court should grant a Rule 33 motion where there is "a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134; *see also Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (noting that if a court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" it should grant a new trial). Thus, a defendant is entitled to a new trial where "the evidence was patently incredible or defied physical realities," an "evidentiary or instructional error compromised the reliability of the verdict," or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony." *Landesman*, 17 F.4th at 331 (cleaned up).

Unlike the case with regard to Rule 29 motions, in evaluating a Rule 33 motion, "the judge is not required to view the evidence in the light most favorable to the prosecution." *United States v. Levy*, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009) (quoting *United States v. Coriaty*, 99-cr-1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001)), *aff'd*, 385 F. App'x. 20 (2d Cir. 2010); *see also Ferguson*, 246 F.3d at 137 (the court is not required to give "blind deference to the jury verdict"). Rather, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134; *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) ("[T]he court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" (quoting *Sanchez*, 969 F.2d at 1413)); *Archer*, 977 F.3d at 189 ("[A] district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis."). Ultimately, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence'

in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

**ARGUMENT**

**I.    THE GOVERNMENT'S USE OF SUMMARY CHARTS AND RELATED WITNESS TESTIMONY WAS IMPROPER.**

On multiple occasions throughout trial, the Government, rather than simply introducing the facts at issue through a witness with personal knowledge of the case, or admitting documents, and then summing up on them, called Federal Bureau of Investigation ("FBI") agents who were not involved in the investigation of this matter to read select information from summary charts. This procedural mechanism is one that appears to be an increasingly common way that the Government seeks to secure convictions without providing the defense a real opportunity to respond to the allegations raised. *See, e.g., United States v. Ahaiwe*, 21-cr-2491, 2023 WL 4196954, at *2 (2d Cir. June 27, 2023) (addressing the admissibility of a summary chart and summary testimony); *United States v. Ortiz-Orellana*, 90 F.4th 689 (4th Cir. 2024) (addressing admissibility of a summary chart under Federal Rule of Evidence 1006); *United States v. Haynes*, 22-cr-4738, 2024 WL 2206500, at *2 (4th Cir. May 16, 2024) (challenging the district court's admission of a summary chart and accompanying lay witness testimony); *see also Alifax Holding SpA v. Alcor Sci. LLC*, 22-cv-1641, 2024 WL 2932910, at *7 (Fed. Cir. June 11, 2024) (challenging the use of summary witness testimony under Rule 1006); *United States Sec. & Exch. Comm'n v. Qin*, 20-cv-10849, 2024 WL 1342803, at *7 (S.D.N.Y. Mar. 29, 2024) (determining admissibility of summary evidence under Rule 1006). Here, it allowed the Government to emphasize, in the middle of trial, cherry-picked content from sweeping summary exhibits in a manner that risked—and then caused—an unfair process and an inaccurate, unsupported result.

Indeed, as explained below, other than asking the jury to draw unsupported inference upon inference from its summary charts, the Government adduced absolutely no evidence to sufficiently establish, as a matter of law, proof beyond a reasonable doubt of all of the essential elements of the offenses charged in the Indictment. As a result, Mr. Hana's unjust conviction should be set aside and judgments of acquittal entered for each count pursuant to Federal Rule of Criminal Procedure 29. In the alternative, a new trial should be ordered under Federal Rule of Criminal Procedure 33, one which will be a real trial, based upon real evidence, rather than on the kind of unfair manner in which the Government tried this case; *i.e.*, through summary charts and extensive summary testimony from agents with no involvement in the case. Indeed, unless the Court acts, innocent people face the very real danger of criminal conviction based on entirely unreasonable and unsupported inferences alone. For these reasons, and those set forth in further detail below, Mr. Hana's post-trial motions should be granted and a judgment of acquittal entered, or at the least, a new trial ordered.

A.  **The Government's Use Of Summary Charts And Summary Agent Testimony.**

On April 28, 2024, just two weeks before the start of trial and more than a week after its deadline for exhibit disclosure, the Government provided the defense with initial drafts of three different summary charts, GX 1302, GX 1303, and GX 1304. Unbeknownst to the defendants at the time, these charts would become the crux of the Government's case. Each of these summary charts contained a timeline of artfully selected text messages, emails, voicemails, records, and other documents relating to different schemes in this case. Specifically, GX 1302 was a 97 page chart including conversations and events from December 13, 2017 to January 29, 2022 relating primarily to the IS EG Halal and Egypt schemes. GX 1303 depicted various messages and events from December 16, 2016 to June 9, 2022 over the course of 58 pages relating to the

Uribe/Mercedes-Benz scheme, and GX 1304 was a 34 page summary chart pertaining to Mr. Daibes, including the allegations related to Qatar.[2]

From the outset, defense counsel objected to the admissibility of these summary charts and to many of their underlying exhibits.  For example, following the receipt of a revised version of GX 1302 on May 15, 2024, defense counsel for Senator Menendez filed a letter, on May 19, 2024, objecting to numerous lines in GX 1302 on the basis that they contained errors, violated the Speech or Debate clause, were rank hearsay, and included irrelevant and unfairly prejudicial information. *See* ECF No. 406.  Mr. Hana raised objections to this exhibit as well, which objections had been narrowed after several meetings with the Government, Tr. 1053:22-1062:18, but which the Court heard on May 21, 2024.  The Court ruled with respect to GX 1302 that "[t]he format of the summary chart seems to me quite appropriate, and there is nothing unusual about it. The items are certainly voluminous, and it seems to me, under 1006, that the chart can be admitted." Tr. 1012:19-22.  The Court also overruled each and every objection raised by the defense, other than a few references to prior holds on foreign military assistance and prior sign-offs, which it held were violative of the Speech or Debate Clause.  ECF No. 420.[3]

---

[2] Because the allegations in GX 1304 have nothing to do with Mr. Hana—as the exhibit itself shows—this portion of the motion focuses primarily upon the issues raised by the Government's use of GX 1302 and GX 1303, as well as GX 1334, and the related summary witness testimony regarding each of these exhibits.

[3] As discussed in further detail below, at the time of the Court's ruling, the parties did not and simply could not properly anticipate and address the manner of the summary chart's preparation and summary witness's anticipated testimony, or the significant constraints that would be placed on the defendants' ability to cross-examine the summary witness about this exhibit.  To the contrary, at the time, the Government was indicating that it intended to call numerous witnesses (the witness list then contained 47 identified individuals, many of whom were not called as witnesses because their critical "testimony" came in through the summary chart).  *See* Certification of Lawrence S. Lustberg ("Lustberg Cert.") Exhibit A,  Government's April 19, 2024 Witness List

In similar vein, on May 27, 2024 the defendants provided the Government with their objections regarding GX 1303 and the underlying exhibits that the Government expressed its intent to introduce in connection with the chart.  Again, certain of those objections were resolved informally, based upon the ruling that the Court had made earlier and lengthy discussions between counsel.  *See* Tr. 2287:7-2306:18 (addressing Senator Menendez's objections to 1303, after which counsel for Mr. Hana noted that they "just filed a letter about how cross of Agent Graves will be presented").

Meanwhile, on May 27, 2024, the defense received the final version of GX 1302,[4] and on May 28, 29, 30, and 31, 2024, the Government presented testimony from FBI Special Agent, Michael Coughlin, the crux of which consisted of verbatim readings of carefully selected text messages, emails and voicemails contained in GX 1302 created by, in Special Agent Coughlin's own words "the government -- the United States Attorney's Office."  Tr. 1173:1-2.  Special Agent Coughlin testified that though he engaged in "a lengthy process" of review, which included "review[ing] the entirety of the document" and "the underlying government exhibits that the document is based on," *id.* 1173:4-6, he did not select the documents that appeared on the summary exhibit; instead, the prosecutors made that selection, *see also id.* 1174:9-14 ("Q.  Do you believe that you reviewed all of the documents in this case?  A.  No.  Q.  Who made the decision what exhibits would be referred to in the summary document?  A.  The U.S. Attorney's Office.").  Special Agent Coughlin admitted that he "was not really involved in the investigation" of this case,

---

(identifying, *e.g.*, Dana Stroul, Nicholas D'Alessio, Bienvenido Hernandez, Nader Moussa, and Elvis Parra).

[4] On June 23, 2024, the Government sent a replacement version of GX 1302.  This version, which made additional redactions in accordance with subsequent rulings, was ultimately provided to the jury.

Tr. 1172:16-18, and had done nothing other than review GX 1302 and the underlying documents for the purpose of providing his testimony, *id*. 1569:21-1570:1 ("Q.  You testified on direct that you were, and I quote, not really involved in their investigation.  You added the word 'really.' What did you mean by that?  A.  Well, beyond my current involvement, so obviously in preparation for today, or the last few days, I prepared for testimony.").

Nevertheless, during Special Agent Coughlin's direct examination, the Government repeatedly asked Special Agent Coughlin to read into the record select communications in GX 1302, or to respond to readings of them by Assistant U.S. Attorney Monteleoni, and through his testimony, attempted to tie these communications to other entries in the chart on the basis of their timing.  *See, e.g.,* Tr. 1223:5-1228:24 (directing Special Agent Coughlin's attention to a text message from Nadine Arslanian[5] to Mr. Hana arranging to meet for dinner on May 6, 2018 at Fornos of Spain in Newark, then directing his attention to a map indicating that the restaurant is a four minute walk from Senator Menendez's office, then directing his attention to an email from Senator Menendez's staffer on May 6, two hours after Nadine and Mr. Hana met for dinner, asking another staffer how many Americans are posted to the United States embassy in Cairo); *id*. 1245:23-1248:15 (directing Special Agent Coughlin's attention to a May 28, 2018 email from Mr. Hana to Nadine regarding numbered points about an American that was injured in Egypt, then to an email from Nadine to Senator Menendez forwarding those points and asking him to fix the letter, and then to a message from Nadine to Senator Menendez stating that "the general" and Mr. Hana got her "clearance for a project."); *id*. 1353:10-1354:5 (directing Special Agent Coughlin to a April 8, 2019 text message from Nadine to the Senator stating "[s]eems like halal went through.

---

[5] For clarity and ease of reference, Ms. Arslanian, who became Ms. Menendez when she married Senator Menendez on October 3, 2020, is referred to throughout this brief, as she was throughout the trial, as "Nadine."

It might be a fantastic 2019 all the way around," then asking Special Agent Coughlin "[w]hen this was sent, about how long is that after Hana received the document that we just looked at regarding the Islamic centers for halal slaughter?"); *id*. 1422:23-1423:9 (directing Special Agent Coughlin to a June 27, 2019 email from John Moldovan to Nadine regarding her outstanding mortgage and asking "[h]ow long is that after the June 19, 2019, dinner at Fleming's we saw referenced in the text messages a few minutes ago?"); *see also id.* 1375:12-19 ("Q.  Directing your attention to 4:50 p.m., can you please read Nadine's reply six minutes later?  A.  'Can you please translate word for word what is written on there the picture.'  Q.  Directing your attention to 5:26 p.m., what does Hana send Nadine after she writes can you please translate word for word what is written on there the picture?  A.  She sends an email."); *id*. 1385:5-1386:24 ("Q.  Directing your attention to the next line at 6:08 p.m. --  I'm not going to ask you to read the full text, but does Hana list a number of names with numbers and then the letter K after the numbers?  A.  Yes, that's correct. . . .  Q.  Directing your attention to the middle of the text, after the line that says 5, could you please read the line starting Nadine?  A.  Nadine Arslan 120K.  Q.  Leaving aside Bob Alvino, how does the 120K after Nadine Arslan's name compare to the numbers after all the other names listed here?  A.  It's more than all the others, other than, as you said, leaving aside Bob Alvino.").  Additionally, because there was no direct evidence of any explicit promises, the Government attempted to use Special Agent Coughlin's testimony to tie certain *quids* to entirely unrelated *quos*.  *See, e.g.,* Tr. 1264:15-1270:15 (directing Special Agent Coughlin's attention to an email from Viv Montemayor from the Egyptian Defense Office to Mr. Hana on June 29, 2018 stating "Maj. Gen. Khaled Shawky mentioned that the meeting of the Egyptian military white paper delegation with Senator Menendez will be on July 26, Thursday . . .," then directing his attention to an Open Table reservation at Mr. Chow in New York for three people on June 30, 2018, then directing him to the

cost of the bill of $524.61); *id.* 1384:4-1385:19 (directing Special Agent Coughlin's attention to a May 24, 2019 email from Under Secretary Ted McKinney referencing a "call from the senator," then "mov[ing] ahead a few days" and directing his attention to text messages between HH HH and Mr. Hana stating "Nadine Arslan 120K").

Confronted with the unfamiliar situation of the Government's presentation of its case through the use of extensive summary charts through an agent with no involvement in the matter, the Court issued a series of rulings curtailing the scope of permissible cross-examination. First, the Court limited cross-examination to items contained on the charts and precluded the defense from asking any questions that would identify communications and other documents that the Government decided not to include in its summary charts, no matter how probative that evidence might be. Tr. 1494:20-1495:2 ("You can question him, I mean, you can establish from him, just repeat it if you want, that he just looked at what he was given, and it's the prosecutors who decided what was there. And then you can question him if you want about his testimony about those documents. But not about other documents that may or may not inform his choice of what's on the chart. Because it wasn't his choice as to what was on the chart."); *id.* 1628:5-10 ("Mr. Weitzman, I've given you a fair amount of leeway here, you'd concede, in light of the length of the government's direct examination, but you can't have him interpreting what's on there or talking about what's not on here. Just stick with what is on there. You can't ask him things outside of the four corners of this document."). Specifically, the Court rejected the argument that the defense should be permitted to cross-examine the summary agents about why the charts contain a cherry-picked selection of messages leading to a distortion of evidence, noting that "[t]his isn't the witness to do that." Tr. 1496:12-20. The Court explained that because the agents "ha[d] no role to play

with what's in the chart, [the defense] can't ask [the agents] what isn't in the chart." Tr. 1501:20-22.

Later, though, when counsel for Mr. Hana, seeking to abide by this ruling, sought to do exactly what the Government had done with regard to matters that *were* on the chart, the Court precluded that too. That is, already confined in the scope of questions that he could pose on cross-examination, Mr. Hana's counsel sought to highlight, in a manner that was virtually identical to the process followed by the Government, certain entries on GX 1302, the summary chart related to the IS EG Halal and Egypt schemes. But though it had allowed the Government to proceed in this manner, the Court, urged on by Government objections, and in front of the jury, found—often in openly critical and derisive terms—that "simply point[ing] the jury to what [the summary chart] said. . . . [was] not the purpose of cross examination." Tr. 1728:20-1729:4 ("The Court:  Mr. Lustberg, so far you've highlighted, you directed this witness's attention to 540, 1095, and 536. But I think in essence what you've done is simply pointed the jury to what that said. That's not the purpose of cross-examination. Next question. Mr. Lustberg:  Thank you. I'm trying to stick to the chart. The Court:  I understand. But, it's to ask this witness questions, not to just restate what's on the chart. Go ahead."); *id.* 1739:15-24 ("Q. That was what was in the text message, correct? A. In this entry on line 971? Q. Yes. A. Yes. Q. And it also says 'I'm not sure if you recall, but we discussed the promissory note over the telephone.' The Court:  Sir, this the jury has it now. There is no point in just reading it. What's the question? Mr. Lustberg:  I want to make sure this was what was in fact in the text message."). As discussed in further detail below, taken

14

together, these rulings violated Mr. Hana's constitutional right to cross-examine a Government witness about summary exhibits that were at the heart of this case.[6]

Following Special Agent Coughlin's testimony on GX 1302, Mr. Hana filed a motion asking the Court to broaden the scope of permissible cross-examination to allow Mr. Hana to question the remaining summary witnesses about documents outside of the summary charts by asking the witnesses to (1) read relevant, but omitted, documents or other communications; and (2) highlight those entries in the Government's summary exhibits that the defense wished to emphasize. ECF No. 441. The Court granted Mr. Hana's request, again implicitly acknowledging the improper constraints placed on Special Agent Coughlin's cross-examination on GX 1302, and, with respect to GX 1303 and GX 1304, afforded "some more leeway to the defendants to, if they so choose, to highlight exculpatory information in the charts that the summary witness has been questioned about." Tr. 2312:12-15. However, the Court's attempt to provide defendants with "more leeway" failed to remedy the injustice that had already occurred with respect to GX 1302, and did not adequately protect Mr. Hana's constitutional rights moving forward.

---

[6] At the conclusion of Special Agent Coughlin's testimony, counsel for Mr. Hana raised his concerns with respect to his ability to "engage in meaningful cross-examination." *See* Tr. 1872:1-1874:10. The Court expressed that it "[didn't] disagree at all with that" and acknowledged "criticiz[ing]" counsel despite the fact that he "tried to stay solidly within [the] four corners" of GX 1302 during his cross-examination. Tr. 1873:17-1874:9 ("Mr. Lustberg: And I just think that we should be given the opportunity to engage in meaningful cross-examination as we see it. The Court: I don't disagree at all with that. I'm asking, however, that the parties be as efficient as possible and move forward expeditiously. And I haven't cut anybody off. And I understand your point. Mr. Lustberg: Well, let me say I did feel cut off. And beyond that, your Honor, yesterday, I really tried to tailor this to be as efficient as possible. Yesterday you admonished Mr. Weitzman repeatedly for not staying within the four corners of Government Exhibit 1302. Today, I tried to stay solidly within those four corners. The Court: And I criticized you for that. Mr. Lustberg: Yes. The Court: I understand your point. All right. Mr. Lustberg: Thank you, your Honor. The Court: I understand the point.").

Thus, on June 4, 2024 the Government provided its final version of GX 1303.  On June 5 and 6, 2024, the Government called Rachel Graves, another Special Agent from the FBI, and similarly delved into cherry-picked readings from GX 1303, a summary chart drafted by "[t]he prosecutors" in this case.  Just as with Special Agent Coughlin, the Government similarly asked Special Agent Graves, on direct examination, to read selected entries on GX 1303 to the jury (or did so itself, often in dramatic fashion) and, based merely on timing alone, attempted to draw connections between certain, often entirely unrelated, entries.  *See, e.g,* Tr. 2403:16-2408:25 (directing Special Agent Graves to Senator Menendez's call to Gurbir Grewal on January 29, 2019, then directing her attention to text messages from Mr. Hana to Mr. Daibes, on February 1 and 7, 2019, regarding assisting Nadine with a car); *id.* 2414:15-2415:14 (directing Special Agent Graves to a March 12, 2019 call from Senator Menendez to Nadine, then to a call from Nadine to Mr. Hana, and eliciting that the two calls were within "[m]oments.  Within the same minute," and then to Senator Menendez's call to Michael Critchley, Elvis Parra's defense attorney, "moments" later); *see also id.* 2353:14-18 ("Q.  Special Agent Graves, directing your attention to line 28, how long is it that it reflects that Hana texts Nadine after Nadine left the voicemail saying she needs to know what names to put it under about the fund raisers?  A. Approximately two minutes."); *id.* 2358:2-7 ("Q.  Can you please read what it reflects Uribe texts Hana?  A. 'If you can talk, give me a call.' Q.  About how long is it that Uribe texts this to Hana after he texted Andy Aslanian at 4:15 p.m. saying:  I don't like the news. No. No.  A.  A few minutes.").  And with no direct evidence of any agreement, the Government also tried, through Special Agent Grave's testimony, to prove a meeting of the minds through the defendants' emails and messages and attendance at certain meetings and dinners, despite the fact that there was absolutely no evidence of what was said at those get-togethers.  *See, e.g.,* Tr. 2468:3-2469:6 (directing Special Agent Graves to Elvis Parra's

16

plea offer, then directing her attention to text messages between Nadine and Mr. Hana on April 26, 2019 setting up a meeting at 7pm with Mr. Uribe and Senator Menendez despite the fact that there was nothing to indicate, including from Uribe's testimony, that this meeting related to anything illegal).

When it came time for cross-examination, however, Special Agent Graves testified that although she reviewed the summary chart "line by line" and checked it against several different Government exhibits including text chains, emails, and thousands of pages of phone records, that were selected by the Government, Tr. 2316:20-22; 2317:17-2318:6, it was the prosecutor's decision as to what portions of the information in the underlying Government exhibits would be included in the chart; thus, she stated, GX 1303 did not reflect all of the information set forth in the underlying exhibits, *id*. 2317:9-16 ("Q.  And is all of the information, in every underlying exhibit, did all of that information always make it into each summary document?  A.  No, it did not.  Q.  Who chose what portions of the information in the underlying government's exhibits would get summarized in the summary document?  A.  The prosecutors."); *see also id.* 2650:12-17.  Special Agent Graves admitted that she was not involved in investigating this case and simply reviewed GX 1303 and the underlying exhibits to prepare for her testimony.[7]  Tr. 2316:10-15 ("Q. Did you participate in that investigation?  A.  No, I did not.  Q.  What did you do to prepare to testify today?  A.  I reviewed a series of summary charts that were backed up by documents including bank records, phone records, e-mails, business records, and documents."); *id*. 2558:23-24 ("Q.  And you are not one of the lead case agents, right?  A.  I'm not part of the case investigation.").  As a result of this type of presentation, Mr. Hana remained unable to cross-

---

[7] On June 20, 2024, the Government called Special Agent Paul Van Wie of the FBI to the stand and engaged in a similar process with regard to GX 1304.

examine Special Agent Graves on documents that fell outside the four corners of the summary chart and on the decision to include or omit certain communications from GX 1303. Tr. 2312:21-2313:1 ("But, the defense cannot cross-examine the summary witness, assuming the testimony is that this -- that the summary witness did not select the exhibits which I expect it to be. Assuming that is true, I am not going to permit the defense to bring out documents that are not in the chart and to cross-examine the witness on those.").

In addition to GX 1302, 1303, and 1304, the Government admitted into evidence several other summary charts documenting pertinent information in the Government's case. *See* GX 1301, GX 1305-1351. For example, the Government admitted GX 1334, a summary chart of fingerprint identifications through FBI Physical Scientist Forensic Examiner, Kira Glass; GX 1339, a summary chart depicting gold bars associated with Mr. Daibes as well as Asahi one-ounce bars through Megan Rafferty, a forensic accountant at the FBI; and GX 1351, a summary chart of phone records from Philip Sellinger's cellphone from December 14-17, 2020 through Special Agent Paul Van Wie of the FBI. As discussed herein, while this motion is addressed at the larger issue raised by the Government's strategy of trial by way of summary chart, particular focus is on GX 1302, GX 1303 and GX 1334 and the uninvolved summary agents who presented those charts.

**B.    The Government Improperly Used Summary Charts And Summary Agent Testimony To Further An Inaccurate, One-Sided Narrative In Support Of Its Own Theory Of The Case, In Violation Of Rule 1006.**

The Government's summary evidence in this case was different, and far more prejudicial to the Defendants' substantive constitutional rights, than that which is contemplated by Federal Rule of Evidence 1006. Rule 1006 provides in relevant part that a witness "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. As emphasized in the 2024 amendments to Rule 1006, the Rule "draws a distinction between summaries of voluminous

admissible information offered to prove a fact," which fall under Rule 1006, and "illustrations offered solely to assist the trier of fact in understanding the evidence," otherwise called "illustrative aids," now the subject of Rule 107 (effective December 1, 2024) and which are not admitted into evidence.  Adv. Comm. Note to the 2024 amendment to Rule 1006.

There are, however, guard rails to assure that Rule 1006 summary charts are not subject to abuse.  "For example, if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion."  *Id.*  "Where, as here, the government introduces summary charts, 'the court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury.'"  *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (quoting *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977)); *see also Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971) ("[A] trial court is charged with grave responsibilities to make certain an accused is not unjustly convicted in a 'trial by charts.'").  Indeed, "[a] summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the Court."  *United States v. Neumann*, 21-cr-439, 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023) (quoting *Fagiola v. Nat'l Gypsum Co. ACS., Inc*., 906 F.2d 53, 57 (2d Cir. 1990)).  The party seeking to admit summary evidence must "establish that the summary is accurate and nonprejudicial."  *UPS Store, Inc. v. Hagan*, 14-cv-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017).

Thus, Rule 1006 summary charts have often been used to synthesize "voluminous" business records or datasets that evade convenient in-court examination.  *See, e.g.*, *United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008) (financial records); *Goldberg v. United States*, 789

F.2d 1341 (9th Cir. 1986) (tax records); *United States v. Behrens*, 689 F.2d 154 (10th Cir. 1982) (pharmacists lists of prescriptions); *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753 (8th Cir. 2020) (lists of fees charged to insurance policyholders); *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009) (bank records and checks); *United States v. Aubrey*, 800 F.3d 1115 (9th Cir. 2015) (documents concerning deposits and withdrawals from accounts); *United States v. Mazkouri*, 945 F.3d 293 (5th Cir. 2019) (healthcare claims data); *United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020) (patient records); *In re Nat'l Prescription Opiate Litig.*, 17-md-2804, 2021 WL 4341317, at *4 (N.D. Ohio Sept. 23, 2021) (government and transactional data); *Brand v. Comcast Corp.*, 302 F.R.D. 201, 212 (N.D. Ill. 2014) (tabulation of total training hours for each employee was a proper summary under Rule 1006). Where Rule 1006 summary charts serve to synthesize communications, they generally do so with regard to sanitized, raw data, such as select date-and time-stamped phone calls where phone records would otherwise be overly burdensome for in-court examination. *See, e.g.*, *Blackwood*, 366 F. App'x at 212 (admitting a summary chart containing only phone records between three co-conspirators on three days "crucial" to the conspiracy charged); *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) (admitting "telephone summary charts" used to highlight "patterns of telephone calls" drawing from a two-binder set of telephone-record summaries given to jury along with a limiting instruction).

But regardless of their content, the law requires a particular approach to Rule 1006 summary charts, whereby "great care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative." *UPS Store, Inc.*, 2017 WL 3309721, at *5; *see also United States v. Markovich*, 95 F.4th 1367, 1378 (11th Cir. 2024) (noting that while summary testimony "need not summarize all the records at issue," it "may be based on a mere subset, provided that the testimony does not purport to represent all the

evidence").  Indeed, the Second Circuit recognizes that a "[summary] chart submitted by the prosecution is a very persuasive and powerful tool and must be fairly used, since, by its arrangement and use, it is an argument to the jury during the course of the trial. . . . A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error."  *Conlin*, 551 F.2d at 538-39.

Accordingly, courts have circumscribed the use of summary evidence in order to minimize the risks that they pose.  *See United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007) ("[T]he government may not use summary witnesses for inappropriate means.").  Thus, for example, Rule 1006 does not authorize the admission of summary evidence for the purpose of generating a narrative to support the prosecution's theory of the case.  *See United States v. Spalding*, 894 F.3d 173, 185 (5th Cir. 2018) ("[B]ecause summaries are elevated under Rule 1006 to the position of evidence," we have warned, "care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes."); *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) ("[I]nformation on the [Rule 1006] summary [must not be] embellished by or annotated with the conclusions of or inferences drawn by the proponent.").  In other words, summary evidence should not be used to convey the Government's position with regard to inferences and assumptions, which is exactly, as further explained below, what the Government did here.  *Conlin*, 551 F.2d at 538-39; *see also United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984) ("Care must be taken to insure that summaries accurately reflect the contents of the underlying document and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.").  Indeed, "[a] summary witness for the Government" cannot tell the jury "what [is] in the evidence" or "what inferences to draw from it."

21

*United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004); *see also United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983) ("A summary chart should not draw controversial inferences or pronounced judgment; these functions are best left to the closing argument of counsel.").  "While such witnesses may be appropriate for summarizing voluminous records, as contemplated by Rule 1006, rebuttal testimony by an advocate summarizing and organizing the case for the jury constitutes a very different phenomenon, not justified by the Federal Rules of Evidence or our precedent." *Nguyen*, 504 F.3d at 572.

Additionally, "in this Circuit it is improper for the Government to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury.  This practice is particularly problematic in criminal cases because it allows the government to paint a picture of guilt before the [supporting] evidence has been introduced." *United States v. Barnwell*, 15-cr-620, 2017 WL 1063457, at *2 (S.D.N.Y. Mar. 20, 2017) (cleaned up) (quoting *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005)).  But that, of course, is precisely what occurred here with respect to GX 1303, by putting it into evidence before Mr. Uribe testified.  On the other end of the case, "summary testimony cannot be used to allow the Government to repeat its entire case-in-chief shortly before jury deliberations." *United States v. Ekwuruke*, 372 F. App'x 521, 524 (5th Cir. 2010).  Either way, the Court should be wary of the Government's approach to summary charts in this case, which was a transparent attempt to admit into evidence "the functional equivalent of . . . mini-summation[s]." *Bray*, 139 F.3d at 1110.

Several legal problems result from the way in which the Government used summary charts here.  First, instead of presenting an "accurate and nonprejudicial" summary of the evidence, the Government here strategically chose to include only select, cherry-picked communications that were crucial to its case, and to compile its summary charts in a manner that often depicted those

communications outside their appropriate context.  For example, with regard to GX 1302, the Government included a slew of text messages and emails purporting to show that Mr. Hana paid Nadine $30,000 for a "sham job," but strategically failed to include communications evidencing the fact that Mr. Hana tasked Nadine with opening a foreign office for his company, IS EG Halal, in India, including a September 26, 2019 text message to Mr. Hana from his assistant, Carolina Silvarredonda, stating "I talked to Nadine and she said she will set up meetings in New Delhi to get the info, and will send it to us by next week."  *Compare* GX 1302 at line 1104, *with* DX 1302 at lines 1104-1 to 1104-18; *see* Section III.E., *infra* (refuting the Government's argument that this was a "sham job").  Similarly, in GX 1303, the Government strategically placed a September 5, 2019 text message from Mr. Hana to Nadine, asking her to call him, in the middle of pertinent conversations between Nadine and Mr. Uribe and Senator Menendez and Gurbir Grewal regarding "Part Two" of Mr. Uribe's plan, in an attempt to make it seem as though Mr. Hana was somehow involved in this scheme long after he had any real discussions about the case.  Moreover, noticeably absent from this summary chart was Nadine's response later that same day that she could not talk, and, perhaps, most importantly Mr. Hana's texts to Nadine on September 9, 2019, which make clear that Mr. Hana was trying to get together to celebrate Egyptian Armed Forces Day, not to participate in some illegality of Mr. Uribe's.  *Compare* GX 1303 at lines 1019 to 1027 *with* DX 1303 at lines 1027-1 to 1027-2, 1067-1 to 1067-2.  In light of these inaccuracies—and the fact that the Government itself acknowledged that it omitted certain documents, *see* Tr. 1498:1-4 ("if Mr. Weitzman believes that this chart cherrypicks, distorts, etc., *because there are omitted documents*, then he should call his own summary witness." (emphasis added))—GX 1302 and GX 1303 should have never been admitted under Rule 1006.  *See Bray*, 139 F.3d at 1110 ("[A] summary document "must be accurate and nonprejudicial.  This means first that the information on the document

summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner. Nothing should be lost in the translation."); *see also Thompson v. Spota*, 14-cv-02473, 2022 WL 17253464, at \*12 (E.D.N.Y. Nov. 28, 2022) ("Summaries prepared pursuant to this Rule are themselves admissible evidence. The offering party must, however, lay a proper foundation for admissibility of the underlying materials and show that the summary is accurate before the summary can be admitted."). In sum, although the Government was fully entitled to present to the jury its narrative of what happened, Rule 1006 and the case law interpreting it do not permit it to do so through summary charts.

Here, untethered to the purpose and limitations of the Rule, the Government used these charts in a fundamentally misleading manner, one that sought to establish a "chronological sequence and interrelatedness between certain events" that was "absolutely critical" to the Government's effort to obtain Mr. Hana's conviction, Tr. 1278:15-17, so critical, in fact, that it spent three and a half days (not including cross-examination) introducing GX 1302, GX 1303, and GX 1304 through its summary agents. Thus, rather than put in evidence, through witnesses and exhibits, as a trial is really supposed to be, the Government largely presented its case through these charts, introduced by agents who, by their own admissions, were not involved in the investigation of this case, or even in the preparation of the charts themselves and would offer no testimony other than the words on the face of the chart. This process not only violated both the letter and the spirit of the Rule, but by highlighting certain parts of lengthy text message and email chains and creating links between and among these various communications that ought to have been the subject of argument, inappropriately connected certain alleged *quids* to *quos*, for which there was no other foundation. As a result, beyond the procedural unfairness of the process, the jury was left with a fundamentally distorted view of the facts.

For example, over Mr. Hana's objection, the jury heard and considered testimony from Special Agent Coughlin purporting to connect a May 23, 2019 call from Senator Menendez to Ted McKinney, Under Secretary for Trade and Foreign Agricultural Affairs, to a May 28, 2019 email from Mr. Hana listing Nadine as an employee of IS EG Halal at a salary of $120,000. Tr. 1382:13-1386:24.[8] Noticeably absent from this colloquy, however, is the fact that Nadine was offered a job with Mr. Hana's new halal certification entity months before that, and as early as March 26, 2019. *See* GX 1302 at line 520 (text message from Nadine to Howard Dorian mentioning "getting [her] $2500/week and health benefits"). Nevertheless, during summation, the Government fully capitalized on Special Agent Coughlin's misleading testimony arguing that "the corrupt quid pro quo [is] undeniably clear" given that "[n]ot even a week after Menendez's call to McKinney that you see Hana here telling his Egyptian contact Nadine is going to be getting $120,000 a year." Tr. 6398:14-17. Having heard this before, it is not surprising that the jury credited the argument, but

---

[8] In addition to omitting relevant context, the Government also attempted to connect these two distinct events based on their mere closeness in time. *See* Tr. 1384:4-24 ("Q. Special Agent Coughlin, directing your attention to May 24, 2019 at 9:48 a.m., who sends the email on that line? A. Ted McKinney. Q. And could you please read what McKinney writes in this email? A. 'Let's continue to gather all relevant facts before I respond to Senator Menendez. Also important to me is that you reassure post in Egypt that we have their back. They should not worry about this call from the senator. It is what it is, and the very nature of this strange issue was bound to generate some interesting questions or calls. Thanks for reassuring them.' . . . Q. Turning to page 54, directing your attention to lines 748 and 749, could you please read those two messages that HH HH sends to Hana by WhatsApp, in order, that are listed as being sent on May 28, 2019, at 3:10 p.m.? A. 'Wael I need a written diagram for the office force. By tasks and titles' . . . 'with salaries' . . . Q. Directing your attention to the middle of the text, after the line that says 5, could you please read the line starting Nadine? A. Nadine Arslan 120K."). As discussed in Section III.E., below, this position, advanced by the Government during Special Agent Coughlin's testimony and reiterated during its summation, required the jury to pile impermissible inference on inference in a manner that is prohibited under well-established Second Circuit precedent. *See Valle*, 807 F.3d at 515 ("[S]pecious inferences [should] not [be] indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.") (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

it should not have heard it through an impermissible and highly prejudicial tactic that should not be able to stand.

Indeed, this process—in which the Government unfairly slanted select communications in an unduly favorable light to the it's theory of the case—was repeated consistently throughout trial and effectively allowed its summary agents to provide a mid-trial summation from the witness stand. That is, far from neutrally summarizing the evidence, the Government's summary charts and presentation of these charts through witnesses, endowed with the credibility of being Special Agents of the FBI but who had limited knowledge of the facts of the case, allowed the Government to weave its narrative from the select, cherry-picked pieces of evidence contained in the charts, essentially allowing it present arguments that should only have been allowed in summation. *See United States v. Jackson*, 849 F.3d 540, 554 (3d Cir. 2017) ("A case agent's testimony may not simply dress[ ] up [an] argument as evidence. . . . After all, the role of the prosecutor [is] to argue in summation what inferences to draw from the evidence." (cleaned up)).[9]

---

[9] Beyond serving as a beneficial, mid-trial summation for the Government, the back-and-forth between the prosecutors and summary agents, who were not involved in the investigation of this case, allowed the Government to play the role of witness, improperly putting its own gloss of communications and documents that spoke for themselves. *See United States v. Tines*, 70 F.3d 891, 897 (6th Cir. 1995) ("[W]hen a trial court permits any evidence to be restated or re-read to jurors, it must avoid two dangers: (1) that the jury may unduly emphasize the testimony, and (2) that the jury may take the reviewed testimony out of context."). For example, when trying to draw temporal connections between certain messages, the prosecutor, on multiple occasions, repeated aloud, frequently in dramatic tones, messages that were previously read by the summary agent. *See, e.g.*, Tr. 1193:4-5 ("Q. How long is that after the text above saying 'Do you know Albio Sires, what's your international position.'"); *id*. 1195:12-15 ("Q. How does that time compare with the time of the previous line where the chart lists Menendez texting Nadine Arslanian phone 'Would be happy to meet will arrange through Nadine, thanks'?"); *id*. 2399:5-6 ("Q. How long is that response, 'what about the rest,' after Hana's message saying Elvis Parra and then an address?"). Additionally, at numerous times, the Government directed its agents to read directly from communications depicted on the summary charts, in a script-like fashion with the prosecutor, as if they were performers in a play. *See, e.g.*, Tr. 1193:7-9 ("Q. Could you please read the text of the Bob Menendez user's response to the text saying 'Do you know Albio Sires, what's your

The Government, however, will surely respond—consistent with its position at trial—that the defense could and did adduce its own summary charts, which included certain communications and documents omitted from the Government's charts. However, the fact that Mr. Hana—like Senator Menendez—created his own chart and called his own summary witness as part of his defense case to affirmatively present evidence tactically left out of the Government's summary charts does not remedy the undue prejudice that Mr. Hana suffered as a result of the Government's clear violation of Rule 1006. At trial, the Government did not dispute that it omitted certain documents from its summary charts, and claimed that it was the defense's burden to "call [their] own summary witness" to the extent they sought to challenge the Government's decision to omit certain documents and communications from its summary charts. Tr. 1498:1-4 ("Mr. Monteleoni: May I suggest, if Mr. Weitzman believes that this chart cherrypicks, distorts, etc., because there are omitted documents, then he should call his own summary witness."). But that is simply not the law. It is the responsibility of the "party offering summary evidence [to] establish that 'the summary is accurate and nonprejudicial . . . [and can] be properly introduced through the testimony

---

international position.'"); *id.* 2410:12-21 ("Q. Skipping down a few lines, directing your attention to line 413, the third 12:15 p.m. entry, please read what Uribe texts to Hernandez – wait. I'm sorry let's go back for a second. Can we go back to page 25? So now on line 409, can you please read the translation of Uribe's response at 12:13 p.m. after Hernandez says: 'We convinced the people to have a meeting in your office on Monday, that's way Ana is more relaxed.'"). As a result, the prosecutor, acting as if he was a participant in these messages, was able to choose what words to place emphasis on when reading the cherry-picked messages to the jury. And, whether intentional or not, the prosecutor's facial expressions and other body mannerisms while acting out these communications certainly served to influence the jury with respect to the nature of the conversations themselves and what inferences should be drawn from them. *See United States v. Allums*, 15-cr-153, 2018 WL 2128372, at *6 (S.D.N.Y. May 9, 2018) (denying relief where there was no analysis of whether the government's transcript reading was prejudicial, without discussing witness theatrics or length of testimony); *see also Fanelli v. Centenary Coll.*, 211 F.R.D. 268, 270 (D.N.J. 2002) ("[Because] words themselves may carry only a limited meaning, courts have also held that facial expressions, voice inflection and intonation, gestures, body language may all express a message" (cleaned up)).

of a witness who supervised its preparation.'" *UPS Store, Inc.*, 2017 WL 3309721, at *5 (quoting *United States v. Stone*, 852 F. Supp. 2d 820, 828 (E.D. Mich. 2012)).  As explained above that burden was not borne by the Government here; the Government's inaccurate summary charts should have never been admitted in the first instance, and the defense's subsequent attempt at correction, through the introduction of its own accurate charts, nearly a month later, did not cure the impact of the highly prejudicial summary testimony elicited by the Government weeks prior. Therefore, irrespective of the fact that Mr. Hana decided to present an affirmative case, an act that he had no obligation to undertake, *see Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."), the Government's failure to satisfy the requirements of Rule 1006 cannot be dispensed with and the resulting prejudice to Mr. Hana cannot be ignored.[10]

Finally, the improper arguments, conclusions, and inferences presented by the Government's summary evidence was compounded by the court's confusing instruction on how the jury should consider the Government's summary charts.  In addressing the concerns raised in connection with GX 1302, the Government explicitly acknowledged that "these charts will be admitted subject to the instruction approved in *Ho* that these are not independent evidence, but

---

[10] By forcing Mr. Hana to call his own witness to rebut the Government's inaccurate charts and related witness testimony, the Government was also presented with the opportunity to cross-examine Mr. Hana's summary witness, and thus poke holes at his defense.  Thus, this procedure afforded the Government an opportunity—that it would not have had if it had stayed within the confines of Rule 1006—to attempt to tarnish Mr. Hana's credibility in front of the jury by picking at various aspects of its summary witness's testimony.  *See, e.g.*, Tr. 6143:6-19 (highlighting, on cross-examination of Mr. Hana's summary witness, the fact that DX 1302 mistakenly used the number "0" instead of the letter "o" in a text message from Nadine stating that she was "soooooo upset").

they are guides to the jury to inspect the underlying evidence." Tr. 1050:9-12. That, however, is not what occurred here. Unlike the instruction approved in *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020), which "properly advised [the jury] that the charts themselves did not constitute independent evidence and that it was the jury's duty to first determine that they accurately reflected the evidence on which they were based," the Court instructed the jury here that it "should consider the charts and summaries that I admitted as you would any other evidence." Tr. 7051:19-20. Although the Court later clarified that "it's up to [the jury] to decide whether the summary exhibits fairly and correctly reflect the underlying testimony and documents they purport to summarize," the instruction as a whole, particularly in light of the earlier comment that the jury should consider the charts as any other evidence, was certainly confusing and may well have caused the unjust result that ensued here.

In sum, the admission of the Government's summary evidence was error in that—and this really is undisputed—it did not fairly represent the content of the underlying exhibits that were ultimately presented to the jury, but was a presentation by the prosecution of what it believed to be the most damning evidence through a mechanism that holds, as the caselaw makes clear, the promise of great prejudice. And indeed, this process denied Mr. Hana of his right not only to a fair trial but really, to a trial-like procedure at all.

### C.    The Government Improperly Used Summary Evidence To Pile Inference On Inference In Order To Establish The Necessary Elements Of Their Case.

This case was extraordinary in terms of its complete lack of direct evidence of the offenses charged: even with regard to those few counts as to which actual live witnesses testified, no evidence was ever adduced of an actual agreement to provide something of value in exchange for an official act, a true *quid pro quo* (or to have Senator Menendez act as an agent of Egypt). There were no tapes, no first-hand accounts, no specific emails or texts among the thousands produced

29

which showed the requisite promise, or agreement.  Thus unable to prove the requisite elements of the offenses charged in this way, the Government resorted not to appropriate circumstantial evidence but to the use of summary charts to support the assumptions and inferences it sponsored. In order to do so, it impermissibly piled one speculative inference on another, though these inferences really were not inferences at all but rather impermissible guesses and speculation, even when viewed in light of the record as a whole and in the light most favorable to the Government. *See supra* at 3-6 (setting forth the standard for a motion under Rule 29).  For this reason, this Court should, as other courts have done when confronted by similarly legally unsupportable verdicts, grant a judgment of acquittal.  *See Graziano*, 616 F. Supp. 2d at 371 ("[T]he Court is loath to stack inference upon inference in order to uphold the jury's verdict."); *United States v. Jones*, 291 F. Supp. 2d 78, 90 (D. Conn. 2003) (granting acquittal motion in part because the government put forth an "unreasonable" inference that was itself "piled on top" of another "factually unsupported inference").

Some reminder of applicable legal fundamentals is in order.  As the Second Circuit has explained, "[a]n inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Pauling*, 924 F.3d at 656; *see also* Leonard B. Sand, *et al.*, Modern Federal Jury Instructions § 6.01 (2011) ("The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction or conclusion which . . . the jury [is] permitted to draw . . . from facts which have been established by either direct or circumstantial evidence.").  Although the Court "must defer to a jury's reasonable inferences, [the Court] give[s] no deference to impermissible speculation."  *Id.*  Indeed, "a conviction based on speculation and surmise alone

cannot stand, and courts cannot credit inferences within the realm of possibility when those inferences are unreasonable." *Langston*, 630 F.3d at 314 (cleaned up).

To be sure, "[a]t times it may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable. Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist." *Pauling*, 924 F.3d at 656. That said, "[t]he line between permissible inference and impermissible speculation 'is drawn by the laws of logic' and not 'judicial idiosyncrasies.'" *Id.*; *see also, e.g.*, *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 543 & n.8 (10th Cir. 1987) (rejecting the plaintiff's inferences because they "consist[ed] of 'reasoning from sequence to consequence, that is, assuming a causal connection between two events merely because one follows the other,'" and describing the *post hoc ergo propter hoc* logical fallacy (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980))).

Moreover, "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *Id.* at 657. The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Martinez*, 54 F.3d at 1043); *see also United States v. Varanese*, 417 F. App'x 52, 53 (2d Cir. 2011) (same).

Nor, as noted, may a conviction be obtained by "stack[ing] 'inference upon inference.'" *Graziano*, 616 F. Supp. 2d at 371; *see also United States v. Mohel*, 604 F.2d 748, 755 (2d Cir. 1979) ("[A] piling of indirect inference upon indirect inference is improper."); *Wilson*, 879 F.3d at 802 ("In a case that hinges on circumstantial evidence, we must not permit a verdict based solely on the piling of inference upon inference."); *Ouedraogo*, 531 F. App'x at 739-40 ("Although the

31

evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against 'piling inference upon inference.'"); *Arras*, 373 F.3d at 1073 ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference."). In this regard, "[a]n inference which is based solely and entirely upon another inference, and which is unsupported by an additional fact or an inference from other facts is an inference upon an inference." Stephen E. Arthur & Robert S. Hunter, 2 Federal Trial Handbook: Criminal § 52:6 (2022-2023 Edition). In application, a jury "may not . . . treat a fact inferred as a fact established that, in turn, can serve as the basis for a further inference and thereby spin out a chain of inferences into the realm of pure conjecture." *Id.*

Put another way, as the Second Circuit has explained, "the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [cannot be] unduly long." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (cleaned up). Indeed, the "prohibition against piling inference upon inference indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion." *United States v. Michel*, 446 F.3d 1122, 1128 (10th Cir. 2006). Thus, "where a conviction appears to be based on multiple and successive inferences, [the court] must exercise caution and measure the 'gap' between fact and conclusion before acquiescing in the jury's leap." *Id.*

Here, the evidence adduced through the Government's summary charts certainly amounted to not only the piling of inference upon inference, but indeed, of unreasonable inference upon unreasonable inference, all supported by no more than suspicion or speculation, and none sufficient to amount to guilt beyond a reasonable doubt—the most fundamental element of our system of

criminal justice.[11]  Foremost, the Government failed to adduce any evidence at trial to support the inferences that the jury was asked to and certainly must have drawn to reach a determination of guilt.  But beyond the lack of factual evidential support, even assuming that these inferences were somehow reasonable, the Government could not indefinitely stack one purportedly reasonable inference upon another to satisfy its burden of proving Mr. Hana's guilt beyond a reasonable doubt. *See United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005) ("[T]he chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one." (quoting *United States v. Shahane*, 517 F.2d 1173, 1178 (8th Cir. 1975)).

As just one example, but one that played a prominent role in the Government's summation and especially its rebuttal—at a point when it could not be responded to—the Government introduced GX 1334, a summary chart identifying finger prints belonging to Nader Moussa and Gazmend Lita on two envelopes found in the Menendez home, to support the inference that Mr. Hana gave his "business associate," Nader Moussa, and "employee," Gazmend Lita, something of value, *i.e.* envelopes of cash, to give to the Senator or Nadine in exchange for some unidentified act.  That is, for the first time in its summation and then in greater force in its rebuttal, the Government argued that after Mr. Hana's home was searched in November 2019, Mr. Hana stopped issuing checks to Nadine for a purportedly "sham job," and started to pay her in cash, through his employees Nader Moussa and Gazmend Lita.  *See* Tr. 6387:6-10 ("And some of the cash in the [Menendez] house, including what we see here in Menendez's boot, that was in

---

[11] Throughout this entire trial the Government improperly relied on unreasonable inference upon inference to prove the necessary elements of its case.  As a result, this issue permeates all of Mr. Hana's Rule 29 arguments made herein, and is discussed, in more specific and targeted detail in Sections III and V below.

envelopes with Moussa's fingerprints on them or some fingerprints of Gus Lita, one of Hana's employees. So more things of value from Hana to Menendez."); *id.* 6992:14-6993:14 ("That -- that; there was a search of Wael Hana's home on November 25, 2019. Disruption in the plan. No more checks. But it's not because she was fired. Remember, of course, she also got a check after she was fired. And this is teed to the argument that somehow Wael Hana was not involved in 2018. But does that mean there's no more payments? No more payments from Wael Hana or IS EG Halal, his company, to Nadine? No. . . .These are envelopes. Right? They're found in the Menendez home. There are three of them that are in red. Whose prints are on them? Nader Moussa, Agent Kougemitros and, the bottom one, Gazmend Lita. Now, who are those people? You might remember the answer. They're connected to Wael Hana. . . . They work for him. So how did Nadine get paid by Wael Hana after the checks stopped? The good old-fashioned way -- cash. By the way, the chart I just showed you is GX-1334, and you'll see from other evidence in the case that one of those envelopes is also unquestionably after the checks, in recent years, and during the scheme. Because that's when the money was withdrawn. It's not that Mr. Hana left the conspiracy. It's that the conspiracy continued, and he just needed to be a lot more careful. So he switched to cash and he switched to his employees, and it's sitting in the home like the rest of the bribes."). But this extraordinary argument required the jury to infer: (1) that after Mr. Hana's home was searched in November 2019, he stopped paying Nadine through checks; (2) that after Nadine stopped receiving checks from IS EG Halal, Mr. Hana continued to pay her in cash; (3) that Mr. Hana paid Nadine through his "employees;" (4) that Nader Moussa was in fact Mr. Hana's employee; and (5) that because Nader Moussa and Gazmend Lita worked for Mr. Hana that the envelopes found in the Menendez home must have been from Mr. Hana. Each such inference was, however, nothing but the kind of guesswork that is prohibited under the law. *See, e.g.*, *United*

34

*States v. Yannotti*, 415 F. Supp. 2d 280, 289 (S.D.N.Y. 2005) ("While a jury may draw reasonable inferences, it may not engage in impermissible speculation."); *United States v. Gotti*, 457 F. Supp. 2d 403, 409 (S.D.N.Y. 2006) ("An inference cannot be based on speculation or guesswork. It must be based on the evidence in the record."); *accord United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) ("Reasonable inferences supported by other reasonable inferences may warrant a conviction, but a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." (cleaned up)).

Thus, for example—remembering that *Mr. Hana's* fingerprints were not found on the envelopes in question—the Government provided no direct or indirect evidence that Mr. Hana ever gave Nader Moussa or Gazmend Lita any cash to give to Nadine or Senator Menendez. Tr. 2913:25-2914:2 ("Q. You did not find any prints for a person names Will Hana, correct? A. Correct."). Nor could it permissibly be inferred that he did from the mere fact that they were associated: the law is clear about that. *See United States v. Cruz*, 363 F.3d 187, 198 (2d Cir. 2004) ("Guilt may not be inferred from mere association with a guilty party."); *United States v. Berenguer*, 562 F.2d 206, 209 (2d Cir. 1977) ("It is, of course, well established that guilt may not be inferred from mere association with a person whose guilt has been established."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 305 (S.D.N.Y. 2008) (rejecting allegations that "amount to little more than arguments for guilt by association"); *see also United States v. Padilla*, 208 F. App'x 476, 479 (7th Cir. 2006) ("[M]ere presence and guilt by association fail to prove criminal liability."). Nor did the Government present any bank statements, messages or other documentary evidence showing that Mr. Hana ever withdrew this money to give to Nadine, or elicit any testimony from Nader Moussa, Gazmend Lita, or any other witness actually called, that Mr. Hana gave his employees cash with the instruction to provide it to Nadine. The Government

did not even identify when the cash was allegedly provided to Nadine—other than baldly asserting, without evidentiary support, that it was after the search of Mr. Hana's residence—or specify what the two envelopes of cash were provided in exchange for, as is required under the law.[12]  *See United States v. Silver*, 948 F.3d 538, 553, 556 (2d Cir. 2020) ("*Silver II*") ("[A]t the time the bribe is made, the promised official act must relate to a properly defined question, matter, cause, suit, proceeding or controversy.").  In fact, the Government did not even identify Nader Moussa as one of Mr. Hana's employees.  *Contra* Tr. 1115:20-22 (Jamela Maali:  "Q.  Based on your conversations with Mr. Hana, did you understand that Mr. Hana and Nader Moussa were friends?  A.  From my understanding, yes.").

In sum, the conclusion that the Government sought—that the envelopes of cash found in the Menendez home were provided by Mr. Hana himself—was not only based upon stacking inference upon inference, but was especially improper because the obvious inference was that the actual individuals whose fingerprints were found on the envelopes were not the ones who provided the cash.  *See Landesman*, 17 F.4th at 320 ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.").  That is, the Government sought—although it was successful with the jury it should not be with the Court, *see United States v. Thomas*, 981 F. Supp. 2d 229, 244 (S.D.N.Y. 2013) ("Sufficiency-of-the-evidence review involves assessment by [a] court[ ] of whether the evidence adduced at trial could support any rational determination of guilt[ ] beyond a reasonable doubt." (quoting *Powell*, 469 U.S. at

---

[12] As explained in Section III, *infra*, the Government's failure to connect the alleged things of value to a particular question or matter that Senator Menendez allegedly promised to, or did, influence, is both an independent ground for reversal and a further reason why the jury undoubtedly based Mr. Hana's guilt on improper speculation and unreasonable inference.

67))—inferences that were not only entirely unsupported by the record, but certainly cannot be piled upon one another to elide the requirement that it prove Mr. Hana's guilt beyond a reasonable doubt.

The undeniable prejudice stemming from the Government's unsupported and unreasonable assumptions in this regard was aggravated by the fact that: (1) GX 1334 was introduced through FBI Physical Scientist Forensic Examiner, Kira Glass, who—other than conducting the latent print analysis—had no involvement in the investigation of this case, *see* Tr. 2816:11-3 ("Q. Other than conducting latent print analysis, did you have any other involvement in this investigation or prosecution? A. No."); and (2) there was no indication prior to the Government's summation that it was going to attempt to link Mr. Hana to the PNC Bank envelopes found with Nader Moussa's and Gazmend Lita's fingerprints. For example, the Government did not call Nader Moussa, though he appeared on the Government's witness list, thus leading the defense to believe that it could elicit the necessary information through him,[13] including his prior statement to law enforcement officials, specifically that he had a bank account with PNC Bank, that he would at times get cash from PNC Bank, that he left Nadine approximately $300 in her garage in early 2019, and, most significantly, that *"[n]o one gave envelopes to [Nader Moussa] to give to [Senator Menendez]/[Nadine Menendez]."* Lustberg Cert. Exhibit B, April 16, 2024 Nader Moussa Interview Notes (3529-087 at 6). Nor was counsel for Mr. Hana able to elicit similar testimony regarding Gazmend Lita's earlier statements, including that he "never delivered an envelope of cash to Menendez or Arslanian, nor was [he] ever asked to do so." Lustberg Cert. Exhibit C, June 14, 2023 Gazmend Lita's Interview Summary (NTW_000002196). And, because the Government

---

[13] It was no until June 12, 2024, and after Kira Glass's testimony, that the Government informed the defense that it no longer intended to call Nader Moussa to the stand.

failed to open on this fact or to develop any facts at trial (other than through the unfair mechanism of the summary chart which did not, obviously provide notice of this argument) to support the inference that Mr. Hana gave his employees cash to provide Nadine, Mr. Hana had no reason to believe that the Government would ask the jury to engage in such rank speculation during its summation, and thus had no reason to call any witness, including Nader Moussa or Gazmend Lita, to rebut this uncorroborated theory.  In other words, by waiting until summation to advance a theory never previously raised, Mr. Hana was entirely prevented from responding with evidence; nor could he even respond with argument to the extent that the issue was raised with particular vehemence by the Government during its extremely lengthy rebuttal.  *See* Tr. 6992:22-6993:5 ("These are envelopes.  Right?  They're found in the Menendez home.  There are three of them that are in red.  Whose prints are on them?  Nader Moussa, Agent Kougemitros and, the bottom one, Gazmend Lita.  Now, who are those people?  You might remember the answer.  They're connected to Wael Hana. Go to the next slide.  They work for him.  So how did Nadine get paid by Wael Hana after the checks stopped?  The good old-fashioned way -- cash").  This unfairness, amounting to trial by ambush, exacerbated by proving its case through charts instead of witnesses, cannot stand.  *See United States v. Ulbricht*, 14-cr-68, 2015 WL 413318, at *6 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858 F.3d 71 (2d Cir. 2017) ("[T]he rules do not allow trial by ambush."); *United States v. Gallo*, 654 F. Supp. 463, 480 (E.D.N.Y. 1987) ("Precision, accuracy, and fairness suffer under a system of 'trial by ambush.'").

Likewise—and again, this is but an example of the way in which the Government proved its case through summary charts, resulting in unfair prejudice to the defense—through its use of GX 1302, the Government asked the jury to infer, based solely on timing, that Mr. Hana purchased several one-ounce Asahi gold bars and then gave Nadine some of these small one-ounce bars in

exchange for arranging a meeting between Senator Menendez and Egyptian Official, Abbas Kamel, and having Senator Menendez provide an article to the Egyptian government, through Nadine, to help the government prepare answers to anticipated questions from United States Senators.   That is, absent any evidentiary support, the Government through Special Agent Coughlin's testimony and again in summation, asked the jury to infer that because Mr. Hana bought twenty-two one-ounce gold bars on June 23, 2021, the day after Senator Menendez's meeting with Abbas Kamel, that these two events were somehow connected.  *See* Tr. 1553:25-1554:21 (Special Agent Coughlin: "Q.  Directing your attention to the next line. Can you please read the details cell. You can skip the serial numbers.  A.  'Check from Wael L. Hana to Awad Jewelry for $40,810. Memo buy gold 22 shown in IS EG Halal photograph along with 10 1-ounce Asahi gold ingots' with serial numbers. . . . Q.  So Special Agent Coughlin, directing your attention to the check image near the bottom of the page.  You can zoom in on that, Mr. Hamill, thank you. Can you please read the name in the upper-left corner of the check.  A.  Wael L. Hana.  Q.  And the handwritten date on the check?  A.  6-23-21.  Q.  How does that date compare to the June 22, 2021, date of the meeting between Kamel and the other senators?  A.  It is the next day."); *id*. 6409:20-6410:14 (Mr. Monteleoni:  "The head of the Egyptian intelligence is coming to meet with U.S. senators in 2021.  That's unusual enough.  But the day before the meeting, what does Menendez do?  He meets with them at the hotel for a special meeting his staff didn't know about. And then, he sends the Egyptian government an article through Nadine that his fellow U.S. senators are planning to ask about reports that Egypt was involved in a human rights abuses. . . . He's doing it so that the Egyptian government can prepare their answers. . . . By the way, remember those small Asahi 1-ounce bars of gold from Hana, some of which found their way into Menendez's house?  Hana bought them the day after this meeting with the senators.").

However, the Government adduced absolutely no evidence as to when this gold was given to Nadine, why this gold was given to Nadine, or that Mr. Hana had any involvement in Senator Menendez's meeting with Abbas Kamel or providing this information.  Instead, the evidence showed that Mr. Hana had no direct communications with Abbas Kamel.[14]  In fact, GX 1302 contained absolutely no communications with Mr. Hana in the five months prior to his purchase of the gold or any communications after June 23, 2021 to tie these two things together.  Thus, in order to connect these two entirely unrelated events, the jury was required to baselessly infer:[15] (1) that Mr. Hana was aware of Abbas Kamel's trip to the United States to meet with United States Senators; (2) that for whatever reason Mr. Hana wanted Senator Menendez to meet with Abbas Kamel; (3) that Mr. Hana wanted Senator Menendez to meet with Abbas Kamel privately, without informing his staff; (4) that Mr. Hana worked with Nadine to coordinate a special meeting between Senator Menendez and Abbas Kamel; (5) that Mr. Hana was somehow involved in having Senator Menendez send an article to Nadine to provide the Egyptian government; (6) that Mr. Hana purchased the one-ounce gold bars because of Senator Menendez's meeting with Abbas Kamel

---

[14] The evidence further showed that only two of the twenty-two bars that Mr. Hana purchased on June 23, 2021 were found during the FBI's search of the Menendez home.

[15] The only evidence even tangentially connecting Mr. Hana to the allegations here are his Egyptian citizenship, the fact that he had previously spoken with and had relationships with other Egyptian officials, and that he had been long-time friends with Nadine.  Such evidence does not support the far-removed inferences that the Government sought to draw here.  *See Summers*, 414 F.3d at 1295 (explaining that "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion"); *see also Yannotti*, 415 F. Supp. 2d at 289 ("While a jury may draw reasonable inferences, it may not engage in impermissible speculation."). Indeed, again, it is largely based upon a theory of guilt by association—in this one which, worse, is grounded in Mr. Hana's national origin, which cannot be countenanced in our system of justice. *See Dawkins v. Artuz,* 152 F. App'x. 45, 47 (2d Cir. 2005) (citing *United States v. Doe*, 903 F.2d 16, 27-28 (D.C. Cir. 1990) (holding that the prosecutor's reference to Jamaicans "just like" the defendants taking over drug trade was improper because it suggested guilt by national association).

and in connection with the information that Senator Menendez sent to his wife; (7) that Senator Menendez agreed to meet with Abbas Kamel in exchange for receipt of some of these gold bars; and (8) that Mr. Hana provided the Menendezes with these gold bars in exchange for this meeting and information.  Every one of these "inferences" is really, the worst kind of speculation or guess, but in any event, such an "unduly long" chain of inferences, divorced from the evidence presented at trial, is completely prohibited by the law, which this Court is bound to enforce.  *Curley*, 639 F.3d at 57 ("[T]he chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [cannot be] unduly long."); *see also Michel*, 446 F.3d at 1128 (The prohibition against piling inference upon inference "indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion.").

In yet another example—those these are only a few among many such examples, many more of which can be easily ascertained by simply examining GX 1302—the Government additionally argued, through that exhibit, that Mr. Hana paid Nadine's mortgage in exchange for a telephone call from Senator Menendez to Under Secretary McKinney to protect Mr. Hana's halal certification company, IS EG Halal.  *See* GX 1302 at lines 802, 956, 987; Tr. 6399:16-6400:1 ("From Nadine texting seems like halal went through in April, to Menendez calling McKinney to protect Hana's halal monopoly in May . . . pressing Daibes to get Hana to pay the mortgage from that company in July . . . That sequence gives you all that you need to prove Counts Five and Six against all defendants.  You can begin and end with this sequence surrounding the McKinney call to convict all the defendants on the Egypt bribery counts.").  However, the only way to support this argument and link these two events is by piling one unsupported inference on top of another, in a manner that is, again, forbidden under the law.  *See Mohel*, 604 F.2d at 755 ("[A] piling of

41

indirect inference upon indirect inference is improper."); *see also Pauling*, 924 F.3d at 656 ("The line between permissible inference and impermissible speculation is drawn by the laws of logic."). Specifically, the jury would here have had to infer, since there was no direct evidence to support: (1) that at the time of Senator Menendez's call to Under Secretary McKinney, Senator Menendez and Mr. Hana foresaw a foreclosure complaint being filed against Nadine, a complaint that was not filed until later; (2) that Mr. Hana and Nadine agreed that Mr. Hana would pay her mortgage in exchange for the Senator's call; (3) that Senator Menendez knew that in exchange for his call to Under Secretary McKinney that Mr. Hana would pay Nadine's mortgage; and, all while accepting, contrary to the evidence; (4) that the payment of Nadine's mortgage was actually a bribe and not a loan.  But these inferences are wholly unsupported, and entirely inconsistent with the evidence presented at trial.

In fact, during its summation, the Government recognized that Senator Menendez had no knowledge of Nadine's delinquent mortgage until well over one month after his call to Under Secretary McKinney on May 23, 2019.  Tr. 6381:10-17 ("This particular thing, her delinquency on the mortgage she keeps from him for a while. . . . So, about the mortgage, she keeps it from him for a while, but then she realizes she's going to have to tell Menendez when they get back from a vacation on July 5. She leaves this long message for Daibes and says that she's going to tell Bob on Friday, that's July 5, after they get back.").  This makes sense given that Nadine's mortgage company did not even file its foreclosure complaint until June 5, 2019, several weeks after Senator Menendez's call to Under Secretary McKinney on May 23, 2019.  But beyond the fact that Mr. Hana and Senator Menendez would have had to predict the future filing of the foreclosure complaint at the time of the Senator's May 23, 2019 call in order for this *quid* to be connected to this *quo*, the fact remains that the overwhelming evidence at trial showed that the

mortgage payment was actually a loan, not a bribe.[16]  As such, this chain of purely speculative inference upon inference must fail and the Court should enter a judgment of acquittal as to the charged against Mr. Hana.  *See Martinez*, 921 F.3d at 466 ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."); *Pauling*, 924 F.3d at 656 ("Impermissible speculation . . . is 'a complete absence of probative facts to support the conclusion reached.'" (quoting *Lavender v. Kurn,* 327 U.S. 645, 653 (1946)); *see also United States v. Waguespack*, 935 F.3d 322, 330 (5th Cir. 2019) (a court "will overturn a guilty verdict where the government has done nothing more than pile inference upon inference to prove guilt.").

Again, these are but examples, but they are powerful ones in that they were so improper, and yet so big a part of the Government's presentation against Mr. Hana in summation and, when their case against him was really threatened, on rebuttal.  They show not only how insufficient and tendentious was the Government's case, but also how unfair this method of presentation was, for these inappropriate inferences flowed directly from the summary charts which were the backbone of the Government's case, a case essentially bereft of probative witness testimony to establish the validity of these inferences.  And they demand, in the interests of upholding a system where guilt

---

[16] In accordance with GX 1302, which notes that a cashier's check was issued from Mr. Hana's lawyer, John Moldovan to Nadine's mortgage company, Nationstar Mortgage, for $23,568.54 with the memo "LOAN AUTH W.HANA/ISEG to N.A," GX 1302 at line 987, Mr. Moldovan testified that he drafted loan documents and a promissory note in connection with the mortgage payment, Tr. 809:5-8 ("Q.  And you testified Will asked you to prepare the loan documents that you prepared and the promissory note that we saw earlier today, correct?  A.  That's right."), and that prior to releasing the funds to Nadine's mortgage company told Nadine that "this is the amount that [Mr. Hana] authorized to send as a personal loan with no interest," *id*. 811:15-20 ("Q.  If you can go to the next page, page 13.  The last message on the bottom, you tell her now couple days later you are going to send it. And am I right that you say to her, 'This is the amount that he authorized to sends as a personal loan with no interest as the memo,' correct?  A.  Correct.").

truly must be proven beyond a reasonable doubt, relief in the form of a judgment of acquittal.  Mr. Hana's motion under Rule 29 should therefore be granted.

>    **D.    The Manner In Which The Government Presented Its Summary Evidence Effectively Denied Mr. Hana Of His Constitutional Right To Confront The Witnesses Against Him.**

As discussed, the manner in which the Government tried this case is troubling because the Government chose to call agents with minimal knowledge of the case to read aloud and thus emphasize strategically selected messages that the Government itself chose to include in summary charts that it alone created, *see* Tr. 1172:16-18 (Special Agent Coughlin:  "Q.  What did you primarily do in connection with the investigation?  A.  I was -- I was not really involved in the investigation."); *id*. 2316:10-11 (Special Agent Graves:  "Q.  Did you participate in that investigation?  A.  No, I did not."), which created the possibility of a verdict unsupported by the evidence.  As well, this process unconstitutionally interfered with Mr. Hana's ability to thoroughly cross-examine the witnesses against him, including these agents about the communications that they read aloud to the jury, turning on its head the system derived by our nation's Founders, which emphasized the importance of meaningful cross-examination, embodied as it is in the Confrontation Clause of the Sixth Amendment to the Constitution.  Indeed, the Government's highly prejudicial approach to trying a criminal case ought not be allowed to stand, as it risks the complete evisceration of the protections guaranteed by the Constitution and really a complete alteration of the idea of trials as we know them.  *See Crawford v. Washington,* 541 U.S. 36, 61-62 (2004) ("[T]he [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing

with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.").

The Sixth Amendment affords every defendant in a criminal prosecution the right to confront the witnesses against him. U.S. Const. amend. VI. "A primary interest secured by [the Confrontation Clause of the Sixth Amendment] is the right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). Indeed, "[i]n operation, the Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." *Smith v. Arizona*, 602 U.S. --, 144 S. Ct. 1785, 1791 (2024). This right to confront one's accusers is a concept that dates back to Roman times." *Crawford*, 541 U.S. at 43. "The founding generation's immediate source of the concept, however, was the common law. . . . The common-law tradition is one of live testimony in court subject to adversarial testing." *Id*.; *see also United States v. Rivera*, 372 F. Supp. 3d 311, 313 (E.D.N.C. 2019) ("A review of the Clause's history and the common law at the time of the Sixth Amendment's ratification show that in person, face-to-face confrontation was key to the Clause's protection."). Accordingly, the Framers designed the Confrontation Clause to combat the principal evil regarding the "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id*. at 50. As a result, the confrontation requirement, which "forces the witness to submit to cross-examination" is now "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970).

Indeed, with the origin of the Confrontation Clause in mind, the Supreme Court has explained that "the Confrontation Clause is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Giles v. California*, 554 U.S. 353, 358 (2008); *see also Crawford*, 541 U.S. at 54 ("The

text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.  Rather, the right . . . to be confronted with the witnesses against him, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.").  But beyond the principle that "the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider 'fair[,]' [i]t is not the role of courts to extrapolate from the words of the Sixth Amendment to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values.  The Sixth Amendment seeks fairness indeed—but seeks it through very specific means (one of which is confrontation) that were the trial rights of Englishmen."  *Giles*, 554 U.S. at 375.

The Framers would be aghast at the way that the Government tried this case here.  Beyond the fact that the Government's summary charts represents a significant overextension of the way that charts under Rule 1006 have been used historically, *see* Section I.B., *supra* (citing cases), the Government's presentation of its summary charts through agents who were not only unfamiliar with the facts of the case but who also had no involvement in the creation of the charts violated "[t]he central concern of the Confrontation Clause [which] is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845 (1990); *see Crawford*, 541 U.S. at 66 ("The Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers.").  The Government's charts were not admitted in lieu of voluminous records, or used to summarize objective data for the jury, but rather served as a roundabout way for the Government to prove its case by painting a one-sided narrative with other people's words *without* placing such

individuals on the stand and subjecting them to "the greatest legal engine ever invented for the discovery of truth," *i.e.*, cross-examination. *Green*, 399 U.S. at 158. But the purpose of summary charts under Rule 1006 is to synthesize voluminous documents or data for the jury, *see* Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."); it is not a substitute for the common law concept that embraced "live testimony in court subject to adversarial testing," which informed the founding generation's views of adequate witness confrontation, *Crawford*, 541 U.S. at 43, or give the Government *carte blanche* to violate a defendant's constitutional rights, *id.* at 61 ("[W]e do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence.").

Indeed, the Supreme Court has explained that the Confrontation Clause is binding and cannot be disregarded for mere convenience, such as the Government's use of its summary charts here. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325 (2009) ("The Confrontation Clause . . . is binding, and we may not disregard it at our convenience."). Accordingly, where the Government seeks to introduce a summary chart through witness testimony, "the witness who prepares the chart should introduce it," *United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008), or, at the least, a witness who can be adequately cross-examined on the contents of the proposed summary should take the stand, *see, e.g.*, *Markovich*, 95 F.4th at 1378-79 (finding the summary witness had "clearly explained" to the jury that her summary reflected only the patients whose files she reviewed—not the entire patient population—and defense counsel cross-examined the witness about the limitations of her summary); *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4341317, at *5 (Rule 1006 summary chart prepared by plaintiff's expert witness admitted because, among other things, the chart would come in through the expert's testimony and "[d]efendants will have

the opportunity to cross-examine [the expert] and to refute Plaintiffs' evidence with their own."). That did not occur here.

In fact, during trial, the Government did not dispute that this critical testimony was placed beyond cross-examination. The prosecution acknowledged that the defense should be able to cross-examine its witnesses on the accuracy of the charts, but noted that this was not possible as the testifying agents had little, if any, knowledge of the case, and made no decisions about the substance of the charts. *See* Tr. 1489:21-1490:1 ("Mr. Monteleoni: Your Honor, may I just raise one matter. I certainly agree that if he believes that the chart doesn't adequately summarize some fact or something like that, that's obviously appropriate subject for cross. But the idea of crossing a witness who doesn't know anything about evidence, just about lack of evidence generally, that --"); *id.* 1495:16-17 ("The Court: . . . this witness made no decisions about the chart. Mr. Monteleoni? Mr. Monteleoni: That's exactly right."). Thus, by strategically selecting an unknowledgeable witness to read the results of the prosecutors' own determinations (and by objecting to any questions beyond that testimony and even to the defense's efforts to emphasize certain entries on the summary charts), the Government not only deprived Mr. Hana of his Sixth Amendment right to confront the actual witnesses against him, the creators of the charts—*i.e.* the prosecutors in this case, but effectively foreclosed Mr. Hana's ability to meaningfully cross-examine the summary witness and thus to test the evidence presented. *Cf. United States v. Morin*, 538 F. App'x. 1, 3 (2d Cir. 2013) (Confrontation Clause was not violated where defendant "was able to question the government agent who prepared" the summary chart, "as to the chart's accuracy."). Specifically, Mr. Hana was significantly constrained in his ability to question the agents on the background and substance of the messages, and related communications that the Government deliberately chose to omit from its summary chart, essentially precluding him from

eliciting testimony that would have allowed the jury to put the communications into their appropriate context. *See United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014) ("For a summary of documents to be admissible . . . the summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it.").[17]  This extremely prejudicial error was then exacerbated by the manner in which the Court addressed the issue, first limiting questioning to items contained on the summary charts and precluding any questioning that would identify communications and documents that the Government chose not to include in the charts, no matter how probative that evidence might be, but then precluding counsel from doing exactly what the Government did and highlighting certain entries on the Government's summary charts. Tr. 1494:20-1501:22; *id*. 1728:20-1739:24.

---

[17] In addition to placing the summary agents' testimony beyond the scope of effective cross-examination, the Government's approach to its summary charts impermissibly allowed the prosecution to inject its own actions—and place its own credibility before the jury—with respect to the development of these critical trial exhibits that certainly contributed to the guilty verdict in this matter. *United States v. White*, 545 F. App'x. 69, 71 (2d Cir. 2013) ("A problem arises, we have suggested, where there is some 'indication in the record that [the prosecutor] sought to use [his] first-hand knowledge of [the] case to influence the jury.'").  That is, the summary agents' testimony made it abundantly clear to the jury that the prosecutors themselves determined which messages were important, including by quite simply deciding which messages to include or omit from the summary charts. *See* Tr. 1491:25-1492:2 (The Court:  Special Agent Coughlin "has no role to play in what he was shown.  And just has put that stuff up, and he's recited what's there."); *id.* 1570:25-1571:1 (Special Agent Coughlin:  "Q. . . . The prosecutors created the chart, is that correct?  A.  That's correct.  Q.  And they decided what line entries to include in the chart?  A.  I did not decide, so my assumption is they decided, yes."); *id*. 2317:13-16 (Special Agent Graves: "Q.  Who chose what portions of the information in the underlying government's exhibits would get summarized in the summary document?   A.   The prosecutors.").  But this approach impermissibly placed the prosecution's credibility at issue and thereby further constrained the defendants' ability to adequately cross-examine the summary agents in this case, as any questioning would have had to be of the prosecutors themselves, something that certainly would have been highly problematic, albeit a problem created by the Government. *See United States v. Salameh*, 152 F.3d 88, 135 (2d Cir. 1998) ("A prosecutor must scrupulously refrain from injecting his credibility into any part of the trial.").

Finally, the fact that Mr. Hana called his own summary witness to elicit testimony that he was precluded from exploring on cross-examination does not remedy this deliberate violation of his Sixth Amendment rights.  There is no doubt that having called a witness to testify to the summary charts at trial, the Government made cross-examination a right that the defendant could invoke.  *See Pointer v. Texas*, 380 U.S. 400, 404 (1965) (reciting that the Confrontation Clause guarantees a criminal defendant the right "to confront the witnesses against him," which includes the right to cross-examine those witnesses); *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) ("The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.").  And while it is true that the purpose of the rights set forth in the Sixth Amendment is to ensure a fair trial, it does not follow that such rights can be disregarded because, as a whole, the trial was fair.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006) ("It is true enough that the purpose of the rights set forth in that Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair.").  Indeed, "[i]f a particular guarantee of the Sixth Amendment is violated, no substitute procedure can cure the violation, and no additional showing of prejudice is required to make the violation complete."  *Bullcoming*, 564 U.S. at 663 (cleaned up).  Thus, regardless of Mr. Hana's decision to call his own summary witness—one that he had no other option but to make—Mr. Hana undoubtedly had the right to confront witnesses against him through the "crucible of cross-examination," *Crawford*, 541 U.S. at 60-61.

In sum, the Government's presentation of its case through unknowledgeable summary witnesses, which foreclosed Mr. Hana's ability to exercise his constitutionally protected right with respect to these problematic summary charts, resulted in an unjust trial that led to Mr. Hana's

wrongful conviction. To prevent the manifest injustice that would occur if the Government was allowed to continue to try its cases in this manner, the Court should, if it does not grant Mr. Hana's motion for a judgment of acquittal pursuant to Rule 29, grant his motion under Rule 33 and order new trial at which the case will be presented in a constitutionally appropriate fashion.

## II. NO REASONABLE JURY COULD FIND THAT SENATOR MENENDEZ UNDERTOOK OR PROMISED TO UNDERTAKE AN "OFFICIAL ACT" UNDER EITHER FEDERAL BRIBERY OR FRAUD LAW.

### A. Procedural History

Before trial, Mr. Hana moved to dismiss Counts 1, 2, 6, 7, and 9 of the S4 Indictment (ECF No. 238) for failing to allege that Senator Menendez undertook or promised to undertake an "official act" under *McDonnell*. ECF Nos. 143, 186, 261. In that regard, the Indictment alleged a number of things of value given to Senator Menendez, either directly or indirectly, and a series of acts he allegedly took during the five-plus years of the alleged conspiracy period. Specifically, the Indictment alleged at least five different schemes in which the Senator agreed to take action in exchange for supposed bribe payments: (1) a scheme for Senator Menendez to "protect" Mr. Hana's business, IS EG Halal, Ind. ¶¶ 22-34; (2) a scheme for Senator Menendez to help Egyptian officials with various requests, *id.* ¶¶ 16-21, 35-38; (3) a scheme for Senator Menendez to "disrupt" two New Jersey State criminal matters, *id.* ¶ 39-44; (4) a scheme for Senator Menendez to "disrupt" a Federal criminal prosecution of defendant Fred Daibes, *id.* ¶¶ 46-54; and (5) a scheme for Senator Menendez to act for the benefit of the Government of Qatar, *id.* ¶¶ 55-66.[18]

---

[18] According to the Indictment, Mr. Hana was not involved in the fourth and fifth alleged schemes regarding Mr. Daibes's criminal prosecution and actions to benefit Qatar. Ind. ¶¶ 46-67. Indeed, the Government presented no evidence at all of Mr. Hana's involvement in these purported schemes, which will be addressed in Section VI, *infra*.

Regarding the scheme to "protect" IS EG Halal, the Indictment alleged that Mr. Hana requested Senator Menendez's "assistance" to counter the USDA's "objections" to his exclusive contract with Egypt by calling "a high-level USDA official" and "insist[ing] that the USDA stop opposing IS EG Halal's status as sole halal certifier." *Id.* ¶¶ 27-28, 30. As to the scheme to assist Egyptian officials, Senator Menendez allegedly sought non-public information about the demographics of employees at the United States Embassy in Cairo and disseminated that information to Nadine, who then passed it along to Mr. Hana, who sent it to Egypt; disclosed to Mr. Hana information about United States military aid to Egypt; anonymously drafted a letter on behalf of Egyptian officials seeking to convince other Senators to release a hold on aid to Egypt; and instructed Nadine to tell Mr. Hana that he would "sign off" on a sale of ammunitions to Egypt. *Id.* ¶¶ 19(a), 19(b) 19(c), 19(d), 20, 21, 37(d), 37(g). Finally, regarding the alleged scheme to "disrupt" the state criminal matters of two individuals, the Indictment alleged that Senator Menendez contacted the New Jersey Attorney General in an attempt to "advise or exert pressure" on him to resolve those matters favorably to those individuals. *Id.* ¶¶ 39, 42(b), 44(b), 44(c).

In his pre-trial motions, Mr. Hana argued that each of those purported schemes failed to establish that Senator Menendez undertook or promised to undertake an "official act" within the meaning of *McDonnell v. United States*, 579 U.S. 550 (2016), discussed below. In sum, Mr. Hana argued that Senator Menendez's call to the USDA was not an "official act" because IS EG Halal's status as the sole halal certifier was not a matter pending before any United States official, department, or agency since Egypt, not the United States, had the authority to grant the sole source contract. ECF No. 143 at 17-18; ECF No. 261 at 5-6. As to the alleged scheme to assist Egyptian officials, Mr. Hana submitted that the mere discussion of foreign military sales and funding was not a decision or action "on" a pending matter before Senator Menendez: information regarding

persons serving in the United States Embassy was not a question or matter pending before any official; and the act of writing a letter itself was not a formal exercise of government power to constitute an official act.  ECF No. 143 at 16-17; ECF No. 261 at 6.  Regarding the alleged scheme two disrupt New Jersey criminal matters, Mr. Hana argued that the Indictment alleged nothing more than telephone calls and meetings between Senator Menendez and the Attorney General, which is plainly deficient under *McDonnell*.  ECF No. 143 at 18-19; ECF No. 261 at 6-7.  Mr. Hana also moved for a bill of particulars identifying each official act that Senator Menendez agreed to or did take in furtherance of the alleged schemes.  ECF No. 143 at 34-35.

In response to Mr. Hana's pre-trial motion, the Government argued that "not all acts promised or agreed to be taken . . . must themselves be official acts" as long as one act or promise to act satisfies the *McDonnell* standard.  ECF No. 180 at 53-54, 72-74.  The Government also submitted that Mr. Hana's motion was premature, as the Indictment needed only track the statutory language and the ultimate issue of whether the acts proven at trial satisfy *McDonnell* was a jury question.  *Id.* at 72-74.  The Court accepted the Government's position, finding that the factual allegations sufficiently notified Mr. Hana of the charged conduct and that it was "up to the jury, under the facts of the case, to determine whether [Senator Menendez] agreed to perform an official act."  Apr. 11 Tr. at 51:20-52:13.  The Court even denied Mr. Hana's request for a bill of particulars setting forth those official acts.  *Id.* at 36:11-14.

As will be explained in detail below, the Government did not meet its burden to establish that Senator Menendez agreed to take or undertook any official act in exchange for things of value.  Indeed, at the close of the Government's case-in-chief, Mr. Hana moved for a judgment of acquittal pursuant to Federal Rule 29 on that very basis.  Tr. 5712:6-7.  The Court did not enter a judgment

of acquittal but permitted the arguments to be raised anew following a guilty verdict.  Tr. 5730:1-8.

### B.    *McDonnell* Standard

In *McDonnell v. United States*, the Supreme Court unanimously held that an "official act" as defined by the federal bribery statute, 18 U.S.C. § 201(a)(3), cannot be construed to encompass every action by a public official in his or her official capacity, lest the statute "raise significant constitutional concerns."  579 U.S. at 574-75; *see also United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017) ("*Silver I*") (noting that the constitutional concerns of an expansive interpretation of "official act" include "the criminalization of virtually all actions taken on behalf of constituents, subjecting public officials to prosecution without fair notice due to the vagueness of the Government's definition, and setting standards of good government for local and state official[s] in contravention of federalism principles").  Instead, to establish an official act for purposes of federal bribery, the Government must satisfy two requirements.

*First*, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official.  *McDonnell*, 579 U.S. at 567.  In this regard, "[t]he question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  *Id.* at 574.  Further, "[i]t must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official."  *Id.*  Following *McDonnell*, courts have stringently construed "question" or "matter" to encompass only activities akin to a lawsuit, hearing, or administrative determination.  *See  United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (efforts to pass state legislation); *United States v. Halloran*, 664 F. App'x 23, 28-29 (2d Cir. 2016) (allocating state funds); *see also United States v. Conrad*, 760 F. App'x 199, 208 (4th

54

Cir. 2019) (per curiam) (awarding and maintaining government contracts); *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (increase in Medicaid reimbursements, Medicaid referral policies, and appointment to state review board); *United States v. Malkus*, 696 F. App'x 251, 252 (9th Cir. 2017) (judicial monetary awards).

*Second*, "the Government must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 579 U.S. at 567. While a decision or action "may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act,' by another official," it is clear under *McDonnell* that merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act.'" *Id.* at 567, 574. Nor do "hosting an event, meeting with other officials, or speaking with interested parties," standing alone, constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter." *Id.* at 571-72; *accord United States v. Boyland,* 862 F.3d 279, 290 (2d Cir. 2017) (jury instruction that merely "contacting . . . other governmental agencies" qualified as an official act was erroneous under *McDonnell*). For its part, "advice" constitutes official action when it describes an interaction between superiors and subordinates, not between members of different governments (*i.e.*, state and federal) or even different departments within the same government. *McDonnell*. 579 U.S. at 567, 574. Thus, in *McDonnell*, the Court held that advice may constitute an official act "on the part of subordinates where their superiors would necessarily rely largely upon the reports and advice of subordinates . . .who were more directly acquainted with the facts and circumstances of particular cases." *Id.* at 572 (cleaned up) (citing *United States v. Birdsall*, 233 U.S. 223, 234 (1914)). And

"pressure" requires something more than a phone call or meeting itself; it must entail some threat or action, such as threatening to withhold funding.  *See Silver I*, 864 F.3d 102 at 120-21.

Further, "[s]imply expressing support" is not a decision or action "on" a matter. *McDonnell*, 579 U.S. at 573; *accord United States v. Pinson,* 860 F.3d 152, 168-69 (4th Cir. 2017) (per curiam) (noting that under *McDonnell,* "an 'official act' needed to be something more than '[s]etting up a meeting, hosting an event, or calling an official'").  It is not, then, enough for the decision or action to simply relate to or concern a pending question or matter.  *See Silver I*, 864 F.3d at 120-121, 122-123 (offering to help navigate city permit process, writing a letter of recommendation on official letterhead, publicly opposing an issue, and attending a meeting with lobbyists do not satisfy *McDonnell's* second requirement); *Boyland*, 862 F.3d at 290 (contacting another government agency does not constitute an official act); *United States v. Jefferson*, 289 F. Supp. 3d 717, 736-37 (E.D. Va. 2017) (meeting with military officials in an effort to gain approval of testing of certain technology was not an official act).[19]

As explained below, the evidence presented at trial failed to establish that Mr. Hana agreed to take actions that would violate either § 201 or § 1346 because it did not sufficiently prove that Senator Menendez agreed to undertake official acts within the meaning of *McDonnell*.

### C.    Actions To Benefit IS EG Halal

During trial, the Government admitted evidence that on May 23, 2019, Senator Menendez called USDA Under Secretary Ted McKinney after Mr. Hana forwarded Nadine an article published in Egypt detailing the USDA's criticism of IS EG Halal's sole source contract.  GX 1302 at lines 721 to 725; Tr. 1797:1-13; 1798:21-1799:2.  Under Secretary McKinney described

---

[19]*McDonnell*'s "official act" requirement applies equally to both bribery and honest services fraud charges, set forth in Counts 1, 2, 6, 7, and 9.  *See McDonnell*, 579 U.S. at 562, 566.

the call as "fairly short," Tr. 1798:9-11, lasting about "two, three minute," Tr. 1973:5-7.

Summarizing, the Under Secretary testified that

> there were three topics.  First, [Senator Menendez] referenced a news article that
> had been brought to his attention.  It was written in Arabic but had English
> translation, and so he made reference of that.  That led then to him saying would
> you please quit interfering with my constituent  [*i.e.*, Mr. Hana's company IS EG
> Halal, Tr. 1799:17-22].  And after that, I wanted to explain why my team and I were
> undertaking the actions we were, including all of the letters.  I started into that
> discussion.  I was interrupted and stopped, and then the call ended shortly thereafter
> because it didn't have much more to go.

Tr. 1798:23-1799:8.  The Under Secretary further explained that he understood Senator Menendez

wanted the USDA "to stop all the activities that [it was] undertaking to seek clarification [and to]

add back some halal certifiers."  Tr. 1800:4-16.  The evidence presented at trial failed to establish

that this brief phone call to Under Secretary McKinney was an official act under *McDonnell* for

two primary reasons, discussed in turn below.

First, IS EG Halal's status was not a question or matter pending before any public official

or United States agency to akin to a lawsuit, hearing, or administrative determination.  *See  Skelos*,

707 F. App'x at 740 (efforts to pass state legislation); *Halloran*, 664 F. App'x at 28-29 (allocating

state funds); *Conrad*, 760 F. App'x at 208 (awarding government contracts); *Suhl*, 885 F.3d at

1113 (increase in Medicaid reimbursements, Medicaid referral policies, and appointment to state

review board); *Malkus*, 696 F. App'x at 252 (judicial monetary awards).  Rather, the record is

replete with evidence that the Egyptian government alone had the sole authority to decide who

certifies imports as halal for the Egyptian people.  Tr. 1856:7-9 (Ted McKinney); *id.* 587:3-6, 13-

16 (Bret Tate).

Thus, the decision to grant IS EG Halal a sole source contract, which Egypt granted

unofficially in April 2019 and formally on May 1, 2019, belonged exclusively to the Egyptian

Government.  Tr. 588:1-4.  And Egypt maintained its decision despite receiving numerous

objections and concerns from USDA officials, including high ranking officials such as Under Secretary McKinney.  Tr. 588: 15-18 (Bret Tate:  "Q: Now, Egypt made the decision to proceed with a single certifier in this case even though the United States protested; am I right?  A: Egypt ultimately did make that decision, yes.").  First, on April 1, 2019, Bret Tate voiced his concerns with the sole source contract to Egyptian Deputy Minister of Agriculture and Land Reclamation Mona Mehrez at the Frankfurt (Germany) Airport.  Tr. 588:8-14.  In a subsequent meeting on April 11, 2019 between the USDA and members of the Egyptian Government, the American agency again "advocated that Egypt allow for multiple certifiers" to no avail.  Tr. 589:4-10.  Under Secretary McKinney also raised the issue with Deputy Minister Mehrez, but "Egypt did not change their position."  Tr. 591:5-11.  Then, Ali Abdi of the U.S. Foreign Agriculture Service raised the issue with the Egyptian organization for import and export control, GOIEC, but that outreach did not lead Egypt to change its position.  Tr. 591:12-20.  Finally, the Charge d'affaires and Acting Ambassador to Egypt Thomas Goldberger raised the halal issue with the Egyptian Minister of Agriculture but, again, Egypt did not alter its position.  Tr. 591:21-592:4.

Thus, months before Senator Menendez's call to Under Secretary McKinney, Egypt repeatedly rejected attempts from the USDA for Egypt to allow for multiple certifiers, demonstrating, contrary to the Government's theory, that Mr. Hana's contract was never "in jeopardy."  But more to the point, this evidence demonstrates that the only entity with power to determine its halal certifier was Egypt, not the USDA or any United States official.

While Mr. Hana concedes that "[t]he bribe recipient need not be the final decisionmaker," *United States v. Kimbrew*, 944 F.3d 810, 814 (9th Cir. 2019), the recipient must "use[] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official," *id.* (quoting *McDonnell*, 579 U.S. at 573).  Here, the

"other official" was Under Secretary McKinney. However, the decision to award IS EG Halal the sole source contract was not pending before McKinney any more than it was pending before Senator Menendez; the decision was within the exclusive province of the Egyptian Government. Tr. 1856:7-9; *id.* 587:3-6, 13-16. But federal bribery law prohibits *quid pro quo* corruption, *i.e.*, the exchange of something of value in return for action, or a promise of action, within the defendant's official power as a public employee – either direct power, or by means of influence over another official. *See* Tr. 7087:14-19 ("The question or matter must be something specific and focused that is pending or may by law be brought before any public official. 'May by law be brought' means something within the specific duties of an official's position -- the function conferred by the authority of that official's office."); *see also United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017) ("The evidence was sufficient for the jury to conclude that he accepted the roof and excavating services *knowing that he was to use his power, i.e., the ability to provide advice, to influence the JRA's awarding of contracts.*"(emphasis added)). Here, both Senator Menendez and Under Secretary McKinney lacked the decision-making authority with regard to Egypt's selection of a single halal certifier. Tr. 587:3-16 (Bret Tate: "Q:[I]n deciding which company and how many companies will become a halal certifier for Egypt, it's Egypt that decides that, correct? A. Egypt does make those decisions, yes. Q. And the United States can have its opinion heard, as it did here, but at the end of the day, it's Egypt that makes that decision; isn't that true? A. The decision must be made in line with Egypt's international commitments under the WTO. But yes, they make the decision."). As a result, there was simply no question or matter pending before any United States body regarding the selection of a halal certifier for imports entering Egypt; accordingly, Senator Menendez's call to Under Secretary McKinney fails under *McDonnell*'s first prong. *See McDonnell*, 579 U.S. at 567; *see also Valdez v. United States*, 475

F.3d 1319, 1327-29 (D.C. Cir. 2008) (en banc) (official action element lacking where a detective accepted cash in return for searching police databases and providing confidential information because the queries did not involve an "active or incipient police investigation" before the officer).

Second, even if the IS EG Halal contract could have been considered a question or matter under *McDonnell*, merely contacting another government agency does not, as a matter of law, constitute a decision or action "on" such question or matter and is, therefore, not an official act. *See Boyland*, 862 F.3d at 290 (merely contacting other governmental agencies does not qualify as an official act under *McDonnell*); *United States v. Fattah*, 914 F.3d 112, 153 (3d Cir. 2019) ("Importantly, a typical meeting, telephone call, or event arranged by a public official does not qualify as such a formal exercise of governmental power."); *id.* at 154 (holding that defendant congressman's act in setting up a meeting between his friend, a financial backer, and a U.S. Trade Representative did not constitute an official act). In other words, merely contacting another government official regarding a question or concern about a constituent, which according to Under Secretary McKinney happened "[m]any times," including in this case, does not raise to the level of an official act under *McDonnell*. 579 U.S. at 567; *Boyland*, 862 F.3d at 290; *Fattah*, 914 F.3d at 153; *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014) ("We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access . . . are not corruption.'" (alteration in original, quoting *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 360 (2010)); *Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 249 (2d Cir. 2024) (same).

Nor does the record establish that Senator Menendez attempted to exert power or influence over Under Secretary McKinney or the USDA. *See Silver I*, 864 F.3d 102. For example,

McKinney testified generally that senators could have "influence over matters involving the USDA," Tr. 1795:5-9, such as an "oversight capacity, where . . . [it is the] House and Senate that determines what the farm bill looks like, funding for the entirety of the foreign ag. service, [and] funding for different projects." Tr. 1795:22-1796:1. However, McKinney testified that Senator Menendez "made no threats" whatsoever, not about USDA funding or about any other USDA interests within the Senator's power. Tr. 1979:23-1980:10. *See Silver I*, 864 F.3d 102 at 120-21 (noting that evidence of exerting pressure requires some action, such as threatening to withhold funding). And to McKinney's knowledge, Senator Menendez never spoke to the Under Secretary's superiors about the halal issue, in an attempt "escalate" the matter "above [McKinney's] head" or otherwise. Tr. 1981:15-19.

At most, Under Secretary McKinney testified that Senator Menendez's tone was "serious" and that he interrupted McKinney's attempt to explain the USDA's position. Tr. 1802:2-18. He also described Senator Menendez as "an influential person" and the call as "influential," Tr. 1804:23-24, and stated that he told his staff in Egypt that he "ha[d] their back" and "wanted them to not worry about the fact that a senator had called and was working on this or asking me to stand down." Tr. 1820:1-11. But this does not establish that the two-to-three minute phone call was an attempt by Senator Menendez to exert pressure over the USDA or Under Secretary McKinney. And there is no evidence anywhere in the record that after the "fairly short" call, the Senator ever again contacted McKinney or the USDA. Tr. 1890:17-25 (Under Secretary McKinney could not recall any action by Senator Menendez with respect to the USDA or US agriculture other than the phone call).

Thus, at most, the record establishes that Senator Menendez briefly discussed with Under Secretary McKinney an issue regarding the Senator's constituent. That evidence simply did not

prove that Senator Menendez undertook or promised to undertake an official act under *McDonnell*. Indeed, the Supreme Court has been clear about exactly this kind of action: "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act.'" 579 U.S. at 567, 571-72, 574 (nor do "hosting an event, meeting with other officials, or speaking with interested parties," standing alone, constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter."); *accord Boyland,* 862 F.3d at 290 (jury instruction that merely "contacting . . . other governmental agencies" qualified as an official act was erroneous under *McDonnell*). Because the evidence establishes only that Senator Menendez spoke with another government official for a few minutes about a constituent, it plainly fails to establish an official act under the case law.

### D.    Actions To Benefit Egypt

#### 1.    Military Sales

At trial, the Government established that Senator Menendez, Nadine, and Mr. Hana met for dinner on May 18, 2019.  GX 1302 at lines 163 to 177.  That same day, Mr. Hana messaged General Khaled Shawky:  "The ban on small arms and ammunition to Egypt has been lifted.  That means sales can begin.  That will include sniper rifles among other articles."  *Id.* at 12.  The only reasonable inference that can be drawn from this text is that Senator Menendez and Mr. Hana spoke about military funding during the dinner.  But simply discussing military financing with Nadine, Mr. Hana, or even with Egyptian officials, which is the most that was proven, does not constitute a decision or action on the matter.  *See Jefferson*, 289 F. Supp. at 736-37 (meeting with military officials in an effort to gain approval of testing certain technology was not an official act).

A few months later, Senator Menendez asked Nadine via text message to "[t]ell Will I am going to sign off this sale to Egypt today.  Egypt:  46,000 120MM Target Practice Rounds and 1,000,000 Rounds Tank Ammunition:  $99 million."  GX 1302 at line 320.  Again, merely speaking

with Nadine or Mr. Hana about the sales is not an official act.  *See Jefferson*, 289 F. Supp. at 736-37.  Further, there is no evidence in the record that Senator Menendez actually signed off on the sale.[20]  And while completion of the official act is not required, *Silver II*, 948 F.3d at 551, no reasonable jury could infer from this message that Senator Menendez had *promised* Mr. Hana at some point that he would approve of certain military sales, or military sales in general.  The more reasonable inference, based upon the evidence established at trial, is that Mr. Hana, a native Egyptian who still had ties to his country, was interested in the bilateral relationship between the United States and Egypt, which relationship centered largely on the provision of military aid.  *See* Tr. 867:12-16 (Joshua Paul:  Egypt is the second largest recipient of foreign military financing grant money from the United States); *id.*. 867:23-868:3 (Joshua Paul:  Egypt receives approximately $1.3 billion from the United States in military funding on an annual basis); *id.*. 936:25-937:4 (Joshua Paul: Egypt has received annual funding from the United States since the 1970s); *see also Landesman*, 17 F.4th at 320 ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.)  Because, at most, the Government established only that Senator Menendez and Mr. Hana simply discussed United States funding decisions, it failed to prove an official act.

## 2.    "Ghostwritten" Letter

The Government also introduced evidence that Senator Menendez anonymously drafted a letter for the Egyptian government, regarding a hold placed on Egyptian military funding, to his fellow Senators based upon information he received from Mr. Hana.  GX 1302 at line 131; Tr.

---

[20]The Court barred the introduction of Senator Menendez's decisions whether or not to place a hold on foreign aid as protected by the Speech or Debate Clause.  ECF No. 252 at 7-8.

1241:6-1255:7.  In summation, the Government submitted that the letter was "a way of promising official acts," but in the same sentence conceded that Senator Menendez "[o]bviously [was] not saying he is joining in the objections that's writing [*sic*] a response to.  But even leaving that aside, it's obvious special treatment."  Tr. 6407:12-21. But "special treatment" of a constituent is not an official act.  *See McDonnell*, 579 U.S. at 567; *see also Kosinski*, 106 F.4th at 249 ("[F]avoritism and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial reason for casting a ballot or making a contribution is that the candidate will respond by producing those political outcomes the supporter favors." (citations omitted)).  And the evidence does not prove that the letter was an attempt by Senator Menendez to officially assert his power and influence, particularly when his fellow congresspersons did not know he authored the letter.  In any event, such a letter does not even amount to the kind of official expression of support courts have held insufficient to constitute official action, as described above.  *See, e.g.*, *Silver I*, 864 F.3d at 120-123.

### 3.    Embassy Figures

Finally, the Government also introduced evidence that Senator Menendez shared with Mr. Hana certain information about the demographics of personnel employed at the United States embassy in Egypt.  GX 1302 at lines 95 to 105, 127; Tr. 1228:22-1230:2.  No evidence at all was presented demonstrating that such embassy demographics was a question or matter pending before any public official, as, for example, a bill pending before a legislature, *Skelos*, 707 F. App'x at 740, or state funds pending allocation, *Halloran*, 664 F. App'x at 28-29, would be.  Therefore, any purported action undertaken with respect to the number and nationality of persons serving at the United States Embassy simply fails under *McDonnell's* first prong.

### E.    Actions To Disrupt New Jersey State Criminal Matters

The Government also alleged, Ind. ¶¶ 39-44, and introduced evidence at trial, that Senator Menendez spoke and met with then-New Jersey Attorney General Gurbir Grewal regarding pending state criminal matters.  Tr. 2713:23-2715:8; *id.*. 2719:14; *id.* 2722:8-22; *id.* 2724:11-12; *id.*; 2729:10-11.  During a five-to-six minute telephone conversation, Senator Menendez "raised a concern about [AG Grewal's] office's handling of matters involving Hispanic defendants as compared to non-Hispanic defendants -- in particular, matters handled by the office of the insurance fraud prosecutor."  Tr. 2715:12-20; Tr. 2718:1-2.  Similarly, during a ten-to-fifteen minute meeting, AG Grewal and the Senator discussed the Senator's "concern about how [the] office of insurance fraud prosecutor was treating Hispanic defendants versus non-Hispanic defendants."  Tr. 2729:13.  During both the telephone call and in-person meeting, AG Grewal told Senator Menendez that the defense attorneys on the cases could raise the issues with prosecutors, but that Grewal could not discuss the issue.  Tr. 2729:25-2730:2.  The Senator did not resist but instead "moved on to small talk" and the conversations ended.  Tr. 2735:9-10.  And after the meeting, Senator Menendez never again raised the issue with AG Grewal.  Tr. 2741:9-12.

Just like the Senator's phone call to Under Secretary McKinney, his conversations with AG Grewal were not official acts.  *See* Section II.C., *supra*.  As explained, neither a mere phone call nor a meeting constitutes an official act, even if during the conversation, public officials discuss pending questions or matters.  *McDonnell*, 579 U.S. at 5767, 571-72, 574; *Boyland*, 862 F.3d at 290; *see also Fattah*, 914 F.3d at 154 (setting up meeting between businessman and U.S. Trade Representative does not qualify as an official act); *Skelos*, 707 F. App'x at 737 ("arrangement of or participation in certain meetings" are not "official acts"); *Jefferson*, 289 F. Supp. 3d at 737 (Congressman's setting up meeting for businessman to pitch product and services to the Army "explicitly excluded from the meaning of 'official act'' under *McDonnell*).

Nor did the Government establish that the conversations were an attempt to exert power or influence over AG Grewal or his office. Indeed, although Grewal testified that he did not want his conversations with the Senator to have a "chilling effect" on the prosecutors and team handling the insurance fraud cases, Tr. 2746:4-9, he also testified that neither he nor his office reported to the United States Senate. Further, no senator could affect the formula by which the United States Department of Justice distributes grant money to state prosecutor offices. Tr. 2750:22-2751:1. Moreover, AG Grewal testified that Senator Menendez did not threaten to haul him before Congress, threaten to enact legislation that would discriminate against his office in any way, or threaten any other retaliatory action. Tr. 2774:9-25. Indeed, AG Grewal testified that retribution was more a concern when dealing with state legislators than United States Senators. Tr. 2775:23-2776:1.[21] Thus, the evidence failed to establish any attempt by Senator Menendez to pressure AG Grewal. *See Silver I*, 864 F.3d 102 at 120-21 (noting that evidence of exerting pressure requires some action, such as threatening to withhold funding). Therefore, the conversations between Senator Menendez and AG Grewal also did not constitute official acts under *McDonnell*'s second prong. 579 U.S. at 571-72.

---

[21] At most, the Government established that AG Grewal's aide thought the meeting was "gross." Tr. 2740:3-11. Aside from being irrelevant to the "official act" analysis, this testimony, which was not clearly tied to any kind of corruption, was unfairly prejudicial and should have been excluded under Federal Rule of Evidence 403. *See United States v. Ayers*, 20-cr-239, 2024 WL 1158686, at *9 (E.D.N.Y. Mar. 18, 2024) (prejudicial evidence "not related to the elements of any crime which the defendants [were] charged" excluded under Rule 403).

III.   **NO RATIONAL JURY COULD FIND THAT MR. HANA PROVIDED ANYTHING OF VALUE TO SENATOR MENENDEZ IN EXCHANGE FOR SENATOR MENENDEZ TAKING ACTION ON A PARTICULAR MATTER OR QUESTION WITH RESPECT TO THE SCHEME TO BENEFIT MR. HANA AND EGYPT.**

A.    **Legal Standard**

The Court should enter a judgment of acquittal as to Counts 1, 2, 6, and 7 because the Government failed to present sufficient evidence to support a conclusion that, beyond a reasonable doubt, there was a *quid pro quo* with respect to the alleged schemes to benefit Mr. Hana and Egypt. *See Eppolito*, 543 F.3d at 45 ("The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged.").

A *quid pro quo*, as discussed at length in prior briefing, is an essential element of the offense. *See, e.g.*, *United States v. Ng Lap Seng*, 934 F.3d 110, 131-32 (2d Cir. 2019); *United States v. Avenatti*, 81 F.4th 171, 194 (2d Cir. 2023); Tr. 7097:11-20 (jury charge); *id*. at 7102:8-12 (jury charge).   In order to establish that element, the Government must (1) "identify" the "particular question or matter" that the official at issue promised to influence; and (2) prove that the official agreed to influence that "particular question or matter" at the time he accepted the corrupt payment or bribe.  *Silver II*, 948 F.3d at 553, 556 ("[A]t the time the bribe is made, the promised official act must relate to a properly defined question, matter, cause, suit, proceeding or controversy."); *see also* Tr. 7089:15-20 (jury charge).  Thus, although the *quid pro quo* element does not require that "the particular act of influence . . . be identified at the time of the official's promise, the particular question or matter to be influenced must be."  *Silver II*, 948 F.3d at 553. And because "the relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*" the "focused and concrete question or matter" must be identified at the time the payment is accepted or agreed upon.  *Id*. at 556 (emphasis in original); *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (holding that the trial court failed

to properly charge the jury "that the specific and focused question or matter on which [the public official] was expected to take official action be identified at the time of the payment").

The need to identify the particular question or matter to be influenced is not excused in circumstances in which the Government proceeds with an "as the opportunities arise" theory of bribery, *i.e.*, "a promise to exercise particular kinds of influence . . . as specific opportunities ar[i]se."[22]  *See Silver II*, 948 F.3d at 553 n.7.  Following *McDonnell*, the Second Circuit has explained that the "as the opportunities arise" theory still requires that "at the time of the payment," the official "understood that [he] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise."  *United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021).  Again, although bribery does not require identification of the specific act to be performed, "to be convicted of bribery under the 'as the opportunities arise' theory" still means that "the public official must, at minimum, promise to influence a 'focused and concrete' 'question or matter' that 'involv[es] a formal exercise of governmental power.'"  *Silver II*, 948 F.3d at 553 (quoting *McDonnell*, 579 U.S. at 569-70).  Put differently, "[w]hen the government proceeds under the 'as opportunities arise' theory of bribery, it must prove that a public official received a payment to which he was not entitled and that, at the time of the payment, the payor and payee understood that [the payee] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise."  *Reichberg*, 5 F.4th at 247.  Without this necessary limitation

---

[22] Mr. Hana maintains his objection to the "as the opportunities arise" theory as legally invalid in light of *McDonnell*.  *See* ECF Nos. 143, 261; Tr. 6322:8-6323:14 (charge conference).  Nevertheless, the Court instructed the jury on the "as the opportunities arise" theory over Mr. Hana's objections, and that theory is addressed herein.  Mr. Hana also objected to the Court's instruction on the *quid pro quo* element, but the Court similarly overruled that objection and rejected the additional language the defense had proposed for that charge.  *See* ECF No. 353-1 (Defendants' Proposed Revisions on the Government's Requests to Charge); *see, e.g.*, Tr. 6319:17-6323:14 (charge conference).

on the "as the opportunities arise" theory, "any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution." *Silver II*, 948 F.3d at 558 ("Otherwise, we risk 'subject[ing] [public officials] to prosecution, without fair notice, for the most prosaic interactions.'") (quoting *McDonnell*, 579 U.S. at 576).

### B.    Procedural History

Prior to trial, Mr. Hana moved to dismiss the Indictment for failure to allege a *quid pro quo*, which required dismissal of Counts 1, 2, 6, 7, and 9.[23]  *See* ECF Nos. 143, 186, 261.  As explained in Mr. Hana's prior briefs, Counts 1 and 2 failed to identify any *quid pro quo*.  *See* ECF No. 143 at 3-11, 20-30; ECF No. 186 at 2-5, 12-20; ECF No. 261 at 8-12.  Instead, the Indictment employed a "kitchen-sink approach," spreading different alleged payments and different alleged "official acts" over 73 paragraphs of the Indictment—which was insufficient.  *See id.*  Similarly, with respect to Counts 6, 7, and 9, the Indictment listed a number of purported *quids* and a number of alleged *quos*, but never tied them together with the required *pro*.  *See id.*  Although Mr. Hana recognized that a *quid pro quo* may involve multiple corrupt payments and multiple official acts, the Indictment failed to allege that Senator Menendez agreed to accept those alleged corrupt payments specifically in order to influence a focused, concrete, and particular question or matter. *See id.*  Thus, he argued, the Court was required to dismiss Counts 1, 2, 6, 7, and 9.

Mr. Hana also moved, in the alternative, for a bill of particulars identifying both the supposed bribes and corresponding matters that they were allegedly intended to influence (*i.e.*, both the "*quid*" and the "*quo*" requirement).  *See* ECF No. 143 at 36-38; ECF No. 186 at 56-63.

---

[23] Count 9 relates solely to the scheme to benefit Mr. Uribe and his associates, which will be addressed in Section IV, *infra*.  Additionally, as discussed, *supra*, Mr. Hana was not involved in the schemes regarding Mr. Daibes's criminal prosecution and actions to benefit the Government of Qatar.

As well, because the Indictment never identified the particular question or matter that Senator Menendez agreed to influence at the time he accepted each thing of value, Mr. Hana sought a bill of particulars identifying which supposed illicit payments were connected to which alleged matters to be influenced (*i.e.*, the "*pro*" requirement).  *See id.*  The Government, in opposition, argued that the Indictment was sufficient because (1) the Indictment only needed to track the statutory language of the statutes charged; (2) a bribery scheme can involve multiple payments and official acts; (3) the Indictment supposedly charged a "single scheme"; (4) Mr. Hana could be found guilty of bribery even if Senator Menendez did not take any action in exchange for the bribe or contemporaneously intend to do so; and (5) the *McDonnell* decision concerned jury instructions, not the facial sufficiency of the Indictment.  ECF No. 180 at 72-74; ECF No. 271 at 3-4.

As explained in Mr. Hana's reply brief, the Government's opposition simply ignored Mr. Hana's arguments concerning the *quid pro quo* requirement.  Contrary to the Government's position, tracking the statutory language, alone, is insufficient under Second Circuit precedent. *See* ECF No. 186 at 14-17.  Mr. Hana also did not dispute that a bribery scheme can involve multiple payments and official acts, that multiple payments and official acts may be charged as one scheme (although not satisfied here), or that Senator Menendez need not actually take the action promised.  The Indictment, however, failed to include any allegation that Senator Menendez agreed to accept particular alleged corrupt payments specifically in order to influence a focused, concrete, and particular question or matter—as is required under the law.  *Id*. at 17-20.

The Court, however, agreed with the Government.  Specific to Mr. Hana's argument that the Indictment failed to allege "that at the time an alleged payment was accepted, or a promise was made, it was in order to influence a particular matter or question," the Court held that this was a matter for the Government to prove at trial:  "[L]ike *McDonnell*, *Silver* was a case concerning jury

70

instructions, not the sufficiency of an indictment. The jury here will determine whether the government has met the standard articulated in *Silver*." Apr. 11, 2024 Tr. 54:10-55:5. The Court also denied Mr. Hana's request for a bill of particulars, again leaving the Government to its proofs: "[T]he detail in the indictment adequately conveys to defendants the government's theory of the case and the proof that will be offered." *Id*. at 35:20-22.

The Defendants raised these arguments again as Rule 29 motions to the Court. *See, e.g.*, Tr. 5705:7-9 ("[T]here is no *pro* in the *quid pro quo* . . . there's certainly no evidence of an agreement."). Defendants explained that, at best, "the government is trying to draw inferences that are unsupported by the facts, inferences of an agreement, but none exists." Tr. 5705:10-12. With regard to the scheme to benefit Mr. Hana and Egypt, Mr. Hana's counsel asserted that there was no evidence of a payment made in exchange for an effort for Mr. Hana to maintain IS EG Halal or in exchange for any actions to benefit Egypt. Tr. 5713:14-22; *id.* at 5717:13-22. As to the scheme to benefit Mr. Uribe and his associates, Mr. Hana's counsel explained that "early on in that scheme, it's very clear that [Mr. Hana was] completely cut out of that; that his role is superseded by Mr. Uribe, who then pays for the car, makes the arrangements for the car and gets thanked for the car by Nadine." Tr. 5715:25-5716:3.

The Government responded with a generalized assertion that "the jury heard extensive, detailed, granular timelines that show the provision of things of value. They show the promises or performance of official acts, and they show the intertwining of those and, in certain cases, very explicit linkages of those by coconspirators, far more than you, candidly, often get in bribery cases. And all of this is extremely powerful proof of corrupt *quid pro quos* that violate the honest services, bribery and extortion statutes, even leaving aside the powerful witness testimony and cooperator testimony that, of course, the jury is entitled to believe." Tr. 5720:18-5721:3.

The Court denied the Rule 29 motions.  Tr. 5730:1-10.  Mr. Hana now re-raises his concerns and asks the Court to make good on its promise to, in fact, "determine whether the government has met the standard articulated in *Silver*."  *See* Apr. 11, 2024 Tr. 55:3-5.

## C.    The Government Failed To Prove A *Quid Pro Quo* at Trial

The Government failed to live up to its pre-trial promises.  Just as it did in the Indictment, the Government presented evidence of a number of things of value—*i.e.*, *quids*—that were given by Mr. Hana over the course of several years, and a number of disparate and varying actions taken by Senator Menendez—*i.e.*, *quos*—during that same period.  The Government's proof, however, was deficient, as a matter of law, because it failed to prove the critical element raised by Mr. Hana multiple times throughout the course of this case:  an agreement between Mr. Hana and Senator Menendez to have Senator Menendez influence *particular* questions or matters *in exchange for* things of value.  *See Silver II*, 948 F.3d at 557; *Triumph Capital Grp., Inc.*, 544 F.3d at 159 ("[T]he relevant question is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

This is evident from the Government's closing, where it relied solely on a sequence of disconnected events in an attempt to prove the *quid pro quo*, without ever connecting a particular promise to a thing of value:

> From Nadine texting seems like halal went through in April, to Menendez calling McKinney to protect Hana's halal monopoly in May, Hana beginning to put Nadine on the payroll days later, Menendez setting up a sham consulting company for Nadine in June, pressing Daibes to get Hana to pay the mortgage from that company in July, and getting a $10,000 check from Hana put into his hand by Daibes in late August. That sequence gives you all you need to prove Counts Five and Six against all the defendants.

Tr. 6399:16-24.  Indeed, the Government tacitly admitted in its closing that it was relying upon nothing more than the coincidence of timing to try to establish a connection:

> The timeline alone shows you this whole time Menendez is still promising more help to Egypt. Right after calling McKinney, he is fielding a request which comes from Ahmed Helmy to Hana, passed from Hana to Nadine, to him. To help out in Egypt's negotiations with April Corley, who is injured in an Egyptian air strike. Ahmed Helmy is saying our decision is we already gave our final offer. 2 million and not a single dollar more. They don't want to offer more money to this injured plaintiff, and that is the case that Helmy sends Hana images of a document from, Hana sends them to Nadine, and Nadine sends them to Menendez.

Tr. 6400:2-12.  But the timeline, alone, is not evidence that anything of value was ever given in exchange for a "promise to influence a 'focused and concrete' 'question or matter' that 'involv[es] a formal exercise of governmental power.'"  *See Silver II*, 948 F.3d at 553.

Indeed, the Government's summary of the supposed *quid pro quo* evidence only underscores that there was never a "focused and concrete" "question or matter" at issue as is necessary under the law for a conviction:

> In September, Helmy has a question for Menendez. So he asks Hana is this true? Hana tries to get through to Nadine. Then he connects with Daibes who calls Menendez. Daibes reports back to Hana who gets the message back to Helmy. All in less than 20 minutes. What was Helmy asking about? First of all, doesn't matter. That kind of immediate access to a U.S. senator already shows how serious Menendez was about his promises to be helpful to Egypt, even if in this case what Helmy was asking about was something minor. But second of all, you know from the evidence and your common sense what Helmy was asking about. He was asking about the things that Egypt always cared about.

> And look, couple days later, Helmy is letting Hana know they're getting promises from Menendez's staff about, quote, having things go well in what relates to Egypt. They're getting the same kinds of promises of assistance to Egypt that Menendez has been giving all along.

> A few days after that, Menendez is back at it, sending a bill about things in the region through Daibes to Hana to Helmy. Why does Menendez do it? For the money to Nadine.  All of that, what we've just been through, is days, days before Menendez is again telling Nadine how to collect her money. In particular, is telling her she should not text or e-mail Fred Daibes, a phrase we'll come back to in a moment.

> *Quid pro quo*. This for that. Promises made to Egypt and protection of the monopoly Egypt gave Hana, for checks from that very monopoly right into Menendez's hand.

Tr. 6400:13-6401:14.  Supposed "promises made to Egypt," or some vague "protection of the monopoly Egypt gave Hana" (as to which Egypt was the sole decision-maker) are insufficient to satisfy the *quid pro quo* requirement under *McDonnell* because those statements are "so lacking in definition or specificity that [they] amount[] to no promise at all."  *See Silver II*, 948 F.3d at 557 ("[A] promise to perform some act to create jobs or lower taxes, or to benefit the payor, without more, cannot be understood to refer to a formal exercise of governmental power that is similar in nature to a cause, suit, proceeding or controversy. . . . More pointedly, such a promise is so lacking in definition or specificity that it amounts to no promise at all. And, absent a promise, there is no *quid pro quo*.").

Perhaps even more fundamentally, Mr. Hana does not dispute that a *quid pro quo* may involve multiple corrupt payments and multiple official acts (*i.e.*, "this for these or these for these," *Silver II*, 948 F.3d at 554; Apr. 11, 2024 Tr. 53:19-23); however, the Government did not, at any point, present evidence showing which supposed corrupt payments were made in exchange for which acts.  Instead, the Government employed the same "kitchen-sink" approach raised by Mr. Hana pre-trial, which is plainly insufficient to prove beyond a reasonable doubt that Senator Menendez agreed to accept corrupt payments knowing at the time he did so that he was being asked to influence a focused, concrete, and particular question or matter.  *See Silver II*, 948 F.3d at 557.  The Government's showing was also improper because it went directly against the protections afforded by the *quid pro quo* requirement.  As the Second Circuit explained: "[W]ithout a requirement that an official must promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution."  *Id.* at 558 ("Otherwise, we risk subject[ing]

[public officials] to prosecution, without fair notice, for the most prosaic interactions.").  That, of course, is precisely what happened here.

As discussed in more detail below, the Government failed to establish the *pro* in the *quid pro quo* with respect to each thing of value given to Senator Menendez, either directly or through Nadine.

### D.     Mortgage Payment

First, there is no evidence in the record to support the Government's theory that Mr. Hana made a payment toward Nadine's mortgage in exchange for any promise of official action by Senator Menendez.  Instead, the Government relied on pure speculation and improper inferences, which is insufficient to satisfy the required *quid pro quo* element.

The Government's theory concerning the mortgage payment has always been that it was not a loan and, therefore, it must have been a bribe.  *See, e.g.*, Ind. ¶¶ 70, 72-73 (alleging that the payment "to the mortgage company in July 2019 to avoid foreclosure" "was not a loan, but a bribe payment"); Tr. 63:6-7 ("They claimed that the payment from Hana to Nadine's mortgage company was also a loan. That was also a lie."); Tr. 6419:3-6 ("So, by deducting the mortgage company payment from the paychecks, she's saying she's not planning on paying that back either. This was never a loan. It was a bribe.").  Critically, as discussed below, even assuming *arguendo* that the mortgage payment was not, in fact, a loan, that is not evidence that it was a bribe.  Here, however, the evidence is deficient for the additional reason that the Government never offered credible evidence to allow a rational trier of fact to find that it was anything other than a loan.  Any such finding—like the Government's theory—therefore, is predicated upon nothing more than speculation.

On July 19, 2019, Mr. Hana, through his lawyer John Moldovan, provided a check to Nadine's mortgage company in the amount of $23,568.54.  GX 1302 at line 987.  Not only is there

no evidence that Mr. Hana made that payment in exchange for any action by Senator Menendez, but the only evidence offered is that Mr. Hana intended for that payment to be a loan and not a bribe. Prior to making any payment to Nadine's mortgage company, Mr. Hana connected Nadine with his lawyer, Mr. Moldovan, who drafted loan documents and communicated with Nadine concerning execution of those documents. *See, e.g.*, GX 1302 at lines 947, 966, 971. Before releasing the funds directly to Nadine's mortgage company on July 19, 2019, Mr. Moldovan stated the following to Nadine:

> The current reinstatement amount is $23568.54
>
> That is the amount that I am wiring
>
> That is the amount he authorized to send as a personal loan with no interest as the memo

GX B222; DX 1302 at lines 985-2 to 985-4. Later that same day, Mr. Moldovan issued a cashier's check to Nadine's mortgage company for $23,568.54 with a memo line "LOAN AUTH W.HANA/ISEG TO N.A." GX 1302 at line 987; GX 5C-200; GX D207-A.[24]

---

[24] At trial, the Government elicited testimony from Mr. Moldovan that he issued the mortgage payment on July 17, 2019, knowing that this was incorrect and contradicted by the evidence, only further supporting that the Government could not show that this payment was anything other than a loan:

> Q: What was the message you sent about two minutes later [on July 17, 2019]?
>
> A: The message was, "I've been instructed to transfer the funds. And I am working on that now. I will let you know as soon as it is complete."
>
> Q. Who instructed you to transfer the funds?
>
> A. Soon after I sent that summary reminder to Nadine, Will came to me and said just send the money. That was what he told me to do.
>
> Q. After Will told you to just send the money, what did you do next in relation to that?
>
> A: I asked him, I said like, like, right now today? Or you know, like, is there a timeline for this? And he said, yeah, right now, go to the bank and do it. So, you

The only evidence offered on the subject also confirmed that Nadine understood that the mortgage payment was a loan. While discussing her mortgage payment with Mr. Uribe, Nadine, referring to Mr. Hana, stated: "I will pay him back."[25] GX 1302 at line 876; GX B209-10. Neither Mr. Moldovan nor Mr. Uribe, who both communicated with Nadine on multiple occasions concerning the loan, testified that Mr. Hana's payment towards Nadine's mortgage was made in

---

know, I said okay. Is someone wiring me the money to get to her? And so he said he'd have the money wired to me. I gave him my account information, and they wired the money to me that day. I went to the bank, and then executed a wire transfer to the loan company to reinstate the loan.

Tr. 796:25-797:17. The Government wanted the jury to believe that the mortgage payment was made on July 17 because the text messages on that day were beneficial to its theory that the payment was not a loan. Specifically, on July 17, 2019, at 10:46 AM, after Mr. Moldovan texted Nadine asking her to sign the promissory note, GX 1302 at line 971, Mr. Moldovan texted her again a couple of minutes later to say: "I've been instructed to transfer the funds and I am working on that now. I will let you know as soon as it is complete," GX 1302 at line 973.

Unfortunately for the Government, the mortgage payment was not released on July 17, 2019. Instead, the cashier's check and the receipt for same are clearly dated July 19, 2019, and only after Mr. Moldovan confirmed in writing that the payment would be made as a loan. *See* GX 5C-200; GX D207-A. In failing to elicit testimony concerning the actual date of the mortgage payment during its direct of Mr. Moldovan, the Government misled the jury including that it omitted from its summary chart the text messages on July 19, 2019, discussed above, confirming that the mortgage payment was made on July 19 and was, in fact, a loan. *See also* Section I.C., *supra* (discussing summary witness testimony concerning mortgage payment).

[25] At trial, the Government elicited testimony from Mr. Uribe that Nadine never told him that she would pay Mr. Hana back, again knowing that this was incorrect and contradicted by not only this text message, but by Mr. Uribe's prior statements to the Government during its investigation of this case, evidence which it did not present to the jury and successfully resisted allowing the defense to do so. Specifically, Mr. Uribe attended a meeting with the Government regarding this case on December 22, 2023, during which he stated to the Government that he understood the message "I will pay him back" to mean that Nadine was going to pay Mr. Hana back for her mortgage. ECF No. 486-1.

Following Mr. Uribe's testimony, on June 22, 2024, Mr. Hana's counsel moved to admit Mr. Uribe's earlier statement to the Government as a prior inconsistent statement under Federal Rule of Evidence 613(b). ECF No. 486. As Mr. Hana's counsel explained in its letter to the Court, Mr. Uribe's statement during trial was indisputably admissible to impeach his trial testimony. *Id.* at 5. On July 3, 2024, the Court denied Mr. Hana's motion. Tr. 6059:6-6061:5.

exchange for any action by Senator Menendez.  In fact, the Government conceded in its closing that Mr. Hana may have "wanted [the loan] paid back."  Tr. 6545:18-20.  The Government's failure to offer actual evidence—direct or circumstantial—that the mortgage payment was anything other than a loan undermines any suggestion that Mr. Hana made the payment for an illicit reason.

But, even if, as the Government argued,  the mortgage payment was not a loan, the record failed to show that it was a bribe.  *See Silver II*, 948 F.3d at 558 (not every "thing of value" given to a public official is a bribe).  The Government was required to prove beyond a reasonable doubt that Senator Menendez agreed to accept the mortgage payment knowing at the time he did so that he was being asked to influence a focused, concrete, and particular question or matter.  *See id.* at 557.  But the Government failed to do so.  Instead, it relied on the timing of the mortgage payment and Senator Menendez's call to Under Secretary McKinney to support the inference that the two events were connected.  *See* Tr. 6399:16-6400:1; *see also* Ind. ¶ 91 (alleging that in exchange for "checks" Senator Menendez promised "to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA").  But the jury could only reach the result sought by the Government based on pure speculation and improper inferences.  *See* Section I.C., *supra* (citing cases).  As is discussed at greater length above, to reach this conclusion, the jury would have had to infer that Mr. Hana, Senator Menendez, and Nadine all knew that Nadine was behind on her mortgage payments at the time Senator Menendez called Under Secretary McKinney, but, in fact, there was no evidence that Senator Menendez knew that Nadine was behind on her mortgage payments at the time (this was long before they were married and even before they were engaged), let alone that the mortgage company was going to file a foreclosure action (which it did two weeks after the call to Under Secretary McKinney).  And, most importantly, there was no evidence whatsoever that Senator

Menendez knew, at the time he made the call to Under Secretary McKinney, that Mr. Hana was going to provide the funds to pay Nadine's mortgage—indeed, the evidence confirms that Nadine hid all of this from Senator Menendez.  *See* GX 5C-100 (mortgage foreclosure complaint); GX 1302 at lines 802 (mortgage foreclosure complaint), 956 (voicemail from Nadine to Mr. Daibes on June 28, 2019 stating that Nadine had not yet told Senator Menendez about her unpaid mortgage), 987 (cashier's check indicating "LOAN AUTH W.HANA/ISEG TO N.A."); Tr. 6381:10-17 ("This particular thing, her delinquency on the mortgage she keeps from him [Senator Menendez] for a while. . . .").  In sum. the Government's failure to present *any* evidence—for there was none— that the mortgage payment was made in exchange for any action by Senator Menendez requires the Court to enter a judgment of acquittal on Counts 1, 2, 6, and 7.

### E.     IS EG Halal Employment

Likewise, the Government failed to present any evidence that Mr. Hana provided Nadine with three $10,000 checks in exchange for any action by Senator Menendez.

The Government's theory concerning Mr. Hana's payment of $30,000 to Nadine is that the payments were made in connection with a "no show" or "sham" job and, therefore, they must have been bribes.  *See, e.g.*, Ind. ¶¶ 1, 19 ("Those bribes included . . . compensation for a low-or-no-show job"; "IS EG Halal issued three $10,000 checks to Strategic International Business Consultants."); Tr. 54:1-6 ("Hana couldn't just write checks to Menendez.  That would be too obvious.  So Hana promised to give Nadine a sham job at his company as a consultant, but she didn't have any relevant business experience, and she wasn't being hired to do any real work.  The promises of a job were just promises of a bribe."); Tr. 6394:11-13 ("[Senator Menendez] knows that this is not a real job for the company. That it is a way to collect payments in exchange for Menendez's promises.").  However, the evidence presented at trial does not support the Government's theory.

Instead, the only evidence introduced on this topic is that Mr. Hana hired Nadine at IS EG Halal for a short three-month period pursuant to a consulting agreement, Mr. Hana paid Nadine $30,000 ($10,000 per month) as required under that agreement, Mr. Hana expected Nadine to perform work, and Mr. Hana did not renew Nadine's employment contract at the end of the three-month term after she failed to perform the work that was expected of her. *See, e.g.*, GX 4C1-P; Tr. 1157:1-3 (Jamela Maali: "Q. Were you aware that after being on that job for three months, that her contract was terminated? A. I was."); GX 1302 at line 956 (Nadine: "I need to be in the office eight hours a day."); Tr. 6177:18-6178:1 (Carolina Silvarredonda: "Q. In connection with your work for IS EG Halal, have you ever met a woman named Nadine Arslanian? A. Not in person. Q. Have you communicated with her? . . . A. [S]he was hired to get us [IS EG Halal] physical office space to open the office in India, and I needed to follow up several times, because she didn't get the office."). Carolina Silvarredonda confirmed all of this during cross examination by the Government. She testified that Nadine was hired to find office space for IS EG Halal in New Delhi, *see* Tr. 6194:10-16; that she communicated with Nadine about that work; and that Nadine never performed the work that she expected, *see* Tr. 6189:18-6192:19 (discussing Ms. Silvarredonda's communications with Nadine in Hana-190). Ms. Silvarredonda also testified that she discussed Nadine's work with Mr. Hana. *See* Tr. 6192:24-6193:7; *id*. at 6193:17-20 (discussing Ms. Silvarredonda's communications with Mr. Hana in Hana-210-R). In fact, Ms. Silvarredonda testified that Nadine "had not done the work quickly enough" or "well enough" and Nadine "was basically fired" as of October 17, 2019. Tr. 6199:5-10; *id*. at 6200:11-12. There is no evidence in the record that contradicts any of these facts. In particular, there was no evidence whatsoever to support the Government's unfair and inflammatory accusation that Mr. Hana paid Nadine in an effort to cover up a bribe—no emails, texts, tape recorded phone calls, nothing that

qualifies as evidence, as opposed to speculation, which is particularly striking given the longstanding relationship between the two. *See Pauling*, 924 F.3d at 656 ("Impermissible speculation . . . is a complete absence of probative facts to support the conclusion reached."); *see also* Hana-1300 (detailing longstanding relationship between Nadine and Mr. Hana).

Notwithstanding the lack of any evidence to support its theory, the Government suggested to the jury that the payments to Nadine must have been bribes because she received her third check from IS EG Halal two weeks after she was fired. Tr. 6201:2-6202:9. But whether she received her final check the day of her termination, the day after, one week later, or two weeks later, it is what was owed under the contract. Not a penny more. And nothing by way of actual evidence as opposed to pure speculation transformed it into a bribe for some unstated official action. It is the epitome of impermissible speculation, of the sort that gives rise, as it did here, to an unjust verdict. *See Pauling*, 924 F.3d at 656.

Indeed, even if Nadine was underqualified for the position or did not intend to perform the work expected of her—neither of which were proven at trial—the checks paid to Nadine from IS EG Halal did not *per se* become bribe payments, as the Government needs to show in order to support these convictions. *See Silver II*, 948 F.3d at 558. Just as it did with the mortgage payment, the Government failed to offer evidence—let alone proof beyond a reasonable doubt—that Senator Menendez knew about or agreed that his then-girlfriend would get three $10,000 checks knowing at the time he did so that he was being asked to influence a focused, concrete, and particular question or matter. *See id.* at 557.

In this regard, the Government relied on the mere closeness in time between Senator Menendez contacting Under Secretary McKinney and Mr. Hana identifying Nadine as an IS EG employee to satisfy the *quid pro quo* element with respect to this purported bribe. *See also* Ind.

81

¶¶ 91, 93 (alleging that in exchange for "checks" Senator Menendez promised "to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA").  As discussed above, the Government advanced this theory through its summary witness who had no personal knowledge of any relevant fact.  *See* Section I.A. and I.B., *supra* (citing Tr. 1384:4-24).  Specifically, the Government introduced evidence that on May 28, 2019, several days after Senator Menendez called Under Secretary McKinney, Mr. Hana texted an individual identified only as "HH HH" information concerning Nadine's employment at IS EG Halal:  "nadine arslan 120 k Vice president."  *See id.*; GX 1302 at lines 752, 759.  The Government never identified "HH HH" or, equally important, the relevance of this text to someone with the initials "HH HH."  Instead, the Government asked the jury to infer from this exchange alone that Mr. Hana provided Nadine with a sham job in exchange for Senator Menendez's call to Under Secretary McKinney:

> So the timeline leading up to that call shows that when Menendez knows there is money in it for Nadine, he swings into action. From zero to making a call that alarms the undersecretary of agriculture enough that he has to tell his professional staff that he has their back.
>
> Menendez gets the request from Hana. He gets right on it like it's his job, because it is. Because he's getting paid for it through Nadine.
>
> You can tell that with what happens after with the sham job. The follow through after the job makes the corrupt *quid pro quo* undeniably clear. Not even a week after Menendez's call to McKinney that you see Hana here telling his Egyptian contact[26] Nadine is going to be getting $120,000 a year. Not even a week after that official act attempted that there is this thing of value being promised and set up. You can stop right here in the timeline and that's all you need to convict Menendez and Hana on these counts. This text tells you Hana is making good on these promises of payment in exchange for Menendez's call to McKinney just days earlier.

---

[26] As noted above, having failed to even identify who "HH HH" is, the Government had no credible evidence to argue to the jury that he was Mr. Hana's "Egyptian contact."

Tr. 6398:5-23.  But this argument required the jury to draw multiple, specious inferences in order to satisfy its burden of showing that, at the time Nadine accepted employment with IS EG Halal, Senator Menendez promised to influence a particular question or matter, *see Silver II*, 948 F.3d at 553, 556:  (1) when Mr. Hana promised Nadine a job, Mr. Hana and Senator Menendez foresaw that some issue would arise with respect to IS EG Halal; (2) that the hypothetical issue would be something over which Senator Menendez would be able to assist; and (3) that, at the time Mr. Hana promised Nadine a position at IS EG Halal, it was in exchange for Senator Menendez promising to help Mr. Hana with that theoretical issue.  These inferences find absolutely no support in the record.  *See Valle*, 807 F.3d at 515 ("[S]pecious inferences [should] not [be] indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty.") (emphasis in original) (quoting *Lorenzo*, 534 F.3d at 159).

Relatedly, the Government argued for the first time in summation that, after November 2019, Mr. Hana stopped issuing checks to Nadine for her purportedly "sham job," and started to pay her in cash.  *See* Tr. 6387:6-10; *id.* at 6992:14-6993:14.  Here, the Government did not establish a *quid* or a *pro*.  As discussed in Section I.C., *supra*, the Government's proofs on this point are entirely speculative.  There is no evidence from which the jury could infer that Mr. Hana provided envelopes of cash to Senator Menendez—the *quid*—and there is no evidence suggesting any promise for which the envelopes of cash were provided in exchange—the *pro*.

And with respect to Senator Menendez's actions in May and June 2018—*i.e.*, the discussions about military financing, the anonymously drafted letter, and the provision of embassy information, *see* Section II, *supra*—the Government presented no evidence to even suggest that Senator Menendez took those actions as part of a promise in exchange for something of value. Indeed, here, the Government cannot even rely on a temporal connection because those actions

took place a year prior to the three $10,000 checks, the mortgage payment, and the purported cash payments.

*   *   *

The Government's failure to present any evidence whatsoever—for there was truly none—that Mr. Hana's mortgage payment or Nadine's employment with IS EG Halal were made in exchange for any action by Senator Menendez as part of the necessary *quid pro quo* requires the Court to enter a judgment of acquittal on Counts 1, 2, 6, and 7.

### F.    Other Things Of Value

In addition to the above, the Government alleged in the Indictment that Mr. Hana gave, offered, and promised Senator Menendez gold, personal property (*i.e.*, an elliptical and air purifier), meals, transportation, promises of carpeting services, and promises of the purchase of an automobile, in exchange for Senator Menendez's promise "to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA, and to take other actions that benefited the Government of Egypt, including with respect to U.S. military aid." Ind. ¶¶ 91, 93.[27] The Government presented absolutely no facts from which a reasonable jury could conclude or infer that those things of value were given in exchange for any actions by Senator Menendez—*i.e.*, no facts were presented that would support the contention that, at the time those supposed bribes were given or promised, it was to influence a particular matter or question—the requirement that is necessary to satisfy the essential *quid pro quo* element of the offense. *See Silver II*, 948 F.3d at 553, 556. Nor, as discussed above, is this

---

[27] The only evidence of transportation presented at trial was provided by Mr. Daibes. *See, e.g.*, Tr. 6374:14 ("transportation from Daibes"); Tr. 6478:11-12 ("Daibes gave minor things, like transportation for Menendez from JFK airport to Menendez's home in New Jersey."). And the only evidence of a "promise of an automobile" was presented in connection with the scheme to benefit Mr. Uribe and his associates, which is addressed in Section IV, *infra*.

*quid pro quo* requirement excused when the Government proceeds under an "as opportunities arise" theory of bribery, as it attempted to do here. *See Reichberg*, 5 F.4th at 247 ("When the government proceeds under the 'as opportunities arise' theory of bribery, it must prove that a public official received a payment to which he was not entitled and that, at the time of the payment, the payor and payee understood that [the payee] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise.").

As to the gold, the Government failed to identify when Mr. Hana provided any gold to Nadine, offer any basis to infer that the gold that was given to her—a friend of Mr. Hana's long before she even met Senator Menendez—was actually meant for Senator Menendez, or explain what action Senator Menendez took in exchange for such gold. Through their summary witness, Special Agent Coughlin, and again in summation, the Government argued that Mr. Hana gave gold bars to Senator Menendez in exchange for Senator Menendez meeting with General Abbas Kamel and providing an article to the Egyptian Government. *See* Section I.C., *supra* (discussing testimony at Tr. 1553:25-1554:21 and Government's summation at Tr. 6409:20-6410:14). However, as discussed in more detail above, the Government's argument is based solely on a timing coincidence and improper inferences, with no supporting evidence. *See* Section I.C., *supra* (discussing the improper inferences required for the jury to reach this conclusion) (citing cases). Indeed, the Government expressly recognized in its summation that the one-ounce gold bars could have been given simply as gifts and not as a bribe. Tr. 6516:1-2 ("Some people might give those small 1 ounce bars of gold as gifts.").

As to the meals, through Special Agent Coughlin's testimony, the Government suggested that Andy Aslanian paid for dinner at Mr. Chow's restaurant on June 29, 2018 in the amount of $524.61 as a "thing of value" in exchange for Senator Menendez's promise to Mr. Hana on July

26, 2018 to approve almost $100 million in military funding.  *See, e.g.*, Section I.A., *supra* (citing Tr. 1264:15-1270:15); Tr. 1289:14-23 ("Q. Could you please read just the first three lines from Dear Wael to July 25, 2018. A. 'Dear Wael. As per your request, this is to confirm a meeting at my office. 528 Hart Senate Office Building at 2 p.m. on July 25, 2018.' Q. How does that 2 p.m. July 25, 2018 time compare to the date and time that Hana used WhatsApp to send to Shawky during the time of his Mr. Chow dinner reservation we saw in the restaurant records? A. It's the same."); *id.* at 1299:2-1300-6, ("Q. . . . Directing your attention to July 25, 2018, . . . Could you please read the message. A. "Tell Will I am going to sign off this sale to Egypt today. Egypt 46,000 120MM target practice rounds and 10,000 rounds tank ammunition. $99 million.").   The Government reasserted this agreement in summation.  *See, e.g.*, Tr. 6424:4-7 (arguing that the dinner at Mr. Chow's restaurant on June 29, 2018 was "actually a thing of value right there. That's enough."); *id.* at 6374:12-19 (discussing the "thing of value" element and stating that "there's no real dispute that Menendez accepted things like meals from Hana . . . That actually is enough just to find this element.").

But, of course, that is not true:  even assuming that the meal at Mr. Chow's, for which Mr. Aslanian paid, is a thing of value for purposes of the federal bribery statute, it is only a bribe if it is in exchange for an official action.  But the Government itself represented to the Court that, regarding the meals, it was "certainly not going to say that's why Menendez did all these things, for these services, but it's part of the scheme."  Tr. 5724:9-19.  This concession was appropriate: the Government knew that it was not enough to show that Senator Menendez attended a dinner at Mr. Chow's and subsequently promised military aid to Egypt.  *See Silver II*, 948 F.3d at 558.  And the Government knew that it presented no evidence that Mr. Aslanian agreed to pay for dinner at Mr. Chow's in exchange for Senator Menendez's promise of aid a month later, let alone that

Senator Menendez agreed to approve nearly $100 million in foreign military aid in exchange for a $500 dinner.

Even more obviously legally insufficient was the evidence adduced as to the elliptical, the air purifier, and the carpeting services: with respect to these, the Government made absolutely no attempt to identify any particular matter or question that Senator Menendez supposedly agreed to influence in exchange for them. Instead, the Government merely mentioned these items in passing, either through their summary witness Special Agent Coughlin, through Jose Uribe, or in summation, as additional things of value provided at some point in time to Senator Menendez. *See, e.g.*, Tr. 6383:8-12 ("Hana sends them an elliptical exercise machine. It's worth thousands. It's for Bob. Your elliptical we put together at 9 a.m. Monday morning, and it's there in their bedroom, while they're married. Obviously, Hana sent it and Menendez received it."); *id*. at 6416:20-24 ("She says she sent the picture of the guy who orders the elliptical. If this elliptical is a totally innocent gift of friendship from Hana, why not just use his name? Why use code? Because it's a bribe.");[28] *id*. at 6386:22 ("Hana sent over things like an air purifier."); *id*. at 6386:23-24

---

[28] Here, the Government incorrectly asserted that Nadine was referring to Mr. Hana when she texted Senator Menendez: "I sent the picture of yours to the guy that orders elliptical to look it up." *See* GX 1302 at line 1161. But the facts presented at trial demonstrate that "the guy that orders [the] elliptical" was Rony Daibes, not Mr. Hana. *See* GX 1302 at lines 1175 to 1197 (text messages between Rony Daibes and Mr. Hana discussing Rony Daibes's conversation with Nadine concerning the elliptical and Rony Daibes confirming that he would coordinate the purchase of the elliptical); *see, e.g.*, GX 1302 at lines 1175 to 1176 (Rony Daibes to Mr. Hana: "ok Nadine finaly decide to take this one" and follow up picture of elliptical on Amazon); GX 1302 at line 1195 (Rony Daibes to Mr. Hana: "I put in amazon and asked Cristina to order it and gave her the address"). There is no evidence that Nadine knew Rony Daibes as anyone other than the individual assisting her with the purchase of her elliptical—which is exactly how she referred to him. The Government thus took a single text message completely out of context and asked the jury to infer that it was evidence of a bribe based on an incorrect and unsupported assertion and the insinuation that it was code. However, as the hundreds of text messages in this case make clear, the Defendants often and openly referred to each other by name, which undermines any assertion that Nadine was using "code" in an attempt to cover up her actions.

("Hana promised that his business associate, Nader Moussa, would do some carpeting for Nadine.").

With each of these additional things of value, the Government blatantly disregarded the *quid pro quo* requirement, which resulted in Mr. Hana being unlawfully convicted. *See Silver II*, 948 F.3d at 558 ( "[A] particular question or matter must be identified at the time the official makes a promise or accepts a payment[.] . . . Otherwise, we risk "subject[ing] [public officials] to prosecution, without fair notice, for the most prosaic interactions.").

*    *    *

In sum, no reasonable jury could find that Mr. Hana provided anything of value to Senator Menendez in exchange for Senator Menendez taking action on a particular matter or question. Because the Government failed to prove beyond a reasonable doubt the necessary *quid pro quo* element, the Court must enter a judgment of acquittal on Counts 1, 2, 6, and 7.[29]

## IV.    NO RATIONAL JURY COULD FIND THAT MR. HANA ENTERED INTO ANY AGREEMENT IN CONNECTION WITH THE SCHEME TO BENEFIT URIBE AND URIBE'S ASSOCIATES.

### A.    The Government Failed To Prove An Agreement To Sustain The Conspiracy Convictions.

The Government also failed to prove beyond a reasonable doubt a mutual understanding between Mr. Hana and Mr. Uribe to accomplish an unlawful end—*i.e.*, to disrupt the criminal prosecution of Elvis Parra or the criminal investigation into Ana Peguero—which mandates that the convictions on the conspiracy counts, Counts 1 and 2, be set aside.

---

[29] As discussed in Section VI, *infra*, because there was no verdict sheet distinguishing between the various separate conspiracies alleged, the Court and the parties do not know the schemes, alleged "official acts," or alleged bribes upon which the jury based its conviction.

1.    **Legal Standard**

"The essence of the crime of conspiracy . . . is the *agreement* to commit one or more unlawful acts." *United States v. Praddy,* 725 F.3d 147, 153 (2d Cir. 2013) (emphasis in original); Tr. 7131:15-17 ("A conspiracy is an agreement by two or more people to take actions that violate the law.").  "A meeting of the minds is required in order for there to be an agreement." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 551 (S.D.N.Y. 2014); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) (A "meeting of minds" is required for a conspiracy.).  That is, the conspirators must have a meeting of the minds on a common criminal objective, or unlawful end, of the conspiracy.  *United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018); *Ulbricht*, 31 F. Supp. 3d at 551; Tr. 7132:16-19 ("[T]he government must prove [] that there was a mutual understanding . . . between two or more people to cooperate with each other to accomplish an unlawful act.").  The defendant must know "what kind of criminal conduct was in fact contemplated." *Ulbricht*, 31 F. Supp. 3d at 551 (quoting *Rosenblatt*, 554 F.2d at 38).

"While the conspirators need not agree on every detail of their venture, there must be proof beyond a reasonable doubt that they agreed on the 'essential nature of the plan.'" *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992).  Indeed, "[t]he government must prove that the defendant agreed to commit a *particular offense* and not merely a vague agreement to do something wrong." *Ulbricht*, 31 F. Supp. 3d at 551 (emphasis in original) (quoting *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir.1998)).  Proof that the defendant "knew that *some* crime would be committed," *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012) (emphasis in original), or of a "general agreement to engage in unspecified criminal conduct," *Rosenblatt*, 554 F.2d at 39, is not sufficient.  Moreover, "a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy." *Ulbricht*, 31

F. Supp. 3d at 551; Tr. 7137:23-25 ("Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.").

2.    **The Government Failed To Prove A Mutual Understanding Or Meeting Of The Minds.**

The Government failed to prove beyond a reasonable doubt that Mr. Hana agreed with Mr. Uribe to commit a particular offense, namely to bribe Senator Menendez, as is required under the law. *See Ulbricht*, 31 F. Supp. 3d at 551. Without that necessary showing, Mr. Hana's convictions on Counts 1 and 2 must be set aside.

According to Mr. Uribe, in early 2018, he and Mr. Hana had a brief conversation outside of Andy Aslanian's office (Ms. Peguero's counsel) during which Mr. Hana said he could make Mr. Parra's criminal case and the investigation into Ms. Peguero "go away." Tr. 2962:9-14. Mr. Uribe testified that he could not recall exactly, but said that the amount they discussed for Mr. Hana to do this was "about" $200,000 to $250,000. Tr. 2962:10-11. Mr. Uribe also claimed that, during that conversation, Mr. Hana "[m]entioned the name of Nadine and Senator Menendez." Tr. 2962:18-22. However, "[a]part from talking about Robert Menendez and Nadine," Mr. Hana did not "say exactly how he was going to make the case go away" and "did not mention any avenues that were being taken to get a resolution." Tr. 2963:3-6. Thus, Mr. Uribe never provided any testimony to support even an inference that he and Mr. Hana agreed during this initial meeting to bribe a U.S. Senator.

Mr. Uribe's testimony regarding subsequent interactions with Mr. Hana similarly lacked any facts to support the idea that there was a mutual understanding between the two to bribe Senator Menendez. Specifically, Mr. Uribe testified that he met with Mr. Hana, Mr. Parra, and Bienvenido Hernandez shortly after the brief conversation outside of Mr. Aslanian's office, and during that meeting Mr. Hana again "mentioned" Senator Menendez and Nadine but, "[e]xcept for

being in touch with Nadine and Senator Menendez, [Mr. Hana] did not discuss the avenues that were going to be taken to execute the resolution of these cases." Tr. 2968:23-2969:2. When asked about this meeting, Mr. Uribe testified consistently that "there was no discussion about Mr. Hana about the specifics of what he was going to do," including no discussion of a car or whether Mr. Hana was going to "pay somebody"—*i.e.*, make a bribe payment. Tr. 3223:7-21; *id*. at 3224:5-8.

In fact, Mr. Uribe confirmed multiple times throughout his testimony that Mr. Hana did not discuss "the steps that were going to be taken, one, two, three, four, to finish," and that Mr. Hana never told him "what he was going to do or how he was going to do it." Tr. 3194:5-11; *id*. at 3219:11-13. As a result, Mr. Uribe could not say whether Mr. Hana's actions would have been legal or illegal. Tr. 3226:22-3227:6.

It follows that there was simply no meeting of the minds or agreement reached with Mr. Hana to bribe Senator Menendez, even assuming the truth of every word uttered by Mr. Uribe, troubling though that assumption might be. Indeed, Mr. Uribe, the only person other than Mr. Hana who was present at both of the essential meetings underlying the Government's conspiracy theory, did not give any testimony as to any actions, legitimate or illicit, that Mr. Hana promised to take in furtherance of the supposed conspiracy. Moreover, the only other evidence on this subject that was presented at trial revealed Mr. Hana's true objective during those conversations— he was recommending a new lawyer, Doug Anton, for Mr. Parra, something which even the Government recognized was entirely legal. *See* Tr. 6967:12 ("You are allowed to hire lawyers.").

Specifically, on March 28, 2018, Mr. Uribe provided Mr. Hana with the contact information for Mr. Parra's new attorney, Michael Critchley, because, as Mr. Uribe testified: "Will requested to provide him with the information that I have available so he perform his part of the deal, of the agreement." Tr. 2973:12-14. Although Mr. Critchley had already filed his notice of

appearance on behalf of Mr. Parra, Mr. Uribe told Mr. Hana that he had not. GX 1303 at line 16

("Michael Critchley, but he's not officially in court yet."). Shortly thereafter, on April 4, 2018—

the same day that Mr. Uribe texted Mr. Hana, "The deal is to kill and stop all investigation," GX

1303 at line 22—Mr. Hana and Mr. Anton communicated with regard to Mr. Anton's possible

representation of Mr. Parra. DX 1303 at line 23-1.[30]

      The evidence further showed that Mr. Hana discussed Mr. Parra's criminal case with Mr.

Anton on multiple occasions around this time, and provided him with information about it, keeping

Mr. Uribe updated on developments. *See, e.g.*, DX 1303 at lines 25-38, 26-3, 26-4. The messages

between Mr. Hana and Mr. Anton continued into June 2018. However, Mr. Hana was unable to

secure Mr. Anton as Mr. Parra's attorney, and Mr. Critchley continued to represent Mr. Parra

through the conclusion of his matter in late-2019. *See, e.g.*, Hana-112 (October 16, 2019 letter

from Critchley, Kinum, & DeNoia, LLC to State of New Jersey re: Elvis Parra); Hana-114

(Critchley report concerning amount of time spent working on *State v. Elvis Parra*). Notably, Mr.

Parra ultimately paid Mr. Critchley $250,000 for his work in connection with his criminal case—

the same amount Mr. Hana purportedly told Mr. Uribe it would cost Mr. Parra to make the case

go away. *See* Hana-114, Hana-115, Hana-124, Hana-125.

---

[30] If the purpose of Mr. Hana's action was to curry favor with Senator Menendez, Mr. Anton was
certainly an odd choice of counsel, since Mr. Anton had been in a serious, romantic relationship
with Nadine and was disliked by Senator Menendez. *See, e.g.*, Tr. 5830:10-15 (Katia Tabourian:
"[M]y sister was in a previous relationship, in an unhealthy relationship and that was creating a lot
of chaos in her relationship with the senator. I think that he -- well, I know that he, I think, was fed
up with the previous relationship constantly coming in between."); DX 1303 at lines 1-4, 1-7
(Senator Menendez to Nadine: "I don't want to interfere with your boyfriend."); DX 1303 at lines
26-57, 26-58 (Senator Menendez to Nadine: "I respect that this is very hard, has an emotional toll
on you based on whatever affection you had/have for him and that you think it will all go away. I
wish it would."); DX 1303 at line 77-0 (Senator Menendez to Katia Tabourian: "Katia, thank you
for the well wishes. I too have been very supportive of Nadine in many ways. I cared for her a
great deal, but I can not get over her being with Doug while she was with me.").

The Government failed to present any evidence refuting the above understanding of what Mr. Hana was seeking to do, and instead argued in conclusory fashion during rebuttal that the plan to hire Mr. Anton "truly makes no sense at all" because "if the whole plan is just to hire Doug Anton, why are they buying [Nadine] a Mercedes at all" and "why is [Senator Menendez] contacting Gurbir Grewal more than once?" Tr. 6967:1-18. The Government asks the right question, but reaches the wrong conclusion: the reason is because Mr. Hana had nothing to do with buying a car for Nadine, or an effort to intervene with the New Jersey Attorney General. The evidence of that is clear and ultimately undisputed.

*First*, Mr. Uribe—not Mr. Hana—promised to purchase Nadine a Mercedes Benz in March 2019, almost a year after Mr. Hana attempted to hire Mr. Anton in connection with Mr. Parra's criminal case. And Mr. Uribe did so only after, in his own words, "time is passing by, nothing is developing in a way that gave [him] assurance that this deal is to be complete," he had "lost hope for Will" and "decided to talk to Nadine directly." Tr. 3000:3-9. When Mr. Uribe talked to Nadine, she "knew nothing" about "Prestige Trucking, Phoenix Risk Management, and Ana Peguero," which "surprised" Mr. Uribe because "Will knew the whole deal." Tr. 3002:10-18. Mr. Uribe's testimony only further confirms that he and Mr. Hana never agreed to bribe Senator Menendez by buying his wife-to-be a car.

*Second*, and similarly, Senator Menendez's contact with then-Attorney General Grewal occurred in 2019, long after Mr. Hana and Mr. Uribe discussed any supposed "deal." Senator Menendez initially contacted A.G. Grewal on January 29, 2019. Earlier that day, Nadine requested and received from Mr. Hana information concerning Mr. Parra's case. GX 1303 at lines 355 to 369. However, Mr. Hana simply responding to Nadine's inquiries is not enough to prove beyond a reasonable doubt that Mr. Hana was part of a conspiracy to bribe Senator Menendez. *See*

*Ulbricht*, 31 F. Supp. 3d at 551 ("[A] defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy.").  Moreover, there is no evidence that Mr. Hana understood that Nadine asked for that information in January 2019 so that Senator Menendez could discuss the matter with A.G. Grewal, or that Mr. Hana was aware of any of the events leading up to Senator Menendez's second contact with A.G. Grewal in September 2019.  Indeed, all of the evidence indicates that from very early on Mr. Uribe excluded Mr. Hana from this scheme—a scheme which benefited only Mr. Uribe and his associates.

Thus, on October 13, 2018, Jose texted Will:  "I will handle this from now on. I am going to face it everyone. I will no allow anybody to harm my Ana."  GX 1303 at line 56.  Mr. Uribe explained the meaning of this text message during trial:  "If Will is not willing to come through with the agreement, for the deal, I was not going to continue hoping that he's able to do anything." Tr. 2987:7-18.  Accordingly, in March 2019, shortly after meeting with Mr. Parra's attorney, Mr. Uribe took matters into his own hands, and Mr. Uribe reached an agreement with Nadine:  "I [Jose Uribe] found Nadine, Nadine and I entered into an agreement. I am doing my part of the deal. She's already picked up her car and I am willing to continue with the deal until this gets fulfilled." Tr. 3031:8-11.  As discussed in more detail below, Mr. Uribe—not Mr. Hana—helped Nadine purchase her car.  And as shown in the Government's summary exhibit in support of this scheme, Mr. Uribe began excluding Mr. Hana from conversations with Nadine and, eventually, stopped communicating with Mr. Hana concerning this scheme altogether.  *See generally* GX 1303 at lines 685, 687, 689, 690; GX 1303 at lines 841 to 1142 (showing Mr. Hana appears in no text messages in June through July 2019; no relevant text messages in August or September 2019; and no text messages in October through November 2019).

It is obvious from the communications and Mr. Uribe's testimony that he alone conspired with Nadine leading up to the September 2019 meeting between Senator Menendez and A.G. Grewal. On July 29, 2019, Detective Lopez, who was in charge of the investigation for the New Jersey Attorney General's Office, contacted Ms. Peguero, through her attorney Mr. Aslanian, to request an interview. GX 1303 at line 901; Tr. 2949:19-20. Immediately after learning of this from Mr. Aslanian, Mr. Uribe reached out to Nadine because Mr. Uribe "want[ed] her to relay this information to the Senator." Tr. 3080:13-17; *id.* at 3082:10-18. Mr. Uribe followed up with Nadine multiple times for an update. *See, e.g.*, Tr. 3146:3-8; GX 1303 at lines 1020, 1107, 1108, 1111. Mr. Uribe also met with Senator Menendez and Nadine multiple times—each time without Mr. Hana—to discuss the criminal investigation into Ms. Peguero. Tr. 3099:23-24 (meeting between Mr. Uribe, Senator Menendez, and Nadine at Il Villagio on August 7, 2019); *id.* at 3124:1-19 (meeting between Mr. Uribe, Senator Menendez, and Nadine at Nadine's house on September 5, 2019); *id.* at 3135:8-17; *id.* at 3137:21-3138:3; GX 1303 at lines 1048 to 1053 (meeting between Mr. Uribe and Senator Menendez organized by Nadine at an apartment building on September 6, 2019). And mere days after Mr. Uribe received a call from Senator Menendez advising that the investigation into Ms. Peguero was over, Mr. Uribe attended a celebratory dinner with Senator Menendez and Nadine—again, without Mr. Hana. Tr. 3144:4-16; *id.* at 3148:7-23; GX 1303 at line 1128.

The evidence at trial demonstrates that, at most, Mr. Hana reached some vague agreement with Mr. Uribe long before any criminal conduct was contemplated, the specifics of which were never stated. *See Rosenblatt*, 554 F.2d at 39. To show the requisite meeting of the minds, the Government was required to prove that Mr. Hana "agreed to commit a *particular offense* and not merely a vague agreement to do something wrong." *Ulbricht*, 31 F. Supp. 3d at 551 (emphasis in

original).  However, the Government did not even show a "general agreement to engage in unspecified criminal conduct," which still would have been insufficient.  *Rosenblatt*, 554 F.2d at 39.  Instead, the evidence confirmed without question that Mr. Hana intended to agree with Mr. Uribe to hire Mr. Anton as a lawyer for Mr. Parra, and nothing more.

To be sure, as the Court instructed the jury, it is often the case that "the only evidence of a conspiracy that's available is that of disconnected acts that, when taken together and considered as a whole, [show] evidence of a conspiracy or agreement to secure a particular result."  Tr. 7133:11-14.  But here, when all of the evidence is considered as a whole, there is no evidence to support a finding beyond a reasonable doubt of an agreement involving Mr. Hana and Mr. Uribe to bribe Senator Menendez in exchange for stopping a state criminal prosecution or investigation.  There is evidence of some conversation in which Mr. Hana offers to help Mr. Uribe with the investigation and mentions Nadine and Senator Menendez (although with no specifics as to their relevance to the issue), but there is no plan, no objective, and certainly no meeting of the minds to bribe Senator Menendez as part of that offer.  There is then evidence that suggests that at some later point—approximately one year later—there was some agreement between Mr. Uribe and Nadine for Mr. Uribe to buy her a car.  But there is no evidence—direct or circumstantial— connecting that agreement with the conversation between Mr. Hana and Mr. Uribe a year earlier.  Rather, any such connection could only be based upon impermissible speculation.  *Yannotti*, 415 F. Supp. 2d at 289 (A jury "may not engage in impermissible speculation.").  Accordingly, the Court must enter a judgment of acquittal as to Mr. Hana on Counts 1 and 2.

### B.    The Government Failed to Prove a *Quid Pro Quo* Involving Mr. Hana and the Scheme to Benefit Uribe and Uribe's Associates.

The Court must enter a judgment of acquittal on Counts 1, 2, and 9 because the evidence failed to prove that Mr. Hana agreed to provide Nadine with a Mercedes Benz convertible for any

reason, and certainly not as a bribe in connection with the scheme to disrupt the criminal prosecution of Mr. Parra or the criminal investigation into Ms. Peguero.  The law concerning the *quid pro quo* in Section III.A., *supra*, applies equally here.  That is, the Government must show that Mr. Hana had an "intent to give or receive something of value in exchange for an . . . act." *Avenatti*, 81 F.4th at 194 (omission in original) (quoting *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013)).  Instead, the evidence presented at trial supports that the promise and purchase of the Mercedes Benz—the "thing of value" in support of this scheme—came entirely from Jose Uribe.  In other words, the Government failed to prove beyond a reasonable doubt that Mr. Hana participated in the *quid*, the *pro*, or the *quo*.

Nadine purchased her Mercedes Benz on April 5, 2019 from Ray Catena.  GX 7E-1.  In the days leading up to her purchase, Mr. Uribe connected Nadine with his friend Leon Pereldik at Ray Catena and communicated with Mr. Pereldik about Nadine's car purchase.  *See, e.g.*, GX 1303 at line 537, 558 to 559 (Jose Uribe: "Did my girl pick up her car ?"; Leon Pereldik: "No,she said she was going to come back today"); GX B115.  In addition to making the arrangements for Nadine to purchase the car, Mr. Uribe gave Nadine $15,000 for the down payment and made thirty-eight of the monthly payments from May 2019 to June 2022.  *See, e.g.*, Tr. 3032:14-3034:14; GX 1303 at lines 611 to 616, 620 to 623, 758, 845 to 846, 894 to 895, 1009 to 1010, 1028 to 1029, 1100, 1135, 1143.  In fact, Mr. Uribe testified that he entered into the agreement with Nadine, not Mr. Hana:  "I [Jose Uribe] found Nadine, Nadine and I entered into an agreement. I am doing my part of the deal. She's already picked up her car and I am willing to continue with the deal until this gets fulfilled."  Tr. 3031:8-11.  Indeed, the Government presented no evidence, even inferentially, that Mr. Hana offered to, agreed to, or assisted with Nadine's purchase of the Mercedes Benz.

The Government offered nothing more than loose and vague references to Mr. Hana and Nadine's car that are clearly insufficient to support a criminal conviction. *See Pauling*, 924 F.3d at 656 ("[I]n a criminal case, the government must do more than introduce evidence at least as consistent with innocence as with guilt."). The Government did this through its summary witness, Special Agent Graves, and summary chart GX 1303. As one example, the summary chart includes two text messages from Mr. Hana to Mr. Daibes: on February 1, 2019 "can you please help naden with car . are Expense" and on February 7, 2019 "can you please help naden with car." GX 1303 at lines 386, 390. During a lengthy exchange with Special Agent Graves spanning over five pages of the transcript, the Government highlighted disconnected entries in the timeline and presented evidence outside of the summary chart in an attempt to show that Mr. Hana promised Nadine a car in exchange for Senator Menendez's assistance with the criminal case and investigation:

> Q. Who does this line indicate that Menendez calls at 5:01 p.m. on January 29, 2019?
>
> A. Gurbir Grewal.
>
> MR. MONTELEONI: Mr. Hamill, can you please put up Government Exhibit 4G-6 and take us to the first page?
>
> Q. Special Agent Graves, this letter has a date of April 16, 2019. Have we gotten there yet?
>
> A. No, we have not.
>
> Q. Directing your attention under the seal where it says State of New Jersey, Office of the Attorney General and then head over to the right, to the right of the words "State of New Jersey," can you please read the top name to the right?
>
> A. Gurbir S. Grewal.
>
> Q. Can you please read the subtitle under the name Gurbir Grewal?
>
> A. Attorney General.
>
> Q. How does that name compare to the name reflected on the chart for who Menendez called at 5:01 p.m. on January 29, 2019?

A. It is the same, minus the middle initial. . . .

Mr. Hamill, can you please put up Government Exhibit 10C-1 and expand the image on the page? . . .

Q. Directing your attention below the picture, can you please read the second line, the large blue words, starting "our office" the second time that that appears? . . .

A. "Our office cannot." . . . "Intervene with judicial issues, provide legal advice or recommend an attorney. Our Senate office cannot legally get involved with pending litigation, including questions about criminal trials or imprisonment, child custody issues, and civil lawsuits. My office cannot overturn or in any way influence a court's decision." . . .

MR. MONTELEONI: Mr. Hamill, if you can take us all the way to page 24 of Government Exhibit 1303?

Q. Special Agent Graves, directing your attention to line 386. On February 1, 2019, at 12:17 p.m., first, how long was that after the January 29, 2019 call from Menendez to Gurbir Grewal?

A. A few days later.

Q. Who does Hana text on February 1, 2019?

A. Fred Daibes.

Q. Can you please read just the two lines what Hana texts Daibes?

A. "Hi Fred. Can you please help Nadine with car. Are expense." . . .

Q. Directing your attention to line 387, can you please read what Nadine texts Hana at 3:07 p.m. on February 3, 2019, according to the chart?

A. "All is great. I'm so excited to get a car next week."

Q. How long did Nadine text Hana, "All is great. I'm so excited to get a car next week" after Hana texts Daibes, "Hi Fred, can you please help Nadine with car"?

A. A couple of days later. . . .

Q. Directing your attention to line 390 on February 7, 2019, who does Hana text at 4:24 p.m. on that date, according to the chart?

A. Fred Daibes. . . .

Q. Special Agent Graves, can you please read this top message from Hana to Daibes? . . .

99

A. "Hey, Fred. Can you please help Naden with car? Thanks."

Q. Directing your attention to the date of the message, about how long was this sent after Hana texted Daibes about helping Naden with the car the first time on February 1st, 2019, according to the first chart?

A. Approximately a week later.

Tr. 2403:16-2408:25.

As discussed in Section I, *supra*, the Government's presentation of evidence in this manner is impermissible and unconstitutional. In addition, the Government's specious connection is entirely unsupported by the record. The only thing that these text messages show is that Mr. Hana asked Mr. Daibes to help Nadine with a car expense, and the only car expense that the record supports Mr. Hana was aware of—*i.e.*, in the timeline—is Nadine's inability to rent a car on January 28, 2019.[31] *See* GX 1303 at line 335. However, the Government did not ask the jury to infer that the texts related to assistance with Nadine's rental car—which would have been the logical inference—but that the texts showed a promise by Mr. Hana to purchase a car for Nadine in exchange for the earlier call from Senator Menendez to Attorney General Grewal—which is an improper, speculative, and unsupported inference. *See Pauling*, 924 F.3d at 656 ("The line between permissible inference and impermissible speculation is drawn by the laws of logic.").

It is also worth noting that the Government did not present any evidence that Mr. Hana received money from Mr. Parra and Mr. Hernandez as part of a *quid pro quo*. Mr. Uribe testified, based solely on second-hand knowledge, that Mr. Hernandez told him that he and Mr. Parra paid

---

[31] Through its summary chart, the Government introduced a prospect sheet from Benzel-Busch Mercedes-Benz, which indicated that, on November 24, 2018, Nadine showed interest in a "2019 Mercedes-Benz C-Class C300 4Matic," but the status was "changed to closed" on January 15, 2019, with the reason "unable to finance." *See* GX 1303 at line 108; GX 7D-1. The Government introduced no testimony on this matter and did not submit any evidence that Nadine ever told Mr. Hana that she was interested in purchasing a Mercedes Benz from Benzel Busch.

Mr. Hana $125,000 at Mr. Hana's apartment on an unknown date.  Tr. 3075:20-3077:3; *id.* at 3205:11-19.  Mr. Uribe stated that he was "not part of the exchange of money at this point and [he did not] have an understanding how did they reach 125."  Tr. 3076:18-19.  In other words, Mr. Uribe could not provide any competent testimony as to the reason why—assuming it was given— Mr. Parra and Mr. Hernandez gave $125,000 to Mr. Hana.  Mr. Uribe also claimed that he was present when Mr. Hernandez gave Mr. Hana $25,000 in cash "sometime in the fall . . . of 2019." Tr. 3077:4-3078:25; *id.* at 3081:7-12.  Notably, Mr. Uribe was not privy to the conversations leading up to Mr. Parra and Mr. Hernandez giving Mr. Hana any money.  *See* Tr. 3076:22-3077:3. Neither was the jury, as the Government did not produce a single text message or email concerning any such payment.  Mr. Uribe assumed that Mr. Hernandez was paying Mr. Hana as part of their supposed "deal" in 2018, but he had no basis in the record for suggesting such a connection.  Even if Mr. Hana did receive money from Mr. Parra and Mr. Hernandez, for the reasons discussed above, the Government did not present any evidence from which a reasonable jury could infer that Mr. Hana sought or received this money in exchange for any actions by Senator Menendez.

The Government's failure to present any evidence whatsoever connecting Mr. Hana to the Mercedes Benz, and its failure to prove beyond a reasonable doubt that Mr. Hana agreed to pay for the Mercedes Benz or received any money as part of the necessary *quid pro quo*, requires the Court to enter a judgment of acquittal on Counts 1, 2, and 9.

## V.    THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR CONSPIRACY TO HAVE SENATOR MENENDEZ ACT AS AN AGENT OF A FOREIGN PRINCIPAL.

Count 15 charged Mr. Hana with criminal conspiracy in violation of 18 U.S.C. § 371, the object of which "was to have a public official, specifically Menendez, act as an agent of . . . the government of Egypt and Egyptian officials," Tr. 7144:12-14, in violation of 18 U.S.C. § 219 ("§

219").[32]  The Court should enter a judgment of acquittal as to this count, as the Government failed

to present any evidence from which any rational trier of fact could permissibly find that such an

agreement existed, let alone that Mr. Hana willfully and knowingly agreed to have Senator

Menendez act as a foreign agent.

As the Court instructed the jury with respect to Count 15, the Government was required to

prove, beyond a reasonable doubt, "[1] that the charged conspiracy existed; [2] that [Mr. Hana]

knowingly and willfully became a member of the conspiracy, with intent to further its illegal

purpose; and [3] that one of the members had knowingly committed an overt act."  Tr. 7144:6-10;

*see also United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) ("A conspiracy conviction

under § 371 requires proof of three essential elements:  (1) an agreement among two or more

persons, the object of which is an offense against the United States; (2) the defendant's knowing

and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the

conspiracy by at least one of the alleged co-conspirators.").  As to the underlying offense under §

219, the Court instructed the jury that it was required to find that (1) the defendant was a public

official; (2) the defendant was or acted as an agent of a foreign principal; and (3) the defendant

acted knowingly.  *See* Tr. 7124:11-14.

"Agent of a foreign principal," as discussed at length in prior briefing,[33] is a term of art

defined under 22 U.S.C. § 611 *et seq.* ("FARA").  Crucially, as elaborated below, the "agency"

---

[32] The jury also found Senator Menendez guilty of Count 16, a substantive violation of 18 U.S.C. § 219.

[33] The relevant statutory definitions provided to the jury are elaborated upon, *infra*, at 6-8.  For ease of reference, Mr. Hana has also previously discussed § 219's incorporation of FARA in his motion to dismiss, ECF No. 143 at 38-47, 55-59; his reply to the Government's opposition to Mr. Hana's motion to dismiss, ECF No. 186 at 23-32; and in a motion in limine, ECF No. 289 at 19. He does not repeat those arguments here.  He also does not here reiterate his argument that he cannot be charged with a violation of § 219 under the legislative policy exception recognized by

relationship defined under FARA—and incorporated into § 219—requires, in essence, a lack of independent action on behalf of the putative agent, who is instead complying with, at the very least, a "request" from a foreign principal in carrying out certain specified political activities for the foreign principal's benefit. *See* Tr. 7127:7-7128:25 (Jury charge). But, as discussed in more detail below, the principal must have some degree of control over the agent and, "[a]s used in [FARA], the term control or any of its variants shall be deemed to include the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, by contract, or otherwise." 28 C.F.R. § 5.100(b). Thus, under FARA, if the alleged relationship is premised on an agent acting at the "request" of a foreign principal, such a "request" "falls somewhere between a command and a plea. . . . A general plea for political or financial support is less likely to constitute a 'request' under the Act than is a more specific instruction." *Att'y Gen. of United States v. Irish N. Aid Comm.*, 668 F.2d 159, 161-62 (2d Cir. 1982) (holding that, under FARA, the word "request" "is not to be understood in its most precatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate.").

The Government has failed as a matter of law to meet its burden in proving either the existence of a conspiracy to have Senator Menendez act as a foreign agent, as defined by FARA and the Court's jury instructions, or, alternatively, Mr. Hana's knowing and willful joinder of such a conspiracy. *See Landesman*, 17 F.4th at 320 ("[T]he government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has

---

*United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), as he is neither an agent of a foreign principal nor a public official, *see* ECF No. 143 at 39-47, as that argument is not dependent upon what occurred at trial. Obviously, he does not here abandon or otherwise waive those arguments, which were raised and rejected previously.

been proven beyond a reasonable doubt.") (quoting *D'Amato*, 39 F.3d at 1256). As described herein, concluding that such a conspiracy was in fact pursued, as the jury did, required drawing unreasonable inferences and speculating as to Mr. Hana and Egyptian officials' communications and intentions, while ignoring evidence regarding the Senator's duties to serve constituents, as well as the longstanding diplomatic relationship between Egypt and the U.S. *See Landesman*, 17 F.4th at 320 ("The jury's inferences, [] must be reasonable" to sustain a conviction); *Pauling*, 924 F.3d at 656 ("An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." (internal quotation marks omitted)).

In particular, the trial record is entirely devoid of any evidence that a foreign principal sought to convey—directly or through an intermediary—"orders" or "requests" to Senator Menendez, or that Senator Menendez abandoned his independence by acting under any sense of obligation toward a foreign principal. Equally clear is the absence in the record of any indication of Mr. Hana's willful and knowing joinder of a scheme to enlist Senator Menendez as an agent of Egypt. As detailed herein, these evidentiary insufficiencies are obvious when one measures what the Government did in fact prove against both what it claimed the evidence showed, as illustrated at summation, and even more significantly against what it was required to prove, as explained by the Court's instructions with respect to the substantive § 219 charge under Count 16, and specifically FARA's definition of "agent of a foreign principal."

### A.    The Government Failed To Sustain Its Burden In Proving The Existence Of A Scheme To Have Senator Menendez Act As A Foreign Agent.

First, the Government failed to present sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that any co-conspirator sought, as the objective of any putative agreement, to have Senator Menendez act as an agent of a foreign principal. In other

words, the Government has not met its burden to prove that the charged conspiracy existed, and

has thus failed to sustain the first element of Count 15.  *See* Tr. 7079:15-22 (Jury charge:  "The

focus of a conspiracy count is on whether there was an unlawful agreement.  There can be no

conspiracy unless at least two people reach such an agreement, whether expressed or implied.  So

when you're looking at the conspiracy counts, think:  Was there an agreement here?  If so, what

was it?").  Indeed, the Government's evidence in this respect—which amounts to attending and

coordinating formal and informal meetings between Senator Menendez and Egyptian officials, and

the exchange of public and non-classified information—fails to support the existence of a scheme

to have Senator Menendez act under the direction or control, or at the order or request, of the

Egyptian government without resorting to unreasonable inferences.

According to the Government, Mr. Hana "recruited [Senator Menendez], [and] encouraged

him to meet with Egyptian officials[,]" while Nadine, acting as a "go-between . . . ask[ed] the

Egyptians for feedback on what else Menendez could do to help them."  Tr. 6542:12-15

(Government summation).  Critically, however, the record is devoid of any indication that Mr.

Hana and a foreign principal ever discussed, much less agreed, to convey "orders" or "requests"

to the Senator of the kind contemplated by FARA, or otherwise have the Senator act as an "agent"

of Egypt.  What the record instead affirmatively reflects is that meetings and informational

exchanges occurred between the Senator and his foreign national constituents, as well as foreign

officials, both of which were an essential part of his role both as a Senator, and as Chair and

Ranking Member of the Senate Foreign Relations Committee ("SFRC").  *See, e.g.*, Tr. 4666:6-12

(Sarah Arkin:  "Q. And by the way, relationship building is an important part of the senator's job,

right, with foreign officials?  A. Yes. It's part of his job as chair.  Q. And in addition to dinners,

lunches and social events with Greek officials, he also had dinners, lunch and social events with

officials from Cyprus, right?   A.  Yes.").   The record also reflects the Egyptian and U.S. governments' decades-long diplomatic cooperation, Egypt's efforts to maintain strong bilateral relations with the U.S., and the process by which Egypt receives yearly foreign military financing from the U.S.   *See* Tr. 867:12-16 (Joshua Paul testified to Egypt's receipt of "grant assistance funding for military financing" from the U.S. government since the Camp David Accords in 1978); Tr. 4510:24-4511:8 (Ms. Arkin:   "A.   The United States and Egypt have a very important relationship, given Egypt's geographic location, its geopolitical role in the Middle East and for U.S. foreign policy its location on the Suez Canal.   It's a very important strategic relationship and also one where the senator had been critical of the concerns about Egypt's human rights conditions").

The Government highlighted, in particular, four instances over the course of three months in 2018 during which the Senator, Nadine, and Mr. Hana exchanged non-confidential information pertaining to the U.S. and Egypt's diplomatic relationship, including regarding military purchases Egypt routinely seeks from the U.S. using the $1.3 billion foreign military financing Congress has granted Egypt yearly for decades.   In every instance, these exchanges followed either social or official Senate office meetings between the Senator, Mr. Hana, and Egyptian officials, and followed up on what the record shows was likely inquired about and discussed at those meetings. But finding the existence of a scheme to have the Senator act as an agent of the Egyptian government on the basis of this record requires baselessly speculating that a select few communications between the Senator, Nadine, Mr. Hana, and Egyptian officials evidence a nefarious agreement for Senator Menendez to abandon his duties to the U.S. in favor of acting for the benefit of Egypt, while ignoring highly relevant, contextualizing evidence as to the SFRC's

role in fostering diplomacy and foreign partnerships, particularly with allies as significant as Egypt.

### 1. "Agent of a Foreign Principal"

To begin, as charged by the Government, the object offense of the Count 15 conspiracy was to have Senator Menendez violate § 219 by acting as an agent of a foreign principal, as that term is defined under FARA. Ind. ¶¶ 106-08. As instructed by the Court:

> An "agent of a foreign principal" includes . . . any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal and who directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal; [] acts within the United States as a political consultant for or in the interests of such foreign principal; [] within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; or [] any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal.

Tr. 7127:7-24. The Court further explained that the "government of a foreign country, such as Egypt, is a foreign principal. Where the government of a foreign country is the pertinent foreign principal, the term 'foreign principal' includes the government's agencies, officials, officers, and employees."[34] Tr. 7124:20-25. The Court also clarified that "[t]he term 'political activities' means

---

[34] Prior to trial, the Government affirmed that neither Mr. Hana nor IS EG Halal could be a "foreign principal" as a matter of law:

> [B]ecause FARA provides that a foreign principal does not include "an individual [who is] a citizen of and domiciled within the United States" or an entity "organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States," *id.* § 611(b)(2), *we do not presently intend to argue that Hana, any other co-defendant, or IS EG Halal is a foreign principal* (although of course that does not mean that they could not be intermediaries, see id. § 611(c)(1)).

'any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." Tr. 7126:10-18.

Thus, as explained by the Court, "a person can act as an "agent of a foreign principal" if he acts under the order, direction, or control of a foreign principal, or at the "request" of a foreign principal, when engaging in certain defined "political activities," or as a "political consultant." Nevertheless, as the jury was instructed, a "request" as defined under FARA "must be something more than an ordinary solicitation, although it can be less than an order or command"; the "ultimate question" is "whether it is fair to draw the conclusion that an individual is not acting independently, such as by simply stating or following his own views, but is instead acting as an agent of the foreign principal," as "the foreign principal making the ask must have some degree of authority over the agent." In other words:

> To decide whether a person is acting as an agent of a foreign principal, you must determine whether he is acting based on his own volition or views or whether he is instead taking direction, or acting at the order, under the control, or in response to a request . . . from a foreign principal. In determining whether this agency test is met, the surrounding circumstances must evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request.

Tr. 7127:25-7128:9.

In sum, the Government was required to prove the existence of an agreement to have Senator Menendez act as a foreign agent, which, as a matter of law, requires the Egyptian

---

Lustberg Cert. Exhibit D, April 7, 2024 Email from Daniel Richenthal to Defense (emphasis added).

government to have had "some degree of authority" over the Senator—in other words, "some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request"—such that the Senator was "not acting independently, such as by simply stating or following his own views" or "volition." Tr. 7127:18-7128:5. Equally necessary to sustain the underlying offense is proof that a putative agent complied with a foreign principal in the way he engaged in certain delineated political activities, or as a political consultant. Evidence presented in this case, and highlighted by the Government in its closing argument, undercuts rather than supports the existence of such a conspiracy.

### 2.    Absence of "Orders," "Requests," or Authority

The record is unequivocally lacking in any indication that any "order" or "request" was ever discussed or conveyed directly or through an intermediary as between Senator Menendez and a foreign principal. While the Government repeatedly emphasized at summation that Senator Menendez "promised to take actions" for the benefit of Egypt,[35] the actual evidence in the case did not show that any such "promise" or "action" by Senator Menendez was, in fact, made in response to an "order" or "request." In this regard, "ordinary solicitations" of the kind foreign officials routinely make of U.S. officials are inadequate to sustain a violation under FARA. Tr. 7127:12-14 (Jury charge). But "ordinary solicitations" were, the evidence showed, exactly what took place here. *See, e.g.,* Tr. 4683:22-4684:13 (Ms. Arkin's testimony regarding "standard" topics of

---

[35] *See, e.g.*, Tr. 6368:22-6369:1 ("[Menendez] promised to take actions for Hana and Daibes in exchange for those bribes. He promised to approve military aid to Egypt, to provide Egypt with sensitive information about Americans stationed abroad and to help Egypt in other ways."); *id.* 6371:4-10 ("[T]here are corruption counts related to the Egypt conduct. That includes both Menendez's promise to aid, promises to aid the government of Egypt in various ways and also to protect Hana's halal monopoly that the government of Egypt gave him."); *id.* 6372:8-11 ("[T]here are the foreign influence counts. Those relate to Menendez's actions and promise to act on behalf of Egypt while he was a U.S. senator.").

meetings with "Egyptian officials," stating that they routinely "advocated to Senator Menendez for the U.S. [Congress] to stop imposing conditions on foreign aid[,]" which "they had advocated for many years before 2018" as well as after); *id.* 4536:23-4537:2 ("A.  I had been speaking with [Egyptian Embassy staffer] a lot about the [Grand Ethiopian Renaissance Dam ("GERD")].  [The Embassy staffer] had been expressing the same position, that Egypt wanted the United States to be more involved in these discussions and negotiations, and I wanted him to know the senator was taking an active role in encouraging that."); *id.* 4685:19-22, 4686:3-8 ("Q.  Do you recall that Egypt, General [Khaled Shawky Osman] also said that if the U.S. doesn't release more aid they might have to go to other sources, like Russia?  A. This is a consistent threat that Egypt makes. . . . Q. And you recall that General Shawky made that statement at the March 2018 meeting as well, right?  A. I think so.  THE COURT:  I think you said it was fairly standard, is that it?  THE WITNESS:  Yes.").  Certainly, there was no evidence as to a specific request made by Egypt, but as the Court instructed the jury, the degree of "specificity of the foreign principal's instructions or requests," is highly relevant to finding an agency relationship.  Tr. 7128:10-18 (of five non-dispositive "[f]actors that may support an agency relationship," the Court cited "[s]pecificity of the foreign principal's instructions or requests"); *Irish N. Aid Comm.*, 668 F.2d at 161-62.

Furthermore, indications that a putative foreign agent is in fact acting independently, or following the course of action they would have with or without a foreign principal benefitting from it, undermine the existence of an agency relationship.  *See Att'y Gen. of United States v. Irish N. Aid Comm.*, 530 F. Supp. 241, 256-57 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982) (recognizing "control" as one way the foreign-agent test can be met); FARA Unit, Dep't of Justice, *The Scope of Agency Under FARA* (May 2020), https://www.justice.gov/media/1070276/dl?inline ("The ultimate test for agency under FARA is whether it is 'fair to draw the conclusion that an

individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal.'"); Tr. 7127:20-24 ("[T]he ultimate question, including based on a request, is whether it is fair to draw the conclusion that an individual is not acting independently, such as by simply stating or believing his own views"); *id.* 7127:25-7128:5 ("To decide whether a person is in fact acting as an agent of a foreign principal, you must determine whether that person is acting based on his own volition or views or whether he is instead taking direction, or acting at the order, under the control, or in response to a request . . . from a foreign principal."); Tr. 7128:10-25 ("Factors that may support an agency relationship include . . . if the foreign principal's goals do not align with the alleged agent's own interest or subjective viewpoint . . . Conversely, . . . [i]f the foreign principal's goals align with the alleged agent's own interests or subjective viewpoint[,]" such "may count against finding an agency relationship").

 The record repeatedly shows that the Senator, in managing relations with Egypt, reasonably attempted different methods of diplomacy in order to both encourage progress in civil rights in Egypt while protecting the U.S. and Egypt's critical strategic defense partnership. *See, e.g.*, Tr. 4512:17-4513:1 (Ms. Arkin characterized the Senator's view by April 2019 as "we've been criticizing Egypt, we've been going after them for so long on human rights, have been really out there publicly criticizing them, and it hasn't really changed anything on the ground. . . . I wanted to take a different tactic. I want to try to engage privately and engage more specifically and do more quiet engagement and criticism on a lot of these issues."); *id.* 4622:18-4623:3 ("Q. In sum and substance [Menendez] articulated to you, . . . that he wanted to approach Egypt with quiet engagement; right? A. Yes, . . . he wanted to try the approach of more quiet engagement, less publicity. Q. And distinct and in contrast to public engagement; correct? A. Yes. Q. But he was still -- he articulated to you he was still committed to human rights improvements in Egypt;

right?  A.  I don't think he said it that way but he did continue to raise human rights concerns directly with Egyptian officials in meetings in which I was present."); *id.* 4640:1-5 ("Q.  And you had many conversations with Senator Menendez about the important role that Egypt plays strategically to the United States in the Middle East, right?  A.  I don't know that I had many conversations about it, but that has been his historical position."); DX 434 (press release quoting letter from Senator Menendez and others to Secretary of State Tillerson, dated March 7, 2018, stating, in part:  "The Egyptian people should have the right to vote for their next President without fear.  We are concerned that recent developments—such as the intimidation and detention of all credible opposition candidates and the restrictive environment for non-governmental organizations and media—will make it impossible for the Egyptian people to participate in a legitimate democratic exercise."); GX 8F-35 (letter dated April 8, 2019 signed by seventeen U.S. Senators, including Senator Menendez, addressed to then-Secretary of State Pompeo, urging Pompeo, in advance of a meeting with President el-Sisi, to, among other things, "stress that our partnerships are stronger and more sustainable when rooted in shared values, including democratic governance, political and economic freedom, and fundamental human rights for all citizens.").[36]

---

[36] Indeed, the Government made much of the fact that Senator Menendez's edits to language in the April 8, 2019 letter addressed to Secretary Pompeo, and co-signed by sixteen other U.S. Senators, reflected less "specific" and "harsh" criticisms of Egypt and el-Sisi, who met with Secretary Pompeo and then-President Trump in Washington D.C. the following day, *see* DX 484; DX 486; Tr. 6538:10-13 ("By the spring of 2019, [Senator Menendez] more fundamentally shifted. He told Sarah Arkin he wanted to try a different approach with Egypt, and he refused to sign a letter that harshly criticized Egypt, choosing instead to soften his public tone.").  Nevertheless, as Ms. Arkin, the SFRC staffer and original author of the April 8, 2019 letter, testified, beyond trying a different approach to this longstanding ally as discussed above, ". . . if you are getting multiple members to sign on to a letter it always involves some negotiations, it is not often the case that you present something and every member agrees on something, so it is a jumping off point for negotiations in some way.  Q. The tone might have to change to get other senators to support it; right?  A.  As you say in the final version of the letter that went out, yes."  Tr. 4617:15-23.

In sum, the Government's theory requires speculating—on the basis of the communications discussed below—that in managing a sensitive but critically important foreign partnership, any policy shift, information sharing, or "promise of action," however harmless, justifiable, or routine, equates to abandoning one's independence in favor of acting as a foreign agent. Moreover, the evidence emphasized by the Government to sustain its burden of proving a conspiracy to have the Senator act as a foreign agent, including specific exchanges of information and meetings arranged between the Senator and Egyptian officials—what the Government characterizes as "promises" of action for Egypt's benefit—fail to evidence even a general "request" or "order" posed to the Senator by a foreign principal, or any agreement to convey same.

### i.     Embassy Figures

The Government emphasized, as evidence both of Senator Menendez acting as a foreign agent, and of a conspiracy to have the Senator act as a foreign agent, the significance of Senator Menendez texting the number of American staff stationed at the American Embassy in Cairo to Nadine on May 7, 2018. *See* GX 1302 at line 102; GX A101-6 ("Just FYI. 277 Americans – combination of diplomats, commercial service, USAID, others[;] 1344 Egyptians, locally employed staff[;] This is what's at American embassy. Most are Egyptians working at Embassy."); Tr. 6534:22-6535:2 (Government summation: "How about acting as a political consultant? . . . he is informing and advising the Egyptian government, through Nadine and then Hana, about the staffing levels at the U.S. embassy in Cairo."). Leaving the non-confidential nature of this information aside,[37] on summation rebuttal, the Government posited that Senator Menendez

---

[37] Although Government witness Bret Tate stated that information regarding U.S. Embassy personnel was "not public," Tr. 573:7-17, he did not explain how the mere number was sensitive and confidential and, indeed, it ultimately was not. Aside from the publicly available State Department Office of the Inspector General ("OIG") report that counsel for Senator Menendez introduced into evidence, dated April 2016 and posted online at least as of April 24, 2018, which

conveyed those figures in direct response to a request from a foreign principal, in line with the requirements of the statute. *See* Tr. 6960:19-24 ("Nadine sent [the Embassy figures] to Will Hana, and Will Hana sent it to an Egyptian official. Because this request came from Egypt."). But this is rank speculation, as the record includes literally no evidence of any such request.

Rather than even inferentially supporting the fact that Senator Menendez texted that information to Nadine in response to a request for same from the Egyptian government or an officer thereof, the record—as shown on summary chart GX 1302—indicates that the Senator requested this information from an SFRC staffer while at dinner with Nadine and Mr. Hana on May 6, 2018, and sent it to Nadine the following day. *See* GX 1302 at lines 90 to 102. Nadine then forwarded that message to Mr. Hana on the same day, May 7, 2018, GX B105-4, and Mr. Hana proceeded to forward it to Ahmed Essam, GX C404, whose response is not in evidence and thus does not appear on GX 1302. Significantly, this is the first time Ahmed Essam's name appears on GX 1302; there is no literally no evidence of a communication from him or anyone else requesting this information. Indeed, the closest-in-time communication of any kind between Mr. Hana and an Egyptian official prior to Nadine forwarding that message was almost two months earlier, on March 13, 2018, when Mr. Hana accompanied Khaled Shawky Osman and others (*not* including Ahmed Essam) to a

---

notes that "approximately 280 U.S. direct-hire positions were filled[,]" DX 748; DX 771, even a simple LinkedIn.com search reveals hundreds of publicly available profiles of those employed at the Embassy, with photos, full names, employment histories, and other identifying information that would seem at least as, if not more, sensitive than the raw number of embassy staffers. *See also* DX 766, DX 711 (another publicly available March 2022-dated OIG report stating, in part, "Beginning in FY2021, the embassy employed 1,100 locally employed staff with 429 staff under the supervision of the management section[,]" and further notes that 223 "direct-hire staff" were working at the embassy). Moreover, there is no evidence on the record, apart from an SFRC staffer indicating Senator Menendez had requested the personnel number, that there was any resistance or follow-up questions as to why the figure was being requested as one would expect if this information was so sensitive.

meeting with Senator Menendez in his D.C. office.  *Id.* at lines 70 to 71.  And the only communications between Mr. Hana and Nadine prior to her forwarding the Embassy figures message occurred on April 19, 2018, over two weeks earlier, when Nadine asked Mr. Hana about a company interested in exporting sea salt to Egypt.  *See* DX 1302 at lines 82-3 to 82-4.

Nadine and Mr. Hana's messages following the exchange of U.S. Embassy figures are also telling.  Within minutes of receiving the message from the Senator on May 7, Nadine texts Mr. Hana the following:  "He said he is waiting for an answer as soon as he gets it he will call me. And he sent me this information about the American Embassy in Egypt."  GX B105-4.  Thus, the numbers provided seem an afterthought to the "answer" Nadine mentions in her message to Mr. Hana, GX B105-4, which, on the basis of the record, appears to have concerned sea salt exports among any number of other topics.  There is literally no evidence of any communicated "order" or "request" by a foreign principal—or any associated agreement to convey either as between anyone—for non-confidential information regarding U.S. Embassy staffing, or any reason given why that information might have been needed, helpful or requested.  Indeed, even if it can be inferred that Egypt requested—in the usual sense of the word—this information as a result of Mr. Hana passing it along, that does not mean that it was "requested" as that term is defined by the statute, such that Senator Menendez was, by providing it, acting as an agent of Egypt, which had "some degree of authority" over him.

### ii.    Military Sales

The Government emphasized two further communications sent by Mr. Hana to Egyptian officials regarding U.S. military sales in support of the Count 15 conspiracy.  Notably, as with the message regarding U.S. Embassy personnel, the record is devoid of any "request" for any of these exchanges of information by a foreign principal, or any coordination indicative of an agreement to

"recruit" Senator Menendez as a foreign agent, as the Government characterized the charge in its summation. *See* Tr. 6542:7-18.

In the first place, U.S. military sales to Egypt are routine and repeated topics of conversation between U.S. and Egyptian officials. *See, e.g.*, Tr. 4683:22-4684:13 (Ms. Arkin testified that "the substance of the [March 2018] meeting was pretty standard for meetings with Egyptian officials," and that the Egyptian officials "advocated to Senator Menendez for the U.S. [Congress] to stop imposing conditions on foreign aid[,]" which "they had advocated for many years before 2018" as well as after); *id.* 4685:19-22 (Ms. Arkin testified that "General Shawky [] said that if the U.S. doesn't release more aid they might have to go to other sources, like Russia . . . [which] is a consistent threat that Egypt makes" and "fairly standard"). Indeed, as explained by former State Department staffer Joshua Paul, with regard to foreign military financing ("FMF"), Egypt has, historically, been the second largest recipient of "grant assistance funding for military financing" from the U.S. since and as a result of the Camp David Accords in 1978. *See* Tr. 867:12-16. This funding has long been critically important to Egypt and the U.S.'s strategic, and diplomatic, relationship, as well as to the U.S.'s own national security interests. *See* Tr. 939:19-940:2 (Mr. Paul: "[W]e've been in a position of on the one hand trying to press Egypt to take steps to strengthen its human rights, to release political prisoners, of which it has had tens of thousands of people in jail simply for their politics, for their views, while at the same time trying to maintain the relationship in order to strengthen certainly Israel's southern border and our regional influence and our ability in particular to go through the Suez Canal on an expedited basis."); *id.* 945:15-19 ("Q. . . . Do some within the U.S. government believe that it is more important to supply aid to Egypt so that they won't get the aid from countries that are not allies like Russia? A. Yes."); Tr. 4605:21-4606:11 (Ms. Arkin: "Q. Did you have an opinion as to whether the purchase of 20

116

Russian Sukhois by Egypt was good for American relations with Egypt or bad? . . . A.  It was bad. Q.  Why is it bad?  A.  We would like Egypt to be purchasing American weapons.  Q.  Was there anything in particular about purchasing them from Russia that was of concern?  A.  Yes. . . . Congress had passed a law called [CAATSA] . . . [that] would have put punitive restrictions on countries that purchased large amounts of -- that purchased big systems from Russia, big military systems from Russia."); *id.* 4606:15-19 ("Q.  Is it [] fair to say that the United States would also prefer that Egypt not develop stronger diplomatic relations with Russia given the role of the United States and Russia at the time?  A.  Yes.").

Through at least October 2023, Congress has appropriated approximately $1.3 billion in foreign military financing ("FMF") grant money to Egypt "on an annual basis."  Tr. 687:23-868:3; *see also* Tr. 940:15-18 (Mr. Paul:  "THE WITNESS: . . . if the original question was why does the U.S. still [grant Egypt FMF], it is because Congress still mandates it every year in the Appropriations Act.");  *id.* 865:24-866:2 (Congress "determines the total maximum amount of foreign military financing grant money that could be made available to another country in any given year[.]").  Indeed, so common is American military aid to Egypt that it is one of only two countries (Israel is the other) to receive FMF from the U.S. government through transfers into an interest-bearing Federal Reserve Bank account based in New York.  *See* Tr. 873:13-24.

Turning to the specific messages in evidence highlighted by the Government, the first, sent on May 18, 2018, was from Mr. Hana to Khaled Shawky Osman ("Shawky")—the Egyptian Defense Attache stationed within the Egyptian Defense Office of the Egyptian Embassy in Washington D.C. at the time.  *See* HANA-180; GX B105-A (image of Maj. Gen. Khaled Shawky's business card).  Mr. Hana's text read "The ban on small arms and ammunition to Egypt has been lifted.  That means sales can begin.  That will include sniper rifles among other articles."  GX

117

C206-1.  This message was ostensibly sent either during or immediately after Mr. Hana met Nadine and the Senator for dinner, *see* GX 1302 at lines 163, 164, 171, and about two months after Mr. Hana, Shawky, and others had met the Senator in the Senator's Washington D.C. office on March 13, 2018.  But here, again, entirely absent from the record is any indication that a foreign principal requested information regarding a small arms sales ban.  The only communications Mr. Hana and Shawky had prior to Mr. Hana sending the small arms message, after the March 13, 2018 Senate office meeting, concerned an official invitation Shawky intended to send the Senator from the Egyptian Defense Office in D.C.  *See* GX 1302 at lines 151 to 162.  Earlier on May 18, 2018, Mr. Hana—who had asked Nadine for the Senator's "business" rather than "personal" email for the invitation, GX B105-5—confirmed with Shawky that the Senator in fact received the invitation that day.  GX C206-1, -1T.  Thus, even assuming that Egypt was interested in the information provided by Mr. Hana—that the hold on small arms sales had been lifted—there is no evidence that this was something that Egypt requested of Senator Menendez (let along had "some degree of authority" to demand of him).  It does not, then, establish the agency relationship that the law requires, or an agreement to secure such a relationship.  This is especially so since, as the record indicates, U.S. military sales to Egypt are a commonplace topic of discussion between U.S. and Egyptian officials, including during Mr. Hana and Shawky's Senate office meeting with Senator Menendez on March 13, 2018.  *See* GX 8F-9 (a meeting memo prepared by SFRC staff for Senator Menendez's meeting with Shawky, circulated on March 12, 2018, includes the text, "On January 23, 2018, the Administration notified Congress of its intent to obligate $1.039 billion out of a total of $1.3 billion in FMF for FY2017.").  The record reasonably indicates, then, that disclosing the fate of the small arms ban was normal follow-up to the March 2018 meeting.  But again, Shawky's reaction to receiving that message from Mr. Hana is significant:  he emailed two Egyptian Defense

Office lobbyists to ask whether they could "help confirm" that a "ban small arms on egypt was left [sic] today." GX 41-3. That request demonstrates a lack of trust toward the information, whether from the Senator or Mr. Hana, which undermines any purported agency relationship or related agreement. Even more importantly, it establishes that the information provided by Menendez was available elsewhere; indeed, the lobbyists' response, after reaching out to an SFRC staffer, confirms the non-classified nature of this information, which was verified within a day. GX 41-3; GX 41-5. But most importantly, there is nothing about any of these communications that suggests that Shawky played any role in obtaining this information, by request of or order to Menendez, as the Government suggested in its summation. *See* Tr. 6535:7-10 ("Menendez inform[ed] Egyptian officials about the lifting of a ban on the sale of small arms to Egypt. Again, informing or advising Egypt on U.S. policy.").

Turning to the second message emphasized by the Government, on July 26, 2018, Senator Menendez sent Nadine a text reading:

> Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million
>
> NOTE: These tank rounds are for tanks they have had for many years. They are using these in the Sinai for the counter-terrorism campaign.

GX A101-14. Nadine proceeded to forward this message to Mr. Hana, who forwarded it to Shawky and Ahmed Essam on the same day, July 26. *See* GX 1302 at lines 322 to 325. The Government in closing argued that this text was "out of the ordinary" first, because he texted it to his then-girlfriend, Nadine, and Mr. Hana, who, as the Government put it, "was at that time a failed trucker[,]" Tr. 6403:5-12; and second, because, according to the Government, the Senator was "promising a quick approval" of this FMS. Tr. 6404:3.

But again, this argument yanks this communication from its context: not only is the approval of this sale completely "ordinary," as the Government conceded, *see* Tr. 6404:2-4 ("So

Menendez is promising not just an approval, which is ordinary, he's promising a quick approval, which is anything but."); *id.* 6403:1-4 ("Now, of course, you've heard the actual sale itself was supported by the State Department.  Was supported by the administration.  Planning on approving on a sale like that is not out of the ordinary[]"), but Senator Menendez sent the message one day after a delegation of Egyptian officials, including Shawky, had met the Senator in D.C.  GX C410.  This so-called "White Paper Delegation" meeting between Senator Menendez and a delegation of visiting and D.C.-based Egyptian defense officials was one of five individual meetings the delegation had arranged with Senators, in addition to individually meeting nineteen Congresspersons, eight Pentagon officials, and several others over the course of roughly a week in July 2018.  *See* DX 1010.  SFRC staffer Dana Stroul had told an Egyptian Defense Office lobbyist she "recommended that Menendez take" the meeting.  GX 41-6.  The record also indicates that military sales and counter-terrorism operations were discussed at the meeting, as they routinely are.  *See* HANA-178 (email between two SFRC staffers, from Dana Stroul to Christopher Barr, regarding a memo prepared for the White Paper Delegation meeting, emphasizing "Make sure you remind RM of Egyptian purchases from Russia, Egypt-NK issues, Egypt-Libya, and Sinai issues"); GX G101 (an Egyptian Defense Office prepared "read-on" for the meeting, including a list of pending FMS).

Thus, there is absolutely no indication that this text amounted to more than Senator Menendez following up regarding a discussion item raised in the course of a formal, SFRC-planned meeting with Egyptian defense personnel, conducted in the course of Senator Menendez fulfilling his usual responsibilities.  And, as a matter of law, and as previously discussed, "general pleas"—which categorically fail to create an agency relationship under FARA—for less conditioned military funding and sales are "standard" features of meetings between Egyptian

officials and their American counterparts.  Indeed, the Egyptian Defense Office prepared a memo in advance of the White Paper Delegation meetings which mentions, generally, certain pending FMS, *see* GX C101, but does not mention this specific FMS with any more detail, though it had been pending for over a month, since June 20, 2018, *see* GX 8A-2 (notification by the State Department to SFRC noting "[t]he Department has reached consensus to seek approval of this export[.]").  There was, then, not only no evidence of a request; the record belies the argument that there was any.

Nor did the Government prove that Senator Menendez was acting as an agent of Egypt because he approved this sale within the forty-day tiered review process to which certain countries, including Egypt, are subject.  *See* Tr. 6538:8-9 (Government summation:  "By July of 2018, [Senator Menendez is] promising to approve a military sale at a record pace.").  To be sure, as Mr. Paul testified, "all major arms sales to countries in the Middle East other than Israel," including Egypt, have forty-day review periods, Tr. 886:13-15, 25, though "[i]n practice it can take a much longer time[,]" Tr. 888:19, and that "[a]s a general matter, [it is] extremely uncommon" for sales to Egypt to clear within that regular 40-day review period.  *Id.* 900:24-901:2.  Though the trajectory of this particular FMS approval may appear uncommon, however, Mr. Paul conceded that there are exceptions, including that while the State Department ignores a Congress-placed hold "[v]ery, very rarely[,]" *id.* 922:11, he was "aware" of "two congressional informal holds blown or ignored by the State Department in 2019 and 2020[.]"  *Id.* 930:5-8.  But in any event, it cannot, consistent with the law, be appropriately inferred that the Senator was acting under the authority of the Egyptian government simply because he approved a military sale roughly thirty-five days after the State Department had itself approved the sale, just because such approvals normally take more than forty days.  Such an inference requires ignoring the Senator's (and several other U.S.

officials') formal discussion with a visiting Egyptian military delegation the previous day; the State Department's interest in clearing military sales "smoothly," *id.* 885:20-21; and, more generally, the U.S.'s interest in maintaining strong strategic, military ties with Egypt. The inference which the Government successfully sought was an improper one; Mr. Hana's conviction for conspiring to make the Senator an agent of Egypt cannot stand.

### iii.    "Ghostwritten" Letter

Finally, the Government in closing argued that the Senator "engage[d] in political activities in the interests of Egypt" by having participated in "ghost-writing" a letter on behalf of Egypt addressing the U.S. government's human rights concerns with Egypt, "to help them respond to other members of the U.S. Senate." Tr. 6533:22-6534:3. The Government characterized the letter as "a way of promising official acts . . . it is obvious special treatment. . . . The special treatment isn't just things that are official acts or a promise of official acts themselves. The whole pattern of giving Egypt special treatment so that they know that when he does promise them official acts, he means it." Tr. 6404:17-25; *see also id.* 6391:23-6392:5 ("Right now consider just the way this timing shows a corrupt quid pro quo. Is this letter itself an official act? No. You know what it is? It is a promise of one. Remember, this funding is going to come before him as the ranking member of the SFRC. These human rights concerns will come before him, too. Here, what he's saying by writing this letter is I'm not going to give you too hard a time on these human rights concerns because, look, I'm writing your rebuttal to them.").

The Government's argument is revealing: not only does it include a concession that the so-called "ghostwritten letter" is not an official act; it also shows that, even under the Government's version of events, it was not itself the act of an agent, only one that showed that he would act as an agent, or a promise to do so. But leaving aside how extraordinarily speculative this argument is, based as it is upon no evidence at all, it, again, completely ignores the legal

requirement of the statute that a foreign principal ordered or requested that Senator Menendez draft a letter advocating for Egyptian foreign policy objectives. The evidence, of course, was directly to the contrary, showing as it does that Senator Menendez was in dialogue with a New Jersey constituent—Mr. Hana—regarding Egypt's human rights record, and that the two exchanged thoughts and opinions on those topics. Specifically, following a series of emails between Mr. Hana and Nadine regarding foreign policy matters, which she forwarded to Senator Menendez, *see* GX 1302 at lines 70-71; GX B105-3; GX A402, on May 14, 2018, Mr. Hana emailed Nadine a series of bullet points expressing broad views regarding Egyptian security policy, criminal procedure, and interest in maintaining strong bilateral relations with the U.S. GX 1302 at line 131; GX C301. These points ostensibly responded to some of the topics being discussed in Washington and between the two countries, and especially an al-Monitor article discussing the U.S.'s foreign military financing grants and sales to Egypt in relation to Egypt's civil rights record. *See* GX C405. The following day, Mr. Hana texted Nadine "did u got [sic] any answers[,]" GX B105-5, possibly suggesting Mr. Hana was interested in the Senator's reactions and thoughts on the responses Mr. Hana raised. But there is absolutely no evidence that, at any point, Mr. Hana requested, on behalf of a foreign principal, that the Senator act as an agent for Egypt by drafting a letter advocating for Egyptian policy positions.

Nor was the letter substantively false or inappropriate, arguing as it did that Egypt was doing a good job of fighting terrorism in the Sinai and Western Sahara. *See* GX C301 (expressing the view that Egypt continues to bear a disproportionate burden in maintaining security and stability in the region: "The Egyptian state alone bears the burden of securing its western border, which extends to about 1200 km with Libya. This insurance is supposed to be a joint responsibility between the two sides. However, we succeeded in monitoring and destroying about 1,300 armed

SUVs carrying terrorists during July 2013. Until the end of 2017."); *id.* (emphasizing Egypt's commitment to its longstanding and crucial bilateral relations with the U.S.: "It must be clear to you in Congress and also in the other American political circles that Egypt is keen to establish strong strategic alliance relations with the United States and to overcome any obstacles that may arise in order to catch up."). Certainly, a suggestion by a U.S. Senator that this argument be advanced to Senate colleagues can hardly be viewed as acting as an agent of Egypt, especially in the absence of a request from Egypt (as opposed to from Mr. Hana who, it must be remembered, was not as a matter of law a foreign principal, *see* n.33, *supra.*

Indeed, the evidence shows that Senator Menendez's actions in editing the information provided by Mr. Hana was not at Egypt's request but at Nadine's, who, after several weeks, re-sent the information compiled by Mr. Hana to the Senator, writing "PLEASE, could you fix this letter and send it back to me. I want to prove a point to the General. He and Will just got me clearance for a project." GX B102; B102-A. The Government argues that "[a]ll of a sudden, when he hears Nadine could get paid, within hours, Menendez writes up a response from Egypt based on some talking points that Hana had sent through Nadine. He writes up this response saying don't worry about these human rights concerns. Give us -- that means give us, Egypt -- our money." Tr. 6391:12-22. But this proves the point: in the absence of any evidence that Egypt made him, or even requested of him (as that term is defined in the statute) that he edit and then send this letter, and after having for several weeks ignored Mr. Hana's analysis of the policy issues, the Senator finally acted when it was as a favor for his then-girlfriend. Whether or not, whatever the text, it was an appropriate way for a Senator to act; it did not amount to acting as an agent of Egypt and it did not constitute the crime charged. And, to reiterate a crucial point, even if "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial

support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Landesman*, 17 F.4th at 320. "[I]t would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." *Pauling*, 924 F.3d at 657 (emphasis in original).

### B. The Government Failed To Sustain Its Burden With Respect To Mr. Hana's Willful Participation In Any Such Conspiracy.

Even if the Court were to disagree and find that a scheme to have Senator Menendez act as an agent of the Egyptian government in fact existed, the Government has nevertheless failed to present sufficient evidence from which a rational jury could conclude that Mr. Hana knowingly and willfully participated in such a scheme. As instructed by the Court, "[c]onspiracy is an agreement by two or more people to take an action or actions that violate the law." Tr. 7075:18-19; *see also id.* 7079:15-22 ("There can be no conspiracy unless at least two people reach such an agreement, whether expressed or implied."). Thus, as the Court instructed the jury, the Government was required to prove, beyond a reasonable doubt, that at some time during the existence of the conspiracy, Mr. Hana, did, in fact, agree to join it. *See United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021) (the Second Circuit "ha[s] frequently noted that the essence of conspiracy is the agreement and not the commission of the substantive offense." (quoting *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001))).

With regard to Mr. Hana's actions, in particular, the allegation that he was involved in a conspiracy because he met with his elected representative, or was included in meetings with his representative and officials from his homeland, is alarming. Indeed, to the contrary, the record clearly indicates that Mr. Hana was justified in believing his elected representative, Senator Menendez, might be receptive to points of foreign policy that mattered to Mr. Hana, including regarding terrorism and the treatment of Coptic Christians in Egypt, and that the Senator was the

correct person to seek out for such advice and advocacy. Nor is there any reason to believe that he would have any sense that it was wrong to provide information he received from his United States Senator to contacts he had in his native land. The criminalization of this activity is not only unjustified, but is troubling.

Specifically, as repeatedly emphasized by Ms. Arkin, one of Senator Menendez's former staffers, "relationship building," involving informal, social, and formal meetings with constituents and foreign officials both were part and parcel of the Senator's role. Tr. 4666:6-12. The record affirms that private citizens, constituents, and foreign officials alike advocated to the Senator on behalf of their home countries. *See, e.g.*, *id.* 4819:7-16 ("Q. . . . Have you seen situations where people from particular countries, from what we called earlier today the diaspora, attempt to persuade Senator Menendez of some foreign policy issue with regard to their country? A. Yes. There are many diaspora communities in New Jersey. Many have policy -- or many have feelings and opinions and positions regarding their countries of origin or parents' countries of origin and advocate for specific United States policies vis-à-vis those countries."); *id.* 4818:5-15 ("Q. . . . Senator Menendez also had meetings with constituents, didn't he? A. Yes. Q. And some of those meetings . . . were in fact about foreign policy, weren't they? A. Yes. Q. And sometimes constituents would urge him to take a position that was what they favored with regard to a country that they cared about. Fair enough? A. Yes."). The record also reflects that the Senator had a particular interest in fostering such relationships and discussions with certain significant diaspora communities within his constituency in New Jersey, including Coptic Christians. *See* Tr. 4820:13-4821:2 (Ms. Arkin: "Q. So what Judge Stein just asked you about was whether members of various diaspora communities, . . . those people will, at times, in your experience, meet with Senator Menendez in order to persuade him of some, with regard to some issue affecting the country from

which they came; right? A. Yes; meet with him or with staff. Q. Any Egyptian ones that you can recall? A. Coptic community in [New Jersey]."); *id.* 4621:9-10 ("A. . . . I know he had meetings with leaders of the Coptic community in New Jersey."); *id.* 4651:10-15 ("Q. And you testified that New Jersey does have a large Coptic Christian community, right? A. Yes. Q. And Senator Menendez advised you that this Coptic Christian community is an important constituency of his, right? A. I mean, it is, yes.").[38]

In an attempt to obscure the normalcy of such social relations and discussions between U.S. officials, their constituents, and foreign officials, and to make them appear suspicious or sinister, he Government at several points argues that these meetings were secretive. *See, e.g.*, Tr. 6395:1-9 ("And here's another thing about this meeting [on May 21, 2019 at Senator Menendez's Senate office] with Helmy and Hana and Nadine. Not on the calendar that Menendez's staff keeps for him. This is not an ordinary meeting."). But in fact, there is was no indication at trial that any attempt was made to hide them: every meeting cited by the Government occurred either at the Senator's office, *see*, *e.g.*, GX C102-A (photograph of Mr. Hana, Shawky, Senator Menendez, and others in the Senator's D.C. office, March 13, 2018), or at a restaurant, in plain view of the general public. *See, e.g.*, GX C206-B (photograph of Mr. Hana, Nadine, Senator Menendez, and Shawky). The Government also suggested that there was something inherently suspicious about Mr. Hana's

---

[38] The record nevertheless reflects that Egyptians, and Coptic Christians, were certainly not the only constituency to which the Senator paid attention, and whose representatives—both foreign officials and private citizens—he regularly met with socially and informally. *See, e.g.*, Tr. 4695:25-4696:12 (Ms. Arkin: "Q. Are you aware that sometimes these private citizens like Tasos would contact Senator Menendez to provide them updates on what is going on in Greece and Cyprus and the like? A. Tasos, yes. . . . Q. You learned that Tasos would reach out to the senator and provide some piece of information and sometimes the senator would ask for follow up on that; right? A. Yes. Sometimes."); *id.* 4696:19-23 ("Q. And would [Tasos] advocate for his home country with you? . . . THE WITNESS: He would advocate for U.S.-Cyprus relations.").

contacts with Egyptian officials, and even that Mr. Hana was working at their behest. *See* Tr. 6394:17 ("Hana has regularly been taking orders from this Helmy"). But this is yet another example of the Government relying upon impermissible guilt by association, *see* n.41, *supra*, especially given the ubiquity of Egyptian officials and the Egyptian military in Egyptian industry and the private sector. *See, e.g.,* Tr. 4525:18-24 (Ms. Arkin: "A. . . . general intelligence services responsible for intelligence, surveillance, collection, cooperation, internally in Egypt, externally outside of Egypt, but also has a heavy hand in many parts of the Egyptian economy, controls some media outlets. It's quite omnipresent throughout Egypt."); *id.* 4813:16-20 ("Q. And again, I think you testified that intelligence in Egypt crosses over from just what we might think of as intelligence and goes to other matters of domestic policy and economy, I think you said was omnipresent. Is that fair? A. Yes."). Indeed, the evidence at trial made clear that Mr. Hana's actions were, far from on Egypt's behalf, meant to further his own economic and personal interests. *See, e.g.*, Tr. 6394:18-24 (as stated by the Government at closing, during a May 21, 2019 meeting in Senator Menendez's Senate office with Mr. Hana and Ahmed Helmy Nor, though Mr. Hana was "talking about the halal company, . . . [i]t appears from what Nadine is telling Menendez that Helmy is actually angry at Hana for talking about the halal in the meeting, while Menendez and Helmy want to talk about issues related to military aid. They want to talk about things like the case of April Corley.").[39]

---

[39] Nor was Mr. Hana involved with important aspects of the Government's purported proofs regarding Senator Menendez's relationship with Egypt: specifically, Mr. Hana had no apparent involvement whatsoever in the Senator's official visit to Egypt in October 2021 (the "CODEL"), and had no direct communications with either Mai Abdelmaguid or Abbas Kamel—two of the Egyptian officials whose meetings and communications with Nadine and the Senator the Government repeatedly emphasized. That said, the CODEL is yet another example of the Government painting as suspicious what the record actually demonstrates was positive, justifiable "relationship building" with a foreign ally. For instance, though the Government made much of the fact that SFRC staffers found it "weird" that Senator Menendez would ask them to contact an

In sum, concluding that Mr. Hana conspired to have Senator Menendez act as an agent of Egypt on the basis of public and non-confidential informational exchanges and formal and informal meetings requires ignoring the entirely commonplace nature of a Senator's role in serving his constituents, and of an SFRC diplomat's task in navigating a sensitive, though crucially important, foreign partnership. Instead, it requires entirely impermissible speculation to conclude that Mr. Hana willfully and knowingly joined such a scheme by virtue of raising publicly available matters of foreign policy to his elected representative or by conveying non-confidential information received as follow-up to meetings with foreign officials, without any specific "request" or "order" to do so. More generally, there is no evidence that Senator Menendez conveyed any of this information, or for that matter did anything at all, out of any sense of "obligation" or feeling he was operating under the "authority" of a foreign principal. Indeed, the record reflects that while the Senator attempted different methods of diplomacy vis-à-vis Egypt, for the sake of balancing the U.S.'s interest in promoting civil rights and in maintaining positive bilateral relations with an important defense partner, his stance and priorities with advancing democratic governance and human rights in Egypt never fundamentally changed.

Finally, the Government's conflation, especially during summation, of the bribery and foreign agent charges reveals the complete lack of indicia of agency in the record essential to defining the object offense underlying the Count 15 conspiracy, and a transparent attempt to muddy the fundamentally distinct elements of the two separate charges. Specifically, in the

---

Egyptian embassy official in the course of arranging the CODEL, Tr. 6411:11-16, SFRC staffers themselves had long been suggesting the Senator make an official trip to Egypt. *See* Tr. 4573:16-20 (Ms. Arkin: "A. I had suggested that [Senator Menendez] make a trip to Israel and Egypt given their respective bilateral relationship – significant bilateral relationships with the United States and the importance of geopolitical and geographic location of both countries."); *id.* 4814:19-4815:1 ("A. . . . I had been strongly recommending that he go to Egypt.").

absence of any evidence a foreign principal sought to convey, through Mr. Hana or otherwise, "requests," "orders," or otherwise assert "control" over the Senator, the Government repeatedly emphasized that the Senator was in fact promising to act for Egypt's benefit, and acting in Egypt's benefit, as a result of being paid and that, for this reason, he was not actually "independent." *See* Tr. 6537:8-13 ("Was he taking these actions for Egypt between 2018 and 2022 based on his own independent judgment of what would benefit the United States? Or was he doing it for another reason, like because he was getting paid. . . . He was doing it because he was getting paid."); Tr. 6997:1-9 ("First, you can definitely advocate for a country if you want, but you can't bribe someone for it. And [Mr. Hana] did."); Tr. 6395:1-5 ("And here's another thing about this meeting [in May 2019] with Helmy and Hana and Nadine. . . . This is a meeting that Menendez wants kept off the books because it's another meeting in which he's putting his power up for sale."); Tr. 6388:17-25 ("if Menendez promised to approve military aid to Egypt, like a foreign military sale or a grant of foreign military financing money, that's a promise of official action."); Tr. 6390:13-16 ("Again and again, when he knew that there was money on the line, for him and Nadine, Menendez sprung into action to take or promise official action. And Hana and Daibes sprung into action to pay him for it.").

But leaving aside that this truly novel and unprecedented interpretation of § 219 raises other legal issues, *see* Section VIII., *infra* (discussing the multiplicitous nature of Counts 1 and 15), the evidence that there was a *quid pro quo* resulting in Senator Menendez's action on behalf of Egypt is, as discussed above, completely unsupported by the record. *See* Section I.F., *supra*. That is because, in short, the very evidence upon which the Government consistently relies to argue *quid pro quo*—coincidences of timing—are missing here. Thus, even assuming that they can be viewed as "*quids*," nothing of value flowed from Mr. Hana to Nadine until July 2019—over a year

after the principal pieces of evidence the Government emphasized in support of the foreign agent charge came into being. *See* GX A101-6 (the U.S. Embassy in Cairo personnel figures are sent by the Senator to Nadine on May 7, 2018); GX C206-1 (Mr. Hana sends Shawky a note about the lift on a ban of small arms sales on May 18, 2018); GX A403 (Senator Menendez sends Nadine a reformatted version of Mr. Hana's bullet points on May 28, 2018); GX A101-14 (Senator Menendez sends Nadine a text noting his intention to sign off on a FMS on July 26, 2018). Thus, as is discussed above, the Government did not in fact connect any alleged bribe payment to Senator Menendez's alleged acts or promises of benefits to Egypt as a foreign agent. But again, even if they did, the necessary indicia of agency were not proven at all, let alone as part of a conspiracy in which Mr. Hana participated. A judgment of acquittal should be entered with respect to Count 15.

## VI.    THE GOVERNMENT DID NOT PROVE THE OVERARCHING CONSPIRACY CHARGED IN THE INDICTMENT IN COUNTS 1 AND 2.

In Counts 1 and 2 of the Indictment, the Government charged this case as if Senator Menendez sat at the center of a web of multiple associates who collaborated in bribing him for favors. In its narrative, Mr. Hana collaborated with Mr. Uribe, Mr. Daibes, and Nadine in a single criminal endeavor. Mr. Uribe and Mr. Daibes were, under this theory, not just fellow bribers of Senator Menendez—they were Mr. Hana's coconspirators, and they collaborated in their general enterprise.

This narrative was not proven at trial. Mr. Hana did not coordinate or confederate with Mr. Daibes or Mr. Uribe, and no evidence was introduced at trial that he did. Mr. Hana had absolutely no stake in whether Mr. Daibes received anything of value from Senator Menendez, and could have received no benefit from Mr. Uribe receiving anything either. The Government's alleged conspiracy, far from constituting a single independent scheme, amount to a classic "rimless wheel"

conspiracy, in which individual spokes each conspire with a central hub, but have little to do with one another.  *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995).  Charging the conspiracy in this way allowed the Government to introduce page after page (and chart after chart) of evidence about the conduct of Mr. Daibes and Mr. Uribe—evidence that had nothing to do with Mr. Hana, but that spilled over into the portions of the trial that *did* concern him and prejudiced his defense.  The Government's failure to prove a single conspiracy constituted just the kind of "abuse" that is threatened by charging "a single massive conspiracy," *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992), the consequences of which "permeated . . . the entire trial," creating a prejudicial variance.  *Kotteakos*, 328 U.S. at 769.  That failure requires that Mr. Hana's convictions be vacated and a judgment of acquittal be entered on the conspiracy counts, or at the very least, a new trial be ordered.

### A.    Factual Background

Before trial, Mr. Hana and Senator Menendez each moved to dismiss the Indictment as duplicitous.  ECF No. 137 at 17-26; ECF No. 143 at 66-89.  Both defendants noted the Indictment's conspiracy counts clustered together five ostensibly related but in fact separate schemes into combined counts,[40] thus creating the chance that "the jury could convict on a less-than-unanimous basis, by having some jurors vote to convict based on one scheme while other jurors vote to convict on another different scheme charged in the same count."  ECF No. 137 at 20; *see also* ECF No. 143 at 68 (noting the risk that "jurors may not have been unanimous as to any one of the crimes charged"); *id.* at 81-83 (addressing the irreparable harm and prejudice that Mr. Hana will suffer by allowing the Government to proceed on the duplicitous Indictment).  The Indictment's form led to

---

[40] These were the Egyptian aid scheme, the IS EG Halal scheme, the New Jersey State scheme, the Federal Prosecution scheme, and the Qatar Investment scheme.  ECF No. 137 at 21-22.

the risk that a defendant "could be found guilty by a jury without knowing *which* of the multiple schemes, multiple alleged "official acts," or multiple alleged bribes any conviction is based on." ECF No. 137 at 25.[41]  The Government responded that the need for a unanimous verdict could be addressed by jury instructions and the verdict form.  ECF No. 180 at 96 (citing *United States v. Arguedas*, 20-cr-135, 2021 WL 5567749, at *1 (S.D.N.Y. Nov. 29, 2021) (noting the option of "resolv[ing] any duplicity problem through jury instructions and the verdict form")).  The Court orally denied defendants' motions, holding that "[p]roving the existence of the 'rim' is a burden for the government at trial, not at the pleading stge."  Apr. 11, 2024 Tr. at 55:6-60:17.

In light of the Court's ruling, the Defendants requested that the Court both (1) give multiple conspiracies and unanimity of theory instructions; and (2) provide an accompanying verdict sheet that gave the jury an opportunity to note which theories of criminality, if any, it was unanimous on.  ECF No. 353.2 (Defendants' Proposed Charges); ECF No. 392.1 (Defendants' Proposed Verdict Sheet).  The Court granted partial relief.  It gave the jury modified versions of the proposed multiple conspiracies and unanimity of theory instructions.  *See* Tr. 7098:13-7099:15, 7107:10-7108:8, 7146:18-7149:12.  But it declined to use Defendants' proposed verdict sheet, instead using the Government's, which—despite its proposal in opposition to Defendants' motions to dismiss—failed to break out each Count's separate schemes.  *Compare* ECF No. 392.1 *with* ECF No. 506 (Verdict Sheet).  As a result, the Court, the parties and, perhaps most significantly, a reviewing Court can have no idea of the schemes of which Mr. Hana was convicted.

---

[41] The defendants re-raised duplicity in response to the S4 Indictment.  *See* ECF Nos. 261, 263. The S4 Indictment added substantive bribery and honest-services fraud charges against Mr. Hana; Mr. Hana argued that these counts were also duplicitous for joining two separate crimes in a single count.  ECF No. 261 at 21-23.

B.      **Legal Standard**

The "essence" of conspiracy is an agreement between one or more persons. *See, e.g.,* *Praddy*, 725 F.3d at 153; *United States v. Aracri*, 968 F.2d 1512, 1521 (2d Cir. 1992) (same); *see also Smith v. United States*, 568 U.S. 106, 110 (2013) (conspiracy is the "combination of minds for an unlawful purpose"). But even in cases involving conspiracy charges, "[g]uilt . . . remains individual and personal," and cannot be "a matter of mass application." *Kotteakos*, 328 U.S. at 772. Thus, to determine whether a single conspiracy or multiple conspiracies have been proven, "we focus on what agreement, if any, the jury could reasonable have found to exist vis-à-vis each defendant." *Johansen*, 56 F.3d at 351; *see also McDermott*, 245 F.3d at 137 ("[N]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it."); *United States v. Borelli*, 336 F.2d 376, 384-85 (2d Cir. 1964) (Friendly, J.) ("[T]he gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant . . . and the scope of his agreement must be determined individual from what was proved as to him.").

In a so-called "hub-and-spoke" (or "wheel") conspiracy, one person typically acts as a central point while others are the "spokes" by virtue of their agreement with the central actor. *See Kotteakos*, 328 U.S. at 754-55. Put another way, "members of a 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." *United States v. Guttenberg*, 07-cr-141, 2007 WL 4115810, at *6 (S.D.N.Y. Nov. 14, 2017) (quoting *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir.1971)). In some hub-and-spoke conspiracies, the spokes are connected by a rim, so there is some coordination between them; those spokes "agree[] to participate in what [they know] to be a

collective venture directed toward a common goal."[42]  *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)); *Eppolito*, 543 F.3d at 47 (same).  For example, a drug kingpin may be a hub who coordinates with multiple spokes—drug manufacturers, transporters, and dealers—all of whom share the same goal (selling drugs and thereby profiting) and all of whom understand that they are smaller parts of a bigger scheme.  *See, e.g.*, *United States v. Taggert*, 09-cr-984, 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (a wheel conspiracy is properly charged when a conspirator was involved in a "broad project for the importation, distribution, and retail sale of narcotics" because the enterprise provides "reason to believe that [the conspirator's] benefits derived from the operation were probably dependent upon the success of the entire venture") (citing *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994)).  Such a fact pattern states a single, overarching conspiracy.  *See United States v. Kapelioujnyj*, 547 F.3d 149, 156 (2d Cir. 2008) ( a single conspiracy may be found where there is "a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.") (quoting *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989)).

In contrast to such a rimmed wheel conspiracy is (not surprisingly) a "rimless wheel" conspiracy:  a hub-and-spoke conspiracy "in which various [spokes] enter into separate agreements with a [hub], but where the [spokes] have no connection with one another, other than the [hub's] involvement in each transaction."  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002); *see United States v. Zabare*, 871 F.2d 282, 287-88 (2d Cir. 1989).  For example, imagine the drug

---

[42] Such a goal or purpose cannot be "unreasonably broad," *United States v. Killeen*, 98-cr-143, 1998 WL 760237, at *3 (S.D.N.Y. Oct. 29, 1998), or impermissibly general, *United States v. Abdelaziz*, 68 F.4th 1, 48 (1st Cir. 2023).

kingpin above, but instead of masterminding a web of employees, he merely travels from house to house, selling drugs to unconnected individuals. The kingpin and his customers would constitute a "rimless wheel conspiracy," which is, of course, a misnomer: a rimless wheel "is not a single, general conspiracy" but instead "amounts to multiple conspiracies between the common defendant and each of the other defendants." *Dickson*, 309 F.3d at 203 (citing *Kotteakos*, 328 U.S. at 768-69). While the drug dealer's clients may have identical goals (buying drugs), they do not *share* a goal. *See Ulbricht*, 31 F. Supp. 3d at 554 (to prove a rimmed wheel, the Government must prove that "each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants"); *United States v. Dawkins*, 999 F.3d 767, 797 (2d Cir. 2021) (finding a single conspiracy when "the evidence shows that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" (cleaned up)). In other words, "while the objectives of the conspiracies [are] *identical*, they [are] not *in common*." *United States v. Harrison*, 942 F.2d 751, 757 (10th Cir. 1991) (emphases in original). Put most clearly, though the "spokes" of a rimless wheel may "engage[] in similar acts for similar reasons" and may be "assisted by the same people," they "engage[] in these actions in order to benefit themselves individually . . . and not to benefit the group as a whole," and "d[o] not care about the success of the other participants." *United State v. Rosnow*, 977 F.2d 399, 406 (8th Cir. 1992).

To constitute a single conspiracy, the spokes surrounding a hub must be interconnected or interdependent: one spoke's success must lead to or assist in another's. *Blumenthal v. United States*, 332 U.S. 539, 558 (1947) (multiple conspiracies exist when no spoke "aided in any way, by agreement or otherwise," another spoke). Proving a single conspiracy, as opposed to disparate and unconnected conspiracies, requires "sufficient proof of mutual dependence and assistance." *United States v. Pauling*, 256 F. Supp. 3d 329, 335 (S.D.N.Y. 2017). Mutual dependence and

assistance can be found when the co-defendants each aid and benefit from each aspect of the putative conspiracy, such as when they "cooperate with each other in what seem[s] to be an open working relationship." *Vanwort*, 887 F.2d at 383; *see United States v. Geibel*, 369 F.3d 682, 692 (2d Cir. 2004) (finding no single conspiracy because the spokes "were not mutually benefitted by [each other's] participation in the scheme"; alleged sharing of information "inured only to the benefit of" one spoke, and "the financial benefits that [the other spoke] actually received from defendants' unknown participation in the trading scheme were trivial"); *see also United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994) (interdependence requires an analysis of "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other").

### C.    The Government Failed To Prove A Single Overarching Conspiracy.

The Government's proposed overarching conspiracy, as set forth both in the Indictment and at trial, suffers from a core problem: the alleged spokes of the wheel lacked a common goal or purpose; in sum, the Government did not prove the rim that it promised to during post-trial motions and that the Court gave it the opportunity to do. Mr. Hana did not work or coordinate with Mr. Daibes or Mr. Uribe, did not depend on Mr. Daibes or Mr. Uribe, and did not have a stake, monetary or otherwise, in whether Mr. Daibes' or Mr. Uribe's aspects of the supposed scheme succeeded. Rather, "[e]ach spoke acted independently and was an end unto itself." *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004). As in *Kotteakos*, "[t]he conspiracies . . . were distinct and disconnected, not parts of a larger general scheme . . . . There was no drawing of all together in a single, over-all, comprehensive plan." *Blumenthal*, 332 U.S. at 558.

It is not sufficient that Mr. Hana knew of Mr. Daibes' and Mr. Uribe's enterprises and interactions with Senator Menendez—although, as discussed below, knowledge by Mr. Hana of Mr. Daibes' alleged schemes was not even proven here. Indeed, the Second Circuit has described

137

the idea that knowledge of one's alleged co-conspirators is enough to create a rimmed wheel as "plainly wrong." *United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945) (Hand, J.). "[I]t is not enough that, when one joins with another in a criminal venture, he knows that his confederate is engaged in other criminal undertakings with other persons, even though they be of the same general nature." *Id.* Instead, the participants must not only share a common dependence on the hub, but also, crucially, must depend on each other. *Id.* at 173; *see also Geibel*, 369 F.3d at 692 ("[M]ere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal."); *United States v. Hughes*, 505 F.3d 578, 588 (6th Cir. 2007) (the mere fact that "all co-defendants and unindicted conspirators knew or should have known that they were involved in a single conspiracy because they were close friends and had socialized together" does not show "that there was any sort of agreement amongst all of those named [defendants]").

In this case, the requirement of an agreement among all named conspirators was not met at trial. Instead of a single overarching conspiracy, in which the Defendants acted in concert, interdependently, and as part of an over-all and comprehensive plan, the Government proved (at most) a set of disparate conspiracies between various Defendants and Senator Menendez, separated in time and in purpose.[43]  *See* ECF No. 143 at 76-77 (explaining the five separate conspiracies alleged in the Indictment). Despite its best efforts, the Government failed to prove that the Defendants cared at all about, or had any stake in, the other Defendants' alleged schemes. As to the Uribe/Parra scheme, as set forth above, *see supra* at III, IV, the Government failed to prove that Mr. Hana ever agreed to do anything relevant to the alleged conspiracy to intervene in a state

---

[43] Mr. Hana, of course, does not concede that the Government proved any conspiracy at trial. But for purposes of demonstrating a variance between the Indictment and the proofs at trial, it does not matter whether the Government proved some smaller conspiracy so long as it failed to prove the larger conspiracies alleged in Counts 1 and 2. *Aracri*, 968 F.2d at 1519.

criminal prosecution and a state investigation; the rudiments of an agreement were, as Mr. Uribe himself testified, never in place. Tr. 2987:7-18; 3000:3-9; 3031:8-11. And even if one were to improperly speculate that Mr. Hana attempted to get paid to help resolve the cases against Elvia Parra and Ana Peguero despite the absence of competent testimony to that effect, *see supra* at IV.B, the Government introduced no evidence that Mr. Hana had a financial or emotional stake in the actual outcome of the prosecution or investigation.

Mr. Hana's lack of involvement in the Daibes part of the case—both the Federal Prosecution scheme, Ind. ¶¶ 45-54, and the Qatar conspiracy, *id.* ¶¶ 45, 55-67—is even clearer. The Government did not even try to introduce evidence that Mr. Hana had anything to do with either the intervention in Mr. Daibes's federal prosecution or his and Senator Menendez's interactions with Qatar; indeed, during the portion of the trial concerning those events, days went by without Mr. Hana's name being uttered or appearing on a single document or summary chart— including, notably, GX 1304, the 23-page, 342-line chart regarding this part of the case on which Mr. Hana's name never once appears.[44] And at no point at trial did the Government even attempt to show what Mr. Hana could possibly have gained from either scheme. There is simply no evidence that Mr. Hana ever reached an agreement with anyone regarding the scheme, or even knew about it.

In short, Mr. Hana lacked sufficient involvement in the New Jersey State scheme, the Federal Prosecution scheme, and the Qatar Investment scheme for them to be a part of the

---

[44]In fact, the Government conceded before trial that Mr. Hana was not aware of all of Mr. Daibes's actions. ECF No. 180 at 113 ("Hana [is not] alleged to have been aware of all of Daibes's actions."). But, of course, even if he was, awareness is not sufficient to demonstrate a single overarching conspiracy. *Geibel*, 369 F.3d at 692 ("[M]ere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal.").

conspiracy with which he was charged and of which he was convicted.  He lacked a common goal with his alleged co-conspirators, and his actions were not interdependent with theirs.  Put another way, assuming all of the Government's allegations were true, the success or failure of any of these three schemes would have had no impact on the Egypt or IS EG Halal schemes.

The same applies in reverse.  Although it nodded in that direction, the Government did not show that Mr. Daibes had a financial stake in the alleged Egypt schemes.[45]  The Government's introduction of stray references to Mr. Daibes' proposed developments or investments in Egypt, Tr. 1295:12-1296:1, or an email from Senator Menendez to Mr. Daibes about a Senate bill concerning natural gas off the Egyptian coast, Tr. 1463:7-1464:21, does not mean that Mr. Daibes was dependent on the supposed scheme's success; there is no evidence, for example, that the success of Mr. Daibes' business interests in Egypt was in any way contingent on the success of the alleged Egypt scheme.  A cursory review of GX 1302 confirms this, as Mr. Daibes only makes occasional appearances and has little to do with the core facts supposedly underpinning the scheme.  *See, e.g.*, GX 1302 at line 1255 (a text from Nadine to Mr. Daibes about glazed donuts).  And, of course, the Government introduced no evidence that Mr. Uribe had any involvement or stake in either the Egypt or IS EG Halal schemes; while Mr. Uribe did communicate with Nadine about her mortgage, he had no apparent involvement or economic interest in Egypt or IS EG Halal related matters.  *See generally* GX 1302.

---

[45] The Government argued that Mr. Daibes was a involved in investments with Mr. Hana and thus stood to profit from the IS EG Halal scheme.  Tr. 6378:15-18.  But there was no proof introduced that Mr. Daibes had anything to do with the halal business or was aware of anything Mr. Hana allegedly did to curry favor with Senator Menendez or that the Senator did to assist Mr. Hana with his IS EG Halal business; for example, there is nothing that tied him to the Senator's call to Under Secretary McKinney, discussed above.  *See* Section II, *supra*; *see also* GX 1302 at 54-55 (failing to mention Mr. Daibes).

Even the alleged IS EG Halal and Egypt schemes were not shown to be interdependent with each other, and therefore ought to have been charged as two separate schemes. Before trial, the Government argued that Senator Menendez's call to the USDA allowed IS EG Halal to serve as a revenue source for bribe payments. ECF No. 180 at 94. But at trial, the Government introduced no evidence supporting this contention—indeed, the facts underlying the alleged IS EG Halal scheme occurred long after the alleged Egypt scheme. Thus, Menendez's actions regarding the embassy personnel information, the ghostwritten letter, and the small-arms ban all occurred in 2018. *See* GX 1302 at lines 8-9 (embassy personnel); *id.* at line 10 (ghostwritten letter); *id.* at line 28 (small arms ban). But Egypt's grant of a sole-source contract to IS EG Halal, and Senator Menendez's call to Under Secretary McKinney, which was supposedly undertaken to "protect" that contract, all occurred in mid-2019. GX 1302 at line 53; Tr. 1797:1-13, 1798:21-1799:2. So even if the Government had proven either the IS EG Halal scheme or the Egypt scheme beyond a reasonable doubt (and for the reasons shown above, *see* Sections II, III, *supra*, it did not), the two schemes, far from being intertwined, were patently independent. That is, under the Government's theory of the case, the Egypt conspiracy not only could have succeeded without the IS EG Halal conspiracy, but it did succeed, with no apparent link to IS EG Halal. That is, even taking the Government's allegations as proven entirely, the two schemes were completely independent.[46]

The Government therefore failed to demonstrate interdependence and mutual assistance—as shown above, it often did not even attempt to demonstrate it—between the alleged co-conspirators as to the multiple aspects of the supposedly singular scheme. This was simply a rimless wheel, with insufficient connection between the alleged spokes to constitute a single

---

[46] While not relevant to Mr. Hana, the Government also failed to prove other necessary interconnections, such as (for example), Mr. Daibes' knowledge or participation in the New Jersey State scheme, or Mr. Uribe's involvement in either the Federal Prosecution or Qatar schemes.

conspiracy. *See Chandler*, 388 F.3d at 807 ("[W]here [as here] the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes."). But when a defendant is charged with joining a single conspiracy, but the evidence at trial actually shows multiple smaller conspiracies, a judgment of acquittal must be entered with regard to the conspiracy charged. *See, e.g.*, *McDermott*, 245 F.3d at 138 (reversing guilty verdict on conspiracy count alleging overarching conspiracy and granting a judgment of acquittal because the defendant at issue had an agreement with co-defendant 1 but not co-defendant 2, and holding that "as a matter of law, no rational jury could find [defendant] guilty beyond a reasonable doubt of a single conspiracy with [co-defendant 2] to commit insider trading").[47]

### D.    There Was  Variance Between the Conspiracy Charged in the Indictment and that Proven At Trial.

At the very least, there was a variance between the allegations in the Indictment, alleging a single conspiracy in Counts 1 and 2, and the proofs at trial, which showed multiple conspiracies. *Aracri*, 968 F.2d at 1519; *see also McDermott*, 245 F.3d at 139 (both reversing conviction and granting a judgment of acquittal on Rule 29 grounds and vacating conviction for variance on Rule 33 grounds). And when there is a variance between proof and indictment, a court must determine whether that variance prejudiced a given defendant. *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015) (quoting *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)). This requires an analysis of whether "the evidence proving the conspiracies in which the defendant did *not* participate prejudiced the case against him in the conspiracy to which he *was* a party." *Johansen*,

---

[47] Mr. Hana maintains that the Indictment was improperly duplicitous, as he argued in his motion to dismiss, because it alleged multiple conspiracies in a single count, ECF No. 143, but the Court rejected this argument, which Mr. Hana does not here abandon, but argues through the prism of multiple conspiracies and variance.

56 F.3d at 351 (emphasis in original).  Courts consider several factors when analyzing whether a variance was prejudicial, including:  (1) whether the trial court gave a *Pinkerton* charge allowing the defendant to be convicted for substantive offenses committed by another; (2) whether statements of persons not in a conspiracy with the defendant were used against him; (3) whether there was prejudicial spillover because of a large number of improperly joined defendants; and (4) whether shocking or inflammatory evidence came in against the defendant.  *Id.*

Here, those criteria are readily satisfied.  First, the Court did give a *Pinkerton* charge.  *See* Tr. 7057:12-7058:19 (instructing the jury that "each member of the conspiracy is deemed responsible for such acts, declarations, statements and omissions of any other coconspirator made in the course of and in furtherance of the conspiracy").  This enabled the jury to consider—and find Mr. Hana guilty based upon—any of Senator Menendez's, Mr. Uribe's, and Mr. Daibes's Parra-, Qatar-, or Daibes-related conduct introduced at trial.  Had this case been properly charged as multiple conspiracies, Mr. Hana would not have been subject to such liability.  And had the defendants' proposed verdict sheet been used, it would have been made clear whether any improper spillover occurred by giving the jury the opportunity to render the more "discriminating verdict" that the caselaw supports.  *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006) (a "discriminating verdict" which found defendants guilty on some counts and not others can indicate whether the jury did not base its findings on improper considerations); *United States v. Greer*, 285 F.3d 158, 174 (2d Cir. 2002) (a "complex verdict" as opposed to guilty verdicts across the board can demonstrate the jury's fair consideration of the charges); *United States v. Badalamenti*, 663 F. Supp. 1542, 1545 (S.D.N.Y. 1987) (a jury's "special findings" allows an analyses of whether all guilty verdicts were supported by the evidence).

143

Second, statements of persons not in a conspiracy with Mr. Hana were used against him, leading to significant evidentiary spillover.  With regards to the New Jersey State/Parra-related conspiracy, for example, statements from Mr. Uribe alone occupied almost four days of trial, and GX 1303 was replete with statements (otherwise irrelevant to Mr. Hana under Rule 401 or inadmissible as hearsay) that were introduced because they related to the Parra scheme and were uttered by Mr. Hana's supposed co-conspirators, including messages in the chart from Fernando Barruos, Andre Aslanian, and Nadine.

Third and fourth, there was prejudicial spillover due to improperly joined defendants, and that joinder led to the introduction of inflammatory evidence.  The improper joinder of Mr. Daibes, for example, resulted in days of trial testimony and the introduction of evidence that was wholly unrelated to Mr. Hana's alleged conspiracy with Senator Menendez and Nadine regarding Egypt and IS EG Halal, days during which Mr. Hana's name was never uttered in court and did not appear on a single document.  *See, e.g.*, Tr. 3785:9-3854:11 (June 18, 2024 testimony of Philip Sellinger); *id*. 4111:7-4267:2 (June 20, 2024 testimony of Paul Van Wie); *id*. 4348-4266; 4312-4455:16 (June 24, 2024 testimony of Paul Van Wie); *id*. 4917-5036:7 (June 26, 2024 testimony of Isabella Fuchs, Vikas Khanna); *see also McDermott*, 245 F.3d at 139 (improper joinder of even one defendant can lead to "substantial" spillover).  And all of this testimony—both the Uribe-related and Daibes-related evidence—was inflammatory evidence about the alleged corruption of a sitting United States Senator, which the jury could not help to impute to Mr. Hana by virtue of his presence at the defense table—particularly given the Government's argument that Menendez's actions regarding Qatar paralleled his actions regarding Egypt.  Tr. 6422:23-25; *id*. 6423:1-4 ("When we get to Qatar, when Menendez is trying to please people he thinks are connected to a foreign government that might benefit the business of someone who just happens to be paying him, how

can that be a coincidence when he's trying to do the exact same thing with the government of Egypt?  Common sense tells you when Menendez did the same thing again and again, it wasn't a coincidence.").  Mr. Hana's trial was therefore saturated with unrelated evidence that nevertheless undercut his defense by lumping him together with others who were alleged to have bribed Senator Menendez.  Indeed, it may well be that this, more than anything else, explains the verdict against Mr. Hana, a verdict that, as set forth above, was so based on speculation and so contrary to the evidence.

The wealth of evidence concerning unrelated conspiracies inhibited Mr. Hana's defense in a concrete way.  Mr. Hana sought to argue that his payments to the Menendezes constituted goodwill gifts, not bribes, and that he lacked the requisite mental state to violate the bribery and honest-services fraud statutes.  Tr. 6785:4-11.  But the reams of evidence presented about other alleged conspiracies likely had the tendency to negate Mr. Hana's arguments regarding his own mens rea.  Given the lack of a verdict sheet distinguishing between the various conspiracies, the jury had little reason to discriminate between Mr. Hana and the other alleged conspirators, and, given the *Pinkerton* charge, in fact gave the jury a reason not to do so.

The First Circuit has found prejudice in notably similar circumstances.  *United States v. Martinez*, 994 F.3d 1 (1st Cir. 2021), concerned a public corruption trial where multiple defendants were charged in connection with multiple schemes, all of which centered around one man.  The defendants were tried together as part of an "overarching conspiracy."  *Id.* at 5.  After holding that one of the defendants should have been severed for trial, the First Circuit found that their joint trial was prejudicial because it rendered that defendant unable to properly present her good-faith defense.  *Id.* at 15.  Thus, she argued that she only took gifts from the man at the center of the wheel, but the trial was full of evidence of others taking bribes from the man.  *Id.*  The evidence

concerning those others' bribes and corrupt intent rendered the defendant's intent much less credible, and the First Circuit—despite finding sufficient evidence to support each conviction—ordered a new trial on all counts. *Id.* at 11; *see also Abdelaziz*, 68 F.4th at 57 (applying *Martinez* and noting "an unacceptable risk that the jury in this case may have imputed other [alleged co-conspirators'] culpable mental states to the defendants). Though this case did not focus on severance (the Court made clear that no such motion would be granted, *see* Apr. 11, 2024 Tr. at 17:13-18:3; Apr. 17, 2024 Tr. at 40:1-18) the same principles underlying *Martinez* apply here: the Defendants were tried as part of an "overarching conspiracy," Mr. Hana attempted to raise a good-faith defense, and the significant amount of evidence about other people's bribes had the tendency to render Mr. Hana's defense less credible by casting him as yet another bad actor illegally seeking favors from Senator Menendez. The same remedy—a new trial—is appropriate here.[48]

### E. The Court Should Find Retroactive Misjoinder And Vacate Mr. Hana's Convictions On The Substantive As Well As The Conspiracy Counts.

Because of the Government's improper charging strategy, Mr. Hana was wrongfully tried as a member of a broad, overarching conspiracy rather than a member of a narrower conspiracy. This resulted in the joinder of his trial with Senator Menendez's and Mr. Daibes's. This joinder was error. If this Court, as it should, recognizes the prejudicial variance that occurred here flowing

---

[48] Nor did the Court's use of a multiple conspiracies instruction serve to rescue the verdict in *Martinez,* where the trial court, like here, instructed the jury that each defendant should be considered individually. *Id.* at 15 & n.9. The Court of Appeals held that this instruction "did not suffice to mitigate th[e] risk of spillover prejudice." *Id.; see also Abdelaziz*, 68 F.4th at 58 ("[G]iven the pervasive risk of evidentiary spillover in this case, the limiting instructions cannot save the convictions."); *McDermott*, 245 F.3d at 139-40 (proper jury instructions "cannot be presumed to be effective" in the case of prejudicial spillover). The same applies here: the multiple conspiracies instruction, uncoupled from a special verdict sheet, could not overcome the spillover prejudice that days of testimony entirely unrelated to Mr. Hana injected into the trial.

from the multiple conspiracies, it should vacate his substantive convictions on the grounds of retroactive misjoinder.

Retroactive misjoinder "occurs where joinder was proper initially because of a conspiracy allegation, but where later developments, such as [a] . . . court's decision . . . to set aside a defendant's conspiracy conviction, appear to render the initial joinder improper." *Abdelaziz*, 68 F.4th at 61; *see also United States v. Hamilton*, 334 F.3d 170, 181-82 (2d Cir. 2003); *United States v. Tellier*, 83 F.3d 578, 581-82 (2d Cir. 1996) (finding retroactive misjoinder where a RICO count on which the court found there had been insufficient evidence to convict had allowed the government to introduce "enormous amount[s] of prejudicial spillover evidence" related to "criminal activities in which [the] defendant did not participate"). Precisely that outcome has occurred here: the initial joinder of defendants, while proper when the Indictment was taken at face value, has become improper once the allegations of a broad conspiracy are stripped away. But allowing the trial to proceed on the assumption that there was such a broad conspiracy contaminated the trial by flooding the proceedings with a mixture of prejudicial and irrelevant evidence regarding other defendants and other schemes. *See Abdelaziz*, 68 F.4th at 61 (finding the same justification for retroactive misjoinder as for prejudicial variance).

The Second Circuit applies a three-part test for assessing retroactive-misjoinder claims, examining "(1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong." *Hamilton*, 334 F.3d at 182 (cleaned up). That test is met here. As to the first prong, the evidence of Senator Menendez's, Mr. Uribe's, and Mr. Daibes's conduct that was unrelated to Mr. Hana

was inflammatory and prejudicial.  Mr. Uribe himself testified for multiple days regarding the intervention of a United States Senator in a state criminal prosecution in exchange for bribes.  As discussed above, his testimony, and the evidence concerning the alleged New Jersey State/Parra scheme, were not sufficient to demonstrate that Mr. Hana had agreed to join any related conspiracy. *See* Section IV, *supra*.  But the testimony of an admitted criminal regarding his interactions with Senator Menendez—the centerpiece of the Government's trial—had the effect of tying Mr. Hana to unsavory individuals, though they had nothing to do with the allegations against him in this case.  Likewise, there were also days of testimony regarding the Qatar and Federal Proseuction scheme, which the Government did not even allege as against Mr. Hana, but which concerned Mr. Daibes, with whom—the evidence showed—Mr. Hana was certainly associated, albeit not at all with regard to these action.  This evidence thus tied him to this other allegedly illegal conduct. Finally, the very first day of fact witnesses concerned the gold and cash found in the Menendezes' house; the jury saw extraordinary pictures of the scene and was even permitted to handle a gold bar.  Tr. 173:5-305:9.  Almost all of this gold had no connection to Mr. Hana, and the Government did not argue otherwise (and as set forth above, the gold that was attributed to Mr. Hana, in much smaller quantities, could not be tied to any particular official act).  But the introduction of the gold and cash set the tone for the proceedings, immediately tying Mr. Hana by implication to highly inflammatory evidence of impropriety.  In short, had Mr. Hana not been wrongly joined with Senator Menendez and Mr. Daibes, much of the Government's flashiest and most attention-grabbing testimony would not have been admitted against him.

As to the second prong, the Second Circuit has explained that "prejudicial spillover is unlikely if the dismissed count and the remaining counts were either quite similar," such that the evidence relevant to the invalidated count would be independently admissible in connection with

the other charges, "or quite dissimilar," such that a jury could readily compartmentalize the evidence. *Hamilton*, 334 F.3d at 182-83. This case falls into the middle ground: the bulk of the evidence introduced against Senator Menendez and Mr. Daibes in the schemes unrelated to Mr. Hana would not have been properly admissible in a prosecution of Mr. Hana alone. But that evidence was not so disconnected—it bore on Senator Menendez's conduct and involved people with whom Mr. Hana was associated—as to limit the risk that the jury would impute that conduct to Mr. Hana, even with a jury instruction that did not permit a finding of guilt by association. Tr. 7137:20-23; *id.* 7152:1-5; *see also Abdelaziz*, 68 F.4th at 62 (applying the Second Circuit's test and holding that there is a risk of spillover prejudice when evidence would not be admissible against a defendant but was not "so disconnected" from that defendant's alleged conduct).

As to the third prong, the evidence against Mr. Hana alone was not strong enough to counteract the risk of prejudice. As demonstrated above, *see* Sections II, III, IV, *supra*, the Government's case failed to introduce sufficient evidence to meet several elements of the bribery, honest-services fraud, and § 219 offenses. Moreover, the Government's case was built by stacking inference on top of inference, highlighting quirks of timing and happenstance in support of its theory of the case. *Ingram v. United States*, 360 U.S. 672, 680 (1959) ("[C]harges of conspiracy are not to be made out by piling inference upon inference."); *Cf. Martinez*, 994 F.3d at 11, 15-17 (vacating conviction due to spillover prejudice where there was sufficient evidence to support conviction but government's case depended on circumstantial evidence form which competing inferences were possible). It is a possibility too great to be ignored that, without the days of testimony and argument related to the other alleged co-conspirators, the jury would not have found the evidence solely directed against Mr. Hana significant enough to satisfy every element of the non-conspiracy offenses beyond a reasonable doubt.

Moreover, there was nothing about the jury's verdict that undermines any claim of prejudice. A "discriminating verdict," in which the jury convicts on some charges but not others, "is an indication that spillover prejudice did not infect the jury's decisional calculus." *Abdelaziz,* 68 F.4th at 62 (quoting *United States v. Correia*, 55 F.4th 12, 36-37 (1st Cir. 2022)). But "[t]he jury in this case returned guilty verdicts on all counts, offering no reassurance that jurors were able to compartmentalize the evidence of each offense." *Id.* (cleaned up); *Hamilton*, 33 F.3d at 183 ("The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others."); *Stewart*, 433 F.3d at 310 (a partial acquittal can indicate a lack of spillover prejudice). And, indeed, this occurred at least in part because the jury was not provided with the more detailed verdict sheet that the Defendants proposed, which would have given the Court and the parties a means of knowing which conspiracies were proven both unanimously and beyond a reasonable doubt and which were not. *See Badalamenti*, 663 F. Supp. at 1545 (a jury's "special findings" can indicate that guilty verdicts were supported by the evidence). For all of these reasons, the requirement of retroactive misjoinder have been met and, to the extent that the Court finds a variance, should—armed with the experience of this trial—grant a severance of Mr. Hana for any retrial.

### F.    The Court's Failure to Use Defendants' Verdict Sheet Requires A New Trial.

Finally, the Court's failure to issue Defendants' proposed verdict sheet is an independent basis for reversal. As relevant to Mr. Hana, Defendants' verdict sheet, ECF No. 392.1, proposed breaking out Counts 1 and 2 into five separate conspiracies, as enumerated above: the Egypt scheme, the IS EG Halal scheme, the Uribe/Parra scheme, the U.S. Attorney scheme, and the Qatar scheme. It also proposed breaking out Counts Six and Seven, which are substantive bribery and honest-services fraud charges against Mr. Hana, into the Egypt and IS EG Halal schemes.

These special interrogatories were necessary to ensure that the jury's verdict was unanimous. Despite the law's "traditional distaste for special interrogatories," the Second Circuit has emphasized that it has a "stated preference for special interrogatories in particularly complex criminal cases." *United States v. Ogando*, 968 F.2d 146, 148-49 (2d Cir. 1992) (quoting *United States v. Coonan*, 839 F.2d 886, 891 (2d Cir. 1988)); *cf. United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984) ("We take this opportunity to alert bench and bar that in a complex RICO trial such as this one, it can be extremely useful for a trial judge to request the jury to record their specific dispositions of the separate predicate acts charged, in addition to their verdict of guilt or innocence on the RICO charge.") (*abrogated on other grounds*). Courts have therefore found good cause to use special verdict sheets in complex cases involving multiple conspiracies, particularly when there is a risk that the jury was not unanimous in its verdict. *See, e.g.*, *United States v. Paredes-Cordova*, 03-cr-987, 2010 WL 11507538, at *2 (S.D.N.Y. Feb. 17, 2010) (using a "detailed verdict form" that required the jury "make distinct findings as to the elements of each alleged conspiracy: specifically, whether the jury found that the Government had proven beyond a reasonable doubt any or all of the objects of each conspiracy, the existence of each conspiracy, and that the Defendant was a member of each conspiracy"). Indeed, special interrogatories can "decrease the likelihood of juror confusion and . . . aid the jury in concentrating on each specific defendant, and the charges against him, rather than incriminating one potentially innocent defendant solely on the basis of his association with the others." *United States v. Palmeri*, 630 F.2d 192, 202 (3d Cir. 1980).

The Court's use of Defendants' proposed multiple conspiracies instruction demonstrates that a special verdict sheet was necessary here. By adopting (with modifications) the multiple conspiracies instruction, particularly over the Government's objection, ECF No. 504, the Court

essentially acknowledged that Counts 1 and 2 are more appropriately read as stating several conspiracies, and not simply one overarching conspiracy. But the failure to adopt Defendants' verdict sheet rendered the multiple conspiracies instruction moot. There is simply no indication in the record that Mr. Hana was convicted by a unanimous jury as to any one conspiracy. As noted in Mr. Hana's motion to dismiss on duplicity grounds, such a conviction violates his Sixth Amendment right to a unanimous verdict. *See* ECF No. 143 at 82-83; *Ramos v. Louisiana*, 590 U.S. 83, 92 (2020) (noting the Sixth Amendment right to a unanimous verdict); *United States v. Crisci*, 273 F.3d 235, 238 (2d Cir. 2001) ("[A] general verdict of guilty on a duplicitous count will not reveal whether the jury reached a unanimous verdict on each offense."). The Court's decision not to use a special verdict sheet was therefore an abuse of discretion and necessitates vacating Mr. Hana's conviction and ordering a new trial.

## VII.    MR. HANA IS ENTITLED TO A NEW TRIAL BECAUSE OF THE IMPROPER OF EXCLUSION OF EVIDENCE UNDER RULE 404(B).

At trial, Mr. Hana was prevented from introducing evidence of his generosity and gift-giving. The proffered evidence went directly to his guilt or innocence on the bribery offenses with which Mr. Hana was charged, and its exclusion barred him from fully defending against those charges. For this reason, Mr. Hana is entitled to a new trial.

### A.    Legal Standard

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But Rule 404(b)(2) states that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Thus, Rule 404(b) "makes evidence of uncharged conduct admissible to prove the defendant's intent in committing the charged conduct." *Reichberg*, 5 F.4th at 241. And the Second Circuit has made clear that "the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword." *United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984). For example, while the "possibilities of prejudice must be assessed even in cases where the prosecutor offers similar acts evidence, not to prove the character of the accused, but to prove one of the permissible subsidiary facts listed in Rule 404(b), such as intent or plan," "risks of prejudice are normally absent when the defendant offers similar acts evidence . . . to prove some fact pertinent to the defense." *Id.* "In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense." *Id.*

It is a truism (often noted by the Government when the shoe is on the other foot) that Rule 404(b) is "a rule of inclusion rather than exclusion," and that "the law favors admission of other acts if they are relevant for any other purpose than to show a propensity or disposition on the part of the defendant to commit a crime." *United States v. Hayes*, 219 F. App'x 114, 116-17 (3d Cir. 2007); *see also United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (holding that the Second Circuit "follow[s] an inclusionary rule" when considering prior-acts evidence); *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005) (holding that a lower standard of admissibility should govern reverse 404(b) evidence because prejudice to the defendant is not a factor); *United States v. Moleski*, 12-cr-811, 2014 WL 197907, at *6 (D.N.J. Jan. 13, 2014) ("Particularly in white collar crime prosecutions, where proving a defendant's intent is the main issue, evidence of uncharged acts that bear on the defendant's intent is generally admitted.").

### B.    Procedural Background

Before trial, the Government moved *in limine* to preclude the defendants from introducing evidence of prior good acts.  ECF No. 291 at 17-19.  At the final pretrial conference, the Court ruled that evidence that a defendant is a "habitual gift giver" is admissible.  May 6, 2024 Tr. 14:8-12.  Consistent with that ruling, counsel for Mr. Daibes attempted to elicit on cross-examination of Jamela Maali testimony regarding specific instances of gift giving by Mr. Daibes.   The Government objected on the grounds that such testimony would constitute "impermissible positive 404(b) evidence introduced to give propensity for gift giving."  Tr. 1087:5-6.  The Court sustained this objections numerous times during Ms. Maali's cross, preventing counsel for Mr. Daibes from questioning Ms. Maali regarding Mr. Daibes' generosity and gift giving, including specific gifts that Mr. Daibes gave Nadine Menendez.  Tr. 1129:5-1130:16.  This same ruling was subsequently applied to prevent Mr. Hana's counsel from asking similar questions to Ms. Maali regarding Mr. Hana's propensity for generosity and prior gift giving.  Mr. Hana's counsel also sought to obtain similar testimony from Mr. Hana's employee Meirna Hanna, but was likewise  prevented from doing so.  Tr. 960:10-12.  Finally, the Court's earlier rulings prevented Mr. Hana from eliciting testimony regarding Mr. Hana's generosity from Carolina Silvarredonda.

### C.    The Preclusion Of Mr. Hana's Evidence Was Erroneous.

The Court's ruling that Rule 404(b) barred this line of questioning was error.  Courts routinely hold that instances of prior conduct can be admissible as probative of a defendant's intent or state of mind when engaging in the conduct that forms the basis of criminal charges—so-called "reverse 404(b)."  Thus, in prosecutions akin to this one, defendants have been permitted to admit evidence that they had previously given gifts or engaged in acts of generosity to demonstrate their intent or state of mind.  That evidence was not admitted to show that on a particular later occasion, a defendant acted in accordance with some character trait, but rather to show that they acted with

a particular mental state at the time of the offense—a mental state that, if credited by the jury, would negate an element of a charged offense.  The decision in *United States v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006), is directly on point.  In that bribery case, alleging that the defendant extended special favors to certain defendants as a prosecutor, the defendant sought to introduce evidence that it was his normal practice as a prosecutor to extend the same type of courtesies to most defendants.  This evidence was "indisputably probative" of the defendant's "innocent state of mind and lack of criminal intent."  *Id.*; *see also United States v. Quality Formulation Labs, Inc.*, 512 F. App'x 237, 240 (3d Cir. 2013) ("Some evidence of earlier good acts may be admissible to show a defendant lacked wrongful intent in later behavior.").[49]

The Third Circuit applied this rule similarly in *United States v. Hayes*, which held that a defendant may introduce evidence tending to negate "allegations of criminality or criminal intent," including evidence that, in other circumstances, he did the precise opposite of what he is charged with.  219 F. App'x at 116.  The defendant in *Hayes* was charged with being part of a conspiracy to falsify test results for various petroleum products made by his company.  *Id.* at 115.  He sought to introduce evidence of specific instances in which he had actually taken steps to ensure that test results were not fabricated and that he had never suggested to employees that falsification of test results was acceptable.  *Id.* at 115-16.  The trial court largely excluded this evidence, but the Third

---

[49] *See also United States v. Sittenfeld*, 20-cr-142, 2022 WL 2192955, at *13 (S.D. Oh. June 17, 2022) (noting that "specific relevant conduct could still be admissible as probative of [defendant's] state of mind"); *United States v. Akers*, 19-cr-7, 2019 WL 4934948, at *6 (E.D. Ky. Oct. 7, 2019) ("However . . . evidence of patient management and prescribing conduct—with respect to the patients underlying the Government's theory of the conspiracy, during the charged timeframe, and in the at-issue non-medical settings—could, potentially, be probative of Defendants' overall course of practice and prescribing intent."); *United States v. James*, 607 F. Supp. 3d 246, 257 (E.D.N.Y. 2022) ("[E]vidence of a defendant's prior 'good acts' may be relevant where . . . such 'good acts' would undermine the underlying theory of a criminal prosecution.").

Circuit reversed, holding that the evidence was plainly relevant and should have been admitted. *Id.* at 117. As the Court explained: "The trial court's focus on character evidence was misplaced. The issue here is not Hayes' good character. Rather, it is his conduct. Evidence that he conducted himself in a manner that was consistent with [the company's] announced policy, and inconsistent with a conspiracy to fabricate test results, was clearly relevant to the charges he had to defend against." *Id.*; *see also United States v. Thomas*, 32 F.3d 418, 420-21 (9th Cir. 1994) (holding that trial court erred in precluding defendant from offering testimony of individuals not named in indictment and who allegedly were not defrauded, despite having a similar relationship to the defendant as those named as victims of alleged fraud); *United States v. Garvin*, 565 F.2d 519, 521-22 (8th Cir. 1977) (holding that trial court erred in precluding defendant, accused of "a criminal purpose to defraud and a scheme to defraud," from introducing evidence that he acted properly with regard to similar transactions to those relied on by the Government to prove fraud); *United States v. Nasher-Alneam*, 399 F. Supp. 3d 561, 568-69 (S.D. W.Va. 2019) (permitting defendant accused of illegal drug distribution to offer evidence regarding the legitimacy of his overall medical practice); *United States v. Ali*, 870 F. Supp. 2d 10, 23 (D.D.C. 2012) (allowing defendant to introduce evidence of his role in other piracy incidents both before and after the specific hijacking at issue, explaining that "the fact that the evidence may negate the government's showing as to [defendant's] mens rea is precisely what makes it admissible under Rule 404(b)."); *United States v. Spayd*, 19-cr-111, 2022 WL 4367621, at *2 (D. Alaska Sept. 20, 2022) (evidence that defendant provided "legitimate medical services or related 'good acts' may be admissible under a reverse Rule 404(b)(2) theory, as they are relevant to [defendant's] intent and knowledge" and to "rebut the proposition that [defendant] maintained her practice for the purpose of illegally distributing drugs.").

156

When the situation is reversed, and the Government seeks to introduce evidence of prior *bad* acts, courts regularly conclude that evidence that a defendant committed uncharged bribery offenses by giving supposed things of value to others is "highly probative" of his intent in committing the charged offense. *United States v. McNair*, 605 F.3d 1152, 1203-04 (11th Cir. 2010). And "evidence of similar conduct that occurs during the same time period has 'heightened' probative value." *Id.* Thus in *McNair*, the court stated: "While the jury might conceivably find that the defendant felt such a strong sense of friendship with McNair that they would give him substantial gifts or make him substantial loans, the fact that they gave alleged 'gifts' or made 'loans' to others involved with the same or similar projects would certainly be relevant to the issues of 'motive' and 'intent.' It could also bear on 'plan' . . . [and i]f the projects are the same or similar, they may well be a part of the same 'series of transactions.' . . . [W]hat might arguably be a 'gift' to one person becomes less likely a gift if the 'gifts' are widespread to others involved with the same or similar projects." *Id.*; *see also United States v. Hill*, 629 F. Supp. 493, 495 (D. Del. 1986) ("The existence of these similar acts [of bribery] tends to prove the presence of a larger plan, scheme or conspiracy of which the crime on trial is part."); *United States v. Webb*, 41 F.3d 1515 (9th Cir. 1994) (unpublished) (affirming admission of certain financial transactions that were similar to the charged bribery payments; earlier transactions were appropriately offered to show opportunity, intent, and absence of mistake).[50] And evidence that a defendant repeatedly violated

---

[50]There is a general principle in the Second Circuit that when a defendant claims that he "never intended to violate any laws and acted in good faith, other-act evidence 'is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.'" *United States v. Bankman-Fried*, 22-cr-0673, 2023 WL 6283509, at *1 (S.D.N.Y. Sept. 26, 2023) (quoting *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993)); *Carboni*, 204 F.3d at 44 (finding other act evidence admissible under Rule 404(b) where "it tended to rebut [defendant's] contention that he acted in good faith").

an employer's bribery policy in connection with uncharged conduct is often deemed admissible to show that the defendant acted with a guilty state of mind as to the conduct charged, particularly given that one of the elements of bribery is "the existence of a corrupt intent." *United States v. Kaufman*, 19-cr-0504, 2021 WL 51521, at *2 (S.D.N.Y. Jan. 6, 2021) (citing *Ng Lap Seng*, 934 F.3d at 142 ("When a statute uses the word 'corruptly,' the government must prove more than the general intent necessary for most crimes. It must prove that a defendant acted with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.")); *see also United States v. Escalona*, 22-cr-20423, 2023 WL 3093630, at *3-4 (S.D. Fla. Apr. 25, 2023) (admitting evidence of ten years of uncharged bribes under Rule 404(b) to show defendant's knowledge, motive, and intent).

Given the abundance of caselaw holding that a defendant's prior bribes are relevant to ascertaining his intent or state of mind when engaging in the charged conduct, it logically follows that his prior non-bribes—that is, gifts to the same persons he is alleged of having bribed—are also relevant to ascertaining that intent as well. But Mr. Hana was not permitted to introduce evidence of those gifts. This prohibition was particularly damaging given the instruction to the jury that goodwill gifts would not qualify as bribes under the charged offenses. *See* Tr. 7092:18-7093:10. Had Mr. Hana been able to introduce evidence from Ms. Maali or Ms. Hanna, he would have had a sound basis to argue to the jury that the supposed "things of value" given to Nadine were merely given out of friendship, rather than with a corrupt purpose or as part of an illegal agreement with Senator Menendez. By not allowing these proofs, the Court stripped Mr. Hana of his defense, rendering his trial one-sided and fundamentally unfair.

Because Mr. Hana was improperly barred from eliciting evidence that would have directly gone to one of the elements of the bribery counts, he was denied a fair trial and his conviction on Counts 1, 2, 6, 7, and 9 must be reversed.

## VIII.  THE COURT SHOULD ENTER JUDGMENT ON ONLY ONE OF THE § 371 CONSPIRACY COUNTS BECAUSE THEY ARE MULTIPLICITOUS.

Since this case's first indictment, the Government's conspiracy charges have been ostensibly premised on a single conspiracy scheme.  Although Counts 1 and 15 of the Indictment charge Mr. Hana with two separate conspiracies under the general conspiracy statute, 18 U.S.C. § 371, the allegations in the Indictment were based on a single conspiratorial agreement to bribe Senator Menendez in exchange for actions taken for the benefit of the Egyptian Government—not two separate agreements to violate two separate statutes.

Mr. Hana moved to dismiss the multiplicitous conspiracy counts in his pretrial motions. ECF No. 143 at 89-102.  The Court found that the motion was premature because Mr. Hana had not been convicted on the conspiracy counts and, hence, was not yet in jeopardy of receiving multiple punishments for the same offense; the Court deferred resolution of the multiplicity claim until after the conclusion of the trial.  Apr. 11, 2024 Tr. at 60:18-62:3.  But the trial is now over, and Mr. Hana was convicted on both counts.  And, as predicted pretrial—and maybe even to a great extent (discussed below)—the Government's theory of prosecution and the proof elicited at trial as to Counts 1 and 15 were exactly the same as what was alleged in the Indictment:  that Mr. Hana participated in a single criminal conspiracy with Senator Menendez and others, which may have evolved slightly over time, but always maintained the same overarching objective, the same core participants, and the same method of operation.  Now, Mr. Hana faces the very real prospect of being punished multiple times for the same offense in violation of his rights under the Double

Jeopardy Clause. Accordingly, Mr. Hana moves the Court to impose judgment on only one of the two § 371 conspiracy counts.[51]

### A.    Factual Background

The Indictment alleged two charges under 18 U.S.C. § 371: Count 1, a conspiracy to commit bribery, and Count 15, a conspiracy to have Senator Menendez violate 18 U.S.C. § 219. Ind. ¶¶ 74-78, 108-110. The Indictment made little effort to distinguish between the two charges. As demonstrated in Mr. Hana's motion to dismiss the Indictment, per the Indictment's terms, Count 1 (at the time, Count 4) was merely a subset of the bribery conspiracy charged in Count 1. *See* ECF No. 143 at 93-102. Count 1 alleged, in part, that Mr. Hana bribed Senator Menendez to engage in acts favorable to the Egyptian government and Egyptian officials. Ind. ¶¶ 16-21, 35-38. This conduct also formed the basis for the foreign-agent conspiracy alleged in Count 15. The alleged conspirators in Count 15 were all alleged in Count 1 (and only Mr. Daibes from Count 1 was not alleged in Count 15); the time period of Count 15's conspiracy was essentially identical to Count 1's, *id.* ¶¶ 75, 109; and there was complete geographic overlap between the two conspiracies, *id.* Moreover, both of Count 15's overt acts were also listed as overt acts for Count 1. *Id.* ¶¶ 78, 110. In short, nothing in the Indictment demonstrated that any alleged acts supporting a conviction on Count 15 would not apply with equal force to Count 1; Count 15's conspiracy was simply a smaller part of Count 1's.

When Mr. Hana argued that the Indictment was duplicitous, the Government confirmed this conclusion. It argued at length before trial that "[e]ach count of the Indictment alleges a single scheme" that "relates to an overarching scheme." ECF No. 180 at 91. It stated that the defendants

---

[51] The Court need only reach this argument if it denies Mr. Hana's motions for acquittal on Counts 1 and 15 and his motion for a new trial on the ground of prejudicial variance. *See* Sections II, V, VI, *supra*.

were "engaged in a single conspiracy," *id.* at 92, and that "far from a series of separate schemes," the defendants' conspiracy had "not just overlap in participants . . . and time periods, but interdependence among the requested acts," *id.* at 93. It stated that "each of the alleged acts sought hat close relationships of interdependence with at least one other set of alleged acts." *Id.* at 95. And it highlighted "[t]he significant overlap in participants, goals, and conduct, and [the] close interdependence among portions of the scheme." *Id.* The Government made an emphatic case that Counts 1 and 15 were significantly intertwined.

Any suspicion that the two alleged conspiracies were separate and distinct schemes was eliminated at trial, where the Government treated the two conspiracies as identical. Most significantly, the Government relied on the contention that Senator Menendez was bribed to support not only the Count 1 but also the Count 15 conspiracy.[52] Thus, in its summation, it argued that Senator Menendez was not acting fully independently (something it needed to show for Count 15 and 16, *see* Section V., *supra*) "because he was getting paid." Tr. 6537:12. These payments to induce him to act on Egypt's behalf were "through promises to Nadine, then eventually, through checks, gold, and the other things that Hana was giving him in connection with the Egypt counts." Tr. 6537:13-16. Egypt, the Government argued, "wanted to bribe Menendez." Tr. 6538:3. And, the prosecutors said, "a few more years of checks, gold, and other things of value" caused him to become Egypt's agent. Tr. 6538:14-15. Senator Menendez was "acting like an agent" because of "the mortgage payment, the IS EG Halal checks for the sham job, the envelopes of cash from Hana's associates, Moussa and Gus Lita with their fingerprints on them, the Asahi gold bars from Hana." Tr. 6539:9-15. The Government thus explicitly collapsed the inquiry for whether Senator

---

[52] Mr. Hana obviously does not concede that any of the Government's conclusions in its summation or rebuttal are accurate.

Menendez conspired to be an agent under Count 15 into the inquiry for whether he conspired to be bribed under Count 1.

This melding of the two alleged conspiracies occurred throughout the summation.  It described Count 1 as "cover[ing] the Egypt part of the scheme."  Tr. 6526:14-15.  It described the bribery scheme as "Menendez . . . trying to please people he thinks are connected to a foreign government"—an apt description as well of the alleged foreign-agent conspiracy.  Tr. 6422:23-24. And its description of the facts underlying Count 1 was flush with Egypt-related facts:  the meeting with General Shawky; Senator Menendez's provision of "sensitive" embassy personnel information (Tr. 6390; 6408-09); the "ghostwritten" letter (Tr. 6391; 6407-08); the approval of Egypt's tank ammunition (Tr. 6393; 6404); Egypt's negotiations with April Corley (Tr. 6400); Ahmed Helmy's communications with and "immediate access to" Senator Menendez (Tr. 6400); the lifting of the small-arms ban (Tr. 6409); Senator Menendez's communications with the Egyptian Government in 2021 (6409-10); and Senator Menendez and Nadine's communications with Mai Abdelmaguid (Tr. 6410-11).  When the Government later discussed Count 16, the object of the conspiracy charged in Count 15, it contended that Senator Menendez's call to Under Secretary McKinney—one of the alleged official acts at the center conspiracy alleged in Count 1—"was an attempt to represent the interests of Egypt."  Tr. 6535:19-22.

The bribery counts required the Government to demonstrate that Senator Menendez was given "things of value"; the Government used the same things of value in its arguments regarding Count 1 to support its contentions regarding Count 15.  For example, the Government relied on checks from Hana to Nadine for her "sham job" in discussing Count 15 as well as Count 1 (Tr. 6375-80; 6380:22-23; 6399-6400; 6412-13).  Likewise, with regard to Hana's payment for Nadine's mortgage (Tr. 6380:23-25; 6381-83; 6399; 6414; 6418); Hana's gift of approximately

$12,000 in one-ounce Asahi gold bars (Tr. 6383; 6410; 6414); the dinner at Mr. Chow (Tr. 6374; 6392; 6424); and the cash with Nader Moussa's and Gus Lita's fingerprints (Tr. 6387:4-11).  All of these made reappearances in the portion of the summation concerning Counts 15 and 16; the Government even used the bribery term of art "things of value" to describe what Senator Menendez was given to induce him to act as Egypt's agent, referring back to the "Egypt counts."  *See* Tr. 6537:13-16 ("checks, gold, and the other things that Hana was giving him in connection with the Egypt counts."); *id*. 6539:9-12; ("the mortgage payment, the IS EG Halal checks for the sham job, the envelopes of cash from Hana's associates, Moussa and Gud Lita with their fingerprints on them, the Asahi gold bars from Hana."); *id*. 6538:14-15 ("things of value").

And when it came time to list the necessary overt acts for each offense, the Government's selection of acts for Counts 1 and 15 could have easily applied to the other.  For one conspiracy, the Government listed "[a]cts like Menendez sending out the tank ammunition promise.  Menendez calling McKinney.  Hana writing the IS EG Halal checks.  Daibes delivering those checks.  Menendez receiving those checks.  Daibes handing over a bar of gold.  So many more."  Tr. 6528:10-19.  For the other, it listed "sending the embassy information, writing a ghost-written letter, meeting with Hana at Mr. Chow to schedule the Shawky meeting and dinner, having Nadine sell the gold bar he got from the scheme in Manhattan."  Tr. 6542:23-6543:3.  These overt acts are highly enmeshed with each other and do not categorically fall into one alleged conspiracy or the other.  Indeed, each could be applied to the other count and vice versa.

### B.    Legal Standard

Multiplicity is the charging of a single offense in separate counts of an indictment.  *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).  Multiplicitous indictments violate the Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once.  *United States v. Sattar*, 314 F. Supp. 2d 279, 307 (S.D.N.Y. 2004) (citing

*United States v. Dixon*, 509 U.S. 688, 696 (1993), and *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 2009)).

The offense in a charge of conspiracy is "the agreement or confederation of the conspirators to commit one or more unlawful acts." *Sattar*, 314 F. Supp. 2d at 307. "A single agreement to commit several crimes constitutes one conspiracy," while "multiple agreements to commit separate crimes constitute multiple conspiracies." *Id.* In determining whether a defendant engaged in a single conspiracy or multiple conspiracies, the focus must be "on what agreement, if any, the jury could reasonably have found to exist vis-à-vis each defendant." *Id.*

When a defendant is charged with two or more conspiracies in violation of the same statutory provision, the multiplicity inquiry turns on whether the Government has proven beyond a reasonable doubt two or more agreements or only one. *United States v. Araujo*, 17-cr-438, 2018 WL 3222527, at *3 (S.D.N.Y. July 2, 2018) (citing *United States v. Ansaldi*, 372 F.3d 118, 124–25 (2d Cir. 2004)); *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) ("[T]o survive a double jeopardy attack, the government would have to show that the two schemes involved 'distinct' agreements."). The Court's inquiry is guided by the Second Circuit's so-called *Korfant* factors. *See Macchia*, 35 F.3d at 667 (citing *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985)). For purposes of determining whether there is one or several conspiracies, the Court must consider the following factors:

> (1) the criminal offenses charged in [the] indictment[]; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Id.* Courts must apply the *Korfant* factors "with the lively awareness that no dominant factor or single touchstone" is dispositive in determining whether multiple allegedly distinct conspiracies "appear in fact and in law the same." *Id.* at 668.

The Second Circuit has "long recognized 'the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy.'"  *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004)).  In assessing multiplicity, therefore, the Second Circuit utilizes a burden-shifting framework.  The defendant bears the initial burden of making a "non-frivolous" or "colorable" showing that the multiple counts in fact charge only one conspiracy.  *Olmeda*, 461 F.3d at 282.  If met, the burden then shifts to the Government, to show, "by a preponderance of the evidence, that there are in fact two [or more] distinct conspiracies and that the defendant is not being placed in jeopardy twice for the same crime."  *Lopez*, 356 F.3d at 467.

### C.    The Proof At Trial Established, At Most, A Single Conspiracy.

Here, assuming the Court does not grant Mr. Hana's motions for judgment of acquittal or a new trial, the recitation of the relevant facts above makes it patently clear that the Government has alleged the same agreement twice:  the conspiracy charged in Count 15 is merely a subset of the conspiracy charged in Count 1.  And "where a smaller conspiracy is wholly contained within a larger one, they are normally, perhaps always, treated as the same offense for jeopardy purposes." *Gaskin*, 364 F.3d at 454 (cleaned up)); *see also United States v. Maxwell*, 20-cr-330, 2022 WL 1294433, at *4, *7 (S.D.N.Y. Apr. 29, 2022) (Nathan, J.) (concluding that one charged conspiracy was a "subset" of and "factually subsumed by" another); *cf. Macchia*, 35 F.3d at 672 (Newman, C.J., concurring) ("Sometimes a pair of . . . conspiracies can be conceptualized as circles that intersect, in which event the issue will be whether the degree of commonality (*i.e.*, the common area within the two intersecting circles) is so extensive and the degree of difference (*i.e.*, the areas of each circle outside the common area) so slight that under any realistic assessment the smaller of the two conspiracies should be considered part of the larger one for jeopardy purposes.").

Applying the *Korfant* factors in light of the evidence adduced at trial only confirms this common-sense conclusion.

*Similarity of operations and common objectives:*  The Government's Indictment and its presentation of the evidence at trial made clear that the conspiracies charged in Counts 1 and 15 had similar—indeed, identical—objectives.  As discussed above, the Government made almost no effort to distinguish between the various counts, with the same evidence moving easily between Counts 1 and 15.  It used the things of value necessary for the bribery conspiracy in Count 1 to support the foreign-agent conspiracy in Count 15.  It used Egypt-related facts necessary for the foreign-agent conspiracy to support the bribery conspiracy, and described Senator Menendez's actions in support of the bribery conspiracy as "an attempt to represent the interests of Egypt."  Tr. 6535:19-22.  Indeed, the Government transparently and explicitly collapsed the inquiries for each conspiracy so that it could rely on the same facts to prove them both.

*The degree of interdependence between alleged distinct conspiracies (Factor 8):*  This factor requires the Court to consider the extent to which the success or failure of one alleged conspiracy is independent of the corresponding success or failure by the other.  *Macchia*, 35 F.3d at 671 (*citing Korfant*, 771 F.2d at 663).  Given the interweaving of the evidence that the Government argued supported both conspiracies, there is little chance that one conspiracy could have succeeded while the other failed.  Indeed, as noted above, the Government argued at length before trial that the defendants were "engaged in a single conspiracy," ECF No. 180 at 92, and that "far from a series of separate schemes," the defendants' conspiracy had "not just overlap in participants . . . and time periods, but interdependence among the requested acts," *id.* at 93.

*Overlap of participants:*  Consistent with the fact that the supposedly distinct conspiracy charged in Count 15 is entirely subsumed by the conspiracy charged in Count 1, the participants

in the Count 15 conspiracy are a subset of those in Count 1. S*ee, e.g.*, *United States v. Calderone*, 982 F.2d 42, 47-48 (2d Cir. 1992) (finding two alleged conspiracies multiplicitous where, among other things, the time frame and geographic scope of one conspiracy was entirely contained within the other conspiracy and the core participants were the same); *Gaskin*, 364 F.3d at 454 ("[W]here a smaller conspiracy is wholly contained within a larger one, they are normally, perhaps always, treated as the same offense for jeopardy purposes." (cleaned up)); *Maxwell*, 2022 WL 1294433, at *4, *7 (concluding that one charged conspiracy was a "subset" of and "factually subsumed by" another). It is apparent from the Indictment and the proofs at trial that only Mr. Daibes is not alleged to have participated in Count 15.

*Overlap in Time:* The temporal overlap between the two conspiracies is also, in essence, identical. The conspiracy charged in Count 1 in the Indictment is alleged to have occurred "[f]rom at least in or about 2018 through at least in or about 2023," while the conspiracy charged in Count 4 is alleged to have occurred "[f]rom at least in or about 2018 through at least in or about 2022." Ind. ¶¶ 75, 109. And the proofs at trial did not indicate any difference in time period between the two conspiracies.

*Overlap in geographic scope:* There is complete geographic overlap between the two conspiracies, both of which are alleged to have occurred "in the Southern District of New York and elsewhere"—"elsewhere" here being predominantly in the State of New Jersey and the District of Columbia. No evidence was introduced at trial that distinguished between the two alleged conspiracies' locations.

*The existence of common overt acts:* Count 1 alleges seven overt acts, while Count 15 alleges two. Ind. ¶¶ 78, 110. But each of Count 15's alleged overt acts is included in the overt acts supporting Count 1. And while the Government (likely deliberately) made sure that its

summation listed different overt acts for each Count, the overt acts it did list obviously applied to both charged conspiracies; indeed, the Government likely could have swapped the overt acts it listed for each conspiracy with little issue.[53]

*The offenses charged:*  The Indictment alleges that Mr. Hana conspired to commit both bribery under 18 U.S.C. § 201 and the offense of having a public official acting as a foreign agent under 18 U.S.C. § 219.  Ind. ¶¶ 74-78, 108-110.  The conspiracy statute charged, 18 U.S.C. § 371, is the same for each.  And while the subject offense are distinct, charging different offenses as the objects of the conspiracies is not fatal to a multiplicity challenge because, as a matter of law, "[a] single agreement to commit several crimes constitutes one conspiracy."  *United States v. Hernandez*, 09-cr-625, 2009 WL 3169226, at *8 (S.D.N.Y. Oct. 1, 2009); *see also Maxwell*, 2022 WL 1294433, at *4 (concluding that different underlying substantive offenses are not "fatal" to a multiplicity claim, and noting that "courts in this district have found two conspiracy counts to be the same offense even when they have different statutory objectives because both counts can arise from the same agreement").

In sum, the Government's case collapsed the tests for the bribery and foreign-agent conspiracies so that it could rely on the same facts to prove each of them.  Having made that decision, it must face the consequences of its decision to prove the same offense twice.  For the reasons above, Counts 1 and 15 describe a single conspiracy, not multiple conspiracies, and are therefore multiplicitous.  The Court should enter judgment on only one of these counts.  *See United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) ("If the jury convicts on more than one

---

[53] Even a more significant difference in overt acts would not defeat a conclusion that the counts are multiplicitous.  *See Calderone*, 982 F.2d at 48 (finding two conspiracies multiplicitous even though 21 overt acts listed in the second conspiracy were not listed in the first, because they were "all in furtherance of the broader conspiracy alleged in the first").

multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." (citing *Ball v. United States*, 470 U.S. 856, 865 (1985)).

## CONCLUSION

For these reasons, Defendant Wael Hana respectfully requests the entry of an order acquitting Mr. Hana of his convictions under Counts 1, 2, 6, 7, 9, and 15 under Federal Rule of Criminal Procedure 29; or, in the alternative, for the entry of an order granting Mr. Hana a new trial under Federal Rule of Criminal Procedure 33. If the Court denies both of these motions for post-trial relief, Mr. Hana alternatively moves the Court to impose judgment on only one of two multiplicitous conspiracies charged under Counts 1 and 15. Mr. Hana incorporates in full the arguments raised in co-defendants Fred Daibes and Robert Menendez's respective memoranda of law in support of their Federal Rules of Criminal Procedure 29 and 33 submissions.

Dated:  August 19, 2024                              Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Ricardo Solano, Jr.
Anne M. Collart
Kelsey A. Ball
Andrew J. Marino
Christina M. LaBruno
Jessica L. Guarracino
Elena M. Cicognani
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com