

Lawrence S. Lustberg

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4731 Fax: +1 973-639-6285
llustberg@gibbonslaw.com

December 10, 2024

**VIA ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      **Re:**    **United States v. Robert Menendez, et al., S4 23 Cr. 490 (SHS)**

Dear Judge Stein:

    We represent Wael Hana in the above-referenced matter. Please accept this letter brief in lieu of a more formal reply to the Government's Memorandum of Law in Opposition to the Defendants' Supplemental Post-Trial Motions (ECF No. 648). For the reasons provided herein, Mr. Hana's Motion for a New Trial (ECF No. 641) should be granted.

\* \* \*

    In a number of respects, the Government's brief is both extraordinary and alarming. Although it was undisputedly the Government that created the laptop that went to the jury, including exhibits that should have been but were neither excluded nor redacted, a great deal of the Government's brief is dedicated to blaming the defense for this careless error, and remorselessly accepting no responsibility for what, at the very least, risks the kind of injustice that one would hope the Government would care about. That argument aside, the Government—in what can only be characterized as an act of real "chutzpah"—argues with great certainty that the jury (though it was instructed to consider all of the evidence) did not look at the exhibits at issue, even though it is the Government that wiped clean the laptop that would allow the Court and the defense to determine what actually happened; the Government's defense that it was not obligated to maintain that laptop reflects a startling apathy with respect to the fairness, as well as the truth-seeking function, of the court process. In fact, the Government's actions in this regard, purportedly because it needed the laptop for another case, are really inexcusable. And with regard to whether the evidence at issue mattered—or whether it was, as the Government contends, "harmless," the critical inquiry under the caselaw—the Government ignores its own prior arguments about how critical this evidence was and somehow takes the position that a cornerstone of its case—that Senator Menendez acted for the benefit of Egypt—now does not matter. This Court sat through this trial and knows that this argument is disloyal to what happened in the courtroom.

December 10, 2024
Page 2

Every case, but especially a case with the public profile of this one, should not result in a conviction, the credibility of which can be called into question by the kind of fundamental error committed here. The fact is that (1) the jury received evidence that it should not have, on a laptop prepared by the Government; (2) we can never know whether the jury actually reviewed that evidence because the Government (on some unknown date—potentially even after this issue had arisen) unilaterally wiped that laptop clean, for no good reason; and (3) the evidence undoubtedly went to critical issues in a case that turned almost entirely on documentary evidence like those at issue here. Mr. Hana's motion for a new trial must, then, be granted if the verdict is to have any semblance of legitimacy, and if the Court's processes are to be, as they should, committed to justice and fairness and not just to sustaining convictions at all costs, as the Government desperately requests.

**I. Mr. Hana Did Not Waive His Constitutional Right To Challenge The Extra-Record Evidence Erroneously Submitted By The Government To The Jury.**

The Government attempts to shift the fault in its submission of improper extra-record material to the jury to the defense by mischaracterizing the parties' exhibit review process and repeatedly pointing the finger at Defendants.[1] *First*, the Government argues that defense counsel had the jury exhibit set for "almost 48 hours." ECF No. 648 ("Gov't Br.") at 17. As Mr. Hana explained, ECF No. 641 at 5 ("Hana Br."), this short window to review the substance of over 3000 exhibits alone demonstrates that he did not waive the right to object to the improperly admitted evidence: it would have been difficult, if not impossible, for defense counsel to thoroughly review each page of the thousands of exhibits to confirm that the content of each, including redactions, accurately reflected what was actually introduced during the trial. If defense counsel was expected to conduct such a review, it would have required significantly more time—which counsel would have requested had that been the case. But defense counsel "is not required to inspect every exhibit at trial to ensure that documents that appear to conform to the copies provided by the Government are in fact identical." *United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009).

*Second*, the Government submits that defense counsel "unilaterally made the decision to review only the exhibit numbers" even though the Government invited Defendants to inspect the "versions" of exhibits proposed to be downloaded onto the laptop. Gov't Br. at 17 (citing to ECF No. 645-2 at 3)). The email to which the Government refers, however, also provides: "You can see a full list of those in the attached index, on tab (2)." ECF No. 645-2 at 3. Because the email simultaneously references both a "list" and "versions," the parties understanding as to the process that they were undertaking is not as clear as the Government would like it to seem. In fact, on the same page of the exhibit (ECF No. 645-2 at 3), there is another email that the Government sent

---

[1] Mr. Hana explained in detail the process by which his defense team reviewed, within a 48-hour period, the exhibits that were to be submitted to the jury. ECF No. 641 at 4-5. Mr. Hana does not reiterate that process here, but instead responds to specific points raised by the Government in its opposition.

December 10, 2024
Page 3

two days before which states: "Please send us your admitted exhibit *lists*, as we have been sending you with our exhibit productions. Please send these *lists* by tonight so that we have time to review in advance of your summations." *Id.* This email demonstrates that the Government also believed its task was to review exhibit *lists* and not to inspect every document to assure that the correct version was being used. In any event, though, to the extent that the parties dispute their understanding of the purpose of the review process, as the Government now does, *see* Govt' Br. at 18, fn. 10, such a disputed fact can only be decided after a hearing.

*Third*, the Government argues that Defendants "could have checked the exhibit numbers at any time during the trial based on the Government's admitted exhibit list, which the Government circulated to the defendants almost daily, as well as by checking the daily trial transcript." ECF Gov't Br. at 17-18. This argument is confusing, as the exhibit list the Government circulated throughout trial was not final. In fact, the argument misses the point, as the issue here concerns not the exhibits that were admitted at trial but those that would be sent to the jury. Indeed, though defense counsel did, in fact, track the exhibits admitted each day of trial, doing so obviously neither rendered unnecessary the checking in which the parties engaged here nor prevented the Government's error of sending a different version of those exhibits to the jury.

*Fourth*, the Government contends that prior version control issues should have put Defendants on notice that they were required to verify the accuracy of each page of each exhibit submitted to the jury. Gov't Br. at 18-19 (citing to Tr. 6161-6166). But this argument actually cuts against the Government. The exhibit in issue was the Government's own, GX E102-3, and the Government conceded at sidebar that it had sent multiple versions of that exhibit to defense counsel. Tr. 6162:7-20. The Government, knowing that its method of circulating numerous versions of the same exhibit had caused confusion, should have kept better track of its records. At the very least, it shares the blame for this fundamental error, but really, was in the very best position to avoid it—both principles that the Government, in its single-minded effort to blame the defense, just ignores.

*Fifth*, the Government argues that given the crucial significance of the documents, Defendants should have checked them specifically for version control issues. Gov't Br. at 20. Of course, hindsight is 2020: we certainly wish we had done so now, and are very concerned that if the Government's argument is accepted, our actions amount to the failure to provide our client with the effective assistance of counsel that the Sixth Amendment to the Constitution provides. *See, e.g., Quartararo v. Fogg*, 679 F. Supp. 212, 248 (E.D.N.Y. 1988) (holding, inter alia, that failure to object to evidence constitutes inadequate performance at trial); *see also Ellerby v. United States*, 187 F.3d 257, 260 (2d Cir. 1998) (ordering that the lower court hold a hearing to determine whether counsel's failure to review government exhibits prior to trial rendered ineffective assistance of counsel). But at the time Defendants were reviewing the exhibits, they did not have any reason to suspect that the Government would submit the incorrect versions of these crucial exhibits. If it is so obvious, as the Government argues, that counsel should have done this, then, as noted, that raises other, different constitutional problems.

December 10, 2024
Page 4

      *Finally*, the Government in opposition, Gov't Br. at 16-17, cites the same waiver cases that it did in its initial submission, ECF No. 630 at 6, without addressing Mr. Hana's argument that those cases are inapposite to the circumstances presented here. As Mr. Hana previously argued, none of the Government's cited cases stand for the proposition that defense counsel is required to review, line by line, thousands of pages of exhibits to confirm that they are the same *versions* of the exhibits that were admitted at trial. *United States v. Stasiv* concerned a very limited amount of extra-record evidence—in that case, a very small universe of physical objects contained in a backpack. No. 19-4286, 2021 U.S. App. LEXIS 31488, at *4 (2d Cir. Oct. 20, 2021). The Court "doubt[ed]" that the defendant was entitled to challenge the inclusion of a receipt, which was located inside the backpack, because defense counsel was responsible for reviewing the contents of the bag. *Id.*; *see also Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) (in dismissing argument that the prosecutors tampered with jury evidence, the court held that petitioner waived his right to challenge the evidence because counsel failed to object to the submission of a single bag that was not in evidence). And *United Sates v. O'Brien* involved review of a certified transcript of one witness's testimony, which was "entitled to a statutory presumption of accuracy," that the jury had requested. No. 13-586, 2017 U.S. Dist. LEXIS 83259, at *41 (E.D.N.Y. May 1, 2017). There, defense counsel reviewed the single transcript—again, a much more practical possibility—and agreed "that it should be sent back to the jury as transcribed." *Id.* Under those circumstances, the court found that defendant waived his right to object to submission of the testimony transcript to the jury. *Id.* at *42. Here, by contrast, defense counsel was not addressing the transcript of a single witness, specifically requested by the jury (and thus obviously something to which counsel should, and always does, inspect), or a handful of physical objects, but over 3000 documentary exhibits. These facts matter, with regard to whether Mr. Hana's constitutional right to fair trial was waived, let alone knowingly and voluntarily waived, as the law requires. *See, e.g., Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) ("To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the 'high standard of proof for the waiver of constitutional rights set forth in *Johnson* v. *Zerbst*, 304 U.S. 458 (1938).'" (cleaned up)); *Grayton v. Ercole*, 691 F.3d 165, 175-76 (2d Cir. 2012) ("A waiver of a constitutional right must be voluntary, knowing and intelligent, that is, the act of waiver must be shown to have been done with awareness of its consequences." (cleaned up)). The Government's waiver argument, blaming the defense for its error, should be rejected.

### II.   The Likelihood Of Whether The Jury Saw The Evidence Is Irrelevant.

      The Government strains mightily to avoid the standard applied by the Second Circuit in its (published) caselaw. Extraneous information's entrance into the jury room is *presumed* prejudicial, *see United States v. Wiley*, 846 F.2d 150, 157 (2d Cir. 1988) ("[E]xtra-record information that comes to the attention of a juror is presumptively prejudicial."), and its import is analyzed under an objective test, assessing "the likelihood that the influence would affect a typical juror," *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam). "A trial court's post-verdict determination of extra-record prejudice must be an *objective* one, focusing on the information's probable effect on a hypothetical average juror." *United States v. Greer*, 285 F.3d

December 10, 2024
Page 5

158, 173 (2002) (emphasis added) (cleaned up).  Thus, the court "may not inquire into the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Id.* (cleaned up); *see also Bibbins*, 21 F.3d at 17 (juror affidavit stating how extrinsic information affected their deliberations was inadmissible).  This standard has been applied by the Second Circuit in case after case, for over six decades now, and continuing to just this past August.  *See, e.g.*, *Palin v. N.Y. Times Co.*, 113 F.4th 245, 278 (2d Cir. 2024); *United States v. Farhane*, 634 F.3d 127, 169 (2d Cir. 2011); *Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003); *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002); *United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989); *United States v. Calbas*, 821 F.2d 887, 896 n.9 (2d Cir. 1987); *United States ex rel. Owen v. McMann*, 435 F.2d 813, 820 (2d Cir. 1970); *Miller v. United States*, 403 F.2d 77, 82 (2d Cir. 1968); *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir. 1961).

The Government's Opposition cites this standard perfunctorily, but fails to apply it in any genuine way.  Put simply, the Government's protracted argument that "there is no reasonable possibility that any juror saw any of the non-admitted portions of any of the [improperly included] Exhibits," Gov't Br. at 20, is entirely at odds with the governing standard.  None of the cases above permit, endorse, or allude to actually inquiring into whether the jury became aware of the contents of the extra-record evidence, and for good reason:  It has nothing to do with an objective analysis of the information's probable effect on a typical, hypothetical, or average juror.[2]

In support of its argument that the Court should conclude that the jury *probably* didn't even see the exhibits, the Government cites sparse authority.  Gov't Br. at 21-22.  None is sufficient to overturn the decades of precedent cited above.  *United States v. Nkansah*, the only published opinion the Government could find from the Second Circuit, was decided on a highly deferential plain error standard (because the issue was not raised below—obviously not the case here), and briefly affirmed the district court's conclusion that the mistakenly submitted evidence did not affect the defendant's substantial rights.  699 F.3d 743, 751 (2d Cir. 2012).  Indeed, the Second Circuit did not even really issue its own holding—it merely summarized the district court's "conclusion . . . that it was highly likely the jury did not view the proffer agreement . . . and that, even if seen by the jury, its contents were either immaterial or already on the record and therefore harmless," before stating:  "We agree."  *Id.*  This cannot be read as an endorsement of an analysis into whether the jury likely viewed the evidence, but is instead an affirmance under the notably demanding plain error standard, albeit one that properly focuses on the harmless error analysis prescribed in the caselaw cited above.  Certainly, it does not purport to—and could not—contradict earlier (and later) Second Circuit cases applying the proper *objective* standard.

The Government's other cases are even less compelling.  Its two unpublished Second Circuit summary orders are not precedential as a matter of law.  *See* Local Rules and Internal Operating Procedures of the Second Circuit 32.1.1(a) ("Rulings by summary order do not have precedential

---

[2] Hence, Mr. Hana does not, in fact, argue that jurors should be interviewed with regard to this issue, although the Government incorrectly implies otherwise.  *See* Gov't Br. at 24 n.14.

December 10, 2024
Page 6

effect."); *United States v. Hatfield*, 795 F. Supp. 2d 219, 223 (E.D.N.Y. 2011) (rejecting government's reliance on summary orders because the "Second Circuit's own rules declare that its summary orders do not have precedential effect"). *United States v. Hansen* fails to cite the objective standard at all, and its conclusion that "the introduction of extra-record evidence was not prejudicial because there was no indication that the jury actually considered it" was not supported by any citation that this is the proper inquiry. 369 F. App'x 215, 216 (2d Cir. 2010). Indeed, *Hansen* explicitly credited the district court's inquiry into the "jurors' statements that they had not looked at the extra-record evidence," *id.*—exactly what is not permitted by the objective standard, but in any event, apparently after a process of juror interviews that the Government opposes here. As for *United States v. Jefferys*, that case also fails to cite the correct test, and the only case it cites in support of inquiring into the jurors' consideration of the extra-record material is *Hansen*. 2022 U.S. App. LEXIS 28661 (2d Cir. 2022). Finally, *United States v. Coney* is not only from the wrong Court of Appeals, but the deferential and highly factual standard it applied (which explicitly did not include the Second Circuit's presumption of prejudice) is materially different from that applied in the Second Circuit, which the Seventh Circuit expressly rejects. 76 F.4th 602, 607 (7th Cir. 2023) (declining to apply a presumption of prejudice, applying the Seventh Circuit's "reasonable possibility" test, endorsing a "fact-intensive inquiry," and citing multiple Seventh Circuit cases in support of that standard).

It makes good sense that the Government's proposed test, which urges the Court to consider (speculate, really) whether the jury viewed the extra-record exhibits, is not the law in this Circuit. The Government's test would, in essence, automatically guarantee that the infection of the jury deliberation room with extra-record evidence is almost always harmless in document-heavy cases, a state of affairs that would flip the presumption of prejudice on its head and invite *less* care when submitting evidence to the jury. The message the Government asks the Court to send is that if something improperly sneaks onto the jury laptop, who cares? They probably wouldn't see it anyway. In the end, the Government's argument that the Court should ignore the presumption of prejudice set forth in cases like *Wiley* as "utterly contrary to reality and common sense," Gov't Br. at 24, is an obvious effort to avoid the inquiry demanded by the law, because, of course, that inquiry does not advantage the Government in seeking to preserve the verdict here.

### III. In Any Event, It Is Not "Implausible" That The Jury Saw And Understood The Erroneously Admitted Evidence.

The Government argues that it is "implausible" that any jury viewed the erroneously admitted evidence because it was not "the subject of any serious dispute at trial." Gov't Br. at 25. This is plainly false, belying the Government's repeated narrative at trial and theory of prosecution throughout.

***First***, contrary to the Government's assertions, the topic of US-Egypt military financing featured extremely prominently at trial and encompassed days' worth of testimony. *See* Tr. 855:2-906:4 (Direct examination of Joshua Paul); *id.* 946:1-948:7 (Re-direct of Joshua Paul); *id*. 4456:9-

December 10, 2024
Page 7

4593:23 (Direct examination of Sarah Arkin). Indeed, whether Senator Menendez provided Egypt with "special treatment" in deciding whether to place or remove certain holds on military funds was a critical dispute for both the bribery charges and the so-called FARA, 18 U.S.C. § 219, charges. Tr. 6407-6409 (Government summation: "The special treatment isn't just things that are official acts or a promise of official acts themselves. The whole pattern of giving Egypt special treatment so that they know that when he does promise them official acts, he means it. . . . This wasn't just a one-time thing. Hana sits down to dinner with Menendez. Next thing he's texting the Egyptian defense attache that the State Department has given a heads up that they're lifting a ban on small arms to Egypt. He keeps doing this even years later."); Tr. 6535-6536 (Government summation: "Like we've talked about in looking at all the special treatment he was giving Egypt, this was highly sensitive, real-time information about the U.S. personnel stationed abroad. Here same type of activity. Menendez informing Egyptian officials about the lifting of a ban on the sale of small arms to Egypt. Again, informing or advising Egypt on U.S. policy. . . . What you have to decide, the ultimate question is whether Menendez was not acting fully independently. Was not simply stating or following his own views, but was instead acting as an agent of the foreign principal."). The Government's argument that "the entire topic of military aid to Egypt was, as the case was ultimately argued to the jury, a secondary issue in the case," Govt. Br. at 36, is based on an alternative reality to the one that played out in the courtroom. That is, the notion that the "Egypt-related corruption counts" were actually based on "Menendez's attempts to pressure the USDA regarding Hana's halal monopoly," *id.*, is—as the Court certainly knows—at odds with what the case was about, and the Government's effort to re-write the script now only serves to emphasize how desperate it is to save its conviction.

Indeed, as is discussed in further detail below, the summation itself, upon which the Government relies in making the argument that arms sales to Egypt had nothing to do with the conviction here, *see id.*, proves the point. Thus, in its summation, the Government explicitly referenced the excluded Helmy Message[3] and told the jury it knew what Helmy was asking about:

---

[3] For ease of the Court's reference, the Helmy Message, which is the improperly admitted evidence upon which Mr. Hana bases his motion for a new trial, refers to the multiple improper versions of the message from Ahmed Helmy to Mr. Hana: "Director office of Egyptian affairs in state department 'Kathryn Kiser' told our DCM today [redacted] a billion $ of usaid [*sic*] to Egypt before the recess !!!! Is this true ?" ECF No. 630-7 (GX C207-8); ECF No. 630-13 (GX C207-97); ECF No. 630-17 (GX D207-3). This text message appears in three of the nine improperly admitted exhibits. ECF No. 630-7 at 1-2 (Helmy sends the Helmy message to Mr. Hana); ECF No. 630-13 at 8 (Helmy re-sends the Helmy message to Mr. Hana and adds: "And that other thing[.] A female employee at his office called the embassy and said that they informed the State Department to have things go well in what relates to Egypt."); ECF No. 630-17 at 2 (Mr. Hana forwards the Helmy message to Mr. Daibes). The only version of that text message that the jury was supposed to have seen included the words "Is this true ?" and nothing more. In other words, the Government was prohibited from showing the jury that Mr. Helmy had texted Mr. Hana to ask about "Kathryn Kiser" communicating with an Egyptian official regarding "usaid" worth a "billion

December 10, 2024
Page 8

> In September, Helmy has a question for Menendez. So he asks Hana is this true? Hana tries to get through to Nadine. Then he connects with Daibes who calls Menendez. Daibes reports back to Hana who gets the message back to Helmy. All in less than 20 minutes. *What was Helmy asking about?* First of all, doesn't matter. That kind of immediate access to a U.S. senator already shows how serious Menendez was about his promises to be helpful to Egypt, even if in this case what Helmy was asking about was something minor. *But second of all, you know from the evidence and your common sense what Helmy was asking about. He was asking about the things that Egypt always cared about.*

Tr. 6400:13-24 (emphasis added). Far from seeking an inference, as the Government submits in briefing, *see* Gov't Br. at 26 and n.16, the Government explicitly told the jury that Helmy "was asking about the things that Egypt always cared about," *i.e.*, military funding, even though Helmy's question was explicitly excluded from the record. Tr. 6400:13-24. Nor it is correct—or fair—as the Government argues over and over that the insignificance of this exhibit is demonstrated by the fact that the defense did not address this particular comment in their summation, Gov't Br. at 6, 7, 25, 26, 41; obviously, that occurred because, as Mr. Hana has argued, Hana Br. at 11, Defendants expected that the jury would see and consider only what was in evidence, which the Helmy Message plainly was not.

*Second*, the Government incorrectly asserts that the jury would not "have felt the need to consult any documents on the subject matter of the Exhibits, let alone the underlying exhibits themselves, let alone the non-admitted portions of them." Gov't Br. at 27. The Government chooses to ignore the Court's clear instruction to the jury to consider *all* the evidence and specifically to give weight to the underlying exhibits referenced in the summary charts, which Mr. Hana highlighted in his moving brief, Hana Br. at 14-16. Tr. 7052:2-17 ("Again, it's up to you to decide whether the summary exhibits fairly and correctly reflect the underlying testimony and documents they purport to summarize. To the extent that the charts conform to what you determine the underlying facts to be, accept them. To the extent they differ from what you determine the underlying evidence to be, you can reject them. But one way or the other, the summary exhibits are not in and of themselves direct evidence -- that is, if I did not admit them as evidence. If I admitted them as evidence, then they're evidence. That's why you have these two separate charges here. There were charts and summaries I admitted into evidence, and there were charts and summary I did not admit into evidence*. In all cases, the underlying evidence and the weight which you attribute to that underlying evidence is what gives value and significance to these charts.*" (emphasis added)). That the Court noted the jury was alert, Gov't Br. at 27, is entirely irrelevant. The jury was still expected to fully follow the Court's deliberation instructions, which told them to consider everything. *See United States v. Berry*, 717 F.3d 823, 830 (10th Cir. 2013) (recognizing "the jury's obligation to consider all of the evidence").

---

$," *i.e.*, evidence linking Senator Menendez to his actions in actually clearing billions of dollars in aid to Egypt.

December 10, 2024
Page 9

*Finally*, the Government repeatedly points to the brevity of the jury's deliberations, contrasting the cursory consideration it gave to the case with how long it took the Government, Gov't Br. at 2, 13, and the defense, *id.* at 9, 13, to uncover problems with the exhibits that were included on the laptop, as evidence that the jury never actually looked at these exhibits. But leaving aside that this casts as a positive that the jury returned a verdict that swept across all counts and all defendants in a way that, in and of itself, reflects poorly on whether it followed the Court's instructions to consider each count and each defendant separately, Tr. 7074:13-18; *id.* 7078:21-25, it once again demands the kind of speculation that the Second Circuit rejects as a means of overcoming the presumption of prejudice in the extraordinary case in which inadmissible evidence in fact goes to the jury. This argument, too, favors salvaging a verdict over ensuring its integrity, and should be rejected.[4]

### IV. Having Destroyed The Evidence, The Court Should Not Give Credence To The Government's Argument That It Is "Far More Likely" That Review Of The Metadata Would Have Revealed That The Jury Did Not View The Erroneously Admitted Exhibits.

The Government's argument that Mr. Hana is not entitled to the adverse inference that the jurors during deliberations viewed unredacted and highly prejudicial exhibits is, again, founded on the entirely speculative conclusion that it is "highly unrealistic" that they did in fact do so, Gov't Br. at 31, despite the Court's instruction that the jury consider all the evidence, and the evident significance of these particular exhibits to the Government's case, as explained above. But it is particularly ironic that the Government continually repeats that there is no "reasonable likelihood based on the actual record[] that the jurors actually reviewed these exhibits[,]" *id.* at 27, 29, 30, 31, 32, when, by virtue of having wiped clean the laptop that went to the jury, the Government removed any opportunity to ascertain whether that conclusion was justified, or supportable. Moreover, as is squarely relevant to a spoliation analysis, the Government at no point states that it deliberately wiped the laptop clean *before* it was made aware that unredacted exhibits were provided thereon, forcing the question of whether the Government acted in bad faith in doing so. Indeed, even as it opposes any kind of factfinding, *see* Gov't Br. at 56-61, the Government fails to provide any information as to (a) how and when it discovered the problem at issue, *i.e.*, that inadmissible evidence went into the jury room; and (b) when it wiped the laptop clean. Of course, no memoranda or documentary evidence is provided with regard to either of those subjects.

Instead, in opposing Mr. Hana's argument that the Government spoliated evidence that the jury in fact viewed unredacted exhibits, the Government posits that Mr. Hana cannot make the

---

[4] Further, as Mr. Hana has noted, Hana Br. at 16, the jury requested a "display port cable to connect the laptop to the TV screen," Tr. 7171:4-5, which strongly indicates that the jury in fact viewed the exhibits on the laptop, though obviously we cannot tell which ones, given that the computer has been wiped clean.

December 10, 2024
Page 10

requisite three-prong showing to warrant an adverse inference instruction to the jury based on the destruction of evidence, namely:

> (1) [T]hat the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*United States v. Tompkins*, No. 23-cr-6525, 2024 U.S. App. LEXIS 27751, at *7 (2d Cir. Oct. 31, 2024) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). The Government's argument is wrong.

Initially, the Government's contention that it had no obligation to preserve the laptop that contained the evidence that the jury actually saw in this case is an extraordinary one indeed. Certainly, it runs afoul of the rules, the norms and the spirit of our system of justice, one that relies upon "[t]he obligation to preserve evidence . . . when the party has notice that the evidence is relevant to future litigation." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008); *accord Resnik v. Coulson*, No. 17-cv-676, 2019 U.S. Dist. LEXIS 92159, at *26 (E.D.N.Y. Jan. 4, 2019); *Fujitsu Ltd v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (stating that the obligation to preserve evidence begins "when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."). Obviously, the integrity of the evidentiary record and of the jury's deliberations on the basis of that record are categorically relevant to the pending post-trial motions, the sentencings, and ultimately the forthcoming appeals of the defendants, including Mr. Hana, of which the Government was certainly aware. Moreover, the determination of "when [a party's] duty to preserve the evidence arose" is fact-sensitive; "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." *Resnik*, 2019 U.S. Dist. LEXIS 92159, at *26-27 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Nor, at the very least, should the Government have taken the steps that it did without consulting with the Court and the defense. In any event, the Government's argument that Mr. Hana has provided "no authority imposing such a rule" that the Government "had a duty to retain, through the pendency at least of direct appeal . . . the actual jury laptop," Gov't Br. at 29 n.20, wholly disregards the necessarily flexible nature of a party's duty to preserve evidence in light of forthcoming litigation, a duty that—particularly in light of Mr. Hana's constitutional right to a fair trial—should not bend due to the Government's purported "limited resources," *id*. at 31, where such evidence is facially relevant to the integrity of the jury's deliberation in light of a forthcoming appeal. Indeed, the notion that this particular laptop had to be re-deployed within a few months of the trial, while post-trial motions remain pending, before sentencing and well before any appeal which could turn on what the jury saw—as the Government itself maintains—is, candidly, laughable. Were there truly no other laptops available? And what could possibly have prevented the Government from raising this issue with the Court before it took this dramatic step?

December 10, 2024
Page 11

The unanswerability of those questions suggests the only conclusion that follows: the Government's actions were not in good faith.

This is particularly so because, although the Government states that the "data was removed from the jury laptop after the verdict []for unrelated and entirely innocuous reasons[]," Gov't Br. at 27, little faith can reasonably be given to that conclusion when the Government has at no point clarified the timing of when the data was wiped; *i.e.*, before or after the Government discovered that the jury had access to unredacted exhibits.[5] To be sure, spoliation requires a "culpable state of mind," which "occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Michael v. GMC*, No. 15-cv-03659, 2016 U.S. Dist. LEXIS 79354, at *7 (S.D.N.Y. June 14, 2016) (quoting *Pesce v. GMC*, 939 F. Supp. 160, 165 (N.D.N.Y. 1996)). "Along this continuum, [t]he resulting penalties vary correspondingly." *Id.*; *see also United States v. Dalisay*, 2005 U.S. Dist. LEXIS 9423, at *22-23 (S.D.N.Y. May 17, 2005) ("the appropriateness and extent of sanctions in [cases concerning Government failure to preserve discoverable evidence] depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.") (quoting *United States v. Grammatikos*, 633 F.2d 1013, 1019-20 (2d Cir. 1980)); *United States v. Rahman*, 189 F.3d 88, 139 (2d Cir. 1999) ("When it occurs, the Government's loss of evidence may deprive a defendant of the right to a fair trial. Whether that loss warrants sanctions depends on the Government's culpability for the loss and its prejudicial effect." (citing *United States v. Bakhtiar*, 994 F.2d 970, 975-76 (2d Cir. 1993))); *United States v. Sattar*, 2003 U.S. Dist. LEXIS 19772, at *2 n.1 (S.D.N.Y. Nov. 5, 2003) (collecting cases). But here, the culpability of the Government's actions, so alarming given the pendency of the case both in the trial court and on

---

[5] The Government's citation to the provision of Rule 37 dealing expressly with failure to preserve electronically stored information for the proposition that the Rule "require[s] not merely intent to destroy the electronically stored information . . . but intent to deprive a party of use of that information in litigation," Gov't Br. at 28-29, ignores the full scope of the provision. Specifically, Rule 37(e) provides, in the disjunctive, that:

> . . .If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; *or*
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

December 10, 2024
Page 12

appeal, and the unilateral nature of the Government's actions, which were disclosed to neither the Court nor the defense, is exacerbated by the unknown and unclarified circumstances resulting in the jury laptop being wiped—specifically the timing of that process with respect to when it was discovered that the jury had had access to unredacted exhibits, which the Government has never stated occurred after that discovery. These facts raise, at a minimum, a tangible possibility of bad faith.

For these reasons, at the very least, the Court should reject the Government's bald submission that "it is far more likely . . . that examination of the laptop would have revealed that the jurors did *not* open these files," Gov't Br. at 30, when the only reason that empirical question cannot be answered is because of the Government's actions. More appropriately, the Court should draw the inference that the Government in fact wiped the computer clean because it would have shown that the jury in fact looked at these documents.

## V. The Erroneously Submitted Evidence Prejudiced Mr. Hana And Denied Him A Fair Trial.

The extra-record material presented to the jury during deliberations significantly prejudiced Mr. Hana's ability to defend himself and fundamentally denied him a fair trial, as was explained in detail in Mr. Hana's moving brief Hana Br. at 8-22. By way of this brief reply, Mr. Hana does not here rehash every argument but instead responds to the Government's two points.

*First*, the Government's argument that the improperly redacted exhibits would have been confusing and incomprehensible to the jury, Gov't Br. at 32-36, is extraordinary indeed, particularly in light of the Government's arguments at trial (and on reconsideration) of how clearly critical they were. ECF No. 421 at 2 ("[T]hese exhibits are evidence of third party conspirators' contemporaneous corrupt *expectation* of official acts in exchange for things of value. As such, they are highly relevant and admissible without regard to their alleged truth."); Tr. 1041:18-1042:1 ("[T]his is the proof of the contemporaneous understandings and beliefs between the bribe payer and the bribe recipient which is at the core of the corrupt exchange. That's the gravamen of the corruption offense, and if that was precluded, there could be no such prosecution. . . . and I should say this is very critical evidence in our case[.]"). Specifically with respect to the Helmy Message, the focus of this motion on behalf of Mr. Hana, the Government (1) explicitly referenced Helmy's "question," which was excluded from evidence, and (2) explicitly told the jury that it knew what that "question" was. Tr. 6400:13-24. There was no need for the jury to guess about anything—the Government told them Helmy "was asking about the things that Egypt always cared about." *Id.* Given the fact that, as explained above, the topic of military finance was a focus of the trial, especially (though not solely) with regard to the charge that Mr. Hana conspired to make Senator Menendez an agent of Egypt, it is no stretch of the imagination for the jury to conclude that what "Egypt always cared about" was receiving U.S. military aid.

December 10, 2024
Page 13

***Second***, contrary to the Government's strained assertions, Gov't Br. at 36-42, the Helmy Message was not cumulative of the properly admitted evidence. As noted above, in what can only be characterized as astonishing, the Government submits that "the entire topic of military aid to Egypt was, as the case was ultimately argued to the jury, a secondary issue." Again, U.S.-Egypt military aid encompassed days' worth of testimony, *see* Tr. 855:2-906:4; *id.* 946:1-948:7; *id*. 4456:9-4593:23, and was a critical dispute for both the bribery and 18 U.S.C. § 219 charges, Tr. 6407-6409; Tr. 6535-6536. Moreover, the Government referenced the approval of military sales and funding multiple times throughout its closing, *see* Hana Br. at 13, including:

- "So Menendez sold the power of his office. He promised to take actions for Hana and Daibes in exchange for those bribes. He promised to approve military aid to Egypt, to provide Egypt with sensitive information about Americans stationed abroad and to help Egypt in other ways." Tr. 6368:22-6369:1.

- "So for these [bribery] counts, if Menendez promised to approve military aid to Egypt, like a foreign military sale or a grant of foreign military financing money, that's a promise of official action." Tr. 6388:17-20.

- "So, Hana and Nadine set up a meeting on July 25, 2018, between Menendez and General Shawky, that Egypt defense attache, the same Egyptian general they'd arranged the meetings with before. This meeting was part of a delegation that was making the rounds to a lot of different people in Washington asking for military aid. . . . [T]he next day, Menendez texts Nadine to tell Hana he's going to approve Egypt's tank ammunition. Nadine takes a screenshot. Screenshot of another promise of an official act." Tr. 6392:8-6393:5.

- "In April [2019], Nadine still hasn't gotten paid by Hana, but she does tell Menendez she's going to. . . . A few weeks later, Menendez takes another meeting with Ahmed Helmy. This is one of the Egyptian officials that Hana has been setting him up with. Someone you can see from the text Hana has regularly been taking orders from this Helmy. Hana is saying the quiet part loud. He's talking about the halal company, the company that's going to pay the Nadine in the meeting. It appears from what Nadine is telling Menendez that Helmy is actually angry at Hana for talking about the halal in the meeting, while Menendez and Helmy want to talk about issues related to military aid." Tr. 6394:7-25.

These excerpts belie the Government's newfound position that military financing was a secondary issue and, thus, the Government's contention that consideration of ruled-upon evidence on this subject was harmless error is simply inconsistent with what actually happened at trial, as the Court well knows.

More importantly, the Helmy Message was unlike any evidence in the trial record, which showed only that Senator Menendez discussed military funding with third parties. *See* ECF No. 593 at 62-63; Hana Br. at 18-20. The improperly admitted versions of the Helmy Message, by

December 10, 2024
Page 14

contrast, strongly suggest, unlike anything in the trial record, that (1) Senator Menendez actually approved billions of dollars' worth of aid to Egypt; and (2) he did so as a special favor to Egyptian officials, as his office purported to call the State Department to make sure they treated Egypt "well." ECF No. 630-13 at 8.

In attempting to argue that the erroneous exhibits were harmless because they "say something that was already permissibly inferable from properly admitted evidence," the Government notes that the portion of Helmy's message—"A female employee at his office called the embassy and said that they informed the State Department to have things go well in what relates to Egypt"—was admitted into evidence. Gov't Br. at 41 n.29. This argument misses the point in Mr. Hana's moving brief that the improper Helmy Message ("Director office of Egyptian affairs in state department 'Kathryn Kiser' told our DCM today [redacted] a billion $ of usaid [sic] to Egypt before the recess !!!!") was *not* supposed to be admitted in the same message stating that someone from the Senator's office "informed the State Department to have things go well in what relates to Egypt." *Compare* ECF No. 630-14 (admitted exhibit), *with* ECF No. 630-13 (improperly submitted exhibit). That is, the jury was never supposed to see these two messages together. When viewed in tandem, however, it becomes abundantly clear that the Senator's instruction to the State Department to "have things go well" for Egypt refers to releasing "a billion" dollars in U.S. military aid to Egypt. That viewing could, then, never be harmless—as he has argued, Hana Br. at 2, 9, Mr. Hana certainly would have addressed these messages in summation, given their significance. Instead, believing that the jury would not see these statements in the same message as one from an Egyptian official—an argument to which the Government never responds[6]— Mr. Hana did not focus his defense, or final argument, on them.

Likewise, with respect to the § 219 charge, the improperly admitted Helmy Message undermined the clearly established record that U.S. military sales to Egypt are routine and repeated topics of conversation between U.S. and Egyptian officials. *See* Hana Br. at 20-21 (citing Tr. 4683:22-4684; *id.* 4685:19-22; *id.* 867:12-16; *id.* 687:23-868:3; *id.* 939:19-940; *id.* 945:15-19). In other words, the Helmy Message, which Mr. Hana did not address at trial because he did not believe the jury would see it, undermines the record evidence that U.S.-Egypt military financing was mundane and, as such, not the result of "special treatment" from Senator Menendez, sufficient to show that he was acting as an agent of Egypt, as the statute requires. *See* 22 U.S.C. § 611(c)

---

[6] Nor is this argument precluded, as the Government insinuates, because Mr. Hana lacks standing to raise a Speech or Debate Clause argument. *See* Govt. Br. at 43 n. 31. Mr. Hana does not contend otherwise and does not here raise an argument under that constitutional provision. Instead, he contends that he was denied a fair trial because the evidence at issue was ruled inadmissible in its entirety as to all defendants and as such was not addressed by Mr. Hana at trial, including in his summation. The prejudice to Mr. Hana thus lies in the fact that he was denied the opportunity to address this inculpatory evidence because he assumed—incorrectly, as it turned out—that the Government would adhere to the Court's Order excluding it (ECF No. 420).

December 10, 2024
Page 15

(defining "agent of a foreign principal").  In sum, the Helmy Message was not cumulative and, because it could not have been addressed by defense counsel, its introduction substantially prejudiced Mr. Hana and denied him a fair trial.

* * *

      For the above reasons, and for the reasons explained more fully in Mr. Hana's moving brief (ECF No. 641), Mr. Hana's motion for a new trial should be granted.

      Respectfully submitted,

      *s/ Lawrence S. Lustberg*

      Lawrence S. Lustberg