UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ, WAEL HANA, and
FRED DAIBES,

                        Defendants.

(S4) 23-Cr-490 (SHS)

OPINION & ORDER

## TABLE OF CONTENTS

I.  Applicable Law ........................................................................................................ 4

   A.  Rule 29 Motion for a Judgment of Acquittal.................................................... 4

   B.  Rule 33 Motion for a New Trial ......................................................................... 5

II.  The Evidence Amply Supports the Convictions of Each Defendant.................... 6

   A.  The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as
      Official Acts Related to the Egypt Scheme; the New Jersey State Criminal
      Matters; and the Daibes Federal Prosecution and Qatar Scheme. ................... 6

     1.  Official Acts Under *McDonnell* ........................................................................ 6

     2.  The *Quid Pro Quo* Requirement ...................................................................... 8

     3.  The Egypt Scheme............................................................................................ 10

        a.   Official Acts ............................................................................................ 10

        b.   *Quid Pro Quo* ........................................................................................ 13

     4.  The New Jersey State Criminal Matters........................................................ 19

        a.   Official Acts ............................................................................................ 19

        b.   *Quid Pro Quo* ........................................................................................ 21

     5.  The Daibes Federal Prosecution & Qatar Scheme ....................................... 25

        a.   Official Acts ............................................................................................ 25

        b.   *Quid Pro Quo* ........................................................................................ 26

   B.  The Evidence Was Sufficient to Prove That Counts 1 and 2 Were Each Single
      Conspiracies. ....................................................................................................... 30

C.   The Evidence Was Sufficient to Prove That Menendez Acted as an Agent of a Foreign Principal and Menendez and Hana Conspired for Menendez to Act as an Agent of a Foreign Principal. ......................................................................... 34

   1.   Acting as an Agent of a Foreign Principal (Count 16) ..................................... 34

   2.   Conspiracy to Have Menendez Act as an Agent of a Foreign Principal (Count 15) ............................................................................................................ 40

D.   The Evidence Was Sufficient to Prove That Menendez and Daibes Conspired to Obstruct Justice and Menendez Obstructed Justice. ....................................... 41

E.   The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York. .................................................... 46

   1.   Substantive Counts Related to Egypt (Counts 5, 7 & 8) ................................. 49

   2.   Substantive Counts Related to the Daibes Federal Prosecution & Qatar Scheme (Counts 11, 13 & 14) .............................................................................. 54

   3.   Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10) ............................................................................................... 54

   4.   The Conspiracy Charges (Counts 1, 2, 3 & 4) .................................................. 56

      a.   The Bribery Conspiracy Charges (Counts 1, 2 & 3) ................................. 56

      b.   The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4) ........................................................................................ 57

   5.   The FARA Charges (Counts 15 & 16) .............................................................. 57

III.  There Was No Manifest Injustice Entitling the Defendants to a New Trial. ...... 58

A.   The Use of Summary Charts and Summary Witnesses by the Government Was Proper. ...................................................................................................... 58

   1.   The Use of Summary Charts in this Case Was Appropriate. ........................ 60

   2.   The Format and Content of the Government's Summary Charts Were Proper. ............................................................................................................. 60

   3.   The Government's Summary Witnesses and Their Testimony Were Proper. ............................................................................................................. 63

   4.   The Government Did Not Open Its Case With Summary Evidence. ........... 65

   5.   The Court's Jury Instruction as to the Summary Charts Was Proper. ......... 66

B.   The Evidence Did Not Violate the Speech or Debate Clause. .......................... 66

C.   The Court Properly Excluded Evidence of Specific Good Acts Under Fed. R. Evid. 404(b) and 405(b). ....................................................................................... 71

    1.   Evidence of Prior Acts of Gift Giving by Daibes Is Not Admissible Under Rule 405(b). ................................................................................................ 71

    2.   Evidence of Defendants' Prior Acts Is Not Admissible Under Rule 404(b). 72

    3.   The Government's Summation Does Not Warrant a New Trial. .................. 75

IV.  Counts 1 and 15 Are Multiplicitous and Judgment Shall Enter on Only One of Those Counts. .............................................................................................. 75

V.   Conclusion .............................................................................................. 78

SIDNEY H. STEIN, U.S. District Judge.

On September 21, 2023, a grand jury indicted Senator Robert Menendez, Nadine Menendez, Wael Hana, and Fred Daibes for their participation in a years-long scheme to bribe Menendez in exchange for things of value, including gold bars, jewelry, and a Mercedes-Benz convertible for Menendez and his wife Nadine.[1] On July 16, 2024, after a nine-week trial with over thirty witnesses and approximately 3,000 exhibits, the jury deliberated over the course of three days and found defendants Menendez, Hana, and Daibes guilty on all counts with which they had been charged in the S4 Indictment.

Now, the defendants—Menendez, Hana, and Daibes—have each moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, contending that the government failed to introduce sufficient evidence to support a conviction on all counts. In the alternative, defendants each contend that they are entitled to a new trial pursuant to Federal Rule of Criminal Procedure 33. Specifically, Hana contends that the government's use of summary charts was improper; Menendez contends that the evidence introduced at trial violated his rights under the Speech or Debate Clause of the U.S. Constitution; and both Hana and Daibes contend that the Court erred by excluding evidence of specific instances of their good acts. Finally, Hana contends that Count 1 and Count 15 are multiplicitous and requests that the Court impose judgment on only one of these counts.

Defendants' motions pursuant to Rule 29 and Rule 33 are denied as set forth below. The jury's guilty verdicts were readily supported by the extensive witness testimony and extensive documentary evidence admitted at trial, and there is no manifest injustice requiring a new trial.[2] The Court does, however, find that Counts 1 and 15 are

---

[1] For clarity, the Court will refer to Robert Menendez as "Menendez" and Nadine Menendez as "Nadine."
[2] The Court will address defendants' supplemental motions for a new trial filed on November 27, 2024 (ECF Nos. 641, 644, 645) in a forthcoming Opinion.

multiplicitous and thus will impose judgment on only one of the two multiplicitous counts.

## I.   APPLICABLE LAW

### A.   Rule 29 Motion for a Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29, after the jury has rendered its verdict, "the Court may set aside the verdict and enter an acquittal" of "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). In determining whether the evidence is sufficient such that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt," *id.* (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)), courts are to "view the evidence presented in the light most favorable to the government" and draw "all permissible inferences . . . in the government's favor." *Id.* (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Additionally, "it is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) (quoting *Guadagna*, 183 F.3d at 129).

"When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). The agreement to join the conspiracy may "be inferred from the facts and circumstances of the case" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *Landesman*, 17 F.4th at 320 (quoting *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008)). Moreover, "the 'agreement or understanding' element of bribery 'is indistinguishable from a conspiratorial agreement,' and accordingly 'may be proven by circumstantial evidence.'" *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir. 1988) (quoting *United States v. Covino*, 837 F.2d 65, 70 (2d Cir. 1988)).

While courts "must defer to a jury's reasonable inferences," they are to "give no deference to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to

exist." *Id.* (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

Additionally, "[w]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *Landesman*, 17 F.4th at 320 (quoting *Pauling*, 924 F.3d at 657). Rather, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Pauling*, 924 F.3d at 657). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

Ultimately "[t]he jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Guadagna*, 183 F.3d at 130 (emphasis in original) (quoting *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)). "'[A] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted).

## B. Rule 33 Motion for a New Trial

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

On a Rule 33 motion, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). In so doing, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* And, as with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020).

But while "'a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 . . . , that discretion should be exercised sparingly' and only in the most extraordinary circumstances." *Landesman*, 17 F.4th at 330 (quoting *Sanchez*, 969 F.2d at 1414). "[A]

district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 188. Under this standard, "a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *Id.* (quoting *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)). Indeed, courts "must take care 'not to usurp the role of the jury.'" *Landesman*, 17 F.4th at 330 (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

Thus, "absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.'" *Archer*, 977 F.3d at 188-89 (internal citations omitted). "[T]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice. In other words, [t]here must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (citation and quotation marks omitted).

## II. THE EVIDENCE AMPLY SUPPORTS THE CONVICTIONS OF EACH DEFENDANT.

### A. The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as Official Acts Related to the Egypt Scheme; the New Jersey State Criminal Matters; and the Daibes Federal Prosecution and Qatar Scheme.

Defendants each contend that the government failed to prove that Menendez "engaged in a *quid pro quo* transaction in which he, directly or indirectly, demanded, sought, received, accepted, or agreed to receive something of value . . . in return for being influenced in the performance or non-performance of an official act." (Tr. 7086 (Jury Charge).) Defendants assert two challenges: first, that the government failed to introduce any evidence of official acts or promises to perform official acts and second, that the government failed to introduce sufficient evidence for the jury to conclude that "anything Menendez did or agreed to do was in exchange for a thing of value." (ECF No. 592 at 14.) As set forth below, these challenges fail.

#### 1. *Official Acts Under* McDonnell

Congress defined the term "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). "The text of § 201(a)(3) sets forth two requirements for an 'official act.'" *McDonnell v. United States*,

579 U.S. 550, 567 (2016). "First, the [g]overnment must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *Id.* To satisfy this requirement, the question, matter, cause, suit, proceeding or controversy must (i) "involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" and (ii) "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 574. "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570. "In particular, 'may *by law* be brought' conveys something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* Notably, "[t]he word 'any' conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id.*

For the second requirement, "the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.* at 574. "That decision or action may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.*

In *McDonnell*, the Supreme Court explained that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) [] without more" does not qualify as an official act. *Id.* However, the Court clarified that "this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant." *Id.* at 573. Rather, "[i]f an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act," and thus "[a] jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal." *Id.*

The *McDonnell* Court emphasized that under its precedents, "a public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agree to do so." *Id.* at 572 (citing *Evans v. United States*, 504 U.S. 255, 268 (1992)). As discussed further below, "[t]he agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *Id.* Moreover, the public official need not even "intend to perform the 'official act,' so long as he agrees to do so." *Id.*

### 2.    *The Quid Pro Quo Requirement*

In addition to an official act, the government must prove a *quid pro quo*, or an "understanding that the payments were made in return for official action." *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) ("*Silver II*") (alterations omitted) (quoting *United States v. Bruno*, 61 F.3d 733, 744 (2d Cir. 2011)). While "the *quid pro quo* must be clear and unambiguous," *United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024), "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Id.* (quoting *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). *See also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."). Instead, "[t]he inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Benjamin*, 95 F.4th at 68 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment)). Put another way, "[t]he showing of a *quid pro quo* . . . may be based on inference and need not involve an express statement," and a "jury may infer such a [*quid pro quo*] based on evidence of the official's 'implicit promise to use his official position to serve the interests of the bribegiver.'" *Id.* at 71 (internal citations omitted).

Ultimately, "[i]t is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 579 U.S. at 572-73. To do so, "[t]he jury may consider a broad range of pertinent evidence, including the nature of the transaction." *Id.* at 573.

"Evidence of the timing of the payments in relation to the actions taken by [the public official] could also be accepted by a rational jury in support of the conclusion that [the defendant] understood that the [] payments were made in return for official action." *Silver II*, 948 F.3d at 567 n.18 (quoting *Bruno*, 661 F.3d at 744). *See also id.* at 570-71 ("[T]he evidence presented at trial, including circumstantial evidence of the timing of [certain] financing approvals and [the official's] 'side letter' retainer agreement" was sufficient for a jury to conclude the official had "accepted payments "with the belief that he was expected to influence *a particular matter*"); *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021) (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions").

For example, in *United States v. Calk*, Stephen Calk, the chief executive officer of a bank, was convicted of bribery for seeking and accepting assistance from Paul Manafort to secure a position in the Trump administration in exchange for Calk's assistance in

approving loans to Manafort from Calk's bank. No. 19-cr-366, 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022), *aff'd*, 87 F.4th 164 (2d Cir. 2023). At trial, the jury heard evidence that the bank denied Manafort's request for a loan prior to the presidential election, but days after the election, Calk approved the loan and then "sent Manafort a wish list of desired positions." *Id.* A month later, as Manafort sought a second loan, Calk told Manafort's lawyer that they were "in no way" ready to close on the loan. *Id.* But "[t]he next day, Calk personally sent Manafort . . . an offer to close the loan[,] . . . shortly after Calk and Manafort had an eleven-minute phone conversation during which Calk confirmed that he would be willing to serve" in a certain position in the administration. *Id.* The court rejected Calk's Rule 29 motion, concluding "[t]he timing and circumstances of each loan was sufficient for the jury to infer Calk's corrupt intent." *Id.*

The Second Circuit has similarly determined that the "timing of the payments in relation to the actions taken by [an official] could also be accepted by a rational jury in support of the conclusion that [the official] understood that the . . . payments were made in return for official action." *Bruno*, 661 F.3d at 744. There, Joseph Bruno, a former New York State Senate majority leader, received $200,000 in consulting fees from companies owned by Jared Abbruzzese. *Id.* at 744. At the time, Abbruzzese had been attempting—unsuccessfully—to convince Bruno to release already-authorized funds to Evident, a technology company in which Abbruzzese had an interest. *Id.* at 736-37, 744. As New York State Senate majority leader, Bruno had control of the funds. *Id.* at 736. Five days after Bruno suggested he become a consultant to Abbruzzese's companies, Bruno directed the transfer of funds to Evident, and six days after that, Bruno and Abbruzzese signed a consulting agreement. *Id.* at 737. The record contained no evidence that Bruno performed any work as a consultant and Bruno was not paid for these services directly. *Id.* The Second Circuit wrote that this evidence "permit[ted] a reasonable jury to find that Bruno performed virtually non-existent consulting work for substantial payments." *Id.* at 744.

A jury may also "infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." *Id.* (quoting *Friedman*, 854 F.2d at 554). *See also United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013) (upholding a *quid pro quo* based on evidence that, *inter alia*, the payments to defendant "were structured as monthly consulting payments," defendant "began paying [official] as a consultant within one year of [his] election to the State Assembly," and defendant failed to "disclose the payments [] on required disclosure forms").

Moreover, "donors and recipients engaged in ongoing bribery schemes do not always spell out in advance the specific match between gift and act." *United States v. Ganim*, 510 F.3d 134, 148 (2d Cir. 2007). As a result, "the extortion and bribery *quid pro quo* does not require a 'link [between] each specific benefit [and] a *single* official act,'"

and instead may "be proven through evidence of 'a scheme involving payments at regular intervals in exchange for specific official[] acts as the opportunities to commit those acts arise'—i.e., 'this for these or these for these, not just this for that.'" *Silver II*, 948 F.3d at 554 (quoting *Ganim*, 510 F.3d at 147-48).[3] Indeed, an "exchange of payments 'for a specific exercise of [an official's] official powers' [is] enough to sustain [an official's] conviction, even though the separate questions of *how* [the official] would influence those issues (which specific actions he would take), as well as the form the kickbacks would ultimately take (cash, meals, etc.), [may] remain[] unspecified." *Id.* at 565-66 (quoting and discussing *Ganim*).

To justify a grant of a Rule 29 motion, defendants must do more than simply offer a competing inference. *Calk*, 2022 WL 101908, at *3. "'[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence' and to assess the weight of the evidence." *United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021) (quoting *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011)).

### 3.   *The Egypt Scheme*

Defendants contend that the government failed to prove that Menendez agreed to perform an official act to benefit Egypt and Hana in exchange for something of value. But as detailed below, the government produced evidence of at least two official acts and more than sufficient evidence upon which a reasonable jury was entitled to conclude that Menendez promised to perform these acts in exchange for items of value.

### a.   *Official Acts*

The government presented evidence of at least two official acts in connection with the Egypt scheme. *First*, the government introduced evidence that Menendez promised to sign off on a foreign military sale to Egypt. Specifically, the jury saw a text message from Menendez to Nadine—which Nadine then immediately transmitted to Hana—in which Menendez wrote "Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million." (GX 1302, rows 320-23, GX A101-14, GX B201-10, GX B105-15.) This act meets both prongs of the definition of official act. First, the decision to place or not place a hold on foreign military sales clearly qualifies as a "question or matter" that came before Menendez in his official capacity as chair of the Senate Foreign Relations

---

[3] Hana asserts that the "as opportunities arise" theory of bribery is no longer valid in the wake of *McDonnell*. (ECF No. 600 at 68 n.22.) The Second Circuit, however, has clearly rejected this argument. *See Silver II*, 948 F.2d at 558 ("We therefore disagree with Silver that the 'as the opportunities arise' theory of bribery does not survive *McDonnell*.").

Committee ("SFRC"). Second, there was undeniably a promised "decision or action": Menendez wrote he was "going to sign off this sale" to Egypt, which would *directly* address the question or matter at issue—i.e., the pending sale of military aid to Egypt that was before Menendez and the SFRC.[4] Defendants, for their part, do not challenge the proposition that approving military sales constitutes an official act. (*See* ECF No. 592 at 9.)[5]

*Second*, the jury could reasonably conclude that Menendez's call to Ted McKinney—at the time, the Undersecretary of Agriculture at the U.S. Department of Agriculture ("USDA")—was evidence of Menendez's promise to perform an official act, and perhaps performance of an official act as well. During the trial, the jury heard evidence that in April of 2019, Egypt rejected or decertified seven American companies that had previously been certified as halal beef exporters to Egypt. (Tr. 1774; GX 8B-3.) In place of those seven companies, Egypt substituted a single company, IS EG Halal Certifiers Inc. ("IS EG")—a New Jersey company owned by Hana with absolutely no prior experience in halal certification. (*See* GX 8B-3.)

Upon learning of Egypt's decision to grant a monopoly to a totally untested company, the USDA became "deeply concerned," and McKinney wrote a letter to his Egyptian counterpart—the Egyptian Deputy Minister of Agriculture—expressing the USDA's desire that the Egyptian government reverse course "effective immediately" "in order to prevent any disruption" in the U.S. market. (GX 1302, row 640, GX 8B-20.) In the wake of that letter, Menendez called McKinney, a call in which McKinney described Menendez to the jury as "serious" and even "curt." (Tr. 1802.) During that call, Menendez told McKinney "[a]t least" twice to "[s]top interfering with my constituent." (Tr. 1799, 1806.) McKinney testified that he understood this constituent to be "the single halal certifier, IS EG." (Tr. 1799.) McKinney explained that "in my mind there was no doubt" that Menendez wanted the USDA to "stop undertaking the

---

[4] The evidence adduced by the government further allowed the jury to infer that Menendez made additional promises of future official acts. Specifically, the jury could reasonably conclude that evidence of Menendez passing along information about other arms transfers (*see, e.g.*, GX C206-1, GX 3D-2, GX C419, GX C207-12) implied additional promises of official acts upon questions or matters before him in his role as chair of the SFRC.

[5] Menendez claims that this evidence violates the Speech or Debate Clause. For reasons discussed *infra*, that claim fails. Hana, for his part, contends that Menendez "merely speaking with Nadine or Mr. Hana about the sales is not an official act." (ECF No. 600 at 62-63.) But bribery is not so narrowly defined. Telling Hana—through Nadine—that he would sign off on an act serves as evidence Menendez *agreed* to take an official act. *See McDonnell*, 579 U.S. at 572 ("[A] public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agree to do so.").

activities that [they had] been working on to try to bring back halal certifiers." (Tr. 1803.) McKinney "felt [Menendez] was telling me to stand down and stop doing all of the things that we were doing to try to revive some sense of competition in the U.S. beef market." (Tr. 1806.) McKinney also explained how unusual a call like this was: he had "never had a call like that before" (Tr. 2009); afterward, he felt the need to "reassure [U.S. Embassy employees] in Egypt that we have their back" and that "[t]hey should not worry about this call from the senator." (Tr. 1819; *see also* GX 1302, row 743, GX 8B-12.)

Given this evidence, the jury was entitled to determine that Menendez was seeking to pressure McKinney concerning the position the USDA was taking on a question or matter before it—its official position on Egypt's halal certification, which the jury certainly was entitled to conclude involved a "formal exercise of governmental power." *McDonnell*, 579 U.S. at 574. And while the question or matter did not come before Menendez, it did not have to. As *McDonnell* set forth, the "decision or action" prong of an official act may be satisfied by a public official "using his official position to exert pressure on another official to perform an 'official act.'" *Id.* From this, the jury could conclude that Menendez attempted to exert pressure on McKinney to stop the USDA's efforts to get Egypt to reinstate competition in halal certification of meat exports to Egypt, which would be more than enough to establish the official act requirement of a bribery offense.

Defendants contend that "the decision to award IS EG Halal the sole source contract was not pending before McKinney any more than it was pending before Senator Menendez; the decision was within the exclusive province of the Egyptian Government." (ECF No. 600 at 59; *see also* ECF No. 592 at 8.) First, even though the USDA could not "force" Egypt to reinstate the prior halal certifiers, it certainly was entitled to exert pressure on Egypt to change course—which McKinney's letter endeavored to do. *McDonnell*, 579 U.S. at 573 (acknowledging that an official "attempting to pressure or advise another official on a pending matter" and agreeing to do so "in exchange for a thing of value" constitutes bribery). Second, the jury could reasonably conclude that the matter Menendez sought to influence was the official position of the United States on this issue—over which McKinney and the USDA retained full control.

Menendez urges that "simply opposing a policy is not official action in its own right," relying on both *McDonnell* and *United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017) ("*Silver I*"). (ECF No. 592 at 8.) But *McDonell* held no such thing and *Silver I* contemplated a different scenario. In *Silver I*, the Second Circuit decided that "taking a public position on an issue, by itself, [was] not a formal exercise of governmental power" because the "record d[id] not establish that Silver formally used his power as

Speaker of the Assembly to" express his opposition. 864 F.3d at 122. Here, by contrast, there can be no doubt that McKinney was acting in his capacity as the Undersecretary of Agriculture at the USDA in attempting to have Egypt change its position on giving a monopoly over U.S. exports of halal meat to an untried company. (*See* GX 8B-20 (letter from McKinney to Egyptian Deputy Minister of Agriculture on official letterhead).) There can similarly be no question that Menendez called McKinney in his capacity as a U.S. Senator. (Tr. 1799, 1806).

### b. *Quid Pro Quo*

The jury was similarly presented with ample evidence to conclude that Menendez promised to perform official acts to benefit Egypt and Hana in exchange for things of value, including a $23,568.54 payment towards Nadine's mortgage and three $10,000 checks from IS EG to Nadine for performing essentially no work for IS EG. Specifically, on July 19, 2019, Hana, with the assistance of his lawyer John Moldovan, paid the outstanding debt on Nadine's mortgage to get her house out of foreclosure. And on August 30 and November 6, 2019, IS EG wrote three $10,000 checks to Nadine's recently established consulting company, Strategic International Business Consultants. (GX 1302, row 1010, GX 5A-1001A; GX 1302, row 1117, GX 5A-1001B; GX 1302, row 1128, GX 5A-1001C.)

Menendez contends that these cannot be bribe payments because they were received *after* the official acts and are thus, at most, gratuities. But bribes are payments that are either "made *or agreed to* before an official act in order to influence the official with respect to a future act." *See Snyder v. United States*, 603 U.S. 1, 5 (2024) (emphasis added). *See also* 18 U.S.C. § 201(b)(2) (criminalizing public officials for, *inter alia*, "agree[ing] to receive or accept anything of value . . . in return for being influenced in the performance of any official act"). The government introduced sufficient evidence for the jury to reasonably conclude the scheme began well before Menendez or Nadine received anything of value.

Indeed, months before any official acts, in February 2018, Nadine asked Menendez—and Menendez agreed—to meet with her and Major General Khaled Shawky Osman, the military attaché at the Egyptian embassy in Washington (GX B105-A, GX 1430), at the embassy so that the pair could be introduced and, in the future, not require "an explanation to Egypt as to why [General Shawky was] meeting an official not at the embassy." (GX 1302, row 44, GX A105-A.) Approximately a week later, Nadine, Hana, and Menendez met "to discuss the points of the meeting" with General Shawky. (GX 1302, row 60, GX A101-99.) And on March 13, 2018, Menendez met with General Shawky, Andy Aslanian, Nadine, and Hana, a meeting that Menendez's staff did not join and otherwise appeared to be unaware of. (GX 1302, rows 74-75, GX 4I-2.)

Just a few months after this meeting, in May 2018, Nadine asked Menendez to "fix" a letter for General Shawky so that she could "prove a point to [Shawky]," noting that General Shawky and Hana had just given her "clearance for a project." (GX 1302, row 184, GX B102, GX B102-A.)

At the end of June, Hana, Nadine, and Menendez met for dinner in Manhattan, during which time Hana was simultaneously communicating with General Shawky. (*See* GX 1302, rows 250-55, GX B105-10, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1, GX C206-3, GX C206-3T.) They again met in Washington D.C. the following month on July 25, 2018. (GX 1302, row 314, GX C410.) The very next day, Menendez told Nadine to tell Hana that he will sign off on an arms sale to Egypt. (GX 1302, row 320, GX A101-14.) Nadine did as Menendez instructed (GX 1302, row 322-23, GX B105-15) and then, two minutes after receiving from Nadine the text of Menendez's message, Hana forwarded the message to General Shawky and another Egyptian official. (GX 1302, rows 324-25, GX C206-7, GX C112-2.)

This series of events provided the jury with ample evidence to conclude that long before Menendez informed Hana of this official act—or received any payment—he *agreed* to do so in exchange for things of value. Menendez contends that "[a]t most, the evidence showed that Senator Menendez agreed to inform an Egyptian-American New Jersey constituent, Hana, of his decision" to sign off on the sale. (ECF No. 592 at 9.) But the jury was entitled to reject that (far-fetched) competing inference, in light of the totality of the government's evidence and Menendez's choice to inform that constituent not through any official channel but though his then-girlfriend.

The same is true for the call to McKinney. In January of 2019, Ali Abdi of the USDA wrote to Dr. Ahmed Abdel Karim, an Egyptian agricultural official, and approved Karim's request "to audit slaughterhouses and Islamic centers within the United States." (GX 1302, row 462, GX C107-C.) Days later, Karim forwarded this letter to Hana. (*Id.*; GX 107-1T.) Around the same time, Nadine wrote to Andy Aslanian that "2019 is going to be a FANTASTIC YEAR for all of us. [Menendez] keeps telling me that and I'm really starting to believe it." (GX 1302, row 441, GX B113.)

On March 26, 2019—almost exactly one year from that first meeting between Menendez, Andy Aslanian, Nadine, Hana, and General Shawky—Nadine wrote that "[i]t has been a year of broken promises by Will to me and I have given 1000% of my myself [sic], my time and kept every promise to Will . . . I am willing to give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1302, row 520, GX B221-1.) She went on to say that this week "I will once again prove my loyalty and dedication." (*Id.*) Shortly afterward, on April 8, 2019, Nadine messaged Menendez that it "[s]eems like halal went

14

through. It might be a fantastic 2019 all the way around." (GX 1302, row 588, GX A101-27.)

A few weeks later, the USDA learned that Egypt had decertified the seven U.S. companies that had been authorized by Egypt to certify meat as halal for exporting into Egypt and had instead authorized IS EG to be the sole exporter. On May 13, 2019, McKinney wrote to the Egyptian Deputy Ministry of Agriculture to express his "deep[] concern[s]" and request that she "immediately . . . reinstate the seven U.S. halal certifiers" that had been suspended or terminated. (GX 1302, row 640, GX 8B-20.) Days later, Hana sent an article about the United States' response to the change to Nadine (GX 1302, row 721, GX C102-6), who then immediately forwarded it to Menendez. (GX 1302, row 722, GX A404.) Within minutes, Menendez called McKinney and sent this same article to him. (GX 1302, row 724, GX 8B-16.) Five days after Menendez made that call to McKinney, Hana listed Nadine as the Vice President of IS EG with an annual salary of $120,000 (GX 1302, row 752, GX C104-4)[6]—i.e., $10,000 per month or $2,500 per week, which matched the salary identified in Nadine's March 2019 text message.

Following Menendez's call to McKinney, the evidence shows that Nadine got paid. In July 2019, Hana, with Moldovan's assistance, paid the outstanding debt on Nadine's mortgage, thus preventing the bank from foreclosing upon her house. (*See* GX 1302, row 987, GX 5C-200; Tr. 750.) And then in August and November 2019, Nadine received three checks for $10,000 each from IS EG. (GX 1302, row 1010, GX 5A-1001A; GX 1302, row 1117, GX 5A-1001B; GX 1302, row 1128, GX 5A-1001C.)

In sum, this circumstantial evidence provides a more than sufficient foundation for the jury to reasonably infer that Menendez agreed to take official action in exchange for items of value for Nadine—including the mortgage payment and the checks from IS EG—before he took or attempted to take any official act. *See Reichberg*, 5 F.4th at 249 ("[C]ircumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions."); *Calk*, 2022 WL 101908, at *2 (finding that the "timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent").

Hana and Menendez assert myriad arguments to contend otherwise. Hana asserts that the government "never offered credible evidence to allow a rational trier of fact to find that [his payment on Nadine's mortgage] was anything other than a loan." (ECF

---

[6] Hana takes issue with the fact that the recipient of this message, "HH," is not identified. (ECF No. 600 at 82.) Given the content and testimony surrounding various communications with HH (e.g., GX C417, GX C104-6, Tr. 992-98), the jury was entitled to infer that "HH" was Hana's "Egyptian contact." (ECF No. 600 at 82 n.26.) In any event, Hana makes no argument that the identity of HH would affect the veracity of the contents of the communication.

No. 600 at 75.) That is not so. Moldovan testified that when he first spoke to Nadine "about the foreclosure and Will, Mr. Hana paying that off, there was no conversation about a promissory note." (Tr. 790-91.) Any mention of a promissory note "came after the fact." (Tr. 791.) Moldovan explained that "a few weeks later, Mr. Hana came to me and sort of out of the blue [ ] said I need you to draw up a promissory note before we send the funds to pay off the mortgage." (*Id.*) Moldovan then drafted a loan agreement per Hana's specifications—a five-year term, no interest, and no payment schedule. (Tr. 791-92.) On June 27, 2019, Moldovan sent this agreement to Nadine for her execution (GX 1302, row 944, GX 4C1-D), but Moldovan testified that she seemed "pretty upset" when she received it. (Tr. 793.) Moldovan explained that Nadine "responded in a way that made me think she didn't see this coming or didn't expect to be the subject of a loan." (*Id.*) Nadine told Moldovan that she "would have to talk to [Hana] and get back to [him]." (*Id.*)

On July 16, 2019, Moldovan attempted to follow up with Nadine, as he was still "awaiting [her] response on the money from [Hana]." (GX 1302, row 966, GX B222.) The next morning, Nadine responded: "I have no idea what response you are waiting for." (GX 1302, row 967, GX B222.) Moldovan then reminded her of the draft loan agreement he had sent weeks ago for her review. (GX 1302, row 971, B222.) Moldovan testified that after he sent that message, Hana came to him and said, "just send the money" (Tr. 797), even though the draft loan agreement had not been signed. That day, Hana wired Moldovan the money to send to Nadine, and on July 19, 2019, Moldovan issued a check to Nadine's mortgage company in the amount outstanding. (GX D207-A at 5.) And while the memo line of the check read "Loan Auth W. Hana / ISEG to N.A" (*id.*), Moldovan testified that a promissory note had not been executed. (Tr. 800.) This evidence provides the jury with more than sufficient support to conclude that this was not a loan but a bribe payment.

Tellingly, Nadine characterized the mortgage payment as a payment to her, along with the $10,000 monthly checks from IS EG. Specifically, in September, Nadine reached out to Daibes because she had not been receiving her payments from Hana as expected. (GX 1302, row 1098, GX D102-10.) Daibes asked her to send him a "rundown" of what she was owed. (GX 1302, row 1100, GX D102-10.) In response, Nadine wrote that the "July 19th cashier's check for the $23,568.54 to the mortgage company" covered most of the payments she was due for May, June, and partially July. (GX 1302, row 1104, GX D102-C.) However, for the month of July, she was still due the remaining $6,431.46, to reach the $10,000 per month she was promised. (*Id.*) She then acknowledged she had received the IS EG payment for September, but she was missing $10,000 payments for August and October. (*Id.*)

16

Menendez next contends there is no evidence that he knew Nadine was behind in her mortgage payments when he called McKinney in May. As an initial matter, it is entirely reasonable for the jury to infer that Menendez knew of Nadine's financial situation, given his high level of involvement in her life as evidenced by the continuous flow of texts, emails, and calls between them. But even assuming Menendez was unaware of the mortgage, the jury saw evidence that Menendez understood Hana owed Nadine a payment. (*See* GX 1302, row 956, GX D108-A ("I have not told Bob yet, because he is going to flip out against Will [Hana].").) That is enough. *See Silver II*, 948 F.3d at 565 (noting a *quid pro quo* is sufficient even if "the separate question[]" as to "the form the kickbacks would ultimately take . . . [may] remain[] unspecified").

With respect to the three $10,000 checks from IS EG to Nadine, Hana asserts that any conclusion that these checks constituted bribe payments "required the jury to draw multiple, specious inferences," including that "(1) when Mr. Hana promised Nadine a job, Mr. Hana and Senator Menendez foresaw that some issue would arise with respect to IS EG Halal; (2) that the hypothetical issue would be something over which Senator Menendez would be able to assist; and (3) that, at the time Mr. Hana promised Nadine a position at IS EG Halal, it was in exchange for Senator Menendez promising to help Mr. Hana with that theoretical issue." (ECF No. 600 at 83.)

Taking these in turn, first, it was entirely foreseeable that, in contemplating a change to Egyptian export policy that would eliminate competition among U.S. halal certifiers, create a monopoly, disrupt U.S. agricultural markets, and raise the price of beef to Egyptian consumers, an issue would arise that involved federal officials. (*See* GX 1302, row 637, GX 8B-19; GX 1302, row 642, GX 8B-8; GX 1302, row 724, GX 8B-16.) Second, it is not an element of the crime of bribery that the official actually be able to deliver what he may have promised, and the jury was not instructed to infer as much. *See McDonnell*, 579 U.S. at 572 (noting there is no requirement that the public official "intend to perform the official act," only that the official agree to do so). And third, given the record evidence—including Nadine's text to Menendez in early April informing him that it looked "like halal went through" and "[it] might be a fantastic 2019 all the way around"—the jury was entitled to infer that Menendez knew of the halal scheme and that he and Nadine stood to benefit significantly from it. (GX 1302, row 588, GX 101-27.)[7] These are "reasoned, logical" conclusions based on facts in the record. *See United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).

---

[7] This same evidence gives the lie to Menendez's argument that "there is zero evidence that Menendez was aware of any of these things of value in advance of his call to McKinney." (ECF No. 592 at 14.)

Hana also urges that the evidence at trial demonstrated that "Mr. Hana hired Nadine at IS EG Halal for a short three-month period pursuant to a consulting agreement, Mr. Hana paid Nadine $30,000 ($10,000 per month) as required under that agreement, Mr. Hana expected Nadine to perform work, and Mr. Hana did not renew Nadine's employment contract at the end of the three-month term after she failed to perform the work that was expected of her." (ECF No. 600 at 80.) Hana is entitled to his view of the evidence, but there was more than ample evidence from which the jury was entitled to conclude that Nadine's "employment" by IS EG was simply a means of funneling bribe payments to her for her and Menendez's benefit. For example, Nadine was the second highest paid individual at IS EG, despite having no prior experience in halal certification or the halal business in general; there was evidence that Nadine did not fulfill any responsibility at IS EG (*see, e.g.,* Tr. 6177-84); and a voicemail in which Nadine stated that Hana told her "he doesn't need me for anything and that I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day." (GX 1302, row 956, GX D108-A.) And perhaps most incriminating, six months before any payment, Nadine—referring to the possibility of IS EG being granted a monopoly by Egypt—wrote to Howard Dorian, one of Hana's associates, that she was willing to "give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1302, row 520, GX B221-1.) All this provides ample support for the reasoned inference that Nadine's alleged consulting contract was simply a means to provide bribe payments to her and Menendez.

Daibes, for his part, contends that "no rational juror could have found that *Mr. Daibes* promised Senator Menendez anything of value in exchange for any official acts" because "there was no evidence that Mr. Daibes managed or otherwise had any business interest in Mr. Hana's IS EG Halal business." (ECF No. 590 at 49-50 (emphasis added).) Putting aside the fact that the government need not establish a motive by Daibes for participating in the scheme, the government introduced ample evidence to show that Daibes was involved in this scheme and contributed to the *quid pro quo*: the jury saw evidence that Daibes heard complaints from Nadine when Hana was late to pay her (*e.g.,* GX 1302, row 956, D108-A; GX 1302, row 981, GX D110-A; GX 1302, row 1098, GX D102-10), that Daibes had previously assisted IS EG with a stock buyback agreement (GX 4E-1), that Nadine asked Menendez whether a check is coming from Daibes or Hana (GX 1302, row 862, GX A101-40; Tr. 1404-06), that Daibes told Menendez he had one of the $10,000 checks from IS EG ready for Nadine, and that Daibes physically handed over another $10,000 check from IS EG to Menendez himself. (*See* GX 1302, row 1099, GX D102-10; GX 1302, rows 1123-28, GX D101-2.) Daibes' attempt to extricate himself from this scheme fails.

### 4. *The New Jersey State Criminal Matters*

Defendants next contend that the government failed to prove that Menendez agreed to perform any official act to benefit Jose Uribe[8] in exchange for things of value. But again, the government has met its burden and the Court finds no justification to disturb the jury's verdict.

#### a. *Official Acts*

The government offered sufficient evidence for the jury to conclude that Menendez promised—and attempted—to take official acts to influence the outcomes of two matters handled by the New Jersey State Attorney General ("NJAG"). Specifically, Menendez agreed to pressure Gurbir Grewal, the New Jersey Attorney General at the time, to favorably influence both the prosecution of Elvis Parra, an associate and good friend of Uribe, and the investigation into Ana Peguero, a woman Uribe viewed as his daughter.

With respect to Parra, the government introduced evidence that Parra had been indicted for insurance fraud by the NJAG in connection with his trucking company and was being represented by Michael Critchley. (Tr. 2941-42; GX 1303, row 1, GX 4G-1, GX 10H-1; GX 1303, row 10, GX 4G-2, GX 4G-13.) As to Peguero, Uribe testified that Peguero became the agent of record and eventually the owner of Uribe's retail insurance company, Phoenix Risk Management. (Tr. 2938.) The NJAG issued subpoenas to Phoenix as part of its investigation into Parra. (Tr. 2946-47.) In 2018 and 2019, the investigation appeared to intensify, as Phoenix received a subpoena seeking additional documents and detectives repeatedly attempted to speak with Peguero. (Tr. 2950-52.)

The government introduced evidence of two instances in which Menendez spoke with Grewal about those matters. *First*, in early 2019, Menendez called Grewal supposedly to discuss the treatment of Hispanic vs. non-Hispanic defendants in the trucking industry (Tr. 2715-16), but in response to Grewal's questions, Menendez admitted it involved a specific criminal matter and the defendant was represented by Michael Critchley. (Tr. 2716.) Grewal then told Menendez that Critchley was a fine lawyer and perfectly capable of raising any concerns with the prosecutors handling the matter, which was the correct way to raise concerns about an ongoing investigation. (Tr.

---

[8] Uribe pled guilty to, among other crimes, conspiracy to bribe Menendez and Nadine by purchasing a Mercedes for Nadine in order to gain the help of Menendez in obtaining favorable treatment in two ongoing New Jersey state criminal investigations. (Tr. 2927, 3175-77.)

2716-17.) Grewal decided not to tell his prosecutors about Menendez's call to make sure they did not "feel pressured or intimidated." (Tr. 2718.)

*Second*, towards the end of 2019, Menendez called Grewal once again, this time asking Grewal to meet with him at his Senate office in New Jersey, and Grewal agreed. (Tr. 2719-20.) The jury heard Grewal explain that Menendez had "a look of surprise" on his face when he saw that Grewal did not come to the meeting alone and instead entered with Andrew Bruck, one of Grewal's assistant attorneys general. (Tr. 2726-28.) Menendez reiterated the same concerns he had shared earlier in the year, regarding "the same matter that [he had] called [] about when Mike Critchley's representing the individual or individuals." (Tr. 2729.) Grewal then told Menendez he could not talk to him further about this issue. (Tr. 2730.) Grewal testified that he understood from this meeting that Menendez "didn't like how the matter was being handled." (Tr. 2731-32.)

In the first instance, there is sufficient evidence for the jury to conclude that both Menendez's call and his subsequent meeting with NJAG Grewal qualify as official acts. There is no doubt that criminal matters handled by the NJAG are properly deemed questions or matters before then-Attorney General Grewal. The decision of whether to investigate and prosecute is both a "formal exercise of governmental power" and was then clearly "pending" before the prosecuting or investigating office. *See McDonnell*, 579 U.S. at 574. Indeed, the Second Circuit has determined that "making an arrest" or "making a decision about whether to issue a desk appearance ticket to the arrestee" are the "sort of specific, formal exercises of government power that can constitute official acts." *Reichberg*, 5 F.4th at 249. *See also United States v. Lee*, 919 F.3d 340, 357-58 (6th Cir. 2019) ("A prosecutor bringing charges against a defendant is certainly within the meaning of 'official act' regarding a 'question, matter, cause, suit, proceeding, or controversy,' as defined by *McDonnell*." (citation omitted).)

From Grewal's testimony, the jury may reasonably infer that Menendez sought to "us[e] his official position to exert pressure on another official to perform an 'official act.'" *McDonnell*, 579 U.S. at 574.[9] It is of no consequence that Grewal is a state official and not a federal official; the Second Circuit has stated that it sees "no basis for ruling

---

[9] Menendez urges that this evidence cannot support an inference that Menendez attempted to influence Grewal because Menendez did not identify the case by name. That is meritless; Menendez stated that he was referring to (i) a pending criminal matter (ii) involving Hispanic individual(s) (iii) connected to the trucking industry (iv) represented by Michael Critchley, and (v) who were under investigation by the New Jersey Office of the Insurance Prosecutor. Grewal knew exactly which case Menendez was raising: he asked Menendez "is this the same matter that you called me about when Mike Critchley's representing the individual or individuals? [Menendez] said yes. And my response was well, then Mike, again, can raise those issues with the prosecutors who are handling the case. I can't talk to you about this." (Tr. 2729-30.)

that a congressman's official acts—especially those 'demonstrating Congressional interest'—may not include efforts that are directed toward local rather than federal officials." *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988). And Grewal testified that New Jersey federal officials (including Menendez) "carry a lot of influence in the state," "you don't want to upset" them, and it is good to "have the support of [these officials.]" (Tr. 2711, 2752.)

Moreover, assuming *arguendo* that the call or meeting are not official acts themselves, they are strong evidence of *an agreement* to perform an official act. *See McDonnell*, 579 U.S. at 573 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act."). Along with the record evidence discussed below, Menendez's call and meeting with Grewal "serve as evidence of an agreement to take an official act." *See id.*

### b.  *Quid Pro Quo*

The government presented ample evidence for the jury to conclude that Uribe, with assistance from Hana, paid for a new Mercedes-Benz for Nadine in exchange for Menendez's official acts (or promises to take official acts) to "stop and kill" the NJAG's prosecution of Parra and investigation into Peguero.

The evidence showed that by early 2018, Uribe had become increasingly concerned regarding Parra's case and the activity in the investigations into entities related to him and his family, including Phoenix and Peguero. Around that time, Uribe discussed these matters with Andy Aslanian, an attorney who represented Phoenix. (Tr. 2948, 2961.) Uribe testified that at that meeting, Hana—both a friend of Uribe and an officemate of Aslanian—overheard Uribe discussing his concerns, pulled Uribe into the hallway, and offered him a "way to make things go away," mentioning both Nadine and Menendez by name. (Tr. 2962.)

Soon after, Uribe organized a meeting between himself, one of his associates, Parra, and Hana. At that meeting, Uribe testified that Hana reiterated that "he ha[d] a way to make this investigation, to . . . get a best resolution for Elvis and make all of this investigations [sic] stop and kill if he receive a sum of, somewhere 200 to $250,000." (Tr. 2968.) Uribe testified that Hana told him he would be in touch with Nadine and Menendez but did not explain exactly what "avenues . . . would be taken to execute the resolution of these cases." (Tr. 2968-69.)

As the year progressed, the NJAG continued to investigate Phoenix and Peguero and repeatedly attempted to schedule a meeting with Peguero. In October, Uribe wrote to Hana, asking him to "be sure that your friend knows about this." (GX 1303, row 54, GX E102-1; *see also* Tr. 2986 (Uribe testifying that "your friend" referred to Menendez).)

Hana responded that he would make sure. (GX 1303, row 55, GX E102-1.) In the fall, the judge presiding over Parra's case denied his motion to dismiss the indictment and set his trial date for the following April. (GX 1303, row 78, GX 4G-3; GX 1303, row 88, GX4G-4.)

On the evening of January 27, 2019, Nadine, Hana, and Menendez met at the Menendez home. (GX 1303, rows 285-87, 292-93, GX B105-32.) Later that night, Hana invited Parra to "have a drink tomorrow" with him and Uribe and asked Parra to call him. (GX 1303, row 294, GX C115-1.) The next day, Hana asked Parra to send him "that date in April and the name of the judge." (GX 1303, row 343, GX C115-2.) Less than thirty minutes later, Parra sent Hana a screenshot of an online profile of the judge presiding over his case. (GX 1303, row 345, GX C115-2, GX C115-B.) Hana forwarded this screenshot to Nadine within minutes. (GX 1303, row 349, GX C102-12, GX C102-F.) An hour later, Nadine and Hana spoke on the phone (GX 1303, row 352, GX 6A-112), and the next morning, Menendez called Nadine. (GX 1303, row 354, GX 6A-312-1.) Immediately after hanging up with Menendez, Nadine called Hana, who then asked Parra for his home address, which he passed back to Nadine. (GX 1303, rows 355-63, GX 6A-112, GX C115-3, GX B105-32.) Nadine responded, "Thank you now I need what the charges are." (GX 1303, row 364, GX B105-32.) Hana then immediately called her and also texted her Parra's case information. (GX 1303, rows 365-68, GX 6A-112, GX B105-32.) Nadine once again called Menendez. (GX 1303, rows 370, 373, GX 6A-206-1.) The very next day, Menendez made his first call to Attorney General Grewal. (GX 1303, row 379, GX 6B-2501.)

During the same period of time, Nadine was in need of a car, since her car had been damaged in an accident. (GX 1303, row 84, GX A109, GX A109-B.) In January, Nadine wrote to a friend to ask if she knew anyone that would give her a "good price on a [Mercedes-Benz] C 300." (GX 1303, row 149, GX B110.) She explained that "Bob and I went and test drove on Saturday but the prices are too high monthly to finance." (*Id.*) By March, Nadine still did not have a car. Uribe testified that he knew that Hana had promised her a car but had not followed through. (Tr. 3001.) As a result, Uribe began to call and text Nadine directly and in March, he told her that "[i]f the problem is the car, I will provide the car as long as [you] help me." (*Id.*) Uribe told the jury that Nadine had agreed. (Tr. 3002.) At that point, Uribe arranged for a friend at a Mercedes-Benz dealership to help Nadine get the Mercedes she wanted. (GX 1303, row 526, GX B209-13; GX 1303, row 561, GX A101-83.) In order to pay the deposit for the car, Uribe testified that he gave Nadine an envelope containing $15,000 in cash. (Tr. 3021, GX 1303, row 593, GXE105-1, GX E105-1T; GX 1303, rows 611-13, 620-21, 627-28, GX B209-13.) He did so because it "was [his] promise to her so she can get her car and she can comply with her part of the agreement." (Tr. 3025.)

On April 5, 2019, Nadine picked up the Mercedes and told Uribe, "I will never forget this." (GX 1303, row 656, GX B209-13.) Less than ten days later, Nadine informed Uribe that she "spoke to him yesterday and I know everything is going to be perfect. 2019 will be fantastic for all of us. God willing." (GX 1303, row 714, GX B209-13.) By May, Uribe had begun to make monthly payments on Nadine's car—paying through an associate, Fernando Barruous, so the payments would not be under his name. (Tr. 3041.) Uribe continued to make monthly payments on Nadine's car for the next three years—including during the time period when Menendez met with Grewal and Bruck in September 2019. (*See* Tr. 3039.)

On October 29, 2019, Uribe texted Nadine that he "just got a call and I am a very happy person" and "GOD bless you and him for ever." (GX 1303, rows 1118-19, GX B209-24.) The following week, Nadine, Menendez, Uribe and his brother went to a celebratory dinner together. (GX 1303, row 1128, GX E109-1, GX E109-A.) The very next day, Uribe told Nadine that he would "like to set [the monthly payments on her car] in auto pay." (GX 1303, row 1129, GX E101-2.)

Given the above sequence of events coupled with Uribe's testimony, there is sufficient evidence from which a jury was able to infer a "clear and unambiguous" *quid pro quo. See Benjamin,* 95 F.4th at 68; *Reichberg,* 5 F.4th at 249 (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions"). The timing and circumstances of the car payments coupled with Uribe's testimony that Nadine and Menendez had agreed to try to end the criminal case against Parra and the investigation into Phoenix and Peguero (Tr. 2927) were more than sufficient for the jury to infer a corrupt *quid pro quo.*

Indeed, the government introduced sufficient evidence for a reasonable jury to infer that Menendez knew that when he contacted Grewal, he was doing so in exchange for a benefit to Nadine. The government introduced evidence that from as early as January 2019, Menendez participated in Nadine's search for a new car, when the pair went together to test drive the Mercedes-Benz convertible she had her eye on. (GX 1303, row 149, GX B110.) Nadine also texted a friend that the monthly payments on this car were too expensive. (*Id.*) The next day, Menendez googled the price of the same model. (GX 1303, rows 172-74, GX A301-12.) In fact, just days after those searches, Hana texted Uribe to inform him that "bob he want have dinner with us tonight." (GX 1303, row 254, GX E102-3.) And when Uribe connected Nadine to his friend at the dealership, Nadine told Uribe she would "go with Bob and look at the cars." (GX 1303, row 536, GX E115, GX E115-A.)

The government also presented evidence that throughout 2019, Menendez knew that Nadine was meeting with Uribe. (*E.g.,* GX 1303, row 561, GX A101-83; GX 1303,

row 619, GX A105-E; GX 1303, row 922, GX A101-93.) And while Grewal testified that he told Menendez he could not talk to Menendez further about his office's pending cases, Uribe testified that Menendez nonetheless told him that his meeting with Grewal had been "promising." (Tr. 3140-41.) Menendez's clear mischaracterization of the meeting allowed the jury to reasonably believe Menendez intended to appease Uribe in order to ensure that Uribe would continue to pay for Nadine's car. In fact, Uribe testified that Menendez told him that Hana and Nadine had asked him to get a better resolution for Parra. (Tr. 3103-04.) Finally, Uribe further testified that he never mentioned the car payments to Menendez because he had no reason to doubt that Menendez knew about them. (Tr. 3107-08.) In sum, there is ample evidence for the jury to conclude that Menendez knew of these payments and that he was contacting Grewal to urge him to end the Parra and Peguero matters in exchange for those payments.

Hana contends that "the Government failed to prove beyond a reasonable doubt that Mr. Hana agreed with Mr. Uribe to commit a particular offense, namely to bribe Senator Menendez." (ECF No. 600 at 90.) To support that argument, Hana emphasizes that during that initial discussion outside of Aslanian's office, Hana did not "say exactly how he was going to make the case go away." (*Id.*) But again, that is not required under the law. *See Silver II*, 948 F.3d at 565-66 (noting a *quid pro quo* is sufficient even if "the separate questions of *how* [official] would influence those issues (which specific actions he would take), as well as the form the kickbacks would ultimately take (cash, meals, etc.), remain[] unspecified"). And while Hana asserts that "the evidence confirmed without question that Mr. Hana intended to agree with Mr. Uribe to hire [a new lawyer] for Mr. Parra, and nothing more" (ECF No. 600 at 96), the record belies that statement. For example, Uribe asked Hana—who agreed—to make sure that "our friend" (Menendez) knew about the investigation into Phoenix and Peguero. And when Uribe met with Menendez, Uribe testified that Menendez stated he "was asked by Will [Hana] and Nadine to get a better resolution" for Peguero and Parra. (Tr. 3104.) This evidence allowed the jury to reasonably infer that Hana did more than simply offer a new lawyer.

Hana next contends he "had nothing to do with buying a car for Nadine" and instead "that the promise and purchase of the Mercedes-Benz—the 'thing of value' in support of this scheme—came entirely from Jose Uribe." (ECF No. 600 at 93, 97.) The government, however, presented ample evidence of Hana's involvement in the purchase of the Mercedes. Uribe testified that Hana told him "he was going to buy . . . a car for Nadine." (Tr. 3001; *see also* GX C209-3 (texts from Hana to Daibes asking for help getting Nadine a car).) Moreover, when Uribe first introduced Nadine to his contact at the Mercedes dealership, Uribe was on the phone with Hana. (GX 1303, row 521, GX 6D-102-6; GX 1303, row 523, GX B209-13, GX B209-L.) Nadine also texted Uribe that "Will [Hana] said he was going to go with me today" to the dealership and she "didn't

want him to think [she] was going behind his back." (GX B2019-13.) In addition, Uribe testified that Hana gave him money for the car. (*See* Tr. 3078-80 (Uribe testifying that Hana was given money in his presence, which Uribe then took, telling Hana "I'm taking the cash . . . I, you know, I'm paying for this car . . . I'm making payments for Nadine's car.").).)[10]

### 5.  *The Daibes Federal Prosecution & Qatar Scheme*

Finally, defendants contend that the government failed to prove that Menendez agreed to perform any official act to benefit Daibes and Qatar in exchange for things of value. But a review of the record yields sufficient evidence for the jury to find that Menendez took or promised to take at least one official act and that he did so in exchange for things of value.

### a.  *Official Acts*

Menendez took an official act by recommending Philip Sellinger to the President for nomination to become the U.S. Attorney for the District of New Jersey to benefit Daibes and by promising to vote on a certain Senate resolution that benefitted Daibes and Qatar.

*First,* the evidence allowed the jury to find official acts related to an ongoing federal criminal prosecution of Daibes. In October of 2018, Daibes had been indicted for fraudulent lending by the United States Attorney's Office for the District of New Jersey. (GX 1401 at 1.) Menendez committed an official act by using his official position as a U.S. Senator to recommend a candidate to be nominated by the President to be the U.S. Attorney for the District of New Jersey who he believed would be favorable to Daibes. Deciding who to recommend to become the U.S. Attorney is undoubtedly a question or matter that came before Menendez in his role as the senior U.S. Senator from New Jersey. Menendez took a clear "decision or action" on that question or matter by recommending Sellinger, a person who, as explained further below, the jury could have reasonably concluded was expected to favorably resolve Daibes' criminal case, to the President to become the U.S. Attorney for the District of New Jersey. Defendants do not dispute that recommending a candidate to be a U.S. Attorney is an official act.[11]

---

[10] Hana contends that this exchange of money occurred "long after the events underlying the [g]overnment's theory of bribery." (ECF No. 622 at 38.) But that is not so. This exchange of money occurred "sometime in the fall . . . of 2019" (Tr. 3081), which is both only a few months after Uribe began making monthly payments on the car and at the same time as Menendez's meeting with Grewal.

[11] Menendez again contends that allowing this evidence violates his rights under the Speech or Debate clause. It does not. (*See infra* Section III.B.)

*Second,* the government similarly produced sufficient evidence to allow the jury to find that Menendez promised to take an official act with respect to Qatar. The jury saw evidence that after a Senate Resolution had been referred to the SFRC, Daibes sent Menendez a copy of this resolution and then later followed up with an article showing another Senator had joined as a cosponsor. Clearly the "question or matter" prong is satisfied; since Menendez was a U.S. Senator—and the chair of the SFRC—the resolution was properly before him for decision. And while the jury heard no evidence of any vote or action on the resolution, the timing and cadence of communications between Daibes and Menendez allowed the jury to reasonably infer that Menendez promised to take an official action favoring Qatar.

### b.   *Quid Pro Quo*

The jury had sufficient evidence to find that Menendez took or promised to take the above official acts in exchange for things of value, including cash and gold bars.

After then President-elect Biden won the 2020 election, Menendez began considering who to recommend to the President to become the U.S. Attorney for the District of New Jersey. The jury heard credible evidence that, as of mid-December 2020, Sellinger was Menendez's top choice for the job. (Tr. 3880-81.)[12] On December 15, 2020, Sellinger traveled to Washington D.C. to meet with Menendez to discuss the position. (GX 1304, row 32, GX 3A-17; Tr. 3609-11.) Just hours before that meeting, Menendez and Daibes spoke by phone. (GX 1304, row 31, GX 6A-615.) During his meeting with Menendez, Sellinger testified that Menendez informed him that "Fred Daibes had a case before the United States Attorney's office and Senator Menendez believed that [Daibes] . . . was being treated unfairly, and Senator Menendez hoped that if I became U.S. Attorney that I would look at it carefully." (Tr. 3612.) Two days later, on December 17, Sellinger called Menendez to inform him that while he "would look at all cases carefully," Sellinger had previously represented developers in a civil case adverse to Daibes such that were he to become U.S. Attorney, he might have to be recused but that the decision was not his to make. (Tr. 3623-24; GX 1304, rows 34-35, GX A119-A, GX 6B-501.) Four hours later, Menendez asked Michael Soliman, his primary political advisor, to research a different candidate for the position, Esther Suarez. (Tr. 3888-91; GX 1304, rows 36-37, GX A113-4, A113-PH4.)

After Suarez's candidacy stalled, the jury learned that Menendez returned to Sellinger and recommended him to President Biden—but only after Menendez was informed by Soliman that Sellinger wanted Menendez to know that he had "checked

---

[12] While Senator Cory Booker also had control over who to nominate, Michael Soliman testified that Senator Booker would defer to Menendez's choice. (Tr. 3877-78.)

with Main Justice and that in fact he did not have to recuse himself from an issue," which Soliman understood to be the then-pending criminal prosecution of Daibes. (Tr. 3935-36, 3939.) Soliman then relayed this message to Menendez, telling him that "I think if you call Sellinger, you'll be comfortable with what he says." (GX 1304, row 80, GX 113-8, GX A113-PH8.)[13] Menendez then put forward Sellinger as his recommendation to the President for nomination to the position of U.S. Attorney for the District of New Jersey.

Meanwhile, in the summer of 2021, Menendez spoke with Sheikh Sultan bin Jassim al Thani, a member of the Qatari royal family and a principal at Heritage Advisors, and forwarded him Daibes' contact information. (GX 1304, row 91, GX A112-PH1; GX 3A-8.) In the following days, Heritage arranged a meeting with Daibes. (*See* GX 1304, row 100, GX 4F-24.) On June 29, 2021, Daibes informed Menendez that al Thani was coming to meet Daibes the next day; Menendez offered to call al Thani before the meeting. (GX 1304, rows 106-07, GX D101-4.) Following that meeting, Heritage and Daibes began negotiating a deal between their companies, in which Heritage would invest $95 million in one of Daibes' real estate developments. (*See* GX 1304, rows 114-15, GX D308, GX 4F-26; GX 4F-17.) In July, with negotiations underway, Daibes informed Ali Al Thawadi, a Qatari official associated with Heritage, that their "mutual friend" would be issuing a statement in favor of Qatar. (GX 1304, row 118, GX 3D-1.) One week later, Menendez released a press release praising Qatar for its humanitarian aid to Yemen and immediately sent it to Daibes, who immediately forwarded it to Al-Thawadi. (GX 1304, rows 120-25, GX A104-2, GX 3D-5, GX 4F-19.) Daibes then texted Menendez on WhatsApp, "[t]hank you" with an emoji and smiley face. (GX 1304, row 127, A104-EX.) In August, Menendez issued another statement praising Qatar, which he once again immediately sent to Daibes. (GX 1304, rows 135-36, GX A104-3.)

---

[13] Sellinger testified that, on that call, he told Soliman he "intended to follow the DOJ process to disclose [his] prior adverse representation to Mr. Daibes and that the Department of Justice . . . would make the determination as to whether [he] should be recused." (Tr. 3634.) Daibes contends that because Soliman and Sellinger gave differing accounts of this conversation, the jury cannot possibly credit Soliman's version of events, which was that Sellinger did not have to be recused. That is not so. "[C]ourts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility." *Ferguson*, 246 F.3d at 133. It is only in exceptional circumstances, such as when testimony is "patently incredible or defies physical realities," that the trial judge may "intrude upon the jury function of credibility assessment." *Id.* at 133-34 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). That is not the case here.

In September, Daibes sent Menendez several photos of luxury watches and asked "[h]ow about one of these." (GX 1304, rows 160-62, GX A104-4, GX A104-B, GX 104-C.) Just two days later, Daibes sent Menendez a link to the Congress.gov page for Senate Resolution 390, a resolution "express[ing] appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge." (GX 1304, row 164, GX A104-4, GX 10G-1.) The link shows that the resolution had been referred to the SFRC. (*Id.*)

Ten days later, Menendez and Nadine traveled to Qatar and met with the Emir of Qatar. (*See* GX 1304, rows 165-68, GX A104-5, GX A104-D, GX 8J-1, GX 8J-2.) When they returned on October 17, 2021, the pair was picked up by Daibes' driver, John Pilot. (GX 1304, rows 169, GX A111-1, GXA111-PH1.) And while defendants contend otherwise,[14] the government provided ample evidence from which the jury could conclude that the very next day, Daibes gave Menendez and Nadine one or more gold bars. In particular, the government introduced cell site evidence and testimony that Menendez, Nadine, and Daibes were all at the Menendez home on the morning of October 18—the day after Nadine and Menendez had returned from Qatar. (GX 16C-2 at 17, Tr. 5442-44.) Later that morning, Nadine texted Daibes to say that "[t]he sweater looks great on you" and she regretted not taking a donut in the very beginning, further indicating that she had seen Daibes that morning. (GX 1304, row 178, GX D102-1.) That very day, Menendez, for the first time, Googled "how much is one kilo of gold" and "how much is one kilo of gold worth." (GX 1304, rows 176-77, GX A125.) The serial numbers of the gold bars recovered from the Menendez home match those of gold bars purchased by Daibes and listed in his inventory of gold. (*See* GX 1F-1164, GX 1F-1239, GX B201-1A, GX 3D-6.) From that point forward, Menendez continued periodically to Google the price of gold. (*See, e.g.*, GX 1304, row 191, GX A301-1 (November 20, 2021); GX 1304, row 198, GX A301-2 (December 13, 2021); GX 1304, row 209, GX A301-5 (December 18, 2021); GX 1304, row 241, GX A301-10 (January 29, 2022); GX 1304, row 252, GX A301-11 (March 6, 2022); GX 1304, row 342, GX A301-18 (May 26, 2022).)

A week later, Daibes sent Menendez a picture of a one kilo gold bar that shows a price of $59,431.20—a most perplexing message to send if the gold bar had been a gift from Daibes, as Menendez contends. (*See* GX 1304, row 181, GX A111-1, GXA111-PH1.) And when Menendez disclosed his possession of gold to the Senate Ethics Committee,

---

[14] Menendez contends "there is *zero* evidence that Daibes provided Senator Menendez with gold at that time," pointing to the lack of "witness[es], surveillance, or document[s] showing a delivery of gold." (ECF No. 623 at 20.) But "bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *Friedman*, 854 F.2d at 554. The jury, however, may make reasonable inferences from the evidence. And based on the evidence presented at trial, the jury was able to reasonably infer that Daibes gave Menendez and Nadine gold around this time.

he stated falsely that Nadine had "entered the marriage with the gold bullion" (Tr. 5279)—essentially the same lie Nadine told Vasken Khorozian when selling the gold through him. (*See* Tr. 5090-93.)

On December 16, 2021, Sellinger was sworn in as the U.S. Attorney and within the week was notified by the Department of Justice that he was recused from the Daibes prosecution. (GX 1304, row 199, GX 1401 at 4; GX 1304 row 210, GX 8M-1.) Nevertheless, in March 2022, even though Menendez knew Sellinger would not be involved in the Daibes prosecution (*see* GX 1304, row 230, GX A301-7), he asked Soliman to meet with Sellinger to tell him to "give Mr. Daibes all due process," because the U.S. Attorney's Office was being "unresponsive to Mr. Daibes' counsel." (Tr. 3946-47.) However, at the meeting between Soliman and Sellinger, Sellinger shut down any opening for Soliman to pass along that message from Menendez, telling Soliman that he was not allowed to discuss business of the United States Attorney's Office with representatives of federal elected officials and he would have to disclose any attempts at such communication. (Tr. 3833-34.) The jury learned that after that meeting, Menendez refused to attend and speak at Sellinger's investiture, telling Sellinger that "the only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship with the United States Attorney, and you don't." (Tr. 3834.) Around this time, Nadine informed Daibes that Menendez was "FIXATED" on Daibes' upcoming trial. (GX 1304, rows 213-14, GX D102-2.) Daibes responded that he "d[idn't] want [Menendez] to be upset over it" and "[t]his is not his fault he was amazing in all he did he's an amazing friend and as loyal as they come." (*Id.*)

On January 21, 2022, Menendez learned that Vikas Khanna was the First Assistant U.S. Attorney and thus would be in charge of Daibes' case in Sellinger's place. (*See* GX 1304, rows 229-30, GX A301-6, A301-7.) That same day, Nadine called Daibes. (GX 1304, row 233, GX 6A-615.) The very next day, Daibes' driver, John Pilot, called Nadine. (GX 1304, rows 234-36, GX 6A-615.) Less than two hours later, Nadine wrote Daibes, "Thank you. Christmas in January." (GX 1304, row 237, GX D102-11.) Within hours, Menendez called Khanna. (GX 1304, row 238, GX 6A-616; GX 6B-1810.) Five days later, Menendez again Googled the price of gold. (GX 1304, row 241, GX A301-10.)

Menendez was able to speak with Khanna approximately a week later. (GX 1304, row 242, GX 6B-1810.) On that call, Menendez congratulated Khanna on his new role as First Assistant and told him he would be working with some great lawyers, including, specifically, Daibes' counsel. (Tr. 4997.) As soon as the call with Khanna ended, Menendez called Daibes. (GX 1304, row 243, GX 6A-820-1.)

This series of events—supported by ample record evidence—supports the jury's finding of a corrupt *quid pro quo*. For example, the timing of and context around Menendez's flip-flop on Sellinger allows the jury to infer corrupt intent. *See Calk*, 2022

WL 101908, at *2 ("The timing and circumstances of each loan"—including quick changes of course—"was sufficient for the jury to infer [defendant's] corrupt intent").

Menendez asserts that his searches for the value of gold "cannot sustain the weight the government gives [them]" because "they cannot be tied close in time to any gift provided to Nadine." (ECF No. 592 at 15-16.) In support of this argument, Menendez relies on *United States v. Bongiovanni*, a recent decision from the Western District of New York that granted the defendant's Rule 29 motion and vacated his bribery conviction. No. 19-cr-227, 2024 WL 3487914 (W.D.N.Y. July 19, 2024). But that case bears little resemblance to this one. There, the court determined that there was no "temporal connection" between the cash payments in exchange for helping an individual and a "Gentlemen's Club" avoid drug charges. *Id.* at *3, *8. Here, as the government points out, Daibes gave several envelopes of cash, at least thirteen gold bars, and participated in the delivery of three bribery payments from Hana to Menendez, among other things. Moreover, Daibes made these deliveries *during the course of the scheme*—not years removed, as was the case in *Bongiovanni. See id.* at *8.

## B. The Evidence Was Sufficient to Prove That Counts 1 and 2 Were Each Single Conspiracies.

Counts 1 and 2 of the S4 Indictment charged defendants with conspiracy to commit bribery and conspiracy to commit honest services wire fraud, respectively. Prior to trial, defendants each moved to dismiss these counts as duplicitous. Specifically, they contended that Counts 1 and 2 each charged all defendants with separate, distinct schemes, rather than one overarching conspiracy. The Court denied the motions to dismiss Counts 1 and 2 as duplicitous on the grounds that "[e]ach of these counts clearly alleges a single conspiracy." (ECF No. 344 at 57.) Proving the conspiracy, however, was a burden for the government to meet at trial. (*See id.*)

At trial, the government proceeded with its theory of a single conspiracy. At defendants' request, the Court instructed the jury on multiple conspiracies and unanimity of theory. (*See* Tr. 7146-49 (Jury Charge).) After deliberating, the jury found defendants guilty on all counts. (*See* ECF No. 511.)

Now, Hana contends that the government failed to introduce sufficient evidence to support defendants' conviction of a single overarching conspiracy. At the very least, he urges, there was a variance between the allegations in the indictment and the evidence at trial, and this variance was prejudicial, necessitating a new trial. Hana further contends that, as a result of the government's "improper charging strategy," his trial was wrongfully joined with his codefendants, also requiring a new trial. (ECF No. 600 at 146.) As set forth below, these arguments are unavailing.

"Whether the government has proved a single or multiple . . . conspiracies is a question of fact for a properly instructed jury." *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) (quoting *United States v. Sureff*, 15 F.3d 255, 229 (2d Cir. 1994)). Importantly, defendants do not challenge the propriety of the Court's instructions in this regard. Rather, Hana challenges the sufficiency of the government's evidence to prove Counts 1 and 2. As with all challenges to the sufficiency of the evidence, the Court "must view the evidence in the light most favorable to the government, . . . and construe all permissible inferences in its favor." *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (quoting *United States v. Heinemann*, 801 F.2d 86, 91 (2d Cir. 1986)). *See also United States v. Chartier*, Nos. 22-3125, 23-6080, 2024 WL 3617023, at *6 (2d Cir. Aug. 1, 2024) ("Because the jury was correctly instructed on this issue, its finding of a single conspiracy as opposed to multiple conspiracies must be affirmed so long as, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [a single conspiracy] beyond a reasonable doubt.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))).

"A single conspiracy may be found where there is '"mutual dependence and assistance" among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.'" *Vanwort*, 887 F.2d at 383 (quoting *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)). The government need only prove that "it reasonably could be inferred that [the defendants] participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)). "The members of the conspiracy do not have to 'conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member.'" *Vanwort*, 887 F.2d at 383 (quoting *Rooney*, 866 F.2d at 32). "Indeed, it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found . . . especially where the activity of a single person was central to the involvement of all." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (internal citation and quotation marks omitted). Ultimately, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *Vanwort*, 887 F.2d at 383 (quoting *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979)).

As one example, in *United States v. Orozco-Prada*, the Second Circuit upheld a jury's finding of a single conspiracy after the district court properly instructed the jury on multiple conspiracies. 732 F.2d 1076, 1086-87 (2d Cir. 1984). There, even though the defendant's contention "that there were two conspiracies . . . [was] plausible," it was

"not so compelling . . . to persuade [the court] that the jury had to accept it." *Id.* at 1087. "Th[e] evidence, though circumstantial, allowed the jury to infer that there was a single conspiracy and that [the defendant] was a participant in that conspiracy." *Id.* And that is the case here.

Hana asserts that the government "proved (at most) a set of disparate conspiracies between various [d]efendants and Senator Menendez, separated in time and in purpose." (ECF No. 600 at 138.) The government, however, introduced sufficient evidence to prove each defendant's membership in a single conspiracy.

*First*, Hana contends that the government did not introduce any evidence to show that Daibes was a co-conspirator in the Egypt scheme. But as detailed *supra*, the government introduced ample evidence of Daibes' willing participation in this scheme, including evidence that Daibes actually physically handed one of the bribe payments to Menendez. Moreover, the jury saw evidence that Daibes participated in sending information to Egyptian officials. Specifically, on September 17, 2019, Menendez sent Daibes the text of the Eastern Mediterranean Security and Energy Partnership Act of 2019. (GX 1302, row 1070, GX 3D-2.) Daibes then forwarded this email to Hana who then immediately sent it to General Helmy. (GX 1302, rows 1071-72, GX C419, GX C207-12.) This evidence is more than sufficient to show Daibes' awareness and participation in this scheme. *See Vanwort*, 887 F.2d at 383.

*Second*, Hana claims there was no evidence that he ever agreed "to do anything relevant to the alleged conspiracy to intervene in a [New Jersey] state criminal prosecution and a [New Jersey] state investigation." (ECF No. 600 at 138-39.) Uribe, however, testified that he worked with Hana to bribe Menendez to assist in resolving both matters. (Tr. 2926-27.) In fact, Uribe testified that Hana was the one who first approached him and offered him a "way to make" the NJAG's prosecution of Elvis Parra and the investigation into Ana Peguero "go away." (Tr. 2962.) Uribe further testified that he met with Hana and Hana told him he would be in touch with Nadine and Menendez to "make all of th[e] investigations stop and kill" for a "sum of, somewhere 200 to $250,000." (Tr. 2968.) The government introduced additional evidence of Hana's substantial involvement in the scheme. (*See* Section II.A.4.b.)

The government introduced evidence of Daibes' involvement in the New Jersey state criminal matters as well. For example, Hana twice asked Daibes for assistance in buying a car for Nadine. (GX 1303, row 386, GXC209-2; GX 1303, row 390, GX C209-3.) The government also introduced evidence of meetings between Hana, Daibes, and Menendez during this time period. (*See, e.g.*, GX 1303, row 396, GX C209-3.) And the jury saw evidence that when Nadine was not getting paid by Hana, she texted Daibes to have Hana leave a check for her in his apartment lobby. (*See* GX 1302 at 1098, GX D102-10.) This evidence is sufficient for the jury to conclude that Daibes was a member of the

charged conspiracy "with a consciousness of its general nature and extent." *Rooney*, 866 F.2d at 32.

*Finally*, Hana contends that the jury saw no evidence that he "had anything to do with either the intervention in Mr. Daibes's federal prosecution or his and Senator Menendez's interactions with Qatar," noting the government failed to show what Hana "could possibly have gained from either scheme." (ECF No. 600 at 139.) But the government introduced evidence that Hana and Daibes entered into a joint venture during the course of the scheme, intertwining their finances. Specifically, the jury heard testimony that Hana and Daibes "prospect[ed] certain locations" for joint real estate development work. (Tr. 749.) In May 2021, Hana and Daibes formed a joint venture to which Hana agreed to contribute $6,000,000. (*See* GX 3C-6.) In January of 2022, Hana purchased a 49% stake in one of Daibes' companies for $12,000,000. (GX 3C-7, GX 3C-8.) At the same time that Hana made these investments with Daibes, Menendez was taking steps to assist Daibes both by recommending that President Biden appoint a U.S. Attorney who Menendez believed would favorably resolve a pending federal prosecution against Daibes and by helping Daibes court Qatari investors. (*See supra* Section II.A.5.b.) A jury could reasonably infer that Hana was helping his business partner avoid imprisonment and secure more business. In addition, the government introduced substantial evidence of the close personal and business ties between Daibes and Hana. (*See, e.g.*, Tr. 787-88, 971, 5077, GX C409.) Ultimately, while Hana attempts to characterize this as a "rimless wheel," where the "spokes of [the] conspiracy have no knowledge of or connection with any other" (ECF No. 600 at 141-42), the evidence instead paints a picture of the three defendants operating in tandem over an extended period of time to effectuate a common goal.

In sum, the Court finds that there is sufficient evidence to support the jury's finding of a single conspiracy as charged in Counts 1 and 2, and thus there was no variance between the charges as alleged and the evidence introduced at trial. As a result, the Court need not reach Hana's contentions that any variance was prejudicial or that his trial was wrongfully joined with his codefendants.[15]

---

[15] Hana asserts that the Court's failure to use his proposed verdict sheet constitutes an independent basis for reversal. (ECF No. 600 at 150, ECF No. 622 at 48-49.) Specifically, Hana contends that special interrogatories for the conspiracy counts were required. That is not so. The jury was properly instructed on multiple conspiracies: "if you find that the specific single conspiracy charged in the count you are considering did not exist, you cannot find any defendant guilty of that conspiracy. This is so even if you find that some conspiracy, other than the one charged in the count you are considering, existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership." (Tr. 7148-49 (Jury Charge).) In light of this instruction, there was no need (and certainly no requirement) to use special interrogatories—and Hana cites no case which has held

**C.  The Evidence Was Sufficient to Prove That Menendez Acted as an Agent of a Foreign Principal and Menendez and Hana Conspired for Menendez to Act as an Agent of a Foreign Principal.**

Menendez and Hana challenge their convictions on the two counts brought under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611 *et seq*. Pursuant to 18 U.S.C. § 219(a), "[w]hoever, being a public official, is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938 . . . shall be fined under this title or imprisoned for not more than two years, or both." At trial, the jury found Menendez guilty of acting as an agent of a foreign principal while serving as a public official (Count 16). The jury also found both Menendez and Hana guilty of conspiring to have Menendez act as an agent of a foreign principal (Count 15).

Prior to trial, Menendez moved to dismiss these counts as unconstitutional as applied to him. (*See* ECF No. 120 at 35-37.) After extensive briefing, the Court rejected Menendez's arguments, holding that the enforcement of this statute against a member of Congress is not barred by the separation of powers doctrine. *See United States v. Menendez*, 720 F. Supp. 3d 301, 314-19 (S.D.N.Y. 2024). In his post-trial submission, Menendez reasserts his as-applied challenge (*see* ECF No. 592 at 37) but provides the Court with no cogent and compelling reason to revisit its earlier decision. *See United States v. Thorn*, 446 F.3d 378, 383 (2d Cir. 2006) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000))). Simply put, Menendez's reiterated constitutional challenge fails.

Now, Menendez and Hana principally contend that the government failed to introduce sufficient evidence for a reasonable jury to convict them of the FARA counts. However, there is ample evidence to support the jury's findings.

### 1.  *Acting as an Agent of a Foreign Principal (Count 16)*

To convict Menendez of acting as an agent of a foreign principal, the jury was required to find that (i) Menendez was a public official, (ii) he was acting or had acted as an agent of a foreign principal—namely, the Government of Egypt and Egyptian

---

otherwise. To the contrary, the Second Circuit has "commit[ted] the decision of whether and how to utilize special interrogatories in such cases to the broad discretion of the district court." *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992).

officials, and (iii) Menendez did so knowingly. (*See* Tr. 7124 (Jury Charge).) Defendants do not challenge the Court's instructions to the jury on this count.

Congress defined an agent of a foreign principal in two ways, as the jury was instructed. First, an agent of a foreign principal is anyone "who acts as an agent, representative, employee or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal" and who "(i) engages within the United States in political activities for or in the interests of such foreign principal; (ii) acts within the United States as a political consultant for or in the interests of such foreign principal; or (iii) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States." (Tr. 7125 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(1). Second, an agent of a foreign principal is "any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal." (Tr. 7125 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(2).

Menendez concedes that he engaged in political activities under FARA. (*See* ECF No. 592 at 35.) Both Menendez and Hana assert, however, there is no evidence that Menendez undertook any of these activities "at the order, request, or under the direction or control" of a foreign principal. Menendez further contends there is no evidence he "had knowledge of the foreign principal's directions and control." (ECF No. 592 at 36.) The government, however, adduced ample evidence from which the jury was entitled to conclude—as it did—that Menendez acted at the request or under the direction or control of Egypt and Egyptian officials and that he knew of that direction and control.

*First*, the jury heard evidence that in the spring of 2019 Menendez changed his public position to become decidedly less critical of Egypt than he was previously. (Tr. 4511-13.) Sarah Arkin, the SFRC deputy staff director responsible for the Middle East and North Africa policy portfolio (Tr. 4461), testified that prior to 2019, "the senator had been critical of the concerns about Egypt's human rights conditions . . . and the government's treatment of all of its citizens fairly and equitably and protection of civil and political rights." (Tr. 4510-11.) However, in the spring of 2019, Menendez informed her that he wanted to "take a different tactic and change [his] approach with respect to Egypt." (Tr. 4511-12.) After that point, Menendez made "fewer public statements specifically singling Egypt out on human rights concerns" (Tr. 4513) and had meetings with Egyptian officials about which he did not inform Arkin. (Tr. 4513-14.) This change in tactics overlaps with Menendez's introduction to, and meetings with, Egyptian

officials through Nadine and Hana. In early 2018, Menendez, at Nadine's behest, was introduced to General Shawky, the defense attaché from the Egyptian government. (*See* GX 3A-4; GX C102-2; GX 4I-2; GX A101-BB; GX 1430.) In May of that year, Nadine told Menendez that Hana and General Shawky had given her clearance for an unidentified project and asked Menendez to edit a letter that was to be sent from an Egyptian official to the United States government. (*See* GX B102-A.) The jury saw evidence that communications and meetings between Nadine, Hana, Menendez and Egyptian officials increased as time went on. (*See, e.g.,* GX 1302, row 44, GX A105-A; GX 1302, rows 56-60, GX A101-99; GX 1302, row 71, GX C102-2, GX C102-A; GX 1302, rows 212-221, GX 206-2T, GX A101-10, GX A101-EX3; GX 1302 at row 299, GX C206-3T, GX C206-B.)

Hana protests that there is no evidence that this "'tactical shift' [by Menendez] was the result of orders or requests originating from meetings involving Egyptian officials and conveyed by Mr. Hana." (ECF No. 622 at 42.) Hana is correct that the government did not introduce explicit evidence of such an order or request from Egyptian officials to Menendez. However, that is not surprising, considering that the government introduced evidence that the defendants were careful to not put the details of their scheme into writing or to discuss these topics in front of others. (*See* GX 1302, rows 660-61, GX A101-32 (Nadine telling Menendez that an Egyptian official "is still yelling at [Hana] for talking about Halal" during a May 2019 meeting); GX 1302, rows 1110-11, GX A101-55 (Nadine asking Menendez if she "should text [Daibes]" and Menendez responding, "No, you should not text or email").) Given the evidence of the nature and timing of Menendez's contacts with Egyptian officials, the jury was perfectly entitled to infer that Menendez became decidedly less critical and confrontational with Egypt at the request of Egyptian officials.

*Second,* the jury saw evidence that Menendez shared sensitive, nonpublic information about the number and nationality of staff at the U.S. Embassy in Cairo and that this information was conveyed to Menendez and then, almost immediately, relayed to Nadine, then Hana, and then transmitted to an Egyptian official. Specifically, immediately after a meeting between Menendez, Nadine, and Hana on May 6, 2018 (GX 1302, rows 87-93, GX B105-4), a Menendez staffer noted that Menendez was asking "how many Americans [are] posted to the embassy" in Cairo, and the staffer added, "Don't ask why I'm asking." (GX 1302, row 95, GX 8A-1.) Another staffer explained that to find out this information, he would "have to ask and then someone is going to ask why." (GX 1302, row 96, GX 8A-1.) The response was "Menendez is asking." (GX 1302, row 97, GX 8A-1.) This information was highly sensitive, nonpublic information. (Tr. 377-79.) The very next day, Menendez texted Nadine, informing her that "[t]his is what's at American embassy," with detailed information on the numbers of both the Americans and Egyptians employed there, along with their roles. (GX 1302, row 102,

GX A101-6.) Nadine immediately called Menendez, and as soon as they hung up, Nadine texted the same information in its entirety to Hana. (GX 1302, rows 103, 105-06, GX 6A-112, GX B105-4.) Hana confirmed receipt of the information and then immediately forwarded the information on to an Egyptian official. (GX 1302, row 127, GX C112-1.)

Menendez contends there is no evidence that this nonpublic information was ever requested by Nadine and Hana, but the jury was entitled to conclude that it most certainly was, based on the meeting between Hana, Nadine, and Menendez and the immediately following flurry of activity. While Nadine and Hana are not foreign principals themselves, that is not required under the law. Rather, FARA allows for an intermediary to make the request. *See* 22 U.S.C. § 611(c)(1). The evidence introduced at trial amply supports the conclusion that Nadine and Hana were acting under the supervision of Egyptian officials, particularly considering the fact that this nonpublic, sensitive information immediately found its way to the Egyptian government. Both the specificity of the information and the speed of the response support an inference that this information was requested by, and then received by, an agent of Egypt.

Grasping at straws, Menendez claims the jury heard no evidence that Menendez "was aware of any connection between Hana and Egypt, apart from Hana's contractual relationship as an approved certifier of halal meat exports." (ECF No. 592 at 35.) There is abundant evidence Menendez knew of Hana's deep and ongoing relationship with Egyptian officials, including with high ranking military officials. (*See, e.g.*, GX 1302, row 54, GX A101-5 (Nadine informing Menendez in February 2018 that she will arrange for introductions between Menendez and Egyptian officials from Hana's office); GX 1302, row 71, GX C102-A (photo of Hana attending meeting with Menendez, Nadine, and Egyptian officials); GX 1302, row 1218, GX A103-4 (Nadine texting Menendez about Hana: "I don't know what happened to [Hana] being so important and knowing everything in the [Egyptian] government, The government giving him a honeymoon and the government paving his roads and the government giving him the best apartment in Cairo.").)

*Third*, the jury heard evidence that Menendez helped Egyptian officials prepare for meetings with U.S. Senators. The jury heard evidence that Abbas Kamel, the Chief of Egypt's General Intelligence Service, met publicly with six U.S. Senators on June 22, 2021. (GX 1302, row 1208, GX 8F-13.) The night before that meeting, Menendez privately met with Kamel at his Washington D.C. hotel. (GX 1302, rows 1207, 1209-10, GX A103-16, GX B213-4, GX A103-21.) Following the meeting, Menendez sent Nadine an article highlighting a line of questioning Kamel was likely to face from Senators the next day regarding the possible involvement of Egypt in the murder of Jamal Khashoggi. (GX 1302, rows 1211-12, GX A103-4, GX A103-A, GX B213-4.) Nadine then immediately

forwarded this article to Mai Abdelmaguid, an Egyptian intelligence official in the Egyptian embassy in Washington D.C. and friend of Nadine (GX 1302, row 1212, GX B213-4.) Immediately, Abdelmaguid responded, telling Nadine that Menendez "had also raised it today" in their private meeting. (GX 1302, row 1213, GX B213-4.) Nadine wrote back to this Egyptian intelligence friend: "Wanted to give you a heads up so you can prepare your answers." (GX 1302, row 1214, GX G301-1.) This continues Menendez's pattern of taking actions that favored Egypt. Here, he is even assisting the head of Egyptian intelligence answer expected questions from U.S. Senators regarding Egypt's possible role in the murder of a journalist.

*Fourth*, the jury saw evidence that Menendez edited a letter that was to be sent on behalf of an Egyptian official. In May of 2018, Nadine requested that Menendez "fix this letter" so she could "prove a point to the General," presumably General Shawky, noting he and Hana had just given her "clearance for a project." (GX 1302, row 184, GX B102, GX B102-A.) Menendez then spoke with Nadine on the phone (GX 1302, row 185, GX 6A-112) and sent her a revised version of the letter. (GX 1302, row 186, GX A403.) While the sender and recipient are not identified, the letter is clearly written from the perspective of the Government of Egypt. (*See id.* (using "we" and "our" in reference to Egypt and its citizens).) Menendez asserts that "[n]othing about the request shows that anyone in the Egyptian government requested that Senator Menendez edit the letter." (ECF No. 592 at 36.) But it was fair for the jury to reject that competing inference.

*Finally*, the jury also saw evidence that an Egyptian official requested—via Hana and Nadine—that Menendez help resolve a lawsuit in Egypt's favor. In May of 2019, General Ahmed Essameldin Mohamed Helmy, an Egyptian official stationed at the embassy in Washington (GX 8A-12; GX 1302, row 1137, GX A101-58, GX A101-L), sent Hana a letter about settlement discussions in a lawsuit brought by an American citizen against the Egyptian government. (GX 1302, row 760, GX C207-7, C207-I.) In that letter, the American made clear that she was not accepting Egypt's settlement offer. (*Id.*) Shortly after sending the information, General Helmy wrote to Hana that "if the guy [i.e., Menendez] takes care of this thing through [Senator-1], he'll be settled in." (GX 1302, row 764, GX C207-7T.) Hana confirmed: "Roger that. Consider it done." (GX 1302, row 766, GX C207-7T.) A few days later, Hana sent information that he had received from General Helmy about the lawsuit to Nadine. (GX 1302, row 767, GX C102-7.) That same day, Nadine spoke to Menendez on the phone and, after they hung up, immediately forwarded him the same information about the lawsuit. (GX 1302, rows

777-78, GX 6A-112, GX A405.) The jury could fairly interpret this evidence as a request from the Egyptian government for Menendez to advance Egypt's interests.[16]

In sum, the jury saw evidence of a multitude of acts that the jury could reasonably conclude Menendez took for Egypt's benefit at the request of the Government of Egypt or its intermediaries.

Alternatively, Menendez may also be an agent of a foreign principal if he "agrees, consents, assumes or purports to act as, or . . . is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal." 22 U.S.C. § 611(c)(2). Menendez does not address this in his submission much less challenge the voluminous evidence to support a finding that he held himself out as an agent of Egypt. As but one example discussed *supra*, Menendez edited a letter written from the perspective of the Egyptian government, referring to Egypt and its citizens using first person pronouns. (*See* GX A403.) Nadine asked Menendez to edit this letter to "prove a point" to a high ranking Egyptian general (GX 1302, row 184, GX B102, GX B102-A)—a comment the jury could readily infer to mean that Nadine and Menendez intended to demonstrate his willingness to work on behalf of Egypt.

Among other evidence, the jury saw a text message from Hana to General Helmy, in which Hana wrote, "Our man is going to India after two weeks and is asking if we need any message or anything for ISEG." (GX C207-13T.) Nadine similarly wrote to General Helmy to tell him, "anytime you need anything you have my number and we will make everything happen." (GX B220-4.) And perhaps most incriminatingly, Nadine asked Hana and an Egyptian official—during a dinner Menendez attended—"[w]hat else can the love of my life do for you?" (Tr. 2126; GX 1G-6A to GX 1G-6N; GX 1302, row 682, GX C207-5, GX C207-5T.)

Ultimately, the government introduced sufficient evidence for the jury to conclude that Menendez acted as an agent of the government of Egypt either by (i) acting at the request of a foreign principal or its intermediary and engaging in political activities in the interest of Egypt within the United States or (ii) holding himself out to be an agent of the Government of Egypt.

---

[16] Hana contends that the jury would have to impermissibly speculate to conclude that this constitutes a request under FARA. (*See* ECF No. 622 at 44 n.12.) While a request must be more than an "ordinary solicitation," as Hana admits, it "can be less than an order or command." (*See* Tr. 7127 (Jury Charge).) And the jury could reasonably conclude that this communication properly constituted a request under FARA.

### 2. *Conspiracy to Have Menendez Act as an Agent of a Foreign Principal (Count 15)*

Hana also contends that the government failed to introduce sufficient evidence for a reasonable jury to convict him of participating in a conspiracy to have Menendez act as an agent of Egypt. The government, however, introduced ample evidence of Hana's involvement in this scheme. Indeed, the government's case was replete with evidence of communications between Menendez and Hana and meetings between Menendez, Hana, and Egyptian officials. Hana contends that he was meeting with Menendez as his elected representative, hoping Menendez "might be receptive to points of foreign policy that mattered to Mr. Hana." (ECF No. 600 at 125.) And from Menendez's side, this was run-of-the-mill "relationship building" between an elected official and a constituent. (*Id.* at 126.) Hana further urges there was no "reason to believe that he would have any sense that it was wrong to provide information he received from his United States Senator to contacts he had in his native land." (*Id.*) The jury was entitled to reject these improbable suggestions, using its common sense in light of the totality of the evidence. As the jury was instructed, a "conspiracy is[,] by its very nature[,] characterized by secrecy" and thus its existence may be inferred "from the circumstances of [the] case and the conduct of the parties involved." (Tr. 7132 (Jury Charge).) *See also United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) ("The existence of—and a particular defendant's participation in—a conspiracy may be established entirely by circumstantial evidence."); *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions.").

Although Hana contends that his actions were not taken on Egypt's behalf but instead were intended to further his own economic and personal interests, the numerous communications between Egyptian officials and Hana suggest otherwise. (*See, e.g.*, GX 1302, rows 412, 423, 592-93, GX C207-1, GX C207-1T, GX C207-4, GX C207-4T (calling General Helmy "boss"); GX 1302, rows 593-98, GX C207-4, GX C207-4T (Hana seeking directions from General Helmy about scheduling a dinner with Menendez); GX 1302, row 619, GX C207-4, GX C207-4T (Hana asking General Helmy if he needs anything); GX 1302, row 766, GX C207-7T (Hana responding to a request from General Helmy by saying "[r]oger that" and "[c]onsider it done").) Moreover, John Moldovan testified that Hana told him "his direct report was an individual by the name of General Ahmed," likely referring to General Helmy, and that Hana had daily calls with this general. (Tr. 723-24.) And ultimately, even if Hana stood to benefit from his actions, it does not mean he did not also take them at Egypt's direction.

40

In sum, the government introduced more than sufficient evidence to support Menendez and Hana's convictions on Counts 15 and 16.

### D. The Evidence Was Sufficient to Prove That Menendez and Daibes Conspired to Obstruct Justice and Menendez Obstructed Justice.

Menendez contends that the evidence was insufficient to convict him of any of the obstruction of justice counts, which are Counts 4, 17, and 18.[17] Daibes contends that the evidence was insufficient to convict him of Count 4, the single count concerning obstruction of justice with which he was charged. Both Menendez and Daibes seek the entry of a judgment of acquittal on Counts 4, 17, and 18 pursuant to Rule 29.

The clause of 18 U.S.C. § 1503 pertinent to defendants' challenge makes it a crime to "corruptly or by threats or force, or by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). This clause, known as the "omnibus" clause, "embraces the widest variety of conduct that impedes the judicial process." *United States v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018) (quoting *United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010)). The Second Circuit has articulated that

> [i]n order to convict for obstruction of justice under the omnibus clause of section 1503, the government must establish (1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, 'that the defendant corruptly intended to impede the administration of that judicial proceeding.'

*United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003)). "The government must show . . . that the defendant's conduct 'ha[d] the natural and probable effect of interfering with a judicial or grand jury proceeding.'" *Sampson*, 898 F.3d at 299 (quoting *Quattrone*, 441 F.3d at 171). Thus, to prove that the defendant acted with the necessary "wrongful intent or improper purpose," *Quattrone*, 441 F.3d at 170, the government must show that the defendant possessed "knowledge that his actions [we]re likely to affect the judicial proceeding," as absence of the same means that the defendant "lack[ed] the requisite intent to obstruct." *United States v. Aguilar*, 515 U.S. 593, 599 (1995).

---

[17] Counts 4 and 17 are counts of a conspiracy to commit obstruction of justice and Count 18 is a substantive count of obstruction of justice.

Both the mode of and the context for the defendant's conduct bear considerable weight in this analysis. The Supreme Court has distinguished between false testimony provided to an investigating agent, on the one hand, and false testimony or documents provided to the grand jury itself, on the other. Whereas "[c]onduct of the latter sort all but assures that the grand jury will consider the material in its deliberations," conduct of the former sort "falls on the other side of the statutory line" because "what use will be made" of such testimony "is far more speculative" and "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 601.

Thus, the Supreme Court has previously found that, to sustain a conviction pursuant to section 1503's omnibus clause, it was not enough to show that a federal judge lied to FBI agents about matters related to the FBI's investigation into an alleged conspiracy for which a grand jury had already been convened, despite that judge having been told by one of the agents that the grand jury had been so convened and that evidence from their conversation would be heard by the grand jury. *Id.* at 595-97, 600-01. In a similar vein, the Second Circuit vacated a conviction for conspiracy to commit obstruction of justice pursuant to section 1503's omnibus clause where the defendant had "initiated a meeting with the federal investigators and prosecutors that had served him with a federal grand jury subpoena for his documents" before allegedly lying to them. *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002).

Courts have found that it is far easier for the government to make the showing that conduct concerning a grand jury subpoena had the natural and probable effect of interfering with a grand jury proceeding. Where there is a grand jury subpoena, criminal liability may exist in cases "where the defendant has notice that his wrongful conduct will affect the administration of justice, because false information will be provided to a grand jury or otherwise pertinent information known to be called for by a grand jury may be placed beyond its reach." *Quattrone*, 441 F.3d at 171. Thus, the Second Circuit has found that "[a] defendant's awareness that a subpoena seeks documents, coupled with his actions taken to place those documents beyond the grand jury's reach clearly would meet the hemming function of the nexus requirement." *Id.* This is so even if the defendant does not "read the grand jury subpoena or know its precise contents; it is enough if he knows that a subpoena calls for a category of documents, or even one particular document, and then takes steps to place those documents beyond the reach of the grand jury." *Id.*

Although Menendez urges that the government has not adduced sufficient evidence that he had a corrupt intent to obstruct a judicial or grand jury proceeding, in fact, the government adduced substantial evidence to establish his corrupt intent.

Starting with the grand jury proceeding central to Counts 17 and 18, it is clear that each of the three elements required to prove a violation of section 1503's omnibus clause was satisfied in the course of this trial. The government presented evidence indicating that Menendez learned about the federal grand jury investigation on June 16, 2022, when his cellphone was seized from him pursuant to a search warrant. (GX 1435; GX 11A-1.) He was served with a grand jury subpoena that very same day, the first of four he would receive (the others being dated November 22, 2022, May 11, 2023, and June 6, 2023). (GX 11A-1; GX 11A-2; GX 11A-3; GX11A-4.)

Thus, as an initial matter, there can be no question that the first and second elements of a section 1503 omnibus clause conviction were satisfied—a federal grand jury proceeding was ongoing, and Menendez knew of it.

Nor is there any question that the third element was satisfied. At trial, the jury heard that Uribe and Nadine met approximately one month after the initial grand jury subpoena was served on Menendez and specifically discussed the grand jury subpoenas they each had received. (Tr. 3161-66.) Uribe testified that at the meeting, he had devised a story to "cover up [his] wrongdoings" in the event that law enforcement asked him about the payments he had made for Nadine's Mercedes-Benz. (Tr. 3166.) The cover story, which Nadine told Uribe she thought "sounds good," was that those payments were a loan for "a good friend,"—i.e., Nadine—who "was in a financial situation, that I was helping a friend until she is financially recovering and was able to pay me back." (Tr. 3165.)

Furthermore, the jury learned that Nadine and Menendez worked together to substantiate that fabricated cover story that the money Nadine had received from Uribe was a loan. To do so, Menendez, with Nadine, sought to return to Uribe the bribe money he had paid to Nadine to obtain the Mercedes. Specifically, in December 2022, Menendez wrote Nadine a check for $23,000 with the contrived memo line "for car payment." (GX 3B-1 at 6.) And Nadine then wrote Uribe a check for $21,000 with the false notation "personal loan." (Tr. 3167-68, GX 3B-1 at 9.)

A similar procedure was followed in December 2022 for the mortgage payments Nadine had received from Hana in 2019. There, Menendez wrote Nadine a check for $23,569 (i.e., the sum that Hana had paid to Nadine's mortgage to avoid foreclosure in 2019), with the memo line "To Liquidate Loan." (GX 3B-1 at 1.) Nadine then wrote a check for $23,568.54—the amount of the mortgage payment—to Hana's lawyer in trust for Hana, with the false memo line, "Full Payment of Wael Hana loan." (GX 3B-1 at 4-5.)

Menendez's creation of documents that would be funneled into the response to a grand jury subpoena is a paradigmatic example of transmitting false information to the grand jury in a manner that unquestionably meets *Aguilar*'s nexus requirement of having the "natural and probable effect" of impeding a grand jury proceeding. Given

that there was an ongoing grand jury investigation of which Menendez most certainly had both knowledge and notice, he had every reason to believe that payments to key players in his bribery scheme—Uribe and Hana—would be scrutinized by the government and put before the grand jury. Indeed, the Second Circuit has previously affirmed a conviction for obstruction of justice in which a defendant deleted documents *before* they were sought by any grand jury subpoena, even though "at no time did [the defendant] delete a document for which there was an outstanding subpoena." *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 168 (2d Cir. 2008) (emphasis added). This is because "[a]s a necessary consequence of its investigatory function, the grand jury paints with a broad brush," *id.* (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991)), so "the inference that the grand jury would issue a subpoena for [particularly relevant documents that the defendant deleted] was quite strong, perhaps inescapable." *Triumph*, 544 F.3d at 169.

Thus, Menendez's creation of false documents very likely to be sought by a grand jury subpoena is enough by itself to satisfy the third element of a conviction pursuant to section 1503's omnibus clause. But the jury was entitled to infer the even stronger fact that Menendez, unlike the defendant in *Triumph*, participated in submitting false documents in direct response to an outstanding subpoena. Nadine produced these checks—each of which had a false and misleading memo line describing the payments—in response to a later grand jury subpoena issued in 2023. (*See* GX 1409; GX 11B-3; GX 3B-1.) At trial, the government presented voluminous evidence—hundreds, if not thousands, of texts, emails, and telephone calls—that indicated that Menendez was significantly involved in all aspects of Nadine's daily life. From that evidence, the jury was entitled to draw the reasonable inference that Menendez participated in Nadine's production of the checks in response to the grand jury subpoena to her. Thus, Menendez may be deemed to have "deliver[ed] false documents . . . to the grand jury itself" through or in concert with Nadine, which is the very type of act that *Aguilar* identifies as conduct that the grand jury will surely consider and which therefore has the natural and probable effect of interfering with an ongoing grand jury proceeding. *See Aguilar*, 515 U.S. at 601. Indeed, the documents concerning the payments from Uribe for the Mercedes and from Hana for Nadine's mortgage "were not peripheral documents" but were "at the very core of the transaction the government was investigating." *Triumph*, 544 F.3d at 169. And ineluctably, at the very core of the obstruction of justice investigation.

Thus, the Court finds that there was sufficient evidence for a rational trier of fact to find Menendez guilty of Counts 17 and 18.

The analysis is very similar for the judicial proceeding captured by Count 4, which charged Menendez and Daibes with conspiracy to commit obstruction of justice as to the criminal prosecution of Daibes in the District of New Jersey.

At trial and as detailed *supra* (*see* Section II.A.5.b), the jury was presented with evidence from which it was able to conclude that Daibes paid things of value to Menendez in exchange for Menendez's promise that he would take official acts to help favorably resolve Daibes' ongoing federal criminal prosecution in New Jersey. The jury also heard extensive evidence related to Menendez's dissatisfaction with how the New Jersey U.S. Attorney's Office was handling Daibes' criminal case and the apparent emphasis Menendez placed on Daibes' criminal case when deciding who to recommend to be the next U.S. Attorney for the District of New Jersey. (*See* Section II.A.5.b.)

Indeed, the jury was entitled to conclude that Menendez only recommended Sellinger because he thought, incorrectly as it turned out, that Sellinger did not have to be recused from Daibes' case and would be able to participate in a favorable resolution of it, and that Menendez's subsequent chilling reception to Sellinger's request that he attend and speak at Sellinger's investiture was a direct response to realizing that an essential reason for Menendez's recommendation of Sellinger—favorable action by Sellinger on Daibes' pending criminal prosecution—would not come to fruition due to Sellinger's recusal.

As with the grand jury proceedings, it is very clear that the first two elements for a conviction pursuant to section 1503's omnibus clause were satisfied: there was a pending judicial proceeding constituting the administration of justice—here, Daibes' criminal case in the District of New Jersey—and that both Menendez and Daibes knew about the proceeding.

As to the third element, Menendez's actions here would properly be said to have the "natural and probable effect" of obstructing justice. There is evidence which indicates that Menendez made very clear to Sellinger before recommending him, and indeed even after Sellinger became U.S. Attorney and was recused from the case, that he thought Daibes was being treated unfairly and should be given special attention. Menendez knew that, as the senior U.S. Senator from New Jersey, he had significant influence in Sellinger being nominated by the President, and that Sellinger, if subsequently appointed U.S. Attorney, would have significant influence over the decisions of the office. Thus, Menendez knew that his recommendation of Sellinger was likely to obstruct justice by his improperly attempting to secure a favorable disposition of an ongoing judicial proceeding.

Menendez contends that this is simply "the fulfillment of [his] constitutionally protected advice and consent role," and analogizes it to a hypothetical in which a Senator believes that her state's U.S. Attorney's office over-prosecutes marijuana

offenses and so justifiably asks potential candidates whether they are against imprisonment in marijuana cases. (ECF No. 592 at 41-42.) The critical defect in Menendez's analogy is that the hypothetical Senator, unlike Menendez, was not acting to fulfill her end of a corrupt bribery agreement. As the Second Circuit has articulated, a defendant's endeavor to persuade a prosecutor "to be lenient" with an individual in a criminal matter "was corrupt because it was a fraud" under the rationale that "it is as 'corrupt' to persuade a public officer by lies as by bribes." *United States v. Polakoff*, 121 F.2d 333, 335 (2d Cir. 1941). Menendez's endeavor, with its impetus being bribe payments received by Daibes to favorably affect his criminal case, similarly qualifies as corrupt and as something of a far different stripe than Menendez's proffered analogy.[18]

Therefore, there was also sufficient evidence for the jury to find Menendez and Daibes guilty of Count 4's conspiracy to commit bribery charge. Thus, defendants' Rule 29 motions on each of the three counts related to obstruction of justice—Counts 4, 17, and 18—are denied.

### E. The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York.

The jury was properly instructed on venue and Menendez raises no objection to that charge. Specifically, the jury was instructed that if the government failed to prove venue as to each defendant on each count of the indictment, "you must return a verdict of not guilty as to that defendant on that count." (Tr. 7157 (Jury Charge).) Menendez now challenges not the instructions but the sufficiency of the government's venue evidence for Counts 1 to 16.[19] In so doing, Menendez "bear[s] a heavy burden," as "the reviewing court is required to draw all permissible inferences in favor of the government." *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)); *see also United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("We review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting every inference that could have been drawn in its favor." (internal quotations omitted)).

"[V]enue is *not* an element of any crime, so as to require proof beyond a reasonable doubt." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). Rather, "the government need establish it only by a preponderance of the evidence." *Tzolov*, 642 F.3d at 318

---

[18] Nor is Menendez's reliance on the Supreme Court's recent decision in *Fischer v. United States* appropriate, for that decision focused on the proper interpretation of 18 U.S.C. § 1512, not section 1503's omnibus clause. *Fischer v. United States*, 603 U.S. 480 (2024).
[19] Menendez does not present any argument regarding venue for Counts 6 or 12, which do not charge Menendez.

46

(citations omitted). When "a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge." *Davis*, 689 F.3d at 185.

To satisfy venue, a defendant must "be tried in the district where his crime was 'committed.'" *Tzolov*, 642 F.3d at 318 (citing U.S. Const. art. iii, § 2, cl. 3; *id.* amend. VI; Fed. R. Crim. P. 18). Where, as here, "a federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Id.* (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)).

To make that determination, a court must "'initially identify the conduct constituting the offense,' and then 'discern the location of the commission of the criminal acts.'" *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)). "Although statutory language necessarily informs the first step of the analysis, the Supreme Court has 'rejected a rigid "verb test"' that "unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed."'" *Davis*, 689 F.3d at 185 (quoting *United States v. Saavedra*, 223 F.3d 85, 90 (2d Cir. 2000)). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *Ramirez*, 420 F.3d at 138. By the same token, "venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Id.* at 141 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989)).

Importantly, "the law recognizes that not all crimes consist of a single, non-continuing act, so as to locate venue in a single district." *Davis*, 689 F.3d at 185. "The commission of some crimes can span several districts." *Id.* (quoting *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007)). In those cases, "Congress has instructed that venue properly lies in 'any district' in which the charged offense 'was begun, continued, or completed.'" *Id.* at 185-86 (quoting 18 U.S.C. § 3237(a)). Bribery, wire fraud, and extortion are all such continuing offenses. *See United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (treating bribery as a continuing offense); *Rutigliano*, 790 F.3d at 396 (treating wire fraud as a continuing offense); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) (Hobbs Act extortion is a continuing offense).

A "telephone conversation[]" can be a "crucial component[] of, not merely preparatory to, [a] bribery scheme." *Stephenson*, 895 F.2d at 874. In *Stephenson*, an export licensing officer at the United States Department of Commerce in Washington D.C. whose job it was to review and approve export applications was charged with bribery for accepting payments in exchange for approving certain applications. *Id.* at 869-70. While Stephenson never physically entered the Southern District of New York, the U.S.

Court of Appeals for the Second Circuit concluded that venue was proper in the Southern District of New York due to phone calls Stephenson had made into that District. *Id.* at 874-75. Specifically, Stephenson telephoned a company based in Manhattan to alert it to deficiencies in its export application. On that call, Stephenson exaggerated the seriousness of the deficiencies in its application and even warned the company of possible prosecution. *Id.* These calls "were designed to make [the company] so anxious to obtain Stephenson's 'help' that its officers would be willing to pay him a bribe." *Id.* at 875. Thus, the Second Circuit concluded, these calls "were part and parcel of the offense of demanding, seeking, and agreeing to receive a bribe." *Id.* (quotation marks and alterations omitted).

Indeed, actions that simply "lay the groundwork for [the defendant's] ultimate receipt" of a bribe payment can be sufficient to establish venue. *United States v. Gross*, No. 15-cr-769, 2017 WL 4685111, at *39 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019). In *Gross*, the head of a federal credit union based in New Jersey was charged with bribery for accepting payments in exchange for turning over control of the credit union to individuals based in Florida. *Id.* at *6. In assessing a post-conviction challenge to venue, the court found that venue was proper in the Southern District of New York due to, *inter alia*, emails that were sent in this District that "facilitat[ed] a key event" in the bribery scheme "that was to occur only weeks later." *Id.* at *38. Not only were these emails communications "essential to ensuring the success of the *key* event in the central quid pro quo arrangement," but they showed the defendant's "good faith efforts to demonstrate to [other members of the scheme] that he was actively working towards this goal—to lay the groundwork for his ultimate receipt of the largest bribe payment." *Id.* at *38-39.

Finally, although the in-district acts must be "'reasonably foreseeable' to a defendant" to make venue lie in that district, *Davis*, 689 F.3d at 186 (quoting *Rommy*, 506 F.3d at 123), the evidence need not show that a defendant "had actual knowledge that particular acts would occur in a particular district to support venue at that location." *Id.* As one example, a defendant received emails from his co-conspirator in a bribery prosecution while that co-conspirator was in the prosecuting district. *Gross*, 2017 WL 4685111, at *40. Although there was insufficient evidence for a jury to conclude that the defendant was aware that a particular email would be sent from within the district, "there was evidence that that [the defendant] knew that [a co-conspirator] . . . traveled to Manhattan at various times." *Id.* As a result, "[e]ven if it was not reasonably foreseeable that any one of these emails would be sent from Manhattan, . . . a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to [the defendant] that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from [the co-conspirator] while [the co-conspirator] was in this district." *Id. See also United States v. Baruch*, 550 F. App'x 30, 33 (2d Cir. 2013)

("The proximity of Manhattan to [the bordering district] and the conspirators' transfer of hundreds of thousands of dollars in cash admitted a preponderance finding that [the defendant] could reasonably have foreseen that his coconspirators transported at least some of the money at issue to [the bordering district] from Manhattan.").[20]

Because "venue must be proper with respect to each count," *Beech-Nut Nutrition Corp.*, 871 F.2d at 1188, the Court addresses each count in turn below.

### 1.  *Substantive Counts Related to Egypt (Counts 5, 7 & 8)*

Menendez challenges whether there was sufficient evidence from which a reasonable juror would be able to conclude that venue was proper for Counts 5, 7, and 8—the substantive counts of bribery, honest services wire fraud, and extortion under color of official right concerning the Egypt scheme.

Specifically, Count 5 charged Menendez with violating 18 U.S.C. § 201, which prohibits a public official from "directly or indirectly, corruptly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act" or "being induced to do or omit to do any act in violation of the official duty of such official person." 18 U.S.C. § 201(b)(2)(A), (C). In this count, the government charged—and the jury convicted Menendez of—demanding, receiving, or accepting a bribe in return for certain official actions to benefit the Government of Egypt and Wael Hana.

As noted above, bribery is a continuing offense such that venue is proper in any district in which the charged offense was begun, continued, or completed. 18 U.S.C. § 3237(a). Thus, venue is proper in any district in which Menendez began, continued, or completed demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an official act.

Count 7 charged Menendez, Hana, and Daibes with committing honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346. "The honest services [wire fraud]

---

[20] Menendez asks this Court to conduct a "substantial contacts" analysis. The Second Circuit has "'[o]n occasion . . . supplemented [its] venue inquiry with a 'substantial contacts' test that takes into account a number of factors,' including the 'site of the defendant's acts' and 'the locus of the effect of the criminal conduct.'" *Rutigliano*, 790 F.3d at 399 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)). "[H]owever, that inquiry is made only if 'the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *Id.* (quoting *Coplan*, 703 F.3d at 80). "In the absence of a showing of hardship, the substantial contacts test does not disturb the general rule that 'prosecution for a continuing offense, "committed in more than one district," may occur "in any district in which such offense was begun, continued, or completed."'" *Gross*, 2017 WL 4685111, at *37 (quoting *Rutigliano*, 790 F.3d at 399). Menendez makes no credible showing of hardship.

statute prohibits the use of the mail or the wires to further 'a scheme or artifice to deprive another of the intangible right of honest services.'" *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024) (quoting 18 U.S.C. § 1346). Specifically, the jury convicted each defendant of participating in a scheme to defraud the public by paying bribes to Menendez in exchange for Menendez taking or not taking certain actions benefiting Egypt and Hana that deprived the public of Menendez's honest services. Like bribery, wire fraud is a continuing offense. *See Rutigliano*, 790 F.3d at 396; *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001). "For a wire fraud charge, venue is established by showing that the defendant used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *United States v. Whitehead*, No. 22-cr-692, 2024 WL 3085019, at *3 (S.D.N.Y. June 21, 2024).

Count 8 charged Menendez with extortion under the Hobbs Act, 18 U.S.C. § 1951, which prohibits anyone from using one's position as a public official, or the authority of public office, to obtain money for oneself, or for another person, knowing the thing of value was made in return for official acts. In this count, the government charged Menendez with obtaining things of value from Hana and Daibes in exchange for certain official actions benefiting the Government of Egypt and Hana.

Hobbs Act extortion is also a continuing offense, *Smith*, 198 F.3d at 384, and "[v]enue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place." *Stephenson*, 895 F.2d at 875. Because the alleged acts here are a bribery scheme, the evidence that satisfies venue as to Count 5 may satisfy venue here as well.

As explained below, for each of these counts, the government introduced several pieces of evidence sufficient for a reasonable juror to conclude by a preponderance of the evidence that venue was proper in the Southern District of New York.

*First*, the government introduced evidence that on June 30, 2018, Menendez, Nadine, and Hana dined at Mr. Chow's, a restaurant located in midtown Manhattan. (GX 1302, row 251, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1; GX 1302, row 256, GX B105-10, GX B105-S.) Hana—via Andy Aslanian—paid for this dinner. (*See* GX 1302, row 258, GX 7B-2, GX 5E-101A.) While at that dinner, Hana sent a confidential WhatsApp message to General Shawky, the military attaché at the Egyptian embassy in Washington, scheduling a meeting for July 25th between Menendez and Egyptian officials. (GX 1302, rows 252-54, GX C206-3, GX C206-3T.) On July 26, the day following that meeting, Menendez sent a text message to Nadine instructing her to inform Hana that Menendez was "going to sign off" on certain military aid to Egypt. (GX 1302, row 320, GX A101-14.) This evidence provided the jury with a stable foundation from which to conclude that this dinner was part and parcel of Menendez seeking and agreeing to receive a bribe. Indeed, the jury was entitled to infer that this Manhattan meeting

"facilitate[ed] a key event" in the bribery scheme "that was to occur only weeks later" and exhibited Menendez's "good faith efforts" to act in Egypt's favor. *See Gross*, 2017 WL 4685111, at *38-39.

In addition, that Hana sent General Shawky a text from within the Southern District of New York satisfies the venue requirements for wire fraud. It entirely reasonable for a jury to conclude from the timing and location of this text that Hana and Menendez "used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *Whitehead*, 2024 WL 3085019, at *3. While it is true that the government introduced no evidence of what was discussed at the restaurant, Hana's payment for the dinner, his message to General Shawky from the restaurant during his meeting with Menendez, and the ensuing timeline provide a strong foundation from which the jury was entitled to conclude that the June dinner in this District was an essential piece of the charged conduct by laying the groundwork for the July meeting and Menendez's promise to approve of the military aid shortly thereafter.

*Second*, the government introduced evidence that Menendez, Daibes, and General Helmy met at the Lotte hotel in midtown Manhattan. (*See* GX 1302, rows 1082-87 and 1092-94, GX D101-1, GX B220-1.) The government also introduced evidence that Daibes texted Menendez to meet at a Starbucks location one block away from this hotel so they could go to the meeting together. (*Id.*) After this meeting, General Helmy informed Nadine that he "ha[d] been instructed from my boss in Cairo to start talks with [Daibes] regarding what was discussed in NY about Egyptian investments in USA," stating that he wanted to inform her because he "met [Daibes] through you and Bob." (GX 1302, rows 1130-31, GX B220-2.) Nadine responded, thanking General Helmy for his "honesty and loyalty." (*Id.*) In light of this evidence, Menendez's contention that this meeting "had nothing to do with the charged offense" is unpersuasive. (ECF No. 623 at 6.) And again, Daibes' text to Menendez while in this District is sufficient to establish venue for wire fraud.

Menendez's contentions that these meetings were merely preparatory are unavailing. Menendez relies on *United States v. Tzolov*, in which the defendant was charged with securities fraud under 15 U.S.C. §§ 78j(b) and 78ff—statutes that, unlike the bribery statute at issue here, carry their own venue provision. 642 F.3d at 318. Venue was found to be inadequate in *Tzolov*, where the government's "sole basis" for venue was the defendants' travel through an airport within the district. *Id.* Indeed, the evidence only showed defendants "going to [the] airport and boarding flights to meetings with investors," which "were not a constitutive part of the substantive securities fraud offense." *Id.* at 319. That is not the case here. The government provided the jury with far more evidence upon which to conclude venue was proper, including

two Manhattan meetings which the jury was entitled to find were "part and parcel of the offense of demanding, seeking, and agreeing to receive a bribe." *See Stephenson*, 895 F.2d at 875 (alterations and quotation marks omitted).

*Third*, the government introduced evidence that Nadine facilitated the sale in Manhattan of two gold bars Daibes gave her. Specifically, on March 31, 2022, Nadine went to Vasken Khorozian, a jeweler in New Jersey, to sell the gold. (Tr. 5063-64, 5092-93, 5098.) When meeting with Khorozian, Nadine told him that the gold had come from her family (Tr. 5092-93)—essentially the same explanation Menendez gave to Shannon Kopplin, the Chief Counsel and Staff Director on the U.S. Senate Select Committee on Ethics, in order to explain why he was newly reporting possessing the gold bars. (*See* Tr. 5211, 5275-79.) When Nadine said she wanted to go forward with the sale—even while acknowledging to Khorozian that she would lose money on it—Khorozian informed her that he would call a buyer in Manhattan and would go to Manhattan the following week to sell it. (Tr. 5090-98.) He then proceeded to call that Manhattan buyer with Nadine present and subsequently sold the gold bars in Manhattan. (Tr. 5090-93, 5098.)[21]

Menendez asserts that it was not foreseeable to him that the gold bars would be sold in New York. But hours before Nadine met with Khorozian, she texted Menendez asking him to call her. (GX 1304, row 273, GX B202-1.) And indeed, Nadine and Menendez spoke by phone just an hour before her meeting with Khorozian. (GX 1304, row 278, GX 6A-615.) Given this evidence, along with the fact that Menendez and Nadine both gave false statements concerning the origins of the gold bars and the evidence of Menendez's involvement in Nadine's daily activities, the jury was more than able to conclude that it was reasonably foreseeable to Menendez that the gold would be sold within this District. *See Davis*, 689 F.3d at 186 (actual knowledge not required).

Alternatively, Menendez challenges that "monetizing those bars into cash was not part of the extortionate scheme" and the scheme had already ended. (ECF No. 592 at 31-32.) But the jury was entitled to disagree, given the government's evidence that Nadine sold the gold, in consultation with both Menendez and Daibes, to repay her mortgage.

---

[21] For the reasons discussed *infra*, this call also satisfies the venue requirements of wire fraud, as Nadine caused Khorozian to use a wire to communicate with someone in the Southern District of New York. *See Whitehead*, 2024 WL 3085019, at *3.

(*See* GX 8K-1 (Kopplin advising Menendez on his reporting responsibilities if Nadine "use[d] the proceeds of the sale of the gold bars to repay a mortgage").[22]

*Fourth,* the government introduced evidence that upon return from their trip to Egypt and Qatar on October 17, 2021, Menendez and Nadine met Daibes' driver, John Pilot, at JFK airport (*see* GX 1302, rows 1248-52, GX 8J-1, GX 8J-2, GX 6A-615; GX A111-1), and then were driven back to their home in Englewood Cliffs, New Jersey.[23] Although Menendez suggests that "a $50 or $100 ride from the airport" is too little to be of value for purposes of the statute (ECF No. 623 at 7), nowhere in the statute does it require that a high value item be paid. *See* 18 U.S.C. § 201(2) (the provision of "anything of value" constitutes bribery). *See also United States v. Calk,* 87 F.4th 164, 183 (2d Cir. 2023) ("[I]t is enough if the item received was regarded as a benefit by the recipient, whether or not others might have taken a different view of its value.").

Menendez next contends that this was a "random car ride without any linkage to the substantive offense." (ECF No. 592 at 32.) But the jury was provided with sufficient evidence to conclude otherwise, given evidence that Pilot's fingerprints were found on an envelope bearing Daibes name and containing more than $9,000 in cash discovered in the Menendez home. (*See* Tr. 257-59; GX 1437; GX 1334.) Moreover, Daibes provided Nadine and Menendez with gold bars almost immediately after Nadine and Menendez returned from Egypt and Qatar and were driven through this District by Daibes' driver. (*See* GX 1302, row 1255, GX B208-2 (Daibes visiting the Menendez home the morning after this car ride); GX 1302, rows 1249-54, GX 6A-615, GX A125 (Menendez looking up the price of one kilo of gold that same morning).) The government also introduced evidence that a few months later, Pilot provided gold on behalf of Daibes to Nadine and Menendez—right after Menendez began researching the attorney overseeing Daibes' prosecution. (*See* GX 1304, rows 231-37, GX A301-7, GX A301-8, GX 6A-615, GX D102-11.)

In sum, the government introduced substantial evidence from which a jury was entitled to conclude that venue was satisfied by a preponderance of the evidence for Counts 5, 7, and 8.

_____

[22] *United States v. Mennuti,* which Menendez cites in support of his argument, is inapposite. In that case, the Second Circuit addressed when a conspiracy to commit mail fraud ends for purposes of statute of limitations. 679 F.2d 1032, 1033 (2d Cir. 1982). Moreover, the Second Circuit concluded that "a conspiracy continues until the conspirators receive their anticipated economic benefits." *Id.* at 1035.

[23] The jury was reasonably able to infer that a ride from JFK airport in Queens to Englewood Cliffs involved crossing through the Southern District of New York while en route.

2.  *Substantive Counts Related to the Daibes Federal Prosecution & Qatar Scheme (Counts 11, 13 & 14)*

Menendez similarly challenges the sufficiency of the government's venue evidence for Counts 11, 13, and 14. These counts charge Menendez with bribery, honest services wire fraud,[24] and extortion under color of right concerning acts in support of Daibes and Qatar, rather than Egypt.

Much of the evidence that allowed the jury to find venue for the Egypt charges supports venue for these counts, as well. First, the evidence of the ride from JFK airport to the Menendez home in Northern New Jersey that Daibes arranged for Menendez and Nadine applies to these counts, too. Specifically, Daibes arranged for Pilot to pick up Nadine and Menendez from JFK airport and drive them to New Jersey, after they had returned from their trip to both Egypt and Qatar. The jury was entitled to infer that this conduct related to these counts, as well. The same is true for Nadine's sale in New York of the gold bars that Daibes provided just two days after Menendez and Nadine returned from that trip.

Beyond that, the government introduced additional evidence that supports the jury's finding that venue is proper in the Southern District of New York for these counts. On September 19, 2021, Menendez, Daibes, and a Qatari official attended an event within this District. (GX 1304, rows 141, 144-47, GX A204-1, GX 4F-2, GX 4F-3.) Daibes was invited to this event by individuals connected to Heritage. (*Id.*) Hours before the event, Daibes sent his "bio" to a principal of Heritage. (GX 1304, rows 148, 150, GX 4F-29.) While at the event, Daibes attempted to call two individuals connected to Heritage. (*See* GX 1304, rows 156-58, GX D209, GX D210.) Just days after this event, Daibes sent a message to Menendez offering him luxury wristwatches. (GX 1304, row 160, GX A104-4, GX 104-B.) This evidence provides ample support for the jury to conclude that this meeting was "part and parcel" of the bribery scheme to benefit Daibes and Qatar.

Thus, the government introduced sufficient evidence for the jury to find that venue was proper in this District for these counts.

3.  *Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10)*

Menendez next challenges the jury's finding of proper venue for Counts 9 and 10, the substantive counts of bribery and extortion under color of official right—two of the

_____

[24] Count 13 charged Daibes with honest services wire fraud, as well.

same three crimes discussed above—concerning Jose Uribe and his associates. As explained earlier, venue is proper for these counts wherever Menendez began, continued, or completed the offense of demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an official act. And for the extortion count, because venue is proper wherever the bribery acts took place, the same evidence may suffice. *See Stephenson*, 895 F.2d at 875.

In support of venue for these counts, the government presented evidence that Nadine sent texts and made telephone calls that used cell towers located in this District.[25] Among these communications were Nadine's instructions to Uribe to meet with Menendez the evening prior to Menendez's meeting with then-New Jersey Attorney General Gurbir Grewal (*see* GX 1303, row 1035, GX B209-23; GX 16C-2 at 13), as well as Nadine's calls to Uribe and Menendez just hours after Menendez's meeting with Grewal. (*See* GX 1303, rows 1042, 1044-46, GX 8C-1, GX 6A-112; GX 16C-2 at 14.) Given this evidence, the jury was more than able to conclude that these communications were "crucial components" of the charged bribery scheme, in which Uribe was making payments on Nadine's Mercedes in exchange for Menendez using his influence to squelch the New Jersey state case against Uribe's associates. *See Stephenson*, 895 F.2d at 874.

Moreover, the jury was entitled to find that these communications were reasonably foreseeable to Menendez. The government introduced ample evidence that Menendez was intimately familiar with the details of Nadine's daily life and travel. Given this knowledge, the jury was able to conclude by a preponderance of the evidence that it was reasonably foreseeable to Menendez that, over the course of the bribery scheme and conspiracy, some essential communications would be sent by Nadine while in the Southern District of New York and using its cell towers. *See Gross*, 2017 WL 4685111, at *40.

In addition, the government presented evidence that Nadine deposited money she had received from Uribe into bank accounts in both New Jersey and on Long Island in the same day. (GX 1328, GX 5F-202.) Specifically, on April 6, 2019—just two days after Uribe gave Nadine $15,000 in cash (Tr. 3021; GX 1303, row 593, GXE105-1, GX E105-1T; GX 1303, rows 620-21, 627-28, GX B209-13)—Nadine made deposits in Englewood, New Jersey and Munsey Park, New York. (GX 5F-202.) The jury was entitled to infer that

---

[25] The evidence was that when someone is located along either side of the Hudson river, the cell site used may be on either side of the river, since signals carry farther over water than land. (Tr. 5435-36.) It is possible that Nadine was physically on the New Jersey side of the river when one or more of her calls were made, but the jury was certainly entitled to find by a preponderance of the evidence that she was located in Manhattan when the relevant call was made.

Nadine had traveled across this District with the cash to make the deposits, and Menendez was aware of her plans—indeed, the government introduced evidence that during this time, Menendez was regularly checking Nadine's location through the Find My Friends application. (*See* GX 1303, row 619, GX A105-E); *see also Gross*, 2017 WL 4685111, at *40 ("[A] reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to [defendant] that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails" from a co-conspirator in the prosecuting district when the government presented evidence that the defendant knew co-conspirator traveled to the district "at various times"). Moreover, contrary to Menendez's assertions, travel through this District with a bribery payment ostensibly to avoid detection is sufficient for venue. *See United States v. Shepard*, 500 F. App'x 20, 22 (2d Cir. 2012) ("[A] foray into Manhattan to avoid detection or conflict—and, thus, to continue the conspiracy—is sufficient to support venue in the Southern District."); *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("Even if the theft of the money from ATMs in Manhattan was a distinct conspiracy, its transportation from that borough to Brooklyn and Queens for transfer out of the United States was a necessary step in the challenged conspiracy sufficient to confer venue in the Southern District."); *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) ("[T]he course of the flight [carrying cocaine] carried the airplane over the Narrows, a body of water that lies within the joint jurisdiction of the Southern and Eastern District . . . was sufficient to make venue in the Southern District proper.").

### 4.  *The Conspiracy Charges (Counts 1, 2, 3 & 4)*

For conspiracy charges, "venue is proper in any district in which 'an overt act in furtherance of the conspiracy was committed.'" *Tzolov*, 642 F.3d at 319-20 (quoting *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008)). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Id.* "The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* "[P]roof of such activity in a district 'by any of the coconspirators' will support venue there as to all of them." *Shepard*, 500 F. App'x at 22 (quoting *Ramirez-Amaya*, 812 F.2d at 816). Ultimately, "venue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense." *Tzolov*, 642 F.3d at 320 (collecting cases).

### a.  *The Bribery Conspiracy Charges (Counts 1, 2 & 3)*

Counts 1, 2, and 3 charge defendants with conspiracies to commit the underlying offenses discussed above: bribery, honest services wire fraud, and—for Menendez—conspiracy to commit extortion under color of official right.

Menendez's only challenge to venue for these counts is that "none of those acts suffice for venue for the substantive counts, and thus they fail to prove venue for the conspiracy counts as well." (ECF No. 592 at 32.) But as explained above, the evidence was more than sufficient to support venue for each of the substantive counts. And in any event, Menendez concedes that "venue is more narrowly construed" on the substantive counts as compared to the conspiracy counts. (ECF No. 592 at 28 (citing *Tzolov*, 642 F.3d at 318-20.))

Indeed, the government introduced evidence of overt acts from each defendant in the Southern District of New York, including in-person meetings and dinners, telephone calls, and text messages. These suffice to support a finding of venue for these conspiracy charges.

### b. The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4)

The same is true for Menendez's challenge to the jury's finding of venue with respect to Count 4, which charged Menendez and Daibes with conspiring to obstruct justice in relation to Daibes' federal criminal case in the District of New Jersey. The government need only introduce evidence of "*any act*, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320 (emphasis added). Nadine and Menendez's car ride from JFK airport to Englewood Cliffs, New Jersey through the Southern District of New York that Daibes provided qualifies as an act that satisfies venue. Similarly, Nadine's sale of the gold bars from Daibes is any such act. (*See* GX 1304, row 270, GX D102-8 (Nadine texting Daibes "Vasken just called me. I'm going to meet him at 2 PM.").) Thus, venue is satisfied for this count.

### 5. The FARA Charges (Counts 15 & 16)

Finally, Menendez challenges the sufficiency of the government's venue evidence for Counts 15 and 16. Count 16 charged Menendez, as a public official, with acting as an agent of a foreign principal—Egypt and its officials—under FARA. *See* 18 U.S.C. § 219(a). Acting as an agent of a foreign principal is further defined in 22 U.S.C. § 611(c). The parties have not cited any prior court decision that analyzes FARA for purposes of venue, and the Court is not aware of any. Nevertheless, a plain reading of statute indicates that "the conduct constituting the offense," *Ramirez*, 420 F.3d at 138, for the purpose of venue includes: "engag[ing] within the United States in political activities for or in the interests of such foreign principal," "act[ing] as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal," "solicit[ing], collect[ing], disburs[ing], or dispens[ing] contributions, loans, money, or other things of value for or in the interest

of such foreign principal," "represent[ing] the interests of such foreign principal before any agency or official of the Government of the United States," and "agree[ing], consent[ing], assum[ing] or purport[ing] to act as . . . an agent of a foreign principal." 22 U.S.C. § 611(c)(1).

The government introduced ample evidence of these acts occurring in the Southern District of New York such that a reasonable jury could conclude venue was proper here. For example, the government introduced evidence that while at a dinner in midtown Manhattan, Hana texted General Shawky scheduling a meeting between Menendez and Egyptian officials. Given the other evidence, the jury was entitled to infer that this meeting was part of or constituted Menendez "agreeing" or "consenting" to act as an agent of a foreign principal. *See id.* § 611(c)(2).

Count 15 charged Menendez and Hana for conspiring to have Menendez act as an agent for Egypt. As explained above, any overt act in furtherance of the conspiracy in this District suffices. Menendez's challenge to this count fails.

## III. THERE WAS NO MANIFEST INJUSTICE ENTITLING THE DEFENDANTS TO A NEW TRIAL.

### A. The Use of Summary Charts and Summary Witnesses by the Government Was Proper.

Hana contends that the government's use of several summary charts—primarily GX 1302, GX 1303, and GX 1304—to present voluminous evidence to the jury was improper. Specifically, GX 1302 is a 97-page chart that places various government exhibits concerning the Egypt scheme in chronological order; GX 1303 is a 58-page chart that similarly lists certain government exhibits concerning the New Jersey state criminal matters; and GX 1304 is a 23-page chart that organizes certain government exhibits by date relating to Daibes' federal prosecution and Qatar.

GX 1302, 1303, and 1304 are all formatted in the same manner. At the top is a row that sets forth the date range the chart covers. (GX 1302-04; *see also* Tr. 1175.) Each chart is comprised of six columns, consisting of (i) a number that identifies the row, (ii) the date of the document or communication, (iii) the time of the communication in Eastern Time, (iv) who sent the communication, (v) who received the communication, and (v) a column entitled "detail." (*See* GX 1302-04). The detail column is populated with the type of communication (e.g., "text," "email," "WhatsApp," or "call") followed by a direct quotation, photograph, or other reproduction excerpted from the underlying exhibit or containing the complete exhibit. (*Id.*) The chart then identifies the underlying exhibit from which the quoted language or reproduction came by exhibit number. (*Id.*) Each chart and each underlying exhibit was admitted into evidence.

To introduce each summary chart, the government called an FBI Special Agent who was not involved in the underlying investigation of the defendants. (Tr. 1172, 2316, 4112.) Each agent explained that the government prosecutors had created each chart, including by selecting what documents were listed and what information from them was set forth in the chart. (Tr. 1173, 2316, 4113.) The FBI agent's role was simply to verify that all of the information in each chart was accurate, based on the underlying exhibits. (*See* Tr. 1173 (Agent Coughlin: "I reviewed the entirety of the document, reviewed the underlying government exhibits that the document is based on, so reviewed the contents of every line of the summary exhibit to determine its accuracy."); Tr. 1174-75, 2316-17, 4112-13, 4115.) As elicited during both direct and cross-examination, each agent explained that the decision as to which exhibits to include in the charts had been made by the prosecutors, not the agents. (Tr. 1174-78, 1570-71, 2318, 2559-60, 2650, 2667-71, 4113, 4220.) The agents testified that they had no knowledge of the facts of the case. (*See* Tr. 1570, 2316, 4112.)

Defendants objected to the introduction into evidence of the summary charts and certain of the underlying documents listed on each chart. (*See, e.g.*, ECF Nos. 406, 441.) After oral argument, the Court determined that the "format of [GX 1302] seems . . . quite appropriate, and there is nothing unusual about it. The items are certainly voluminous, and it seems to me, under [Rule] 1006, that the chart can be admitted." (Tr. 1012; *see also* Tr. 2312 (reiterating same).) To the extent there were evidentiary objections to the admission of specific underlying documents on each chart, the Court heard argument and ruled on the disputed documents. Because the witnesses each testified that they did not draft or otherwise decide what to include in the chart, the Court determined that the agents could not be cross-examined on what was not on the chart but could be cross-examined on anything that was on the chart. (Tr. 1501-03.) After the government's first summary witness testified, the Court—at Hana's request—broadened the scope of cross-examination to allow defendants to cross-examine the agents on exculpatory information contained in the underlying documents but not set forth in the excerpt from that document listed on the chart. "In other words, if the summary witness is questioned about document 12 and the government brings out something that helps it, on cross the defense can bring out material that's exculpatory on that document." (Tr. 2312.) During the defense case, defendants offered their own versions of these summary charts through their forensic accountant, which were admitted into evidence. (*See* Tr. 6079; DX 1302; DX 1303; DX 1304.) In these charts, defendants added and interwove their own entries, including approximately 163 new underlying documents, into the government charts, highlighted in yellow. (Tr. 6082-87.) The 163 underlying documents that were added by the defense were admitted into evidence as well (*id.*) and the witness was questioned by the defendants.

Hana once again challenges the use of the government's charts and the underlying documents. The Court concludes that the admission and use of the charts and underlying documents was appropriate.

### 1.   *The Use of Summary Charts in this Case Was Appropriate.*

When this action was tried in the summer of 2024, Federal Rule of Evidence 1006 provided that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006 (2011) (amended 2024).[26] The Second Circuit has "regularly affirmed the use of such charts." *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (quoting *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003)).

The evidence in this case was undeniably voluminous. GX 1302 alone summarized information from 5,840 pages of documents in addition to numerous phone records. (*See* ECF No. 409 at 4.) And each agent testified that he or she had reviewed hundreds if not thousands of documents in the process of verifying the information set forth on each chart. (*See, e.g.,* Tr. 1174, 2560, 4219.) The Second Circuit has determined that "it was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts in a complex fraud trial." *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020). That court has similarly approved the use of a summary chart for "hundreds of calls and text messages," *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020), and for "well over 100 telephone calls spanning three days between four individuals," *Blackwood*, 366 F. App'x at 212. The defense assertion that summary evidence was inappropriate in these circumstances is meritless.

### 2.   *The Format and Content of the Government's Summary Charts Were Proper.*

Hana next challenges the content and format of the government's summary charts. Specifically, he urges that the information on the summary charts was "cherry-picked" by the government to only show the jury "communications that were crucial to its case" and put them "outside their appropriate context." (ECF No. 600 at 22-23.)

"A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized . . . and must be 'based upon and fairly represent

---

[26] Effective December 1, 2024, Federal Rule of Evidence 1006 provides that "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a).

competent evidence already before the jury.'" *Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir. 1990) (internal citation omitted) (quoting *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977)).[27] "All that is required is enough explanation to allow the jury to see how the [entries] on a chart were derived from the underlying evidence." *United States v. Citron*, 783 F.2d 307, 317 (2d Cir. 1986). The testifying agents supplied that explanation and they were cross-examined by defense counsel.

Indeed, a "summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case." *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013) (internal quotation marks omitted). Ultimately, it is "well within the government's right" to "t[ake] evidence out of context to support [its] narrative." *United States v. Parnas*, No. 19-cr-725, 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022), *aff'd sub nom. United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023); *see also Ho*, 984 F.3d at 209-10 (rejecting argument that visual timeline should be precluded because it presented a "narrative supporting the prosecution's theory of the case").

Here, the government elicited sufficient testimony to lay the foundation for the admission of its summary charts. Each agent testified about the origins and accuracy of the charts. (*E.g.*, Tr. 1172-78, 2316-19, 4112-15.) Each agent made clear that the charts did not purport to present every piece of evidence in the case. (*See, e.g.*, Tr. 1174 ("Do you believe that you reviewed all of the documents in this case?" Agent Coughlin: "No."), Tr. 2317 ("Are all of the government's exhibits that you checked the summary documents against cited in the summary documents?" Agent Graves: "Not all of the information is cited in the summary document."), Tr. 4113-14 ("Do you believe that you've reviewed all of the documents that the others in the public corruption squad gathered in their investigation?" Agent Van Wie: "I have not.").) Each agent explained what each column represented on the chart and how it tied to the underlying evidence (by listing the exhibit number of the underlying document). And each agent testified that it was the prosecutors, not the agent, who decided which exhibits to include in the summary charts. (Tr. 1173-74, 2316-17, 4113-14.)

Given this, the government elicited more than sufficient testimony to tie the summary chart to the underlying evidence and to "fairly represent" the underlying evidence as well. *See Fagiola*, 906 F.2d at 57. Tellingly, a summary chart with a nearly identical format to the charts at issue here was recently admitted by another court in

---

[27] As noted above, the charts themselves as well as the documents underlying each chart were admitted into evidence. Indeed, Rule 1006 was amended effective December 1, 2024 in order "to clarify that a party may offer a Rule 1006 summary 'as evidence.'" Fed. R. Evid. 1006 advisory committee's note to 2024 amendment.

this District. *See Parnas*, 2022 WL 669869, at *7; *compare* GX 1302 *with* ECF No. 611-1 (summary chart in *United States v. Parnas*, containing date, from, to, and detail columns). Moreover, the Second Circuit recently upheld the admission of a summary chart that took the form of a visual timeline. *See Ho*, 984 F.3d at 209-10; (ECF No. 409-4 (summary chart admitted in *United States v. Ho*)).

For the same reasons, the summary charts cannot be said to contain any "annotation[s] or suggestion[s], even inferential, that may be considered argumentative." (ECF No. 600 at 20 (quoting *UPS Store, Inc. v. Hagan*, No. 14-cv-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017)).) These charts represented a subset of the underlying materials, arranged in chronological order. Indeed, the summary exhibits state the complete or excerpted content of messages, texts, and other documents and list the lengths of phone calls while clearly attributing them to the underlying evidence. It was "well within the government's right" to select and present evidence that would support its narrative. *See Parnas*, 2022 WL 669869, at *7. The fact that the government omitted documents and communications that the defense preferred be added to the chart does not mean that the summary is inaccurate or argumentative. In fact, the defense ably cross-examined the agents on those parts of the underlying documents that were not contained in the excerpts on the face of the charts and indeed, during the defense case, introduced their own versions of the charts with additional lines and underlying documents having been added by the defense.

At the end of the day, there is no reason to believe that the jury was left with a distorted view of the facts due to the content or format of the charts. The agents' testimony made clear what the charts were and what they were not: they summarized select exhibits chosen by the prosecutors and did not reflect the entire universe of evidence in this case. There is no indication that the jury believed otherwise. To the extent Hana believed that these charts presented a distorted view of the facts, he was free to create and introduce his own summaries—which he did. (*See* DX 1302, DX 1303, DX 1304.) The defense charts took the same form as the government's charts but wove in additional line items which the defense chose to present.

Finally, Hana urges that the summary charts allowed the government to "impermissibly pile[] one speculative inference on another" to establish the necessary elements of its case. (ECF No. 600 at 30.) To illustrate this point, Hana points out that GX 1334, a chart listing whose fingerprints were found on which exhibits and listed the fingerprints of Nader Moussa and Gazmend Lita—business associates of Hana—on two envelopes of cash found in the Menendez home, was used by the government to support an inference that Hana gave Moussa and Lita something of value, i.e., envelopes of cash, "to give to the Senator or Nadine in exchange for some unidentified act." (ECF No. 600 at 33.) Hana contends that it is an unsupportable inference for the

jury to infer from *the fact* that Moussa and Lita's fingerprints were found on envelopes of cash in the Menendez home to the conclusion that Hana had these two men—his business associates—deliver money to Nadine. To the contrary, such an inference is perfectly supportable from the known facts.

The facts here do not resemble the impermissible piling of indirect inference upon indirect inference that Hana claims is afoot. Rather, this inference is "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). Indeed, this inference builds upon several, concrete facts in the record and is perfectly permissible for the jury to draw. Hana's attempts to make out a case of "impermissible speculation" and "indirect inference upon indirect inference" are no more availing in the other examples he provides. (ECF No. 600 at 38-41, 41-43.)

### 3.    The Government's Summary Witnesses and Their Testimony Were Proper.

Hana contends the government's presentation of its summary evidence—through FBI agents who were otherwise uninvolved in the case—"unconstitutionally interfered with [his] ability to thoroughly cross-examine the witnesses against him." (ECF No. 600 at 44.) First, Hana contends that this Court "significantly constrained his ability to question the agents on the background and substance of the messages, and related communications that the Government deliberately chose to omit from its summary chart." (*Id.* at 48.) Going further, he urges that "by strategically selecting an unknowledgeable witness to read the results of the prosecutors' own determinations . . . the [g]overnment . . . deprived Mr. Hana of his Sixth Amendment right to confront the actual witnesses against him, the creators of the charts—*i.e.* the prosecutors in this case." (*Id.*) These contentions do not withstand scrutiny.

Federal Rule of Evidence 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). "The scope and extent of cross-examination are generally within the sound discretion of the trial court." *United States v. Whitten*, 610 F.3d 168, 183 (2d Cir. 2010) (quoting *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993)), *see also* Fed. R. Evid. 611(a). In similar circumstances, the Second Circuit has held that a district court did not abuse its discretion when it limited the scope of the cross-examination of a government summary witness when the defense sought to go "outside the scope of [the agent's] direct testimony." *United States v. Koskerides*, 877 F.2d 1129, 1136-37 (2d Cir. 1989). *See also* Fed. R. Evid. 611(b). Here, the prosecution elicited on direct examination, and the defendants did as well on cross-examination, that the documents summarized were selected by the prosecutors, that they were a selective set,

and that there were other documents pertinent to the case that were not selected for the charts.

Each summary witness explained that he or she was not involved in the underlying investigation of the case and had simply verified the contents of the summary charts. There is no rule that permits a defendant to hijack the government's case to present its own exculpatory evidence. Defendants were not barred from introducing documents that were not part of the government's charts; they were merely unable to introduce them on the government's case. Indeed, when it came time for the defense case, defendants called their own summary witness to introduce three summary charts (DX 1302, DX 1303, DX 1304) that were identical to the government's charts but had in addition the exculpatory evidence they had hoped to present during cross-examination of the FBI agents on the government's case.

Hana takes specific issue with the government's choice to present its summary evidence through FBI agents who were not involved in the underlying investigation. However, the use of witnesses who were not involved in the underlying investigation but had reviewed a summary chart for its accuracy is not extraordinary and has been often sanctioned in the past. *See United States v. Fahnbulleh*, 752 F.3d 470, 478-79 (D.C. Cir. 2014) (upholding admission of summary chart summarizing "over 10,000 pages of raw data" that was "not prepared by the witness who introduced it" but the witness had "reviewed the summary"); *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983) ("[T]hat [the witness] did not prepare the [summary] charts in no way hampered the defendants' ability to cross-examine him" because the witness "carefully reviewed the charts and ensured that they reflected information contained in documents already in evidence" and could "identify the source of all the information on the chart and . . . explain how all the . . . figures were derived"). Indeed, a court in this District admitted a summary under Rule 1006 despite defendant's objection that the summary "was created by [p]laintiffs' attorneys." *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 631 (S.D.N.Y. 2018). There is nothing improper or novel about the government's use of summary witnesses who did not author the summary charts themselves but reviewed the charts for accuracy prior to testifying.

Nor did the government's use of FBI agents to introduce the summary charts "deprive[] Mr. Hana of his Sixth Amendment right to confront the actual witnesses against him, the creators of the charts—*i.e.* the prosecutors in this case." (ECF No. 600 at 48.) "[T]he Confrontation Clause prohibits admission at trial of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him." *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017). Thus, "[t]he Confrontation Clause applies only when the

evidence is 'testimonial.'" *United States v. Moseley*, 980 F.3d 9, 28 (2d Cir. 2020) (citing *Crawford v. Washington*, 541 U.S. 36, 50-52 (2004)).

Hana has not cited—and this Court is not aware of—any court that has held that the act of selecting exhibits for inclusion in a summary chart under Rule 1006 is testimonial such that the Confrontation Clause is implicated. To the contrary, the Eleventh Circuit has squarely rejected this argument. *See United States v. Melgen*, 967 F.3d 1250, 1260-61 (11th Cir. 2020). In *Melgen*, the defendant asserted that "the mere act of choosing selection criteria to decide which [information] to include in the summary comparisons was a testimonial act." *Id.* at 1261. The defendant contended that this gave him "the right to cross-examine whoever selected the criteria," which "would be the members of the prosecution team that directed the creation of the exhibit." *Id.* The Eleventh Circuit wrote that "[t]hat approach has no basis in our law." *Id.* Indeed, "[a]ttorneys routinely make decisions about which evidence they believe is relevant to establishing a particular point—decisions that may include, for example, which witnesses to call, or as here, which summaries to enter into evidence." *Id.* The Confrontation Clause, however, "does *not* reach back a step further to demand the opportunity to cross-examine an attorney over why they decided to call a particular witness—or, as in this case, about why they chose specific selection criteria in compiling the summary." *Id.* (emphasis in original); *see also United States v. Happ*, No. CR2-06-129(8), 2008 WL 5101214, at *14-16 (S.D. Ohio Nov. 25, 2008); *United States v. Hofstetter*, No. 15-cr-27, 2019 WL 5057176, at *5 (E.D. Tenn. Oct. 8, 2019) ("The act of selecting files for the summaries does not . . . constitute a testimonial statement."). And in this District, when the government offered charts that summarized "the breadth of the alleged fraud" using tax returns, reports, and agreements, the district court held that the tax loss figures contained in the charts were "not 'testimonial' in the *Crawford* sense," so "their admission d[id] not implicate the Sixth Amendment." *United States v. Stein*, 584 F. Supp. 2d 660, 662-63 (S.D.N.Y. 2008).

This Court reaches the same conclusion here. Attorneys routinely choose what evidence to put before a jury. *See Melgen*, 967 F.3d at 1261. Indeed, the "selection of relevant evidence for presentation to the factfinder is inherent to the nature of litigation." *Hofstetter*, 2019 WL 5057176, at *5. That the evidence was summarized in a chart does not transform this routine function into a testimonial act. Hana's attempt to invoke the Confrontation Clause fails.

### 4. *The Government Did Not Open Its Case With Summary Evidence.*

Hana next contends that it was improper for the government to introduce one of the summary charts, GX 1303, before Jose Uribe testified because a case agent should not "offer a summary opinion as to culpability before any evidence to support such a

conclusion has been presented for jury review." *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005). But that is not what happened here. First, the government did not open its case with GX 1303, as Hana contends; indeed, GX 1303 was introduced during the third week of trial. (*See* Tr. 2319.) Second, in *Garcia*, the agent had opined on the culpability of the defendant. *Garcia*, 413 F.3d at 214. Here, by contrast, no agent offered any opinion on the defendants' culpability but simply answered questions on what was contained on the face of the documents listed on the charts.

### 5. *The Court's Jury Instruction as to the Summary Charts Was Proper.*

Grasping at straws, Hana claims the Court's instruction on charts and summaries that were admitted as evidence (Tr. 7051:13-20 (Jury Charge)) and its instructions on charts and summaries that were not admitted as evidence (Tr. 7051:20-70:52-17 (Jury Charge)) were "confusing." The answer to that is straight forward. Those two instructions were each taken directly from Sand, et al., *Modern Federal Jury Instructions*, Instr. 5-12 and 5-13; were agreed to by the parties; and no party voiced any objection to those two instructions! Any objection has been waived. *See, e.g., United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009) ("[A] defendant who has 'invited' a challenged charge 'has waived any right to appellate review.'" (quoting *United States v. Giovanelli*, 464 F.3d 346, 351 (2d Cir. 2006))). And even if that were not the case, the Court's instructions to the jury were correct.[28]

### B. The Evidence Did Not Violate the Speech or Debate Clause.

Menendez contends that the government repeatedly violated his rights under Article I's Speech or Debate Clause. In support of this contention, Menendez objects to the following: (i) Menendez's text message to Nadine, "Tell Will I am going to sign off this sale to Egypt today" (GX A101-14); (ii) a state department employee's testimony concerning the role and responsibilities of the chair and ranking member of the SFRC; (iii) evidence concerning Menendez's "positions and strategy vis-à-vis Egypt" (ECF No. 592 at 20-21); (iv) evidence concerning Menendez's recommendation of Philip Sellinger to President Biden for the position of U.S. Attorney for the District of New Jersey; (v) two text messages from Daibes to Menendez concerning a Senate resolution (GX A104-

---

[28] Indeed, the Advisory Committee on Evidence has recently clarified that while "[s]ome courts have mistakenly held that a Rule 1006 summary is 'not evidence' and that it must be accompanied by limiting instructions cautioning against its substantive use," "Rule 1006 summaries must be admitted as substantive evidence." Fed. R. Evid. 1006 advisory committee's note to 2024 amendment.

4, GX 10G-1, GX 104-5, GX A104-E); and (vi) an email from Daibes to Menendez with the text of a proposed bill (GX 3D-2).

The Court, however, has already thoroughly addressed and rejected the majority of Menendez's contentions both before and during trial. *See, e.g., United States v. Menendez*, 720 F. Supp. 3d 301, 309-314 (S.D.N.Y. 2024); *United States v. Menendez*, 2024 WL 3014205, at *1-2 (S.D.N.Y. June 14, 2024); (*see also* Tr. 563-66, 3591-92, 4475-89). "[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Crowley*, 318 F.3d 401, 420 (2d Cir. 2003) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991)); *see also United States v. Thorn*, 446 F.3d 378, 383 (2d Cir. 2006) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000))). Menendez presents no reason to revisit the Court's prior rulings.

Moreover, "[c]ourts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion." *United States v. Malka*, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022) (collecting cases); *see also United States v. Flom*, 256 F. Supp. 3d 253, 271-72 (E.D.N.Y. 2017) ("[Defendant] may not use Rule 33 as a vehicle to relitigate pretrial rulings with which he disagrees."), *aff'd*, 763 F. App'x 27 (2d Cir. 2019); *United States v. Campos*, No. 16-cr-395, 2017 WL 4402579, at *3 (S.D.N.Y. Oct. 3, 2017) (same), *aff'd*, 763 F. App'x 97 (2d Cir. 2019); *United States v. Delva*, No. 12-cr-802, 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015) ("A Rule 33 motion is not an appropriate forum to revisit an evidentiary issue that the Court already decided."); *United States v. Donziger*, No. 19-cr-561, 2021 WL 3726913, at *4 (S.D.N.Y. Aug. 23, 2021) (denying Rule 33 motion when defendant used it as a "vehicle to relitigate" denial of earlier motion and noting defendant cannot "use Rule 33 to obtain *de facto* reconsideration of a ruling on a post-trial motion with which he is dissatisfied"); *United States v. Soto*, No. 12-cr-556, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("This Court joins the majority of courts in this Circuit in finding that, in the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."), *aff'd sub nom., United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015); *United States v. Smith*, No. 08-cr-390, 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009) (denying Rule 33 motion when defendant "seeks to use Rule 33 as a vehicle to relitigate evidentiary rules with

67

which he disagrees"); *United States v. Scott*, No. 17-cr-630, 2023 WL 6064329, at *6 (S.D.N.Y. Sept. 14, 2023).[29]

*First*, Menendez objects to the introduction of a text message he sent to Nadine in which he instructed her to "[t]ell Will I am going to sign off this sale to Egypt today." (GX A101-14.) All parties agree that the Speech or Debate Clause does not bar the government from introducing a *promise* to perform a legislative act. (ECF No. 592 at 26, ECF No. 611 at 91.) Menendez simply urges that this message cannot be construed as such a promise. (ECF No. 592 at 20.) The Court expressly disagreed at trial when the defense moved to preclude that message and argument was held. Menendez offers no reason for the Court to change course. (*See* Tr. 566 ("Promises by a member to perform an act in the future are not legislative acts. 'Tell Will I am going to sign off this sale to Egypt today' is a promise.").)[30]

*Second*, Menendez challenges one line of testimony from Joshua Paul, the Director of Congressional and Public Affairs at the State Department, about the role of the chair and ranking member of the SFRC as follows: "the chairman or chair or ranking member of the [SFRC] has immense influence over whether a sale notified to that committee goes though." (Tr. 895.) The Court fails to see how this testimony about the role of the chair of the SFRC comes anywhere near the vicinity of the Speech or Debate Clause, which immunizes "Congressmen and their aides . . . from liability for their *actions* within the 'legislative sphere.'" *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (emphasis added). Simply, there is no action here, let alone any action taken by Menendez.

*Third*, Menendez objects to the testimony of Sarah Arkin, Deputy Staff Director of the SFRC, concerning her "understanding of Mr. Menendez's public position with respect to Egypt" and how it changed over time. (*See* Tr. 4510; *see generally* Tr. 4509-14.) This evidence does not implicate the Speech or Debate Clause in any manner whatsoever and Menendez offers no authority to suggest otherwise.

Menendez also contends that evidence concerning the March 13, 2018 meeting between Menendez, Nadine, Hana, Andy Aslanian, and the Egyptian defense attaché, General Shawky, at Menendez's Senate office in Washington D.C. violates the Speech or

---

[29] Indeed, Menendez was entitled to take an interlocutory appeal from this Court's decision denying his motion to dismiss the indictment on the grounds of a violation of the Speech or Debate Clause, *Helstoski v. Meanor*, 442 U.S. 500, 508 (1979), but did not do so.

[30] Menendez contends that "this text message was no different than the messages that the Court did exclude concerning a January 2022 article regarding $2.5 billion in arms sales to Egypt." (ECF No. 592 at 20.) But those messages concerned acts that had already been performed. And the Supreme Court has made clear that Speech or Debate Clause "protection extends only to an act that has *already been performed*." *United States v. Helstoski*, 442 U.S. 477, 490 (1979) (emphasis added).

Debate Clause. (*See* GX 1302, rows 65-75, GX A101-101, GX A101-DD, GX 3A-1, GX B105-B, GX B105-2, GX 8F-9, GX 3A-4, GX C102-2, GX C102-A, GX C102-B, GX 4I-2.) Prior to trial, the Court held that evidence concerning "meetings that Menendez had with Egyptian officials" is "not legislative factfinding or information gathering meriting the Speech or Debate Clause's protection." *Menendez*, 720 F. Supp. 3d at 312-13. Menendez has presented no evidence or argument that would convince this Court otherwise. In any event, the testimony regarding the March 13 meeting was that everything said by Menendez at that meeting had been "said before publicly." (Tr. 4689.)

Moreover, this meeting may be understood as "implementing a corrupt bargain,"— over which the Speech or Debate Clause offers no protection. *See Menendez*, 720 F. Supp. 3d at 313 ("While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, *it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts.*" (emphasis in original) (quoting *United States v. Renzi*, 651 F.3d 1012, 1026 (9th Cir. 2011))). As the government demonstrated at trial, "[t]he . . . purpose for these meetings and dinners . . . dovetails precisely with Menendez's . . . corrupt promise to use his power as Ranking Member or Chairman of the SFRC to assist Egypt in acquiring foreign military sales and foreign military financing." *Id.*

Indeed, the jury saw Menendez's handwritten invitation to General Shawky (GX 3A-1), and heard Arkin testify that during her entire time at the SFRC, she had never seen a handwritten invitation other than this one. (Tr. 4502.) Arkin also explained that this meeting bypassed the usual scheduling channels, which involved foreign officials reaching out to her to request a meeting with Menendez, and the staff would then make a recommendation to the Senator. (*Id.*) The government also introduced evidence from Menendez's staffers that they were unaware of this meeting, did not attend, and otherwise understood that the meeting was "not policy-focused." (GX 1302, row 74, GX 4I-2.) In sum, the government offered sufficient evidence—none of which violated the Speech or Debate Clause—to conclude that this meeting was part and parcel of Menendez's corrupt bargain.

*Fourth*, Menendez claims that evidence regarding Menendez's recommendations to President Biden of Esther Suarez and then Philip Sellinger for the position of U.S. Attorney violated the Speech or Debate Clause. The Court has already squarely rejected this contention in its March 14, 2024 Opinion as follows: "a Senator's pre-nomination activities—including information gathering in determining who the Senator is considering for recommendation to the President plus the recommendation itself—are not legislative acts." *Menendez*, 720 F. Supp. 3d at 310. In its March 14, 2024 Opinion, the Court declined—and continues to decline—to extend the Speech or Debate Clause to

reach a Senator's pre-nomination conduct while considering candidates to recommend to the President for nomination to the Senate. *See id.* at 311.

*Fifth*, Menendez contends that the government introduced improper evidence concerning Senate Resolution 390 (S. Res. 390), titled "A resolution expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge." (GX 10G-1.) Specifically, Menendez objects to two text messages in which Daibes sent him screenshots of the publicly available title and status of Senate Resolution 390. (*See* GX A104-4; GX A104-5; GX A104-E; GX 10G-1.)

Once again, the Court has already rejected Menendez's challenge in its prior Opinion on the grounds that both of these messages were sent *before* Menendez had taken any legislative act. *See Menendez*, 2024 WL 3014205, at *1. "It is without question that a text to a senator, sent by an individual who is neither a legislator nor an aide, providing that senator with publicly available information regarding a pending resolution as to which the senator has yet to take any legislative act is not 'speech or debate.'" *Id.* at *2. In addition, the names of any senators who sponsored or co-sponsored this resolution were redacted in the two texts presented to the jury and the jury was informed that Menendez was not one of those senators. (*See* GX A104-4; GX A104-5; GX A104-E; GX 10G-1.)

The presentation to the jury of that information was entirely proper. The Speech or Debate Clause does not prohibit the government from introducing evidence of a promise or a request that a member of Congress take a legislative act in the future. Indeed, as this Court has repeatedly held, the Clause's protection "extends only to an act that has *already been performed*." *Menendez*, 2024 WL 3014205, at *1 (emphasis in original) (quoting *Helstoski*, 442 U.S. at 490). The Eleventh Circuit case upon which Menendez relies, *United States v. Swindall*, 971 F.2d 1531 (11th Cir. 1992), does not compel a different conclusion. In *Swindall*, a former member of the U.S. House of Representatives was convicted of making false material declarations to a grand jury by attempting to conceal his discussions of money-laundering with an undercover agent. *Id.* at 1534. To prove Swindall knew of money laundering statutes, the government argued to the jury that it could "infer that defendant knew of the contents and requirements of these bills because he sat on the committees that considered them." *Id.* at 1546. The Eleventh Circuit held this was improper because it allowed the jury to "infer that Swindall performed legislative *acts* to acquire knowledge about the bills." *Id.* (emphasis in original). That is not the case here: the government offered these text messages to allow the jury to infer that *Daibes asked or otherwise sought to have* Menendez take an action on the resolution in the future—not that Menendez actually took any action.

*Finally,* Menendez contends that his Speech or Debate rights were violated "most directly" by the introduction of GX 3D-2, a blank email Daibes sent to his assistant, forwarding an email he received from Menendez containing the text of Senate Bill 1102, entitled "Eastern Mediterranean Security and Energy Partnership Act of 2019." (GX 3D-2.) The parties agree that, on its face, this exhibit does not state whether the bill had been introduced and does not even mention Menendez or any other member of Congress. (*See id.*)

As this Court previously explained in response to Menendez's motion to strike this exhibit, "[t]he public sharing of a piece of legislation," "the mere mentioning of a piece of legislation," and "sending the text [of an act]" are simply not legislative acts. (Tr. 3591-92 (denying the motion).) *See also Hutchinson v. Proxmire,* 443 U.S. 111, 133 (1979) ("[T]he transmittal of [news letters or press releases] by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process."); *McMillan,* 412 U.S. at 313-14 ("[T]he Speech or Debate Clause [does not] protect a private republication of documents introduced and made public at a committee hearing, although the hearing was unquestionably part of the legislative process."). Menendez contends, however, that the introduction of this bill "creat[ed] the distinct and inescapable impression for the jury that [he] proposed the bill." (ECF No. 592 at 26.) This conclusion is simply not "inescapable." Tellingly, it took Menendez's own counsel eight days to realize that Menendez proposed the bill. (*See* Tr. 1510.)

In sum, Menendez's assertions that evidence introduced at trial violated his rights under the Speech or Debate Clause must fail both on their merits and because Menendez has provided no reason for the Court to disturb its prior rulings.

### C.  The Court Properly Excluded Evidence of Specific Good Acts Under Fed. R. Evid. 404(b) and 405(b).

Hana and Daibes each contend the Court erred by precluding them from eliciting testimony regarding specific instances of their past generosity and gift giving. Daibes asserts that this evidence was admissible under Federal Rule of Evidence 405(b), while Hana urges it was admissible under Rule 404(b). Each of these contentions fails.

#### 1.  *Evidence of Prior Acts of Gift Giving by Daibes Is Not Admissible Under Rule 405(b).*

Federal Rule of Evidence 405(b) provides that "[w]hen a person's character or trait is an essential element of a . . . defense, that character or trait may [] be proved by relevant specific instances of the person's conduct."

At trial, Daibes sought the admission of evidence of specific instances of his generosity pursuant to Rule 405(b) to support his defense that the things of value found in the Menendez home from Daibes were gifts, not bribes, thus making his generosity an "essential element" of his defense thereby permitting evidence of prior acts pursuant to Rule 405(b). The Court rejected this argument on the grounds that "the government is not required to prove that Daibes lacked generosity to prove its case"; thus, he need not prove his generosity. (Tr. 5544.) Indeed, the Advisory Committee on Evidence clarified that the admission of evidence of specific acts is "confine[d]" under Rule 405(b) to "cases in which character is, in the strict sense, an issue, and hence deserving of the searching inquiry." Fed. R. Evid. 405 advisory committee's note to 1972 amendment. "It is allowed only when character itself is an issue under substantive law." *Shakur v. United States*, 32 F. Supp. 2d 651, 668 (S.D.N.Y. 1999).

As this Court explained during trial, Daibes' generosity is, at most, "relevant to rebut an inference of his corrupt intent but the Second Circuit has cautioned that 'if specific good deeds could be introduced to disprove intent or intention, which are elements in most crimes, the exception to Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed.'" (Tr. 5544 (quoting *United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997).) Daibes provides no authority to prompt this Court to revisit its prior decision.[31] *See, e.g., United States v. Delva*, 2015 WL 629375, at *4 ("A Rule 33 motion is not an appropriate forum to revisit an evidentiary issue that the Court already decided.").

Daibes further contends that the Court itself made Mr. Daibes's generosity an essential element of his defense because the Court instructed the jury that "giving a gift or thing of value to a public official to cultivate friendship or to build goodwill in hopes of ultimately affecting one or more unspecified official acts now or in the future is not federal bribery." (Tr. 7092 (Jury Charge).) The Court, however, gave this commonplace and proper instruction at defendants' request. In any event, the Court fails to see how its instruction about what does *not* constitute federal bribery makes generosity an "essential element" of Daibes' defense.

## 2.  *Evidence of Defendants' Prior Acts Is Not Admissible Under Rule 404(b).*

Hana contends defendants were improperly precluded under Rule 404(b) from eliciting testimony concerning defendants' gift giving in order for the jury to be able to

---

[31] The Court similarly rejected Daibes' contention that his prior acts of gift giving were admissible as habit evidence under Rule 406. (Tr. 5545.) Daibes does not challenge this ruling in his post-trial submission.

infer that the cash and gold bars found in the Menendez home were simply personal gifts from Daibes and Hana.

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). The Second Circuit has made clear that "[t]o be admissible under Rule 404(b) the evidence must serve a non-propensity purpose." *United States v. Quattrone*, 441 F.3d 153, 191 (2d Cir. 2006).

The Second Circuit has "long recognized that '[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions.'" *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)). "The reasoning behind this rule is straightforward: A single occurrence of lawful conduct is 'simply irrelevant' to other occurrences of unlawful conduct." *Id.* (quoting *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999)). Accordingly, "it does not follow that [a defendant's] proposed reverse Rule 404(b) evidence is admissible simply because it was at least marginally relevant to the question of [defendant's] intent." *United States v. Zodhiates*, 235 F. Supp. 3d 439, 451 (W.D.N.Y. 2017), *aff'd*, 901 F.3d 137 (2d Cir. 2018).[32]

Indeed, admitting prior acts evidence under Rule 404(b) "may circumvent the careful limits . . . Rule 405 place[s] on character evidence." *Zodhiates*, 235 F. Supp. 3d at 451. "Knowledge and intent—the primary issues for which [the defendant] sought to introduce reverse Rule 404(b) evidence—'are elements of most crimes.'" *Id.* at 452 (quoting *Doyle*, 130 F.3d at 542). "[I]f the Court did not treat [the defendant's] proposed reverse Rule 404(b) evidence the same way the evidence would be treated under Rule 405, Rule 405(b) could be circumvented in nearly any case in which the defendant's intent or knowledge was at issue." *Id.* Thus, "where a defendant's reverse Rule 404(b) evidence is also character evidence, the Court must treat the reverse Rule 404(b) evidence the same way that it would treat the evidence under Rule 405." *Id.*

The Second Circuit has affirmed the exclusion of so-called reverse Rule 404(b) or prior acts evidence in bribery prosecutions. *See United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021); *Chambers*, 800 F. App'x 43. In *Dawkins*, the defendant, a liaison between

---

[32] Evidence offered by a defendant of other acts—usually good acts—under Rule 404(b)(1) are often referred to as "reverse 404(b)" evidence. *See, e.g.*, *United States v. Zodhiates*, 235 F. Supp. 3d 439, 450-51 (W.D.N.Y. 2017).

sports agents and athletes, was charged with paying bribes to basketball coaches in exchange for the coaches' agreement to steer their best athletes towards his management agency. *Id.* at 777. At trial, Dawkins sought to introduce testimony about his relationships with "much more powerful coaches than the assistant coaches he was charged with bribing, and that he made no attempt whatsoever to bribe the more influential coaches." *Id.* at 792. Dawkins contended this evidence tended to show that he "lacked the specific intent to commit the charged offenses." *Id.* The Second Circuit rejected this argument, noting that "'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—i.e., if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit." *Id.*

The Second Circuit reached the same conclusion in *United States v. Chambers*. In *Chambers*, a former attorney was charged with bribing a police officer in exchange for favorable treatment for the attorney's clients. 800 F. App'x at 45. At trial, Chambers sought to introduce evidence that he ran a "legitimate law practice," making it "less likely that he had corrupt intent to bribe [the officer.]" *Id.* at 46. The Second Circuit held that the district court did not abuse its discretion in excluding this evidence, as this was "precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit." *Id.*

Here, Hana contends defendants should have been allowed to elicit testimony from Jamela Maali, an employee of Daibes, and Meirna Hanna, an employee of Hana, about specific instances of gift giving by defendants. But as the Court explained during trial, examples of gifts Daibes or Hana gave without expecting anything in return are only relevant to argue that when they gave items such as cash and gold to Nadine and Menendez, they were acting in accordance with the giver's character trait of generosity. (*See* Tr. 5543-44 (addressing Daibes' motion).) That is propensity reasoning that is plainly impermissible under Rule 404(b)(1). *See Quattrone*, 441 F.3d at 191.

Hana contends that the evidence does not go to propensity but rather would show "that [he] acted with a particular mental state at the time of the offense." (ECF No. 600 at 154-55.) But as explained above, the Second Circuit has rejected this argument. *See Dawkins*, 999 F.3d at 792 ("'[G]ood acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—i.e., if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit.").[33]

---

[33] Hana cites a single case from within this Circuit dealing with reverse Rule 404(b) evidence, *United States v. James*, 607 F. Supp. 3d 246 (E.D.N.Y. 2022). In that case, the defendant was charged with health care fraud for submitting false health insurance claims. *Id.* at 250. At trial, the defendant sought to introduce prior good acts—namely, evidence of his legitimate billing practices. *Id.* at 256. The district court admitted this evidence because the government's theory of the case was that the defendant's business "was almost

74

### 3. *The Government's Summation Does Not Warrant a New Trial.*

Daibes contends that the fact that the Court precluded the introduction of evidence of his prior gift giving combined with the statements in the government's summation that the gold and envelopes of cash from Daibes were found in the Menendez home, in combination constituted a manifest injustice requiring a new trial under Rule 33. He is wrong. The allegedly objectionable statements by the government in summation include: "[f]riends do not give friends envelopes stuffed with $10,000 in cash[] just out of friendship. Friends do not give those same friends kilogram bars of gold worth $60,000 each out of the goodness of their hearts" (Tr. 6507); "[i]f bank envelopes neatly labeled with $10,000 markings were just Daibes' love language, why did they only start in or after 2020?" (*id.*); and "[t]here is no evidence in the record of this trial, zero, that there is some kind of habit or practice anywhere in the world of giving kilogram gold bars worth $60,000 each out of friendship." (Tr. 6516.) Those statements are not improper.

Importantly, Daibes did not object to these statements during or even after summation. When defense counsel fails to object to the government's statements, "an appellate court will reverse only if the summation was so extremely inflammatory and prejudicial, that allowing the verdict to stand would seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Briggs*, 457 F.2d 908, 912 (2d Cir. 1972) (internal citations and quotation marks omitted). And even if Daibes had made a timely objection, "[i]t is a 'rare case' in which [the court] will identify a prosecutor's summation comments, even if objectionable, as so prejudicial as to warrant relief from conviction." *Unites States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018). The government's statements in this case simply do not approach this level.

## IV. COUNTS 1 AND 15 ARE MULTIPLICITOUS AND JUDGMENT SHALL ENTER ON ONLY ONE OF THOSE COUNTS.

Count 1 of the S4 Indictment charged all defendants with conspiracy under 18 U.S.C. § 371 to bribe Menendez in violation of 18 U.S.C. § 201. Count 15 charged Nadine, Menendez and Hana—but not Daibes—with conspiracy under 18 U.S.C. § 371 to have Menendez act as an agent of a foreign principal in violation of 18 U.S.C. § 219.

---

entirely fraudulent," to the point where the court could not identify a single non-fraudulent claim out of more than 100,000. *Id.* at 258. "Evidence of past 'good acts' by a defendant is generally not probative unless a defendant is alleged to have 'always' or 'continuously' committed 'bad acts or where the evidence of 'good acts' would undermine the underlying theory of a criminal prosecution." *United States v. Damti*, 109 F. App'x 454, 455-56 (2d Cir. 2004) (citation omitted). Here, by contrast, the government's theory of prosecution did not claim defendants *never* gave gifts.

Prior to trial, Hana moved to dismiss one of those counts as multiplicitous. (ECF No. 143 at 89-102.) The Court denied that motion as premature. (ECF No. 344 at 60-62.) Because the jury convicted Hana on both Counts 1 and 15, Hana renews his multiplicity argument at this time, contending he now faces the possibility of being punished twice for the same offense in violation of the Double Jeopardy Clause. Accordingly, he asks this Court to impose judgment on only one of these two counts.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "If the two offenses at issue are both conspiracies charged under the same statute, then the multiplicity inquiry turns on whether the two conspiracies are the same 'in fact,' meaning they involve the same agreement." *United States v. Maxwell*, No. 20-cr-330, 2022 WL 1294433, at *3 (S.D.N.Y. Apr. 29, 2022), *aff'd*, 118 F.4th 256 (2d Cir. 2024). "A defendant may be convicted of separate counts for 'overlapping conspiracies,' but not 'where a smaller conspiracy is "wholly contained" within a larger one.'" *United States v. Fishman*, No. 20-cr-160, 2022 WL 1744698, at *3 (S.D.N.Y. May 31, 2022) (quoting *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004)).

To guide this determination, courts apply the factors set forth in *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985). *See, e.g., United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994); *Maxwell*, 2022 WL 1294433, at *3. These factors include:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Macchia*, 35 F.3d at 667 (quoting *Korfant*, 771 F.2d at 662). "In applying the *Korfant* factors, 'no dominant factor or single touchstone' determines whether two allegedly distinct conspiracies 'appear in fact and in law the same.'" *Maxwell*, 2022 WL 1294433, at *3 (quoting *Macchia*, 35 F.3d at 668). "[T]he *Korfant* list is not exhaustive, and every case must be assessed on its own terms . . . based on the entire record." *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004).

"In assessing the evidence, the Second Circuit applies a burden-shifting framework." *Maxwell*, 2022 WL 1294433, at *3. "The defendant carries the initial burden of making a non-frivolous showing that the two counts in fact charge only one conspiracy." *Id.* "If met, the burden then shifts to the [g]overnment to show, 'by a preponderance of the evidence, that there are in fact two distinct conspiracies and that

the defendant is not being placed in jeopardy twice for the same crime.'" *Id.* (quoting *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004) (per curiam)).

Hana contends that Count 15 is simply a subset of the conspiracy charged in Count 1. The Court agrees. While two *Korfant* factors favor the government, the weight of the factors demonstrates that Counts 1 and 15 are multiplicitous.

To be sure, the first and seventh *Korfant* factors favor the government: the offenses were charged in the same indictment and the counts allege different statutory objectives—namely, Count 1 alleges a conspiracy to bribe Menendez in violation of 18 U.S.C. § 201, while Count 15 alleges a conspiracy to have Menendez act as an agent of a foreign principal in violation of 18 U.S.C. § 218. That is not dispositive, however, since "no single *Korfant* factor is dominant or dispositive." *Maxwell*, 2022 WL 1294433, at *4.

The remaining factors weigh in Hana's favor. There is significant overlap between the participants in the conspiracy alleged in Count 1 and the participants in Count 15. Count 1 charged all defendants, while Count 15 charged Menendez, Nadine, and Hana, excluding simply Daibes. Multiplicity does not require a complete overlap of participants. Rather, substantial—but not complete—overlap in "key participants, and in core roles played by those participants, significantly favors the [d]efendant as to [this] *Korfant* factor." *Id.* at *5.

As to the third factor, the time periods of the two counts overlap substantially. Count 1 began in 2018 and extended into 2023; Count 15 is wholly within this time frame, spanning from 2018 to 2022. As to the sixth factor, the geographic scope of the alleged conspiracies is identical, with the acts at issue in both counts occurring predominately in New York, New Jersey, and Washington D.C.

In fact, the government used much of the same evidence to argue to the jury that defendants were guilty of Count 1 as it did Count 15, demonstrating a high degree of similarity in operations between the two counts. (*See* Tr. 6375, 6380, 6384 (arguing Nadine's "sham job," Hana's payment to bring Nadine's mortgage current, and the Asahi gold bars demonstrate the bribery scheme that is the object of Count 1); Tr. 6539 ("[T]he mortgage payment, the IS EG Halal checks for the sham job, the envelopes of cash from Hana's associates, . . . , the Asahi gold bars from Hana . . . that's how you know that Menendez's acting like an agent."); *see also* Tr. 6391 ("We're going to come back to [the ghostwritten letter] later in the *quid pro quo*, and we'll come back to this when we talk about the charges that Menendez was acting as an agent of Egypt.").) The government made clear that Count 1 "[c]overs the Egypt part of the scheme." (Tr. 6526.) Moreover, all of the overt acts alleged in the indictment in support of Count 15 are also listed among the overt acts of Count 1.

Last, the government's evidence in this case made clear that these schemes were highly interdependent. Specifically, the government introduced evidence—and argued to the jury—that Menendez acted as an agent of Egypt *because* he was bribed to do so. (Tr. 6537.)

Applying the *Korfant* factors, the Court concludes that Count 15 is merely a subset of Count 1, and the counts are thus multiplicitous. Accordingly, the Court will impose judgment on only one of the two multiplicitous counts.[34]

## V. CONCLUSION

For the reasons set forth above, the Rule 29 and Rule 33 motions of the defendants are denied and Counts 1 and 15 of the S4 Indictment are deemed to be multiplicitous.

Dated: New York, New York
        December 13, 2024

SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

[34] This determination applies to both Hana and Menendez, who were convicted of both Counts 1 and 15.