UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ROBERT MENENDEZ,

Defendant.

23 Cr. 490 (SHS)

**SENTENCING MEMORANDUM ON BEHALF OF ROBERT MENENDEZ**

PAUL HASTINGS LLP

ADAM FEE
AVI WEITZMAN
200 Park Avenue
New York, NY 10166

*Attorneys for Defendant Robert Menendez*

## Table of Contents

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 4

    I.    Senator Menendez's Personal History and Character ............................ 4

        A.    Bob's Early Life ...................................................................... 5

        B.    A Lifetime of Public Service .................................................. 6

        C.    Senator Menendez's Family ................................................ 14

LEGAL ANALYSIS ........................................................................................ 15

    I.    The Appropriate Advisory Guidelines Range is 21-27 Months, and the PSR's Contrary Guidelines Analysis Lacks Evidentiary and Legal Support. ................. 15

    II.    A Substantially Below-Guidelines Sentence With a Condition of Rigorous Community Service Is Appropriate. ................................................. 27

        A.    Substantial Departures from the Guidelines Are Permitted, Appropriate, and Commonplace in Bribery Cases ........................... 28

        B.    The Guidelines Are Not an Appropriate Guide for Actual Sentencing Practice in Bribery Cases ......................................... 32

        C.    Senator Menendez's History and Characteristics Militate Against A Substantial Sentence of Incarceration ..................................... 35

        D.    Substantial Additional Incarceration Is Not Required to Reflect the Nature, Circumstances, and Seriousness of the Offense or to Provide Just Punishment for the Offense ................................................ 36

        E.    Neither Specific nor General Deterrence Is Best Served by a Substantial Sentence of Additional Imprisonment, Nor is it Needed to Protect the Public and to Promote Respect for the Law ............................... 40

        F.    A Sentence of Substantial Additional Incarceration Is Likely to Result in Unwarranted Sentencing Disparities ....................................... 43

        G.    The Court Should Consider Alternatives to Incarceration ...................... 44

CONCLUSION ................................................................................................ 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kimbrough v. United States*,
    552 U.S. 85 (2007)....................................................................................32, 35

*Pepper v. United States*,
    562 U.S. 476 (2011)........................................................................................28

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016)..........................................................................32

*United States v. Brennan*,
    395 F.3d 59 (2d Cir. 2005)............................................................................44

*United States v. Bruno*,
    09-cr-0029-GLS (N.D.N.Y. May 6, 2010) ......................................................29, 30

*United States v. Caballero*,
    93 F. Supp. 3d 209 (S.D.N.Y. 2015)..............................................................21

*United States v. Carmona-Rodriguez*,
    No. 04 Cr. 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ...................42

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)..........................................................................28, 44

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012)..........................................................................17

*United States v. Cuti*,
    No. 08 Cr. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ..................16

*United States v. Dokmeci*,
    No. 13 Cr. 455 (JG), 2016 WL 915185 (E.D.N.Y. Mar. 9, 2016).........................45

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)..........................................................................44

*United States v. Faibish*,
    No. 12 Cr. 265 (ENV) (E.D.N.Y. Mar. 10, 2016) ...............................................25

*United States v. Greenfield*,
    44 F.3d 1141 (2d Cir. 1995)..........................................................................17

*United States v. Johnson*,
  No. 16 Cr. 457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .............................. 32

*United States v. Kang*,
  No. 16 Cr. 837 (JPO) (S.D.N.Y. 2017) ....................................................................... 46

*United States v. Kent*,
  821 F.3d 362 (2d Cir. 2016) ....................................................................................... 24

*United States v. Leitch*,
  No. 11 Cr. 609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ........................................ 45, 46

*United States v. Litvak*,
  No. 3:13 Cr. 19 (JCH) (D. Conn. July 23, 2014) ......................................................... 25, 26

*United States v. Murphy*,
  108 F.R.D. 437 (E.D.N.Y. 1985) ................................................................................ 45

*United States v. Pippin*,
  903 F.2d 1478 (11th Cir. 1990) .................................................................................. 45

*United States v. Preacely*,
  628 F.3d 72 (2d Cir. 2010) ......................................................................................... 28

*United States v. Rivernider*,
  No. 3:10 Cr. 222 (D. Conn. Dec. 18, 2013) ................................................................. 26

*United States v. Ruiz*,
  No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982 (S.D.N.Y. May 10, 2006) ....................... 42

*United States v. Sabhnani*,
  599 F.3d 215 (2d Cir. 2010) ....................................................................................... 23

*United States v. Skelos*,
  15-cr-00317-KMW (S.D.N.Y. Apr. 4, 2016) ............................................................... 30, 31

*United States v. Stevenson*,
  834 F.3d 80 (2d Cir. 2016) ......................................................................................... 23

*United States v. Tomko*,
  562 F.3d 558 (3d Cir. 2009) ....................................................................................... 43

*United States v. Treadwell*,
  593 F.3d 990 (9th Cir. 2010) ...................................................................................... 17

**Statutes**

18 U.S.C. §3553(a)(1) ..................................................................................................... 35

18 U.S.C. §3553(a)(2)(A)–(C) ........................................................................40

18 U.S.C. §3553(a)(3) ...................................................................................44

18 U.S.C. §3553(a)(6) ...............................................................................29, 43

28 U.S.C. §991(b)(1)(A) ...............................................................................28

U.S.S.G., Ch. 1 pt. A(3) (1987) ...................................................................28

U.S.S.G. §1B1.3(a)(1)(B) .............................................................................17

U.S.S.G. §2B1.1, comment n.3(A)(iv) .........................................................17

U.S.S.G. §2C1.1(a)(1) ..................................................................................23

U.S.S.G. §2C1.1(b)(2) ............................................................................16, 20

U.S.S.G. §2C1.1(b)(3) ..................................................................................23

U.S.S.G. §3B1.1, comment n.4 ....................................................................21

## Other Authorities

Am. Bar Ass'n Criminal Justice Section, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014) ......................................24, 25, 45

Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U.L.J. 485, 492 (1999) .................................................................................................43

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988) .................................28

Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005)....................................43

U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* 20 (2009), https://www.ussc.gov/sites/default/files/pdf/researchand-publications/research-projects-andsurveys/alternatives/20090206_Alternatives.pdf ...............................................45

U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004), https://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/fifteenyears-guidelines-sentencing ...............................................43

Senator Robert Menendez respectfully submits this memorandum of law in connection with his sentencing, presently scheduled for January 29, 2025.[1]

## INTRODUCTION

Senator Menendez is not the typical defendant. His public office and the accompanying attention it draws distinguish him. And of course the charges of conviction in this case arise from his position, and the actions he took as a United States Senator, a position he resigned in worldwide disgrace after his conviction. At the sentencing hearing before the Court, the government will undoubtedly focus on Senator Menendez's conviction and argue that the underlying facts reflect a betrayal of his oath as a public servant.

But Senator Menendez—Bob as he is known by his family, friends, constituents, colleagues, and foreign dignitaries—is atypical in ways that extend far beyond the evidence presented at trial. He has lived an extraordinarily *good* life. One marked by great challenges—his father's suicide, poverty, and forging a role for Latinos in local and national politics—and distinguished by deep devotion to his personal and religious ideal of *service*.

Lawyers' rhetoric cannot capture the depth and breadth of Bob's commitment to helping those who need it most. The letters attached to this submission in **Appendix 1** reflect just a fraction of the work Bob has done in service to others: A 5-year old girl stricken by leukemia, her family stymied by immigration authorities blocking the arrival of the one relative who was a suitable marrow donor (Bob's intervention saved her life). A federal judge and her family

---

[1] Certain redactions have been made to the letters of support attached hereto. Unredacted copies will be filed under seal.

1

victimized by unconscionable violence. A dying mother wishing to see her son—stuck abroad—one last time. A woman in need of a transplant whose mother was a perfect match, but for her inability to obtain a visa to visit and make the needed donation (Bob's intervention saved this woman's life, too). Millions of Latino families in dire need of access to government-funded healthcare.

Bob helped all of them. He did not do so to garner votes—many of them were not his constituents. And he did so without fanfare—nearly all of the stories relayed in these letters were private before this filing. Bob helped them because service is the defining theme of his life. It is what led him out of the poverty of his youth. And gave him purpose during the dark days following his father's sudden, tragic passing and, much later, his mother's terrible affliction and slow, painful decline with Alzheimer's Disease. And it has, at times, imposed great costs on his own family.

Our goal in this memorandum is not to repeat the vigorous factual and legal defenses asserted at trial. Nor is it to bury the Court in arguments about evidence already in the record and addressed at great length in other filings. Indeed, because Senator Menendez will appeal his conviction, this submission will not address his conduct as it relates to the offenses of conviction, other than as relevant to the disputed Guidelines enhancements. We instead focus on Bob's personal background and truly extraordinary record of service, topics which, though not subjects at trial, are now before the Court to consider pursuant to the sentencing factors enumerated in 18 U.S.C. § 3553(a).

Unsurprisingly, Senator Menendez's conviction has rendered him a national punchline and stripped him of every conceivable personal, professional, and financial benefit. He gave up the Senate seat he proudly held for the past 18 years. If his conviction is upheld, he will lose his federal pension (with the recent passage of Bill S. 932, stripping Members of Congress convicted

of public corruption offenses of their pension). His law license has been suspended and will be revoked if his conviction stands. His state pension and government provided insurance are at risk, too. And illustrative of the countless minor indignities he now faces, his name has been stripped from an elementary school in New Jersey. His once broad circle of friends and political allies have largely disappeared. While all defendants suffer inevitable personal and professional consequences if convicted of serious federal crimes, Senator Menendez in many important respects has already been punished relatively more harshly due to his position.

Bob is now 71, with his long-built reputation in tatters. He has suffered financial and professional ruin. And he now is helping his wife battle a life-threatening cancer diagnosis in the midst of her upcoming trial in this case. We respectfully submit that, notwithstanding his conviction, Bob is deserving of mercy because of the penalties already imposed, his age, and the lack of a compelling need to impose a custodial sentence.

We acknowledge that the starting point for the Court's analysis is to calculate the applicable, albeit advisory, federal Sentencing Guidelines range. The Probation Department's Guidelines calculation produces a preposterous result (292-365 months) that would fit neither the offender nor the offense, as evidenced by Probation's own sentencing recommendation. The PSR's Guidelines calculation is driven by the amount of the alleged bribes received, a "double-counting" enhancement for his position as a public official, and a disputed leadership enhancement. We address each of those in turn below.

But even the proper Guidelines range—which we submit is 21-27 months—would be improper under Section 3553(a)'s sentencing factors. Respectfully, while the Probation Department itself recognizes that its calculated Guidelines range passes far beyond the appropriate punishment, Probation's recommended sentence of 12 years' imprisonment would be draconian—likely a life and death sentence for someone of Bob's age and condition. This case is

extraordinary in many ways, including in the history and characteristics of the defendant. While this District has previously seen public officials sentenced in corruption cases, we submit that no defendant before this Court has lived a life so overwhelmingly devoted to serving his community and his country. Senator Menendez has given his life to his country and to his community. With this case, his political and professional careers have ended; his reputation is destroyed; and the latter years of his life are in shambles. He is certain never to commit future offenses. And his current state—stripped of office and living under a permanent shadow of disgrace and mockery—are more than sufficient to reflect the seriousness of the offenses and to promote respect for the law. This is especially so when any sentence of incarceration—let alone the term recommended by Probation—would effectively constitute a life sentence, and would tear Bob away from the family who depend on him so dearly, including his beloved children and grandchildren. Bob still has more he can do for his community and society, even outside of the Senate. The recommended sentence of imprisonment would short-circuit any possibility of him using his remaining years to further serve the powerless and the needy.

For the reasons stated herein, we respectfully submit that a sentence substantially less than advisory Guidelines range is sufficient but not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a) and the interests of justice.

## BACKGROUND

### I.    Senator Menendez's Personal History and Character

Bob Menendez, age 71, is the epitome of the American Dream. Rising out of poverty against the odds, Bob chose to dedicate his life to his country and his community. But for this conviction, Bob has served his constituents, his state, and his country with honor, dedication, and distinction for nearly 50 years.

4

### A.    Bob's Early Life

Bob is the son of Cuban emigres who fled the brutal, dictatorial regime under Fulgencio Batista to seek a better life here in the United States.  A devout Catholic and the youngest of three children, Bob was the first U.S.-born member of his family, born not long after his family arrived in the United States with little more than the money they had stashed away in a grandfather clock.  His older sister, Caridad, testified at trial about the circumstances of their flight from Cuba and arrival in the United States.  Bob was raised by his hard-working parents with Cardidad's help in a working-class neighborhood in Union City, New Jersey, and grew up in a modest tenement apartment.  Bob's parents struggled to support their family through their humble trades: his father was an itinerant carpenter and his mother was a seamstress.  While they never went hungry, they faced significant financial problems, which were often compounded by Bob's father's compulsive gambling addiction.

Bob attended the local public schools and was his high school class president.  He was the first member of his family to attend college (St. Peter's University) and the first member of his family to attend a post-graduate degree (from Rutgers Law School).

Even before he graduated from college, Bob committed himself to a lifetime of public service.  In 1974, at the young age of 20, he chose to run for public office and won a seat on the local Union City School Board, believing that he could make a difference in the educational lives of the students throughout the community.  He followed that up about a decade later (in 1986) by being elected Mayor of Union City; then, in 1988, he was elected to the State Assembly and subsequently to the New Jersey State Senate in 1991.

During these early, formative years of Bob's political career, he cemented himself as someone who stood up for the downtrodden, and also against powerful political self-interest.  Indeed, undermining the government's caricature of a craven greedy politician is the fact that

Senator Menendez testified at the corruption trial of Union City Mayor William Musto.  A young man in his 20s, Bob was "so fearful of retribution he wore a bullet-proof vest" when he pointed the finger at his political mentor.  *See* https://www.politico.com/states/new-jersey/story/2017/09/06/once-a-corruption-fighter-menendez-now-set-to-stand-trial-on-bribery-charges-114282.  As noted by Bob's nephew:

> "I remember when he testified against William Musto in a corruption case.  He always taught me to do the right thing, no matter the personal cost.  Those were the days he had to wear a bulletproof vest because of the threats to his life. Still, he continued despite the danger because he believed in what he was doing."

Ex. A (Letter submitted by Dr. Ronald Gonzalez, nephew).

Bob's youth was scarred by the untimely loss of his father: when Bob was only 23, his father committed suicide after accumulating gambling debts.  Bob was wracked by guilt—his father had earlier asked Bob to help pay off the father's debts to bookies.  But as a young husband and breadwinner—hopeful to be a father and with little available cash—Bob could not assist.  Shortly thereafter, his father took his own life.  Bob had the heart wrenching task of identifying his father's body.  Bob had to learn how to survive on his own from a young age, and these challenging, humble beginnings shaped the man and public servant he became: determined, hard working, scrappy, compassionate, and understanding; a man more likely to be found at an iHop than a Michelin star restaurant.

## B.    A Lifetime of Public Service

Over a 50-year period, Bob has run successful electoral campaigns at the local, state and national level.  He served as: the mayor of Union City, New Jersey from 1986 through 1992; a member of the New Jersey General Assembly from 1988 through 1991; a member of the New Jersey Senate from 1991 through 1993; a member of the United States House of Representatives from 1993 through 2006; and a member of the United States Senate from 2005 through 2024.

Throughout, Bob has had a distinguished track record of standing up to powerful interests on behalf of the underrepresented. He has earned him a well-deserved reputation as a fighter who won't stand down in the face of injustice.

That reputation is not just well-earned, it is his calling in life—one that emanates not just from his own family's teachings, but from his Catholic faith, which has endured in good times and in bad, carrying him through his darkest hours. Indeed, since his youth, Bob has prayed daily, and exchanges daily prayers with his sister, Caridad. It's his faith in God and humanity that has compelled him to devote his life to public service and community.

### i. Bob's Service to the Latino Community

Bob has maintained an unwavering dedication to the promotion and betterment of the Latino community. Bob was only the sixth Latino to serve in the United States Senate, and during his time as a Federal public servant, Bob was a proud member of the Congressional Hispanic Caucus. As noted by Janet Murguia, CEO of Unidos US, the largest national Latino civil rights and advocacy organization in the United States, Bob was the "most powerful and influential Latino member of Congress ever to serve in the House and Senate." Ex. B. She glowingly describes how Bob provided "tireless, selfless, and unwavering support" for the Hispanic community in New Jersey and nationwide during his tenure in the House and Senate. *Id*.

Just a few examples of Senator Menendez's advocacy on behalf of the Latino community as recalled by his colleagues and constituents include:

- Leading a bipartisan Senate coalition "that shepherded the only comprehensive immigration legislation to be passed by the Senate in this century." Ex. B (Letter submitted by Janet Murguia);

- Ensuring "the Affordable Care Act included Latino families", resulting in "more than four million individuals in our community [being] able to access health care for the first time." *Id.*;

- Advocating "for affordable housing" and "helping to enact programs to assist buyers in purchasing their first home." *Id.*;

- Fighting "for child tax credits that lifted millions of Latinos out of poverty." *Id.*;

- Advocating for aid to Puerto Rico after Hurricane Maria devastated the island in 2017, and being known as "a true friend to Puerto Rico, offering hope when it was needed most." Ex. C (Letter submitted by Eduardo Bhatia, former President of the Senate of Puerto Rico);

- Advocating for "former Cuban political prisoners in his own community in New Jersey." Ex. D (Letter submitted by Elio Muller, former AUSA and President Clinton appointee);

- Promoted "The Menendez Bill", which eventually was "passed and signed into law as the Title II of Cuban Liberty and Democratic Solidarity Act of 1996." *Id.*;

- Advocating for "diversity on public corporate boards," including "Hispanic inclusion," through introducing legislation "that would require public companies to disclose information related to the racial, gender, ethnic makeup and veteran status of corporate boards and senior management." *Id.*;

- Advocating for "Latino representation in the media and information sector."[2];

---

[2] https://chc.house.gov/media-center/press-releases/menendez-lujan-grisham-request-update-on-fcc-efforts-to-improve-latino

- Authoring the federal statute providing for a National Latino Museum, stating "I firmly believe that it's time that Hispanic Americans get their own world-class museum on the National Mall … [n]o one can deny that the 60 million Latino Americans living in this country will continue to shape America's future, just as we have shaped America's past."[3]; and

- Advocating for diversity generally, noting "Diversity is not something to tolerate, but rather something we must embrace for the good of all of us … doing right by communities of color is doing what's right for the country."[4]

### ii. Bob's Commitment to Advocating for the United States on the International Stage

As the Chair or Ranking Member of the Senate Foreign Relations Committee ("SFRC") for a decade, Bob was one of the most powerful voices in American foreign affairs. Bob's tenure on the SFRC has had a significant impact on U.S. foreign relations. He is known for his strong stance on human rights, democracy, and global security above all else, and for shaping U.S. policy towards countries around the world, including his family's home country Cuba.

Bob's advocacy extended well beyond the Hispanic community. One Armenian-American constituent described how Bob was a forceful "advocate for the Armenian-American community" by "push[ing] for a formal Senate Resolution to recognize the Armenian Genocide in every single session of Congress since 2006." Ex. E (Letter submitted by Vera A. Nazarian,

---

[3] https://www.legistorm.com/stormfeed/view_rss/1676597/member/374/title/menendez-makes-push-for-national-latino-museum.html

[4] https://www.theatlantic.com/politics/archive/2013/11/menendez-ethnically-diverse-america-requires-we-all-adjust/430419/

constituent).  Senator Menendez's efforts led to the United States' recognition of the Armenian

Genocide in 2022, which "gave us [of Armenian descent] a voice when we felt powerless to

global powers much larger than us."  *Id.*

Former President of Cyprus Nicos Anastasiades remembers Bob as a supporter of

"international law" who "helped in the reorientation of the foreign policy of the Republic of

Cyprus, with the result that the former member country of the non-aligned became, during my

presidency, a strategic partner of the USA."  Ex. F (Letter submitted by Hon. Nicos

Anastasiades).

Other select accomplishments include supporting anti-regime protests in Iran,[5]

sponsoring the "Authorization for the Use of Military Force Against the Government of Syria to

Respond to Use of Chemical Weapons,"[6] supporting anti-terrorism efforts and broad human

rights improvements in the Middle East and throughout the world, and advocating for women

and children who suffer at the hands of human traffickers,[7] among countless others.

Indeed, despite the government's hyperbolic claim that he was in the pocket of foreign

interests like Egypt and Qatar, Bob came to be known as one of the most hawkish Democratic

supporters of Israel.  Among other things, Senator Menendez opposed the Iran nuclear deal;

opposed the Boycott, Divestment, and Sanctions (BDS) movement; and cosponsored the

---

[5] https://www.foreign.senate.gov/press/rep/release/risch-menendez-blackburn-coons-lankford-lead-28-senate-colleagues-in-reintroducing-bipartisan-resolution-in-support-of-anti-regime-protests-in-iran

[6] https://www.congress.gov/bill/113th-congress/senate-joint-resolution/21

[7] https://www.foreign.senate.gov/press/dem/release/chairman-menendez-delivers-opening-remarks-at-full-committee-hearing-on-examining-us-and-global-commitments-to-combatting-human-trafficking

Israel Anti-Boycott Act and the Combating BDS Act of 2017, two bills that aimed to fight discriminatory boycotts that target Israel. He repeatedly condemned anti-Israel feelings and resolutions at the United Nations, including the UN Security Council Resolution 2334, which claims that Israel's settlements have no legal validity.  He supported the Taylor Force Act, which states that no American governmental funds shall be given to a Palestinian entity that financially rewards terrorists and their families.  He was even one of the few Democrats to support moving the U.S. embassy to Jerusalem and cosponsored the United States-Israel Security Assistance Authorization Act of 2018, a legislation that supported full funding of security assistance to Israel as outlined in the 2016 U.S.-Israel Memorandum of Understanding.  And in 2019, he voted for the Strengthening America's Middle East Security Act which, among other things, strengthened Israel's security and allowed a state or local government to adopt measures to divest its assets from entities that boycott Israel.  Notably, even as other Democrat politicians called for Senator Menendez's resignation following his indictment in September 2023, AIPAC (the American Israel Public Affairs Committee) stood by him, stating: "The pro-Israel community deeply appreciates Senator Menendez's leadership in strengthening the U.S.-Israel relationship."[8]

---

[8] https://forward.com/fast-forward/562191/bob-menendez-senate-democrats-pro-israel-pacs/

### iii.   Bob Tirelessly Advocated for his New Jersey Constituents

As recalled by those close to him and constituents alike, Bob was a champion for his constituents, always lending an ear and a helping hand to improve the lives of not just New Jerseyans, but all Americans.  Mayor Hector C. Lora describes Bob as:

> "a man who remembers where he came from and who carries a deep-rooted sense of responsibility toward those less fortunate.  His commitment to vulnerable populations—children, seniors, the disabled, and those who struggle to navigate bureaucratic processes—has always been unwavering.  What has continuously set him apart is that whenever I reached out to him with issues involving individuals, no matter how small the matter, he was always willing to give them his time and face-to-face interaction, something so rare for politicians of his stature."

Ex. G (Letter submitted by Mayor Hector C. Lora, Mayor of Passaic, New Jersey).  Bob performed simple acts of kindness and support for his constituents, "consistently demonstrat[ing] his commitment to helping others and making a positive impact on the lives of those in need." Ex. H (Letter submitted by Rabbi Menachem Genack).  Others recall how Bob championed his constituents in both very public and very unseen ways, from securing federal funding for those left in ruins after the devastating Hurricane Sandy (the worst natural disaster in New Jersey's history) to chipping in at a local food bank:

- During the COVID-19 pandemic, Bob "spent countless hours on the ground, listening to people's concerns and offering tangible solutions…showcasing his unwavering commitment to his constituents."  Ex. I (Letter submitted by Alexander Duran, constituent);

- Securing Hurricane Sandy relief, and being "the only representative of our government who stood up for us.  He held congressional hearings, press conferences & called for an investigation."  Ex. J (Letter submitted by Douglas E. Quinn, constituent).  In addition, Bob stayed invested in the well-being of

survivors of hurricane Sandy for years, advocating to get displaced people back in their homes long after the public attention had moved on;

- Securing state and federal funding "for the improvement of the education system" in Hudson County including "the construction of new elementary school buildings." Ex. I (Letter submitted by Alexander Duran, constituent);

- Securing emergency visa applications for numerous constituents and others, including for humanitarian purposes and to provide life-saving treatments. *See, e.g.,* Exs. E (Letter submitted by Vera A. Nazarian), K (Letter submitted by Christian A. Onuoha, now a Councilman), L (Letter submitted by Nina Saria, constituent), H (Letter submitted by Rabbi Menachem Genack), M (Letter submitted by Gertrudis Ramirez, constituent)

- Advocating for Alzheimer's "research funding, improving access to early assessment and diagnosis, and helping patients receive proper care." Ex. N (Letter submitted by Alicia Menendez, daughter);

- Advocating for "moms who were desperate for federal medical research to address their children's autism." Ex. O (Letter submitted by Danny O'Brien, former Chief of Staff & SFRC Staff Director);

- Protecting the federal judiciary by advocating for the "Daniel Anderl Judicial Security and Privacy Act … putting the safety and protection of the federal judiciary before himself." Ex. P (Letter submitted by Mark A. Anderl, constituent and husband of the Honorable Esther Salas);

- Feeding the homeless, even "when the cameras and crowds had gone." Ex. G (Letter by Mayor Hector C. Lora);

- Taking his free time to "share his enthusiasm for serving others and to encourage the students to consider public service as a way of fighting for change and giving back."  Ex. O (Letter submitted by Danny O'Brien).

### C.    Senator Menendez's Family

#### i.    His Children and Grandchildren

At age 22, Bob married his first wife Jane Jacobsen, with whom he shares two children, Alicia and Rob.  Alicia is a television commentator, host, author, and activist.  Her successful career in media spans frequent guest appearances on CNN, Fox, and MSNBC, co-hosting a Sirius XM radio show, acting as a correspondent on PBS's "Amanpour & Company", serving as a contributor to NBCLatino.com, founding a website that offered a Latino take on politics and media, and until 2024, hosting a weekend MSNBC program "American Voices with Alicia Menendez," among other accomplishments.

Rob followed in his father's footsteps, attending Rutgers Law School and becoming a member of the United States House of Representatives in 2023.  Prior to that he was a member of the Port Authority of New York and New Jersey.  Like his father before him, Rob is a member of the Congressional Hispanic Caucus.

Through Alicia and Rob, Bob has four young grandchildren.  According to his children, Bob is a grandfather extraordinaire.  Alicia describes him as a "silly and doting grandfather, willing to break his back playing horsey if it means hearing his granddaughters giggle."  Ex. N (Letter submitted by Alicia Menendez).  And Rob wishes nothing more than for Bob to have "the opportunity to pick up my son and daughter from school, be there for their games, plays, and ballets…[to make up] for all those days, weeks, years and precious moments that he missed in furtherance of" the American people while serving his country.  Ex. Q (Letter submitted by Robert J. Menendez, son).

14

### ii.    His Marriage to Nadine

Bob and Nadine had a whirlwind romance—at least until September 2023, when they were both indicted in this case.  They dated for approximately 18 months, and then Bob proposed in front of the Taj Mahal, serenading Nadine to the love ballad "Never Enough" from *The Greatest Showman*.  https://www.youtube.com/watch?v=uOIaPijJwx8.  Just over one year later they were married surrounded by their closest friends and family.

A few years later, disaster hit:  Bob and Nadine were both indicted, Bob was found guilty, Nadine was diagnosed with life-threatening breast cancer, and Nadine is barreling towards her own trial while undergoing further operations.  Yet, despite the impending sentencing, Bob has been shockingly selfless in his love and devotion to Nadine.  As said best by his daughter, Alicia, "during the darkest days of his own life, he has navigated his wife's breast cancer diagnosis with a type of grace and forgiveness I honestly do not understand but admire."  Ex. N (Letter submitted by Alicia Menendez).  Bob is Nadine's primary caretaker and is heavily involved in all aspects of her treatment, from ensuring appointments are scheduled, transporting her to doctors, applying medications and treatments, and even changing her tubes following surgery.

Put simply, Bob is Nadine's rock.  Nadine depends on her husband Bob not only for her care and survival, but also for her emotional wellbeing.  In her time of physical, medical, and legal need, she should be given the dignity of having her husband to care for her; and in turn, Bob should be given the latitude to care for his beloved wife.

## LEGAL ANALYSIS

## I.    The Appropriate Advisory Guidelines Range is 21-27 Months, and the PSR's Contrary Guidelines Analysis Lacks Evidentiary and Legal Support.

The PSR's Guidelines range calculation of 292–365 months is not just ridiculously disproportionate to the conduct of conviction; it also incorrectly applies three sentencing

enhancements that should be eliminated.  The Probation Department calculates a total offense

level of 40, based on: (1) a base offense level of 14 because Menendez was a public official at

the time of the offense; (2) a 14-level enhancement for a purported total loss amount of

$884,778.39; (3) a 4-level enhancement because "the offense involved an elected public official,

namely the defendant"; (4) a 4-level enhancement because the defendant was a purported

organizer or leader of criminal activity that involved five or more participants or was otherwise

extensive; and (5) a 2-level enhancement because the defendant purportedly obstructed or

attempted to obstruct the administration of justice.  PSR ¶¶ 142-52.  For the reasons stated

below, the enhancements for loss amount, leadership, and being an elected public official are

inappropriate and should be rejected.  After eliminating these enhancements, the correct total

offense level is 16, yielding an advisory guidelines range of 21-27 months.

## A.    The Government Has Not Proved the Proffered Loss Amount Enhancement by A Preponderance of the Evidence

The loss amount enhancement applied by the Probation Department looks to the greatest

of: (1) the value of the bribe payments; (2) the benefit received or to be received in return for the

payment; or (3) the loss to the government from the offense.  U.S.S.G. §2C1.1(b)(2).  Here, the

Probation Department calculated the enhancement based solely on the value of the bribe

payments.  PSR ¶ 144.  Because the government cannot prove by a preponderance of the

evidence that this specific loss amount of $884,778.39 was foreseeable to Senator Menendez, the

enhancement is inappropriate.

In seeking a loss enhancement, "the Government bears the burden to prove both the

existence and amount of the loss attributable to the offenses of conviction."  *United States v.

Cuti*, No. 08 Cr. 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011).  A calculation

under USSG § 2B1.1 must be made with particularity and supported by a preponderance of the

evidence. *See United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings must be grounded in the evidence and not derive from mere speculation."). The cornerstone of any loss amount/bribery calculation under §2B1.1 is foreseeability. U.S.S.G. §2B1.1, comment n.3(A)(iv) (Pecuniary harm is reasonably foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."); *see also* U.S.S.G. §1B1.3(a)(1)(B) ("in the case of a jointly undertaken criminal activity" a defendant may be held responsible for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity"). "[A] district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010), *overruled on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020); *United States v. Greenfield*, 44 F.3d 1141, 1149 (2d Cir. 1995) (an individual defendant "can be held accountable for the loss that stemmed from [particular acts] if, but only if, these acts . . . were reasonably foreseeable by [the defendant].").

The Court cannot simply use the jury's verdict to prove the amount of the bribes, because the government urged conviction on a theory that relied on *de minimis* payments as bribes. For example, in summation the government urged the jury to convict solely based on a $524.61 dinner at Mr. Chow's restaurant. Trial Tr. 6374:12-23 (government arguing to the jury that the Mr. Chow dinner is sufficient "thing of value" to sustain a bribery charge); GX 7B-2, GX 5E-101A (credit card statements showing the cost of the meal). The jury was not asked to make a

finding regarding the value of the bribery scheme, let alone the amount of bribes that Senator

Menendez was aware of or was reasonable foreseeable to him.  Accordingly, the verdict does not

resolve the matter in question, and the Court must examine the facts.

Far from examining the actual facts, the Probation Department merely accepted the

government's total bribe calculation as alleged.   Worse, the government and the Probation

Department suggested that it is the defendant's burden to disprove the bribe amount alleged,

without acknowledging the government bears the burden of proof on this issue.  *See* PSR at 83-

84.  But it is the government's burden to prove the foreseeable bribe amount based on evidence,

not speculation.  For example, the government cannot establish that the total amount of cash and

gold bars attributed to Nadine Menendez was reasonably foreseeable to Senator Menendez.  To

the contrary, the evidence showed that Senator Menendez was unaware of activities that Nadine

was undertaking, including the receipt and sale of gold bars by Nadine, and cash she stored in

her locked closet and her safe deposit box.  Trial Tr. 5136-5137 (Vaskin Khorozian testifying to

his understanding that Nadine did not discuss her visit to his store, and sale of gold bars, with

Senator Menendez); Trial Tr. 2199-2204 (Anna Frenzilli's testimony describing the lack of any

record of Senator Menendez visiting Nadine's safe deposit box and the absence of any items

bearing Senator Menendez's name in the safe deposit box); Tr. 5840 (Katia Tabourian's

testimony that Nadine kept her personal closet locked and private, and did not share the key with

others).  Other than the government's arguments, there is almost no evidence to support an

inference that Senator Menendez was aware of the cash and gold Nadine stored in her personal

and secure closet and safe deposit box.

Indeed, in other respects, the evidence showed that Nadine was clearly engaged in

conduct without Senator Menendez's knowledge.  She continued to date her abusive ex-

boyfriend behind Senator Menendez's back, and even asked that ex-boyfriend to support her financially while she was dating Senator Menendez. *See, e.g.*, DX 1818. She similarly withheld information from Senator Menendez regarding her mortgage troubles and the loan she received from Wael Hana (GX D108), as well as her visit to Vaskin Khorozian to sell gold (Trial Tr. 5136-5137). And even the government's star witness, Jose Uribe, confirmed that he never discussed his payments for Nadine's car (or any agreement to make those payments) with Senator Menendez (Trial Tr. 3376–80), who believed that the car had been paid for by Nadine's father. There simply is no communication or other evidence from which the Court could reasonably conclude that Senator Menendez was aware that Jose Uribe in particular paid for the vehicle.

The government made much at trial of the Senator's Google searches for the price of gold, and will surely suggest that this is evidence of the Senator's knowledge that Nadine received gold bars as bribes. Far from, the Google searches actually show that Senator Menendez searched for the price of commodities, including crude oil, precious metals, and gold specifically, even before the date the government alleges Nadine received bars of gold from Fred Daibes. GX 1337. And in any event, Senator Menendez understood that Nadine had family gold including kilogram gold bars – which she inherited (DXs 1117, 1535), and that such gold was being sold to pay off Nadine's mortgage (DX 1304, lines 325-1, 326-1, 326-2 (Nadine depositing proceeds from gold sale then sending a "wire transfer for the payoff of one of the mortgages.")). Thus, Menendez's search for the price of gold does not evidence his knowledge of bribes in gold bars.

Moreover, the evidence at trial showed that the cash found in Senator Menendez's office was stored differently than the cash located in Nadine's closet and safe deposit box. By way of example, the cash in his office was bundled in rubber bands and had post it notes that reflect the

19

Senator counted the amount withdrawn.  The cash in Nadine's closet and safe deposit box, by contrast, was stored in envelopes.  *Compare* GX 1D-132 and GX 1F-1197 (images of bank envelopes seized from Nadine's closet and safe deposit box) *with* GX 1F-1306 and GX 1F-1307 (images of cash seized from Senator Menendez's office, wrapped in rubber bands and labelled with post-it notes).  The different methods of storage is more consistent with an inference that Senator Menendez withdrew the cash in the duffel bag in his office from his bank account over the course of his political career, which is exactly what Menendez's sister Caridad Gonzalez testified she had observed years ago.  Trial Tr. 5777-5778 (Caridad Gonzalez testimony concerning her personal knowledge of Senator Menendez's practice of withdrawing and storing cash in his home)And, unlike the cash in the closet, the cash in the duffel bag found in the office largely pre-dated 2018, *see* unadmitted DX 1335 (attached as Exhibit R hereto), again confirming that Senator Menendez more likely withdrew the cash from the Senate and House credit unions over the course of many years.

Viewed in totality, the evidence at trial actually showed that very little of the alleged bribe payments were known or foreseeable to Senator Menendez.  Of all the cash recovered from 41 Jane Drive and Nadine's safe deposit box, the jury was shown only *one envelope* bearing a fingerprint (or DNA) from *both* Senator Menendez *and* an alleged co-conspirator (here, Fred Daibes).  And that envelope contained a mere $5,300.  GX 1338.  This is the *only* cash that can, in any way, be plausibly linked to Senator Menendez and reasonably foreseeable to any alleged criminal conspiracy.  This is the only cash, then, that the Court should rely on to identify the amount of bribe payments that were reasonably foreseeable to Senator Menendez.  Pursuant to U.S.S.G. §2C1.1(b)(2), no further enhancement is warranted under §2B1.1.

**B.    Senator Menendez Does Not Warrant a Leadership Enhancement**

The PSR's Guidelines range calculation is mistaken for the additional reason that it includes a 4-level leadership enhancement. There is no evidence that warrants that enhancement against Senator Menendez.

The law is clear that a leadership enhancement is only warranted where the defendant exercises a "level of control consistent with a leader or organizer."  *United States v. Caballero*, 93 F. Supp. 3d 209, 219 (S.D.N.Y. 2015), *aff'd*, 672 F. App'x 72 (2d Cir. 2016).  Merely "issu[ing] instructions" to alleged co-conspirators or "sett[ing] parameters" on their conduct is insufficient where the defendant "used only limited measures to enforce" his instructions or otherwise lacked "heightened control" over his co-conspirators.  *Id.* (citing *United States v. Batista*, 684 F.3d 333, 345–46 (2d Cir. 2012); *United States v. Gaskin*, 364 F.3d 438, 467 (2d Cir. 2004)) (additional citations omitted).

Additionally, the Guidelines outline several factors for the court's consideration, including "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. §3B1.1, comment n.4.  A leadership enhancement "does not apply to a defendant who merely suggests committing the offense."  *Id.*

The Probation Department accepted the government's recommendation of a leadership enhancement based on the government's allegation that "Menendez led and organized the scheme generally and Nadine Menendez's participation in the criminal activity in particular."

PSR at 84.  The evidence does not support this conclusion.  Indeed, far from organizing the scheme, the evidence showed that Senator Menendez was largely unaware of numerous of its components; indeed, it was supposed co-conspirators who tried to approach Senator Menendez (usually via Nadine) asking for favors, not the other way around. In addition to the examples identified above, Senator Menendez also was unaware of the communications between Wael Hana and Egyptian officials.  *E.g.*, GX C207-8 (text correspondence between Wael Hana and Ahmed Helmy concerning Senator Menendez's political activity).  Nor was he aware that Wael Hana bought an exercise machine for Nadine, or provided her a loan to pay off her mortgage. *Compare* GX A103-2 (Nadine representing to Senator Menendez that she would order him an elliptical) *with* GX 3C-10 (email correspondence showing that Wael Hana, through an employee, in fact purchased the elliptical); DX 108 & DX 110 (voicemails from Nadine to Daibes indicating that Senator Menendez is unaware of Wael Hana's mortgage loan to Nadine).   And, of course, as already noted, Senator Menendez had no knowledge of Jose Uribe's payments for Nadine's car.  Trial Tr. 3376-3380 (Uribe testimony that he never discussed making Nadine's car payments with Senator Menendez).  It is simply illogical to believe that a leader would be uninformed—and worse, misled—about the scheme in these critical ways.

While it is true that there are some communications that reflect advice or recommendations Senator Menendez provided to Nadine (PSR ¶ 131), those suggestions do not show that Senator Menendez dictated "Nadine Menendez's participation in the criminal activity," as the government claimed.  Even co-conspirators can make suggestions to each other without controlling each other's conduct.  Nothing about the communications remotely shows control by Senator Menendez, as is needed to warrant a leadership enhancement.  Indeed, the irony of the government's position is that it seeks it impose a leadership enhancement on Senator Menendez

for purportedly directing the criminal conspiracy, while at the same time claiming that Senator Menendez was being directed as a foreign agent of Egypt (through Wael Hana). These are internally conflicting theories, and the government cannot have it both ways.

C.    **The Probation Department Included Two Enhancements Based on Menendez's Status as an Elected Public Official, Which Constitutes Unwarranted Double Counting**

The Probation Department assessed two separate enhancements based on Menendez's status as an elected public official. *First*, the base offense level was increased from 12 to 14 levels because "the defendant was a public official." U.S.S.G. §2C1.1(a)(1). *Second*, an additional 4-levels was added because "the offense involved an elected public official or any public official in a high-level decision-making or sensitive position." U.S.S.G. §2C1.1(b)(3). This constitutes impermissible double counting.

"Impermissible double counting occurs [under the Sentencing Guidelines] when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Sabhnani*, 599 F.3d 215, 251 (2d Cir. 2010) (alteration in original) (*quoting United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000)). "Multiple adjustments are properly imposed, however, 'when they aim at different harms emanating from the same conduct.'" *Id.* (quoting *Volpe*, 224 F.3d at 76).

Here, Menendez is being penalized twice under the sentencing guidelines for being an elected public official: first with a 2-level base offense enhancement, and second with a specific 4-level enhancement.[9] This is fundamentally unfair and results in a 6-level enhancement that

---

[9] We acknowledge that the Second Circuit has rejected this argument in *United States v. Stevenson*, 834 F.3d 80, 84 (2d Cir. 2016), but that decision involved a plain error standard given that the objection was not preserved in the district court.

was never intended for elected public officials convicted of bribery.  The Court should apply

only the 2-level base offense enhancement.  *United States v. Kent*, 821 F.3d 362, 369 (2d Cir.

2016) (district court engaged in impermissible double counting when it applied leadership

enhancement based on same facts used to support other guidelines enhancements).

### D.    The Appropriate Advisory Guidelines Range is 21-27 months

In light of the above, the advisory Guidelines range should include an offense level of 16

based on (1) a base offense level of 14 because Menendez was an elected public official at the

time of the offense; and (2) a 2-level enhancement because the defendant purportedly obstructed

or attempted to obstruct the administration of justice.  With his lack of criminal history, the

advisory guidelines range is 21-27 months imprisonment.

### E.    Alternatively, the Court May Apply the ABA Task Force's "Shadow Guidelines" Instead of the "Loss Amount" Calculation in U.S.S.G. §2B1.1

It has been widely recognized among judges and commentators that the loss amount

enhancements in §2B1.1 of the Sentencing Guidelines—which are incorporated by reference in

the bribery guidelines of §3C1.1—produce unduly harsh sentencing recommendations in

economic crime cases.  In recognition of that, an alternative approach to loss amount has gained

traction in recent years for such offenses—an approach the Court should consider applying here.

Rather than apply the §2B1.1 enhancement, some judges have applied the so-called "shadow

guidelines" (the "Shadow Guidelines") proposed in 2014 by the American Bar Association's

Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic

Crimes—a blue ribbon panel of prominent judges (including Judges Lynch, Gleeson, and Rakoff

from this Circuit), law professors, and practitioners.  *See* American Bar Association Criminal

Justice Section, A Report on Behalf of the American Bar Association Criminal Justice Section

Task Force on the Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014)

(available at: https://www.americanbar.org/content/dam/aba/publications/criminaljustice/
economic_crimes.pdf).  Among other things, the ABA Task Force proposal narrows the §2B.1.1
loss amount table from 15 tiers to 6, and decreases the enhancement for highest loss amount
from 30 offense levels to 14.  *Id.* at 2.

Federal judges in this Circuit have applied the Shadow Guidelines in many recent cases
involving economic crimes.  For example, in a 2016 sentencing, Judge Vitaliano of the Eastern
District of New York rejected the Sentencing Commission's Guidelines and followed the
Shadow Guidelines' proposed loss amount table: resulting in a sentence of 63 months instead of
life in prison.  *United States v. Faibish*, No. 12 Cr. 265 (ENV) (E.D.N.Y.).  In *Faibish*, a CEO
was convicted by a jury of conspiracy to commit bank and securities fraud and making false
statements to the SEC.  The PSR had calculated a $32 million loss amount—$26 million lost by
an FDIC-insured bank, and millions more lost by shareholders as a result of the company's
bankruptcy—yielding a Guidelines sentence of life in prison that was capped by statute to 80
years.  *See* Sentencing Tr., *United States v. Faibish*, No. 12 Cr. 265, ECF No. 271 (E.D.N.Y. Mar.
10, 2016).  Noting at sentencing that the latest Guidelines "are just mindlessly accelerated once
you have numbers of any size added in the loss or gain table," Judge Vitaliano conducted an
alternative offense level analysis under the Shadow Guidelines as more "fairly reflective of what
a court is required to do under Section 3553(a)" and "most reasonable here."  *Id.* at 23, 54.  The
Judge imposed a sentence of 63 months' imprisonment.  *Id.* at 54.

Other judges in this Circuit have similarly cited and relied upon the ABA Task Force's
Shadow Guidelines.  For example, in *United States v. Litvak*, No. 3:13 Cr. 19 (JCH) (D. Conn.),
Chief Judge Janet C. Hall of the District of Connecticut stated that she was in "complete
agreement with the drafters of this proposal, some of whom are very highly regarded judges in

25

this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable." Sentencing Tr. at 135–36, *United States v. Litvak*, No. 3:13 Cr. 19 (JCH), ECF No. 298 (D. Conn. July 23, 2014). Judge Hall sentenced the defendant to 24 months in prison where the Guideline recommendation was 108–135 months. *Id.* at 158.

Similarly, in *United States v. Rivernider*, No. 3:10 Cr. 222 (D. Conn.), Judge Robert N. Chatigny of the District of Connecticut applied the Shadow Guidelines in sentencing a defendant convicted of 18 counts of wire fraud and conspiracy to commit wire fraud. Judge Chatigny noted that the Shadow Guidelines' calculation yielding a sentence of 144 months' imprisonment was "preferable to" the 324–405 month calculation under the current Guidelines that "significantly overstate[d]" the defendant's culpability. Sentencing Tr. at 206, 212, *United States v. Rivernider*, No. 3:10 Cr. 222 (RNC) (D. Conn. Dec. 18, 2013).

This Court should similarly apply the Shadow Guidelines in this bribery case. It is truly mind boggling to comprehend why §2B1.1 adopts the increments in the frequency noted below:

| (1) If the loss exceeded $6,500, increase the offense level as follows: | |
| --- | --- |
| LOSS (APPLY THE GREATEST) | INCREASE IN LEVEL |
| (A) $6,500 or less | no increase |
| (B) More than $6,500 | add **2** |
| (C) More than $15,000 | add **4** |
| (D) More than $40,000 | add **6** |
| (E) More than $95,000 | add **8** |
| (F) More than $150,000 | add **10** |
| (G) More than $250,000 | add **12** |
| (H) More than $550,000 | add **14** |
| (I) More than $1,500,000 | add **16** |

Does the distinction between a $94,000 bribe and a $101,000 bribe merit a two level enhancement? What makes a $560,000 bribe equivalent in nature to a bribe of $1.4 million? These arbitrary lines cannot remotely be justified, and the Shadow Guidelines acknowledge that

by reducing the frequency of enhancement, as well as the maximum available enhancement, under §2B1.1:

> (1) **Loss**.  If the loss exceeded $20,000, increase the offense level as follows:
>
> | (A) More than $20,000 | add [4] |
> | (B) More than $100,000 | add [6] |
> | (C) More than $1,000,000 | add [8] |
> | (D) More than $5,000,000 | add [10] |
> | (E) More than $10,000,000 | add [12] |
> | (F) More than $50,000,000 | add [14] |

We respectfully submit that the Shadow Guidelines more appropriately comprehend that losses (and bribes) between $100,000 and $1 million presumptively warrant similar punishment, and that it is not until more than $1 million in losses that a defendant should be penalized to any greater degree.  Applying the Shadow Guidelines in this case, even accepting the government's purported bribe amount of $884,778—which we continue to dispute—no more than a 6-level enhancement under §2B1.1 is warranted.  That would result in a total offense level of 22 (assuming defendant's other Guidelines objections are sustained), yielding an advisory guidelines range of 41-51 months' imprisonment.

## II.    A Substantially Below-Guidelines Sentence With a Condition of Rigorous Community Service Is Appropriate.

Whether or not the Court adopts the Probation Department's Guidelines analysis, a substantially below-Guidelines sentence is appropriate in this case.  Indeed, recognizing the facial unreasonableness of a 292-365 month sentence—the bloated result of an unsupported Guidelines analysis urged by the prosecutors here—the Probation Department recommends a sentence of 12 years' imprisonment.  For the reasons stated below, even that below-Guidelines sentence of imprisonment is far harsher than necessary to satisfy the 3553(a) factors, out of line with comparable sentences meted out in this Circuit, and contrary to the interests of justice.  We

27

respectfully submit that a sentence substantially below the advisory Guidelines range, and

including at least two years' rigorous community service, is sufficient but not greater than

necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

### A.    Substantial Departures from the Guidelines Are Permitted, Appropriate, and Commonplace in Bribery Cases

The United States Sentencing Guidelines are only the starting point of sentencing analysis: "they

are truly advisory." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) (citation omitted).

Indeed, "[a] district court may not presume that a Guidelines sentence is reasonable; it must

instead conduct its own independent review of the sentencing factors . . . ." *United States v.

Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  The Court has wide latitude to vary from

the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a), in order to ensure that

the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S.

476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247

(1949)).  The Court should exercise that discretion here.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Sentencing

Commission to issue guidelines that "assure the meeting of the purposes of sentencing," 28

U.S.C. § 991(b)(1)(A), but the Sentencing Commission couldn't agree on which purposes should

predominate; for example, whether principles of just deserts should be given greater weight than

incapacitation.  Instead, the Commission decided to take its cue from past practice; it issued

guidelines that it claimed were based on an empirical study of past sentences.  *See* U.S.S.G., Ch.

1 pt. A(3) (1987); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key

Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).  In effect, the purposes that

judges had previously relied on—the purposes implicit in actual past sentences—would be their

guide.  But, in fact, the guidelines that the Commission set did not accurately reflect past practice.

Numerous sentencing courts in this District and elsewhere have imposed sentences significantly below the Guidelines range in bribery cases where, as here, the range is so out of touch with the actual facts and circumstances of the case.  Indeed, a sentence within the Guidelines range would result in dramatic unwarranted disparities under §3553(A)(6) because the Guidelines range urged by the Probation Department in this case dwarfs the sentences handed down to elected officials for conduct far more egregious than present here: conduct that involved the extortion of those with business before the State, actual pressure and threats of others for corrupt payments, and the sale of public contracts.  For all the government's hype, the reality is that nothing Senator Menendez did for Daibes, Hana or Uribe in any way effected legislation or official government action or policy.  Indeed, each of Senator Menendez's government counterparts in the various charged schemes—Undersecretary McKinney, N.J. Attorney General Grewal, and U.S. Attorney Sellinger—acknowledged that the contact from Senator Menendez did not change government action even one iota.  That stands in stark contrast to other well-known public corruption cases, identified below.  A review of these cases makes clear that a sentence of even half the government's proposed Guidelines range in Menendez's case would be one of the harshest ever imposed.  Some examples of sentences imposed in other public corruption cases follow:

***United States v. Bruno (Two-Year Sentence):***  Joseph Bruno was New York State Senate Majority Leader and one of the three most powerful men in New York State.  He was convicted in 2009 of two counts of honest services mail fraud.  As alleged at trial, he accepted payments worth $280,000 for consulting work and other goods he never performed or delivered by exploiting his official position for personal gain, including by directing certain State grants to

29

entities in which Bruno's bribers had an interest. Bruno further concealed the nature of those relationships and the existence of the payments on his disclosure forms. The court calculated an offense level of 30 and a Guidelines Range of 97-121 months. In delivering its judgment, the sentencing court noted that Bruno had "trampled on the integrity of the State Legislature and people who put their trust in you and others, and there has to be a penalty for that." Sentencing Transcript, *United States v. Bruno*, 09-cr-0029-GLS (N.D.N.Y. May 6, 2010), Dkt. No. 306 at 94.[10] In reaching the appropriate balance with the severe Guidelines recommendation, the court ultimately imposed a sentence of **24 months**.

*United States v. McDonnell (Two-Year Sentence):* Virginia Governor Robert McDonnell was convicted of 11 counts of public corruption related allegations including extortion and theft of honest services. As with the allegations against Menendez, the allegations against Governor McDonnell largely involve the provision of gifts to Governor McDonnell and his wife, including luxury sports cars. In return, Governor McDonnell made introductions between his alleged briber and other high-ranking Virginia State officials. McDonnell's Guidelines range was 121-151 months. He was sentenced to **24 months**. His conviction was later vacated on appeal by the United States Supreme Court.

*United States v. Skelos (51 Month Sentence):* Dean Skelos was the New York Senate Majority Leader and one of the three most powerful elected officials in New York State. In 2015, Skelos was convicted of pressuring and threatening companies with substantial business before the New York Senate into providing his son with no-show jobs worth hundreds of

---

[10] We can provide a copy of the sentencing transcripts referenced in this memorandum upon the Court's request.

thousands of dollars.  Notably, it was Skelos who first approached the bribe payors seeking payments for his son, leaving these companies with the impression that he would withdraw his critical legislative support if they did not comply.  Gov't Sentencing Mem., *United States v. Skelos*, 15-cr-00317- KMW (S.D.N.Y. Apr. 4, 2016), Dkt. 173 at 24.  In stark contrast, Senator Menendez here made no such threats of any bribe givers, and never threatened to use his official powers to pressure any other government actors.  Moreover, in the *Skelos* case, Senator Skelos ultimately took official actions to benefit the companies paying his son, including by supporting legislation and steering contracts worth millions of dollars to them, and his son then held those companies "hostage" for a commission on the value of those contracts.  In total, Skelos and his son sought more than $760,000 in extortion payments, bribes and gratuities. In his retrial (his first conviction was vacated on appeal), Senator Skelos testified in his own defense, but the jury rejected his testimony.

Skelos' conduct was far more egregious than anything done here by Senator Menendez. The Guidelines recommendation for Skelos was 151 to 188 months. Following his retrial, Skelos was sentenced to a term of imprisonment of **four years and three months**.

*Additional Examples:*

New York State Senator Carl Kruger was convicted of political bribery for accepting more than $1 million in exchange for official action.  At sentencing, the Court described his conduct as "extensive, long-lasting, substantial bribery schemes that frankly were like daggers in the heart of honest government."  (Rashbaum, William K. "After Resigning, Tearful Senator Pleads Guilty to Accepting Bribes." New York Times, Dec. 20, 2011).  The Court sentenced him to 7 years in prison, which was below the advisory Guidelines range of 108-135 months.

New York State Senator Efrain Gonzalez was convicted of conspiracy and fraud for stealing more than $700,000 from non-profit groups.  (Weiser, Benjamin. "A Former Bronx Senator Gets 7 Years for Corruption." New York Times, May 25, 2010).  He too received a sentence of 7 years in prison, again well below the advisory Guidelines range of 135-169 months.

New York State Senator Shirley Huntley was convicted of stealing $87,000 from a non-profit organization she ran.  (Secret, Mosi. "One-Year Prison Sentence for an Ex-State Senator Who Taped Her Colleagues." New York Times, May 9, 2013).  She received a sentence of 366 days, which was below the advisory Guidelines range of 18-24 months.

## B.    The Guidelines Are Not an Appropriate Guide for Actual Sentencing Practice in Bribery Cases

Consistent with the recognition that the Guidelines do not control sentences, the United States Supreme Court has noted that a district court may issue a non-Guidelines sentence "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citation omitted).  The Court of Appeals has similarly stated that sentences governed by §2B1.1 loss amount calculations is an approach "unknown to other sentence systems," and while it was one the Commission was entitled to adopt, "its unusualness is a circumstance that a sentencing court is entitled to consider." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citation omitted); *see also United States v. Johnson*, No. 16 Cr. 457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators.  The problems with the loss enhancement have been evident since the inception of the Guidelines.").

Indeed, despite the application by judges of the Sentencing Guidelines for decades, a sentence based on the bribery Guideline does not accurately reflect actual sentences in bribery cases.  The average and median sentences under §2C1.1 are a tiny fraction of the recommended Guidelines sentence here.  For example, between 2015 and 2024, the average sentence for defendants with a criminal history category of I under §2C1.1 in the Second Circuit was 15 months and the median was 6 months out of a total population of 213 defendants sentenced to a term of incarceration.  *See* U.S.S.C., Interactive Sourcebook, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard





If we expand that to all Circuits, between 2015 and 2023, the average sentence for criminal history category I under §2C1.1 was 25 months and the median sentence was 15 months out of a population of 1,729 defendants sentenced to a term of incarceration.



In other words, there is no reason whatsoever to presume that the Guidelines provide useful guidance in bribery cases.  When the Commission formulated guidelines for white collar offenses, it departed from "empirical data and national experience," and in so doing it departed

34

from its "characteristic institutional role." *Kimbrough*, 552 U.S. at 109. In the years since 1987, the Loss Table has only become more distorted by the effects of inflation; the recommended punishment for many loss amounts has effectively doubled. And finally, the Commission's own data shows that the bribery guidelines in particular continue to recommend sentences far above the sentences that are actually imposed in most cases. In this context, to impose a Guidelines sentence—or one substantially influenced by the Guidelines— would be to create a serious sentencing disparity and an unjust result.

### C. Senator Menendez's History and Characteristics Militate Against A Substantial Sentence of Incarceration

The "history and characteristics of the defendant," a sentencing factor enumerated in 18 U.S.C. §3553(a)(1), support a below-Guidelines sentence.

As discussed in detail above, Senator Menendez's life has been one of hard work and dedication to caring for and helping his family, community, and countless others. He has helped thousands (if not millions) of constituents, literally saving lives and preventing impoverishment and homelessness. He has been a tireless advocate for human rights protections throughout the World. He has supported Israel and has supported the United States' efforts to fight Al Qaeda and Iran-backed terrorism at every turn. Until this conviction marred his reputation, his career and life has been celebrated mainly for his work on behalf of the powerless and downtrodden. Not many people—and we expect few, if any, criminal defendants in history—have had the record of public service that Senator Menendez has.

Senator Menendez has no criminal history, and before this case, lived an upstanding life devoted to family, community, and public service. He has received strong, widespread support from family, friends, colleagues, religious and international leaders, and countless others. Despite this conviction, numerous upstanding community members have written to the Court to

speak to Bob's moral character, kindness and generosity, and to explain that the offenses of conviction are inconsistent with Bob's overall character.

Bob has more to give to society beyond serving a lengthy prison sentence. Just one example: every year for decades Bob has fed the homeless at a local soup kitchen in New Jersey, even scrubbing the floor when no cameras or photographers were present. Ex. G (Letter submitted by Mayor Hector C. Lora). He has much more to give to society, and to his family that depends on him and cherishes him. A substantial sentence of imprisonment would deprive so many of Bob's goodness and generosity.

### D. Substantial Additional Incarceration Is Not Required to Reflect the Nature, Circumstances, and Seriousness of the Offense or to Provide Just Punishment for the Offense

The "nature and circumstances of the offense" and the "need for the sentence imposed . . . to reflect the seriousness of the offense . . . and to provide just punishment for the offense"—two additional sentencing factors set out by Section 3553(a)—also support a below-Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1) & (a)(2)(a). That is, without questioning the *proof* of the acts underlying Senator Menendez's convictions, there can be no dispute that the *outcomes* of such acts—vis-à-vis any victim, constituent, and/or the public at large—were entirely neutral, if not positive, to society. There was simply no competent evidence presented to show that *any* of the acts alleged by the government harmed *anyone.*

Take the allegations with respect to ISEG Halal, for example. In that context, the government argued (i) that ISEG Halal's role as an exclusive certifier (the so-called "monopoly") harmed competing halal certification businesses and the American beef industry by raising the cost of certifying Halal meat destined for Egypt; and (ii) that Senator Menendez was somehow responsible for the maintenance of that "monopoly." But these arguments crumble under the slightest scrutiny. As a first point, the government admitted in its own *Indictment* that Senator

36

Menendez's brief call to USDA Under-Secretary McKinney (the only alleged action that Senator Menendez took with respect to ISEG Halal) had no impact whatsoever on relevant policy. *See* S4 Indict. ¶ 30 ("[Under Secretary McKinney] did not accede to the MENENDEZ's demand" that "the USDA stop interfering with ISEG Halal's monopoly"). And Under-Secretary McKinney confirmed as much at trial. Trial Tr. 1983-84. Accordingly, Senator Menendez's call to Under Secretary McKinney—again, the only act alleged in connection with ISEG Halal— could not *possibly* have caused any harm to anyone (as no one acted in accordance with Senator Menendez's demand). Moreover, it was conceded that the "monopoly" was solely within the government of Egypt's authority to grant or take away. The USDA simply had no power to actually change Egypt's position in this regard.

Indeed, despite its bluster, the government was unable to identify any competing Halal certifiers that were harmed by the Senator's conduct, let alone by ISEG's role as an exclusive certifier, as opposed to such competitor's own failure to comply with Halal slaughter and butchering strictures. GX C107-AT (translated report of findings of Egyptian Halal certifier audit). And data published by the U.S. government and admitted at trial showed that exports of American beef to Egypt *increased* following the onset of ISEG's service as an exclusive certifier, further belying any notion that the "monopoly" harmed American industry. DX 761A (USDA Agricultural Export Yearbook showing increase in U.S. exports of beef to Egypt after 2019). Simply, in the one instance where the government attempted to show harm arising from Senator Menendez's conduct, it was not able to do so.

Regarding the "Egypt scheme," everything Senator Menendez did was actually consistent with U.S. interests and policy. With respect to the letter Senator Menendez edited at Nadine's request regarding aid to Egypt, there was no evidence this letter was *sent* by Egyptian officials,

let alone that it had any impact on U.S. policy.  Nor was there any evidence showing how the

Senator's sharing *unclassified* information concerning the aggregate number of employees at the

American embassy in Cairo—information that the Egyptian government already had—with  his

wife did impact, or could possibly have impacted, anyone's safety or well-being (other than the

risible testimony from an Agriculture attaché that such information is "one piece of information

that could be aggregated" with unspecified "other information" in order to, somehow, "identify"

particular embassy employees for acts of terrorism).  Trial Tr. 378-379 (Tate Direct Testimony).

Nor was there evidence that correcting an Egyptian official's misconception about American aid

policy, about a day before Egypt's lobbyists provided the same correction, harmed anyone

(indeed, it's hard to imagine what the harm of doing so would even be).

As to the government's overblown allegations regarding the approval of military aid, the

actual record shows that military aid provided to Egypt during the period of the alleged scheme

was entirely consistent with the value and types of aid that the U.S. had been regularly providing

for decades, meaning that any act or "promise" by Senator Menendez regarding such aid had no

material impact.  Trial Tr. 938 (Josh Paul Cross Testimony describing the continuous flow of aid

to Egypt).  In fact, one of the approved aid packages that the government emphasized at trial

provided ammunition for the Egyptian military to *fight ISIS* in the Sinai Peninsula – undoubtedly

a worthwhile use of American military aid.  GX 8A-2; Trial Tr. 943 (Josh Paul Cross Testimony).

Indeed, just two weeks after Senator Menendez's resignation from the Senate (in late August

2024) following his conviction, President Biden overrode congressional human rights conditions

on military aid to Egypt—conditions that *Senator Menendez* worked hard to implement—in

order to grant Egypt its full allocation of $1.3 billion—a first in President Biden's administration.

https://www.reuters.com/world/biden-administration-grants-egypt-13-billion-military-aid-

despite-rights-2024-09-11/.  To put a finer point on it, despite the prosecutors' suggestion that

Senator Menendez was shilling to increase Egypt's military aid from the United States, in reality

it was only after Senator Menendez's resignation from the Senate that Egypt got its full allotment

of military aid.

   The New Jersey State and Federal schemes, too, resulted only in the Senator making non-

threatening requests or suggestions that were either ignored or not understood to be requests for

action at all.  Specifically, then N.J. Attorney General Gurbir Grewal testified that Senator

Menendez's call involved him raising general concerns about mistreatment of constituents and

*no request* for any action on any particular case.  Trial Tr. 2773, 2794 (Grewal Cross Testimony).

U.S. Attorney Phillip Sellinger likewise testified that he did not understand Senator Menendez to

be asking for anything improper or unethical.  Trial Tr. 3662 (Sellinger Cross Testimony).  And

the evidence showed that both Grewal and Sellinger took *zero action* regarding any alleged co-

conspirator following their encounters with Senator Menendez, and that neither of them felt any

pressure to act as a result of Senator Menendez's call.  Trial Tr. 2739 (Grewal Direct Testimony

confirming that he did "nothing" following both his phone call and meeting with Senator

Menendez); Trial Tr. 4995 (Khanna Direct Testimony confirming that Sellinger was recused from

Daibes' case).

   In sum, despite the talk of cash and gold bars, Senator Menendez was convicted for

perhaps the most forgettable and least impactful bribery scheme in recent memory.  *Unlike* the

positive effects of the Senator's lifetime of public service, the supposed *quos* of the broader

scheme—requests in telephone calls that were ignored (if they were even understood), provision

of information that was largely public already, and "promises" to perform acts that Senator

Menendez would have done anyway and that are consistent with U.S. foreign policy—simply did

not impact the public, negatively or otherwise.  Of course, and to reiterate, we do not challenge here that taking bribes in exchange for inconsequential acts can still be a crime.  But doing so is *not* a crime that merits a substantial sentence of imprisonment under the circumstances, and certainly not a sentence *greater* than those meted out to public officials who actually harmed the public through their conduct, such as by selling government contracts to less meritorious bidders or stealing from non-profit organizations.  Instead, a sentence far *shorter* than the Probation Department's recommendation is appropriate here in recognition of the lack of any harm caused by the Senator's conduct (and to distinguish that conduct from more harmful acts taken by public officials).

**E.**     **Neither Specific nor General Deterrence Is Best Served by a Substantial Sentence of Additional Imprisonment, Nor is it Needed to Protect the Public and to Promote Respect for the Law**

A below-Guidelines sentence would reflect the needs for "adequate deterrence to criminal conduct," to "protect the public from further crimes of the defendant," and to "promote respect for the law," as required by 18 U.S.C. § 3553(a)(2)(A)–(C).

*First*, Senator Menendez is never going to commit any future offenses.  Indeed, those close to him see the counts of conviction as aberrational to the Senator's life, which has been characterized by a commitment to public service and true love of this country:

- "Through all of these years I have only seen Sen. Menendez apply his power and leadership for the good of his constituents, minorities and for the greater good of making America advance to the aspirational values of our country…Your honor cannot appreciate the shock and surprise to me and our mutual friends to read and hear the news about the matters giving rise to this case…this is not the man we have known and served with."  Ex. D (Letter submitted by Elio Muller);

40

- "The man described in the sensationalized press articles does not resemble the man I have come to know and respect.  The Senator I know is a compassionate leader who has always genuinely cared about making a difference in the lives of others."  Ex. I (Letter submitted by Alexander Duran);

- "What I can attest to is that I observed his work and his interactions with others on an almost-daily basis for six years, during which I never observed any of the things like those charged in this matter.  What Bob Menendez did show me was an abiding love of country and humanity."  Ex. O (Letter submitted by Danny O'Brien);

- "[M]y experiences with Senator Menendez reveal a man deeply devoted to his country, his state and constituents. The Senator I have come to know is a true friend, a patriot, and a dedicated public servant. His actions, driven by genuine concern and a commitment to service, illustrate his character far better than any alternative portrayal."  Ex. K (Letter submitted by Councilman Christian A. Onuoha);

- "My personal experiences with Senator Menendez reflect a man who has always been devoted to his country and his constituents, with an unwavering commitment to public service and helping those in need. The Senator I know is a compassionate leader, a true friend, and a dedicated public servant."  Ex. H (Letter submitted by Rabbi Menachem Genack);

- "[M]y experiences with Senator Menendez have been of such that they reflect a man with a heart for the people, devoted to his country and his constituents, with unfailing devotion to helping others and serving the public…a true patriot and a devoted public servant."  Ex. S (Letter submitted by Rev. Dr. Calvin McKinney).

- "It is my pleasure to serve as a character reference for Bob Menendez because it is my deep personal belief that the man that I have known professionally well over several decades, is NOT the man that has been portrayed in the public domain and made to be a mockery of in the media." Ex. T (Letter submitted by Lyndon K. Boozer) (emphasis in original).

*Second*, the punishment Senator Menendez has already faced pre- and post-trial amply satisfy the objectives of both specific and general deterrence. As noted, Senator Menendez has suffered extreme public shame and upheaval, and his finances and reputation are destroyed, likely for the rest of his life. He is the butt of late-night talk show jokes, and his name will live in infamy as the first politician in history to be convicted of being a foreign agent. He will never be in a position of authority or hold public office again. He will live the rest of his days a social and political pariah, whether inside or outside of jail.

Moreover, Senator Menendez is 71 years old, and will not be a recidivist. Indeed, statistically speaking, defendants much younger than he (e.g., defendants over 40 years old) are particularly suited for non-Guidelines sentences given that they "exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez*, No. 04 Cr. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing below-Guidelines sentence in part because defendant was a 55-year-old and first-time offender); *see also* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 23 (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2016/recidivism_overview.pdf (analyzing all federal offense types, including fraud offenses); *United States v. Ruiz*, No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (citing U.S. Sentencing Comm'n, *Measuring*

*Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines* 28

(2004), https://www.ussc.gov/research/ research-publications/measuring-recidivism-criminal-

history-computation-federal-sentencingguidelines).  And empirical evidence indicates that even

short sentences send a strong message to potential white collar offenders.  *See Adelson*, 441 F.

Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can

have a strong deterrent effect on prospective 'white collar' offenders"); Richard S. Frase,

*Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White*

*Collar Criminals?*, 23 S. Ill. U.L.J. 485, 492 (1999); U.S. Sentencing Comm'n, *Fifteen Years of*

*Guidelines Sentencing* 56 (2004), https://www.ussc.gov/research/research-and-

publications/research-projects-and-surveys/fifteenyears-guidelines-sentencing (noting that the

Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement

for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and

to achieve deterrence" (emphasis added)).  *Cf. United States v. Tomko*, 562 F.3d 558, 573, 582

(3d Cir. 2009) (declining to adopt government's argument that district court's probation-only

sentence in complex securities fraud case, which government described as a "100% downward

variance," would harm general deterrence).

### F.    A Sentence of Substantial Additional Incarceration Is Likely to Result in Unwarranted Sentencing Disparities

The Court must also consider "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. §

3553(a)(6), and sentence of substantial additional incarceration here is likely to cause the kind of

disparities proscribed by Section 3553.

The Second Circuit has repeatedly noted that a sentencing court's obligation to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a) includes the need to avoid unwanted sentencing disparities. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 182–83 (2d Cir. 2010); *United States v. Cavera*, 550 F.3d 180, 188–89 (2d Cir. 2008); *United States v. Brennan*, 395 F.3d 59, 69 (2d Cir. 2005). In this regard, the Court must consider not only co-defendants in this case, but also similarly situated defendants in other cases.

As noted above, similarly situated defendants in public corruption cases in this Circuit have regularly received far shorter sentences for similar (and worse) offenses than the term recommended by Probation. *See supra* Section IV.A. And unlike public servants who stole from non-profit organizations or extorted funds from unwitting participants, the counts of conviction here involved receipt of gifts and the like from friends of Senator Menendez and Nadine (like Fred Daibes and Wael Hana), who lavished gifts on them long before the allegations here.

### G.    The Court Should Consider Alternatives to Incarceration

Finally, the Court should independently consider whether a non-custodial sentence—such as home detention and rigorous community service—would best serve the requirements of 18 U.S.C. §3553(a) and the ends of justice in this case. *See* 18 U.S.C. §3553(a)(3) (requiring the sentencing courts to consider "the kinds of sentences available").

There is growing recognition by the U.S. Sentencing Commission, commentators, the Department of Justice, and the courts that alternatives to incarceration warrant greater consideration generally, and in the white collar context particularly. In 2009, the Sentencing Commission issued a report on alternative sentencing that recognized that "[e]ffective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly

incarceration."[11]  Similarly, the 2014 ABA Shadow Guidelines for Economic Offenses concluded

that "a sentence other than imprisonment is generally appropriate" for defendants charged with

non-serious economic offenses that have no criminal history.[12]  And in October 2014, then-

Deputy Attorney General Sally Yates noted that "[w]hile it's true that there are dangerous

defendants from whom society needs to be protected, there are others . . . for whom alternatives

to incarceration make a lot more sense."  *United States v. Dokmeci*, No. 13 Cr. 455 (JG), 2016

WL 915185, at *10 (E.D.N.Y. Mar. 9, 2016).

Courts, too, have long recognized the need to consider alternative sentences.  *See, e.g.*,

*United States v. Murphy*, 108 F.R.D. 437, 439 (E.D.N.Y. 1985) ("For most crimes of white collar

corruption it may not be necessary to provide substantial prison terms."); *United States v. Pippin*,

903 F.2d 1478, 1484 (11th Cir. 1990) (noting that, after "extensive study," the Sentencing

Commission recommended leeway for the sentencing judges to impose non-custodial sentences

in white collar cases with low Guidelines ranges).  For example, former Judge Gleeson of the

Eastern District has written at length in two opinions on the virtues of alternatives to

incarceration.  *See Dokmeci*, 2016 WL 915185; *United States v. Leitch*, No. 11 Cr. 609, 2013 WL

753445 (E.D.N.Y. Feb. 28, 2013).  Judge Gleeson lamented how "every theft, tax evasion,

---

[11] U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* 20
(2009), https://www.ussc.gov/sites/default/files/pdf/researchand-publications/research-projects-andsurveys/alternatives/20090206_Alternatives.pdf.

[12] Am. Bar Ass'n Criminal Justice Section, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014),
https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.authcheckdam.pdf.

antitrust, insider trading, fraud, and embezzlement case is . . . no more eligible for a sentence of probation, even when committed by a first-time offender, than would a crime of violence." *Leitch*, 2013 WL 753445, at *1.  Judge Gleeson recognized that probation is itself "significant punishment" and that there are "an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison."  *Id.* at *12. Judge Oetken of this Court reached the same conclusion in a recent conspiracy to commit securities fraud and honest services wire fraud case, in which he imposed, following a guilty plea, a non-incarceratory sentence for a first-time offender with a total offense level of 30: an offense level that would have produced a Guidelines range of 97 to 121 months but for a five-year statutory maximum that capped the Guidelines range at 60 months.  *See United States v. Kang*, No. 16 Cr. 837 (JPO) (S.D.N.Y. 2017).

## CONCLUSION

For the foregoing reasons, the sentencing factors set out in Section 3553(a), as applied to the circumstances of this defendant and case, justify a substantially below-Guidelines sentence that credits Senator Menendez's lifetime of good deeds and good character, his low likelihood of offending in the future, and the punishment he has already sustained due to his conviction.  As urged by a friend and former member of the Puerto Rican Senate Roberto L. Prats, "please consider that you are sentencing a good man who devoted his entire professional career to serving others.  In doing so, he touched the heart and soul of many citizens, me included, asking for nothing in return."  Ex. U (Letter submitted by Roberto L. Prats, Esq.).  We respectfully submit that the Court should impose a sentence that relies heavily on alternatives to incarceration, as such a sentence is sufficient but not greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. §3553(a).

Date:  January 2, 2025
      New York, New York

Respectfully submitted,

By: /s/ Avi Weitzman
Avi Weitzman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 725-3620

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 1(310) 620-5719
Facsimile: 1(310) 620-5819

Attorneys for Defendant Robert Menendez