UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                           :

UNITED STATES OF AMERICA         :

                                       :

        *-v.-*               :      S4 23 Cr. 490 (SHS)

                                       :

ROBERT MENENDEZ,           :
WAEL HANA,                  :
  a/k/a "Will Hana," and      :
FRED DAIBES,             :

                                       :

                    Defendants.    :

                                       :

------------------------------------------------------------x

## SENTENCING MEMORANDUM OF THE
## UNITED STATES OF AMERICA

 

MATTHEW PODOLSKY
Chief Counsel to the Acting United States Attorney
Attorney for the United States
Acting under Authority Conferred by
28 U.S.C. § 515

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

Christina A. Clark
Special Assistant United States Attorney

   - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

I.     The Offense Conduct ................................................................................................. 2

     A.     The Bribery and Foreign Influence Conduct Related to Egypt ............................. 3

     B.     The Bribery Conduct Related to New Jersey State Criminal Matters ................. 10

     C.     The Bribery Conduct Related to Daibes's Federal Prosecution and Qatar .......... 12

     D.     The Obstruction of the Grand Jury's Investigation ............................................. 15

II.     The Presentence Investigation Reports ..................................................................... 16

III.     Other Public Corruption Prosecutions ..................................................................... 18

     A.     Prosecutions of U.S. Senators .............................................................................. 19

     B.     Recent Sentences in Significant Corruption Cases .............................................. 21

IV.     Available Time Credits ............................................................................................. 23

     A.     The First Step Act ................................................................................................. 24

          1.     Good Conduct Time ................................................................................. 24

          2.     Earned Time Credit ................................................................................. 25

     B.     The Residential Drug Abuse Program .................................................................. 26

DISCUSSION ......................................................................................................................... 27

I.     THE SENTENCING RANGES SET FORTH IN THE PRESENTENCE REPORTS ARE ACCURATE .............................................................................................................. 27

     A.     Applicable Law ..................................................................................................... 27

     B.     Discussion ............................................................................................................. 28

          1.     Bribe Amounts Attributable to Menendez and Hana .............................. 29

               a)     Menendez Received the Bribes Specified in the PSRs ................. 29

               b)     The Bribes Set Forth in the PSRs Were Within the Scope of Hana and Daibes's Jointly Undertaken Criminal Activity ..................... 31

      2.      Menendez's Leadership Role ................................................ 34

      3.      Public Official Adjustment ................................................ 36

II.    SUBSTANTIAL SENTENCES OF IMPRISONMENT ARE WARRANTED ............... 37

    A.    Applicable Law ................................................................ 37

    B.    Discussion ..................................................................... 38

      1.      Menendez Should Receive a Sentence of at Least Fifteen Years ............ 38

          a)     The Nature and Circumstances of the Offense ............................ 38

          b)     The History and Characteristics of the Defendant ...................... 46

          c)     The Purposes of Sentencing ................................................ 52

      2.      Hana Should Receive a Sentence of at Least Ten Years ........................ 58

          a)     The Nature and Circumstances of the Offense ............................ 59

          b)     The History and Characteristics of the Defendant ...................... 62

          c)     The Purposes of Sentencing ................................................ 64

      3.      Daibes Should Receive a Sentence of at Least Nine Years .................... 69

          a)     The Nature and Circumstances of the Offense ............................ 69

          b)     The History and Characteristics of the Defendant ...................... 71

          c)     The Purposes of Sentencing ................................................ 73

III.   THE COURT MUST ORDER FORFEITURE AND SHOULD ORDER SUBSTANTIAL FINES ............................................................... 74

    A.    Applicable Law ................................................................ 74

      1.      Forfeiture ..................................................................... 74

      2.      Fine ........................................................................... 78

    B.    Discussion ..................................................................... 79

      1.      Menendez and Hana Must Forfeit the Proceeds of Their Crimes ............ 79

          a)     Menendez's Forfeiture Order ............................................... 79

          b)     Hana's Forfeiture Order ................................................... 86

      2.      Each Defendant Should Pay a Substantial Fine ............................. 87

CONCLUSION ........................................................................ 89

## PRELIMINARY STATEMENT

In July 2024, after an over nine-week trial before this Court, Robert Menendez, Wael Hana, and Fred Daibes were found guilty by the jury of multiple crimes arising out of a long-running bribery and foreign influence scheme of rare gravity. This case is the first ever in which a Senator has been convicted of a crime involving the abuse of a leadership position on a Senate committee. It is the first ever in which a Senator—or any other person—has been convicted of serving as a foreign agent while being a public official.

Even leaving aside their historical rarity, the defendants' crimes amount to an extraordinary attempt, at the highest levels of the Legislative Branch, to corrupt the nation's core sovereign powers over foreign relations and law enforcement. Menendez corruptly promised to influence national security, including this country's provision of large quantities of lethal military aid. He corruptly divulged, to a foreign government, sensitive non-public information that could put at risk U.S. and foreign nationals serving at an embassy abroad. He corruptly promised to influence foreign relations, including attempting to pressure a federal agency engaged in diplomatic attempts to protect U.S. businesses from an extractive monopoly granted by a foreign nation to one of his coconspirators. And he corruptly promised to subvert the rule of law by disrupting multiple felony criminal proceedings, state and federal, including by influencing the selection of the chief federal law enforcement officer for New Jersey.

The gravity of each of these promised abuses of power is only underscored by the naked greed that motivated them. Hana and Daibes solicited each of these corrupt promises from Menendez, and showered him and his wife with hundreds of thousands of dollars of bribes including cash, gold, paychecks for a fake job, and a luxury Mercedes-Benz convertible. They did so to aid their own businesses and deflect government scrutiny of themselves and their associates.

And Menendez, who swore an oath to represent the United States and the State of New Jersey, instead put his high office up for sale in exchange for this hoard of bribes.

The Court should impose substantial sentences of imprisonment—sentences of imprisonment of at least fifteen years for Menendez, at least ten years for Hana, and at least nine years for Daibes—and significant financial penalties to provide just punishment for this extraordinary abuse of power and betrayal of the public trust, and to deter others from ever engaging in similar conduct.

## BACKGROUND

### I.    The Offense Conduct

As proven at trial, the defendants engaged, for years, in a corruption and foreign influence scheme of stunning brazenness, breadth, and duration, resulting in exceptionally grave abuses of power at the highest levels of the Legislative Branch of the United States Government.  This conduct, motivated by greed and a sense of entitlement to convert the public's trust to private and personal benefit, was egregious.

Because the Court is deeply familiar with the offense conduct from presiding over the trial and from its thorough opinion recognizing the sufficiency of the evidence and denying the defendants' request for a new trial, *see United States v. Menendez*, No. S4 23 Cr. 490 (SHS), 2024 WL 5103452, at *7-32 (S.D.N.Y. Dec. 13, 2024), the Government focuses herein only on the principal aspects of the defendants' conduct that the Government considers most relevant to sentencing.  For a more detailed description of the offense conduct, the Government respectfully

refers the Court to the Government's memorandum in opposition to the defendants' Rule 29 motions (Dkt. 611 at 11-77), as well as to the presentence investigation reports.[1]

### A.    The Bribery and Foreign Influence Conduct Related to Egypt

The defendants' conduct related to Egypt amounts to exceptionally severe, and at least in some respects historically unique, offenses implicating national security, the foreign relations of the United States, and the security of U.S. employees stationed abroad and foreign nationals working for the United States abroad.

As an initial matter, the bribes exchanged for Menendez's promises and acts related to Egypt underscore the defendants' contemporaneous understanding of the wrongfulness of their actions.  Many of the bribes took the form of payments from Hana's monopoly, whether to Nadine Menendez's mortgage company styled as a "loan", or to a sham consulting company that Menendez helped set up, in exchange for a patently insubstantial supposed consulting job for Nadine Menendez.  *See, e.g.*, *Menendez*, 2024 WL 5103452, at *9-12.  Others involved kilogram bars of gold, physically delivered by Daibes upon Menendez's return from a trip to Egypt.  *See, e.g.*, *id.* at *19.  In each case, the bribes were delivered in secrecy and concealed with lies, showing that none of the defendants was deterred by the knowledge of the wrongfulness of their conduct.  Menendez and Hana were both well aware that Nadine Menendez's job was a mere fig leaf.  *See,*

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Menendez Mem." refer to the sentencing memorandum of Robert Menendez (Dkt. 677).  Citations to "Hana Mem." refer to the sentencing memorandum of Wael Hana (Dkt. 687).  Citations to "Daibes Mem." refer to the sentencing memorandum of Fred Daibes (Dkt. 676).  Citations to "Menendez PSR" refer to the presentence investigation report of Menendez, dated November 25, 2024.  Citations to "Hana PSR" refer to the presentence investigation report of Hana, dated November 8, 2024.  Citations to "Daibes PSR" refer to the presentence investigation report of Daibes, dated November 8, 2024.  Citations to "Ex. A" refer to the proposed forfeiture order as to Menendez attached hereto, and citations to "Ex. B" refer to the proposed forfeiture order as to Hana attached hereto.

*e.g.*, *id.* at *12. (*See also, e.g.*, Dkt. 611 at 17-19, 22-23.) Daibes took care to deliver the checks to Menendez face-to-face, and Menendez, for his part, not only directed Nadine Menendez not to put communications with Daibes in writing, *see, e.g.*, *id.* at *25 (quoting Menendez instructing Nadine Menendez, "No, you should not text or email"), but also kept all of these bribes off of his public Senate financial disclosure forms (*see, e.g.*, Dkt. 611 at 23-24).

As brazen as the receipt of bribes was, the acts Menendez took and promised in exchanged for these bribes were truly alarming. While bribery offenses are serious crimes even when founded on promises to perform routine or potentially beneficial acts, the acts that Menendez promised and attempted were far from routine or beneficial.

Menendez's promises and attempts to pressure the U.S. Department of Agriculture ("USDA") to accede to a business monopoly for Hana amount to a serious abuse of power affecting the foreign relations of the United States, businesses, and consumers. Egypt's decision to grant Hana a new monopoly on halal certification had sweeping and negative implications for U.S. businesses (Tr. 443, 546, 579-80), and accordingly became a high-priority issue for the Under Secretary of Agriculture for Trade and Foreign Agricultural Affairs, Ted McKinney. (Tr. 1775 (McKinney testifying that halal monopoly was "Very, very important"); Tr. 1776 ("It was unheard of, and so we were very concerned with the loss of an entire market and, with that, the ramifications to farmers and ranchers, the processors and even all the way to the consumers that might be purchasing those in Egypt.").) This precipitous move, which caused a tenfold increase in the prices charged to U.S. beef exporters (a price that was largely passed on to Egyptian consumers, but with the likely effect of harming U.S. exporters by shrinking the export market (Tr. 408, 579-80, 1786-87)), triggered an urgent response by the Executive Branch, including a campaign of diplomatic

communication by the chargé d'affaires at the U.S. Embassy in Cairo (the President's representative overseas), and by the Under Secretary. (Tr. 390, 472-76, 479-84, 546-48, 1777-80, 1787-91.) It was these diplomatic actions—the articulation and effectuation of the considered and official position of the United States on a significant matter affecting the foreign relations of the United States—that Menendez sought to influence. (*See, e.g.*, Tr. 1789.) This conduct alone, seeking to pressure the Executive Branch to stand down from its attempt to protect U.S. industry— in order to enrich Hana, who was (if even qualified at all) patently far less qualified to conduct halal certification than the certifiers that Egypt rejected (*see, e.g.*, Tr. 430, 434-35, 464-65)—was itself a serious abuse of Menendez's power as a U.S. Senator.

Beyond the abuse of his powers as a Senator, Menendez's abuse of the powers of his leadership position on the Senate Foreign Relations Committee ("SFRC") is a truly unique aggravating factor in this aspect of the offenses. His leadership position was relevant to his attempt to pressure Under Secretary McKinney (*see, e.g.*, Tr. 1768 (McKinney testifying Foreign Agricultural Service funded almost exclusively from farm bill passed by Congress); Tr. 1795-96 (McKinney testifying that farm bill reauthorization was a reason USDA took Congressional inquiries seriously); Tr. 4597 (SFRC staffer testifying that SFRC oversees portions of farm bill related to Foreign Agricultural Service); Tr. 1804 (McKinney testifying that SFRC has "broad oversight" of matters related to foreign affairs, including agricultural matters)), and was crucial to his promises to approve U.S. military aid to Egypt.

Menendez was entrusted by the public with extraordinary powers over the United States's foreign relations, far exceeding the powers generally available to any U.S. Senator or even a regular member of the SFRC. (*See, e.g.*, Tr. 877-78 ("[T]he chair and the ranking member of the

Senate Foreign Relations Committee have an immense amount of influence and sway over the State Department.  That is the committee that confirms our leadership in the form of our assistant secretaries, our secretary.  It confirms our ambassadors, the United States ambassadors around the world.  It writes the laws that, you know, define what we do, how we operate.  So there are any number of steps that, in theory, a chair or ranking member who would be unhappy with the State Department could take were we to break the hold."); *see also, e.g.*, Tr. 872-73, 947.)  These powers gave Menendez substantial ability to affect both the timing and the substance of the United States's provision of military aid to Egypt in excess of one billion dollars per year (Tr. 878-79).  And they gave him even more power to approve or to block the sales of U.S. military equipment—including lethal military equipment—to Egypt.  (*See, e.g.*, Tr. 888-91.)  Although there was a very narrow set of circumstances in which the Executive Branch could proceed with arms sales in spite of opposition by the Chair or Ranking Member of the SFRC, as a practical matter the Chair or Ranking Member could entirely block such sales.  (*See, e.g.*, Tr. 894-95, 930-31; *see also* Tr. 895 ("As a practical matter, the chairman or chair or ranking member of the Senate Foreign Relations Committee has immense influence over whether a sale notified to that committee goes through.").)  A knowledgeable State Department witness summarized the power over foreign military sales possessed by the leadership of the SFRC as "[m]ore than any other member of Congress."  (Tr. 947.)

Not only were Menendez's promises to approve military aid a grave abuse of his leadership position, but they were also promises to undertake actions with significant implications for human rights and national security.  Although the foreign military financing and foreign military sales that Menendez promised to approve had a number of supporters in the Executive Branch and the

Legislative Branch, they were far from uncontroversial.  To the contrary, reports of serious human rights abuses by Egypt—including human rights abuses reportedly conducted using U.S.-manufactured military equipment provided to Egypt in the very foreign military sales program that was the subject of Menendez's corrupt promises—had led others in the Legislative Branch and the Executive Branch to register their objections.  (*See, e.g.*, Tr. 874-75; GX 8F-9; GX 10A-1; GX A402.)  Indeed, these objections were not mere public statements, but had led to Egypt not timely receiving all of its appropriated military aid.  (*See, e.g.*, Tr. 876; GX 8F-9.)  Thus, unlike in many corruption offenses, the promises that Menendez gave and that Hana and Daibes sought did not concern simply routine or uncontroversial actions (which would nonetheless be serious).  Rather, Menendez's promises to Hana and Daibes involved actions relating to the provision of huge sums of military aid, including lethal military equipment, in circumstances raising concerns that they would be used in human rights abuses.

The involvement of a foreign government is another highly unusual, and at least in some respects historically unique, factor in this aspect of the offense conduct.  This case presents the first ever charge and conviction under Title 18, United States Code, Section 219, the statute prohibiting a federal public official from acting as an agent of a foreign principal.  As the trial evidence showed, Menendez did not give these corrupt promises related to Egypt as part of a solely private or domestic bribery scheme, as serious as that conduct would be.  Instead, he agreed to and did act as an agent of Egypt.  The evidence showed that during the course of the scheme, in addition to the corrupt promises described above, he modulated his public criticism of Egypt, *see, e.g.*, *Menendez*, 2024 WL 5103452, at *24-25, and sought to take a trip to Egypt circumventing ordinary State Department protocols (Dkt. 611 at 51-52), behaving in such an abnormal manner that his

loyal and longtime staff members were stunned (Tr. 4587-90). Menendez even directed one of those staff members not to attend the trip to appease Egyptian officials (Tr. 4585), leading the then-SFRC staff director to remark, "All of this Egypt stuff is very weird. I've never seen anything like it." (GX 8F-22).

Beyond these deeply troubling acts, Menendez repeatedly, and surreptitiously, provided Egypt with advocacy adverse to his colleagues and sensitive information related to U.S. foreign policy. Menendez's provision of information to and advocacy on behalf of a foreign government—and indeed the provision of information to the intelligence service of a foreign government with a controversial human rights record—were an extraordinary betrayal of the public trust. In multiple instances, Menendez advocated on behalf of the Egyptian government and provided assistance to the Egyptian government in a manner directly adverse to his own fellow U.S. Senators. Menendez helped ghost-write a letter seeking to justify Egypt's alleged human rights abuses against objections lodged by another U.S. Senator of his own party. In short, while a U.S. Senator himself, Menendez literally not just took the side of, but secretly authored a response in the voice of, a foreign government against his own fellow U.S. Senators. *See, e.g.*, *Menendez*, 2024 WL 5103452, at \*26 ("While the sender and recipient are not identified, the letter is clearly written from the perspective of the Government of Egypt."). He also briefed the head of Egyptian intelligence on questions other U.S. Senators were preparing to ask regarding reports that Egypt had aided in a notorious human rights abuse, the murder and dismemberment of a U.S. lawful permanent resident journalist. *See id.* He did so, in the explicit words of his codefendant wife, so that the head of Egyptian intelligence could prepare his "rebuttals" (GX 1302 row 1220; GX B213-1) and "answers" (GX 1302 row 1215; GX G301-1) to Menendez's fellow U.S.

Senators' questions.  In circumstances where there were specific reports that a foreign country had engaged in serious human rights abuses, for Menendez to clandestinely aid that foreign country in generating "rebuttals" to the questions of his own colleagues about those abuses was a true betrayal of the trust placed in him.

Menendez's provision of non-public information to Egypt was—like his advocacy on behalf of the Egyptian government—also indefensible and a grave abuse of his power.  By virtue of his leadership position on the SFRC, Menendez was privy to a wide variety of information that, while not formally classified, was non-public, sensitive, and not for distribution to foreign governments (or their agents).  Menendez repeatedly provided, through Hana and Nadine Menendez, such sensitive and non-public information.  Some of it was the work product of his SFRC staffers, who compiled information regarding the activity of other Senators to brief him, not knowing that he would paste it into an email and send it, through Nadine Menendez, to Hana. (*Compare* GX 1302 row 69 (citing GX 8F-9) *with* GX 1302 row 107 (citing GX A402).)  Some of it was pre-publication information of the State Department, which had shared information with SFRC staffers in advance of their lifting a ban on small arms to Egypt, not knowing that Menendez would sit down at a dinner with Hana and transmit that information, through Hana, to the Egyptian defense attaché.  (*See* GX 1302 rows 165-79.)  And some of it, egregiously, was the State Department's non-public current staffing and nationality figures for the U.S. Embassy in Cairo. *See Menendez*, 2024 WL 5103452, at *25.

The figures on Embassy staffing that Menendez provided to Egypt, which the Court has recognized as "highly sensitive, nonpublic information," *see Menendez*, 2024 WL 5103452, at *25, were kept confidential in order to protect U.S. Embassy staff from being identified, located,

and targeted by foreign intelligence services or others (Tr. 573-75). As a result, this information was not even shared *with Menendez* as a matter of course. Instead—after meeting Hana and Nadine Menendez at a restaurant near his office—Menendez had to dispatch a staffer to request that information from the State Department. *See id.* at *25. The State Department, rightly, would not provide that information without a reason, but was willing to provide it upon learning that "Menendez is asking," *id.*, an indication of the degree of power and influence Menendez held. Plainly, neither the embassy personnel serving in Cairo, nor the State Department staffers disclosing the information upon learning that the request came from Menendez, nor still the staffer tasked with gathering this information for Menendez, could have imagined that Menendez would pass it, through his then-girlfriend and then Hana, to the Egyptian government.

### B. The Bribery Conduct Related to New Jersey State Criminal Matters

Menendez's and Hana's attempts to tamper with two pending state criminal matters, in exchange for cash and a luxury convertible for Nadine Menendez, amounted to a serious threat to the integrity of the criminal justice system.

The corrupt promises that Menendez and Hana made to influence pending criminal cases are inherently and gravely serious conduct that threatens public confidence in the criminal justice system. Hana promised that he would have Menendez "stop and kill" a pending state criminal prosecution, *Menendez*, 2024 WL 5103452, at *15, and Menendez confirmed to Jose Uribe that Hana had asked Menendez to "get a better resolution" in that pending prosecution. (Tr. 3104.) These promises themselves, even if no action had been taken on them, would still be greatly corrosive to public confidence in the justice system.

Menendez, however, did not stop at mere promising. Instead, he actually took actions to attempt to influence pending criminal cases, and did so by attempting to pressure the then-New

10

Jersey Attorney General.  *See Menendez*, 2024 WL 5103452, at *13.  Indeed, Menendez did so

twice, first calling then-New Jersey Attorney General Gurbir Grewal in January 2019 and then—

undeterred by Grewal rebuffing his improper contacts—summoning Grewal to his state Senate

office to attempt to pressure him face-to-face.  *Id.*

Notably, this conduct was exactly what Menendez, through his Senate website, had for

years consistently told the public he would not undertake.  (*See, e.g.*, GX 10C-1 ("OUR OFFICE

CANNOT . . . INTERVENE with judicial issues, provide legal advice or recommend an attorney.

*Our Senate office cannot legally get involved with pending litigation, including questions about*

*criminal trials or imprisonment*, child custody issues, and civil lawsuits." (emphasis added)); *see*

*also, e.g.*, GX 10G-2 (same text in 2020); GX 10G-3 (same in 2019); GX 10G-4 (same in 2018);

GX 10G-5 (same in 2015).)  The trial evidence, however, showed that the only thing true about

Menendez's statement was that Menendez would not intervene in the criminal cases of people who

were not paying him bribes.

Not only did Menendez attempt to pressure the New Jersey Attorney General, but he did

so by contriving a false allegation of discrimination.  *See Menendez*, 2024 WL 5103452, at *13

(describing Menendez as claiming that Hispanic defendants were being treated differently than

non-Hispanic defendants).  (*Cf., e.g.*, GX 1303 rows 354-79 (Menendez soliciting and receiving

briefing from Hana through Nadine Menendez, not including any information suggesting that

Hispanic defendants were being treated differently from non-Hispanic defendants); Tr. 3128

(Uribe testifying that Menendez asked him to write down only the names related to cases to be

influenced, not evidence of discrimination); Critchley Dep. Tr. 86:14-19 ("Q. When Menendez

called you about Mr. Parra's case, to the best of your recollection, in substance, did he ask you for

facts about whether or not the prosecution was selective or discriminatory?  A. No.  To the best of my recollection.").)  The willingness to use a false allegation of discrimination in exchange for bribes only makes Menendez's already egregious conduct worse.

Finally, these corrupt promises and attempts were made in exchange for nakedly improper things of value—a luxury convertible for Nadine Menendez, and cash payments to Hana— showing the low regard in which Menendez and Hana held the criminal justice system.  *See, e.g.*, *Menendez*, 2024 WL 5103452, at \*15-16.  As with the other bribes, these were concealed and not disclosed on Menendez's Senate financial disclosure forms (*see, e.g.*, GXs 10E-4, 10E-5, 10E-6, 10E-7), thus further deceiving the public.

Menendez's and Hana's conduct with respect to New Jersey state criminal proceedings— seeking to pressure the highest levels of New Jersey state law enforcement with lies, in order to disrupt felony criminal matters, all for the most venal of motives—displayed nothing less than contempt for the due administration of justice.

### C.    The Bribery Conduct Related to Daibes's Federal Prosecution and Qatar

Menendez's and Daibes's exchange of cash and gold bars for Menendez's attempted intervention into Daibes's federal criminal prosecution, and for the request that Menendez advance a Senate resolution relating to Qatar, reflect another alarming abuse of Menendez's powers and an attempted direct assault on the integrity of the federal criminal justice system.

As an initial matter, the nature of the bribes—bank envelopes stuffed with cash, and kilogram bars of gold—shows Menendez's and Daibes's awareness of, and lack of care for, the wrongfulness of their actions.  Daibes provided at least ten envelopes stuffed with cash, totaling over $80,000, to Menendez and Nadine Menendez, which they secreted in Nadine Menendez's safe deposit box and their shared residence—including in their bedroom closet, and in the pocket

of one of Menendez's jackets hanging in the basement (in close proximity to hundreds of thousands of dollars of other cash, including cash with the fingerprints of an associate of Hana (*see* Tr. 2855-56; *see also Menendez*, 2024 WL 5103452, at *43), and cash wrapped with money bands showing it was not withdrawn from Menendez's or Nadine Menendez's bank accounts (*see* GX 1F-1264, GX 1F-1266)).  (*See, e.g.*, GX 1338, GX 1F-1164, GX 1F-1165, GX 1F-1188, GX 1F-1239, GX B201-1A & GX 3D-6.)  None of this was disclosed on Menendez's Senate financial disclosure forms as required, even though it was all provided during the course of the scheme and required to be disclosed.  (*See, e.g.*, GXs 10E-4, 10E-5, 10E-6, 10E-7.)

Menendez's receipt of things of value from Daibes knowing that Daibes wanted Menendez in exchange to use his powers as SFRC Chair to advance a formal resolution praising Qatar, *see Menendez*, 2024 WL 5103452, at *19, was another serious abuse of Menendez's leadership position.  The jury heard evidence that resolutions can be highly significant to the United States's bilateral relations with foreign nations (*see* Tr. 4491-93), and that the Chair of the relevant committee has an important role in advancing resolutions within the jurisdiction of the committee (*see* Tr. 4493-94).  Accordingly, the corrupt request that Menendez—as Chair of the SFRC—advance a resolution that was assigned to the SFRC in return for bribes, *see Menendez*, 2024 WL 5103452, at *19 ("The link shows that the resolution had been referred to the SFRC."), was a request that he abuse his leadership position.

Menendez's attempt to influence the pending federal felony prosecution of Daibes in the District of New Jersey was also an egregious assault on the integrity of the federal criminal justice system.  The jury heard evidence that Menendez raised the Daibes case—*alone* among individual cases—in what Menendez characterized as a job interview for the position of U.S. Attorney for

the District of New Jersey, then changed his decision on whom to recommend as U.S. Attorney based on his beliefs about whether that candidate would have to be recused from supervising the Daibes prosecution. *See Menendez*, 2024 WL 5103452, at *18. Following the U.S. Attorney's eventual confirmation, Menendez continued attempting to influence the Daibes prosecution, including by asking his outside political advisor to raise the case directly with the U.S. Attorney—notwithstanding Menendez's knowledge that the U.S. Attorney was recused from the case. *See id.* at *20. In an indication of the patent wrongfulness of Menendez's requests, Menendez's political advisor—for the first time in approximately 15 years of working for Menendez—declined to carry out Menendez's request and instead falsely told Menendez that he had. (Tr. 3945-46.)

Menendez's belief that he was entitled to have the U.S. Attorney influence Daibes's case—notwithstanding the fact that the U.S. Attorney was recused from it by the Department of Justice—is shown by his decision to retaliate against the U.S. Attorney by shunning his investiture and contacting the other New Jersey Senator, Cory Booker, to try to convince him to do the same. (*See, e.g.*, Tr. 3652-53 (Sellinger: "He said, I'm going to pass. The only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship with the United States Attorney, and you don't."); GX A204-2.)

The fact that Menendez's attempt to influence Daibes's prosecution involved abuse of his power, as the senior U.S. Senator from New Jersey, to recommend to the White House his preferred candidate for U.S. Attorney for New Jersey escalates the severity of the offense. The power by custom to make recommendations for presidential nominations is another form of public trust that Menendez abused, separate and apart from the trust placed in him by virtue of his committee leadership position. (Tr. 3878.) And more fundamentally, the fact that Menendez allowed corrupt

14

motives to influence his recommendation—which recommendation was ultimately accepted and led to the confirmation of the U.S. Attorney—imparts far-reaching potential consequences to the offense conduct.  Although the U.S. Attorney was not implicated in any of the offense conduct (or otherwise alleged or shown to have engaged in any wrongdoing) and was recused from Daibes's prosecution, the fact that the selection process of the chief federal law enforcement officer for New Jersey—an individual who necessarily makes innumerable decisions in numerous cases over the course of their term—was corruptly influenced is nevertheless an extraordinary circumstance.  No matter how qualified the U.S. Attorney, this conduct greatly, and unfairly, damages public confidence in the administration of justice.

Beyond these factors, the fact that Daibes paid these bribes, and Menendez received them, while Daibes was on federal bail further exacerbates the seriousness of the offense conduct.  Courts considering whether to release defendants on appearance bonds under the Bail Reform Act must necessarily place a degree of trust in defendants to comply with their conditions during the pendency of the case.  Rather than uphold that trust, Daibes treated it as an opportunity to try to buy his way out of the charges.

### D.    The Obstruction of the Grand Jury's Investigation

Compounding the seriousness of each of the above offenses, Menendez took steps to obstruct the grand jury's investigation and prosecution.  After becoming aware that the Federal Bureau of Investigation ("FBI") was actively investigating his conduct, including through the searches of his and his wife's residence and cellphones and the service of multiple grand jury subpoenas, Menendez conspired with Nadine Menendez to generate falsified documents to be provided to the grand jury in an effort to thwart the grand jury's work.  *See Menendez*, 2024 WL 5103452, at *28-31.  Indeed, these documents reinforced the very same cover-up story that Nadine

Menendez and Uribe came up with after being served with grand jury subpoenas, a lie Uribe acknowledged was intended to "cover up [his] wrongdoings." *Id.* at *29 (internal quotation marks omitted). And further demonstrating Menendez's knowing obstruction and persistence in concealing his conduct, Menendez deceived his then-counsel into making false statements directly to the Government, including not just the false statements on the checks provided to the grand jury, but also the flat denial that Menendez was contemporaneously aware of Hana's payments, even the check from Hana that Daibes himself put in Menendez's hand. (*See, e.g.*, Dkt. 611 at 61-62.)

Ultimately, Menendez's determination to commit crimes was not an isolated and aberrational episode. It persisted not just for the four years leading up to the FBI's search of his home, but even for months *after* he was aware he was under such scrutiny. And it was another abuse of the public trust and attempt to pervert the fair and uniform administration of justice. *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 342-43 (1974) ("The institution of the grand jury is deeply rooted in Anglo-American history. . . . The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement.").

## II.    The Presentence Investigation Reports

The offense conduct summary set forth in the defendants' presentence investigation reports ("PSRs") is accurate, with one minor revision. Paragraph 76 of Menendez's PSR, referring to Nadine Menendez causing two kilograms of bribe gold from Daibes to be sold in Manhattan, states "NADINE MENENDEZ caused some of the gold to be sold to a jeweler in New Jersey, and the jeweler in New Jersey in turn sold the gold in New York." (Menendez PSR ¶ 76.) As the Court is aware from the trial, this conduct is more accurately described not as a sale of the gold to the jeweler and a subsequent sale by the jeweler in New York, but as a single transaction—one in which Nadine Menendez entrusted the jeweler with the two kilogram bars of gold so that the

16

jeweler could sell them, on her behalf, in New York, in exchange for the jeweler receiving a fee from the sale price. *See Menendez*, 2024 WL 5103452, at *36. Accordingly, the quoted phrase in the PSR should be revised to "NADINE MENENDEZ caused a jeweler in New Jersey to sell some of the gold in New York in exchange for a fee."

The Government also notes that, although at the time of this writing, the defendants' Guidelines calculations as set forth in the PSRs are all correct, Daibes's Criminal History Category may change prior to the scheduled January 29, 2025 sentencing in this case. That is because Daibes is scheduled to be sentenced on January 23, 2025 in *United States v. Daibes*, No. 18 Cr. 655 (SDW) (D.N.J.), *i.e.*, the federal prosecution of Daibes that Menendez and Daibes conspired and attempted to influence and obstruct. Depending on the sentence imposed in that case, Daibes's Criminal History Category under the Sentencing Guidelines may need to be recalculated prior to sentencing in this case.

The U.S. Probation Office recommends a twelve-year sentence for Menendez, a downward variance from his 292-365 month Sentencing Guidelines range. (Menendez PSR at 88.) In making this recommendation, the Probation Office recognizes Menendez's offense as "among the most heinous" corruption offenses in this district and others (*id.* at 90-91), and notes, among other things, his abuse of his committee leadership position, his betrayal of his oath of office, his "greed and willful disregard for ethics and laws that govern and guide our elected officials at the highest level," his "apparent minimal regard for the effect his actions had on the country," his long-term participation in the crime, and his obstruction of justice as "significant aggravating factors" (*id.* at 90). The Probation Office balances these factors against Menendez's age and history of civic service in arriving at a twelve-year recommendation. (*See id.* at 90-91.)

The Probation Office recommends a seven-year sentence for Hana, a downward variance from his 97-121 month Guidelines range.  (Hana PSR at 75.)  Hana's PSR lists as aggravating factors, among other things, the amount of the bribes, the numerous bribe schemes, the involvement of a Senator with a committee leadership position, and Hana's motive for committing the offense, noting, "Hana decided that he was above the laws of this country and his own personal financial success was paramount, even at the cost of U.S. businesses."  (*Id.* at 76.)  The Probation Office considers Hana's familial responsibilities to his wife and children as mitigating factors.  (*Id.* at 77.)

The Probation Office recommends a nine-year sentence for Daibes, a downward variance from his 168-210 month Guidelines range (Daibes PSR at 64), based on aggravating factors including the abuse of Menendez's Senate leadership position, the offense being "financially motivated and rooted in greed," and his failure to be deterred by his arrest in connection with the District of New Jersey prosecution, which also was based on a financially motivated offense (*id.* at 65-66).  In mitigation, the PSR notes Daibes's family circumstances and charitable history.  (*See id.* at 66.)

## III.    Other Public Corruption Prosecutions

As set forth herein, this case is unusual, and in at least certain respects unique, in U.S. history.  Menendez's conduct—the conduct he committed and that Hana and Daibes bribed him to commit—stands in, at a very minimum, the first rank of seriousness of offenses for which any U.S. Senator has ever been convicted.  And even in cases presenting less unique factors, courts across the country impose highly substantial sentences of incarceration for serious public corruption and obstruction offenses.

A.      **Prosecutions of U.S. Senators**

The fact that this case involves any offense committed by a U.S. Senator renders it a rarity in historical terms.  Throughout the course of U.S. history, only twelve other U.S. Senators have been charged with crimes while serving in the Senate, and of those prosecutions, only four ultimately resulted in convictions, according to public source reporting reflecting consultation with the Senate Historical Office.  *See* Rachel Looker, *How common are indictments in the Senate? Here's a look at senators who faced charges* ("Looker Article"), USA Today (Sept. 23, 2023), *available at* https://www.usatoday.com/story/news/politics/2023/09/23/roundup-senators-menendez-indicted/70932038007/.  An examination of public source reporting regarding each of these charges reflects that the charges in this case are among the most serious, if not the most serious, charges of which a U.S. Senator has ever been convicted in the history of the United States.

In addition to Menendez,[2] the other U.S. Senators to have been charged with crimes are:

1.      Senator Theodore Stevens of Alaska was charged in 2008 with several counts of making false statements for failing to report gifts and services in connection with a home renovation.  He was convicted at trial but his conviction was subsequently vacated.  *See, e.g.*, Looker Article.

2.      Senator Kay Bailey Hutchinson of Texas was charged in 1993 and 1994 with state official misconduct, evidence tampering, and misuse of government employee and property offenses.  These charges did not result in a conviction.  *See, e.g.*, *id.*

3.      Senator David Durenberger of Minnesota was charged in 1993 with misusing public funds by improperly seeking reimbursement of approximately $4,000, and pleaded guilty in 1995 to five misdemeanor charges of converting public funds for personal use.  Durenberger was sentenced to one year probation and a $1,000 fine.  *See, e.g.*, *id.*

4.      Senator Harrison Williams, Jr. of New Jersey was indicted in 1980 for taking bribes in exchange for obtaining a government contract, in one of the "Abscam" sting operations.  Williams (unlike other defendants in these sting operations) rejected a

---

[2] Menendez was indicted on corruption and false statement charges in the District of New Jersey in 2015.  That prosecution did not result in a conviction.

cash bribe, but was convicted based on his agreement to accept (fictitious) shares of stock. *See United States v. Williams*, 529 F. Supp. 1085, 1090, 1100 (E.D.N.Y. 1981). Williams was sentenced to three years in prison. *See, e.g.*, Looker Article.

5.    Senator Edward Gurney of Florida was indicted in 1974 on charges of lying to a grand jury and bribery. He was acquitted in 1976. *See, e.g.*, *id.*

6.    Senator Burton Wheeler of Montana was indicted in 1924 on conflict of interest charges. He was acquitted. *See, e.g.*, *id.*

7.    Senator Truman Newberry of Michigan was indicted in 1919 on federal campaign finance offenses arising under the then-extant Federal Corrupt Practices Act, related to his spending $3,800 on his Senate race. He was convicted in 1920, but his conviction was subsequently overturned. *See, e.g.*, *id.*

8.    Senator John Hipple Mitchell of Oregon was convicted in 1905 on charges related to receiving approximately $2,000 for expediting land claims. He was sentenced to six months in prison. *See, e.g.*, *id.*

9.    Senator Joseph Burton of Kansas was indicted in 1904 on charges of receiving approximately $2,500 for services rendered before a federal department and interceding in a mail fraud case. He served five months in prison. *See, e.g.*, *id.*

10.    Senator Charles Dietrich of Nebraska was indicted in 1903 on charges related to accepting a bribe and entering into a government contract while serving as a Senator. He was acquitted. *See, e.g.*, *id.*

11.    Senator Richard Kennedy of Delaware was charged in 1898 on charges related to embezzlement and misapplication of bank funds. His prosecution did not result in a conviction. *See, e.g.*, *id.*

12.    Senator John Smith of Ohio was indicted in 1807 on charges relating to conspiring with Vice President Aaron Burr to commit treason. He was found not guilty. *See, e.g.*, *id.*

Of the Senators convicted of crimes, apart from Menendez, only one held a position in the leadership of a Senate committee at the time of his indictment: Williams was Chair of the Senate Committee on Labor and Human Resources, but his crimes did not relate to the committee he

chaired at the time.[3]  The Government thus believes that no Senator has ever before been convicted of the abuse of a leadership position on a committee of the U.S. Senate.

Moreover, no Senator has ever before been charged with being a foreign agent while serving as a public official, or conspiring to do so.  Indeed, this case presents the first such charge, and the first such conviction, in U.S. history.

### B.    Recent Sentences in Significant Corruption Cases

Even in cases not involving the unique factors presented by this prosecution, federal courts in New York and across the nation generally impose very substantial sentences of imprisonment in significant public corruption cases.  *See, e.g.*, *United States v. Jose Louis Huizar*, No. 20 Cr. 326 (C.D. Ca. 2024) (13-year sentence following guilty plea for 55-year-old Los Angeles City Councilmember who accepted bribes of approximately $2 million); *United States v. Arturo Cuellar*, No. 19 Cr. 522 (S.D. Tex. 2023) (20-year sentence following trial conviction of 69-year-old former county commissioner who received nearly $1.4 million in bribes); *United States v. Larry Householder*, No. 22 Cr. 77 (S.D. Ohio 2023) (20-year sentence for 64-year-old Ohio House Speaker who was convicted at trial of accepting nearly $61 million in bribes for supporting nuclear plant bailout); *United States v. Sheldon Silver*, No. 15 Cr. 93 (VEC) (S.D.N.Y. 2020) (6.5-year sentence for 76-year-old Speaker of the New York State Assembly who was convicted at trial of multi-year scheme to obtain approximately $3,700,000 in bribes and kickbacks in exchange for official acts related to cancer research and approval of real estate legislation); *United States v. Jonathan Woods*, No. 17 Cr. 50010 (W.D. Ark. 2018) (18-year and four-month sentence for 41-

---

[3] Stevens was the Ranking Member of a Senate committee at the time of his indictment, but as noted above, his prosecution did not ultimately result in a conviction.

year-old Arkansas state representative who was convicted at trial of awarding approximately $600,000 in grant money in exchange for kickbacks); *United States v. Stephen Stockman*, No. 17 Cr. 116 (S.D. Tex. 2018) (10-year sentence for 61-year-old Congressman convicted at trial of soliciting approximately $1.25 million in charitable donations fraudulently diverted to personal and campaign expenses); *United States v. Rod Blagojevich*, No. 08 Cr. 888 (N.D. Ill. 2016) (14-year sentence for 54-year-old Governor of Illinois who was convicted at trial of attempts to trade appointment of U.S. Senator for $1.5 million in campaign contributions and other personal benefits, as well as attempts to illegally obtain another $125,000 in campaign contributions); *United States v. Chaka Fattah, Sr.*, No. 15 Cr. 346 (E.D. Pa. 2016) (10-year sentence for 60-year-old Congressman convicted at trial of bribery of approximately $18,000, theft of approximately $23,000 of campaign funds, and receipt of several hundred thousand dollars of campaign contributions); *United States v. William F. Boyland, Jr.*, No. 11 Cr. 850 (E.D.N.Y. 2015) (14-year sentence for 45-year-old New York State Assemblyman following trial conviction for bribery of approximately $55,000, fraudulent reimbursements of approximately $70,000, and misappropriation of state funds amounting to approximately $200,000); *United States v. James Dimora*, No. 10 Cr. 387 (N.D. Ohio 2012) (28-year sentence for 57-year old county commissioner who was convicted at trial of accepting approximately $250,000 in bribes); *United States v. Mark A. Ciavarella, Jr.*, No. 09 Cr. 272 (M.D. Pa. 2011) (28-year sentence for 61-year-old Pennsylvania judge convicted at trial of having received over $2 million in exchange for helping construct a juvenile detention center and placing juvenile offenders at the center); *United States v. Kwame Kilpatrick*, No. 10 Cr. 20403 (E.D. Mich. 2010) (28-year sentence for 43-year-old Mayor of Detroit who was convicted at trial of accepting kickbacks of approximately $4.6 million).

Similarly, courts rightly treat obstruction of justice by a public official related to bribery investigations as a very serious offense deserving of a substantial sentence of incarceration. *See, e.g.*, *United States v. Robert Lustyik*, No. 12 Cr. 645 (D. Utah 2015) (10-year sentence for 53-year-old FBI counterintelligence agent following guilty plea for obstructing bribery investigation); *see also United States v. Robert Lustyik*, No. 13 Cr. 616 (VLB) (S.D.N.Y. 2015) (5-year *consecutive* sentence for same FBI agent following guilty plea for selling confidential law enforcement information for cash).

While courts typically impose higher sentences on bribe recipients, federal courts also treat paying bribes to public officials as an extremely serious offense and impose high sentences for that conduct as well where warranted. *See, e.g.*, *United States v. Ricardo Quintanilla*, No. 19 Cr. 522 (S.D. Tex. 2023) (200-month sentence following trial conviction of businessman who paid approximately $85,000 in bribes in connection with the award of city contracts); *United States v. Joel Esquenzi*, No. 09 Cr. 21010 (S.D. Fla. 2011) (180-month sentence following trial conviction following guilty plea of 53-year-old businessman for paying approximately $200,000 in bribes to Panamanian officials in foreign bribery prosecution); *United States v. Brent Wilkes*, No. 07 Cr. 330 (S.D. Cal. 2008) (144-month sentence for 53-year-old defense contractor who paid approximately $700,000 in bribes to Member of Congress in exchange for government contracts)

## IV.    Available Time Credits

Federal law provides several forms of time credits, *i.e.*, reductions in time served in prison, that likely apply, in whole or in part, to the defendants, which may be relevant to the Court in fashioning an appropriate sentence. *See, e.g.*, *United States v. Fowler*, 948 F.3d 663, 670 (4th Cir. 2020) (consideration of future good time credit is proper in light of Section 3553(a) factors relating

to "protection of the public and deterrence"); *United States v. Prevatte*, 66 F.3d 840, 848 (7th Cir. 1995) (Posner, C.J., concurring).

## A.    The First Step Act

The First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) (the "FSA"), was enacted on December 21, 2018.  As relevant here, a prisoner can earn time credit under the FSA in two ways: Good Conduct Time and Earned Time Credit.

### 1.    *Good Conduct Time*

A well-behaved prisoner can earn "up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations."  18 U.S.C. § 3624(b).[4]  Congress intended this provision to provide an incentive for good behavior and to deter misconduct.  *See Barber v. Thomas*, 560 U.S. 474, 482-83 (2010); *see also United States v. Martin*, 100 F.3d 46, 48 (7th Cir. 1996) (quoting legislative history stating, "If a prisoner is aware that his behavior will have a direct effect on his release date, he can set a personal goal for early release by demonstrating compliance with prison rules.  Thus, prison discipline should improve greatly.") (citations omitted)).  All inmates convicted of a federal offense are eligible to earn Good Conduct Time.[5]

---

[4] As the statutory language makes clear, it is the Bureau of Prisons ("BOP")—not a prosecutor or the court—that has authority to determine a prisoner's eligibility for this provision.  *See United States v. Santos Diaz*, 66 F.4th 435, 443 (3d Cir. 2023) (noting that 18 U.S.C. § 4042, "the statute governing the duties of the BOP," carries a "mandate" giving BOP "a broad authority over all federal penal and correctional institutions").

[5] BOP, FSA – Frequently Asked Questions (last visited January 6, 2025), https://www.bop.gov/inmates/fsa/faq.jsp#fsa_good_conduct_time.

Before the FSA, there had effectively been a cap of approximately 47 days earned annually on such Good Conduct Time.  Section 102(b) of the FSA amended 18 U.S.C. § 3624, making this provision more generous by allowing additional credit for good conduct and providing that the credit be based on the sentence imposed rather than actual time served.  *See id.*, 18 U.S.C. § 3624(b)(1).  This means that the BOP will calculate Good Conduct Time based on a prisoner's whole sentence, not just the time a prisoner actually serves.  For example, a 10-year sentence now yields a maximum Good Conduct Time of 540 days (54 x 10), rather than the maximum of 470 days it would have yielded prior to the FSA.  As such, prisoners who exhibit "exemplary compliance with institutional disciplinary regulations" may now receive a maximum of "54 days for each year of the prisoner's sentence imposed by the court," including credit for time they never actually serve.  *Id.*

      2.    *Earned Time Credit*

The FSA also established a second system under which a prisoner can earn credit, Earned Time Credit, by participating in programs aimed at reducing recidivism.[6]  Each prisoner, who is to be evaluated by the BOP for suitable "evidence-based recidivism reduction programming or productive activities," will be classified as presenting a minimum, low, medium, or high risk of recidivism.  18 U.S.C. § 3632(a)(3)-(6).[7]  Eligible defendants can accrue up to 15 days of Earned

---

[6] Here, too, the BOP has broad authority to run this system and determine eligibility.  *See* BOP, FSA of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4), Program Statement No. 5410.01 CN-2 (Mar. 10, 2023), *available at* https://www.bop.gov/policy/progstat/5410.01_cn2.pdf. *See also* BOP, FSA (last visited January 6, 2025), https://www.bop.gov/inmates/fsa/.

[7] A prisoner's classification as minimum, low, medium, or high risk is based on the prisoner's Prisoner Assessment Tool Targeting Estimated Risks and Needs ("PATTERN") score.  *See* BOP – PATTERN Risk Assessment (last visited January 6, 2025),

Time Credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. *See id.* § 3632(d)(4)(A)(i)-(ii). Twelve months (365 days) of those Earned Time Credits may be used to reduce a defendant's sentence. *See* 18 U.S.C. § 3624(g)(3).

An inmate is eligible to earn Earned Time Credits if: (a) he was convicted of a United States federal code offense; (b) he was not convicted of a disqualifying offense;[8] and (c) he is at an institution, but not in disciplinary segregation. Moreover, eligible prisoners are automatically enrolled in the program, and temporary operational or programmatic interruptions authorized by the BOP will not ordinarily affect an eligible inmate's "successful participation[.]" 28 C.F.R. § 523.41(c)(3). For example, to the extent a prisoner is unable to participate in evidence-based recidivism-reducing programs or activities as a result of the lack of availability at a BOP facility, the prisoner will still earn the time credit.[9]

**B.    The Residential Drug Abuse Program**

The Residential Drug Abuse Program ("RDAP") is the BOP's most intensive treatment program. Offenders live in a unit separate from the general population; they participate in half-day programming and half-day work, school, or vocational activities. RDAP, which is typically

---

https://www.bop.gov/inmates/fsa/pattern.jsp.

[8] Disqualifying offenses include, among others, terrorism offenses, certain sex offenses, certain drug offenses, immigration offenses, and some serious violent felonies. *See* 18 U.S.C. § 3632(d)(4)(D)-(E). Although the BOP makes the final determination regarding program eligibility, none of the offenses of conviction in this case is a disqualifying offense.

[9] A prisoner is not considered to be successfully participating if the prisoner is: (i) placed in Special Housing Unit for disciplinary reasons; (ii) housed at a non-BOP designation (*e.g.*, United States Marshal Service contract facility, state/local jail, hospital, furlough, local writ); (iii) subject to a mental health/psychiatric hold; or (iv) "opts out." 28 C.F.R. § 523.41(c)(4).

nine months in duration, is offered in 11 federal facilities in the Northeast.[10]  Once an inmate successfully completes RDAP, the inmate is eligible to receive an additional year reduction in his sentence, as long as the sentence was longer than 36 months, 18 U.S.C. § 3621(e)(2)(B), in addition to Good Conduct Time and Earned Time Credit.

Regardless of the sentenced imposed, a prisoner will generally not be placed in RDAP until the prisoner has 48 months or less remaining on his or her sentence. Moreover, inmates must be eligible for Residential Reentry Center ("RRC") placement to participate in RDAP because there is a transitional drug abuse treatment component in RDAP.

## **DISCUSSION**

### I.   THE SENTENCING RANGES SET FORTH IN THE PRESENTENCE REPORTS ARE ACCURATE

#### A.   Applicable Law

A defendant's Guidelines range, including the amount of loss, is based on all relevant conduct for sentencing purposes.  *See* U.S.S.G. § 1B1.3(a) (specific offense characteristics shall be determined on the basis of relevant conduct).  Pursuant to Section 1B1.3(a), relevant conduct includes, in addition to acts committed, aided, or caused by a defendant:

> (B) in the case of a jointly undertaken criminal activity . . . all acts or omissions of others that were—
>> (i) within the scope of the jointly undertaken criminal activity,
>> (ii) in furtherance of that criminal activity, and
>> (iii) reasonably foreseeable in connection with that criminal activity;
> that occurred during the commission of the offense of conviction [or] in preparation for that offense[.]

---

[10]    BOP, Substance Abuse Treatment, (last visited January 6, 2025), https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.

U.S.S.G. § 1B1.3(a)(1).

Thus "in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995). Those findings must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Lopez*, 768 F. App'x 19, 20 (2d Cir. 2019). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Moseley*, 980 F.3d 9, 29 (2d Cir. 2020) (internal quotation marks omitted). Rather, "[i]n calculating the amount of loss under the Guidelines, a sentencing court 'need only make a reasonable estimate of the loss.'" *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

The Second Circuit has held that the base offense level of 14 pursuant to U.S.S.G. § 2C1.1(a)(1) is not double-counting when applied together with the four-level upward adjustment pursuant to U.S.S.G. § 2C1.1(b)(3). *See United States v. Stevenson*, 834 F.3d 80, 84 (2d Cir. 2016) ("We conclude that the two enhancements do not serve identical purposes or address the same harm. . . . Thus, we conclude that the application of sentencing enhancements under both U.S.S.G §§ 2C1.1(a)(1) and 2C1.1(b)(3) did not here constitute double counting.").

**B.    Discussion**

The detailed and thorough PSRs correctly calculate the applicable advisory Sentencing Guidelines ranges. These calculations are overwhelmingly supported by the extensive trial evidence. The defendants, in attempting to dispute them, resort to unpersuasively relitigating matters amply proven at trial.

1.    *Bribe Amounts Attributable to Menendez and Hana*

Menendez and Hana both seek, in the guise of disputing the bribe amount, to relitigate the core facts of the trial making them guilty.  (*See* Menendez Mem. 16-20; Hana Mem. 19-25.) Although these efforts are not procedurally precluded by the jury's general verdict, they are substantively refuted by the voluminous and damning evidence that the verdict was based on. Indeed, the very evidence the Court already recognized "amply" provided "more than sufficient" evidence to support that verdict, *e.g.*, *Menendez*, 2024 WL 5103452, at *4, *7, supports the finding, by a preponderance of the evidence, that the bribes specified in the PSRs were provided, that they were within the scope of the jointly undertaken criminal activity entered into by Hana and Daibes, and that they were foreseeable to each of them.

a)    Menendez Received the Bribes Specified in the PSRs

Menendez strains unpersuasively to disclaim his knowledge of the bribes he received.  (*See* Menendez Mem. 18-20.)  Indeed, he argues for inferences that the Court has already rejected based on the evidence, such as the claim that Menendez was wholly unaware of the receipt or sale of the kilogram gold bars from Daibes.  (*Compare* Menendez Mem. 18-19 *with Menendez*, 2024 WL 5103452, at *19, *36.)  With similar disregard of the evidence underpinning the Court's rulings, Menendez tries to relitigate his knowledge of the mortgage company payment (*compare* Menendez Mem. 18-19 *with Menendez*, 2024 WL 5103452, at *10-11) and Uribe's payment for the Mercedes-Benz (*compare* Menendez Mem. 19 *with* Menendez, 2024 WL 5103452, at *16).  In light of the extensive evidence in the trial record and for the reasons set forth in the Government's post-trial memorandum, none of these arguments is persuasive, and all are without merit.  (*See generally* Dkt. 611 at 15-25, 29-34, 37-42.)

Menendez fares no better in attempting to dispute the overwhelming proof that the cash specified in the PSR constituted bribe proceeds.  As an initial matter, his arguments that he was unaware of the deliveries of multiple envelopes of cash are inconsistent with the Court's decision that these envelopes supported an inference of a *quid pro quo*.  (*Compare* Menendez Mem. 18, 20 *with* Menendez, 2024 WL 5103452, at *20, *43.)  Even beyond the Court's ruling, however, the highly damning facts regarding the placement, packaging, and amounts of the cash easily support a finding by a preponderance of the evidence that this cash was attributable to the scheme.  (*See infra* Section III.B.1.a (listing specific items of cash subject to forfeiture with citations to supporting record evidence for each item); *see generally, e.g.*, Dkt. 611 at 40-42.)

Menendez's claim that the cash in the duffel bag in his office was not attributable to the bribe scheme (*see* Menendez Mem. 19-20) further underscores the point.  None of the cash in the duffel bag in his office was included in the total amount of bribes specified in the PSR.  (*See* Menendez PSR ¶ 123.)  Indeed, this exclusion is generous to him, given that the amount of cash in the house simply could not be explained by Menendez's withdrawals, a fact which even his own counsel was forced to acknowledge in closing argument.  (*See, e.g.*, Tr. 6630 (Menendez counsel: "There was definitely more total cash found in 41 Jane than Bob had withdrawn over the years.  Even if you take the biggest number that we showed you, using that sort of backward-looking assumption, there is more cash found by the FBI in 41 Jane than that number.").)  Thus, to the extent that the cash in the duffel bag—which is *not* counted as proceeds of the scheme in the loss amount calculation—is differently situated and packaged from other cash that *is* counted, that difference cuts against Menendez, and in favor of the inclusion of the cash specified in the PSR.

More broadly—and contrary to Menendez's continued attempts to place the blame for his own actions on his wife (Menendez Mem. 18-20)—the evidence showed that all of these bribes were known, and *a fortiori* foreseeable, to Menendez. As the Court recognized, the evidence gave rise to powerful inferences that Menendez, by virtue of his close involvement with the details of Nadine Menendez's life, was well aware of the things of value she was collecting. *See, e.g.*, *Menendez*, 2024 WL 5103452, at *30 ("At trial, the government presented voluminous evidence— hundreds, if not thousands, of texts, emails, and telephone calls—that indicated that Menendez was significantly involved in all aspects of Nadine's daily life."); *see also, e.g.*, *id.* at *36, *38. Menendez's attempt to blame his wife for the bribes is no more persuasive now than it was at trial.

Accordingly, the extensive and detailed evidence presented at trial provides overwhelming support for an inference, by far more than the required preponderance of the evidence, that Menendez received and was aware of or able to foresee the specific subset of things of value identified in the PSR, and thus that the loss amount is correctly calculated.

   b) <u>The Bribes Set Forth in the PSRs Were Within the Scope of Hana and Daibes's Jointly Undertaken Criminal Activity</u>

Hana's and Daibes's arguments that the corrupt payments were not within the scope of their jointly undertaken criminal activity (Hana Mem. 19-25; Daibes Mem. 3-4) are similarly unpersuasive. The same evidence that supported the jury's finding that Counts One and Two were each single conspiracies amply justifies a finding that Hana and Daibes entered into a criminal agreement with, among others, each other and Menendez, with a scope encompassing the exchange of all the things of value and the promises of all the official acts proven at trial. (*Compare* Hana Mem. 19-23 *and* Daibes Mem. 3-4 *with Menendez*, 2024 WL 5103452, at *22.)

31

Each of the factors identified by the Second Circuit favors a finding that the bribes provided during the course of the scheme were within the scope of Hana's and Daibes's agreement.  Hana and Daibes did not "work independently" but instead "pool[ed] their profits and resources"—quite literally by entering into a joint venture, *Studley*, 47 F.3d at 575; *see Menendez*, 2024 WL 5103452, at \*22.  Hana clearly "assisted in designing and executing the illegal scheme," *Studley*, 47 F.3d at 575 (emphasis omitted), as he himself initiated it and even attempted to involve Daibes in additional portions of it by trying to get him to provide the Mecedes-Benz convertible as a bribe, *see Menendez*, 2024 WL 5103452, at \*22.[11]  And the "role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct," *Studley*, 47 F.3d at 575, encompasses the provision of a series of bribes by Hana and Daibes, to the extent that, indeed, Daibes was involved in providing bribes funded by Hana, and Hana attempted to get Daibes to fund bribes that Hana himself had promised, *see Menendez*, 2024 WL 5103452, at \*22.  Moreover, given the close business and personal relationship between Hana and Daibes, the provision of such bribes was easily foreseeable by both Hana and Daibes.  *See id.*  (*See also, e.g.*, Daibes PSR at 59-61 (Government response to objections, detailing evidence of close relationship).)

Hana's attempt to distance himself from the cash bearing the fingerprints of his business associates, Gazmend Lita and Nader Moussa, also fails, as the Court has also already ruled.  The

---

[11] The fact that Daibes did not actually provide the car, of course, does not render it unforeseeable that the car would eventually be provided by another—in fact, that Daibes was asked to provide it proves that he easily could foresee that someone else would do so after he declined (and for the conspiracy counts, all that matters is that he could foresee that someone would *agree* to do so).

evidence obviously supports a reasoned, logical inference that this cash was attributable and known to Hana.[12]  (*Compare* Hana Mem. 23-25 *with Menendez*, 2024 WL 5103452, at *43.)

This case, in which both of the bribe-payors actually shared in the profits of the bribe scheme and cooperated on the delivery of multiple bribe payments, is nothing like *Studley*, cited by Hana (Hana Mem. 17), in which the defendant telemarketer was "competing *against* the other sales representatives for commissions" on the fraudulent sales.  47 F.3d at 576 (emphasis in original).  Rather, it fits well within circumstances in which courts have held defendants accountable for the activities of their codefendants.  *See, e.g.*, *United States v. Martinez-Rios*, 143 F.3d 662, 678 (2d Cir. 1998) (affirming that entire tax loss was within scope of agreement where codefendants pooled accounts), *superseded by rule on other grounds as stated by United States v. Cook*, 772 F.3d 477, 481 (2d Cir. 2013); *United States v. Peets*, No. 22-525-cr, 2023 WL 6386828, at *1 (2d Cir. Oct. 2, 2023) (affirming finding that codefendant obtaining firearm in return for drugs was within scope of defendant's agreement, since "[t]he scope of the conspiracy necessarily included [the codefendant] accepting something of value in exchange for drugs"); *United States v. Beckford*, 545 F. App'x 12, 14-15 (2d Cir. 2013) (affirming finding that defendant had agreed to the entire scope of the conspiracy to obtain wireless devices fraudulently based on evidence of

---

[12] Hana's attempt to defeat this inference with Moussa's pretrial statements that he allegedly did not remember giving envelopes of cash to the Menendezes on behalf of Hana (Hana Mem. 24) is not persuasive.  Even considering the statements made to the Government in an interview, Moussa did remember giving Hana an envelope of cash shortly before he saw Hana make a delivery of a paper bag—which Moussa assumed contained cash, though he could not see inside it—to Daibes.  (*See* 3529-087 at 5.)  (The Government provided witness statement material for the Court in connection with trial, and is prepared to re-submit this document upon request.)  Thus even taking Moussa's stated lack of recollection at face value, his own account provides ample reason to believe that Hana was involved in the delivery of cash, which Hana received from Moussa, that ended up as a bribe in the Menendezes' house.

33

defendants' participation in obtaining some of the wireless devices, along with evidence of contacts and relationship with coconspirators); *United States v. Wahl*, 563 F. App'x 45, 51 (2d Cir. 2014) (affirming finding that defendant was accountable for full amount of multiple clinics' fraudulent Medicare billings where defendant was associated with each of the clinics at high level); *United States v. Eisner*, No. 10-1192-cr, 2011 WL 2411011, at *26 (2d Cir. June 16, 2011) (holding defendant responsible for codefendant's Ponzi scheme conduct where the defendant knew "the extent of the losses caused [by the] scheme . . . , was instrumental in its initial development, and continued to participate and profit from the scheme throughout [its] existence"); *United States v. Ankamah*, No. S2 03 Cr. 206 (LBS), 2004 WL 744487, at *5-7 (S.D.N.Y. Apr. 6, 2004) (holding defendant liable for codefendants' contribution to loss because "their efforts were not entirely isolated but rather intertwined," there was "significant collaboration and communication" among them, and their "conduct was in furtherance of a joint undertaking, in which Defendant participated," to commit tax fraud). Indeed, the Second Circuit has recently affirmed holding a defendant responsible for acts that, unlike here, the defendant disapproved of and tried to avoid. *See, e.g.*, *United States v. Pica*, 106 F.4th 197, 203 (2d Cir. 2024) (affirming finding that murder was within the scope of armed robbery even where defendant "cautioned his co-participant not to harm the victim" (internal quotation marks omitted)). The Court should thus find that each of the things of value specified in the PSR, and each of the acts promised and requested, was within the scope of Hana's and Daibes's agreement and reasonably foreseeable to each of them.

2.    *Menendez's Leadership Role*

Contrary to Menendez's arguments (*see* Menendez Mem. 21-23), the Probation Office properly applied the four-point leadership adjustment under U.S.S.G. § 3B1.1(a). As set forth at length in the Government's response to Menendez's objections to the PSR, the trial evidence

amply shows that Menendez led and organized the scheme generally and Nadine Menendez's participation in the criminal activity in particular. (*See* Menendez PSR at 84-86 (reproducing Government response).) He repeatedly directed her to pass information and documents, including sensitive and non-public information, from him to Hana, including giving specific instructions on exactly how to do so (*id.* at 84-85; *see also id.* at 85 ("You should do as you've done in the past, copy it and then send it separately to him.")), and also directed her on how to set up her supposed consulting company, including following up with her on her progress (*id.* at 85). This alone suffices for the application of the enhancement. *See, e.g.*, *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) ("Although the criminal activity at issue must involve five or more participants or be otherwise extensive, the Sentencing Guidelines only require that the defendant be an organizer or leader of one or more of those participants for the Section 3B1.1(a) enhancement to be appropriate.").

Particularly tellingly, the communications between Menendez and Nadine Menendez reveal that she checked with him as to whether and how to contact Daibes to seek a bribe payment. (*See* Menendez PSR at 85.) The trial evidence revealed numerous attempts by Nadine Menendez to ask Menendez whether she should contact Daibes seeking the bribe payment, and Menendez eventually telling her not to do so in writing—an instruction she complied with. (*See id.* ("No, you should not text or email.").) Given the nature of the offenses, this close supervision is fatal to Menendez's claim that all he did was offer "suggestions." (Menendez Mem. 22.)

Similarly, Menendez repeatedly used Nadine Menendez as a go-between to gather information for him and convey directions to other conspirators, such as in the New Jersey Attorney General's Office conduct. (*See* Menendez PSR at 85-86.) This supervision included

summoning her with a bell to provide paper for Uribe to write down the names of persons and entities he wanted Menendez to intervene regarding, and—while at dinner with her, her adult daughter, and Uribe—sending her a text message telling her to go to the bathroom, so that she and her daughter would leave the table and Menendez could then boast to Uribe of having intervened on his behalf twice.  (*See id.* at 85.)  The evidence more broadly includes a number of indications of Nadine Menendez's desire to impress Menendez, and does not reflect Nadine Menendez ever summoning or dismissing Menendez from her presence, using him as a go-between for her, directing him what not to put in writing, or otherwise exercising any supervision over him.  (*See id.*)  Moreover, although his leading or organizing Nadine Menendez's participation is sufficient, Menendez also led and organized the other conspirators as well, such as by controlling when and whether to meet and what steps to take in furtherance of the conspiracy.  (*See id.* at 85-86.)[13]

### 3. *Public Official Adjustment*

Finally, Menendez's claim that the base offense level under U.S.S.G. § 2C.1.1(a)(1) is double-counted with the four-level upward adjustment under U.S.S.G. § 2C1.1(b)(3) (*see* Menendez Mem. 23-24) is contradicted by the law of the Second Circuit.  *See Stevenson*, 834 F.3d at 84.  Menendez's attempt in a footnote to escape this binding holding by noting that the plain error standard applied (Menendez Mem. 23 n.9) is unavailing, as the Second Circuit did not base its decision on the plain error standard.  *See Stevenson*, 834 F.3d at 83 ("*There was no error here*,

---

[13] Menendez is incorrect to claim that the foreign influence charges required Menendez to be "directed" by Egypt, let alone in a way that would preclude him from being able to lead or organize others.  (Menendez Mem. 22-23.)  As the Court is well aware, direction and control is not the standard for Counts Fifteen or Sixteen.  *See, e.g.*, *Menendez*, 2024 WL 5103452, at *26 n.16.

much less plain error." (emphasis added)); *see also id.* at 84 ("We conclude that the two enhancements do not serve identical purposes or address the same harm.").

## II.    SUBSTANTIAL SENTENCES OF IMPRISONMENT ARE WARRANTED

In light of the egregious and unique conduct in this case, substantial sentences of imprisonment of at least fifteen years for Menendez, at least ten years for Hana, and at least nine years for Daibes, are warranted.

### A.    Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, however, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a). *See id.* at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a)(2).

**B.     Discussion**

1.     *Menendez Should Receive a Sentence of at Least Fifteen Years*

Menendez's offense conduct is the most serious of the defendants in this case and requires a substantial sentence. However, the Government does not believe that a Guidelines sentence is necessary in the circumstances of this case. Rather, based principally upon Menendez's age, a moderate downward variance would be reasonable. In order to reflect the seriousness of the offenses, afford deterrence, and promote respect for the law, Menendez should receive a sentence of incarceration of at least fifteen years.

a)     The Nature and Circumstances of the Offense

Menendez's conduct may be the most serious for which a U.S. Senator has been convicted in the history of the Republic. Very few Senators have even been convicted of any criminal offense, and of those, most of the Senators engaging in bribery accepted amounts that are a fraction of what Menendez reaped, even adjusting for inflation. The one defendant who agreed to accept arguably larger amounts, Harrison Williams, Jr., agreed to accept only fictitious stocks as part of an FBI sting operation in a brief series of meetings, not an extensive multi-year scheme covering multiple bribes and multiple promised official acts. Even beyond the amounts at issue, none of the other Senators' proven offenses involved similar or comparable subject matter to the corrupt promises exchanged in this case, as discussed below. Thus, while comparisons across historical time periods are of course difficult—and while the charges that John Smith conspired with Aaron Burr to commit treason may have been more serious if they had been proven—the record shows Menendez's conduct is perhaps more serious than that for which any other Senator has been convicted in United States history.

38

A number of additional factors differentiate the conduct in this case, and in particular Menendez's conduct, from any other criminal case of which the Government is aware. In addition to being likely the most serious offenses of which any U.S. Senator has ever been convicted, the offenses are, to the Government's knowledge, the only offenses in U.S. history involving the corrupt abuse of a leadership position of a committee of the U.S. Senate. This abuse is especially egregious because this particular leadership position gave Menendez more influence than "any other member of Congress" over the foreign military sales program. (Tr. 947.) In sum, Menendez was entrusted by the public not merely to represent the State of New Jersey and the United States generally, but also to help oversee and seek to influence the foreign policy of the United States. Indeed, the trust that Menendez abused involved a matter of longstanding interbranch practice that had developed in order to allow the United States to speak with one voice in matters of foreign policy.[14] Corrupting the U.S. Government's mechanism for interbranch oversight of military aid necessarily impairs the ability for it to conduct its foreign policy effectively.

Menendez's offenses were also unique in being the only instance in history of a U.S. Senator convicted of acting as an agent of a foreign principal (and conspiring to do so). And even in this category of one, Menendez's offenses have significant aggravating factors. The foreign agent statute can be violated in a number of ways, including actions on behalf of nongovernmental principals, actions that do not involve advocacy directly adverse to representatives of the United States, and actions that do not involve the dissemination of sensitive information that is kept non-public in order to protect U.S. employees serving abroad and foreign nationals working for the

---

[14] Indeed, the State Department witness explained at trial the importance of the process of interbranch consultation on arms sales, in order to avoid public interbranch conflicts that can harm the United States's relationships with partner nations. (Tr. 885.)

United States. But here, Menendez acted as an agent of a foreign principal in particularly egregious ways. For example, Menendez served not a nongovernmental principal, but instead assisted intelligence officials of a foreign government, which had a controversial human rights record. Menendez, similarly, did not engage in advocacy that was tangential to U.S. interests, but instead directly assisted the foreign government in opposing his own colleagues who were raising human rights concerns. And of course, Menendez did not just engage in advocacy—he also provided tangible, sensitive non-public information, including information that was kept non-public in order to protect employees of the U.S. serving abroad, and the foreign nationals assisting them, from, among other things, foreign intelligence services. (Tr. 378-79, 573-74.)

Even those aspects of Menendez's conduct that are not unprecedented are astounding and unheard-of in the Government's experience. The Government is unaware of any other case in which an elected official took bribes not in exchange for routine and comparatively uncontroversial official acts (which is itself a serious offense), but in exchange for promises to approve (a) military aid, (b) including lethal military equipment, (c) that was likely to be used in active operations, (d) in the amounts of hundreds of millions or billions of dollars, (e) which was at the time an active subject of controversy, (f) because the recipient of that aid was suspected of engaging in human rights abuses, (g) involving previous deliveries of military aid from the same programs.

Similarly, Menendez's attempts to affect the United States's foreign policy position on the monopoly in halal certification that Egypt awarded to Hana were exceedingly serious. Menendez did not simply provide any ordinary constituent service (which would itself have been a serious criminal offense if he did so in exchange for a bribe). Instead, he attempted to pressure a Senate-confirmed Under Secretary of Agriculture, and to do so—uniquely in that Under Secretary's

40

experience—in a way that was damaging to the nation as a whole. (*See, e.g.*, Tr. 2010 ("[I]t was the first time I'd ever had a call that we thought would clearly harm elements of the U.S. food and ag. industry. First time.").)[15] Egypt's decision to take certification business away from U.S. businesses, and to award a monopoly to the obviously less qualified (at best) Hana, may have been within Egypt's powers as a sovereign. But the USDA was well within its rights and its duties to articulate a position opposing that monopoly, which harmed not just Egyptian consumers, but also U.S. certifiers forced out of the business and U.S. exporters, which faced the prospect of a diminished export market because they were forced to pass on Hana's exorbitant fees to price-sensitive consumers. For Menendez to attempt to pressure the USDA to acquiesce to Hana's monopoly, to make sure that he and his then-girlfriend got paid at the expense of the country, was stunningly venal.

The more domestic aspects of Menendez's conduct are similarly reprehensible. Menendez's promised official acts related to domestic matters were far from routine. He promised, and attempted, to influence and obstruct multiple felony criminal matters, including two pending charged cases. The means he used to attempt to do this included attempting to pressure the ultimate supervisor of the New Jersey state law enforcement officials conducting an investigation and prosecution. Indeed, the way he tried to apply that pressure involved contriving a false accusation of discrimination. Such a ploy, Menendez surely knew, could only disserve actual efforts to fight actual discrimination.

---

[15] By contrast, the testimony was that ordinary constituent calls were for actions that were broadly beneficial and did not come at the expense of the nation as a whole. (*See, e.g.*, Tr. 1953 (McKinney testimony describing ordinary constituent calls, "I didn't take it, nor did I think they mean it as selfish for their district. They were looking out for the entirety of the industry. If you lifted up the industry, you helped their constituents as well."); *see also, e.g.*, Tr. 1954.)

Menendez's attempts to influence the federal prosecution of Daibes were, if anything, even more egregious. The attempt to influence any pending federal criminal prosecution is rare enough, but the attempt to do so by influencing the selection of the chief federal law enforcement officer for New Jersey is on a different level altogether. Even Rod Blagojevich, who received a 14-year sentence for attempting to sell his power to appoint an interim U.S. Senator, did not do so with the intent to obstruct a specific pending federal felony prosecution. The fact that Menendez (unlike Blagojevich) actually succeeded in causing his preferred candidate to become U.S. Attorney is even worse, risking a serious loss of public confidence, however undeserved, in the administration of justice.

Put differently, one rare and particularly noteworthy aspect of the offense conduct in this case is that, unlike many corruption cases, it involves a series of attempts to corruptly abuse the core sovereign powers of the state (whether the United States or New Jersey) regarding law enforcement and foreign relations. Many corruption cases, such as those involving grants, contracting, or other means of accessing state assets, essentially seek to abuse the state's *proprietary* interest in safeguarding public property. They are thus a form of theft from the state as a property-owner or fraud on the state, and have little if any connection to the state's sovereign powers besides the important fact that the property ultimately derives from taxpayers. Menendez promised, however, to attempt to corruptly influence the state's *sovereign* powers to conduct foreign relations and to enforce criminal laws. These powers, which are far more unique than the state's role as property-owner, are foundational to the rule of law and to democracy itself. Every member of the public—lawyers, judges, government officials, private citizens, and defendants alike—is bound by the state's sovereign powers in the core fields of law enforcement and foreign

42

relations, and depends on the state's integrity in wielding them. It is this sovereign responsibility that Menendez corruptly promised to tamper with. This fact alone places Menendez's conduct in a rare category even among corruption offenses.[16]

On top of these unique or nearly unique factors, of course, the Court should not lose sight of the host of serious aggravating factors that are more commonly encountered, and that are also present here. This scheme unfolded over many years and numerous criminal transactions; it spanned a variety of subject matters; Menendez played a dominant leading role in organizing it; he reaped a substantial monetary benefit from it; he used sophisticated, deliberate, and deceptive means, including outright lies, to conceal the scheme while it was ongoing; and he obstructed justice in order to conceal it after being approached by the FBI. Indeed, the extensive presentation of the evidence at trial demonstrates how much effort was required to uncover and redress his conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of crime and hence the punishment required to deter it."); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (quoting *id.*). In any other case, these would rightly be considered substantial aggravating factors. They are no less worthy of that consideration here.

---

[16] Corrupt promises affecting regulatory or permitting matters also seek to tamper with the state's sovereign power, but the state's powers to, for example, issue permits for real estate developments or take other regulatory actions, though important, are still less core to the rule of law than its powers to enforce criminal law and conduct foreign relations.

Menendez's attempts to trivialize his offense conduct (*see* Menendez Mem. 36-40) show a true lack of appreciation for the serious nature of his crimes.[17] The requirement that members of Congress abide by their oaths of loyalty to the people, and the nation, that they are elected to represent is foundational. *See, e.g.*, *United States v. Silver*, No. 15 Cr. 93 (VEC) (July 27, 2018) (ECF No. 460, Sent'g Tr., at 42) ("[C]orruption is a crime that does not just victimize individuals and does not just take money wrongfully from the public fisc. Corruption attacks the very heart of our system of government. The doubt that many Americans harbor about whether our public servants are operating in their own interests or whether their vote is available for purchase to the highest bidder is magnified every time a politician is revealed to be corrupt."); United Nations Office on Drugs and Crime, *United Nations Convention Against Corruption, Foreword* (2004), *available at* https://www.unodc.org/documents/treaties/UNCAC/Publications/Convention/08-50026_E.pdf ("Corruption is an insidious plague that has a wide range of corrosive effects on societies."). Courts in this district routinely emphasize the harm that even the abuse of comparatively lower levels of public trust, for comparatively lesser financial gain, does to our aspirations to live in a just society. *See, e.g.*, *United States v. Rupnarain*, No. 24 Cr. 125 (VEC) (S.D.N.Y. Aug. 5, 2024) (ECF No. 28, Sent'g Tr., at 25) (corruption is "one of the most serious of all federal offenses," because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain"); *id.* at 26 ("I think society expects public corruption to be treated seriously and for corrupt officials to

---

[17] Menendez's maintenance of his position that he is innocent does not in any way require him to belittle what are indisputably serious allegations. If he so chose, he could acknowledge that the charges against him allege grave misconduct, while maintaining that he was innocent of committing it.

be punished."); *United States v. Figueroa*, No. 22 Cr. 605 (DLC) (S.D.N.Y. Feb. 9, 2023) (ECF No. 27, Sent'g Tr., at 17) ("[C]orruption is a corrosive, destructive issue. People need to have faith in their government."); *United States v. Escobar*, No. 24 Cr. 213 (JPO) (S.D.N.Y. July 25, 2024) (ECF No. 23, Sent'g Tr., at 25-26) (sentencing corrupt New York City Housing Authority ("NYCHA") employee, remarking, "It's the kind of conduct that undermines faith in our government and in institutions that are supposed to help people. It is criminal conduct that is hard to detect. It's more subtle than some other forms of criminal conduct, but there are real victims; not just NYCHA but sort of the public's faith in the government. It creates cynicism, this sort of corruption."); *United States v. Costanzo*, No. 22 Cr. 281 (JPO) (S.D.N.Y. Apr. 24, 2024) (ECF No. 253, Sent'g Tr., at 54) ("There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption.").

The fact that other public servants resisted Menendez's pressure does not, contrary to his truly audacious suggestion (*see* Menendez Mem. 36-39), somehow excuse his corrupt attempts to pressure them. Corrupt attempts—let alone from one of the most trusted and powerful members of Congress—to influence pending criminal cases in exchange for bribes are corrosive to public confidence in the rule of law. And corrupt promises affecting the provision of military aid to a foreign nation undermine the delicate balance that has been worked out between the branches over the years, frustrating the nation's aim to speak with one voice in matters of foreign affairs. Having collected hundreds of thousands of dollars in cash, gold, a luxury automobile, and other payments in exchange for his promises to affect national security, foreign relations, and the rule of law,

Menendez cannot now be heard to turn around and cry "no harm, no foul," because law-abiding government officials had the integrity to refuse him.

b)    The History and Characteristics of the Defendant

As significant as the aggravating factors presented by the offense conduct are the relative scarcity of mitigating ones presented by Menendez's history and characteristics, apart from his age. The Government considers Menendez's age of 71 to be a mitigating factor, which the Government has taken into account in making its recommendation. However, Menendez is in good health and there is simply no cogent support for Menendez's hyperbolic claim that "any sentence of incarceration" would "effectively constitute a life sentence" (Menendez Mem. 4). To the contrary, there is every reason to believe that Menendez can serve a substantial term of imprisonment and still expect to return to society. (*See* Menendez PSR ¶¶ 174-80.)

Apart from Menendez's age, there are no factors that serve to greatly mitigate Menendez's sentence. Most of the instances of Menendez's conduct referenced in the letters he submits amount to him competently discharging the duties of his office, such as by working towards the passage of beneficial legislation.[18] Even to the extent that on certain occasions Menendez and his staff took additional actions on behalf of members of the public, Menendez's history of using his position of power to assist people in the community is to be expected. It would have been aberrational if Menendez, despite climbing to wield among the most power in the entire Congress,

---

[18] To the extent that any of the materials Menendez submitted in connection with his sentencing reflect any of his legislative acts, that was his voluntary choice and not a constitutional "questioning" within the meaning of the Speech or Debate Clause. *See, e.g.*, *United States v. Myers*, 635 F.2d 932, 942 (2d Cir. 1980) ("The protection against being 'questioned' outside of Congress prevents the use of legislative acts against a Member. It does not prevent him from offering such acts in his own defense, even though he thereby subjects himself to cross-examination.").

never over the course of many decades used that power to help anyone. *See, e.g.*, *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a legislator "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants"); *United States v. Morgan*, 635 F. App'x 423, 449-50 (10th Cir. 2015) (finding that sentencing judge erred in sentencing the former President Pro Tem of the Oklahoma State Senate to probation for accepting a $12,000 bribe, in part, by giving undue weight to letters of support: "The number of letters was certainly impressive but not surprising. As the Government aptly points out: 'One does not become President Pro Tem without the confidence of many supporters, some quite influential.' The letters must be viewed in that light.").

More broadly, sentencing courts do not typically consider claims of charitable works and standing in the community, absent an extraordinary showing. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (standard is "exceptional degree" of public service and good works under § 3553(a)); *cf.* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.").[19] That is in part because many defendants do not have the resources—in time, money, social standing, or power—to perform such deeds, and so the law is reticent to

---

[19] *Canova* is instructive, whether this Court considers this factor under the Guidelines or Section 3553(a). In the appeal in that case, the initial question was whether the defendant qualified for a departure under the Guidelines. *Canova*, 412 F.3d at 358. But because *Booker* had been decided between the defendant's sentencing and appeal, and because the Circuit remanded to the district court on other grounds, the Circuit discussed the propriety of considering the defendant's public service both under the Guidelines and under Section 3553(a). *Id.* at 358-59 & n.29.

show leniency to the few defendants who are fortunate enough to have such options.  *See, e.g.,* *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity.  They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."); *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"); *United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990) ("[T]o allow any affluent offender to point to the good his money has performed . . . suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced.  The very idea of such purchases of lower sentences is unsavory[.]"); *Vrdolyak*, 593 F.3d at 683 (quoting *id.*); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who

cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.").

Menendez does not make an extraordinary showing of charitable or community works that warrant a downward variance. His claim that "no defendant before this Court has lived a life so overwhelmingly devoted to serving his community and his country" (Menendez Mem. 4) is not plausible. To the contrary, it is extremely common for successful defendants to have performed extensive charitable or other community works. *See, e.g.*, *Serafini*, 233 F.3d at 773; *Morgan*, 635 F. App'x at 449-50; *United States v. Repking*, 467 F.3d 1091, 1095 (7th Cir. 2006) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." (internal quotation marks omitted)), *abrogated on other grounds by Gall*, 552 U.S. at 47. Indeed, many of Menendez's works—even if altruistically motivated in part—inherently benefited him as an elected official by helping to develop his reputation and network of contacts, regardless of whether each such work was publicized. *See, e.g.*, *Vrdolyak*, 593 F.3d at 683 (discounting public services of "influential Chicago alderman" because "[p]oliticians are in the business of dispensing favors"); *cf., e.g.*, *Repking*, 467 F.3d at 1095-96 (discounting "charitable works" that were "entirely consistent with [the defendant's] business development plan"); *Morken*, 133 F.3d at 630 (discounting charitable and public oriented acts of prominent local businessman).[20]

---

[20] The Government does not, of course, contend that every single beneficial action Menendez took was calculated for public consumption. The Government notes, however, that at least one of the instances he heralds as taking place "when no cameras or photographers were present" (Menendez Mem. 36), appears at least in part to have been publicized through photographs contemporaneously

Moreover, Menendez's tenure in the Senate was *far* from unblemished. Indeed, one of the most unusual aspects of Menendez's history and characteristics is (unlike many other defendants) not a mitigating factor, but an aggravating one. In April of 2018—in other words, during the early stages of the charged conduct here—he was publicly admonished by the U.S. Senate Select Committee on Ethics (the "Ethics Committee") for accepting gifts of significant value from a private individual without obtaining required approval from the Ethics Committee; for failing to publicly disclose certain gifts as required by Senate Rule and federal law; and for—while accepting these gifts—using his position as a Member of the Senate to advance the donor's personal and business interests. *See* U.S. Senate, Select Comm. on Ethics, *Public Letter of Admonition* (Apr. 26, 2018), *available at* https://www.ethics.senate.gov/public/_cache/files/49c12c75-7a26-4fe6-b070-19fcef4d7532/senator-robert-menendez---public-letter-of-admonition.pdf.[21] In this letter, which Menendez fails to mention in his memorandum, the Ethics Committee "determined that this conduct violated Senate Rules, federal law, and applicable standards of conduct." *Id.* at 1. The letter of admonition, which also directed Menendez to revise his financial disclosure forms and repay gifts he received, was based on conduct Menendez committed over a period of years predating the offense conduct in this case, and before Menendez began a relationship with Nadine Menendez. *Id.* at 2. Menendez's willingness to engage in the charged scheme immediately after receiving a formal admonition for such similar conduct speaks volumes about his character.

---

distributed on social media, in an illustration of one of the ways in which such acts benefited Menendez as well as the public. (*See* Menendez Mem. Ex. G (Dkt. 677-6 at 25-26)).

[21] Such public letters of admonition are relatively rare. The last public letter of admonition to any Senator before Menendez was approximately six years earlier; the next such letter to any Senator was approximately five years after the letter to Menendez.

Menendez's other circumstances do not constitute mitigating factors requiring leniency. The death and disease of his parents (Menendez Mem. 2, 6), while unfortunate, reflect a reality that all who reach advanced age will experience. The circumstances of his father's death are particularly unfortunate, but the effects of that event when Menendez was a young man simply do not explain, much less excuse, the criminal conduct Menendez committed decades later, while he was in his 60s. And while he was not born to tremendous luxury and privilege (Menendez Mem. 4-6), he was fortunate enough to live a life of substantially more opportunity than many defendants can enjoy, and was willing to corrupt his office to have more than public service would provide.[22]

Nor do the circumstances or motivation for his participation in the charged offenses constitute mitigating factors. Menendez was not dragged into committing crimes for years by a more culpable and persuasive coconspirator. Instead, he called the shots and set the terms of his participation and of the actions of his coconspirators. And Menendez is a sophisticated man and lawyer. He was not somehow duped into committing multiple crimes, much less ones that rested on his own promises, actions, and lies. Nor was he duped into committing obstruction of justice. Nor was he driven to commit these offenses out of desperation. Instead, he was one of the most powerful people in the government of the most powerful nation on earth. At any time, he could

---

[22] Menendez's claim (Menendez Mem. 6) that his taste in restaurants somehow is indicative of a character trait meriting leniency in sentencing is puzzling. To whatever extent Menendez's portrayal of himself as "a man more likely to be found at an iHop than a Michelin star restaurant" (Menendez Mem. 6) is even relevant to his sentencing on serious corruption charges, it is noteworthy that the trial revealed that the restaurant Menendez was in fact most likely to be found at was a high-end Washington steakhouse, which his counsel admitted to the Court he dined at "almost every night of the workweek," and the bills of which were paid for by his political action committee ("PAC"). (Tr. 2033-38.) Assuming that Menendez's practice of routinely using PAC funds to pay for high-priced steakhouse dinners was in fact lawful, the Government does not believe that it reflects any extraordinary character trait meriting leniency.

have retired from the Senate and enjoyed a highly remunerative career in the private sector. Indeed, even keeping his position, he was able to amass enough funds for a comfortable life—as discussed in Section III.B.2, *infra*, even after forfeiture, Menendez will have sufficient assets to pay a substantial fine. Menendez's offenses were plainly motivated by the belief that the power that he was entrusted with belonged, not to the people, but to him. He committed the crimes because he felt entitled to use that power for himself, to get himself and his wife paid.

Menendez's arguments that he has supposedly been punished enough show the same deeply misplaced sense of entitlement. (*See* Menendez Mem. 2-4, 42, 46.) His position as a Senator was not a personal possession of his, the loss of which could amount to a deprivation. It was a public trust, one which he has no right to if the public, upon learning of his conduct, loses its trust in him. In a similar vein, Menendez's complaint that "his name has been stripped from an elementary school in New Jersey" (Menendez Mem. 3) evidences a jarring lack of perspective. Rejoining the ranks of the many Americans who do not have elementary schools named for them may be an unpleasant turn of events for Menendez, but is not an adequate punishment for criminal conduct.[23] It is not a punishment at all.

### c)   The Purposes of Sentencing

Taking the many serious aggravating factors in conjunction with the mitigating factor of Menendez's age, a sentence including a term of incarceration of at least fifteen years, which is a substantial downward variance from Menendez's 292 to 365-month Guidelines range, and which

---

[23] Indeed, Menendez's argument, if accepted, would lead to the perverse result that defendants with the greatest professional success, who, after being caught abusing their position, have prior awards or honors taken away, would receive the *lowest* sentences for their crimes, no matter how calculated they were, while defendants with lesser professional success or renown, who committed the same crimes, would receive more severe sentences.

is further subject to the applicable time credits summarized in Background Section IV, above, strikes the appropriate balance of redressing the extraordinary severity of Menendez's offenses, and the powerful need for general deterrence, without amounting to an effective life sentence.

In view of the gravity of the offenses, a sentence even remotely approaching Menendez's request for "rigorous community service" (Menendez Mem. 27-28, 44-46) would—to put it mildly—not promote respect for the law or provide for meaningful general deterrence. Indeed, even in a far less notorious case, a variance much less substantial than that requested by Menendez—a variance from a 235 to 293-month Guidelines range to a year and a day of incarceration—has been rejected by the Second Circuit as substantively unreasonable. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *6 (2d Cir. Apr. 12, 2023). The cases Menendez cites in support of the extraordinary leniency he seeks (*see* Menendez Mem. 28-35, 43-44) do not involve the unusual aggravating factors present in this case, much less in combination, and accordingly are of no assistance. *See, e.g.*, *Zukerman*, 897 F.3d at 430 ("[The defendant's] arguments based on aggregated sentencing data and vague summaries of other cases are unconvincing. The relevant question is not simply whether there are disparities, but whether there are unwarranted sentencing disparities as between [the defendant] and others with similar records who have been found guilty of similar conduct. The point merits little discussion because [the defendant] failed to provide sufficient information to compel the district court to find that these other defendants were so similarly situated to himself that any disparity in sentence would be unwarranted." (internal quotation marks, citation, and brackets omitted)); *see also, e.g.*, *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009) ("The district court was not required to consult [the defendant's proffered] statistics. Averages of sentences that provide no details underlying the

sentences are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases." (internal quotation marks and brackets omitted)).

Instead, the closest comparisons that the Government has found to the offense conduct support a sentence of at least 15 years. Likely the closest single case is that of Rod Blagojevich, who as Governor of Illinois attempted to obtain campaign contributions in exchange for appointing a particular candidate to fill a Senate vacancy, and who received a fourteen-year sentence. *See, e.g.*, FBI, *Press Release: Former Illinois Governor Rod R. Blagojevich Sentenced to 14 Years in Prison for Corruption in Office* (Dec. 7, 2011), *available at* https://archives.fbi.gov/archives/chicago/press-releases/2011/former-illinois-governor-rod-r.-blagojevich-sentenced-to-14-years-in-prison-for-corruption-in-office. Blagojevich's conduct bears some resemblance to Menendez's actions with respect to the Daibes prosecution, except that, among other things: (i) the funds Blagojevich solicited in exchange for this act and his other acts, though exceeding the amount of the bribes in this case, were destined towards a campaign, not towards his personal consumption; (ii) Blagojevich did not take this or any of his actions in order to affect any pending judicial proceeding, let alone a pending federal felony prosecution; and (iii) Blagojevich did not undertake any conduct comparable to the other portions of the scheme, such as any attempt to affect the national security or foreign relations of the United States, to affect state criminal proceedings, or to act on behalf of intelligence officials of a foreign government. A sentence of at least fifteen years of imprisonment would reflect the aggravating factors in Menendez's case; in any event, Menendez's more extensive and far-reaching crimes should certainly not result in a *lesser* sentence than Blagojevich's.

54

Another substantial sentence that the Government considers instructive is that for William F. Boyland, Jr., a New York State Assemblyman who received a fourteen-year sentence for bribery and theft offenses. *See, e.g.*, U.S. Attorney's Office, Eastern Dist. of N.Y., *Press Release: Former New York State Assemblyman William F. Boyland, Jr. Sentenced to 14 Years for Bribery, Fraud, Extortion, Conspiracy, and Theft* (Sept. 17, 2015), *available at* https://www.justice.gov/usao-edny/pr/former-new-york-state-assemblyman-william-f-boyland-jr-sentenced-14-years-bribery-fraud. Boyland requested bribes from undercover FBI agents in exchange for offering to assist a promoter in obtaining approvals necessary to hold carnivals, and for offering to obtain grant money and handle zoning issues for a real estate project. In addition, Boyland submitted over $70,000 in fraudulent travel reimbursements, and fraudulently steered $200,000 to a nonprofit that paid for community events promoting Boyland and his campaign. This conduct was in all relevant respects less severe than that of Menendez based on, among other things, (a) Menendez's abuse of a higher-level position of trust, (b) Menendez's corrupt promises relating to national security and foreign relations, (c) Menendez's corrupt promises to disrupt multiple federal and state criminal matters, (d) Menendez's obtaining hundreds of thousands of dollars more in proceeds from the scheme, and (e) Menendez's obstruction of justice.

Similarly, Menendez's request for the Court to apply "Shadow Guidelines" instead of the U.S. Sentencing Guidelines (*see* Menendez Mem. 24-27) is misguided, at least in this case. Whatever the merit of "Shadow Guidelines" in other cases—such as in cases in which complex market interactions create cascading loss amounts several steps removed from defendants' real conduct (*see, e.g.*, Menendez Mem. 25 (describing such a case))—they are seriously inapposite here, where the bribes were a series of tangible items individually received and stockpiled by

Menendez and his wife, largely in their shared house.  While different considerations may perhaps apply in the context of certain financial frauds, it is not remotely obvious that *bribes* of "between $100,000 and $1 million presumptively warrant similar punishment."  (Menendez Mem. 27.)[24]  To the contrary—at least where bribes are concerned as opposed to broader measures of financial loss—that proposition is highly counterintuitive and runs afoul of the Second Circuit's commonsense observation that "[w]here the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."  *See United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008).  But in any event, the variance the Government proposes is not far above the sentencing range that would result from the use of the "Shadow Guidelines" in place of the Sentencing Guidelines with respect to loss amount, and—in light of the aggravating factors in this case—would be amply justified even if the Court were to find the "Shadow Guidelines" persuasive.

The Probation Office's recommended sentence of twelve years (Menendez PSR at 88), though approaching the level of an appropriate sentence, does not adequately distinguish the extraordinary severity of Menendez's offenses from those of other corrupt officials, such as Blagojevich and Boyland, who received longer sentences than the twelve years recommended by the Probation Office.  The Probation Office's recommendation appears to place too great weight on the beneficial aspects of Menendez's time in the Senate.  (*Id.* at 90.)  This overlooks that his tenure in the Senate was marred by his violation of the Senate's own ethics rules before he even

---

[24] Similarly, whatever the merits in general of a rule that "it is not until more than $1 million in losses that a defendant should be penalized to any greater degree" (Menendez Mem. 27), the public would likely be quite confused as to why a corrupt politician amassing a hoard of cash, gold, and other bribes worth over $800,000 should be treated the same as one who had acquired $100,001.

committed these offenses.  But more fundamentally, service in the Senate was not a hardship Menendez selflessly endured, but a rare privilege he enjoyed and then abused.  Serving in the Senate should have been its own reward.  If Menendez was not corrupt, it would have been.  It is not something Menendez needs to be *rewarded for* at all, much less rewarded by escaping punishment for his historic abuse of that same position after having previously been admonished.

Contrary to his self-portrayal as a long-suffering everyman in his sentencing memorandum (Menendez Mem. 3-14), Menendez has for years had the rare privilege of wielding a power, and holding a status, that few even in our nation's Congress—let alone the public—have ever attained. He should not be treated any more favorably than the countless other defendants whom this Court routinely sentences to prison for equally self-interested—but less headline-worthy—conduct.  As Judge Colleen McMahon explained in *United States v. Binday*, No. 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."  (ECF No. 349, Sent'g Tr., at 46); *see id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("While no defendant should be made a martyr to public

passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant.  No sentence of probation, or anything close to it, could serve this purpose.").

Menendez's requested "rigorous community service" (Menendez Mem. 27-28, 44-46), or anything like it, would utterly disserve the purposes of sentencing.  For the abuse of power at the highest levels of the Legislative Branch, the attempts to corrupt the criminal justice system that all law-abiding citizens depend on, and the sale of allegiance to a foreign power and attempt to corruptly influence the foreign relations and national security of the United States, in exchange for bribes of cash, gold, and a luxury convertible, to be met with "rigorous community service"—or even a relatively brief sentence of imprisonment shorter than that imposed on, for example, many street-level drug dealers—would breed deep cynicism.  It would bring the law into disrepute.  It would afford little or no general deterrence at all.  It would be widely perceived as, and would be, a denial of just punishment.

Instead of Menendez's requested extraordinary leniency, this Court should impose a sentence that reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, and affords adequate deterrence in a critical area.  This Court should redress Menendez's shocking abuse of power with a sentence including a term of incarceration of at least fifteen years.

2.    *Hana Should Receive a Sentence of at Least Ten Years*

Although less culpable than Menendez, Hana is nevertheless a central figure in the scheme, who played a particularly aggravating role in a way that is not fully captured in the Sentencing Guidelines range, and who presents minimal mitigating factors.

a)    <u>The Nature and Circumstances of the Offense</u>

Hana's role in initiating the scheme is a significant aggravating factor that is not reflected in his Sentencing Guidelines range.  The evidence at trial showed that Hana began assembling the initial *quid pro quo* as soon as shortly after Menendez first began dating Nadine Menendez (then Nadine Arslanian).  According to a text message sent by Antranig Aslanian, the very day after the first date between Menendez and Nadine Menendez, Hana met with Nadine Menendez and discussed ways in which this relationship could result in a paycheck for her.  (*See* GX 1302 row 30; *see also, e.g.*, GX 1302 rows 12-28.)  Hana set up the initial meetings with Egyptian officials (*see, e.g.*, GX 1302 rows 31-38, 44-52, 56-68, 70-73, 118, 139-56, 162, 199-237, 249-280, 299-301), made the initial promises of payment to Nadine Menendez (*see, e.g.*, GX 1302 rows 40-42, 184, 520), and solicited the initial information, advocacy, and promises of assistance for the Egyptian government (*see, e.g.*, GX 1302 rows 84-106, 127 (Embassy information); *id.* rows 107-26 (information regarding Senator-1 holds); *id.* rows 131-38, 183-91 (ghostwritten letter); *id.* rows 157-81 (small arms ban lifting), *id.* rows 309-31 (promise to approve sale of tank ammunition)).  Ultimately, Hana played a crucial role in putting together the original *quid pro quo* that initiated the scheme.  This is a serious aggravating factor that is almost comparable to playing a leadership role but that, unlike a leadership role, is not taken into account in the Sentencing Guidelines range.

Hana also reaped tremendous financial benefits from the course of the scheme.  The monopoly that Menendez intervened to protect catapulted Hana from a failed business career to his current multimillion dollar net worth.  (*Compare* Tr. 2960-61 *with* Hana PSR ¶ 195.)  Indeed, although the trial record did not prove the internal decision-making that led Egypt to award the monopoly to Hana—who was, *at best*, far less qualified than the existing U.S. halal certifiers that he replaced, if he was even qualified at all (*see, e.g.*, Tr. 403-04, 430, 434, 451-54, 464-65, 476)—

59

there is every reason to conclude that at least *Hana believed* that his corrupt relationship with Menendez contributed to Egypt's decision to award the monopoly to him in the first place. Ahmed Essam, one of the very same Egyptian officials to whom Hana sent Menendez's promise to approve a sale of tank ammunition (GX 1302 row 325; *see also* GX 8A-12), and to whom Hana also sent the sensitive information about the staffing of the U.S. Embassy in Cairo (*id.* row 127), also corresponded with Hana, in advance, about the beef audit that the Egyptian government was going to conduct and about Hana's meetings with the USDA in connection with that audit (*id.* rows 504-07). Particularly given the abundant circumstantial evidence of favoritism toward Hana in that audit (*see, e.g.*, Tr. 432-33, 451-54, 464-65, 492-94), there is every reason to conclude that—whatever Egypt's internal decision-making may have been—Hana believed that his conduct with Menendez related to Egyptian military aid helped procure for him the halal certification monopoly. Either way, to afford adequate deterrence any sentence must take into account that the offense conduct sought to protect an incredibly lucrative business monopoly that was at odds with American interests and policy.

Hana's account of his alleged business operations (Hana Mem. 7-8, 32-33) merely confirms that he does not possess any special talent or extraordinary trait that justified the selection of him over the multiple experienced U.S. businesses he replaced. Indeed, while Egypt has chosen to expand Hana's monopoly to require exporters worldwide to enrich Hana (and the Egyptian Government, which claims 70% of the monopoly profits Hana extracts) (Hana Mem. 8), Hana does not even seek to establish, and the Government is not aware of any indication, that any country in the world apart from Egypt recognizes IS EG Halal's certifications. To the extent that Hana emphasizes that his qualifications consist of the fact that he is Coptic Christian as opposed

to the prior American halal certifiers that were allegedly Muslim (Hana Mem. 7)—and even assuming that this was considered a legitimate criterion and not a form of religious discrimination—he does not explain how he is qualified, above every one of the estimated approximately 11 million Christians in Egypt, to hold this monopoly.  *See, e.g.*, CIA, *The World Factbook: Egypt* (last visited January 6, 2025), https://www.cia.gov/the-world-factbook/countries/egypt/ (listing total population of 111 million, approximately 10% of whom are Christian).[25]

Hana's account of his offense conduct is a series of attempts to relitigate his unavailing challenges to the jury's verdict of guilty on every charged count.  Hana's arguments that his payments to Nadine Menendez were simply a form of generosity are squarely foreclosed by the jury's verdict, as well as the Court's opinion upholding that verdict.  (*Compare* Hana Mem. 8-11, 29-31 *with Menendez*, 2024 WL 5103452, at *11-12.)  Indeed, the Court has specifically rejected Hana's claim that the information about the staffing and nationality of the U.S. Embassy in Cairo was public information (*compare* Hana Mem. 10 *with Menendez*, 2024 WL 5103452, at *25), and Hana provides no explanation for why, if he simply received this information about the Embassy staffing as part of a purported private argument with Menendez, Hana then immediately forwarded it to Ahmed Essam, an Egyptian government official with whom Hana also shared Menendez's promise to approve a sale of tank ammunition, and who also corresponded with Hana about the

---

[25] Hana's listing of his relationships with Egyptian government officials as a factor somehow mitigating the seriousness of his offense conduct (*see* Hana Mem. 32-33) is confusing.  The Government agrees that these relationships explain how Hana was able to play such an important role in initiating a foreign influence and bribery scheme, but that is no more a mitigating factor than a drug dealer's relationship with a source of supply mitigates his or her decision to sell drugs or an insider trader's relationship with a source of material non-public information mitigates his or her decision to trade on that information.

upcoming U.S. beef audit that was to grant Hana the monopoly.  (*See* GX 1302 row 127; *see also id.* rows 324, 504-07.)

Similarly, Hana's claim that he never gave Menendez anything in exchange for Menendez's attempt to pressure the USDA is inconsistent with the verdict, and one that the Court has already rejected based on the overwhelming trial evidence.  (*Compare* Hana Mem. 11 *with Menendez*, 2024 WL 5103452, at \*11-12.)

Hana's attempts to disavow his bribery in connection with New Jersey state criminal matters have already been made and rejected as well (*compare* Hana Mem. 12, 34 *with Menendez*, 2024 WL 5103452, at \*22), as have his attempts to distance himself from the conspiratorial agreement regarding Daibes's federal prosecution and Qatar (*compare* Hana Mem. 12, 35 *with Menendez*, 2024 WL 5103452, at \*22).

b)   The History and Characteristics of the Defendant

Hana's history and characteristics present certain sympathetic factors, particularly concerning his immediate family, but those factors are not unique to him, and do not amount to a reason for substantial leniency.  Moreover, Hana's relative youth and the utter lack of any redeeming motive for his offenses, which appear to have been prompted by naked greed, counsel powerfully against leniency.

Hana's family circumstances are sympathetic (Hana Mem. 39-43, 55-58), but it is unfortunately quite common for those who commit serious offenses to have young children.  *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (quoting *id.*).  Unlike the families of many defendants, moreover, Hana's immediate family would

appear to have more than ample resources with which to support themselves during his incarceration. (*See* Hana PSR ¶ 195.)

Hana's decision to return voluntarily to the United States to face the charges (Hana Mem. 59) also is not a significant mitigating factor. Hana risked arrest in Egypt or in another country to which he might travel had he not returned, and given Hana's extensive business operations in the United States, an attempt to avoid arrest would likely have had a negative impact on his income, at least in the United States, and as a practical matter would likely have jeopardized his position in his business globally. In any event, numerous defendants return to the United States to face charges rather than risk arrest or limitations on travel—and to increase the likelihood of bail, as Hana was granted here. The mere fact that Hana is such a defendant does not counsel in favor of a lower sentence, much less the extraordinary sentence that he seeks.

The other personal circumstances urged by Hana do not counsel in favor of substantial leniency. Hana's generosity and charitable acts to his employees and others (Hana Mem. 43-49, 53-54) are of course commendable, but do not come close to the extraordinary level that renders them worthy of leniency. *See, e.g.*, *Canova*, 412 F.3d at 358-59; *Vrdolyak*, 593 F.3d at 682-83; *Ali*, 508 F.3d at 149 & n.17; *Repking*, 467 F.3d at 1095-96; *Morken*, 133 F.3d at 630; *Fishman*, 631 F. Supp. 2d at 403.

Hana's immigration to the United States in order to pursue business opportunities (Hana Mem. 36-39) does not differentiate him from a number of defendants who immigrate to the United States to pursue a better life. To the contrary, Hana's upbringing by wealthy parents who had Egyptian government contacts (Hana Mem. 32) shows that he had a level of privilege and opportunity that not all defendants who come before this Court enjoy. Even leaving that aside,

63

Hana has not made any showing that his plan to use his Egyptian government contacts to obtain a monopoly in a field in which he had no experience, and then to use that monopoly power to increase prices tenfold (*see* Tr. 408)—likely causing a wide array of indigent consumers to shoulder significant price increases to one of the cheapest sources of protein available to them (*see* Tr. 385-86; *see also* Tr. 579-80 ("[T]his was a source of food for consumers with very meager means, and so, sort of from a humanitarian perspective, it was in their interest for the prices to be lower."))—reflects any positive character trait.  It appears, rather, to reflect greed.

Finally—unlike Menendez and Daibes—Hana is relatively young and is expected to have a long life ahead of him following his sentence.  He will also have substantial assets following the service of any sentence, both to provide for his family and to assist him in reintegrating into society.  Thus, the circumstances supporting reasonable downward variances in the cases of Menendez and Daibes do not apply here.

c)    <u>The Purposes of Sentencing</u>

In light of Hana's role in initiating a historically broad and serious corrupt scheme—a role that is not captured in the Sentencing Guidelines—and the lack of mitigating factors relative to his codefendants, a sentence of at least ten years (near the top of his Guidelines range) is warranted in order to reflect the seriousness of the offenses, promote respect for the law, afford adequate deterrence to criminal conduct, and protect the public from further crimes by the defendant.

Hana's claim that he has already been punished enough (*see* Hana Mem. 51-53) is unpersuasive.  Although his family not being with him during the pendency of this case is unfortunate, the expeditious litigation of this case means that Hana has endured pretrial release for

64

far shorter periods of time than are common in many federal criminal cases, let alone criminal cases of this magnitude and seriousness.[26]

Hana's attempt to enlist Egyptian meat consumers as reasons he cannot receive a substantial sentence (*see* Hana Mem. 53-54) is audacious, given his role in extracting monopoly profits from them. Any sentence this Court may impose on Hana will not threaten "food for the table for millions of Egyptians" (Hana Mem. 53 (internal quotation marks omitted)). The decisions that affect Egyptian meat consumers are not made by the Court, but by the Government of Egypt, which decided during the course of the scheme to greatly *increase* the costs for its own meat consumers by granting Hana a monopoly that he then used to increase prices tenfold, from which the Egyptian government also greatly profited. Whatever the reasons behind that decision, the Court should no more grant leniency to Hana on account of his business, which has enriched him greatly, than it would to the owner of any other multimillion-dollar business. *See, e.g.*, *United States v. Sharapan*, 13 F.3d 781, 785 (3d Cir. 1994) (there is "nothing extraordinary in the fact that the imprisonment of [a business's] principal for mail fraud and filing false corporate tax returns may cause harm to the business and its employees"); *United States v. Rutana*, 932 F.2d 1155, 1158 (6th Cir. 1991) ("[E]ven assuming that [the defendant's] imprisonment would lead to the failure of his business and the loss of his employees' jobs, this fact does not distinguish [him] from other similar offenders.").[27]

---

[26] The Government is not aware of the reasons Hana's family members have assertedly been unable to come to the United States, as his children are U.S. citizens and his wife was issued a visa. Hana, without documentary support, attributes the obstacles to the Egyptian government. (*See* Hana PSR ¶ 168.)

[27] Hana's list of cases where a defendant who is "indispensable" to his business receives leniency (Hana Mem. 54-55) is inapposite. Given that Hana increased the price for halal certification more

Contrary to Hana's attempt to downplay the value of deterrence (*see* Hana Mem. 58-62), substantial general deterrence is warranted for Hana's conduct because it served to protect a monopoly so lucrative that it elevated him into an overnight multimillionaire.  *See, e.g.*, *Cavera*, 550 F.3d at 196 ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.").[28]  The Court should impose a sentence that deters anyone considering his example, who might otherwise be tempted by the fact that Hana is likely to retain substantial sums of money from that monopoly after his release.[29]

Hana's argument that the loss amount substantially overstates the seriousness of the offenses (Hana Mem. 25-28) is no more persuasive than Menendez's request to employ "Shadow Guidelines."  Whatever the merit of deviating from loss-based calculations in fraud cases or those in which losses result from indirect factors such as impersonal market operations, they have no application here, where the value was a series of things personally given to a powerful public official to corruptly induce abuses of power.  Nor, given Hana's role initiating the scheme in the

---

than tenfold upon receiving the monopoly (*see, e.g.*, Tr. 408 (price for container of beef increased from $200-400 range to over $5,000)), it is apparent that, even if there had in fact been any non-pretextual problems with existing certifiers—which the trial record indicates there were not—someone else in the world would be able to fix those problems for less than a tenfold markup.  In any event, given that he has already stepped aside as CEO (Hana Mem. 1), it is not clear that his sentence would have any meaningful impact on his business at all.  Ultimately, Hana has not made a showing that he is so "indispensable" that he should receive leniency in order to continue his lucrative business operations.

[28] Hana is correct that Menendez is no longer a Senator (*see* Hana Mem. 58-59), but that does not answer the broader point that Hana's wealth and Egyptian government contacts apparently both persist, let alone the need for general deterrence.

[29] Hana's characterization of how long sentences should be in order to achieve deterrence in white collar cases generally (*see* Hana Mem. 61-62), whatever its merits in financial fraud cases, is a poor fit in the context of international foreign-influenced bribery schemes such as this.

first place and continued financial interdependence with Daibes, is it in any way unfair to hold him accountable for all the bribes paid during the scheme. *See, e.g.*, *Menendez*, 2024 WL 5103452, at *22.

Hana's discussion of other allegedly similar offenses (*see* Hana Mem. 63-66), like Menendez's similar discussion, does not identify cases with the unusual set of deeply aggravating factors present here, and as a result is of little use in fashioning a sentence, *see, e.g.*, *Zukerman*, 897 F.3d at 430; *Irving*, 554 F.3d at 76. Although the Government agrees that Hana's status as a bribe-payor rather than a bribe recipient is a salient distinction (as in the other cases cited by Hana), and renders Hana less culpable than Menendez as a result, none of the cases cited by Hana are comparable to the seriousness of the offenses here. Indeed, there are other cases in which, even in the absence of unusual aggravating factors such as present here, bribe-payors receive sentences comparable to or even higher than those sought by the Government here. *See* Background Section III.B, *supra*.

For this reason, the seven-year sentence recommended by the Probation Office (Hana PSR at 75) is too lenient. Neither Hana's family circumstances nor his charitable giving, which appear in part to drive the Probation Office's recommendation (*id.* at 76-77), are sufficiently noteworthy to mitigate the serious criminal conduct Hana committed. Indeed, Hana's extremely high net worth, which he corruptly bribed Menendez in order to protect (and which he obtained by effectively extracting monopoly rents from indigent Egyptian meat consumers), enabled him to engage in these acts of charity and will mitigate the impact to his family of a sentence that adequately redresses his serious conduct. Moreover, the aggravating factors identified herein (both with respect to the unusually severe aspects of the scheme and with respect to Hana's role in

67

initiating it) are largely not taken into account in Hana's Sentencing Guidelines range, which would have been the same had Hana bribed a low-level elected official in comparable amounts. Given these aggravating factors and Hana's lack of compelling mitigating circumstances, a sentence even at the low end of the Sentencing Guidelines range, let alone a downward variance, would be insufficient to serve the purposes of sentencing.

Hana's suggestion that respect for the law counsels in favor of extraordinary leniency (*see* Hana Mem. 50-51) is entirely backward. There may be some cases in which respect for the law is promoted by a lenient sentence. This, however, is obviously not such a case. It would not promote respect for the law for a defendant who solicits a cash payment to fund a bribe to a U.S. Senator in order to influence a felony criminal case to receive extraordinary leniency. It would not promote respect for the law for a defendant who bribes a U.S. Senator to pressure a federal government agency to protect his own business monopoly—a monopoly that extracts exorbitant profits from indigent Egyptian consumers, and thereby earns the bribe-payor millions of dollars—to receive extraordinary leniency. It would not promote respect for the law for a defendant who played a leading role in initiating the first-ever offense in which a public official was convicted of being a foreign agent to receive extraordinary leniency.[30]

Accordingly, balancing the serious aggravating factors of the offense conduct; the aggravating factor of Hana's role in initiating the offenses, which is not taken into account in Hana's Sentencing Guidelines range; and the modest mitigating factors presented by Hana's

---

[30] The Court's multiplicity ruling means that Hana will not receive a separate sentence for the foreign agent conspiracy offense of which Hana was convicted in Count Fifteen, but only because the Court found that conduct to be included in Count One. It in no way means that Hana should not be sentenced for that conduct *at all*, as Hana seems to suggest. (*See* Hana Mem. 32-33.)

history and characteristics, a sentence of incarceration of at least ten years, subject to the available time credits discussed in Background Section IV, above—*i.e.*, a sentence within, but near the top of, Hana's Sentencing Guidelines range—reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, and affords adequate deterrence to criminal conduct.

### 3. *Daibes Should Receive a Sentence of at Least Nine Years*

Daibes too is less culpable than Menendez, and while his conduct is similarly culpable to Hana's, his history and characteristics present certain mitigating factors to a degree that Hana's do not. At the same time, Daibes's conduct—which occurred while he was on bail for another serious federal offense—was incredibly serious and threatened the integrity of the federal criminal justice system, and must be met with correspondingly serious punishment well in excess of the leniency he requests. On balance, for the reasons set forth herein, a sentence of incarceration of at least nine years would be fair and appropriate.

### a) The Nature and Circumstances of the Offense

Like Hana's, Daibes's offense conduct bears a significant aggravating factor—in Daibes's case, the commission of the offense while on pretrial release from his District of New Jersey prosecution. Unlike Hana's offense conduct, however, Daibes's aggravating factor is already taken into account in the Sentencing Guidelines. (*See* Daibes PSR ¶ 146.)[31]

---

[31] Daibes's September 2024 guilty plea in the District of New Jersey prosecution also renders him (unlike Hana) ineligible for the zero-point offender downward adjustment provided in U.S.S.G. § 4C1.1, and thus, between this and the obstruction of justice enhancement, the District of New Jersey prosecution ultimately accounts for the entirety of the difference between the offense levels calculated in Daibes and Hana's presentence reports. (*Compare* Daibes PSR ¶¶ 140-150 *with* Hana PSR ¶¶ 142-153.)

Daibes's commission of the offenses while on federal bail is an incredibly serious aggravating factor. The fact that, while released on bond on pending federal felony charges, he was willing to shower Menendez with cash and gold bars as part of a corrupt agreement to influence that prosecution is alarming. Contrary to his argument that he has been deterred and is unlikely to reoffend (*see* Daibes Mem. 3, 5, 15-16), Daibes's willingness to violate the conditions of his federal pretrial release renders it difficult to have real confidence that he will not reoffend, or indeed that he will obey any conditions of supervision upon release from custody. Even beyond that, Daibes's willingness to take advantage of the release he was granted under the Bail Reform Act in order to commit new crimes—let alone new crimes of this magnitude—has a corrosive effect on the trust that is a crucial component of any system of pretrial release. The system simply does not function if enough people are willing to abuse it as thoroughly as Daibes did.

Even leaving aside the fact that he was on pretrial release, Daibes's conduct is incredibly serious in itself. Indeed, the most valuable of the bribes given in the entire scheme—the series of kilogram gold bars—were given by Daibes. The conduct Daibes was most extensively involved in, regarding the attempts to influence his own federal prosecution, amounts to an assault on the integrity of the federal criminal justice system. Even if that had been all Daibes had done, it would have been a corrosive attempt to undermine the rule of law at the highest level. But of course, although he was not the driving force behind the conduct related to Egypt, Daibes willingly participated in that conduct, playing a critical role in assisting Hana in paying multiple bribes in connection with that aspect of the scheme. And Daibes profited greatly from that conduct as well, in the form of multimillion dollar joint venture investments of Hana's monopoly proceeds. And Daibes was not just involved in, but actually played the driving role in the conduct related to Qatar,

which involved the payment of bribes in an effort to solicit Menendez's corrupt abuse of his SFRC leadership position in a matter that was important to the bilateral relations between the United States and a foreign country.  (*See* Tr. 4491-93 (importance of formal Senate resolutions of the kind Daibes requested that Menendez corruptly advance).)

b)    <u>The History and Characteristics of the Defendant</u>

Daibes presents certain mitigating characteristics that support a modest degree of leniency, although not the extraordinary leniency he seeks (*see* Daibes Mem. 3).  As with Menendez, Daibes's age is a relevant mitigating factor.  Daibes's apparent history of generosity merits some consideration as well.

At 67, Daibes is several years younger than Menendez, but still of an age that, at least in this case, reasonably mitigates against such a long term of incarceration that would approach an effective life sentence.  Although Daibes also asserts his health conditions are a mitigating factor, and it is proper to consider them, he does not presently have any condition that immediately appears life-threatening, or appears unusual for someone of his age.  (*See* Daibes PSR ¶¶ 171-74; Daibes Mem. 5.)

Daibes's charitable deeds and generosity appear to present a more persuasive sentencing factor than those of Menendez or Hana, but they still do not warrant the undue leniency Daibes seeks.  (*See* Daibes Mem. 6-12.)  As set forth in Section II.B.1.b, above, the law accords with common sense: charitable giving by affluent persons is rarely meriting of leniency, and Daibes's particularly high net worth renders him far more capable of generosity than even many well-off persons, although the Government acknowledges that Daibes's level of generosity may have been somewhat above the average for someone of his affluence.  And while some of Daibes's giving was performed anonymously, Daibes surely benefited from the reputation of generosity that he

earned by his giving; indeed, his purported generosity apparently extended to providing housing for the mayor of his town.[32] *See, e.g.*, *Repking*, 467 F.3d at 1095-96; *Morken*, 133 F.3d at 630.

Daibes's family circumstances are also sympathetic, though not to a degree that would of themselves warrant substantial leniency for a serious offense. (*See* Daibes Mem. 12-14.) Daibes's role in the care for his adult son cannot justify a sentence that does not adequately redress Daibes's criminal conduct. And unlike many other defendants who also have dependents with particular needs, Daibes has considerable means to arrange for care for his son. (Daibes PSR ¶ 182.)

In contrast to his other arguments regarding his history and characteristics, Daibes's argument that his District of New Jersey prosecution is somehow a reason for leniency is entirely unpersuasive. (*See* Daibes Mem. 14-15.) After violating the terms of his bail in that case in order to commit these serious offenses, Daibes eventually pled guilty to a felony charge of making false entries in bank records in violation of 18 U.S.C. § 1005, and agreed to a stipulated Sentencing Guidelines range providing an 18- to 37-month term of imprisonment. *See United States v. Daibes*, No. 18 Cr. 655 (SDW) (D.N.J.) (ECF No. 140). Clearly, committing a different federal felony (and then attempting to corruptly obstruct its prosecution while on bail) is not a *mitigating* factor. It is the opposite.

---

[32] *See* State of N.J., Commission of Investigation, *Public Matters, Private Interests: An Inquiry into Local Government Ethics and Integrity Issues in the Borough of Edgewater*, at 4 (May 2023), *available at* https://www.nj.gov/sci/pdf/Edgewater%20Report%20Final.pdf ("Edgewater Mayor Michael McPartland received below market, payment deferred and interest-free rent at a luxury apartment building owned by Daibes. The arrangement began months after McPartland's appointment as mayor in January 2015."); *see also id.* at 1-2 ("SCI investigators found some local officials received personal perks and economic benefits from the developer, which raised questions about the motives behind official actions favorable to Daibes.").

c)    The Purposes of Sentencing

Balancing extremely serious offense conduct with mitigating factors, a sentence of imprisonment of at least nine years—*i.e.*, the sentence recommended by the U.S. Probation Office (Daibes PSR at 64)—strikes the correct balance. It is still a sufficiently substantial sentence to reflect the seriousness of the offenses and promote respect for the law, but affords meaningful leniency to Daibes in light of his age and other personal characteristics.

By comparison, the two-year sentence requested by Daibes is far too low to adequately serve the purposes of sentencing. The cases Daibes presents as a comparison (*see* Daibes Mem. 16-18) do not involve the same aggravating factors as this case does. Daibes does not identify any that involved corruption in as high a level of government, involved a scheme implicating the country's foreign relations, or involved attempts to tamper with the integrity of a federal prosecution, let alone all three together, let alone where the defendant was on bail at the time he committed his offenses. As a result, these cases are not instructive, *see, e.g.*, *Zukerman*, 897 F.3d at 430; *Irving*, 554 F.3d at 76, and it is also important to ensure that an unduly lenient sentence does not create an unwarranted disparity with one of Daibes's codefendants in this case.[33] For all of the foregoing reasons, the Court should reject Daibes's request for only a two-year sentence

---

[33] Indeed, even Daibes's list—which omits, for example, *each* of the substantial sentences for bribe-payors cited in Background Section III.B, *supra*—includes several cases involving defendants who appear far less culpable in which courts gave sentences well in excess of Daibes's requested leniency. *See, e.g.*, *United States v. Tommy Goss*, No. 19 Cr. 3048 (MDH) (72-month sentence following guilty plea of 68-year-old charity officer who paid bribes to state officials and embezzled funds); *United States v. Richard McDonough*, No. 09 Cr. 10166 (D. Mass. 2011) (84-month sentence following trial conviction of 66-year-old lobbyist who bribed state legislator related to state contracts); *United States v. Richard Scrushy*, No. 05 Cr. 119 (M.D. Ala. 2007) (82-month sentence following trial conviction of 48-year-old businessman who bribed Alabama governor).

(which would likely not result in him serving close to two years in light of the applicable time credits available) and impose a sentence with a term of incarceration of at least nine years.

## III.  THE COURT MUST ORDER FORFEITURE AND SHOULD ORDER SUBSTANTIAL FINES

In addition to a term of imprisonment, the Court must order forfeiture to separate Menendez and Hana from the proceeds of their offenses, and should order heavy fines in order to redress and deter all defendants' egregious conduct.

### A.  Applicable Law

#### 1.  *Forfeiture*

"Criminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessening the economic power of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (citation and internal quotation marks omitted).

Federal Rule of Criminal Procedure 32.2(b)(1) provides:

> **(A) Forfeiture Determinations.** As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

> **(B) Evidence and Hearing.** The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must

74

conduct a hearing after the verdict or finding of guilty.

Fed. R. Crim. P. 32.2(b)(1).

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995). Accordingly, the Government's burden of proof is by a preponderance of the evidence. *See, e.g.*, *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005).

The Federal Rules of Evidence do not apply at a hearing pursuant to Rule 32.2(b)(1)(B), and accordingly "'information,' in addition to evidence, may be taken at" such a hearing. *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007). In order to be considered at a hearing, information must be accepted by the Court as "relevant and reliable," Fed. R. Crim. P. 32.2(b)(1)(B), but if it is, there is no prohibition on relying upon hearsay or documentary submissions not admissible under the Rules of Evidence in place of live testimony. *See Capoccia*, 503 F.3d at 110 (allowing use of hearsay); *United States v. Stathakis*, No. 04 Cr. 790 (CBA), 2008 WL 413782, at *14 n.2 (E.D.N.Y. Feb. 13, 2008) (relying on hearsay).[34]

The United States is entitled to forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title [*i.e.*, Title 18]), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).[35] Specified unlawful activity includes any violation listed in 18 U.S.C. § 1961(1), *see* 18 U.S.C. § 1956(c)(7)(A), which in turn

---

[34] The Advisory Committee Notes for Rule 32.2 contemplate the use of live testimony only in "some instances" where it is "needed to determine the reliability of proffered information." Fed. R. Crim. P. 32.2 adv. comm. notes (2009 Amendments) ("The Committee foresees that in some instances live testimony will be needed to determine the reliability of proffered information.").

[35] "While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c)." *Stevenson*, 834 F.3d at 85.

includes any "act which is indictable under any of the following provisions of title 18, United States Code . . . 201 (relating to bribery) . . . 1343 (relating to wire fraud) . . . 1503 (relating to obstruction of justice) . . . [and] 1951 (relating to . . . extortion)," 18 U.S.C. § 1961(1)(B).  This forfeiture is mandatory.  *See, e.g.*, *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied."); *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012) (forfeiture and restitution both are mandatory).

The Second Circuit has acknowledged that "[t]he calculation of forfeiture amounts is not an exact science." *United States v. Treacey*, 639 F.3d 32, 48 (2d Cir. 2011).  Accordingly, "'[t]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'"  *Id.* (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).  "A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding."  *Treacey*, 639 F.3d at 48.

The purpose of forfeiture is "punitive rather than restitutive," and as a result "district courts are not required to conduct an investigative audit to ensure that a defendant is not deprived of a single farthing more than his criminal acts produced."  *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) (internal quotation marks omitted).  Absent Eighth Amendment concerns, the defendant's ability to pay a money judgment is irrelevant.  *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Viloski*, 814 F.3d 104, 114-15 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $1 billion as consistent with defendant's future ability to

"earn[] a living upon his release from prison."); *United States v. Bonventre*, 646 F. App'x 73, 92 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $19 billion in Madoff Ponzi scheme).

In *Honeycutt v. United States*, the Supreme Court explained that an individual defendant may only be required to forfeit criminal proceeds that he personally acquired or controlled. 581 U.S. at 445-54; *see also United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019). As courts, including the Second Circuit, have made clear both before and after *Honeycutt*, however, proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but "must have, at some point, been under the defendant's control . . . in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (citation and internal quotation marks omitted); *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019). Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *See Tanner*, 942 F.3d at 68; *Rajaratnam v. United States*, 736 F. App'x 279, 284 (2d Cir. 2018) (although proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, defendant acquired those proceeds for forfeiture purposes where he "had authority over disbursements, and, thus, exercised control over the proceeds at some point" (internal quotation marks omitted)); *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *Uddin*, 551 F.3d at 181 (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "[w]hether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from

defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party").

### 2.    *Fine*

Section 3572(a) of Title 18, United States Code, sets forth the factors to be considered by a district court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).  Section 5E1.2 of the Guidelines states that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  In determining the size of any fine, a district court shall consider:

1.    the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

2.    any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

3.    the burden that the fine places on the defendant and his dependents relative to alternative punishments;

4.    any restitution or reparation that the defendant has made or is obligated to make;

5.    any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

6.    whether the defendant previously has been fined for a similar offense;

7.      the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

8.      any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  The Guidelines further provide that, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* The Second Circuit has held that "a defendant's wealth and earning capacity are pertinent considerations in assessing an appropriate fine," *Zukerman*, 897 F.3d at 431-32, and has affirmed the imposition of above-Guidelines fines, *see, e.g.*, *id.* at 426 (affirming imposition of $10 million fine based on § 3572(a) factors); *United States v. DiNapoli*, 844 F. App'x 426, 430 (2d Cir. 2021) (affirming imposition of above-Guidelines $250,000 fine).  The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

**B.      Discussion**

1.      *Menendez and Hana Must Forfeit the Proceeds of Their Crimes*

The proposed forfeiture orders attached hereto as Exhibits A and B require Menendez and Hana to forfeit the proceeds of their crimes.  Each proposed order specifies a money judgment established by the trial record, and the forfeiture order as to Menendez requires the forfeiture of specific property that he received as bribes during the course of the scheme.

a)      Menendez's Forfeiture Order

Menendez's forfeiture order imposes a money judgment of $922,188, and requires him to forfeit all of his right, title, and interest in a series of items of specific property, all as established by the trial record.

The forfeitability of each of the items of specific property is readily ascertainable from the

trial record.  The items of specific property listed in the order of forfeiture, together with supporting

citations from the trial record, are:

1.  The 2019 Mercedes-Benz C-Class C300 automobile, vehicle identification number WDDWK8EB7KF873859 (Ex. A ¶ a; Tr. 3021; GX 1303 row 1143; GXs 5I-102, 5I-103, 7F-6, 7F-7; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *15-16);[36]

2.  Two one-kilogram gold bars with serial numbers matching Daibes's gold inventory seized in the search of Menendez and Nadine Menendez's residence, *i.e.*:

    a)  A one-kilogram Swiss Bank gold bar bearing serial number 590005 (Ex. A ¶ d.i; GXs 42, 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *19); and

    b)  A one-kilogram Metaux Precieux SA Metalor gold bar bearing serial number 890581 (Ex. A ¶ d.ii; GXs 56, 1F-1023, 1F-1237, 1F-1239, 3D-6; GX 1301; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *19);[37]

3.  The contents of seven envelopes of cash bearing fingerprints or DNA of Daibes and seized during the search of Menendez and Nadine Menendez's residence, *i.e.*:

    a)  $10,000 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B28 and 1B73 (Ex. A ¶ b.i; GXs 28, 73, 1F-1259, 1F-1273, 1F-1274, 1F-1276; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

---

[36] Citations to alphabetically designated paragraphs in the forfeiture order refer to subparagraphs of the paragraph beginning on page 3 of that order, which is the last paragraph on that page.  For example, the citation to "Ex. A ¶ a" refers to the subparagraph on page 3 reading "a. The Mercedes."  For purposes of calculating the money judgment, Uribe's $48,867.88 in payments toward the car were used.

[37] For purposes of calculating the money judgment, a publicly listed price of a kilogram of gold as of the approximate time at which the Government provided information to the U.S. Probation Office in or about August 2024, or $77,156.54, was used.  *See, e.g.*, *Treacey*, 639 F.3d at 48 ("The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." (internal quotation marks omitted)).  The use of the gold price at that point in time not only simplifies the calculation of forfeiture, by avoiding the need to continually recalculate the money judgment figure in advance of sentencing, but benefits the defendant, as the current price of a kilogram of gold as of the time of the writing of this memorandum is more than seven thousand dollars higher than the price used in the calculation.

b) $9,100 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B34 and 1B78 (Ex. A ¶ b.ii; GXs 34, 78, 1F-1126, 1F-1129, 1F-1170, 1F-1171; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

c) $7,400 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B35 and 1B79 (Ex. A ¶ b.iii; GXs 35, 79, 1F-1126, 1F-1129, 1F-1166, 1F-1167, 1F-1168, 1F-1169, 1F-15001; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

d) $5,300 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B49 and 1B84 (Ex. A ¶ b.iv; GXs 49, 84, 1F-1126, 1F-1129, 1F-1178, 1F-1179, 1F-1180; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

e) $9,500 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B44 and 1B86 (Ex. A ¶ b.v; GXs 44, 86, 1F-1126, 1F-1129, 1F-1196, 1F-1197, 1F-1198, 1F-1202, 1F-1203; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

f) $10,000 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B58 and 1B88 (Ex. A ¶ b.vi; GXs 58, 88, 1F-1126, 1F-1129, 1F-1175, 1F-1176, 1F-1177; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20); and

g) $1,200 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. A ¶ b.vii; GXs 64, 90, GXs 1F-1017, 1F-1019, 1F-1236, 1F-1246, 1F-1247; GXs 1301, 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

4. The contents of three envelopes of cash bearing fingerprints of Daibes and seized during the search of Nadine Menendez's safe deposit box, *i.e.*, $30,000 in U.S. currency seized from envelopes and logged into the FBI's Evidence Management System under numbers 1B13 and 1B94 (Ex. A ¶ c.i; GXs 1D-132, 1D-133, 1D-134; GX 1338; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *20);

5. The contents of three envelopes of cash with fingerprints of Hana's associates Nader Moussa and Gazmend Lita seized during the search of Menendez and Nadine Menendez's residence, *i.e.*:

a) $7,500 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B19 and 1B70 (Ex. A ¶ b.viii; GXs 19, 70, 1F-1311, 1F-1312, 1F-1313, 1F-1314, 1F-15002; GXs 1301, 1334; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *43);

b) $700 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. A ¶ b.ix; GXs 64, 90, GXs 1F-1017, 1F-1240, 1F-1250; GXs 1301, 1334; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *43); and

c) $1,350 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. A ¶ b.x; GXs 64, 90, GXs 1F-1017, 1F-1240, 1F-1246; GXs 1301, 1334; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *43);

6. The contents of two bags of cash found in close proximity to one of the envelopes with Daibes's fingerprints and one of the envelopes with Moussa's fingerprints, and including large amounts of cash in money bands indicating it was withdrawn from a bank at which neither Menendez nor Nadine Menendez maintained accounts, seized during the search of Menendez and Nadine Menendez's residence, *i.e.*:

a) $95,000 in U.S. currency seized from a yellow plastic bag and logged into the FBI's Evidence Management System under number 1B43 (Ex. A ¶ b.xi; GXs 43, 1F-1264, 1F-1265, 1F-1266; GX 1301); and

b) $100,000 in U.S. currency seized from a paper bag and logged into the FBI's Evidence Management System under number 1B37 (Ex. A ¶ b.xii; GXs 37, 1F-1259, 1F-1260, 1F-1261, 1F-1262, 1F-1263; GX 1301);

7. The contents of five envelopes of cash stored next to and packaged similarly to the envelopes of cash bearing Daibes's fingerprints, seized during the search of Nadine Menendez's safe deposit box, *i.e.*, $44,200 in U.S. currency seized from envelopes and logged into the FBI's Evidence Management System under numbers 1B13 and 1B94 (Ex. A ¶ c.ii; GX 13, 1D-132, 1D-133, 1D-134);

8.    The contents of envelopes of cash seized from jackets and footwear stored in close proximity with, and packaged similarly to, one of the envelopes with Daibes's fingerprints and one of the envelopes with Moussa's fingerprints, *i.e.*:[38]

 a) $5,350 in U.S. currency located in a right red shoe in the basement and logged into the FBI's Evidence Management System under number 1B23 (Ex. A ¶ b.xiii; Tr. 281-84 GXs 1F-1312, 1F-1317, 1F-1318);

 b) $20,000 in U.S. currency seized located in a left red shoe in the basement and logged into the FBI's Evidence Management System under number 1B26 (Ex. A ¶ b.xiv; Tr. 281-84; GXs 1F-1321, 1F-6009, 1F-6010, 1F-6011, 1F-6012, 1F-6013, 1F-6014, 1F-6015; GX 1438);

 c) $7,000 in U.S. currency located in a left brown boot in the basement and logged into the FBI's Evidence Management System under number 1B72 and 1B22 (Ex. A ¶ b.xv; GXs 22, 72, 1F-1311, 1F-1312, 1F-1315, 1F-1316, 1F-15003; GX 1301);

 d) $11,000 in U.S. currency seized from a manila envelope and logged into the FBI's Evidence Management System under numbers 1B28 and 1B73 (Ex. A ¶ b.xvi; GXs 28, 73, 1F-1259, 1F-1273, 1F-1274, 1F-1275, 1F-1276; GX 1301);

 e) $6,000 in U.S. currency seized from an envelope found in a black leather jacket and logged into the FBI's Evidence Management System under numbers 1B29 and 1B74 (Ex. A ¶ b.xvii; GXs 29, 74, 1F-1259, 1F-1270, 1F-1271, 1F-1272; GX 1301); and

 f) $4,300 in U.S. currency seized from an envelope located in a Congressional Hispanic Caucus jacket in the basement and logged into the FBI's Evidence Management System under numbers 1B30 and 1B75 (Ex. A ¶ b.xviii; GXs 30, 75, 1F-1259, 1F-1267, 1F-1268, 1F-1269; GX 1301);

9.    Nine one-ounce gold bars with serial numbers matching Daibes's gold inventory seized in the search of Menendez and Nadine Menendez's residence, *i.e.*:

---

[38] Indeed, one of these envelopes was in fact in the same jacket as one of the envelopes with Daibes's fingerprints on it.  (*See* Ex. A ¶ b.xvi; *see, e.g.*, GXs 1F-1275, 1301, 1338.)

a)     A one-ounce Credit Suisse gold bar bearing serial number 162424 (Ex. A ¶ e.iii; GXs 42, GXs 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301);

b)     A one-ounce Credit Suisse gold bar bearing serial number 938081 (Ex. A ¶ e.iv; GXs 42, GXs 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301);

c)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143952 (Ex. A ¶ e.v; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

d)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143957 (Ex. A ¶ e.vi; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

e)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143959 (Ex. A ¶ e.vii; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

f)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143961 (Ex. A ¶ e.viii; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

g)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143962 (Ex. A ¶ e.ix; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

h)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143963 (Ex. A ¶ e.x; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301); and

i)     A one-ounce Valcambi Suisse gold bar bearing serial number AA143974 (Ex. A ¶ e.xi; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);[39]

10.     Six one-ounce bars of gold with serial numbers adjacent or near-adjacent to serial numbers in photographs of Hana gold bars, either seized during the search of

---

[39] For purposes of calculating the money judgment, a publicly listed price of an ounce of gold as of the approximate time at which the Government provided information to the U.S. Probation Office in or about August 2024, or $2,399.60, was used with respect to these gold bars. *See, e.g.*, *Treacey*, 639 F.3d at 48. As with the price of a kilogram of gold, the use of this price is favorable to the defendant, as the price in August 2024 is hundreds of dollars lower than today's price.

Menendez and Nadine Menendez's residence or found pictured on Nadine Menendez's cellphone, *i.e.*:

    a)    A one-ounce Asahi gold bar bearing serial number A124806 (Ex. A ¶ e.i; Tr. 956-57; GXs 38, 1F-1126, 1F-1129, 1F-1204, 1F-1205, 1F-1208, 1F-1209, 3C-20, 3M-1, B201-17; GX 1301);

    b)    A one-ounce Asahi gold bar bearing serial number A124824 (Ex. A ¶ e.ii; Tr. 956-57; GXs 38, 1F-1126, 1F-1129, 1F-1204, 1F-1205, 1F-1208, 1F-1209, 3C-20, 3M-1, B201-17; GX 1301);

    c)    A one-ounce Asahi gold bar bearing serial number A124818 (Ex. A ¶ e.xii; Tr. 956-57; GXs 3C-20, 3M-1, B201-17);

    d)    A one-ounce Asahi gold bar bearing serial number A124819 (Ex. A ¶ e.xiii; Tr. 956-57; GXs 3C-20, 3M-1, B201-17);

    e)    A one-ounce Asahi gold bar bearing serial number A124820 (Ex. A ¶ e.xiv; Tr. 956-57; GXs 3C-20, 3M-1, B201-1A);

    f)    A one-ounce Asahi gold bar bearing serial number A124825 (Ex. A ¶ e.xv; Tr. 956-57; GXs 3C-20, 3M-1, B201-17); and

    g)    A one-ounce Asahi gold bar bearing serial number A124825 (Ex. A ¶ e.xvi; Tr. 5080-86; GXs 3L-1, B201-17);[40]

11.    One Vision Fitness S7100 HRT Suspension Trainer (Ex. A ¶ f; *see, e.g.*, GXs 1F-1015, 3C-11, A103-3); and

12.    One Blueair Classic 605 air purifier (Ex. A ¶ g; GXs 1F-1084, 7N-2, C218-1).[41]

The value of Menendez's money judgment is also readily ascertainable from the trial

---

[40] For purposes of calculating the money judgment, the same ounce of gold price was listed for these gold bars as for the nine one-ounce gold bars matching Daibes's gold inventory discussed in footnote 39, above.

[41] The above-described list of specific property does not include all of the cash seized in the course of the searches, even though the trial evidence revealed that the post-2018 cash in the basement and office alone exceeded Menendez's withdrawals from his bank accounts during that time period. For example, the "cash in the duffel bag found in the office" (Menendez Mem. 20) is not listed as specific property. The Government reserves the right to seek forfeiture, under 21 U.S.C. § 853(p), of additional seized cash or other assets as substitute assets for crime proceeds, including for proceeds that the defendants transferred to third parties, but does not herein ask the Court to issue any order with respect to those additional quantities of cash at this time.

record.  As set forth in the PSR (*see* Menendez PSR ¶¶ 224-25), the money judgment amount

consists of the value of the items of specific property set forth above, together with the value of

several items of specific property that are not believed to still be in Menendez's possession.[42]  The

additional items accounted for in Menendez's money judgment, together with supporting citations

to the trial record, are:

1.  $30,000 derived from checks marked with numbers 1055, 1072, and 1097 from IS EG Halal Certified Inc. to Strategic International Business Consultants, LLC (*see, e.g.*, GXs 5A-1001A, 5A-1001B & 5A-1001C; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *9-10);

2.  $23,568.54 derived from cashier's check marked with number 6759202328 from Wells Fargo Bank N.A. to Nationstar Mortgage d/b/a Mr. Cooper (*see, e.g.*, Tr. 750; GX 5C-200; *see also, e.g.*, *Menendez*, 2024 WL 5103452, at *9-10);

3.  A one-kilogram Johnson Matthew gold bar with serial number G114008 and a one-kilogram Royal Canadian Mint gold bar with serial number A002006, depicted in an image recovered from the Nadine Menendez Cellphone (*see, e.g.*, Tr. 5088-93, 5100-02; GX 1339, GXs B201-1A, 5A-5001A, 5A-5001B; *see also, e.g.*, Menendez, 2024 WL 5103452, at *36);[43] and

4.  Two one-kilogram gold bars sold by Nadine Menendez through Vasken Khorozian on or about May 2022 (*see, e.g.*, Tr. 5112-18; GX 5A-5001C; GX 5I-603A).[44]

b)  Hana's Forfeiture Order

Hana's forfeiture order imposes a money judgment of $125,000, as established by the trial

record.  The trial testimony established that the $125,000 money judgment amount is the amount

---

[42] The final forfeiture of the specific property will be applied towards the satisfaction of the money judgment.  (*See* Ex. A at 9.)

[43] The money judgment is calculated based on the value of the checks that Nadine Menendez received in exchange for the gold (*see* GXs 5A-5001A, 5A-5001B), and not the (higher) price of gold at the time of the preparation of the offense conduct summary for the Probation Office.

[44] As discussed above, the money judgment is calculated based on the value of the checks that Nadine Menendez received in exchange for the gold (*see* GXs 5A-5001C, 5I-603A), and not the (higher) price of gold at the time of the preparation of the offense conduct summary for the Probation Office.

of the cash payment that Hana received from Elvis Parra and Bienvenido Hernandez in exchange for his promises to corruptly influence Parra's prosecution through Menendez.  (*See, e.g.*, Tr. 3076 ("Bien Hernandez and Elvis Parra paid Will."); *id.* ("Q. Did Bien tell you how much they paid Will? A. $125,000.").)  This amount, conservatively, does not include the additional $25,000 payment that was initially offered to Hana but which Hana allowed Uribe to take in reimbursement for his payment for the Mercedes-Benz convertible.  *See, e.g.*, *Menendez*, 2024 WL 5103452, at *17 (citing Tr. 3078-80).

### 2.   *Each Defendant Should Pay a Substantial Fine*

The Court should also order substantial fines as to each of the defendants.  Each of the defendants will have significant assets remaining after any forfeiture, and as a result should receive "punitive" fines that adequately serve the purposes of sentencing, just like the terms of incarceration.  *See* U.S.S.G. § 5E1.2(d) ("The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.").  All of the factors supporting the imposition of substantial terms of incarceration for Menendez, Hana, and Daibes support the imposition of substantial fines for each of them.  Indeed, given that each of the crimes was financially motivated, and that each of the defendants is likely to retain significant assets after any forfeiture, the need for large fines is particularly pronounced in this case.

In the case of Menendez—whose offense conduct is the most severe—the Court should impose the highest possible fine that it determines still allows the defendant reasonably to support himself following his release, and at least amounting to $2,823,681, the value of Menendez's Thrift Savings Plan account.  Each of the aggravating factors applicable to Menendez's offenses discussed in Section II.B.1.a in connection with his term of imprisonment—including the nearly unique or unique and exceedingly serious aspects of his offenses—calls for a substantial financial

penalty as a "punitive" sanction, U.S.S.G. § 5E1.2.  By contrast, the one meaningful mitigating factor that Menendez presents, his age, applies with greatly diminished force to the financial aspects of the penalty.  Given that Menendez's offenses were financially motivated, and that Menendez will have substantial assets left following the imposition of a forfeiture order, a fine within the Sentencing Guidelines range of $50,000 to $500,000 would not sufficiently reflect the gravity of, and would afford inadequate deterrence to, criminal conduct as serious as Menendez's. (Menendez PSR ¶ 201.)

In the case of Hana and Daibes, statutory maximum fines are necessary in order to have any punitive effect, given the extremely high net worth they will each retain following any forfeiture.  Indeed, because they are bribe payors rather than bribe recipients, Hana's forfeiture is a modest $125,000 and Daibes does not have any forfeiture at all.[45]  Accordingly, Hana's multimillion-dollar net worth (Hana PSR ¶ 195) renders a statutory maximum fine, which in light of the Court's multiplicity ruling is $1,250,000, the minimum necessary to be "punitive" within the meaning of U.S.S.G. § 5E1.2.[46]  Similarly, Daibes has an even greater net worth (Daibes PSR ¶ 182), rendering a statutory maximum fine of $1,750,000 also the minimum necessary fine to amount to a punitive sanction.

---

[45] Given that their offenses were each undertaken, in part, to protect and expand their business operations, which they did successfully, theoretically a portion of Hana and Daibes's continued interests in their businesses could be deemed proceeds of the crimes.  However, there is no need for the Court to undertake the complex task of attributing portions of each defendant's business to the offenses, when the Court can achieve similar ends by imposing statutory maximum fines on Hana and Daibes.

[46] The Government respectfully disagrees with the Court's ruling that Counts One and Fifteen are multiplicitous, *Menendez*, 2024 WL 5103452, at *54, thus lowering the statutory maximum fine, but does not herein seek its reconsideration.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should impose significant sentences of imprisonment—terms of imprisonment of at least fifteen years for Menendez, at least ten years for Hana, and at least nine years for Daibes—and significant financial penalties that reflect the seriousness of the defendants' crimes, the immeasurable harm they have caused to the public trust, and the need to deter others from engaging in such egregious abuses of power.

Dated:  New York, New York
       January 9, 2025

                          Respectfully submitted,

                          MATTHEW PODOLSKY
                          Chief Counsel to the Acting United States Attorney
                          Attorney for the United States
                          Acting under Authority Conferred by
                          28 U.S.C. § 515

By:     s/_____
                          Eli J. Mark
                          Daniel C. Richenthal
                          Paul M. Monteleoni
                          Lara Pomerantz
                          Catherine Ghosh
                          Assistant United States Attorneys
                        (212) 637-2431/2109/2219/2343/1114
                          Christina A. Clark
                        Special Assistant United States Attorney
                        (202) 307-5191