UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>ROBERT MENENDEZ, WAEL HANA, and FRED DAIBES,<br><br>       Defendants. | (S4) 23-Cr-490 (SHS)<br><br>OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

 In September 2023, a grand jury indicted Senator Robert Menendez ("Menendez"), Nadine Menendez, Wael Hana, Fred Daibes, and Jose Uribe for their roles in a complex scheme to bribe Menendez to take official acts to benefit them and foreign governments. After a nine-week trial, a jury found defendants Menendez, Hana, and Daibes guilty on all counts with which they had been charged. Months after the jury rendered its verdict, as the government prepared for the upcoming trial of Nadine Menendez, the government discovered that several improperly redacted exhibits had been loaded onto the laptop that had been provided to the jury during its deliberations. In light of this discovery, each defendant has now filed a supplemental motion for a new trial. In the alternative, Menendez seeks discovery into the circumstances surrounding the loading of the improperly redacted material onto the jury's laptop. Because the defendants have waived any objection to the improperly redacted contents of the laptop and its submission to the jury and because the defendants were not prejudiced by the improperly redacted material, defendants' supplemental motions for a new trial are denied.

I. BACKGROUND

 A. Presentation of Evidence to the Jury

 The trial of defendants Menendez, Hana, and Daibes began on May 13, 2024. A nine-week trial ensued: thirty-seven witnesses testified and the parties introduced more than 3,000 exhibits, containing tens of thousands—or more likely, hundreds of thousands of pages of evidence. Of these more than 3,000 exhibits, approximately 2,800 were introduced by the government. (*See* ECF No. 645-4; *see also* ECF No. 645-1 ¶ 3.) Of the government's exhibits, three featured particularly prominently in the government's case: GX 1302, GX 1303, and GX 1304, which were lengthy summary charts admitted

pursuant to Federal Rule of Evidence 1006. *See United States v. Menendez*, 2024 WL 5103452, at *40-45 (S.D.N.Y. Dec. 13, 2024).[1] The summary charts were used by the government to synthesize much of the voluminous evidence presented with respect to the three main schemes charged in the indictment. Together, these three exhibits consumed more than a week of testimony and presentation.

Behind the scenes, the parties were in "near-daily" communication, exchanging lists of exhibits admitted during trial each day and seeking corrections, if needed, in a concerted effort by all parties to keep accurate records of what exhibits had been offered and either rejected or admitted into evidence. (ECF No. 648 at 10-11; *see also* ECF No. 648-1.) On at least one occasion, the parties disagreed about which version of an exhibit had been admitted into evidence. (*See* Tr. 6160-66.)

Toward the end of the trial, the parties prepared to submit the case to the jury. As part of that process, the parties arranged for a government-issue laptop to be loaded with every one of the exhibits admitted during trial, along with an index. (ECF No. 655 at 3.)[2] On July 10, 2024, two days before deliberations began, the government sent defense counsel a "full set of all the GX [government exhibits] we have marked as admitted" as well as a "full list of those [exhibits] in the attached index" and asked defense counsel to confirm "if this set reflects your internal versions so we can have it ready for the jurors' laptop on Thursday." (ECF No. 645-2 at 3.) Menendez's defense team responded that they were "still reviewing the GX list and will get back to you shortly if we have any edits or questions." (*Id.* at 2.) Menendez's counsel now states that "[g]iven the government's exhibit list contained over 2,800 exhibits," the defense spent this time "review[ing] file names to determine whether any non-admitted exhibits were included in the set of exhibits to be provided to the jury." (ECF No. 645-1 ¶ 3.)

The government further arranged for all defense counsel to review or "QC" (i.e., quality control) the laptop before it went to the jury to make certain it accurately reflected the admitted documents. (ECF No. 645-2 at 1-2.) What followed was an iterative process, with the attorneys proposing changes. (*See* ECF No. 641-1 at 10, 13.) On July 12, while the Court was charging the jury, a member of Menendez's defense team "reviewed [the] laptop" and spent approximately two and a half hours checking "the file names contained in the Jury Laptop against the file names contained in the

---

[1] In addition to the three charts themselves, the Court also admitted into evidence the documents underlying each entry on each chart. *Menendez*, 2024 WL 5103452, at *40, *41 n.26.

[2] The index listed the several thousand exhibits in evidence and provided a rudimentary description for each. (*See* ECF No. 645-4 (describing 97 exhibits in the "A100 Subseries" as "Excerpt[s] from report of message thread between [phone number 1] and [phone number 2], 11/23/2017 - 06/15/2022").)

parties' agreed-upon admitted exhibit list." (ECF No. 645-13 ¶¶ 2-3.) This attorney also "opened a select number of exhibit files contained on the Jury Laptop to confirm the contents of the exhibits accurately matched the contents of the admitted exhibits," but he did not review the contents of each and every exhibit. (*Id.* ¶ 4.) Defense counsel did not inform the Court that they believed they had insufficient time to review the contents of the laptop nor did any defense attorney ask the Court for additional time in which to review the documents on the laptop. Menendez's counsel now states that the defense attorneys "relied on the government to provide an accurate copy of the admitted government exhibits." (*Id.*)[3]

As part of its charge, the Court informed the jury that "a computer [has] been loaded with all the exhibits so you'll be able to call up any of the exhibits, except the actual materials." (Tr. 7161 (Jury Charge).) The Court noted that it was "not telling you you should do that or have to do that. I'm just telling you it's a service we have available." (Tr. 7161-62 (Jury Charge).) The Court also reminded the jury to "consider all the evidence." (*E.g.*, Tr. 7133 (Jury Charge).)

Once the Court completed its charge, the government informed the Court outside the presence of the jury that the laptop "ha[d] been inspected by all defense counsel" and was "ready to go." (Tr. 7165.) No objections were made. That afternoon, the jury began its deliberations with access to the laptop. Shortly after beginning its deliberations, the jury sent the Court a note asking for a cable to allow it to use the laptop, and one was sent to the jury room. (Tr. 7171.) Over the course of its deliberations, the jury sent two other notes; none related to any exhibit. On July 16, 2024, after approximately twelve hours of deliberation, the jury reached its verdict, finding the defendants guilty on all counts with which they had been charged.[4]

### B. The Extra-Record Material on the Jury Laptop

Four months later, on November 13, 2024, the government notified the Court that in the process of preparing for the upcoming trial of Nadine Menendez, it had discovered that incorrect versions of nine exhibits had been mistakenly loaded onto the jury's laptop. (ECF No. 630.) These exhibits primarily contain two statements that were subject to this Court's May 24, 2024 Order (*see* ECF No. 420 (the "May 24 Order")), which precluded the government from introducing certain statements concerning Menendez's past legislative acts under the Speech or Debate Clause. (*See id.* (citing *United States v.*

---

[3] Members of all three defense teams participated in the review of the laptop. (ECF No. 630 at 3.)

[4] At some point following the verdict, the government wiped the contents of the laptop (*see* ECF No. 645-6) in order to use the laptop in other cases. (*See* ECF No. 648 at 30-31.)

3

*Helstoski*, 442 U.S. 477, 489 (1979).) This evidence included (i) a September 2019 text message from Egyptian defense attaché Ahmed Helmy to Hana in which Helmy stated that "Director office of Egyptian affairs in state department 'Kathryn Kiser' told our DCM today that senator Menendize [sic] put an hold on a billion $ of usaid to Egypt before the recess !!!!" (ECF No. 409-1, rows 1030, 1040 (the "September 2019 Message")), which Hana later forwarded to Daibes; and (ii) January 2022 messages containing the web address "https://amp.cnn.com/cnn/2022/01/25/politics/us-arms-sales-egypt/index.html" which Menendez received and then sent to Nadine Menendez, who wrote to Hana that "Bob had to sign off on this . I'm sending you an article" and texted the web address to him via a different messaging application. (ECF No. 409-1, rows 1263-64, 1267, 1270 (together, the "January 2022 Messages").)[5]

    In the May 24 Order, the Court had directed that the September 2019 Message and the January 2022 Messages in both GX 1302 and the underlying exhibits be redacted in their entireties before being admitted into evidence. (*See* ECF No. 420.) The government then sought reconsideration of this ruling. (*See* ECF No. 421.) In its motion, the government proposed applying a more limited redaction to the September 2019 Message and January 2022 Messages. (*See id.*) Specifically, for the September 2019 Message, the government proposed that only the phrase "that Senator Menendize put an hold on" be redacted from the message. (ECF No. 421-1.) For the January 2022 Messages, the government proposed admitting only "I'm sending you an article" and the web address. (*See id.*) The Court denied the government's motion and adhered to its decision striking the messages in full. (*See* Tr. 1343.)

    In compliance with these Orders, the government redacted the entirety of the affected rows in the relevant chart, GX 1302. Thus, what is on the face of GX 1302 accurately reflects in all respects what the Court ordered and what the government proceeded to use and feature throughout its case, both on direct examination of the agent who presented the chart as well as in its summation.

    It is in the underlying exhibits, however, where the oversight lies: the government discovered that it had inadvertently loaded onto the jury's laptop nine exhibits underlying the GX 1302 chart that did not fully comply with the May 24 Order directing that the messages be stricken. These underlying exhibits improperly reflected the redactions the government had sought in its motion for reconsideration, rather than the

---

[5] One version of this web address displayed a thumbnail of the CNN logo and a thumbnail picture of the President of Egypt. (*See* ECF No. 630-1 (GX A103-10).)

broader redactions the Court had previously ordered.[6] Again, the broader redactions that were ordered by the Court are reflected accurately on the version of GX 1302 that the jury was shown, that was admitted into evidence, and that the government argued from in summation.

Since the submission of the government's November 13 letter, the parties have brought to the Court's attention a handful of other exhibits that were inadvertently loaded onto the jury's laptop. Four of these exhibits—GX B207, GX C207, GX D207, and GX C603—contain the unredacted September 2019 Message and January 2022 Messages within lengthy text chains.[7] These exhibits are each transcripts of text and call history that cover many months or years of communications and range in length from 51 to 636 pages.[8] The government had intended to remove two of these exhibits (GX B207 and GX C207) from the list of exhibits it moved into evidence in connection with its first summary witness but inadvertently neglected to do so. (ECF No. 655 at 3.) Defense counsel reviewed this list of exhibits, but all similarly failed to notice the error. (*Id.*) Neither of these exhibits were utilized during the trial.

---

[6] The source of this error stems from the government's motion to reconsider the Court's May 24 Order. In connection with that motion, the government prepared two sets of the exhibits affected by the Order: one set with redactions that complied with the May 24 Order and another set with the redactions the government proposed in its motion. (ECF No. 630 at 2.) The government produced both sets of exhibits to the defense. (*Id.*)

[7] The other exhibits identified are as follows. The government noticed (i) that the fifth page of GX 10A-8 contains an improperly redacted reference to a legislative act taken by a U.S. Senator other than Menendez (ECF No. 655 at 6 n.8) and (ii) that GX C107-AT contained a translation that was "not the final translation previously stipulated to by the parties." (ECF No. 660 at 2 n.4.) Defendants do not claim that either of these exhibits prejudiced them. From their own review, defendants identified two improperly redacted statements among the more than 3,000 exhibits loaded on the jury laptop. First, defendants note that the version of GX C207-10 on the jury laptop contains an excerpt in Arabic that should have been redacted. (ECF No. 645 at 11.) The Court understands that the exposed text translates to "Washington or New Jersey." (ECF No. 645-1 ¶ 15.) Defendants do not claim that they were prejudiced by this error. Second, defendants point out that GX 3D-1 contained a text message from Daibes to a Qatari individual stating "Send me your email address and I will send the articles on the Hitler car." (ECF No. 645 at 12.) The Court had previously directed the government to redact the word "Hitler." The Court addresses this message *infra*.

[8] Specifically, the following statements appear in each exhibit. For GX B207, the web address of the January 2022 Messages appears on page 72 and the message "Bob had to sign off on this . I'm sending you an article" appears on page 166. For GX C207, the September 2019 Message appears on pages 547, 548, 561 and 562 of the document. For GX D207, the September 2019 Message appears on page 10. For GX C603, the message "Bob had to sign off on this . I'm sending you an article" appears on page 66.

The two remaining exhibits—GX C603 and GX D207[9]—were referenced in GX 1302. Taking each exhibit in turn, GX C603 was cited on a page of the chart that the government never presented to the jury. (*See* GX 1302, rows 1266, 1268 (citing GX C603 on page 97 of the exhibit); Tr. 1567 (concluding examination on page 96 of GX 1302).) Second, GX D207 was cited in row 986 of GX 1302 as the source for a July 19, 2019 text message in which Hana forwarded Daibes the payoff statement for the reinstatement of Nadine Menendez's loan. (GX 1302, row 986.) In GX D207, a 51-page document, the payoff statement referenced in GX 1302 appears on the first page. (GX D207 at 1.) Hana's forwarding of the September 2019 Message to Daibes appears ten pages later. (*Id.* at 10.)

### C. Defendants' Supplemental Rule 33 Motions

On November 27, 2024, defendants each filed supplemental motions for a new trial pursuant to Federal Rule of Criminal Procedure 33 premised on the improperly redacted documents loaded onto the jury's laptop that contain primarily the September 2019 Message and the January 2022 Messages. (ECF Nos. 641-45.) Menendez contends that the inadvertent loading of those documents violated his rights under the Speech or Debate Clause, requiring vacatur of all sixteen counts of conviction. Hana urges that this error denied him a fair trial because he was "denied the opportunity to address the inculpatory evidence." (ECF No. 641 at 9.) Daibes, too, contends he was denied a fair trial because an exhibit contained a reference to Adolf Hitler that should have been redacted.

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). In evaluating a motion under Rule 33, "the ultimate test is whether letting a guilty verdict stand would be a manifest injustice. In other words, [t]here must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (alteration in original) (citation and quotation marks omitted).

---

[9] The government has clarified that GX D207 should be treated like GX C603. (ECF No. 660 at 2.)

## II. DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL.

### A. The Parties Shared Responsibility for Submitting the Proper Exhibits to the Jury.

"'[D]efense counsel (is) as responsible as the prosecutor for seeing to it that only proper exhibits (are) sent to the jury room.'" *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975) (alterations in original) (quoting *United States v. Burket*, 480 F.2d 568, 571 (2d Cir. 1973)). As a result, "the failure of counsel to register a timely objection to the submission of improper evidence to the jury will be deemed a waiver, unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial." *Id.* (internal citation omitted). *See also United States v. Stasiv*, No. 19-4286, 2021 WL 4888865, at *2 (2d Cir. Oct. 20, 2021); *United States v. Jeffreys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct 17, 2022) ("[D]efense counsel's declining of the district court's offer to inspect the evidence before it went to the jurors[] may have resulted in waiver."); *Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) ("[P]etitioner's counsel shares the responsibility with the prosecutor for failing to notice that a bag that was not in evidence was given to the jury. There is no evidence that this improper submission to the jury was anything other than a mistake."); *United States v. O'Brien*, No. 13-cr-586, 2017 WL 2371159, at *13 (E.D.N.Y. May 31, 2017), *aff'd*, 926 F.3d 57 (2d Cir. 2019). This rule applies in "circumstances in which defense counsel failed to discover that . . . *known* inadmissible portions of documents were not properly redacted." *United States v. Lee*, 573 F.3d 155, 161 n.2 (3d Cir. 2009) (emphasis in original) (citing *United States v. Strassman*, 241 F.2d 784, 785-86 (2d Cir. 1957)).

Based on this extensive caselaw, the Court finds that defendants have waived any objection to the submission of the improperly redacted exhibits at issue to the jury. All defense counsel had access to the list of exhibits—as well as the exhibits themselves—that were to be loaded onto the jury laptop for two days prior to the laptop entering the jury room. (*See* ECF No. 645-2 at 3.) For whatever reason, defense counsel apparently focused their attention during their "QC" or quality control of the contents of the laptop on whether the file names on the laptop matched those on the agreed-upon list of exhibits (*see* ECF No. 645-1 ¶¶ 3-4, 7; ECF No. 645-13 ¶¶ 3-4), despite the fact that that there had been an issue the week prior in which the parties did not agree on which version of an exhibit was in evidence. (*See* Tr. 6161-66.)

Now, faced with the apparent failure of the defense to accurately review the exhibits themselves, counsel claim there was insufficient time to do so. (ECF No. 645-1 ¶ 7; ECF No. 645-13 ¶ 4.) At no time, however, did any member of the three defense teams share this purported concern with the Court or request more time to review the laptop. Although defendants claim they "relied on the government to provide an

7

accurate copy of the admitted government exhibits" (*id.*), they may not now shirk their shared responsibility "for seeing to it that only proper exhibits (are) sent to the jury room." *Camporeale*, 515 F.2d at 188.

In response, Menendez urges that because these exhibits contain phrases that had been excluded by the Court on Speech or Debate Clause grounds, the Court must treat these exhibits exactly as it would if the "prosecutors [had] blurted out the contents of [these messages] during closing." (ECF No. 645 at 13.) However, by no stretch of the imagination can the inadvertent inclusion of a small number of improperly redacted exhibits (among thousands of others) be equivalent to a nonexistent direct statement to the jury by the government in summation. Rather, the Court will analyze these exhibits for what they are: "'molecules of extra-record matter'" that found their way into the jury room. *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994) (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970)). The Court agrees with the government that a defendant's waiver of a claim that he or she was prejudiced by extra-record information in the jury room does not turn on the nature of those exhibits but whether the defendant had an opportunity to discover the mistake. Indeed, if these exhibits were as critical as Menendez now claims, surely they would have been amongst the "select number of exhibit files" (ECF No. 645-13 ¶ 4) that the defense read during its review of the laptop, but they were either not read by the defense or the error was not noticed. In sum, it is clear defendants had an opportunity yet failed to discover the "*known* inadmissible portions of documents [that] were not properly redacted." *See Lee*, 573 F.3d at 161 n.2.

Menendez next contends that failure to order a new trial here would incentivize attorneys to "*intentionally* try to pull a fast one" and sneak extra-record material into the jury room. (ECF No. 645 at 2.) But as the facts lay bare, there is no indication that this error was anything other than pure inadvertence—which Menendez concedes. (*Id.* at 1-2 ("Without doubting that the error was unintentional . . . .").) In any event, this rule—that the parties share responsibility for submitting the proper exhibits to the jury room—has been the law in this Circuit for fifty years. *See Camporeale*, 515 F.2d at 188; *see also Gov't of Virgin Islands v. Joseph*, 685 F.2d 857, 864 (3d Cir. 1982). It acts to incentivize all parties to carefully review materials before submission to the jury, thus reducing the potential for post-judgment confusion and extended motion practice, as here. *See, e.g., United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

Thus, the Court finds that defendants have waived any objection to the inadvertent loading of the improperly redacted exhibits onto the jury's laptop, and for the reasons explained below, the Court determines that defendants were not denied a fair trial.

### B. Defendants Were Not Prejudiced by the Improperly Redacted Material Inadvertently Loaded onto the Jury Laptop.

Even if defendants had not waived any objection to the loading of improperly redacted exhibits onto the jury laptop, defendants were not prejudiced such that a new trial is required.

Although "[i]t is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial," *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002), "[t]his presumption . . . may be overcome by a showing that the extra-record information was harmless." *Bibbins*, 21 F.3d at 16. "'The touchstone of [this] decision . . . is thus not the mere fact of infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice.'" *Id.* (quoting *McMann*, 435 F.2d at 818).

The court's "'post-verdict determination of extra-record prejudice must be an objective one,' focusing on the information's probable effect on a 'hypothetical average juror.'" *Greer*, 285 F.3d at 173 (quoting *United States v. Calbas*, 821 F.2d 887, 896 n.9 (2d Cir. 1987)). "The trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985). "The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Id.*

As an initial matter, the Court concludes it is extraordinarily unlikely that the jury even "became aware" of the presence of the extra-record material on the jury laptop. *See Greer*, 285 F.3d at 173. That point bears repeating: it is extraordinarily unlikely that the jury was even aware of the miniscule amount of extra-record material on the laptop. The extra-record material was a few phrases buried in thousands of exhibits and many thousands of pages of evidence. All defense counsel as well as the government attorneys—acutely attuned to the evidence in this case—failed to notice the improper redactions during their preparation and review of the jury laptop, and for a full four months thereafter. It was the *government* that disclosed the error to defense counsel, which then conducted a document-by-document examination of the exhibits provided to the jury. Despise that intensive review, the defense failed to identify the four exhibits containing the September 2019 Message or the January 2022 Messages, which the government identified in mid-December. (*See* ECF No. 631 at 2 (counsel for Menendez stating that his team is undertaking a "document by document" review of the exhibits "to determine whether any other inadmissible exhibits were provided to the jury"); ECF No. 655 (government noting that these four exhibits "went undiscovered by all parties

9

until [they were] identified by the Government on December 11, 2024" as it prepared for Nadine Menendez's trial).)

Furthermore, no party or witness ever presented to the jury the improperly redacted September 2019 Message or January 2022 Messages. Indeed, the only references by the parties to these exhibits, whether on direct examination or cross examination, in summation, or in reference to the chart, were necessarily to the proper versions of the exhibits, because no one realized improper versions would be loaded onto the laptop until four months after the jury's verdict had been rendered. In addition, the version of summary chart GX 1302 that was loaded onto the laptop reflected the correct redactions.[10] After nine weeks of trial, the jury's deliberations spanned merely twelve hours, an impossibly small amount of time in which to examine all the evidence in this case in enough detail to locate the improper statements, particularly when no advocate or witness had led them there.[11] At bottom, defendants posit that the jury was a team of super sleuths, determined to uncover a few bits of information—that it had no reason to know existed—sprinkled on a few of pages within tens of thousands of pages of evidence.[12]

Even in the infinitesimal chance that the jury happened upon this evidence, there is similarly a miniscule likelihood that the jury would have understood it, much less attribute the significance to these exhibits that the defendants now do. Moreover, even when the jury is exposed to extra-record information that is "critical to the

---

[10] Defendants claim that the redactions striking out full rows of GX 1302 to comply with the Court's Orders "tantaliz[ed]" the jury (ECF No. 651 at 17), inviting jurors to "speculate about what was missing" and go looking through the underlying exhibits. (ECF No. 641 at 15 n.4.) That is totally meritless. The Court instructed the jury that "whatever's under [the redactions] had no role to play in your deliberations. Don't concern yourself with what was covered. Concern yourself only with the part of the item that was admitted into evidence." (Tr. 7059-60 (Jury Charge).) And juries are presumed to follow the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Aquart*, 912 F.3d 1, 34 (2d Cir. 2018).

[11] In the only reference to these exhibits in the summations, the government did not refer to the excluded portions of the messages. (*See* Tr. 6400-01.) There is no reason to believe that the "jury would naturally have investigated further," as defendants assert. (ECF No. 645 at 26.)

[12] Contrary to defendants' assertions, the Court may consider the likelihood that the jury viewed the extra-record material as part of its "objective assessment of possible prejudice." *United States v. Farhane*, 634 F.3d 127, 169 (2d Cir. 2011). *See United States v. Nkansah*, 699 F.3d 743, 751 (2d Cir. 2012) (affirming district court's conclusion that "the mistaken submission of the proffer agreed did not affect [defendant's] substantial rights" considering, *inter alia*, "it was highly likely the jury did not view the proffer agreement before it was recovered"), *abrogated on other grounds by United States v. Bouchard*, 828 F.3d 116 (2d. Cir. 2016).

10

government's case," that exposure is not prejudicial "if it concerns a matter as to which there is abundant properly admitted evidence." *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983). And here, as set forth below, there was indeed "abundant properly admitted evidence" on the points at issue here. *Id.*

Menendez, seizing on the government's characterization of the evidence when seeking its admission, calls this evidence "very critical." (ECF No. 645 at 13.) As an initial matter, the actions of defense counsel undercut that characterization. If this evidence were in fact critical to the government's case, it follows that these exhibits would most certainly have been among the select number defense counsel chose to inspect when reviewing the jury laptop. Two conclusions naturally follow: either defense counsel chose not to inspect these exhibits *or* defense counsel did open and review these exhibits but did not notice the improper redactions. Either scenario undercuts the theory that this evidence is a smoking gun laying in plain view.

Moreover, the September 2019 Message and the January 2022 Messages did not "fill[] a major gap" in the government's case. (ECF No. 645 at 21.) As detailed in the Court's December 13, 2024 Opinion, *Menendez*, 2024 WL 5103452, at *7-12, *23-26, the government introduced ample evidence of acts—including official acts—that Menendez took to benefit Egypt. These include (i) Menendez's promise to sign off on a $99 million foreign military sale to Egypt (GX 1302, rows 320-23, GX A101-14, GX B201-10, GX B105-15); (ii) Menendez editing a letter to be sent on behalf of the Egyptian government, "respond[ing] to some of the issues that have been raised by Senator [Senator-1] and others, which have lead [sic] to a hold on $300 million dollars in appropriated aid to Egypt" (GX 1302, row 186, GX A403); (iii) Menendez's telephone call to Undersecretary McKinney to get him to stop interfering with IS EG's monopoly; (iv) Menendez's change in his public position to become less critical of Egypt; (v) Menendez seeking and obtaining sensitive, nonpublic information about the personnel in the U.S. Embassy in Cairo and then giving that information to Egyptian officials; and (vi) Menendez helping Egyptian intelligence officials prepare for their meetings with U.S. Senators. *See Menendez*, 2024 WL 5103452, at *7-12, *23-26. Accordingly, in the face of substantial evidence supporting the government's allegations concerning Menendez's participation in the Egypt scheme, the improperly redacted documents almost certainly had no effect on a hypothetical average juror. *See Greer*, 285 F.3d at 173 (applying objective test focusing on the extra-record information's probable effect on a hypothetical average juror).[13]

---

[13] The same is true for Daibes' text message reading "Send me your email address and I will send the articles on the Hitler car." (ECF No. 645 at 12.) The jury was never directed to this message and no

11

In response, Menendez returns to the Speech or Debate Clause, contending that a "harmless-error analysis will not excuse a violation," relying on *United States v. Swindall*, 971 F.2d 1531, 1548 n.21 (11th Cir. 1992). Menendez once again forgets the reality that these statements are extra-record information in a small number of exhibits accidentally placed on a jury laptop and not a statement made in open court by any attorney. Further, it is not clear that *Swindall* supports Menendez's position. Indeed, the *Swindall* court acknowledged that "[a] member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Id.* at 1548 (quoting *United States v. Brewster*, 408 U.S. 501, 512 (1972)). Here, the government's case did not rely on legislative acts taken by Menendez. *Accord United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (acknowledging that while "testimony relative to legislative matters should not have been heard by the grand jury," the testimony "constituted an insignificant portion of the evidence presented to the jury and was not a factor in the issuance of the indictment").

For his part, Hana contends that his trial was fundamentally unfair because he was not able to rebut the information in the exhibits at issue here. Specifically, he claims that he "declined to call his retained expert witness to contextualize the long history of U.S.-Egyptian relations and the provision of military aid, which would also have rebutted the contention, uniquely explicit in these documents, that Senator Menendez was engaging in 'special' or 'favorable' behavior towards Egypt and its officials." (ECF No. 641 at 9.) The Court does not agree that this evidence "uniquely" exhibited Menendez's special treatment towards Egypt. As explained *supra*, the jury heard evidence of, *inter alia*, Menendez promising to sign off on a foreign military sale, assisting Egyptian intelligence officials as they prepared to meet with U.S. Senators, and editing a letter to be sent from the Egyptian government concerning the provision of U.S. aid to Egypt. In sum, evidence of Menendez's special treatment towards Egypt was plainly and explicitly before the jury and Hana was free to counter that evidence as he wished.

At the end of the day, there is no question that this trial was fair to all defendants. *Cf. Greer*, 285 F.3d at 170 ("[A] motion for a new trial must be granted if the trial was not fair to the moving party." (quoting *Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996))).

---

summary chart contained this message. Moreover, while a reference to Hitler might evoke an emotional response, Daibes uses the name as a descriptor to indicate that a certain car relates in some unknown way to Hitler, and the single reference would almost certainly be meaningless to the jury. Ultimately, any theoretical prejudice to Daibes is certainly not so great as to warrant a new trial.

**III. DISCOVERY IS NOT WARRANTED.**

In the alternative, Menendez seeks wide-ranging discovery "into the facts and circumstances underlying the government's transmission of excluded evidence to the jury and the scope of the improper evidence that was provided." (ECF No. 645 at 32.) He posits that it is *possible* that inclusion of this improper evidence on the jury laptop was not simply an innocent mistake but does so without the slightest fact to support this supposition. As a threshold matter, the Federal Rules of Criminal Procedure, as well as the deliberative process privilege, exempt from discovery "reports, memoranda, or other internal government documents made by an attorney for the government . . . in connection with investigating or prosecuting the case," Fed. R. Crim. P. 16(a)(2), *see, e.g.*, *Grand Ctr. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482-83 (2d Cir. 1999), although in criminal cases, discovery may be ordered when a defendant provides "some evidence tending to show the existence of the essential elements of the defense." *United States v. Berrios*, 501 F.2d 1207, 1211-12 (2d Cir. 1974). Menendez's conjecture about what is plausible does not approach this level and is totally unsupported in the record.

Menendez also seeks discovery into the scope of the improperly redacted material that was loaded onto the jury laptop. But discovery is not necessary for that purpose, as defendants have been in possession of a full set of the exhibits loaded onto the jury laptop since at least November 15, 2024. (ECF No. 645-1 ¶ 11.) And as early as November 18, 2024, Menendez's counsel informed the Court that his team was reviewing each exhibit on the laptop "document by document[] to determine whether any other inadmissible exhibits were provided to the jury." (ECF No. 631 at 2.) Menendez provides no reason why discovery is needed to assist in this process—which, by Menendez's own estimate, has long ago been complete. (*See id.*)

Similarly, defendants seek discovery into the circumstances surrounding the wiping of the laptop, although they have not supported that request with any reason or evidence for the Court to believe the erasure of the laptop was anything but a routine procedure designed to free the laptop for use in other cases, especially where defendants have in their possession a complete set of the documents loaded onto the laptop exactly as it was provided to the jury.

Menendez's request for discovery is denied.

**IV. CONCLUSION**

In sum, the interests of justice do not require a new trial. Defendants were "as responsible as the prosecutor for seeing to it that only the proper exhibits [were] sent to the jury room." *Camporeale*, 515 F.2d at 188. And while all three teams of defense counsel reviewed the jury laptop, they failed to object to the submission of the laptop to the jury or seek additional time in which to review the laptop's contents. In addition, it

is extraordinarily unlikely that the jury ever became aware of the "molecules of extra-record matter," *Bibbins*, 21 F.3d at 16, on the jury laptop when no one had referenced that material during the trial. The defendants were not prejudiced such that a new trial is required.

Defendants' supplemental motions for a new trial are denied, as is Menendez's request for discovery.

Dated: New York, New York
       January 22, 2025

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.