**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S4 23-cr-490 (SHS)

---

## SENATOR ROBERT MENENDEZ'S REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL

**PAUL HASTINGS LLP**

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 620-5719
Facsimile: (310) 620-5819

Avi Weitzman
Paul C. Gross
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 725-3620

*Attorneys for Defendant Robert Menendez*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

I.      Senator Menendez Presents No Flight Risk or Danger to the Public. .............................3

II.     Senator Menendez's Appeal Will Present "Substantial" Questions That, if Resolved in His Favor, Would Result in Reversal or a New Trial. ...................................3

        A.      The Speech or Debate Clause Questions Are Substantial. ...................................4

                1.      The U.S. Attorney Recommendation ......................................................4

                2.      Information Gathering Relating to the Egypt Scheme .............................6

                3.      The "Sign Off" Text .............................................................................8

                4.      The Laptop Violations .........................................................................9

        B.      The *McDonnell* "Official Action" Questions Are Substantial. ...........................11

                1.      New Jersey .......................................................................................11

                2.      Egypt ................................................................................................15

        C.      Section 219's Constitutionality Presents Substantial Questions. .......................16

        D.      The Government's Venue Choice Raises Substantial Questions. .......................17

        E.      Success on Appeal Will Likely Result in a New Trial on All Counts ................18

CONCLUSION ..............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Gravel v. United States*,
408 U.S. 606 (1972) ...........................................................................................4

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ...........................................................................................9

*McDonnell v. United States*,
579 U.S. 550 (2016) ...................................................................................*passim*

*McSurely v. McClellan*,
521 F.2d 1024 (D.C. Cir. 1975) ........................................................................9

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ...........................................................................................5

*In re Search of the Rayburn House Office Building Room No. 2113*,
432 F. Supp. 2d 100 (D.D.C. 2006) .................................................................10

*United States v. Aguilar*,
515 U.S. 593 (1995) .........................................................................................21

*United States v. Allocco*,
305 F.2d 704 (2d Cir. 1962) ...............................................................................4

*United States v. Arthur*,
544 F.2d 730 (4th Cir. 1976) ......................................................................19, 20

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) .........................................................................*passim*

*United States v. Birdsall*,
233 U.S. 223 (1914) .........................................................................................13

*United States v. Brewster*,
408 U.S. 501 (1972) ...........................................................................................9

*United States v. Dowdy*,
479 F.2d 213 (4th Cir. 1973) ..............................................................................7

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) ...............................................................................20

*United States v. Durenberger*,
    1993 WL 738477 (D. Minn. Dec. 3, 1993) ...................................................................10

*United States v. Forrester*,
    60 F.3d 52 (2d Cir. 1995) ............................................................................................20

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)........................................................................................10

*United States v. Helstoski*,
    442 U.S. 477 (1979) .....................................................................................................9

*United States v. Jefferson*,
    289 F. Supp. 3d 717 (E.D. Va. 2017) ...................................................................12, 15

*United States v. Johnson*,
    383 U.S. 169 (1966) .....................................................................................................8

*United States v. Kirk Tang Yuk*,
    885 F.3d 57 (2d Cir. 2018)..........................................................................................18

*United States v. Mackey*,
    No. 23-7577, Dkt. Nos. 37.1 & 44.1 (2d Cir. Jan. 5, 2024) ......................................17

*United States v. Mangano*,
    2025 WL 479623 (2d Cir. Feb. 13, 2025)...............................................................*passim*

*United States v. Randell*,
    761 F.2d 122 (2d Cir. 1985)....................................................................................*passim*

*United States v. Saavedra*,
    223 F.3d 85 (2d Cir. 2000)..........................................................................................18

*United States v. Sawyer*,
    85 F.3d 713 (1st Cir. 1996).........................................................................................14

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002)..........................................................................................21

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017).............................................................................12, 14, 15

*United States v. Stephenson*,
    895 F.2d 867 (2d Cir. 1990)........................................................................................18

*United States v. Swindall*,
    971 F.2d 1531 (11th Cir. 1992)...................................................................................10

*United States v. Triumph Capital Group, Inc.*,
  544 F.3d 149 (2d Cir. 2008)....................................................................20

*United States v. Tzolov*,
  642 F.3d 314 (2d Cir. 2011)....................................................................17

*United States v. Urciuoli*,
  513 F.3d 290 (1st Cir. 2008) ...........................................................12, 15

*United States v. Weisser*,
  417 F.3d 336 (2d Cir. 2005)......................................................................6

*United States v. Williams*,
  644 F.2d 950 (2d Cir. 1981)....................................................................11

**Federal Statutes**

18 U.S.C. § 201(b)(2).................................................................................17

18 U.S.C. § 666...........................................................................................21

18 U.S.C. § 3143(b) .............................................................................*passim*

**Rules**

Fed. R. Evid. 103(b)....................................................................................6

## INTRODUCTION

This was a first-of-its-kind prosecution of a then-sitting U.S. Senator, and it proceeded to final judgment at breakneck speed despite incredible legal and factual complexities. Nonetheless, the government insists the Senator should be shipped to prison before the Second Circuit even has the opportunity to weigh in on the host of groundbreaking questions presented. The Court should soundly reject that position. The Court has seen enough over the past year to appreciate that the Senator's now-docketed appeal will present serious and important questions going to the heart of the prosecution. Even if the Court is confident in its own resolution of those questions, the contrary arguments clearly have "more substance" beyond being just "not frivolous." Opp. 2 (quoting *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985)). The questions on appeal are substantial, and bail pending appeal is therefore more than warranted.

The theme of the government's opposition is that this Court has already "considered" and "rejected" Senator Menendez's arguments "in a series of exhaustive written opinions." Opp. 1. That is correct, but it is also not determinative (or even highly relevant), since that is how our judicial system works. Those rulings are precisely what Senator Menendez intends to appeal. In *every* case where a criminal defendant seeks bond pending appeal, the district court has considered and rejected defense arguments. The question is not whether the arguments were thoughtfully considered by the district court—it is whether the questions are nonetheless substantial (*i.e.,* close or debatable), such that the Court of Appeals could come out the other way. *See Randell*, 761 F.2d at 125-26. Here, the answer is surely yes. The Speech or Debate arguments involve cutting-edge constitutional questions; the "official act" questions address the scope of federal corruption laws that the Supreme Court has repeatedly narrowed over the past decade; the Section 219 arguments are arising for the first time *in history*; and the venue arguments pose the fundamental quandary of why a Senator for New Jersey, accused of taking corrupt acts in D.C. and New Jersey, was

1

somehow charged in SDNY. Across these points, the Senator's appellate positions are well-supported by caselaw, scholarship, historical evidence, policy, and first-principles arguments.

The government also argues that, even if "substantial," winning these arguments on appeal would not knock out the Senator's obstruction of justice convictions (Counts 17-18). The government is mistaken. The government's theory of obstruction here was that the Senator concealed "bribe payments." Tr. 6547:18–19. So, any errors tainting the bribery counts necessarily also infect the derivative counts charging obstruction of justice; a jury that finds no bribery is much more likely to find no intent to obstruct (a non-existent bribery scheme) or no obstructive conduct. At minimum, the government is unable to show that it is highly probable that the jury was not influenced on the obstruction theories by the evidentiary and other errors affecting the heart of the case. That is enough to compel a new trial. And, in any event, Senator Menendez preserved vigorous objections to the obstruction of justice counts during trial and in his post-trial motions, citing to controlling Supreme Court and Second Circuit authority and raising (at minimum) a "substantial" question as to the sufficiency of the evidence on those counts. *See* Dkt. No. 592 at 38-43.

Unsurprisingly, for tactical reasons the government prefers not to concede that any of its positions or theories are subject to doubt. But this Court should recognize the obvious: This will be a momentous, precedent-setting appeal on a host of complicated legal issues. It clearly presents "substantial question[s] of law or fact," and those questions (if resolved in the Senator's favor on appeal) would likely result in meaningful relief. 18 U.S.C. § 3143(b). Under these conditions, it is neither appropriate nor legally justified to force the Senator to begin his prison sentence before the bona fides of the convictions have been evaluated by the Second Circuit. In short, Senator Menendez is entitled by law to continued release on bond pending appeal.

## ARGUMENT

### I. SENATOR MENENDEZ PRESENTS NO FLIGHT RISK OR DANGER TO THE PUBLIC.

The government does not dispute that Senator Menendez presents no risk of flight or harm to the community.  Instead, as he has throughout these proceedings, the Senator will participate in his appeal while complying with the same conditions that have been in effect—without incident—since September 2023.  Accordingly, the Senator is entitled to relief so long as he satisfies the "substantial question" prong of 18 U.S.C. § 3143(b).  As discussed next, he clearly does.

### II. SENATOR MENENDEZ'S APPEAL WILL PRESENT "SUBSTANTIAL" QUESTIONS THAT, IF RESOLVED IN HIS FAVOR, WOULD RESULT IN REVERSAL OR A NEW TRIAL.

Senator Menendez satisfies the merits prong of § 3143(b) because his appeal will raise at least one substantial question that is material to the counts of conviction.  Indeed, it will present several—on the Speech or Debate Clause, "official acts," the constitutionality of Section 219 as applied to Members of Congress, venue, and others.  Ignoring the merits of those issues, the government instead falls back on the argument that this Court has already resolved them.  Of course, that's true—by the time a defendant seeks this relief, the district court has *always* rejected his challenges.  Nonetheless, a defendant is entitled to release if his appeal presents issues that are "close" or "fairly debatable."  *Randell*, 761 F.2d at 125.  On that score, the government all but ignores the fact that other courts and esteemed scholars have adopted Senator Menendez's position on a host of crucial issues, which demonstrates that the issues presented were very close calls.  The government also sprinkles in various harmlessness and waiver theories, but none moves the needle.  And as a last redoubt, the government offers the ridiculous argument that even if Senator Menendez ultimately prevails on *every appellate issue* he intends to raise, he would not be entitled to relief.  That is plain wrong, and ignores the way the government structured this house of cards.

### A.    The Speech or Debate Clause Questions Are Substantial.

As Senator Menendez explained in his motion, his appeal will present at least four Speech or Debate Clause errors that qualify as "substantial" under § 3143(b).  Once again, the government's umbrella response is that this Court already rejected these arguments at various points in these proceedings.  But release pending appeal would never be granted if § 3143(b) conditioned it on a judge's finding of self-error.  Indeed, courts *routinely* grant release pending appeal in complex, high-profile bribery prosecutions, despite the district court's belief in its own rulings.  *See* Mot. 4.  In short, this Court's prior rulings do not detract in any way from the plain substantiality of the Senator's appellate arguments.

### 1.    The U.S. Attorney Recommendation.

To prove a *quid pro quo* in the New Jersey scheme, the government relied on evidence of the Senator's "deliberative and communicative process[]," *Gravel v. United States*, 408 U.S. 606, 625 (1972), for determining whether to recommend to the President a particular candidate for U.S. Attorney.  *See* Dkt. No. 654 (R33 Order) at 25.  This Court recognized that such a recommendation—including "pre-nomination activities" integral to it—*would be* a "squarely ... legislative act" *if* it qualified as "Advice" within the meaning of Article II.  Dkt. No. 252 (MTD Op.) at 4.  In resolving that question against the Senator, the Court chose sides in a robust scholarly debate, and arguably departed from the Second Circuit's observation that to properly render their constitutional advisory role, Senators' views "must be obtained and weighed" by the Executive *before* a nomination is made.  *United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962).  The government offers no meaningful rebuttal to the contention that the Senator's Speech or Debate argument is (at least) "fairly debatable," and instead simply points to this Court's rulings, which as noted do not control this question.  *See* Opp. 23.

4

Exposing its own doubts about its chances on appeal on this issue, the government stretches to argue that Senator Menendez somehow waived the *very argument* this Court addressed in its order on his motion to dismiss.  *See* Opp. 23–24.  That is wrong.  In fact, during trial, the government argued the opposite— that *all* of Senator Menendez's Speech or Debate objections are preserved for appeal—and thereby *prevailed* in urging the Court to overrule Senator Menendez's objections.  *See* Dkt. No. 479 at 2 ("Nor was there a need for Menendez to file a motion at all to preserve his broad asserted view of the Speech or Debate Clause"); Tr. 4488-89 (overruling Speech or Debate objections referenced in Dkt. Nos. 476 and 479).  Having successfully so argued, judicial estoppel prohibits the government from now conveniently shifting to a contrary position.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel[] generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").

And that is not the only time that the government conceded that Senator Menendez preserved all of his Speech or Debate objections, including as to the U.S. Attorney scheme. To quote the government, Senator Menendez's constitutional objections to evidence surrounding the Sellinger recommendation *were* "encompassed within" his motion to dismiss the indictment.  Opp. 25.  In deciding *that* motion, this Court held that a pre-nomination recommendation "is not a constitutionally mandated function of a Senator," and "*[t]herefore* … that a Senator's pre-nomination activities"—"including information gathering in determining who the Senator is considering for recommendation"—"are not legislative acts."  MTD Op. 5 (emphasis added). Given that unambiguous merits ruling, the Senator was not required to object each time prosecutors offered evidence that fell within his understanding of the Speech or Debate Clause's scope—"any

objection would have been futile." *United States v. Weisser*, 417 F.3d 336, 346 (2d Cir. 2005); Fed. R. Evid. 103(b).

Indeed, elsewhere the government faults the Senator for objecting *too often* on Speech or Debate grounds. *See* Opp. 19. And this Court itself announced that its ruling on the motion to dismiss was "the law of the case" but that the defense would "have the opportunity to appeal it." Tr. 565:11-16. Simply, there was no waiver here; this Court must apply § 3143(b)'s substantiality standard, not the inapplicable test for plain error.

In a belated attempt to address the *correct* standard, the government tosses in an argument that Michael Soliman's status as a "political consultant" singlehandedly defeats the Senator's claim on this score. Opp. 27–28. But the Senator's Speech or Debate Clause objection with respect to the Sellinger recommendation is about *his own* constitutional rights, not Soliman's—so the fact that Soliman was not a Senate employee is simply irrelevant. The Clause should have protected *all* evidence of the Senator's decision-making and information gathering—regardless of which witness the government chose to transmit testimony on those privileged topics. The government's reliance on Soliman's job title as an all-purpose response to the Senator's Speech or Debate claims certainly does not render his appellate claims "[in]substantial" under § 3143(b).

**2.    Information Gathering Relating to the Egypt Scheme.** When a Senator engages in "information gathering" to help inform his legislative decision-making, he undertakes a legislative act. *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988). Indeed, this Court recognized as much, at least as a general matter. MTD Op. at 2–3, 8. But it held that these particular meetings were not immune because the Senator used the information gathered there "implement[] a corrupt bargain." MTD Op. at 8. As explained, however, the Fourth Circuit has expressly rejected the notion that the "actual motives" animating information-gathering efforts

control the scope of Speech or Debate immunity.  *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973).  Notably, the government does not respond to *Dowdy* (which the Second Circuit favorably cited in *Biaggi*), or otherwise engage on the merits; it merely cites this Court's order on the motion to dismiss and calls it a day.  *See* Opp. 25.  But again, the Court's role at this stage is to assess whether the Senator has presented a question that "*could be* decided the other way." *Randell*, 761 F.2d at 125 (emphasis added).  Respectfully, it is reasonably possible that the Second Circuit will decline to open a circuit split on this issue.

Pivoting again (cynically) to waiver, the government insists that Senator Menendez "did not object" to every piece of evidence that could be characterized as an information-gathering meeting with Egyptian officials.  Opp. 25.  Again, the government distorts the factual record, and ignores the repeated objections lodged by Senator Menendez to such information gathering meetings and discussions.  *See, e.g.,* Dkt. No. 120 at 31 (motion to dismiss: "all" such meetings are "textbook information-gathering activities … safeguarded by" the Clause), 32 ("each of Senator Menendez's meetings amounted to 'information gathering activities' that are indisputably protected by the Constitution"); MTD Op. at 9 ("Menendez's contention that the Speech or Debate Clause protects activity related to the Egyptian Aid Scheme is denied in full."); Dkt. No. 476 ("the Constitution does not permit the government to elicit testimony" relating to "Senator Menendez's discussions with Staffer-1 regarding the Senator's posture toward Egypt"); Tr. 4480:2-7 (counsel for the government: "I was going to move from meetings generally with foreign officials. . . to meetings with Egyptian officials. Now, let's be clear, the defense has also objected to that. They jumped up, on my count, at least four times. ***That objection's also preserved***").

In the face of the court's rulings, further cumulative objections would have been futile given the Senator *did* object on Speech or Debate grounds to every such information-gathering

7

meeting at multiple points before and during trial, only to have this Court disagree across the board. That is why even the government agreed at trial that the objection was "preserved," after the Court "ruled on it months ago" in the motion-to-dismiss opinion. Tr. 4480:2-8. And it is why, in response to Senator Menendez's counsel's statement "that our prior objection to discussion of what occurs in that meeting with the Egyptians has been overruled and that our objection is preserved," the Court responded "Correct." Tr. 4489:13-17. Senator Menendez's appellate argument is plainly preserved, and the government is estopped from arguing to the contrary in any event. *Supra*, 5.

Undeterred, the government switches tack, and argues that the Senator nonetheless waived his Speech or Debate rights by engaging with prosecution witnesses about the context and conduct of these meetings. Opp. 26. This only confirms the substantial nature of the issues presented. Far from *excusing* a Speech or Debate violation, the Senator's forced participation in the scrutiny of his own legislative acts is the very reason why Speech and Debate protections are enshrined in the Constitution. The Speech or Debate clause shields all legislative activity from adversarial testing by Executive officials in a Judicial tribunal. *See, e.g.*, *United States v. Johnson*, 383 U.S. 169, 179–81 (1966). Once this Court rejected the Senator's arguments for Speech or Debate immunity, he had no choice but to try to engage and defend his legislative acts to the jury. He could not simply ignore the (misleading) portrayal of the evidence that was admitted against him. Far from amounting to any forfeiture of constitutional rights, the government's argument *exposes* the constitutional injury.

3.      **The "Sign Off" Text.** This Court determined that "the actions Menendez … took as a Senator in deciding whether or not to place a hold on foreign aid to Egypt are legislative acts." MTD Op. at 8. However, the government was allowed to introduce the functional equivalent of that same legislative decision in the form of the Senator's "tell Will I am going to sign off" text to

8

Nadine. *See* R33 Order at 68.  As explained in the Senator's motion, reasonable jurists could debate whether that message's use of the future tense, standing alone, was enough to strip it of Speech or Debate protection.  Mot. 11.  That easily circumvented rule sits uncomfortably with the Supreme Court's instruction to give the Clause "a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979).  Rather than adopt a rigid test that turns solely on whether the referenced act has been completed, the Second Circuit could instead distinguish a promise to enter an illicit "compact" from evidence of what a legislator actually "decided" to do. *United States v. Helstoski*, 442 U.S. 477, 489 (1979).  And if *that* is the line the Circuit draws, the "sign off" text that drew much attention at trial would be squarely on the protected side.

The government calls this argument "frivolous" and warns of "absurd" implications.  Opp. 21–22.  But it is attacking a straw man: The Senator has not argued that "a corrupt agreement or promise" retroactively becomes a legislative act when the promisor follows through (Opp. 22); he agrees that a "promise to act in a certain way" is not immune. *United States v. Brewster*, 408 U.S. 501, 526 (1972).  Senator Menendez simply contends that the "sign off" text was *not* a "promise," but instead a contemporaneous description of a legislative *decision*—and that admitting evidence like that evades the Clause's "intrinsically functional" protections. *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975).  Tellingly, the government never grapples with the implications of its *own* rule, which would permit prosecutors to admit a *New York Times* headline: "Senator Menendez will drop hold on Egyptian aid." *That* is the truly absurd outcome.  At minimum, the merits of that approach are "fairly debatable." *Randell*, 761 F.2d at 125.

4.      **The Laptop Violations.**  Finally, the government offers no persuasive response on its *admitted* Speech or Debate Clause violations.  It virtually ignores this Court's waiver holding (which the Senator explained was unprecedented and contrary to Supreme Court law), and focuses

solely on the supposed lack of prejudice, while gliding past the fact that *no court* has ever deemed a Speech or Debate error harmless. Indeed, it offers zero response to the Senator's argument that these errors are structural. *See* Mot. 12. It likewise ignores the fact that other courts have rejected "harmless-error analysis" in this context. *United States v. Swindall*, 971 F.2d 1531, 1548 n.21 (11th Cir. 1992); *see also In re Search of the Rayburn House Office Building Room No. 2113*, 432 F. Supp. 2d 100, 116 n.9 (D.D.C. 2006), *rev'd on other grounds*, 497 F.3d 654 (D.C. Cir. 2007); *United States v. Durenberger*, 1993 WL 738477, at *3–4 (D. Minn. Dec. 3, 1993). Again, the fact that other courts have adopted the Senator's position proves that the Second Circuit "very well could" reject the government's. *Randell*, 761 F.2d at 125.

Even if some form of harmless-error review applied, however, the government's arguments stand on shaky appellate ground. The government relies heavily on the speculation that "the jury almost certainly *never even saw*" the relevant exhibits, Opp. 17, but at closing, it specifically drew jurors' attention to exhibits that contained a violative—and highly prejudicial—message from an Egyptian official. *See* Tr. 6400 (closing); Dkt. No. 630-11 (GX C207-9) (partially redacted text from Egyptian official stating that "Senator Menendize [*sic*] put a hold on a billion $ of usaid to Egypt before the recess!!!"). And for good reason—these exhibits contain the *only* documents that tie Senator Menendez to a specific, consummated sale of military aid to Egypt. Indeed, while the government now tries to backtrack, at trial it described the violative evidence provided to the jury as "very critical," "highly probative," and "compelling." Tr. 1041-42; Dkt. No. 648, at 3. At a minimum, a court faced with this record could reasonably conclude that the government has not overcome the "presum[ption]" of prejudice that follows a jury's exposure to excluded evidence. *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002).

More generally, the government's sweeping theory that *every* Speech or Debate violation in this proceeding was harmless (Opp. 20–21) cannot possibly justify the denial of release. Senator Menendez has identified Speech or Debate errors that *pervaded* both the New Jersey and Egypt schemes. On the former, any evidence regarding the Sellinger recommendation process should have been excluded; on the latter, crucial building blocks of the government's case—including all-important text messages and meetings—should never have gone to the jury. There is no credible argument that this wide swath of evidence—the subject of untold hours of trial presentation by numerous government witnesses—was "insignificant." *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981). This Court should not adopt that view in this posture, particularly against the backdrop of authority holding that Speech or Debate errors are not even subject to harmless-error analysis *at all*. *Supra*, 9-10.

### B.    The *McDonnell* "Official Action" Questions Are Substantial.

The government's interpretation of *McDonnell v. United States*, 579 U.S. 550 (2016), and its "official act" requirement is, at a minimum, "fairly debatable." *Randell*, 761 F.2d at 125. As explained (Mot. 14), the government relied on a colloquial understanding of *McDonnell*'s "advice" and "pressure" terminology—one incompatible with the Supreme Court's instruction that a defendant must actually "use[] his official position" to engage in *any* form of "official act." 579 U.S. at 574. Rather than present a meaningful response, the government gestures vaguely at "ample evidence" and "clear law" that purportedly supports its position. Opp. 5, 7. But this Court need not disagree with its own prior rulings to grant the Senator's motion. The government's dalliance with the line between official acts and informal influence presents a host of "close" questions that warrant bond pending appeal.

**1.    New Jersey.** While the government does not meaningfully grapple with the legal merits, it does confirm its adherence to a highly aggressive—and flawed—reading of *McDonnell*:

In its view, *whenever* a public official "attempts to apply pressure," his act is an official one.  Opp. 7 (emphasis omitted).  The government relies on *Biaggi*, but that decision predates *McDonnell*'s clarification of the official-act requirement by nearly three decades.  The Second Circuit could easily reject an interpretation that reads the words "using his official position" out of *McDonnell* and untethers federal bribery statutes from any abuse of *power* by government officials.  It could instead conclude—as other courts have—that there is a crucial difference between "exploit[ing]" the "leverage" conferred by one's official authority (official) and merely "trading on the reputation, network and influence that comes with political office" (not official).  *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008); *see also United States v. Jefferson*, 289 F. Supp. 3d 717, 738-43 (E.D. Va. 2017).  Indeed, though the government ignores it, the Second Circuit has *already* recognized a distinction between expressing a "position on an issue" and "formally us[ing] [one's] power" to *act on* that preference.  *United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017).

Rather than argue that the Senator's *actual* position is insubstantial, the government again tilts at a straw man argument of its own creation: the view that Senator Menendez's lack of a "formal official relationship" with Attorney General Grewal automatically precluded the Senator from engaging in *McDonnell* "advice" or "pressure."  *See* Opp. 8.  That has never been the Senator's claim.  Instead, he has argued at every turn that his (undisputed) inability to take official action *directly* on New Jersey matters means that merely communicating his *preferences* to a State official does not involve "us[e] [of] his official position."  *McDonnell*, 579 U.S. at 574.  In this context, something more is needed—for instance, evidence that the Senator sought to "exploit" his federal legislative power by "invok[ing] any purported oversight authority or threaten[ing] to use official powers in support of his advocacy" for Uribe.  *Urciuoli*, 513 F.3d at 296.  Here, the jury saw *nothing of the kind*—just a "call" and "meeting" during which the Senator (at most)

"express[ed] support" for a course of action. *McDonnell*, 579 U.S. at 573. To the point, Mr. Grewal testified unequivocally that Senator Menendez *never* "threaten[ed]" to "use any of his official powers as Senator" against Mr. Grewal, such as by "haul[ing] [Mr. Grewal] in front of Congress" or "enact[ing] legislation that would discriminate against New Jersey." Tr. 2774-76. Instead, Mr. Grewal testified only to "extremely polite and respectful . . . interactions" with Senator Menendez, in which the Senator simply expressed "concerns about how [the Office of the Insurance Fraud Prosecutor] was treating . . . Hispanic defendants." *Id.* 2771-74. As *McDonnell* teaches, that cannot qualify as official "advice," official "pressure," or indeed *any* kind of "official action." *See id.*

The government also argues that the Second Circuit's recent decision in *United States v. Mangano*, 2025 WL 479623 (2d Cir. Feb. 13, 2025), forecloses Senator Menendez's *McDonnell* arguments. That is wrong. To start, even assuming *Mangano* rejected the argument that a public official can *never* engage in an official act by "advising or pressuring another official in a different unit of government," Opp. 7, that holding would not aid the government because the Senator never advanced that categorical rule. Moreover, *Mangano*'s analysis focused almost exclusively on the defendant's argument that the "advice" category of official acts is strictly confined to the facts of *United States v. Birdsall*, 233 U.S. 223 (1914); *see Mangano*, 2025 WL 479623 at *21 ("According to [the defendant], the only sort of advice that can amount to an official act involves" the precise fact pattern in *Birdsall*.). Again, Senator Menendez has not made that argument. While *Birdsall* certainly informs a proper interpretation of *McDonnell*'s "advice" discussion, prosecutors can establish that a defendant "us[ed] his official position" based on other theories provided they involve an abuse of power. *McDonnell*, 579 U.S. at 574. Here, the government offered *no theory*

of "advice" apart from an influential politician's "expressi[on] [of] support" for a constituent.  *Id.*
at 573.  As a result, the jury lacked sufficient evidence to convict the Senator on an "advice" theory.

Nor does *Mangano* paper over the analogous defects in the government's interpretation of
"pressure."  The Second Circuit decided *Mangano* on the understanding that the defendant *had*
"leverag[ed] his authority as County Executive to pressure the Town," including by offering to
secure "jobs or promotions for some of [the Town Supervisor's] associates."  2025 WL 479623 at
*5–6.  In the context of a County Executive, those acts are in fact a use of official powers.  By
contrast, the jury heard zero evidence of "leveraging" official powers in this way with respect to,
for example, the Uribe scheme (or the call to McKinney, as explained below).  There is thus no
reason to construe *Mangano* as a retreat from *Silver*'s holding that an official act requires some
"formal[] use[] [of] power" by the defendant, as opposed to merely communicating a viewpoint
while wielding generalized political influence.  *Silver*, 864 F.3d at 122.

Finally, the government ignores the Senator's instructional-error argument, which provides
another substantial appellate issue.  *See* Mot. 17.  The government's theory that jurors should apply
"a layperson's" sense of "pressure" and "advice" (Tr. 6316) flies in the face of *McDonnell*.  As a
result, the jury lacked adequate guidance on the crucial distinction between official "advice" or
"pressure" and merely expressing one's preference as an influential public official.  And where
"the line between the merely unattractive and actually criminal conduct is blurred, the court must
take pains to explain the difference to the jury."  *United States v. Sawyer*, 85 F.3d 713, 741 (1st
Cir. 1996).  As this Court has recognized, instructions in bribery cases "must carefully focus the
jury's attention on the difference between lawful" and illicit conduct.  *Biaggi*, 909 F.2d at 695.  At
a minimum, whether the instructions here did so presents a close question.

14

2.      **Egypt.** As before, the government mostly points to "the record" and its supposedly "ample evidence" rather than engaging on the legal merits. Opp. 5. But again, the jury heard *no* evidence that Senator Menendez used, agreed to use, or threatened to use, a shred of his Senatorial authority to either "advi[se]" or "pressure" the USDA. *McDonnell*, 579 U.S. at 574; *see* Tr. 1979–81 (McKinney testifying that the Senator did not leverage his official authority during the call). While the government asserts that Senator Menendez "sought to use his own official position to attempt to influence McKinney[]," Opp. 5, that *ipse dixit* comes with no record citation. To the contrary, the government effectively admits that, in its view, what *really* matters is that the Senator "w[as] … a Senator" when he picked up the phone. *Id.* That is almost verbatim the argument that the Supreme Court *rejected* in *McDonnell*. Instead, the Second Circuit could reasonably conclude that this act was not "official." The Senator's reading of *McDonnell*—under which merely being an "influential person" (Tr. 1804) does not convert one's every verbal preference into a nascent official act—is consistent with both Second Circuit and out-of-circuit precedent. *See Silver*, 864 F.3d at 122; *Urciuoli*, 513 F.3d at 296; *Jefferson*, 289 F. Supp. 3d at 738-43.

Next, the government slaps the label "plainly incorrect" on Senator Menendez's argument that the USDA's aspirational position on Egypt's monopoly decision was not an "official act." *See* Opp. 6. To be sure, this Court sided with the government based on evidence that "McKinney was acting in his capacity as the Undersecretary of Agriculture … in attempting to have Egypt change its position"—in particular, his use of "official letterhead." R33 Order at 13. Respectfully, however, the Second Circuit could reasonably conclude that *Silver* barred that approach when it rejected a simplistic "official capacity" test and held that the use of "government letterhead" is insufficient without, for example, a "threat[] to withhold funding." 864 F.3d at 118, 120–21. Here too, the government is effectively re-advancing the sweeping positions it *lost* in *McDonnell*.

15

### C.    Section 219's Constitutionality Presents Substantial Questions.

Whether Section 219 is unconstitutional as applied to Senator Menendez also presents a substantial question.  As the Court knows, this is the first time a Member of Congress has been prosecuted, let alone sentenced to prison, under the statute.  That is not because prosecutors previously failed to notice this curious provision tucked away in Title 18.  Rather, it is because they recognized that wielding the law against a Senator or Representative would raise concerns under the separation of powers.  This Court need not take Senator Menendez's word for it.  Not long after the law's enactment, the Department of Justice told Congress that it would be "totally out of line" to prosecute a Senator or Representative for acting on "requests" from foreign governments.  *Inquiry into the Matter of Billy Carter and Libya: Hearing Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts, of the S. Comm. on the Judiciary*, 96th Cong., 2d Sess., 700, 701 (1980) (statement of Philip B. Heymann, Assistant Att'y Gen.).  Exactly so.  This issue is thus "novel," and it "could be decided the other way" by other reasonable jurists.  *Randell*, 761 F.2d at 125.

The government's response misses the mark.  It observes that not every constitutional argument is "automatically" substantial.  Opp. 14–15.  That is not remotely Senator Menendez's claim.  the Government cannot with a straight face deny that the Section 219 question is at least novel, close, and cutting-edge.  Indeed, at an earlier stage, the government boasted that this case presents the "first such charge … in U.S. history."  Dkt. No. 620 at 21.  And even the most careful opinion is not immune from review and potential reversal, *see Randell*, 761 F.2d at 124–25, which is why courts regularly grant release pending appeal in high-profile, sensitive fraud and corruption cases just like this one, *see* Mot. 3–4 (compiling cases).

16

**D.      The Government's Venue Choice Raises Substantial Questions.**

The government's attempts to sweep venue under the rug fall flat.  It claims that it is "not uncommon to deny bail pending appeal where the asserted appellate issues concern venue."  Opp. 12.  But nor is it uncommon to *grant* bail when a case presents serious venue issues.  *See* Mot. 4.  For example, just over a year ago, the Second Circuit granted bail pending appeal in *United States v. Mackey*, where one of the two main appellate issues involved venue.  *See* Order, No. 23-7577 (2d Cir. Dec. 4, 2023), Dkt. No. 37.1.  Indeed, the venue issues in Mackey involved some of the same novel, aggressive theories asserted by the government here.  *See* Opening Br. at 35–46, *United States v. Mackey*, No. 23-7577 (2d Cir. Jan. 5, 2024), Dkt. No. 44.1 (arguing that mere passage of a communication through district insufficient to support venue).

Next, the government relies on a series of misstatements and *non-sequiturs* to claim there are no substantial questions regarding venue.  For instance, it says that venue can be based on "an in-person meeting in which one bribe-payor provided a thing of value worth several hundred dollars" to a bribe recipient, or by paying "thousands of dollars in bribes in the district."  Opp. 12– 13.  Even if true, that is not this case. The charged bribes here—cash, gold bars, Nadine's car, etc.—were all given in *New Jersey*.  The government cites no record evidence of a single bribe paid in New York.

Turning from factual to legal error, the government claims "the sale of kilogram gold bars[] received as a bribe" is "part and parcel" of the crime and thus sufficient for venue.  Opp. 12.  But the actual standard asks whether the *defendant* committed *essential conduct* in the venue or whether "it is foreseeable that such an act would occur in the district of venue and it does." *United States v. Tzolov*, 642 F.3d 314, 319 (2d Cir. 2011) (internal quotation marks omitted).  A defendant commits the essential conduct elements for bribery under 18 U.S.C. § 201(b)(2) if he "corruptly demands, seeks, receives, accepts, or agrees to receive or accept" a bribe.  *United States v.*

17

*Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990).  Senator Menendez did none of that when third parties entered into a gold transaction in Manhattan.

As for the conspiracy counts, the government points out that preparatory acts can be sufficient for venue.  Opp. 13.  But that comes nowhere close to ending the venue analysis.  For one, the acts in the district must have been "reasonably foreseeable" to the Senator.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018).  And "the criminal acts in question [must] bear 'substantial contacts'" with the venue district.  *United States v. Saavedra*, 223 F.3d 85, 92–93 (2d Cir. 2000).  These additional requirements, entirely glossed over by the government, go to the heart of the grave venue issues posed here—*e.g.*, whether it was foreseeable to Senator Menendez that Uribe or a New Jersey jeweler might call into SDNY, and whether a case about bribes paid in New Jersey in exchange for acts in D.C. and New Jersey has substantial contacts with SDNY.  These and other venue questions in this case are substantial, to say the least.

**E.    Success on Appeal Will Likely Result in a New Trial on All Counts.**

The government also argues that, even if Senator Menendez's appellate issues are "substantial" within the meaning of § 3143(b), he is still not entitled to release pending appeal, because success on those issues would not wipe out ***all*** counts of conviction.  *See* Opp. 35–42.  The government is wrong in its premise.  Appellate reversal—even on the Speech or Debate Clause issues *alone*—is "likely to result in" a new trial on all counts.  18 U.S.C. § 3143(b)(1)(B).

The government hinges its contrary claim on Counts 17–18, the substantive and conspiracy counts for obstruction of the SDNY grand jury investigation.[1]  It submits that those counts "would

---

[1] In a footnote, the government claims the Speech or Debate Clause violations did not infect the New Jersey scheme (Counts 9–10) either.  Opp. 21 n.8.  But as Senator Menendez explained, the prosecutors expressly argued to the jury that it should treat each of the three "schemes" as evidence to corroborate the others—so if two legs of the stool are deemed unconstitutional, the third cannot stand alone.  *See* Mot. 25–26.  The government does not appear to respond to this point in any way.  In all events, the New Jersey scheme is vitiated by the *McDonnell* error, and Counts 9–10 also fail for lack of venue.  There are

stand even if" the Second Circuit agreed with "*every* claim of error Menendez now presses." Opp. 36. That is wishful thinking. In reality, there is no way these two counts could survive under those conditions. The reason is simple: The government's theory of obstruction was that the Senator and Nadine tried to conceal their receipt of bribes. *See* Tr. 63:2–7 (Opening: "When the FBI started asking questions about *these bribes*, Menendez and Nadine … tried to cover up their crimes" by claiming that payments from Uribe and Hana were loans, all of which "was a lie." (emphasis added)); Tr. 6547:18–19 (Closing: "[T]hese were never loans. They were *bribe* payments." (emphasis added)). So if the Second Circuit concludes that the bribery convictions cannot stand because of the pervasive use of evidence barred by the Speech or Debate Clause and/or because the charges cannot constitute "official act" bribery, the derivative obstruction counts obviously would need to be retried too with an entirely new—and much narrower—trial record.

The government argues at length that a defendant can commit obstruction even if he is not guilty of any underlying offense. Opp. 36–37. Of course that is true. But it is equally true that, if the theory of obstruction in a particular case rests on the predicate of some other crime, errors that taint the latter also infect the former. The question is whether, given the relationship between the counts, an error as to one may have influenced the jury's consideration of the other. The answer to that is, of course.

Consider, for example, *United States v. Arthur*, 544 F.2d 730 (4th Cir. 1976). That case charged a bank president with bribery, and also with misapplying bank funds. One can certainly commit the latter offense without committing the former. But the government's theory was that the defendant had misapplied the bank funds by (among other things) using them as bribes. *See*

---

accordingly at least three independent reasons why the Senator's substantial appellate issues would compel (at minimum) a new trial on Counts 9–10.

*id.* at 733–34. So after the Fourth Circuit concluded that the *bribery* instructions were erroneous, it went on to hold that the conviction for *misapplication* had to be vacated too: "The determination of whether appellant used bank money to bribe state and party officials was … a crucial step in ascertaining whether he was guilty of misapplying that money." *Id.* at 736.

The same is true here. One can commit obstruction without committing bribery. But the government's theory here was that the Senator had obstructed the grand jury by characterizing the payments to Nadine as loans **when they were really bribes**. So, just as in *Arthur*, it is likely if not inevitable that the jury's "determination" of whether the Senator had taken bribes was "a crucial step in ascertaining whether he was guilty of" obstruction. 544 F.2d at 736. That means errors impacting the first step require vacatur of the derivative convictions too. *Cf. id.*

Here the error was evidentiary. The proper inquiry is therefore whether the government can show with high confidence that the error "did not contribute to the verdict" on the obstruction counts. *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995). "[T]o uphold a verdict in the face of an evidentiary error, it must be 'highly probable' that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003). The government cannot seriously contend that that it is "highly probable" that rampant Speech or Debate violations did not infect the obstruction verdicts. If the jury had never seen the Speech or Debate evidence, and as a result had acquitted Senator Menendez of the bribery offenses, it is surely more likely that the jury would have acquitted him of the obstruction offenses too. That is enough for a new trial.

The case that the government cites, *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149 (2d Cir. 2008), only proves Senator Menendez's point. In that case, the court upheld an obstruction verdict even though the government's withholding of exculpatory evidence required a new trial on certain underlying charges. But the court did so only because it determined that

suppression of the exculpatory evidence did not "raise[] a reasonable probability that the verdict on the obstruction of justice count would have been different." *Id.* at 165 n.13. And that made sense, because the obstructive conduct in *Triumph* was "the deletion of relevant files … using Destroy-It! Software," for which the evidence was "overwhelming." *Id.* Whether or not the defendant had committed racketeering, specifically deleting files in anticipation of a subpoena is obstruction of justice. Here, by contrast, the checks upon which the government relied were not obstruction (or even false) ***unless they were designed to obscure or conceal bribe payments***. No bribes, no obstruction—or, at minimum, a jury could very readily so conclude.[2]

Finally, the government is wrong that Senator Menendez "does not contest" the underlying obstruction convictions. *See* Opp. 36, n.14. While Senator Menendez did not list (and had no obligation to list) every single substantial issue he may raise on appeal in his opening brief, the Senator clearly preserved his objection to his convictions on the obstruction counts throughout trial and in his post-trial motion under Rule 29 and 33. Specifically, Senator Menendez argued that, under controlling Supreme Court and Second Circuit authority, the government was required, but failed, to show Senator Menendez's specific intent that his (allegedly) false statements would be repeated to the grand jury. *See* Dkt. No. 592 at 40 (citing *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002) and *United States v. Aguilar*, 515 U.S. 593, 599 (1995)). This Court disagreed, but there remains a fair probability that the Second Circuit will adopt Senator Menendez's view that evidence was insufficient to prove intent—especially where, as here, the documents forming the bulk of the government's evidence on obstruction (checks with allegedly

---

[2] *Mangano* is even less relevant, because it *upheld* honest-services fraud bribery convictions, while rejecting overlapping bribery convictions under 18 U.S.C. § 666 for the technical reason that the defendant was not an "agent" of a particular local government. *See* 2025 WL 479623, at *1–2. It made no possible difference to the obstruction counts whether the defendants had engaged in bribery under one statute or two.

misleading entries in the memo line) were produced by *Nadine Menendez's* lawyers, not by Senator Menendez. *Id.* at 41. This is yet another substantial question that warrants deferring any prison term until after the Second Circuit has had an opportunity to consider this difficult and close issue.

At bottom, it may well be appropriate to deny release pending appeal when the defendant's appellate issues, "assumed *arguendo* to be meritorious," nonetheless "do not bear on" some of the charges. Opp. 39. But that is quite obviously not the case here, where the substantial evidentiary (and other) challenges to the bribery counts necessarily call into question the obstruction counts premised on the concealment of bribes. There is therefore no need to delve into complexities surrounding how Senator Menendez's sentence would be altered if certain counts survived (Opp. 40–42). It suffices that the Senator's serious appellate arguments would unsettle the foundation of the entire case, making it "likely" that success on those arguments would "result in … an order for a new trial" on *all* counts. 18 U.S.C. § 3143(b).

## <u>CONCLUSION</u>

For these reasons, this Court should grant Senator Menendez continued release while the Second Circuit considers his appeal, subject to the same conditions that have been in place since September 2023.

Dated: February 22, 2025

Respectfully submitted,

By: _/s/  Adam Fee_
    Adam Fee
    PAUL HASTINGS LLP
    1999 Avenue of the Stars
    Los Angeles, CA 90067
    Telephone: (310) 620-5719
    Facsimile: (310) 620-5819

    Avi Weitzman
    Paul C. Gross
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 318-6000
    Facsimile: (212) 725-3620

    *Attorneys for Defendant Robert Menendez*